**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHEMTURA CORPORATION, *et al.*, [1] | ) | Case No. 09-_____ (   ) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

DECLARATION OF STEPHEN FORSYTH, EXECUTIVE
VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF
CHEMTURA CORPORATION, IN SUPPORT OF FIRST DAY PLEADINGS

1.    My name is Stephen Forsyth.  I am the Executive Vice President and Chief

Financial Officer, as well as a Director, of Chemtura Corporation ("Chemtura Corp.").

Chemtura Corp. is a publicly held company (NYSE: CEM)[2] organized under the laws of the

State of Delaware and is the direct or indirect parent corporation of each of the other debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively with Chemtura Corp.,

the "Debtors").  In my capacity as Chemtura Corp.'s Chief Financial Officer, I am responsible

for the Debtors' accounting, business finance, financial planning and analysis, information

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

[2]    On February 17, 2009, Chemtura Corp. was notified by the New York Stock Exchange ("NYSE") that it was no longer in compliance with the NYSE's minimum share price rule, which requires, among other things, that the average closing price of Chemtura Corp.'s common stock be above $1.00 over 30 consecutive trading days.  As of the date hereof, Chemtura Corp. has not been delisted from the NYSE.

technology, internal audit, tax and treasury functions and I serve as an integral member of Chemtura Corp.'s executive committee.  In addition to my title at Chemtura Corp., I hold officer or director-level positions with many of the other Debtors.  I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

3.      To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "First Day Pleading" and, collectively, the "First Day Pleadings"), filed concurrently herewith.  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  Indeed, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing and make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4.      This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") and I am authorized to submit it

on behalf of the Debtors.  No one individual at Chemtura Corp. has personal knowledge of all of the facts set forth in this Declaration.  All facts set forth herein are based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, and/or information supplied to me by other members of the Debtors' management and the Debtors' advisors.  If called upon to testify, I would testify to the facts set forth herein on that basis.

5.     This Declaration is divided into four parts.  Part I provides background information with respect to the Debtors' corporate history and their business operations, as well as a summary of the Debtors' prepetition capital structure.  Part II describes the circumstances leading to the commencement of these chapter 11 cases.  Part III describes the relief sought by the Debtors in each of the First Day Pleadings.  Part IV provides an overview of <u>Exhibits B</u>, <u>C</u>, <u>D</u>, <u>E</u>, <u>F</u>, <u>G</u>, <u>H</u>, <u>I</u>, <u>J</u>, <u>K</u> and <u>L</u> attached hereto, which in turn set forth certain additional information about the Debtors, as required by Local Rules 1007-2(a) and (b).

## I.

## DESCRIPTION OF THE DEBTORS' CORPORATE HISTORY, BUSINESS OPERATIONS AND PREPETITION CAPITAL STRUCTURE

**A.     The Company's Corporate History and Corporate Structure**

   **i.     Overview**

6.     Chemtura Corp., together with its Debtors and non-Debtor subsidiaries and affiliates (collectively, the "Company"), is among the largest publicly-traded specialty chemical companies in the United States, dedicated to manufacturing and marketing specialty chemicals, crop protection and pool, spa and home care products.  Chemtura Corp. is the successor to Crompton & Knowles Corporation, which was incorporated in 1900 and engaged in the manufacture and sale of specialty chemicals beginning in 1954.  The Company is the product of

3

expansion through a number of significant acquisitions and mergers since that time as well as organic growth, including the 1996 acquisition of Uniroyal Chemical Company, Inc., the 1999 merger with Witco Corporation and the 2005 merger with Great Lakes Chemical Corporation. In addition to the descriptions provided below, attached as Exhibit A hereto is a chart detailing the Company's organizational structure, including a depiction of the Debtors and their non-Debtor affiliates.

**B.    The Company's Business Operations**

   **i.    Overview**

7.    As described above, the Company is a globally diversified manufacturer and marketer of specialty chemicals products, most of which sold to industrial manufacturing customers for use as additives, ingredients or intermediates that add value to their end products. The Company's crop protection products are sold globally through distributors and dealers to growers of agricultural produce.  The Company's pool and spa chemicals are sold through local dealers, large retailers and mass merchants such as Walmart, Lowe's and Home Depot.  The Company has approximately 3,400 U.S. and foreign patents and pending patent applications and has approximately 4,900 U.S. and foreign registered and pending trademarks in more than 100 countries.

8.    The Company operates on a global scale as evidenced by the breakdown of its customer locations for its approximate $3.5 billion in net sales in 2008 as follows: (a) 48% to customers in the U.S. and Canada, (b) 32% to customers in Europe and Africa, (c) 15% to customers in Asia/Pacific and (v) 5% to customers in Latin America.  Much of the Company's operations overseas are conducted through Chemtura Corp.'s numerous foreign-organized direct and indirect subsidiaries, described in more detail in section I.C, below, none of which are Debtors in these chapter 11 cases.

4

9.     The Company's business operations consist of five reporting segments, as summarized in the following table and as described in detail below:

| Reporting Segment | Nature of Business | Approximate Percent of Total Net Revenues in 2008 |
|---|---|---|
| Polymer Additives Segment | Antioxidants, brominated performance products, flame retardants, fumigants, polymerization additives and initiators (also known as organometallics), PVC additives and surfactants. | 45% |
| Performance Specialties Segment | Petroleum additives and urethanes. | 28% |
| Consumer Products Segment | Performance chemicals for sale to customers, including pool and spa treatment chemicals and household cleaners. | 15% |
| Crop Protection Segment | Seed treatments, fungicides, miticides, insecticides, growth regulants and herbicides. | 11% |
| Other Business Segment | Remnants of certain non-core businesses previously divested, including industrial water additives and rubber chemicals. | 2% |

**ii.    The Polymer Additives Segment**

10.     The Company's Polymer Additives Segment engages in the manufacture and sale of chemical additives designed to improve the performance of polymers to a broad range of industries, including the plastics, agricultural, fine chemical, oilfield, building construction, electronics and automotive industries.   The Polymer Additives Segment produces and manufactures a variety of related products, including antioxidants, brominated performance products, flame retardants, fumigants, polymerization additives and initiators (also known as organometallics), PVC additives and surfactants.   These products are sold to a wide range of customers, ranging from direct sellers to monomer producers, polymer manufacturers, compounders and fabricators and fine chemical manufacturers.

11.     The Company's Polymer Additives Segment had net sales of $1.6 billion in 2008 and $1.8 billion in 2007, which represented approximately 45% and 48% of the Company's total net sales in 2008 and 2007, respectively.

### iii.     The Performance Specialties Segment

12.     The Performance Specialties Segment consists of engineered chemical solutions, including petroleum additives and urethanes product lines that provide, among other things, detergency, friction modification and corrosion protection in motor oils, greases, refrigeration and turbine lubricants, castable urethane prepolymers used in various types of coatings such as clear floor finishes, high-gloss paints and textiles treatments.  The Company sells these products directly to manufacturers and through third-party distribution channels.

13.     The Performance Specialties Segment had net sales of $999 million in 2008 and $911 million in 2007, which represented approximately 28% and 24% of the Company's total net sales in 2008 and 2007, respectively.

### iv.     The Consumer Products Segment

14.     The Company's Consumer Products Segment manufactures performance chemicals that are sold to consumers for in-home and outdoor use.  These products, which are marketed under various registered trade names such as BioGuard®, Aquachem®, Pooltime®, Omni®, Poolbrite® and Crystal®, include recreational water purification products used in pools and spas such as sanitizers, algicides, biocides, oxidizers, pH balancers, mineral balancers and other specialty chemicals and accessories.  The Company distributes these products to pool and spa dealers and mass-market retailers located throughout North America, Europe, Australia and South Africa.

15.     The Consumer Products Segment also includes specialty and multi-purpose cleaners that are primarily distributed to major national retailers in the do-it-yourself, hardware,

mass market and discount sectors. These products include non-abrasive bathroom cleaners, glass and surface cleaners, toilet bowl cleaners, drain openers and rust and calcium removers and multi-purpose cleaners that are distributed under the registered trade names The Works® and Greased Lightning®.

16.     The Consumer Products Specialties Segment had net sales of $516 million in 2008 and $567 million in 2007, which represented approximately 15% of the Company's total net sales in 2008 and 2007.

**v.     The Crop Protection Segment**

17.     The Crop Protection Segment produces and distributes six major product lines: seed treatments, fungicides, miticides, insecticides, growth regulates and herbicides. The products have been primarily developed for use on high-value agricultural markets such as tree and vine fruits, ornamentals and nuts and secondarily for commodity row crops such as soybeans, oilseed rape and corn. The Company's Crop Protection Segment works closely with customers, distributors, research stations and individual growers as part of an on-the-ground coordinated effort through which it develops products in response to changing customer demands, drawing upon existing technologies to tailor the products to match immediate customer needs, depending on, for example, varying weather conditions and the degree of infestation. The Crop Protection Segment sells its products in North America through a distribution network of more than 100 distributor outlets that sell directly to end-use customers. This Segment also provides products to over 1,400 distributors, dealers, cooperatives, seed companies and large growers outside North America.

18.     A key feature of the Crop Protection Segment is its expertise with respect to registering its products in the various jurisdictions in which it operates. Registration of products is a complex process that can form a significant barrier to entry into developed markets in the

7

multinational economy: the Company's nearly 50 years of experience in successfully registering its products around the world is a valuable asset that has allowed it to expand its distribution network and focus on profitable markets that are less sensitive to competitive pricing pressures.

19.    The Crop Protection Segment had net sales of $394 million in 2008 and $352 million in 2007, which represented approximately 11% and 9% of the Company's total net sales in 2008 and 2007, respectively.

### vi.    The Other Business Segment

20.    The Company's Other Business Segment consists of the remnants of non-core businesses that the Company has previously divested, such as the industrial water additives business divested in 2006 and the two rubber chemicals businesses divested in 2007. The Company's Other Business Segment generates revenues from the sale of industrial water additives used in the desalination process for the purchaser of its industrial water additives business. In addition, revenues generated from residual sales of antiozonants that protect rubber compounds from cracking and deteriorating (although I note that the production of antiozonants was recently discontinued).

21.    The Other Business Segment had net sales of $57 million in 2008 and $111 million in 2007, which represented approximately 2% and 3% of the Company's total net sales in 2008 and 2007, respectively.

### C.    The Debtors' Non-Debtor Affiliates and Subsidiaries

22.    The group of entities making up the Company includes numerous affiliates, subsidiaries and joint ventures that are not Debtors in these chapter 11 cases. These non-Debtors affiliates and subsidiaries include domestic U.S. entities as well as entities located in the rest of North America and in South America (*e.g.*, Canada, Mexico, Argentina, Ecuador, Colombia, Brazil and Chile), Europe, Middle East and Africa (*e.g.*, England, France, Germany,

8

Netherlands, Italy, Saudi Arabia, South Africa and Switzerland) and Asia/Pacific (*e.g.*, Australia, Malaysia, Indonesia, Thailand, Taiwan, Singapore and China).

23.     Certain of the Debtors' international non-Debtor subsidiaries and affiliates have arrangements with various banks for lines of credit.  As if December 31, 2008, these lines of credit aggregated approximately $17 million of which $4 million was outstanding.

24.     Additionally, certain of the Company's European subsidiaries (none of which are Debtors in these chapter 11 cases) participate in a program to sell certain of their eligible accounts receivable (the "European Accounts Receivable Facility").  At the end of 2008, the purchaser under that facility imposed limitations due to the Company's financial condition, which effectively stopped the continuing sales of accounts receivable under the European Accounts Receivable Facility.

25.     As of December 31, 2008, as a result of the restrictions described above, the net amount of international accounts receivable that had been sold under the European Accounts Receivable Facility had declined to $67 million compared to $177 million as of September 30, 2008.  With the continuing restriction on the sale of receivables under that facility (along with collections of certain receivables that had been previously sold), as of March 13, 2009, the net receivables sold had further declined to approximately $20 million.

26.     Following discussion between Chemtura Corp. and certain of its European subsidiaries, the purchaser under the European Accounts Receivable Facility has proposed to restart the facility subject to satisfaction of certain conditions.  The proposal, among other things, reduces the maximum value of accounts receivable that can be sold from €175 million (approximately $227 million) to €70 million (approximately $91 million).    Further, the purchaser's willingess to restart the facility is conditioned on Chemtura Corp. providing the

9

purchaser with an updated patronage letter which requires that Chemtura Corp. perform the obligations of its subsidiaries under the European Accounts Receivable Facility if the purchaser demands that they do so.

27.    The revised terms of the European Accounts Receivable Facility require approval of the purchaser's board of directors.  The purchaser requires evidence (in the form of approval by this Court) that Chemtura Corp. can perform its obligations under the patronage letter before it will request such board approval for the recommencement of the European Accounts Receivable Facility under the revised terms.  As described in more detail below, one of the First Day Pleadings seeks Court authorization for Chemtura Corp. to deliver the required updated patronage letter so that this critical source of liquidity for the Company's international operations can be restored.

**D.      The Debtors' Prepetition Capital Structure**

**i.      Overview**

28.    As of the Petition Date, the Debtors have funded debt facilities in place with a face amount of approximately $1.2 billion, including:  (a) a $350 million revolving credit and letter of credit facility (as amended, the "Existing Credit Facility"), (b) $370 million outstanding under certain 7% unsecured notes due 2009 (the "2009 Notes"); (c) $500 million outstanding under certain 6.875% unsecured notes due 2016 (the "2016 Notes"); and (d) $150 million outstanding under certain 6.875% debentures due 2026 (the "2026 Debentures" and collectively with the 2009 Notes and 2016 Notes, the "Notes").

29.    The chart below summarizes the Debtors' prepetition indebtedness, including approximate current outstanding amounts as of December 31, 2008; further detail with respect to each category of debt obligation is provided below.

| Debt Obligation | Original Amount | Approximate Amount Outstanding[3] as of December 31, 2008 | Maturity Date | Security Status |
|---|---|---|---|---|
| Existing Credit Facility | $350 million | $272 million[4] | July 2010 | Secured ($139.2 million) Unsecured ($132.8 million) |
| 2009 Notes | $400 million | $370 million | July 2009 | Unsecured |
| 2016 Notes | $500 million | $500 million | June 2016 | Unsecured |
| 2026 Debentures | $270 million | $150 million | February 2026 | Unsecured |

30.    As noted previously, the Company is a publicly-traded company, whose shares are listed on the New York Stock Exchange.  The Company is authorized to issue 500 million shares of $0.01 par value stock common stock, of which 254.1 million shares were issued and 11.5 million shares were held as treasury stock as of December 31, 2008.  The Company also is authorized to issue 300,000 shares of preferred stock without par value.  No such shares were outstanding as of December 31, 2008.

31.    On February 17, 2009, Chemtura Corp. was notified by the New York Stock Exchange ("NYSE") that it was no longer in compliance with the NYSE's minimum share price rule, which requires, among other things, that the average closing price of Chemtura Corp.'s common stock be above $1.00 over 30 consecutive trading days.  As of the date hereof, Chemtura Corp. has not been delisted from the NYSE.

---

[3]    These amounts are net of unamortized discounts or premiums.

[4]    Includes approximately $90 million in issued and outstanding letters of credit.

### ii. The Existing Credit Facility

32.     The Debtors entered into the Existing Credit Facility in July 2005 (the "Original Credit Agreement") in connection with the consummation of the merger of Chemtura Corp. (formerly known as Crompton Corporation) and Great Lakes Chemical Corporation and certain of its subsidiaries.  The Existing Credit Facility is evidenced by an amended and restated credit agreement, dated as of July 31, 2007, among Chemtura Corp. and certain of its domestic subsidiaries, as borrowers, Citibank, N.A., as agent (the "Existing Credit Facility Agent"), and certain lenders thereto (the "Existing Credit Facility Lenders").  The obligations under the Existing Credit Facility are unconditionally guaranteed on a joint and several basis by Chemtura Corp. and certain of its domestic subsidiaries (collectively, the "Subsidiary Credit Facility Guarantors").[5]

33.     The obligations under the Existing Credit Facility were originally unsecured.  The Original Credit Agreement provided, however, that at any time in which the Debtors' non-credit enhanced long-term senior unsecured debt was rated at or lower than a rating of BB+ by Standard and Poor's or Ba2 by Moody's Investors Services, Chemtura Corp. and the Subsidiary Credit Facility Guarantors would be required to provide a security interest in the stock of their first tier subsidiaries and other equity interests (limited to 66% of the voting stock of Chemtura

---

[5]     The Subsidiary Credit Facility Guarantors include the following entities, each of which is a Debtor in these chapter 11 cases:  A&M Cleaning Products, LLC; Aqua Clear Industries, LLC; ASCK, Inc.; ASEPSIS, Inc.; Biolab Company Store, LLC; Biolab Franchise Company, LLC; Biolab Textile Additives, LLC; Bio-Lab, Inc.; CNK Chemical Realty Corporation; Crompton Colors Incorporated; Crompton Holding Corporation; Crompton Monochem, Inc.; GLCC Laurel, LLC; Great Lakes Chemical Corporation; Great Lakes Chemical Global, Inc.; GT Seed Treatment, Inc.; Homecare Labs, Inc.; ISCI, Inc.; Laurel Industries Holdings, Inc.; Kem Manufacturing Corporation; Monochem, Inc.; Naugatuck Treatment Company; Recreational Water Products, Inc.; Uniroyal Chemical Company Limited (Delaware); Weber City Road LLC; and WRL of Indiana, Inc.

Corp.'s first-tier foreign subsidiaries) to the Existing Credit Facility Lenders to secure the outstanding obligations under the Original Credit Agreement (the "Original Collateral").

34.    This Original Collateral provision was invoked in May 2007, following a downgrade of the Company's long-term unsecured debt.  As a result, Chemtura Corp. and the Subsidiary Credit Facility Guarantors were required to provide (and did provide) interests in the Original Collateral to the Existing Credit Facility Lenders to secure the outstanding obligations under the Original Credit Agreement (the "Original Pledge and Security Agreement").

35.    In July 2007, Chemtura Corp., the Subsidiary Credit Facility Guarantors and the Existing Credit Facility Lenders amended and restated the Original Pledge and Security Agreement and the Original Credit Agreement (the "First Amended Credit Agreement") to provide for a cap on the amount of the secured obligations granted thereunder.  This cap, which was designed to avoid the trigger of certain lien covenants in the Company's 2009 Notes, 2016 Notes and the 2026 Debentures,[6] provided that the value of the security interest in favor of the Existing Credit Facility Lenders would at all times be less than the lowest threshold that would trigger an "equal and ratable" security interest for note holders under any of the indentures for the Company's outstanding Notes.

36.    In December 2008, in an effort to prevent the Debtors from breaching financial covenants contained in the First Amended Credit Agreement, Chemtura Corp., the Subsidiary Credit Facility Guarantors, the Existing Credit Facility Agent and the Existing Credit Facility Lenders entered into an amendment and waiver to the First Amended Credit Agreement (the

---

[6]    These lien covenants, described in more detail below, require Chemtura Corp. and the subsidiary guarantors of those Notes to secure each of the outstanding obligations thereunder on an equal and ratable basis with certain other indebtedness if secured debt, including the obligations under the Original Credit Agreement, exceeds certain threshold values.

"Credit Agreement Waiver" and, to the extent of permanent amendments to the First Amended Credit Agreement, the "Existing Credit Agreement"). The Credit Agreement Waiver provides for, among other things, a waiver of the Company's compliance with certain financial covenants and events of default under the Existing Credit Agreement for the period beginning December 30, 2008 and ending March 30, 2009 (the "Waiver Period").

37.     The Credit Agreement Waiver provides that outstanding advances under the Existing Credit Agreement cannot exceed $190 million for the period beginning February 1, 2009 and ending March 30, 2009 and letters of credit cannot exceed $97 million until the end of the Waiver Period. Additionally, the Credit Agreement Waiver limits the Debtors' ability to take certain actions during the Waiver Period, including incurring certain debt and liens, disposing of certain assets, making certain investments, paying cash dividends and repurchasing equity.

38.     The Credit Agreement Waiver also effected several permanent changes to the terms and conditions governing the collateral securing the outstanding obligations under the Existing Credit Agreement. Included in these permanent changes was the requirement that Chemtura Corp. and the Subsidiary Credit Facility Guarantors hold all cash in an aggregate amount of more than $500,000 in either a deposit account with the Existing Credit Facility Agent (or an affiliate thereof) or an account subject to an account control agreement in favor of the Existing Credit Facility Agent.

39.     Furthermore, in connection with the execution of the Credit Agreement Waiver, Chemtura Corp. and the Subsidiary Credit Facility Guarantors also amended and restated the Original Pledge and Security Agreement (the "Existing Pledge and Security Agreement"). Pursuant to the Existing Pledge and Security Agreement, Chemtura Corp. and the Subsidiary

14

Credit Facility Guarantors each granted a security interest in each of their respective interests in the Original Collateral as well as all "inventory" (as such term is defined under the New York Uniform Commercial Code) to the Existing Credit Facility Agent for the ratable benefit of itself and the Existing Credit Facility Lenders.  The Existing Credit Agreement continues to provide that the value of the security interest in favor of the Existing Credit Facility Lenders would at all times be less than the lowest threshold that would trigger an "equal and ratable" security interest in the collateral under the provisions of the lien covenants set forth in the indentures for each of the Company's outstanding Notes.

### iii.   The Unsecured Notes

40.    The Debtors have an aggregate of approximately $1.02 billion in principal amount of unsecured[7] notes outstanding, consisting of the 2009 Notes, the 2016 Notes and the 2026 Debentures.

### a.   Overview of the 2009 Notes and the 2026 Debentures

41.    Great Lakes Chemical Corporation ("GLCC"), a wholly owned subsidiary of Chemtura Corporation, issued the 2009 Notes in July 1999 (well before its merger with Chemtura Corp. in 2005 (the "2005 Merger")).  The 2009 Notes are governed by an Indenture, dated as of July 16, 1999, by and between GLCC and J.P. Morgan Trust Company, National Association, as successor trustee, which indenture was amended on July 1, 2005 (as further described below).  The stated maturity date on the 2009 Notes is July 15, 2009.

42.    The 2026 Debentures are obligations of Chemtura Corp., as successor in interest to Witco Corporation.  The 2026 Debentures are governed by an Indenture, dated as of February

---

7    *See* section iv, below.

1, 1993, by and among Witco Corporation (as predecessor in interest to Chemtura Corp.) and Manufacturers and Traders Trust Company and U.S. Bank National Association, as successor trustees to The Chase Manhattan Bank, N.A., which indenture was amended on February 1, 1996, further amended on August 31, 1999, further amended on August 5, 2004 and further amended on July 1, 2005 (as further described below).  The stated maturity date on the 2026 Debentures is February 1, 2026.

43.     In connection with the consummation of the 2005 Merger, on July 1, 2005, certain of the Debtors, including Chemtura Corp. and certain of its domestic, wholly-owned subsidiaries, entered into supplemental indentures with the applicable trustee to the 2009 Notes and the 2026 Debentures (collectively, the "Supplemental Indentures").  Pursuant to the Supplemental Indentures, certain of Chemtura Corp.'s domestic subsidiaries each provided a subsidiary guaranty to both the 2009 Notes and the 2026 Debentures (each a "2009/2026 Subsidiary Guaranty" and, collectively, the "2009/2026 Subsidiary Guarantees").[8]   Additionally, the Supplemental Indenture for the 2009 Notes provides for a guaranty by Chemtura Corp. of the 2009 Notes.

---

[8]   The guarantors originally subject to the 2009/2026 Subsidiary Guarantees consisted of the following wholly-owned domestic subsidiaries of Chemtura Corp.:  A&M Cleaning Products, LLC; Aqua Clear Industries, LLC; ASCK, Inc.; Asepsis, Inc.; Biolab Services, Inc.; Biolab Textile Additives, LLC; Bio-Lab, Inc.; CNK Chemical Realty Corporation; Crompton Colors Incorporated; Crompton Europe Financial Services Company; Crompton Holding Corporation; Crompton Manufacturing Company, Inc.; Crompton Monochem, Inc.; GLK Services, Inc.; Great Lakes Chemical Global, Inc.; GT Seed Treatment, Inc.; Homecare Labs, Inc.; ISCI, Inc.; Kem Manufacturing Corporation; Monochem, Inc.; Naugatuck Treatment Company; Pabu Services, Inc.; Recreational Water Products, Inc.; Uniroyal Chemical Company, Inc.; Uniroyal Chemical Company Limited (Delaware); Weber City Road LLC; and WRL of Indiana, Inc.

The following entities were originally subject to the 2009/2026 Subsidiary Guarantees, but are not Debtors in these chapter 11 cases:  Biolab Services, Inc.; Crompton Europe Financial Services Company; Crompton Manufacturing Company, Inc.; GLK Services, Inc.; Pabu Services, Inc.; and Uniroyal Chemical Company, Inc.

