Elihu Inselbuch
Rita C. Tobin
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Telefax: (212) 644-6755

Ronald E. Reinsel
Jeffrey A. Liesemer
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W., Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax: (202) 429-3301

*Counsel for Karen Smith and*
*Certain Other Diacetyl Claimants*

**Objection Deadline: Aug. 12, 2009 at 4:00 p.m. EDT**
**Hearing Date: Aug. 17, 2009, at 9:45 a.m. EDT**

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
| | ) |
| CHEMTURA CORPORATION, *et al.*, | ) |
| | ) |
| Debtors. | ) |
| | ) |

Chapter 11

No. 09-11233 (REG)

Jointly Administered

## LIMITED OBJECTION OF THE DIACETYL CLAIMANTS TO THE DEBTOR'S MOTION FOR AN ORDER (A) SETTING A BAR DATE FOR FILING PROOFS OF CLAIM; (B) APPROVING THE FORM AND MANNER FOR FILING PROOFS OF CLAIM AND (C) APPROVING NOTICE THEREOF

# TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ...................................................................................3

THE DEBTORS' REQUESTED RELIEF ..................................................................................6

ARGUMENT ...................................................................................................................9

      A.     Contrary To The Debtors' Assertion, There Is No Absolute
           Requirement For POCs. ............................................................................9

      B.     The Proposed Notice To Potential Diacetyl Claimants Is Insufficient
           To Meet The Requirements Of Due Process ........................................10

      C.     A Bar Date for Diacetyl Claims is at Best Premature.............................13

      D.     Estimation Rather Than Individual Adjudication Based On Pocs May
           Be Appropriate.......................................................................................17

      E.     The Bankruptcy Code and Bankruptcy Rules Provide for Temporary
           Allowance of Claims for Voting Purposes, a Process
           That Does Not Entail a Bar Date or Proof of Claim Forms...................22

CONCLUSION.................................................................................................................24

*In re McCall*, 44 B.R. 242 (Bankr. E.D. Pa. 1984)............................................................19

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).........................10, 11

*In reNDEP Corp.*, 203 B.R. 905 (D. Del. 1996)...........................................................15, 16

*Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999)..............15

*In re Nova Real Estate Investment Trust*, 23 B.R. 62 (Bankr. E.D. Va. 1982)......18, 19, 22

*Official Committee of Asbestos Claimants of G-1 Holdings, Inc. v. Heyman*, 277
    B.R. 20 (S.D.N.Y. 2002)..............................................................................................15

*Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478 (1988).....................10

*In re Radio-Keith Orpheum Corp.*, 106 F.2d 22 (2d Cir. 1939).........................................19

*In re Simmons*, 765 F.2d 547 (5th Cir. 1985) ...................................................................13

*Waterman Steamship Corp. v. Aguiar (In re Waterman Steamship Corp.)*, 157
    B.R. 220 (S.D.N.Y 1993).......................................................................................10, 11

*Weigner v. City of New York*, 852 F.2d 646 (2d Cir.1988), *cert. denied,* 488 U.S.
    1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989)............................................................11

*In re Zolner*, 173 B.R. 629 (Bankr. N.D. Ill. 1994), aff'd, 249 B.R. 287 (7th Cir.
    1995) .......................................................................................................................22, 23

### DOCKETED CASES

*In re ACandS Inc.,* Case No. 02-12687 (RJN)(Bankr. D. Del. October 3, 2003)..............24

*In re Asbestos Claims Management Corp.*, Case No. 02-37124 (SAF) ............................24

*In re Babcock & Wilcox Co.*, Case No. 00-10992 (Bankr. E.D. La. May 1, 2003)...........24

*In re Federal-Mogul Global Inc.*, Case No. 01-10578 (RTL) (Bankr. D. Del.
    June 14, 2004)..............................................................................................................24

*In re Pittsburgh Corning Corp.*, Case No. 00-22876 (JKF) .............................................24

Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075.........................................................15

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 354 (1977).................................................18

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re A.H. Robins, Co.*, 880 F.2d 694 (4th Cir. 1989)..........................................................23

*In re Armstrong World Industrial, Inc.*, 292 B.R. 678 (10th Cir. 2003)............................23

*In re Baldwin-United Corp.*, 55 B.R. 885 (Bankr. S.D. Ohio 1985) ...........................19, 23

*In re Bellucci*, 119 B.R. 763 (Bankr. E.D. Cal. 1990) ...................................................22, 23

*Bittner v. Borne Chem. Co.*, 691 F.2d 134 (3d Cir. 1982)............................................18, 19

*In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338 (5th Cir. 1984) ...........................17, 19

*In re Charter Co.*, 876 F.2d 861 (11th Cir. 1989) ..............................................................13

*In re Chateaugay Corp.*, 944 F.2d 997 (2nd Cir. 1991) .......................................17, 18, 19

*Cimino v. Raymark Industrial, Inc.*, 151 F.3d 297 (5th Cir. 1998).......................................9

*In re Dana Corp.*, 379 B.R. 449 (Bankr. S.D.N.Y.,2007) ...................................................18

*In re Eagle-Picher Industrial*, 137 B.R. 679 (Bankr. S.D. Ohio 1992)............................15

*In re Eagle Picher Industrial*, 189 B.R. 681 (Bankr. S.D. Ohio 1995) ............................20

*In re Eagle-Picher Industrial*, 203 B.R. 256 (S.D. Ohio 1996)........................................20

*In re FRG, Inc.*, 121 B.R. 451 (Bankr. E.D. Pa. 1990)................................................22, 23

*In re Farley, Inc.*, 146 B.R. 748 (Bankr. N.D. Ill. 1992) ...................................................19

*In re Federal Press Co.*, 116 B.R. 650 ........................................................................19, 22

*In re Fesq*, 153 F.3d 113 (3d Cir. 1998) .............................................................................15

*In re Goldstein*, 114 B.R. 430 (Bankr. E.D. Pa. 1990) ......................................................22

*In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988), *aff'g* 68 B.R. 618
(Bankr. S.D.N.Y.1986) ..................................................................................................23

