Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

David J. Zott, P.C.
Alyssa A. Qualls
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09 11233 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**AUTHORIZING THE ESTIMATION OF DIACETYL CLAIMS, ESTABLISHING**
**ESTIMATION PROCEDURES, AND GRANTING CERTAIN RELATED RELIEF**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

PLEASE TAKE NOTICE that a hearing on the *Debtors' Motion for Entry of an Order Authorizing the Estimation of Diacetyl Claims, Establishing Estimation Procedures, and Granting Certain Related Relief* (the "**Motion**") will be held before the Honorable Robert E. Gerber of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, Room 621, One Bowling Green, New York, New York, on **April 7, 2010 at 10:30 a.m. (ET)**.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, in text-searchable Portable Document Format (PDF), Wordperfect or any other Windows-based word processing format (in either case, with a hard-copy delivered directly to Chambers), and shall be served upon: (a) the Debtors and their counsel; (b) the Office of the United States Trustee for the Southern District of New York; (c) counsel to the statutory committee of unsecured creditors, appointed in these chapter 11 cases; (d) proposed counsel to the statutory committee of equity security holders appointed in the these chapter 11 cases; (e) counsel to the agent for the Debtors' prepetition and postpetition secured credit facility; (f) the indenture trustee for each of the Debtors' outstanding bond issuances; (g) the Internal Revenue Service; (h) the Environmental Protection Agency; (i) the Securities and Exchange Commission; (j) counsel to the Diacetyl Claimants (as defined in the Motion); and (k) all those persons and entities that have formally requested notice pursuant to Bankruptcy Rule 2002 and the Local Bankruptcy Rules, so as to be

actually received on **March 30, 2010 at 4:00 p.m. (ET)**.  Only those responses that are timely filed, served and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

New York, New York
Dated: March 19, 2010

/s/ M. Natasha Labovitz
Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

David J. Zott, P.C.
Alyssa A. Qualls
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Counsel to Debtors and Debtors in Possession

Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

David J. Zott, P.C.
Alyssa A. Qualls
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHEMTURA CORPORATION, *et al.*,[2] | ) | Case No. 09 11233 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE**
**ESTIMATION OF DIACETYL CLAIMS, ESTABLISHING ESTIMATION**
**PROCEDURES, AND GRANTING CERTAIN RELATED RELIEF**

---

[2]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................1

Jurisdiction................................................................................................................2

Background................................................................................................................2

I.     The Need For Estimation Of The Diacetyl Claims...............................................2

     A.     The Diacetyl Claims And Their Uncertain Value.....................................2

     B.     Impact Of The Diacetyl Claims On The Plan Process...............................3

     C.     The Debtors' Efforts To Obtain The Necessary Information To Estimate The Diacetyl Claims ...........................................................4

II.     Proposed Estimation Procedures.........................................................................7

     A.     Limited Fact Discovery Period for Estimation Of The Diacetyl Claims.................8

     B.     Proposed Use of Valuation Experts ........................................................10

     C.     Protective Order Governing Confidentiality Of Discovery ....................11

     D.     The Proposed Case Management Order .................................................12

Relief Requested .....................................................................................................13

Basis for Relief .......................................................................................................13

     A.     The Court Has Jurisdiction To Estimate The Diacetyl Claims For Purposes Other Than Distribution And Good Cause Exists For Such Estimation................13

     B.     The Court Has Authority To Approve The Estimation Procedures.......................14

Motion Practice .......................................................................................................15

Notice .....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Company, Inc. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) .................................................................................... 14

*AIU Ins. Co., et al. v. Chemtura Canada Co./Cie, et al.*,
    No. 1:10-cv-01597(DC) (S.D.N.Y.) ........................................................................ 6

*Bird v. Crown Convenience (In re NWFX, Inc.)*,
    864 F.2d 588 (8th Cir. 1988) .................................................................................... 15

*Canal Corp. v. Finnman (In re Johnson)*,
    960 F.2d 396 (4th Cir. 1992) .................................................................................... 15

*Chemtura Canada Co./Cie, et al. v. AIU Ins. Co., et al.*,
    Adv. No. 10-02881 (Bankr. S.D.N.Y.) ................................................................... 6

*In re Chauteaugay Corp.*,
    111 B.R. 67 (Bankr. S.D.N.Y. 1990) ....................................................................... 13

*In re Farley*,
    146 B.R. 748 (Bankr. N.D. Ill. 1992) ...................................................................... 14

*In re Lloyd E. Mitchell, Inc.*,
    373 B.R. 416 (Bankr. D. Md. 2007) ......................................................................... 7

*In re Poole Funeral Chapel, Inc.*,
    63 B.R. 527 (Bankr. N.D. Ala. 1986) ...................................................................... 14

*In re Ralph Lauren Womenswear, Inc.*,
    197 B.R. 771 (Bankr. S.D.N.Y. 1996) ..................................................................... 8

*In re Windsor Plumbing Supply Co., Inc.*,
    170 B.R. 503 (Bankr. E.D.N.Y. 1994) ..................................................................... 6

*U.S. ex rel. Camillo v. Ancilla Sys., Inc.*,
    233 F.R.D. 520 (S.D. Ill. 2005) ............................................................................... 11

**Statutes**

11 U.S.C. § 105(a) ............................................................................................................. 14, 15

11 U.S.C. § 502(c) ............................................................................................................. 7, 8

ii

11 U.S.C. § 502(c)(1) ................................................................................................ 7

28 U.S.C. § 1408 ...................................................................................................... 2

28 U.S.C. § 1409 ...................................................................................................... 2

28 U.S.C. § 157 ........................................................................................................ 2

28 U.S.C. § 157(b)(2)(B) .............................................................................. 2, 13, 14

45 C.F.R. § 164.512(e)(1)(v) .................................................................................. 11

**Rules**

Fed. R. Bankr. P. 1129 .................................................................................... 2, 14

Fed. R. Bankr. P. 3018 ............................................................................................ 8

Fed. R. Bankr. P. 3018(a) ....................................................................................... 7

Fed. R. Bankr. P. 7026 .......................................................................................... 10

Fed. R. Civ. P. 26 .................................................................................................. 10

S.D.N.Y. R. Bankr. P. 9013-1(a) .......................................................................... 15

Chemtura Corporation ("**Chemtura**") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") seek entry of an order substantially in the form attached hereto as <u>Exhibit A</u>:

(a)      authorizing the estimation of diacetyl-related claims (the "**Diacetyl Claims**") filed against the Debtors;

(b)      approving and entering a case management order substantially in the form attached hereto as <u>Exhibit 1</u> to <u>Exhibit A</u> (the "**CMO**"), which sets forth the estimation procedures that will govern the schedule and process for estimating the Diacetyl Claims (the "**Estimation Procedures**");

(c)      approving and entering a protective order substantially in the form attached hereto as <u>Exhibit 2</u> to <u>Exhibit A</u> ("**Protective Order**"); and

(d)      scheduling a hearing (the "**Estimation Hearing**") on or about July 19, 2010, at the convenience of the court, to estimate the Diacetyl Claims.

In support of this motion the Debtors respectfully state as follows:

<u>**Preliminary Statement**</u>

1.      The valuation of the Diacetyl Claims pending against the Debtors is a fundamental issue and a gating item in these chapter 11 cases. That valuation not only impacts the treatment of the Diacetyl Claims themselves under a chapter 11 plan, but also will determine the amount of distributable value available for other stakeholders. Recognizing this fact, the Debtors are keenly aware of their duty as honest brokers to develop a reasoned claim valuation for the Diacetyl Claims. In furtherance of this duty, the Debtors have been engaged in both informal and, where necessary, formal discovery initiatives to obtain and evaluate the information necessary to fairly and reasonably value the Diacetyl Claims.

2. The Debtors have received a substantial amount of information to date as a result of their discovery efforts, and expect more information to be discovered over time. Using the available information, the Debtors intend to pursue a consensual valuation of the Diacetyl Claims in connection with confirmation of a chapter 11 plan, but there can be no guarantee that all necessary parties in interest will consent to such a valuation. Accordingly, the Debtors must be prepared to seek judicial valuation of the Diacetyl Claims if negotiation efforts are not successful. The instant motion provides for a schedule and procedures for this Court to fairly estimate the Debtors' aggregate liability with respect to the Diacetyl Claims, including both the total liability and the uninsured portion thereof, as necessary for chapter 11 plan purposes.

### Jurisdiction

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

4. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105 and 1129 of title 11 of the United States Code (the "**Bankruptcy Code**") and 28 U.S.C. § 157(b)(2)(B).

### Background

**II. The Need For Estimation Of The Diacetyl Claims**

**A. The Diacetyl Claims And Their Uncertain Value**

6. From 1982 to 2005, Chemtura Canada Co./Cie ("**Chemtura Canada**"), a wholly owned indirect subsidiary of Chemtura, manufactured and sold diacetyl to certain customers in the United States. Between 1998 and 2005, Chemtura acted as an intermediary, purchasing diacetyl from Chemtura Canada and then selling the diacetyl to U.S. customers. Approximately 300 products liability actions currently pending nationwide allege that exposure to diacetyl caused respiratory illness. Before the commencement of these chapter 11 cases, Chemtura or

Chemtura Canada had been named as defendants in 21 diacetyl-related lawsuits, 15 of which remain pending.[3]

7.      In response to the Debtors' comprehensive noticing of the October 30, 2009 claims bar date, the Debtors have received approximately 375 non-duplicative Diacetyl Claims, which include claims based upon certain of the prepetition lawsuits described above.[4]  All but approximately 13 of the Diacetyl Claims are filed in "unliquidated" amounts.  The 13 claims that were asserted with an alleged liquidated amount total approximately $59,800,000.  Additionally, approximately seven Diacetyl Claims were filed by corporate defendants in various diacetyl-related litigations that seek indemnification and/or contribution from Chemtura on account of the claimants' own diacetyl liability.

### B.      Impact Of The Diacetyl Claims On The Plan Process

8.      As the Debtors have previously informed the Court, determining the extent of the Debtors' diacetyl-related liability is a key gating item to developing and confirming a plan of reorganization (the "**Plan**") in these chapter 11 cases.  The Debtors wish to pursue a consensual Plan with their various constituencies, and in the context of outlining a Plan it has become clear that the value of the Diacetyl Claims would have a substantial impact on the Plan treatment for those claims and also for all other constituents.  To the extent consensus cannot be reached among all key constituents regarding valuation of the Diacetyl Claims, those claims will need to be estimated by this Court for chapter 11 plan purposes.

---

[3]      On June 23, 2009, this Court entered a temporary restraining order enjoining the prosecution of these lawsuits against Chemtura Canada, Citrus & Allied Essences, Ltd., and Ungerer & Co. pending the outcome of a preliminary injunction hearing.  By agreement of the parties, the restraining order was extended through January 31, 2010.  In the interim, the District Court for the Southern District of New York entered an order transferring the diacetyl claims pending against Chemtura, Chemtura Canada, and Citrus to the Southern District of New York and referred them to this Court.

[4]      Some of the Diacetyl Claims also include allegations of injury from exposure to acetoin, a related chemical.

### C. The Debtors' Efforts To Obtain The Necessary Information To Estimate The Diacetyl Claims

9.     As previously identified in other pleadings before this Court, evaluation of the Diacetyl Claims has been challenging. First, many of the Diacetyl Claims were filed without basic information about the circumstances of the claimants' alleged injuries, including information that would assist in determining potential insurance coverage for these claims. Second, even if the claims included sufficient information, the Debtors lacked adequate data regarding the range and basis for settlement and judgment values associated with the Diacetyl Claims in order to determine what is—and is not—a compensable diacetyl-related injury. Lastly, the Debtors lacked visibility into the amount of claims and, in some cases, the number of claims underlying the corporate defendants' proofs of claim.

10.    During the past several months, the Debtors have been working diligently to overcome these challenges to estimating the Diacetyl Claims. For example, the Debtors have been working cooperatively with the holders of the Diacetyl Claims (the "**Diacetyl Claimants**") to obtain some of the information necessary to estimate these claims (potentially on a consensual basis). In this regard, on January 14, 2010, the Debtors entered into a stipulation with all tort claimants represented by Humphrey, Farrington, & McClain, P.C. ("**Humphrey Farrington**") who filed proofs of claim relating to diacetyl (the "**Humphrey Claimants**"). *See* 1/14/10 Stipulation and Order (the "**Stipulation**") [Dkt. No. 1763]. In the Stipulation, the Humphrey Claimants agreed to provide, among other information, the time period of alleged exposure, product identification information, and the Forced Expiratory Volume Score ("**FEV1**") for each of the Humphrey Claimants. In follow-up discussions, the Humphrey Claimants agreed to

provide the FEV1/FVC[5] ratios for each claimant, certain medical records, and a history of voluntary and involuntary dismissals of diacetyl-related claims. To date, the Debtors have received some of the promised information, including the dates the Humphrey Claimants were employed at facilities where exposure to diacetyl occurred and the FEV1 scores and FEV1/FVC ratios for certain of the Humphrey Claimants. The Debtors are still awaiting the production of underlying medical records and a dismissal history from the Humphrey Claimants.

11. The Debtors entered into a similar stipulation with all tort claimants represented by Andrews & Thornton LLP, which was entered by the Court on January 27, 2010. *See* 1/20/10 Stipulation and Order [Dkt. No. 1833]. The Debtors also obtained similar information from counsel for other claimants in response to procedural objections to certain Diacetyl Claims. Specifically, these claimants have produced certain underlying medical evidence and expert reports, among other things.

12. Recently, on March 16, 2010, the Court partially granted the Debtors' application under Bankruptcy Rule 2004 against Humphrey Farrington (the "**Humphrey Farrington 2004 Application**"), which sought the production of information concerning previous diacetyl settlements. *See* Dkt. No. 2057. In particular, the Court ordered the Debtors and Humphrey Farrington to establish a protocol by which Humphrey Farrington could produce the settlement information in a summary form with corresponding injury levels for those settlements. The Court required that the information would be produced on an anonymous basis, without identifying the settling plaintiffs and defendants, and established additional protections for the confidentiality of the information. (3/16/10 Hearing Tr. at 56-57, attached as Exhibit B.) In

---

[5] The FEV1 and FEV1/FVC information provide general information regarding a person's lung function. This information is not specific to any particular lung injury and does not provide sufficient information to permit the diagnosis of a diacetyl-related lung injury. As a result, the Debtors continue to seek more specific medical information for each Diacetyl Claimant.

support of its ruling, the Court found that this "critically important information" (*id.* at 61) is "clearly relevant to the estimation process, which requires, for the good of . . . Chemtura's creditors . . . and the need to reorganize this case; to get our arms around the estate's aggregate exposure; to estimate these claims for the purpose of creating the necessary reserves; for determining the feasibility of any reorganization plan; and at least arguable in determining what it will take to satisfy creditor claims [and] if there's money or value in the estate available after that, we can provide for a distribution to equity." (*Id.* at 59-61.)

13.     In addition to the Humphrey Farrington Rule 2004 Application, the Debtors have sought similar discovery from American International Group, Chartis, Inc., and Chartis Claims, Inc. (collectively, "**AIG**"), an insurer who has paid to resolve claims alleging injury from exposure to diacetyl and who has provided insurance to Chemtura that covers the Diacetyl Claims.[6] *See* Dkt. No. 1918. The Debtors intend to approach AIG to determine whether a consensual resolution can be reached given the Court's ruling with respect to the Humphrey Farrington 2004 Application. If a consensual resolution with AIG is not possible, the Debtors' application for Rule 2004 relief will be heard by this Court on April 7, 2010.