44.     The Supplemental Indentures further provided that the respective 2009/2026 Subsidiary Guarantees were to be automatically and unconditionally released upon the repayment of Chemtura Corp.'s, as successor in interest Crompton Corporation, 9⅞% Senior Notes due 2012 and the Senior Floating Rate Notes due 2010 (together, the "Chemtura Senior Notes").   The Chemtura Senior Notes are no longer outstanding.   Accordingly, the 2009 Notes and the 2026 Debentures are not subject to any of the 2009/2026 Subsidiary Guarantees. Chemtura Corp.'s guaranty of the 2009 Notes, however, continues to be in effect.

### b.     Overview of the 2016 Notes

45.     The 2016 Notes are governed by an Indenture, dated as of April 24, 2006, by and among Chemtura Corp., as issuer, certain of its wholly-owned domestic subsidiaries, as guarantors, and Wells Fargo Bank, N.A., as trustee.   The stated maturity date on the 2016 Notes is June 1, 2016.

46.     The 2016 Notes are jointly and severally, fully and unconditionally guaranteed (the "2016 Subsidiary Guarantees") by certain wholly-owned domestic subsidiaries of Chemtura Corp., each of which is a Debtor in these chapter 11 cases.[9]

---

[9]   The guarantors providing the 2016 Subsidiary Guarantees consist of the following wholly-owned domestic subsidiaries of Chemtura Corp.:   A&M Cleaning Products, LLC; Aqua Clear Industries, LLC; ASCK, Inc.; Asepsis, Inc.; Biolab Textile Additives, LLC; Bio-Lab, Inc.; Chemtura USA Corporation; CNK Chemical Realty Corporation; Crompton Colors Incorporated; Crompton Holding Corporation; Crompton Monochem, Inc.; Enenco, Incorporated; Great Lakes Chemical Corporation; Great Lakes Chemical Global, Inc.; GT Seed Treatment, Inc.; Homecare Labs, Inc.; ISCI, Inc.; Kem Manufacturing Corporation; Monochem, Inc.; Naugatuck Treatment Company; Recreational Water Products, Inc.; Uniroyal Chemical Company Limited (Delaware); Weber City Road LLC; and WRL of Indiana, Inc.

### iv.    Determination of the Amount of the Debtors' Prepetition Secured Bank Debt

47.    The amount of the Debtors' prepetition secured indebtedness under the Existing Credit Agreement is dependent on the lowest threshold, if any, under the Indentures that would require the Debtors to secure their respective obligations under the Notes.

48.    Specifically, and as noted above, Chemtura Corp., the Subsidiary Credit Facility Guarantors and the Existing Credit Facility Lenders have amended and restated the Existing Pledge and Security Agreement to provide that the value of the security interest granted in favor of the Existing Credit Facility Lenders under the Existing Credit Agreement would at all times be less than the lowest lien covenant threshold specified under the Notes.  This provision in the Existing Credit Agreement is designed to track language in each of the Indentures:  although each of the 2009 Notes, 2016 Notes and the 2026 Debentures are unsecured obligations and rank equal in right of payment with all other unsecured, unsubordinated indebtedness of the obligor(s), each of the applicable Indentures requires that the Notes must be secured on an "equal and ratable" basis with other secured indebtedness if that other indebtedness is granted a security interest with value in excess of specified secured debt thresholds (respectively, the "2009 Indenture Basket," the "2016 Indenture Basket" and the "2026 Indenture Basket" and, collectively, the "Indenture Baskets").[10]

---

[10]    Specifically, the Existing Pledge and Security Agreement defines each of the Indenture Baskets as follows:

"2009 Indenture Basket" shall mean, at any time, the amount of outstanding secured obligations that were originally able to be created an incurred and are then permitted to suffer or exist and be secured by the Borrower and its Subsidiaries pursuant to Section 4.9 of the 2009 Indenture without the requirement to equally and ratably secure any of the notes issued pursuant to the 2009 Indenture, including any liens of the Secured Parties that were permitted to be taken and suffer to exist under Section 4.7 or otherwise under the 2009 Indenture.

"2016 Indenture Basket" shall mean, at any time, the amount of outstanding secured obligations that were permitted to be incurred and secured (at the time of incurrence) by the Borrower and its Subsidiaries pursuant to Section 1006(b) the [sic] 2016 Indenture without the requirement to

(Continued…)

49.    The individual Indenture Baskets are different from one another in at least two material respects. *First*, each of the Indenture Baskets sets forth a different restriction on the Company's incurrence or maintenance (depending on the covenant) of secured debt, as follows (each, a "Lien Covenant"):[11]

| 2009 Lien Covenant | "[Great Lakes Chemical Company] will not, and will not permit any of its Restricted Subsidiaries to, create, incur or otherwise cause or suffer to exist or become effective any Liens of any kind upon any Principal Property or any shares of stock or debt of any Restricted Subsidiary now owned or hereafter acquired, unless all payments due under this Indenture and the Securities are secured on an equal and ratable basis . . . ." |
|---|---|
| 2016 Lien Covenant | "For so long as any of the Securities are outstanding, [Chemtura Corp.] will not, and will not permit any Subsidiary to create, any Security Interest on any of its property or assets (including Capital Stock), whether owned on the date hereof or hereafter acquired, to secure any Debt unless it shall secure equally and ratably with such Debtor all Securities then Outstanding for so long as such obligation is so secured . . . ." |
| 2026 Lien Covenant | "[Chemtura Corp.] will not create or assume and will not permit any Subsidiary other than a Foreign Subsidiary to create or assume any Mortgage of or upon any of its or their assets, real or personal, now owned or hereafter acquired or of or upon any income of profits therefrom, without making effective provision, and [Chemtura Corp.] covenants that in any such case it will make or cause to be made effective provision, whereby the Securities shall be secured by such Mortgage equally and ratably with any and all other obligations and Indebtedness thereby secured, so long as any such other obligations and Indebtedness shall be so secured . . . ." |

50.    *Second*, each Indenture Basket establishes a carve-out from its Lien Covenant based on a specific "asset test."  The Indenture Baskets generally provide that, notwithstanding

---

equally and ratably secure any of the notes issued pursuant to the 2016 Indenture, including any liens of the Secured Parties that were permitted to be taken under Section 1006(a) or otherwise under the 2016 Indenture.

"2026 Indenture Basket" shall mean at any time, the amount of outstanding secured obligations that were permitted to be incurred and secured (at the time of incurrence) by the Borrower and its Subsidiaries pursuant to Section 1010 of the 2026 Indenture without the requirement to equally and ratably secure any of the notes issued pursuant to the 2026 Indenture, including any liens of the Secured Parties that were permitted to be taken under Section 1008 or otherwise under the 2026 Indenture.

[11]  Capitalized terms used but not defined in this section D.iv. shall have the meanings ascribed to such terms in the applicable Indenture.

the applicable Lien Covenant, the Company is permitted to incur secured debt obligations without the requirement to equally and ratably secure the respective Note obligations so long as such secured obligations are below a certain threshold, which is expressed as a percentage of various definitions of the Company's assets (each, a "Lien Carve-Out").   The three Lien Carve-Outs state, in pertinent part, as follows:

| Lien Carve-Out to 2009 Lien Covenant | "Notwithstanding the [2009 Lien Covenant] . . . [Great Lakes Chemical Corp.] and its Restricted Subsidiaries may issue, assume, suffer to exist or guarantee Indebtedness which would otherwise be subject to the [2009 Lien Covenant] . . . if . . . the principal amount of all such Debt incurred after the date hereof, and which would otherwise be or have been prohibited by the [2009 Lien Covenant] . . . does not at any such time exceed 15% of the consolidated total assets of [Great Lakes Chemical Corp.] and its consolidated Subsidiaries as shown in the most recent audited consolidated balance sheet contained in the latest annual report to the stockholders of [Great Lakes Chemical Corp.]." |
|---|---|
| Lien Carve-Out to 2016 Lien Covenant | "Notwithstanding the [2016 Lien Covenant] . . . [Chemtura Corp.] or any Subsidiary may issue, incur, create, assume or guarantee Debt secured by Security Interests which would otherwise be subject to [the 2016 Lien Covenant] . . . in an aggregate amount which, together (but without duplication) with (x) all other outstanding Debt of [Chemtura Corp.] and each Subsidiary or any of them which (if originally issued, incurred, created, assumed or guaranteed at such time) would otherwise be subject to [the 2016 Lien Covenant] after giving effect to [certain exceptions to the 2016 Lien Covenant] . . . the aggregate Debt of Subsidiaries of Chemtura pursuant to Section 1010(b) does not at the time exceed 15% of Consolidated Net Tangible Assets of Chemtura."[12] |

---

[12]   The 2016 Indenture defines "Consolidated Net Tangible Assets" to mean "as of any particular time, the aggregate amount of assets (less applicable reserves and other properly deductible items) after deducting therefrom:  (a) all current liabilities except for (1) notes and loans payable, (2) current maturities of long-term debt and (3) current maturities of obligations under capital leases; and (b) to the extent included in said aggregate amount of assets, all goodwill, trade names, trademark, patents, organization expenses, unamortized debt discount and expenses and all other intangible assets, to the extent included in said aggregate amount of assets, all as set forth on the most recent consolidated balance sheet of the Company and its consolidated subsidiaries and computed in accordance with generally accepted accounting principles.

| Lien Carve-Out to 2026 Lien Covenant | "Notwithstanding the provisions contained in [the 2026 Lien Covenant] . . . [Chemtura Corp.] and its Subsidiaries . . . may . . . secure obligations or Indebtedness which would otherwise be subject to [the 2026 Lien Covenant] . . . if after giving effect to any such security arrangements . . . the aggregate amount of all such obligations and Indebtedness then outstanding which would otherwise be or have been prohibited by the limitations of [the 2026 Lien Covenant] . . . does not at any such time exceed 10% of Consolidated Net Tangible Assets."[13] |
|---|---|

51.    Although I am not a lawyer, my understanding, based on my review of each of the Lien Covenants and their respective Lien Carve-Outs, is that the 2026 Lien Basket provides the lowest threshold of the three Lien Covenants.  Moreover, based upon my analysis of the operation of the 2026 Lien Basket and the amounts outstanding under the Existing Credit Agreement (including outstanding letters of credit) at various points in time prepetition, I believe that the amount of the Debtors' prepetition secured debt under the Existing Credit Agreement is at least equal to $139.2 million.  This amount is based upon the total amount of permitted secured indebtedness in September 2008, which is the first point in time at which outstanding indebtedness under the Existing Credit Agreement (including outstanding letters of credit) exceeded the amount permitted under the 2026 Lien Carve-Out.

### v.    The Debtors' Existing Receivables Facility

52.    Following the execution of the Credit Agreement Waiver in December 2008, the Debtors were provided financing through the sale and securitization of certain domestic accounts receivable pursuant to (a) the Receivables Sale Agreement, dated as of January 23, 2009, among

---

[13]    The 2026 Indenture defines "Consolidated Net Tangible Assets" to mean "total consolidated assets of [Chemtura Corp.] and its Subsidiaries, less the following: (1) current liabilities of [Chemtura Corp.] and its Subsidiaries; (2) all depreciation and valuation reserves and all other reserves (except (a) reserves for contingencies which have not been allocated to any particular purpose, and (b) deferred credits, including deferred federal and foreign income taxes and deferred investment tax credits) of [Chemtura Corp.] and its Subsidiaries; (3) the net book amount of all intangible assets of [Chemtura Corp.] and its Subsidiaries, including, but without limitation, the unamortized portions of such items as goodwill, trademarks, trade names, patents and debt discount and expenses less debt premium; and (4) appropriate adjustments on account of minority interests of other Persons holding stock in Subsidiaries."

Chemtura Corp., Great Lakes Chemical Corporation, GLCC Laurel, LLC and Biolab, Inc., as sellers and Chemtura Receivables LLC ("Chemtura Receivables"), as the buyer (the "U.S. Accounts Receivable Sale Agreement") and (b) the Receivables Purchase Agreement, dated as of January 23, 2009, among January 23, 2009, among Chemtura Receivables, as the seller, Chemtura Corp., as the servicer, Citicorp USA, Inc., as agent, Citigroup Global Markets Inc., as arranger, The Royal Bank of Scotland Plc and certain purchasers entered into a Receivables Purchase Agreement (the "U.S. Accounts Receivable Purchase Agreement," and, together with the U.S. Accounts Receivable Sale Agreement, the "Existing Receivables Facility").

53.      Under the Existing Receivables Facility, receivables generated by the Debtors' main operating entities – Chemtura Corp., Great Lakes Chemical Corporation, GLCC Laurel, LLC and Biolab, Inc – are sold to Chemtura Receivables, which is a special purpose, bankruptcy remote affiliate of the Debtors that is wholly-owned by Chemtura Corp.  Upon receipt of such receivables, Chemtura Receivables sells ownership interests in the receivables to the participating purchasers pursuant to the U.S. Accounts Receivable Purchase Agreement.  The U.S. Accounts Receivable Purchase Agreement further provides that purchasers are granted a security interest in all of the receivables owned by Chemtura Receivables.

54.      The Existing Receivables Facility will terminate as a result of the commencement of these chapter 11 cases.  As a result, no further receivables will be purchased from the Debtors and all cash generated from the receivables owned by Chemtura Receivables would be applied to satisfy the outstanding secured debt of that entity.  As of March 6, 2009, the repurchase price for the undivided interest in the receivables sold pursuant to the Existing Receivables was $117,388,411.52, and the face value of those receivables was approximately $232 million (the "Receivables Portfolio").

22

## II.

## CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

**A.    Adverse Market Conditions**

55.    The Company operates in a highly competitive industry that is in the midst of a sustained global recession that has caused business fundamentals to deteriorate.   Among the deteriorating indicators are sharp declines in demand for products and restricted access to credit. In addition, for much of 2008 the chemicals industry experienced rapid inflation in the costs of its raw material, energy and freight.   While the inflation in input costs have started to abate, with significantly lower demand, the Company has not yet seen much benefit from the cost decline due to sharp reductions in demand for the Company's products and thereby a decline in its purchases of raw materials.   These macroeconomic factors have harmed the Company's business operations -- and those of the Company's competitors -- by significantly decreasing demand, resulting in lower manufacturing output and higher manufacturing variances, all of which have contributed to an unprecedented decline in the Company's operating profitability and access to liquidity.

56.    The current market difficulties facing the chemicals industry have been widely recognized, and the current industry conditions have had significant negative effects on several of the Debtors' competitors.   For example:

- On January 6, 2009, the U.S. units of Dutch-based petrochemical producer LyondellBasell Industries AF SC filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

- On January 12, 2009, U.S.-based pigment producer Tronox Inc. and certain of its affiliates filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

23

- On February 3, 2009, Moody's Investors Service reported that out of the 75 North American chemical companies that it covers, 72% are in the high-yield category. Moreover, Standard & Poor's has recently reported that 64% of the North American companies that it covers are in the "junk" category.

- On February 20, 2009, U.S.-based foam products maker Foamex International Inc. and certain of its affiliates (collectively, "Foamex") filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. (Indeed, Foamex has listed the Company as one of its 20 largest unsecured creditors.)

57.    The Debtors are similarly situated to others in their industry. The Company's financial information presents a compelling story, though one that is far from unique: the Company reported a net loss of $690 million for the fourth quarter of 2008 and a net loss of $973 million for the 2008 fiscal year. The Company's Polymer Additives Segment, which accounted for approximately 45% of total net revenues in 2008, saw a reduction of $154 million (35%) in revenues against the same period in 2007, as customers experienced or anticipated declines in demand and implemented temporary plant shutdowns in response to changing demands and targeted their own inventory reductions. Similarly, the Company's Performance Specialties Segment, which accounted for approximately 28% of the Company's net sales in 2008, saw a decrease in operating profit of 32% in the fourth quarter of 2008 compared to the same period in 2007 as result of customers reducing or canceling orders and the resulting impact on its manufacturing operations.

**B.    Pending Debt Maturities and Potential
Defaults on the Debtors' Long-Term Obligations**

58.    Pending maturities of, and potential defaults under, certain of the Debtors' prepetition debt obligations compounded the difficulties associated with the sharp deterioration in the Company's financial performance in 2008 and its ongoing liquidity constraints. Specifically, the Debtors' $370 million 2009 Notes are due and payable on July 15, 2009.

24

Additionally, Chemtura Corp. and the Subsidiary Credit Facility Guarantors will be unable to comply with covenants in the Existing Credit Agreement upon the expiration of the Credit Agreement Waiver on March 30, 2009, and therefore will be in default under the Existing Credit Agreement. Such a default would trigger cross-default provisions contained in the Debtors' other debt instruments, including the Indentures governing the 2009 Notes, the 2016 Notes and the 2026 Debentures.

59.     Although the Company's management team has made significant efforts since October 2008 to address the upcoming maturity of the 2009 Notes and a potential default under the Existing Credit Agreement – for example, through seeking the sale of certain business assets or a refinancing of certain debt obligations as they come due (*see* section II.F., below) – those efforts have proven unsuccessful to date. Accordingly, absent these chapter 11 filings or a consensual out-of-court restructuring of their prepetition debt obligations, it appeared likely that the Debtors would default on their obligation to redeem the 2009 Notes in July and would fail to satisfy the conditions contained in the Existing Credit Agreement and default under the Indentures for the 2016 Notes and the 2026 Debentures.

## C.     Legacy Liabilities

60.     The Company is subject to various legacy liabilities, including liabilities related to environmental remediation and pension and other post-retirement benefits expenses.

### i.     Environmental Liabilities

61.     The Company is involved in claims, litigation, administrative proceedings and investigations in a number of jurisdictions related to various environmental liabilities. These liabilities include clean-up costs associated with hazardous waste disposal sites, natural resource property damage and personal injury. For example, since 1991, the Company has been conducting clean up of the ground water at one of its plant sites in Elmira, Canada. Chemtura

25

Corp. and certain of the Debtors have been identified by federal, state or local governmental agencies as potentially responsible parties (known as "PRPs") under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 with respect to costs associated with legacy operations and waste disposal sites at various locations in the U.S.[14] Additionally, certain of the Debtors are involved with environmental remediation and compliance activities at some of their current and former sites in the U.S. and abroad.

62.     The Debtors continually evaluate and review estimates for future remediation as well as operation and management costs directly related to remediation to determine appropriate environmental reserve amounts.   The Debtors' environmental reserves include estimates for determining clean-up costs; however, the extent of contamination at a number of sites has not yet been fully investigated or the final scope of remediation at such sites is not yet determinable.

63.     As of December 31, 2008, the Company's reserves for estimated environmental remediation costs over the next ten years totaled approximately $107 million, with estimates of overall potential environmental liability ranging up to $146 million.

**ii.     Pension and Other Post-Retirement Benefits Expenses**

64.     In addition to their obligations for funded debt and environmental liabilities, the Debtors have substantial obligations with respect to pension plans and other post-retirement benefits.  With respect to pension obligations, the Debtors maintain several tax-qualified defined benefit pension plans on behalf of approximately 2,300 active Employees (the "Defined Benefit Plans").  Specifically, the Defined Benefit Plans consist of (a) the Chemtura Corporation Pension

---

[14]   Specifically, the following Debtors are subject to environmental liabilities of one kind or another:  Chemtura Corp.; Great Lakes Chemical Corporation; Bio-Lab, Inc.; Crompton Colors Incorporated; KEM Manufacturing Corporation; Naugatuck Treatment Company; and Weber City Road LLC.

Plan for certain of the Debtors' employees, former employees and other plan beneficiaries, (b) a plan for employees, former employees and other plan beneficiaries associated with the Debtors' facility in Perth-Amboy, New Jersey and (c) the Marshall Plan and Multiemployer Plan referenced in footnote 14 below.[15]

65.      Because the Defined Benefit Plans are largely frozen at the present time, there are minimal new benefit accruals.   As of December 31, 2008, the Debtors estimated that the aggregate fair value of the assets held in trust under the Defined Benefit Plans was approximately $630 million, and the total obligations under the Defined Benefit Plans were approximately $826 million.

66.      The Debtors evaluate the Defined Benefit Plans each plan year to ensure that the minimum funding obligations will be met.   As of the Petition Date, the Debtors believe that no minimum funding contributions will be required for the Defined Benefit Plans during 2009 (the "Minimum Funding Contributions"), and the Debtors do not currently anticipate making any voluntary contributions to these plans in 2009 (the "Voluntary Pension Contributions").[16]   With respect to the Multiemployer Plan, the Debtors expect to contribute approximately $100,000 to the Multiemployer Plan in 2009, per the terms of the applicable collective bargaining agreement.

---

[15]   The Defined Benefit Plans also include a defined benefit pension plan covering former employees and other plan beneficiaries associated with a plant in Marshall, Texas (the "Marshall Plan") that the Debtors sold in November 2007.   The Marshall Plan was frozen at the time of the sale and there are no more active employees participating in the plan.   The Debtors also contribute to a Taft-Hartley multiemployer pension plan (the "Multiemployer Plan"), which is currently not frozen and covers certain union employees, former union employees and other beneficiaries associated with a facility in Fords, New Jersey.

[16]   The Debtors have estimated their Minimum Funding Contributions and their anticipated Voluntary Pension Contributions for 2009 based on certain elections, assumptions and methods, including those permitted under the Pension Protection Act of 2006.   To the extent there is a change in such elections, assumptions or methods, such change could alter the Debtors' Minimum Funding Contributions and/or Voluntary Pension Contributions to the Debtor-sponsored Defined Benefit Plans in 2009 and in the future.

67.     In addition to their pension obligations, the Debtors provide certain groups of retired employees (the "Retirees") post-retirement medical and life insurance benefits (collectively, the "Other Post-Retirement Benefits").

68.     The Other Post-Retirement Benefits include basic and supplemental life insurance coverage provided by Prudential and MetLife.  Approximately 2,250 Retirees receive basic life insurance coverage through the Debtors' Retiree life insurance program, which costs the Debtors approximately $36,000 per month.  In addition, the Debtors provide supplemental life insurance to approximately 555 Retirees, (and the premiums for this insurance are fully paid by the participating Retirees).[17]

69.     The Other Post-Retirements Benefits also include various medical insurance plans, the terms of which vary depending on whether the Retiree is under or over the age of 65. The Debtors maintain several self-insured medical insurance plans that cover approximately 750 Retirees under the age of 65 and costs the Debtors approximately $5.6 million per year, net of premiums paid by the Retirees.  In addition, the Debtors maintain several self-insured medical insurance plans that cover approximately 3000 Retirees over the age of 65 and costs the Debtors approximately $8.5 million per year, net of premiums paid by the Retirees.

70.     The Debtors estimate that, as of December 31, 2008, the total liability for Retirees currently participating in Other Post-Retirement Benefits is approximately $135 million. Additionally, the Debtors estimate that, as of December 31, 2008, the potential liability for active

---

[17]   The Debtors' also maintain a self-insured surviving spouse death benefit insurance plan which provides $2,250 in coverage for certain former Uniroyal employees and union employees.  The Debtors estimate that this plan costs approximately $10,000 per year.

Employees that may receive Other Post-Retirement Benefits in the future is approximately $28 million.

71.    Additionally, the Debtors currently provide benefits, pursuant to certain non-qualified pension and other deferred compensation arrangements (the "Non-Qualified Benefit Arrangements").   The participants in these Non-Qualified Benefit Arrangements are former executives of the Debtors, predecessor companies and other legacy entities whose liabilities and obligations were assumed by the Debtors either contractually or by law, including through past merger and acquisition activity.   As of the Petition Date, the Debtors estimate that they pay benefits in excess of $3 million per year in respect of the Non-Qualified Benefit Arrangements. These benefits are unsecured claims.  The Non-Qualified Benefit Arrangements are unfunded.

**D.    The Debtors' Prepetition Cost-Saving and Restructuring Efforts**

72.    The Company has undertaken a number of cost-saving and restructuring actions to address the rapid changes in the economic environment and to manage its prepetition liabilities.

**i.    Reductions in Force, Realignment of Business Segments and Plant Closures**

73.    On April 4, 2007, the Company announced a realignment of its business segments, which was meant to streamline its business operations, allow the Company to re-evaluate its manufacturing footprint and re-direct efforts to focus on end-use markets.  As part of this realignment, in June 2007, the Company identified more than 600 position reductions (including 300 people employed by the Debtors) and approved the closure of several locations.

74.    During the fourth quarter of 2008, the Company undertook a series of actions to conserve cash and reduce costs, including staff reductions, temporary plant closures (with the furlough of employees), suspension of payment the Company's dividend, reductions in capital spending and sales of surplus assets and working capital reductions.  Specifically, on December

11, 2008, the Company announced a global restructuring program designed to reduce cash fixed costs. This initiative involves a worldwide reduction in the Company's professional and administrative staff by approximately 500 people, including approximately 250 people employed by the Debtors. The Company hopes that this restructuring program ultimately will reduce indirect costs by approximately $50 million by eliminating layers of employees and redefining job scope for certain employees, resulting in a streamlined workforce that accomplishes more on a per-employee basis.