*In re Joint Eastern and Southern Districts Asbestos Litigation*, 830 F. Supp. 686
(E. & S.D.N.Y.,1993) ....................................................................................................18

S. Rep. No. 95-989, 95th Cong., 2d Sess. 65 (1978) ........................................................18

## OTHER AUTHORITY

*4 Alan N. Resnick and Henry J. Sommer, Collier on Bankruptcy* ¶ 501.01[1]
(15th ed. 2004) ......................................................................................................passin

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| CHEMTURA CORPORATION, *et al.*, | No. 09-11233 (REG) |
| Debtors. | Jointly Administered |

## LIMITED OBJECTION OF THE DIACETYL CLAIMANTS TO THE DEBTOR'S MOTION FOR AN ORDER (A) SETTING A BAR DATE FOR FILING PROOFS OF CLAIM; (B) APPROVING THE FORM AND MANNER FOR FILING PROOFS OF CLAIM AND (C) APPROVING NOTICE THEREOF

Karen Smith and Certain Other Diacetyl Claimants (the "**Humphrey Farrington Claimants**"),[1] by and through their undersigned counsel, hereby file this Limited Objection to Debtor's Motion (the "Motion") for an Order Setting a Bar Date for Filing Proofs of Claim ("POC") to the extent that the Motion presently seeks to set such a bar date with respect to diacetyl personal injury claims.

While the Diacetyl Claimants do not oppose the Debtors' request for setting a bar date with respect to its general commercial or other claims, setting a bar date at this juncture with respect to diacetyl personal injury claims is, at best, premature and unnecessary, and at worst, a bold attempt to cut off the rights of prospective personal injury claimants without adequate notice or due process.

---

[1]     The Humphrey Farrington Claimants are Norma Batteese, Charles Campbell, Natoma Campbell, Emmett D. Cooper, Bernard Couser, Lola Couser, Nancy Dudley, Josephine Dunbar, Paul Dunbar, Elizabeth Fults, Donna F. Millar, Mark L. Millar, Doris Pate, Dennis Patton, Donald Powell, Kelly Powell, Debra Robinson, Dawn Riley, Robert Riley, Jill Roth, Kathy Smead, Richard Smead, Karen Smith, William Smith, Gerardo Solis, Don Stephens, Doris Stubbs, Louis Watson, Mary Watson, Wayne Watson and Phoebe Williams, each of whom is represented by the law firm of Humphrey, Farrington & McClain, P.C., in underlying diacetyl-related, personal-injury litigation.

The Debtors' Motion, if granted, would require that all individuals with diacetyl-related personal injury claims against a Debtor that arose prior to March 18, 2009 (other than certain employees plus narrow exceptions for individuals with previously filed claims) would need to file a POC not later than October 30, 2009 or be forever barred, estopped and enjoined from asserting such claims against the Debtors.  Under the circumstances in which the Debtors' produced, marketed and placed the injury-causing diacetyl product into the stream of commerce, the resulting personal injury victims have had effectively no notice of the Debtors' responsibility for their exposure to the product nor have the Debtors or their immediate clients disclosed the customer lists to whom the product was sold and distributed such that adequate notice to affected food industry workers and consumers can be made.  The Debtors' proposed publication notice with respect to the POC bar date merely seeks to exploit such claimants' the lack of knowledge to achieve through stealth an artificial reduction in claims that may be asserted against them and to permanently bar meritorious claims.

Rather, the rush to set a present bar date for all potential diacetyl product injury claims in reliance upon vague general publication notice fails to provide adequate due process and appears intended to slam the door on prospective claimants before the claimants can even discover that the door exists.

Accordingly, the Diacetyl Claimants respectfully request that the Court deny the Motion to the extent that it seeks to establish a present Bar Date for Filing POCs with respect to diacetyl personal injury claims and condition the setting of any such date only upon adequate disclosure of and notice to the potentially affected claimant population.

## INTRODUCTION AND BACKGROUND

1.      On March 18, 2009, Chemtura Corporation ("Chemtura Corp.") and various of its

affiliates filed voluntary petitions under Chapter 11 of the Bankruptcy Code thereby

commencing the above-captioned, jointly administered cases.

2.      Among other things, Chemtura Corp. sold a product called diacetyl, an artificial

butter flavoring chemical used in a variety of food manufacturing processes.  According to the

National Institute for Occupational Safety and Health (NIOSH):

> In general, flavoring chemicals are very volatile, so they evaporate
> into the air from their liquid or solid form and can be easily
> inhaled. They can also be inhaled in the form of a powder if
> airborne dust is created in the production process. Many of these
> chemicals are highly irritating to the eyes, respiratory tract, and
> skin. At flavoring and microwave popcorn production plants where
> workers developed severe lung disease, workers routinely handled
> or were exposed to open vessels containing flavorings or their
> chemical ingredients. In a sense, such plants are large kitchens
> where workers mix several chemical ingredients in large pots or
> other containers to produce various products. The application of
> heat in the production process can increase the amount of flavoring
> chemicals that get into the air. In addition to microwave popcorn
> and flavorings plants, other food industries with potential exposure
> to butter flavoring chemicals include snack foods (*e.g.* chips,
> pretzels), commercial and retail bakeries (*e.g.* cakes, cookies,
> bread), retail baking mix production, margarine and other
> vegetable oil-based cooking products, butter and other diary
> products, and candy manufacturers. Use of butter-flavored cooking
> oil products to prepare meals in restaurants may also lead to
> worker exposures. While exposures in the flavoring industry and in
> microwave popcorn production have caused severe lung disease in
> some workers, the degree of risk to workers from exposures in
> other settings is currently unknown.

*See*: NIOSH Safety and Health Topic: Flavorings-Related Lung Disease  Exposures to Flavoring
Chemicals http://www.cdc.gov/niosh/topics/flavorings/exposure.html#occur, copy attached as
Exhibit 1.

3.      Exposure to diacetyl results in severe lung function impairment, known as

Bronchiolitis Obliterans.  *See e.g.* Occupational Bronchiolitis Obliterans Masquerading as

COPD, 176 American Journal of Respiratory and Critical Care Medicine 427-28 (2007).
Attached as Exhibit 2.