14.     Given the progress that the Debtors have made to date in gathering information to evaluate the Diacetyl Claims and the Debtors' strong desire to move these cases to resolution as quickly as possible, the Debtors believe the time is right to establish procedures to estimate the Diacetyl Claims while they continue to pursue plan negotiations based upon information received to date and a potential consensual resolution of such claims.

---

[6]     *See AIU Ins. Co., et al. v. Chemtura Canada Co./Cie, et al.*, No. 1:10-cv-01597(DC) (S.D.N.Y.); *Chemtura Canada Co./Cie, et al. v. AIU Ins. Co., et al.*, Adv. No. 10-02881 (Bankr. S.D.N.Y.).

### III.    Proposed Estimation Procedures

15.    The Debtors do not seek to estimate any individual Diacetyl Claim for the purposes of allowance, resolve the legal question of the Debtors' liability to the Diacetyl Claimants, or fix the value of individual Diacetyl Claims for distribution purposes.  As a result, normal pretrial discovery and motion practice are not necessary for the estimation of the Diacetyl Claims.  *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994) (stating that the appropriate method for estimating claims should be determined by reference to the applicable circumstances—ranging from "full-blown evidentiary hearings" to "a mere review of pleadings, briefs, and a one-day hearing involving oral argument of counsel"—but "[w]hatever the procedure the court chooses to estimate a claim, it must be consistent with the policy underlying Chapter 11, that a 'reorganization must be accomplished quickly and efficiently.'  It may sometimes be inappropriate to hold time-consuming proceedings which would defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue delay.") (internal citations omitted).

16.    Taking the above into account, the Debtors have proposed procedures and a timeline that will enable the estimation process and evidentiary hearing to be completed within approximately three months.  As this Court has previously recognized, the Debtors are seeking to emerge from chapter 11 as quickly as possible to allow the Debtors to shed the large expenses and burdens attendant with their chapter 11 cases.  (*See, e.g.*, Nov. 18, 2009 Hearing Tr. 26:9-17 (stressing that "[i]t is at least prudent, if not essential, for the debtors to be doing the homework that needs to be done to enable this case to exit from Chapter 11 as quickly as can be responsibly achieved.").)  The Debtors respectfully submit that the proposed timeline fairly balances their need to complete the reorganization process against the legitimate interests of the individual tort claimants.  *See, e.g.*, *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 423 (Bankr. D. Md. 2007)

(holding estimation for purpose of determining voting rights "does not run afoul of any rules or adversely impact the rights of any party").

17.     The proposed procedure further complies with Bankruptcy Rule 3018(a) which gives the Court latitude to temporarily allow a claim 'in an amount which the Court deems proper for the purpose of accepting or rejecting a plan.' Bankruptcy Rule 3018(a). The statutory predicate for Rule 3018(a) is § 502(c) of the Code, which allows for the estimation of any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the case."); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (holding that Rule 3018 and Section 502(c) of the Bankruptcy Code "allow for the estimation of 'any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the estate,'" but the court's "findings of fact will not have any preclusive effect upon the ultimate disposition of [the] claim."). To meet the goal of a fair valuation on a reasonable time frame, the Debtors propose the following Estimation Procedures and respectfully request that the Court approve them.

### B.     Limited Fact Discovery Period for Estimation Of The Diacetyl Claims

18.     While the Debtors have received a substantial amount of information from the Diacetyl Claimants to date, additional information, such as medical records, remains outstanding with respect to most claimants. Therefore, to reach a fair estimate, the Debtors propose a brief period during which parties may pursue limited fact discovery and complete informal discovery that has already begun. The Debtors do not intend for parties to seek merits discovery on the Diacetyl Claims, such as expert scientific testimony on whether the alleged exposure caused the alleged injury and independent medical examinations of each claimant. Instead, the Debtors believe that the Diacetyl Claimants should be required to produce the following basic factual

information (the "**Diacetyl Claimant Information**"), to the extent that such information is in the claimants' possession and has not already been produced:

a) Dates of the injured person's exposure to diacetyl and/or acetoin;

b) The injured person's FEV1/FVC ratio;

c) Evidence of the injured person's medical diagnosis of Bronchiolitis Obliterans, if any, and readily accessible supporting medical records;

d) Whether the claim is based upon loss of consortium; and

e) Available evidence, if any, tying the injured person's exposure to diacetyl and/or acetoin manufactured and/or sold by Chemtura and Chemtura Canada.

19. While certain of the Diacetyl Claimants have produced much, if not all, of the requested information, a short fact discovery period will ensure that all of the Diacetyl Claimants provide this information, which in turn will lead to a more reliable estimate. The Debtors do not anticipate that the production of the requested supplemental information will be unduly burdensome or prejudicial to the claimants, most of whom are represented by experienced counsel currently prosecuting related personal injury tort claims. Moreover, at its essence, this request seeks the bare minimum factual information that would comprise each plaintiff's *prima facie* case and, accordingly, should be readily available to plaintiffs and their counsel. Accordingly, the CMO contemplates that the Diacetyl Claimants be required to produce the information identified in paragraph 18 above during the discovery period.

20. In addition, during the discovery period, the Debtors propose that parties pursue discovery against the corporate Diacetyl Claimants to produce the following information (the "**Third-Party Claimant Information**"), to the extent that they have not done so already and the information is in their possession:

a) Settlement agreements underlying any proof(s) of claim for indemnity and/or contribution;

b) The identity of any pending lawsuit(s) underlying any proof(s) of claim for indemnity and/or contribution, including the identity of each plaintiff in such pending lawsuit(s); and

c) For each settled or pending lawsuit(s):

    i. Dates of the injured person's exposure to diacetyl and/or acetoin;

    ii. The injured person's FEV1/FVC ratio;

    iii. Evidence of the injured person's medical diagnosis of Bronchiolitis Obliterans, if any, and readily accessible supporting medical records;

    iv. Whether the claim is based upon loss of consortium; and

    v. Available evidence, if any, tying the injured person's exposure to diacetyl and/or acetoin manufactured and/or sold by Chemtura and Chemtura Canada.

21. Lastly, during the discovery period, the Debtors propose that parties also pursue discovery from the Diacetyl Claimants or their attorneys with respect to past settlement information concerning diacetyl claims consistent with the protocol that the Debtors and Humphrey Farrington will establish in relation to the Humphrey Farrington 2004 Application, as directed by the Court at the March 16, 2010 hearing. The Court already has determined that this information is "clearly relevant to the estimation process." (3/16/10 Hearing Tr. at 59-61, Exhibit B.) The Debtors intend to seek this information on a consensual basis in the first instance, but may be required to obtain the information through formal discovery due to its confidential nature.

### C. Proposed Use of Valuation Experts

22. The Debtors have retained an expert to assist in the valuation of the Diacetyl Claims and prepare an expert report under Federal Rule of Civil Procedure 26 (made applicable hereto by Bankruptcy Rule 7026). This expert's report will, among other things, estimate the amount of the Debtors' aggregate potential liability for the Diacetyl Claims. The expert will analyze historical diacetyl settlements and verdicts, as well as diacetyl litigation trends, among

other things, and use this information to build a model to value the Debtors' pending Diacetyl Claims.

23.     The Debtors anticipate that other interested parties will also retain experts in connection with the estimation of the Diacetyl Claims.  The Debtors, therefore, propose that the estimation process include a time period for expert discovery, including depositions.

### D.     Protective Order Governing Confidentiality Of Discovery

24.     Two factors to be considered in estimating the Diacetyl Claims, historical settlement values and the nature and severity of any medical condition or disease, fairly implicate confidentiality concerns that have been recognized by the Debtors and this Court.  For example, in connection with Humphrey Farrington Rule 2004 Application, the Court ordered that any settlement information receive strict attorneys'-eyes-only treatment.  (3/16/2010 Hearing Tr. at 58:13-25.)  Similarly, any medical records produced by the Diacetyl Claimants should be afforded confidentiality protections consistent with HIPAA.[7]

25.     To resolve the legitimate confidentiality concerns described above, the Debtors have prepared a Proposed Order Governing the Confidentiality of Discovery.  (The proposed Protective Order is attached hereto as Exhibit 2 to Exhibit A.)  This order will ensure the confidentiality of any personal health information produced in connection with these estimation proceedings and limit access to information regarding historical settlement values, consistent with the Court's prior ruling.

---

[7]     To satisfy HIPPA's requirements, a protective order must prohibit "using or disclosing the protected health information for any purpose other than the litigation . . ." and "[r]equire [ ] the return to the covered entity or destruction of the protected health information . . . at the end of the litigation or proceeding." 45 C.F.R. § 164.512(e)(1)(v).  *See, e.g.*, *U.S. ex rel. Camillo v. Ancilla Sys., Inc.*, 233 F.R.D. 520, 522 (S.D. Ill. 2005) ("The HIPAA provisions do not create a privilege against production or admissibility of evidence; they merely create a procedure for obtaining protected medical information in litigation.").

### E.    The Proposed Case Management Order

26.    Finally, the Debtors request approval and entry of the CMO.  (A copy of the proposed CMO is attached hereto as <u>Exhibit 1</u> to <u>Exhibit A</u>.)  This CMO proposes a period of approximately three months from the beginning of the discovery period through an estimation hearing.  The CMO also sets deadlines for key dates necessary to keep the estimation process on track, such as deadlines for the completion of claimant and settlement discovery and expert discovery, as follows:

| | |
|---|---|
| Deadline for service of fact discovery upon Diacetyl Claimants | Within three days of entry of the CMO |
| Deadline for Diacetyl Claimants to submit information in response to fact discovery requests | May 7, 2010 |
| Deadline for the Debtors' service of expert report(s) and memorandum of law in support of the estimation of Diacetyl Claims | May 28, 2010 |
| Deadline for Diacetyl Claimants' and/or Committees' service of expert report(s) and any brief in response to the Debtors' memorandum of law in support of estimation of Diacetyl Claims | June 18, 2010 |
| Deadline for the Debtors' service of rebuttal expert report(s) | July 2, 2010 |
| Date by which depositions of any party's experts must be completed and deadline for the Debtors' reply memorandum in further support of estimation of Diacetyl Claims | July 12, 2010 |
| Evidentiary hearing | On or about July 19, 2010 |

27.    This proposed three-month time frame is reasonable, particularly because the estimation is solely for plan purposes and not for purposes of determining ultimate distributions with respect to individual Diacetyl Claims.

28.     For the reasons set forth herein, the Debtors seek entry of the Estimation Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>:

      a)     authorizing the estimation of the Diacetyl Claims;

      b)     approving and entering the CMO, which sets forth the Estimation Procedures;

      c)     approving and entering the Protective Order; and

      d)     scheduling the Estimation Hearing.

**Basis for Relief**

**A.     The Court Has Jurisdiction To Estimate The Diacetyl Claims For Purposes Other Than Distribution And Good Cause Exists For Such Estimation.**

29.     This motion asks this Court to estimate the value of the Diacetyl Claims in the aggregate.  This estimation is for chapter 11 plan purposes, not for distribution.  Accordingly, this Court has jurisdiction over the motion as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

30.     Section 157(b)(2)(B) provides, in pertinent part, that a bankruptcy court has jurisdiction to hear core proceedings "but not the liquidation or estimation of contingent or unliquidated personal injury tort of wrongful death claims against the estate for purposes of distribution."  Reading this jurisdictional limitation narrowly, the court in *In re Chauteaugay Corp.*, 111 B.R. 67, 72-73 (Bankr. S.D.N.Y. 1990), distinguished estimation for purposes of plan confirmation from the estimation of claims for ***distribution*** purposes, holding that the former "is permissible and constitutes a core proceeding."

31.     Numerous courts have similarly held that § 157(b)(2)(B) allows a bankruptcy court to exercise jurisdiction over the estimation of personal injury tort claims for purposes other than distribution.  *See A.H. Robins Company, Inc. v. Piccinin*, 788 F.2d 994, 1013 n.16 (4th Cir.

1986) ("This [§ 157(b)(2)(B)] leaves estimation for other purposes within the jurisdiction of the bankruptcy court."); *In re Poole Funeral Chapel, Inc.*, 63 B.R. 527, 532 (Bankr. N.D. Ala. 1986) (holding that bankruptcy court has right and duty to estimate personal injury tort claims for purposes of feasibility of the plan and allowing district court to try cases for purpose of distribution); *In re Farley*, 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992) (bankruptcy court may estimate value of personal injury claims "for purposes of voting and determining plan feasibility").

32.     Here, good cause exists to estimate the Diacetyl Claims.  The potential value of these claims is subject to dispute and is fundamentally important to the Debtors' confirmation of a Plan and the rights of the Debtors' stakeholders (including Diacetyl Claimants and all other stakeholders) to recovery in these chapter 11 cases.  The Debtors are in the process of formulating an estimate of the Diacetyl Claims based upon the information that they have been able to obtain over the last several months and intend to use that estimate for purposes of negotiating a chapter 11 plan.  Ultimately, however, in the absence of consensus among all key constituents regarding a valuation or settlement of the Diacetyl Claims, the Debtors will require the Court to estimate the Diacetyl Claims in order for the Debtors to establish reserves under any chapter 11 plan and prove feasibility under section 1129 of the Bankruptcy Code.  Because of the posture of these chapter 11 cases and the Debtors' desire to emerge from chapter 11 as quickly as possible, the Debtors believe that it is appropriate to begin the estimation process now.

**B.     The Court Has Authority To Approve The Estimation Procedures.**

33.     Authority exists to approve the Estimation Procedures pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) provides, in pertinent part, that a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code,

the Court has expansive equitable power to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets. *See Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 404 (4th Cir. 1992) ("[T]he allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of its equitable powers."); *Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern.") (citations omitted).

34.     In the instant case, as discussed above, estimation of the Diacetyl Claims is a key issue to the Debtors' confirmation of a Plan. The proposed Estimation Procedures are tailored to allow for limited discovery necessary for the Debtors and other parties in interest to evaluate and properly analyze the Diacetyl Claims. Additionally, the timeframe for completing the estimation of the Diacetyl Claims set forth in the CMO is reasonable given the substantial fact discovery done to date and the Debtors' strong desire to emerge from chapter 11 as expeditiously as possible. As such, the Debtors submit that the proposed Estimation Procedures will inure to the benefit of all parties in interest and that this Court should enter an order approving the Estimation Procedures and the CMO.

## Motion Practice

35.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. Accordingly, the Debtors submit that this motion satisfies Rule 9013-1(a) of the Local Rules of Bankruptcy Procedure for the Southern District of New York.

## Notice

36.     The Debtors have provided notice of this motion to: (a) the Debtors and their counsel; (b) the Office of the United States Trustee for the Southern District of New York;

(c) counsel to the statutory committee of unsecured creditors, appointed in these chapter 11 cases; (d) proposed counsel to the statutory committee of equity security holders appointed in the these chapter 11 cases; (e) counsel to the agent for the Debtors' prepetition and postpetition secured credit facility; (f) the indenture trustee for each of the Debtors' outstanding bond issuances; (g) the Internal Revenue Service; (h) the Environmental Protection Agency; (i) the Securities and Exchange Commission; (j) counsel to the Diacetyl Claimants; and (k) all those persons and entities that have formally requested notice pursuant to Bankruptcy Rule 2002 and the Local Bankruptcy Rules.   In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter an order, substantially in the form annexed hereto as Exhibit A, (i) authorizing the estimation of the Diacetyl Claims; (ii) approving and entering the CMO, which sets forth the Estimation Procedures; (iii) approving and entering the Protective Order; and (iv) scheduling the Estimation Hearing; and (b) grant such other and further relief as is appropriate.