### ii.   Exploration of Potential Asset Sales

75.     In light of the crisis in the financial markets in the late summer and autumn of 2008, the Company concluded that it could no longer rely upon a refinancing transaction in the debt capital markets to address the maturity of the 2009 Notes in July 2009. In October 2008, the Company began exploring potential sales of certain of their business assets, which could generate the cash needed to redeem the 2009 Notes. These efforts included the potential sale of the Company's entire Crop Protection Segment as well as its petroleum-additives business, which is part of the Company's Performance Specialties Segment. Initial buyer interest in each sale process was strong, with attractive initial expressions of value. A number of well-qualified buyers were selected to perform due diligence on each business segment, and those potential buyers expended significant time and expense in the pursuit of a transaction.

76.     With the continuing recession and speculation about the financial condition of the Company, however, certain potential buyers reduced their prior expressions of value, expressed concern about the ability of the Company to perform its obligations under a sale agreement, or concluded not to proceed with a transaction. Although the Company still believes that there are buyers for the assets it is seeking to sell, it has been forced to conclude that a sale is unlikely to

30

be concluded in sufficient time to offset the continued deterioration in its liquidity or at a value that will permit the Company to address in full its debt maturities and liquidity needs.

**E.      Fourth Quarter Covenant Defaults and Ongoing Liquidity Constraints**

77.      Historically, the Company relied on various sources of liquidity to fund its operations and service its debt obligations, including cash generated from operations, reductions in cash on hand, borrowings under the Existing Credit Facility, sales of accounts receivables under the U.S. Accounts Receivable Facility and the European Accounts Receivable Facility, net proceeds from asset sales and access to the financial capital markets.  The deepening recession and the commensurate decline in the Company's financial performance during the fourth quarter of 2008 significantly constrained the Company's ability to access these sources of liquidity.

78.      In particular, the downgrades in the Debtors' credit ratings constrained the Company's access to liquidity by limiting the cash it obtained from accounts receivable sold and purchased under the Company's previous domestic accounts receivable securitization facility. The deterioration of the Company's financial performance also caused the provider of its European Accounts Receivable Facility to restrict sales of accounts receivable under that facility, as described in detail above.  As a result of the restricted availability under both of these facilities, the Debtors sought to obtain additional liquidity by entering into the current U.S. Accounts Receivable Facility and by attempting to negotiate an amendment to the European Accounts Receivable Facility.

79.      Additionally, and as discussed in section I.C.ii., above, the Company has faced an inability to comply with two financial maintenance covenants set forth in the First Amended Credit Agreement.  As a result, on December 30, 2008, Chemtura Corp., the Subsidiary Credit Facility Guarantors, the Existing Credit Facility Agent and the Existing Credit Facility Lenders entered into the Credit Agreement Waiver.

31

80.     Although the Credit Agreement Waiver has given the Company vital breathing room to explore strategic financial alternatives including the sale of a business, the Credit Agreement Waiver contains conditions that have limited the Company's liquidity.  Specifically, the Credit Agreement Waiver provided that outstanding advances under the Existing Credit Agreement could not exceed $190 million and letters of credit could not exceed $97 million for the period from February 1, 2009 until the end of the Waiver Period.  Additionally, the Credit Agreement Waiver limited the Company's ability to take certain actions during the Waiver Period, including incurring debt or liens, selling assets, making investments, paying cash dividends and repurchasing equity.

81.     The Company anticipated that as a result of financial performance in the first quarter of 2009, they will not be in compliance with the financial covenants set forth in the Existing Credit Agreement after March 30, 2009 when the Waiver Period expires. In addition, the Company's dwindling liquidity and slowing progress with its asset sale process meant that obtaining another waiver from the Existing Credit Facility Lenders was not likely.  Accordingly, in the absence of these chapter 11 filings, the Company faced a likely default under the Existing Credit Agreement.

82.     The Company was also experiencing difficulty overseas where, despite several attempts at negotiation, the Company was unable to restart the sales of accounts receivable under the European Accounts Receivable Facility.  As a result, and because of ongoing collections of receivables previously sold under that facility, the outstanding value of accounts receivable factored pursuant to the facility have continued to decline significantly since December 31, 2008, which further reduced available liquidity for the Company as a whole, including for its international operations.

83.     The Company's restricted access to liquidity has placed significant stress on business operations, including the Company's relationships with specialized third party vendors and suppliers that are crucial for ordinary course operations.  Because of the demands inherent in the highly complex and competitive chemical manufacturing industry, the Company relies on suppliers and vendors uniquely qualified to handle hazardous materials and navigate the just-in-time logistics associated with its operations and their customers' demands.  As a result of sharp declines in the Company's financial performance during the fourth quarter of 2008, trade vendors imposed tightened credit terms that the Company was increasingly unable to meet and the Company's access to vendors and suppliers has become increasingly constrained.

84.     The Company's, and thereby the Debtors', restricted access to both cash and trade credit has strained their supply chain nearly to or, in some cases beyond, the breaking point.  With dwindling liquidity, the Company has not been able to keep their trade payments current.  This has caused vendors to further restrict the credit they provide to the Company and the goods and services they are prepared to supply.  As a result, the Debtors already have experienced supply interruptions in some areas of their business.  In certain instancs, the Debtors have been required to slow down or even interrupt production at some facilities.  The levels and frequency of interruptions have increased progressively each week, and at this time deliveries to customers, and therefore broader customer relationships, are being impacted.

85.     Absent an immediate infusion of liquidity, the Debtors are likely to experience further suspensions of, or sustained limitations to, their business operations that ultimately would have a disastrous effect on the value of the Company as a whole.  Indeed, presently, the Debtors have approximately $6 million of cash on hand to operate their businesses.  The Debtors' inability to maintain and stabilize their business operations would result in depleted inventories,

33

missed supply obligations and potentially irreparably damaged customer relationships.   Such results would be particularly damaging with respect to the Debtors' seasonal business operations – for example, the Company's Crop Protection Segment and the pool and spa products lines of the Consumer Products Segment – at this critical time of year when the spring/summer selling season is just beginning in the Northern hemisphere.

86.     In light of the foregoing, and after carefully exploring and exhausting all possibilities to gain near-term access to liquidity, including seeking re-financing of its debt obligations and selling certain business segments, the Debtors have determined that commencing these chapter 11 cases and obtaining the proposed debtor-in-possession financing represents the best available alternative for the Debtors to meet their immediate and ongoing liquidity needs. Accordingly, after a process that has included the preparation of each of the First Day Pleadings filed with the Court and the negotiation of the Debtors' proposed debtor-in-financing credit agreement, the Debtors have commenced these chapter 11 cases to provide the Debtors with the tools and the opportunity to achieve a financial restructuring and to prevent further deterioration in the value of their business.

## III.

## DESCRIPTION OF RELIEF SOUGHT
## IN THE DEBTORS' FIRST DAY PLEADINGS[18]

87.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and to promote a smooth transition to operations in chapter 11, the Debtors have requested various relief in their First Day

---

[18] Capitalized terms in this Section III used but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Pleadings.

Pleadings.  The First Day Pleadings seek authority to, among other things, obtain debtor-in-possession financing on an interim basis, preserve customer relationships, maintain employee morale, and ensure the continuation of the Company's cash management systems and other business operations without interruption.  Receiving Court approval of the relief sought in the First Day Pleadings is essential to giving the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' constituents.

88.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

89.     I have reviewed each of the First Day Pleadings.  The facts stated therein and attached hereto as Exhibit M are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

## IV.

## OVERVIEW OF EXHIBITS SETTING FORTH INFORMATION
## ABOUT THE DEBTORS PURSUANT TO LOCAL RULE 1007-2(A)-(B)

90.    Local Rule 1007-2 requires certain information related to the Debtors, which I

have provided in the exhibits attached hereto as Exhibits B, C, D, E, F, G, H, I, J, K and L.

Specifically, these exhibits contain the following information with respect to the Debtors:[19]

- Pursuant to Local Rule 1007-2(a)(4), Exhibit B attached hereto provides information with respect to the holders of the 20 largest unsecured claims against the Debtors on a consolidated basis.

- Pursuant to Local Rule 1007-2(a)(5), Exhibit C attached hereto provides information with respect to the holders of the five largest secured claims against the Debtors on a consolidated basis.

- Pursuant to Local Rule 1007-2(a)(6), Exhibit D attached hereto provides a summary of the Debtors' assets and liabilities on a consolidated basis.

- Pursuant to Local Rule 1007-2(a)(7), Exhibit E attached hereto provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Rule 1007-2(a)(8), Exhibit F attached hereto provides information on the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents or secured creditor or agent for any such entity.

- Pursuant to Local Rule 1007-2(a)(9), Exhibit G attached hereto provides information on the property or premises owned,

---

[19] The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

leased or held under other arrangement from which the Debtors operate their businesses.

- Pursuant to Local Rule 1007-2(a)(10), Exhibit H attached hereto lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

- Pursuant to Local Rule 1007-2(a)(11), Exhibit I attached hereto lists the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

- Pursuant to Local Rule 1007-2(a)(12), Exhibit J attached hereto provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), Exhibit K attached hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the 30-day period following the Petition Date.

- Pursuant to Local Rule 1007-2(b)(3), Exhibit L attached hereto provides the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees for the 30-day period following the Petition Date.

[Remainder of page intentionally left blank.]

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

18th day of March, 2009.

By: _____

Name:    **Stephen Forsyth**
Title:    **Executive Vice President &**
         **Chief Financial Officer**
         **Chemtura Corporation**

**<ins>Exhibit A</ins>**

**The Company's Corporate Organization Chart**

13954417

# CHEMTURA CORPORATION, *et al.* FILING ENTITIES CORPORATE STRUCTURE CHART



# CHEMTURA CORPORATION CORPORATE STRUCTURE CHART

CHEMTURA CORPORATION (Delaware)
ASIA PACIFIC = 27
AMERICAS = 17
EUROPE, MIDDLE EAST, AFRICA = 79
USA = 40
Crompton Specialties Sdn. Bhd. (Malaysia)
PT Crompton Indonesia (Indonesia)
Chemtura (Thailand) Ltd. (Thailand)
Chemtura Taiwan Limited (Taiwan)
Crompton, Inc. (Philippines)
Chemtura Hong Kong Limited (China-HK)
Chemtura (HK) Holding Co. Limited (China-HK)
Crompton Specialties Asia Pacific Pte Ltd. (Singapore)
Branch: India
Chemtura Singapore Pte Ltd. (Singapore)
Crompton Specialties Shanghai Company Ltd. (China - PRC)
Nanjing Crompton Shuguang Organosilicon Specialties Company, Ltd. (China - PRC) (Joint Venture)
Chemtura Chemicals (Nanjing) Co., Ltd. (China - PRC)
Chemtura Australia Pty. Ltd. (Australia)
Uniroyal Chemical Taiwan Ltd. (Taiwan)(JV)
Chemtura Chemicals India Pte. Ltd. (India)
Chemtura Shanghai Co., Ltd. (China-PRC)
Chemtura Korea Inc. (Korea)
Crompton Specialties Ltd. (Thailand) (JV)
Unimers India Ltd. (India)
Chemtura Japan Limited (Japan)
Great Lakes Chemical (Far East) Limited (China-Hong Kong)
Great Lakes Chemical (S) Pte Ltd (Singapore)
Asia Stabilizers Co. Ltd. (Korea) (Joint Venture)
BioLab Australia Pty. Ltd. (Australia)
Recreational Water Products Pty. Ltd. (Australia)
Hydrotech Chemical Corporation Pty. Ltd. (Australia)
Chemtura New Zealand Limited (New Zealand)
Crompton & Knowles of Canada Ltd. (Canada)
9056-0921 Quebec Inc. (Canada)
Bio-Lab Canada, Inc. (Canada)
Hydrotech Chemical Corporation (Canada)
ASEPSIS, Inc. (Canada)
Chemtura Corporation Mexico S. de R.L. de C.V. (Mexico)
Chemtura Quimica Argentina S.A.C.I. (Argentina)
Chemtura Specialties Ecuador S.A. (Ecuador)
Chemtura Colombia Ltda. (Colombia)
Chemtura Industria Quimica da Brasil Ltda. (Brazil)
Crompton Corporation Ltda. (Chile)
Crompton Servicios S.A. de C.V. (Mexico)
Chemtura Canada Co./Cie (Canada)
Crompton Services B.V.B.A. (Belgium)
Crompton LLC (Delaware)
Chemtura Belgium N.V. (Belgium)
Chemtura Verwaltungs GmbH (Germany)
Chemtura Holdings GmbH (Germany)
Chemtura Organometallics GmbH (Germany)
Chemtura Vinyl Additives GmbH (Germany)
Crompton Specialties GmbH (Germany)
Chemtura Vermögensverwaltungs GmbH & Co. KG (Germany)
Chemtura Europe Limited (Scotland)
Chemtura Corporation U.K. Limited (England)
Baxenden Chemicals Ltd. (England)
Baxenden Scandinavia A.S. (Denmark)
Isofoam Ltd. (England)
Tetrabrom Technologies LTD. (Israel) (Joint Venture)
BLSA Industries (Pty) Ltd. (South Africa)
Crompton Europe Financial Services Company (Delaware)
Crompton (Uniroyal Chemical) Registrations Limited (England)
Branches: Czech Republic; Hungary; Kazakhstan; Moldova; Poland; Slovakia; Turkey U.A.E.
Great Lakes Holding Deutschland GmbH (Germany)
Chemtura Manufacturing Germany GmbH (Germany)
POOLTIME GmbH (Germany)
Bayrol Iberica S.A. (Spain)
Bayrol Scandinavia A/S (Denmark)
Interbayrol A.G. (Switzerland)
Bayrol France S.A.S. (France)
Blue Systemes S.A.S. (France)
MPC S.A.R.L. (France)
Chemtura Sales Germany GmbH (Germany)
Bayrol Deutschland GmbH (Germany)
Great Lakes Chemical Konstanz GmbH (Germany)
ASEPSIS U.K. Limited (UK)
CPC Bayrol Limited (UK)
Uniroyal Chemical S.A. (Spain)
Uniroyal Chemical S.A.R.L. (Switzerland)
Chemtura (Pty) Ltd. (South Africa)
Branch: Kenya
Crompton S.A. (Switzerland)
Chemtura Management GmbH (Germany)
Great Lakes Vermögensverwaltungs GmbH & Co. KG (Germany)
Chemtura Europe GmbH (Switzerland)
Great Lakes Europe Unlimited (UK)
GL Development Ltd. (British W.Indies Cayman Islands)
Chemtura Manufacturing UK Limited (UK)
Chemtura UK Limited (UK)
Chemtura Sales UK Limited (UK)
BioLab U.K. Limited (UK)
Great Lakes Chemical (Netherlands) B.V. (The Netherlands)
Chemtura Receivables LLC (Delaware)
Crompton Holding Corporation (Delaware)
Crompton Colors Incorporated (Delaware)
DiaKhem Technologies, LLC (Michigan) (Joint Venture)
Chemtura Holding Company, Inc. (Delaware)
Knight Investments B.V. (The Netherlands)
Great Lakes Holding (Europe) AG (Switzerland)
Chemtura Sales (Europe) GmbH (Switzerland)
Chemtura LLC (Russia)
Chemtura Europe d.o.o. (Slovenia)
Gulf Stabilizers Industries, Ltd. (Saudi Arabia) (Joint Venture)
Gulf Stabilizers Industries Sales FZCO (UAE) (Joint Venture)
Great Lakes Holding SAS (France)
Chemtura France SAS (France)
Chemtura Sales France SAS (France)
Chemtura Technology B.V. (The Netherlands)
Crompton Overseas B.V. (The Netherlands)
Chemtura Netherlands B.V. (The Netherlands)
Crompton European Holdings B.V. (The Netherlands)
Crompton Holdings B.V. (The Netherlands)
Certis Europe B.V. (The Netherlands)
Crompton Kazakhstan LLP (Kazakhstan)
Crompton Financial Holdings(Ireland)
Chemtura Technology Belgium N.V. (Belgium)
Branches: The Netherlands
Chemtura Italy S.r.l. (Italy)
Crompton Chemicals B.V. (The Netherlands)
Chemtura Manufacturing Italy S.r.l. (Italy)
Branches: Bulgaria; Romania; Russia; Ukraine
Crompton Investments S.A.S. (France)
EPA B.V. (The Netherlands)
Crompton Ireland Investment Company Ltd. (Ireland)
Sonneborn Crompton Sodium Joint Venture B.V. (The Netherlands) (Joint Venture)
Rubicon LLC (Utah) (Joint Venture)
Kem Manufacturing Corporation (Georgia)
Uniroyal Chemical Company Ltd. (Bahamas/Delaware)
GT Seed Treatment, Inc. (Minnesota)
Anderol B.V. (The Netherlands)
Anderol Italia S.r.l. (Italy) (Joint Venture)
Hatco Advanced Technologies Corporation (Delaware)
Hattech GmbH (Germany)
Estech Managing GmbH (Germany) (Joint Venture)
Estech GmbH & Co. KG (Germany) (Joint Venture)
Crompton & Knowles Receivables Corporation (Delaware)
CNK Chemical Realty Corporation (Pennsylvania)
Weber City Road LLC (Louisiana)
Monochem, Inc. (Louisiana)
Crompton Monochem, Inc. (Louisiana)
NPC Services, Inc. (Louisiana) (Joint Venture)
Naugatuck Treatment Company (Connecticut)
Assured Insurance Company (Vermont)
Great Lakes Chemical Corporation (Delaware)
WRL of Indiana, Inc. (Indiana)
Penn Specialty Chemicals, Inc. (Delaware)
Niagara Insurance Company Ltd. (Bermuda)
ISCI, Inc. (Indiana)
Bio-Lab, Inc. (Delaware)
Great Lakes Chemical Global, Inc. (Delaware)
Laurel Industries Holdings, Inc. (Delaware)
ASCK, Inc. (Delaware)
BioLab Franchise Company, LLC (Delaware)
Aqua Clear Industries, LLC (New York)
Recreational Water Products, Inc. (Delaware)
BioLab Textile Additives, LLC (Delaware)
A & M Cleaning Products, LLC (Delaware)
ASEPSIS, Inc. (Georgia)
Poolbrite (SA) (PTY) Ltd. (South Africa)
HomeCare Labs, Inc. (Delaware)
Recreational Water Products Inc. (Canada)
BioLab Company Store, LLC (Delaware)
Chemtura Sales Mexico, S. de R.L. de C.V. (Mexico)
GLLC Laurel, LLC (Delaware)
GLCC Mexico Holdings, Inc. (Delaware)
GLCC Laurel de Mexico, S.A. de C.V. (Mexico)
Antimony Products (PTY) Ltd. (S.A.) (Joint Venture)
QO Chemicals, Inc. (Delaware)
Great Lakes Trading Company, Inc. (Delaware)
QO Chemicals GmbH (Germany)
Chemol Reszvenytarsasag International
Chart Codes:
Filing Entity
CORPORATION
Partnership
Branch
K&E14363063



## Exhibit B

**Holders of the Debtors' 50 Largest Unsecured Claims on a Consolidated Basis**

**Consolidated List of the Holders of the 50 Largest Unsecured Claims of the Debtors**

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 50 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of March 18, 2009.

| No. | Holder of Claim | Mailing Address/Phone Number/Fax Number | Nature of Claim | Contingent, Unliquidated, Disputed or Partially Secured | Amount of Claim |
|---|---|---|---|---|---|
| 1. | Wells Fargo Bank, N.A. | Lynn M. Steiner<br>Vice President<br>Corporate Trust Services<br>MAC N9311-110<br>Minneapolis, MN  55479<br>Tel: 262-361-4376<br>lynn.m.steiner@wellsfargo.com | Corporate 2016 Notes | | $500,000,000.00 |
| 2. | The Bank of New York Mellon Trust Company, N.A. | Irina Bogomolny<br>2 N. LaSalle Street, Suite 1020<br>Chicago, IL 60602<br>Tel: 312-827-8691<br>Fax: 312-827-8542<br>irina.bogomolny@bnymellon.com | Corporate Notes 2009 | | $370,000,000.00 |
| 3. | Manufacturers & Traders Trust Co. / Deutsche Bank | Kevin Ebert, CCTS<br>Corporate Trust Officer<br>25 South Charles Street, 16th Floor<br>Baltimore, MD 21201<br>Tel: 410-244-4632<br>kmebert@mtb.com | Corporate 2016 Debentures | | $150,000,000.00 |
| 4. | CITIBANK, N.A. | Bank Loan Syndications Department<br>Two Penns Way<br>New Castle, Delaware 19720 | Syndicated Loan | | $132,800,000.00 |
| 5. | Occidental Chemical Corp. | P.O. Box 406422<br>Atlanta, GA 75356 | Trade Claim | | $3,455,642.40 |
| 6. | SAP Americas | 3999 Westchester Pike<br>Newton Square, PA 19073 | Trade Claim | | $3,349,859.01 |
| 7. | Nisso America, Inc. | Attn: Mr. Nakamura<br>45 Broadway, Suite 2120<br>New York, NY 10006<br>Tel: 212-490-0350<br>Fax: 212-972-9361 | Trade Claim | | $2,986,973.02 |
| 8. | Lyondell Chemical Co. | 2640 Collections Dr Ctr<br>Chicago, IL 60693<br>Tel: 610-359-3241 | Trade Claim | | $2,734,761.81 |

| No. | Holder of Claim | Mailing Address/Phone Number/Fax Number | Nature of Claim | Contingent, Unliquidated, Disputed or Partially Secured | Amount of Claim |
|---|---|---|---|---|---|
| 9. | Synthesia | Aliachem A.S., Odstepny Zavod Se Sidlem:Pardubice Pardubice - Semtin 53217 Tel: 420-466-821-111 Fax: 420-466-821-020 | Trade Claim | | $2,718,619.16 |
| 10. | Sinon Corporation | 111, Chung Shan Road Ta-Tu Hsiang, Taichung Hsien 00432 TW Tel: 886-4-26934261 Fax: 886-4-26934265 | Trade Claim | | $2,382,450.00 |
| 11. | Preston Park 2004 LLC | The Hampshire Partners Fund VI LLC P.O. Box 9020 Hicksville, NY 11802 | Trade Claim | | $1,160,443.89 |
| 12. | Caremark | Prescription Services Division P.O. Box 840336 Dallas, TX 75284 Tel: 847-559-5762 | Trade Claim | | $1,145,345.66 |
| 13. | Greenberg Traurig PA | 1221 Brickell Avenue Miami, Fl 33131 Tel: 305-579-0500 Fax: 305-579-0717 | Trade Claim | | $1,124,613.00 |
| 14. | Thermphos International BV | P.O. Box 406 Ak Vlissingen - NL 4380NL Tel: 0031-113-689557 Fax: 0031-113-689501 | Trade Claim | | $1,094,960.92 |
| 15. | Yash Technologies, Inc. | 605 17th Avenue East Moline, IL 61244 Tel: 309-755-0433 Fax: 309-796-1242 | Trade Claim | | $1,020,340.26 |
| 16. | Shell Chemicals Americas Inc. | Box 240 STN-M Calgary, Alberta T2P 2H6 Tel: 866-897-4355 Fax: 800-567-8862 Philippe.Godin@shell.com | Trade Claim | | $948,325.59 |
| 17. | Gulf Stabilizers Industries | Box 35625 Jubail Industrial City 31961 Tel: 966-3341-7727 Fax: 00966-3341-6033 | Trade Claim | | $918,000.00 |
| 18. | Invista, S.A.R.L. | P.O. Box 905624 Charlotte, NC 28290-5624 Tel: 704-586-7300 Fax: 704-586-7500 | Trade Claim | | $874,877.49 |
| 19. | PPG Industries Inc. | Box 360175M Pittsburgh, PA 15251-6175 Tel: 800-323-2487 Fax: 724-325-5049 | Trade Claim | | $841,891.20 |

2

| No. | Holder of Claim | Mailing Address/Phone Number/Fax Number | Nature of Claim | Contingent, Unliquidated, Disputed or Partially Secured | Amount of Claim |
|---|---|---|---|---|---|
| 20. | Weil, Gotshal and Manges | 1300 Eve St. NW. Ste 900 Washington, DC 20005 Tel: 202-682-7000 Fax: 202-857-0940 | Trade Claim | | $832,986.00 |
| 21. | Acid Chem (USA) Inc. | 201 W. Passaic Street, Suite 100 Rochelle Park, NJ 07662 Tel: 201-909-0305 Fax: 201-909-9892 | Trade Claim | | $771,344.00 |
| 22. | BASF Corporation | Box 360941 Pittsburgh, PA 15251-6941 Tel: 973-895-8256 Fax: 973-426-5039 | Trade Claim | | $764,931.61 |
| 23. | CIBA Corporation | Box 7247-7318 Philadelphia, PA 19170-7318 | Trade Claim | | $740,956.93 |
| 24. | BMR-Landmark At Eastview LLC | Attn: General Counsel/Real Estate Box 51918A Los Angeles, CA 90051-6218 Tel: 858-485-9840 Fax: 858-485-9843 | Trade Claim | | $737,296.71 |
| 25. | Shell Chemical LP | P.O. Box 7247-6189 Philadelphia, PA 19170-6189 Tel: 800-872-7435 | Trade Claim | | $710,922.05 |
| 26. | DLA Piper US LLP | 111 S Calvert St. Ste. 1950 Baltimore, MD 21202-6193 Tel: 410-580-3000 Fax: 410-580-3665 | Trade Claim | | $692,943.00 |
| 27. | O'Melveny & Myers, LLP | PO Box 894436 Los Angeles, CA 90189-4436 | Trade Claim | | $670,101.00 |
| 28. | WS Packaging Group Inc. | P.O. Box 127 Algoma, WI 54201 Tel: 920-487-3424 Fax: 920-866-6483 | Trade Claim | | $665,472.60 |
| 29. | Sapient Corp | P.O. Box 4886 Boston, MA 02212 | Trade Claim | | $652,430.15 |
| 30. | Plastican Inc. | P.O. Box 868 Box 1453 Leominster, MA 01453 Tel: 978-537-4911 Fax: 978-537-6376 | Trade Claim | | $651,216.86 |
| 31. | Lyondell Chemical Company | P.O. Box 3234 Carol Stream, IL 60132-3234 Tel: 713-652-4151 Fax: 713-652-4151 | Trade Claim | | $614,394.28 |
| 32. | Merrill Lynch | Global Markets and Investment Banking Chase Manhattan Plaza New York, NY 10081-6500 Tel: 212-449-4630 | Trade Claim | | $598,120.34 |