4.      The diacetyl sold by Chemtura Corp. was made by Chemtura Canada, a non-debtor subsidiary of Chemtura Corp.

5.      According to Chemtura Corp., from 1998 until at least 2005 it sold the diacetyl produced by Chemtura Canada exclusively (or at least primarily) to Citrus & Allied Essences, Ltd. ("Citrus"). However, no discovery or disclosure has been had from the Debtor to verify the identity of its diacetyl customers.

6.      Upon information and belief, Citrus placed its own labels on the Chemtura diacetyl containers, provided its own material safety data sheets, and re-sold the diacetyl it purchased from Chemtura to numerous entities, including at least Ungerer & Company ("Ungerer"). Other than Ungerer, outside of a handful of flavor companies, it is unknown to whom Citrus re-sold the Chemtura diacetyl or whether Ungerer also re-sold the Chemtura diacetyl. No discovery or disclosure has been had from either Citrus or Ungerer to verify the identity of their diacetyl re-sale customers.

7.      Regardless, as a result of such re-labeling and re-sales, it would be difficult for any subsequent purchasers, including the flavoring companies and others in the food industry who actually used the product in food manufacturing, to know that the diacetyl they bought or used originated from Chemtura. Similarly, the individual food industry workers who have been occupationally exposed to the chemical during the manufacturing process would have little, if any, knowledge of Chemtura's original responsibility for their exposure to the diacetyl product.

8.      Food product consumers, including consumers of microwave popcorn, have also been exposed to diacetyl and been diagnosed with bronchiolitis obliterans and may hold potential

claims against the Debtors.  Such consumer products do not typically identify diacetyl as an

ingredient or identify the supplier of the diacetyl, but rather typically state that they contain

"natural and artificial butter flavoring," thus such consumers also have no information that they

may have been exposed to the diacetyl product or that Chemtura may be the source of that

exposure.

9.    There are essentially four different types of potential diacetyl claimants:

    a.    Claimants who have been exposed to diacetyl, who are currently sick and
who have filed tort claims;

    b.    Presently unknown claimants who have been exposed to diacetyl, who are
currently sick, but who have not yet been properly diagnosed with a
disease caused by diacetyl or have not yet discovered the Debtors'
responsibility for their diacetyl exposure;

    c.    Presently unknown claimants who have been exposed to diacetyl, who are
not yet, but will become sick; and

    d.    Future claimants who have not yet been exposed to diacetyl, but who will
be exposed and become sick in the future.

10.    The Debtors' proposed POC procedures, including imposition of a bar date,

would act to preclude at least three out of the four categories of diacetyl claimants from any type

of recovery.   Moreover, the burdensome and unfair procedures proposed are totally unnecessary

to meet any legitimate concern of the Debtors that allocation of value as between commercial

and other creditors be based on the relative size of the claims of the different creditor

constituencies, that the vote of diacetyl claimants reflect the views of bona fide claimants, and

that proper procedures be followed when claims are actually paid to insure that only those who would have been paid without bankruptcy are paid.

## THE DEBTORS' REQUESTED RELIEF

11.    The Debtors assert that they anticipate that thousands of parties in interest may file claims against them in these Chapter 11 cases, including with respect to legacy liabilities and related to businesses that the Debtors do not operate or may never have operated.  Thus, the Debtors' assert that they have "designed a bar date process involving a combination of direct noticing and publication, with the intent to undertake reasonably diligent efforts to identify and provide actual notice to known creditors and to provide publication notice reasonably calculated to reach unknown creditors."  Motion at ¶¶ 4-6.

12.    The Debtors propose to require that all POCs be required to be received on or before October 30, 2009 (the "Bar Date") and that if any claimant who is required, but fails, to file a POC by the Bar Date "shall be forever barred, estopped and enjoined from asserting such a claim against the Debtors".  Motion at ¶¶11, 31.

13.    The Debtors further propose to provide actual notice of the Bar Date and POC procedures by mail to all "known creditors," including to counsel for known tort claimants with pending lawsuits who are represented by counsel.  Motion at ¶¶16-21.  The Debtors' notice to tort counsel, procedures go too far, however, in proposing to require that the attorney must be liable for either providing the Debtors with the names and addresses of all actual or potential claimants known to them for the Debtors to send them a bar date package or for the attorney to obtain and provide such packages directly.  Such counsel should not be placed at risk of liability to determine who may or may not be a "potential claimant" against the Debtors.

- 6 -

14.    The Debtors propose to provide actual notice of the Bar Date only to their "known

creditors" and to rely upon a generalized publication notice to allegedly "unknown" creditors,

including presumably to all persons who have been exposed to the Debtors' diacetyl products

and who thus may presently hold or will later manifest claims against the Debtors or who will

only later discover the Debtors' responsibility for their claims. Motion at ¶16.

15.    A proposed form of the General Bar Date Notice for publication is attached as

Exhibit F to the Motion and is proposed to be published in the *New York Times* and *USA Today*

"on at least one occasion prior to September 15, 2009." Motion at ¶19.

16.    The proposed General Bar Date Notice, however, identifies only the corporate

names of the Debtors and certain predecessor entities and provides only basic information

regarding the procedure for filing proofs of claims. It is utterly devoid of any information

concerning the nature of the Debtors' business, the products (including diacetyl) that they sold

and distributed or the known potential health risks presented by those products. While such a

generalized and sterile general publication  notice may be sufficient for commercial creditors

who knowingly and voluntarily entered into commerce with the Debtors and who can readily

identify the Debtors as parties to their transactions, the cursory notice and its proposed general

publication is not reasonably calculated to either reach or adequately inform individual creditors

who have been involuntarily exposed to the Debtors' products, including potential diacetyl

personal injury claimants. Moreover, because many such potential claimants may not yet have

manifested illness, obtained adequate diagnoses or yet discovered the Debtors' responsibility for

their exposure, the generalized notice is effectively no notice at all that they may be deprived of

their rights to recovery.