New York, New York
Dated: March 19, 2010

*/s/ M. Natasha Labovitz*
Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

David J. Zott, P.C.
Alyssa A. Qualls
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

Counsel to Debtors and Debtors in Possession

## Exhibit A

## Estimation Procedures Order

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09 11233 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER ESTABLISHING PROCEDURES
## FOR ESTIMATION OF DIACETYL CLAIMS

Upon the motion (the "**Motion**") of Chemtura Corporation and its affiliated debtors and

debtors in possession in the above captioned chapter 11 cases (collectively, the "**Debtors**") for

entry of an order (a) establishing procedures for estimation (the "**Estimation Procedures**") of

diacetyl claims (the "**Diacetyl Claims**"); (b) approving and entering the case management order

(the "**CMO**"); (c) approving the production of supplemental information to the proofs of claim

and the law firm subpoenas; (d) entering the proposed Protective Order; and (e) scheduling a

hearing (the "**Estimation Hearing**") on or about July 19, 2010 to estimate the Diacetyl Claims

pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"); and

the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to

28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal
taxpayer-identification number, are: Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712);
Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC
(0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348);
CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding
Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical
Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare
Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc.
(3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc.
(8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of
Indiana, Inc. (9136).

pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion will benefit the Debtors' estates, their creditors and all other parties in interest; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and upon the arguments and testimony presented at the hearing before the Court, and any objections to the Motion having been withdrawn, resolved or overruled on the merits; and after due deliberation and sufficient cause appearing therefore, it is **ORDERED** that:

1.      The Motion is granted.

2.      The CMO, which contains the Estimations Procedures described in the Motion, attached hereto as <u>Exhibit 1</u> is hereby approved.

3.      The Protective Order attached hereto as <u>Exhibit 2</u> is entered.

4.      The Estimation Hearing shall be held on July 19, 2010, at 9:45 a.m. ET.

5.      Nothing in this Order or the Motion shall constitute an admission of the validity, nature, amount, or priority of any claim against the Debtors, and the Debtors reserve their rights to dispute the validity, nature, amount, or priority of any Claim asserted.

6.      Approval of the Estimation Procedures by this Order is without prejudice to the Debtors' right to seek an order of the Court approving additional or different procedures with respect to specific Claims or categories of Claims, or to modify the Estimation Procedures.

7.      The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this order in accordance with the Motion.

8.      The terms and conditions of this order shall be immediately effective and enforceable upon entry of the order.

9.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York
Date: _____, 2010

_____
Honorable Robert E. Gerber
United States Bankruptcy Judge

<u>**Exhibit 1**</u>

**Case Management Order**

Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

David J. Zott, P.C.
Alyssa A. Qualls
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09 11233 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

<u>**PROPOSED CASE MANAGEMENT ORDER**</u>

Upon the motion by the above-captioned debtors and debtors in possession (collectively,

the "**Debtors**" or "**Chemtura**") for an order approving procedures for estimating certain diacetyl

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

claims (the "**Estimation Motion**"); and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Estimation Motion is proper in this District pursuant to 28 U.S.C. §§1408 and 1409; and adequate notice of the Estimation Motion having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause appearing therefore, it is hereby **ORDERED** that:

1.      The CMO is approved as set forth herein.  The CMO may be modified by subsequent Order of the Court upon cause shown or agreement of the parties, provided the hearing date of July 19, 2010, set forth below does not change.

2.      Debtors, the Statutory Committee of Unsecured Creditors (the "**Creditors' Committee**"), the Statutory Committee of Equity Security Holders (the "**Equity Committee**"), the Debtors' postpetition and prepetition secured lenders (the "**Lenders**"), and the Diacetyl Claimants (as such term is defined below) are parties to this proceeding (collectively, the "**Parties**") and shall be entitled to participate in the following discovery and estimation proceedings.

3.      The schedule of critical events for the evidentiary hearing on the Estimation Motion shall be as follows:

**A.      FACT DISCOVERY SCHEDULE**

4.      The tort claimants who timely filed proofs of claim alleging exposure to diacetyl and/ or acetoin (the "**Diacetyl Claimants**") are directed to produce Diacetyl Claimant Information and Third-Party Claimant Information, as outlined in paragraphs 18 and 20 to the Estimation Motion.

5.      The Debtors are authorized to pursue discovery from the Diacetyl Claimants or their attorneys with respect to past settlement information concerning diacetyl claims consistent with the protocol that the Debtors and Humphrey, Farrington & McClain, P.C. will establish in relation to the Humphrey Farrington 2004 Application.

6.      The Protective Order attached to the Order Granting the Estimation Motion as Exhibit 2 governing the confidentiality of information produced by the Diacetyl Claimants and law firms in this proceeding is approved.

7.      The Parties may serve fact discovery within three days of entry of the CMO.

8.     May 7, 2010, at 5:00 p.m. ET ("**Return Date**") shall be the last date and time by which the Diacetyl Claimants must produce the requested supplemental information.

9.     All documents, including medical records, responsive to the information requests shall be produced by the Return Date.

10.     All discovery from the Diacetyl Claimants or their attorneys with respect to past settlement information concerning diacetyl claims shall be produced by the Return Date.

11.     Documents produced by any Party shall be simultaneously delivered (either through email or by disc) to all other Parties.

12.     Documents received by any Party in response to a discovery request and/or subpoena shall be delivered (either through email or by disc) to all other Parties within two business days of receipt.

## B.     EXPERT DISCOVERY AND BRIEFING SCHEDULE

13.     On or before May 28, 2010 the Debtors shall serve their expert report(s) and opening estimation brief, which shall estimate the Debtors' liability for diacetyl claims.  Service by email shall constitute valid service.

14.     On or before June 18, 2010, the Diacetyl Claimants, the Creditors' Committee, the Equity Committee, and/or the Lenders shall serve their expert report(s) and responsive estimation brief(s), if any, which shall estimate the Debtors' liability for diacetyl claims.  Service by email shall constitute valid service.

15.     On or before July 2, 2010, the Debtors shall serve their rebuttal expert report(s), which shall respond to any expert reports served by the Claimants, the Creditors' Committee, the Equity Committee, and/or the Lenders.  Service by email shall constitute valid service.

16.     During the period May 28, 2010 through July 12, 2010, the Parties shall be entitled to depose each other's experts and engage in other expert discovery.

17.     On or before July 12, 2010, the Debtors shall serve their reply brief in further support of estimation of diacetyl claims.

## C.     EVIDENTIARY HEARING

18.     On July 19, 2010, the Court shall hold an estimation hearing.  Testimony at the hearing shall be limited to previously disclosed estimation experts.  Direct examinations shall be submitted via declaration 7 days before the hearing.

This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

SO ORDERED.

Dated: _____, 2010
      New York, New York

                              _____
                                 Honorable Robert E. Gerber
                                 United States Bankruptcy Judge

# Exhibit 2

## Protective Order

Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

David J. Zott, P.C.
Alyssa A. Qualls
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09 11233 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**PROPOSED ORDER REGARDING CONFIDENTIALITY OF DISCOVERY**

Chemtura Corporation ("**Chemtura**") seeks the disclosure of information regarding:

(i) diacetyl-related claims (the "**Diacetyl Claims**") filed against the Debtors; and (ii) past

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

settlements of claims alleging injury from exposure to diacetyl. Recognizing that this information may contain personal medical information and financial data and that the settlement information requires a higher level of protection, in order to expedite the exchange of discovery materials, to facilitate the prompt resolution of disputes over confidentiality, and to protect discovery material entitled to be kept confidential, the Court hereby **ORDERS** as follows:

1.      The Debtors, the Committee of Unsecured Creditors (the "**Creditors' Committee**"), the Committee of Equity Security Holders (the "**Equity Committee**"), the Debtors' postpetition and prepetition secured lenders (the "**Lenders**"), and the holders of the personal injury tort claims ("**Claimants**") are parties (collectively, the "**Parties**") to a proceeding to estimate the value of certain personal injury tort claims (the "**Estimation Hearing**").

2.      In connection with the Estimation Hearing, the parties have sought or may seek certain discovery from one another, and from third parties (the "**Non-Parties**"), including through service of document requests, interrogatories, depositions, subpoenas, and otherwise as provided by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court (the "**Discovery Requests**").

3.      This Order applies to all information, documents and things subject to discovery in this action produced either by a Party or a Non-Party (each a "**Producing Person**") in response to or in connection with any discovery conducted related to the Estimation Hearing, including without limitation, deposition testimony (whether based upon oral examination or written questions), answers to interrogatories, requests for admission, responses to requests for admission, documents and things produced (including documents and things produced to the receiving Party for inspection and documents and things provided to the receiving Party, whether

in the form of originals or copies) as well as any and all copies, abstracts, digests, notes, summaries, and excerpts thereof (collectively referred to as the "**Discovery Material**").

A.    <u>**Confidential Discovery Material**</u>

4.    A Producing Person may designate Discovery Material as "Confidential" if such Producing Person believes in good faith that such Discovery Material constitutes or includes information that has not been made public and that the Producing Person would not make public in the ordinary course of its activities, including but not limited to technical, business, financial, personal or other information, including information that is protected by PL 104-191, the Health Insurance Portability and Accountability Act (the "**Confidential Material**").

5.    Any Confidential Material may be designated by the Producing Person as such by marking the first page with the word "Confidential."

6.    Confidential Material and the substantive information contain within shall be given, shown, made available to or communicated only to the following:

(a)    the Parties and their counsel;

(b)    testifying and consulting experts retained by the Parties (the "**Expert**s");

(c)    any person who is identified as a witness at a deposition or hearing in connection with the Disputes (a "**Witness**"), provided that such witness may not maintain any Confidential Material in his or her possession.

(d)    the Court, its officers, and clerical staff;

(e)    outside photocopying, graphic production services, or litigation support services;

(f)    court reporters, stenographers, or videographers who record deposition or other testimony in the litigation;

(g)    any other person or entity to whom the Producing Person may consent in writing.

7.      Before any Expert is given access to Confidential Material, such person shall be given a copy of this Order and sign the acknowledgement attached hereto as Exhibit A, acknowledging that he or she read the Order and agrees to be bound by the terms thereof.

8.      Parties shall attempt in good faith to maintain the confidentiality of Confidential Material by filing the same under seal, pursuant to the applicable rules and procedures of the United States Bankruptcy Court for the Southern District of New York, the United States District Court for the Southern District of New York, and the United States Court of Appeals for the Second Circuit.

9.      To the extent that any Party wishes to use Confidential Material at a court hearing in the above-captioned proceedings, the Party who intends to use such Confidential Material shall provide the Producing Party with sufficient advance notice to afford the producer a reasonable opportunity to object to the use of such information.  For purposes of using such documents or information at trial, the inclusion of a document containing Confidential Material on a Party's pre-trial exhibit list shall satisfy this notice requirement.

10.     In the case of depositions, if counsel for a Party believes that a portion or all of the testimony given at a deposition constitutes Confidential Material of such Party or Non-Party, counsel shall so state on the record and shall request that the entire transcript or the relevant portion of testimony be sealed.  In addition, any Party may designate the transcript or videotape of a deposition as Confidential within five (5) court days of the Party's receipt of the transcript from the court reporter.  Such designation and notice shall be made in writing to the court reporter, with copies to all other counsel, identifying the portion(s) of the transcript that constitute items designated as Confidential Material.

11. If any receiving Party objects to the designation of any Discovery Material as "Confidential," the receiving Party shall first raise the objection with the Party responsible for such designation, and seek to confer in good faith by telephone or in person to attempt to resolve any dispute respecting the terms or operation of this Order. If such dispute cannot be resolved within five (5) court days, the objecting Party may then move the Bankruptcy Court for appropriate relief.

**B.**     **Designation of Discovery Material As Attorneys' Eyes Only**

12. A Producing Person may designate Discovery Material as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" if such Producing Person believes in good faith that such Discovery Material discloses the material terms of individual settlement agreements relating to settlements of personal injury claims involving exposure to diacetyl and/or acetoin ("**Confidential Settlement Information**").

13. The producing party my redact from the Confidential Settlement Information the names and identifying information of the settling parties.

14. The Confidential Settlement Information and any documents containing the Confidential Settlement Information shall be identified and labeled "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" in addition to being deemed "CONFIDENTIAL" pursuant to the above provisions.

15. Confidential Settlement Information and documents designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" shall be disclosed only to the persons identified below, shall be used only in strict accordance with this Order, and shall only be used for prosecuting or defending this bankruptcy action:

(a)     counsel at Kirkland & Ellis LLP representing Chemtura in this bankruptcy action;

(b)     counsel for the Creditors' Committee, proposed counsel for the Equity Committee, and counsel for the Lenders;

(c)     the Experts; and

(d)     the Court, its officers, and clerical staff.

16.     Confidential Settlement Information and documents designated "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" shall NOT be shown to, produced, or used in any way that would allow it to become known to any other parties in this bankruptcy action, or to any counsel representing Chemtura, or any other defendant, in the underlying tort litigation, to any nonparties, or the general public.

17.     If Confidential Settlement Information and/or documents designated "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" are filed with the Court, the sealed envelope or other sealed container shall also contain a statement in substantially the following form:

CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY
**HIGHLY CONFIDENTIAL**
SUBJECT TO ATTORNEYS' EYES ONLY PROTECTIVE ORDER
ENTERED [DATE OF ENTRY] IN NO. 09-01123
UNITED STATES BANKRUPTCY COURT- S.D.N.Y.

18.     Any service copies of documents filed pursuant to paragraphs 8 and 17 above shall have all Confidential Material and Confidential Settlement Information redacted from the document prior to service.

19.     No reference shall be made to any Confidential Settlement Information and documents designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" in open court by any party or witness in this bankruptcy action.  To the extent that any Confidential Settlement Information or documents marked as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" must be discussed at the Estimation Hearing, the Party

wishing to introduce such evidence shall inform the Court and the Court, at its discretion, may hear such discussions *in camera* in the presence of only Court staff, bankruptcy counsel for Chemtura, bankruptcy counsel for the Committee, and bankruptcy counsel for the Claimants. However, nothing in this Order shall prevent the Debtors from publicly disclosing aggregate values or estimates of its potential liability for personal injury claims involving diacetyl and/or acetoin, including in a Disclosure Schedule, Plan of Reorganization, or related documents.

C. **Additional Provisions Regarding The Use Of Confidential Material And Confidential Settlement Material**

20. The Confidential Material and Confidential Settlement Information may only be used in connection with the Estimation Hearing.

21. The limitations on disclosure contained in this Order shall not apply to documents or information that (i) were already in the possession of the receiving Party, without an obligation of confidentiality to another person, including a Party, prior to their disclosure in this case; (ii) are received on a non-confidential basis from a person that does not owe an obligation of confidentiality to any other person, including a Party, with respect thereto; or (iii) are published or become publicly available in a manner that is not in violation of this Order or of any obligation of confidentiality to any other person, including a Party.

22. This Order, and the narrowly limited attorneys'-eyes-only use of Confidential Settlement Information and/or documents designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" for the purpose described herein, shall not be deemed any waiver of the confidentiality provisions contained in the Diacetyl Claimants' and underlying tort defendants' settlement agreements.