3

| No. | Holder of Claim | Mailing Address/Phone Number/Fax Number | Nature of Claim | Contingent, Unliquidated, Disputed or Partially Secured | Amount of Claim |
|---|---|---|---|---|---|
| 33. | SI Group, Inc. | Lockbox 088168<br>Chicago, IL 60695-1168<br>Tel: 518-347-4200 | Trade Claim | | $571,505.63 |
| 34. | PPG Industries Inc. | 1 PPG PI<br>Pittsburgh, PA 15272-0001<br>Tel: 412-434-3131<br>Fax: 412-434-2448 | Trade Claim | | $559,002.00 |
| 35. | Sedgwick, Detert, Moran & Arnold | Steuart Tower, 8th Floor<br>San Francisco, CA 94105 | Trade Claim | | $551,069.00 |
| 36. | Kyowa Hakko U.S.A. Inc. | W502085<br>Box 7777<br>Philadelphia, PA 19175-2085<br>Tel: 212-319-5353<br>Fax: 212-421-1283 | Trade Claim | | $549,357.00 |
| 37. | Synasia Inc. | 240 Amboy Ave<br>Metuchen, NJ 08840<br>Tel: 732-205-9880<br>Fax: 732-205-1788 | Trade Claim | | $528,971.72 |
| 38. | AG Processing, Inc. | Box 3480<br>Omaha, NE 68103-0480<br>Fax: 402-492-7721 | Trade Claim | | $511,132.84 |
| 39. | Skadden, Arps, Slate, Meagher & Flom LLP | Four Times Square<br>New York, NY 10036<br>Tel: 212-735-3000<br>Fax: 212-735-2000 | Trade Claim | | $496,825.32 |
| 40. | Patrick Products Inc. | 150 S Werner St<br>Leipsic, OH 45856<br>Tel: 419-943-3733<br>Fax: 419-943-3734 | Trade Claim | | $483,171.74 |
| 41. | American Chemistry Council, Inc. | Department 6044<br>Washington, DC 20042-6044 | Trade Claim | | $470,360.00 |
| 42. | Holly Oak Chemical Inc. | P.O. Box 266<br>Fountain Inn, SC 29644<br>Tel: 800-552-5363<br>Fax: 864-862-1474 | Trade Claim | | $456,028.80 |
| 43. | Packaging Corp of America | PO Box 532058<br>Atlanta, GA 30353 | Trade Claim | | $454,951.43 |
| 44. | Covalence Specialty Coatings | Dept. CH10372<br>Palatine, IL 60055-0372 | Trade Claim | | $448,222.65 |
| 45. | ADM Archer Daniels Midland | Box 92572<br>Chicago, IL 60675-2572<br>Tel: 651 388-7111<br>Fax: 217-424-6196 | Trade Claim | | $427,514.43 |
| 46. | PMC Biogenex, Inc. | PO Box 8500-7346<br>Philadelphia, PA 19178<br>Tel: 800-872-1117<br>Fax: 856-533-1896 | Trade Claim | | $425,315.91 |

K&E 14294491.5

| No. | Holder of Claim | Mailing Address/Phone Number/Fax Number | Nature of Claim | Contingent, Unliquidated, Disputed or Partially Secured | Amount of Claim |
|---|---|---|---|---|---|
| 47. | Jiangsu Yabang Import & Export Co. Ltd. | R 205 Niutang Bridge Changzhou City Jiangsu, China 213163 Tel: 86-519-86390292 Fax: 86-519-86390287 | Trade Claim | | $425,243.70 |
| 48. | M L Smith Jr Inc. | P.O. Box 1717 Ruston, LA 71273-1717 Tel: 318-255-4474 Fax: 318-255-8661 | Trade Claim | | $414,404.05 |
| 49. | AKZO Nobel Functional Chemicals LLC | Box 905361 Charlotte, NC 28290-5361 Tel: 800-906-9977 Fax: 312-544-7159 | Trade Claim | | $412,850.40 |
| 50. | Rimex Supply Ltd. | 9726 186th St Surrey, British Columbia, Canada V4N 3N7 Tel: 604-888-0025 Fax: 604-888-7642 | Trade Claim | | $406,340.00 |

5

## Exhibit C

**Holders of the Debtors' 5 Largest Secured Claims**

**Holders of the Debtors' 5 Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' five largest secured claims on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of [March 17, 2009].

| No. | Creditor | Contact; Mailing Address & Telephone Number and Fax Number | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1. | CITIBANK, N.A. | Two Penns Way<br>New Castle, DE 19720<br>Tel: (651) 466-3000 | $139,200,000.00 | Inventory and pledge of stock in the subsidiaries |
| 2. | Odyssey Logistics & Technology Corp. | 39 Old Ridgebury Rd, A4<br>Danbury, CT 6810<br>Tel: (203) 448-3900<br>Fax: (203) 448-3902<br>E-mail: calvincheung@odysseylogistics.com | $4,467,659.56 | Certain material assets of the Debtors |
| 3. | KMCO, L.P. | P.O Box 1026<br>Houston, TX 77251-1026<br>Tel: (281) 272-4100<br>Fax: (281) 272 - 4102 | $1,065,456.35 | Certain material assets of the Debtors |
| 4. | Elite International Transportation | Box 62047<br>Houston, TX 77205-2047<br>Tel: ((281)-775-2100<br>Fax: (281) 775-2190<br>E-mail: paymentnotice@bdpinternational.com | $592,247.57 | Certain material assets of the Debtors |
| 5. | Turner Industries Group, L.L.C. | Maintenance & Turnaround Div.<br>Box 3688<br>Baton Rouge, LA 70821<br>Tel: (225) 922-5050<br>Fax: (225) 922-5055 | $452,696.76 | Certain material assets of the Debtors |

**<u>Exhibit D</u>**

**Summary of the Debtors' Assets and Liabilities**

**Summary of the Debtors' Assets and Liabilities**

The following financial data (unaudited) is the latest available information and reflects the Debtors' financial condition, as consolidated with its domestic affiliated debtors and non-debtors as of December 31, 2008. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value):       $3.06 billion
Total Liabilities:             $2.60 billion

**<u>Exhibit E</u>**

**Schedule of Publicly Held Securities**

13954417

## Schedule of Publicly Held Securities

*Common Stock*

Chemtura Corp. is authorized to issue 500 million shares of $0.01 par value stock common stock.  As of December 31, 2008, Chemtura Corp. had issued 254.1 million shares of common stock, with 11.5 million shares held as treasury stock.  There are 5,377 holders of record of Chemtura Corp.'s common stock as of January 26, 2009.

The following table sets forth information, as of March 17, 2009, concerning beneficial ownership of Chemtura Corp.'s outstanding common stock held by each of its current officers and directors.

| Name | Amount and Nature of Beneficial Ownership | | Deferred Compensation Plan | DRIP | Restricted Stock Plan |
|---|---|---|---|---|---|
| | Common Stock | Exercisable Options | | | |
| Carol V. Anderson | 6,558 | 22,100 | 0 | 0 | 0 |
| Nigel D. T. Andrews | 7,947 | 31,677 | 0 | 0 | 24,103 |
| James W. Crownover | 7,558 | 31,677 | 0 | 0 | 24,103 |
| David G. Dickey | 5,310 | 54,250 | 0 | 0 | 0 |
| Billie S. Flaherty | 0 | 23,900 | 0 | 0 | 0 |
| Stephen C. Forsyth | 353,272 | 67,500 | 0 | 0 | 0 |
| Martin M. Hale | 575,319 | 36,123 | 0 | 0 | 24,103 |
| Roger L. Headrick | 68,677 | 58,493 | 36,433 | 4,251 | 28,262 |
| Kevin V. Mahoney | 0 | 21,750 | 0 | 0 | 0 |
| Craig A. Rogerson | 0 | 0 | 0 | 0 | 0 |
| Alan Swiech | 713 | 7,875 | 0 | 0 | 0 |
| Bruce F. Wesson | 3,235 | 73,593 | 46,796 | 0 | 28,262 |
| Robert S. Wedinger | 3,248 | 45,250 | 0 | 0 | 0 |
| Directors and Executive Officers as Group | 1,031,837 | 474,188 | 83,229 | 4,251 | 104,730 |

*2009 Notes*

Great Lakes Chemical Corporation, a wholly-owned subsidiary of Chemtura Corp., has issued $400 million principal amount in 7% unsecured notes due 2009, of which $370 million is outstanding as of the Petition Date. There are approximately 47 holders of record of these Notes as of March 16, 2009.

*2016 Notes*

Chemtura Corp. has issued $500 million principal amount in 6.875% unsecured notes due 2016, of which $500 million is outstanding as of the Petition Date.  There are approximately 37 holders of record of these Notes as of March 16, 2009.

*2026 Debentures*

Chemtura Corp. has issued $270 million principal amount in 6.875% debentures due 2026, of which $150 million is outstanding as of the Petition Date.  There are approximately 29 holders of record of these Notes as of March 16, 2009.

## Exhibit F

**Debtors' Property Not in the Debtors' Possession**

**Debtors' Property Not in the Debtors' Possession**

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of December 30, 2008, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.[1]

| Type of Property | Person or Entity in Possession of Property | Address & Telephone Number of Person or Entity in Possession of Property |
|---|---|---|
| Inventory | ContraPac | 675 Great Southwest Parkway Atlanta, GA 30336 |
| Inventory | Albemarle Corporation | Tyrone Industrial Park Tyrone, PA 16686 |
| Inventory | Ametek | 42 Mountain Avenue Nesquehoning, PA 18240 |
| Inventory | Bartlo Packaging Inc. | 61 Willett St Passaic, NJ 07055 |
| Inventory | Bold Corp. | Highway 129 North Ocilla, GA 31774 |
| Inventory | Bold Corp. | 7745 Magnolia Industrial Blvd. Tifton, GA 31794 |
| Inventory | BPS Inc. | 28 Phillips Road Helena, AZ 72342 |
| Inventory | Colormatrix Corp. | 680 North Rocky River Dr. Berea, OH 44017 |
| Inventory | Compound Engineer Solutions | 473 Rt. 46 Clifton, NJ 07753 |
| Inventory | Toll Compaction Inc. | 14 Memorial Drive Neptune, NJ 07753 |
| Inventory | DanChem Technologies Inc. | 1975 Richmond Blvd. Danville, VA 24543 |
| Inventory | Eastman Chemical | Highway 129 North Kingsport, TN 37662 |
| Inventory | Grant Mfg Alloying, Inc. | 200 C Furnace Street Birdsboro, PA 19508 |
| Inventory | Helena Chemical Co. | 434 Fenn Rd. Cordelle, GA 31010 |
| Inventory | Akzo Nobel Ind Specialties | 15200 Almeda Road Houstan, TX 77053 |
| Inventory | Inchem | 800 Cel-River Rd. Rock Hill, SC 29730 |
| Inventory | KMCO, L.P. | 16503 Ramsey Rd. Crosby, TX 77532 |

---

[1]    In addition to the properties listed above, in the ordinary course of business, property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors or agents. Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical if not impossible.

| Inventory | Orrex Plastic Company | 2800 S. Orrex Ave<br>Odessa, TX 79766 |
|-----------|-----------------------|----------------------------------------|
| Inventory | PBI Gordon Corp. | Alternate 69 Highway<br>Crestline, KS 66728 |
| Inventory | Pueblo Chemical and Supply Co. | South Start Route 83<br>Garden City, KS 67846 |
| Inventory | Rubicon Chemical | 9156 Highway 75<br>Geismar, LA 70734 |
| Inventory | Stoney Creek | 3300 West Fourth Street<br>Trainer, PA 19061 |
| Inventory | Hartley Oil Co. | Rt. 68 South<br>Ravenswood, WV 26164 |
| Inventory | American Custom Drying | 109 Elbow Lane<br>Burlington, NJ 08016 |
| Inventory | Land View Inc. | 3245 N. 4500 E<br>Murtaugh, ID 83344 |
| Inventory | Platte Chemical Co. | 917 Platte Road<br>Greenville, MS 38764 |
| Inventory | Sonneborn Corporation | 100 Sonneborn Lane<br>Petrolia, PA 16050 |
| Inventory | Plastic Diversity Solution LLC | 349 Lake Road<br>Dayville, CT 06241 |
| Inventory | Fas Pack | 411 Fairfield Ave<br>Michigan City, IN 46360 |
| Inventory | AR Packing | W22 N 744 Cheaney Road<br>Wankesha, WI 531016 |
| Inventory | Weylchem | 3750 Clanton Road<br>Augusta, GA 30906 |
| Inventory | Essential Industrials | 28391 Essential Road<br>Merton, WI 53056 |
| Inventory | Reddick Fumigants | 3002 West Main Street<br>Williamston, NC 27892 |
| Inventory | Manufacturing Chemical Inc. | 17 Callahan Road<br>Dalton, GA 30721 |
| Inventory | Hendrix & Dall | 900 W. Golden Road<br>Tifton, GA 31792 |
| Inventory | Spartech Polycom, Inc. | 1141 108th Street<br>Arlington, TX 76011 |
| Inventory | Midwest Customer Services | 1802 Danner Winter Street<br>Fort Wayne, IN 46803 |
| Inventory | Padanaplast | 1395 Danner Drive<br>Aurora, OH 44202 |
| Inventory | Caroline Palleting | 1694 Fisher Court<br>Newton, NC 28658 |
| Inventory | Fractal Mechanics | 869 West Avenue<br>Rochester, NY 14611 |
| Inventory | Spartec | 1121 108th Street<br>Arlington, TX 76011 |

K&E 14293823.

## Exhibit G

**Debtors' Property**

13954417

**Debtors' Property**

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses as of March 16, 2009.

<u>Owned Real Property</u>

| Address | City | State | Country | Code |
|---|---|---|---|---|
| Bay Minette Plant<br>43300 Highway 225 | Bay Minette | AL | USA | 36507 |
| El Dorado Plant (GLCC)<br>2226 Haynesville Highway (Central)<br>324 Southfield Cutoff (South) | El Dorado | AR | USA | 71730 |
| El Dorado Plant (GLCC)<br>5821 Shuler Road (West) | Magnolia | AR | USA | 71753 |
| McFarland<br>13074 Zachary Ave | McFarland | CA | USA | 93250 |
| Conyers Plant<br>1700 Old Covington Highway | Conyers | GA | USA | 30012 |
| Mapleton Metal Organics Plant<br>8220 W. Route 24 | Mapleton | IL | USA | 61547 |
| Ashley Plant<br>601 Thomson Drive (Warehouse)<br>101 S Parker Drive (Manuf.) | Ashley | IN | USA | 46705 |
| West Lafayette Office (GLCC)<br>1801 U.S. Highway 52 West | West Lafayette | IN | USA | 47906 |
| Lake Charles Plant<br>910 Interstate 10 West<br>P.O. Box 520 | West Lake | LA | USA | 70669 |
| Taft Plant<br>Highway 3142 | Taft | LA | USA | 70057 |
| Adrian Plant<br>1400 East Michigan | Adrian | MI | USA | 49221 |
| Naugatuck Office/Lab<br>12 Spencer Street | Naugatuck | CT | USA | |
| Gastonia Plant<br>214 W. Ruby Avenue | Gastonia | NC | USA | 28054 |

| Address | City | State | Country | Code |
|---|---|---|---|---|
| Perth Amboy Plant<br>1000 Convery Boulevard | Perth Amboy | NJ | USA | 08862-1932 |
| Hatco - Fords Plant<br>1020 King George Post Road | Fords | NJ | USA | 08863 |
| Anderol  Plant<br>215 Merry Lane | E. Hanover | NJ | USA | 07936 |
| Morgantown North Plant, 1000<br>1000 Morgantown Industrial Park | Morgantown | WV | USA | 26501 |

Leased Real Property

| Address | City | State | Country | Zip Code |
|---|---|---|---|---|
| 206 Southwest 8th Street | Bentonville | AZ | USA | 72712 |
| 104 North Washington | El Dorado | AZ | USA | 71730 |
| 5555 North 51st Avenue<br>Suite 101 | Glendale | AZ | USA | 85301 |
| Jacobsen<br>4701 West Jefferson Street | Phoenix | AZ | USA | 85043 |
| 2595 E Perrin Street | Fresno | CA | USA | 93720 |
| American Warehouse<br>3150 S. Willow Avenue | Fresno | CA | USA | 93725 |
| Ventura Transfer Co.<br>5724 Bandini Blvd | Long Beach | CA | USA | 90810 |
| 4051 Santa Ana Street | Ontario | CA | USA | 91761 |
| 199 Benson Road | Middlebury | CT | USA | 06762 |
| 300 Center Point Blvd | New Castle | DE | USA | 19720 |
| Averitt<br>11125 Palmbay Drive | Orlando | FL | USA | 32824 |
| Gray Distr. Service<br>1315 Industry Avenue | Albany | GA | USA | 31706 |
| 1350 Lester Rd | Conyers | GA | USA | 30012 |
| 1601 Rockdale Industrial Blvd | Conyers | GA | USA | 30012 |
| 1715 Dogwood Drive | Conyers | GA | USA | 30012 |

2

| | | | | |
|---|---|---|---|---|
| 14108 Lochridge Blvd. | Covington | GA | USA | 30014 |
| 1725 N Brown Road | Lawrenceville | GA | USA | 30043 |
| 1735 N Brown Rd | Lawrenceville | GA | USA | 30043 |
| 425 Buford Hwy<br>Suite 103 | Suwanee | GA | USA | 30024 |
| 560 Old Peachtree Pkwy | Suwanee | GA | USA | 30024 |
| Chicagoland<br>7715 South 78th Ave. | Bridgeview | IL | USA | 60455 |
| Broadway Warehouse<br>7750 Industrial Drive | Forest Park | IL | USA | 60130 |
| 2320 Lakecrest Drive | Pekin | IL | USA | 61554 |
| Afton Chamical Corp.<br>01 Monsanto Ave. | Sauget | IL | USA | 62201 |
| 9025 N River Rd Suite 400 | Indianapolis | IN | USA | 46240 |
| MidAmerica Warehouse<br>1380 Perry Road | Plainfield | IN | USA | 46168 |
| Dixie Warehouse & Cartage Co.<br>6406 Grade Lane | Louisville | KY | USA | 40213 |
| Kinder Morgan<br>3540 River Road | Harvey | LA | USA | 70058 |
| Track No. 105-5, | Lake Charles | LA | USA | 40601 |
| 910 Interstate 10 W | Westlake | LA | USA | 40669 |
| Great Lakes<br>4530 Annapolis Road | Baltimore | MD | USA | 21227 |
| 1400 East Michigan Street | Adrian | MI | USA | 46221 |
| G.R. Daniels Warehouse, LLC<br>19258 Turner Ave. | Hutchinson | MN | USA | 55350 |
| Foam Supplies Inc.<br>4387 Rider Trail N | Earth City | MO | USA | 63045 |
| Cascio Storage & Whse Inc.<br>1795 North Theobald Ext. | Greenville | MS | USA | 38701 |

3

| | | | | |
|---|---|---|---|---|
| Carolina DC<br>2002 Oaks Parkway | Belmont | NC | USA | 28012 |
| Carolina Warehouse<br>2002 Oaks Parkway | Belmont | NC | USA | 28012 |
| Baxter-Harris<br>2000 & 2002 Oaks Parkway | Belmont | NC | USA | 28012 |
| American Warehousing<br>106 U.S. HWY 117 Bypass | Goldsboro | NC | USA | 27530 |
| Dana Corporation<br>210 East Essex Ave | Avenal | NJ | USA | 07001 |
| Transflow<br>454 York Street | Elizabeth | NJ | USA | 07201 |
| 771 Old Saw Mill River Road | Tarrytown | NY | USA | 10591 |
| Terminal Warehouse<br>1779 Marvo Dr. | Akron | OH | USA | 44306 |
| Freeport Terminal<br>700 Roadside Drive | Freeport | PA | USA | 16229 |
| Le Saint Warehouse<br>900 Sathers Avenue | Pittston | PA | USA | 18640 |
| Northeast DC<br>900 Sathers Avenue | Pittston | PA | USA | 18640 |
| 1235B South Loop 4 | Buda | TX | USA | 78610 |
| UTI<br>3450 Roy Orr Blvd. | Grand Prairie | TX | USA | 75050 |
| American Warehouse<br>1918 Collingsworth Road | Houston | TX | USA | 77009 |
| AWI - Houston<br>1918 Collingsworth Road | Houston | TX | USA | 77009-4398 |
| Robertson Whse<br>4206 Locust Drive | Lubbock | TX | USA | 79404 |
| Inland Empire Distribution Co.<br>1211 East St. Helens | Pasco | WA | USA | 99301 |

| | | | | |
|---|---|---|---|---|
| Prairie Industries<br>800 N State Street | Prairie du Chien | WI | USA | 53821 |

K&E 14293835.

## Exhibit H

**Location of Debtors' Assets, Books and Records**

**Location of Debtors' Assets, Books, and Records**

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

The Debtors' books and records are primarily located at 199 Benson Road, Middlebury, Connecticut 06749.

In addition the Debtors have assets in every location in which they operate their business, including, the locations listed on <u>Exhibit G</u>, attached hereto, which is incorporated herein by this reference.