17.     In contrast to the proposed General Bar Date Notice, the Debtors have proposed a far more comprehensive and informative notice procedure to be directed to environmental and tort claims related to Plant and Disposal sites and have provided to supplement the general publication notice with both Site-Specific Mailing Notice (directed to potential claimants living within a certain radius of any Plant or Disposal Site) and Site –Specific Publication Notices in newspapers and periodicals with circulation covering the towns and cities where the Plant and Disposal Sites are located.  Motion at ¶¶ 20, 25.

18.     Copies of the proposed Site-Specific Publication Notices are attached as Exhibit H to the Motion and typically identify; among other things, the specific site location; the specific Debtor(s) involved at that site; the specific chemicals or products produced, stored or disposed of at the site; whether asbestos-containing materials were present at the site; and give notice that: "If you have any "claim against a Debtor related to exposure to any products , raw materials or contaminants [as listed in the Notice] that were produced, manufactured, supplied, used or disposed of by [the specific Debtors identified in the Notice]" a claim must be filed.  The Site-Specific Publication Notices additionally specifically identify that:

> If you have, or your property, or your spouse or immediate family member, was exposed to any [identified Site-Specific Materials], and if that exposure directly or indirectly caused injury that becomes apparent either now or in the future, you may have a claim under various legal theories for damages.  Among other things, personal injury damages could relate to physical, emotional or other personal injuries, such as personal or bodily injury, wrongful death, loss of consortium, medical monitoring, survivorship or proximate, consequential, general and special damages or punitive damages.

While the Humphrey Farrington Claimants take no position with respect to the adequacy of the proposed Site-Specific Bar Date Notices with respect to claimants holding potential site-specific environmental or tort claims, such proposed notices and the proposed procedures for providing

- 8 -

such notice are in stark contrast to the lack of specification and attention to notice proposed to be provided to potential diacetyl personal injury claimants.

## ARGUMENT

**A.    Contrary To The Debtors' Assertion, There Is No Absolute Requirement For POCs.**

The Debtors state that: "Bankruptcy Rule 3003(c)(3) provides that the Court shall fix the time within which proofs of claim must be filed in a Chapter 11 case pursuant to section 501 of the Bankruptcy Code." *See* Debtor's Motion at page 1, ¶ A3. However, the Debtors' assumption that a bar date must be established for all claims is not correct. Moreover, a requirement at this juncture for POCs from all potential diacetyl personal injury claimants would not serve any useful purpose in these bankruptcy proceedings where no plan has yet been proposed and it is thus entirely unclear how the Debtors will propose to address and treat the present and unknown future diacetyl claims in these cases. Further, even if a it were appropriate to presently seek the filing of claims by persons exposed to the Debtors' diacetyl products, the proposed notice procedures are wholly insufficient to provide reasonable notice consistent with the requirements of due process.

The course of action the Debtors would impose on the Court and the other parties is not required by the Bankruptcy Code; and, moreover, it is inconsistent with the Bankruptcy Code. Most important, while confirmation may require determining an aggregate value of both present and future claims, and the Debtors' POC proposals would make a determination of that figure within a reasonable timeframe all but impossible. There is no process provided here for a collective determination of individual cases that is consistent with constitutional and statutory standards of due process and jury trial rights. *See* Cimino v. Raymark Indus., Inc., 151 F.3d 297, 316 (5th Cir. 1998).

B.    **The Proposed Notice To Potential Diacetyl Claimants Is Insufficient To Meet The Requirements Of Due Process.**

The Debtors propose to give actual notice of the bar date only to "known" creditors and, other than with respect to the Site-Specific Notices, to rely entirely on their proposed generalized form of publication notice to inform potential claimants, including presently unknown and future diacetyl claimants, of the alleged need to file POCs or suffer their claims being forever barred. The Debtors assert that such reliance on publication notice is consistent with the case law and practice in this district, citing among others, *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306 (1950); Tulsa *Prof'l Collection Serv, Inc. v. Pope*, 485 U.S. 478 (1999) and *Waterman Steamship Corp. v. Aguiar (In re Waterman Steamship Corp.)* 157 B.R. 220, 221 (S.D.N.Y 1993) for the proposition that actual notice is only required where the name and address of the claimant are reasonably ascertainable. *See* Motion at ¶ 16. The statement concedes too little.

While reliance on publication may be appropriate in some circumstances, as the Supreme Court stated in *Mullane*, due process requires the provision of *reasonable* notice to those parties whose claims are to be discharged: An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice *reasonably calculated, under all the circumstances, to apprise interested parties* of the pendency of the action and afford them an opportunity to present their objections. *Mullane,* 339 U.S. at 314 ("when notice is a person's due, process which is a mere gesture is not due process.") Notice which is not personally addressed, including notice by publication, may suffice only if it is reasonable under the circumstances. *Tulsa,* 485 U.S. at 490.

In *Waterman*, the Court was presented with the question of the adequacy of notice given to persons exposed to asbestos on board the Debtor's ships of their need to file proofs of claim

in Waterman's bankruptcy proceedings. There, the Court stated that, although for creditors who are not 'reasonably ascertainable' publication notice can suffice, "the proper inquiry in evaluating the adequacy of notice is whether a party acted reasonably in selecting means likely to inform persons affected." Id. at 221 citing *Weigner v. City of New York,* 852 F.2d 646, 649 (2d Cir.1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989)). Additionally, although the debtor is not required to search out each conceivable or possible creditor, in providing notice "a debtor must make reasonably diligent efforts to uncover the identities of those who have claims against the debtor." Id. (citing *In re Thomson McKinnon Securities, Inc.,* 130 B.R. 717, 720 (Bankr.S.D.N.Y.1991)). Accordingly, the Court in *Waterman* held that, while  persons who were known to be actual or potential claimants were entitled to personal notice, those actual or potential claimants who could not be personally identified with reasonable effort to receive personal notice "were entitled to notice which was reasonably calculated, under all the circumstances, to appraise them of the pendency of the action and afford them an opportunity to present their objections. Id. at 222 (citing *Mullane*).