23. Within 60 days of the conclusion of all proceedings, and any appeal, in connection with the plan confirmation, all Confidential Material, Confidential Settlement

Information, and documents designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" shall be returned to counsel for the respective Producing Parties, or destroyed. If a person in possession of Confidential Material, Confidential Settlement Information, and documents designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" chooses to destroy documents after the conclusion of these proceedings, that person shall certify such destruction in writing to counsel for the Producing Party. Notwithstanding anything in this paragraph, to the extent that the information in the Confidential Material, Confidential Settlement Information, and documents designated as "CHEMTURA BANKRUPTCY ACTION ATTORNEYS' EYES ONLY" remains confidential, the terms of this Order shall remain binding.

24. This Order applies to all Non-Parties that are served with subpoenas in connection with the Motion or who otherwise produce documents or are noticed for deposition in connection with the Motion, and all such Non-Parties are entitled to the protection afforded hereby upon signing a copy of this Order and agreeing to be bound by its terms.

25. Any person or Party subject to this Order that may be subject to a motion or other form of legal process seeking the disclosure of another Party's or Non-Party's information designated under one of the categories of confidentiality pursuant to this Order: (i) shall promptly notify that Party or Non-Party so that it may have an opportunity to appear and be heard on whether that information should be disclosed, and (ii) shall not provide such materials unless required by law or with the consent of the Producing Party.

26. If information subject to a claim of attorney-client privilege, work product immunity, or other privilege is inadvertently or mistakenly produced, such production will in no

way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such information.

27. This Order shall remain in effect after the conclusion of this case and this Court shall retain concurrent jurisdiction to enforce the terms of this protective order.

**SO ORDERED:**

_____    _____

HONORABLE ROBERT E. GERBER             DATE
UNITED STATES BANKRUPTCY JUDGE,
SOUTHERN DISTRICT OF NEW YORK

<u>EXHIBIT A</u>

**Undertaking To Be Bound By Protective Order**

I, _____, have been retained on behalf of _____, with respect to the estimation and/or resolution of all diacetyl-related actions and/or claims against Chemtura in the chapter 11 cases captioned as *In re Chemtura Corporation*, Case No. 09-11233 (REG) (Jointly Administered), currently pending in the United States Bankruptcy Court for the Southern District of New York (the "**Chapter 11 Cases**"). I have reviewed the terms of the Protective Order (the "**Order**"); I have been advised of the requirements contained therein for, *inter alia*, maintaining the confidentiality of Confidential Material and/or Confidential Settlement Information; and I agree without reservation to abide by all of the Order's terms and requirements.

_____

[INSERT SIGNATURE]

<u>**Exhibit B**</u>

**3/16/10 Hearing Transcript**

1
2  UNITED STATES BANKRUPTCY COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  Case No. 09-11233(REG)
5  - - - - - - - - - - - - - - - - - - - -x
6  In the Matter of:
7
8  CHEMTURA CORPORATION, et al.
9
10            Debtors.
11
12  - - - - - - - - - - - - - - - - - - - -x
13
14              United States Bankruptcy Court
15              One Bowling Green
16              New York, New York
17
18              March 16, 2010
19              10:31 AM
20
21  B E F O R E:
22  HON. ROBERT E. GERBER
23  U.S. BANKRUPTCY JUDGE
24
25

♀

1

     2    HEARING re Debtors' Application for an Order Directing Oral

     3    Examination and Production of Documents Pursuant to Rule 2004

     4    of the Federal Rules of Bankruptcy Procedure with Respect to

     5    Humphrey, Farrington & McClain, P.C.

     6

     7

     8

     9

    10

    11

    12

    13

    14

    15

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25    Transcribed by:  Lisa Bar-Leib

 ♀

                                                                 3

     1

     2    A P P E A R A N C E S :

     3    KIRKLAND & ELLIS, LLP

     4         Attorneys for Debtors and Debtors-in-Possession

         5          300 North LaSalle

         6          Chicago, IL 60654

         7

         8     BY:   DAVID J. ZOTT, ESQ.

         9

        10     KIRKLAND & ELLIS, LLP

        11          Attorneys for Debtors and Debtors-in-Possession

        12          601 Lexington Avenue

        13          New York, NY 10022

        14

        15     BY:   M. NATASHA LABOVITZ, ESQ.

        16

        17     AKIN GUMP STRAUSS HAUER & FELD, LLP

        18          Counsel for Official Committee of Unsecured Creditors

        19          One Bryant Park

        20          New York, NY 10036

        21

        22     BY:   PHILIP C. DUBLIN, ESQ.

        23          MEREDITH A. LAHAIE, ESQ.

        24

        25

♀

                                                                    4

         1

         2     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

         3          Attorneys for Equity Committee

         4          Four Times Square

         5          New York, NY 10036

         6

         7     BY:   DAVID M. TURETSKY, ESQ.

8

9  HUMPHREY, FARRINGTON & MCCLAIN, P.C.

10       Attorneys for Certain Diacetyl Claimants

11       221 West Lexington

12       Suite 400

13       Independence, MO 64050

14

15  BY:   KENNETH B. MCCLAIN, ESQ.

16

17  CAPLIN & DRYSDALE, CHARTERED

18       Local Counsel for Certain Diacetyl Claimants

19       375 Park Avenue

20       New York, NY 10152

21

22  BY:   ELIHU INSELBUCH, ESQ.

23       RITA C. TOBIN, ESQ.

24

25

♀

1

2  MORGAN, LEWIS & BOCKIUS LLP

3       Attorneys for Givaudan Flavors Corporation

4       101 Park Avenue

5       New York, NY 10178

6

7  BY:   JOHN M. VASSOS, ESQ.

8

9  DECHERT LLP

10       Attorneys for Firmenich Incorporated

11          2929 Arch Street

12          Philadelphia, PA 19104

13

14     BY:    JULIET SARKESSIAN, ESQ.

15            SEAN WAJERT, ESQ.

16            BRUCE CLARK, ESQ.

17            ABRAHAM REIN, ESQ.

18

19

20

21

22

23

24

25

♀

6

1

2     LANDMAN CORSI BALLAINE & FERD, P.C.

3            Attorneys for Berje Incorporated

4            120 Broadway

5            27th Floor

6            New York, NY 10271

7

8     BY:    MELANIE K. SUHRADA, ESQ.

9            KEVIN TAM, ESQ.

10

11

12     FOX ROTHSCHILD LLP

13            Attorneys for International Flavors & Fragrances, Inc.

14          and Bush Boake Allen, Inc.

15          100 Park Avenue

16          Suite 1500

17          New York, NY 10017

18

19   BY:   YANN GERON, ESQ.

20

21

22

23

24

25

♀

1

2   DINSMORE & SHOHL LLP

3          Attorneys for International Flavors & Fragrances, Inc.

4           and Bush Boake Allen, Inc.

5          255 East 5th Street

6          1900 Chemed Center

7          Cincinnati, OH 45202

8

9   BY:   DANIEL L. JONES, ESQ.

10

11   HINSHAW & CULBERTSON LLP

12          Attorneys for Creditor Polarome International, Inc.

13          780 Third Avenue

14          4th Floor

15          New York, NY 10017

16

17    BY:    PHILIP TOUITOU, ESQ.

18           CONCEPCION A. MONTAYA, ESQ.

19

20    EDWARDS ANGELL PALMER & DODGE LLP

21           Attorneys for Citrus & Allied Essences

22           750 Lexington Avenue

23           New York, NY 10022

24

25    BY:    PAUL J. LABOV, ESQ.

♀

1

2    SIMPSON THACHER & BARTLETT LLP

3           425 Lexington Avenue

4           New York, NY 10017

5

6    BY:    ALEXANDER SIMKIN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20
21
22
23
24
25

♀

1                P R O C E E D I N G S

2          THE COURT:  Have seats, please.  Okay.  Chemtura.  We

3    have the 2004 application.  I want to get people's appearances

4    on this matter and then I want everybody to sit down.  I'm

5    going to have some preliminary comments.

6          Right.  For the debtors.  That going to be you, Mr.

7    Zott, today?

8          MR. ZOTT:  Yes, Your Honor.

9          THE COURT:  All right.  And I see the committee, Mr.

10   Dublin.  And, forgive me, for the equity committee?

11         MR. TURETSKY:  David Turetsky of Skadden Arps.

12         THE COURT:  Okay, Mr. Turetsky.  And for the diacetyl

13   plaintiffs, for the Humphrey Farrington firm, and then for the

14   co-defendants.

15         MR. MCLAIN:  Kenneth McClain, Your Honor.

16         THE COURT:  McClain is it?

17         MR. MCCLAIN:  Yes.

18         THE COURT:  Okay.  Thank you, Mr. McClain.  And

19   various co-defendants.

20         MR. LABOV:  Your Honor, Paul Labov, Citrus & Allied

21   Essences.

22         THE COURT:  That was Labov?

23          MR. LABOV:  Yes, Your Honor.

24          MR. TOUITOU:  Philip Touitou and Charles --

25          THE COURT:  I can't hear you.  You don't have the

♀

1    benefit of the microphone and you're -- yes.  Would you come

2    up, please?

3          MR. TOUITOU:  It's Touitou from Hinshaw and Culbertson

4    from Polarome.

5          THE COURT:  Forgive me.  You didn't put your name up

6    in the corner of the motion and -- your name again?

7          MR. TOUITOU:  My name is Philip.  Last name is

8    Touitou, T-O-U --

9          THE COURT:  Touitou.  Okay.  I see it on the back of

10   your papers.  Mr. Touitou, please remember the requirements of

11   my case manager order that require counsel's names to be on the

12   front page of the corner.  This is exactly the reason.

13          MR. TOUITOU:  Very well.

14          THE COURT:  Thank you.  Okay.  Yes, sir?

15          MR. VASSOS:  Stand up, Your Honor, then?  'Cause we're

16   going to have the same problem.  John Vassos from Morgan, Lewis

17   & Bockius for Givaudan.

18          THE COURT:  Is that Vassos?

19          MR. VASSOS:  Vassos, V, as in Victor, A-S, as in Sam,

20   S again, O and S one more time.

21          THE COURT:  Okay.  And I don't see your name along

22   with Mr. Herman's and Mr. Shanker's names.

23          MR. VASSOS:  Right.  When this got postponed, they

24   were unable to do it and asked me to cover.

25          THE COURT:  Sure.  Okay.  Thank you.  All right.  Yes,

1     sir?

2          MR. JONES:  Yes, Your Honor.  Daniel Jones, Dinsmore &

3     Shohl for a second non-party, International Flavors &

4     Fragrances and Bush Boake Allen, Incorporation.

5          THE COURT:  All right.  Let me call out your objection

6     in just a second.  I see you there.  Thank you, Mr. Jones.

7          All right.  Folks, make your presentations as you see

8     fit, starting with you, Mr. Zott.  But I have problems with

9     both sides' positions and I want you to help me with the

10    following questions and concerns.

11         It appears to me after all of your briefs that while

12    the information that's requested is not relevant to the

13    particular claim of a particular individual diacetyl claimant,

14    it seems to me extraordinarily relevant to the debtor's need to

15    get its arms around the totality of the universe of its

16    diacetyl claims so that it can establish a mechanism in its

17    plan for satisfying them and so that it can get its arms around

18    the feasibility of its plan and for a host of plan related

19    reasons not the least of which would be determining whether we

20    have anything left to ultimately make a distribution to equity

21    as well as the creditors community which would, of course, be

22    ahead of equity.

23         It seems to me that the real issue here is one of

24    addressing prejudice to parties other than the debtors,

25    prejudice from diacetyl claimants who want to maximize their

1    recovery within the balance of the law and, to the extent
2    relevant, to co-defendants.  Now, subject to your rights to be
3    heard, it seems to me that those needs and concerns are
4    different.

5            Co-defendants, presumably, if they want to get
6    indemnification and their contribution from the estate would
7    have to provide information to me and presumably the debtors
8    sooner or later anyhow unless I'm missing something.  How else
9    am I going to know what to give you in the way of a claim for
10   indemnification and contribution?  So -- and the fact that
11   people stick into a settlement agreement a provision for
12   confidentiality, while I can understand why it would be
13   respected in the tort world out there, I'm not sure if those
14   considerations either carry over analytically or are binding on
15   a bankruptcy judge when the information is being used for a
16   wholly different purpose and, where appropriate, protective
17   measures are put in place.

18           With that said, I'm not sure whether or not we have
19   enough in the way of protections for anybody.  I do believe,
20   frankly, that the Humphrey firm's objection may have been a
21   little disingenuous when it seemed to be talking about
22   prejudice to everybody except its own litigants.  I would have
23   thought that what it would be telling me is judge, we don't
24   want our opponent to know what we settled these for in other
25   contexts because we think that's going to impair our ability to

♀

13

1    get the maximum recovery for any particular claimant.  But if
2    that's the point you're making, why don't you just tell me that
3    and then let's deal with those particular concerns?

4          Now, the problem I have is balancing my belief --
5     again, I've read the briefs but I'll hear you guys tell me if I
6     read the briefs wrong.  And I think I understand the issues.
7     Subject to your rights to be heard, it seems to me that the
8     estate has a pretty good reason for wanting this information
9     and that the real issue is protecting not so much the co-
10    defendants, because they've already written out their checks
11    and their entitlements in this case will depend in most
12    respects on what they've shelled out as part of their own
13    settlements, but in terms of protecting the tort litigants.
14    The tort litigants of the future are those that are now being
15    represented by the Humphrey firm -- in terms of their own
16    claims.  And I am not sure, Mr. Zott, when we get to your
17    remarks, as to whether the mechanisms you have are or are not
18    satisfactory in terms of protecting their legitimate needs and
19    concerns.  My tentative subject to people's rights to be heard
20    is to say there's going to be discovery in this area but we've
21    got to work and put our noodles together to come up with a more
22    protective regime.
23         One of the problems that I'm having is a mechanical
24    one.  It appears to me that to determine what you're going to
25    have to write out, what the estate is going to have to write

♀

14

1     out in checks, it's going to require something more than just
2     knowing what's been paid in the past because I assume that
3     these settlements depend on individual assessments of exposure,
4     risk and the like.  And I don't see how you do that, on the one
5     hand, when the folks who settled are kept anonymous on the
6     other.  So I don't see how you do the matching.  That's why I'm

    7  not sure if I should be micromanaging the discovery or whether
    8  I should be laying out general ground rules and then say you
    9  guys got to put something together on your own that addresses
   10  everybody's needs and concerns either by using experts as some
   11  kind of intermediary or what?  I think at the very least I
   12  would be uncomfortable with anything that provides lawyers
   13  either defending toward claims on the merits or settling those
   14  tort claims on an individual one-off basis from having this
   15  information because I think it's in that area where the
   16  Humphrey firm's needs and concerns are the strongest.
   17          Now, this is more complicated than a lot of the
   18  matters that I've addressed in this and other cases over the
   19  last several years so I'm going to let you folks talk it out.
   20  And if you think that my understandings based on my reading of
   21  the briefs are wrong, you can diplomatically tell me so.  But
   22  that's what I need you to address.  Okay?
   23          Mr. Zott, I'll start with you.  Main lectern, please.
   24          MR. ZOTT:  Thank you, Your Honor.  Good morning, Your
   25  Honor.  Let me say that I don't think your understanding is

                                                              15

    1  wrong in any really -- in any aspect based on the comments you
    2  made.  And what I'd like to do is walk through the presentation
    3  but spend most of my time on the points you raised and not a
    4  lot of time on the -- I think the areas where the Court has
    5  already reached its preliminary conclusions.
    6          First, the background I think Your Honor is familiar
    7  with, that we're dealing with many diacetyl proofs of claims,
    8  375 or so.  For us to determine the approximate value or fair
    9  value of those claims is an important -- very important to our

10    ability to move forward and develop a plan of reorganization
11    and emerge from bankruptcy.  Your Honor mentioned one of the
12    reasons which is whether or not there would be any potential
13    recovery for equity and that does, in part, depend upon the
14    value of these claims.  So that's one issue.  Our other
15    creditors would need to know the value of these claims so they
16    know what they would potentially recovery and how a plan could
17    be structured.  So it's an important issue for us to try and
18    get a better handle on and to try to get a better
19    understanding.  We have worked hard to get information
20    informally and we've been quite successful in getting
21    information without actually going to try each individual
22    diacetyl claim.  And we have entered into stipulations so we've
23    gotten basic information on things such as the exposure of the
24    claimants' -- what we call their FVC scores, which is a measure
25    of their lung performance, and product identification related

♀

16

1     issues all which will help us to determine if the claimants
2     actually have a claim against Chemtura and to determine what
3     their level of injury is if they have injury.
4             THE COURT:  Pause, please, Mr. Zott.  The third of
5     those major individual factors you described was product
6     identification.  Help me better understand that.  Does that
7     mean what kinds of products Chemtura might have sold that
8     ultimately led to injuries or something wholly different?
9             MR. ZOTT:  In Chemtura's case, Chemtura ultimately was
10    responsible for only really one product, I think, at issue here
11    which is diacetyl.  So it's more --
12            THE COURT:  Oh.  But it's the products that the
                          Page 14

13    diacetyl found itself going into?