## Exhibit I

## Litigation

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding Schedules to be filed by the Debtors in these chapter 11 cases.

| No. | Matter Name | Jurisdiction | Type | Status |
|---|---|---|---|---|
| 1. | Green, Wade vs. Bio-Lab, Inc. | Alabama | Product Liability | Pending |
| 2. | Stetler vs. Pentair Pool Products, Inc. | California | Product Liability | Pending |
| 3. | Tricor Refining, LLC v Crompton | California | Environmental | Pending |
| 4. | Herrera, Francisco v. Citrus and Allied Essences, Ltd. | California | Product Liability | Pending |
| 5. | Irma Rosa Ortiz vs. Flavor and Extract Manufacturers Association of the United State | California | Product Liability | Pending |
| 6. | Loring, James A. vs. Chemtura Corporation | Connecticut | Employment | Pending |
| 7. | Batteese, Norma L. vs. Flavor of North America, Inc. | Illinois | Product Liability | Pending |
| 8. | Campbell, Charles v. International Flavors & Fragrances, Inc | Illinois | Product Liability | Pending |
| 9. | Michael Robinson vs. Bell Flavors & Fragrances, Inc. (US) | Illinois | Product Liability | Pending |
| 10. | Solis, Gerardo vs. The Flavor & Extract Manufacturers Association of the United States | Illinois | Product Liability | Pending |
| 11. | Williams, Phoebe vs. BASF Corporation | Illinois | Product Liability | Pending |
| 12. | Karen Smith vs. Berje Incorporated (US) | Kentucky | Product Liability | Pending |
| 13. | Albemarle Corp. v. Chemtura (Albemarle II) Invest. of Albemarle US2001/0047118 | Louisiana | Intellectual Property | Pending |
| 14. | Albemarle v. GLCC (IP) (Albemarle I) | Louisiana | Intellectual Property | Pending |
| 15. | Karen S. Geile vs. Berje Inc. | Missouri | Product Liability | Pending |
| 16. | Fults, Elizabeth et al. vs. International Flavors & Fragrances, Inc. et al | Missouri | Product Liability | Pending |
| 17. | Gustafson/Bayer Indemn Claim | New York | Commercial | Pending |
| 18. | Quala Systems v. Chemtura | North Carolina | Environmental | Pending |
| 19. | Bernice Walker vs. Givaudan Flavors Corp. (US) | Ohio | Product Liability | Pending |
| 20. | Cooper vs. Citrus and Allied (Canada) | Ohio | Product Liability | Pending |

| 21. | Emmett D. Cooper vs. Citrus and Allied (US) | Ohio | Product Liability | Pending |
|---|---|---|---|---|
| 22. | Mark L Millar vs. Cargill Flavor Systems US LLC formerly Degussa Flavors & Fruit Systems US, LLC and formerly Alex Fries, Inc. and also formerly Alfebro, Inc | Ohio | Product Liability | Pending |
| 23. | Ronald H. Feldkamp vs. Cargill Flavor Systems US, LLC (US) | Ohio | Product Liability | Pending |
| 24. | Kovaly, John E. v Uniroyal | Ohio | Product Liability | Pending |
| 25. | Spartech Polycom vs. Chemtura Corporation | Texas | Commercial | Pending |
| 26. | Richard Smead vs. DSM Food Specialties USA, Inc. (US) | Wisconsin | Product Liability | Pending |
| 27. | Canadian Lindane NAFTA | N/A | Commercial | Pending |

2

**<u>Exhibit J</u>**

**Senior Management**

**Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Prior Experience |
|------|-------|--------|------------------|
| Craig A. Rogerson | President, Chairman and Chief Executive Officer | Since December 2008 | Mr. Rogerson previously served as President, CEO and director of Hercules, Incorporated from December 2003 until its acquisition by Ashland, Incorporated on November 13, 2008. |
| Stephen C. Forsyth | Executive Vice President and Chief Financial Officer | Since April 2007 | Mr. Forsyth previously served as Treasurer for Chemtura from June 2007 to November 2008.  Mr. Forsyth previously served for 26 years with Hexcel Corporation in a variety of executive capacities, most recently as Executive Vice President and Chief Financial Officer. |
| Robert S. Wedinger, PhD | Executive Vice President, Strategic Initiatives | Since January 2009 | Dr. Wedinger previously served as Chief Business Officer for Chemtura from December 2007 to December 2008 and Group President of Performance Specialties from April 2007 to December 2008. Dr. Wedinger joined Chemtura in 2006 as Vice President and General Manager of Process Chemicals and Polymers. Previously, Dr. Wedinger served in a variety of executive capacities at J.M. Huber Corporation, most recently as Vice President and General Manager of Performance Materials. |
| David G. Dickey | Executive Vice President and Group President of Performance Products | Since January 2009 | Mr. Dickey previously served as Chief Functional and Services Officer for Chemtura from December 2007 to December 2008. Mr. Dickey joined Chemtura in March 2006 |

| Name | Title | Tenure | Prior Experience |
|------|-------|--------|------------------|
| | | | as Vice President, Global Supply Chain, Non-Manufacturing. Previously, Mr. Dickey served as General Manager for Carrier, a division of United Technologies Corporation. |
| Billie S. Flaherty | Senior Vice President, General Counsel and Corporate Secretary | Since January 2009 | Ms. Flaherty previously served as Associate General Counsel for Chemtura, having joined the Company in October 2005.  Previously Ms. Flaherty served as Vice President, Environmental, Health and Safety for Pitney Bowes, Inc. |
| Kevin V. Mahoney | Senior Vice President and Corporate Controller | Since October 2006 | Mr. Mahoney previously spent 18 years with American Express Company, where he most recently was Senior Vice President of Corporate Reporting. |
| Alan Swiech | Senior Vice President, Human Resources | Since January 2009 | Mr. Swiech previously served as Vice President of Administration for Akebono Corporation NA, and President of AMAK, LLC. |

K&E 14293851.

## **Exhibit K**

**Payroll**

13954417

**Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | Approximately $14.5 million for 30 days. |
| **Payments to Officers, Directors and Stockholders** | **Officers**: Approximately $0.24 million for 30 days<br><br>**Directors**: Approximately $59,580 for 30 days<br><br>**Stockholders**: N/A |
| **Payments to Advisors** | Approximately $0.4 million for 30 days to be paid in accordance with applicable first day motions. |

**<u>Exhibit L</u>**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables.**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the commencement of these chapter 11 cases, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $115 million |
| **Cash Disbursements** | $171 million |
| **Net Cash Gain** | $(56) million |
| **Unpaid Obligations** | $50 million |
| **Unpaid Receivables** | $215 million |

## <u>Exhibit M</u>

**Description of Relief
Sought in the Debtors' First Day Pleadings**

# THE DEBTORS' FIRST DAY PLEADINGS[1]

## Financing Motions

**A.**   **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Post-Petition Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 105(A), 362, 364(C)(1), 364(C)(2), 364(C)(3) and 364(D), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Authorizing the Debtors' Use of Proceeds to Repurchase a Receivables Portfolio, (IV) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)**

1.      The Debtors have negotiated and reached an agreement to enter into, subject to approval of the Court, a $400,000,000 Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the "DIP Loan Agreement," and the postpetition financing made available thereby, the "DIP Facility").  The DIP Loan Agreement, dated as of March 18, 2009, is by and among Chemtura Corp., as borrower, the other Debtors as guarantors, Citibank, N.A., as initial issuing bank and administrative agent (the "DIP Agent"), and the lenders named therein (the "DIP Lenders").  The Debtors are also seeking authorization to use cash collateral, which together with the DIP Facility will be used to, among other things, support the working capital and general corporate purposes of the Debtors.

2.      The Debtors, with the assistance of Lazard Frères & Company LLC ("Lazard") as their financial advisor and investment banker, analyzed their cash needs in an effort to determine what is necessary to maintain their operations in chapter 11 and work towards a successful reorganization.   The Debtors also conferred with individuals in their operational and management teams to understand key business metrics in both the near and long term.  As part of

---

[1]    As noted in the Declaration, capitalized terms in this Exhibit used but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Pleadings.

the Debtors' recent financial analysis and projections, the Debtors developed a 13-weeek cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. This forecast considers a number of factors, including, among others, the impact of a bankruptcy filing (including tightening trade credit terms), material cash disbursements, required vendor payments, cash flows from the Debtors' various business segments (some of which are seasonal and are just beginning) and the cost of raw materials.

3.      The Debtors explored potential sources for immediate liquidity, including debtor-in-possession financing. Beginning in mid-February, Lazard approached several potential lenders, including the Debtors' prepetition lenders, regarding the possible extension of financing to the Debtors. During the last week of February, four parties signed confidentiality agreements and conducted diligence. The Debtors ultimately received preliminary indications regarding pricing and terms for postpetition financing from five different sources. In early March 2009, the Debtors executed two non-binding proposal letters and expense reimbursement agreements. Thereafter, the Debtors engaged in intense discussions and negotiations with both parties, including diligence initiatives and the negotiation of definitive financing terms and conditions.

4.      After exploring all options and driving both negotiations to their respective limits, I believe that the proposal from the Prepetition Agent represents the best and most favorable financing under the circumstances. Although the DIP Loan Agreement includes certain extraordinary provisions, including a partial roll-up of the prepetition secured indebtedness, the pricing under the DIP Facility proved to be far superior to that of any other proposal.

5.      In accordance with the terms and conditions of the DIP Loan Agreement, the DIP Lenders have agreed to extend the DIP Facility in an aggregate amount of $400 million. Specifically, upon entry of the Interim Order, the DIP Lenders will provide the Debtors with a

2

revolving credit commitment of $25 million and a term loan commitment of $165 million, which will be used to (a) refinance the Receivables Portfolio under the Existing Receivables Facility, (b) pay costs and expenses in connection with such refinance and these chapter 11 cases and (c) provide financing for working capital, letters of credit, capital expenditures and other general corporate purposes of the Debtors.

6.      Additionally, upon the entry of the a final order by the Court, the terms of the DIP Loan Agreement provide for (a) the outstanding amount of the advances under the $25 million revolving credit facility committed under the Interim Order to be included in a committed term facility, of up to an aggregate amount of $250 million, (b) a commitment of a revolving facility in the aggregate amount of $63.5 million and (c) the commitment of a roll-up revolving facility in the aggregate amount of $86.5 million.

7.      The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinge upon obtaining immediate access to financing. Absent an immediate infusion of capital or access to financing, the Debtors simply cannot operate their businesses. At this time, I believe that the Debtors' liquidity needs can be satisfied only if the Debtors are authorized to borrow up to a total of $190 million under the proposed DIP Loan Agreement on an interim basis, and use such proceeds to fund their operations. Approval of the DIP Loan Agreement will allow the Debtors to remain operational, including paying their current and ongoing operating expenses (*e.g.*, postpetition wages, salaries, and utility and vendor costs).

8.      I believe that the decision to enter into the DIP Loan Agreement is the culmination of an intense, month-long process targeted at procuring the best available financing under the circumstances. The Debtors weighed initial proposals from no less than five lenders and ultimately proceeded with involved negotiations with two potential lenders. Ultimately, the

3

Debtors' decision to enter into the DIP Facility was no decision at all – there simply was no other available alternative.

9.      Ultimately, I believe that, in light of the fact that no other financing option is available, paying down a portion (or even all) of the prepetition secured indebtedness will have little adverse affect on the Debtors' unsecured creditors and will provide the Debtors with the only opportunity available to continue their business operations.  As reflected in the budget attached to the DIP Loan Agreement, I believe that after payment of the portion of the prepetition secured indebtedness, the DIP Facility will provide them with sufficient liquidity for working capital and general corporate purposes and fund operations as a going concern. Moreover, I do not believe that payment of a portion of the prepetition secured indebtedness will unduly restrict the Debtors' restructuring options moving forward in these chapter 11 cases

**B.      Debtors' Motion for Order, Pursuant to Section 364(B) of the Bankruptcy Code, Authorizing Chemtura Corporation to Enter Into Guarantee with Intesa MedioFactoring SpA With Respect to Certain Obligations of the Debtors' Non-Debtor Affiliates**

10.     As discussed previously, the Company is a broad multinational organization including numerous affiliates, subsidiaries and joint ventures that are not Debtors in these chapter 11 cases.  Certain of the Company's European subsidiaries (collectively, the "European Accounts Receivable Subsidiaries")[2] participate in a program to sell certain of their eligible accounts receivable (the "European Accounts Receivable Facility").  The European Accounts Receivable Facility is evidenced by several factoring agreements entered into agreements, by and among the European Accounts Receivable Subsidiaries and Intesa Mediofactoring SpA

---

[2]    The European Subsidiaries that will continue to participate in the facility are the following non-Debtor entities: (a) Chemtura Sales (UK) Ltd; (b) Chemtura Sales Italy Srl; (c) Chemtura Sales France SA; and (d) Chemtura Sales Germany Gmbh.

4

("Mediofactoring") (as amended from time to time, the "European Accounts Receivable Agreement").

11.    Pursuant to the European Accounts Receivable Facility, the European Accounts Receivable Subsidiaries sell their accounts receivable to Mediofactoring in exchange for an amount equal to the face value of the receivables (or the amount that would actually be owed under the receivables after deducting certain identified discounts), with interest to the extent the amount for the purchase of receivables is paid before such receivable is actually collected. The facility permits the European Accounts Receivable Subsidiaries to receive advance payment on receivables that have been validly sold to Mediofactoring, although such receivables have not yet been collected.

12.    Traditionally, the European Accounts Receivable Subsidiaries' sale of accounts receivable through the European Accounts Receivable Facility provided sufficient liquidity to fund their operational needs. However, the deepening recession and the commensurate decline in the Company's financial performance during the fourth quarter of 2008 significantly constrained the ability of the European Accounts Receivable Subsidiaries to access liquidity under the European Accounts Receivable Facility because the Company's declining financial performance led Mediofactoring to impose restrictions in the European Accounts Receivable Subsidiaries' ability to sell accounts receivable under the European Accounts Receivable Facility. As of December 31, 2008, these restrictions resulted in a net decline in the value of receivables sold under the European Accounts Receivable Facility to $67 million, as compared to $177 million as of September 30, 2008. As of March 13, 2009, the amount available under the Euro Accounts Receivable Facility had further declined to approximately $19.5 million. These

reductions have severely constrained the liquidity available to the Debtors' European subsidiaries.

13.     In order to address Mediofactoring's concerns, and in an effort to remove the restrictions under the European Accounts Receivable Facility, Chemtura Corp. and the European Accounts Receivable Subsidiaries entered into arms' length negotiations with Mediofactoring beginning in late 2008 and continuing well into March 2009, all with a goal to amend the terms of the European Accounts Receivable Facility.

14.     In late February 2009, after extensive negotiations, Mediofactoring proposed to restore the European Accounts Receivable Facility, subject to the satisfaction of certain adjustments.  First, the maximum value of accounts receivable available to be sold under the European Accounts Receivable Facility was reduced from €175 million (approximately $227 million) to €70 million (approximately $91 million).  Additionally, as a condition to amending the European Accounts Receivable Facility, Chemtura Corp. was required to provide an updated "patronage letter" (the patronage letter currently in place which generally requires Chemtura Corp. to guarantee the obligations of the European Accounts Receivable Subsidiaries under the European Accounts Receivable Agreement).

15.     Pursuant to the Prepetition Accounts Receivable Facility Guarantee, Chemtura Corp. is obligated to, among other things, reimburse Mediofactoring up to a total of €70 million on written demand, for any and all amounts due and owing by the European Accounts Receivable Subsidiaries under the terms of the European Accounts Receivable Agreement (collectively, the "Guaranteed Obligations").

16.     Although the theoretical amount of Guaranteed Obligations is capped at €70 million, the realistic exposure of Chemtura Corp. is vastly smaller.  The Guaranteed Obligations

6

include the repurchase of receivables under limited circumstances and the payment of interest and fees due to Mediofactoring for factoring transactions. Ultimately, because of the narrow instances in which Chemtura Corp. could be called upon to perform the obligations of the European Accounts Receivable Subsidiaries. and because Chemtura Corp.'s actual expense under similar patronage arrangements has been limited, I believe that the risk to Chemtura Corp. and the Debtors under the patronage arrangement is limited.

17.    Notwithstanding the agreement to execute of the Prepetition Accounts Receivable Facility Guarantee, liquidity under the European Accounts Receivable Facility remains constrained because Mediofactoring remains concerned as to the ability of Chemtura Corp. to perform the Guaranteed Obligations due to its financial circumstances. As a result, the board of directors of Mediofactoring has not yet approved the recommencement of purchases of accounts receivable under the proposed revised terms with the European Accounts Receivable Agreement, leaving the European Accounts Receivable Subsidiaries with constrained liquidity. Mediofactoring has indicated, however, that it will seek approval of the patronage letter by its board as soon as practicable after entry of the interim order by this Court.

18.    The success of the Debtors' restructuring efforts is closely tied to the fate of the European Accounts Receivable Subsidiaries and other subsidiaries outside the U.S. Accordingly, maintaining the Company's highly-integrated manufacturing and marketing system, including businesses maintained by entities that are not Debtors in these chapter 11 cases, is vital to the value of Debtors' assets, and the ability of the Debtors to complete a reorganization. Preservation of the operations and value of these subsidiaries is in the interests of all stakeholders in these chapter 11 cases. Additionally, the DIP Facility described above does not make funds generally available to the Debtors' non-Debtor affiliates and subsidiaries,

7

including the European Accounts Receivable Subsidiaries.[3]   Thus, the liquidity provided by the

European Accounts Receivable Facility is critical to the Company's overall liquidity needs.

Finally, I believe that the risk to Chemtura Corp. in guaranteeing the obligations of the Euro

Accounts Receivable Subsidiaries under the Euro Accounts Receivable Facility is far

outweighed by the benefits to the Debtors.

C.    **Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Continue
      Their Existing Cash Management System, Bank Accounts and Business Forms,
      (B) Granting Postpetition Intercompany Claims Administrative Expense Priority,
      and (C) Authorizing Continued Intercompany Arrangements**

19.    The Company maintains an integrated cash management system that provides

well-established mechanisms for the collection, concentration, management, disbursement and

investment of funds used in their operations (the "Cash Management System").   Disbursements

to third parties are usually made through one of four methods:   (a) a traditional written check;

(b) wire transfers from the Debtors' accounts; (c) automatic clearing house payments ("ACH

Payments");[4] or (d) reverse ACH debits.   Due to their convenient nature, I believe that it is

preferable for the Debtors to make many of their disbursements by wire transfer or ACH, as

opposed to by written check.   In addition, a portion of the Debtors' customer receipts are

received through wire transfers.   I believe that the Debtors' inability to perform transactions by

debit, wire or ACH Payments or other similar methods would interfere with the Debtors'

---

[3]   The DIP Facility does, however, permit the Debtors to provide intercompany loans to their non-Debtor foreign
      subsidiaries in an aggregate maximum amount of $7.5 million.

[4]   ACH Payments are electronic funds transfers through a system run by a third-party administrator, the National
      Automated Clearing House Association and are generally used as a substitute for checks and to make electronic
      payments of a repetitive nature at a reduced cost as compared to wire transfers.

performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors.

20.     Whereas historically the Debtors have operated using one integrated Cash Management System for all of their world-wide operations, in preparation for filing these chapter 11 cases, the Debtors have created a distinction between bank accounts and intercompany transfers within the United States (the "U.S. Cash Management System") and bank accounts and intercompany transfers outside the United States (the "International Cash Management System"). Before the Petition Date, funds from the International Cash Management System would be swept into the U.S. Cash Management System on a daily basis.  The Debtors would then fund cash back into to the International Cash Management System as needed to fund certain expenses and disbursements for the Debtors' foreign non-Debtor affiliates (the "Foreign Subsidiaries").   In connection with the commencement of these chapter 11 cases, the Debtors (i) have instructed the applicable banks to terminate the daily cash sweeps between the International Cash Management System and the U.S. Cash Management System and (ii) except as permitted under the DIP Facility, will cease the practice of  lending  funds into the International Cash Management System to fund the Foreign Subsidiaries' operations.

21.     The U.S. Cash Management System currently consists of 25 bank accounts in the United States (collectively, the "U.S. Bank Accounts") and is used to receive incoming payments (by transfer or by check) and to make disbursements in the ordinary course of the Debtors' business.  The Bank Accounts are maintained at eight separate banks: (a) Citibank, N.A. ("Citi"); (b) J.P. Morgan Chase, N.A. ("Chase"); (c) The Royal Bank of Scotland ("RBS"); (d) Fifth Third Bank ("Fifth Third"); (e) Wachovia Corporation, N.A. ("Wachovia"); (f) Bancorp South ("Bancorp"); (g) Bank of America ("BOA"); and (h) Regions Bank ("Regions" and, together

with Citi, Chase, RBS, Fifth Third, Wachovia and Bancorp, the "Banks").    Additionally,

Crompton Financial Holdings (a non-Debtor subsidiary of Chemtura) maintains an account at

Citi in Ireland (the "Irish Account") that serves as the concentration account for more than 100

additional bank accounts maintained by the Foreign Subsidiaries as part of the International Cash

Management System (the "Foreign Subsidiary Accounts").[5]

22.    The Cash Management System is managed primarily by the Debtors' financial

personnel at their corporate headquarters in Middlebury, Connecticut.    Use of the integrated

Cash Management System enables the Debtors to: (a) forecast and report the Debtors' cash

positions; (b) monitor collection and disbursement of funds; and (c) maintain control over the

administration of the various bank accounts, which control is required to effect collection,

disbursement and movement of cash at the Debtors' and the Foreign Subsidiaries' manufacturing

facilities and business offices throughout the United States, Australia, Canada, Latin America

and Europe.

23.    The Debtors have used a sophisticated, integrated cash management system for

more than ten years, and the Cash Management System has evolved over time into a mainstay of

the Company's ordinary, usual and essential business practices.    The Debtors refine the system

from time to time.    For example, in the second quarter of 2008, the Debtors consolidated their

U.S. Cash Management System significantly by reducing the number of accounts from more

than 75 to only 25.    In addition, the Debtors are in the process of closing additional accounts and

further consolidating the U.S. Cash Management System.

---

[5]    Partly due to the commencement of these chapter 11 cases, the Foreign Subsidiaries are currently in the process
of  implementing a more streamlined cash management system.  As a result, I anticipate that a number of the
Foreign Subsidiary Accounts will be closed in the near term.

24.     The account at Regions is a petty cash account, which typically holds less than $5,000 and the account at Bancorp typically holds less than $300,000 and disburses any such amounts on deposit within one business day of receipt. Accordingly, these accounts do not represent bank accounts with significant deposits within the Debtors' Cash Management System.

25.     The principal components of the U.S. Cash Management System and the flow of funds among the various U.S. Bank Accounts are described below.

**(i)     Concentration Account**

26.     The centerpiece of the U.S. Cash Management System consists of a concentration account maintained at Citi by Chemtura Corp.   On March 13, 2009, in anticipation of commencing these chapter 11 cases, Chemtura Corp. opened a new concentration account at Citi (the "Citi Concentration Account").   On the Petition Date, Chemtura Corp. activated the Citi Concentration Account and closed off the links from its old concentration account.   The Citi Concentration Account receives funds from the following bank accounts in the following manner:

> a.     daily sweeps from the Documentary Collections account maintained by Chemtura Corp. at RBS (the "Documentary Collections Account"), which is used to collect payments made by drafts and letters of credit from the Debtors' export customers;
>
> b.     daily deposits from the Lockbox account maintained by Chemtura Corp. at Citi (the "Lockbox Account") and other operating accounts described below, which are used to collect check and other payments received by the Debtors; and
>
> c.     manual movement of funds from the ACH/Fed Wire Receipts account maintained by non-Debtor, Chemtura Receivables LLC, at Citi (the "ACH/Fed Account"), which is used to collect wire transfer payments from the Debtors' customers.

27.     Funds from the Citi Concentration Account are disbursed to the following six Bank Accounts, which are described in more detail below:

a.      the disbursement accounts maintained by Chemtura Corp. at Citi (collectively, the "Main Disbursement Account");[6]

b.      the two disbursement accounts maintained by Great Lakes Chemical Corporation at Bancorp (together, the "GLCC Account");

c.      the operating account maintained by Chemtura at Fifth Third (the "Fifth Third Operating Account");

d.      the operating account maintained by BioLab Company Store, LLC at Wachovia (the "Company Store Account"); and

e.      the operating account maintained by BioLab Franchise Company, LLC at Wachovia (the "Franchise Account").[7]

**(ii)     Operating Accounts**

28.      In addition to the Citi Concentration Account, the Debtors have the following three additional operating accounts.  The Debtors manually fund cash into each of these accounts upon request by the applicable business division:

a.      the Franchise Account, which is primarily used to pay rent, payroll and advertising fees associated with the Debtors' BioLab Franchise business;

b.      the Company Store Account, which is primarily used to collect sales receipts and pay expenses necessary to operate the Debtors' BioLab Company Store located in Suwanee, Georgia (the "Company Store"); and

c.      the Fifth Third Operating Account, which is primarily used to receive payments from customers of the Debtors' GLCC Laurel, LLC business.

---

[6]   Currently, the Main Disbursement Account comprises seven separate accounts at Citi.  However, the Debtors are in the process of closing six of these seven accounts and allowing the final checks to clear.  As a result, I anticipate that shortly Account No. XXXX5094 will be the only account remaining.

[7]   The Debtors are in the process of closing the GLCC Account, the Company Store Account, the Fifth Third Operating Account and the Franchise Account and anticipate that such accounts will be closed within one to two months of the Petition Date.

(iii)    **Disbursement Accounts**

29.    The Debtors maintain the following disbursement accounts:[8]

      a.    the Main Disbursement Account, which is funded automatically from the Citi Concentration Account, is used to make the majority of the Debtors' disbursements by check, wire transfer and ACH Payments;

      b.    a checking account maintained by Chemtura Corp. at BOA, which is only funded by management contributions to Chemtura Corp.'s Political Action Committee and currently has a zero balance; and

      c.    the GLCC Account, which is manually funded from the Citi Concentration Account, is used primarily to pay royalties, rents and revenue distributions in connection with the Debtors' mineral leases in Arkansas.

(iv)    **Petty Cash Accounts**

30.    The Debtors maintain the following two petty cash accounts, which each carry balances of less than $5,000:

      a.    the petty cash account maintained by the BioLab Company Store LLC at Wachovia, which is funded by the Company Store Account and is used for small purchases in the connection with the operation of the Company Store; and

      b.    the petty cash account maintained by Great Lakes Chemical Corporation at Regions, which is only maintained to provide employees at the Debtors' El Dorado, Arkansas facility with a place to cash their paychecks.

(v)    **Stand-Alone Accounts**

31.    In addition to the Bank Accounts described above, the Debtors maintain three stand-alone demand deposit accounts, two at Citi and one at Chase, (collectively, the "Stand-Alone Accounts").  While the Stand Alone Accounts generally are not used at this time for the

---

[8]    The Debtors are in the process of closing the disbursement account maintained by GLCC Laurel, LLC at Fifth Third, which is funded from the Fifth Third Operating Account.  Accordingly, that account is not described in detail herein.

flow of funds and carry a balance of $0, I anticipate that the Debtors may use these accounts in the future to facilitate the efficient administration of certain tax and insurance obligations.

### (vi)   The Debtors' Existing Business Forms and Checks

32.     In the ordinary course of their business, the Debtors use checks and a variety of correspondence and business forms, including, but not limited to, letterhead, purchase orders and invoices.  The Debtors keep a large quantity of the appropriate business forms on hand at each of their offices and facilities.  The Debtors have prepared communications materials to distribute to the various parties with whom they conduct business, which will, among other things, inform such parties of the commencement of these chapter 11 cases.