*Waterman* ultimately found that the Bankruptcy Court failed to analyze whether the non-personal notice given by the Debtor sufficed to meet the *Mullane* standard with respect to those individuals who had manifested any detectable signs of disease when the notice of the bar date was given and who were thus able to perceive the significance and implications of the information.  Significantly, however, *Waterman* also held that any potential future claims of potential claimants who had not yet manifested any detectable signs of disease when the notice of the bar date was given *were not discharged* in the bankruptcy proceeding. Id.

Particularly in light of the attention focused by the Debtors here on providing supplemental Site-Specific notice and identification with respect to potential environmental

- 11 -

claims, it is readily apparent that the bare publication notice provided with respect to potential but presently unknown diacetyl claims demonstrates neither reasonably diligent efforts to uncover the identities of those who may have such claims nor is such proposed notice *reasonable reasonably calculated, under all the circumstances* to apprise them of the pendency of the action and its potential effect on their claims. Instead, it is a mere gesture and not due process at all.

Rather, at minimum, if such notice is even appropriate at this time, the Debtors should be required to disclosure the client lists of all parties to whom they sold or distributed the diacetyl products, and to make reasonable efforts to identify and obtain similar lists from its customers, in order to identify those food industry work sites where the product was actually used and where potential claimants were exposed to it in order that more effective site-specific notice (which would include at minimum more particular identification of the responsible debtor, the particular product involved, the product risk and the potential types of claim) can be given. Further, as in *Waterman*, any prospective bar date should not affect the rights of any potential future claimants who, although exposed to the Debtors' diacetyl product, have not yet manifested or been diagnosed with illness or yet discovered the Debtors' responsibility for their injury.

Similarly, the Debtors should be required to establish appropriate public notice procedures with respect to diacetyl exposure to potential consumers claimants.

**C.    A Bar Date for Diacetyl Claims is at Best Premature.**

The basic premise and the fundamental fallacy of Debtors' argument is their assumption

that in any chapter 11 proceeding, a POC for all claims is either mandatory or necessary.  The

Debtors do not address any type of procedure that would allow estimation of claims, nor indeed

do they address any progress toward reorganization except the proposal that individual POCs

should now be filed by all claimants.

In the first instance, nothing in the Bankruptcy Code or Bankruptcy Rules requires a POC

as a prerequisite for having creditors' claims considered.  In re Simmons, 765 F.2d 547, 551 (5th

Cir. 1985) ("[N]o creditor is required to file a proof of claim."); see also *4 Collier on Bankruptcy*

¶ 501.01[1], at 501-3 (15th ed. 2004) ("It should be noted that the filing of a proof of claim or

interest is permissive, and no creditor or interest holder is ever required to file one.") [hereinafter

"*Collier*"].  Instead, POCs are a tool to be used when they would serve some legitimate purpose

in the proceeding.  In re Simmons, 765 F.2d at 551 ("A proof of claim should be filed only when

some purpose would be served."); *Collier* ¶ 501.01[1], at 501-3 to 501-4 (quoting In re

Simmons).  Particularly with respect to potential diacetyl claimants, there is no present purpose

or need for the filing of such proofs of claim.

The primary purpose of the bar date/POC process, has been described as the achievement

of finality in bankruptcy proceedings.  In re Charter Co., 876 F. 2d 861, 863 (11th Cir. 1989).  In

this case, however, the final resolution of diacetyl personal injury claims likely will occur only

after the Plan becomes effective and there is some provision for those injured and sick victims of

diacetyl exposure whose injuries are not yet obvious.  Similar to the requirement of the

Bankruptcy Code in asbestos cases, under section 524(g) a trust should be established to handle

the claims of both present and future claimants.  The Debtors' POC procedure and request for

- 13 -

present Bar Date would not allow any future claimants. Moreover, particularly in the absence of

a plan, the process proposed by the Debtors could not serve the primary purpose contemplated by

the Bankruptcy Code or Bankruptcy Rules since it would, without effective notice, leave many

potential creditors without recourse.

In this case, however, the final resolution of diacetyl personal injury claims likely will

occur only after the Plan becomes effective and there is some provision for those injured and sick

victims of diacetyl exposure whose injuries are not yet obvious. Similar to the requirement of

the Bankruptcy Code in asbestos cases, under section 524(g) a trust should be established to

handle the claims of both present and unknown future claimants. In contrast, the Debtors'

proposed POC procedure and request for present Bar Date does not allow for, yet seeks to bar,

future claimants. Moreover, particularly in the absence of any filed plan, the process proposed

by the Debtors does not serve the primary purpose contemplated by the Bankruptcy Code or

Bankruptcy Rules since it would, without effective notice, leave many potential creditors without

recourse.

The principal support for Debtors' position that the Bankruptcy Court is absolutely

required to impose a bar date which would include a mandate that diacetyl claimants file formal

POCs in this case, is their reliance on Bankruptcy Rule 3003(c)(2)and (3). That Rule states in

full:

> (2) Who Must File a Claim. Any creditor or equity security holder
> whose claim or interest is not scheduled or scheduled as disputed,
> contingent, or unliquidated shall file a proof of claim or interest
> within the time prescribed by subdivision (c)(3) of this rule; any
> creditor who fails to do so shall not be treated as a creditor with
> respect to such claim for the purposes of voting and distribution.
>
> (3) Time for Filing. The court shall fix and for cause shown may
> extend the time within which proofs of claim or interest may be
> filed. Notwithstanding the expiration of such time, a proof of claim

- 14 -

may be filed to the extent and under the conditions stated in Rule
3002(c)(2), (c)(3), and (c)(4) [provisions of the Rules not relevant
here].

However, Bankruptcy Rule 3003(c) does not mandate the establishment of a bar date by the

bankruptcy court for all claims.

Indeed, bankruptcy courts have substantial discretion to determine whether, in particular

circumstances, a bar date should be required at all. *See, e.g.*, In re Eagle-Picher Indus., 137 B.R.