14         MR. ZOTT:  Correct.  And whether the claimants

15    actually worked, for example, at a facility that was supplied

16    by our -- ultimately supplied through the supply chain that we

17    were part of.  So they could have very well been supplied by

18    another supplier of diacetyl.  We weren't the only one.  That's

19    an example of product identification.

20         So the issue then is while we're getting information,

21    we have very little information on the value of these claims.

22    That is, how you'd go about actually valuing the claim.  This

23    is an early tort, as I mentioned, and we've mentioned in

24    various briefs there's very little public information.  There's

25    been some settlements but not a great deal.  And whatever there

♀

17

 1    is out there publicly we've gathered, we've ourselves settled

 2    only two cases for very disparate values.  And there's some

 3    verdict history but also a limited verdict history.

 4         At the same time, the Humphrey Farrington firm has

 5    been dealing with these claims for a long -- some time.

 6    They've had several hundred claims that they filed.  And we

 7    believe that they've settled a very substantial number of

 8    claims.  So they have access to a body of information that

 9    would allow us to determine the value that these claims have

10    settled.  And that is very relevant.  And on the issue of

11    relevance, I think Your Honor put your finger right on it,

12    which is we agree completely that if we were going to try a

13    particular claim, like Karen Smith's claim, we would not be

14    able to introduce settlement value to try to show the value of

15    that claim or to show liability or lack thereof.  That would be

16    clearly prohibited under the Rules of Evidence.   That's some of
17    the cases they cite.   What we're talking about is something
18    totally different here, which is trying to measure the
19    aggregate exposure of the debtor to the whole set of these
20    claims, not litigating any particular claim.   And in that
21    context, this information is clearly relevant.   It's been
22    recognized as relevant in the analogous context of the asbestos
23    type litigation where we cite numerous cases that have looked
24    at precedent settlement histories as one of the foundations for
25    how to measure the value of these claims, starting with the

♀

                                                              18

1     Eagle Pitcher.   That was the first case.   And that case then
2     led to a whole series of cases that I'm sure Your Honor is
3     familiar with:   Federal Mogul, Owens Corning, et cetera.   So we
4     are looking at trying to measure the aggregate exposure of the
5     estate to a set of claims.   And in that context, this type of
6     information is some of the most probative information to try to
7     determine the value of those claims.
8            I won't spend much time on it.   We've noted in our
9     brief that the Second Circuit doesn't even impose a heightened
10    standard for legitimate settlement related discovery, even
11    under Rule 26.   We're under Rule 2004 which is generally
12    considered broader.   But we certainly have, I think, a
13    compelling case that this information is relevant and
14    therefore, subject to appropriate protections, should be
15    discovered.
16           Now, Your Honor, the issue then, I think, is -- but
17    before -- let me address then -- you did mention the issue of
18    confidentiality and protection and there are sort of two sets
                              Page 16

19    of interests.  One is the settling defendants and then the
20    other is the claimants.  And you are correct that some --
21    certainly some defendants have asserted cross-claims or
22    indemnification or contribution against the estate.  And an
23    example would be Citrus that clearly has asserted those claims.
24    They actually would like to turn over, I believe, this
25    settlement information.  They know it's part of their

♀

19

1     affirmative burden, really, for their claim, but they can't do
2     so absent some order that would permit this to be produced
3     given the existence of certain confidentiality agreements.
4     They've asked, as I understand it, the plaintiff's counsel to
5     allow them to turn that over.  They haven't been able to do
6     that.  There are other companies, like Givaudan, who did assert
7     cross-claims, claims for contribution for both past settlements
8     as well as future settlements and they have dropped -- a couple
9     of companies, Givaudan and Polarome, either have or are in the
10    process of dropping their claims for past settlements in order
11    to try to avoid this discovery.  And while that may be a
12    solution for certain parties, it's not going to be a solution
13    for all parties and for all purposes.
14         In terms of the prejudice, we did begin with the basic
15    proposition that parties cannot shield information from
16    discovery by agreeing as confidential among themselves.
17    There's certainly a lot of law that says, you know, there's a
18    right to information.  And the appropriate way to deal with
19    confidentiality issues is through a protective order.  And then
20    the question becomes the level of protection.
21         For now, I just -- a couple things.  We propose that

22    the information would only be -- first we'd propose for now

23    only a production of the settlement agreements themselves where

24    the parties are redacted -- the names of the parties.

25    Secondly, that that can be provided only to designated

1     bankruptcy counsel for the debtor, so not their tort counsel,

2     as well as designated counsel for the committees, and then any

3     of their experts.  We've already retained an expert on this

4     issue of valuing these claims and the expert has told us you

5     have to go and get this settlement information 'cause that is

6     one of the key determinants of value.

7           So we've proposed redacting those settlement

8     agreements.  And all we're asking for is that plus

9     corresponding to those settlements would be what we call and

10    FVC score which is really a measure of the level of impairment.

11    Your Honor asked earlier how you would do this by redacting the

12    names and don't you really need to somehow cross-reference the

13    settlement amount with the claimant.  And what we've -- at

14    least the way we've thought about it is to do that anonymously.

15    We don't need to know who the defendant or who the plaintiff

16    is.  What we do need to know is for that dollar amount, what is

17    the corresponding proof of level of injury so that we can begin

18    to stride a  --

19          THE COURT:  Well, that's what is at the bottom of my

20    confusion, Mr. Zott, because thinking of it as a problem in

21    high school math, don't you need to find the dollars per FVC

22    score or something like that?  In other words, you have to

23    determine what kind of FVC scores are out there and then

24    determine the liability by settlement that is the consequence

25    of any such score.  But then don't you, in addition, need to

♀

1    know the universe of FVC scores that are out there so that if
2    you have kind of a ratio, you can then apply it to the FVC
3    scores you have out there and the number of people that have
4    them.
5            MR. ZOTT:  Right.
6            THE COURT:  I have trouble seeing how you do that with
7    anonymity.
8            MR. ZOTT:  Well, we have already received for the
9    proofs of claims -- we've received a -- charts that would tie
10    these claimants -- those that have submitted proofs of claims
11    against us.  We have, through agreement, received information
12    on their FEV scores and their -- it's FEV/FVC which is another
13    measure of lung impairment.  So we do have -- so at least for
14    the named claimants, we've got, for those that are available,
15    we've got information on that one measure of the level of
16    impairment.  Now -- and then if we set that information aside
17    and now we get information on the settlement that are out -- I
18    don't know how many.  Let's just say there are fifty
19    settlements and here's the dollar amount.  And then there's a
20    corresponding FEV/FVC score.
21            THE COURT:  So anonymity is only partial anonymity.
22    The matching has been revealed to you.  And that presumably --
23    it's consensually from the Humphrey firm?
24            MR. ZOTT:  Right.  For those that have filed proofs of
25    claim, we do know -- we know their scores if they have a score.

♀

1    What we wouldn't know is for the settling parties.  We wouldn't
2    know their identity.  But their identity doesn't matter.  All
3    we really --
4            THE COURT:  Finish your thought.
5            MR. ZOTT:  Yeah.  All we really need to do is see
6    here's the dollar value of their settlement and here's their
7    corresponding FEV score which is their level of impairment
8    approximately --
9            THE COURT:  All right.  Well, I think I'm keeping up
10   with you.  But then if the Humphrey firm has already given you
11   that, why do you need it again?
12           MR. ZOTT:  No.  We haven't gotten the settlement
13   information.  What we've gotten so far is for the claimants
14   that have asserted claims.  We have --
15           THE COURT:  You know their scores?
16           MR. ZOTT:  We know their scores if they have a score,
17   right.
18           THE COURT:  So what you need to work with that is to
19   get what I primitively refer to as the ratio so that you can
20   determine the theoretical settlement value for a universe of
21   people who have those scores.
22           MR. ZOTT:  Yeah.  In other words, what we have -- we
23   know their -- the scores for the claimants but we have no idea
24   how that score translates into a dollar amount, in the
25   marketplace basically, for settling a claim.  That's what we

○

1    don't know.  So we need to be able to take a database of prior

2    settlements where similar claimants that have a range of

3    scores, what are they actually receiving in payment for their

4    claims because that's really how we value it.

5         THE COURT:  So you need for those settlements, putting

6    aside their names, you need the dollars that were given in the

7    settlement agreement coupled with the levels of impairment or

8    the scores that each of those guys have.

9         MR. ZOTT:  Right.

10        THE COURT:  Is there a way by which you can get that

11   by something analogous to interrogatories or by information

12   sufficient to determine types of document request as contrasted

13   to all documents relating to document requests?

14        MR. ZOTT:  What we've thought about is -- the way

15   we've narrowed -- our request has already been narrowed to the

16   point where we're just asking for the actual settlement

17   agreements themselves with redacted names and then the

18   corresponding FEV/FVC score.  I have talked to Mr. McClain

19   about another even a more limited proposal that I think would

20   work for us which is if we don't even get the actual agreements

21   but we simply received a chart that would lay out the dollar

22   amounts and the corresponding FEV/FVC score and then we ask

23   that they be -- while they're anonymous, the claims be grouped

24   so that all the settlements relating to a particular claimant

25   be grouped and then the next claimant be grouped because, here,

⚲

24

1    a single claimant may sue ten defendants.  And to figure out

2    the value of their claim -- they may have had ten different

3    settlements or five different settlements.  So you really need

4    to figure out the total amount that they were paid.  I told him

5    if we could do that on an anonymous -- a chart like that and
6    then signing some interrogatories or some sort of verification
7    that these are all the settlements and this is a fair portrayal
8    so that we know that they're not cherry picking the best
9    settlements, the highest dollar.  We need some mechanism to
10   know that these are the settlements.  That and perhaps coupled
11   with if our expert wanted to actually take a look at those
12   settlements to verify any information, they could do that, not
13   even make copies of them, but just look at them, fly to St.
14   Louis, look at them, don't copy them, don't bring them back.
15   And that that would be available to any other expert.  So only
16   the experts --
17             THE COURT:  As kind of an audit type role as
18   contrasted to an information gathering role?
19             MR. ZOTT:  To make sure that that information is
20   accurate, yeah.
21             THE COURT:  In other words, to satisfy you that he's
22   being honest with you.
23             MR. ZOTT:  Right.  That -- that's right.  And there
24   may be information in those settlements that would be relevant
25   to them in terms of valuation but where the attorneys don't

♀

25

1    have to see that at all and it can only be the expert.  I know
2    one of the parties, Polarome, suggested that the way to do this
3    is to hire an expert and then to have the expert only see this
4    information and no attorneys.  Well, this is pretty close to
5    that where we just get a chart, a verification, that that's
6    accurate and reflects all the settlements.  And then the
7    ability of our expert and, obviously, if the committee has an

8    expert or equity has an expert that they can actually look

9    at -- in an audit sort of function, look at that -- those

10    actual settlements, not take them with them, sign a protective

11    order that they won't disclose that information.  And then we

12    would have to, obviously, when it comes time for any kind of

13    reports, we would need to deal with that on a sealed type

14    highly protected basis.

15          THE COURT:  What kind of a wall do you envision would

16    be set up to give the claimants comfort that you're going to

17    use it only on the plan side and you're not going to use it

18    against them on the litigation or settlement side in the

19    context of the one on one type of negotiation and/or litigation

20    that tort claimants would, at least seemingly, have the right

21    to?

22          MR. ZOTT:  Well, the proposal that we had in mind

23    would be that, first of all, the information would only be

24    disclosed in the first instance.  Even the chart, I'm talking

25    about, would only be disclosed to designated counsel on the

♀

26

1    bankruptcy.  So the tort litigant -- the tort lawyers who are

2    representing the debtor in the tort litigation would not have

3    access to it.  So they wouldn't be aware of it as a first

4    level.

5          And then a second level is, you know, we -- in a way,

6    we should take a step back because even the rule, which Your

7    Honor is actually correct that we couldn't use these

8    settlements to try to prove invalidity of a particular claim.

9    Even then, the Courts say it doesn't mean it's not

10    discoverable.  So that information is generally discoverable.

11    But when you go to trial, you wouldn't be able to introduce it

12    into evidence.

13          THE COURT: Yeah. But there's a difference between

14    what's relevant in the trial in the Section 402 sense, a Rule

15    402 sense. And in terms of the negotiating chemistry before

16    you ever get to the admissibility of something in trial, I

17    assume, subject to people's rights to be heard, that it's a no-

18    brainer that this stuff is inadmissible at trial.

19          MR. ZOTT: Right.

20          THE COURT: I mean, that's classic Rule 408 stuff as

21    well as 402 stuff.

22          MR. ZOTT: Absolutely.

23          THE COURT: But if you know what your opponent has

24    taken in the past, it is of tactical value in terms of making a

25    settlement offer to your opponent. I guess your opponent could

    27

1    always tell you to pound sand and tell you I ain't going to

2    accept it. But I mean, on the one hand, I can see how it

3    shortens the settlement process because you're using the

4    earlier settlements as a template for settling this one,

5    getting money in the victim's pocket and moving on. But on the

6    other hand, it is something that if I were a plaintiff's

7    lawyer, I prefer my opponent not to have. My negotiating

8    opponent as well as my in-the-courtroom opponent.

9          MR. ZOTT: Right. Right. Well, the -- and I agree

10    with that. And it's a fair and legitimate concern. The best

11    that we could come up with is given the structure I propose,

12    even the bankruptcy lawyers would see only a chart that would

13    tell them values of past settlements associated with FEV

14   scores.  They obviously wouldn't tie to a particular claimant.