33.     The Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them before the Petition Date, other than those authorized by this Court.  Procedures the Debtors have implemented and will implement include: (a) the opening of the Citi Concentration Account; (b) notification to banks that all pre-petition checks that should not be honored; (c) segregation of the Debtors' accounts payables into pre-petition and post-petition; (d) training of the Debtors' accounting staff on procedures for identifying and segregating pre-petition obligations; and (e) specific authorization procedures to issue a check for any pre-petition liabilities to assure that it is authorized by a specific Court Order.

34.     As soon as practicable after the Petition Date, the Debtors will include "debtor-in-possession" on the checks they print electronically.  Upon depletion of the Debtors' check stock and/or business forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their status as debtors in possession.

### (vii)   The Debtors' U.S. Intercompany Claims

35.     The Debtors, the Foreign Subsidiaries and certain U.S. non-Debtor entities maintain business relationships with each other, resulting in intercompany receivables and

14

payables in the ordinary course of business (the "Intercompany Claims"). Domestically, in connection with the daily operation of the U.S. Cash Management System (including transactions by Debtor and non-Debtor subsidiaries without their own bank accounts), as funds are disbursed throughout the U.S. Cash Management System, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor (the "Inter-Debtor Transactions"). More often than not, these Intercompany Transactions are settled by book entry rather than by an actual transfer of cash. The Debtors track all Debtor Intercompany Transactions electronically in their accounting system and can ascertain, trace and account for them as needed. If the Intercompany Transactions were to be discontinued, the U.S. Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

        **(viii)    The Debtors' International Intercompany Claims**

       36.    Historically, as described above, the Debtors would fund certain operations and pay certain expenses for their Foreign Subsidiaries by transferring funds to the Irish Account to be disbursed through the International Cash Management System and by accounting for such transactions as intercompany loans, dividends or investments, as appropriate. After the Petition Date, aside from certain transfers permitted under the DIP Facility, such as allocation of centralized costs and payment or prepayment for intercompany transfers of goods and services in the ordinary course of business, the Foreign Subsidiaries' will fund their own operations and expenses.

        **(ix)    Intercompany Arrangements**

       37.    In addition to the programs described above and the division between the U.S. Cash Management System and the International Cash Management System, which are designed to insulate the Foreign Subsidiaries as much as possible from the day-to-day impact of the Debtors' chapter 11 filing while still maintaining the solvency of these important assets of the

15

Debtors, I anticipate the need to continue to maintain the day-to-day operating relationships with the non-Debtor affiliates (as described below, and together with the programs set forth above, the "Intercompany Arrangements"), as follows:

a.  Intercompany Sales.  The Debtors and certain non-Debtor affiliates buy and sell products from and provide certain services to each other.  In certain instances, in the ordinary course of business, the Debtors purchase, and in some instances, pre-pay the cost of goods and services provided.  The amounts paid by the Debtors are based on arms'-length transfer pricing, with a portion of these amounts used to fund the non-Debtor affiliates' manufacturing and operational costs.

b.  Centrally-billed Expenses.  The Debtors incur centrally billed expenses, such as marketing, financial and management expenses.  These expenses are allocated among the Debtors and their non-Debtor affiliates based on usage.

c.  Intercompany Loans.  The Debtors and their non-Debtor affiliates make loans between and among each other to fund operations.  Except as permitted, the Debtors will not make any intercompany loans to non-Debtor affiliates.

d.  Royalties.  Royalties are charged either with reference to a percentage of sales to certain Debtors and non-Debtors for the use of technology and other intellectual property of the Debtors.

38.    The Intercompany Arrangements are made between and among the Debtors and certain of their non-Debtor affiliates in the ordinary course of the Debtors' businesses.  Before the Petition Date, the obligations related to the Intercompany Arrangements were satisfied through a netting process, which involved the offset of claims owed by the parties as opposed to actual transfers of funds.  After the Petition Date, I anticipate that the Debtors will settle postpetition obligations related to Intercompany Arrangements between Debtors and non-Debtor affiliates by transferring funds between the appropriate accounts in the U.S. Cash Management System and the International Cash Management System.  The Debtors maintain records of all

16

transfers and can ascertain, trace and account for all Intercompany Arrangements and will continue to do so during these chapter 11 cases.

39.    If the Intercompany Arrangements were discontinued, a number of services currently provided and currently maintained by the Debtors would be disrupted.  The Debtors have already modified certain intercompany functions to limit the degree and scope of certain transactions between debtors and non-Debtors.    Any further modifications would be counterproductive in that they would risk causing serious operational and business disruptions for the Debtors, their non-Debtor subsidiaries, or both.

<u>Operations Motions Pursuant to Rule 6003</u>

**D.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, But Not Directing, Debtors (I) to Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) to Pay and Honor Employee Medical and Other Benefits and (III) to Continue Employee Benefits Programs and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

**i.    Overview of the Debtors' Workforce and Employee Obligations**

40.    As of the Petition Date, Chemtura Corp. and its non-debtor and Debtor affiliates employ a total of approximately 4,700 employees, approximately 2,380 of which are employed by the Debtors on a full-time, salaried basis (the "Full-Time Employees") and 10 of which are employed by the Debtors on a part-time basis (the "Part-Time Employees").  The remaining employees are employed by the Company's affiliates and subsidiaries.

41.    I understand from associates at the Company responsible for human resources that approximately 275 of the Full-Time Employees are members of various unions, including (a) the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local Nos. 7-807, 1-08 and 397, (b) the Lake Charles Metal Trades Council, (c) the International Brotherhood of Teamsters Union Local No. 102; and (d) the International Union, United Automobile, Aerospace and Agricultural Workers of America,

17

Local 963 (the "Union Employees" and, together with the non-union, Full-Time Employees and the Part-Time Employees, the "Employees").[9]   In addition to their Employees, the Debtors supplement their workforce with temporary workers and independent contractors, some of which are retained through third party employers and agencies, depending on the Debtors' business needs (often on a seasonal basis).

42.     The Employees perform a variety of critical functions, including sales, customer service, manufacturing, research, accounting, finance, management and other tasks.   The Employees' skills and their knowledge and understanding of the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' businesses.

43.     Just as the Debtors depend on the Employees for their day-to-day operations, the Employees depend on the Debtors.   Indeed, the vast majority of the Debtors' Employees rely exclusively on payments received from the Debtors for their compensation, benefits and expense reimbursements to continue to pay their daily living expenses.   In addition, the Debtors pay and incur a number of obligations related to their Employees, such as federal and state withholding taxes and other withheld amounts (including wage garnishments, Employees' share of insurance premiums, taxes and 401(k) contributions), health benefits, retirement benefits, workers' compensation benefits, vacation time, life and accidental death and dismemberment insurance, short- and long-term disability coverage, various reimbursable expenses and other benefits that

---

[9]   Specifically, the vast majority of the Debtors' Employees are employed by Chemtura Corporation, Bio-Lab, Inc. and Great Lakes Chemical Corporation.

18

the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described herein, the "Employee Obligations").[10]

44.    I understand from my colleagues in the human resources department that, as of the Petition Date, certain prepetition amounts owed on account of the Employee Obligations remain outstanding due to a number of factors, including (a) discrepancies that exist between amounts paid prepetition and the amounts that should have been paid, (b) the possibility some prepetition checks may not have cleared before the Petition Date and (c) the fact that certain accrued obligations may not yet have become due and payable as of the Petition Date.

### ii.    Employee Compensation

### a.    Employee Payroll Obligations

45.    The Debtors pay the majority of their Employees on a bi-weekly basis, with certain Union Employees being paid on a weekly basis.  The Debtors' payroll obligations generally include base wages and salaries, overtime compensation and bonuses, as applicable (collectively, the "Employee Payroll Obligations").[11]  On average, the Debtors' gross payroll totals approximately $7.27 million every two weeks.

46.    The Debtors' payroll is administered by Ceridian Employer Services, a third party service provider, which debits the Debtors' concentration account and then funds pay checks,

---

[10]  The summary of the Debtors' various Employee Obligations included in this Declaration is intended as a summary only and is qualified entirely by the Debtors' official policies or other practices, programs or agreements, whether written or unwritten.

[11]  In addition to the Employee Payroll Obligations, the Debtors compensate members of their Board of Directors. While a component of director compensation was at one time paid in the form of restricted stock, the Debtors recently amended the compensation such that all compensation is now paid in the form of (a) quarterly cash payments in the total amount of $172,000 per year, and (b) cash compensation for serving as a committee chair, which varies by the individual committee leadership assignment.  As of the Petition Date, I do not believe any prepetition compensation amounts are outstanding to members of the Board of Directors.

direct deposits and various wages and attachments.[12]  Ceridian generally administers the

Debtors' payroll by depositing funds into Employees' bank accounts by electronic transfer or, in

more limited circumstances, by providing checks, and the Debtors' payroll for the period ending

March 20, 2009 has already been paid to Ceridian Employer Services and debited from the

Debtors' account.  Nonetheless, certain limited prepetition payroll amounts may remain unpaid

as of the Petition Date because, among other things, wire transfers may not have been completed

or various checks may not have cleared before the Petition Date or because certain Employees

may be owed payment in arrears for, for example, overtime work in the days preceding this

chapter 11 filing (the "Unpaid Employee Compensation").  I understand from my colleagues in

the human resources department that approximately $1.5 million in Unpaid Employee

Compensation is outstanding as of the Petition Date.  I also understand from my colleagues that

no Unpaid Employee Compensation appears to be outstanding in an amount greater than $10,950

per any individual Employee.

### b.    Employee Incentive Programs

47.    In addition to paying salaries and hourly wages, in order to offer appropriate

incentives to encourage their Employees and thereby maximize the value of their businesses, the

Debtors offer a number of bonus programs to their Employees (collectively, the "Employee

Incentive Programs").  The Debtors' Employee Incentive Programs are overseen, developed and

administered by the Organization, Compensation and Governance Committee of the Board of

Directors of Chemtura Corp. (the "Compensation Committee"), in conjunction with the Debtors'

---

[12]    The Debtors rely on both Ceridian Employer Services and Ceridian Benefits Services (together, "Ceridian") for
a number of Employee-related services, including retiree billing, managing Employees' expense reimbursement
accounts and paying all withholding and payroll taxes to applicable third parties.  The Debtors pay an aggregate
of approximately $150,000 per month for Ceridian's services.

senior management team and Corporate Compensation Group (the "Compensation Group").  In some cases, the Compensation Committee also works with an independent consultant to develop incentive programs.  The Employee Incentive Programs are an important component of the Debtors' Employee compensation structure and are designed to encourage Employees to achieve performance goals and maintain Chemtura's competitive status with industry peers.

(1)     Sales and Performance Incentive Plans

48.     The Debtors' operations are organized in separate reporting segments (*e.g.*, Consumer Products and Crop Protection), certain of which maintain a sales incentive plan designed to compensate eligible Employees in each business segment for attaining specific performance targets (each a "Sales Incentive Plan" and, collectively, the "Sales Incentive Plans").[13]  Each Sales Incentive Plan is developed and approved at the beginning of the performance period by the leader of the applicable business segment, in conjunction with guidance provided by the Compensation Group.  The Sales Incentive Plans generally set specific performance targets for eligible Employees and establish which Employees are eligible to participate.  Individual awards under the Sales Incentive Plans are approved by the leader of the respective business segment.

---

[13]  In addition to the Sales Incentive Plans, the Compensation Committee establishes yearly targets and bonus levels for a Management Incentive Program (the "MIP") pursuant to the Debtors' Short-Term Incentive Plan (the "STIP"), which was approved by the Debtors' shareholders in 2005.  Each year's MIP generally provides that payments for a given year are due on or before March 15th of the subsequent year.  The Debtors have already paid amounts owed under the MIP for 2008 in the ordinary course of business.  The Debtors have established targets under the MIP for 2009, bonus payments relative to which would not be due until 2010.  In addition to the STIP, the Debtors' shareholders have approved an equity compensation plan that provides for employee compensation denominated in shares of Chemtura stock, including stock options and stock units, to certain employees and non-employee directors.

49.     Approximately 64 of the Debtors' non-insider[14] Employees met their performance targets under the applicable Sales Incentive Plan for 2008, resulting in a total payable bonus pool of $715,000, out of a target pool of approximately $2 million.  The Debtors are currently developing their Sales Incentive Plans for 2009 and expect to continue such programs for non-insiders in the ordinary course after the Petition Date.  I do not believe that there are amounts outstanding with respect to Employees of the Debtors on account of Sales Incentive Plans as of the Petition Date, although certain amounts owed to Employees of the Debtors' international affiliates may not have come due and may be payable in the ordinary course by non-Debtors.

(2)     Signing Bonuses

50.     As part of the Debtors' efforts to attract and retain a talented Employee base, the Debtors have entered into agreements with certain of their Employees to pay signing bonuses in installments together with their base compensation (the "Signing Bonuses").  Four non-insider Employees are likely to become eligible to receive installment payments of their Signing Bonuses after the Petition Date, the payment of which is triggered by and conditioned upon the Employees' continued service in the Debtors' employ following the Petition Date.  The amount of the remaining installment of such Signing Bonuses range from $15,000 to $50,000 per Employee and total $85,000 (the "Unpaid Signing Bonuses").  In each instance, the Signing Bonuses served as an inducement by the Debtors to attract the Employee from a previous employer.

---

[14]  For the purpose of this Declaration, references to the Debtors' insiders mean the Debtors' officers, as set forth in the Debtors' annual and quarterly reports filed with the Securities and Exchange Commission.

(3)      Service Award Program

51.      The Debtors also provide awards to their rank-and-file Employees, based on length of service and/or good performance during their tenure with the Debtors (the "Service Award Program"). Pursuant to the Service Award Program, Employees are permitted to choose a gift from a catalog, in recognition of their dedicated service, at certain milestone dates in an Employee's tenure or, in some cases, earn tickets to various entertainment and sporting events as a reward for good performance. I understand from my colleagues in the human resource department that approximately 135 Employees will have earned the ability to receive a gift under the Service Award Program during the first quarter of 2009. I understand that the cost of administering the Service Award Program in 2009 will be approximately $58,000.

### c.      Union Expenses

52.      As previously noted, there are approximately 274 Union Employees. The Debtors withhold certain amounts from their Union Employees' compensation for union-related expenses such as union dues (the "Union Expenses"). The Debtors pay the amounts withheld for Union Expenses to third parties, including unions, on a monthly basis. On average, the Debtors withhold and transfer an aggregate of approximately $23,000 per month in Union Expenses. I understand from my colleagues in the human resource department that the Debtors may owe approximately $23,000 on account of Union Expenses that were withheld but unpaid as of the Petition Date (the "Unpaid Union Expenses").

### d.      Employee Severance Plans

53.      As previously discussed, the Debtors instituted several initiatives before the Petition Date to reduce costs related to their workforce. As part of these initiatives, the Debtors offered severance payments to certain non-insider, former full-time Employees. These severance payments were offered to certain former employees pursuant to the Debtors' two severance

23

plans, which have been in place in materially the same form since April 27, 2007 and January 1, 2006, respectively (together, the "Employee Severance Plans").[15]  To be eligible under the Severance Plans, Employees are required to, among other things, complete six consecutive months of continuous employment, be terminated by the Debtors other than for "cause" (as defined in the Employee Severance Plans), and execute and perform under a valid separation agreement including a release of claims against the Debtors.

<div align="center">(1)    Severance Payments</div>

54.    The Employee Severance Plans include a cash component, such that qualifying terminated Employees are entitled to up to 52 weeks of severance pay, based on the respective Employee's salary band and, in some cases, also on the Employee's years of service, paid in installments in accordance with the Debtors' normal payroll practices (the "Severance Payments").

55.    I understand from my colleagues in the human resources department that as of the Petition Date, the Debtors owed prepetition Severance Payments to 119 of their former, non-insider Employees, in an amount totaling approximately $2.4 million (collectively, the "Unpaid Severance Payments").  The total of all prepetition Unpaid Severance Payments owed to former, non-insider Employees at or below $10,950 per each eligible former Employee is approximately $1.5 million.

---

[15]  Specifically, the Employee Severance Plans consist of two separate plans that the Debtors maintain in the ordinary course of business: (a) the Chemtura Corporation Severance Plan (the "Base Severance Plan") and (b) the Chemtura Corporation Executive and Key Employee Severance Plan (the "Executive Severance Plan"). Participants in the Base Severance Plan do not include insiders, while the Executive Severance Plan includes both insiders and non-insiders.  Despite the separate plans, the terms of the two Employee Severance Plans are the same in terms of severance pay and post-termination continuation of medical benefits absent a change in control (as defined in the Executive Severance Plan).  The major difference between the two programs is that the Executive Severance Plan contains additional terms with respect to severance benefits payable upon a termination following a change in control, as defined therein.

(2)      Severance Benefits and Outplacement Assistance

56.      In addition to the Severance Payments, the Employee Severance Plans provide qualifying terminated Employees the opportunity to receive non-cash benefits, such as the ability to continue medical insurance in accordance with the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") at the then-applicable premium rate for active Employees (collectively, the "Severance Benefits").  The Debtors also provide these qualifying terminated Employees the opportunity to participate in an outplacement program provided by a third party service provider, once they sign a separation agreement with the Debtors (the "Outplacement Program").  I understand from my colleagues in the human resources department that, as of the Petition Date, approximately 69 former Employees are participating in the Outplacement Program.  I understand certain amounts are outstanding to the third party service provider on account of the Outplacement Program.  I expect that the Debtors will maintain the Severance Benefits and the Outplacement Program after the Petition Date.

**e.      Temporary Worker Compensation**

57.      In addition to the Employees, the Debtors employ approximately 25 professional independent consultants and approximately 100 independent contractors, many of whom have specific areas of expertise related to the Debtors' business operations and which the Debtors hire on an as-needed basis, such as the Debtors' seasonal business segments (the "Independent Contractors").  It is my understanding that the total amount of obligations with respect to the employment of Independent Contractors is approximately $30,000 per month (collectively, the "Independent Contractor Obligations").  Given the nature of the Independent Contractors' relationship to the Debtors, records with respect to the Independent Contractors are typically maintained on a decentralized basis.  Additionally, because certain of the Debtors' business operations are seasonal (for example, the Debtors' spa and pool products lines), the number of

25

Independent Contractors is subject to fluctuate. Accordingly, although it is my understanding that the human resources department does not at this time have specific amounts of Independent Contractor Obligations that may be outstanding as of the Petition Date I nonetheless believe, based on historical payroll numbers, that approximately $15,000 is outstanding on account of Independent Contractor Obligations as of the Petition Date (the "Unpaid Independent Contractor Obligations").

### iii.    Reimbursable Expenses

58.    The Debtors reimburse Employees, Independent Contractors and members of the Debtors' Board of Directors for certain approved, reasonable expenses incurred in the scope of their employment or service (the "Reimbursable Expenses").[16] The Reimbursable Expenses include, among other things, business-related travel expenses, meals, hotels, flights, car rentals and procurement activity.[17]

59.    Employees, Independent Contractors and Directors must submit an expense report with appropriate supporting documentation for all Reimbursable Expenses. Although the Debtors request that reimbursement requests be submitted promptly, not all of the Employees, Independent Contractors and Directors comply with such requests. Based upon my understanding, the Debtors are unable to provide a detailed amount of unpaid prepetition

---

[16]    A subset of the Reimbursable Expenses consists of various stipends to certain of the Debtors' Union and non-Union Employees for reimbursement of work-related needs, such as safety equipment, overtime meals and cash reimbursements (collectively, the "Employee Stipends"). I believe that the costs associated with the Employee Stipends in the aggregate are approximately $61,800 per month. I believe that only a de minis amount (less than $1,000) in unpaid Employee Stipends is outstanding as of the Petition Date.

[17]    Additionally, approximately 1,000 of the Employees pay for certain business-related expenses with a Citibank Visa credit card, which is invoiced to the Debtors directly (the "Credit Card Program"). Employees use the Credit Card Program for approved travel and certain procurement activity with pre-approved vendors (up to a pre-approved limit of $5,000 per transaction). The relief requested herein does not include authority to pay amounts related to the Credit Card Program.

Reimbursable Expenses at this time because it is likely that Employees, Independent Contractors and Directors will submit requests for expenses incurred prepetition after the Petition Date. Based on historical figures and current amounts to be paid at the next pay period, however, I believe that the Debtors owe at least $35,000 on account of Reimbursable Expenses as of the Petition Date (the "Unpaid Reimbursable Expenses").

<div align="center">

iv.    **Employee Benefits**

</div>

60.    The Employee Obligations include obligations based on comprehensive benefits that the Debtors provide to all of their Full-Time Employees (and certain Part-Time Employees) and certain of their dependents and beneficiaries, including medical, dental and vision benefits, short- and long-term disability, life insurance, retirement plans and other miscellaneous company benefits, as described below (collectively, and as more fully described below, the "Employee Benefits").

<div align="center">

a.    **Medical, Vision and Dental Plans**

</div>

61.    I understand from my colleagues in the human resources department that, as of the Petition Date, the Debtors provide health care coverage, including prescription drug coverage, to approximately 5,156 Employees and dependents (including coverage under COBRA for approximately 750 individuals), dental care to approximately 5,330 Employees and dependents, and vision care to approximately 3,643 Employees and dependents. Specifically, the Debtors maintain the following medical plans, dental plan, vision plan and flexible spending accounts for all of their eligible Employees.

<div align="center">

(1)    Medical Plans

</div>

62.    The Debtors offer their eligible Employees (including certain Union Employees) and their dependents health care coverage in one of the following plans:  (a) the Anthem Blue Cross Blue Shield PPO Plans; (b) the Anthem PPO Plus Plan; (c) the Lumenos Medical Plan

<div align="center">27</div>

(Anthem); (d) the Kaufman Union Medical Plan (Anthem) and (e) the United Health Care ("United Health") HMO medical plan, which generally include prescription drug coverage (collectively, the "Medical Plans").[18]

63.    The Medical Plans are self-insured, and the Debtors pay Anthem approximately $1.9 million per month and United Health approximately $21,000 per month, each net of Employee contributions, for claims and costs related to the Medical Plans.  Additionally, the Debtors pay approximately $113,000 per month to Anthem in administrative fees related to the Medical Plans.  I understand from my colleagues that as of the Petition Date, the Debtors owe approximately $443,000 million on account of the various Medical Plans, net of premiums collected from Employees (the "Unpaid Medical Plan Expenses").

(2)    Dental Plan

64.    In addition to the Medical Plans, the Debtors offer dental coverage to their eligible Employees and dependents through Delta Dental (the "Dental Plan").  The Dental Plan provides benefits based on reasonable and customary charges up to an individual maximum benefit ranging from $1,000 to $1,500, with individual deductibles ranging from $25 to $150.

65.    The Dental Plan costs the Debtors approximately $135,000 per month in claims and other costs, net of Employee contributions.  Additionally, the Debtors pay approximately $8,500 per month to Delta Dental on account of administrative fees related to the Dental Plan.  I understand from my colleagues that as of the Petition Date, the Debtors owe approximately $254,000 on account of the Dental Plan, net of premiums collected from Employees (the "Unpaid Dental Plan Expenses").

---

[18]  The United Health HMO is only available to those Employees employed at the Debtors' facilities in West Lafayette, Indiana.

(3)     Vision Plan

66.     The Debtors also offer their eligible Employees vision coverage through a vision service plan operated and administered by VSP (the "Vision Plan").  The Vision Plan offers coverage for eye exams, frames, lenses and contacts, as well as discounts and savings on laser vision correction, anti-reflective coatings, progressive and prescription glasses and sunglasses. Employees must cover all insurance costs of the Vision Plan, and the Debtors withhold approximately $22,000 per month on account of Employee contributions to the Vision Plan.  As of the Petition Date, I believe that the Debtors have collected approximately $18,200 in Employee contributions to the Vision Plan, which have not been paid (the "Unpaid Vision Plan Expenses").  I believe that the Unpaid Vision Plan Expenses are likely held in trust by the Debtors.

(4)     Flexible Benefit Plan

67.     The Debtors also offer their eligible Employees the ability to contribute a portion of their pre-tax compensation (collectively, the "FSA Contributions") to spending accounts (the "FSA Plans"), which contributions are deducted by the Debtors from the participating Employees' paychecks. The FSA Contributions accumulate in participating Employees' flexible spending accounts and are available for Employees to use to pay for eligible out-of-pocket health care and dependent care expenses.  Approximately 795 Employees participate in the FSA Plans and, on a monthly basis, the Debtors withhold approximately $111,000 of FSA Contributions.  I understand from my colleagues in human resources that as of the Petition Date, the Debtors have collected approximately $85,000 in FSA Contributions from Employees' paychecks that have not yet been contributed to the FSA Plans (the "Unremitted FSA Contributions").  I believe that the Unremitted FSA Contributions are likely held in trust by the Debtors.

b.        **Insurance and Disability Benefits**

68.        The Debtors provide all active Full-Time Employees with term life insurance, accidental death and dismemberment insurance, business travel insurance and short-term disability coverage provided by Prudential (collectively, the "Basic Insurance").  I understand that the Basic Insurance coverage costs approximately $244,500 per month.  As of the Petition Date, I believe that the Debtors owe approximately $148,725 on account of premiums for the Basic Insurance (the "Unpaid Basic Insurance Expenses").