679, 680-81 (Bankr. S.D. Ohio 1992) (setting an asbestos claims bar date is not mandatory but

rather a matter left to the sound discretion of the bankruptcy court); Official Committee of

Asbestos Claimants of G-1 Holdings, Inc. v. Heyman, 277 B.R. 20, 34 n.8 (S.D.N.Y. 2002)

(noting that "in many asbestos bankruptcies, no bar date [is] ever set"). In exercising this

discretion, the courts can select not to impose a bar date, as also indicated by the bankruptcy

court in southern Ohio:

> The Debtors appear to assume that they have an absolute right to have a
> bar date set by which time proofs of claim must be filed. After careful
> consideration of this question, we have reached the conclusion that while such bar
> dates are commonly set in Chapter 11 cases, upon good cause shown **the court
> may dispense with one in a given case**. In re Eagle Picher Indus., Inc., 137 B.R.
> 679, 680 (Bankr. S.D.Ohio 1992) (emphasis added).

Moreover, even if Bankruptcy Rule 3003(c) purported to remove all of the court's

discretion with regard to the issuance of a bar date (which it does not), it could not be given that

effect. Numerous courts, relying on the Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075, have

held that the Bankruptcy Rules themselves shall not be interpreted in a manner that would

abridge, enlarge, or modify any substantive right.[2] With this in mind, Bankruptcy Rule 3003

---

[2] *See, e.g.*, In re Fesq, 153 F.3d 113, 116 (3d Cir. 1998) ("[T]he [Bankruptcy] Code defines the creation, alteration,
or elimination of substantive rights but the Bankruptcy Rules define the process by which these privileges may be
effected.") (*citing* In re Hanover Indus. Mach. Co., 61 B.R. 551, 552 (Bankr. E.D. Pa. 1986)); Northview Motors,
Inc. v. Chrysler Motors Corp., 186 F.3d 346, 351 n.4 (3d Cir. 1999) (as a matter of law, a Bankruptcy Rule is a rule
of procedure and cannot create a substantive requirement not found in the Bankruptcy Code); In reNDEP Corp., 203

should not be read to remove the discretion that the bankruptcy court has regarding the bar date

process -- particularly where the court is specifically granted broad discretion over case

administration pursuant to section 105(a) of the Bankruptcy Code.[3]

It follows, then, that the real issue is not the allegation that creditors subject to a bar date

must file their POCs by that date or forever be barred from collecting on the liability, but

whether it is necessary or appropriate at this juncture in this particular case to impose a present

bar date at all, with respect to diacetyl personal injury claims. Here, there clearly would be a

strong positive impact on the expeditious administration of this case if the Court were to decline

to exercise its discretion to impose a bar date/POC process. Equally important, there would be

no prejudice to the Debtors if this Court were to instead establish a procedure to estimate the

diacetyl liability and, under a plan, create a trust fund for both present and future claimants,

similar to the asbestos trust procedures outlined in section 524(g) of the Bankruptcy Code.

Following the procedures applicable to asbestos cases is appropriate here, in that the claimed tort

injury from exposure to diacetyl is similar to that suffered by victims of exposure to asbestos.

Both types of victims were exposed to an airborne substance that is toxic, and when inhaled

results in lung damage which is frequently not evident (or correctly diagnosed) for a period of

time.

---

B.R. 905, 910 n.4 (D. Del. 1996) (to the extent that a Bankruptcy Rule divests a party of a substantive right, the Bankruptcy Rule should not be followed).

[3] Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 105(a) has been held to afford the bankruptcy court broad equitable powers to fashion any relief necessary for the effective administration of the bankruptcy case that is not inconsistent with the express terms of the Bankruptcy Code. *See generally Collier* ¶ 105-7[2], at 105-7 to 105-8.1.

Establishing a fund for the diacetyl claimants, both present and future, is the most efficient means for the Debtors to move forward with a confirmable reorganization plan. No present bar date for the filing of diacetyl POCs is either necessary or appropriate to do so.

**D.     Estimation Rather Than Individual Adjudication Based On Pocs May Be Appropriate.**

The inappropriateness of presently requiring the filing of diacetyl POCs in this case is also made clear by the fact that the Bankruptcy Code explicitly provides an alternative road where it is impractical to adjudicate individual claims under section 502(b). That alternative is an estimation of claims under section 502(c)(1). In a tort case like this, which consists of pending claims plus, if they are to be affected at all, the need to take account of future claims, estimation is the only practical course. Estimation is fully authorized in law and established in practice in similar tort bankruptcies.

Section 502(c)(1) provides "there shall be estimated for purpose of allowance under this section . . .any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." The estimation provision thus allows, indeed requires, the bankruptcy court to conduct an estimation process for unliquidated claims for which the conduct of an adjudicatory allowance process under section 502(b) would be impractical under the circumstances or would significantly and unnecessarily delay the case. *See generally Collier* ¶ 502.04[2], at 502-54 to 502-55; In re Brints Cotton Mktg., Inc., 737 F.2d 1338, 1341 (5th Cir. 1984) (where over 1,200 pre-petition "on-call" cotton contracts were unliquidated and liquidation of each would have delayed the case significantly, bankruptcy court did not abuse discretion in estimating their aggregate value). *See also* In re Chateaugay Corp., 944 F.2d 997, 1006 (2nd Cir. 1991) (estimation of creditors' past and future indemnity claims based on debtors' retirement of property; contingent claims "may be estimated if their liquidation

- 17 -

would unduly delay the administration of the case"); In re Dana Corp., 379 B.R. 449, 452

(Bankr. S.D.N.Y.,2007) (bankruptcy court, over the Government's objection, entered order

establishing the estimation process and timeline for the asbestos claims at issue); In re Joint

Eastern and Southern Districts Asbestos Litigation, 830 F.Supp. 686, 689(E. & S.D.N.Y.,1993)

(future asbestos claims estimated); In re Nova Real Estate Inv. Trust, 23 B.R. 62, 65 (Bankr.

E.D. Va. 1982) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 354 (1977); S. Rep. No. 95-

989, 95th Cong., 2d Sess. 65 (1978)).

There are no congressionally-mandated limitations on the courts' discretion to estimate

claims. Indeed, the Third Circuit in Bittner v. Borne Chem. Co. also held that an appellate court,

in reviewing the method chosen by a lower court to estimate claims under section 502(c)(1),

should reverse only if the lower court abused its discretion. Bittner, 691 F.2d 134, 136 (3d Cir.

1982).