15   But the tort lawyers wouldn't have access even to that.  I

16   mean, they would have no ability.  They wouldn't be discovered

17   to them.  We'd be under protective order obligations not to

18   disclose it to them.  So -- and then, beyond that, the --

19   whatever tactical advantage might exist is certainly mitigated

20   by that process.  I'll point out, I mean, Givaudan did put in

21   to their annual report -- they put in the fact that in the

22   aggregate they settled approximately fifty or so claims for

23   forty-four million dollars.  So you could also -- I mean, you

24   could do the math on that and figure out at least --

25             THE COURT:  Well, I know how to do the division --

♀

                                                               28

1             MR. ZOTT:  Yeah.

2             THE COURT:  -- that my kid learned in third grade.

3    But what I don't know is how to consider that as related or

4    nonrelated to levels of injury.

5             MR. ZOTT:  Correct.  That's right.  And that would be

6    anonymously correlated on the chart I'm talking about which

7    would not be available to tort claimants.  And I think at that

8    point it's just a subject that we're bound by that protective

9    order and we have to comply with it.

10            THE COURT:  I assume you have tort lawyers in Missouri

11   and other states that are actually on the firing line with this

12   litigation or at least were until the automatic stay went into

13   place?

14            MR. ZOTT:  We do have -- I know we have national tort

15   counsel, which is -- the Mayer Brown firm is handling the

16   diacetyl litigation.  And in terms of exactly what they have on

                            Page 25

17    the ground, I'm not sure.  But I know they have national tort
18    counsel.
19          THE COURT:  Okay.  But those are people who are
20    different than -- you're a litigator but you're not a tort
21    litigator?
22          MR. ZOTT:  Well, I -- we have never represented
23    Chemtura in connection with the underlying defense of those
24    claims.  I mean, obviously, our firm does that kind of work.
25    But we don't do that work for them and we never have.

♀

                                                                29

1           THE COURT:  All right.  I'll give you a chance to
2     reply.  But do you have other thoughts before I hear from Mr.
3     McClain?
4           MR. ZOTT:  No.  I don't, Your Honor.  I think that in
5     the end, we probably will need to move forward.  I think we're
6     planning soon to file a motion, an estimation motion, at least
7     to get the process start to eventually estimate -- our goal, if
8     we could settle these claims consensually, we'd love to do that
9     and provide everyone with certainty.  But we need to understand
10    the value either for settlement or if we need to estimate them
11    and for plan purposes, either way, this information is
12    information that is not just going -- it will ultimately be
13    helpful, I think, for the Court in reaching a fair and
14    reasonable value for these claims.
15          THE COURT:  If you want to hand off to Ms. Labovitz on
16    this or if you yourself know, either way, it's fine.  But the
17    estimation motion would be for purposes of necessary reserves
18    feasibility but not what any individual tort litigant would
19    get?

                              Page 26

20          MR. ZOTT:  Correct.  That's right.

21          THE COURT:  Okay.

22          MR. ZOTT:  Exactly right.

23          THE COURT:  Would it be for any purposes other than

24     the two that I identified?

25          MR. ZOTT:  I think it would be -- I'll hand off.

♀

1           THE COURT:  Ms. Labovitz, can you help me on this?

2      Because -- answer it, Ms. Labovitz.  But you know my next

3      question which is am I in 157 territory or not?

4           MS. LABOVITZ:  I do know that next question.  Your

5      Honor, the precise outlines of the plan are under discussion

6      but certainly are not developed enough for me to answer your

7      question with specificity.  But at a high level, you are

8      absolutely right that the purpose of the estimation would be to

9      establish reserves and to prove feasibility of a plan.  We

10     recognize that that estimation may take some time.  We don't

11     necessarily want to do it right on the eve of confirmation.

12     And as a result, we think that it's appropriate to file an

13     estimation motion and kick off that process now with the caveat

14     that without a plan before us, the precise outlines of the

15     estimation will, at the very beginning stages of that, perhaps

16     be fuzzier on the edges.  But we know what the discovery will

17     need to be.

18          THE COURT:  And I think you answered it either

19     expressly or implied.  But what you're telling me is that

20     estimation would not be used that would be putting me in

21     dangerous ground on 157(b)(2).  I'm not sure if I have the

22     subsection right.  I would not be trying to go by estimation to

Page 27

23    determine any particular litigant's entitlement.

24         MS. LABOVITZ:  That's precisely correct, Your Honor.

25    We would be seeking estimation on an aggregate basis based on

⚲

31

1     statistical or actuarial measures and not based on the merits

2     of any individual's claim.

3          THE COURT:  All right.  Thank you.  Mr. Zott, anything

4     from you before I hear from Mr. McClain?

5          THE COURT:  Mr. McClain, please.

6          MR. MCCLAIN:  Your Honor, the -- Mr. Zott laid out --

7     he and I have been involved in several levels of discussions

8     while I tried to work through some workable arrangement in

9     regard to this information and met with the insurers as well.

10    But I need to be clear.  The defendants who have made these

11    agreements with my firm are still objecting to disclosing any

12    of this information.  And so, my official position must be that

13    I, too, object.  I am contractually bound to do that.  But if

14    the Court's directing me to give you my thoughts, I'd be happy

15    to do so.

16         THE COURT:  Well, I am going to direct you to give me

17    your thoughts.  And I may have to issue a ruling that somebody

18    in the courtroom doesn't like.  But I think I telegraphed my

19    thinking.  I think the principle prejudice to be protected here

20    is against the 300 -- I don't know how many clients you have.

21    But --

22         MR. MCCLAIN:  356, I think.

23         THE COURT:  Okay.  356.  I want to do something that

24    enables me to be in a position where Chemtura can be

25    reorganized and your individual 356 people get whatever their

Page 28

1   legal entitlements are.  No more, no less.  And -- but I have a

2   practical need as a bankruptcy judge to have my estate set up

3   reserves that are appropriate, again, no more, no less, for

4   satisfying the estimated liability.  And then obviously, I love

5   settlements.  You'd either agree on appropriate amounts for

6   your individual folks or agree to disagree and tee them up for

7   determination.  Just the --

8           If there is an individual prejudice to you that Mr.

9   Zott's game plan or some massaged version of it wouldn't

10  satisfactorily address, I need your help in that regard.  I'll

11  hear from your defendants next.  But, frankly, I think that

12  with appropriate safeguards, their concerns don't trouble me as

13  much as your individual 356 folks do.

14          MR. MCCLAIN:  Well, Your Honor, as Mr. Zott laid out,

15  the proposal that he made to me yesterday, which has this

16  anonymous process -- we've already given him a good bit of

17  information so that he understands the nature of the claims

18  that are in front of him, these 356 people, in terms of their

19  physical impairment.  What he needs, as you've pointed out, is

20  some kind of matrix by which to value those levels of

21  impairment based on past settlements.  And there are a

22  substantial number of past settlements, something over 150.  So

23  there's a good basis of -- to make such settlements.

24          The method that he outlines here of an anonymous

25  matrix that my firm would prepare is something that's very

1    feasible for us to do.  And I think that the suggestion that we

2    have then the settlement agreements available to confirm

3    exactly what -- you know, the basis of the chart that we

4    prepare is a workable one.  And I think that if in fact it's

5    limited to the experts involved on all sides, whether it's for

6    the debtor or for the claimants or for the indemnity claimants,

7    I think that that is a good fairly safeguarded system.  And

8    with the protection in place that only the bankruptcy lawyers

9    would see them with some sufficient penalties if it's disclosed

10    to the tort claimants in any circumstance without leave of

11    court, I think that is about the best that I can come up with

12    in terms of an overall framework.  As you know, it needs to be

13    massaged somewhat, and we need to go through and work out some

14    language that will clearly define these roles, but in general I

15    think that it's a workable framework for us.

16          In regard to the question regarding our objection to

17    Citrus and Allied, we do not have an objection to a similar

18    procedure in terms of Citrus & Allied turning over their

19    information in terms of their aggregate payouts tied to FEV

20    scores with the settlement agreements being able to be viewed

21    by the experts in the same fashion.

22          THE COURT:  Well, theirs is a hybrid of that.  And

23    maybe I should be putting it to their counsel, but, I mean,

24    they're going to say, or I would have thought they would say,

25    they wrote out a check to one of your clients or to you on

1    behalf of your clients -- I'll allow him to be heard in a

2    minute -- and they're presumably going to say I wrote out a

3    check to one of the Humphrey's guys and now you got to write

4    out a check to me.  I don't know if that'll be a straight

5    indemnification or whether that'll be based on some

6    determination of relative fault or something or relative injury

7    for which more detail would be required.  Do you have anything

8    to bring to the table on that confusion I have, or should I

9    wait until I hear from Citrus' counsel?

10        MR. MCCLAIN:  Yeah, I think that they're better to

11    address it.  I'll -- I will simply say that I don't object to

12    them disclosing the amount they paid to my client or what the

13    FEV score of the client was that they paid.  I mean, those are

14    clearly helpful in regard to this indemnity claim.  And if

15    there's additional information that Chemtura needs, I'm sure we

16    can work that through, kind of, in the same fashion that we've

17    talked about in regard to the 356.

18        So I think that there's the framework of a deal that

19    has adequate protections for all sides and does in fact satisfy

20    the legitimate needs of Chemtura to fashion an estimation of

21    what these claims are worth.

22        THE COURT:  All right, well, thank you, Mr. McClain.

23        I'll now start hearing from counsel for the

24    codefendants.

25        MR. LABOV:  Good morning, Your Honor.  Paul Labov,

♀

1    Edwards Angell Palmer & Dodge, for Citrus & Allied Essences.

2        Your Honor, you hit the nail right on the head, at

3    least with respect to Citrus, when you talked about

4    codefendants in the indemnification and contribution claims.  I

5    really don't need to say any more.  You presumed exactly what

6    Citrus will say; that is, simply to the extent that we've paid

7    out to Mr. McClain's clients, they're now going to seek
8    contribution and indemnity from Chemtura.  I don't know another
9    way to do that other than to provide Chemtura with the amount
10   of the claim for the particular claimant.  There's just no
11   other way to add them up.
12          And so while we agree with the aggregate proposal and
13   we agree with the ratios, generally speaking, subject to
14   certain protections which will be worked out, there's certainly
15   an issue with respect to those claims, and right now I believe
16   there are two or three of them, four total, two or three with
17   Mr. McClain's clients; the fourth one, the underlying tort
18   defendant did not object to releasing that.  I believe we
19   provided that to Mr. Zott, or Ms. Qualls of his office.
20          But with respect to the others, we'll need to move
21   forward with our claims at some point in time.  And so in
22   addition to being held for the aggregate, we'll need to protect
23   our own interest and turn that over, whether that's by court
24   order or agreement between the parties, or a combination of
25   both.

♀

1           So other than that -- oh, and with respect to your
2    question on relative fault, I believe that that is actually an
3    issue wherever these claims are sitting throughout the country,
4    to be determined by tort counsel in those locales.
5           THE COURT:  All right.  Thank you, Mr. Labov.
6           Other codefendants wish to be heard?
7           Come on up, please.
8           Everybody'll be heard sooner or later, so just set up
9    a queue that you find most convenient.

10          MR. JONES:  Good morning, Your Honor.  Again, Daniel

11     Jones on behalf of IFF and BBA, against International Flavors

12     and Fragrances, and Bush Boake Allen.

13          I want to touch on a couple of the points that you

14     raised at the outset, and in conjunction with that I'd also

15     like to distinguish my two clients from, I think, some of the

16     others that are here today; specifically, IFF and BBA are

17     nonparties.  What I mean by that is we've never made a third-

18     party claim against Chemtura; we've never sought contribution,

19     indemnity; we've never made a cross-claim; we've never -- and

20     we -- nor have we made a proof of claim in this matter.  We

21     have nothing to do -- we've, in no way, shape or form,

22     interjected ourselves into this matter and, as such, we've not

23     interjected our settlement agreements into this matter.

24          We've probably settled probably over a hundred cases

25     with clients represented by Humphrey Farrington.  So we have a

♀

1     very, very vested interest in the disclosure of the settlement

2     amounts.

3          I need to also inform the Court, we are different from

4     Chemtura in that we don't make diacetyl.  We used to make

5     butter flavors.  Our liability, if any, in the case is based on

6     the manufacturing of butter flavors.  I don't -- we don't even

7     know if Chemtura was ever in -- or I should -- strike that.

8          We don't know if diacetyl manufactured by Chemtura was

9     even in any of our butter flavors.

10          THE COURT:  Pause, please, Mr. Jones.  Help me keep up

11     with you.  If that is so, and if you were sued for butter

12     flavoring and not for diacetyl, why would the Humphrey firm or

13    you, if somebody were trying to subpoena you directly, be

14    giving out information that didn't relate to diacetyl suits?

15         MR. JONES:  I'm not sure I understand your question,

16    Your Honor.

17         THE COURT:  If you were peddling product that had

18    diacetyl in it, I don't see how your settlement agreements fall

19    into the database that's a matter of concern and that we've

20    been talking about so far.

21         MR. JONES:  I don't think they are either, but they

22    are based on the broad request that was made to Humphrey

23    Farrington.  It did not distinguish in any way, shape or form

24    which settlement agreements would be subject to the subpoena

25    that was attached.

⚥

38

1         THE COURT:  Well, I'll give everyone in the room a

2    chance to be heard, but I'm wondering why this couldn't be

3    clarified and made moot by a phone call.  I'll -- I may be

4    missing something.  You guys are ahead of me on this.  But I'm

5    trying to meet legitimate needs and concerns of everybody who

6    has a legally cognizable need and concern.

7         Mr. McClain is rising and I think he's offering to be

8    of help to me.  Do you mind yielding to him for a second, Mr.

9    Jones?

10         MR. JONES:  I do not, Your Honor.

11         MR. MCCLAIN:  Your Honor, maybe it's unclear.  The

12    settlements with Mr. Jones did involve injuries from butter

13    flavor, but the active ingredient that was at issue in the

14    butter flavor is diacetyl.  And the diacetyl supplied to Mr.

15    Jones' client was in large part, in regard to the artificial

16    diacetyl, was manufactured by Chemtura; that's what the proof

17    shows.

18          So the settlements in regard to the butter flavor

19    were --

20          THE COURT:  The butter flavor came in part from

21    diacetyl?

22          MR. MCCLAIN:  Yeah, the butter flavor entirely comes

23    from diacetyl; it is what makes butter -- diacetyl is found in

24    natural butter; it is what makes butter smell like butter and

25    taste like butter.  It is distilled chemically from various

♀

39

1    sources, sometimes from butter itself, sometimes from other

2    chemicals, but then it is used to manufacture what we call

3    artificial butter flavor.

4          So it is the sine qua non of the lawsuits.  Without

5    diacetyl, there is no damage that we can detach from butter

6    flavors.  In fact, that's the central issue in terms of the

7    experiments that have been done on animals and everything else:

8    that the diacetyl is the active ingredient causing the damage.

9    So it all comes back to the nature and character of the same

10    claims being asserted here.  We are asserting that the damage

11    comes from diacetyl supplied by Chemtura.  So, if that helps.

12          THE COURT:  All right.

13          Well, Mr. Jones, I sense a difference in perspective

14    between you and Mr. McClain on that issue.