69.        In addition to the Basic Insurance, the Debtors offer their eligible Employees the opportunity to purchase additional insurance options, including supplemental life insurance, spousal life insurance, dependent life insurance, supplemental accidental death and dismemberment insurance, pre-paid legal insurance, long-term disability, auto insurance and homeowners coverage through providers such as Prudential, Liberty and MetLife (collectively, "Supplemental Insurance"), the premiums for which are paid entirely by the electing Employee. The Debtors withhold approximately $156,200 per month in Employee contributions on account of Supplemental Insurance.  I understand from my colleagues that the Debtors have withheld, but not yet paid, approximately $500,000 in Employee contributions to Supplemental Insurance as of the Petition Date (the "Unpaid Supplemental Insurance Expenses").  I believe that the Unpaid Basic Life Insurance Expenses and the Unpaid Supplemental Insurance Expense are likely held in trust by the Debtors.

70.        I believe that the Unpaid Basic Insurance Expenses and the Unpaid Supplemental Insurance Expense are likely held in trust by the Debtors and are not property of the Debtors' estates.  Nevertheless, in an abundance of caution, the Debtors seek Court authorization to remit the Unpaid Basic Insurance Expenses and the Unpaid Supplemental Insurance Expenses.

### c. Workers' Compensation

71.    The Debtors provide workers' compensation coverage for their Employees at the statutorily-required level for each state in which the Debtors have business operations (the "Workers' Compensation Program").    The Debtors' Workers' Compensation Program is administered through a third-party provider and covers workers' compensation claims through an incurred loss program with a $250,000 liability limit per accident per each Employee injury/claim.   The Debtors' annual insurance premium and fees for the Workers' Compensation Program total approximately $548,000 in the aggregate for the period beginning June 1, 2008 and ending June 1, 2009; the Debtors paid such premium and fees in full prior to the Petition Date.   I understand from my colleagues that based on historical activity, certain of the benefits under the Workers' Compensation Program have been incurred prepetition but have yet to be fully paid, certain other claims were filed prepetition but have yet to be resolved and certain claims may have accrued prepetition but have not been submitted (the "Prepetition Workers' Compensation Claims").[19]

### d. Paid Time-Off and Leaves of Absence

72.    The Debtors provide paid time off to their Employees to cover, among other things, vacation, sick days, jury duty, bereavement leave, holidays and military leave[20]

---

[19]   Specifically, loss payments to claimants are paid from a pre- funded escrow account that the Debtors replenish monthly based on actual payout activity in the previous month during the last week of the month or the first week of the following month.   Accordingly, the Debtors may owe certain amounts to the escrow account maintained in connection with the Workers' Compensation programs as of the Petition Date.   I believe that, based on historical numbers, the average monthly cost of replenishing the escrow account is approximately $141,000.

[20]   Specifically, pursuant to the Debtors' military leave policy, salaried and hourly non-Union Employees who are called up to active duty as members of the National Guard or the U.S. Reserve Forces are provided a military leave of absence for up to a maximum of five years with compensation during the first six months of service equal to the difference between such Employee's base pay and his or her military pay.

(collectively, the "PTO").  The amount of PTO available to a particular Employee is generally determined by the Employee's length of service, a specific policy and/or statutory requirements. For example, pursuant to the Debtors' current vacation policy, eligible Employees accrue 1/12 of a capped annual allowance of vacation time determined by length of employment.  Generally, Employees can accrue two to five weeks of vacation time per calendar year, depending on their years of service, with some Employees having higher levels of vacation eligibility due to certain merger and acquisition activity and administration of legacy programs. Except for certain Employees at the Debtors' facility in Perth Amboy, New Jersey, vacation time is not accounted for or reported separately from other payroll expenses (*e.g.*, regular time, overtime, sick leave, holidays and the like), but is reflected as a subset of payroll obligations in the Debtors' financial statements.[21]   Except in extenuating circumstances, unused vacation time at the end of each calendar year is forfeited and, in any event, no more than five days may carry over to a following year, except as required by local law.

73.    In certain instances, however, if an Employee leaves the Debtors' employ, earned, but unused PTO, if any, is paid out in a final paycheck, or otherwise as required by local law.[22] The Debtors historically have monthly expenses of approximately $780,000 on account of

---

[21]  Certain Employees at the Debtors' facility in Perth Amboy, New Jersey earn vacation time in the current year, for use in the following year.  This vacation time is accounted for separately in the Debtors' financial statements The Debtors estimate that this accrual is approximately $324,000 as of February 28, 2009 (the "Accrued PTO"). This amount, however, is not a current cash payment obligation, but reflects PTO that is expected to be taken in the ordinary course of business.

[22]  The Debtors' Employees are also eligible for up to twelve paid holidays per calendar year, three of which are considered "floaters" and are reserved for Employees to use for any personal reason, including the observance of holidays not on the Debtors' general holiday schedule.  These holidays and "floaters" generally are not a form of accrued leave and are not paid upon termination of employment.

accrued PTO for their hourly Employees, including cash payouts of earned, but unused PTO upon termination of employment.

74.    In addition, the Debtors provide for unpaid leaves of absence, including family and medical leave, jury duty, bereavement leave and extended military leave, to the extent that unpaid leave is legally required over and above the paid time off pursuant to the Debtors' policies described above (collectively, the "Leaves of Absence").   The Debtors administer certain of the Leaves of Absence, such as family and medical leave, through a third party service provider and incur approximately $4,150 per month in administrative costs related to the Leaves of Absence.

### e.    Employee Savings and Retirement Plans and Benefits

#### (1)    401(k) Employee Savings Plan

75.    The Debtors maintain an Employee Savings Plan, administered through various third parties, for the benefit of all eligible Employees.  The Employee Savings Plan is a tax qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "401(k) Plan"). Approximately 2,234 Employees currently participate in the 401(k) Plan, with a total of approximately $1 million withheld each month from Employees' paychecks for Employee contributions to the 401(k) Plan (the "Employee 401(k) Contributions").

76.    The 401(k) Plan also includes an employer matching component, pursuant to which the Debtors match a certain percentage of the Employee 401(k) Contributions. Specifically, in most cases, the Debtors match Employee 401(k) Contributions dollar-for-dollar up to six percent of each Employee's base salary (the "Employer 401(k) Contributions," and,

together with the Employee 401(k) Contributions, the "401(k) Contributions"). I believe that the Debtors pay approximately $675,000 per month in Employer 401(k) Contributions in 2009.[23]

77.    As of the Petition Date, the Debtors hold but have not yet contributed approximately $760,000 in Employee 401(k) Contributions withheld from Employees' paychecks as part of the 401(k) Plan (the "Unremitted Employee 401(k) Contributions") and owe, but have not contributed, approximately $382,000 in Employer 401(k) Contributions (the "Unpaid Employee 401(k) Contributions"). I understand from my colleagues that the Unpaid Employee 401(k) Contributions are likely held in trust by the Debtors.

(2)    Supplemental Savings Plan

78.    In addition to the 401(k) Plan, the Debtors provide certain of their executive officers with the opportunity to participate in a non-qualified, defined contribution plan that is designed to provide benefits similar to those available under the 401(k) Plan for contributions that are in excess of the limits imposed by federal law on contributions to the 401(k) Plan (the "Supplemental Savings Plan").

79.    In accordance with his or her prior election and the terms of the Supplemental Savings Plan, a participant may make contributions to the Supplemental Savings Plan, provided that the participant contributed to the 401(k) Plan during the plan year up to the contribution limits imposed by applicable federal law. At the time of election to participate, the Participant determines the form of distribution for their future payout from the Supplemental Savings Plan. Each participant has the option of receiving payouts in the form of a lump sum, or a five-year or

---

[23]    In addition to the 401(k) Contributions, the Debtors also pay an aggregate of approximately $1.6 million per year to third parties for services related to the administration of the 401(k) Plan, including audit and investment services.

ten-year installment payout.  Contributions made to the Supplemental Savings Plan remain assets of the Debtors, subject to creditor claims.  I expect that the Debtors will continue to administer the Supplemental Savings Plan after the Petition Date.

<div align="center">(3)    Defined Benefit Plans</div>

80.    The Debtors maintain several tax-qualified defined benefit pension plans on behalf of approximately 2,300 active Employees (the "Defined Benefit Plans").  Specifically, the Defined Benefit Plans consist of (a) the Chemtura Corporation Pension Plan for certain of the Debtors' Employees, former Employees and other plan beneficiaries and (b) a plan for Employees, former Employees and other plan beneficiaries associated with the Debtors' facility in Perth Amboy, New Jersey.[24]  The Defined Benefit Plans are largely frozen at the present time, with minimal new benefit accruals.  I understand from my colleagues that as of December 31, 2008, the Debtors' estimated aggregate fair value of the assets held in trust under the Defined Benefit Plans is approximately $630 million, with total obligations under the Defined Benefit Plans of approximately $826 million.

81.    The Debtors evaluate the Debtor-sponsored Defined Benefit Plans each plan year to ensure that minimum funding obligations will be met.  I expect that, as of the Petition Date, no minimum funding contributions will be necessary with respect to these plans during 2009 (the "Minimum Funding Contributions"), and I do not anticipate that the Debtors will make any

---

[24]  The Defined Benefit Plans also include a defined benefit pension plan covering former Employees and other plan beneficiaries associated with a plant in Marshall, Texas that was recently divested by the Debtors.  The Debtors sold the Marshall plant in November 2007 and thus the associated Defined Benefit Plan is completely frozen and there are no more active Employees in the plan.  The Debtors also contribute to a Taft-Hartley multiemployer pension plan, covering certain Union Employees, former Union Employees and other beneficiaries associated with a facility in Fords, New Jersey, which is currently not frozen (the "Multiemployer Plan").

voluntary contributions to these plans in 2009 (the "Voluntary Pension Contributions").[25] With respect to the Multiemployer Plan, however, the Debtors expect to contribute approximately $100,000 to the Multiemployer Plan in 2009, per the terms of the applicable collective bargaining agreement (the "Multiemployer Plan Contributions" and, together with the Minimum Funding Contributions and the Voluntary Pension Contributions, the "Pension Plan Contributions"). I believe that such contributions may be statutory requirements and/or may be obligations arising postpetition.

82.     Additionally, the Debtors incur annual expenses related to the administration of the Defined Benefit Plans, including, but not limited to, required premiums paid to the Pension Benefit Guarantee Corporation, investment management services and pension trust liability insurance and actuarial services. I believe that these costs are approximately $4.6 million per year (the "Defined Benefit Plan Expenses"). The vast majority of the Defined Benefit Plan Expenses are paid from funds held in separate retirement trusts; however, to the extent such trusts become or are currently underfunded, the Debtors may have future obligations with respect to the Defined Benefit Plan Expenses.

(4)     Other Post-Retirement Benefits

83.     The Debtors provide certain groups of retired Employees (the "Retirees") post-retirement medical and life insurance benefits (collectively, the "Other Post-Retirement Benefits").

---

[25] My colleagues in the human resources department have estimated their Minimum Funding Contributions and their anticipated Voluntary Pension Contributions for 2009 based on certain elections, assumptions and methods, including those permitted under the Pension Protection Act of 2006. To the extent there is a change in such elections, assumptions or methods, such change could alter the Debtors' Minimum Funding Contributions and/or Voluntary Pension Contributions to the Debtor-sponsored Defined Benefit Plans in 2009 and in the future.

84.     <u>Life Insurance</u>.     The Other Post-Retirement Benefits include basic and supplemental life insurance coverage provided by Prudential and MetLife (the "OPEB Life Insurance Benefits").  In addition, approximately 2,250 Retirees receive OPEB Life Insurance Benefits, which costs the Debtors approximately $36,000 per month.   Approximately 555 Retirees receive supplemental life insurance through the Debtors, which premiums are fully paid by the electing Retirees.[26]   I understand from my colleagues that, as of the Petition Date, approximately $41,151 is outstanding on account of the OPEB Life Insurance Benefits, net of Retiree-paid premiums (the "Unpaid OPEB Life Insurance Expenses").

85.     <u>Medical Insurance</u>.  The Other Post-Retirements Benefits also include various medical insurance plans, the terms of which vary depending on whether the Retiree is under or over the age of 65 (the "OPEB Medical Insurance Benefits").  With respect to Retirees under the age of 65, the Debtors maintain several self-insured medical insurance plans that provide coverage to approximately 750 participants and which cost the Debtors a total of approximately $5.6 million per year, net of Retiree-paid premiums.  With respect to Retirees over the age of 65, the Debtors maintain several self-insured medical insurance plans that provide coverage to approximately 3,000 participants and that cost the Debtors a total of approximately $8.5 million per year, net of Retiree-paid premiums.  I believe that, as of the Petition Date, approximately $1.8 million is outstanding on account of the OPEB Medical Insurance Benefits, net of Retiree-paid premiums (the "Unpaid OPEB Medical Insurance Expenses").

---

[26]  The Debtors' also maintain a surviving a surviving spouse death benefit insurance plan of $2,250 for certain former Uniroyal Employees and Union Employees, which is self-insured.  I understand from my colleages that this plan costs approximately $10,000 per year.

### f.  Relocation Program

86.    The Debtors maintain a relocation program for eligible Employees who are required to relocate to a new job location, which program is administered by a third party service provider (the "Relocation Program").  Currently, approximately 37 active and former Employees are receiving or will receive benefits under the Relocation Program.  These benefits include, among others, closing costs on new homes, moving costs, cost of living adjustments and home buy-outs.  The costs of the benefits under the Relocation Program varies for each Employee and depend on how far along the Employee is in completing the relocation process.  I do not believe that any amounts under the Relocation Program are outstanding to any Employees as of the Petition Date.

87.    I understand from my colleagues that certain amounts are outstanding to the third party service provider on account of the Relocation Program (the "Unpaid Relocation Reimbursements").  I expect that the Debtors will maintain the Relocation Program after the Petition Date and request interim authority to permit qualifying active Employees who participated in this program before the Petition Date to continue participating in the Relocation Program on a postpetition basis.

### g.  Education Assistance Program

88.    The Debtors offer education assistance to their active Full-Time Employees, which is intended to help Employees gain proficiency in their present positions, learn the latest developments in their field and prepare them for advancement in their careers (the "Education Assistance Program").  Pursuant to the Education Assistance Program, the Debtors reimburse eligible Employees for up to 95 percent of covered costs incurred in connection with approved courses, including tuition, books, registration fees and lab fees.  The Debtors pay an aggregate of approximately $28,500 per month on account of the Employee Education Program.  I do not

38

believe that any amounts on account of the Education Assistance Expenses are outstanding as of the Petition Date. I anticipate that the Debtors will maintain the Education Assistance Program after the Petition Date.

### h.      Merit Scholarship Program

89.      In addition to the Education Assistance Program, the Debtors maintain a merit-based grant program available to the dependents of their active Full-Time Employees (the "Merit Scholarship Program"). Briefly, the Merit Scholarship Program allows eligible dependents to apply for a merit-based scholarship of up to $2,500 per year to apply toward the costs of higher education. Although the Debtors are no longer accepting new applications for this program as of January 1, 2009, the Debtors have prepetition obligations under the Merit Scholarship Program for dependents of Employees who are currently enrolled in higher education programs in reliance on this benefit of approximately $23,500, $23,175, $12,875 and $2,575 for 2009, 2010, 2011 and 2012, respectively (the "Prepetition Merit Scholarship Obligations").

### i.      Employee Assistance Program

90.      The Debtors offer their Employees free access to confidential consultation, online resources and other personal support through LifeWorks, a third party service provider (the "Employee Assistance Program"). The Employee Assistance Program costs the Debtors approximately $6,270 per month in administrative fees and other costs. It is my understanding that no amounts on account of the Employee Assistance Program are outstanding as of the Petition Date. I understand from my colleagues, however, that the Debtors will maintain the Employee Assistance Program after the Petition Date.

### j.    Adoption Program

91.    The Debtors offer certain of their active, Full-Time Employees reimbursement for all or a portion of the costs directly related to adopting a child (the "Adoption Program").[27]    The Adoption Program provides for reimbursement of up to $5,000 for adoption-related fees, including, among other things, legal fees and court costs, medical expenses, immigration fees, immunization fees, translation fees and transportation expenses.    I do not believe any amounts on account of the Adoption Program are outstanding as of the Petition Date.

### k.    Employee Referral Program

92.    The Debtors provide cash incentives to certain Employees for referring prospective employees to fill open positions (the "Employee Referral Program").    Pursuant to the Employee Referral Program, participating Employees are eligible for a $2,500 fee if the person they referred is hired and remains employed for at least six months.    I understand from my colleagues in human resources department that the Employee Referral Program costs approximately $1,460 per month.    I do not believe any amounts are outstanding on account of the Employee Referral Program as of the Petition Date.    I do expect, however, that the Debtors will continue to maintain the Employee Referral Program on a postpetition basis.

### l.    Voluntary Benefits Programs

93.    The Debtors deduct various amounts from Employees' paychecks in connection with a number of benefits programs (collectively, the "Voluntary Benefits Programs").    The Voluntary Benefits Programs include deductions on account of, among others, the YMCA, the YWCA, U.S. savings bonds and membership to various "Wellness Centers," which are located

---

[27]    Union Employees are not eligible to participate in the Adoption Program unless such benefits are specifically bargained for by such Employee's bargaining unit.

on-site at Chemtura Corporation's headquarters in Middlebury, Connecticut and Morgantown, West Virginia (the "Employee Voluntary Deductions"). In addition to the Employee Voluntary Deductions, in certain cases, the Debtors contribute to the Voluntary Benefits Programs on an ongoing basis – for example, the Debtors contribute approximately $10,500 to maintaining the Wellness Center in Middlebury, net of Employee contributions, on a monthly basis (the "Employer Voluntary Contributions"). Overall, an average of approximately $13,600 in Employee Voluntary Deductions is deducted from Employees' paychecks per month on account of the Voluntary Benefits Programs. I understand from my colleagues that, based on historical numbers, certain of the Employee Voluntary Deductions have been collected but remain unremitted and certain Employer Voluntary Contributions have accrued but remain unpaid as of the Petition Date (collectively, the "Unpaid Voluntary Benefits Expenses").

### m.   Gross Pay Deductions, Governmental Withholdings and Payroll Taxes

94.     In addition to the amounts described above, the Debtors routinely deduct certain other miscellaneous amounts from Employee paychecks (the "Other Employee Deductions"). I understand that approximately $95,000 of the Other Employee Deductions may not have been forwarded to the appropriate third party before the Petition Date (collectively, the "Unremitted Other Employee Deductions").

95.     In addition to the Other Employee Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state or local taxing authority (collectively, the "Payroll Taxes"). The Payroll Taxes, including portions paid by both Employees and the Debtors, total approximately $4.5 million per month, which amounts are deducted from the Debtors' concentration account by Ceridian and paid on the Debtors' behalf.

Although the Payroll Taxes for the period ending March 20, 2009 have been debited from the Debtors' account by Ceridian, I believe that the Debtors owe approximately $405,000 of Payroll Taxes (including portions paid by both Employees and the Debtors) have accrued since the Petition Date and remain unpaid (collectively, the "Unpaid Payroll Taxes"). I believe that both the Unremitted Employee Deductions and the Unpaid Payroll Taxes are likely held in trust by the Debtors.

E.   **Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests *and* Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, Debtors to Pay or Honor Prepetition Obligations to Certain Foreign Critical Vendors and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

96.   The Debtors depend on third parties to supply goods, materials and services without which the Debtors' business could not operate. Indeed, to meet the demands inherent in the highly complex and competitive chemical manufacturing industry, the Debtors rely on suppliers and vendors uniquely qualified to handle hazardous materials and navigate the just-in-time logistics associated with the Debtors' operations and their customers' demands. Without such vendors, the value of the Debtors' business operations would be significantly diminished and, in some cases, operations may arrest altogether.

97.   In the Company's case, the supply chain is already strained, in some cases nearly to or beyond the breaking point. In the weeks immediately before the filing of these chapter 11 cases, the Debtors experienced a sudden and severe liquidity crisis that placed significant stress upon the Debtors' vendor relationships. In some areas of their business, the Debtors already have been experiencing supply interruptions, as vendors demanded payments in excess of the Debtors' ability to fund them. In certain cases, the Debtors were required to slow or even interrupt production at some facilities. If similar supply interruptions and cessations continue,

42

such results would be particularly damaging with respect to the Debtors' seasonable business operations – for example, the Debtors' pool and spa products and crop protection product lines – the selling season for which is just beginning.

98.    Over the past few weeks certain vendors that became concerned about the Debtors' financial condition have demanded that the Debtors pay for their goods on accelerated payment terms, cash in advance and cash on delivery basis.  I believe that if additional vendors take these actions it would be detrimental to the Debtors, their estates and their creditors.

99.    I believe that the majority of the Debtors' vendors will be comforted by the increased liquidity made available to them under the DIP Financing, and therefore I am optimistic that the Debtors' trade terms ultimately will stabilize over the course of these chapter 11 cases.  In some limited instances, however, I understand from my colleagues in the procurement group that certain vendors – in some cases, Critical Vendors and Foreign Vendors (each as defined below) – may refuse to do business with the Debtors unless and until the vendor is paid its prepetition claim in full.

100.   Given the specialized type of goods and the complexity of services required to maintain the Debtors' operations, I understand from my colleagues that the Debtors could not replace the Critical Vendors and Foreign Vendors within a reasonable time or on terms as beneficial to the Debtors as those already in place.  Moreover, if a Critical Vendor or a Foreign Vendor were to refuse to do business with the Debtors, the resulting disruption in supply would ripple through the Debtors' businesses, idling production of certain product lines or, in some cases, entire production facilities and damaging the Debtors ability to create final products (and, therefore, generate revenue), all to the detriment of their estates and their creditors.  In fact, because many aspects of the Debtors' business use just-in-time inventory management, and

43

because certain of the Debtors' customers impose very strict delivery time requirements as part of their own inventory management practices, any disruption in the Debtors' production may result not only in the loss of short-term revenue, but also in the disruption or even permanent loss of customer relationships.

101.     Indeed, this is a critical time for the Debtors.  Two of the Debtors' most profitable and valuable business segments are seasonable business operations – namely the pool and spa products and crop protection products segments.  Both of these business segments have increased supply requirements and strict delivery schedules during the first and second quarter of each year in order to meet customer demands for these seasonal products.  As a result, it is essential that the Debtors maintain stability in their supply chain at this crucial time in their seasonable operations.  Any interruption in these operations or failure to meet customer demands could result not only in an immediate loss of value for the Debtors, but also a loss in the Debtors' market share with respect to these key business segments.

102.     For all of these reasons, maintaining an unbroken supply chain is critical to the preservation of value in these chapter 11 cases.  To the extent the Debtors can maintain their current supply of goods and services at existing lower costs during the postpetition period and avoid the severe disruptions to their businesses that likely would arise from the cessation of the delivery of such goods or the performance of such services, I believe that it is prudent for the Debtors to pay selected Critical Vendors some or all of their prepetition claims for the overall benefit of their estates and their reorganizations.

### i.     The Debtors' Critical Vendors

103.     There is a limited class of vendors that is critical to the Debtors' business operations and that may choose not to continue providing goods and services to the Debtors during these chapter 11 cases.  In the United States, certain members of Debtors' senior

44

management and the procurement group have determined that this class of vendors (collectively, the "Critical Vendors") includes those suppliers and service providers that (a) provide either (i) "single source" goods or services or (ii) other goods and services that are essential to the Debtors' operations and that cannot be obtained elsewhere or cannot be replaced except at exorbitant additional cost or excessive delay or disruption and (b) do not have long-term written supply contracts or other relationships with the Debtors such that they could be compelled to continue providing goods or services to the Debtors postpetition.

### ii.    The Debtors' Foreign Vendors

104.    The Debtors also regularly transact business with vendors located outside of the United States and its territories, and therefore the Debtors' supply chain is dependent upon a number of foreign suppliers that provide goods and services that are essential to the Debtors' businesses.  Specifically, the Debtors' supply chain includes foreign vendors who supply raw materials necessary for the Debtors' operations and foreign carriers who deliver the raw materials to the Debtors' production facilities in the United States and finished products to customers overseas.  Additionally, as previously noted, the Company has approximately 3,400 U.S. and foreign patents and pending patent applications and has approximately 4,900 U.S. and foreign registered and pending trademarks in more than 100 countries.  The Debtors rely on over 140 firms worldwide to monitor and maintain the value of their intellectual property.