The estimation provisions are designed – and have been applied – for precisely the

situation presented by this and other tort bankruptcies.  Many diacetyl claims are pending in

these cases and many more are yet to be discovered and asserted.  The individual resolution of

these claims would be virtually impossible to accomplish in a manner consistent with due

process and jury trial protections. Indeed, the Third Circuit has observed that, although it is

conceivable that in "rare and unusual cases" a trial may be necessary to obtain a reasonably

accurate evaluation of a claim, such methods usually run contrary to the efficient administration

of the bankruptcy estate, especially where there is sufficient evidence on which to base a

reasonable estimate of the claim. Bittner, 691 F.2d at 135. See also, In re Chateaugay Corp., 944

F.2d 997 (2d Cir. 1991)(Second Circuit noted that "nothing prevents the speedy and rough

estimation of [environmental] claims" in  Chapter 11 proceeding in order to avoid extensive pre-

enforcement judicial review, *citing* Bittner and In re Radio-Keith Orpheum Corp., 106 F.2d 22 (2d Cir. 1939).)

A section 502(c) estimate is not a finding or a fixing of the exact amount of the claim, but rather a reasonable approximation of the claim or claims in question. In re Fed. Press Co., 116 B.R. 650, 653 (bankruptcy court not required to be "clairvoyant") (*quoting* In re Baldwin-United Corp., 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985)). Estimation is an approximation of the value of a claim, using "whatever method is best suited to the circumstances." In re Brints Cotton Mktg., 737 F.2d 1338, 1341 (5th Cir. 1984) (internal quotes omitted); *see also, e.g.*, Bittner, 691 F.2d at 135 (estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim"); cf. In re McCall, 44 B.R. 242, 244 (Bankr. E.D. Pa. 1984) (holding plan inadequate because it failed to estimate creditor's unliquidated claims).

Under section 502(c)(1), the court's estimation options include the following: (1) accepting the claim at face value; (2) estimating it at zero in which case its discharge is waived under section 1141(d);[4] and (3) arriving at an independent estimation by whatever means is appropriate. In re Fed. Press Co., 116 B.R. at 653. *See generally* Bittner, 691 F.2d at 136; Nova Real Estate Inv. Trust, 23 B.R. at 66. Some courts have simply estimated a personal injury claim as equal in value to the nationwide average of unreduced jury verdicts for similar injuries. *See, e.g.*, In re Fed. Press Co., 116 B.R. at 654. Others have valued tort claims based on the value of settlements. *See, e.g.*, In re Farley, Inc., 146 B.R. 748, 752, 756 (Bankr. N.D. Ill. 1992) (court estimated a claim based on its settlement value as calculated by multiplying the likely verdict by the chance of success).

---

[4] *Collier*, ¶ 1141.05[4], at 1141-20.

This common-sense approach to valuing tort liabilities, based on a well-recognized expert methodology, has been used by courts to confirm "cram-down" plans in contested bankruptcies involving tort claims. *See* In re Eagle-Picher Indus., 203 B.R. 256, 281 (S.D. Ohio 1996). The Eagle-Picher case best outlines the general considerations that should enter into the estimation of a debtor's aggregate liability in a case involving asbestos, a substance that is inhaled and results in lung injury, similar to diacetyl although the injury is not always immediate.

The following factors have been highlighted by the courts:

1.     The estimate should be primarily based upon the claims history of the particular company whose liability is being estimated. This consideration does not, however, rule out the desirability of considering trends general to the industry, particularly regarding the rate of filing of claims.

2.     The total number of claims to be expected should be estimated.

3.     The estimation of claims should categorize them by disease and occupation, as well as other factors.

4.     Valuation of claims should be based upon claim resolution values for claims close to the filing date of the bankruptcy case.

In re Eagle Picher Indus., 189 B.R. 681, 690-91 (Bankr. S.D. Ohio 1995).

By contrast, a bar date would serve no useful purpose for determining the Debtor's aggregate diacetyl liability.  Estimation, by definition, is an approximation, and necessarily involves comparing a known or established quantum of data to the thing being estimated. Here, there are only two possible "quantum of data" from which to estimate the liability to present and future claimants: (1) the numbers and types of claims filed with regard to similar diacetyl

personal injury cases in the tort system and the values of these cases resolved under settlement criteria and methodology; or (2) whatever numbers of claims might be filed in response to a Bar Date Order, which have never been evaluated, litigated, or reduced to any liquidated value.

In order to establish a "known" value for the Bar Date claims that could legitimately serve as a basis of comparison for estimating the future claims that would be statistically meaningful and equivalent to the history of claims resolved, the Court would be required either to try each case to verdict or to:

1.    Analyze and evaluate at the very least a statistically valid sample of the claims;

2.    Value the claims by comparison to jury verdicts in similar claims, if they could be found, or try the sample cases to juries in this Court or the state courts to which the cases are currently assigned.

This process would take years – if it could be done at all.

In an estimation proceeding, of course, the Debtors can present their own view of their potential diacetyl liability through experts of their choosing. In particular, the Debtors will be entirely free to try to convince the Court that they did not have any liability on most of those cases. The Diacetyl Claimants maintain, of course, that such arguments are without merit and simply ignore the state law substantive rights of the victims of exposure to products containing diacetyl. However, the key point is that there is no need for multiple individual claims to be presented and reviewed by the Court for those arguments to be advanced and considered without violation of the Diacetyl Claimants right to due process.

E.    **The Bankruptcy Code and Bankruptcy Rules Provide for Temporary Allowance of Claims for Voting Purposes, a Process That Does Not Entail a Bar Date or Proof of Claim Forms.**

A claims bar date for diacetyl claims also is not necessary to establish voting rights with respect to any not yet proposed plan of reorganization.  Section 1126(a) states that holders of "allowed" claims under section 502 may vote to accept or reject a chapter 11 plan.  Bankruptcy Rule 3018(a) provides a measure short of completing the full allowance process for the limited purposes of establishing eligibility for voting pursuant to section 1126(a). *See* In re Bellucci, 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990). Under Bankruptcy Rule 3018(a), notwithstanding objections to a claim, the court after notice and hearing may temporarily allow the claim in an amount that the court deems proper for the purpose of accepting or rejecting a plan.  The Eastern District of Pennsylvania has described the temporary allowance process as "'a tool which the court or any party can invoke to expedite confirmation when numerous objections to claims cloud the issue of creditors' rights to vote.'" In re FRG, Inc., 121 B.R. 451, 453 (Bankr. E.D. Pa. 1990) (*quoting* In re Goldstein, 114 B.R. 430, 434 (Bankr. E.D. Pa. 1990)).