15          MR. JONES:  On the first point, I would only -- with

16    respect to diacetyl being a component of butter flavoring, I

17    would agree insofar as that is concerned.  Mr. McClain's

18    experts during these trials referred to these as a toxic soup

19    for many other different ingredients as well.  Now, was
20    diacetyl considered as one of the causative agents?  Yes, but
21    there were others as well.
22         Having said that, I very much disagree with him, with
23    respect, that there is any evidence at all that suggests
24    Chemtura was in our butter flavor -- Chemtura diacetyl was in
25    our butter flavors.  Indeed, we don't know; we don't.  So

⚲

                                                                40


1     there's no -- Your Honor, we've not made any third-party
2     claims, in part for that very reason, because we didn't know
3     whose diacetyl was in our butter flavors.  So without that
4     knowledge, we made the strategic decision that we didn't have a
5     leg to stand on with respect to making such a claim.
6          So, again, I need to reinforce the notion, we've not
7     interjected ourselves into this matter.  Our settlement
8     agreements --
9               THE COURT:  No, I understood that the first time --
10              MR. JONES:  Okay.
11              THE COURT:  -- you told it to me, Mr. Jones.  The
12    problem I have -- I was a commercial lawyer back in my first
13    life, I wasn't much of a tort lawyer, in fact I didn't call
14    myself a tort lawyer at all, but I always thought that the guy
15    who's standing at the side of a car wreck, even if he hasn't
16    injected himself in it, if he has relevant information he
17    provides it.  If he knows whether the light was red or green,
18    he tells the Court what he knows.  If you are invoking my
19    court's jurisdiction or not, if you have information that's
20    relevant to something that I as a judge or the Court as a court
21    must adjudicate, I'm not aware of there being a Get Out of Jail

22    Free card on a matter of civic responsibility of that

23    character.

24              MR. JONES:  Well, the only thing I would say to that,

25    and we've touched on this somewhat but I need to emphasize the

♀

41

1     point, as a litigator, which is what I am, a party gains

2     significant leverage when they have another party's information

3     from prior settlements.

4              THE COURT:  A matter that I think, in the colloquy

5     between Mr. Zott and I, there seems to be quite a bit of

6     agreement on.

7              MR. JONES:  And so with that in mind, that is

8     definitely part and parcel of the fact that it was a

9     confidential settlement agreement that we reached with Mr.

10    McClain's clients, coupled with the fact that, again, that

11    there is the concern of the leverage that would be gained by

12    Chemtura, and the other parties for that matter who may gain

13    such information.  Our brief touched on -- we mentioned it,

14    referenced it as a Pandora's Box.  We're concerned that once

15    that information gets out, it's out and it's not coming back.

16    And that's basically where -- you know, where our position

17    lies.

18              THE COURT:  Thank you, Mr. Jones.

19              MR. JONES:  You're welcome.

20              THE COURT:  Who's on deck?

21              Just give me a moment, please.

22    (Pause)

23              THE COURT:  Yes, sir.

24              MR. TOUITOU:  It's Philip Touitou from Hinshaw and

25    Culbertson for Polarome International.

♀

1         I think the issues that have already been discussed
2    before -- the Court has clearly recognized what are the main
3    concerns; of course, that is future settlements with tort
4    claimants.  And I won't belabor the issues there.
5         The one suggestion I might have is what happens to the
6    proposed chart?  We might agree, for example, and I know that
7    there are discussions going on -- I think they've already been
8    alluded to with my client and obviously with others -- about
9    how to try and resolve the issue.  But I think maybe one of the
10   concerns is what happens to the chart.  And it's typical in
11   other agreements that a chart or information like that might be
12   destroyed after it's used.  Since what we're talking about here
13   is really a sampling that the debtor needs in order to estimate
14   their claim, we might include a provision whereby, after a
15   period of time when they've had a chance to verify whatever
16   information is provided, that those charts will not be copied
17   and they'll be destroyed after a certain point.  It might
18   give -- you know, we know there are photocopiers, but it might
19   give some additional assurance to those of us who are concerned
20   that it might fall into the wrong hands and be used in a manner
21   that's not contemplated by the Court.
22        And one other point that I wanted to mention is, for
23   our clients, our clients did provide some information with
24   regard to the public information that's available concerning
25   verdicts in this area.  And the one concern I had in listening

♀

1    to the arguments today was whether -- how reliable a sampling
2    of settlements will be in estimating the debtor's potential
3    liability here.  If I were one to estimate potential liability
4    of a client, I might want to look at what the jury verdicts
5    have been in this area.  And our letter to Chemtura's counsel
6    outlined, you know, a number of publicly known verdicts.  And
7    I'm not sure I understand the reason why they haven't looked at
8    the scores in those cases.  They easily have the numbers; those
9    are publicly available.  And perhaps giving those somewhat
10    greater weight in evaluating what their potential liability is,
11    since --
12         THE COURT:  Well, pause, please, Mr. Touitou, because
13    I would have thought, as a relatively ignorant outsider, that
14    an expert testifying on how much I should reserve, whether the
15    plan is feasible, whether there's anything left in this estate
16    for equity, would want to look at all relevant sources of
17    information and would come up with a weighting or a view as to
18    whether data should be included or excluded as part of the
19    ultimate conclusion, and then he or she would be cross-examined
20    by anybody who had a different view in the world, and that
21    would be the way by which a judge would make the determination.
22         MR. TOUITOU:  I suspect that that's how, if this gets
23    resolved, it will go.  And I'm not here to say that
24    settlements, you know, don't have any relevance for the
25    purposes that have been stated here.  But I am saying there is

♀

1    public information out there that shouldn't be discounted, and

2  I'm not certain to what extent, you know, it might ameliorate

3  or at least limit the kind of the other settlement-type

4  information they need, because settlements are voluntary; they

5  don't necessarily fully measure a party's liability.  And we --

6       THE COURT:  Well, I don't know if they measure a

7  party's liability in the legal sense at all, but they do

8  measure a basis upon which two people with very different views

9  of the world came to an agreement that would be reasonably

10  satisfactory to each of them.  There are cliches about nobody

11  being totally happy with a settlement.

12       MR. TOUITOU:  Sure.

13       THE COURT:  But I think it's fair to say also that

14  when people reach a settlement, nobody's totally unhappy with

15  it or they wouldn't have agreed to it in the first place.

16       MR. TOUITOU:  Right.  So, at any rate, I agree that

17  that is so.

18       And undoubtedly, as we've heard here today, a

19  number -- a good number of these cases have been settled, and I

20  think even we heard today, based on what we've heard, that

21  about 200 or so of these cases have been settled with the

22  plaintiffs' counsel here.

23       So I'm going to keep my remarks short here and just

24  simply say that there is public information out there too;

25  we'll leave it to the experts to determine how those should be

♀

45

1  weighted.  But it's not as if the debtor doesn't have a

2  ready -- some significant body of information to work with.

3       THE COURT:  All right.  Thank you very much.

4       MR. VASSOS:  Good morning, Your Honor.  John Vassos

5        from Morgan Lewis, on behalf of Givaudan.

6              I'm a little worried.  I don't want to belabor

7        arguments that have already been made, and I have a number of

8        them that have been made, but I'm going to touch on a couple of

9        them.  But let me jump right to one that I don't think has been

10       made, and that's the issue of what I would call false

11       math/false science.  It is tempting to sit here and say we can

12       get the numbers, the scores, dollar amount, come up with a

13       mathematical formula and that gives us information.  I'm not

14       sure it really does.  One of the arguments that I read in the

15       brief that was put forward here was what they needed was not

16       only information about the settlement amount but the rationale.

17       And that last part of it is very key.

18             For example, Givaudan is also a manufacturer of butter

19       flavoring.  They are a defendant that is different in kind than

20       Chemtura.  Part of the thinking that goes into any settlement

21       they do is indemnification claims that they may have against a

22       manufacturer such as Chemtura.  That will factor in.  There are

23       a series of individual issues and questions --

24             THE COURT:  Pause, please.

25             MR. VASSOS:  Of course.


♀

                                                                  46


1              THE COURT:  In other words, if you think that while

2        you're writing out the check now you may get part or more than

3        part of what you've written out, that can inform your exercise

4        of discretion as a tort lawyer defending that claim when you

5        decide how much you're going to write out a check to Mr.

6        McClain's client.

7              MR. VASSOS:  Sure.  All kinds of things factor in.

8    You may look at issues of collateral estoppel; is it the first

9    case in a particular jurisdiction; is that a favorable

10    jurisdiction to me or an unfavorable jurisdiction to me?  There

11    are a series of factors that go in.  And the idea that suddenly

12    you can just pluck out a number and say I now know everything I

13    need to know and that's going to inform the settlement, I

14    think, is very misleading.  And I worry very much --

15          THE COURT:  Well, it's an analytic matter --

16          MR. VASSOS:  I'm sorry.

17          THE COURT:  I understand what you're saying, Mr.

18    Vassos, but taken to its logical conclusion, that would mean

19    that you can never use history to estimate an estate's claims

20    exposure.  And I'm wondering if that proves too much.  We have

21    the asbestos cases as a more than minimal amount of yardstick

22    or precedent, which tells us that looking at past experience is

23    pretty much the traditional way of getting our arms around

24    these liabilities.

25          MR. VASSOS:  No one's going to deny, and certainly I'm

♀

47

1    not, that past settlements will have some value.  But I really

2    do question whether a settlement from a defendant that's

3    different in kind, a different place in the chain, as opposed

4    to the manufacturer -- you don't know who the plaintiffs are;

5    you don't know how they were exposed to the chemical; you don't

6    know warnings they may have read about, the impacts of the

7    chemicals or any notice that they were on.  There are a series

8    of factors that would go into it that would have to be weighed

9    out.

10          And I'm very worried about the slippery slope.  I'm

11  very worried when someone says to me, yes, we're going to

12  aggregate your confidentiality provision but, don't worry,

13  we're going to give you a confidentiality provision.  That

14  seemed almost counterintuitive, because if my first

15  confidentiality provision wasn't enough to protect the

16  information, what confidence can I possibly have on behalf of

17  my client that, no matter how hard we try, any other

18  confidentiality provision's going to give me protection?

19          I would also add, we are -- just as the plaintiffs are

20  in a position where they don't want negotiating information out

21  there, we are defending a series of these cases; there are

22  hundreds of them left that we are a defendant in.  And having

23  information out there about the type of settlements we have

24  done in the past is equally prejudicial to us.  And I

25  understand --

°

48

1          THE COURT:  Well, pause, please --

2          MR. VASSOS:  Yeah, of course.

3          THE COURT:  -- Mr. Vassos.

4          MR. VASSOS:  Sure.

5          THE COURT:  I assume that either you or your tort

6  lawyer co-counsel have had Mr. McClain on the other side of the

7  table maybe 350 times or 550 times, or many, many times.

8          MR. VASSOS:  I would have to believe it's many, many

9  times, Your Honor.  Since it's not what I do, I can't speak

10  honestly, but I would --

11          THE COURT:  Well, doesn't Mr. McClain --

12          MR. VASSOS:  -- I'd have to assume many, many times.

13          THE COURT:  All right, well, I'm asking you, but the

14    question's going to sound like you're reading the mind of

15    another guy, but wouldn't Mr. McClain have a pretty good

16    knowledge, from having himself been on the firing line, of what

17    your guys have been willing to write out in the way of checks?

18              MR. VASSOS:   That is actually absolutely true, Your

19    Honor.  I think that's a very fair point.  But he is not the

20    only plaintiff's lawyer in the world and not the only

21    plaintiff's lawyer handling this.  So there's still an issue, I

22    think, about maintaining the confidentiality of our

23    settlements.  And we have the right to try and protect that,

24    understandably.  Debtor has recognized that in their papers

25    that there is an important concern in protecting

♀

49

1     confidentiality.

2              So the idea, though, that you're going to aggregate

3     that important concern to give information that doesn't

4     translate may be an apples-to-oranges comparison given the

5     differences between the defendants, given the differences

6     possibly between the plaintiffs and how the plaintiffs were

7     situated.  It seems to me you're going to be getting into the

8     old garbage-in-garbage-out if you're only getting a limited

9     information that doesn't provide the full context and

10    rationale.  And you can't get that without, frankly, getting a

11    privileged communication from my client.

12              I question whether or not this is really giving the

13    value debtor says they're getting from -- they're hoping to get

14    from it, keeping in mind the debtor has already settled two

15    cases without this information.  They were able to come to an

16    assessment based on scores, information from plaintiffs and

17    other information that they had as to what -- how they valued

18    the claim.  They've done it already without the benefit of the

19    information they're asking for.  And they have more

20    information.  They do have some trial information, which gives

21    them some additional information to factor in; that should be

22    enough.  They're skilled counsel.  They've been down the path.

23          THE COURT:  Well, as a matter of freshman's

24    statistics -- I don't know if you've -- you're holding yourself

25    out as a statistician --

♀

1          MR. VASSOS:  I am not.

2          THE COURT:  -- I am not, but I think I learned in my

3    freshman statistics course that a database with 200 or so data

4    points is a lot better than a database with 2 data points.

5          MR. VASSOS:  There is no disputing, and I cannot

6    dispute, the basic thesis:  More information is better than

7    less.  But I do question the quality of the information,

8    whether it is truly an apples-to-apples comparison, but even

9    more importantly, the offsetting importance of protecting

10   confidential settlement information, the potential chilling

11   effect upon settlements if people have to worry that this

12   information is going to be discoverable, notwithstanding

13   confidentiality, confidentiality which was highly bargained for

14   and very important to the parties.

15          So it's a balancing test.  I don't think anyone would

16   say, and I am not standing here and saying, the information may

17   not have some relevance, but I seriously question how much

18   relevance.  Is it really on point given the differences between

19   the positions of the defendants, certainly at least my client,

20    who is not a manufacturer like Chemtura of the product but is

21    in fact a manufacturer of butter flavoring?  That's further

22    down in the process.  We are in divergent positions.

23          So I seriously question whether the value that they

24    say they're going to be getting from this information offsets

25    the prejudice to my client of having confidential settlement

51

1     information that they bargained to be confidential turned over,

2     and the risk that it will be disclosed further down the chain.

3     I mean, certainly if we get to the point where Your Honor -- I

4     understand where Your Honor was leaning, and if we get to that

5     point, which I hope we won't, we would want to have

6     conversations and be heard on what those protections are, how

7     limited the information is, the kind of things other counsel

8     have raised.  But I believe sincerely that we should even be

9     excluded from the process.  I don't think they're going to get

10    anything more out of this process than they can get from their

11    experts and the information they already have.

12          If they know, for example, that they have been willing

13    to pay settlement to somebody with a score of X, and they know

14    from the plaintiff, and Plaintiffs are willing to give them the

15    information, what are those scores for all the plaintiffs in

16    the group?  My information at best that they're asking for is

17    cumulative to a theory and a process they've already come up

18    with that their experts are paid to do and that tort counsel is

19    paid to do every day.  In the twenty-five years I've been

20    practicing, that's the first question a client asks me:  What's

21    my risk; what's my exposure; how much is it going to cost me to

22    defend this action; what would be a reasonable settlement?

                        Page 46

23    Those are things that are constantly in our minds, constantly

24    being asked for and constantly being arrived at, without

25    benefit of this kind of information.   And to get people's

⚥

                                                                52


1    confidential business information to give a little bit of help

2    and a little bit of an advantage seems unfairly burdensome on

3    defendants who acted in good faith in entering into

4    confidential settlement agreements, and not nearly probative or

5    valuable enough to the debtor.