105.    Certain of the Debtors' foreign vendors and suppliers provide goods and services that are absolutely essential to the Debtors' operations and may refuse to continue to do business with the Debtors after the commencement of these chapter 11 cases.  In preparing for the filing of these chapter 11 cases, certain members of the procurement group have determined that this

45

limited class of foreign vendors, (collectively, the "Foreign Vendors")[28] includes those foreign suppliers and service providers that provide either (i) "single source" goods or (ii) other goods and services that are essential to the Debtors' operations and either cannot be obtained elsewhere or cannot be replaced except at exorbitant additional cost or excessive delay or disruption.[29]

### iii.    Comparison to the Overall Trade Creditor Body

106.    The Company purchases goods and services on a massive scale, requiring historical average costs of approximately $10 million per business day just to maintain operations.  It is my understanding from my colleagues in the procurement group that, based upon their books and records, the Debtors  have approximately 2,100 vendors, including foreign vendors, with outstanding prepetition claims in the total estimated amount of $105 million.  Of this amount, approximately 95 vendors have claims of, at a minimum, an estimated amount of $40 million for (a) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date and/or (b) essential goods provided to the Debtors that were received by the Debtors before the Petition Date.  Specifically, approximately 70 of those vendors are domestic critical vendors holding claims of at least $25 million.  Payment of certain Critical Vendor Claims and Foreign Vendor Claims is necessary to avoid irreparable harm to their businesses and to maintain favorable credit terms with the Critical Vendors and Foreign Vendors.

---

[28]  The term "Foreign Vendors" shall not include foreign vendors, service providers or other non-governmental entities if such entities are known to have assets within the United States that would be subject to the jurisdiction of this Court and that would otherwise be available to satisfy a judgment entered by the Court if such entities were to violate the automatic stay provisions of section 362 of the Bankruptcy Code or take any actions contrary to an order of this Court.  In addition, "Foreign Vendors" shall not include any of the Debtors' foreign affiliates.

[29]  The delivery time for goods received from foreign vendors is up to 30 days.

46

### iv.   The Process for Identifying Critical Vendors, and the Need to Pay Such Vendors

107.    It is my understanding that members of the procurement group have reviewed the Debtors' business relationships and identified Critical Vendors and Foreign Vendors that are so essential that the loss of their particular goods or services would cause immediate and irreparable harm to the Debtors' businesses and market share.  These Critical Vendors and Foreign Vendors fall into two general categories: (a) suppliers of goods, such as the raw materials that the Debtors process and convert into the final products they sell to their customers and (b) suppliers of services that are integral to the daily operation and maintenance of the Debtors' businesses.

108.    Raw materials are the lifeblood of the Debtors' business.  Even a short delay in their delivery could damage the health of the Debtors' operations.  The Debtors purchase certain raw materials from a specific Critical Vendor or Foreign Vendor because either: (a) the vendor is a limited-source supplier that holds a virtual monopoly over the raw material; (b) the vendor provides such raw material at a price that would be prohibitively expensive for the Debtors to replace; or (c) the Debtors are obligated by their customers or other regulations to use a specific or qualified vendor.

109.    In addition, as operators of complex chemical manufacturing and polymers businesses, the Debtors must purchase certain services from vendors that have the specific qualifications and expertise necessary to operate potentially dangerous facilities, handle hazardous materials and navigate the just-in-time logistics specific to the Debtors' operations. Given the paucity of qualified providers of these services and the deleterious impact upon the Debtors if certain vendors stop performing, these vendors are Critical Vendors and Foreign Vendors.

110.    The procurement group has carefully considered whether the payments on account of the Critical Vendor Claims and Foreign Vendor Claims are necessary and whether such payments will ensure that the Debtors will have access to adequate amounts of trade credit on a postpetition basis.  Specifically, the Debtors' procurement group has undertaken a thorough review of their accounts payable and their lists of prepetition vendors to identify those vendors that are essential to the Debtors' operations.  In determining the kinds and amount of claims that may be payable pursuant to the requested relief, senior management of the Debtors' various business segments and others throughout the Debtors' procurement operations have identified the creditors that are most essential to the Debtors' operations.

111.    Many of the Debtors' Critical Vendors may have delivered goods in the ordinary course of business within the 20-day period before the Petition Date.   Indeed, it is my understanding from my colleagues that no less than 25% and up to 50% of the total amount of Critical Vendor Claims and Foreign Vendor Claims is on account of essential goods that were received during the 20-day period before the Petition Date.

112.    Satisfaction of the Critical Vendor Claims and Foreign Vendor Claims is essential to ensure that the Debtors can continue to meet customer demands to bring money into the estate. Because the Debtors' business operations are largely dependant on their relationships with their suppliers and customers, the loss of these relationships would immediately harm the Debtors' business, thus irreparably jeopardizing the value of the estates.

**F.    Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Shippers, Warehousemen and Lien Claimants and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

113.    The Debtors require the delivery of raw materials on a regular basis for the production and distribution of their finished products throughout North America and overseas.

48

The Debtors' pricing policies, marketing strategies and fundamental business operations rely on their ability to receive raw materials and distribute finished products in a timely fashion. To maintain their operations and efficiently transport raw materials and finished products, the Debtors employ an intricate distribution network that uses both foreign and domestic third party carriers.

114.   Specifically, the Debtors' domestic distribution network depends upon the use of reputable domestic common carriers, truckers, rail carriers, barge owners and stevedores (the "Shippers") to deliver raw materials to the Debtors' production facilities and distribute finished products to the Debtors' customers. The services provided by the Shippers are essential to the ordinary-course, day-to-day operations of the Debtors. At any given time, there are numerous shipments of raw materials, work in process and finished products en route to or from the Debtors' manufacturing facilities. Thus, it is a certainty that Shippers are currently in possession of the Debtors' property, and the delivery of the raw materials, work in process and finished products that are currently held by Shippers is vital to maintaining the Debtors' operations during this critical time of transition into chapter 11. If the Debtor do not pay prepetition ordinary course obligations owed to these Shippers, the Shippers might refuse to deliver or release such property to the Debtors until they are paid. Such an outcome could cause significant disruptions to the operation of the Debtors' business that would impede operations. I understand from certain members of the management team that, as of the date hereof, the Debtors owe the Shippers approximately $95,000.

115.   The Debtors also rely upon third-party contractors, such as lease terminals and tank farms, to store raw materials and finished products (the "Warehousemen"). These Warehousemen hold the Debtors' goods and may refuse to release them pending payment from

49

the Debtors in satisfaction of their claims, thereby disrupting the Debtors' operations. It is my understanding that as of the date hereof, the Debtors owe the Warehousemen approximately $606,000.

116. Furthermore, the Debtors rely on third-party processors to manufacture or finish goods to the Debtors' exact specifications using, in many cases, the Debtors' (a) proprietary technology, (b) trade secrets and other intellectual property and (c) production equipment (the "Processors," and, together with the Shippers and Warehousemen, the "Possessory Lien Holders"). The Processors include certain parties with whom the Debtors have entered into "toll" agreements to process and finish products produced by the Debtors. At any given time, the Processors may be performing services on, and therefore have possession of, the Debtors' supplies, raw materials, work in progress and finished goods. I believe that as of the date hereof, the Debtors owe the Processors approximately $2.94 million on account of the tolling agreements.

117. In addition to the various Possessory Lien Holders described above, the Debtors also employ several third-party logistics coordinators to manage the transport of their raw materials and finished products (the "Logistics Coordinators"). These Logistics Coordinators coordinate Possessory Lien Holders for delivery and storage of the Debtors' raw materials and finished products. In many instances, the Debtors' payments to Possessory Lien Holders are coordinated by and funded through the Logistics Coordinators on a pass-through basis. Any interruption in payments to these Logistics Coordinators would likely result in a lengthy delay in the Debtors' payments to their Possessory Lien Holders and a serious risk of the Possessory Lien Holders withholding delivery or services. As described above, these delays could have a significant adverse impact on the Debtors' business and impede their transition into operations

under chapter 11.  It is my understanding that as of the date hereof, the Debtors owe the Logistics Coordinators approximately $5.92 million.  The majority of the amount owed to the Logistics Coordinators is for pass-through funding to the Possessory Lien Holders.  Specifically, it is my understanding that only 9% of the total amount owed to the Logistics Coordinators is for the Logistics Coordinators' fees.

118.    The Debtors' machinery and equipment used at their facilities, as well as the facilities themselves, require a significant amount of ongoing maintenance and repair.  The Debtors rely on, and routinely contract with, a number of third parties for such maintenance and repair.  Under applicable state law, under certain circumstances, many parties maintaining and repairing the Debtors' real and personal property have a right to assert and perfect construction, materialman's, mechanics' or other statutory liens, which attach to the Debtors' real and personal property.  I believe that as of the date hereof, the Debtors owe the lien claimants approximately $1.06 million.

119.    Certain Possessory Lien Holders have outstanding invoices as of the Petition Date for goods delivered to the Debtors or the Debtors' customers prior to the Petition Date, or for goods currently in transit, including amounts owed to or paid through the Logistics Coordinators (collectively, the "Prepetition Shipping Charges").  In addition, the Debtors have ongoing repair and maintenance projects with respect to several of their facilities, and a substantial number of lien claimants may not have been paid for certain prepetition goods and services (the "Lien Claims").

120.    Paying the Prepetition Shipping Charges and Lien Claims will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  The Possessory Lien Holders may be unwilling to release the goods in their

51

possession. Therefore, unless the Debtors can pay the Prepetition Shipping Charges, it is highly unlikely the Debtors will continue obtain to goods currently in transit.

<div align="center">**Operations Motions Deferred for a Later Hearing**</div>

**G.     Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services**

121.     The Debtors incur utility expenses for electric, natural and industrial gas, steam, water, telephone, internet, and other similar utility services. Approximately 55 utility providers (collectively, the "Utility Providers") provide these services through approximately 63 accounts. On average, the Debtors spend approximately $4.65 million each month on utility costs.

122.     The Utility Providers service the Debtors' corporate headquarters, manufacturing plants and other production sites. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption in utility services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and service their customers. I believe this disruption would adversely impact customer relationships resulting in a decline in the Debtors' revenues and profits. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

**H.     Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, Debtors to Continue to Administer Insurance Coverage and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

123.     the Debtors maintain a comprehensive insurance program that provides coverage related to, among other things, directors' and officers' liability, property and business interruption, aircraft liability, executive risk coverage, crime, pension trust liability, general liability, automobile liability, excess liability, pollution liability, international liability, cargo and

surety bonds (collectively, the "Insurance Programs").  The annual premiums for the Debtors'

Policies, together with the associated taxes and fees (the "Insurance Premiums") total

approximately $17.85 million.

124.    I believe that the Insurance Programs are essential to the preservation of the value

of the Debtors' businesses, property and assets.  In many cases, insurance coverage such as that

provided by the Policies is required by the diverse regulations, laws and contracts that govern the

Debtors' commercial activities.

I.    **Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, the Debtors to Pay Certain Taxes and Fees and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

125.    In the ordinary course of their business, the Debtors:  (a) collect and incur taxes,

including certain sales, use, franchise, business and other taxes in operating their business

(collectively, the "Taxes"); (b) charge fees and other similar charges and assessments

(collectively, the "Fees") on behalf of various taxing, licensing and other governmental

authorities (collectively, the "Authorities"); and (c) pay Fees to such Authorities for licenses and

permits required to conduct the Debtors' business in the ordinary course.  The Debtors pay the

Taxes and Fees monthly, quarterly, annually or biennially to the respective Authorities, in each

case as required by applicable laws and regulations.

126.    It is my understanding from various members of the Company's tax and legal

departments that the Debtors' failure to pay the Taxes and Fees could materially and adversely

impact the Debtors' business operations in several ways.  The Authorities may initiate audits of

the Debtors, which would unnecessarily divert the Debtors' attention from the tasks required by

the reorganization process at a critical time for the Debtors' business.  The Authorities may also

attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue

other remedies that will be administratively burdensome to the estates.  Furthermore, certain

directors and officers could be subject to personal liability, which would likely distract those key personnel from their duties related to the Debtors' restructuring.  Moreover, with respect to the Fees, I understand the Debtors' failure to pay such Fees to the Authorities and other relevant third parties would cause the Debtors to incur late fees, penalties and other charges in addition to the Fees.

127.    The Debtors collect and remit sales taxes in connection with the sale of products to their customers.  The Debtors also are responsible for remitting use taxes on account of the purchase of various inventory, raw materials, supplies or other goods used in the Debtors' business.  The Debtors remit sales and use taxes on a monthly basis, and the Debtors remit approximately $3.6 million in the aggregate in sales and use taxes per year to certain of the Authorities.  Based on historical monthly payments, I believe that the Debtors, as of the date hereof, may owe approximately $300,000 to the Authorities for prepetition sales and use taxes.

128.    The Debtors pay franchise taxes to certain of the Authorities to operate their business in the applicable taxing jurisdiction.   States assess franchise taxes in one of the following manners: (a) a flat franchise tax on all businesses; (b) a franchise tax based on net operating income; and (c) a franchise tax on capital employed in the business.  The Debtors pay franchise taxes on a quarterly and an annual basis, and the Debtors remit approximately $4 million in franchise taxes per year to certain of the Authorities.  I believe that the Debtors, as of the date hereof, may owe approximately $833,000 to the Authorities on account of prepetition franchise taxes.

129.    Certain states require the Debtors to pay various business taxes.  These Taxes may be based on gross receipts or other bases determined by the taxing jurisdiction.  Further, certain states require the Debtors to pay annual reporting fees to state governments to remain in good

54

standing for purposes of conducting business within the state. The Debtors pay approximately $187,000 per year with respect to these various business taxes and annual reporting fees. I believe that the Debtors, as of the date hereof, may owe approximately $39,000 with respect to prepetition business taxes and annual reporting fees. The Debtors acknowledge that some of these business taxes and annual reporting fees may, under applicable law, be entitled to a priority claim as a secured claim.

130.    Various state and local laws require the Debtors to obtain and pay fees for a wide range of licenses and permits from a number of local, state and federal regulatory agencies. In addition, the Debtors are also required by applicable law to pay certain foreign taxes and fees, import/export fees, customs fees and duties. In particular, the Debtors are subject to certain taxes related to the manufacture of specialty chemicals.[30] The method for calculating amounts due under such licenses and permits and the deadlines for paying such amounts varies by jurisdiction. Finally, the Debtors have approximately 3,400 U.S. and foreign patents and pending patent applications and approximately 4,900 U.S. and foreign registered and pending trademarks in more than 100 countries. The Debtors rely on over 140 firms worldwide to monitor and maintain the value of their intellectual property, by, among other things, paying regulatory and filing fees on behalf of the Debtors to regulatory agencies and governmental Authorities. The Debtors pay the firms for their services, a substantial portion of which goes to reimburse the firms for fees paid on behalf of the Debtors to the applicable regulatory agencies and governmental Authorities.

---

[30]    *See, e.g.*, New Jersey Spill Compensation and Control Tax, N.J. STAT. ANN. § 58:10-23.11h.

J.    **Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, Debtors to Maintain Customer Programs and Honor Prepetition Obligations Related Thereto and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

131.    The Debtors sell more than 3,500 chemical products and formulations to various dealers, distributors and major retailers (the "Customers"), who in turn market and sell these products and formulations to the commercial public.  Maintaining the loyalty and goodwill of the Customers is critical to the Debtors' reorganization efforts.  To develop and sustain their reputations and to support their worldwide sales efforts, the Debtors, in the ordinary course of their business, maintain programs to generate goodwill, meet competitive market programs and ensure Customer and commercial public satisfaction (the "Customer Programs").

132.    As part of their Customer Programs, the Debtors utilize various rebate programs to enhance product loyalty among their existing Customers and attract new Customers (the "Rebate Programs").  The Debtors' Rebate Programs do not follow a one-size-fits-all form; rather, they vary across business segments (for example, the Debtors have determined that certain programs are more effective for their consumer division, whereas other programs are more effective in a business-to-business context) and the specific rebate terms and conditions offered vary from customer to customer.  The specific terms of the Debtors' Rebate Programs are proprietary and confidential and, accordingly, are not described here.  On an overall basis, however, the Rebate Programs include volume rebates, growth rebates, co-op allowances and a broad variety of other allowances and incentives.

133.    By way of example, ***volume rebates*** form one important component of the Debtors' Rebate Programs.  Volume rebates are paid after the Customers hit target volumes of sales and which are calibrated to encourage Customers to offer their commercial customers lower prices to reach the target volume.  By contrast, ***growth rebates*** are paid after the

Customers increase their sales compared with sales in a previous period, and they are calibrated to encourage Customers to increase their use of the Debtors' products on a period-over-period basis.

134.     The Debtors also offer Customers rebates in the form of annual ***co-op allowances*** to assist Customers with advertising and promoting the Debtors' brands.  Through this program, the Debtors issue rebates to Customers equal to the cost of portions of advertisements which feature the Debtors' products.  Items eligible for co-op reimbursement under this program include direct mail promotions to dealers and training schools for dealers.  The Debtors generally specify a time frame through which the co-op allowance must be spent in order for a particular Customer to be eligible for reimbursement.

135.     Further, as part of the Rebate Programs, the Debtors offer Customers a variety of other rebates, including stocking allowances, in-season allowances, inventory protection for crop and consumer products, brand incentives, consumer loyalty payments and discounts, business planning incentive rebates and sales achievement incentive rebates.  These various rebates, while they vary widely from region to region, from division to division and from season to season, are all generally offered with the goal of enhancing Customer loyalty and attracting new Customers.

136.     The Debtors accrued approximately $45 million in obligations to the Customers on account of the 2008 Rebate Programs.  I understand from my colleagues that the Debtors owe approximately $6.6 million remained outstanding as of the Petition Date.  Furthermore, as of February 28, 2009, the Debtors had accrued approximately $9.5 million in obligations to Customers on account of the 2009 Rebate Programs.  Of this amount, I believe that approximately $9 million remained outstanding as of the Petition Date.  A very significant portion of all of the Debtors' obligations under the Rebate Programs will never be paid to

Customers in cash, but rather will be offered as credits against future purchases by those Customers of the Debtors' products.

<p align="center">**Professional Retention and Compensation Motions**</p>

**K.     Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors Effective *Nunc Pro Tunc* to the Petition Date**

137.    The Debtors seek to retain Kirkland & Ellis LLP ("K&E") as their attorneys because K&E has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  K&E has been working with the Debtors since December 2008 with respect to various restructuring, litigation and other related matters.

**L.     Debtors' Application for Entry of an Order Authorizing the Employment and Retention of WolfBlock LLP as Conflicts Counsel for the Debtors Effective *Nunc Pro Tunc* to the Petition Date**

138.    The Debtors seek to retain WolfBlock LLP ("WolfBlock") as their conflicts counsel because WolfBlock has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. WolfBlock has been working with the Company since well before the petition date with respect to various bankruptcy-related matters in which the Debtors are a creditor or other party in interest.

**M.     Debtors' Application for Entry of an Order Authorizing (A) the Employment and Retention of Alvarez & Marsal North America, LLC as Crisis Manager for the Debtors and (B) the Appointment of Ray Dombrowski as Chief Restructuring Officer for the Debtors Effective *Nunc Pro Tunc* to the Petition Date**

139.    The Debtors seek to retain Alvarez & Marsal North America, LLC ("A&M") and to appoint Ray Dombrowski chief restructuring officer of the Debtors.  A&M has been working

with the Company since March 2009 with respect to various restructuring and other related matters.

**N.    Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Lazard Frères & Co. LLC as Investment Banker for the Debtors and Debtors in Possession Effective *Nunc Pro Tunc* to the Petition Date**

140.    The Debtors seek to retain Lazard Frères & Co., LLC ("Lazard") as their investment banker because, among other things, Lazard has extensive experience and an excellent reputation in providing high quality investment banking services to debtors and creditors in bankruptcy reorganizations and other restructurings.  Lazard has been working with the Company since February 2009 with respect to various restructuring and other related matters.

**O.    Debtors' Motion for Entry of an Order Authorizing and Approving the Employment and Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent**

141.    The Debtors may have more than 50,000 potential creditors in these chapter 11 cases.  Accordingly, the Debtors propose to engage Kurtzman Carson Consultants LLC ("KCC") to act as the Debtors' notice and claims agent, because this is an effective and efficient manner of providing notice to the thousands of creditors and parties in interest of the filing of the Debtors' chapter 11 cases and other developments in the chapter 11 cases, and of addressing other similar duties during these cases.

**P.    Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business**

142.    The Debtors employ various attorneys in the ordinary course of their business (each, an "OCP" and, collectively, the "OCPs").  The OCPs provide services for the Debtors in a variety of matters unrelated to these chapter 11 cases, including legal services with regard to specialized areas of the law, environmental regulation, accounting services, auditing and tax services and certain consulting services.

143.    In the ordinary course of business, the Debtors also employ professional service providers such as public relations and communications consultants, engineers, environmental consultants, product testing consultants, information technology consultants, marketing and business consultants, consultants with respect to the Debtors' various intellectual property and other service providers (collectively, the "Service Providers").  Although some of the Service Providers have professional degrees and certifications, they provide services to the Debtors that are integral to the day-to-day operation of the Debtors' businesses and do not directly relate to or materially affect the administration of these chapter 11 cases.

144.    I believe that although the OCPs and Service Providers will wish to continue to represent the Debtors during these chapter 11 cases, many would not be in a position to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise and familiarity that the OCPs and Service Providers have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating and retaining replacement professionals.  Accordingly, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.  Moreover, in light of the substantial number of OCPs and Service Providers, and the significant costs associated with the preparation of employment applications and fee applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP and Service Provider.

145.    I am aware that some of the OCPs and Service Providers may hold relatively small unsecured claims against the Debtors in connection with services rendered to the Debtors

60

prepetition; I do not believe that such claims would cause any of the OCPs or Service Providers to have an interest materially adverse to the Debtors, their creditors or other parties in interest.

**Q.     Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals**

146.    I believe that establishing orderly procedures for payment of K&E, WolfBlock, A&M, Lazard, KCC and any other professionals retained in these chapter 11 (collectively, the "Professionals") will streamline the administration of these chapter 11 cases by facilitating efficient review of the Professionals' fees and expenses while saving the Debtors unnecessary copying and mailing expenses.

## Procedural Motions

**R.     Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases**

147.    As discussed herein above, the 27 Debtors in these chapter 11 cases include Chemtura Corp. and 26 of its direct and indirect subsidiaries, each of which is wholly-owned or controlled by the Company, or of which the Company holds the power to vote twenty percent (20%) or more of the subsidiaries' outstanding voting securities.  The Debtors operate as an integrated business with common ownership and control, and they share key financial and operational systems.

148.    The joint administration of these chapter 11 cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates.  Nor will joint administration adversely affect the Debtors' respective creditors because this motion requests only administrative, not substantive, consolidation of the estates.  Thus, I believe individual creditors' rights should not be harmed by the relief requested; by contrast, non-debtor parties in interest will benefit from the cost reductions associated with the joint administration of these cases.

61

**S.**     **Debtors' Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures**

149.    I expect that there may be more than 50,000 parties in interest in these cases, that hundreds of parties will file requests for service of filings and that numerous motions and applications will be filed in these chapter 11 cases.  The costs and burdens that might arise absent adoption of case management procedures -- such as, for example, those associated with multiple hearings per month, plus the costs associated with copying, mailing, overnighting or otherwise serving paper copies of all such documents -- could impose significant economic and administrative burdens on the Debtors' estates, the Court and all other parties in interest  Given the size and scope of these cases, I believe that implementation of case management procedures will facilitate their efficient administration.

**T.**     **Debtors' Motion for Entry of an Order Granting an Extension of Time to File Schedules and Statements**

150.    As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in these chapter 11 cases and the geographical spread of the Debtors' operations, the Debtors have not yet finished gathering the statements of financial affairs, schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and lists of equity security holders.  Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these chapter 11 cases, I believe that with an additional 30 day extension, the Debtors will be able to focus the attention of key accounting and legal personnel on vital operational and restructuring issues during the critical first weeks after filing these chapter 11 cases.   This will help the Debtors make a smooth transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

U.      **Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors and (C) Mail Initial Notices**

151.    The Debtors propose to retain Kurtzman Carson Consultants LLC ("KCC") as notice and claims agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices.  With such assistance, the Debtors will be prepared to file a computer-readable consolidated list of creditors and a list of equity security holders upon request and will be capable of undertaking all necessary mailings.  Indeed, because the Debtors have thousands of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

152.    I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit KCC to promptly notice those parties.  Accordingly, maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices will maximize efficiency and accuracy, and reduce costs.

**V.      Motion for Entry of an Order Establishing Notification and Hearing Procedures for Transfers of Certain Common Stock and for Related Relief**

153.    The Debtors have incurred, and are currently incurring, significant net operating losses ("NOLs").   As of December 31, 2008, the Debtors had NOLs of approximately $245 million, and Tax Credits of approximately $68 million.   These Tax Attributes could translate into a potential future tax savings of approximately $166 million, based on a combined federal and state income tax rate of approximately 40%.

154.    The Debtors seek authorization to protect and preserve these valuable tax attributes, including the NOLs and certain other tax and business credits ("Tax Credits" and, with the NOLs, the "Tax Attributes") by establishing notification and hearing procedures regarding the trading of common stock that must be complied with before trades or transfers of such securities become effective.   It is my understanding that unrestricted trading of common stock could adversely affect the Debtors' NOLs.