Case law under Bankruptcy Rule 3018(a) holds that the court, in temporarily allowing a claim, is merely required to come to a reasonable estimate of the probable value of the claim or claims in order to permit the case to go forward in an expeditious manner.  *See* In re Nova Real Estate Inv. Trust, 23 B.R 62, 65-66 (Bankr.E.D.Va. 1982).  Bankruptcy courts, therefore, have the discretion to allow or disallow all or part of a claim on a temporary basis if the allowance is to facilitate the section 1126(a) voting process.  In re Goldstein, 114 B.R. 430, 434 (Bankr. E.D. Pa. 1990) (temporary allowance process wholly within court's reasonable discretion); In re FRG, Inc., 121 B.R. 451, 459 (Bankr. E.D.Pa. 1990); In re Fed. Press, 116 B.R. 650, 654

(Bankr.N.D.Ind. 1989); *see also* In re Zolner, 173 B.R. 629, 633 (Bankr. N.D. Ill. 1994), aff'd,

249 B.R. 287 (7th Cir. 1995).

The temporary allowance process for voting purposes may be invoked by either a creditor

or any other party in interest. In re Bellucci, 119 B.R. 763, 778 (Bankr. E.D.Cal. 1990); In re

FRG, Inc., 121 B.R. at 453. In either case, only a summary type hearing is contemplated. In re

Baldwin United Corp., 55 B.R. 885, 899 (Bankr. S.D.Ohio 1985); In re Zolner, 173 B.R. at 633;

*Collier* ¶ 3018.01[5], at 3018-8 to 3018-9. In any event, as is the case with respect to an

estimation procedure under section 502(c)(1), the bankruptcy judge's decision to use the

temporary allowance process, as well as the manner in which the process was conducted, will be

overruled only upon a showing of an abuse of discretion. In re Armstrong World Indus., Inc.,

292 B.R. 678, 684 (10th Cir. 2003).

For nearly two decades the courts in mass tort bankruptcy cases have utilized the

temporary allowance process provided in Rule 3018(a) because of the sheer number of

unliquidated claims in those proceedings, and because of the need to expedite the administration

of the case so that the sick and dying tort creditors could begin to receive compensation for their

injuries. For example, the voting procedures approved by the bankruptcy court in the Johns-

Manville case nearly 20 years ago provided that the value of each asbestos personal injury claim

would be fixed at $1 for purposes of determining whether the valuation requirement of section

1126(a) had been met. This temporary allowance process did not involve a bar date. Importantly,

in ruling on the Manville confirmation order, the Second Circuit stated that, in view of the

outcome of the vote, any alleged irregularities in the voting procedures were, at most, harmless

error. Thus, although they did not rigidly comply with the Bankruptcy Rules, the voting

procedures met the goal of expanded suffrage and participation in the reorganization by all

- 23 -

parties in interest. <u>In re Johns-Manville Corp.</u>, 843 F.2d 636, 698 (2d Cir. 1988), *aff'g* 68 B.R.

618 (Bankr. S.D.N.Y.1986); *see also* <u>In re A.H. Robins, Co.</u>, 880 F.2d 694, 698 (4th Cir. 1989)

(any error that occurred because of the manner in which the district court weighted unliquidated

personal injury claims against the debtor was harmless, given that 94% of voting claimants voted

to confirm plan).

More recently, bankruptcy courts in mass tort bankruptcy cases have routinely approved

temporary allowance processes to facilitate voting.  In none of those cases has the court imposed

a bar date requirement or mandated the filing of POC forms as a part of the approved voting

procedures. *See, e.g.*, <u>In re Federal-Mogul Global Inc.</u>, Case No. 01-10578 (RTL) (Bankr. D.

Del. June 14, 2004); <u>In re ACandS, Inc.</u>, Case No. 02-12687 (RJN) (Bankr. D. Del. Oct. 3,

2003); <u>In re Pittsburgh Corning Corp.</u>, Case No. 00-22876 (JKF) (Bankr. W.D. Pa. Nov. 26,

2003); <u>In re Babcock & Wilcox Co.</u>, Case No. 00-10992 (Bankr. E.D. La. May 1, 2003); <u>In re</u>

<u>Asbestos Claims Mgmt. Corp.</u>, Case No. 02-37124 (SAF) (Bankr. N.D. Tex. Dec. 12, 2002).

Instead, each of these courts has recognized that the practical consequences to the administration

of the debtor's estate are wholly unacceptable, and that, in any case, neither a bar date nor the

POC forms are required by the Bankruptcy Code or Bankruptcy Rules.

## **CONCLUSION**

For all of the foregoing reasons, the Humphrey Farrington Claimants respectfully request

that the Court deny the Motion to the extent that it seeks to set a present Bar Date with respect to

present and unknown future diacetyl claims.

If and to the extent that a prospective Bar Date for such claims may become appropriate in the future, the Debtors should, after appropriate discovery and disclosure of industrial site-specific locations where the diactyl product was used, be required to provide adequate site-specific notice with respect to potential claims as well as adequate and appropriate public consumer notice.

Respectfully submitted,

**CAPLIN & DRYSDALE, CHARTERED**

_____

Elihu Inselbuch
Rita C. Tobin
375 Park Avenue, 35th Floor
New York, New York  10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755
E-mail:  rct@capdale.com

--and--

Ronald E. Reinsel
Jeffrey A. Liesemer
One Thomas Circle, N.W., Suite 1100
Washington, D.C.  20005
Telephone: (202) 862-5007
Facsimile: (202) 429-3301

_Counsel for Certain Diacetyl Claimants_

New York, New York
Dated:  August 12, 2009