6         THE COURT:   All right.   Thank you.

7         I think I heard from all the parties who filed briefs.

8    Anybody else before I give Mr. Zott a chance to reply?

9       (No response)

10         THE COURT:   Go ahead, Mr. Zott, if you wish.

11         MR. ZOTT:   Thank you, Your Honor.   Let me just suggest

12    sort of the two main objections we've heard; one is the sort of

13    relevance or probative value, and that's the objection we just

14    heard now.   And I think there's a little bit of confusion here

15    in the sense that the arguments I just heard being made were

16    that -- weren't really arguments that go to discovery.   Those

17    are really arguments that go to, when you get this information,

18    will it ultimately prove to be probative for value in

19    Chemtura's liability.   And I'm sure that we're going to have

20    experts, and other parties may have experts, that will tussle

21    about that issue.

22         But in terms of the relevance, that is, where we're

23    talking about the same claims -- I mean, the same complaints,

24    the same claims, the same alleged injury, the same causal

25    connection, oftentimes the defendants -- same set of defendants

⚲

     1    in the same case, and then they settle a claim which is, for

     2    all intents and purposes, exactly the same claim that is being

     3    brought against us, it's clearly relevant for discovery

     4    purposes.

     5            In terms of whether ultimately there are

     6    distinguishing features between, say, a Givaudan and a

     7    Chemtura, that's an issue that the experts will have to hash

     8    out, who are the experts; they can value and they can draw

     9    those distinctions.  But it's not a reason to cut off the

    10    process of getting that information in order to make those

    11    determinations.

    12            In terms of the -- he refers to the fact that we may

    13    have enough information, and the truth is we simply don't have

    14    enough information.  I mean, that's why we're here, because we

    15    ultimately settled two claims; beyond that, we really have --

    16    we have some public information, what's been reported in an

    17    annual report, and we've received a few settlements through

    18    this process voluntarily.  But we don't have any kind of a

    19    database that would tie settlement values to levels of injury,

    20    and that's the critical piece we're missing.

    21            So in terms of going -- the suggestion to go and hire

    22    an expert, well, we have done that and the expert said you need

    23    to go and get this information because this is very, very

    24    probative to our ability to reliably and fairly estimate the

    25    value of these claims.  And that's the reason that we're here

⚲

1    today.

2         In terms of the -- just the confidentiality point, the

3    bottom line there is the law says that there is a balance, and

4    then the law strikes that balance so that where parties have

5    legitimate needs for confidentiality, it doesn't mean that the

6    information is therefore rendered undiscoverable in our system

7    of justice; it means that appropriate protections have to be

8    put in place.  And that's true for trade secrets, for patents,

9    for things that are really at the core of the whole -- of an

10   ability of a firm to profit and stay in business.  Even at that

11   level, the law says protective orders are the way to go.

12        We're not talking about anything nearly that

13   sensitive.  And we're talking about trying to reach a fair

14   balance.  And in terms of that fair balance, I think the

15   framework that I laid out earlier and that Mr. McClain, I

16   believe, largely, you know, with -- obviously, we're going to

17   have to work out some nuances, but I think he also agreed in

18   the main that that's a fair framework.

19        There was one suggestion about destroying the chart

20   when we're done with this process.  I think that's fine,

21   because that's typically done where you will destroy

22   confidential information or else return it to the other party.

23   I have no issue with that.

24        So the bottom line here is this information is clearly

25   relevant under the broad standards.  I think it will be helpful

1    to the Court and to the parties to have more reliable better

2    estimates.  And in terms of confidentiality, we're certainly

3    willing to do anything within reason to make sure that the

4    legitimate concerns of the parties are protected.   And I
5    believe what we've proposed today, Your Honor, goes a long way
6    to doing that.
7              THE COURT:   All right.   Thank you.
8              MR. ZOTT:   Thank you.
9              THE COURT:   All right, folks, we're going to take a
10   recess.   I can't guarantee you exactly how long I'll be.   I
11   would like everybody back in the courtroom in fifteen minutes.
12   We're in recess.
13       (Recess from 11:40 a.m. until 12:10 p.m.)
14             THE COURT:   All right.   Ladies and gentlemen, the
15   debtors' motion is going to be granted in part and, at
16   Chemtura's option, either continued in part or denied without
17   prejudice in part.   I'm going to tell you what we're going to
18   do and the bases for the exercise of my discretion in this
19   regard.
20             Mr. Zott and Mr. McClain are to establish a protocol
21   for providing, subject to safeguards, information on what you
22   might refer to as a macroeconomic basis, generally in
23   accordance with Mr. Zott's proposal as articulated to me in
24   oral argument, and as it might be refined by the further
25   comments that Mr. McClain put up in terms of massaging or

♀

56

1    improving upon that proposal in accordance with the remarks
2    that he made when he had a chance to speak.   After each of them
3    or their designees establish that protocol, the Humphrey firm
4    will then provide the information in accordance with the
5    agreed-upon protocol.   The general objective being to address
6    each sides' legitimate needs and concerns, plus those of the

7    tort defendants, who also have an interest in this process.

8          The tort defendants will have the ability to consult

9    with Mr. Zott and Mr. McClain on developing the protocol, but

10   will not have a veto over its provisions.  However, if after

11   negotiations they have material concerns as to the way Mr. Zott

12   and Mr. McClain put it together, they can arrange for a

13   conference call with me, in which case I'll consider any of

14   their specific concerns.

15         Somewhat more specifically, Mr. McClain will, after

16   resolving the specifics of the protocol, prepare some kind of

17   chart or matrix or as otherwise agreed between him and Mr.

18   Zott, that provides on an overall and anonymous basis,

19   settlement amounts and the injury levels for those settlement

20   amounts.  Presumably, Mr. Zott -- excuse me -- Mr. McClain will

21   have done so by reference to settlement agreements.  But he

22   will be able to do so without fear that he'll be violating any

23   confidentiality provisions in those agreements.

24         In the first instance -- and this is one area where

25   Mr. Zott's motion is at this point granted only in part -- it

♀

57

1    will be without actually handing over the settlement

2    agreements, in the absence of any later ruling by me upon a

3    future showing of need, if it were to be determined that the

4    matrix or chart or alternate method isn't satisfactory.  So in

5    the first instance, I would like to see if you guys can work

6    out a mechanism by which the information can be provided

7    without actually handing over the agreements.  But it's without

8    prejudice to the estate's ability to say hey, we tried, but

9    this method isn't working, and we actually need to see the

10    agreements.  I don't think the actual agreements themselves
11    would be necessary, but I'm giving each side a reservation of
12    rights in that respect.
13         The protocol and approval order are to provide, in
14    addition, that the information will be used only for the claims
15    estimation process, not for the defense of individual claims,
16    and that the information provided, which will initially go only
17    to experts and nontort lawyers for the debtors and the two
18    official committees, shall not be shared with any others,
19    including, without limitation, tort lawyers defending
20    individual diacetyl claims or other plaintiffs' lawyers.  A
21    violation of the protocol and the order, will of course, be
22    punishable by contempt.  The Humphreys firm, Mr. McClain, and
23    Mr. Zott, are authorized to put in any other safeguards that
24    either side might reasonably request of the other, to maintain
25    the confidentiality of the information provided.

♀

                                                              58


1         The parties also are to agree upon an auditing
2    mechanism, using experts or any other mechanism that you agree
3    upon, so everybody in the room will have confidence in the
4    integrity of the process.  By auditing mechanism, I should
5    clarify that, because I think I stated it imperfectly.  Since
6    the Humphreys firm will not, at least in the first instance, be
7    providing the settlement agreements, the auditing process is to
8    provide a means, presumably by an independent expert or by
9    experts with the ability to look over each others' shoulders,
10    either by spot checking or by looking at the overall databases,
11    to provide comfort that Mr. McClain is playing it straight,
12    which I'm confident he will.

13          I'm not looking for anything too elaborate here.  I'm
14     looking for something sufficient to give the party getting the
15     information, which in this case is the estate and its
16     committees, comfort that it's getting accurate information.
17     But I don't care too much how you do it, consistent with the
18     other things that I said.
19          I am expressly ruling that with the confidentiality
20     protections that will be in the protocol and the order having
21     been put into place, the objections of the codefendants to the
22     litigation brought by the Humphrey firm are overruled; that my
23     order authorizing this limited disclosure trumps any
24     contractual provisions in the settlement agreements to the
25     contrary; and that the Humphreys firm may produce the data

♀

                                                                     59


1      whose disclosure I'm ordering, without fear of any liability to
2      the counterparties to its settlement agreements.  In the spirit
3      of that overruled ruling, the Humphreys firm may, if it is so
4      advised, put in more specific language that gives it the
5      comfort it needs to know that it is not subjecting itself to
6      liability to those counterparties.
7          Now, for the legal underpinnings of that and the bases
8      for the exercise of my discretion.  Of course the information
9      of the character that I am ordering production of today isn't
10     relevant to the rights of an individual tort claimant to
11     recover from the Chemtura estate.  But that isn't the point.
12     The requested information is clearly relevant to the estimation
13     process, which requires, for the good of the thousands or -- of
14     Chemtura creditors, or exactly however many there might be, and
15     the need to reorganize this case; to get our arms around the

16    estate's aggregate exposure; to estimate these claims for the
17    purpose of creating the necessary reserves; for determining the
18    feasibility of any reorganization plan; and at least arguably
19    in determining what it will take to satisfy creditor claims so
20    that if there's money or value in the estate available after
21    that, we can provide for a distribution to equity.
22              Needless to say, the allocation of value in this
23    estate as between the creditor community and the equity
24    committee -- or the equity community -- is not something I'm
25    determining today.  But I'm stating the obvious, that to

♀

60

1    determine that down the road, we need basic information from
2    which the debtors can propose a plan that meets their
3    obligations in accordance with federal bankruptcy law.
4              I assume, without deciding, that other factors beyond
5    those whose disclosure I described, including some that Mr.
6    Vassos identified, would in many if not most, if not all cases,
7    be relevant to the decision of parties when they reached
8    settlements in the past.  If such information can be shared as
9    informing the ultimate estimation process, so much the better.
10   But the failure to provide that goes to the persuasiveness of
11   the ultimate estimation result, not the usefulness of this
12   information, as the critical starting point in enabling us to
13   estimate the claims in the Chemtura case, in the diacetyl
14   liability area.  Experts, once they have that critical first-
15   step information, can then argue, if they have a mind to, and
16   if they have different perspectives, as to how to weight or
17   consider the information that's been provided, just as experts
18   in a valuation dispute argue about the weighting of discounted

19    cash flow, comparable companies analysis, comparable
20    transactions analysis, or other expert -- other methods experts
21    use in providing the Court with subjective views as to how the
22    Court should rule.  But it's plain that this information is
23    relevant.
24          So therefore, what we're really talking about is
25    balancing the estate's need to get critically important

♀

1     information with avoiding prejudice or at least minimizing it
2     and keeping it within acceptable limits, to those whose ox
3     might be gored if the information were made public.  Plainly,
4     it should not be made public, and most significantly, it should
5     not be made public or available to the tort lawyers who are
6     fighting the one-off battles as to liability for any particular
7     injured party's claim.  But I'm comfortable that especially
8     with Mr. Zott and Mr. McClain putting their noodles together,
9     and giving the codefendants the consultation rights that I'm
10    directing, we're going to come up with a method that
11    appropriately eliminates material prejudice.
12          The objections of the co-defendants are accordingly
13    overruled.  For those like Citrus, who have filed claims, they
14    will need to show me what they've had to write out in the way
15    of checks to tort litigants in any event, to get their claims
16    allowed.  And frankly, I didn't understand Citrus to be
17    objecting to that notion, once it would know that it's not
18    acting violative of any duties it has by contract.  In any
19    event -- and I'm now going to give Citrus, just like I'm giving
20    the Humphreys firm the comfort order each would need.
21          Some other parties -- and I think it was Mr. Jones who

22   was the person who was commenting on this -- have not filed

23   claims against the estate, but nevertheless, the information

24   that impacts upon their asserted rights is not analytically

25   different from the information that is provided by any third-

♀

62

1    party witness, even if he or she did not inject himself or

2    herself into the litigation fray; just like the person who's

3    the witness at the site of a car wreck and provides relevant

4    information as to whether the light was red or green.

5            I reject the notion that for all purposes, parties

6    may, by contract, protect information that they have that is

7    relevant to legal issues from judicial scrutiny.  Of course

8    they may have needs and concerns that depending upon the legal

9    context in which they're asserting them, may deserve protection

10   under particular circumstances, or as much protection as we can

11   give them, most significantly, by protective order.  But the

12   needs of the federal courts cannot be made hostage to the

13   rights of parties that they give each other in contracts.

14           Of course, when we're talking about something that has

15   broad significance to thousands of creditors or equity holders,

16   as we have here in Chemtura, that is quite different than

17   parties trying to get that information for their private

18   advantage in one-off tort litigations.  In general, if not in

19   the great bulk of cases, I assume that state and federal courts

20   will honor parties' legitimate concerns when information of the

21   character sought to be protected is improperly to be used for

22   one-off litigation advantage.  But those considerations do not

23   apply here.  Likewise, when I underscore the importance of

24   creating the appropriate reserves and determining feasibility

25    in the Chemtura plan context, my earlier ruling, cited by many

                                                                    63

1     in their objections, under materially different facts, is
2     plainly distinguishable.
3            Mr. Zott, I'm going to leave it to you and your
4     colleagues to think about the mechanics of implementing my
5     order.  It may be most appropriate for you to work with Mr.
6     McClain in consultation with the other guys to come up with a
7     protocol for getting the information you're going to get, and
8     then to put an order on top of the protocol that both approves
9     the order and grants your motion, to the extent I granted it.
10    Any other approach that you and Mr. McClain agree upon is
11    likely to be acceptable to me.
12           But the important aspect of this ruling is that you're
13    entitled to the information you're asking for, but we want to
14    do it in a way that minimizes the prejudice to the 356 diacetyl
15    individual claimants, and that provides reasonable protections
16    in the confidentiality range, both for them and for the tort
17    litigants -- excuse me -- the codefendants in the tort actions
18    who are also impacted by this motion.
19           All right.  Thank you, folks.  Have a good day.  We're
20    adjourned -- oh, yes?  Come on up, please, Mr. Vassos, to a
21    microphone.
22    MR. VASSOS:  Just one housekeeping matter that I
23    wanted to note on the record.  I noted during the discussion
24    earlier that my client indicated they would withdraw certain
25    indemnification claims in hope of avoiding this discovery

1    issue.  I've informed debtors' counsel that we will take that

2    issue up with them.  We may want to reinstitute those claims.

3    And I just wanted to state that on the record.

4         THE COURT:  All right.  Each of you has whatever

5    rights you had vis-a-vis that.  And I'm not going to decide

6    that today.

7         MR. VASSOS:  Understood, Your Honor.  Thank you, Your

8    Honor.

9         THE COURT:  Thank you.  Have a good day.  We're

10   adjourned.

11     (Whereupon these proceedings were concluded at 12:29 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

243139.TXT
2                     I N D E X

3

4                   R U L I N G S

5  DESCRIPTION                        PAGE    LINE

6  Debtors' Rule 2004 motion granted in part,    55      16

7  continued in part or denied without prejudice

8  in part as delineated on the record

9  Co-defendants' objection overruled           61      13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

⚥

1

2              C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB (CET**D-486)

9    AAERT Electronic Certified Transcriber

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, New York 11501

15

16   Date:  March 17, 2010

17

18

19

20

21

22

23

24

25