**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHEMTURA CORPORATION, *et al.*,[1] | ) Case No. 09-11233 (REG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**NOTICE OF FILING**
**OF REVISED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11**
**PLAN OF CHEMTURA CORPORATION, *ET AL.* (SOLICITATION VERSION)**

PLEASE TAKE NOTICE that, to provide clarity to all parties in interest, Chemtura

Corporation and certain of its affiliates, as debtors and debtors in possession (collectively, the

"**Debtors**"), are filing the attached solicitation version of the *Disclosure Statement for the Joint*

*Chapter 11 Plan of Chemtura Corporation, et al.* (the "**Disclosure Statement**"), which was

approved pursuant to an order of the Court on August 5, 2010 [Docket No. 3492].

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will

consider confirmation of the *Joint Chapter 11 Plan of Chemtura Corporation, et al.*, dated

August 4, 2010 (as may be modified, amended or supplemented from time to time, the "**Plan**")

will commence at **9:45 a.m. Eastern Daylight Time on September 16, 2010**, before the

Honorable Robert E. Gerber, United States Bankruptcy Judge, in the United States Bankruptcy

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

Court for the Southern District of New York, One Bowling Green, Room 621, New York, New York 10004-1408.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 9, 2010 at 4:00 p.m. Eastern Daylight Time** (the "**Plan Objection Deadline**"). Any objection to the Plan must: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York and any orders of the Court; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such entity; (d) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with a proof of service, with the Court and served so that it is **actually received** no later than the Plan Objection Deadline by the following parties:

| |
|---|
| **KIRKLAND & ELLIS LLP** |
| Attn: Richard M. Cieri |
| Attn: M. Natasha Labovitz |
| Attn: Craig A. Bruens |
| Attn: Brian E. Schartz |
| 601 Lexington Avenue |
| New York, New York 10022-4611 |
| |
| *Counsel to the Debtors and Debtors in Possession* |
| **AKIN GUMP STRAUSS HAUER & FELD LLP** |
| Attn: Daniel H. Golden |
| Attn: Philip C. Dublin |
| Attn: Meredith Lahaie |
| One Bryant Park |
| New York, New York 10036 |
| |
| *Counsel to the Statutory Committee of Unsecured Creditors* |
| **SKADDEN ARPS SLATE MEAGHER & FLOM LLP** |
| Attn: Jay Goffman |
| Attn: David M. Turetsky |
| Four Times Square |
| New York, New York 10036 |
| |
| *Counsel to the Statutory Committee of Equity Security Holders* |

**SHEARMAN & STERLING LLP**
Attn:  Fred Sosnick
599 Lexington Avenue
New York, New York 10022

*Counsel to the Agent for the Debtors' Postpetition and Prepetition Secured Lenders*

**JONES DAY**
Attn:  Richard Wynne
Attn:  Erin Brady
555 S. Flower Street
Los Angeles, California 90071

*Counsel to the Ad Hoc Bondholders' Committee*

**THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK**
Attn:  Susan D. Golden
33 Whitehall Street, 21st Floor
New York, New York 10004

*U.S. Trustee*

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, Plan or related documents, you should contact Kurtzman Carson Consultants LLC, the voting and claims agent retained by the Debtors in these chapter 11 cases (the "**Voting and Claims Agent**"), by:  (a) calling the Debtors' restructuring hotline at (866) 967-0261; (b) visiting the Debtors' restructuring website at: www.kccllc.net/chemtura; (c) e-mailing the Debtors at kcc_chemtura@kccllc.com; and/or (d) writing to Chemtura Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave., El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.nysb.uscourts.gov.

New York, New York
Dated:  August 5, 2010

/s/ M. Natasha Labovitz
Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Counsel to the Debtors
and Debtors in Possession

# Exhibit 1

**Solicitation Version of the Disclosure Statement**

Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
Brian E. Schartz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

Counsel to the Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHEMTURA CORPORATION, *et al.*,[1] | ) Case No. 09-11233 (REG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

### DISCLOSURE STATEMENT FOR THE
### JOINT CHAPTER 11 PLAN OF CHEMTURA CORPORATION, *ET AL.*

---

Dated:  August 4, 2010

---

[1]    The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal taxpayer identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

| IMPORTANT INFORMATION FOR YOU TO READ |
|---|

**THE DEADLINE TO VOTE ON THE JOINT CHAPTER 11
PLAN OF CHEMTURA CORPORATION, *ET AL.* IS
SEPTEMBER 9, 2010 AT 5:00 P.M. EASTERN DAYLIGHT TIME**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> RECEIVED BY THE
VOTING AND CLAIMS AGENT OR THE SECURITIES VOTING AGENT, AS APPLICABLE, BEFORE
THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this Disclosure Statement for the *Joint Chapter 11 Plan of Chemtura Corporation, et al.* [Docket No. 3497] (as may be amended, modified or supplemented from time to time, the "Plan") to holders of Claims and Interests entitled to vote on the Plan for the purpose of soliciting votes to accept or reject the Plan. <u>Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.</u> Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning given to those terms in the Plan; the terms of which are adopted and incorporated herein by reference.

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or business advice. The Debtors urge any holder of a Claim or Interest to consult with its own advisors for any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of the adequacy of the disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan. The Debtors have not authorized any entity to give any information about or concerning the Plan other than the information contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

The Debtors urge every holder of a Claim or Interest entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in section XII of this Disclosure Statement and (3) consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and all documents that are attached or were filed in connection with the Plan and Disclosure Statement <u>before</u> deciding whether to vote to accept or reject the Plan or to make any other elections as described in the Plan and Disclosure Statement.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Chapter 11 Cases and certain documents related to the Plan. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other referenced documents, the Plan or other referenced documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained in or attached to this Disclosure Statement is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, much of that financial information has not been audited. The Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should be aware that, at the time of their review, the facts may have changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation or waiver. Rather, holders of Claims and Interests and other parties in interest should construe this Disclosure Statement as a statement made in settlement negotiations related to the numerous

K&E 17416258.15

contested matters, adversary proceedings and other pending or threatened litigation or actions that are described herein. The Debtors, New Chemtura or the Reorganized Debtors may seek to investigate, file and prosecute Causes of Action and may object to Claims after Confirmation or the Effective Date irrespective of whether this Disclosure Statement identifies any such Causes of Action or objections to Claims.

---

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

---

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The Debtors are relying on section 1145(a)(1) of the Bankruptcy Code or other applicable law, including, in certain circumstance, the Securities Act of 1933, as amended (the "Securities Act") with respect to the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and the state securities law, all as more fully described in section XIII of this Disclosure Statement, entitled "<u>Important Securities Law Disclosure</u>."

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof, as well as any similar or comparable language. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis set forth in <u>Exhibit D</u> to this Disclosure Statement, the distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and, if applicable, Interests may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

<u>Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative</u>. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

---

### QUESTIONS AND ADDITIONAL INFORMATION

---

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact Kurtzman Carson Consultants LLC by (i) calling (866) 967-0261, (ii) emailing kcc_chemtura@kccllc.com or (iii) visiting http://www.kccllc.net/chemtura.

K&E 17416258.15

# TABLE OF CONTENTS

**Page**

**LETTER FROM THE CREDITORS' COMMITTEE** ............................................................................... 1

**LETTER FROM THE EQUITY COMMITTEE** ..................................................................................... 3

**I.      EXECUTIVE SUMMARY** ............................................................................................................ 7

    A.      Overview of this Disclosure Statement and the Executive Summary ........................... 7

    B.      Purpose and Effect of the Plan ................................................................................... 8

    C.      Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan ...................................................................................................................... 10

    D.      Voting on the Plan.................................................................................................... 31

    E.      Additional Plan-Related Documents ......................................................................... 34

    F.      Confirmation and Consummation of the Plan ........................................................... 35

**II.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** .................................. 37

**III.    QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE STATEMENT AND THE JOINT PLAN** ............................................................................................................ 40

    A.      What is Chapter 11? ................................................................................................. 40

    B.      What is the Companies' Creditors Arrangement Act? ............................................... 40

    C.      Why are the Debtors sending me this Disclosure Statement? .................................... 40

    D.      Am I entitled to vote on the Plan?  What will I receive from the Debtors if the Plan is consummated?.......................................................................................................... 40

    E.      What happens to my recovery if the Plan is not confirmed or does not become effective? ........... 41

    F.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?" ................................................................................... 41

    G.      How are the Debtors obtaining the Cash and other value required to make distributions (if applicable) to satisfy Claims and Interests? ............................................................. 41

    H.      Can I choose to receive only Cash or New Common Stock?...................................... 42

    I.      What is an Unsecured Convenience Claim? .............................................................. 42

    J.      Are there risks to owning stock in New Chemtura upon emergence from bankruptcy? ................. 42

    K.      I am a holder of an Interest in Chemtura.  What will I receive if I vote to accept the Plan? .......... 42

    L.      I am a holder of an Interest in Chemtura.  What will I receive if I vote to reject the Plan? ........... 43

    M.      Will Chemtura Canada file a Plan of Arrangement with respect to the Canadian Case? ............... 45

    N.      I am a creditor of Chemtura Canada.  How will I be affected by Chemtura Canada's reorganization in the United States and Canada? ................................................................................... 45

    O.      What impact will the reorganization of Chemtura Canada have on the Debtors' business operations? ............................................................................................................... 45

    P.      Is there potential litigation related to the Plan? ........................................................ 45

K&E 17416258.15

Q.      What is included in the solicitation packages to be sent to Claim and Interest holders who are eligible to vote on the Plan? ................................................................................ 45

R.      Will there be releases granted to parties in interest as part of the Plan? ......................... 46

S.      What is the deadline to vote on the Plan? ......................................................................... 47

T.      How do I vote for or against the Plan? .............................................................................. 47

U.      Why is the Bankruptcy Court holding a Confirmation Hearing? ....................................... 48

V.      When is the Confirmation Hearing set to occur? .............................................................. 48

W.      What is the deadline to object to Confirmation? ............................................................... 49

X.      What is the purpose of the Confirmation Hearing? ........................................................... 49

Y.      What role does the Bankruptcy Court play after the Confirmation Hearing? ................... 49

Z.      What is the effect of Confirmation on the Debtors' ongoing business? ............................. 49

AA.     Will any party have significant influence over the corporate governance and operations of New Chemtura and the other Reorganized Debtors? ................................................ 49

BB.     I am a holder of a Diacetyl Claim.  How am I affected by the Plan and the reorganization of Chemtura Canada? ................................................................................ 50

CC.     Do the Debtors recommend voting in favor of the Plan? ................................................... 50

IV.     CHEMTURA'S HISTORY ....................................................................................................... 51

A.      Company Overview ............................................................................................................ 51

B.      Organizational Structure ................................................................................................... 51

C.      Prepetition Capital Structure ............................................................................................ 52

D.      Additional Disclosure with Respect to Chemtura Canada's History and Operations ...... 56

V.      EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES ................. 58

A.      Adverse Market Conditions ............................................................................................... 58

B.      Liquidity Constraints ......................................................................................................... 58

C.      Looming Debt Maturities and Potential Defaults .............................................................. 59

D.      Legacy Liabilities .............................................................................................................. 59

E.      Prepetition Restructuring Initiatives ................................................................................. 61

VI.     COMMENCEMENT OF THE CHAPTER 11 CASES ......................................................... 62

A.      "First-Day" Motions and Related Relief ........................................................................... 62

B.      Initial Financing Orders .................................................................................................... 63

VII.    DEVELOPMENTS DURING THE CHAPTER 11 CASES .................................................. 65

A.      Appointment of the Statutory Committees and Formation of the Ad Hoc Bondholders' Committee ................................................................................................... 65

B.      Retention of Professionals ................................................................................................ 69

C.      Development of the Debtors' Long-Range Business Plan ................................................. 70

D.      The Claims Process ........................................................................................................... 74

E.      Rejection and Assumption of Executory Contracts and Unexpired Leases ...................... 76

K&E 17416258.15

F.      Debtor-in-Possession Financing During the Chapter 11 Cases................................77

G.      Retiree Matters................................................................................................78

H.      Employee Matters.............................................................................................82

I.      Litigation and Adversary Proceedings ...............................................................86

J.      Sales of Certain Debtors' Assets .......................................................................94

K.      Material Settlements and Resolutions ................................................................96

L.      Exclusivity and the Equity Committee's Competing Plan Proposal .....................98

M.      Settlement Among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee and Entry into the Plan Support Agreement ................................99

N.      Anticipated Developments Regarding Chemtura Canada Before Confirmation...........101

**VIII.   DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION** ....................................**103**

A.      Administrative Claims, Priority Tax Claims, DIP Claims and Statutory Fees............103

B.      Classification and Treatment of Claims and Interests ........................................106

C.      Acceptance Requirements ................................................................................129

D.      Means for Implementation of the Plan ..............................................................129

E.      Treatment of Executory Contracts and Unexpired Leases ..................................141

F.      Provisions Governing Distributions ...................................................................143

G.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims Other than Diacetyl Claims...........................................................................................147

H.      Procedures for Reserving Environmental Claims ...............................................149

I.      Procedures for Reserving For and Resolving Diacetyl Claims ............................150

J.      Settlement, Release, Injunction and Related Provisions .....................................152

K.      Conditions Precedent to Confirmation of the Plan and the Effective Date ...................156

L.      Modification, Revocation or Withdrawal of the Plan ..........................................158

M.      Retention of Jurisdiction .................................................................................159

N.      Miscellaneous Provisions.................................................................................161

**IX.    ADDITIONAL DISCLOSURE REGARDING CLAIMS AND RECOVERIES UNDER THE PLAN**....................................................................................................**165**

A.      Overview of the Debtors' Insurance Policies .....................................................165

B.      Discussion of Settlements Contemplated Pursuant to the Plan ...........................167

**X.     VOTING ON THE PLAN** ...........................................................................................**183**

A.      Overview........................................................................................................183

B.      Holders of Claims and Interests Entitled to Vote on the Plan .............................183

C.      Voting Record Date ........................................................................................183

D.      Voting on the Plan...........................................................................................183

E.      Ballots Not Counted .......................................................................................184

F.      Recovery Preference Election ..........................................................................184

K&E 17416258.15

|   | G. | Rights Offering | 185 |
|---|----|-----------------|-----|
|   | H. | Additional Disclosures for Class 13a Interests in Chemtura | 185 |
| XI. | | CONFIRMATION OF THE PLAN | 187 |
|   | A. | The Confirmation Hearing | 187 |
|   | B. | Deadline to Object to Confirmation | 187 |
|   | C. | Requirements for Confirmation | 187 |
|   | D. | Best Interests of Creditors/Liquidation Analysis | 188 |
|   | E. | Feasibility/Financial Projections | 188 |
|   | F. | Acceptance by Impaired Classes | 188 |
|   | G. | Confirmation Without Acceptance by All Impaired Classes/Fair and Equitable Test | 189 |
|   | H. | Valuation of the Debtors | 190 |
| XII. | | RISK FACTORS | 191 |
|   | A. | Risks Related to Confirmation | 191 |
|   | B. | Risks Related to the Company's Businesses | 193 |
|   | C. | Risks Relating to Recoveries Under the Plan | 199 |
|   | D. | Disclosure Statement Disclaimer | 200 |
| XIII. | | IMPORTANT SECURITIES LAW DISCLOSURE | 202 |
| XIV. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 203 |
|   | A. | Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims and Interests | 204 |
|   | B. | Certain U.S. Federal Income Tax Consequences to New Chemtura and the Reorganized Subsidiary Debtors | 209 |
| XV. | | RECOMMENDATION | 213 |
| | | APPENDIX | 215 |

K&E 17416258.15

**EXHIBITS**

EXHIBIT A        Plan

EXHIBIT B        Disclosure Statement Order and Solicitation Order

EXHIBIT C        Organizational Chart of the Debtors and their Non-Debtor Affiliates and Subsidiaries

EXHIBIT D        Liquidation Analysis

EXHIBIT E        Financial Projections

EXHIBIT F        Valuation Analysis

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS
DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

K&E 17416258.15

**Letter from the Creditors' Committee**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF CHEMTURA CORPORATION, *ET AL.***

July 23, 2010

**To the Unsecured Creditors of Chemtura Corporation and Its Debtor Subsidiaries**:

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Chemtura Corporation, *et al.* (the "Debtors"), the statutory fiduciary representing the interests of unsecured creditors in the Debtors' chapter 11 cases, writes this letter to unsecured creditors to recommend that each unsecured creditor entitled to vote on the Debtors' *Joint Chapter 11 Plan of Chemtura Corporation, et al.* (the "Plan") vote in favor of the Plan. The Plan generally provides that each unsecured creditor, subject to certain exceptions as noted below, will receive a combination of cash and common stock in the amount of its unsecured claim plus postpetition interest, as applicable.

As described throughout the disclosure statement for the Plan (the "Disclosure Statement"), the Plan incorporates, among other things, the terms of a global settlement reached among the Creditors' Committee, the Debtors and an ad hoc committee of certain holders of notes issued by the Debtors (the "Ad Hoc Bondholders' Committee" and, together with the Debtors and the Creditors' Committee, the "Parties"). The global settlement, among other things, resolves issues related to (i) the total enterprise value of the Debtors' estates (and the allocation of such value among the estates), (ii) the Debtors' underfunded pension obligations, and (iii) the entitlement of certain of the Debtors' note issuances to a makewhole premium or no-call payment as a result of the satisfaction of such notes under the Plan. Each of these resolutions is discussed in greater detail below.

First, the Plan is premised upon a total enterprise value for the Debtors of $2.050 billion. The Creditors' Committee believes that the actual value of the Debtors' estates may be less than $2.050 billion, but that as a whole the Plan and the settlements contained therein are in the best interests of unsecured creditors as they avoid significant, time consuming litigation for which the results would be uncertain and are projected to provide unsecured creditors with a full recovery on account of allowed unsecured claims (including postpetition interest). Second, the Plan provides that the Debtors will make a one-time cash funding contribution of $50 million in exchange for the Pension Benefit Guaranty Corporation's (the "PBGC") agreement not to pursue a PBGC-initiated termination of the Debtors' underfunded defined benefit plans. Third, the Plan resolves certain disputes arising from the indentures governing the Debtors' 6.875% unsecured notes due 2016 (the "2016 Notes") and the Debtors' 6.875% unsecured notes due 2026 (the "2026 Notes"). The 2016 Notes indenture contains a makewhole provision that arguably entitles holders of the 2016 Notes to a premium in the event that the 2016 Notes are repaid prior to their stated maturity. Similarly, the 2026 Notes indenture contains a no-call provision that prohibits the repayment of the 2026 Notes before their stated maturity. Although the Debtors dispute whether either the makewhole premium or no-call damages are payable at this time, as part of the global settlement reached among the Parties, the makewhole premium will be allowed in the amount of $50 million and no-call damages will be allowed in the amount of $20 million. Such amounts represent approximately 50% of the amounts that would be payable if the provisions were found to be applicable and enforceable in full.

Pursuant to the Plan, each unsecured creditor, other than creditors holding claims of less than $50,000, holders of claims against Chemtura Canada Co./Cie, ("Chemtura Canada") (to the extent it commences a chapter 11 case before the Plan is confirmed) and holders of claims against any Debtor or non-debtor affiliate resulting, directly or indirectly, from alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde, including all claims for indemnification or contribution relating to alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde ("Diacetyl Claims"), will receive a combination of cash and common stock (the "New Common Stock") in post-bankruptcy Chemtura Corporation in the amount of its unsecured claim plus postpetition interest. Unsecured creditors entitled to vote on the Plan other than holders of Diacetyl Claims or holders of claims against Chemtura Canada (to the extent it commences a chapter 11 case before the Plan is confirmed) have the right to make a binding election to seek their recovery in the form of the maximum available percentage of cash or the maximum available percentage of New Common Stock, to the extent such recovery is available. Holders of Diacetyl Claims will receive a distribution from a reserve of cash to be funded by insurance proceeds and/or Chemtura Corporation and Chemtura

1

Canada Co./Cie.  Holders of Claims against Chemtura Canada (to the extent it commences a chapter 11 case before the Plan is confirmed) other than holders of Diacetyl Claims will be paid in full, in cash in the ordinary course of business or will otherwise be unaffected by the chapter 11 cases.

The Plan also provides that holders of equity interests in Chemtura Corporation will receive (i) to the extent the class of equity interests votes in favor of the Plan, their pro rata share of 5% of the New Common Stock and the right to participate in a rights offering of up to $100 million or (ii) to the extent the class of equity interests votes to reject the Plan, their pro rata share of value available for distribution after all allowed unsecured claims have been paid in full and a disputed claims reserve for disputed unsecured claims has been established.

Please be advised that Article X of the Plan contemplates releases for numerous parties.  The Creditors' Committee recommends that, prior to voting on the Plan, each unsecured creditor review closely the releases contained in Article X.

Please be further advised that detailed voting instructions are included in the Disclosure Statement and the exhibits attached thereto.  To ensure that all votes are counted, each unsecured creditor entitled to vote on the Plan should carefully review and comply with the voting instructions before voting on the Plan.

The Creditors' Committee considered various restructuring alternatives and weighed the risks and costs associated with the various alternatives.  **Given the current facts and circumstances of the Debtors' chapter 11 cases, the Creditors' Committee believes that the Plan provides the best alternative for unsecured creditors and, therefore, recommends that the Debtors' unsecured creditors entitled to vote on the Plan vote in favor of the Plan**.

If you have any questions with respect to the Plan or the treatment for your claims, please contact Meredith Lahaie at (212) 872-1000 (mlahaie@akingump.com).

**Very truly yours,**

**THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS
OF CHEMTURA CORPORATION,** *et al.*

2

**Letter from the Equity Committee**

**OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
OF CHEMTURA CORPORATION, *et al.*, DEBTORS
CASE NO. 09-11233 (REG), JOINTLY ADMINISTERED**

c/o Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

August 4, 2010

TO:    HOLDERS OF INTERESTS IN CLASS 13A: COMMON STOCKHOLDERS OF CHEMTURA
       CORPORATION

    The Official Committee of Equity Security Holders (the "Equity Committee") of Chemtura Corporation ("Chemtura") and its affiliated debtors and debtors in possession (collectively, the "Debtors"), appointed on December 29, 2009 pursuant to section 1102 of title 11 of the United States Code, writes this letter to Class 13a holders of Interests in Chemtura Corporation to advise you of its position regarding the Debtors' Joint Chapter 11 Plan of Reorganization (the "Plan"). Any capitalized terms used but not defined herein have the meaning ascribed to such terms in the Debtors' Plan.

    The Equity Committee represents the interests of all Chemtura common stockholders. As described throughout the disclosure statement for the Plan, the Equity Committee disagrees with the Debtors on a variety of issues related to the Plan. The Equity Committee believes that the Debtors have neither fulfilled their fiduciary duties to stockholders to maximize the value of these estates nor disclosed enough information for Class 13a stockholders to determine whether to accept or reject the Plan.

    ***For these reasons and those set forth below, the members of the Equity Committee have each determined at this time that they intend to vote their respective Interests to reject the Debtors' Plan.*** Each holder of a Class 13a Interest must, however, make its own independent decision as to whether or not the Debtors' Plan is acceptable to that Interest Holder before voting to accept or reject the Debtors' Plan.

    The Equity Committee believes that the Plan does not provide recoveries to stockholders that they are legally entitled to receive. To begin with, the Equity Committee believes that the Debtors are solvent. They are satisfying all of their Allowed Claims in full plus accrued interest and postpetition interest. This means that the residual value of the Debtors after all creditors are paid in full should redound to the benefit of the stockholders. But the Debtors' Plan does not unequivocally distribute all residual value to stockholders after allowed unsecured claims are satisfied in full.

    Instead, the Equity Committee believes that the Plan incorporates a "carrot and stick" approach to Class 13a votes. If Class 13a votes as a class to accept the Plan, its members will receive a fixed distribution. This distribution is comprised of 5% of the stock in the reorganized company on the Effective Date and an opportunity to participate in a $100 million rights offering to invest new equity in Reorganized Chemtura. If, however, Class 13a votes as a class to reject the Plan, its members will receive an uncertain recovery amount. The Debtors estimate that this distribution (comprised of an uncertain proportion of cash and stock) will result in a recovery ranging anywhere from 1.6% - 10.4% of the value of Reorganized Chemtura (the "Recovery Range"). A summary table illustrating the consequences of a Class 13a accepting and rejecting vote is set forth below. This alternative treatment, which is dependent upon the outcome of the Class 13a vote, reveals that there may be up to 10% equity value for stockholders, in the Debtors' view. However, under the Debtors' Plan, Class 13a will receive only half of that value if it votes to accept the Plan.

    Notwithstanding the fact that the Debtors are forcing their stockholders to make an election that may significantly affect their recoveries under the Plan, the Equity Committee is of the firm view that the Debtors do not

3

provide sufficient information to determine whether an accepting or rejecting Class 13a vote is preferable.  In addition, the Equity Committee believes there are many undisclosed variables that stockholders should be aware of:

- The Recovery Range may include residual amounts in the three reserves that the Debtors will fund on the Effective Date for Environmental Claims, Diacetyl Claims and Disputed Claims (together, the "Reserves").  The Reserves for Environmental Claims and Diacetyl Claims will be funded with cash.  The Reserve for Disputed Claims will be funded with a combination of cash and stock.  *As a result of what the Equity Committee believes to be inadequate information provided by the Debtors, the Equity Committee believes that it is impossible to ascertain the relative amounts of cash and stock that will be available from the Reserves.  Therefore, it is likely that at least a portion of the Recovery Range to be distributed to Class 13a members will be in the form of cash, rather than stock in reorganized Chemtura.*

- The distribution of residual amounts in the Reserves, if any, will be made only after all the claims asserted against the Reserves have been adjudicated or settled.  This process may take several years following the Effective Date.  *Therefore, it is likely that a portion of the recovery to be distributed to Class 13a members may not be distributed for several years.*

Of additional concern to the Equity Committee is the Plan's inclusion of a settlement among the Official Committee of Unsecured Creditors (the "UCC"), an ad hoc committee of bondholders (the "Ad Hoc Committee"), and the Pension Benefit Guaranty Corporation ("PBGC").  Under the terms of this settlement (which will be subject to the Bankruptcy Court's approval at the confirmation hearing), the Debtors propose to pay approximately $127 million in various settlement payments to holders of 2016 Notes ($50 million settlement), holders of 2026 Notes ($20 million settlement), a contribution to one of the Debtors' U.S. pension plan ($50 million) and professional fees of the Ad Hoc Committee's advisors ($7 million or more).  Because these creditor constituents are already being paid in full on account of their Allowed Claims, the Equity Committee believes that these settlements provide certain unsecured creditors with *more* than their Allowed Claims and improperly shift value from the stockholders to the unsecured creditors.

4

The Equity Committee encourages each Interest holder to carefully consider its own investment goals and needs in determining whether it chooses to vote for the capped 5% recovery on the Effective Date as opposed to a recovery within the Recovery Range at an indeterminate time in the future.  While the Equity Committee is not making a recommendation because it believes the disclosure statement does not contain adequate information for you to make an informed decision, we remind you that each member of the Equity Committee has determined at this time that they intend to reject the Plan.  The vote of stockholders holding at least two-thirds in amount of Chemtura common stock will determine the outcome of the Class 13a vote.  **The vote of Class 13a will be binding on all members of Class 13a.  The deadline by which all votes to either accept or reject the Plan must be submitted is 5:00 p.m. Eastern Daylight Time on September 9, 2010 (the "Voting Deadline").**

SUMMARY TABLE OF THE CONSEQUENCES OF A CLASS 13A ACCEPTING AND REJECTING VOTE

| Class 13a Vote | Accept | Reject |
|---|---|---|
| Distribution on the Effective Date | 5% of Stock in New Chemtura | Cash and Stock Worth 1.6 - 10.4% of the Equity Value of New Chemtura (at Debtors' Valuation) to be received over an indeterminate period of time and to be received in an indeterminate combination of cash and new common stock |
| Rights Offering Available to Stockholders | $100 million | None |
| Residual Cash From the Diacetyl Reserve | Retained by Debtors (Unknown Amount) | Distributed to Stockholders Over an Indeterminate Period of Time (Unknown Amount) |
| Residual Cash From the Environmental Reserve | Retained by Debtors (Unknown Amount) | Distributed to Stockholders Over an Indeterminate Period of Time (Unknown Amount) |
| Residual Cash From the Disputed Claims Reserve | Retained by Debtors (Unknown Amount) | Distributed to Stockholders Over an Indeterminate Period of Time (Unknown Amount) |
| Residual Stock From the Disputed Claims Reserve | Retained by Debtors/Cancelled (Unknown Amount) | Distributed to Stockholders Over an Indeterminate Period of Time (Unknown Amount) |

K&E 17416258.15

The Debtors have provided you with a ballot in connection with their plan or reorganization.  In order to have your vote counted with respect to the Debtors' Plan, you must complete and return the ballot in accordance with the procedures set forth therein.  PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT TO THE DEBTORS' BALLOTING AGENT.

Very truly yours,

THE OFFICIAL COMMITTEE OF EQUITY
SECURITY HOLDERS OF CHEMTURA
CORPORATION, *et al.*

K&E 17416258.15

# I.
## EXECUTIVE SUMMARY

### A.    Overview of this Disclosure Statement and the Executive Summary

Chemtura Corporation ("**Chemtura**"), a Delaware corporation with its corporate offices in Philadelphia, Pennsylvania and Middlebury, Connecticut, and 26 of its domestic subsidiary debtors and debtors in possession (collectively, the "**Debtors**" and, as reorganized pursuant to the Plan, the "**Reorganized Debtors**") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on March 18, 2009 (the "**Petition Date**"). The Chapter 11 Cases are jointly administered for procedural purposes only under lead case number 09-11233 (REG).

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims and Interests in Chemtura because the Debtors are asking holders of Claims and Interests in Chemtura to accept the *Joint Chapter 11 Plan of Chemtura Corporation, et al.*, dated July 26, 2010 (the "**Plan**"). A copy of the Plan is attached hereto as **Exhibit A**. The Plan constitutes a separate chapter 11 plan for Chemtura and each of its 26 affiliated Debtors. ***Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to those terms in the Plan.***

In addition to the 27 current Debtors, the Plan contemplates that Chemtura's indirectly owned subsidiary, Chemtura Canada Co./Cie ("**Chemtura Canada**") may file a voluntary petition for relief under chapter 11 of the Bankruptcy Code and commence ancillary recognition proceedings under Part IV of the Companies' Creditors Arrangement Act (the "**CCAA**") in the Ontario Superior Court of Justice, located in Ontario, Canada (the "**Canadian Court**" and such proceedings, the "**Canadian Case**"). It is expected that Chemtura Canada will file the voluntary petition for relief and commence the Canadian Case in August 2010. The Debtors will, at that time, ask the Bankruptcy Court to enter an order jointly administering Chemtura Canada's Chapter 11 Case with the current Chapter 11 Cases under lead case number 09-11233 (REG) and appoint Chemtura Canada as the "foreign representative" for the purposes of the Canadian Case. Chemtura Canada will then seek an order of the Canadian Court recognizing the Chapter 11 Cases as "foreign proceedings" under the CCAA.

Additional disclosure with respect to Chemtura Canada and its contemplated reorganization is provided in section VII.N of this Disclosure Statement, entitled "Anticipated Developments Regarding Chemtura Canada Before Confirmation." The Plan and this Disclosure Statement use the term "Debtors" to refer to all current Debtors and, to the extent Chemtura Canada commences a proceeding under the Bankruptcy Code and the CCAA, the term "Debtors" refers to Chemtura Canada as the context requires. Additionally, the Plan refers to the 26 current Debtors other than Chemtura as the "Subsidiary Debtors."

The contemplated filing of Chemtura Canada under the CCAA is designed only to address the Claims resulting, directly or indirectly, from alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde, including all Claims for indemnification or contribution relating to alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde ("**Diacetyl Claims**"). As provided for in the Plan and as described throughout this Disclosure Statement, all holders of Claims against and Interests in Chemtura Canada other than holders of Class 10 Diacetyl Claims will be left "unimpaired" or otherwise unaffected by Chemtura Canada's reorganization proceedings.

For purposes of clarity, the Debtors' restructuring strategy with respect to Chemtura Canada is only to address the Diacetyl Claims already asserted against Chemtura Corporation. The Debtors will, in the event Chemtura Canada commences a Chapter 11 Case, seek to have all of the Diacetyl Claims already filed against Chemtura Corporation deemed to be filed against Chemtura Canada, and the Debtors do not intend to set a new bar date with respect to Claims against Chemtura Canada. Accordingly, the Debtors do not expect the filing of Chemtura Canada to increase the amount of Diacetyl Claims presently asserted in the Chapter 11 Cases.

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. The Bankruptcy Court entered an order approving the Disclosure Statement on August 5, 2010 [Docket No. 3492] (the "**Disclosure Statement Order**"), as well as an order (i) approving, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the

K&E 17416258.15

Plan and certain vote tabulation procedures, (ii) establishing the deadline for filing objections to the Plan and (iii) scheduling the Confirmation Hearing. [Docket No. 3491] (including the exhibits thereto, the "**Solicitation Order**"). The Disclosure Statement Order and the Solicitation Order are attached hereto as collective **Exhibit B**.  **Please note that this Disclosure Statement has not yet been approved by the Bankruptcy Court as to Chemtura Canada because at this time it is not a Debtor in the Chapter 11 Cases.  The Debtors are, however, using this Disclosure Statement to solicit approval of votes to accept or reject the Plan with respect to holders of Class 10 Diacetyl Claims against Chemtura Canada.  The Debtors will, at or before the Confirmation Hearing, seek an order by the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as it applies to holders of Class 10 Diacetyl Claims against Chemtura Canada.**

A hearing to consider confirmation of the Plan is scheduled to be held before the Honorable Robert E. Gerber at 9:45 a.m. Eastern Daylight Time on September 16, 2010 at the Bankruptcy Court, located at One Bowling Green, New York, New York 10004-1408, Sixth Floor (the "**Confirmation Hearing**").  Additional information with respect to Confirmation is provided in section XI of this Disclosure Statement, entitled "Confirmation of the Plan."  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made before or at the Confirmation Hearing or any adjournment thereof.**

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan.  Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of continuing negotiations among the Debtors and various parties have not been finally agreed upon and may be modified at any time before Confirmation in accordance with the terms of the Plan.

For the benefit of the Bankruptcy Court and all parties in interest, a glossary of key terms used throughout the Plan and this Disclosure Statement is included as an **Appendix** to this Disclosure Statement.  **Please note, however, that the Appendix and the description of the Plan provided throughout this Disclosure Statement are only a summary, and this Disclosure Statement should be read in conjunction with the Plan.  In the case of any inconsistency between the summary and description of the Plan in this Disclosure Statement and the Plan, the terms of the Plan will govern.**

*This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan.  The Executive Summary is qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan and the Plan Supplement, which will be filed no later than fourteen days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court.  The Debtors urge all parties to read the Executive Summary in conjunction with the entire Disclosure Statement, the Plan and the Plan Supplement.*

**B.       Purpose and Effect of the Plan**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth how a debtor will treat its claims and interests.

A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders, substitute the

K&E 17416258.15

obligations set forth in the Plan for those pre-bankruptcy Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates. Instead, the Plan, although proposed jointly, constitutes a separate chapter 11 plan for each of the 27 Debtors in the Chapter 11 Cases (and, to the extent it commences a Chapter 11 Case, Chemtura Canada). Holders of Allowed Claims or Interests will receive the same recovery provided to other holders of Allowed Claims or Interests in the applicable Class according to the respective Debtor against which they hold a Claim or Interest and will be entitled to their share of consideration available for distribution to such Class.

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their long-range business plan, make the distributions contemplated under the Plan and pay certain of their continuing obligations in the ordinary course of the Reorganized Debtors' businesses.

As described throughout this Disclosure Statement, the Plan provides for a comprehensive restructuring of the Debtors' pre-bankruptcy obligations, preserves the going-concern value of the Debtors' businesses, maximizes recoveries available to all constituents, provides for an equitable distribution to the Debtors' stakeholders and preserves employment.

Following the Effective Date, the Debtors will emerge from chapter 11 with an improved, less leveraged balance sheet. As of the Petition Date, the Debtors had funded debt facilities in place with a face amount of approximately $1.3 billion, including (a) $350 million revolving credit and letter of credit facility; (b) $370 million in principal amount outstanding under certain 7% unsecured notes due 2009; (c) $500 million in principal amount outstanding under certain 6.875% unsecured notes due 2016; and (d) $150 million in principal outstanding under certain 6.875% debentures due 2026. In contrast, under the Plan, the Reorganized Debtors will have approximately $750 million in funded debt at the time of emergence from chapter 11.

With the assistance of their professional advisors, the Debtors also conducted a careful review of their current operations, their prospects as an ongoing business, financial projections included in the long-range business plan developed by management and estimated recoveries in a liquidation scenario. Following this review, the Debtors concluded that recoveries to their stakeholders will be maximized by the Debtors' continued operations as a going concern and by the Debtors' emergence from chapter 11 on the timetable and with the structure proposed in the Plan.

In developing the Plan, the Debtors engaged in good faith negotiations with the statutory committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Creditors' Committee**"), the committee of equity security holders (the "**Equity Committee**") appointed in the Chapter 11 Cases and an ad hoc committee representing certain holders of the 2009 Notes, the 2016 Notes, the 2026 Debentures and the Unsecured Lender Claims (the "**Ad Hoc Bondholders' Committee**"). Although discussions with the Equity Committee are ongoing, the Debtors are pleased to report that, subject to the terms of the letter included at the beginning of this Disclosure Statement, both the Creditors' Committee and the Ad Hoc Bondholders' Committee support the Plan.

Indeed, the Plan embodies a global settlement of issues between the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee as further described in section VII.M of this Disclosure Statement entitled "Settlement Among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee and Entry into the Plan Support Agreement."

Consistent with the global settlement described above, the Ad Hoc Bondholders' Committee and the Creditors' Committee have entered into an agreement to support the Plan (the "**Plan Support Agreement**"). The Plan Support Agreement is further described in section VII.M of the Disclosure Statement. In addition, contemporaneously with the filing of this Disclosure Statement and the Plan, the Debtors have filed a motion with the Bankruptcy Court to enter into the Plan Support Agreement. To the extent the relief requested therein is granted by the Bankruptcy Court, the Debtors will enter into the Plan Support Agreement.

The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the valuation, liquidation and other analyses

K&E 17416258.15

prepared by the Debtors with the assistance of their advisors (*see* **Exhibits D**, **E** and **F** attached hereto), the value of the Debtors is substantially greater as a going concern than in a liquidation.  The Debtors also believe that any alternative to Confirmation, such as an attempt by another party to file a competing plan, could result in significant delays, litigation and additional costs and could negatively affect value by causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, which could ultimately reduce the recoveries for all holders of Allowed Claims and, if applicable, Interests in Chemtura.

---

**FOR ALL OF THESE REASONS AND THE OTHER REASONS
DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU
TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE.**

**SUBJECT TO THE TERMS OF THE LETTER SUBMITTED IN CONNECTION
HEREWITH, THE CREDITORS' COMMITTEE SUPPORTS THE PLAN AS
CURRENTLY PROPOSED.  AS SUCH, THE CREDITORS' COMMITTEE
URGES HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.**

**THE EQUITY COMMITTEE DOES NOT SUPPORT THE PLAN.**

---

C.     **Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan**

(i)     *Summary of Classification of Claims and Interests Under the Plan*

The Plan organizes the Debtors' creditor claims and equity interests into groups called "Classes."  For each Class, the Plan describes (a) the underlying "Claim" or "Interest," (b) the recovery available to the holders of Claims or Interests in that Class under the Plan, (c) whether the Class is "Impaired" under the Plan, meaning that each holder will receive less than the full value on account of its Claim or Interest or that the rights of holders under law will be altered in some way (such as receiving stock instead of holding a Claim) and (d) the form of consideration (*e.g.*, cash, stock or a combination thereof), if any, that such holders will receive on account of their respective Claims or Interests.

The Plan provides that, for the avoidance of doubt, to the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, such Class is designated with respect to such Debtor.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.

The table below provides a summary of the classification and description of Claims and Interests under the Plan.  This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."[2]  Additionally, the Plan is attached hereto as **Exhibit A** and is incorporated by reference.

---

[2]     The Debtors' estimates of Claims include assumptions about what portions of Allowed Claims will become Insured Claims and include only those portions which the the Debtors assume to be Insured Deficiency Claims.  Such assumptions include whether the insurers will agree to pay amounts in excess of self-insured retentions, if any, prior to actual payment of such self-insured retentions.  If the assumptions about the conduct of insurers are mistaken, then the Debtors' good faith estimate of Claims in the Disclosure Statement could materially increase.

K&E 17416258.15

**SUMMARY OF CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN**

| Class | Name of Class | Applicable Debtor(s) | Description of Class | Estimated Range of Allowed Claims Against All Applicable Debtors |
|---|---|---|---|---|
| Class 1 | Prepetition Secured Lender Claims | Chemtura and each of the Subsidiary Debtors | Secured Claims arising from the Debtors' $350 million prepetition credit facility financing agreement. | $52.7 million, plus unpaid postpetition interest, if any, at the Waiver Rate and fees, as described in the Plan |
| Class 2 | Lien Claims | All Debtors, including Chemtura Canada to the extent it commences a Chapter 11 Case before the Confirmation Date | Secured Claims against any Debtor except for DIP Facility Claims or Prepetition Secured Lender Claims. | $1.0 million, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan |
| Class 3 | Other Priority Claims | All Debtors including Chemtura Canada to the extent it commences a Chapter 11 Case before the Confirmation Date | Claims that are accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than Administrative Claims or Priority Tax Claims. | $.5 million, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan |
| Class 4a | General Unsecured Claims Against Chemtura | Chemtura | Any Unsecured Claims against any Debtor, unless such Claim is: (a) a 2009 Notes Claim, (b) a 2016 Notes Claim, (c) a 2026 Notes Claim, (d) a Diacetyl Claim, (e) an Environmental Claim, (f) a Prepetition Unsecured Lender Claim, (g) an Unsecured Convenience Claim, (h) an Intercompany Claim (i) an Administrative Claim, (j) a Priority Tax Claim, (k) an Other Priority Claim, (l) a Claim Accrued for Professional Compensation or (m) the portion of any Insured Claim that is not an Insured Deficiency Claim. | *See Note 1, below.* |
| Class 4b | General Unsecured Claims Against the Subsidiary Debtors | All Subsidiary Debtors, based on the Subsidiary Debtor that a specific Claim is asserted against | | |
| Class 4c | General Unsecured Claims Against Chemtura Canada | Chemtura Canada to the extent it commences a Chapter 11 Case before the Confirmation Date | | |
| Class 5 | Prepetition Unsecured Lender Claims | Chemtura and each of the Subsidiary Debtors | Prepetition Lender Claims, other than the Prepetition Secured Lender Claims, arising from the Debtors' $350 million prepetition credit facility financing agreement. | $118.1 million, plus postpetition interest, if any at the Waiver Rate, and fees as described in the Plan |
| Class 6 | 2016 Notes Claims | Chemtura and each of the Subsidiary Debtors | Unsecured Claims arising from the 6.875% unsecured notes due 2016. | $508,263,159, plus postpetition interest at the contract rate, including amortization of original issue discount, as provided in the 2016 Notes Indenture, plus the Make-Whole Settlement Amount, provided, however, that interest will not apply to or accrue on the Make-Whole Settlement Amount |
| Class 7 | 2009 Notes Claims | Great Lakes Chemical Company and Chemtura | Unsecured Claims arising from the 7% unsecured notes due 2009. | $374,508,524, plus postpetition interest at the contract rate as provided in the 2009 Notes Indenture and the amount of any original issuer discount amortized post petition that is estimated to be in the amount of $23,976 as of July 15, 2009 |
| Class 8 | 2026 Notes Claims | Chemtura | Unsecured Claims arising from the 6.875% unsecured notes due 2026. | $151,253,447, plus postpetition interest at the contract rate, including amortization of original issue discount, as provided in the 2026 Notes Indenture, plus the No-Call Settlement Amount, provided, however, that interest will not apply to or accrue on the No-Call Settlement Amount |

11

| | | | | SUMMARY OF CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN |
|---|---|---|---|---|

| Class | Name of Class | Applicable Debtor(s) | Description of Class | Estimated Range of Allowed Claims Against All Applicable Debtors |
|---|---|---|---|---|
| Class 9 | Unsecured Convenience Claims | Chemtura and each of the applicable Subsidiary Debtors, based on the Debtor that a specific Claim is asserted against | Unsecured Claims against any of the Debtors, except Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date), that, but for being defined as an Unsecured Convenience Claim, would be General Unsecured Claims and either are (a) Allowed in an amount of $50,000 or less or (b) Allowed in an amount greater than $50,000 but are subject to an irrevocable election by the holders of the Claims to reduce the Allowed amount of the Claim to $50,000 for the purposes of rendering the Claims as Unsecured Convenience Claims. | (Amounts will depend on specific elections made by creditors at the time of voting on the Plan) |
| Class 10 | Diacetyl Claims | Chemtura and, to the extent it commences a Chapter 11 Case before the Confirmation Date, Chemtura Canada | Unsecured Claims against any Debtor or any Non-Debtor Affiliate resulting, directly or indirectly, from alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde, including all Claims for indemnification or contribution relating thereto. | See Note 1, below. |
| Class 11 | Environmental Claims | Chemtura and each of the applicable Subsidiary Debtors | Unsecured Claims by a Governmental Unit against Chemtura or any of the Subsidiary Debtors arising out of, related to or based upon federal or state environmental laws or regulations, environmental orders, consent decrees and other obligations in connection with (a) sites that are not part of the Debtors' bankruptcy estates, including previously owned or operated sites that are no longer owned or operated by the Debtors and third-party sites that have never been owned or operated by the Debtors to which the Debtors or their predecessors are alleged to have sent waste or other materials and (b) the Debtors' owned or operated sites solely to the extent that such Claims arise out of, relate to or are based upon costs expended or paid by a Governmental Unit before the Petition Date or penalties owing to a Governmental Unit for violations of environmental laws or regulations that occurred before the Petition Date. | See Note 1, below. |
| Class 12 | Intercompany Claims | All Debtors, based on the Debtor that a specific Intercompany Claim is asserted against | Unsecured Claims that are held by a Debtor against another Debtor or any Claim held against a Debtor by a Non-Debtor Affiliate that is a direct or indirect subsidiary of Chemtura. | N/A |

K&E 17416258.15

| | | | **SUMMARY OF CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN** | |
|---|---|---|---|---|
| **Class** | **Name of Class** | **Applicable Debtor(s)** | **Description of Class** | **Estimated Range of Allowed Claims Against All Applicable Debtors** |
| Class 13a | Interests in Chemtura | Chemtura | Interests representing any share of common stock, preferred stock or other instrument evidencing an ownership in any of the Debtors, whether or not transferable, and any option, warrant or other right, contractual or otherwise, to acquire any such interest in a Debtor that existed before the Effective Date, any phantom stock or other similar stock unit provided pursuant to the Debtors' prepetition employee compensation programs and any Claim related to the purchase of interests subject to subordination pursuant to section 510(b) of the Bankruptcy Code. | N/A |
| Class 13b | Interests in the Subsidiary Debtors and Chemtura Canada | All Debtors, other than Chemtura, including Chemtura Canada to the extent it commences a Chapter 11 Case before the Confirmation Date | | N/A |

*Note 1 to Table:*  The Debtors estimate that the aggregate amount of Allowed (i) Class 4a General Unsecured Claims against Chemtura; (ii) Class 4b General Unsecured Claims against the Subsidiary Debtors; (iii) Class 11 Environmental Claims against the applicable Debtors; and (iv) Class 10 Diacetyl Claims against Chemtura Corporation and Chemtura Canada (to the extent it commences a Chapter 11 Case), will range from approximately $246.0 million to $320.4 million (excluding postpetition interest on such Claims).  Additional information with respect to these estimates is provided in section I.(iv).I.C(iv), on page 30, of this Disclosure Statement, entitled, "Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan."

In addition to the Classes identified above, the Plan provides for recoveries to certain types of Claims that are not separately classified under the Plan, as follows:

- **Allowed Administrative Claims**.  Administrative Claims include Claims for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.  Except with respect to Administrative Claims that are Claims Accrued for Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim and the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or Reorganized Debtor agrees to less favorable treatment to such holder, each holder of an Allowed Administrative Claim will be paid in full, in Cash, as provided in Article II of the Plan.

- **Professional Compensation**.  Professional Compensation includes Claims of professionals (a) retained pursuant to a Final Order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date pursuant to sections 327, 328, 329, 330, 363 and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.  Claims for Accrued Professional Compensation will be paid in full, in Cash. Additionally, the Plan provides that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business for services performed after the Effective Date

13

without the need to file a final fee application, as provided in Article II of the Plan.

- **Priority Tax Claims**.  Priority Tax Claims include any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.  Priority Tax Claims will receive, at the option of the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld), one of the following treatments: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such holder and the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or otherwise determined upon an order of the Bankruptcy Court.

- **DIP Claims.**  DIP Claims include DIP Revolver Claims and DIP Term Claims.  Holders of DIP Revolver Claims will receive, as indefeasible payment in full and final satisfaction of the DIP Revolver Claims, Cash in the full Allowed amount of their Claims, provided however, that any DIP Revolver Claims representing unfunded letters of credit will be deemed fully satisfied without any payment in Cash upon such letters of credit being replaced by new letters of credit issued under the Exit Financing.  Holders of DIP Term Claims will receive, as indefeasible payment in full and final satisfaction of the DIP Term Claims, Cash in the full Allowed amount of their Claims.

- **Administrative Claims, Priority Tax Claims and DIP Claims Against Chemtura Canada**.  The Plan constitutes a pre-arranged Plan for Chemtura Canada in the event it becomes a Debtor before the Confirmation Date. For the avoidance of doubt, in the event Chemtura Canada becomes a Debtor before the Confirmation Date, each holder of an Administrative Claim, Priority Tax Claim or DIP Claim against Chemtura Canada (to the extent there are such Claims against Chemtura Canada) will receive the same treatment as the treatment for holders of Administrative Claims, Priority Tax Claims and DIP Claims, respectively, as set forth in Article II of the Plan.

- **Statutory Fees**.  The Plan provides that the Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee, including quarterly fees payable under 28 U.S.C. §1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business at the time of Confirmation.  On and after the Effective Date, the Reorganized Debtors shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors when due in the ordinary course until such time as the Bankruptcy Court enters a final decree in such Reorganized Debtor's Chapter 11 Case.  The Debtors estimate that the total amount of fees owed to the U.S. Trustee on the Effective Date pursuant to this provision of the Plan will total approximately $106,000.

*(ii)*      *Summary of Treatment and Voting Rights of Claims and Interests Under the Plan*

The Debtors are not proposing the substantive consolidation of their respective bankruptcy estates.  Thus, although the Plan generally applies to all of the Debtors (and to the extent it commences a Chapter 11 Case, Chemtura Canada), the Plan includes within it distinct chapter 11 plans of reorganization, one for each Debtor.  This means, among other things, that for voting purposes, each holder of a Claim or Interest entitled to vote to accept or reject the Plan will vote its Claims and Interests in the appropriate Class for the applicable individual Debtor or Debtors.

14

Distributions to creditors under the Plan generally will include a combination of common shares in the capital of New Chemtura authorized pursuant to the Plan ("**New Common Stock**"),[3] Cash, reinstatement or such other treatment as agreed between the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) and the applicable creditor.  The specific forms and sources of distribution applicable to a particular Class are summarized below and described in detail in section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization." Distributions, if any, under the Plan to holders of Interests in Class 13a will include shares of New Common Stock and, potentially, Cash, based on whether holders of Interests in Class 13a vote to accept or reject the Plan.

With respect to Prepetition Unsecured Lender Claims, the 2009 Notes Claims, the 2016 Notes Claims, the 2026 Notes Claims and General Unsecured Claims against Chemtura and the Subsidiary Debtors (collectively, the "**Participating Creditor Classes**"), a pool will be established from which distributions will be made to Participating Creditor Classes (the "**Unsecured Distribution Pool**").  The Unsecured Distribution Pool will be funded with (a) available distributable Cash following funding of the Diacetyl Reserve and payment to all holders of Allowed Unsecured Convenience Claims, (b) all proceeds of the Rights Offering, to the extent that Class 13a for Chemtura (as discussed below) Corporation votes to accept the Plan and holders of Interests in such Class elect to participate in the Rights Offering and (c) the New Common Stock, subject to reduction solely to the extent that Class 13a votes to accept the Plan in the amount of the 5% of the New Common Stock made available to holders of Interests in such Class and up to $100 million in value of New Common Stock made available to holders of Interests in such Class in the form of the Rights Offering, subject to dilution for the Incentive Plans.  For the avoidance of doubt, creditors of Chemtura Canada will not be included in any Participating Creditor Class.

The Unsecured Distribution Pool will be used to fund (a) the payments pursuant to the Plan of all Allowed Claims in the Participating Creditor Classes and (b) a reserve created by the Debtors to hold a contribution of Cash and New Common Stock for the benefit of holders of subsequently Allowed Claims for distribution according to the procedures set forth in Article VIII of the Plan.  To the extent that holders of Interests in Chemtura do not vote in favor of the Plan, any value available in the Unsecured Distribution Pool following the payment, in full, of all Allowed Claims and the funding of the reserves for all such Disputed Claims as set forth in the Plan will be shared among holders of Interests in Chemtura on a pro rata basis.

Additionally, each holder of an Allowed Claim in the Participating Creditor Classes will have the option, when voting on the Plan, to make a binding election to receive its recovery in the form of the maximum available percentage of cash or the maximum available amount of New Common Stock (collectively, the "**Electing Creditors**").  If a holder of an Allowed Claim in any Participating Creditor Class elects this binding option, the Cash or New Common Stock, which would have otherwise been distributed to such holder of an Allowed Claim, will be reallocated among all Electing Creditors according to their recovery preferences.  The extent to which any Electing Creditor receives an increased percentage of the consideration it requested will depend upon the elections of all Electing Creditors as a whole.  The reallocation, however, will not diminish recoveries to each Electing Creditor.  Each Electing Creditor will receive the total value of the consideration it would have otherwise received, in the form of its recovery preference to the extent possible.  Holders of Disputed Claims will not have the opportunity to be Electing Creditors and, to the extent their Claims are Allowed, will receive their recovery in the Cash-to-New Common Stock ratio reflecting the Cash and New Common Stock available in the Unsecured Distribution Pool.

If a holder of an Allowed Claim in any Participating Creditor Class does not timely make a binding election pursuant to the requirements set forth in the Solicitation Order, as discussed in section X of this Disclosure Statement, such holder will receive its recovery in the Cash-to-New Common Stock ratio reflecting the Cash and New Common Stock available in the Unsecured Distribution Pool.

---

[3]    For the avoidance of doubt, regardless of whether noted in the Plan or this Disclosure Statement, all New Common Stock distributed under the Plan to holders of Claims, and if applicable, Interests, including New Common Stock distributed in connection with the Rights Offering, if applicable, shall be subject to dilution by the Incentive Plans.

K&E 17416258.15

The Plan is premised upon an estimated enterprise value of New Chemtura and the Reorganized Debtors, which the Plan refers to as the "**New Chemtura Total Enterprise Value**." Under the Plan, the New Chemtura Total Enterprise Value consists of $2.05 billion plus (except as otherwise agreed among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee in their discretion), total Cash available to satisfy Allowed Unsecured Claims, plus the amount of Cash to be retained following the Effective Date, which is expected to be approximately $125 million. The New Chemtura Total Enterprise Value is based upon the expert analysis of the Debtors' retained financial advisor and investment banker, Lazard Frères & Co., LLC. As discussed in detail in **Exhibit F** to this Disclosure Statement, the New Chemtura Total Enterprise Value was determined based upon the mid-point value of the Debtors' assets and liabilities as of an assumed Effective Date of September 30, 2010 and incorporates various assumptions and estimates. Distributions under the Plan with respect to holders of Claims and Interests will be based upon the New Chemtura Total Enterprise Value.

As part of the global settlement among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee, distributions to holders of Class 4a General Unsecured Claims against Chemtura, 2016 Notes Claims and 2026 Notes Claims will be determined subject to the "Shortfall Adjustment." The Plan defines "**Shortfall Adjustment**" as the reduction of the distributions to certain Classes pursuant to the Plan, in the following order: (a) first, distributions to the holders of the 2026 Notes Claims on account of the No-Call Settlement Amount; (b) second, distributions to the holders of the 2016 Notes Claims on account of the Make-Whole Settlement Amount; (c) third, on a pro rata basis, postpetition interest payments payable to the General Unsecured Claims against Chemtura and the 2026 Notes Claims; and (d) fourth, on a pro rata basis, payments payable on account of the General Unsecured Claims against Chemtura and the 2026 Notes Claims. The Shortfall Adjustment will act to reduce distributions only to the extent that insufficient Cash and New Common Stock would be available on the Effective Date to fully fund the Diacetyl Reserve, the Disputed Claims Reserve and Environmental Reserve (collectively, the "**Plan Reserves**") following liquidation of all Disputed Claims, Diacetyl Claims and Environmental Claims and payment of all formerly Disputed Claims that have become Allowed.[4]

The Debtors, after arms'-length negotiations with certain stakeholders, including the Equity Committee, the Creditors' Committee and the Ad Hoc Bondholders' Committee, have determined to provide holders of Class 13a Interests in Chemtura Corporation with two recovery options in the Chapter 11 Cases. The first option, which will be applicable if holders of Class 13a Interests in Chemtura Corporation vote as a class to accept the Plan, provides an opportunity for a guaranteed recovery without requiring equity holders to bear the risk that the amount of Allowed Claims and the amounts required to fund the Plan Reserves may be higher than the Debtors' estimates (but also does not provide equity holders with a benefit if the amount of Allowed Claims and the amounts required to fund the Plan Reserves are lower than the Debtors' estimates). The first option also provides the opportunity for equity holders to participate in the Rights Offering. The second option, by contrast, provides that holders of Class 13a Interests in Chemtura Corporation will receive distributions of all distributable Cash and New Common Stock available after all Allowed Claims have been paid in full in accordance with the absolute priority rule and the Plan Reserves have been funded in amounts established by the Bankruptcy Court, in addition to the possibility of later distributions in the event that the Plan Reserves prove to be higher than the amount of Disputed Claims that are ultimately Allowed.

The Debtors have considered numerous possible treatments for holders of Class 13a Interests in Chemtura and for other stakeholders in these Chapter 11 Cases. The Debtors have elected to propose the Plan treatment described above because, among other things, this treatment (i) provides the possibility of a guaranteed recovery for equity holders, (ii) provides optionality such that equity holders may choose (as a Class) either to receive a guaranteed recovery or to bear the risks and benefits of the claims resolution process, and (iii) is consistent with the global settlement described in section IX.B of this Disclosure Statement whereby numerous litigable issues in the Chapter 11 Cases will be resolved, including that the Creditors' Committee and the Ad Hoc Bondholders' Committee have agreed not to assert that the Debtors' enterprise value is insufficient to allow any distribution to equity holders.

---

[4]    Based upon the Debtors' estimates of likely reserves for Diacetyl Claims, Environmental Claims and other Disputed Claims, the Debtors do not anticipate a Shortfall Adjustment in the event Class 13a votes to reject the Plan.

K&E 17416258.15

The New Common Stock available in the Rights Offering will consist of a portion of the New Common Stock that would otherwise have been distributed to holders of Allowed Unsecured Claims and such holders of Allowed Unsecured Claims shall receive the proceeds of the Rights Offering in lieu of such New Common Stock, subject to the election procedures above. As described in Table 1 below entitled "Estimated Recoveries," recoveries for holders of certain Claims may be lower if holders of Interests in Chemtura vote as a Class to accept the Plan.

The amount of the Rights Offering reflects negotiations among the Debtors and the Creditors' Committee and the Ad Hoc Bondholders' Committee (the "**Plan Support Parties**") as described in detail in section IX.B of this Disclosure Statement, and is a material provision of the Plan Support Agreement, as described in detail in section VII.M of this Disclosure Statement. The Bankruptcy Code does not require that the Debtors or the Plan Support Parties make the Rights Offering available to holders of Class 13a Interests in Chemtura Corporation; however, the Debtors and the Plan Support Parties have determined to make the Rights Offering available as an accommodation to the requests of certain holders of equity interests and to incentivize Class 13a to vote to accept the Plan. As with all other aspects of the global settlement embodied in the Plan Support Agreement, in the event the amount of the Rights Offering is increased or decreased without agreement among the Debtors and the Plan Support Parties, the Plan may not be effectuated, as described in section IX.B of the Disclosure Statement. Additionally, in such an instance there can be no guarantee that an alternative form of rights offering will be made available to equity holders.

The Plan provides that, in the event Class 13a votes to reject the Plan, each holder of an Interest in Chemtura Corporation shall receive its Pro Rata share of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of the Plan and the Plan Reserves have been established.

It is difficult to predict with certainty whether and to what extent holders of Class 13a Interests in Chemtura Corporation will receive a recovery in the event Class 13a votes to reject the Plan. As described elsewhere in the Disclosure Statement, the distribution available for Class 13a in such an event will include New Common Stock and, to the extent the Plan Reserves exceed all Claims that are ultimately Allowed, may include an additional distribution in a combination of New Common Stock and Cash. The Debtors estimate the aggregate value of the distribution available to Class 13a if the class rejects the plan would be an equivalent of between 1.6% and 10.4% of the value of the New Common Stock. For the avoidance of any doubt, the Debtors note that the estimated range of recovery to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to reject the Plan, which the Debtors estimate to be from 1.6% to 10.4%, expressed as a percentage of New Common Stock, after all Unsecured Claims have been paid in full and the Plan Reserves have been established, only indirectly takes into account possible recovery on account of follow-on distributions in the event that the Plan Reserves exceed the amount necessary to pay all Claims in full. The Debtors' intent is that Insurance Proceeds on account of Diacetyl Claims that are received after the Effective Date, such that the Diacetyl Reserve is already fully funded, will be treated as excess Plan Reserve amounts and therefore will be made available to holders of Class 13a Interests in Chemtura following the liquidation of all Disputed Claims in the event Class 13a votes to reject the Plan.

The value available for Class 13a if it rejects the Plan will depend on the amount of Allowed Claims. While some of the Claims against the Debtors will be Allowed or agreed in a fixed amount as of the Effective Date, other Claims are Disputed Claims for which the value is not now known and may not be known as of the Effective Date. Specifically, the Debtors are faced with numerous litigation claims and other unliquidated claims that are not expected to be fixed at the Effective Date. Under the Plan, the Debtors will ask the Bankruptcy Court to establish reserves (the "**Plan Reserves**") for three separate categories of disputed claims: the Diacetyl Reserve, the Environmental Reserve and the Disputed Claims Reserve. The amount of the Plan Reserves will determine the initial amount of New Common Stock available for distribution to Class 13a if it rejects the Plan, and the overall value of the Disputed Claims that ultimately become Allowed by the Bankruptcy Court will determine whether, and to what extent, there is any later distribution to Class 13a on account of excess Plan Reserves after all creditors have been paid in full.

The Debtors have calculated the estimated range of recoveries set forth below and throughout this Disclosure Statement based on an estimate assuming the amount of Allowed Claims asserted against the Debtors to date is either high or low (*i.e.*, a "best case" or "worst case" scenario). The ultimate determination of whether such Claims will be Allowed against the Debtors, or the amount the Debtors must fund in the Plan Reserves pending allowance, depends on a number of complex factors, including the particular legal bases and factual circumstances

17

underlying each Disputed Claim and the Bankruptcy Court's approach in establishing reserves for such Claims. Among other things, the amount of the initial distribution of New Common Stock to Class 13a will depend on (a) the amount that the Bankruptcy Court determines must be reserved for Diacetyl Claims in the Diacetyl Reserve, (b) the amount, if any, of insurance coverage that has been determined as of the Effective Date, by settlement or litigation judgment, to be available for Diacetyl Claims, (c) the amount that the Bankruptcy Court determines must be reserved for Environmental Claims in the Environmental Reserve and (d) the amount that the Bankruptcy Court determines must be reserved for all other Disputed General Unsecured Claims, including both trade claims and non-diacetyl litigation claims, in the Disputed Claims Reserve. The Debtors currently estimate that the aggregate value of all Unsecured Claims (other than bank and bond claims) that must either be satisfied as of the Effective Date or included in the Plan Reserves will range from approximately \$246.0 million to \$320.4 million (excluding postpetition interest on such Claims). Ultimately, whether any excess value remains in the Plan Reserves after all Unsecured Claims have been either Allowed or Disallowed and all Allowed Claims have been paid in full will depend on the settlement or litigation of each Claim that is Disputed as of the Effective Date. Because of the inherent difficulty in predicting the approach by the Bankruptcy Court in establishing the Plan Reserves and in predicting the ultimate outcome of litigating Disputed Claims, the Debtors cannot say at this time whether and to what extent the total amount of Allowed Claims will ultimately fall within the estimated low or high ranges, or even exceed those amounts. Estimates of potential recoveries to holders of Class 13a Interests in Chemtura in the event Class 13a does not vote to accept the Plan are provided for **illustrative purposes only** in section I.C(iv), on page 30, of this Disclosure Statement, entitled, "Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan."

Additionally, the form of consideration available to holders of Interests in Chemtura in the event Class 13a votes to reject the Plan depends on a number of considerations, including the actual amount of Allowed Diacetyl Claims and Allowed Environmental Claims as well as the amount of other Disputed Claims that are ultimately Allowed and satisfied from the Plan Reserves. On this point, it is important to note that the Plan provides that the Disputed Claims Reserve is funded with both Cash and New Common Stock, while the Environmental Reserve and the Diacetyl Reserve are both funded only in Cash. Thus, the ultimate combination of Cash and/or New Common Stock that holders of Class 13a Interests in Chemtura may receive (if any) in the event Class 13a votes to reject the Plan depends not only on the ultimate amount of Allowed Claims, but also the extent to which such Allowed Claims are Diacetyl Claims, Environmental Claims or other subsequently Allowed Claims that are satisfied from the appropriate Plan Reserve.

Although the Debtors are not able to provide more specific estimates at this time, the Debtors believe that the Plan's treatment of holders of Class 13a Interests in Chemtura Corporation in the event such Class votes to reject the Plan is consistent with what such holders would otherwise be entitled to under applicable law, including the absolute priority rule contained in the Bankruptcy Code.

For the further avoidance of doubt, in the event Class 13a Interests in Chemtura Corporation vote to accept the Plan, excess Cash in the Disputed Claims Reserve after all Allowed Unsecured Claims are paid in full will be returned to the Reorganized Debtors for general corporate use in accordance with the terms of the Plan. Additionally, any excess New Common Stock will be cancelled or held as treasury stock, rather than distributed to holders of Class 13a Interests in Chemtura Corporation. Also for the avoidance of doubt, in the event Class 13a Interests in Chemtura vote to reject the Plan, excess amounts in the Environmental Reserve and the Diacetyl Reserve will become part of the Disputed Claims Reserve and, if holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of excess Cash and New Common Stock in the Disputed Claims Reserve (if any).

**IF CLASS 13A VOTES TO ACCEPT THE PLAN, IT WILL RECEIVE A FIXED DISTRIBUTION, AS A CLASS, OF 5% OF THE NEW COMMON STOCK ON THE EFFECTIVE DATE AND THE ABILITY TO PARTICIPATE IN THE RIGHTS OFFERING. THIS FIXED 5% OF NEW COMMON STOCK RECOVERY MAY BE LESS THAN, OR MAY BE MORE THAN, THE RECOVERY AVAILABLE IF CLASS 13A REJECTS THE PLAN.**

Additionally, it is important to note that distributions, if any, to holders of Class 13a Interests in Chemtura Corporation will be determined based upon whether such Class votes to accept or reject the Plan, and not whether an

18

individual holder of such Interest votes to accept or reject the Plan. Specifically, if a holder of a Class 13a Interest in Chemtura Corporation votes to accept the Plan, but Class 13a votes to reject the Plan, the holder who voted in favor the Plan will **not** receive a Pro Rata share of 5% of the New Common Stock and will not be afforded the opportunity to participate in the Rights Offering (which will not otherwise be effectuated in that instance). Similarly, the distribution of 5% of the New Common Stock to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to accept the Plan will be made to **all** holders of Class 13a Interests, regardless of how they voted, and not only to those holders of Interests in Chemtura Corporation who voted to accept the Plan.

The Debtors believe that, to the extent Class 13a votes in favor of the Plan and the Rights Offering is fully subscribed, the Debtors will be required to comply with the registration requirements set forth in the Securities Act of 1933, as amended. While the Debtors believe that the registration may not delay emergence from chapter 11, it is possible depending on the timing and scope of review by the Securities and Exchange Commission, that the Rights Offering will not be able to be consummated at the time the Plan otherwise would become effective. Specifically, section 5.12(b) provides that the Rights Offering shall be subject to compliance with the Securities Act of 1933, as amended, including the filing and approval of an appropriate securities registration form with the Securities and Exchange Commission. In the event such registration statement is not effective at the time all conditions precedent to the Plan are satisfied or waived, the Effective Date may be delayed until the effective date of the registration statement. Alternatively, the Plan provides that the Debtors will work with the Creditors' Committee and the Ad Hoc Bondholders' Committee to explore alternatives that would allow the Effective Date to occur before the effective date of the registration statement.

The Equity Committee believes that the Class 13a treatment is improper and illegally coercive and lacks any legal or factual basis and intends to oppose confirmation on these grounds, among others. The Debtors disagree and will defend such challenge at the Confirmation Hearing.

As set forth above, if holders of Class 13a Interests in Chemtura vote as a Class to reject the Plan, holders of Interests in Chemtura will receive their Pro Rata share of value available for distribution (if any) after all Allowed Unsecured Claims have been paid in full and the Disputed Claims Reserve has been established in accordance with the terms of the Plan. Specifically, to the extent Class 13a does not vote to accept the Plan, recoveries for holders of Interests in Chemtura under the Plan (if any) are subject to the outcome and resolution of several factors, including the following:

- *New Chemtura Total Enterprise Value*. As discussed above, the Debtors, together with their retained financial advisor and investment banker, Lazard Frères & Co., LLC have determined that the New Chemtura Total Enterprise Value is $2.05 billion. If Class 13a Holders of Interests in Chemtura vote as a Class to reject the Plan, the ultimate recoveries to holders of Interests, if any, will depend on, among other things, holders of Allowed Unsecured Claims being paid in full based on the New Chemtura Total Enterprise Value.

- *Actual Amount of Allowed Claims*. As discussed in section VII.D, below, the Debtors are actively engaged in the claims reconciliation process, determining the appropriate basis to address the numerous and varied proofs of claim. As of July 25, 2010, a total of approximately 6,888 proofs of claim, including 2,743 contingent, unliquidated and disputed claims, remain on the Debtors' claims register. Accordingly, in the event holders of Interests in Chemtura vote to reject the Plan, actual recoveries under the Plan available to such holders will depend on the ultimate number and amount of Allowed Claims against each of the Debtors.

- *Estimation of Diacetyl Claims*. As discussed in section VII.I, below, the Debtors are subject to ongoing litigation related to Diacetyl Claims. The Debtors have received approximately 375 non-duplicate diacetyl-related proofs of claim, which include 362 unliquidated Claims and 13 Claims with an alleged liquidated amount of approximately $59,800,000. In conjunction with the Debtors' efforts to obtain important information with respect to the Diacetyl Claims, the Debtors have sought and obtained authority from the Bankruptcy Court to estimate the Diacetyl Claims at a hearing to be determined at a later time. The Debtors' ultimate liability on account of Diacetyl

19

Claims will also depend on the amount of insurance coverage available with respect to Diacetyl Claims. The aggregate liability owed on account of Diacetyl Claims will impact the amount of recovery available to holders of Interests in Chemtura if they do not vote in favor of the Plan.

As described in section VIII of this Disclosure Statement, Article III of the Plan provides that, on the Effective Date, Interests in the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) will remain outstanding or will be cancelled at the option of the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld.

The tables below summarize the classification, status, voting rights, treatment and estimated range of recoveries of Claims and Interests under the Plan. Additionally, the tables provide an illustrative range of recovery to holders of Interests in Chemtura to the extent they do not vote in favor of the Plan, taking into account the factors described above. These summaries are described in the form below for illustrative purposes only and are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."

### SUMMARY OF STATUS, TREATMENT AND VOTING RIGHTS

| Class | Status | Voting Rights | Plan Treatment of Class |
|---|---|---|---|
| Class 1: Prepetition Secured Lender Claims | Unimpaired | Permitted to Vote on a Provisional Basis | Each holder of a Prepetition Secured Lender Claim will receive, on the Effective Date, in full and final satisfaction of its Prepetition Secured Lender Claim, payment in full in Cash. |
| Class 2: Lien Claims | Unimpaired | Deemed to Accept | Each holder of an Allowed Lien Claim shall receive, in full and final satisfaction of its Secured Claim, one of the following treatments at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld): (a) payment of the Allowed Claim in full in Cash on the later of the Initial Distribution Date or as soon as practicable after a particular Claim becomes Allowed and, to the extent such allowed Lien Claim is oversecured, interest as applicable pursuant to Section 3.3(n)(i) of the Plan from and after the later of the date such Lien Claim (i) became due in the ordinary course of business or (ii) was invoiced to the applicable Debtor; (b) such other treatment as may be agreed by the applicable Debtor and the holder; or (c) the holder will retain its Lien on such property and be Reinstated. |
| Class 3: Other Priority Claims | Unimpaired | Deemed to Accept | Each holder of an Allowed Other Priority Claim for each of the applicable Debtors shall receive, on or as soon as reasonably practicable after the Initial Distribution Date, in full and final satisfaction of the Claim, one of the following treatments at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld): (a) payment in full in Cash, plus interest as applicable pursuant to Section 3.3(n)(i) of the Plan, on the later of the Initial Distribution Date or as soon as practicable after such claim becomes Allowed or (b) such other treatment as may be agreed to by the applicable Debtor and the holder. |

K&E 17416258.15

**SUMMARY OF STATUS, TREATMENT AND VOTING RIGHTS**

| Class | Status | Voting Rights | Plan Treatment of Class |
|---|---|---|---|
| **Class 4a:**<br>General Unsecured Claims Against Chemtura | Impaired | Entitled to Vote | Each holder of an Allowed General Unsecured Claim against Chemtura, in full and final satisfaction of such Claim, or as soon as reasonably practicable after the Initial Distribution Date: (A) shall receive its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura and all Claims in Class 8) of the Cash and New Common Stock available in the Unsecured Distribution Pool after payment in full of (or appropriate funding of the Disputed Claims Reserve for) all Claims in Classes 4, 5, 6 and 7 for each of the Subsidiary Debtors, with the distribution of New Common Stock subject to dilution for the Incentive Plans, up to the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan; or (B) will be Reinstated, unless the holder and Chemtura (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment.<br><br>Each payment of Cash and New Common Stock with respect to Allowed General Unsecured Claims against Chemtura shall have an aggregate value equal to the full amount of such holder's Allowed Claim plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.<br><br>To the extent that insufficient value is available in the Unsecured Distribution Pool to pay all holders of Allowed General Unsecured Claims against Chemtura, in full plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, each holder will be entitled to payment pursuant to Section 8.5 of the Plan of its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura and in Class 8), in accordance with the Shortfall Adjustment and Shortfall Readjustment, if any, of the excess amounts of Cash and New Common Stock, if any, held in the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve following liquidation of all Disputed Claims and payment of all formerly Disputed Claims that have become Allowed.<br><br>Additionally, each holder of an Allowed General Unsecured Claim against Chemtura shall have the right to make a binding election to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9 of the Plan. |
| **Class 4b:**<br>General Unsecured Claims Against the Subsidiary Debtors | Impaired | Entitled to Vote | Each holder of an Allowed General Unsecured Claim for each of the Subsidiary Debtors, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date: (A) shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan; or (B) will be Reinstated, unless the holder and the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment.<br><br>Additionally, each holder of an Allowed General Unsecured Claim against the Subsidiary Debtors shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9 of the Plan. |
| **Class 4c:**<br>General Unsecured Claims Against Chemtura Canada | Unimpaired | Deemed to Accept | Each holder of a General Unsecured Claim for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall, unless the holder of such Claim and Chemtura Canada (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment, and unless otherwise satisfied pursuant to an order of the Bankruptcy Court before the Initial Distribution Date, be paid in full, in Cash, on the later of: (A) the Initial Distribution Date; (B) the first date such Claim is Allowed or as soon as reasonable practicable thereafter; and (C) the date such Allowed Claim becomes due and payable by its terms, or as soon thereafter as is practicable. |

21

**SUMMARY OF STATUS, TREATMENT AND VOTING RIGHTS**

| Class | Status | Voting Rights | Plan Treatment of Class |
|---|---|---|---|
| Class 5:<br>Prepetition Unsecured Lender Claims | Impaired | Entitled to Vote | Each holder of an Allowed Prepetition Unsecured Lender Claim for Chemtura and each of the Subsidiary Debtors, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan; provided, however, that any Prepetition Unsecured Lender Claims representing unfunded letters of credit shall be deemed fully satisfied without any payment in the form of Cash or New Common Stock upon such letters of credit being replaced by new letters of credit issued under the Exit Financing.<br><br>Additionally, each holder of an Allowed Prepetition Unsecured Lender Claim shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9 of the Plan. |
| Class 6:<br>2016 Note Claims | Impaired | Entitled to Vote | The 2016 Notes Claims against Chemtura Corporation and each of the Subsidiary Debtors shall be Allowed in the amount of $508,263,159 on account of principal and prepetition interest, plus postpetition interest at the contract rate, including amortization of original issue discount, as provided in the 2016 Notes Indenture, plus the Make-Whole Settlement Amount of $50 million, provided, however, that interest shall not apply to or accrue on the Make-Whole Settlement Amount.<br><br>Each holder of an Allowed 2016 Notes Claim for Chemtura and each of the Subsidiary Debtors, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, with such payment of Cash and Common Stock having an aggregate value equal to the full amount of such holder's Allowed Claim, plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.<br><br>Additionally, each holder of an Allowed 2016 Notes Claim will have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9 of the Plan. |
| Class 7:<br>2009 Note Claims | Impaired | Entitled to Vote | The 2009 Notes Claims against Chemtura Corporation and Great Lakes Chemical Corporation shall be Allowed in the amount of $374,508,524 on account of principal and pre petition interest, plus all postpetition interest at the contract rate as provided in the 2009 Notes Indenture, and, for the avoidance of doubt, the amount of any original issue discount amortized post petition, which is estimated in the amount of $23,976 as of July 15, 2009.<br><br>Each holder of an Allowed 2009 Notes Claim for Chemtura and GLCC, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock, subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan.<br><br>Additionally, each holder of an Allowed 2009 Notes Claim shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9 of the Plan. |

22

**SUMMARY OF STATUS, TREATMENT AND VOTING RIGHTS**

| Class | Status | Voting Rights | Plan Treatment of Class |
|---|---|---|---|
| Class 8:<br>2026 Notes Claims | Impaired | Entitled to Vote | The 2026 Notes Claims against Chemtura Corporation shall be Allowed in the amount of $151,253,447 on account of principal and prepetition interest, plus postpetition interest at the contract rate, including amortization of original issue discount, as provided in the 2026 Notes Indenture, plus the No-Call Settlement Amount of $20 million, provided, however, that interest shall not apply to or accrue on the No-Call Settlement Amount.<br><br>Each holder of an Allowed 2026 Notes Claim, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date will receive its Pro Rata Share (determined with respect to all Claims in Class 4a for Chemtura and all Claims in Class 8) of the Cash and New Common Stock available in the Unsecured Distribution Pool following payment in full of (or appropriate funding for the Disputed Claims Reserve for) all Claims in Class 4, 5, 6 and 7 for each of the Subsidiary Debtors, with the distribution of New Common Stock, subject to dilution for the Incentive Plans, up to the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, with such payment of Cash and Common Stock having an aggregate value equal to the full amount of such holder's Allowed Claim, plus postpetition interest, if any, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.<br><br>To the extent that insufficient value is available in the Unsecured Distribution Pool to pay all holders of Allowed 2026 Notes Claims, in full plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, each holder will be entitled to payment pursuant to Section 8.5 of the Plan of its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura and in Class 8), in accordance with the Shortfall Adjustment and Shortfall Readjustment, if any, of the excess amounts of Cash and New Common Stock, if any, held in the Disputed Claims Reserve following liquidation of all Disputed Claims, Diacetyl Claims and Environmental Claims and payment of all formerly Disputed Claims that have become Allowed.<br><br>Additionally, each holder of an Allowed 2026 Notes Claim shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9 of the Plan. |
| Class 9:<br>Unsecured Convenience Claims | Unimpaired | Deemed to Accept | Each holder of an Allowed Unsecured Convenience Claim for each of the applicable Debtors (other than Chemtura Canada) will receive, in full and final satisfaction of such Unsecured Convenience Claim, Cash in the amount of its Allowed Unsecured Convenience Claim, plus interest as applicable pursuant to Section 3.3(n)(i) of the Plan. |
| Class 10:<br>Diacetyl Claims | Impaired | Entitled to Vote | Each holder of an Allowed Diacetyl Claim in Class 10 for Chemtura and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall receive, in full and final satisfaction of such holder's Allowed Diacetyl Claim: (A) payment in Cash on the Effective Date pursuant to a negotiated settlement pursuant to Bankruptcy Code 9019 and section 1123 of the Bankruptcy Code and as approved by order of the Bankruptcy Code or (B) to the extent an Allowed Diacetyl Claim is not subject to a negotiated settlement as of the Effective Date, a distribution from the Diacetyl Reserve in accordance with the procedures set forth in Article X of the Plan (i) if such Allowed Diacetyl Claim is an Insured Claim, in the amount of such holder's Allowed Insured Deficiency Claim multiplied by the Diacetyl Recovery Ratio, or (ii) if such Allowed Diacetyl Claim is not an Insured Claim, in the amount of such holder's Allowed Diacetyl Claim multiplied by the Diacetyl Recovery Ratio. |

K&E 17416258.15

**SUMMARY OF STATUS, TREATMENT AND VOTING RIGHTS**

| Class | Status | Voting Rights | Plan Treatment of Class |
|---|---|---|---|
| Class 11: Environmental Claims | Impaired | Entitled to Vote | Each holder of an Allowed Environmental Claim shall receive one of the following treatments at the option of the applicable Debtor (excluding Chemtura Canada) (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld): (A) payment in Cash on the Effective Date or such other treatment as agreed pursuant to a negotiated settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and as approved by order of the Bankruptcy Court, (B) to the extent an Allowed Environmental Claim is not subject to a negotiated settlement as of the Effective Date, a distribution from the Environmental Reserve in Cash in accordance with the procedures set forth in Article IX of the Plan, in the amount of such holder's Allowed Environmental Claim or (C) the holder will retain its Environmental Claim, which will be Reinstated. |
| Class 12: Intercompany Claims | Impaired | Deemed to Accept | At the election of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld), Intercompany Claims shall (A) be Reinstated, (B) remain in place subject to certain revised documentation, (C) be modified or cancelled as of the Effective Date, (D) include Cash payments to address the treatment of certain foreign pension obligations of the Company and/or (E) with respect to certain Intercompany Claims in respect of goods, services, interest and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, may be settled in Cash in an amount not to exceed $25 million. |
| Class 13a: Interests in Chemtura | Impaired | Entitled to Vote | All Class 13a Interests in Chemtura shall be cancelled and of no further force and effect on the Effective Date, whether surrendered for cancellation or otherwise, and each holder of an Interest shall receive, in full and final satisfaction of such Interest, on the Effective Date, one of the following treatments: (a) to the extent that Class 13a for Chemtura votes to accept the Plan, on or as soon as practicable after the Effective Date, each holder of a share of prepetition common stock or equivalent Interest in Chemtura shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of 5% of the New Common Stock, subject to dilution for the New Incentive Plan, and its Pro Rata share of the Rights to participate in the Rights Offering; and (b) to the extent that Class 13a for Chemtura votes to reject the Plan, each holder of an Interest shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13) of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of this Plan and the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve have been established in accordance with the terms of this Plan. |
| Class 13b: Interests in the Subsidiary Debtors and Chemtura Canada to the extent it commences a Chapter 11 Case before the Confirmation Date | Unimpaired / Impaired | Deemed to Accept | At the option of the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on the Effective Date, all Class 13b Interests in the Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall remain outstanding, shall be cancelled or shall be transferred pursuant to the Plan, including as set forth in Section 5.22 of the Plan. |

(iii)    ***Estimated Range of Recoveries of Holders of Claims and Interests Under the Plan***

The tables presented below estimate recoveries to holders of Claims and Interests in the event Class 13a holders of Interests in Chemtura votes to accept or reject the Plan. The following estimated recoveries for holders of Allowed General Unsecured Claims are presented for illustrative purposes **only** and assume, where applicable, that the Rights Offering is fully subscribed. Actual recoveries may vary depending on a number of factors, including

24

those described in the Plan and this Disclosure Statement, as well as those set forth in section XII of this Disclosure Statement entitled "Risk Factors."

**ESTIMATED RECOVERIES**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO ACCEPT THE PLAN**
**AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Claims | Low Amount of Allowed Claims | | | High Amount of Allowed Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 1: Prepetition Secured Lender Claims | 100%, plus postpetition interest at the Waiver Rate | N/A | 100% | 100%, plus postpetition interest at the Waiver Rate | N/A | 100% |
| Class 2: Lien Claims | 100%, plus, to the extent a Lien Claim is oversecured, postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% | 100%, plus, to the extent a Lien Claim is oversecured, postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% |
| Class 3: Other Priority Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% |
| Class 4a: General Unsecured Claims against Chemtura | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, less the applicable Shortfall Adjustment, if any[5] | 76.9% | 23.1% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, less the applicable Shortfall Adjustment, if any[6] | 82.7% | 17.3% |
| Class 4b: General Unsecured Claims against the Subsidiary Debtors | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 76.9% | 23.1% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 82.7% | 17.3% |
| Class 4c: General Unsecured Claims against Chemtura Canada | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% |
| Class 5: Prepetition Unsecured Lender Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 76.9% | 23.1% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 82.7% | 17.3% |

---

[5]   The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[6]   The Debtors estimate the Shortfall Adjustment to be zero in this instance.

25

**ESTIMATED RECOVERIES**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO ACCEPT THE PLAN**
**AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Claims | Low Amount of Allowed Claims | | | High Amount of Allowed Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 6: 2016 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any[7] | 76.9% | 23.1% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any[8] | 82.7% | 17.3% |
| Class 7: 2009 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 76.9% | 23.1% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 82.7% | 17.3% |
| Class 8: 2026 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[9] | 76.9% | 23.1% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[10] | 82.7% | 17.3% |
| Class 9: Unsecured Convenience Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% |
| Class 10: Diacetyl Claims[11] | 100% | N/A | 100% or such other treatment as provided for in the Plan | 100% | N/A | 100% or such other treatment as provided for in the Plan |

---

[7]   The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[8]   The Debtors estimate the Shortfall Adjustment to be approximately 58.8% of the Make-Whole Settlement Amount in this instance.

[9]   The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[10]   The Debtors estimate the Shortfall Adjustment to be the full amount of the No-Call Settlement Amount in this instance.

[11]   The Debtors note that certain holders of Diacetyl Claims believe that recoveries to holders of Diacetyl Claims could be less than 100% to the extent that such Claims are liquidated at amounts greater than the Bankruptcy Court estimates for purposes of establishing the Diacetyl Reserve.  Such holders of Diacetyl Claims dispute whether the Bankruptcy Court has jurisdiction to estimate the amount of the Diacetyl Claims for purposes of establishing the Diacetyl Reserve contemplated under the Plan.  The Debtors disagree and will defend this aspect of the Plan at the Confirmation Hearing.  The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

K&E 17416258.15

**ESTIMATED RECOVERIES**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO ACCEPT THE PLAN**
**AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Claims | Low Amount of Allowed Claims | | | High Amount of Allowed Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 11: Environmental Claims | 100% | N/A | 100% or such other treatment as provided for in the Plan | 100% | N/A | 100% or such other treatment as provided for in the Plan |
| Class 12: Intercompany Claims | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 13a: Interests in Chemtura Corporation | N/A | Pro Rata share of 5% of the New Common Stock subject to dilution for the New Incentive Plan and its Pro Rata share of the Rights to participate in the Rights Offering | N/A | N/A | Pro Rata share of 5% of the New Common Stock subject to dilution for the New Incentive Plan and its Pro Rata share of the Rights to participate in the Rights Offering | N/A |
| Class 13b: Interests in the Subsidiary Debtors and Chemtura Canada | N/A | N/A | N/A | N/A | N/A | N/A |

**ESTIMATED RECOVERIES**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO REJECT THE PLAN**

| Claims | Low Amount of Allowed Claims | | | High Amount of Allowed Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 1: Prepetition Secured Lender Claims | 100%, plus postpetition interest at the Waiver Rate | N/A | 100% | 100%, plus postpetition interest at the Waiver Rate | N/A | 100% |
| Class 2: Lien Claims | 100%, plus, to the extent a Lien Claim is oversecured, postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% | 100%, plus, to the extent a Lien Claim is oversecured, postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% |
| Class 3: Other Priority Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% |

27

**ESTIMATED RECOVERIES**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO REJECT THE PLAN**

| Claims | Low Amount of Allowed Claims | | | High Amount of Allowed Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 4a: General Unsecured Claims against Chemtura | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan less the applicable Shortfall Adjustment, if any[12] | 83.8% | 16.2% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, less the applicable Shortfall Adjustment, if any[13] | 89.9% | 10.1% |
| Class 4b: General Unsecured Claims against the Subsidiary Debtors | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 83.8% | 16.2% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 89.9% | 10.1% |
| Class 4c: General Unsecured Claims against Chemtura Canada | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | N/A | 100% |
| Class 5: Prepetition Unsecured Lender Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 83.8% | 16.2% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 89.9% | 10.1% |
| Class 6: 2016 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any[14] | 83.8% | 16.2% | 100% of principal, plus postpetition interest, pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any[15] | 89.9% | 10.1% |
| Class 7: 2009 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 83.8% | 16.2% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 89.9% | 10.1% |

---

[12]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[13]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[14]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[15]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

28

**ESTIMATED RECOVERIES**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO REJECT THE PLAN**

| Claims | Low Amount of Allowed Claims | | | High Amount of Allowed Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 8: 2026 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[16] | 83.8% | 16.2% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[17] | 89.9% | 10.1% |
| Class 9: Unsecured Convenience Claims | 100% | N/A | 100% | 100% | N/A | 100% |
| Class 10: Diacetyl Claims[18] | 100% | N/A | 100% or such other treatment as provided for in the Plan | 100% | N/A | 100% or such other treatment as provided for in the Plan |
| Class 11: Environmental Claims | 100% | N/A | 100% or such other treatment as provided for in the Plan | 100% | N/A | 100% or such other treatment as provided for in the Plan |
| Class 12: Intercompany Claims | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 13a: Interests in Chemtura | N/A | *See* section I.C(iv), page 30, of this Disclosure Statement entitled, "Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan." | | N/A | *See* section I.C(iv), page 30, of this Disclosure Statement entitled, "Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan." | |
| Class 13b: Interests in the Subsidiary Debtors and Chemtura Canada | N/A | N/A | N/A | N/A | N/A | N/A |

---

[16]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[17]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[18]    The Debtors note that certain holders of Diacetyl Claims believe that recoveries to holders of Diacetyl Claims could be less than 100% to the extent that such Claims are liquidated at amounts greater than the Bankruptcy Court estimates for purposes of establishing the Diacetyl Reserve.  Such holders of Diacetyl Claims dispute whether the Bankruptcy Court has jurisdiction to estimate the amount of the Diacetyl Claims for purposes of establishing the Diacetyl Reserve contemplated under the Plan.  The Debtors disagree and will defend this aspect of the Plan at the Confirmation Hearing.  The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

K&E 17416258.15

(iv)    *Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan*

The Plan provides that, in the event Class 13a Interests in Chemtura votes to reject the Plan, each holder of an Interest in Chemtura shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of the Plan and the Plan Reserves have been established in accordance with the terms of the Plan, which the Debtors estimate to be in a range of between 1.6% to 10.4%, expressed as a percentage of New Common Stock.  For the avoidance of any doubt, the Debtors note that this estimated range of recovery only indirectly takes into account possible recovery on account of follow-on distributions in the event that the Plan Reserves exceed the amount necessary to pay all Claims in full.  The likelihood that any such follow-on distribution will be available will depend in part on the size of the Plan Reserves as determined by the Bankruptcy Court before the Effective Date.  The higher the Plan Reserves, the lower the initial distribution to Class 13a will be if Class 13a votes to reject the Plan.  The Debtors believe that the likelihood of follow-on distributions becoming available for distribution to Class 13a if it rejects the Plan will increase if the Plan Reserves are higher.

As described above, to the extent Class 13a does not vote to accept the Plan, recoveries (if any) for holders of Interests in Chemtura under the Plan are subject to the outcome and resolution of several factors, including the actual amount of Environmental Claims, Diacetyl Claims and Disputed Claims.  The table below and the notes that follow are provided for **illustrative purposes only** as additional disclosure with respect to the sensitivities that would influence recoveries to holders of Class 13a Interests in Chemtura in the event Class 13a votes to reject the Plan.

**SAMPLE SENSITIVITIES REGARDING ESTIMATED RECOVERIES TO HOLDERS OF CLASS 13A INTERESTS IN CHEMTURA IF CLASS 13A VOTES TO REJECT THE PLAN**

| Variable | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 | Scenario 5 | Scenario 6 |
|---|---|---|---|---|---|---|
| Environmental Claims | High ($87 million) | Mid ($82 million) | High ($87 million) | High ($87 million) | Mid ($82 million) | Low ($77 million) |
| Diacetyl Claims[19] | High ($85 million) | High ($85 million) | Mid ($58 million) | Mid ($58 million) | Low ($31 million) | Low ($31 million) |
| Other Litigation General Unsecured Claims | High ($31.6 million) | Mid ($26.6 million) | Low $21.5 million) | Mid ($26.6 million) | Low ($21.5 million) | Low ($21.5 million) |
| Other General Unsecured Claims | High ($140.8 million) | Mid ($129.1 million) | High ($140.8 million) | Low ($117.4 million) | Low ($117.4 million) | Low ($117.4 million) |
| Total Claims | $344.4 million | $322.7 million | $307.3 million | $289 million | $251.9 million | $246.9 million |
| **Illustrative Recovery**[20] | **1.6%** | **3.2%** | **4.3%** | **5.7%** | **8.4%** | **10.4%** |

[19]    Amounts with respect to Diacetyl Claims are net of insurance proceeds.

[20]    "Illustrative Recovery" is the estimated value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of the Plan and the Plan Reserves have been established in accordance with the terms of the Plan, expressed as a percentage of New Common Stock.  As described above and elsewhere in this Disclosure Statement, the full recovery available for holders of Interests in Class 13a, if Class 13a votes to reject the Plan, will depend in part upon (i) the size of the Plan Reserves as determined by the Bankruptcy Court before the Effective Date and (ii) the possibility for follow-on distributions to holders of Interests in Class 13a if the Plan Reserves ultimately exceed the value of all Allowed Claims.  To the extent that follow-on distributions are available from the Plan Reserves, a portion of such distributions may be in the form of Cash rather than New Common Stock.  The proportion of Cash to New Common Stock in such distributions will depend on the Cash-to-New-Common-Stock ratio of distributions to holders of General Unsecured Claims under the Plan, which is described in section VIII.B(iii)m.iii, page 122, of this Disclosure Statement, entitled "Additional Disclosure With Respect to Recoveries to Holders of Interests in Class 13a for Chemtura Corporation," and will also depend on whether the excess Plan Reserve value is attributable to the Diacetyl Reserve and the Environmental Reserve (which will be reserved entirely in Cash) or to the Disputed Claims Reserve (which will be reserved partly in Cash and partly in New Common Stock).  Furthermore, to the extent that follow-

(Continued...)

K&E 17416258.15

The recovery ranges provided in the table above are based upon various assumptions regarding estimates of (i) Environmental Claims; (ii) Diacetyl Claims (net of Insurance Proceeds available to satisfy Diacetyl Claims); (iii) other litigation-type Claims that if Allowed would be treated as General Unsecured Claims; and (iv) other General Unsecured Claims (excluding Prepetition Unsecured Lender Claims, 2016 Notes Claims, 2009 Notes Claims and 2026 Notes Claims).  Whether an item is marked as "High," "Mid" or "Low" depends on the context to which it applies.  For example, in the instances where Environmental Claims and Diacetyl Claims are marked as "High," the underlying numbers are based on the high-end of the Debtors' estimated reasonable range of those Claims.

The Debtors estimate that the Diacetyl Reserve will be funded in an amount within the range of approximately $31 million to $85 million, which amount will be established by the Bankruptcy Court at a hearing before or at the same time as the Confirmation Hearing.  The Debtors further estimate that the Environmental Reserve will be funded in an amount within the range of approximately $77 million to $87 million, which amount will be established by the Bankruptcy Court at a hearing before or at the same time as the Confirmation Hearing.  The Debtors also estimate that the Disputed Claims Reserve will be funded in an amount within the range of approximately $21.5 million to $31.6 million, which amount will be established by the Bankruptcy Court at a hearing before or at the same time as the Confirmation Hearing.  As set forth below, the Debtors cannot guarantee that actual amounts of Allowed Claims will not vary materially from the ranges provided.

As noted, this information is provided for informational purposes only.  Actual recoveries to holders of Class 13a Interests in Chemtura in the event Class 13a votes to reject the Plan may materially differ from the estimates provided herein.  It is important for holders of Class 13a Interest in Chemtura to understand that the proportion of Cash and New Common Stock available to holders of Interests in Chemtura in the event Class 13a votes to reject the Plan is incapable of being determined at this time.  The Plan provides that the Disputed Claims reserve is funded with both Cash and New Common Stock, while the Environmental Reserve and the Diacetyl Reserve are both funded only in Cash.  Thus, the ultimate combination of Cash and/or New Common Stock that holders of Class 13a Interests in Chemtura may receive (if any) in the event Class 13a votes to reject the Plan depends not only on the ultimate amount of Allowed Claims, but also the extent to which such Allowed Claims are Diacetyl Claims, Environmental Claims or other subsequently Allowed Claims that are satisfied from the appropriate Plan Reserve.  At this time, the Debtors cannot identify with any degree of certainty the proportion of Cash and New Common Stock that will be available to holders of Class 13a Interests in Chemtura if Class 13a votes to reject the Plan.  Additionally, although the Debtors have provided various ranges of potential outcomes in the table above, no amount within those ranges is believed to be more or less likely to occur based on currently available information, and the Debtors cannot guarantee that actual amounts of Allowed Claims will not vary materially from the ranges provided above.

**D.**    **Voting on the Plan**[21]

On August 5, 2010, the Bankruptcy Court entered the Solicitation Order, approving, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures  and establishing the deadline for filing objections to the Plan and scheduling the Confirmation Hearing.  Copies of the Solicitation Order and the Disclosure Statement Order are attached hereto as collective **Exhibit B**.  The Solicitation Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

---

on distributions are available from the Plan Reserves, such distributions will be made only after all Disputed Claims are allowed, disallowed or otherwise resolved, which could take an extended period of time.  The Illustrative Recovery as set forth above does not attempt to take into account the distinction between Cash and New Common Stock, and it shows the gross value of estimated distributions rather than attempting to show such distributions on a present value basis.

[21]    Capitalized terms in section I.D. of this Disclosure Statement that are not otherwise defined shall have the meaning ascribed to them in the Solicitation Order (and any exhibits thereto).

K&E 17416258.15

> **THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS ONLY A SUMMARY**.
> PLEASE REFER TO THE SOLICITATION ORDER ATTACHED HERETO FOR A MORE
> COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

(i)      *Holders of Claims and Interests Entitled to Vote on the Plan*

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan.  As shown in the table above, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims and Interests in Classes 1, 4a, 4b, 5, 6, 7, 8, 10, 11 and 13a (collectively, the "**Voting Classes**").  For purposes of clarity, the only Voting Class with respect to Chemtura Canada is Class 10 Diacetyl Claims.  Although Chemtura Canada is not yet a Debtor in the Chapter 11 Cases at this time, the Debtors are using this Disclosure Statement to solicit approval of votes to accept or reject the Plan with respect to holders of Class 10 Diacetyl Claims against Chemtura Canada.

The holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may receive a distribution under the Plan.  Accordingly, holders of Claims and Interest in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from holders of Classes 2, 3, 4c, 9, 12 and 13b.  Additionally, the Solicitation Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.  The table above provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

(ii)      *Voting on the Plan*

**The Voting Deadline is 5:00 p.m. Eastern Daylight Time on September 9, 2010**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that they are **actually received** on or before the Voting Deadline by either the Voting and Claims Agent or the Securities Voting Agent at the following addresses:

K&E 17416258.15

---

**DELIVERY OF BALLOTS**

Ballots must be **actually received** by the Voting and Claims Agent or Securities Voting Agent, as appropriate, by the Voting Deadline of 5:00 p.m. Eastern Daylight Time on September 9, 2010 at the following addresses:

*Voting and Claims Agent:*
*[For Classes 1, 4a, 4b, 5, 10 and 11]*

Chemtura Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California  90245

* * * * * * *

*Securities Voting Agent:*
*[For Classes 6, 7, 8 and 13a]*

Chemtura Ballot Processing
c/o Epiq Bankruptcy Solutions LLC
757 Third Avenue, 3rd Floor
New York, New York 10017

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a Ballot before the Voting Deadline.

If you have any questions on the procedures for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

**(866) 967-0261**

---

(iii)     *Recovery Preference Election*

The Plan provides that (a) each holder of a Prepetition Unsecured Lender Claim, or a General Unsecured Claim against a Debtor other than Chemtura Canada may, at the time of voting upon the Plan, make a binding election to seek to receive the maximum available percentage of its recovery in the form of Cash or the maximum available percentage of its recovery in the form of New Common Stock and (b) holders of Notes Claims may, before the Voting Deadline, make a binding election to seek to receive the maximum available percentage of its recovery in the form of Cash or the maximum available percentage of its recovery in the form of New Common Stock (collectively, the "**Recovery Preference Election**").  The implementation of this aspect of the Plan as part of the solicitation process is described in the Solicitation Order.

(iv)     *The Rights Offering*

As described in the tables above, the Plan provides that to the extent Class 13a Interests in Chemtura votes to accept the Plan, holders of an Interest in Chemtura as of the business day before the date on which the Debtors first send the Rights Exercise Forms to Eligible Holders pursuant to the terms of the Plan and the Rights Offering Procedures will receive the right, but not the obligation, to purchase their respective Pro Rata share of 7.38 million shares of New Common Stock in the Rights Offering.  The implementation of the Rights Offering is described in the Solicitation Order.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,**
**PLEASE CONTACT THE VOTING AND CLAIMS AGENT OR SECURITIES VOTING**
**AGENT, AS APPROPRIATE.  ANY BALLOT RECEIVED AFTER**
**THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH**
**THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

K&E 17416258.15

E.       **Additional Plan-Related Documents**

(i)       *The Plan Supplement*

The Debtors will file the Plan Supplement, which shall be acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee (which consent shall not be unreasonably withheld), with the Bankruptcy Court no later than 14 days before the Confirmation Hearing (or such later date as may be approved by the Bankruptcy Court).  The Debtors will file the Plan Supplement with the Bankruptcy Court and post a notice on its website (www.kccllc.net/chemtura) that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained.  The Plan Supplement will include:

- to the extent known, the identity of the members of the New Boards of New Chemtura and each of the other Reorganized Debtors, as well as the nature and amount of compensation for any member of a New Board who is an "insider" under section 101(31) of the Bankruptcy Code;

- a list of Executory Contracts and Unexpired Leases to be assumed, together with the proposed Cure Claim amount for each such contract or lease;

- a list of retained Causes of Action;

- the form of the Exit Credit Facility Agreement and any similar operative financing document or indenture setting forth the terms of the Exit Financing or term sheets for the foregoing;

- the Corporate Governance Documents;

- the elected treatment of Intercompany Claims;

- the terms of the New Incentive Plan and the terms of the New Employment Agreements;

- the terms of the coverage under any new D&O Liability Insurance Policies, including the policy or policies providing tail coverage; and

- to the extent the Disbursing Agent includes an Entity or Entities other than the Reorganized Debtors, the identity of such Entity or Entities.

(ii)       *The Contract/Lease Schedule*

The Debtors will file a schedule or schedules, as necessary, listing the Executory Contracts and Unexpired Leases the Debtors intend to assume pursuant to Article VI of the Plan (the "**Contract/Lease Schedule**") with the Bankruptcy Court as part of the Plan Supplement on or before 14 days before the Confirmation Hearing.  The Contract/Lease Schedule will include (a) the name of the non-debtor counterparty, (b) the legal description of the contract or lease to be assumed and (c) the proposed amounts of Cure Claims, if any.

On the date of filing of the Contract/Lease Schedule or as soon as practicable thereafter, with the assistance of the Notice and Claims Agent, the Debtors will serve a notice of filing upon each non-debtor counterparty to any listed Executory Contracts or Unexpired Leases.  The notice of filing will describe the procedures by which such parties may object to the proposed assumption of their respective Executory Contract or Unexpired Lease and any amount of Cure Claims to be paid in connection therewith and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or Cure Claim or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule, must be filed with the Bankruptcy Court and served so as to be **actually** **received** at least three days before the Confirmation Hearing by the notice parties listed directly below under the heading, "Plan Objection Deadline."

34

Any counterparty to any Executory Contract or Unexpired Lease who fails to timely file and serve an objection in accordance with the Plan will be deemed to have consented to the assumption or rejection of that party's Executory Contract or Unexpired Lease by the Debtors in accordance with Article VI of the Plan.

F.      **Confirmation and Consummation of the Plan**

(i)      *Plan Objection Deadline*

**The Plan Objection Deadline is 4:00 p.m. Eastern Daylight Time on September 9, 2010**.  This means that written objections to Confirmation, if any, that conform to the applicable provisions of the Disclosure Statement Order, the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be **actually received** on or before the Plan Objection Deadline by the following parties:

- Counsel to the Debtors: Kirkland & Ellis LLP, Attn: Richard M. Cieri, Esq., M. Natasha Labovitz, Esq. and Dana Yankowitz, Esq., 601 Lexington Avenue, New York, New York 10022;

- Counsel to the Creditors' Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Daniel H. Golden, Philip C. Dublin, Esq. and Meredith A. Lahaie, Esq., One Bryant Park, New York, New York, 10036;

- Counsel to the Equity Committee: Skadden Arps Slate Meagher & Flom LLP, Attn: Jay Goffman, Esq. and David Turetsky, Esq., Four Times Square, New York, NY 10036;

- U.S. Trustee: Office of the U.S. Trustee for the Southern District of New York, Attn: Susan D. Golden, Esq. and Brian Masumoto, Esq. Whitehall Street, 21st Floor, New York, New York 10004;

- Counsel to the Postpetition and Prepetition Secured Lenders: Sherman & Sterling, LLP, Attn: Fred Sosnick, Esq., 599 Lexington Avenue, New York, New York 10022; and

- Counsel to the Ad Hoc Bondholders' Committee: Jones Day, Attn: Richard Wynne and Erin Brady, 555 S. Flower Street, Los Angeles, California 90071.

(ii)      *Confirmation Hearing*

**The Confirmation Hearing will commence at 9:45 a.m. Eastern Daylight Time on September 16, 2010**.  The Confirmation Hearing will be held before the Honorable Robert E. Gerber in the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408.  At least 28 days before the Voting Deadline, the Debtors will (a) serve the Confirmation Hearing Notice upon all known creditors of the Debtors and (b) publish the Confirmation Hearing Notice in the national editions of *The New York Times* and *USA Today*, which will contain, among other things, details regarding voting on and objecting to Confirmation, including the Voting Deadline and the Plan Objection Deadline, and the date, time and location of the Confirmation Hearing.  The Confirmation Hearing Notice will also be posted on the Debtors' restructuring website (http://www.kccllc.net/chemtura).  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made before or at the Confirmation Hearing or any adjournment thereof.**

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, it will commence the Canadian Case and seek entry of the Canadian Confirmation Order to, among other things, recognize the Confirmation Order in the Canadian Case following the entry of the Confirmation Order.

(iii)      *Effect of Confirmation and Consummation of the Plan*

Following Confirmation, subject to Article XI of the Plan, the Plan will be consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article XI of the Plan will become effective.  As such, it is important to read the provisions contained in Article XI of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – may affect you and any claim you or the Debtors may hold against a Released Party (as defined in the Plan) so that you cast your vote accordingly.  **The Releasing Party Release described in**

**Article XI of the Plan provides that holders of Claims and Interests are bound by the Releasing Party Release, regardless of whether the holder of Claim or Interest votes to accept or reject the Plan.**

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, each of the Released Parties afforded value to the Debtors and aided in the reorganization process. The Debtors believe that the Released Parties played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.

Certain parties in interest, including the U.S. Trustee, have asserted that the releases contained in the Plan are overbroad and do not comport with applicable case law. The Debtors disagree and will defend the releases at the Confirmation Hearing. The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan to the extent the Bankruptcy Court does not approve the releases.

Further discussion of the releases contemplated in the Plan is provided in section VIII of this Disclosure Statement.

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

36

## II.
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides important information regarding the Plan, which the Debtors are seeking to have confirmed by the Bankruptcy Court and recognized by the Canadian Court in the Canadian Case. The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee believe that the Plan is in the best interests of all stakeholders. The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee urge all holders of Claims and Interests who are entitled to vote on the Plan to vote in favor of the Plan.

**All capitalized terms used but not defined herein will have the meanings provided to them in the Plan.**

**The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary provided in this Disclosure Statement and the Plan, the Plan will govern.**

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent contained in Article XII of the Plan and described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or otherwise waived.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court or by the Canadian Court.**

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for the purposes of soliciting acceptances with respect to the Plan. The Disclosure Statement and the information it contains may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any other information, representations or inducements made to obtain acceptance of the Plan should not be relied on by any holder of a Claim or Interest entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly stated otherwise herein.

For additional information about the Debtors' business operations, please refer to Chemtura's Annual Report on Form 10-K and its subsequent amendment, filed on April 29, 2010, for the fiscal year ended December 31, 2009, the Form 10-Q for the quarterly period ended March 31, 2010, filed with the SEC on May 10, 2010 and any other recent report to the Securities and Exchange Commission. These filings are available through Chemtura's investor relations website at http://phx.corporate-ir.net/phoenix.zhtml?c=68079&p=irol-sec or by visiting the Securities and Exchange Commission's website at http://www.sec.gov.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

K&E 17416258.15

- any future effects as a result of the pendency of the Chapter 11 Cases or the Canadian Case;

- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;

- projected dividends;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated environmental liabilities;

- projected and estimated tort liabilities;

- other projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- regulatory changes;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing services;

- projected price increases;

- projected general market conditions; and

- benefits from new technologies.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases or the Canadian Case on the Debtors' operations, management and employees, and the risks associated with operating the businesses during the Chapter 11 Cases or the Canadian Case;

- customer response to the Chapter 11 Cases or the Canadian Case;

- inability to have claims discharged/settled during the Chapter 11 Cases or the Canadian Case;

- general economic, business and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy;

- ability to pass to customers increases in raw material prices;

- interest rate fluctuations;

- exposure to litigation;

- dependence upon key personnel;

- ability to implement cost reduction and market share initiatives in a timely manner;

- efficacy of new technologies and facilities;

- the financial condition of the Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- natural disasters; and

- inability to implement the Debtors' business plan.

38

**Except as expressly stated, the statements and analysis provided herein are being made by the Debtors and their professionals alone.  Although the Plan embodies a global settlement among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee (all as discussed in detail herein, including in section IX.B of this Disclosure Statement), the Creditors' Committee and the Ad Hoc Bondholders' Committee reserve all rights with respect to the statements or opinions expressed in this Disclosure Statement, subject to the terms and conditions set forth in the Plan and the Plan Support Agreement and except where a representation or opinion is expressly attributed to the Creditors' Committee or the Ad Hoc Bondholders' Committee.**

K&E 17416258.15

<div align="center">

**III.**
**QUESTIONS AND ANSWERS REGARDING**
**THIS DISCLOSURE STATEMENT AND THE JOINT PLAN**

</div>

**A.**     **What is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly situated creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that includes all of the legal and equitable interests of the debtor in property as of the bankruptcy commencement or petition date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A plan that is confirmed by the bankruptcy court is binding on the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's claims and interests in accordance with the terms of the confirmed plan.

**B.**     **What is the Companies' Creditors Arrangement Act?**

The CCAA is a Federal Act under Canadian law that allows a company to restructure its financial affairs through a "Plan of Arrangement" or, in certain circumstances, to "recognize" a plan or scheme approved by a court in a foreign proceeding, including under the United States Bankruptcy Code.  As with the process used in the United States, the CCAA allows a company to continue to operate its business while it restructures in an organized, court-supervised setting.

**C.**     **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Bankruptcy Court approved this Disclosure Statement under section 1125 of the Bankruptcy Code on August 5, 2010.  A copy of the Disclosure Statement Order is attached hereto as **Exhibit B**.  This Disclosure Statement is being submitted to the Debtors' stakeholders in accordance with these Bankruptcy Code requirements and the Disclosure Statement Order.

Additionally, it is important to note that this Disclosure Statement has not yet been approved by the Bankruptcy Court as to Chemtura Canada because at this time Chemtura Canada is not a Debtor in the Chapter 11 Cases.  The Debtors are, however, using this Disclosure Statement to solicit approval of votes to accept or reject the Plan with respect to holders of Class 10 Diacetyl Claims against Chemtura Canada.  The Debtors will, at or before the Confirmation Hearing, seek an order by the Bankruptcy Court approving this Disclosure Statement as it applies to holders of Class 10 Diacetyl Claims against Chemtura Canada pursuant to section 1125 of the Bankruptcy Code.

**D.**     **Am I entitled to vote on the Plan?  What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and the distribution and consideration that you will receive under the Plan, if any, depend on what kind of Claim or Interest you hold.  As described in section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization," Article III of the Plan creates categories of holders of Claims and Interests, each of which is referred to as a "Class."  A summary of the Classes of Claims and Interests and a description of each Class's voting status are set forth in the Executive Summary of this Disclosure Statement.

<div align="center">

40

</div>

You should refer to this entire Disclosure Statement, the Plan and the Plan Supplement for a complete description of the classification and treatment of each Class of Claims and Interests.

For more information about the treatment of Claims and Interests, see "Description of the Joint Plan of Reorganization," which begins on page 103.

**E.     What happens to my recovery if the Plan is not confirmed or does not become effective?**

In the event that the Plan is not confirmed or does not become effective, there is no assurance that the Debtors will be able to reorganize their businesses. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated under the Plan could be implemented and what holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. It is possible that any alternative plan of reorganization may provide holders of Claims and Interests with less than they would have received pursuant to the Plan. Moreover, non-confirmation of the Plan may result in an extended chapter 11 process. For a more detailed description of the consequences of this or liquidation of the Debtors, see "Confirmation of the Plan," beginning on page 187 and the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.

**F.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" refers to approval of the Plan by the Bankruptcy Court. Confirmation does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation, there are certain conditions that need to be satisfied or waived so that the Plan can be consummated or become effective. References to the "Effective Date" in the Plan and Disclosure Statement mean the date that all of these conditions have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter, in accordance with Article XII of the Plan (and for Claims that are not yet Allowed, distributions will be further delayed). *See* "Confirmation of the Plan," which begins on page 187, for a discussion of the conditions to Consummation.

**G.     How are the Debtors obtaining the Cash and other value required to make distributions (if applicable) to satisfy Claims and Interests?**

As explained below, the Plan contemplates that the Reorganized Debtors will enter into an exit financing facility that will be (a) a senior secured or unsecured term loan or loans and/or the issuance of senior secured or unsecured notes which, in the aggregate, have a principal amount of approximately $750 million and (b) a senior secured revolver facility of up to a principal amount of $250 million (together, the "**Exit Financing**"). This Exit Financing will be used, along with the Debtors' cash on hand, and, if applicable, proceeds of a rights offering, to make any cash payments provided for in the Plan and provide working capital after the Effective Date. Additionally, the Plan contemplates issuing up to 100 million shares of stock in New Chemtura (which is referred to as New Common Stock), which stock will provide an additional source of recovery for holders of unsecured Claims and possibly for holders of Interests in Chemtura. *See* "Description of the Joint Plan of Reorganization," which begins on page 103.

As explained below, the Plan contemplates that the Reorganized Debtors will enter into an exit financing facility that will be (a) a senior secured or unsecured term loan or loans and/or the issuance of senior secured or unsecured notes which, in the aggregate, have a principal amount of approximately $750 million and (b) a senior secured revolver facility of up to a principal amount of $250 million (together, the "**Exit Financing**"). This Exit Financing will be used, along with the Debtors' cash on hand and, if applicable, proceeds of a rights offering, to make any cash payments provided for in the Plan and provide working capital after the Effective Date. Additionally, the Plan contemplates issuing up to 100 million shares of stock in New Chemtura (which is referred to as New Common Stock), which stock will provide an additional source of recovery for holders of unsecured Claims and possibly for holders of Interests in Chemtura. *See* "Description of the Joint Plan of Reorganization," which begins on page 103.

The Debtors, together with their financial advisors, determined that the amount of Exit Financing contemplated by the Plan was the appropriate level of indebtedness on the Effective Date based upon a number of considerations, including the Debtors' targeted credit rating level upon emergence based on a comparison of the Debtors to other companies in the specialty chemicals industry of comparable size and complexity, which companies are the same as those used by Lazard in the Comparable Company Analysis component of its valuation of the Debtors as described in **Exhibit F** to this Disclosure Statement, entitled "Valuation Analysis."

The Equity Committee believes that the Reorganized Debtors can support a significantly higher amount of leverage upon exit from the Chapter 11 Cases and that the much lower amount of leverage contemplated by the Plan results in unnecessary dilution to holders of Class 13a Interests in Chemtura. The Equity Committee has indicated that its belief is based on, among other factors, the Debtors' current EBITDA run rate as well as management's EBITDA projections for 2011 and beyond and the amount of leverage maintained by comparable companies in the specialty chemicals industry. The Debtors disagree that a higher amount of leverage would be appropriate.

**H.     Can I choose to receive only Cash or New Common Stock?**

If you are a holder of a Prepetition Unsecured Lender Claim or a General Unsecured Claim against a Debtor other than Chemtura Canada, you are eligible to elect, when voting on the Plan, to receive your recovery in the form of the maximum available amount of Cash or the maximum available amount of New Common Stock. If you are a holder of a Notes Claim, you are eligible to elect before the Voting Deadline to receive your recovery in the form of the maximum available amount of Cash or the maximum available amount of New Common Stock. If you elect this option, the Cash or New Common Stock that would have otherwise been distributed to you as a holder of an Allowed Claim, will be reallocated among all holders of an Allowed Claim who are eligible and elect to receive their recovery in the form of the maximum available amount of Cash or the maximum available amount of New Common Stock. The extent to which a holder of an Allowed Claim receives an increased percentage of Cash or New Common Stock will depend upon the elections of all holders of Claims in Participating Creditor Classes. Making such an election will not diminish recoveries to holders of Claims. Each holder of a Claim in a Participating Creditor Class that elects this option will receive the total value of the consideration it would have otherwise received, in the form of their recovery preference to the extent possible. Holders of Disputed Claims are not eligible to make an election, even if they hold a Claim in a Participating Creditor Class.

Additionally, holders of General Unsecured Claims against a Debtor other than Chemtura Canada that are (a) Allowed in an amount of $50,000 or less or (b) Allowed in an amount greater than $50,000, but the holder of such Claim has made an irrevocable election to reduce the Allowed amount of the Claim to $50,000 for the purposes of rendering the Claim an Unsecured Convenience Claim, will be paid in Cash in the amount of the Allowed Unsecured Convenience Claim.

**I.      What is an Unsecured Convenience Claim?**

An Unsecured Convenience Claim is a prepetition Unsecured Claim against a Debtor other than Chemtura Canada that would be classified as a General Unsecured Claim, except it is (a) Allowed in an amount of $50,000 or less or (b) Allowed in an amount greater than $50,000, but the holder has made an irrevocable election to reduce the Allowed amount of the Claim to $50,000 for the purposes of rendering the Claim an Unsecured Convenience Claim. If you elect to treat your Allowed Claim as an Unsecured Convenience Claim, you will receive Cash in the amount of the Allowed Unsecured Convenience Claim.

**J.     Are there risks to owning stock in New Chemtura upon emergence from bankruptcy?**

Yes. Please see the discussion of "Risk Factors," which begins on page 191.

**K.     I am a holder of an Interest in Chemtura.  What will I receive if I vote to accept the Plan?**

As described in section VIII of this Disclosure Statement, the Plan provides that if holders of Interests in Chemtura vote as a Class to accept the Plan, they will receive their pro rata share of 5% of New Common Stock (subject to dilution on account of the Incentive Plans), plus the right to participate in a Rights Offering for New

42

Common Stock in the value of up to $100 million, if fully subscribed, at a price consistent with the New Chemtura Total Enterprise Value.

For the further avoidance of doubt, in the event Class 13a Interests in Chemtura Corporation vote to accept the Plan, excess Cash in the Disputed Claims Reserve after all Allowed Unsecured Claims are paid in full will be returned to the Reorganized Debtors for general corporate use in accordance with the terms of the Plan. Additionally, any excess New Common Stock will be cancelled or held as treasury stock, rather than distributed to holders of Class 13a Interests in Chemtura Corporation. Also for the avoidance of doubt, in the event Class 13a Interests in Chemtura vote to reject the Plan, excess amounts in the Environmental Reserve and the Diacetyl Reserve will become part of the Disputed Claims Reserve and, if holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of excess Cash and New Common Stock in the Disputed Claims Reserve (if any).

Additionally, it is important to note that distributions, if any, to holders of Class 13a Interests in Chemtura Corporation will be determined based upon whether such Class votes to accept or reject the Plan, and not whether an individual holder of such Interest votes to accept or reject the Plan. Specifically, if a holder of a Class 13a Interest in Chemtura Corporation votes to accept the Plan, but Class 13a votes to reject the Plan, the holder who voted in favor the Plan will **not** receive a Pro Rata share of 5% of the New Common Stock and will not be afforded the opportunity to participate in the Rights Offering (which will not otherwise be effectuated in that instance). Similarly, the distribution of 5% of the New Common Stock to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to accept the Plan will be made to **all** holders of Class 13a Interests, regardless of how they voted, and not only to those holders of Interests in Chemtura Corporation who voted to accept the Plan.

### L.    I am a holder of an Interest in Chemtura.  What will I receive if I vote to reject the Plan?

If Class 13a Interests in Chemtura vote as a Class to reject the Plan, they will receive their pro rata share of value available for distributions after all Allowed Unsecured Claims have been paid in full in accordance with the terms of the Plan and the Disputed Claims Reserve has been established in accordance with the terms of the Plan. Specifically, recoveries for holders of Interests in Chemtura are subject to the outcome and resolution of several factors described throughout the Disclosure Statement, including the actual amount of Allowed Claims and the estimation of Diacetyl Claims.

Additionally, it is important to note that distributions, if any, to holders of Class 13a Interests in Chemtura Corporation will be determined based upon whether such Class votes to accept or reject the Plan, and not whether an individual holder of such Interest votes to accept or reject the Plan. Specifically, if a holder of a Class 13a Interest in Chemtura Corporation votes to accept the Plan, but Class 13a votes to reject the Plan, the holder who voted in favor the Plan will **not** receive a Pro Rata share of 5% of the New Common Stock and will not be afforded the opportunity to participate in the Rights Offering (which will not otherwise be effectuated in that instance). Similarly, the distribution of 5% of the New Common Stock to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to accept the Plan will be made to **all** holders of Class 13a Interests, regardless of how they voted, and not only to those holders of Interests in Chemtura Corporation who voted to accept the Plan.

The Plan provides that, in the event Class 13a votes to reject the Plan, each holder of an Interest in Chemtura Corporation shall receive its Pro Rata share of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of the Plan and the Plan Reserves have been established.

It is difficult to predict with certainty whether and to what extent holders of Class 13a Interests in Chemtura Corporation will receive a recovery in the event Class 13a votes to reject the Plan.  As described elsewhere in the Disclosure Statement, the distribution available for Class 13a in such an event will include New Common Stock and, to the extent the Plan Reserves exceed all Claims that are ultimately Allowed, may include an additional distribution in a combination of New Common Stock and Cash.  The Debtors estimate that the aggregate value of the distribution available to Class 13a if the class rejects the plan would be an equivalent of between 1.6% and 10.4% of the value of the New Common Stock.  For the avoidance of any doubt, the Debtors note that the estimated range of

43

recovery to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to reject the Plan, which the Debtors estimate to be from 1.6% to 10.4%, expressed as a percentage of New Common Stock, after all Unsecured Claims have been paid in full and appropriate reserves have been established, only indirectly takes into account possible recovery on account of follow-on distributions in the event that the Plan Reserves exceed the amount necessary to pay all Claims in full.

The value available for Class 13a if it rejects the Plan will depend on the amount of Allowed Claims. While some of the Claims against the Debtors will be Allowed or agreed in a fixed amount as of the Effective Date, other Claims are Disputed Claims for which the value is not now known and may not be known as of the Effective Date. Specifically, the Debtors are faced with numerous litigation claims and other unliquidated claims that are not expected to be fixed at the Effective Date. Under the Plan, the Debtors will ask the Bankruptcy Court to establish the Plan Reserves for three separate categories of disputed claims: the Diacetyl Reserve, the Environmental Reserve and the Disputed Claims Reserve. The amount of the Plan Reserves will determine the initial amount of New Common Stock available for distribution to Class 13a if it rejects the Plan, and the overall value of the Disputed Claims that ultimately become Allowed by the Bankruptcy Court will determine whether, and to what extent, there is any later distribution to Class 13a on account of excess Plan Reserves after all creditors have been paid in full.

The Debtors have calculated the estimated range of recoveries set forth above based on an estimate assuming the amount of Allowed Claims asserted against the Debtors to date is either high or low (*i.e.*, a "best case" or "worst case" scenario). The ultimate determination of whether such Claims will be Allowed against the Debtors, or the amount the Debtors must fund in the Plan Reserves pending allowance, depends on a number of complex factors, including the particular legal bases and factual circumstances underlying each Disputed Claim and the Bankruptcy Court's approach in establishing reserves for such claims. Among other things, the amount of the initial distribution of New Common Stock to Class 13a will depend on (a) the amount that the Bankruptcy Court determines must be reserved for Diacetyl Claims in the Diacetyl Reserve, (b) the amount, if any, of insurance coverage that has been determined as of the Effective Date, by settlement or litigation judgment, to be available for Diacetyl Claims, (c) the amount that the Bankruptcy Court determines must be reserved for Environmental Claims in the Environmental Reserve and (d) the amount that the Bankruptcy Court determines must be reserved for all other Disputed General Unsecured Claims, including both trade claims and non-diacetyl litigation claims, in the Disputed Claims Reserve. The Debtors currently estimate that the aggregate value of all Unsecured Claims (other than bank and bond claims) that must either be satisfied as of the Effective Date or included in the Plan Reserves will range from approximately $246.0 million to $320.4 million (excluding postpetition interest on such Claims). Ultimately, whether any excess value remains in the Plan Reserves after all Unsecured Claims have been either Allowed or Disallowed and all Allowed Claims have been paid in full will depend on the settlement or litigation of each Claim that is Disputed as of the Effective Date. Because of the inherent difficulty in predicting the approach by the Bankruptcy Court in establishing the Plan Reserves and in predicting the ultimate outcome of litigating Disputed Claims, the Debtors cannot say at this time whether and to what extent the total amount of Allowed Claims will ultimately fall within the estimated low or high ranges, or even exceed those amounts. Estimates of potential recoveries to holders of Class 13a Interests in Chemtura in the event Class 13a does not vote to accept the Plan are provided for **illustrative purposes only** in section I.I.C(iv)I.C(iv), on page 30, of this Disclosure Statement, entitled, "<u>Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan</u>."

Additionally, the form of consideration available to holders of Interests in Chemtura Corporation in the event Class 13a votes to reject the Plan depends on a number of considerations, including the actual amount of Allowed Diacetyl Claims and Allowed Environmental Claims as well as the amount of other Disputed Claims that are ultimately Allowed and satisfied from the Plan Reserves. On this point, it is important to note that the Plan provides that the Disputed Claims Reserve is funded with both Cash and New Common Stock, while the Environmental Reserve and the Diacetyl Reserve are both funded only in Cash. Thus, the ultimate combination of Cash and/or New Common Stock that holders of Class 13a Interests in Chemtura Corporation may receive (if any) in the event Class 13a votes to reject the Plan depends not only on the ultimate amount of Allowed Claims, but also the extent to which such Allowed Claims are Diacetyl Claims, Environmental Claims or other subsequently Allowed Claims that are satisfied from the appropriate Plan Reserve.

Although the Debtors are not able to provide more specific estimates at this time, the Debtors believe that the Plan's treatment of holders of Class 13a Interests in Chemtura Corporation in the event such Class votes to reject

44

the Plan is consistent with what such holders would otherwise be entitled to under applicable law, including the absolute priority rule contained in the Bankruptcy Code.

**M.    Will Chemtura Canada file a Plan of Arrangement with respect to the Canadian Case?**

No.  Rather than filing a Plan of Arrangement under the CCAA, Chemtura Canada will seek an order from the Canadian Court recognizing the entry of the Confirmation Order by the Bankruptcy Court under the terms of the CCAA following Confirmation by the Bankruptcy Court.

**N.    I am a creditor of Chemtura Canada.  How will I be affected by Chemtura Canada's reorganization in the United States and Canada?**

As described in section I of this Disclosure Statement, entitled "Executive Summary," all holders of Claims or Interests in Chemtura Canada *other than* holders of Diacetyl Claims will be Unimpaired (in other words, unaffected) by Chemtura Canada's reorganization process.  Generally, this means that all other holders of Claims or Interests will be paid in full in the ordinary course of business or otherwise permitted to pass through the reorganization process without their rights being affected.

**O.    What impact will the reorganization of Chemtura Canada have on the Debtors' business operations?**

Although there can be no guarantees, the Debtors anticipate that for several reasons Chemtura Canada's reorganization process will have a minimal effect on the Debtors' business operations overall.  First, the Debtors anticipate that Chemtura Canada's reorganization process will last only a short amount of time – roughly from the first part of August 2010 to the Confirmation Hearing.  Second, and as discussed throughout this Disclosure Statement, the only holders of Claims against Chemtura Canada that will be subject to the terms of the reorganization process are holders of Diacetyl Claims, which means that the Plan, if confirmed, will permit Chemtura Canada to satisfy other Claims in the ordinary course of business notwithstanding the reorganization process.  Last, as discussed in section VII.N of this Disclosure Statement, the Debtors will seek relief from the Bankruptcy Court and the Canadian Court early in the reorganization process authorizing the Debtors to satisfy and honor all Claims other than Diacetyl Claims in full in the ordinary course of business, notwithstanding the commencement of Chemtura Canada's Chapter 11 Case.  For all of these reasons, and with the caveat that there can be no guarantees at this time, the Debtors are confident that Chemtura Canada's reorganization will have minimal effect on the Debtors' business operations overall.

**P.    Is there potential litigation related to the Plan?**

Yes.  In the event that certain Classes of Claims and/or Interests vote to reject the Plan, the Debtors may nevertheless seek Confirmation.  In that case, the Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims or Interests if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  However, there may be litigation to determine whether the Bankruptcy Code requirements have been met.  For a more detailed discussion, see "Risk Factors — Risks Related to Confirmation," beginning on page 191.

**Q.    What is included in the solicitation packages to be sent to Claim and Interest holders who are eligible to vote on the Plan?**

All parties in interest will receive notice of the Confirmation Hearing, which is the hearing at which the Debtors will seek Confirmation.  Additionally, holders of Claims against and Interests in the Debtors who are eligible to vote on the Plan will receive appropriate solicitation materials that will contain important information about voting to accept or reject the Plan.  The solicitation materials and documents will include an appropriate form of ballot, a copy of the Disclosure Statement (in CD-ROM form), detailed instructions about voting on the Plan and a copy of the Disclosure Statement Order and the Solicitation Order.

K&E 17416258.15

The notices to be sent to parties in interest will state that this Disclosure Statement, the Plan and all of the exhibits thereto and related documents are available to any party free of charge from Kurtzman Carson Consultants LLC, the voting and claims agent retained by the Debtors in the Chapter 11 Cases, by:  (a) calling the Debtors' restructuring hotline at (866) 967-0261; (b) visiting the Debtors' restructuring website at: www.kccllc.net/chemtura; (c) e-mailing the Debtors at kcc_chemtura@kccllc.com; and/or (d) writing to Chemtura Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave., El Segundo, California 90245.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: https://ecf.nysb.uscourts.gov.  You should refer to the Solicitation Order, which is attached hereto as **Exhibit B**, with respect to any questions concerning solicitation of the Plan.

### R.      Will there be releases granted to parties in interest as part of the Plan?

Yes.  Under the Plan, each holder of a Claim or Interest will fully release and discharge from liability the following parties, which the Plan refers to individually as a "**Released Party**," and collectively, as the "**Released Parties**":

- the Debtors;

- New Chemtura;

- the Reorganized Debtors;

- the current and former directors and officers of the Debtors;

- the Creditors' Committee and the current and former members thereof, in their capacity as such;

- the Ad Hoc Bondholders' Committee and the current members thereof, in their capacity as such;

- the Indenture Trustees;

- the DIP Agent;

- the DIP Lenders;

- with respect to each of the parties identified above, their subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, affiliates and representatives in each case, only in their capacity as such; and

- the PBGC, its agents, attorneys and financial advisors.

The Plan includes a provision that provides that each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, New Chemtura, the Reorganized Debtors and the Released Parties, as of the Effective Date, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Additionally, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, New Chemtura, the Reorganized Debtors and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims,

K&E 17416258.15

asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, New Chemtura, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan and Disclosure Statement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth in Article XI of the Plan does not release any post-Effective Date obligations of any Released Party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, nor does it release any Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement. Additionally, nothing in the Chapter 11 Cases, the Confirmation Order, the Plan, the Bankruptcy Code (including section 1141 thereof) or any other document filed in the Chapter 11 Cases will in any way be construed to discharge, release, limit, or relieve the Debtors, the Reorganized Debtors, or any other party, in any capacity, from any liability or responsibility with respect to the U.S. Pension Plans or any other defined benefit plan under any law, governmental policy, or regulatory provision. PBGC and the U.S. Pension Plans shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code, or any other document filed in the Chapter 11 Cases.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, each of the Released Parties afforded value to the Debtors and aided in the reorganization process. The Debtors believe that the Released Parties played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.

Certain parties in interest, including the U.S. Trustee, have asserted that the releases contained in the Plan are overbroad and do not comport with applicable case law. The Debtors disagree and will defend the releases at the Confirmation Hearing. The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan to the extent the Bankruptcy Court does not approve the releases.

**S.**      **What is the deadline to vote on the Plan?**

5:00 p.m. (Eastern Daylight Time) on September 9, 2010.

**T.**      **How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot to be used for voting on the Plan, is being distributed to the holders of Claims and Interests entitled to vote on the Plan. If you are a holder of a Claim or Interest in Classes 1, 4a, 4b, 5, 6, 7, 8, 10, 11 and 13a you may vote for or against the Plan by completing the Ballot and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures.

The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC ("**KCC**") to serve as the Notice and Claims Agent and the voting agent for claims and to generally oversee the voting process (the "**Voting and Claims Agent**"). The Voting and Claims Agent will also process and tabulate Ballots for Classes 1, 4a, 4b, 5, 10 and 11. The Debtors have also engaged Epiq Bankruptcy Solutions LLC as their securities voting agent (the "**Securities Voting Agent**"). The Securities Voting Agent will process and tabulate Ballots for Classes 6, 7, 8 and 13a.

K&E 17416258.15

---

**DELIVERY OF BALLOTS**

Ballots must be **actually** **received** by the Voting and Claims Agent or Securities Voting Agent, as appropriate, by the Voting Deadline of 5:00 p.m. Eastern Daylight Time on September 9, 2010 at the following addresses:

*Voting and Claims Agent:*
*[For Classes 1, 4a, 4b, 5, 10 and 11]*

Chemtura Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California  90245

* * * * * * *

*Securities Voting Agent:*
*[For Classes 6, 7, 8 and 13a]*

Chemtura Ballot Processing
c/o Epiq Bankruptcy Solutions LLC
757 Third Avenue, 3rd Floor
New York, New York 10017

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a Ballot before the Voting Deadline.

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

**(866) 967-0261**

---

More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims and Interests that are entitled to vote on the Plan, as well as being set forth in the Voting and Tabulation Procedures.  For your vote to be counted, your Ballot must be completed, signed and **actually** **received** by 5:00 p.m. by the Voting and Claims Agent or the Securities Voting Agent, as applicable, on the Voting Deadline, September 9, 2010.

Any Ballot that is properly executed by the holder of a Claim or Interest, but which does not clearly indicate either an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will **not** be counted.

Each holder of a Claim or Interest may cast only one Ballot per each Claim or Interest held.  It is important to follow the specific instructions provided on each Ballot.  For information regarding voting, see the section herein entitled "Voting on the Plan," which begins on page 183 as well as the Voting and Tabulation Procedures included in the Disclosure Statement Order, which is attached here to as **Exhibit B**.

U.      **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation and be heard at the Confirmation Hearing.

V.      **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for September 16, 2010 to take place at [9:45] a.m. (Eastern Daylight Time) before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York,

K&E 17416258.15

New York 10004-1408, Sixth Floor.  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

W.      **What is the deadline to object to Confirmation?**

Objections to Confirmation must be filed and served on the Debtors, and certain other parties in interest, so that they are **actually received** no later than September 9, 2010 at 4:00 p.m. (Eastern Daylight Time) in accordance with the requirements set forth in the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit B**.  Unless objections to Confirmation are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

X.      **What is the purpose of the Confirmation Hearing?**

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  The confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the effective date of a plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Y.      **What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan.  In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of Claims (and, to the extent applicable, Interests) are accomplished pursuant to the Plan.  *See* Article XIV of the Plan.

Z.      **What is the effect of Confirmation on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article XII of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, New Chemtura and each other Reorganized Debtor may operate its business and, except as otherwise provided by the Plan, may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

In the event that the Plan is not consummated, the Plan will be null and void in all respects.  Accordingly, any settlement or compromise, distribution on account of any Claim or, if applicable, Interest, assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void.

AA.     **Will any party have significant influence over the corporate governance and operations of New Chemtura and the other Reorganized Debtors?**

Yes.  On the Effective Date, the New Board will consist of nine directors, one of which will be the chief executive officer.  The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee will establish a board selection committee to select eight members of the New Board in addition to the chief executive officer.  The board selection committee, which will be advised by an independent search firm, will be charged with working together to try to reach consensus upon a list of the members of the New Board of Chemtura.  In the event, however, that consensus is not reached by the board selection committee, the Creditors' Committee and the Ad Hoc Bondholders' Committee shall, together, be entitled to designate six members of the New Board and the Debtors

49

will be entitled to designate two members of the New Board of Chemtura. Each designated member of the New Board will meet minimum eligibility requirements consistent with service on the board of a public company of comparable size to New Chemtura and the other Reorganized Debtors, with such minimum requirements to be identified by the independent search firm advising the board selection committee.

To the extent known, the identity of the members of the New Boards of New Chemtura and of each of the Reorganized Debtors and the nature and compensation for any member of a New Board who is an "insider" under section 101(31) of the Bankruptcy Code will be identified in the Plan Supplement but, in any event, shall be disclosed at or before the Confirmation Hearing.

**BB.    I am a holder of a Diacetyl Claim. How am I affected by the Plan and the reorganization of Chemtura Canada?**

As discussed in section VII.N, entitled "<u>Anticipated Developments Regarding Chemtura Canada Before Confirmation</u>" in the event Chemtura Canada commences a Chapter 11 Case, the Debtors will seek an order from the Bankruptcy Court deeming all Proofs of Claim filed against Chemtura as filed against Chemtura Canada on account of Diacetyl Claims. Distributions to holders of Allowed Diacetyl Claims will be in made in accordance with the Plan. Specifically, each holder of an Allowed Diacetyl Claim will be entitled to receive payment from applicable insurance. The portion of any Allowed Diacetyl Claim that is not covered by insurance, including self-insured retention amounts and deductibles, will be satisfied by distributions from the reserve to be created by the Debtors, to hold a contribution of Cash from Chemtura and Chemtura Canada. To the extent that an Allowed Diacetyl Claim is not an Insured Claim, such Allowed Diacetyl Claim will be satisfied by distributions from the reserve to be created by the Debtors, to hold a contribution of Cash from Chemtura and Chemtura Canada.

Additionally, each holder of a Diacetyl Claim will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged Chemtura Canada from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), consisting of, based on or relating to, or in any manner arising from, in whole or in part, any Diacetyl Claim.

For purposes of clarity, the Debtors' restructuring strategy with respect to Chemtura Canada is only to address the Diacetyl Claims already asserted against Chemtura Corporation. As noted, the Debtors will, in the event Chemtura Canada commences a Chapter 11 Case, seek to have all of the Diacetyl Claims already filed against Chemtura Corporation deemed to be filed against Chemtura Canada, and the Debtors do not intend to set a new bar date with respect to Claims against Chemtura Canada. Accordingly, the Debtors do not expect the filing of Chemtura Canada to increase the amount of Diacetyl Claims presently asserted in the Chapter 11 Cases.

**CC.    Do the Debtors recommend voting in favor of the Plan?**

Yes. It is the Debtors' opinion and belief that the Plan provides for a larger distribution to the Debtors' creditors and, potentially, Interest holders than would result from any other available alternative. The Debtors believe the Plan, which contemplates refinancing and/or a significant deleveraging, is in the best interests of all holders of Claims and Interests. Any other alternative, including a sale of substantially all of the Debtors' assets or liquidation under chapter 7 of the Bankruptcy Code, would realize lesser value than the value to be afforded under the Plan. Thus, the Debtors recommend that holders of Claims and Interests who are entitled to vote on the Plan vote to accept it.

K&E 17416258.15

# IV.
# CHEMTURA'S HISTORY

### A.    Company Overview

The Debtors and approximately 140 Non-Debtor Affiliates located world-wide (collectively with the Debtors, the "**Company**") are a global diversified producer of specialty chemicals, polymer products and crop protection chemicals and leading U.S. suppliers of pool and spa chemicals.  The majority of the Company's chemical products are sold to industrial manufacturing customers for use as additives, ingredients or intermediates that add value to their end products.  The Company's agrochemical products are sold through dealers and distributors to growers, while the pool and spa chemicals are sold through local dealers, large retailers and mass merchants.  The Company is a market leader in several of its key product lines.

Chemtura, incorporated in Delaware in 1999, is the successor to Crompton & Knowles Corporation ("**C&K**"), which was incorporated in 1900 and engaged in the manufacture and sale of specialty chemicals beginning in 1954.  C&K traces its roots to the Crompton Loom Works, which was incorporated in the 1840s.  In 1996, C&K acquired Uniroyal Chemical Company, Inc.  In 1999, C&K merged with Witco Corporation ("**Witco**") and became CK Witco Corporation.  In 2000, CK Witco Corporation changed its name to Crompton Corporation.  In 2005, Crompton Corporation acquired Great Lakes Chemical Corporation ("**GLCC**") and several of its affiliates and subsidiaries.  Concurrently with the acquisition of GLCC, Crompton changed its name to Chemtura, which is a Debtor in the Chapter 11 Cases and the direct or indirect parent of each of the other 26 Subsidiary Debtors.

### B.    Organizational Structure

### (i)    Overview of Debtors' Organizational Structure

The chart below details the Debtors' prepetition organizational structure (excluding Non-Debtor Affiliates and Chemtura Canada).  For additional information with respect to the ownership structure of Chemtura Canada, see section IV.D of this Disclosure Statement, entitled "Additional Disclosure with Respect to Chemtura Canada's History and Operations."



K&E 17416258.15

(ii)     *The Debtors' Non-Debtor Affiliates and Subsidiaries*

As discussed above, the Company includes the Debtors as well as numerous affiliates, subsidiaries and joint ventures of the Debtors that are not debtors in the Chapter 11 Cases.  These include domestic U.S. entities, as well as entities located in the rest of North America and in South America (*e.g.*, Canada, Mexico, Argentina, Ecuador, Colombia, Brazil and Chile), Europe, the Middle East and Africa (*e.g.*, England, France, Germany, Netherlands, Italy, Saudi Arabia, South Africa and Switzerland) and the Asia/Pacific region (*e.g.*, Australia, China, India, Singapore, Taiwan and Thailand).  Attached as __Exhibit C__ to this Disclosure Statement is an organizational chart summarizing the Company's corporate structure, including the Debtors and their Non-Debtor Affiliates and subsidiaries, as of May 31, 2010.

C.     **Prepetition Capital Structure**

(i)     *Overview*

As of the Petition Date, the Debtors had funded debt facilities in place with a face amount of approximately $1.37 billion, including:  (a) a $350 million revolving credit facility, including a letter of credit facility, with a maturity date of July 2010 (as amended, the "**Prepetition Credit Facility**"); (b) $370 million in principal amount outstanding under certain 7% unsecured notes due July 16, 2009 (the "**2009 Notes**"); (c) $500 million in principal amount outstanding under certain 6.875% unsecured notes due June 1, 2016 (the "**2016 Notes**"); and (d) $150 million in principal amount outstanding under certain 6.875% debentures due February 1, 2026 (the "**2026 Notes**," and collectively with the 2009 Notes and 2016 Notes, the "**Notes**").  The Company also had off-balance sheet accounts receivable facilities under which they had received proceeds from the sale of their accounts receivable.  Chemtura Canada is not an issuer, borrower or guarantor of the outstanding obligations under the Prepetition Credit Facility or the Notes.

The chart below summarizes the Debtors' prepetition indebtedness, including approximate outstanding amounts as of the Petition Date.  Further detail with respect to each category of debt obligation is provided below.

| Debt Obligation | Original Principal Amount | Approximate Principal Amount Outstanding[22] as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|---|
| Prepetition Credit Facility | $350 million | $272 million[23] | July 2010 | Secured ($139.2 million)[24]  Unsecured ($132.8 million) |
| 2009 Notes | $400 million | $370 million | July 2009 | Unsecured |
| 2016 Notes | $500 million | $500 million | June 2016 | Unsecured |
| 2026 Notes | $270 million | $150 million | February 2026 | Unsecured |

(ii)     *Prepetition Credit Facility*

The Debtors other than Chemtura Canada entered into the Prepetition Credit Facility in July 2005 (the "**Original Credit Agreement**") in connection with the consummation of Crompton Corporation's acquisition of

---

[22]   These amounts exclude any unamortized discounts, premiums or interest.

[23]   Includes approximately $90 million in issued and outstanding letters of credit as of the Petition Date.

[24]   As discussed in greater detail in section VI.B of this Disclosure Statement, the Debtors conditionally repaid $86.5 million of the outstanding amount of the secured portion of the debt under the Prepetition Credit Agreement following the Petition Date.  The Creditors' Committee Action sought, among other things, to unwind such repayment.

K&E 17416258.15

GLCC and certain of its subsidiaries and affiliates.  The Prepetition Credit Facility is evidenced by an amended and restated credit agreement, dated as of July 31, 2007, among Chemtura and certain of its domestic subsidiaries, as borrowers, Citibank, N.A., as agent (the "**Prepetition Administrative Agent**"), and certain lenders thereto (the "**Prepetition Lenders**").  The obligations under the Prepetition Credit Facility were unconditionally guaranteed on a joint and several basis by Chemtura and certain of its domestic subsidiaries (collectively, the "**Subsidiary Credit Facility Guarantors**").[25]  Each of the Subsidiary Credit Facility Guarantors is a Debtor in the Chapter 11 Cases.

The obligations under the Prepetition Credit Facility were originally unsecured.  The Original Credit Agreement provided, however, that at any time in which the Debtors' non-credit enhanced long-term senior unsecured debt was rated at or lower than a rating of BB+ by Standard and Poor's or Ba2 by Moody's Investors Services, Chemtura and each of the Subsidiary Credit Facility Guarantors would be required to provide a security interest in the stock of their first tier subsidiaries and other equity interests (limited to 66% of the voting stock of Chemtura's first-tier foreign subsidiaries) to the Prepetition Administrative Agent to secure the outstanding obligations under the Original Credit Agreement (the "**Original Collateral**").

This provision requiring posting of the Original Collateral was invoked in May 2007, following a downgrade of the Debtors' long-term unsecured debt.  As a result, Chemtura and the Subsidiary Credit Facility Guarantors were required to provide (and did provide) interests in the Original Collateral to the Prepetition Lenders to secure the outstanding obligations under the Original Credit Agreement (the "**Original Pledge and Security Agreement**").

In July 2007, Chemtura, the Subsidiary Credit Facility Guarantors and the Prepetition Lenders amended and restated the Original Pledge and Security Agreement and the Original Credit Agreement (the "**First Amended Credit Agreement**") to provide for a cap on the amount of the secured obligations granted thereunder.  This cap, which was designed to avoid the trigger of certain lien covenants in the Notes, provided that the value of the security interest in favor of the Prepetition Lenders would at all times be less than the lowest threshold that would trigger an "equal and ratable" security interest for note holders under the provisions of the lien covenants set forth in the Indentures, as supplemented, for the Debtors' outstanding Notes.

In December 2008, in an effort to prevent the Debtors from breaching financial covenants contained in the First Amended Credit Agreement, Chemtura, the Subsidiary Credit Facility Guarantors, the Prepetition Administrative Agent and the Prepetition Lenders entered into an amendment and waiver to the First Amended Credit Agreement (the "**Credit Agreement Waiver**" and, to the extent of permanent amendments to the First Amended Credit Agreement, the "**Prepetition Credit Agreement**").  The Credit Agreement Waiver provided for, among other things, a waiver of the Debtors' compliance with certain financial covenants and events of default under the Prepetition Credit Agreement for the period beginning December 30, 2008 and ending March 30, 2009 (the "**Waiver Period**") and a two percent increase in the interest rate under the Prepetition Credit Agreement for the Waiver Period.[26]

The Credit Agreement Waiver also effectuated several permanent changes to the terms and conditions governing the collateral securing the outstanding obligations under the Prepetition Credit Agreement.  Included in these permanent changes was the requirement that Chemtura and the Subsidiary Credit Facility Guarantors hold all Cash in an aggregate amount of more than $500,000 in either a deposit account with the Prepetition Administrative Agent (or an affiliate thereof) or an account subject to an account control agreement in favor of the Prepetition Administrative Agent.

Furthermore, in connection with the execution of the Credit Agreement Waiver, Chemtura and the Subsidiary Credit Facility Guarantors also amended and restated the Original Pledge and Security Agreement (the

---

[25]  The Subsidiary Credit Facility Guarantors include every Debtor except for Chemtura Corporation or Chemtura Canada.

[26]  The Credit Agreement Waiver provided that outstanding advances under the Prepetition Credit Agreement could not exceed $190 million for the period beginning February 1, 2009 and ending March 30, 2009 and letters of credit could not exceed $97 million until the end of the Waiver Period.  Additionally, the Credit Agreement Waiver limited the Debtors' ability to take certain actions during the Waiver Period, including incurring certain debt and liens, disposing of certain assets, making certain investments, paying cash dividends and repurchasing equity.

K&E 17416258.15

"**Prepetition Security Agreement**").  Pursuant to the Prepetition Security Agreement, Chemtura and the Subsidiary Credit Facility Guarantors each granted a security interest in each of their respective interests in the Original Collateral, as well as all their "inventory" (as such term is defined under the New York Uniform Commercial Code), to the Prepetition Administrative Agent for the ratable benefit of the Prepetition Administrative Agent and the Prepetition Lenders.  The Prepetition Credit Agreement continued to provide that the value of the security interest in favor of the Prepetition Lenders would at all times be less than the lowest threshold that would trigger an "equal and ratable" security interest in the collateral under the provisions of the lien covenants set forth in the Indentures, as supplemented, for each of the Debtors' outstanding Notes.  Accordingly, a portion of the indebtedness under the Prepetition Credit Agreement is unsecured.

As is discussed in section VI.B of this Disclosure Statement, after the Petition Date and in connection with the Debtors' entry into their initial postpetition financing facility, the Debtors conditionally repaid $86.5 million of the outstanding amount of the secured portion of the debt under the Prepetition Credit Agreement.

Additionally, as discussed in section VII.I(iv) of this Disclosure Statement, the Creditors' Committee commenced litigation during the Chapter 11 Cases challenging, among other things, the Debtors' repayment of a portion of this debt.

### (iii)    *The Unsecured Notes*

As of the Petition Date, the Debtors (other than Chemtura Canada) had an aggregate of approximately $1.02 billion in principal amount of unsecured Notes outstanding.

### a.    Overview of the 2009 Notes and 2026 Notes

GLCC, a wholly owned subsidiary of Chemtura, issued the 2009 Notes in July 1999, before its acquisition by Crompton Corporation in 2005 (the "**GLCC Transaction**").  The 2009 Notes, with a stated maturity date of July 15, 2009, are governed by an Indenture, dated as of July 16, 1999, by and between GLCC and J.P. Morgan Trust Company, N.A., as successor trustee to The First National Bank of Chicago, which indenture was supplemented on July 1, 2005 (as further described below) (the "**2009 Notes Indenture**").  Currently, The Bank of New York Mellon Trust Company serves as the indenture trustee for the holders of the 2009 Notes [Docket No. 427].

The 2026 Notes are obligations of Chemtura, as successor in interest to Witco.  The 2026 Notes, with a stated maturity date of February 1, 2026, are governed by an Indenture, dated as of February 1, 1993, by and among Witco (as predecessor in interest to Chemtura) and Manufacturers and Traders Trust Co. and U.S. Bank National Association, as successor trustees to The Chase Manhattan Bank, N.A., as amended by a First Supplemental Indenture, dated as of February 1, 1996, a Second Supplemental Indenture, dated as of August 31, 1999, a Third Supplemental Indenture, dated as of August 5, 2004 and a Fourth Supplemental Indenture, dated as of July 1, 2005 (as further described below) (the "**2026 Notes Indenture**").  Currently, Manufacturers & Traders Trust Co. serves as successor indenture trustee for the holders of the 2026 Notes [Docket No. 818].

In connection with the consummation of the GLCC Transaction, on July 1, 2005, certain of the Debtors, including Chemtura, entered into supplemental indentures with the applicable trustee to the 2009 Notes and the 2026 Notes (collectively, the "**Supplemental Indentures**").  Pursuant to the Supplemental Indentures, certain of Chemtura's domestic subsidiaries each provided a subsidiary guaranty to both the 2009 Notes and the 2026 Notes (each a "**2009/2026 Subsidiary Guaranty**" and, collectively, the "**2009/2026 Subsidiary Guarantees**").  Additionally, the Supplemental Indenture for the 2009 Notes provides for a guaranty by Chemtura of the 2009 Notes.

The Supplemental Indentures further provided that the respective 2009/2026 Subsidiary Guarantees were to be automatically and unconditionally released upon the repayment of Chemtura's 9⅞% Senior Notes due 2012 and the Senior Floating Rate Notes due 2010 (together, the "**Chemtura Senior Notes**"), as successor in interest to Crompton Corporation.  The Chemtura Senior Notes were no longer outstanding as of the Petition Date.  Accordingly, the 2009 Notes and the 2026 Notes are not subject to any of the 2009/2026 Subsidiary Guarantees.

54

As of the Petition Date, Chemtura and GLCC were the only Debtors obligated on the 2009 Notes. Additionally, Chemtura is the only Debtor obligated on payment of the 2026 Notes.

### b.    Overview of the 2016 Notes

The 2016 Notes, with a stated maturity date of June 1, 2016, are governed by an Indenture, dated as of April 24, 2006, by and among Chemtura, as issuer, certain of its wholly owned domestic subsidiaries, as guarantors, and Wells Fargo Bank, N.A., as trustee, and later amended by a Supplemental Indenture, dated as of February 11, 2009 (the "**2016 Notes Indenture**"). Currently, U.S. Bank National Association serves as the successor indenture trustee to Wells Fargo Bank, N.A. for the holders of the 2016 Notes.

The 2016 Notes are jointly and severally, fully and unconditionally guaranteed by Chemtura and each of the other Debtors, other than Chemtura Canada to the extent it commences a Chapter 11 Case.

### (iv)    *Common Stock and Preferred Stock*

Chemtura is authorized to issue 500 million shares of $0.01 par value stock common stock, of which 254.1 million shares were issued and 11.5 million shares were held as treasury stock as of the Petition Date. Chemtura is also authorized to issue 300,000 shares of preferred stock without par value. No such shares are outstanding.

On February 17, 2009, Chemtura was notified by the New York Stock Exchange ("**NYSE**") that it was no longer in compliance with the NYSE's listing rules. Effective March 18, 2009, the NYSE suspended trading of Chemtura's common stock. The NYSE delisted Chemtura's common stock on April 16, 2009; the stock has continued to trade, however, on the Pink Sheets (CEMJQ) during the course of the Chapter 11 Cases.

### (v)    *Receivables Facilities*

### a.    The U.S. Accounts Receivable Facility

Historically, the Company has relied on various sources of liquidity to fund its operations and service its debt obligations, including, among others, the sales of accounts receivables into domestic and foreign accounts receivable facilities. Following the execution of the Credit Agreement Waiver in December 2008, the Debtors were provided financing through the sale and securitization of certain domestic accounts receivable pursuant to (a) the Receivables Sale Agreement, dated as of January 23, 2009, among Chemtura, GLCC, GLCC Laurel, LLC and BioLab, Inc., as sellers and Chemtura Receivables LLC ("**Chemtura Receivables**"), as the buyer (the "**U.S. Accounts Receivable Sale Agreement**"); and (b) the Receivables Purchase Agreement, dated as of January 23, 2009, among Chemtura Receivables, as the seller, Chemtura, as the servicer, Citicorp USA, Inc., as the agent, Citigroup Global Markets Inc., as the arranger, The Royal Bank of Scotland Plc and certain purchasers (the "**U.S. Accounts Receivable Purchase Agreement**," and, together with the U.S. Accounts Receivable Sale Agreement, the "**U.S. Accounts Receivables Facility**").

Under the U.S. Accounts Receivables Facility, receivables generated by the Debtors' main operating entities – Chemtura, GLCC, GLCC Laurel, LLC and BioLab, Inc. – were sold to Chemtura Receivables, which is a special purpose, bankruptcy remote affiliate of the Debtors that is wholly owned by Chemtura and is not a Debtor. Upon receipt of such receivables, Chemtura Receivables sold ownership interests in the receivables to the participating purchasers pursuant to the U.S. Accounts Receivable Purchase Agreement. The U.S. Accounts Receivable Purchase Agreement further provided that purchasers were granted a security interest in all of the receivables owned by Chemtura Receivables.[27]

---

[27]    Additionally, Chemtura granted the Prepetition Administrative Agent a lien and security in 100% of Chemtura's ownership interests in Chemtura Receivables. The Creditors' Committee Action sought, among other things, to avoid Chemtura's granting of such lien.

As discussed in section VI.B of this Disclosure Statement, the Debtors unwound the U.S. Accounts Receivables Facility early in their Chapter 11 Cases in connection with the Debtors' entry into their initial postpetition financing facility with the re-purchase of $117.2 million in accounts receivable.

### b.  The European Accounts Receivable Facility

In addition to the U.S. Accounts Receivable Facility, certain of the Company's European subsidiaries (collectively, the "**European Accounts Receivable Subsidiaries**") participated in a program to sell certain of their eligible accounts receivable (the "**European Accounts Receivable Facility**"). The European Accounts Receivable Facility was evidenced by several factoring agreements entered into by and among the European Accounts Receivable Subsidiaries and Intesa Mediofactoring SpA ("**Mediofactoring**") (as amended from time to time, the "**European Accounts Receivable Agreement**").

Pursuant to the European Accounts Receivable Facility, the European Accounts Receivable Subsidiaries sold their accounts receivable to Mediofactoring in exchange for an amount equal to the face value of the receivables (or the amount that would actually be owed under the receivables after deducting certain identified discounts), with interest to the extent the amount for the purchase of receivables is paid before such receivable is actually collected.

As a result of the Debtors' declining financial performance in the fourth quarter of 2008, the Company's access to liquidity was limited under both its domestic and foreign accounts receivable facilities. The Debtors' credit ratings limited the cash the Company obtained from accounts receivable sold and purchased under its U.S. Accounts Receivable Facility. Similarly, Mediofactoring, the provider of the Company's European Accounts Receivable Facility, imposed restrictions in the European Accounts Receivable Subsidiaries' ability to sell accounts receivable under the facility. As a result of the restricted availability under this facility, the Debtors sought to obtain additional liquidity by attempting to negotiate an amendment to the European Accounts Receivable Facility that would permit the facility to continue; however, as discussed in section VI.B below, entitled "Initial Financing Orders," those efforts were unsuccessful.

### D.  Additional Disclosure with Respect to Chemtura Canada's History and Operations

#### (i)  History

Chemtura Canada is the successor to Crompton Co./Cie, a corporation organized under the laws of Nova Scotia, Canada. Crompton Co./Cie, which was formerly known as Uniroyal Chemical Co./Cie, is the result of a December 30, 2000 merger of Uniroyal Chemical Co./Cie, Witco Canada, Inc. and Witco Dominion Financial Services Company Ltd.

#### (ii)  Organizational Structure

Chemtura Canada is a wholly owned indirect subsidiary of Chemtura. Additionally, as indicated below, Chemtura Canada directly or indirectly owns several subsidiaries that operate, among other countries, in Italy (Chemtura Italy S.r.l.), Brazil (Chemtura Industria Quimica da Brasil Ltda.) and India (Unimers India Ltd.). The following chart details Chemtura Canada's place in the Company's organizational structure:

K&E 17416258.15



### (iii)    Business Operations

Chemtura Canada is part of the Company's globally diversified specialty chemicals business, with operations in the Company's Industrial Performance Products segment and Chemtura AgroSolutions™ Engineered Products segment.  In 2009, Chemtura Canada had sales of approximately $220 million (Canadian dollars) and income after tax of approximately $7 million (Canadian dollars).  Chemtura Canada owns several facilities in Canada, including manufacturing plants located in Elmira, Ontario and West Hill, Ontario.  Additional disclosure with respect to the Company's operations overall is provided in section VII.C of this Disclosure Statement, entitled "Development of the Debtors' Long-Range Business Plan."

As discussed in section V.D(ii) of this Disclosure Statement, entitled "Litigation Relating to Diacetyl Claims," from 1982 to 2005, Chemtura Canada manufactured and sold diacetyl – a butter flavoring ingredient that was widely used in the food industry before 2005 – to certain customers in the United States.  During this time, Citrus & Allied Essences, Ltd. ("**Citrus**"), a flavoring manufacturer, distributor and supplier of specialty flavoring ingredients, was the exclusive reseller of diacetyl manufactured by Chemtura Canada for the United States market. While Chemtura Canada always produced the diacetyl, Chemtura acted as an intermediary between 1998 and 2005, purchasing diacetyl from Chemtura Canada and then selling the diacetyl to U.S. customers, including Citrus.

**V.**
**EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES**

The following is a general description of factors that led to the commencement of the Chapter 11 Cases in March 2009. Because Chemtura Canada did not file for bankruptcy protection in March 2009, only section V.D(ii). below regarding legacy liabilities for Diacetyl Claims is applicable to Chemtura Canada.

**A.      Adverse Market Conditions**

The Company operates in a number of highly competitive industries that, before and after the Petition Date, were struggling in the midst of a sustained global recession, which caused the Debtors' business fundamentals to deteriorate. Among the deteriorating indicators were sharp declines in demand for products and restricted access to credit. In addition, for much of 2008, the chemicals industry experienced rapid inflation in the costs of its raw material, energy and freight. While the inflation in input costs started to abate before the Petition Date, the Company was not able to benefit from the cost decline due to sharp reductions in demand for the Company's products and a related decline in its purchases of raw materials. These macroeconomic factors harmed the Company's business operations — and those of its competitors — by significantly decreasing demand, resulting in lower manufacturing output and higher manufacturing variances. All of these factors contributed to an unprecedented decline in the Company's operating profitability and its access to liquidity.

The Company reported a net loss of $690 million for the fourth quarter of 2008 and a net loss of $973 million for the 2008 fiscal year. As but one example, the Company's former Polymer Additives segment (which after the Petition Date became the Industrial Engineered Products segment after transferring the plastic antioxidants business to the newly formed Industrial Performance Products segment) accounted for approximately 45% of total net revenues in 2008, and saw a reduction of 35% in revenues against the same period in 2007, as customers experienced or anticipated declines in demand, implemented temporary plant shutdowns in response to those changing demands and targeted their own inventory reductions. Similarly, the Company's former Performance Specialties segment (which after the Petition Date became part of the newly formed Industrial Engineered Products segment), accounted for approximately 28% of the Company's net sales in 2008, and saw a decrease in operating profit of 32% in the fourth quarter of 2008 compared to the same period in 2007 as a result of customers reducing or canceling orders and the resulting impact on its manufacturing operations.

**B.      Liquidity Constraints**

The Company has traditionally relied on various sources of liquidity to fund operations and service debt obligations, including cash generated from operations, reductions in cash on hand, borrowings under credit facilities, sales of accounts receivable, including sales under the U.S. Accounts Receivable Facility and the European Accounts Receivable Facility, net proceeds from asset sales and access to the financial capital markets. The deepening recession and the commensurate decline in the Company's financial performance during the fourth quarter of 2008 significantly constrained the Company's ability to access these sources of liquidity.

Moreover, although the Credit Agreement Waiver provided the Debtors with additional time to explore strategic financial alternatives, including the potential sale of certain business assets or segments, it contained conditions that limited the Debtors' liquidity. Specifically, the Credit Agreement Waiver provided that outstanding advances under the Prepetition Credit Agreement could not exceed $190 million and letters of credit could not exceed $97 million for the period from February 1, 2009 until the end of the Waiver Period. Additionally, the Credit Agreement Waiver limited the Debtors' ability to take certain actions during the Waiver Period, including incurring debt or liens, selling assets, making investments, paying cash dividends and repurchasing equity.

As discussed in section IV.C of this Disclosure Statement, downgrades in the Company's credit ratings further constrained the Debtors' access to liquidity by limiting the cash obtained from accounts receivable sold and purchased under its U.S. Accounts Receivable Facility. Moreover, the deterioration of the Debtors' financial performance also caused the provider of the European Accounts Receivable Facility to restrict sales of accounts receivable under that facility.

The Company's restricted access to liquidity placed significant stress on business operations, including the Company's relationships with specialized third-party vendors and suppliers that were crucial for ordinary course

58

operations.  Because of the demands inherent in the highly complex and competitive chemical manufacturing industry, the Company generally relies on suppliers and vendors uniquely qualified to handle hazardous materials and navigate the just-in-time logistics associated with its operations and customers' demands.  As a result of sharp declines in the Company's financial performance during the fourth quarter of 2008, trade vendors imposed tightened credit terms that the Company was increasingly unable to meet and the Company's access to goods and services from vendors and suppliers became increasingly constrained.

The Debtors' restricted access to both cash and trade credit strained their supply chain nearly to or, in some cases beyond, the breaking point before the Petition Date.  With dwindling liquidity, the Debtors were not able to keep their trade payments current.  This caused vendors to further restrict the credit they provided to the Debtors and the goods and services they were prepared to supply.  As a result, the Debtors experienced serious supply interruptions in some areas of their business.  In certain instances, the Debtors were required to slow down or even interrupt production at some facilities.  The levels and frequency of interruptions increased progressively each week before the Petition Date, and therefore, broader customer relationships were negatively impacted.

Indeed, the Debtors estimate that they had approximately $6 million of cash on hand as of the Petition Date.

### C.    Looming Debt Maturities and Potential Defaults

Pending maturities of, and potential defaults under, certain of the Debtors' prepetition debt obligations compounded the difficulties associated with the sharp deterioration in the Debtors' financial performance in 2008 and their ongoing liquidity constraints.  Specifically, the Debtors' 2009 Notes were due and payable on July 15, 2009.  Additionally, the Debtors were not in a position to comply with covenants in the Prepetition Credit Agreement upon the expiration of the Credit Agreement Waiver on March 30, 2009, and therefore, would likely have defaulted under the Prepetition Credit Agreement.  Such a default would have triggered certain cross-default provisions contained in the Debtors' other debt instruments, including the Indentures governing the Notes.

In light of the crisis in the financial markets, in the late summer and autumn of 2008, the Company concluded that it could no longer rely upon a refinancing transaction in the debt capital markets to address the maturity of the 2009 Notes in July 2009.  In October 2008, the Company began exploring potential sales of certain of their business assets, which the Company believed could generate the cash needed to repay the 2009 Notes at maturity.  These efforts included the potential sale of the Company's Chemtura AgroSolutions[TM] Engineered products business "**Chemtura AgroSolutions[TM] Products**" f/k/a "Crop Protection Engineered Products") and the Petroleum-Additives business.  Initial buyer interest in each of these potential sales was strong, with attractive initial expressions of value.  A number of well-qualified buyers performed due diligence on each business segment and spent significant time and expense in the pursuit of a transaction.

Despite the initial strong reaction to a potential asset sale, those efforts ultimately proved to be unsuccessful due to the continuing recession, the Debtors' fragile condition and general uncertainty in the credit markets.  Thus, the Company concluded that a sale was unlikely to be closed in sufficient time to offset the continued deterioration in the Company's liquidity position or provide a net value that would permit the Debtors to address in full their debt maturities and liquidity needs.

### D.    Legacy Liabilities

As of the Petition Date, the Debtors were subject to various legacy liabilities related to environmental remediation, certain litigation actions, including litigation relating to Diacetyl Claims, and pension and other post-retirement benefits expenses.

#### (i)    Environmental Liabilities

Before the Petition Date, the Debtors were performing or paying for remediation activities at, or were involved in various claims, litigation, administrative proceedings and investigations in a number of jurisdictions, related to environmental liabilities for sites currently owned and/or operated by the Debtors and certain "legacy" sites.  The "legacy" sites include previously owned or operated sites that are no longer owned or operated by the

Debtors and third-party sites that have never been owned or operated by the Debtors to which the Debtors or their predecessors are alleged to have sent waste or other materials.  Specifically, the Debtors or their predecessors formerly owned or conducted operations at approximately 84 properties and facilities in 22 states in addition to approximately 113 sites that are and have always been owned and operated by unaffiliated third parties for which the Debtors may also have liability.

Additionally, before the Petition Date, the United States Environmental Protection Agency had alleged violations of the Clean Air Act and the Clean Water Act and penalties in excess of $100,000 for the Debtors' actions at their warehouse in Conyers, Georgia and a fire that occurred there on May 25, 2004.  Separately, the Debtors and certain of their former officers and employees were named as defendants in six putative class action lawsuits and in fifteen lawsuits filed by individual or multi-party plaintiffs in the Georgia and Federal courts relating to the fire at the Conyers warehouse.  Similarly, as of the Petition Date, Tricor Refining, LLC ("**Tricor**") had commenced an action against Chemtura, alleging that Chemtura had failed to comply with its contractual obligations relating to environmental liabilities with respect to property that Chemtura previously sold to a third party and which was subsequently acquired by Tricor.

As discussed in section VII.I(i) below, the Debtors have taken several actions to address these and other environmental liabilities during the course of their Chapter 11 Cases.

### (ii)    *Litigation Relating to Diacetyl Claims*

Before the Petition Date, Chemtura distributed, and one of its affiliates produced diacetyl, a butter flavoring ingredient that was widely used in the food industry before 2005.  Specifically, from 1982 to 2005, Chemtura Canada manufactured and sold diacetyl to certain customers in the United States.  During this time, Citrus & Allied Essences, Ltd. ("**Citrus**"), a flavoring manufacturer, distributor and supplier of specialty flavoring ingredients, was the exclusive reseller of diacetyl manufactured by Chemtura Canada for the United States market.  While Chemtura Canada always produced the diacetyl, Chemtura acted as an intermediary between 1998 and 2005, purchasing diacetyl from Chemtura Canada and then selling the diacetyl to U.S. customers, including Citrus.

In 2001, food industry factory workers began alleging that exposure to diacetyl and other flavorings caused respiratory illness.  Product liability actions were filed in the United States, alleging that diacetyl and the other flavorings were defectively designed and manufactured, and that the flavoring manufacturers and distributors had failed to properly warn end users of the dangers of exposure to diacetyl.  Currently, there are approximately 300 such suits pending nationally (including lawsuits against third-party entities that are not affiliated with the Debtors).

To date, there are 23 pending lawsuits based upon allegations that exposure to diacetyl manufactured by Chemtura Canada and distributed by Chemtura and Citrus caused respiratory illness in numerous food industry factory workers.  The Plan refers to diacetyl-related claims, including claims related to acetoin and acetaldehyde and Claims for indemnification or contribution relating to alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde, as the "**Diacetyl Claims**."

Although the Diacetyl Claims were not a direct cause of the commencement of the Chapter 11 Cases in March 2009, the Debtors have expended significant efforts since the Petition Date to address these liabilities and the Plan provides for specific treatment of Diacetyl Claims.  Additionally, the Debtors intend to commence a Chapter 11 Case and corresponding Canadian Case recognizing the Confirmation Order in respect of Chemtura Canada solely for the purpose of addressing Chemtura Canada's potential liability with respect to the Diacetyl Claims.  For a description of litigation and developments with respect to Diacetyl Claims during the Chapter 11 Cases, see section VII.I of this Disclosure Statement, entitled "Litigation and Adversary Proceedings."  For additional description with respect to the bankruptcy filing of Chemtura Canada, see section VII.N of this Disclosure Statement, entitled "Anticipated Developments Regarding Chemtura Canada Before Confirmation."

### (iii)    *Pension and OPEB Liabilities*

In addition to their obligations for funded debt, environmental liabilities and Diacetyl Claims, the Debtors also faced substantial obligations with respect to pension obligations and benefits provided to certain groups of retired employees.  Although these liabilities were not a direct cause of the commencement of the Chapter 11 Cases,

K&E 17416258.15

the Debtors have, in some instances, made efforts to reduce these liabilities where they relate to unvested benefits. Additional information with respect to the defined benefit plans is provided in section VII.G of this Disclosure Statement, entitled "Retiree Matters."

###### E.    Prepetition Restructuring Initiatives

Over the course of the two years preceding the Chapter 11 Cases, the Company undertook a number of cost-saving and restructuring actions to address the rapid changes in the economic environment and to manage their prepetition liabilities.

###### (i)    Reductions in Force, Realignment of Business Segments and Plant Closures

In April 2007, the Company announced a realignment of its business segments that was meant to streamline business operations.  As part of this realignment, in June 2007, the Company identified more than 600 position reductions (including 300 people formerly employed by the Debtors) and approved the closure of several locations.

Similarly, during the fourth quarter of 2008, the Company undertook a series of actions to conserve cash and reduce costs, including staff reductions, temporary plant closures (with the furlough of employees), suspension of payment of Chemtura's dividend, reductions in, and deferrals of, capital spending and sales of surplus assets and working capital reductions.  In December 2008, the Company announced a global restructuring program designed to reduce fixed cash costs.  This initiative involved a worldwide reduction in the Company's professional and administrative staff by approximately 500 people, the majority of which were employed by the Debtors.  The Company's restructuring program reduced indirect costs by eliminating layers of employees and redefining job scope for certain employees, resulting in a streamlined workforce scaled to the reduced level of revenues.

###### (ii)    Exploration of Potential Asset Sales

In light of the crisis in the financial markets, in the late summer and autumn of 2008, the Debtors concluded that they could no longer rely upon a refinancing transaction in the debt capital markets to address the maturity of the 2009 Notes in July 2009 (as discussed in section IV.C(ii) above).  In October 2008, the Debtors began exploring potential sales of certain of their business assets, which the Debtors believed could generate the cash needed to repay the 2009 Notes at maturity.  These efforts included the potential sale of the Debtors' Chemtura AgroSolutions[TM] Products business as well as the Petroleum-Additives business among other assets.  Initial buyer interest in each of these potential sales was strong, with attractive initial expressions of value.  A number of well-qualified buyers performed due diligence on each business segment and spent significant time and expense in the pursuit of a transaction.

Despite the initial strong reaction to a potential asset sale, the continuing recession and speculation about the Debtors' financial condition caused certain potential buyers to express concern about the Debtors' ability to perform their obligations under a sale agreement and to decide not to proceed with a transaction.  Thus, the Debtors concluded that a sale was unlikely to be closed in sufficient time to offset the continued deterioration in the Debtors' liquidity position or provide a net value that would permit the Debtors to address in full their near term debt maturities and liquidity needs.

## VI.
## COMMENCEMENT OF THE CHAPTER 11 CASES

On the Petition Date, each of the Debtors (other than Chemtura Canada) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  The Chapter 11 Cases are being jointly administered for procedural purposes only under the caption *In re Chemtura Corporation, et al.*, Case No. 09-11233 (REG), before the Honorable Robert E. Gerber.  The Debtors continue to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

### A.    "First-Day" Motions and Related Relief

To ensure a smooth transition to operations in chapter 11, the Debtors filed a number of motions with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to immediate financing and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases.  At a hearing held on March 20, 2009, the Bankruptcy Court entered several orders granting the Debtors' initial requests for relief, as discussed below.

#### (i)    Procedural Orders

To facilitate a smooth and efficient administration of the Chapter 11 Cases and minimize the impact to daily business operations, the Bankruptcy Court entered certain "procedural" orders by which the Bankruptcy Court (a) approved the joint administration of each of the Debtors' 27 Chapter 11 Cases [Docket No. 28]; (b) established certain case management and administrative procedures [Docket Nos. 73 and 351]; and (c) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 50 largest unsecured creditors [Docket No. 113].

#### (ii)    Operational Orders

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits while seeking to facilitate the stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them, on an interim basis, to:

- maintain customer programs and honor their prepetition obligations arising under or relating to those customer programs [Docket No. 48];

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits [Docket No. 44];

- pay prepetition claims of shippers, warehousemen, processors and lien claimants [Docket No. 47]; and

- maintain their existing cash management systems, grant postpetition intercompany claims administrative expense priority and continue intercompany arrangements [Docket No. 51].

In addition to the foregoing relief, the Bankruptcy Court authorized the Debtors, on an interim basis, to pay, (a) up to an aggregate amount of $10 million, the prepetition claims of certain critical and priority vendors and (b) up to an aggregate amount of $15 million, the prepetition claims of certain foreign vendors and third-party service providers essential to the ongoing operation of the Debtors' businesses [Docket Nos. 45 and 46].

Following the Bankruptcy Court's interim approval of the operational orders on March 20, 2009, the Bankruptcy Court, on April 13, 2009, entered Final Orders authorizing the Debtors to pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits [Docket No. 175], pay the prepetition claims of certain critical and priority vendors and foreign vendors [Docket

Nos. 176 and 177] and pay prepetition claims of shippers, warehousemen, processors and lien claimants [Docket No. 178]. Subsequently, on April 29, 2009 and May 1, 2009, the Bankruptcy Court entered Final Orders authorizing the Debtors to maintain customer programs and honor their prepetition obligations arising under or relating to those customer programs[28] [Docket No. 278] and maintain their existing cash management systems, grant postpetition intercompany claims administrative expense priority and continue intercompany arrangements [Docket No. 295], respectively.

### B.    Initial Financing Orders

In addition to the Debtors' initial procedural and operational relief, the Debtors filed two motions on the Petition Date seeking authority to ensure adequate access to liquidity during their Chapter 11 Cases, as discussed below.

### (i)    *The Postpetition Guarantee of the Factoring Facility with Mediofactoring*

On the Petition Date, in an effort to alleviate the liquidity constraints on certain of the Debtors' European subsidiaries' participation in the European Accounts Receivable Facility, the Debtors filed a motion seeking authority for Chemtura to enter into a guarantee in favor of Mediofactoring in connection with the European Accounts Receivable Facility (the "**Mediofactoring Motion**"). On March 20, 2009, the Bankruptcy Court entered an interim order approving the Mediofactoring Motion [Docket No. 50]. Following the interim approval of the Mediofactoring Motion, Mediofactoring informed the Debtors that it did not intend to restart funding under the European Accounts Receivable Facility. As discussed in section VI.B(ii) herein, through entry into the Initial DIP Facility (as defined below), the Debtors were able to make available up to $40 million in the aggregate of intercompany loans for use by the Debtors' foreign Non-Debtor Affiliates and subsidiaries to the extent needed.

### (ii)    *The Initial Debtor-in-Possession Financing Facility*

The Debtors' primary source of financing during the initial stages of their Chapter 11 Cases was ongoing access to cash collateral, as well as an aggregate $400 million debtor-in-possession financing facility (the "**Initial DIP Facility**"). The Initial DIP Facility consisted of (a) a "non-rollup" revolving facility in the amount of $63.5 million, (b) a roll-up revolving facility in the amount of $86.5 million and (c) a term loan facility in the amount of $250 million. The Bankruptcy Court entered an interim order approving the Debtors' access to the Initial DIP Facility on March 20, 2009 [Docket No. 58] (the "**Interim DIP Order**"). The Debtors used the funds generated by the Initial DIP Facility to, among other things, gain access to working capital and indefeasibly re-purchase approximately $117 million in accounts receivables previously sold pursuant to the U.S. Accounts Receivable Facility, which had terminated upon commencement of the Chapter 11 Cases.

Following the Bankruptcy Court's interim approval of the Initial DIP Facility, the Creditors' Committee expressed a number of concerns regarding the terms and conditions with respect to the Initial DIP Facility, including the Debtors' contemplated use of the proceeds from the Initial DIP Facility to pay $86.5 million outstanding to the Prepetition Lenders. To ensure access to financing on the best possible terms and to address the Creditors' Committee's concerns, the Debtors pursued negotiations with Citibank, N.A., as agent under the Initial DIP Facility. At the same time, the Debtors also investigated an alternative source of postpetition financing. The result of those discussions was the approval of an amendment to the Initial DIP Facility that, among other things, increased the Debtors' ability to provide intercompany loans to their non-Debtor foreign subsidiaries from $7.5 million to $40 million.

On April 29, 2009, the Bankruptcy Court entered a Final Order approving the Initial DIP Facility, as amended [Docket No. 281] (the "**Final DIP Order**"). The Debtors subsequently used the proceeds from the Initial

---

[28]    The Bankruptcy Court entered an interim order authorizing but not directing the Debtors to maintain customer programs and to honor prepetition obligations related thereto on March 20, 2009 [Docket No. 48] that was subsequently amended on April 13, 2009 [Docket No. 179].

DIP Facility to, among other things, conditionally repay approximately $86.5 million of the debt outstanding under the Prepetition Credit Agreement.  As discussed in section VII.I(iv) below, the Creditors' Committee subsequently commenced litigation, among other things, with respect to the Debtors' repayment of this indebtedness during the Chapter 11 Cases.

As discussed in section VII.F(iii) below, the Debtors subsequently refinanced the Initial DIP Facility during the course of their Chapter 11 Cases.

64

## VII.
## DEVELOPMENTS DURING THE CHAPTER 11 CASES

A.    **Appointment of the Statutory Committees and Formation of the Ad Hoc Bondholders' Committee**

(i)    *Appointment of the Creditors' Committee*

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable.  On March 26, 2009, the U.S. Trustee appointed the Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "**Creditors' Committee**").  The Creditors' Committee was initially comprised of the following members:

- U.S. Bank National Association, as Indenture Trustee, 60 Livingston Avenue, St. Paul, Minnesota 55107,  Attn.: Cindy Woodward, Vice President;

- The Bank of New York Mellon Trust Company, as Indenture Trustee, 6525 West Campus Oval Road, Suite 200, New Albany, Ohio 43054,  Attn.: Donna J. Parisi, Vice, President;

- Pension Benefit Guaranty Corporation, 1200 K Street NW, Washington, DC  20005, Attn.: Suzanne Kelly, Financial Analyst;

- Manufacturers & Traders Trust Co., 25 South Charles Street, 16th Floor, Baltimore, Maryland  21201, Attn.: Vincent J. Marriott, III, Counsel;

- Riversource Investments, LLC (n/k/a Columbia Management), 216 Ameriprise Financial Center, Minneapolis, Minnesota 55474, Attn.: Mark Van Holland, Vice President;

- Federated Investment Management Company, Federated Investors Tower, 1001 Liberty Avenue, Pittsburgh, Pennsylvania 15222, Attn.: B. Anthony Delserone Jr., Vice President;

- Occidental Chemical Corporation, 5005 LBJ Freeway, Dallas, Texas 75244, Attn.: Gary D. Lee, Jr., Manager Credit Services;

- Entergy Arkansas, Inc. 639 Loyola Avenue, 26th Floor, New Orleans, Louisiana 70113, Attn.: Alan H. Katz, General Counsel; and

- WS Packaging, Inc., 2571 S. Hemlock Road, Green Bay, Wisconsin 54229; Attn.: Brenda Bomber, Corporate Credit Manager.

The Creditors' Committee subsequently retained Akin Gump Strauss Hauer & Feld LLP, as legal counsel [Docket No. 439]; Houlihan Lokey Howard & Zukin Capital, Inc., as financial advisor [Docket No. 638]; FTI Consulting, Inc., as forensic accountant [Docket No. 663]; Garden City Group, as information agent [Docket No. 716]; and Reed Smith LLP, as special insurance counsel [Docket No. 2815].

On August 10, 2009, the membership of the Creditors' Committee was amended to include three diacetyl claimants as described in greater detail in section VII.A(iv) below and to exclude Occidental Chemical Corporation [Docket Nos. 895 and 897].  On October 29, 2009, WS Packaging, Inc. voluntarily resigned from the Creditors' Committee.

(ii)    *Appointment of the Equity Committee*

Beginning in the summer of 2009, the U.S. Trustee received several requests for appointment of a committee to represent the interests of equity security holders (the "**Equity Committee**").  The Debtors challenged

K&E 17416258.15

these requests for a number of reasons, including a belief that (a) based upon then-available information, equity security holders did not have a substantial likelihood of a meaningful recovery in the Chapter 11 Cases, (b) the appointment of an equity committee would result in substantial tangible and intangible costs to the Debtors and their estates and (c) the interests of equity holders were aligned with the interests of unsecured creditors who already were represented by the Creditors' Committee.    On two occasions, by letters dated August 10, 2009 and September 18, 2009, the U.S. Trustee declined to appoint an equity committee.

Following further correspondence with the U.S. Trustee in November and December 2009, the U.S. Trustee appointed the Equity Committee on December 29, 2009 [Docket No. 1676].  The Equity Committee was initially comprised of the following members:

- Alan J. Carr, Strategic Value Master Fund, Ltd., 100 West Putnam Avenue, Greenwich, Connecticut 06930

- Kwok S. Wong, 25-16 Murray Street, Flushing, New York 11354;

- Lauren Rosenberg, Chemtura Corporation Employee Savings Plan Fiduciary Counselors Inc., 700 12th Street, NW, Suite 700, Washington D.C. 20005.

- Raj V. Iyer, Canyon Capital Advisors, 2000 Avenue of the Stars, 11th Floor, Los Angeles, California 90067;

- R.B. Huntly and O.M. Huntly, 2605-55 Charles Street, W, Toronto, Ontario M5S2W9, Canada;

- Michael Flynn, 2181 Fox Chase, Lawrenceville, Georgia 30043; and

- Pete Esmet, 422 E. 8th Avenue, Conshohocken, Pennsylvania 19428.

On January 7, 2009, the membership of the Equity Committee was amended to replace R.B. Huntly and O.M. Huntly with Peter A. Pizzi, 121 SW 101 Terrace, Plantation, Florida 33324 [Docket No. 1718].  On January 12, 2010, the membership of the Equity Committee was further amended to replace Peter A. Pizzi with Jon Eric Jacks, 1000 Orchard Street, Longview, Texas 75605 [Docket No. 1748].  On June 16, 2010, Jon Eric Jacks resigned from the Equity Committee.  On June 21, 2010, Michael Flynn resigned from the Equity Committee.  The Equity Committee has retained Skadden, Arps, Slate, Meagher & Flom LLP as legal counsel [Docket No. 2905], and has retained UBS as its financial advisor, subject to authority from the Bankruptcy Court [Docket No. 2901].

### (iii)    *Organization of the Ad Hoc Bondholders' Committee*

The ad hoc committee of noteholders (the "**Ad Hoc Bondholders' Committee**") is composed of an informal group of holders of Notes issued by the Debtors.  Many members of the Ad Hoc Bondholders' Committee also hold General Unsecured Claims and Prepetition Unsecured Lender Claims against the Debtors.  The Ad Hoc Bondholders' Committee formed in September 2009 with the stated purpose to develop consensus among a broad cross-section of creditors as to the terms of a reorganization plan, with the stated goal of obtaining a consensual resolution of the Chapter 11 Cases and expediting the Debtors' exit from chapter 11.  The Ad Hoc Bondholders' Committee represents that its members hold collectively more than $770 million in Claims.  This amount is represented to include 62% of the Debtors' obligations under the Indentures, as well as a significant portion of Claims under the Prepetition Credit Agreement and the DIP Loan Agreement.

On June 11, 2010, the Ad Hoc Bondholders' Committee filed the *Verified Statement Of Jones Day Regarding Representation Of An Ad Hoc Committee Of Bondholders Pursuant To Federal Rule Of Bankruptcy Procedure 2019*, identifying the respective names, addresses and claim amounts of each of the members [Docket No. 2879].  The Ad Hoc Bondholders' Committee is comprised of the following members:

- 1798 Global Partners (USA) Corp., 888 7th Avenue, 11th Floor, New York, New York 10019;

K&E 17416258.15

- Brencourt Credit Opportunities Master, Ltd., c/o Brencourt Advisors, LLC, 600 Lexington Avenue, 8th Floor, New York, New York 10022;

- The Catalyst Credit Opportunity Master Fund, Ltd., c/o Catalyst Investment Management Co., LLC, 767 Third Avenue, 32nd Floor, New York, NY 10017;

- Chimney Rock Value Fund, L.P., 350 Park Avenue, 11th Floor, New York, New York 10022;

- Citigroup Distressed Trading Desk, Citigroup Global Markets Inc., 390 Greenwich Street, 4th Floor, New York, New York 10013;

- Credit Distressed Blue Line Master Fund, Ltd., 450 Park Avenue, New York, New York 10022;

- Cyrus Capital Partners, L.P., 399 Park Avenue, 39 Floor, New York, New York 10022;

- Gruss Global Investors Master Fund, 667 Madison Avenue, 3rd Floor, New York, New York 10021;

- Jefferies High Yield Trading, LLC, 1 Station Place, 3 North, Stamford, Connecticut 06902;

- Knighthead Master Fund, L.P., c/o Knighthead Capital Management, LLC, 623 Fifth Avenue, 29th Floor, New York, New York 10022;

- KS Capital Partners, L.P., 11 West 42nd Street, 30th Floor, New York, New York 10036;

- KS International, Inc., 11 West 42nd Street, 30th Floor, New York, New York 10036;

- Latigo Partners, L.P., 590 Madison Avenue, 9th Floor, New York, New York 10022;

- Longacre Fund Management, LLC, 810 Seventh Avenue, Floor 33, New York, New York 10019;

- LMA SPC for and on behalf of MAP84 Segregated Portfolio, c/o Knighthead Capital Management, LLC, 623 Fifth Avenue, 29th Floor, New York, New York 10022;

- Marathon Asset Management, One Bryant Park, 38th Floor, New York, New York, 10036;

- OCP Investment Trust, 910 Sylvan Avenue, Suite 100, Englewood Cliffs, New Jersey 07632;

- Onex Debt Opportunity Fund, Ltd., 910 Sylvan Avenue, Suite 100, Englewood Cliffs, New Jersey 07632;

- Par-Four Investment Management LLC, 50 Tice Boulevard, Woodcliff Lake, New Jersey 07677;

- Redwood Master Fund, 910 Sylvan Avenue, Englewood Cliffs, New Jersey 07632;

- Scoggin Capital, 660 Madison Avenue, 20th Floor, New York, New York 10021;

- Senator Investment Group, L.P., 1330 Avenue of the Americas, 26th Floor, New York, New York 10019;

67

- Seneca Capital Investments, L.P. (on behalf of affiliated funds), 590 Madison Avenue, 28th Floor, New York, New York 10028;

- Silver Lake Credit Fund, L.P., One Market Plaza, Steuart Tower, 10th Floor, Suite 1000, San Francisco, California 94105;

- TPG Opportunity Fund I, L.P., 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102;

- Tricadia Capital Management, LLC, 780 Third Avenue, 29th Floor, New York, New York 10017;

- Värde Partners, L.P. (as General Partner of the Värde funds), 8500 Normandale Lake Boulevard, Suite 1500, Minneapolis, Minnesota 55437; and

- York Capital Management L.P., 767 Fifth Avenue, 17th Floor, New York, New York 10153.

On or about September 25, 2009, the Ad Hoc Bondholders' Committee retained Jones Day as legal counsel. The Ad Hoc Bondholders' Committee has also retained Moelis & Company as a financial advisor.

A subcommittee of four members of the Ad Hoc Bondholders' Committee (the "**Restricted Ad Hoc Subcommittee**") signed a confidentiality agreement in May 2010 and received access to confidential information from the Debtors. The Restricted Ad Hoc Subcommittee, with the assistance of their professionals, represented the interests of the Ad Hoc Bondholders' Committee in vigorous plan negotiations. These negotiations culminated in the agreement of the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee as to the fundamental terms of the Plan. The Restricted Ad Hoc Subcommittee believes that the Plan provides the opportunity for all holders of Notes issued by the Debtors to obtain a favorable recovery. As discussed in section VII.M, the Restricted Ad Hoc Subcommittee, as well as numerous other members of the Ad Hoc Bondholders' Committee and certain other holders of Notes, have entered into a Plan Support Agreement with the Debtors and the Creditors' Committee, and the Ad Hoc Bondholders' Committee has committed to using its commercially reasonable best efforts to obtain the support of the Plan Support Agreement from the additional members of the Ad Hoc Bondholders' Committee.

<div align="center">

*(iv)*    *Requests for Appointment of a Tort Claimants' Committee*

</div>

On two separate occasions, in June 2009 and March 2010, the United States Trustee received written requests from individual holders of Diacetyl Claims seeking the appointment of a statutory committee of tort claimants. In each instance, the Debtors (and the appointed official committees then in existence) opposed the appointment of a tort claimants committee. Specifically, the Debtors (and the appointed official committees) contended that the appointment of a tort claimants' committee was not warranted in their Chapter 11 Cases because (a) the impetus of the Debtors' chapter 11 filing had not been driven by a need to address, channel and restructure the Debtors' tort liabilities, (b) the Creditors' Committee was adequately representing the tort claimants' interests, (c) the tort claimants had the ability to be heard and participate in the Chapter 11 Cases without the appointment of a statutory committee and (d) the appointment of a tort claimants' committee would have resulted in substantial tangible and intangible costs to the Debtors and their estates.

On each occasion, the U.S. Trustee declined to appoint a statutory committee of tort claimants. However, on August 10, 2009, the U.S. Trustee did appoint the following three diacetyl claimants as additional members to the Creditors' Committee:

- Francisco Herrera, 22332 Hillshort Court., Wildomar, California 92595;

- Irma Rosa Ortiz, 5757 Main Street, South Gate, California 90280; and

- Gerardo Solis, 1305 Burke Lane, South Egin, Illinois 60177-3068.

<div align="center">68</div>

Moreover, on May 3, 2010, certain diacetyl claimants filed a motion with the Bankruptcy Court seeking an appointment of a diacetyl claimants' committee or alternatively, an appointment of a subcommittee of diacetyl claimants to the Creditors' Committee [Docket No. 2612]. The diacetyl claimants argued that the appointment of a committee comprised of diacetyl claimants was necessary in light of the Bankruptcy Court's approval of a procedure for judicial estimation of the Diacetyl Claims in the aggregate as discussed in further detail in section VII.D(iv) below. The motion has been opposed by the Debtors, the Creditors' Committee and the Equity Committee and remains pending before the Bankruptcy Court, where a hearing is currently scheduled for August 4, 2010.

### B.    Retention of Professionals

During the course of their Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to retain Professionals to assist in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases. Specifically, the Debtors have retained the following professionals:

- A&L Goodbody Solicitors, as Irish Counsel [Docket No. 1111];

- Allen & Overy LLP, as special litigation counsel [Docket No. 326];

- Alvarez and Marsal North America, LLC, as crisis manager [Docket No. 276];

- Baker & McKenzie, as special transactional counsel [Docket No. 1084];

- De Pardieu Brocas Maffei A.A.R.P.I., as French Counsel [Docket No. 991];

- Deloitte AG, as European financial advisory services provider [Docket No. 1037];

- Deloitte Financial Advisory Services LLP, as claims administrator and provider of emergence accounting services [Docket No. 1506].

- Deloitte Tax LLP, as tax advisor [Docket Nos. 397 and 1016];

- DLA Piper LLP, as special litigation counsel [Docket No. 319];

- Duane Morris LLP, as conflicts counsel [Docket No. 396];

- Duff & Phelps LLC, as accounting and financial services provider [Docket No. 1202];

- Great American Group Machinery & Equipment LLC, as appraisers [Docket No. 320];

- Howrey LLP, as special insurance counsel [Docket No. 1288];

- Katten Muchin Rosenman LLP, as special counsel with respect to intellectual property matters [Docket No. 318];

- Kilpatrick Stockton LLP, as special insurance counsel [Docket No. 2851];

- Kirkland & Ellis LLP, as restructuring attorneys [Docket No. 277];

- KPMG LLP, as independent auditor and tax consultant [Docket Nos. 182 and 976];

- Lazard Frères & Co. LLC, as financial advisor and investment banker [Docket No. 641];

- Loyens & Loeff, as Belgian and Dutch counsel [Docket No. 1113];

K&E 17416258.15

- Mayer Brown LLP, as special litigation counsel [Docket No. 2852];

- Morgan, Lewis & Bockius LLP, as special litigation and advisory counsel [Docket No. 2207];

- O'Melveny & Myers LLP, as special litigation counsel [Docket No. 803];

- Ogilvy Renault LLP, as Canadian counsel [Docket No. 395];

- Pillsbury Winthrop Shaw Pittman LLP, as special litigation counsel [Docket No. 1648];

- Roberts Mlotkowski Safran & Cole P.C., as special intellectual property counsel [Docket No. 1178];

- The Genetelli Consulting Group, as tax services provider [Docket No. 321]; and

- Walder Wyss & Partners Ltd., as Swiss counsel [Docket No. 1176].

In addition to these professionals, the Debtors have also retained law firms as "ordinary course professionals" to advise them with respect to certain of the Debtors' daily business operations, including intellectual property matters, pending litigation matters and the Debtors' non-Debtor foreign affiliates and subsidiaries, pursuant to the Ordinary Course Professional Order [Docket No. 181]. [29]

## C.    Development of the Debtors' Long-Range Business Plan

### (i)    Overview

The Company is a globally diversified manufacturer and marketer of specialty chemicals products, most of which are sold to industrial manufacturing customers for use as additives, ingredients or intermediates that add value to customers' end products.

The Company operates on a global scale. For example, of the Company's approximate $2.5 billion in net sales in 2009 (a) 49% was generated from sales to customers in the U.S. and Canada, (b) 31% was generated from sales to customers in Europe and Africa, (c) 15% was generated from sales to customers in the Asia/Pacific region and (d) 5% was generated from sales to customers in Latin America. Much of the Company's operations overseas are conducted through Chemtura's numerous foreign-organized direct and indirect subsidiaries, none of which are currently Debtors in the Chapter 11 Cases or in any foreign insolvency proceedings. The chart attached hereto as **Exhibit C** shows the organizational structure of each of the Debtors and their Non-Debtor Affiliates and subsidiaries.

### (ii)    Business Units and Long-Range Business Plan

Before the commencement of the Chapter 11 Cases, the Debtors' businesses consisted of five reporting segments: polymer additives, performance specialties, consumer products, crop protection and an "other" segment.

Prior to the Petition Date, the Company reorganized its businesses into the following four reporting segments to provide greater focus and accountability on individual business operations: (a) Consumer Performance Products; (b) Industrial Performance Products, comprised of petroleum additives, urethanes and antioxidants; (c) Chemtura AgroSolutions™ Engineered Products; and (d) Industrial Engineered Products, comprised of flame retardants and brominated performance products, organometallics, PVC additives and surfactants. The following diagram outlines and details the different business segments:

---

[29]    The Debtors have subsequently filed 13 supplements to the initial list of professionals utilized in the ordinary course of business [Docket Nos. 426, 471, 494, 664, 784, 853, 877, 1031, 1237, 1515, 2060, 2447 and 2630].

K&E 17416258.15

| | Consumer Performance Products | Industrial Performance Products | Chemtura AgroSolutions™ Engineered Products | Industrial Engineered Products |
|---|---|---|---|---|
| **2009 Net Sales** | $457 million | $999 million | $332 million | $753 million |
| **Key Products** | • Swimming Pool & Spa Chemicals<br>• Cleaning Products | • Petroleum Additives<br>• Urethanes<br>• Antioxidants<br>• UV Stabilizers<br>• Elastomer Additives | • Seed Treatment<br>• Fungicides<br>• Miticides<br>• Insecticides<br>• Growth Regulants<br>• Herbicides | • Brominated Performance Products<br>• Flame Retardants<br>• Fumigants<br>• Organometallics<br>• PVC Additives<br>• Surfactants |
| **Major End-Use Markets** | • Pools and Spas<br>• Water Parks<br>• Resorts<br>• Municipal Pools<br>• Cleaners | • Building and Construction<br>• Packaging<br>• Consumer Products<br>• Lubricants<br>• Engine and Gear Oils<br>• Industrial Oils and Greases<br>• Coatings<br>• Adhesives<br>• Sealants<br>• Automotive | • Agriculture | • Plastics<br>• Agriculture<br>• Fine Chemical<br>• Oilfield<br>• Building and Construction<br>• Solar<br>• Coatings<br>• Pharmaceuticals<br>• Electronics<br>• Consumer Durables<br>• Paints and Polymers |
| **Key Brands** | • BioGuard®<br>• Aqua Chem®<br>• BAYROL®<br>• Guardex®<br>• Pool Time®<br>• ProGuard®<br>• Spa Essentials®<br>• SpaGuard®<br>• Spa Time®<br>• Omni®<br>• Mineral Springs®<br>• The Works®<br>• Greased Lightning®<br>• Poolbrite®<br>• Cristal®<br>• Miami®<br>• Sun® | • Naugalubes®<br>• Naugard®<br>• Hybase®<br>• Lobase®<br>• Synton®<br>• Hatcol®<br>• Adiprene®<br>• Vibrathane®<br>• Fomrez®<br>• Witcobrond®<br>• Trixene®<br>• Weston®<br>• Anderol®<br>• Royco®<br>• Petronate®<br>• Durad®<br>• Calcinate®<br>• Reolube®<br>• Anox®<br>• Ultranox®<br>• Polybond®<br>• Royaltuf®<br>• Lowilite®<br>• Lowinox® | • Vitavax®<br>• Acramite®<br>• Omite®<br>• Floramite®<br>• Rimon®<br>• ProCure®<br>• Firestorm®<br>• Casoron®<br>• Royal MH-30®<br>• Royaltac®<br>• Off-Shoot T®<br>• Flupro®<br>• Rancona®<br>• Anchor®<br>• Adept®<br>• Dimilin®<br>• Micromite®<br>• Blizzard®<br>• B-Nine®<br>• Temprano®<br>• Terraguard®<br>• Viticure®<br>• Pantera®<br>• Enhance®<br>• Grain Guard® | • GeoBrom®<br>• Firemaster®<br>• Fyrebloc®<br>• Pyrobloc®<br>• Smokebloc®<br>• Thermoguard®<br>• Mark OBS®<br>• Timonox® |

Following the Petition Date, the Debtors, together with their retained advisors, developed a Long-Range Business Plan ("**LRBP**") for the period 2010 through 2014. The process to develop the LRBP started with each component of each reporting segment developing its own long-range business plan. Those plans were consolidated into the LRBP together with the plans for the Debtors' shared service and corporate functions. The business plans of the various reporting segments and their components have three common themes: (a) to provide ecologically friendlier products and to enhance supply to emerging clean industries; (b) to improve service to customers and become their preferred provider; and (c) to provide global reach.

The sub-sections below describe each of the Company's separate reporting segments following development of the LRBP.

K&E 17416258.15

### a.    Consumer Performance Products

The Consumer Performance Products segment manufactures performance chemicals that are sold to consumers for in-home and outdoor use. These products, which are marketed under registered trade names such as BioGuard®, Aquachem®, Pooltime®, Omni®, Poolbrite® and Crystal® include recreational water purification products used in pools and spas such as sanitizers, algicides, biocides, oxidizers, pH balancers, mineral balancers and other specialty chemicals and accessories. The Company distributes these products to pool and spa dealers and mass-market retailers located throughout North America, Europe, Australia and South Africa. Certain product lines manufactured by the Consumer Performance Products segment are seasonal (*e.g.*, pool chemicals business serving the North American and European recreational water market), typically recording higher sales in the second and third quarters of each year. The Consumer Performance Products segment also includes specialty and multi-purpose cleaners that are primarily distributed to major national retailers in the do-it-yourself, hardware, mass market and discount sectors. These products include non-abrasive bathroom cleaners, glass and surface cleaners, toilet bowl cleaners, drain openers and rust and calcium removers and multi-purpose cleaners that are distributed under the registered trade names The Works® and Greased Lightning®.

The Consumer Performance Products segment had net sales of $516 million in 2008, which represented approximately 15% of the Company's total net sales in 2008. As of December 31, 2009, the Consumer Performance Products segment had net sales of $457 million, an 11.4 % decrease over the same period the year before.

### b.    Industrial Performance Products

Industrial Performance Products produces engineered specialty chemicals used in a variety of industrial applications. These products are sold directly to manufacturers and through distribution channels. The Industrial Performance Products segment had net sales of $999 million for 2009, a 31.8 % decrease over the same period the year before.

#### i.    *Petroleum Additives*

Petroleum Additives are used to improve performance in petroleum-related products, including motor oils, industrial oils, metal-working fluids and fuels. These products are marketed under different trade names such as Naugalube® and Naugard® antioxidants; Calcinate®, Hystrene® and Industrene® anti-wear agents; and Lobase®, Hybase®, Calcinate® and Petronate® sulfonate detergents. These products are sold in the automotive, refrigeration, aviation and other industrial markets.

#### ii.    *Urethanes*

The Company's Urethanes business engages in the manufacture of hot-cast urethane prepolymers and are a manufacturer of specialty aqueous urethane dispersions and polyester polyols. The Urethanes business' products include a wide variety of wear and abrasion resistant cast elastomers, which are recognized worldwide for their toughness, load-bearing capacity and cut and tear resistance. The Company's prepolymers, curatives and systems are used in industrial and printing rolls, mining and oil and gas machinery and equipment, mechanical goods, solid industrial tires and wheels, electronic devices and processing equipment and in recreation and consumer goods. The Company markets these products under trade names such as Adiprene,® Vibrathane,® Ribbon Flow,® Royalcast,® Witcobond® and Fomrez®.

#### iii.    *Antioxidants and UV Stabilizers*

Antioxidants and UV Stabilizers engages in the manufacture and sale of main antioxidants and binary blends, specialty antioxidants, rubber chemicals, polymer modifiers, nonylphenol and inhibitors. These products are sold to a wide range of customers in industries ranging from the automotive, building and construction, durable, packaging, industrial and agricultural films industry.

### c.    Chemtura AgroSolutions™ Engineered Products

The Chemtura AgroSolutions™ Engineered Products segment produces and distributes six major product lines: seed treatments, fungicides, miticides, insecticides, growth regulates and herbicides. The products have been

72

primarily developed for use in high-value agricultural markets such as tree and vine fruits, ornamentals and nuts and secondarily for commodity row crops such as soybeans, oilseed rape and corn.  The Chemtura AgroSolutions™ Engineered Products segment works closely with customers, distributors, research stations and individual growers as part of an on-the-ground coordinated effort through which it develops products in response to changing customer demands, drawing upon existing technologies to tailor the products to match immediate customer needs, depending on, for example, varying weather conditions and the degree of infestation.  Chemtura AgroSolutions™ Engineered Products sells its products in North America through a distribution network of more than 100 distributor outlets that sell directly to end-use customers.  This segment also provides products to over 1,400 distributors, dealers, cooperatives, seed companies and large growers outside North America.

Chemtura AgroSolutions™ Engineered Products are seasonal in nature and correspond to agricultural cycles, weather conditions and weed and insect infestations, a fact that is reflected in the segment's performance before and during the Chapter 11 Cases.  Chemtura AgroSolutions™ Engineered Products had net sales of $394 million in 2008, which represented approximately 11% of the Company's total net sales in 2008.  During 2009, Chemtura AgroSolutions™ Engineered Products experienced a reduction in demand on account of the impact on the global agricultural markets of lower commodity prices and restricted availability of credit to growers, particularly in emerging regions, with annual net sales as of December 31, 2009 of $332 million, a 15.7% decrease over the same period the year before.

### d.    Industrial Engineered Products

Industrial Engineered Products produces an extensive line of additives and organometallic specialties to a broad range of industries that are designed to improve the performance of polymers in their end-use applications.  The products are sold across the entire value chain ranging from direct sales to monomer producers, polymer manufacturers, compounders and fabricators, fine chemical manufacturers and oilfield service companies to industry distributors.

The Industrial Engineered Products unit had annual net sales of $753 million in 2009, a 35.7% decrease over the same period the year before.

#### i.    *Flame Retardants and Brominated Performance Products*

Flame Retardants manufactures and sells chemical additives designed to improve the performance of polymers to a broad range of industries, including the agricultural, fine chemical, oilfield, building construction, electronics and automotive industries.  Flame Retardants produces and manufactures a variety of related products, including antioxidants, brominated performance products, flame retardants, fumigants and polymerization additives.  These products are sold to a wide range of customers, including direct sellers to monomer producers, polymer manufacturers, compounders and fabricators and fine chemical manufacturers.

#### ii.    *Organometallics*

Organometallics is a niche business practiced by very few companies worldwide, and consists of polymerization additives and initiators (also known as organometallics), which are used as catalysts in the polyolefin industry.  The Company has a long expertise and history of producing and handling pyrophoric material in specialty containers.   The Company sells these products to the automotive, construction and building, consumer, pharmaceuticals and photovoltaic industries.

#### iii.    *Former PVC Additives*

The Company's former Polyvinyl Chloride ("**PVC**") Additives business manufactured heat stabilizers (such as tin stabilizers, liquid and solid mixed metals, liquid phosphate esters, epoxidized soybean oil, thiochemicals and OBS®), plasticizers, impact modifies (Blendex®) and chemical foaming agents.  The primary end-use market of the PVC Business' products included the building and construction trades. The PVC Business had net sales of $425 million in 2008, which represented approximately 12% of the Company's total net sales in 2008. In conjunction with the development of the LRBP, the Debtors made the determination to explore a sale of this business.  As discussed in detail in section VII.J(ii) below, during the course of the Chapter 11 Cases, the Debtors

73

consummated a sale of the PVC Additives segment following a Bankruptcy Court-approved auction process. The sale closed on April 30, 2010.

<div align="center">

*iv.    Surfactants*

</div>

Surfactants assist in the homogenization of resin systems and facilitate the lubricity in the processing and fabrication of such resins. On February 29, 2008, the Company sold its oleochemicals business, the largest portion of the surfactants product offering, which had net sales of approximately $160 million in 2007.

### *(iii)    Intellectual Property and Licenses*

The Company has approximately 3,500 United States and foreign granted patents and pending patent applications and has approximately 4,700 United States and foreign registered and pending trademarks. Patents, trade names, trademarks, know-how, trade secrets, formulae and manufacturing techniques assist in maintaining the competitive position of certain of the Company's products. Patents, formulae and know-how are of particular importance in the manufacture of a number of specialty chemicals manufactured and sold by the Company.

Additionally, the Company is licensed to use certain patents and technologies owned by other companies, including some foreign companies, to manufacture products complementary to the Company's own products, for which it pays royalties in amounts not considered material to the Company's consolidated financial results. Products to which the Company has such rights include certain crop protection chemicals.

### D.    The Claims Process

### *(i)    Filing of the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities*

On June 11, 2009, the Debtors filed their statements of financial affairs and schedules of assets and liabilities (collectively, the "**Initial SOFAs and Schedules**") pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007. On August 14, 2009 and July 23, 2010, certain of the Debtors filed amended schedules of assets and liabilities (together with the Initial SOFAs and Schedules, the "**SOFAs and Schedules**"). The SOFAs and Schedules provide information concerning each Debtor's assets, liabilities (including accounts payable), Executory Contracts and other financial information as of the Petition Date. Copies of the Debtors' SOFAs and Schedules are available free of charge by accessing www.kccllc.net/chemtura.

### *(ii)    Establishment of the Claims Bar Date*

On August 21, 2009, the Bankruptcy Court entered an order [Docket No. 992] (the "**Bar Date Order**") establishing October 30, 2009 (the "**Bar Date**") as the deadline by which each person or entity asserting a claim against any of the Debtors was required to file written proof of such claim. In accordance with the Bar Date Order, the Debtors provided written notice of the Bar Date to each of the parties and entities identified as holders of Claims on the SOFAs and Schedules and to all known actual or potential holders of Claims of the Debtors according to the Debtors' books and records at the time of mailing of the notice. For known holders of Claims, this notice was accompanied by a "personalized" proof of claim form approved by the Bankruptcy Court. Additionally, in an effort to reach unknown holders of Claims, the Debtors published notice of the Bar Date in the *New York Times* and *USA Today*, as well as site-specific notices in over 150 newspapers and periodicals with circulations covering the locations of the Debtors' current and former plant and disposal sites.

### *(iii)    Claims Review and Objection Process*

As of July 25, 2010, approximately 15,340 Proofs of Claim had been filed against the Debtors, totaling more than $29 billion in asserted liabilities. More than 8,000 of these filed Proofs of Claim have been asserted in "unliquidated" amounts or contain an "unliquidated" component. The following table – which is provided for informational purposes only – summarizes the number of Proofs of Claim and their aggregate asserted amounts that were filed against each Debtor, including the Debtors' estimates, where available, with respect to Proofs of Claim filed in "unliquidated" amounts:

<div align="center">

74

</div>

| Debtor | Total Number of Claims Asserted | Total Estimated Amount |
|---|---|---|
| A & M Cleaning Products, LLC | 36 | $551,521,345.47 |
| Aqua Clear Industries, LLC | 36 | $514,521,345.47 |
| ASCK, Inc. | 36 | $514,550,067.47 |
| ASEPSIS, Inc. | 36 | $514,550,067.47 |
| BioLab Company Store, LLC | 39 | $514,550,067.47 |
| BioLab Franchise Company, LLC | 36 | $514,550,067.47 |
| BioLab Textile Additives, LLC | 35 | $514,550,067.47 |
| Bio-Lab, Inc. | 487 | $565,811,298.09 |
| Chemtura Corporation | 11,770 | $5,766,164,109.18 |
| CNK Chemical Realty Corporation | 38 | $551,522,675.47 |
| Crompton Colors Incorporated | 53 | $515,332,096.12 |
| Crompton Holding Corporation | 48 | $529,882,819.17 |
| Crompton Monochem, Inc. | 40 | $514,585,105.01 |
| GLCC Laurel, LLC | 47 | $555,852,820.55 |
| Great Lakes Chemical Corporation | 1,161 | $7,057,799,959.28 |
| Great Lakes Chemical Global, Inc. | 46 | $3,514,802,920.15 |
| GT Seed Treatment, Inc. | 39 | $551,551,399.97 |
| HomeCare Labs, Inc. | 58 | $514,608,696.20 |
| ISCI, Inc. | 39 | $514,850,067.47 |
| Kem Manufacturing Corporation | 46 | $557,063,589.29 |
| Laurel Industries Holdings, Inc. | 39 | $551,552,174.46 |
| Monochem, Inc. | 376 | $518,824,527.80 |
| Naugatuck Treatment Company | 45 | $536,108,557.47 |
| Recreational Water Products, Inc. | 40 | $552,707,913.70 |
| Uniroyal Chemical Company Limited (Delaware) | 642 | $584,921,796.84 |
| Weber City Road LLC | 35 | $551,550,067.47 |
| WRL of Indiana, Inc. | 37 | $554,045,696.30 |

To address these numerous Claims in an expeditious and orderly fashion, the Debtors sought and obtained Bankruptcy Court approval of procedures by which the Debtors and the Creditors' Committee could object to Claims [Docket No. 1785] (the "**Claims Objection Procedures Order**"). The Claims Objection Procedures Order provides a two-tier Claims objection process. Tier I includes specific procedural Claims objections, while Tier II includes substantive Claims objections.

The Debtors and the Creditors' Committee have been actively engaged in reconciling the Proofs of Claim and determining the appropriate basis to address them. As of July 26, 2010, the Debtors have filed 36 Tier I omnibus objections to Claims in accordance with the Claims Objection Procedures Order. The Debtors also have filed 68 substantive objections to Claims primarily asserted by governmental agencies and private parties with respect to environmental liabilities.[30] The Bankruptcy Court has entered 31 orders granting the Debtors' Tier I objections to Claims, successfully expunging over 7,531 claims totaling $9,200,636,976.15. Moreover, 574 Proofs of Claim totaling $13,700,199.51 have been withdrawn by stipulation or court order.

In addition to the foregoing, the Creditors' Committee, joined by the Debtors and the Equity Committee, objected to three Proofs of Claim asserted in the amount of $3 billion, each filed by the Council for Education and Research on Toxics. The objecting parties were successful in expunging the $9 billion from the Debtors' claim

---

[30] Certain of the substantive objections to environmental claims are discussed in greater detail in section VII.K(vi), entitled "Efforts to Settle Environmental Liabilities."

K&E 17416258.15

register as further described in the *Findings of Fact, Conclusions of Law, and Order Granting the Objections of the Official Committee of Unsecured Creditors of Chemtura Corporation, et al. to the Council for Education and Research on Toxics' Claim Nos. 12051, 12053 and 12055*, dated May 17, 2010 [Docket No. 2689]. As the Debtors continue to analyze and reconcile Claims, they intend to file additional objections as appropriate in order to maintain an accurate claims register.

### (iv)      Review and Estimation of Diacetyl Claims

In addition to the Claims-related efforts described above, the Debtors have undertaken efforts to review and estimate the Diacetyl Claims, which are described in detail in section VII.D(iv) of this Disclosure Statement.

### E.      Rejection and Assumption of Executory Contracts and Unexpired Leases

### (i)      Summary of Rejection and Assumption of Material Contracts and Leases

As of the Petition Date, the Debtors were party to thousands of contracts and leases as part of the ordinary course of their business operations. During the Chapter 11 Cases, the Debtors reviewed their Executory Contracts and Unexpired Leases to identify for rejection certain contracts and leases that did not provide a net benefit to the Debtors' estates. To date, the Bankruptcy Court has entered several orders authorizing the Debtors to reject certain Executory Contracts and Unexpired Leases.

Additionally, in advance of the deadline imposed by section 365(d)(4) of the Bankruptcy Code with respect to leases of nonresidential real property, the Bankruptcy Court entered two orders authorizing certain Debtors to assume more than 1,000 Unexpired Leases considered beneficial for their estates and their business operations. The majority of these leases were "brine" leases, which may not constitute leases of nonresidential real property, but which leases were assumed by the Debtors in an abundance of caution and had no associated cure costs [Docket Nos. 1142 and 1195].

Additionally, on November 3, 2009, the Bankruptcy Court entered an order authorizing Chemtura to enter into an amendment to the lease with respect to its headquarters located in Middlebury, Connecticut and assume such lease as amended [Docket No. 1386]. Following entry of this order, Chemtura relocated several of its business operations from the Middlebury, Connecticut facility, including transitioning the location of Chemtura's corporate offices to Philadelphia, Pennsylvania.

### (ii)      Resolution of the Lyondell Lease

On December 20, 1994, in conjunction with an Asset Purchase Agreement (the "**Olin APA**"), BioLab, Inc. ("**BioLab**") and Olin Corporation, a predecessor in interest of Lyondell Chemical Company ("**Lyondell**"), entered into a lease for a tract of land located in Lake Charles, Louisiana containing an industrial complex (the "**BioLab Facility**" and such lease, the "**BioLab Lease**"). Additionally, pursuant to two separate agreements, Lyondell provided BioLab with (a) utilities and related services with respect to the BioLab Facility pursuant to an agreement dated February 3, 2003 (the "**Lyondell Services Agreement**") and (b) railcar switching services with respect to the BioLab Facility pursuant to an agreement dated January 11, 1999 (the "**Lyondell Railcar Agreement**").

On January 6, 2009, April 24, 2009 and May 8, 2009, Lyondell and several of its affiliates commenced chapter 11 cases in the Bankruptcy Court, Case No. 09-10023 (REG). On May 12, 2009, Lyondell filed a motion seeking to reject Executory Contracts in its bankruptcy cases (the "**Rejection Motion**"). The Rejection Motion sought, among other things, rejection of the Lyondell Services Agreement; yet, it did not include the BioLab Lease or the Olin APA. Additionally, on May 12, 2009, Lyondell filed a motion in the Chapter 11 Cases for relief from the automatic stay to proceed with the Rejection Motion [Docket No. 378].

Subsequently, on November 2, 2009, the Bankruptcy Court entered a stipulation and order in Lyondell's chapter 11 cases by which Lyondell rejected both the Lyondell Services Agreement and the Lyondell Railcar Agreement and entered into two new postpetition agreements with BioLab, pursuant to which BioLab is able to obtain the services previously provided through the Lyondell Services Agreement, with an effective date of

November 1, 2009.  By orders dated October 9, 2009, October 27, 2009, November 24, 2009, January 11, 2010, February 11, 2010, March 10, 2010, April 14, 2010, May 11, 2010 and June 9, 2010 the Bankruptcy Court extended the time within which BioLab could determine whether to assume or reject the BioLab Lease.

The Debtors and Lyondell are engaged in extensive discussions to resolve issues relating to the BioLab Lease and are negotiating a resolution of those issues that may involve, among other things, the possible transfer of the land on which the BioLab Facility sits to BioLab.  On April 19, 2010, Lyondell filed a motion in its bankruptcy case to assume the BioLab Lease at a cure cost of $0.00.  The Debtors and Lyondell have adjourned that motion and continue working to arrive at agreement on the terms of a stipulation involving the contemplated settlement transaction.  On July 1, 2010, the Bankruptcy Court entered a stipulation and order extending the time period within which BioLab must assume or reject the BioLab Lease to August 5, 2010 [Docket No. 3076].

### F.    Debtor-in-Possession Financing During the Chapter 11 Cases

#### (i)    Second Amendment to the Initial DIP Facility

As discussed in section VI.B(ii) above, the Bankruptcy Court authorized the Debtors to enter into the Initial DIP Facility on a final basis on April 29, 2009.  For further discussion regarding the first amendment to the Initial DIP Facility, see "Commencement of the Chapter 11 Cases-Initial Financing Orders."

On July 14, 2009, the Bankruptcy Court entered an order approving the Debtors' entry into a second amendment to the Initial DIP Facility.  This amendment included, among other things, two options to extend the maturity date of the Initial DIP Facility for an additional three months, subject to payment of certain fees and a written request by February 22, 2010.

#### (ii)    Efforts to Secure Stand-Alone Financing for Certain of the Debtors' Foreign Affiliates

The Debtors have made efforts to secure stand-alone financing for certain of their non-Debtor foreign affiliates in Europe and, specifically, to replace the European Accounts Receivable Facility as described in greater detail in section IV.C(v)b of this Disclosure Statement, entitled "Receivables Facilities – The European Accounts Receivable Facility."  To date, the Debtors have been unable to raise such financing for their non-Debtor foreign affiliates on acceptable terms.

#### (iii)    Refinancing of the Initial DIP Facility

Improvements in the credit markets during the Chapter 11 Cases created the potential for the Debtors to realize increased benefit from a refinancing of the Initial DIP Facility.  To that end, on February 4, 2010, the Debtors filed a motion seeking authority to enter into a $450 million amended and restated postpetition secured superpriority financing facility (the "**Replacement DIP Facility**"), the proceeds of which would be used to refinance the Initial DIP Facility in full and to provide the Debtors with a source of working capital and funding for other general corporate purposes.

The Replacement DIP Facility consists of a $300 million term loan and a $150 million revolving credit facility (with a $50 million letter of credit subfacility).  The Replacement DIP Facility provided the Debtors with financing on cheaper and more favorable terms, yielding the Debtors an estimated $9.3 million in savings as compared to the Initial DIP Facility.  Additionally, the financing contemplated by the Replacement DIP Facility allowed the Debtors to realize several cost and operational advantages over the Initial DIP Facility, including (a) increasing the amount of the facility by $50 million, (b) allowing the Debtors to retain the proceeds of certain divestures, such as the sale of the PVC Additives segment (as discussed in section VII.J(ii) below), (c) providing additional availability of funds and eliminating expensive extension fee provisions associated with the Initial DIP Facility and (d) loosening several other covenants.  Lastly, the maturity date of the Replacement DIP Facility is the earlier of February 2, 2011 or the Effective Date, thereby allowing the Debtors to focus their efforts on exiting chapter 11 rather than addressing the need to replace or renegotiate an expiring credit facility.

On February 9, 2010, the Bankruptcy Court entered an order approving the Debtors' entry into the Replacement DIP Facility, which order became final by its terms on February 18, 2010 [Docket No. 1935].

K&E 17416258.15

### G.      Retiree Matters

#### (i)      Defined Benefit Plans

As noted above, as of the Petition Date, the Debtors sponsored the material employee benefit plans discussed below, each of which is governed by provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461 ("**ERISA**"), and the Internal Revenue Code (collectively, the "**U.S. Pension Plans**"). This section provides additional information with respect to the U.S. Pension Plans.

As provided in section 5.3 of the Plan, the rights under the U.S. Pension Plans will not be Impaired or affected by the Chapter 11 Cases, and the Debtors will contribute $50 million upon the Effective Date to the Chemtura Corporation Retirement Plan (the "**Chemtura Retirement Plan**"), one of the Debtors' U.S. Pension Plans.

The U.S. Pension Plans are covered by the termination insurance program provided under Title IV of ERISA. The Pension Benefit Guaranty Corporation ("**PBGC**") is the United States government agency that administers this termination insurance program, which covers most private defined-benefit pension plans. The U.S. Pension Plans are covered by the termination insurance program described in Title IV of ERISA. The PBGC's principal purpose is to guarantee the payment of certain pension benefits to participants upon termination of a pension plan.[31]

For purposes of clarity, this section VII.G does not relate to holders of Claims against Chemtura Canada.

#### a.      Single-Employer Pension Plans

When a "single-employer plan" within the meaning of 29 U.S.C. § 1301(a)(15) (a "**Single-Employer Plan**") terminates with insufficient assets to pay benefits, PBGC generally becomes statutory trustee of the plan and pays benefits to the plan's participants up to statutory limits.

The Chemtura Retirement Plan, sponsored by Chemtura, is a Single-Employer Plan. As of January 1, 2009, the Chemtura Retirement Plan provided pension benefits to approximately 1,353 employees and 13,581 retirees and deferred vested plan participants.[32] The Debtors estimate that the Chemtura Retirement Plan was underfunded by $398.8 million on a PBGC termination liability basis as of April 1, 2010. There have been no cash contributions made to the Chemtura Retirement Plan during the Chapter 11 Cases as the Debtors have been able to apply credit balances to meet funding requirements as permitted under the Pension Protection Act of 2006. The Debtors estimate that absent an additional voluntary contribution or other arrangement, no cash contributions to the Chemtura Retirement Plan would be required with respect to the 2010 plan year after continuing application of available credit balances. Absent any voluntary contributions in 2010 or 2011, the Debtors estimate that a total of approximately $105.8 million would be due in cash contributions during calendar years 2012 and 2013 based on current economic conditions.

Chemtura also sponsors the Retirement Plan for Hourly Paid Bargaining Employees of Witco (Perth Amboy) (the "**Perth Amboy Plan**"), a Single-Employer Plan, which as of January 1, 2009, provided pension benefits to approximately 46 hourly employees and 76 retirees and deferred vested participants. The Debtors estimate that the Perth Amboy Plan was underfunded by $1.8 million on a PBGC termination liability basis as of April 1, 2010. No cash contributions have been due to the Perth Amboy Plan during the Chapter 11 Cases. The Debtors also estimate that a total of approximately $1.1 million will be due in cash contributions to the Perth Amboy Plan for calendar years 2010 through 2013 based on current economic conditions.

Chemtura also sponsors the Retirement Plan for Hourly Paid Bargaining Unit Employees of Witco (Marshall) (the "**Marshall Plan**"), a Single-Employer Plan, which as of January 1, 2009 provided pension benefits

---

[31]    *See* 29 U.S.C. § 1302.

[32]    A "deferred vested" plan participant is a plan participant who is no longer actively employed and has a vested right to a pension benefit under the terms of the plan, but who has not yet started to receive payment of that pension benefit.

K&E 17416258.15

to approximately 31 retirees and 33 deferred vested participants. The Marshall plant was sold before the Petition Date; therefore, there are no active employees in the Marshall Plan. The Debtors estimate that the Marshall Plan was underfunded by approximately $1.0 million on a PBGC termination liability basis as of April 1, 2010. The only cash contribution made to the Marshall Plan during the Chapter 11 Cases was a contribution of $150,000 made on September 15, 2009. The Debtors estimate that a total of approximately $0.3 million will be due in cash contributions to the Marshall Plan in calendar years 2011 through 2013 based on current economic conditions.

On or about October 30, 2009, the PBGC filed separate Proofs of Claim against each of the Debtors, except Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date). In accordance with the *Order Approving Stipulation Permitting Pension Benefit Guaranty Corporation to File Consolidated Claims Under a Single Case Number*, [Docket No. 1226], a single Proof of Claim was deemed to constitute the filing of a Proof of Claim against each and every Debtor in the Chapter 11 Cases, except Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date). Specifically, the PBGC filed a Claim for each of the Single-Employer Plans based on:

- the estimated amount of the Single-Employer Plans' unfunded benefit liabilities if the Single-Employer Plans were to terminate ("**Unfunded Liability Claims**");[33]

- the estimated amount of unpaid minimum funding contributions that may be owed to the Single-Employer Plans (the "**Funding Claims**"), in unliquidated amounts;

- the estimated amount of insurance premiums, including termination premiums under 29 U.S.C. § 1306(a)(7) ("**DRA Premiums**"), interest and penalties that may be owed to PBGC if the Single-Employer Plans were to terminate or be terminated, in unliquidated amounts; and

- the shortfall and waiver amortization charges that may be owed to the Single-Employer Plans.[34]

As described above, section 5.3 of the Plan provides for maintenance of the Debtors' Single-Employer Plans and the payment by the Debtors of a $50 million contribution to the Chemtura Retirement Plan on the Effective Date. Apart from this $50 million contribution, the Debtors have either timely made all minimum funding contributions or have not been required to make minimum funding contributions, so there will be no pre-Confirmation Funding Claims payable under the Plan. Also, because the Unfunded Liability Claims and DRA Premiums only arise upon termination of the Singe-Employer Plans, such Claims will not arise and shall not be entitled to any distribution under the Plan.

### b.    Multiemployer Pension Plan

The Debtors also contribute to the Teamsters Local 102 Pension Fund, a multiemployer pension plan, as the result of the Debtors' acquisition of Hatco Corporation in 2007. The plan's actuary estimated the Debtors' liability, if a mass withdrawal had occurred (which it did not) in the plan year ended March 31, 2009, to be approximately $5.0 million.

### (ii)    Non-Qualified Pension Arrangements

Before the Petition Date, the Debtors provided benefits pursuant to certain non-qualified pension and other deferred compensation arrangements (the "**Non-Qualified Pension Arrangements**"). Under the Non-Qualified Pension Arrangements, certain of the Debtors' executive officers were provided the opportunity to participate in

---

[33]   Specifically, the PBGC filed claims for the unfunded benefit liabilities of: (a) the Chemtura Retirement Plan in the amount of $327.7 million; (b) the Perth Amboy Plan in the amount of $2.1 million; and (c) the Marshall Plan in the amount of $1.0 million. The PBGC asserted a portion of these amounts is entitled to status as an administrative and/or priority claim.

[34]   Specifically, the PBGC filed claims for shortfall and waiver amortization charge under (a) the Chemtura Retirement Plan in the amount of $174.1 million; (b) the Perth Amboy Plan in an unliquidated amount; and (c) the Marshall Plan in an unliquidated amount.

Non-Qualified Pension Arrangements designed to provide benefits similar to those available under a tax qualified plan administered pursuant to section 401(k) ("**401(k) Plan**") for contributions that are in excess of the limits imposed by federal law on contributions to the 401(k) Plan. The participants in these Non-Qualified Pension Arrangements include former executives of the Debtors, predecessor companies and other legacy entities whose liabilities and obligations were assumed by the Debtors either contractually or by law, including through past merger and acquisition activity. As of December 31, 2009, the Debtors estimated that they paid benefits in excess of $3 million per year in respect of the Non-Qualified Pension Arrangements. The obligations under the Non-Qualified Pension Arrangements were unfunded.

### (iii)    Other Post-Employment Benefits

#### a.    Overview of Other Post-Employment Benefits

As of the Petition Date, the Debtors provided medical expense reimbursement, insurance premium reimbursement, partial reimbursement and/or subsidy arrangements and life insurance benefits (collectively referred to as "**Other Post-Employment Benefits**" or "**OPEB**") to certain of their retirees. The Other Post-Employment Benefits were a significant liability of the Debtors as of the Petition Date. As of October 2009, the Debtors determined that their unfunded OPEB liability was approximately $105.9 million with respect to approximately 2,590 current retirees, with projected cash outlays of $55.4 million for the five-year period thereafter. The Debtors also determined that their unfunded OPEB liability was approximately $12.0 million with respect to 284 active or former employees as of that date.[35] As discussed in this subsection, the Debtors have sought – and, in some instances, obtained – authority from the Bankruptcy Court to modify the Other Post-Employment Benefits.

#### b.    Modification of OPEB

##### i.    The OPEB Motion

On October 29, 2009, the Debtors filed a motion for authorization to modify OPEB with respect to approximately 1,911 of the 2,590 current retirees and all the currently active or former employees, as well as their spouses and dependents [Docket No. 1368]. In the motion, the Debtors asserted that they had the unilateral right to amend or terminate the OPEB described therein pursuant to relevant plan documents. Moreover, they further asserted that to the extent any retirees had been covered by a collective bargaining agreement ("**CBA**") during active employment, any OPEB described thereunder was explicitly limited to the duration of the CBA and all such CBAs had expired.

The Debtors estimated that the proposed modifications to OPEB would reduce their unfunded OPEB liability by approximately $70.1 million and reduce the first year cash outlay by approximately $7.0 million. The Debtors note, however, that modification of OPEB is subject to ongoing litigation in the Bankruptcy Court, and there can be no guarantee at this time that the Debtors will achieve the estimated result provided herein. The United Steelworkers (the "**USW**"), Chemical Workers Counsel of the United Food and Commercial Workers Local 698C (the "**CWC**") and certain individual retirees filed objections to the Debtors' motion arguing that certain retirees have vested OPEB rights under the terms of the applicable plan documents and CBAs and, therefore, the Debtors are not entitled to terminate their obligations to provide OPEB unless and until authorized to do so under section 1114 of the Bankruptcy Code. If the Debtors are unable to achieve this estimated result, they anticipate based upon current Plan structure that they will have sufficient funds to pay the associated additional obligations, although such obligations may not be included in the Debtors' cash flow projections.

---

[35]    The Debtors note the Uniroyal Retirees Group disagrees with the Debtors' estimate of the number of retirees and has reserved all rights to assert it is a different number.

K&E 17416258.15

### ii.    The Entry of the First OPEB Order

The Bankruptcy Court granted the relief requested in the OPEB motion on November 30, 2009 in all respects (the "**First OPEB Order**") [Docket No. 1529], except as the motion applied to (a) former hourly employees of Crompton Corporation / Uniroyal Chemical who were represented by the USW (or one of its predecessors) while actively employed, (b) former hourly employees of Witco / Richardson Company who were represented by the USW (or one of its predecessors) while actively employed, (c) former hourly employees of the Great Lakes Chemical Corporation at the Nitro, West Virginia facility who were represented by the USW (or one of its predecessors) while actively employed (collectively, (a), (b) and (c) the "**USW Retirees**"), (d) former hourly employees of Witco / OSi Specialties, Inc. at the Sistersville, West Virginia facility who were represented by the CWC (or one of its predecessors) while actively employed (the "**CWC Retirees**"), (e) John Prior, a former salaried employee of Crompton Corporation / Uniroyal Chemical ("**Prior**"), and (f) Peter Barna, Charles J. Marsden, Vincent A. Calarco, Gerald H. Fickenscher, Karen Osar, Edward L. Hagan, William Stephenson and John Ferguson, each former Debtor executives (the "**Executive Retirees**").

### iii.    Non-Union Objections to the OPEB Motion

At the November 18, 2009 hearing, the Bankruptcy Court directed the Executive Retirees and the Debtors to jointly file supplemental documents that the Executive Retirees alleged to contain promises of OPEB vesting. Those documents were provided and the Bankruptcy Court was expected to rule as to the objections of the Executive Retirees without further argument.

At the same hearing, the Bankruptcy Court also requested that the Debtors and Prior provide the Bankruptcy Court with additional briefing regarding the OPEB motion as it applies to Prior.

The additional briefing was provided to the Bankruptcy Court on December 3, 2009 [Docket No. 1547] and December 10, 2009 [Docket No. 1582], which the Bankruptcy Court took under submission and was expected to rule as to Prior's objection without further argument.  No ruling has, as yet, been issued.

Following the November 18 Hearing, counsel purporting to represent approximately 600 retirees alleged to be similarly situated to Prior (the "**Uniroyal Retirees Group**") moved the Bankruptcy Court on December 3, 2009 to reconsider the First OPEB Order and allow the group to file a late objection to the Debtors' motion [Docket No. 1581].  The Bankruptcy Court denied the Uniroyal Retirees Group's motion on January 6, 2010, but the order was not entered on the docket until April 5, 2010 [Docket No. 2395].  The Uniroyal Retirees Group subsequently filed a notice of appeal on April 8, 2010 of the Bankruptcy Court's denial of their motion and moved the Bankruptcy Court to stay the Debtors' modification of OPEB pursuant to the First OPEB Order.  The stay was granted by the Bankruptcy Court on April 21, 2010 [Docket No. 2538] pending reargument of the stay motion or hearing of the Uniroyal Retirees Group's appeal to the District Court.

On June 17, 2010, the Bankruptcy Court entered a stipulation and order pursuant to which the Debtors agreed to waive the Uniroyal Retirees Group's failure to timely object to the OPEB Motion and permitted the Uniroyal Retirees Group to submit legal briefing on the matter [Docket No. 2096].  The Uniroyal Retirees Group filed their opening legal brief on June 25, 2010 [Docket No. 3011].  Oral argument on the legal brief is scheduled to be heard on August 4, 2010 at 9:45 a.m. (EDT).

### iv.    Union Objections to the OPEB Motion and the Second OPEB Order

After a hearing on January 6, 2010 with respect to the legal arguments raised by the USW Retirees and CWC Retirees, the Bankruptcy Court granted the OPEB motion on February 11, 2010 in all remaining respects with respect to the CWC Retirees (the "**Second OPEB Order**") [Docket No. 1960].

With respect to the USW Retirees, the Bankruptcy Court continued the OPEB motion for an evidentiary hearing with respect to certain open issues of fact identified by the court at the January 6, 2010 hearing.  The Debtors are currently engaged in negotiations with the USW Retirees to determine whether a consensual resolution to the OPEB motion may be reached and have not yet scheduled an evidentiary hearing on the motion.

81

*v.* *Modifications to OPEB Pursuant to the First and Second OPEB Orders*

On May 1, 2010, the Debtors implemented changes to OPEB to the extent permitted under the First OPEB Order and Second OPEB Order. The Debtors intend to implement future changes to OPEB with respect to Prior, the Uniroyal Retirees Group, the Executive Retirees and the USW Retirees to the extent permitted under future orders of the Bankruptcy Court.

### (iv)   UK Pension Obligations

Certain of the Debtors' subsidiaries and affiliates also sponsor pension plans in their respective jurisdictions that are or may be underfunded. Non-Debtor Chemtura Manufacturing UK Limited ("**CMUK**") sponsored the Great Lakes UK Limited Pension Plan (the "**UK Pension Plan**"), an occupational pension scheme that was established and participated in the UK Pension Plan in order to provide pensions and other benefits, most of which are defined benefits in nature, based on pensionable salary. The UK Pension Plan provides benefits to approximately 580 pensioners and 690 members entitled to deferred payment of defined benefits. Although an actuarial valuation as of December 31, 2008 is still being finalized, the estimated funding deficit as of that date, as measured in accordance with section 75 of the Pension Act of 1995 (UK) is approximately £95 million.

The Trustees of the UK Pension Plan (the "**UK Pension Trustees**") have filed 27 contingent, unliquidated Proofs of Claim against each of the Debtors. On July 8, 2010, the Debtors filed an objection seeking to disallow and expunge these proofs of claim [Docket No. 3146].

In light of the filings of the Chapter 11 Cases and the financial constraints on CMUK, the Company has engaged in discussions with the UK Pension Trustees and the UK Pensions Regulator relating to the funding of the estimated deficit of the UK Pension Plan.

### H.   Employee Matters

### (i)   The Debtors' Employees, Management Team and Board of Directors

#### a.   Employees

As of December 31, 2009, the Company employed a total of approximately 4,400 full-time employees.

The Debtors estimate that approximately 264 of their employees are members of unions, including (a) the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local Nos. 7-807, 1-08 and 397; (b) the Lake Charles Metal Trades Council; (c) the International Brotherhood of Teamsters Union Local No. 102; and (d) the International Union, United Automobile, Aerospace and Agricultural Workers of America, Local 963. Additionally, the Debtors supplement their workforce with independent contractors, some of which are retained through third-party employers and agencies, depending on the Debtors' business needs (often on a seasonal basis).

#### b.   Management Team

The Debtors' current senior management team has both deep-rooted and recent experience in the specialty-chemicals industry. The following individuals comprise the Debtors' senior management team as of April 30, 2010. The compensation for certain members of the Debtors' management for the fiscal year ending December 31, 2009 is set forth in the Annual Report on Form 10-K, which can be obtained from the SEC's EDGAR website (http://www.sec.gov/edgar.shtml). The following individuals comprise the executive officers of the Debtors:

- Craig A. Rogerson, Chairman, President and Chief Executive Officer

- Chet H. Cross, Executive Vice President and Group President – Engineered Products

- Stephen C. Forsyth, Executive Vice President and Chief Financial Officer

82

- Billie S. Flaherty, Senior Vice President, General Counsel and Secretary

- Kevin V. Mahoney, Senior Vice President and Corporate Controller

- Alan M. Swiech, Senior Vice President – Human Resources & Communication

- Carol V. Anderson, Vice President and Treasurer

- Raymond E. Dombrowski, Chief Restructuring Officer

### c.    Board of Directors

The following persons comprise the current board of directors of Chemtura (the "**Board**"):

- Craig A. Rogerson, *Chairman of the Board of Directors, President and Chief Executive Officer*, Craig A. Rogerson has served as President, Chief Executive Officer and Chairman of the Board since December 2008. Mr. Rogerson has over 31 years of experience working in the specialty chemicals industry and has previously served as President, CEO and director of Hercules Inc. until its acquisition by Ashland Inc. in November 2008. Mr. Rogerson served in a variety of executive capacities with Hercules, including Vice President and General Manager of the BetzDearborn Division, President of the FiberVisions and Pinova Divisions, Vice President of Global Procurement and Chief Operating Officer. He also served as President and CEO for three years at Wacker Silicones Corporation. Mr. Rogerson, beginning in 2005, serves as a director and member of the nuclear oversight committee of PPL Corporation. He has also been a member of the boards of directors of the American Chemistry Council and the Society of Chemical Industries since 2006 and 2008 respectively. Mr. Rogerson graduated with a Chemical Engineering degree from Michigan State University.

- Burton M. Joyce, *Director*. Burton M. Joyce has served as a director of Chemtura since October 2009. Mr. Joyce served as the Chairman and director of IPSCO Inc., now SSAB Enterprises, LLC, a North American steel and pipe manufacturer from 2000 to 2007. Mr. Joyce was previously Vice Chairman, President, CEO, Chief Operating Officer and Executive Vice President-Finance of Terra Industries, Inc. and director of Terra Industries, Inc., Terra Nitrogen Co. and Hercules, Inc. From 1977 to 1986, Mr. Joyce held various positions in finance and general management at United Technologies Corporation. He currently serves as a director and member of the audit and compensation committees of Norfolk Southern Corporation. Mr. Joyce earned a Bachelor of Science in accounting at Miami University (Ohio).

- Bruce F. Wesson, *Director*. Bruce F. Wesson has served as a director of Chemtura, or a predecessor company, since 1980. Mr. Wesson is a Managing Director of Galen Associates, a healthcare venture firm, New York, NY and a general partner of Galen Partners, L.P. Mr. Wesson served over 23 years with the Corporate Finance Division of Smith Barney, Harris Upham & Co. Inc. and was most recently a Senior Vice President and Managing Director. While there, Mr. Wesson oversaw and headed the Major Account Group and chaired the Valuation Committee. Since 1998, he has been serving as a director of Acura Pharmaceuticals, Inc. and is a member of the compensation committee. Moreover, Mr. Wesson has also been serving as director of Derma Sciences, Inc. since 2006 and vice lead director since 2008. Mr. Wesson currently serves as the Vice Chairman, as a director and as chairman of the audit committee of MedAssets, Inc. and is a member of the board of directors of several private portfolio companies of Galen Associates.

- John K. Wulff, *Director*. John K. Wulff has served as a director of Chemtura since October 2009. He is the retired Chairman of Hercules Inc., a position he held from July 2003 until Ashland, Inc.'s acquisition of Hercules in November 2008. Prior to that, he served as a member of the Financial Accounting Standards Board from 2001 to 2003. Mr. Wulff is the former Chief Financial Officer of Union Carbide Corporation and had been Union Carbide's Vice President and Principal Accounting Officer, as well as Controller. Prior to joining Union Carbide, Mr. Wulff

was a partner with KPMG and predecessor accounting firms from 1977 to 1987. Mr. Wulff currently serves as a director, chairman of the audit committee and as a member of the governance and compensation committee of Moody's Corporation. He is also director and chairman of the audit committee of Sunoco, Inc. and a director and chairman of the compensation committee of Celanese Corporation. Mr. Wulff previously served as a director and chairman of the nominating and governance committee of Fannie Mae. Mr. Wulff earned a Bachelor of Science in economics from the University of Pennsylvania.

- Nigel D. T. Andrews, *Director*. Nigel D. T. Andrews served as director of GLCC from 2000 to 2005, including as Chairman from 2004 to 2005 and has been a director of Chemtura since 2005. Mr. Andrews served as Executive Vice President of General Electric Capital Corp. from 1993 to 2000 and prior to that time as Vice President and General Manager of General Electric Plastics-Americas and as Vice President of Corporate Business Development of General Electric Company, reporting to the Chairman. Mr. Andrews, a chemical engineer, began his career in marketing at Shell International Chemical Company in London. He earned an MBA from the London Business School and subsequently joined Booz Allen Hamilton in New York, now Booz & Company, where he became a partner in Booz Allen's chemicals and strategy practices. Since 2002, Mr. Andrews has served as a director and as a member of the audit and remuneration committees of Old Mutual plc., a trustee of Victory Funds and as a governor of the London Business School.

- James W. Crownover, *Director*. James W. Crownover served as director of GLCC from 2002 to 2005, including as presiding director, and has been a director of Chemtura since 2005. Mr. Crownover retired in 1998 as a director of the global management consulting firm of McKinsey & Company. During Mr. Crownover's 30-year career with McKinsey, Mr. Crownover served as director, as head of its southwest practice and as co-head of its worldwide energy practice working with clients across the globe. Mr. Crownover, since 2006, has served as a director, as chairman of the compensation committee and as a member of the nominating and corporate governance committee of FTI Consulting, Inc. Moreover, Mr. Crownover is also serving as a director, as chairman of the governance committee and as a member of the compensation committee of Weingarten Realty Investors and, beginning in 2008, as a director and as a member of the audit and integration committees of the Republic Services, Inc. He has previously served as a director, as a member of the audit committee and as chairman of the governance committee of Allied Waste Industries and as chairman of the audit and pension committees of Unocal Corporation. Mr. Crownover also serves as Chairman of the Board of Trustees of Rice University and as a director of the Houston Grand Opera.

- Martin M. Hale, *Director*. Martin M. Hale is a former director of GLCC having served from 1978 to 2005 and in the capacity of Chairman of the Board from 1995 to 2000 and has been a director of Chemtura since 2005. From 1983 to 2001, Mr. Hale was Executive Vice President and partner of Hellman Jordan Management Company, Inc., a registered investment advisor. From 1980 to 1983, Mr. Hale was President and CEO of Marsh & McLennan Asset Management Corp. Mr. Hale currently serves as a director and chairman of the audit committee of Innospec Inc. (formerly known as Octel Corp.) and is an Honorary Trustee of the Museum of Fine Arts in Boston, MA.

- Roger L. Headrick, *Lead Director*. Roger L. Headrick has served as a director of Chemtura since 1988, as co-lead director since May 2008 and as lead director since 2009. Mr. Headrick is the Managing General Partner of HMCH Ventures, a private investment company, in Wayzata, MN and is also the President and CEO of ProtaTek International, Inc., a biotechnical animal vaccine company, in St. Paul, MN. Mr. Headrick is the former President and Chief Executive Officer of the Minnesota Vikings Football Club, Inc., Eden Prairie, MN during which he served as Chairman of the NFL Properties Executive Committee, the marketing arm of the NFL. He has also served as a member of the NFL Broadcast Committee and the NFL Internal Committee. From 1982 to 1989, Mr. Headrick was the Executive Vice President and Chief Financial Officer of The Pillsbury Company and Chairman and Managing General Partner of Burger King Investors Master Limited

Partnership. Prior to joining Pillsbury, Mr. Headrick held various financial positions both domestically and overseas at Exxon Corporation, spanning over 20 years, including Deputy Controller. Mr. Headrick also previously served as a director of CVS Caremark and as Trustee for the University of Minnesota Cancer Center Advisory Board, the Minnesota Medical Foundation and The Sanford Burnham Medical Research Institute in La Jolla, California.

### (ii)    2009 Key Employee Incentive Plan and Emergence Incentive Plan

As with many specialty chemical companies, before the Petition Date, the Company's compensation plan for management-level employees included three critical components: (a) a base salary; (b) an annual incentive plan providing compensation for meeting and/or exceeding performance targets during a particular compensation year; and (c) a longer term incentive plan designed to reward the senior management team for long-term improvements in equity value (the "**Prepetition Incentive Program**"). Fundamentally, the Prepetition Incentive Program, which was developed, overseen and implemented by the Board, was intended to attract, retain and motivate talented executives with an eye toward delivering strong annual business results and fostering a results-oriented culture.

Following their chapter 11 filings, the Debtors, together with their advisors and in conjunction with the professionals retained by the Creditors' Committee, reviewed and revised the Prepetition Incentive Program, subject to approval by the Bankruptcy Court. Specifically, the revised incentive program consisted of two parts: a management incentive plan for the 2009 calendar year (the "**2009 MIP**") and an Emergence Incentive Plan, which applies to the 12-month period preceding emergence from chapter 11 (the "**2009 EIP**" and, together with the 2009 MIP, the "**2009 Key Employee Incentive Plan**"), as follows:

- *2009 MIP*. The 2009 MIP was available to approximately 280 of the Debtors' management-level employees. The Debtors designed the metrics for the 2009 MIP to emphasize performance based on EBITDA on a consolidated or business unit basis, while also maintaining a focus on cash through the measurement of accounts receivable and inventory as components of working capital. Payments under the 2009 MIP were paid only where such stated performance objectives were achieved. The total amount payable under the 2009 MIP at target was approximately $11.5 million.

- *2009 EIP*. The 2009 EIP was available to certain of the Debtors' management-level employees and qualifying new employees. The number of employees included in the 2009 EIP and the size of the grant pool under the Emergence Incentive Plan depended at all times on the achievement of specific EBITDA goals, ranging from between 20 to 200 employees. Additionally, the value of the incentive pool that was to be made available to eligible employees at the time of emergence was linked to specific EBITDA levels, with a maximum pool of $16.5 million at an EBITDA level of $300 million. Awards under the 2009 EIP were to be made in the form of cash or stock, in the discretion of the New Board. Accrual under the 2009 EIP ceased as of March 31, 2010 upon the approval of the 2010 Emergence Incentive Plan, as discussed below.

On July 28, 2009, the Bankruptcy Court entered an order approving the 2009 Key Employee Incentive Plan [Docket No. 847]. As of the date hereof, the Debtors have paid a total of approximately $9,036,279 under the 2009 MIP. No amounts have been distributed (or are expected to be distributed prior to emergence) pursuant to the 2009 EIP.

K&E 17416258.15

(iii)    *2010 Key Employee Incentive Plan and Emergence Incentive Plan*

On February 19, 2010, the Debtors filed a motion seeking authority to implement an incentive plan for certain management-level employees during the course of 2010 (the "**2010 Key Employee Incentive Plan**").  As with the 2009 Key Employee Incentive Plan, the 2010 proposal included (a) an incentive plan for 2010 (the "**2010 MIP**") and (b) an Emergence Incentive Plan for 2010.

The Debtors designed the 2010 Key Employee Incentive Plan to build upon the successful structure of the 2009 Key Employee Incentive Plan and developed associated achievement targets that together were calibrated to achieve two goals:  (a) to motivate the members of the Debtors' management and align their incentives with those of the Debtors' stakeholders, thereby furthering the goal of chapter 11 by maximizing the value of the Debtors' chapter 11 estates, and (b) to motivate and reward exceptional performance beyond a chapter 11 exit.

At a hearing held on April 19, 2010, the Bankruptcy Court did not approve the proposed 2010 Key Employee Incentive Plan, but permitted the Debtors to continue the motion to reassess EBITDA threshold levels for the 2010 MIP.  On May 7, 2010, the Debtors submitted a revised proposal for the 2010 MIP, which reflected updated EBITDA threshold and target levels for payouts pursuant to the 2010 MIP and addressed certain questions raised by the Bankruptcy Court regarding the appropriate metric to be used for measuring employee performance.  The Bankruptcy Court approved the 2010 Key Employee Incentive Plan, as amended, on May 18, 2010 [Docket No. 2707].

I.    **Litigation and Adversary Proceedings**

(i)    *Environmental Litigation*

Certain of the Debtors face potentially significant environmental liabilities and obligations at numerous sites that are owned or operated, as well as sites that are not part of the Debtors' bankruptcy estates.  This section describes these liabilities as they relate to Chemtura and the Subsidiary Debtors.  The environmental liabilities discussed herein do not include liabilities of Chemtura Canada, which are not affected by the Chapter 11 Cases.

These liabilities exist largely as a result of the lengthy industrial history of the Debtors' predecessors, particularly with respect to the non-owned "legacy" sites.  The Debtors are subject to environmental orders, consent decrees, notices of liability, claims, demands and other actual or contingent obligations and liabilities, including injunctive obligations to perform response actions with respect to actual or potential releases and threats of releases of hazardous substances or other contaminants, at or in connection with various owned and non-owned sites.  As discussed in this subsection, the Debtors have taken steps during the Chapter 11 Cases to address their environmental liabilities in accordance with the Bankruptcy Code.

On November 3, 2009, the Debtors filed an adversary proceeding seeking a declaratory judgment that environmental liabilities associated with approximately 197 formerly-owned or never-owned third-party waste sites are unsecured claims that are dischargeable in bankruptcy.  (Adv. Proc. 09-01719).  The sites at issue in the November complaint consisted of sites that the Debtors either previously owned and sold to third-parties or sites that the Debtors never owned, but at which the Debtors retained environmental remediation liability (collectively, "**Non-owned Sites**").  Some, but not all of the sites in the Debtors' complaint were subject to consent orders and state governments asserting that the liabilities relating to such sites were non-dischargeable obligations of the Debtors.  The complaint alleged that the Non-owned Sites were not part of the Debtors' bankruptcy estates, that the Debtors did not control those sites and that the Debtors could only clean-up these sites by paying a third-party remediation consultant.  For these reasons and because the federal and/or state governments are seeking the payment of funds to cover such remediation obligations, the Debtors contended, based on the United States Supreme Court's decision in *Ohio v. Kovacs*, that their environmental liabilities with respect to the Non-owned Sites are dischargeable.  *See, e.g., Ohio v. Kovacs*, 469 U.S. 274, 283 (1985).  The Creditors' Committee filed a statement of intervention in the environmental litigation on December 4, 2009 (Adv. Proc. 09-01719) [Docket No. 5].

By letter dated December 8, 2009, the Debtors requested a pre-motion conference to move for summary judgment with respect to the legal issue of dischargeability of the environmental obligations at the Non-owned Sites.  At a telephone hearing on December 14, 2009, federal and state regulators alleged that a number of the Non-owned

Sites at issue in the Debtors' complaint were not ripe for adjudication, rendering summary judgment inappropriate, and the Bankruptcy Court scheduled a further pre-motion status conference for the parties to address these concerns. On January 4, 2010, the Debtors proposed to amend their complaint in order to narrow the number of sites at issue to ten sites. A second hearing was held on January 14, 2010 to determine whether the Debtors may pursue summary judgment with respect to the more narrowly defined amended complaint. At the hearing, the Debtors agreed to stipulate solely for purposes of their summary judgment motion that there may be on-going pollution at the ten Non-owned Sites so that the Bankruptcy Court could address the legal issue of whether obligations at such sites were nonetheless dischargeable. The Bankruptcy Court also provided a limited grant of the Government Defendants' request for discovery so that the parties could attempt to agree upon undisputed facts concerning the Non-owned Sites.[36] With the Bankruptcy Court's approval of the Debtors' request to proceed with a summary judgment motion and direction on how to proceed, the Debtors filed their proposed amended complaint on January 19, 2010.

On January 21, 2010, certain of the Government Defendants moved to withdraw the reference with respect to the Amended Complaint to the United States District Court for the Southern District of New York (the "**District Court**"). In addition, after the Debtors had filed the amended complaint, the Bankruptcy Court permitted three private-party defendants from the State of New Jersey to intervene as additional defendants: Highview Properties One LLC, Passaic Valley Sewerage Commissioners and Harmony Township (the "**Intervener Defendants**"). The Government Defendants filed answers to the amended complaint and asserted that the Debtors' environmental clean-up obligations at the Non-owned Sites are non-dischargeable. On February 5, 2010, the Debtors responded to discovery requests served by four different defendants and, on February 12, 2010, the Debtors moved for summary judgment with respect to nine of the ten Non-owned Sites identified in the amended complaint.

On March 26, 2010, the District Court granted the Government Defendants' motion for withdrawal of the reference. As a result, the Debtors' adversary proceeding is now pending before the District Court. On April 21, 2010, the Government Defendants and the Intervener Defendants filed their oppositions to the Debtors' motion for summary judgment and in response to the Defendants' cross-motions for summary judgment. In their opposition papers, the defendants assert that the Debtors' obligations at the Non-owned Sites are non-dischargeable obligations.

With the approval of the District Court, the Debtors and the Government Defendants have agreed to adjourn the remaining briefing with respect to the Debtors' summary judgment motion and the Government Defendants' cross-motion for summary judgment on two separate occasions. On June 15, 2010, the District Court held a status conference, following which the District Court suspended further briefing pending the ongoing settlement negotiations. On July 15, 2010, the District Court held a status conference at which the Debtors advised the District Court of the progress being made towards resolution of the dispute with certain Defendants and requested an additional 30-day stay of the briefing. The District Court granted the stay and set another status conference on September 7, 2010.

To the extent the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consents shall not be unreasonably withheld) and the holders of Environmental Claims cannot achieve a consensual resolution of the scope of the Debtors' environmental liabilities, then, in accordance with section 3.3(k) of the Plan, the Debtors will either seek to estimate the amount of such Environmental Claims at a particular site and fund a Cash reserve in such estimated amount pending litigation or otherwise Reinstate the respective Environmental Claim.

### (ii)    Diacetyl Litigation

As discussed in section V.D(ii) of this Disclosure Statement, as of the Petition Date, Chemtura and its non-Debtor affiliate Chemtura Canada were subject to ongoing litigation related to Diacetyl Claims. This section of the Disclosure Statement describes the litigation with respect to Diacetyl Claims during the Chapter 11 Cases. For a

---

[36] The "**Government Defendants**" are United States of America, State of Connecticut, State of New York, State of North Carolina, Santa Ana Regional Water Quality Control Board, California Department of Toxic Substances Control, California State Water Resources Control Board, Connecticut Commissioner of Environmental Protection, Florida Department of Environmental Protection, New York Department of Environmental Conservation, North Carolina Department of Environment and Natural Resources, North Carolina Division of Waste Management and Pennsylvania Department of Environmental Protection.

K&E 17416258.15

description of the Plan's treatment of holders of Diacetyl Claims, see section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization—Treatment of Class 10 for Chemtura Corporation – Diacetyl Claims."

The Debtors, in the exercise of their business judgment, have concluded that the opportunity to cap and discharge their diacetyl obligations in the Chapter 11 Cases is an important benefit that should be pursued. Additionally, the Debtors believe that the Equity Committee's proposal to reinstate diacetyl obligations fails to account for the significant costs of defense and potential liability, whether by settlement or verdict, from reinstating the Diacetyl Claims, which would concern the Debtors' postpetition lenders, vendors and customers, place a further strain on cash flows, jeopardize feasibility, place significant risk on the recoveries of any party receiving New Common Stock under the Plan and subject the Debtors to defending numerous lawsuits with the concomitant expense and risk of uncertain results.

The Equity Committee does not agree with the Debtors' view that Environmental Claims and Diacetyl Claims need to be resolved in the Chapter 11 Cases, but rather believes that they should ride through the Chapter 11 Cases and be addressed in the ordinary course.

### a.    Temporary Stay of Diacetyl Litigation

Chemtura has devoted significant efforts during the Chapter 11 Cases to addressing its potential diacetyl liabilities and obtaining insurance coverage for such liabilities. After filing for chapter 11 relief, Chemtura promptly filed suggestions of bankruptcy in all diacetyl-related cases pending against it to provide notice of the automatic stay. Since Chemtura Canada and Citrus were not Debtors, the personal injury and wrongful death claims against Chemtura Canada and Citrus continued in various jurisdictions. On June 17, 2009, Chemtura commenced an adversary proceeding in the Bankruptcy Court seeking to stay the pending personal injury cases involving Diacetyl Claims against Chemtura Canada and Citrus, the primary distributor of diacetyl for Chemtura Canada and Chemtura (Adv. Proc. 09-01282). On June 19, 2009, the Creditors' Committee filed a statement of intervention [Docket No. 7]. On June 23, 2009, the Bankruptcy Court entered a temporary restraining order (the "**Diacetyl TRO**") enjoining the prosecution of the pending diacetyl litigation against Chemtura Canada, Citrus and Ungerer & Co. ("**Ungerer**"), another distributor of diacetyl manufactured by Chemtura Canada, pending a hearing on Chemtura's motion for a preliminary injunction to enjoin such litigation (Adv. Proc. 09-01282) [Docket No. 29].

By agreement of the affected parties, the Diacetyl TRO was extended to the later of January 31, 2010 or the date on which the District Court ruled on Chemtura's Motion to Transfer (defined below). On November 3, 2009, the Bankruptcy Court entered an order granting the extension as agreed to by the parties (Adv. Proc. 09-01282) [Docket No. 130].

### b.    Consolidation of Diacetyl Litigation in District Court

In addition to obtaining the Diacetyl TRO, on July 8, 2009, Chemtura filed a motion in the District Court pursuant to 28 U.S.C. § 157(b)(5) for entry of an order transferring all diacetyl cases pending in state and federal court against Chemtura, Chemtura Canada and/or Citrus to the District Court in order to pursue the cases in a single forum (the "**Motion to Transfer**") [Misc. Docket No. M47]. The District Court granted the Motion to Transfer on January 22, 2010 [Misc. Docket No. M47], and the District Court subsequently referred the cases to the Bankruptcy Court (the "**Transfer Order**") [Misc. Docket No. M47]. After Chemtura filed the Motion to Transfer in July 2009, five additional cases related to diacetyl were filed that named Chemtura, Chemtura Canada and/or Citrus as defendants. On February 5, 2010, Chemtura requested the District Court to (i) issue a supplemental order providing for the transfer of these five cases and any later-filed case alleging injury from exposure to diacetyl on the same terms as the Transfer Order and (ii) clarify that only the claims against Chemtura, Chemtura Canada and Citrus – and not the entire case (including claims against other defendants) – would be transferred. The District Court entered an order granting the requested relief on February 25, 2010.

On February 19, 2010, claimants led by Karen Smith, plaintiffs in one of the above-referenced diacetyl cases transferred pursuant to the Transfer Order, filed a motion for partial reconsideration of the Transfer Order to request that diacetyl-related tort claims pending against Citrus be remanded to the originating courts. The motion was later joined by additional diacetyl plaintiffs FONA International, Inc. and another group led by Anderson

88

Levey.  The District Court denied the motion to remand the diacetyl plaintiffs' claims on April 7, 2010.  The Karen Smith diacetyl plaintiffs did not appeal the District Court's decision.  Presently, all pending diacetyl litigation against Chemtura, Chemtura Canada and Citrus is pending in the Bankruptcy Court.

### c.        Diacetyl-Related Proofs of Claim

As discussed in section VII.D(ii) of this Disclosure Statement, on August 21, 2009, the Bankruptcy Court entered the Bar Date Order, which established the October 30, 2009 Bar Date as the last date for persons or entities to file claims against the Debtors arising before the commencement of the Chapter 11 Cases.

The Bar Date Order approved a comprehensive noticing plan in relation to prepetition claims, including Diacetyl Claims.  Specifically, with respect to Diacetyl Claims, the Bar Date Order provided for site-specific publication and mailing notices of the Bar Date that were targeted to provide notice of the Bar Date to potential tort claimants – including holders of Diacetyl Claims – at locations that the Debtors determined were most likely to contain actual or potential claimants and also at additional locations requested by counsel for known holders of Diacetyl Claims.

As of October 30, 2009, the Debtors had received approximately 375 non-duplicative diacetyl-related proofs of claim, which include claims based upon certain of the prepetition lawsuits described above.  These claims are included in the Plan's definition of Diacetyl Claims.[37]  All but approximately 13 of the Diacetyl Claims are filed in "unliquidated" amounts.  The 13 Diacetyl Claims asserted with an alleged liquidated amount total approximately $59,800,000.  Of the 375 Diacetyl Claims, approximately seven were filed by corporate defendants in diacetyl-related lawsuits seeking indemnification and/or contribution from Chemtura on account of the claimants' own diacetyl liability.  As previously described, in the event Chemtura Canada commences a Chapter 11 Case, the Debtors anticipate seeking an order from the Bankruptcy Court deeming the Diacetyl Claims filed against Chemtura as also filed against Chemtura Canada.

### d.        Coverage Litigation Regarding Diacetyl Claims

The Debtors have taken steps to protect insurance coverage with respect to the Diacetyl Claims.  Specifically, Chemtura asserts that it and Chemtura Canada have insurance coverage for the Diacetyl Claims under various general liability policies, including certain liability policies issued to them or their predecessors between 1996 and 2007 (collectively, the "**Insurance Policies**").[38]  In all potentially applicable coverage periods from 1996 through 2007, certain companies of the American International Group, Inc. ("**AIG**") issued the first layer of available insurance coverage to Chemtura or to a predecessor of Chemtura ("**AIG Insurance Policies**").  This subsection describes litigation with AIG (or its affiliates) regarding insurance coverage for the Diacetyl Claims under the AIG Insurance Policies.

#### i.        The AIG State Court Action

On February 4, 2010, a number of AIG-affiliated insurance entities (the "**AIG Plaintiffs**") filed a declaratory judgment action against Chemtura Canada and Zurich Insurance Company ("**Zurich**") in the New York State Supreme Court (Case No. 10-cv-01597-DC) (the "**AIG State Court Action**").  The AIG State Court Action seeks a declaratory judgment as to the extent of insurance coverage for the Diacetyl Claims provided by AIG to Chemtura Canada.

On February 25, 2010, Chemtura Canada removed the AIG State Court Action to the District Court pursuant to 28 U.S.C. § 1452 [Docket No. 1] (the "**Removal Action**").  The removal of the AIG State Court Action

---

[37]    Some of the Diacetyl Claims also include allegations of injury from exposure to acetoin, a related chemical.

[38]    While the Debtors believe that insurance is available as a general matter relative to the Diacetyl Claims, the applicability of any one policy to any individual claim and the amount of any uninsured portion of a particular claim, is subject to the policy terms, including among other things coverage periods and specified self-insured retentions.  Additional disclosure with respect to the Debtors' insurance policies is provided in section IX.A of this Disclosure Statement, entitled "Overview of the Debtors' Insurance Policies."

K&E 17416258.15

was later joined by Zurich on the basis of diversity of citizenship [Docket No. 14].[39]  On March 29, 2010, the AIG Plaintiffs filed a motion to remand the AIG State Court Action to the New York State Supreme Court [Docket No. 11] (the "**Motion to Remand**").  Zurich filed an opposition to the Motion to Remand on April 15, 2010 [Docket No. 18], and Chemtura Canada filed its opposition to the Motion to Remand on April 16, 2010 [Docket No. 20].  The matter is currently pending before the District Court.

<div align="center">

*ii.*        *AIG Lift Stay Motion*

</div>

On February 5, 2010 – the day after the AIG Plaintiffs commenced the AIG State Court Action – the AIG Plaintiffs filed a motion for relief from the automatic stay in the Bankruptcy Court to permit them to include Chemtura as a defendant in the AIG State Court Action [Docket No. 1908] (the "**AIG Lift Stay Motion**").  On February 23, 2010, the Debtors filed an objection to the AIG Lift Stay Motion and a cross-motion for enforcement of the automatic stay (the "**Lift Stay Objection and Cross Motion**") [Docket No. 2063], which was joined by the Creditors' Committee [Docket No. 2064].  On April 19, 2010, the Bankruptcy Court heard the AIG Lift Stay Motion and the Lift Stay Objection and Cross Motion and requested additional, simultaneous letter briefs from the Debtors and the AIG Plaintiffs on two issues.  Consideration of the motions was continued and the parties submitted letter briefs on April 27, 2010.  The matter is under submission and currently pending a decision by the Bankruptcy Court.

<div align="center">

*iii.*       *The AIG Adversary Complaint*

</div>

On March 3, 2010, Chemtura and Chemtura Canada initiated an adversary proceeding against a number of AIG-affiliated insurance entities (the "**AIG Defendants**") in the Bankruptcy Court (the "**AIG Adversary Proceeding**") (Adv. Proceeding No. 10-02881) [Docket No. 1].  In the AIG Adversary Proceeding, Chemtura and Chemtura Canada assert that the AIG Defendants are obligated to, among other things, fully defend Chemtura and Chemtura Canada and pay indemnity costs in connection with the Diacetyl Claims.  In response, on March 29, 2010, the AIG Defendants filed a motion in the District Court to withdraw the reference to the Bankruptcy Court of the AIG Adversary Proceeding [Docket No. 15].

The AIG Defendants then filed a motion requesting the Bankruptcy Court to (a) stay the AIG Adversary Proceeding pending a decision by the District Court on the Motion to Withdraw the Reference or (b) dismiss the AIG Adversary Proceeding and abstain from hearing any remaining claims [Docket No. 19].  The Creditors' Committee filed a statement of intervention in the Adversary Proceeding on April 23, 2010 [Docket No. 24], and an initial status conference was held on April 27, 2010.  The matter remains pending before the Bankruptcy Court.  On July 15, 2010, the District Court entered an order referring the matter back to the Bankruptcy Court [Docket No. 38].

<div align="center">

*iv.*       *Settlement Negotiations*

</div>

As of the date of this Disclosure Statement, Chemtura and Chemtura Canada have reached an agreement in principle, subject to internal approvals, documentation and Bankruptcy Court approval, with the AIG Defendants and AIG Plaintiffs in relation to the above-described actions, subject to certain approvals on each side, which would resolve all, or substantially all, of each action.  The terms of the agreement, which are required to be confidential pending internal approvals and documentation, are anticipated to provide with respect to the Debtors' insurance coverage for Diacetyl Claims.  The Debtors anticipate filing a motion for Bankruptcy Court approval of the settlement immediately upon documentation.

<div align="center">

**e.**        **Discovery Issues with Respect to Diacetyl Claims**

</div>

In addition to the litigation efforts described above, the Debtors have worked extensively with certain holders of Diacetyl Claims and their representatives and other parties to obtain information necessary to determine, for estimation and reserve purposes only, the potential amount of aggregate liability with respect to the Diacetyl Claims, as well as the insurance available to cover such claims.

---

[39]    Chemtura Canada also submitted an Affirmation of Consent to Removal on Diversity Grounds on April 13, 2010 [Docket No. 15].

<div align="center">90</div>

To that end, the Debtors have reached agreements to obtain certain information necessary to evaluate the Diacetyl Claims, including the dates of employment during which the claimants allegedly were exposed to diacetyl, so that Chemtura can better assess the potential insurance coverage for the alleged claims.  On January 14, 2010, the Debtors entered into a stipulation with all tort claimants represented by the law firm of Humphrey Farrington & McClain P.C. ("**Humphrey Farrington**"), which had filed approximately 366 proofs of claim relating to diacetyl (the "**Humphrey Claimants**").  Pursuant to that agreement, the Humphrey Claimants agreed to provide, among other information, the time period of alleged exposure, product identification information and the Forced Expiratory Volume Score ("**FEV Score**") for each of the Humphrey Claimants [Docket No. 1763].  On January 27, 2010, the Debtors entered into a similar stipulation with all tort claimants represented by the law firm Andrews & Thornton LLP [Docket. No. 1833], which also provided for the withdrawal of approximately 158 claims filed against each of the Debtors other than Chemtura.  The Debtors also engaged in discussions with the other diacetyl claimants to informally obtain similar information necessary to evaluate the Diacetyl Claims.

Based upon generally accepted valuation techniques for tort claims, for aggregate estimation and reserve purposes only, the Debtors determined that among the factual inputs to evaluating Diacetyl Claims are the values attributed to similar or identical claims in prior verdicts or settlements.  In an effort to reach a supportable aggregate value estimate of the Diacetyl Claims, the Debtors filed an application under Bankruptcy Rule 2004 against Humphrey Farrington on February 19, 2010 (the "**Humphrey Farrington 2004 Application**"), which sought the production of information concerning previous diacetyl settlements [Docket No. 2057].  Numerous parties opposed the Humphrey Farrington 2004 Application [Docket Nos. 2109, 2144, 2153, and 2156], and the Debtors responded to those objections on March 5 and March 15, 2010 [Docket Nos. 2181 and 2246].  The Bankruptcy Court granted the Humphrey Farrington 2004 Application in part at the hearing on March 16, 2010.  At the Bankruptcy Court's instruction, the Debtors and Humphrey Farrington established a protocol by which Humphrey Farrington would produce the settlement information in summary form with corresponding FEV Scores for those settlements, and by which the information would be produced on an anonymous basis, without identifying the settling plaintiffs.  The protocol was implemented by the Bankruptcy Court's order granting the Humphrey Farrington 2004 Application on February 23, 2010 [Docket No. 2397], and Humphrey Farrington delivered data to the Debtors pursuant to that protocol on April 15, 2010.

In addition to the Humphrey Farrington Rule 2004 Application, the Debtors have sought similar discovery from AIG.  On February 5, 2010, the Debtors filed an application under Bankruptcy Rule 2004 against AIG and certain of its affiliates (the "**AIG 2004 Application**") [Docket No. 1918] to request information regarding past settlement of diacetyl-related claims under liability insurance policies.  On February 16, 2010, numerous parties, including AIG, filed objections to the AIG 2004 Application [Docket Nos. 1972, 1981 and 2007].  AIG has opposed the AIG 2004 Application on the grounds that the AIG State Court Action is pending.  The Debtors filed an omnibus reply to the 2004 Application Objections on March 31, 2010 [Docket No. 2365].  The AIG 2004 Application has been adjourned to the hearing before the Bankruptcy Court scheduled for July 13, 2010 and may be withdrawn as a result of discovery received in relation to the Estimation Motion (as defined below).

#### f.    Estimation of Diacetyl Claims

In conjunction with the Debtors' efforts to obtain important information with respect to the Diacetyl Claims, the Debtors have sought and obtained authority from the Bankruptcy Court to estimate the Diacetyl Claims on an aggregate basis only and solely for purposes of addressing the Diacetyl Claims in these bankruptcy cases.  Specifically, on March 19, 2010, the Debtors filed a motion outlining a streamlined procedure for judicial estimation of the Diacetyl Claims (the "**Estimation Motion**") [Docket No. 2281].  Between March 30, 2010 and April 2, 2010, the Debtors received ten objections to the Estimation Motion [Docket Nos. 2349, 2352, 2355, 2366, 2372, 2373, 2374, 2376, 2380 and 2381].  The Debtors filed an omnibus reply on April 2, 2010 [Docket No. 2387] and the Creditors' Committee filed a joinder to the Debtors' reply [Docket No. 2388].

The Bankruptcy Court heard the Estimation Motion on an initial basis on April 7, 2010.  In accordance with the Bankruptcy Court's instructions, the Debtors submitted a proposed order establishing procedures for estimation of the Diacetyl Claims on April 23, 2010.  On April 27, 2010 the Bankruptcy Court entered an order establishing procedures for the estimation of Diacetyl Claims and setting August 11, 2010 as the hearing date to estimate the Diacetyl Claims (the "**Estimation Procedure Order**")  [Docket No. 2571].  In particular, the Estimation Procedure Order, with respect to fact discovery, (1) directs claimants who filed the Diacetyl Claims to

91

submit certain information as specified in the Estimation Motion; (2) authorizes the Debtors to pursue discovery in relation to the Diacetyl Claims; and (3) permits any party in interest to serve discovery requests on any other party or third-party until April 30, 2010 at 5:00 p.m. (EDT) with responses due on May 28, 2010 at 5:00 p.m. (EDT). Moreover, with respect to expert discovery and briefing, the Estimation Procedure Order outlines (1) deadlines for service of expert reports that estimate the Debtors' liability for the Diacetyl Claims and (2) certain requirements regarding the deposition of experts.

### g.      Objections to Certain Diacetyl Claims

The Diacetyl Claims include seven Proofs of Claim filed by corporate entities (the "**Corporate Diacetyl Claimants**") seeking indemnity or contribution for pending and/or settled diacetyl-related litigation.  The Corporate Diacetyl Claimants include Citrus & Allied Essences, Ltd., Ungerer & Company, Flavor Concepts, Inc., Polarome International, Inc., Givaudan Flavors Corporation, Spartan Chemical Company and FONA International, Inc.  On June 22, 2010, the Debtors filed objections to disallow and expunge the claims filed by the Corporate Diacetyl Claimants pursuant to section 502(e)(1)(B) of the Bankruptcy Code and/or state law barring such claims (the "**Corporate Diacetyl Claims Objection**") [Docket Nos. 2961-2962, 2964-2970].  Responses to the objections were filed by Polarome International, Inc. [Docket No. 3093], Ungerer & Company [Docket No. 3094], Citrus & Allied Essences, Ltd. [Docket No. 3097], Flavor Concepts, Inc. [Docket No. 3100], Givaudan Flavors Corporation [Docket No. 3106] and Spartan Chemical Company [Docket No. 3132] (collectively, the "**Responses**").  On July 9, 2010, the Debtors replied to the Responses to the Corporate Diacetyl Claims Objection [Docket No. 3149].  A hearing on these objections is scheduled for a date to be determined.

### h.      Settlement Negotiations

As of the date of this Disclosure Statement, Chemtura and Chemtura Canada have reached an agreement with certain individual holders of Diacetyl Claims that would resolve 347 of the 373 non-duplicative proofs of claim filed in the Chapter 11 Cases that assert Diacetyl Claims against the Debtors in exchange for a payment of $50 million.  The Debtors filed a motion seeking approval of this settlement with the Bankruptcy Court on July 29, 2010 [Docket No. 3420], and it remains subject to Bankruptcy Court approval.  The settlement is taken into account in the Debtors' estimated range of potential outcomes for Diacetyl Claims.

### (iii)      *Automatic Stay Litigation*

### a.      VanDeMark Chemical, Inc. Litigation

On June 1, 2009, GLCC filed a complaint against VanDeMark Chemical, Inc. ("**VanDeMark**") seeking (i) a declaratory judgment that VanDeMark violated the automatic stay provided in section 362 of the Bankruptcy Code by attempting to refuse performance of a contract postpetition; (ii) an injunction to enjoin VanDeMark from refusing to perform under the contract; and (iii) damages for VanDeMark's breach of contract (Adv. Pro. No. 09-01259).  In addition, GLCC filed a motion for an order enforcing the automatic stay and holding VanDeMark in civil contempt.

On June 19, 2009, the parties entered into a stipulation and agreed order whereby, among other things, VanDeMark agreed to perform under the contract and GLCC agreed to withdraw and voluntarily dismiss the VanDeMark adversary proceeding and the contempt motion without prejudice.  The stipulation and agreed order was approved by the Bankruptcy Court on June 30, 2009 [Docket No. 689].

### b.      Occidental Chemical Corporation Litigation

On June 5, 2009, BioLab filed a complaint against Occidental Chemical Corporation ("**OxyChem**") related to a dispute between the parties under OxyChem's executory supply contract with BioLab (Adv. Pro. 09-01266).  Specifically, BioLab sought a temporary restraining order and preliminary injunction to enjoin an alleged failure by OxyChem to supply essential raw materials pursuant to the parties' existing contract.  OxyChem asserted, in contrast, that OxyChem had fully complied with the agreement.  For the reasons stated on the record at a hearing on the temporary restraining order held on June 6, 2009, the Bankruptcy Court denied the requested temporary

restraining order.  Ultimately, on August 14, 2009, BioLab voluntarily dismissed the adversary proceeding against OxyChem [Docket No. 927].

### (iv) *Creditors' Committee Litigation*

On April 22, 2009, the Creditors' Committee filed a motion seeking, among other things, standing and authority to investigate, commence and prosecute certain alleged Causes of Action on behalf of the Debtors' estates against Citibank, N.A., as the agent under the Prepetition Credit Agreement, related to certain claims and liens granted in connection with the Credit Agreement Waiver, certain cash transfers made to the Prepetition Lenders in the 90-day period before the Petition Date and certain liens granted in Chemtura's ownership of Chemtura Receivables, as well as, a declaratory judgment of the Bankruptcy Court with respect to the secured nature of the Prepetition Credit Agreement.

According to the Creditors' Committee, if the litigation were successful, the Debtors' estates would benefit by (a) the stripping of the purported liens on the Debtors' inventory and capital of Chemtura Receivables, (b) the unwinding of the $86.5 million Rollup Revolving Credit Facility and (c) the recovery of at least $6 million in cash.

The Debtors consented to the relief sought in the Standing Motion, but retained authority to propose settlements of the claims.  On July 28, 2009, the Bankruptcy Court entered an order granting the Creditors' Committee's request consistent with the conditions sought by the Debtors [Docket No. 835] (the "**Standing Order**").

On July 29, 2009, the Creditors' Committee commenced an adversary proceeding to pursue the claims permitted pursuant to the Standing Order (Adv. No. 09-01394) [Docket No. 1] (the "**Creditors' Committee Action**").

In connection with the Bankruptcy Court's entry of the Standing Order and the commencement of the Creditors' Committee Action, the parties to the litigation negotiated an initial scheduling order (Adv. No. 09-01394 [Docket No. 35]).  The scheduling order established a timetable for the Creditors' Committee Action, originally setting February 1, 2010 as the trial date.  The Adversary Proceeding Scheduling Order also established procedures for written discovery, depositions, experts, summary judgment briefing schedule, status conferences and discovery dispute resolution.  Following initial discovery, the parties to the litigation agreed to several adjournments and extensions under the scheduling order.

### (v) *NAFTA Arbitration*

Chemtura Canada, a Canadian company and wholly owned indirect subsidiary of Chemtura, produces, among other things, lindane-containing products for seed treatment.  During the late 1990s, the United States government considered prohibiting the entry of Canadian canola oil into the United States on the basis that the seed from which the oil was made had been treated with lindane, a substance not yet authorized for that crop in the United States.  In response, Canada entered into an agreement with the United States to eliminate the manufacture and sale of lindane and its related products and, through its Pest Management Regulatory Agency ("**PMRA**"), required registrants (including Chemtura Canada) to suspend or terminate their product registrations for such products.

On October 28, 1999, PMRA and Chemtura entered into a voluntary withdrawal agreement (the "**Withdrawal Agreement**") under which Chemtura agreed to a phase-out of lindane in canola seed pesticides. More specifically, the Withdrawal Agreement (a) required Chemtura to suspend product registration and to cease the manufacture of lindane in canola seed pesticides by December 31, 1999; (b) allowed for all other uses of lindane on other crops and permitted Chemtura to continue to sell its lindane products until July 1, 2001; and (c) promised a reinstatement of product registrations on canola if the PMRA product review determined that lindane was safe or the United States issued a tolerance.  Following its product review, PMRA concluded that lindane was unsafe and banned it for all uses in the Canadian market.

In response, Chemtura submitted a claim to arbitration (the "**Arbitration Claim**") on October 17, 2002, pursuant to the North American Free Trade Agreement ("**NAFTA**"), seeking to resolve its dispute with the Canadian government.  The action alleged (a) damages for breach of Article 1105, 1103 and/or 1110 of NAFTA in

K&E 17416258.15

the amount of approximately $78.6 million, (b) costs associated with the arbitration, including expert and legal fees and applicable taxes thereon, and (c) pre- and post-award compound interest on the amounts identified in (a) and (b).

Arbitral tribunal hearings in relation to the Arbitration Claim commenced on September 2, 2009; however, no final decision has yet been issued.

### J.    Sales of Certain Debtors' Assets

#### (i)    *Non-Core Asset Sales*

As of the Petition Date, the Debtors maintained and controlled a wide array of assets, including real, personal and intangible property interests. The Debtors' normal practice was to identify from time-to-time certain "non-core" assets unnecessary to the Debtors' business operations and to market those assets for sale, which allowed the Debtors to streamline their operations by eliminating the cost of maintaining property not essential to their business, allowing for the purchase of other assets and improving their cash position.

To continue selling non-core assets during their Chapter 11 Cases without the expense and inefficiency of filing numerous motions with the Bankruptcy Court, the Debtors filed a motion on April 24, 2009 to establish streamlined procedures for the sale of assets during their Chapter 11 Cases (the "**Non-Core Asset Sale Procedures**"). The Debtors designed the Non-Core Asset Sale Procedures to permit them to dispose of non-core assets pursuant to section 363 of the Bankruptcy Code without further motion to the Bankruptcy Court. A particular sale, transfer or abandonment qualifies for treatment under these procedures if, among other things, it is (a) for an aggregate sale price of no more than $5 million and (b) not subject to an objection by certain parties entitled to receive notice of each sale. On May 15, 2009, the Bankruptcy Court entered an order establishing the Non-Core Asset Sale Procedures [Docket No. 398]. The Non-Core Asset Sale Procedures have facilitated non-core asset sales and have enabled the Debtors to efficiently abandon certain non-performing assets.

#### (ii)    *Sale of the Polyvinyl Chloride Additives Business*

The Company is a globally diversified manufacturer and marketer of specialty chemicals products and operates four reporting segments, one of which was the polyvinyl chloride additives business (the "**PVC Business**") (not one of the four reporting segments). The PVC Business manufactured products often used in building and construction and other markets including consumer, crop production, industrial production, electronics and automotive industries. The PVC Business was conducted through two facilities located in Lampertheim, Germany and Taft, Louisiana.

The PVC Business suffered from a number of difficulties stemming from a number of unfavorable market conditions. Accordingly, and after considering all available options in consultation with its financial advisors and in connection with the development of its LRBP, Chemtura determined that the value of the PVC Business would be best maximized through a sale if an appropriate price could be achieved. The Debtors believed that this alternative would not only allow Chemtura an immediate infusion of cash proceeds, but would also significantly improve the cash flows of the Debtors and their non-Debtor subsidiaries.

The Debtors and Lazard engaged in extensive efforts to market the PVC Business over the course of several months. In total, 74 financial buyers and nine strategic buyers were approached with regard to the sale of the PVC Business.

In mid-October 2009, the Debtors received final initial bids from certain potential purchasers. After significant analysis with the assistance of Lazard and in consultation with the Creditors' Committee, the Debtors determined that the highest and otherwise best offer was that made by SK Atlas, LLC and SK Capital Partners II, LP (collectively, "**SK Capital**"), a private investment firm that invests in companies to enhance revenue and profit and has significant experience in the specialty materials and the chemical industry.

Chemtura and SK Capital engaged in rigorous arm's-length negotiations over both the purchase price and contract terms, ultimately entering into a Share and Asset Purchase Agreement, dated December 23, 2009 (the "**SK Purchase Agreement**"). The SK Purchase Agreement set forth the terms of the sale of all the assets in relation to the PVC Business, subject to higher or otherwise better offers, free and clear of all liens, claims, encumbrances and

94

other interests and SK Capital's assumption of certain contracts.  Moreover, SK Capital agreed to serve as the "stalking horse" bidder for the sale with an initial stalking horse bid of $2.1 million plus the assumption of certain liabilities (the "**Stalking Horse Bid**").

The Debtors filed a motion on December 23, 2009 to establish streamlined bidding and auction procedures and to authorize the sale of the PVC Business [Docket No. 1643], which the Bankruptcy Court approved on January 14, 2010 (the "**Bidding Procedures Order**") [Docket No. 1761].  Subsequently, the Debtors, together with Lazard, continued to market the PVC Business in accordance with the Bidding Procedures Order.  In total, the Debtors received three qualifying overbids in addition to the Stalking Horse Bid.

Following an auction held on February 22, 2010, the Debtors, in consultation with the advisors to their key constituencies, determined that Galata Chemicals LLC (formerly Artek Aterian Holding Company, LLC) and its sponsors, Aterian Investment Partners Distressed Opportunities, LP and Artek Surfin Chemicals, Ltd. (collectively, "**Galata**"), presented the highest and best bid for the PVC Business.  The successful bid included initial cash consideration of $16,230,000 and further non-cash consideration, including the assumption of certain liabilities related to the PVC Business.  The Bankruptcy Court entered an order authorizing the sale of the PVC Business to Galata on February 23, 2010 [Docket No. 2075], and the sale to Galata closed on April 30, 2010.

       (iii)       *Sale of the Natural Sodium Sulfonates and Oxidized Petrolatums Businesses*

As discussed in section VII.C(ii)b.i of this Disclosure Statement, the Company's Petroleum Additives division produces, among other things, natural sodium sulfonates ("**Sodium**") and oxidized petrolatums ("**Oxpet**") as additive components used in transport and industrial lubricant applications.  These components are widely used in engine oils, gear oils and greases.  The primary facilities for the Sodium and Oxpet product lines are three plants located in the Netherlands and another located in Petrolia, Pennsylvania (collectively, the "**Sodium and Oxpet Facilities**").

In 2005, Chemtura (f/k/a Crompton Corporation) and Sonneborn Holding, LLC ("**Sonneborn Holding**"), along with their Dutch affiliates, Chemtura Netherlands B.V. and Sonneborn Refined Products B.V. (collectively, the "**Dutch Affiliates**"), entered into a number of agreements, ultimately establishing a Dutch joint venture in which each of the Dutch Affiliates holds a 50% interest (the "**2005 Transaction**").  As a result of the 2005 Transaction, Sonneborn, Inc. and Sonneborn Refined Products B.V. (collectively, "**Sonneborn**") now owns and operates the Sodium and Oxpet Facilities for the purpose of producing specialty chemicals, while the Company owns certain rights associated with those operations (together with the Sodium and Oxpet Facilities, the "**Sodium and Oxpet Business**").  Notwithstanding the 2005 Transaction, the Company has retained the ability to sell and market Sodium and Oxpet.  Under the terms of the amended asset purchase agreement that was part of the 2005 Transaction, Sonneborn Holding was granted the right to purchase the Chemtura Sodium business in June of 2013, which would result in a complete divestiture of the business from Chemtura to Sonneborn Holding.

On October 28, 2009, Sonneborn filed a Proof of Claim against Chemtura in the amount of approximately $14.25 million, seeking repayment of approximately $9.9 million in remediation costs, $4.2 million in pension benefits and $160,000 for certain trade accounts receivables (the "**Sonneborn Claim**").  The Debtors objected to the Sonneborn Claim on February 9, 2010 (the "**Sonneborn Objection**").  Subsequently, Sonneborn filed a response to the Debtors' objection, and on March 2, 2010 filed an amended Proof of Claim (the "**Amended Sonneborn Claim**").  During the past several months, Chemtura and Sonneborn engaged in negotiations regarding, among other things, the Sodium and Oxpet Business and the Amended Sonneborn Claim.

On June 30, 2010, Chemtura filed a motion seeking approval of the sale of the remaining portion of the Sodium and Oxpet Business to Sonneborn in exchange for the following consideration: (i) the cash component of $5 million (subject to a working capital adjustment); (ii) Sonneborn's waiver and release of the Sonneborn Claim, (iii) the termination of the Asset Purchase Agreement by and between Chemtura and Sonneborn, dated March 17, 2005 and certain of the related agreements thereto and (iv) Sonneborn's assumption of certain liabilities relating to the Sodium and Oxpet Business and other assets.  The transaction would relieve Chemtura of approximately $14.25 million in environmental and pension liabilities because Sonneborn would withdraw the Sonneborn Claim. The Bankruptcy Court approved the motion on July 21, 2010.

### K.      Material Settlements and Resolutions

#### (i)      *Settlements of the Securities Class Action Lawsuit*

As of the Petition Date, Chemtura, together with certain non-Debtor parties, was a defendant in a consolidated class action pending in the District Court for the District of Connecticut styled *In re Crompton Corp. Securities Litigation*, No. 3:03-CV-1293 (EBB) (the "**Securities Class Action**"). The Securities Class Action was based on C&K's acquisition of Witco and asserted, among other things, that the defendants issued materially false and misleading financial statements and breached their fiduciary duties to Witco's shareholders.

Efforts before the Petition Date had proven successful in moving towards consensual resolution of the Securities Class Action. Specifically, following a mediation that began in August 2006 between the plaintiffs and the defendants, the parties entered into a settlement agreement on November 28, 2008 pursuant to which they agreed to settle the Securities Class Action for a total payment by the defendants of $20,650,000. Pursuant to this agreement, Chemtura made two prepetition payments totaling $9,292,500 to an escrow account pending final court approval of the settlement. The remaining portion of the settlement was funded by insurance.

Following these payments, the Debtors commenced the Chapter 11 Cases and Chemtura sought return of the amounts that it had paid into the escrow account on grounds that the payments constituted preference payments pursuant to section 547 of the Bankruptcy Code. On October 28, 2009, the Bankruptcy Court approved a stipulation and agreed order whereby the plaintiffs agreed to voluntarily return Chemtura's prepetition payments [Docket No. 1347].

After the return of Chemtura's settlement payment, the parties continued to negotiate a resolution of the Securities Class Action. On May 4, 2010, the Bankruptcy Court entered an order authorizing Chemtura to enter into and perform under a settlement agreement to fully and finally compromise and settle all claims asserted against the defendants in the Securities Class Action (the "**Securities Class Action Settlement**") [Docket No. 2614]. The Securities Class Action Settlement superseded and terminated the prepetition settlement agreement and provides for a settlement payment on behalf of all of the defendants totaling $11,357,500. This sum would be paid from Chemtura's Executive and Organization Liability Insurance Policy which would constitute the entire consideration for the settlement. The Securities Class Action Settlement is currently pending approval by the District Court for the District of Connecticut.

#### (ii)      *The Albemarle Settlement*

Between 2002 and 2005, Chemtura, GLCC and Albemarle Corporation ("**Albemarle**") were parties to three intellectual property suits in the District Court for the Middle District of Louisiana and the District Court for the Eastern District of Virginia (collectively, the "**Albemarle Civil Actions**"). The Albemarle Civil Actions related to the parties' alleged mutual infringement of United States patents stemming from the use, production and sale of certain decabromodiphenylethane products. On October 29, 2009, Albemarle filed two Proofs of Claim [Claim Nos. 10552 and 14161] (together, the "**Albemarle Claims**") against Chemtura and GLCC, respectively, on account of the Albemarle Civil Actions.

In addition, before the Petition Date, Chemtura filed a Request for *Inter Partes* Reexamination of U.S. Patent No. 6,958,423 (the "**Reexamination Request**"), an Albemarle patent, which was asserted against Chemtura and GLCC in one of the pending Albemarle Civil Actions. The Reexamination Request was made to verify the validity of the Albemarle patent in question. The Reexamination Request was granted and a reexamination was initiated (collectively with the Albemarle Civil Actions, the "**Albemarle Actions**").

During the Chapter 11 Cases, Chemtura, GLCC and Albemarle entered into negotiations to consensually resolve all disputed matters between the parties in the Albemarle Actions concurrently with negotiations concerning other business relationships between the parties. On January 21, 2010, the Bankruptcy Court entered an order authorizing Chemtura and GLCC to enter into a settlement and cross-licensing agreement with Albemarle, which resolved the Albemarle Actions and the Albemarle Claims [Docket No. 1800]. The Albemarle settlement (a) released Chemtura and GLCC from any and all claims that could have been asserted against them in the Albemarle Actions and (b) granted Chemtura and GLCC a license to manufacture, use and import certain decabromodiphenylethane products under the patents that were at issue in the Albemarle Actions.

K&E 17416258.15

### (iii)    The United Steel Workers Settlement

Certain current and former unionized employees represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("**United Steelworkers**") at the Debtors' facility located in Morgantown, West Virginia commenced two grievance actions against Chemtura to recover alleged unpaid holiday pay accrued before the Petition Date pursuant to a collective-bargaining agreement.  On October 29, 2009, the United Steelworkers filed, on behalf of the employees, a Proof of Claim against Chemtura [Claim No. 10824] asserting a Claim based on the grievance actions and obligations relating to post-employment benefits and other employee benefits.

On December 18, 2009, the Bankruptcy Court entered an order authorizing Chemtura and the United Steelworkers to enter into a settlement of the prepetition grievance actions [Docket No. 1525].  The settlement permitted Chemtura to pay $33,136.88 in full and final satisfaction of the then-pending grievance claims.  As discussed in more detail in section VII.K, however, the Debtors remain in negotiations with the United Steelworkers with respect to disputes over OPEB liabilities.

### (iv)    The Janet Fina/American International Group, Inc. Settlement

On August, 25, 2003, a shareholder derivative lawsuit was nominally brought on behalf of Chemtura by Janet Fina (the "**Plaintiff**"), individually and as the named plaintiff, against Chemtura, as a nominal defendant, and certain current and former directors and officers (collectively, the "**Derivative Defendants**").  The lawsuit asserted that the Derivative Defendants had breached certain fiduciary duties in connection with alleged disclosure improprieties resulting from an alleged illegal, undisclosed price-fixing conspiracy.

Well before the commencement of the Chapter 11 Cases, the Plaintiff and the Derivative Defendants had entered into mediation to resolve the Derivative Lawsuit and had reached a tentative agreement to settle the lawsuit through a payment that the Debtors' insurers had agreed to fund.  The agreement, however, was not finalized at the time that Chemtura filed its Chapter 11 Case.  On August 13, 2009, the Bankruptcy Court entered an order authorizing Chemtura to settle the derivative litigation on the terms of the settlement agreed to prepetition, including that the payment required in connection with the lawsuit would be funded by insurance [Docket No. 925].

### (v)    The United States and Canada Antitrust Lawsuit Settlements

The Debtors produce and sell, among other things, certain rubber chemicals and additives used to improve the elasticity, strength and durability of rubber products.  On March 15, 2004, Chemtura entered into a plea agreement with the United States, pleading guilty to a one-count information charge of participating in fixing the price of certain rubber chemicals in violation of the Sherman Antitrust Act.  On May 27, 2004, the District Court for the Northern District of California imposed a $50 million fine (the "**U.S. Antitrust Fine**") of which only $16 million remained outstanding as of the Petition Date.

Similarly, on May 20, 2004, Chemtura pleaded guilty to one count of conspiring to prevent or lessen competition unduly in the production, manufacture and supply of certain rubber chemicals in Canada in violation of federal Canadian law.  On May 28, 2004, the Canadian federal court in Ottawa imposed a CDN $9 million fine (the "**Canadian Antitrust Fine**," and, collectively with the U.S. Antitrust Fine, the "**Antitrust Fines**") of which only CDN $2.8 million remained outstanding as of the Petition Date.

Upon the filing of the Chapter 11 Cases, Chemtura entered into negotiations with the United States Attorney's Office and the Attorney General of Canada to reduce (subject to true-up provisions with respect to General Unsecured Claim recoveries in Chemtura's Chapter 11 Case) and defer the final installment payments of the Antitrust Fines and reached separate settlement agreements with the United States and Canada (together, the "**U.S./Canada Settlement Agreements**").  On July 7, 2009, the Bankruptcy Court granted an order authorizing Chemtura to enter into its separate settlement agreements with the United States and Canada [Docket No. 717].  The U.S./Canada Settlement Agreements, in part, required Chemtura, to make certain payments in satisfaction of its antitrust liabilities

97

### (vi)    *Efforts to Settle Environmental Liabilities*

The Debtors face potentially significant environmental liabilities and obligations at a number of currently owned and "legacy" sites.  In connection with these environmental liabilities, federal and state environmental agencies filed approximately 60 Proofs of Claim alleging liabilities under federal and state environmental laws and regulations (the "**Environmental Proofs of Claim**").  Some of these Proofs of Claim were purportedly asserted as "protective" Claims by governmental agencies who asserted that the obligations of the Debtors are nondischargeable.

As discussed in section V of this Disclosure Statement, the Debtors have sought to address their alleged environmental liabilities at various sites through both settlement discussions and litigation.  In addition to the adversary proceeding concerning dischargeability of environmental obligations described in section VII.I(i), the Debtors have also filed eleven separate objections to the Environmental Proofs of Claim.[40]  Since filing the objections, the Debtors have been engaged with the federal and state environmental agencies in efforts to consensually resolve the Environmental Proofs of Claim.  To date, the negotiations have not yet resulted in any settlements, but have been productive.  As a result, the Debtors have agreed to adjourn the state and federal environmental agencies' response deadline with respect to the Debtors' claims objections to July 28, 2010.  The Debtors are continuing their efforts to settle the Environmental Proofs of Claim.

### L.    **Exclusivity and the Equity Committee's Competing Plan Proposal**

### (i)    *Previous Exclusivity Extensions*

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (the "**Exclusive Filing Period**").  If a debtor files a plan during the Exclusive Filing Period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptance of the Plan (the **Exclusive Solicitation Period**" and, together with the Exclusive Filing Period, the "**Exclusive Periods**").  During the Exclusive Periods, no other party in interest may file a competing plan of reorganization.  However, a court may extend these periods upon the request of a party in interest.

The Debtors' initial Exclusive Filing Period and Exclusive Solicitation Period were set to expire on July 16, 2009 and September 14, 2009 respectively.  On July 28, 2009, the Bankruptcy Court entered an order granting the Debtors' motion filed on July 2, 2009 seeking a 120-day extension of the Exclusive Filing Period and Exclusive Solicitation Period, through and including November 13, 2009 and January 12, 2010 respectively [Docket No. 843].  Subsequently, on October 27, 2009, the Bankruptcy Court entered an order providing an additional 90-day extension of the Exclusive Filing Period and the Exclusive Solicitation Period through and including February 11, 2010 and April 12, 2010, respectively [Docket No. 1335].  Similarly, on February 23, 2010 the Bankruptcy Court entered an order authorizing an additional 120-day extension of the Exclusive Filing Period and the Exclusive Solicitation Period, through and including June 11, 2010 and August 10, 2010, respectively [Docket No. 2080].  On May 27, 2010, the Debtors filed a motion seeking a further extension of the Exclusive Filing Period and the Exclusive Solicitation Period through and including September 18, 2010 and November 17, 2010 [Docket No. 2743].  The Bankruptcy Court entered an order granting that motion on June 17, 2010 [Docket No. 2910].

### (ii)    **The Equity Committee's Motion to Terminate Exclusivity and the Debtors' Opposition Thereto**

On July 9, 2010, the Equity Committee filed a motion for an order terminating the exclusive periods during which only the Debtors may file and solicit votes on a plan of reorganization.  The Debtors filed a response to that motion on July 19, 2010 [Docket No. 3306].  The Creditors' Committee and the Ad Hoc Bondholders' Committee also filed responses to the motion [Docket No. 3307 and 3305, respectively].  The Equity Committee filed a reply to

---

[40]    The Debtors filed omnibus objections to the Proofs of Claim of the United States Environmental Protection Agency and the New York, Pennsylvania, California, Connecticut, Florida, North Carolina and New Jersey state environmental agencies [Docket Nos. 1816, 1909, 1910, 1911, 1912, 1913, 1914, 1915, 1916, 1917 and 1919].

K&E 17416258.15

the responses on July 20, 2010 [Docket No. 3322].  At a hearing held on July 21, 2010, the Court denied the Equity Committee's motion.

### M.    Settlement Among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee and Entry into the Plan Support Agreement

As previously described, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders.  As a result of these negotiations, the Plan embodies a global settlement of issues between the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee, including:

- the agreement by the Creditors' Committee and the Ad Hoc Bondholders' Committee to accept the reorganization value resulting from the Debtors' expert's analysis (which the Plan refers to as the "New Chemtura Total Enterprise Value and which is described in detail in **Exhibit F** to this Disclosure Statement) solely for purposes of confirmation of the Plan as proposed;

- the enforceability and allowance of claims held by the 2016 Notes and/or the 2026 Notes relating to certain make-whole premiums and damages for breach of certain no-call provisions, which the Plan refers to as the "Make-Whole Settlement Amount" and the "No-Call Settlement Amount," respectively and which are described in detail in section IX.B. of this Disclosure Statement;

- the extent and validity of GLCC's ownership interest in non-debtor affiliate Chemtura Holding Company, Inc., which settlement is described in detail in section IX.B. of this Disclosure Statement;

- the extent, validity and appropriate resolution of claims and asserted rights of regulatory action held by the PBGC, as described in detail in section IX.B. of this Disclosure Statement;

- a framework for addressing and resolving (a) Diacetyl Claims asserted against the Debtors and/or their affiliates and (b) environmental liabilities asserted by certain governmental entities;

- treatment that would resolve or result in the dismissal of certain litigation between the Creditors' Committee and the Debtors' prepetition bank lenders in a manner acceptable to the Creditors' Committee, the Debtors and the Ad Hoc Bondholders' Committee;

- resolution of certain asserted rights of the Ad Hoc Bondholders' Committee and its members to payment in full of their professional fees and expenses, as described in detail in section IX.B. of this Disclosure Statement by agreeing to pay such fees and expenses up to an aggregate cap (as discussed below).; and

- the appropriate allocation of value attributable to the 2026 Notes Claims and the 2016 Notes Claims (including amounts on account of certain make-whole premiums and damages for breach of certain no-call provisions) to the extent there is insufficient value to satisfy all Claims in the Participating Creditor Classes, plus postpetition interest, as described in detail in section IX of this Disclosure Statement.

As discussed in detail throughout this Disclosure Statement, each of these issues was contested among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee and/or certain members of the two committees, and the parties were only able to settle these issues under the construct of a global settlement encompassed within the Plan.  As a result of this global settlement, the Plan will provide the Debtors' creditors with substantial recoveries and allow for recovery to holders of Interests in Chemtura.  Importantly, the Plan will allow the Debtors to emerge from chapter 11 as a viable business enterprise as expeditiously as possible.

99

In connection with the Plan and the global settlement embodied therein, the Creditors' Committee and certain members of the Ad Hoc Bondholders' Committee and other holders of Notes (the "**Consenting Holders**," and together with the Creditors' Committee, the "**Supporting Parties**") have entered into the Plan Support Agreement.  The Plan Support Agreement provides that the Debtors also will become a party, subject to its terms upon Bankruptcy Court approval, which the Debtors have sought by motion filed on June 17, 2010.  The Plan Support Agreement provides for the Supporting Parties to support the Plan and for the Consenting Holders to vote in favor of the Plan so long as their votes have been solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code.  The Debtors believe that the Plan Support Agreement will facilitate Confirmation and the Debtors' emergence from chapter 11.

The key terms of the Plan Support Agreement include:

- the Debtors will execute the Plan Support Agreement immediately upon Bankruptcy Court approval;

- no material changes can be made to the Plan without the approval of each of the Creditors' Committee and the Required Consenting Holders (as defined in the Plan Support Agreement), all as more specifically set forth in the Plan Support Agreement;

- the Supporting Parties will support the Plan;

- the Consenting Holders will vote for the Plan upon solicitation of the Consenting Holders' votes in accordance with sections 1125 and 1126 of the Bankruptcy Code;

- the Debtors agree to pay the reasonable, documented and necessary out-of-pocket fees and expenses incurred by the Ad Hoc Bondholders' Committee, equal to the larger of (a) $7 million or (b) an amount larger than $7 million as agreed upon by the Debtors and the Creditors' Committee (the "**Ad Hoc Committee Fee Cap**"),[41] on the effective date of the Plan, so long as neither the Ad Hoc Bondholders' Committee nor any Consenting Holder has breached the Plan Support Agreement and provided that the Plan Support Agreement has not terminated pursuant to certain sections of the agreement;

- the Plan Support Agreement will terminate upon the earliest of the following events, among others:

---

[41] Payment of the of the reasonable, documented and necessary out-of-pocket fees and expenses incurred the Ad Hoc Bondholders' Committee through the effective date of the Plan is subject to:  (a) prior to the Confirmation Hearing, the Ad Hoc Bondholders' Committee shall file with the Bankruptcy Court a brief application (the "**Ad Hoc Committee Fee Application**") containing (i) details as to time and expense entries for services rendered by Jones Day (counsel to the Ad Hoc Bondholders' Committee), redacted as appropriate to preserve confidential and/or privileged information, (ii) summary of the circumstances and terms of the Ad Hoc Bondholders' Committee's retention of Moelis (financial advisors to the Ad Hoc Bondholders' Committee) and (iii) a discussion of the work completed by Jones Day and Moelis during the Chapte r11 Cases that contributed to the Plan Support Agreement (as defined below) and/or formulation of the term sheet on the Plan or otherwise provided benefit to the Debtors, provided that, except as discussed in the Plan Support Agreement, each of the Debtors and the Creditors' Committee will review the Ad Hoc Committee Fee Application and will support payment or reimbursement of the reasonable, documented and necessary out-of-pocket fees and expenses of the Ad Hoc Bondholdes' Committee up to the Ad Hoc Committee Fee Cap, and (b) to the extent the Bankruptcy Court requires the Ad Hoc Bondholders' Committee to submit an applicabion for reimbursement of its professional fees and expenses pursuant to section 503(b) of the Bankruptcy Code, (i) the parties agree and acknowledge that the Ad Hoc Bondholders' Committee and its professionals have made a "substantial contribution" to the Chapter 11 Cases, as that term is used under section 503(b) of the Bankruptcy Code and (ii) each of the Debtors and the Creditors' Committee agree not to object to such application to the extent that it seeks reimbursement of the reasonable, documented and necessary out-of-pocket fees and expenses incurred by the Ad Hoc Bondholders' Committee up to the Ad Hoc Committee Fee Cap.

In short, the Plan Support Agreement provides that the Debtors and the Creditors' Committee will support payment of fees and expenses to the Ad Hoc Bondholders' Committee up to the Ad Hoc Committee Fee Cap, including payment of fees and expenses incurred by the Ad Hoc Bondholders' Committee in connection with Confirmation (if any).

K&E 17416258.15

- at 5:00 P.M. prevailing Eastern Time on: (a) August 15, 2010 unless the Debtors have commenced solicitation of votes for the Plan; (b) October 15, 2010, if the Plan has not been confirmed by the Bankruptcy Court at such time; and (c) the date that is 30 calendar days following entry of the Bankruptcy Court's order confirming the Plan if there has not been substantial consummation of the Plan;

- the occurrence of a "Material Adverse Event," which includes a material change in conditions which is reasonably expected to cause a materially adverse impact to the feasibility or confirmability of the Plan or the Debtors' prospects after emerging from chapter 11;

- the Debtors file, propose or otherwise support a plan of reorganization that is different from the Plan; or

- the Debtors or the Supporting Parties materially breach the Plan.

- nothing in the Plan Support Agreement shall require the Creditors' Committee (and its members and professionals) or the Debtors (and their directors, officers and professionals) to take any action (or refrain from taking any action) that is inconsistent with their fiduciary obligations under applicable law;

- the Plan Support Agreement expressly recognizes that, to the extent consistent with fiduciary duties, (i) the Debtors may continue to engage in discussions with the Equity Committee with respect to securing alternate equity financing; (ii) the Creditors' Committee can continue to negotiate with the Equity Committee and other parties in interest with respect to resolving matters relating to the Debtors' restructuring and confirmation of a plan of reorganization; and (iii) the Creditors' Committee will not violate the terms of the Plan Support Agreement if it supports an alternative plan of reorganization that provides for the payment in full, in cash, of all allowed unsecured claims if doing so is consistent with its fiduciary duties.

Contemporaneously with the filing of this Disclosure Statement and the Plan on June 17, 2010, the Debtors filed a motion with the Bankruptcy Court to enter into the Plan Support Agreement (the "**PSA Motion**") [Docket No. 2926]. To the extent the relief requested therein is granted by the Bankruptcy Court, the Debtors will enter into the Plan Support Agreement. On July 9, 2010 the Equity Committee filed an objection to the PSA Motion requesting that the Bankruptcy Court deny the relief requested [Docket No 3154]. The Debtors have since agreed to adjourn the PSA Motion, and in connection therewith, have entered into two amendments to the Plan Support Agreement with the parties. The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee each filed a response to the Equity Committee's objection on August 2, 2010 [Docket Nos. 3440, 3441 and 3436, respectively]. This matter is currently scheduled to be heard before the Bankruptcy Court on August 4, 2010 at 9:45 a.m. (EDT). Additionally, the Equity Committee also intends to vigorously oppose approval of the settlements embodied in the Plan at Confirmation. Although the Debtors are confident they will prevail at Confirmation, in the event the Equity Committee is successful in contesting the settlements at the Confirmation Hearing, there could be potential litigation related to the Plan, which could delay Confirmation and may result in the Plan not being effectuated. To the extent that these settlements are not approved by the Bankruptcy Court, there could be potential litigation related to the Plan.

### N.    Anticipated Developments Regarding Chemtura Canada Before Confirmation

As discussed, to address potential liability related to Diacetyl Claims, the Debtors anticipate that Chemtura Canada will file a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and commence an ancillary recognition proceeding under Part IV of the CCAA in the Canadian Court during August 2010. These proceedings will allow for recognition in Canada of the treatment of the Diacetyl Claims under the Plan, which claims as described below will be deemed as also filed against Chemtura Canada. This section describes key aspects of the contemplated process relating to Chemtura Canada.

101

(i)        ***"First-Day" Motions and Related Relief***

To ensure a smooth transition to operations in chapter 11 and under the CCAA and in recognition of the fact that Chemtura Canada is seeking only to address certain Diacetyl Claims while leaving all other claims unimpaired, on the commencement date of its restructuring proceedings, the Debtors intend that Chemtura Canada will file a number of motions with the Bankruptcy Court requesting authorization to honor the unimpaired prepetition claims and obligations in the ordinary course of business and requesting that certain of the First-Day Orders (as discussed in section VI.A of this Disclosure Statement) previously entered in the Chapter 11 Cases be made applicable to Chemtura Canada.  Additionally, the Debtors intend that Chemtura Canada will file a motion seeking authority to have its Chapter 11 Case jointly administered with those of the other Debtors for procedural purposes only under case number 09-11233 (REG).  The Debtors further intend that Chemtura Canada will file a motion to ensure continued access to its prepetition cash management system.  Lastly, the Debtors intend that Chemtura Canada will file a motion to have all current Diacetyl Claims filed against Chemtura to be deemed also filed against Chemtura Canada.

(ii)       ***Anticipated Plan Process***

The contemplated proceedings under the CCAA relating to Chemtura Canada are ancillary proceedings that will recognize Chemtura Canada's Chapter 11 Case, which will be jointly administered with those of the other Debtors.  Accordingly, the process relating to Chemtura Canada will proceed toward emergence on the same time frame as that of the other Debtors.  In particular, although this Disclosure Statement has not yet been approved by the Bankruptcy Court as to Chemtura Canada because at this time it is not a Debtor in the Chapter 11 Cases, the Debtors are using this Disclosure Statement to solicit approval of votes to accept or reject the Plan with respect to holders of Class 10 Diacetyl Claims against Chemtura Canada at the same time that they are using it to solicit votes from the Voting Classes applicable to each of the other 27 Debtors.  Additionally, and although Chemtura Canada is not yet a Debtor in the Chapter 11 Cases, the key dates with respect to solicitation of votes to accept or reject the Plan are the same as the dates set forth in the Solicitation Order and described in section X of this Disclosure Statement entitled "Voting on the Plan."

The Debtors anticipate that Chemtura Canada will commence its bankruptcy proceedings in the U.S. and recognition proceedings in Canada well in advance of the Confirmation Hearing and will, at or before the Confirmation Hearing, seek an order by the Bankruptcy Court approving this Disclosure Statement as it applies to holders of Class 10 Diacetyl Claims against Chemtura Canada pursuant to section 1125 of the Bankruptcy Code.

In the event the Bankruptcy Court approves this Disclosure Statement as to Chemtura Canada and confirms the Plan, the Confirmation Order will apply to Chemtura Canada as well.  At that time, Chemtura Canada will seek entry of an order by the Canadian Court in the Canadian Case recognizing the Bankruptcy Court's confirmation of the Plan.  Following entry of the respective orders by the Canadian Court and the Bankruptcy Court, Chemtura Canada will, subject to the terms and conditions set forth in the Plan and described throughout this Disclosure Statement, emerge from bankruptcy protection contemporaneously with the other 27 Debtors.

102

## VIII.
## DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION

THIS SECTION VIII IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION VIII AND THE PLAN (INCLUDING ANY ATTACHMENTS THERETO) AND THE PLAN SUPPLEMENT, THE LATTER SHALL GOVERN.

### A.    Administrative Claims, Priority Tax Claims, DIP Claims and Statutory Fees

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Priority Tax Claims and DIP Claims.  These Classes are excluded from the Classes of Claims and Interests set forth in Article III of the Plan and have the treatment set forth below.

The Debtors estimate that the amount of Administrative Claims and Priority Tax Claims (not including Claims for Accrued Professional Compensation) will aggregate within a range of approximately $7.8 million to $9.5 million as of the Effective Date.  As described below, the projected recovery under the Plan for holders of Administrative Claims and Priority Tax Claims is 100%.

Additionally, the Debtors estimate that the total amount of DIP Claims will aggregate approximately $300 million as of the Effective Date.  As described below, the projected recovery under the Plan for holders of DIP Revolver Claims and DIP Term Claims is 100%.

### (i)    Administrative Claims

#### a.    Administrative Claims

The Plan defines an Administrative Claim as any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:

- the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors;

- compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date;

- all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; and

- all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

The Plan provides that, except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim and the

K&E 17416258.15

applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or Reorganized Debtor agrees to less favorable treatment to such holder, each holder of an Allowed Administrative Claim shall be paid in full, in Cash, on the <u>latest</u> of:

- the Initial Distribution Date;

- the first date such Administrative Claim is Allowed or as soon as reasonable practicable thereafter; and

- the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is practicable.

### b.       Professional Compensation

### i.       Claims for Accrued Professional Compensation

The Plan defines "Accrued Professional Compensation" as, at any given moment, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, accounting and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that has not been denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation shall not include any accrued, contingent and/or unpaid fees for services and obligations for reimbursement of expenses rendered or incurred before the Effective Date by any Entity retained pursuant to the Ordinary Course Professional Order and authorized to be compensated thereunder without filing a fee application.

The Plan provides that Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 45 days after the Effective Date.  Additionally, the Plan provides that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Effective Date without the need to file a final fee application.

**Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Creditors' Committee, the U.S. Trustee and the requesting party no later than 75 days after the Effective Date.**

### ii.       Post-Effective Date Fees and Expenses

The Plan provides that, upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  Additionally, the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business, including fees and expenses for the Creditors' Committee's Professionals for services rendered, post-Effective Date as contemplated by the Plan, if any, without any further notice to any party or action, order or approval of the Bankruptcy Court.

### c.       Administrative Claim Bar Date

**Importantly, the Plan provides for the following deadlines with respect to Administrative Claims:**

- **except as otherwise provided in Section 2.1 of the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors pursuant to**

104

the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 60 days after the Effective Date; and

- objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than 90 days after the Effective Date.

Notwithstanding the foregoing requirements in the Plan, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim that has been previously Allowed by Final Order, including all Administrative Claims expressly Allowed under this Plan.

Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or Reorganized Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

### (ii)    *Priority Tax Claims*

The Plan defines a "Priority Tax Claim" as any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.  The Plan defines "Governmental Unit" as any domestic, foreign, provincial, federal, state, local or municipal (a) government, (b) governmental agency, commission, department, bureau, ministry or other governmental entity, (c) natural resource trustee agency or (d) any other governmental unit as defined in section 101(27) of the Bankruptcy Code.

The Plan provides that each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld), one of the following treatments:

- Cash in an amount equal to the amount of such Allowed Priority Tax Claim;

- Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or

- such other treatment as may be agreed upon by such holder and the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or otherwise determined upon an order of the Bankruptcy Court.

The projected recovery under the Plan for holders of Allowed Priority Tax Claims is 100%.

### (iii)    *DIP Claims*

The Plan defines a "DIP Claim" as any Claim derived from or based upon the DIP Loan Agreement, including the DIP Revolver Claims and the DIP Term Claims.

### a.    **DIP Revolver Claims**

The Plan provides that DIP Revolver Claims shall be Allowed and deemed to be Allowed Claims in the full amount due and owing under the DIP Revolver Loan, including principal, interest, reasonable fees, reasonable expenses and issued, outstanding and undrawn letters of credit, in each case to the extent required to be paid under the terms of the DIP Loan Agreement.

Holders of DIP Revolver Claims will receive, on or as soon as practicable after the Initial Distribution Date, as indefeasible payment in full and final satisfaction of the DIP Revolver Claims, Cash in the full Allowed amount of their Claims.  The Plan further provides, however, that any DIP Revolver Claims representing unfunded

letters of credit shall be deemed fully satisfied without any payment in Cash upon such letters of credit being replaced by new letters of credit issued under the Exit Financing.

The amount of the DIP Revolver Claims, however, depends on the amount outstanding under the DIP Revolver Loan at the time of the Effective Date. The Debtors expect that substantially all of the amount outstanding under the Revolver Loan Agreement will consist of amounts in respect of undrawn letters of credit, which letters of credit will either be rolled into replaced by the Exit Financing(s). Accordingly, the Debtors estimate based upon current projections that the amount of Cash required to satisfy the DIP Revolver Claims pursuant to the Plan will be negligible.

### b.    DIP Term Claims

The Plan provides that DIP Term Claims shall be Allowed and deemed to be Allowed Claims in the amount of $300 million, plus contingent and unliquidated claims arising under the DIP Refinancing Facility. Holders of DIP Term Claims will receive, on or as soon as practicable after the Initial Distribution Date, as indefeasible payment in full and final satisfaction of the DIP Term Claims, Cash in the full Allowed amount of their Claims.

The amount of the DIP Term Claims is subject to adjustment downward pursuant to the terms of the DIP Loan Agreement on account of any mandatory prepayments made with respect to, among other things, proceeds received from significant asset sales during the Chapter 11 Cases.

### c.    Statutory Fees

The Plan provides that the Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee, including quarterly fees payable under 28 U.S.C. §1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business at the time of Confirmation. On and after the Effective Date, the Reorganized Debtors shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors when due in the ordinary course until such time as the Bankruptcy Court enters a final decree in such Reorganized Debtor's Chapter 11 Case.

The Debtors estimate that the total amount of fees owed to the U.S. Trustee on the Effective Date pursuant to this provision of the Plan will total approximately $106,000.

### (iv)    *Administrative Claims, Priority Tax Claims and DIP Claims Against Chemtura Canada*

The Plan constitutes a pre-arranged Plan for Chemtura Canada in the event it becomes a Debtor before the Confirmation Date. For the avoidance of doubt, in the event Chemtura Canada becomes a Debtor before the Confirmation Date, each holder of an Administrative Claim, Priority Tax Claim or DIP Claim against Chemtura Canada (to the extent there are any such Claims against Chemtura Canada) shall receive the same treatment as the treatment for holders of Administrative Claims, Priority Tax Claims and DIP Claims, respectively, as set forth in Article II of the Plan (as described in section VIII.A of this Disclosure Statement).

### B.    Classification and Treatment of Claims and Interests

### (i)    *Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, the Plan designates the Classes of Claims and Interests identified below in this section VIII.B of this Disclosure Statement. The Plan provides that a Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and will receive distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

K&E 17416258.15

(ii)    *Summary of Classification*

As described in section I of this Disclosure Statement entitled, "Executive Summary," the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below (and described in more detail in Section 3.3 of the Plan) with the following exceptions:

- Class 7 shall be applicable only to Chemtura Corporation and Great Lakes Chemical Corporation;

- Class 8 shall be applicable only to Chemtura Corporation; and

- Class 10 shall be applicable only to Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date).

The Plan provides that, for the avoidance of doubt, to the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, such Class is designated with respect to such Debtor. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.

The following chart represents the general classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Prepetition Secured Lender Claims | Unimpaired | Permitted to Vote on a Provisional Basis[42] |
| 2 | Lien Claims | Unimpaired | Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 4a | General Unsecured Claims Against Chemtura Corporation | Impaired | Entitled to Vote |
| 4b | General Unsecured Claims Against the Subsidiary Debtors | Impaired | Entitled to Vote |
| 4c | General Unsecured Claims Against Chemtura Canada | Unimpaired | Deemed to Accept |
| 5 | Prepetition Unsecured Lender Claims | Impaired | Entitled to Vote |
| 6 | 2016 Notes Claims | Impaired | Entitled to Vote |
| 7 | 2009 Notes Claims | Impaired | Entitled to Vote |
| 8 | 2026 Notes Claims | Impaired | Entitled to Vote |
| 9 | Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 10 | Diacetyl Claims | Impaired | Entitled to Vote |
| 11 | Environmental Claims | Impaired | Entitled to Vote |
| 12 | Intercompany Claims | Impaired | Deemed to Accept |
| 13a | Interests in Chemtura Corporation | Impaired | Entitled to Vote |
| 13b | Interests in the Subsidiary Debtors and Chemtura Canada | Unimpaired / Impaired | Deemed to Accept |

---

[42] Although the Debtors believe that Class 1 holders of Prepetition Secured Lender Claims are Unimpaired by the terms of the Plan and therefore are deemed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code, such Class shall be permitted to vote to accept or reject the Plan on a provisional basis. The Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the Prepetition Administrative Agent reserve all rights with respect to whether holders of Class 1 Prepetition Secured Lender Claims are in fact Unimpaired by the terms of the Plan.

K&E 17416258.15

(iii)     *Treatment of Claims and Interests*

To the extent a Class contains Allowed Claims or Interests with respect to any Debtor, the classification of Allowed Claims and Interests is specified below:

### a.     Treatment of Class 1 - Prepetition Secured Lender Claims

The Plan defines a "Prepetition Secured Lender Claim" as any Claim derived from or based upon the Prepetition Credit Agreement that is Secured by the "collateral," as such term is defined in section 2 of the Prepetition Security Agreement, including unpaid reasonable, documented and necessary out-of-pocket fees and expenses of the Prepetition Administrative Agent through and including the Effective Date, all to the extent not previously paid by any of the Debtors.

The Plan provides that Prepetition Secured Lender Claims against Chemtura Corporation and each of the Subsidiary Debtors shall be Allowed in the amount of $52.7 million less any amounts attributable to letters of credit that expire undrawn before the Effective Date, plus unpaid postpetition interest, if any, at the Waiver Rate and unpaid reasonable, documented and necessary out-of-pocket fees and expenses of the Prepetition Administrative Agent through and including the Effective Date. Holders of Class 1 Prepetition Secured Lender Claims are not entitled to and will not receive default interest in addition to interest at the Waiver Rate.

The Plan defines Waiver Rate as the interest rate applicable with respect to the Prepetition Credit Agreement as determined pursuant to section 2 of the Waiver and Amendment No. 2 to the Amended and Restated Credit Agreement, dated December 30, 2008, by and among Chemtura Corporation, as borrower, each of the guarantors named therein, the lenders party thereto and the Prepetition Administrative Agent.

The Plan provides that each holder of a Prepetition Secured Lender Claim will receive, on the Effective Date, in full and final satisfaction of its Prepetition Secured Lender Claim, payment in full in Cash.

The projected recovery under the Plan for holders of Prepetition Secured Lender Claims is 100%. Class 1 for Chemtura Corporation and each of the Subsidiary Debtors is Unimpaired; however, holders of Class 1 Prepetition Secured Lenders Claims shall be permitted to vote to accept or reject the Plan on a provisional basis. The Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the Prepetition Administrative Agent reserve all rights with respect to whether holders of Class 1 Prepetition Secured Lender Claims are in fact Unimpaired by the terms of the Plan.

### b.     Treatment of Class 2 - Lien Claims

The Plan defines a "Lien Claim" as any Secured Claim that is not: (a) a DIP Claim or (b) a Prepetition Secured Lender Claim.

The Plan provides that, on or as soon as practicable after the Initial Distribution Date, each holder of an Allowed Claim in Class 2 for each of the applicable Debtors, in full and final satisfaction of its Secured Claim, shall receive one of the following treatments at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld):

- payment of the Allowed Claim in full in Cash on the later of the Initial Distribution Date or as soon as practicable after a particular Claim becomes Allowed and, to the extent such allowed Lien Claim is oversecured, interest as applicable pursuant to Section 3.3(n)(i) of the Plan (as described in section VIII.B(iii)n of this Disclosure Statement) from and after the later of the date such Lien Claim (I) became due in the ordinary course of business or (II) was invoiced to the applicable Debtor;

- such other treatment as may be agreed to by the applicable Debtor and the holder; or

- the holder shall retain its Lien on such property and be Reinstated.

108

The Debtors estimate that the amount of Lien Claims will aggregate approximately $1.1 million as of the Effective Date.  The projected recovery under the Plan for holders of Allowed Lien Claims is 100%.

Class 2 for each of the applicable Debtors is Unimpaired, and holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Lien Claims are not entitled to vote to accept or reject the Plan.

### c.      Treatment of Class 3 - Other Priority Claims

The Plan defines an "Other Priority Claim" as any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim or (b) a Priority Tax Claim.

The Plan provides that each holder of an Allowed Claim in Class 3 for each of the applicable Debtors shall receive, on or as soon as reasonably practicable after the Initial Distribution Date, in full and final satisfaction of its Claim, one of the following treatments on account of such Claim, determined at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld):

- payment of the Allowed Claim in full in Cash, plus interest as applicable pursuant to Section 3.3(n)(i) of the Plan (as described in section VIII.B(iii)n of this Disclosure Statement), on the later of the Initial Distribution Date or as soon as practicable after such claim becomes Allowed; or

- such other treatment as may be agreed to by the applicable Debtor.

The Debtors estimate that the amount of Other Priority Claims will aggregate approximately $.1 million as of the Effective Date.  The projected recovery under the Plan for holders of Allowed Other Priority Claims is 100%.

Class 3 for each of the applicable Debtors is Unimpaired, and holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 3 Other Priority Claims are not entitled to vote to accept or reject the Plan.

### d.      Treatment of Class 4 - General Unsecured Claims

The Plan defines "General Unsecured Claim" as any Unsecured Claim against any Debtor, unless such Claim is:

- a 2009 Notes Claim;

- a 2016 Notes Claim;

- a 2026 Notes Claim;

- a Diacetyl Claim;

- an Environmental Claim;

- a Prepetition Unsecured Lender Claim;

- an Unsecured Convenience Claim;

- an Intercompany Claim;

- an Administrative Claim;

K&E 17416258.15

- a Priority Tax Claim;

- an Other Priority Claim;

- a Claim Accrued for Professional Compensation; or

- the portion of any Insured Claim that is not an Insured Deficiency Claim.

Holders of General Unsecured Claims are included in the "Participating Creditor Classes" under the Plan and will receive a distribution from the Unsecured Distribution Pool, as described below. The Plan defines "Unsecured Distribution Pool" as the pool from which distributions shall be made to the Participating Creditor Classes, which pool shall be funded with:

- available distributable Cash following funding of the Diacetyl Reserve and payment to all holders of Allowed Unsecured Convenience Claims;

- all proceeds of the Rights Offering, to the extent that Class 13a for Chemtura Corporation votes to accept the Plan and holders of Interests in such Class elect to participate in the Rights Offering; and

- the New Common Stock, subject to reduction solely to the extent that Class 13a for Chemtura Corporation votes to accept the Plan in the amount of the 5% of the New Common Stock made available to holders of Interests in such Class and up to $100 million in value of New Common Stock made available to holders of Interests in such Class in the form of the Rights Offering, and subject to dilution for the Incentive Plans.

### i.    Treatment of Class 4a for Chemtura Corporation

The Plan provides that each holder of an Allowed Claim in Class 4a for Chemtura Corporation shall, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date:

- receive its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and all Claims in Class 8) of the Cash and New Common Stock available in the Unsecured Distribution Pool following payment in full of (or appropriate funding of the Disputed Claims Reserve for) all Claims in Classes 4, 5, 6 and 7 for each of the Subsidiary Debtors, with the distribution of New Common Stock subject to dilution for the Incentive Plans, up to the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, and as described in section VIII.B(iii)n of this Disclosure Statement; or

- be Reinstated, unless the holder and Chemtura Corporation (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment. Each payment of Cash and New Common Stock shall have an aggregate value equal to the full amount of such holder's Allowed Claim plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.

Additionally, the Plan provides that, to the extent that insufficient value is available in the Unsecured Distribution Pool to pay all holders of Allowed Claims in Class 4a for Chemtura Corporation, in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, each holder shall be entitled to payment pursuant to Section 8.5 of the Plan of its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and in Class 8), in accordance with the Shortfall Adjustment and Shortfall Readjustment, if any, of the excess amounts of Cash and New Common Stock, if any, held in the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve following liquidation of all Disputed Claims, Diacetyl Claims and Environmental Claims and payment of all formerly Disputed Claims that have become Allowed. Holders of Class 4

110

Claims will not receive more than 100% recovery on account of their Claims, as provided in Section 5.28 of the Plan.

### ii.    Treatment of Class 4b for each of the applicable Subsidiary Debtors

The Plan provides that each holder of an Allowed Claim in Class 4b for each of the applicable Subsidiary Debtors shall, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date:

- receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, and as described in section VIII.B(iii)n of this Disclosure Statement; or

- be Reinstated, unless the holder and the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment.

### iii.    Election for Class 4a and Class 4b for Chemtura Corporation and each of the applicable Subsidiary Debtors

The Plan provides that each holder of an Allowed Claim in Class 4a and 4b for Chemtura Corporation and each of the applicable Subsidiary Debtors shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9 of the Plan, and as described in section VIII.D(ix) of this Disclosure Statement.

### iv.    Voting for Class 4a and Class 4b for Chemtura Corporation and each of the applicable Subsidiary Debtors

Class 4a and Class 4b for Chemtura Corporation and each of the applicable Subsidiary Debtors is Impaired. Therefore, holders of Class 4a and Class 4b General Unsecured Claims are entitled to vote to accept or reject the Plan.

### v.    Treatment of Class 4c for Chemtura Canada

The Plan provides that each holder of a Claim in Class 4c for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall, unless the holder of such Claim and Chemtura Canada (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment, and unless otherwise satisfied pursuant to an order of the Bankruptcy Court before the Initial Distribution Date, be paid in full, in Cash, on the later of: (A) the Initial Distribution Date; (B) the first date such Claim is Allowed or as soon as reasonable practicable thereafter; and (C) the date such Allowed Claim becomes due and payable by its terms, or as soon thereafter as is practicable.

### vi.    Voting for Class 4c for Chemtura Canada

Class 4c for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) is Unimpaired, and holders of Class 4c Claims against Chemtura Canada are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 4c General Unsecured Claims against Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are not entitled to vote to accept or reject the Plan.

K&E 17416258.15

vii.    **Estimated Amounts of Allowed General Unsecured Claims and Recoveries**

The Debtors estimate that the aggregate amount of Allowed (i) Class 4a General Unsecured Claims against Chemtura; (ii) Class 4b General Unsecured Claims against the Subsidiary Debtors; (iii) Class 11 Environmental Claims against the applicable Debtors; and (iv) Class 10 Diacetyl Claims against Chemtura Corporation and Chemtura Canada (to the extent it commences a Chapter 11 Case), will range from approximately $246 million to $320.4 million.

Holders of Class 4c Claims against Chemtura Canada will be paid in full, in Cash and are therefore Unimpaired by the Plan. Additionally, and as discussed in section I of this Disclosure Statement entitled "Executive Summary," actual recoveries to holders of Allowed Class 4a and Class 4b General Unsecured Claims depend on a number of factors, including whether Class 13a Interests in Chemtura Corporation vote to accept the Plan and the actual amount of all Allowed General Unsecured Claims against each of the Debtors.

By way of illustration only, the following two tables show estimated recoveries to holders of Allowed General Unsecured Claims in Class 4a and Class 4b, based on the assumptions associated with each table.

**The tables presented below estimate recoveries to holders of Allowed General Unsecured Claims in Class 4a and Class 4b in the event Class 13a votes to accept or reject the Plan. The following estimated recoveries are presented for illustrative purposes <u>only</u> and assume, where applicable, that the Rights Offering is fully subscribed. Actual recoveries may vary depending on a number of factors, including those described in the Plan and this Disclosure Statement, as well as those set forth in section XII of this Disclosure Statement entitled "<u>Risk Factors</u>."**

**ESTIMATED RECOVERIES TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO <u>ACCEPT</u> THE PLAN**
**AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 4a General Unsecured Claims Against Chemtura Corporation | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, less the applicable Shortfall Adjustment, if any[43] | 76.9% | 23.1% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, less the applicable Shortfall Adjustment, if any[44] | 82.7% | 17.3% |
| Class 4b General Unsecured Claims Against the Subsidiary Debtors | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 76.9% | 23.1% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 82.7% | 17.3% |

---

[43]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[44]    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

K&E 17416258.15

**ESTIMATED RECOVERIES TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS
IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO REJECT THE PLAN**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 4a General Unsecured Claims Against Chemtura Corporation | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, less the applicable Shortfall Adjustment, if any[45] | 83.8% | 16.2% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, less the applicable Shortfall Adjustment, if any[46] | 89.9% | 10.1% |
| Class 4b General Unsecured Claims Against the Subsidiary Debtors | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 83.8% | 16.2% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 89.9% | 10.1% |

### e.      Treatment of Class 5 - Prepetition Unsecured Lender Claims

### i.      Plan Description

The Plan defines a "Prepetition Unsecured Lender Claim" as any Claim derived from or based upon the Prepetition Credit Agreement other than the Prepetition Secured Lender Claims.

The Plan provides that Prepetition Unsecured Lender Claims against Chemtura Corporation and each of the Subsidiary Debtors shall be Allowed in the amount of $118.1 million less any amounts attributable to letters of credit that expired and/or were undrawn before the Effective Date, plus unpaid postpetition interest, if any, at the Waiver Rate.  Holders of Class 5 Prepetition Unsecured Lender Claims are not entitled to and will not receive default interest in addition to interest at the Waiver Rate.

Prepetition Unsecured Lender Claims are included in the "Participating Creditor Classes" under the Plan and will receive a distribution from the Unsecured Distribution Pool, as described below.

The Plan provides that each holder of an Allowed Claim in Class 5 for Chemtura Corporation and each of the Subsidiary Debtors shall, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date, receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, and as described in section VIII.B(iii)n of this Disclosure Statement.  The Plan further provides, however, that any Prepetition Unsecured Lender Claims representing unfunded letters of credit shall be deemed fully satisfied without any payment in the form of Cash or New Common Stock upon such letters of credit being replaced by new letters of credit issued under the Exit Financing.

Additionally, the Plan provides that each holder of an Allowed Claim in Class 5 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or

---

[45]   The Debtors estimate the Shortfall Adjustment to be zero in this instance.

[46]   The Debtors estimate the Shortfall Adjustment to be zero in this instance.

K&E 17416258.15

the maximum available percentage of New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as provided in Section 5.9 of the Plan.

Class 5 for Chemtura Corporation and each of the Subsidiary Debtors is Impaired. Therefore, holders of Class 5 Prepetition Unsecured Lender Claims are entitled to vote to accept or reject the Plan.

ii.    **Estimated Recoveries to Holders of Prepetition Unsecured Lender Claims**

By way of illustration only, the following two tables show estimated recoveries to holders of Prepetition Unsecured Lender Claims, based on the assumptions associated with each table.

**The tables presented below estimate recoveries to holders of Prepetition Unsecured Lender Claims in the event Class 13a votes to accept or reject the Plan. The following estimated recoveries for holders of Prepetition Unsecured Lender Claims are presented for illustrative purposes only and assume, where applicable, that the Rights Offering is fully subscribed. Actual recoveries may vary depending on a number of factors, including those described in the Plan and this Disclosure Statement, as well as those set forth in section XII of this Disclosure Statement entitled "Risk Factors."**

**ESTIMATED RECOVERIES TO HOLDERS OF PREPETITION UNSECURED LENDER CLAIMS
IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO ACCEPT THE PLAN
AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 5 Prepetition Unsecured Lender Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 76.9% | 23.1% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 82.7% | 17.3% |

**ESTIMATED RECOVERIES TO HOLDERS OF PREPETITION UNSECURED LENDER CLAIMS
IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO REJECT THE PLAN**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 5 Prepetition Unsecured Lender Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 83.8% | 16.2% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 89.9% | 10.1% |

K&E 17416258.15

**f.      Treatment of Class 6 - 2016 Notes Claims**

**i.      Plan Description**

The Plan defines a "2016 Notes Claim" as any Claim arising under the 2016 Notes.

The 2016 Notes Indenture Trustee has filed a claim in the amount of $510,217,013.89. The Debtors' position is that the 2016 Notes Indenture Trustee's prepetition claim should be reduced by the amount of any unamortized original issuer discount ("**OID**"), which the Debtors calculate as $1,953,855.32. The Plan proposes to resolve this discrepancy by allowing the 2016 Notes Claim in the amount of $508,263,159 and treating the portion of the original issue discount amount that amortizes postpetition as postpetition interest, which will be paid in addition to all interest accruing postpetition at the contract rate, as provided in the 2016 Notes Indenture, plus the Make-Whole Settlement Amount of $50 million (provided, however, that interest shall not apply to or accrue on the Make-Whole Settlement Amount). The 2016 Notes Indenture Trustee is reviewing the Debtors' original issue discount amount and amortization of original issue discount and reserves the right to object to the amount and propriety and amount of the Debtors' original issue discount amount and amortization of original issue discount.

2016 Notes Claims are included in the "Participating Creditor Classes" under the Plan and will receive a distribution from the Unsecured Distribution Pool, as described below.

The Plan provides that each holder of an Allowed Claim in Class 6 for Chemtura Corporation and each of the Subsidiary Debtors, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, and as described in section VIII.B(iii)n of this Disclosure Statement. Additionally, the Plan provides that such payment of Cash and New Common Stock having an aggregate value equal to the full amount of such holder's Allowed Claim plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.

The Plan further provides that each holder of an Allowed Claim in Class 6 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available Cash or the maximum available New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as provided in Section 5.9 of the Plan, and as described in section VIII.D(ix) of this Disclosure Statement.

Class 6 for Chemtura Corporation and each of the Subsidiary Debtors is Impaired. Therefore, holders of Class 6 2016 Notes Claims are entitled to vote to accept or reject the Plan.

**ii.      Estimated Recoveries to Holders of 2016 Notes Claims**

By way of illustration only, the following two tables show estimated recoveries to holders of 2016 Notes Claims, based on the assumptions associated with each table.

**The tables presented below estimate recoveries to holders of 2016 Notes Claims in the event Class 13a votes to accept or reject the Plan. The following estimated recoveries for holders of 2016 Notes Claims are presented for illustrative purposes <u>only</u> and assume, where applicable, that the Rights Offering is fully subscribed. Actual recoveries may vary depending on a number of factors, including those described in the Plan and this Disclosure Statement, as well as those set forth in section XII of this Disclosure Statement entitled "<u>Risk Factors.</u>"**

**ESTIMATED RECOVERIES TO HOLDERS OF 2016 NOTES CLAIMS**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO <u>ACCEPT</u> THE PLAN**
**AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 6 2016 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any[47] | 76.9% | 23.1% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any[48] | 82.7% | 17.3% |

**ESTIMATED RECOVERIES TO HOLDERS OF 2016 NOTES CLAIMS**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO <u>REJECT</u> THE PLAN**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 6 2016 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any [49] | 83.8% | 16.2% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the Make-Whole Settlement Amount, less the applicable Shortfall Adjustment, if any[50] | 89.9% | 10.1% |

      **g.**      **Treatment of Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation - 2009 Notes Claims**

      **i.**      **Plan Description**

The Plan defines a "2009 Notes Claim" as any Claim arising under the 2009 Notes.

The 2009 Notes Indenture Trustee has filed a claim in the amount of $374,532,500. The Debtors' position is that the 2009 Notes Indenture Trustee's prepetition claim should be reduced by the amount of any OID, which the Debtors calculate as $23,976 as of July 15, 2009. The Plan proposes to resolve this discrepancy by allowing the

---

47    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

48    The Debtors estimate that the holders of the 2016 Notes Claims will receive approximately 52.8% of the Make-Whole Settlement Amount in this instance.

49    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

50    The Debtors estimate the Shortfall Adjustment to be zero in this instance.

K&E 17416258.15

2009 Notes Claim in the amount of $374,508,524 and treating OID as post petition interest, which will be paid in addition to all interest accruing postpetition at the rate of 7% on the amount of $374,508,524, as provided in the 2009 Notes Indenture. In the event the Plan is not confirmed, the 2009 Notes Indenture Trustee reserves all its rights with respect to its claim, including the right to challenge the Debtors' assertion of an OID and treatment thereof

2009 Notes Claims are included in the "Participating Creditor Classes" under the Plan and will receive a distribution from the Unsecured Distribution Pool, as described below.

The Plan provides that each holder of an Allowed Claim in Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, and as described in section VIII.B(iii)n of this Disclosure Statement.

The Plan provides that each holder of an Allowed Claim in Class 7 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available Cash or the maximum available New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as provided in Section 5.9 of the Plan, and as described in section VIII.D(ix) of this Disclosure Statement.

Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation is Impaired. Therefore, holders of Class 7 2009 Notes Claims are entitled to vote to accept or reject the Plan.

### ii.        Estimated Recoveries to Holders of 2009 Notes Claims

By way of illustration only, the following two tables show estimated recoveries to holders of 2009 Notes Claims, based on the assumptions associated with each table.

**The tables presented below estimate recoveries to holders of 2009 Notes Claims in the event Class 13a votes to accept or reject the Plan. The following estimated recoveries for holders of 2009 Notes Claims are presented for illustrative purposes <u>only</u> and assume, where applicable, that the Rights Offering is fully subscribed. Actual recoveries may vary depending on a number of factors, including those described in the Plan and this Disclosure Statement, as well as those set forth in section XII of this Disclosure Statement entitled "<u>Risk Factors</u>."**

K&E 17416258.15

**ESTIMATED RECOVERIES TO HOLDERS OF 2009 NOTES CLAIMS**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO <u>ACCEPT</u> THE PLAN**
**AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | Default % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | Default % Overall Recovery | Default % Recovery in New Common Stock | Default% Recovery in Cash |
| Class 7 2009 Notes Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 76.9% | 23.1% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 82.7% | 17.3% |

**ESTIMATED RECOVERIES TO HOLDERS OF 2009 NOTES CLAIMS**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO <u>REJECT</u> THE PLAN**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | Default % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | Default % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 7 2009 Notes Claims | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 83.8% | 16.2% | 100%, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan | 89.9% | 10.1% |

    **h.**       **Treatment of Class 8 for Chemtura Corporation - 2026 Notes Claims**

    **i.**       **Plan Description**

The Plan defines a "2026 Notes Claim" as any Claim arising under the 2026 Notes.

The 2026 Notes Indenture Trustee has filed a claim in the amount of $151,346,354.17. The Debtors' position is that the 2026 Notes Indenture Trustee's prepetition claim should be reduced by the amount of any unamortized original issue discount, which the Debtors calculate as $92,907.65. The Plan proposes to resolve this discrepancy by allowing the 2026 Notes Claim in the amount of $151,253,447 and treating the portion of the original issue discount amount that amortizes postpetition as postpetition interest, which will be paid in addition to all interest accruing postpetition at the contract rate, as provided in the 2026 Notes Indenture, plus the No-Call Settlement Amount of $20 million (provided, however, that interest shall not apply to or accrue on the No-Call Settlement Amount). The 2026 Notes Indenture Trustee is reviewing the Debtors' original issue discount amount and amortization of original issue discount and reserves the right to object to the amount and propriety of the Debtors' original issue discount amount and amortization of original issue discount.

2026 Notes Claims are included in the "Participating Creditor Classes" under the Plan and will receive a distribution from the Unsecured Distribution Pool, as described below.

The Plan provides that each holder of an Allowed Claim in Class 8 for Chemtura Corporation shall, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date receive its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and all Claims in Class 8) of the Cash and New Common Stock available in the Unsecured Distribution Pool following payment in full of (or appropriate funding of the Disputed Claims Reserve for) all Claims in Classes 4, 5, 6 and 7 for each of the Subsidiary Debtors, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the

amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, and as described in section VIII.B(iii)n of this Disclosure Statement.  Additionally, the Plan provides that such payment of Cash and New Common Stock will have an aggregate value equal to the full amount of such holder's Allowed Claim plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.

Moreover, to the extent that insufficient value is available in the Unsecured Distribution Pool to pay all holders of Allowed Claims in Class 8, in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, the Plan provides that each holder shall be entitled to payment pursuant to Section 8.5 of the Plan, of its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and in Class 8), in accordance with the Shortfall Adjustment and Shortfall Readjustment, if any, of the excess amounts of Cash and New Common Stock, if any, held in the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve following liquidation of all Disputed Claims, Diacetyl Claims and Environmental Claims and payment of all formerly Disputed Claims that have become Allowed.

The Plan provides that each holder of an Allowed Claim in Class 8 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available Cash or the maximum available New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as provided in Section 5.9 of the Plan, and described in section VIII.D(ix) of this Disclosure Statement.

Class 8 for Chemtura Corporation is Impaired.  Therefore, holders of Class 8 2026 Notes Claims are entitled to vote to accept or reject the Plan.

### ii.      Estimated Recoveries to Holders of 2026 Notes Claims

As discussed in section I of this Disclosure Statement entitled "Executive Summary," actual recoveries to holders of Allowed Class 8 2026 Notes Claims depend on a number of factors, including whether Class 13a Interests in Chemtura Corporation vote to accept the Plan and the actual amount of all Allowed General Unsecured Claims against each of the Debtors.

By way of illustration only, the following two tables show estimated recoveries to holders of 2026 Notes Claims, based on the assumptions associated with each table.

**The tables presented below estimates recoveries to holders of 2026 Notes Claims in the event Class 13a votes to accept or reject the Plan.  The following estimated recoveries for holders of 2026 Notes Claims are presented for illustrative purposes only and assume, where applicable, that the Rights Offering is fully subscribed.  Actual recoveries may vary depending on a number of factors, including those described in the Plan and this Disclosure Statement, as well as those set forth in section XII of this Disclosure Statement entitled "Risk Factors."**

K&E 17416258.15

**ESTIMATED RECOVERIES TO HOLDERS OF 2026 NOTES CLAIMS**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO <u>ACCEPT</u> THE PLAN**
**AND THE RIGHTS OFFERING IS FULLY SUBSCRIBED**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | Default % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | Default % Overall Recovery | Default % Recovery in New Common Stock | Default% Recovery in Cash |
| Class 8 2026 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[51] | 76.9% | 23.1% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[52] | 82.7% | 17.3% |

**ESTIMATED RECOVERIES TO HOLDERS OF 2026 NOTES CLAIMS**
**IF CLASS 13A INTERESTS IN CHEMTURA VOTES TO <u>REJECT</u> THE PLAN**

| Class | Low Amount of Claims | | | High Amount of Claims | | |
|---|---|---|---|---|---|---|
| | Default % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash | Default % Overall Recovery | Default % Recovery in New Common Stock | Default % Recovery in Cash |
| Class 8 2026 Notes Claims | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[53] | 83.8% | 16.2% | 100% of principal, plus postpetition interest pursuant to Section 3.3(n)(i) of the Plan, plus the No-Call Settlement Amount, less the applicable Shortfall Adjustment, if any[54] | 89.9% | 10.1% |

i.    **Treatment of Class 9 - Unsecured Convenience Claims**

The Plan defines an "Unsecured Convenience Claim" as any Unsecured Claim against any of the Debtors, except Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date), that, but for being defined as an Unsecured Convenience Claim, would be a General Unsecured Claim, and either (a) is Allowed in an amount of $50,000 or less or (b) is Allowed in an amount greater than $50,000, but is subject to an irrevocable election by the holder thereof to reduce the Allowed amount of the Claim to $50,000 for the purpose of rendering the Claim an Unsecured Convenience Claim. For the avoidance of doubt, any General Unsecured Claim against Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) that, but for being a claim against Chemtura Canada, would be defined as an Unsecured Convenience Claim, shall be a General Unsecured Claim against Chemtura Canada, which shall be Unimpaired pursuant to the terms hereof.

---

[51]    The Debtors estimate the Shortfall Adjustment to be 0.0% of the No-Call Settlement Amount in this instance.

[52]    The Debtors estimate that the holders of the 2026 Notes Claims will receive 0% of the No-Call Settlement Amount in this instance.

[53]    The Debtors estimate the Shortfall Adjustment to be 0.0% of the No-Call Settlement Amount in this instance.

[54]    The Debtors estimate the Shortfall Adjustment to be 0.0% of the No-Call Settlement Amount in this instance.

K&E 17416258.15

The Plan provides that each holder of an Allowed Unsecured Convenience Claim in Class 9 for Chemtura Corporation and each of the applicable Subsidiary Debtors shall receive, in full and final satisfaction of such Unsecured Convenience Claim, Cash in the amount of its Allowed Unsecured Convenience Claim, plus interest as applicable pursuant to Section 3.3(n)(i) of the Plan, and as described in section VIII.B(iii)n of this Disclosure Statement.

The projected recovery under the Plan for holders of Unsecured Convenience Claims is 100%, plus postpetition interest.

Class 9 for Chemtura Corporation and each of the applicable Subsidiary Debtors is Unimpaired and holders of Class 9 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 9 Unsecured Convenience Claims are not entitled to vote to accept or reject the Plan.

> **j.    Treatment of Class 10 for Chemtura Corporation and Chemtura Canada - Diacetyl Claims**

The Plan defines "Diacetyl Claims" as, collectively, all Claims against any Debtor or any Non-Debtor Affiliate resulting, directly or indirectly, from alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde, including all Claims for indemnification or contribution relating to alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde.

The Plan provides that each holder of an Allowed Diacetyl Claim in Class 10 for Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall receive, in full and final satisfaction of such holder's Allowed Diacetyl Claim:

- payment in Cash on the Effective Date pursuant to a negotiated settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and as approved by order of the Bankruptcy Court;

- to the extent an Allowed Diacetyl Claim is not subject to a negotiated settlement as of the Effective Date, a distribution from the Diacetyl Reserve in accordance with the procedures set forth in Article X of the Plan (I) if such Allowed Diacetyl Claim is an Insured Claim, in the amount of such holder's Allowed Insured Deficiency Claim multiplied by the Diacetyl Recovery Ratio, or (II) if such Allowed Diacetyl Claim is not an Insured Claim, in the amount of such holder's Allowed Diacetyl Claim multiplied by the Diacetyl Recovery Ratio.

The Plan defines an "Insured Deficiency Claim" as the unsecured balance, if any, of an Insured Claim that remains after deducting the amount of Insurance Proceeds available on account of such Insured Claim. Additionally, the Plan defines the "Diacetyl Recovery Ratio" to be the Pro Rata share of the Diacetyl Reserve of: (a) each Allowed Insured Deficiency Claim that is a Diacetyl Claim which is also an Insured Claim or (b) each Allowed Diacetyl Claim that is not an Insured Claim.  The Plan further provides, however, that in no event shall the recovery of any holder of an Allowed Diacetyl Claim exceed 100% through any combination of payments under Insurance Policies or distributions pursuant to the Plan.

The Debtors' use of the Diacetyl Trust or Diacetyl Reserve will be a tax-driven decision and is not expected to have any impact on the holders of Diacetyl Claims.

The projected recovery under the Plan for holders of Allowed Diacetyl Claims is 100%.[55]

---

[55]    The Debtors note that certain holders of Diacetyl Claims believe that recoveries to holders of Diacetyl Claims could be less than 100% to the extent that such Claims are liquidated at amounts greater than the Bankruptcy Court estimates for purposes of establishing the Diacetyl Reserve.  Such holders of Diacetyl Claims dispute whether the Bankruptcy Court has jurisdiction to estimate the amount of the Diacetyl Claims for purposes of establishing the Diacetyl Reserve contemplated under the Plan.  The Debtors disagree and will defend this aspect of

(Continued…)

K&E 17416258.15

Class 10 for Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) is Impaired.  Therefore, holders of Class 10 Diacetyl Claims are entitled to vote to accept or reject the Plan.

For purposes of clarity, the Debtors' restructuring strategy with respect to Chemtura Canada is only to address the Diacetyl Claims already asserted against Chemtura Corporation.  As noted, the Debtors will, in the event Chemtura Canada commences a Chapter 11 Case, seek to have all of the Diacetyl Claims already filed against Chemtura Corporation deemed to be filed against Chemtura Canada, and the Debtors do not intend to set a new bar date with respect to Claims against Chemtura Canada.  Accordingly, the Debtors do not expect the filing of Chemtura Canada to increase the amount of Diacetyl Claims presently asserted in the Chapter 11 Cases.

The Debtors, in the exercise of their business judgment, have concluded that the opportunity to cap and discharge their diacetyl obligations in the Chapter 11 Cases is an important benefit that should be pursued.  Additionally, the Debtors believe that the Equity Committee's proposal to reinstate diacetyl obligations fails to account for the significant costs of defense and potential liability, whether by settlement or verdict, from reinstating the Diacetyl Claims, which would concern the Debtors' postpetition lenders, vendors and customers, place a further strain on cash flows, jeopardize feasibility, place significant risk on the recoveries of any party receiving New Common Stock under the Plan and subject the Debtors to defending numerous lawsuits with the concomitant expense and risk of uncertain results.

The Equity Committee does not agree with the Debtors' view that Environmental Claims and Diacetyl Claims need to be resolved in the Chapter 11 Cases, but rather believes that they should ride through the Chapter 11 Cases and be addressed in the ordinary course.

In the event the Diacetyl Claims are not settled, the Debtors intend to pursue the insurance coverage litigation.  The source of funding for such litigation would be operating Cash and Cash from the revolver facility.  If the Debtors were unsuccessful in such litigation, the impact of such litigation would be on holders of non-Diacetyl Claims and Interests in Chemtura Corporation because the Debtors would reserve for the Diacetyl Claims in the full amount of such Claims (as estimated by the Bankruptcy Court, minus (i) Insurance Proceeds, if any, available in respect of Diacetyl Claims as of the Effective Date pursuant to (a) separate settlement or agreement that has been approved by the Bankruptcy Court as of the Effective Date or (b) a Final Order by the Bankruptcy Court or other court of competent jurisdiction) and the recovery of Insurance Proceeds (if any) would inure to the benefit of holders of Claims (in the event Class 13a accept the Plan) or holders of Interests in Chemtura Corporation (in the event Class 13a rejects the Plan and all holders of Claims are otherwise paid in full).

Certain holders of Diacetyl Claims dispute whether the Bankruptcy Court has jurisdiction to establish a cap on Diacetyl Claims at an estimation trial because such proceeding is not a "core" proceeding under applicable federal law.  The Debtors disagree and will defend this aspect of the Plan at the Confirmation Hearing.  The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

Certain holders of Diacetyl Claims dispute whether the Plan is confirmable over the objection of dissenting holders of General Unsecured Claims or Diacetyl Claims in the event Class 13a votes to accept the Plan and is therefore entitled to a Pro Rata share of 5% of the New Common Stock.  The Debtors disagree and will defend this aspect of the Plan at the Confirmation Hearing. The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

One holder of a Diacetyl Claim has asserted that the Plan unfairly discriminates between holders of Diacetyl Claims and Environmental Claims and has indicated that it is likely to assert such objection at the Confirmation Hearing.  The Debtors disagree and will defend this aspect of the Plan at the Confirmation Hearing.

---

the Plan at the Confirmation Hearing.  The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

K&E 17416258.15

The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

One holder of a Diacetyl Claim has asserted that the Plan impermissibly shifts the risk of loss from the holders of Class 13a Interests in Chemtura Corporation to holders of Diacetyl Claims in the event the Bankruptcy Court's estimation of the Diacetyl Claims is insufficient. The Debtors disagree and will defend this aspect of the Plan at the Confirmation Hearing. The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

The Debtors plan to submit a proposed case management order for estimating Diacetyl Claims for approval by the Bankruptcy Court. Additionally, the Debtors note that they are in the very late states of finalizing settlements with respect to a substantial majority of the holders of Diacetyl Claims and are continuing discussions with other holders of Diacetyl Claims. The Debtors note that the Equity Committee has indicated that it does not support such settlements. The Debtors disagree and will defend such challenge at the appropriate time.

The Plan does not purport to address "future" Diacetyl Claims. The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . ." 11 U.S.C. § 101(5)(A). For purposes of these Chapter 11 Cases, the Debtors believe that all Diacetyl Claims arose before the Petition Date at the time of exposure to Diacetyl or at the time of the alleged conduct of Chemtura or Chemtura Canada, to the extent it files a chapter 11 case, giving rise to a Diacetyl Claim. *See, e.g., In re Grossman's, Inc.*, 607 F.3d 114, 125 (3rd Cir. 2010) ("We agree and hold that a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a "right to payment" under the Bankruptcy Code."); *In re Quigley Co., Inc.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008) ("If the Asbestos PI Claimant was exposed to asbestos before the Quigley petition date, he or she holds a 'claim.'"). Notwithstanding the foregoing, courts have held that due process may prevent a debtor from discharging a prepetition claim. *See, e.g., In re Grossman's*, 607 F.3d at 122 ("Discharge of [claims of persons who are unaware of their injuries] without providing adequate notice raises questions under the Fourteenth Amendment"); *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Claims that are not discharged in such instances are sometimes referred to as "future" claims. The Plan does not purport to determine or prejudge whether a particular Diacetyl Claimant was provided with due process sufficient to discharge its Diacetyl Claim. The Debtors reserve the right to argue that the claim of a "future" Diacetyl Claimant arose before the Petition Date, and accordingly, is discharged pursuant the provisions of the Plan. If a "future" Diacetyl Claimant establishes that its Diacetyl Claim was not discharged pursuant to the Plan, then such Diacetyl Claimant would be entitled to assert its Diacetyl Claim against the Reorganized Debtors to the extent permitted under applicable state law.

### k.    Treatment of Class 11 - Environmental Claims

The Plan defines "Environmental Claims" as any Claim by a Governmental Unit against Chemtura Corporation or any of the Subsidiary Debtors arising out of, related to or based upon federal or state environmental laws or regulations, environmental orders, consent decrees and other obligations in connection with (a) sites that are not part of the Debtors' bankruptcy estates, including previously owned or operated sites that are no longer owned or operated by the Debtors and third-party sites that have never been owned or operated by the Debtors to which the Debtors or their predecessors are alleged to have sent waste or other materials and (b) the Debtors' owned or operated sites solely to the extent that such Claims arise out of, relate to or are based upon costs expended or paid by a Governmental Unit before the Petition Date or penalties owing to a Governmental Unit for violations of environmental laws or regulations that occurred before the Petition Date.

The Plan provides that each holder of an Allowed Environmental Claim in Class 11 for Chemtura Corporation and each of the applicable Subsidiary Debtors shall receive one of the following treatments at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld):

- payment in Cash on the Effective Date or such other treatment as agreed pursuant to a negotiated settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and as approved by order of the Bankruptcy Court;

123

- to the extent an Allowed Environmental Claim is not subject to a negotiated settlement as of the Effective Date, a distribution from the Environmental Reserve in Cash in accordance with the procedures set forth in Article IX of the Plan, in the amount of such holder's Allowed Environmental Claim; or

- the holder will retain its Environmental Claim, which will be Reinstated.

The projected recovery under the Plan for holders of Allowed Environmental Claims is 100%.

Class 11 for Chemtura Corporation and each of the applicable Subsidiary Debtors is Impaired. Therefore, holders of Class 11 Environmental Claims are entitled to vote to accept or reject the Plan.

The Equity Committee does not agree with the Debtors' view that Environmental Claims and Diacetyl Claims need to be resolved in the Chapter 11 Cases, but rather believes that they should ride through the Chapter 11 Cases and be addressed in the ordinary course.

### l.        Treatment of Class 12 - Intercompany Claims

The Plan defines an "Intercompany Claim" as (a) any Claim held by a Debtor against another Debtor or (b) any Claim held against a Debtor by a Non-Debtor Affiliate that is a direct or indirect subsidiary of Chemtura Corporation.

The Plan provides that each holder of an Intercompany Claim, at the election of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld), Intercompany Claims shall:

- be Reinstated;

- remain in place subject to certain revised documentation;

- be modified or cancelled as of the Effective Date;

- include Cash payments to address the treatment of certain foreign pension obligations of the Company; and/or

- with respect to certain Intercompany Claims in respect of goods, services, interest and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, may be settled in Cash in an amount not to exceed $25 million.

The Plan Supplement shall set forth the applicable Debtor's election with respect to the treatment of each Intercompany Claim.

Class 12 for each of the applicable Debtors is Impaired. Holders of Class 12 Intercompany Claims are deemed to accept the Plan.

### m.        Treatment of Class 13 - Interests

The Plan defines an "Interest" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or other right, contractual or otherwise, to acquire any such interest in a Debtor that existed before the Effective Date, any phantom stock or other similar stock unit provided pursuant to the Debtors' prepetition employee compensation programs and any Claim related to the purchase of interests subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

124

### i.        Plan Description of Class 13a for Chemtura Corporation

The Plan provides that, on and after the Effective Date, all Class 13a Interests in Chemtura Corporation shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and each holder of an Interest shall receive, in full and final satisfaction of such Interest, on the Effective Date, one of the following treatments:

- to the extent that Class 13a for Chemtura Corporation votes in favor of the Plan, on or as soon as practicable after the Effective Date, each holder of a share of prepetition common stock or equivalent Interest in Chemtura Corporation shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of 5% of the New Common Stock, subject to dilution for the New Incentive Plan, and its Pro Rata share of the Rights to participate in the Rights Offering; and

- to the extent that Class 13a for Chemtura Corporation votes to reject the Plan, each holder of an Interest shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of this Plan and the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve have been established in accordance with the terms of this Plan.

Class 13a for Chemtura Corporation is Impaired.  Therefore, holders of Class 13a Interests in Chemtura Corporation are entitled to vote to accept or reject the Plan.

### ii.        Estimated Recoveries to Holders of Interests in Class 13a for Chemtura Corporation

As described above, to the extent that Class 13a for Chemtura Corporation votes in favor of the Plan, on the Effective Date, each holder of an Interest in Chemtura Corporation shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of 5.0% of the New Common Stock, subject to dilution for the Incentive Plans, and its Pro Rata Share of the Rights to participate in the Rights Offering.

The amount of the Rights Offering reflects negotiations among the Debtors and the Plan Support Parties, as described in detail in section IX.B of this Disclosure Statement, and is a material provision of the Plan Support Agreement, as described in detail in section VII.M of this Disclosure Statement.  The Bankruptcy Code does not require that the Debtors or the Plan Support Parties make the Rights Offering available to holders of Class 13a Interests in Chemtura Corporation; however, the Debtors and the Plan Support Parties have determined to make the Rights Offering available as an accommodation to the requests of certain holders of equity interests and to incentivize Class 13a to vote to accept the Plan.  As with all other aspects of the global settlement embodied in the Plan Support Agreement, in the event the amount of the Rights Offering is increased or decreased without agreement among the Debtors and the Plan Support Parties, the Plan may not be effectuated, as described in section IX.B of the Disclosure Statement.  Additionally, in such an instance there can be no guarantee that an alternative form of rights offering will be made available to equity holders.

To the extent that Class 13a for Chemtura Corporation votes to reject the Plan, each holder of an Interest in Chemtura Corporation shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of this Plan and the Disputed Claims Reserve has been established in accordance with the terms of this Plan, which the Debtors estimate to range from approximately 1.6% to 10.4% of the New Common Stock, subject to dilution for the Incentive Plans and depending on, among other things, the ultimate amount of Allowed Claims against the Debtors.

K&E 17416258.15

       **iii.**    **Additional Disclosure With Respect to Recoveries to Holders of Interests in Class 13a for Chemtura Corporation**

The Plan provides that, in the event Class 13a votes to reject the Plan, each holder of an Interest in Chemtura Corporation shall receive its Pro Rata share of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of the Plan and the Plan Reserves have been established.

It is difficult to predict with certainty whether and to what extent holders of Class 13a Interests in Chemtura Corporation will receive a recovery in the event Class 13a votes to reject the Plan. As described elsewhere in the Disclosure Statement, the distribution available for Class 13a in such an event will include New Common Stock and, to the extent the Plan Reserves exceed all Claims that are ultimately Allowed, may include an additional distribution in a combination of New Common Stock and Cash. The Debtors estimate that the aggregate value of the distribution available to Class 13a if the class rejects the plan would be an equivalent of between 1.6% and 10.4% of the value of the New Common Stock. For the avoidance of any doubt, the Debtors note that the estimated range of recovery to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to reject the Plan, which the Debtors estimate to be from 1.6% to 10.4%, expressed as a percentage of New Common Stock, after all Unsecured Claims have been paid in full and appropriate reserves have been established, only indirectly takes into account possible recovery on account of follow-on distributions in the event that the Plan Reserves exceed the amount necessary to pay all Claims in full. The Debtors' intent is that Insurance Proceeds on account of Diacetyl Claims that are received after the Effective Date, such that the Diacetyl Reserve is already fully funded, will be treated as excess Plan Reserve amounts and therefore will be made available to holders of Class 13a Interests in Chemtura following the liquidation of all Disputed Claims in the event Class 13a votes to reject the Plan.

The value available for Class 13a if it rejects the Plan will depend on the amount of Allowed Claims. While some of the Claims against the Debtors will be Allowed or agreed in a fixed amount as of the Effective Date, other Claims are Disputed Claims for which the value is not now known and may not be known as of the Effective Date. Specifically, the Debtors are faced with numerous litigation claims and other unliquidated claims that are not expected to be fixed at the Effective Date. Under the Plan, the Debtors will ask the Bankruptcy Court to establish reserves (the "Plan Reserves") for three separate categories of disputed claims: the Diacetyl Reserve, the Environmental Reserve and the Disputed Claims Reserve. The amount of the Plan Reserves will determine the initial amount of New Common Stock available for distribution to Class 13a if it rejects the Plan, and the overall value of the Disputed Claims that ultimately become Allowed by the Bankruptcy Court will determine whether, and to what extent, there is any later distribution to Class 13a on account of excess Plan Reserves after all creditors have been paid in full.

The Debtors have calculated the estimated range of recoveries set forth above based on an estimate assuming the amount of Allowed Claims asserted against the Debtors to date is either high or low (*i.e.*, a "best case" or "worst case" scenario). The ultimate determination of whether such Claims will be Allowed against the Debtors, or the amount the Debtors must fund in the Plan Reserves pending allowance, depends on a number of complex factors, including the particular legal bases and factual circumstances underlying each Disputed Claim and the Bankruptcy Court's approach in establishing reserves for such claims. Among other things, the amount of the initial distribution of New Common Stock to Class 13a will depend on (a) the amount that the Bankruptcy Court determines must be reserved for Diacetyl Claims in the Diacetyl Reserve, (b) the amount, if any, of insurance coverage that has been determined as of the Effective Date, by settlement or litigation judgment, to be available for Diacetyl Claims, (c) the amount that the Bankruptcy Court determines must be reserved for Environmental Claims in the Environmental Reserve and (d) the amount that the Bankruptcy Court determines must be reserved for all other Disputed General Unsecured Claims, including both trade claims and non-diacetyl litigation claims, in the Disputed Claims Reserve. The Debtors currently estimate that the aggregate value of all Unsecured Claims (other than bank and bond claims) must either be satisfied as of the Effective Date or included in the Plan Reserves. Ultimately, whether any excess value remains in the Plan Reserves after all Unsecured Claims have been either Allowed or Disallowed and all Allowed Claims have been paid in full will depend on the settlement or litigation of each Claim that is Disputed as of the Effective Date. Because of the inherent difficulty in predicting the approach by the Bankruptcy Court in establishing the Plan Reserves and in predicting the ultimate outcome of litigating Disputed Claims, the Debtors cannot say at this time whether and to what extent the total amount of Allowed Claims will ultimately fall within the estimated low or high ranges, or even exceed those amounts. Estimates of potential recoveries to holders of Class 13a Interests in Chemtura in the event Class 13a does not vote to accept the Plan are

126

provided for **illustrative purposes only** in section I.I.C(iv)I.C(iv), on page 30, of this Disclosure Statement, entitled, "Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan." Additionally, although the Debtors have provided various ranges of potential outcomes in the table in that section of this Disclosure Statement, no amount within those ranges is believed to be more or less likely to occur based on currently available information, and the Debtors cannot guarantee that actual amounts of Allowed Claims will not vary materially from the ranges provided above.

The form of consideration available to holders of Interests in Chemtura Corporation in the event Class 13a votes to reject the Plan depends on a number of considerations, including the actual amount of Allowed Diacetyl Claims and Allowed Environmental Claims as well as the amount of other Disputed Claims that are ultimately Allowed and satisfied from the Plan Reserves. On this point, it is important to note that the Plan provides that the Disputed Claims Reserve is funded with both Cash and New Common Stock, while the Environmental Reserve and the Diacetyl Reserve are both funded only in Cash. Thus, the ultimate combination of Cash and/or New Common Stock that holders of Class 13a Interests in Chemtura Corporation may receive (if any) in the event Class 13a votes to reject the Plan depends not only on the ultimate amount of Allowed Claims, but also the extent to which such Allowed Claims are Diacetyl Claims, Environmental Claims or other subsequently Allowed Claims that are satisfied from the appropriate Plan Reserve.

Although the Debtors are not able to provide more specific estimates at this time, the Debtors believe that the Plan's treatment of holders of Class 13a Interests in Chemtura Corporation in the event such Class votes to reject the Plan is consistent with what such holders would otherwise be entitled to under applicable law, including the absolute priority rule contained in the Bankruptcy Code.

The Equity Committee believes that the Class 13a treatment is improper and illegally coercive and lacks any legal or factual basis and intends to oppose confirmation on these grounds, among others. The Debtors disagree and will defend such challenge at the Confirmation Hearing.

The Debtors believe that, to the extent Class 13a votes in favor of the Plan and the Rights Offering is fully subscribed, the Debtors will be required to comply with the registration requirements set forth in the Securities Act of 1933, as amended. While the Debtors believe that the registration may not delay emergence from chapter 11, it is possible depending on the timing and scope of review by the Securities and Exchange Commission that the Rights Offering will not be able to be consummated at the time the Plan otherwise would become effective. The Rights Offering shall be subject to compliance with the Securities Act of 1933, as amended, including the filing and approval of an appropriate securities registration form with the Securities and Exchange Commission. In the event such registration statement is not effective at the time of the Effective Date, the Rights Offering may, at the option of the Debtors with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee (which consent shall not be unreasonably withheld), (1) delay the Effective Date until the effectiveness of the registration statement or (2) consummate the rights offering after the Effective Date as soon as practicable following the effectiveness of the registration statement.

For the avoidance of doubt, in the event Class 13a Interests in Chemtura Corporation vote to accept the Plan, excess Cash in the Disputed Claims Reserve after all Allowed Unsecured Claims are paid in full will be returned to the Reorganized Debtors for general corporate use in accordance with the terms of the Plan. Additionally, any excess New Common Stock will be cancelled or held as treasury stock, rather than distributed to holders of Class 13a Interests in Chemtura Corporation. Also for the avoidance of doubt, in the event Class 13a Interests in Chemtura vote to reject the Plan, excess amounts in the Environmental Reserve and the Diacetyl Reserve will become part of the Disputed Claims Reserve and, if holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of excess Cash and New Common Stock in the Disputed Claims Reserve (if any).

Additionally, it is important to note that distributions, if any, to holders of Class 13a Interests in Chemtura Corporation will be determined based upon whether such Class votes to accept or reject the Plan, and not whether an individual holder of such Interest votes to accept or reject the Plan. Specifically, if a holder of a Class 13a Interest in Chemtura Corporation votes to accept the Plan, but Class 13a votes to reject the Plan, the holder who voted in favor the Plan will **not** receive a Pro Rata share of 5% of the New Common Stock and will not be afforded the

K&E 17416258.15

opportunity to participate in the Rights Offering (which will not otherwise be effectuated in that instance). Similarly, the distribution of 5% of the New Common Stock to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to accept the Plan will be made to **all** holders of Class 13a Interests, regardless of how they voted, and not only to those holders of Interests in Chemtura Corporation who voted to accept the Plan.

###### iv.    Plan Description of Class 13b for the applicable Subsidiary Debtors and Chemtura Canada

The Plan provides that, at the option of the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on the Effective Date, all Class 13b Interests in the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall remain outstanding, shall be cancelled or shall be transferred pursuant to the Plan, including as set forth in Section 5.22 of the Plan.

Class 13b for each of the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) is Unimpaired or Impaired, and holders of Class 13b Subsidiary Debtor and Chemtura Canada Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Interests in Class 13b for each of the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are not entitled to vote to accept or reject the Plan.

###### n.    Treatment Provisions Applicable to All Classes of Unsecured Claims and Interests

###### i.    Payment of Interest

Section 3.3(n)(i) of the Plan provides that, to the extent that the Plan provides for payment of interest to holders of Allowed Unsecured Claim, such interest shall be paid in the same form of consideration as the underlying Allowed Unsecured Claim, and the amount of Allowed interest shall be calculated between the Effective Date, on the one hand, and the later of the date such Allowed Claim:

- became due in the ordinary course of business; or

- was invoiced to the applicable Debtor, on the other hand, with such interest to be payable (except as expressly specified herein) at the federal judgment rate as of the Petition Date or at the contract rate to the extent allowable under applicable law in accordance with the Contract Interest Rate Procedures.

For the avoidance of doubt, the Plan provides that, to the extent interest is payable on a particular Allowed Claim in accordance with the foregoing, the amount of such Allowed Claim shall be increased to include interest.

###### ii.    Distribution from the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve

The Plan further provides that, to the extent excess Cash or New Common Stock remains in the Disputed Claims Reserve, Diacetyl Reserve or Environmental Reserve following the resolution of all Disputed Claims, Diacetyl Claims and Environmental Claims such excess Cash or New Common Stock shall be distributed among Claims and Interests as and to the extent provided in Section 8.5 of the Plan, and described in section VIII.I(v) of this Disclosure Statement.

###### (iv)    Treatment of Claims Against and Interests in Chemtura Canada

The Plan provides that it constitutes a pre-arranged Plan for Chemtura Canada in the event it becomes a Debtor before the Confirmation Date. For the avoidance of doubt, in the event Chemtura Canada becomes a Debtor before the Confirmation Date: (a) each holder of a Lien Claim, Other Priority Claim or Intercompany Claim against

128

Chemtura Canada shall receive the same treatment as the treatment for holders of all other Lien Claims, Other Priority Claims and Intercompany Claims, respectively, as set forth in Article III of the Plan, (b) each holder of a General Unsecured Claim against Chemtura Canada shall receive the treatment as set forth in Section 3.3(d)(iii), of the Plan and (c) each holder of a Diacetyl Claim against Chemtura Canada shall receive the treatment as set forth in Section 3.3(j) of the Plan and (d) each holder of an Interest in Chemtura Canada shall receive the same treatment as the treatment for holders of Interests in Subsidiary Debtors as set forth in Section 3.3(m)(ii) of the Plan.

### C.    Acceptance Requirements

#### (i)    *Acceptance or Rejection of the Plan*

##### a.    Voting Classes

The Plan provides that Class 4a for Chemtura Corporation and Class 4b for each of the applicable Subsidiary Debtors, Classes 5, 6 and 11 for Chemtura Corporation and each of the applicable Subsidiary Debtors, Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation, Classes 8 and 13a for Chemtura Corporation and Class 10 for Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are Impaired under the Plan and are, therefore, entitled to vote to accept or reject the Plan.

##### b.    Presumed Acceptance of the Plan

The Plan provides that Classes 1 and 9 for Chemtura Corporation and each of the applicable Subsidiary Debtors, Classes 2 and 3 for each of the applicable Debtors and Class 4c for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, provided, however, that holders of Class 1 Prepetition Secured Lender Claims shall be permitted to vote to accept or reject the Plan on a provisional basis.  Class 12 for each of the Debtors and Class 13b for each of the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims in Class 12 for each of the Debtors and holders of Interests in Class 13b for each of the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are either Plan proponents or affiliates of Plan proponents.

#### (ii)    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to modify the Plan in accordance with Article XIII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### D.    Means for Implementation of the Plan

#### (i)    *General Settlement of Claims and Interests*

As discussed in detail in section IX.B of this Disclosure Statement and as otherwise provided in the Plan, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, Distributions, Releases and other benefits provided under the Plan, the provisions of the Plan shall upon Consummation constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan.  Subject to Article VII of the Plan, all distributions made to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

#### (ii)    *The Creditors' Committee Action*

As discussed in detail in section IX.B of this Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided in the Plan, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, on the Effective Date of the Plan the Creditors' Committee will agree to dismiss the Creditors' Committee Action with prejudice, provided, however, that the Creditors' Committee reserves all rights to pursue the Creditors' Committee Action in the event that, for any reason, the Effective Date does not occur.

### (iii)    The PBGC Settlement

As discussed in detail in section IX.B(iii) of this Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided in the Plan, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, the provisions of the Plan shall constitute a good faith compromise and settlement between the Debtors, the Creditors' Committee and the PBGC with the consent of the Ad Hoc Bondholders' Committee arising from or related to the disputed Claims and PBGC's asserted rights of regulatory action, whereby Chemtura Corporation shall make a contribution in the amount of $50 million with respect to its underfunded U.S. pension obligations on the Effective Date, which shall have the effect of reducing later contribution requirements according to statute.

### (iv)    The CHCI Preferred Stock Settlement

As discussed in detail in section IX.B(i) of this Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided in the Plan, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies between the Estates and CHCI arising from or related to Great Lakes Chemical Corporation's ownership of the CHCI Preferred Stock, whereby for all purposes related to distributions and allocated value among the Debtors pursuant to the Plan (and solely for Plan purposes) the CHCI Preferred Stock shall be given effect for 50% of its value.

### (v)    The Make-Whole Settlement and the No-Call Settlement

As discussed in detail in section IX.B(i)c of this Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided in the Plan, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, the provisions of the Plan shall constitute:

- a good faith compromise and settlement of all Claims and controversies between the Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the 2016 Notes Indenture Trustee arising from or related to the Make-Whole Premium, which the Plan defines as the claim asserted by certain holders of 2016 Notes and the 2016 Notes Indenture Trustee for obligations, if any, for payment of a make-whole premium or similar damages or prepayment penalties as required in connection with the 2016 Notes Indenture; and

- a good faith compromise and settlement of all Claims and controversies between the Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the 2026 Notes Indenture Trustee arising from or related to the No-Call Penalty, which the Plan defines as the claim asserted by certain holders of 2026 Notes and the 2026 Notes Indenture Trustee for obligations, if any, for payment of damages or prepayment penalties in connection with the 2026 Notes Indenture.

The Plan provides that the holders of 2016 Notes will be entitled to an Allowed Claim equal to the Make-Whole Settlement Amount (i.e., $50 million). Moreover, the holders of 2026 Notes will be entitled to an Allowed Claim equal to the No-Call Settlement Amount (i.e., $20 million). The terms of the Make-Whole Settlement and the

K&E 17416258.15

No-Call Settlement were available to the Debtors by the Creditors' Committee, the Ad Hoc Bondholders' Committee, the 2016 Notes Indenture Trustee and the 2026 Notes Indenture Trustee only if the Debtors settled all of the Claims and controversies as a whole on the terms as offered.  Postpetition interest will not be paid on the Make-Whole Settlement Amount or the No-Call Settlement Amount.

<div align="center">

*(vi)*    ***The Settlement Regarding the Fees of the Ad Hoc Bondholders' Committee***

</div>

As discussed in detail in section IX.B(ii) of this Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided therein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors shall pay in full in Cash within five business days of the Effective Date (unless otherwise provided in the Plan) the reasonable, documented and necessary out-of-pocket fees and expenses incurred by the Ad Hoc Bondholders' Committee up to an aggregate cap equal to the Ad Hoc Committee Fee Cap, consistent with that certain Plan Support Agreement, dated as of June 17, 2010, among the Debtors, the Creditors' Committee, members of the Ad Hoc Bondholders' Committee and certain other holders of Notes Claims, without the need of any party to file fee applications with the Bankruptcy Court.  In short, the Plan Support Agreement provides that the Debtors and the Creditors' Committee will support payment of fees and expenses to the Ad Hoc Bondholders' Committee up to the Ad Hoc Committee Fee Cap.

The Ad Hoc Bondholders' Committee shall provide the Debtors and the Creditors' Committee with the invoices (or such other documentation as the Debtors and the Creditors' Committee may reasonably request) for services rendered on a periodic basis, and in any event no later than fifteen days before the Effective Date.  The Debtors and the Creditors' Committee will have ten business days from receipt of such invoices to review and raise any objections to the reasonableness of the fees or expense items set forth therein.  All invoiced fees shall be deemed reasonable if no notice of objection is provided within ten business days of their receipt by the Debtors and the Creditors' Committee, and if deemed reasonable shall be paid within five business days of the Effective Date (other than for fees and costs incurred in the 60 days prior to the Effective Date, which fees and costs, if not objected to, will be paid within fifteen business days of receipt if the Debtors and the Creditors' Committee do not object to the reasonableness of such fees).  To the extent that the Debtors or the Creditors' Committee object to any of the fees of the Ad Hoc Bondholders' Committee, the Debtors shall not be required to pay any disputed portion of such fees until a resolution of such objection is agreed to by the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee, or until issuance of a further order of the Bankruptcy Court upon motion by the Ad Hoc Bondholders' Committee.

Notwithstanding the foregoing, the Debtors and the Creditors' Committee acknowledge that they have reviewed the December 19, 2009 retainer agreement between Jones Day and Moelis & Company outlining the fees payable to Moelis & Company for its work in this matter, and hereby agree that the Monthly Fee and the Restructuring Fee (each as defined therein) are deemed reasonable and will be paid within five business days of the Effective Date; provided, however, that because the Debtors and Creditors' Committee do not believe it will be necessary for Moelis & Company to provide testimony in this case, any Testimony Fees (as defined in the retainer agreement) are not deemed reasonable at this time, and will be subject to future consideration if and when incurred by the Ad Hoc Bondholders' Committee, and would not cause the Ad Hoc Committee Fee Cap to be increased from $7 million, unless specifically and subsequently agreed to by the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee, pursuant to the terms of the Plan Support Agreement.

The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee expressly agree and acknowledge that pursuant to Bankruptcy Rule 9019 and section 1129(a)(4) of the Bankruptcy Code, because the payment of the Ad Hoc Bondholders' Committee's fees is pursuant to the overall settlement underlying the Plan, the sole ground for objecting to any of the Ad Hoc Bondholders' Committees fees, whether informally or before the Bankruptcy Court or other court of competent jurisdiction, shall be as to matters of reasonableness under section 1129(a)(4) of the Bankruptcy Code.

<div align="center">131</div>

### (vii)    *Environmental Matters*

#### a.    **Post-Effective Date Environmental Obligations**

All environmental obligations owing to Governmental Units relating to sites owned or operated by Chemtura Corporation or the Subsidiary Debtors as of the Effective Date, except those obligations that constitute Environmental Claims on account of costs expended or paid by a Governmental Unit before the Petition Date or penalties owing to a Governmental Unit for violations of environmental laws or regulations that occurred before the Petition Date, shall remain in place after the Effective Date. Nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any environmental obligations owing to Governmental Units at owned or operated sites.

#### b.    **Environmental Adversary Proceeding**

Nothing in the Plan shall constitute or be construed as an adjudication or settlement of the disputed issues between the parties to the adversary proceeding (Adv. Case. No. 09-01719) commenced by Chemtura Corporation and the Subsidiary Debtors against certain Governmental Units seeking a declaratory judgment that certain environmental orders and obligations that are or may be asserted against Chemtura Corporation and the Subsidiary Debtors by the Governmental Units with respect to non-owned former sites and non-owned off-site disposal sites are Claims that are dischargeable in the Chapter 11 Cases, which adversary proceeding is currently pending as of the date of the Plan before the United States District Court for the Southern District of New York.

### (viii)    *The Unsecured Distribution Pool*

The Plan describes the "Unsecured Distribution Pool" as the pool from which distributions shall be made to the Participating Creditor Classes, which pool shall be funded with: (a) available distributable Cash following funding of the Diacetyl Reserve and payment to all holders of Allowed Unsecured Convenience Claims, (b) all proceeds of the Rights Offering, to the extent that Class 13a for Chemtura Corporation votes to accept the Plan and holders of Interests in such Class elect to participate in the Rights Offering and (c) the New Common Stock, subject to reduction solely to the extent that Class 13a for Chemtura Corporation votes to accept the Plan in the amount of the 5% of the New Common Stock made available to holders of Interests in such Class and up to $100 million in value of New Common Stock made available to holders of Interests in such Class in the form of the Rights Offering, and subject to dilution for the Incentive Plans.

As provided in the Plan, the Unsecured Distribution Pool shall be used to fund:

- the payments pursuant to the Plan of all Allowed Claims in the Participating Creditor Classes, all on the terms set forth herein with respect to each such Class; and

- the Disputed Claims Reserve.

To the extent that Class 13a for Chemtura Corporation votes to reject the Plan, any Cash or New Common Stock available in the Unsecured Distribution Pool following the funding described above (which shall include, for the avoidance of doubt, payment of all Allowed Claims in the Participating Creditor Classes in full and with interest in the full Allowed amount), then each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash and New Common Stock.

To the extent that there is insufficient value available in the Unsecured Distribution Pool to satisfy in full all Allowed Claims in the Participating Creditor Classes pursuant to the Plan, the resulting shortfall in distributable value shall result in the Shortfall Adjustment. Notwithstanding the foregoing, to the extent that additional Cash and New Common Stock become available for distribution after the Initial Distribution Date pursuant to Section 8.5, the resulting distributable value shall result in the Shortfall Readjustment.

K&E 17416258.15

(ix)     *Election of Cash and New Common Stock*

The Plan provides that each holder of an Allowed Claim in any Participating Creditor Class (except for Classes of Notes Claims) may, at the time of voting upon the Plan, or, with respect to holders of Notes Claims, before the Voting Deadline whether or not such holder votes on the Plan, make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock.

The following Classes are "Participating Creditor Classes" under the Plan:

- Prepetition Unsecured Lender Claims;

- Notes Claims; and

- General Unsecured Claims (other than General Unsecured Claims against Chemtura Canada, in the event it becomes a Debtor before the Confirmation Date).

To the extent that a creditor makes such an election, the Cash or New Common Stock that otherwise would be distributable to such creditor will be aggregated in the Electing Creditors' Pool and will be reallocated among all Electing Creditors according to their recovery preferences (with all distributions to be made such that each Electing Creditor receives the aggregate value of consideration it otherwise would be entitled to, in the form of the preferred distribution to the extent possible). Whether and to what extent any Electing Creditor receives an increased percentage of the consideration it requested will depend upon the elections of all holders of Allowed Claims in the Participating Creditor Classes taken as a whole.

The failure of a holder to make a binding election to participate in the Electing Creditors' Pool during the voting period (including the failure to submit a validly executed ballot or other form) will reflect an agreement that such holder will receive its recovery in the Cash-to-New Common Stock ratio reflecting the Cash and New Common Stock in the Unsecured Distribution Pool.

(x)     *Exit Financing/Incurrence of New Indebtedness*

The Plan provides that, on the Effective Date, the Reorganized Debtors shall enter into the Exit Credit Facility Agreement and complete the Exit Financing in order to fund distributions under the Plan and to fund the Reorganized Debtors' business operations, and the Debtors shall be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Financing, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization or approval of any person. The terms of the Exit Financing, including sizing, composition, fees, interest rates, and maturity will be reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee and will be market-based.

The Exit Financing will be used, along with the Debtors' cash on hand, and, if applicable, proceeds of a rights offering, to make any cash payments provided for in the Plan and provide working capital after the Effective Date. Additionally, the Plan contemplates issuing up to 100 million shares of stock in New Chemtura (which is referred to as New Common Stock), which stock will provide an additional source of recovery for holders of unsecured Claims and possibly for holders of Interests in Chemtura. *See* "Description of the Joint Plan of Reorganization," which begins on page 103.

The Debtors, together with their financial advisors, determined that the amount of Exit Financing contemplated by the Plan was the appropriate level of indebtedness on the Effective Date based upon a number of considerations, including the Debtors' targeted credit rating level upon emergence based on a comparison of the Debtors to other companies in the specialty chemicals industry of comparable size and complexity, which companies are the same as those used by Lazard in the Comparable Company Analysis component of its valuation of the Debtors as described in **Exhibit F** to this Disclosure Statement, entitled "Valuation Analysis."

133

The Equity Committee believes that the Reorganized Debtors can support a significantly higher amount of leverage upon exit from the Chapter 11 Cases and that the much lower amount of leverage contemplated by the Plan results in unnecessary dilution to holders of Class 13a Interests in Chemtura.  The Equity Committee has indicated that its belief is based on, among other factors, the Debtors' current EBITDA run rate as well as management's EBITDA projections for 2011 and beyond and the amount of leverage maintained by comparable companies in the specialty chemicals industry.  The Debtors disagree that a higher amount of leverage would be appropriate.

### (xi)    *Sources of Consideration for Plan Distributions*

#### a.    **Cash Consideration**

The Plan provides that all Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Exit Financing(s) or other Cash on hand of the Debtors, including Cash derived from business operations.  Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth therein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

#### b.    **Issuance of New Common Stock**

On the Effective Date, New Chemtura shall issue up to 100 million shares of New Common Stock for distribution to the holders of Allowed Claims against or Interests in Class 4a for Chemtura Corporation, Class 4b for each of the applicable Subsidiary Debtors, Classes 5 and 6 for Chemtura Corporation and each of the Subsidiary Debtors, Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation and Classes 8 and 13a for Chemtura Corporation pursuant to the terms set forth in the Plan.  All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.

Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The Reorganized Debtors will use their commercially reasonable best efforts to list the New Common Stock on a national securities exchange, with the initial goal of listing on the New York Stock Exchange or NASDAQ by the Effective Date.

### (xii)    *The Rights Offering*

#### a.    **Use of Rights Offering Proceeds**

As set forth in Section 3.3(m)(i)(A) of the Plan, if Class 13a for Chemtura Corporation votes to accept the Plan, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of the Rights to participate in the Rights Offering.  The proceeds of the Rights Offering will be used to provide $100 million in Cash (or such lesser amount of proceeds actually achieved, to the extent the Rights Offering is not fully subscribed) funding to the Reorganized Debtors to fund distributions pursuant to the Plan.

#### b.    **Rights Offering Procedures**

If Class 13a for Chemtura Corporation votes to accept the Plan, each holder of an Interest in Class 13a for Chemtura Corporation will be entitled to subscribe for and to acquire the Rights being offered pursuant to the Rights Offering in accordance with the terms of the Rights Offering Procedures, in substantially the form annexed hereto as Exhibit 1.

The Rights Offering shall be subject to compliance with the Securities Act of 1933, as amended, including the filing and approval of an appropriate securities registration form with the Securities and Exchange Commission.  In the event such registration statement is not effective at the time all conditions precedent to the Plan are satisfied

K&E 17416258.15

or waived, the Effective Date may be delayed until the effective date of the registration statement.  Alternatively, the Debtors will work with the Creditors' Committee and the Ad Hoc Bondholders' Committee to explore alternatives that would allow the Effective Date to occur before the effective date of the registration statement.

<p style="text-align:center">(xiii)    <b><i>Cancellation of Securities and Agreements</i></b></p>

The Plan provides that, on the Effective Date, and except as otherwise specifically provided for in the Plan:

- the obligations of the Debtors under the Prepetition Credit Agreement and the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and

- the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares (including the CHCI Preferred Stock), certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, that any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of:

  - allowing holders of Prepetition Secured Lender Claims, Prepetition Unsecured Lender Claims, 2009 Notes Claims, 2016 Notes Claims and 2026 Notes Claims (as applicable) to receive distributions under the Plan as provided therein;

  - allowing the Prepetition Administrative Agent and the Indenture Trustees, if applicable, to make distributions under the Plan as provided therein, and deduct therefrom such compensation, fees and expenses due thereunder or incurred in making such distributions; and

  - allowing the Prepetition Administrative Agent and the Indenture Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.

On and after the Effective Date, all duties and responsibilities of the Prepetition Administrative Agent under the Prepetition Credit Agreement and the Indenture Trustees under the Indentures, as applicable, shall be discharged except to the extent required in order to effectuate the Plan.

<p style="text-align:center">(xiv)    <b><i>Surrender of Existing Securities</i></b></p>

The Plan provides that, as a condition precedent to receiving any distribution on account of any Note, each record holder of any Notes shall be deemed to have surrendered such Notes or other documentation underlying such Notes and all such surrendered Notes and other documentation shall be deemed to be cancelled in accordance with Section 5.12 of the Plan.

<p style="text-align:center">135</p>

(xv)    **Section 1145 Exemption**

The issuance of the New Common Stock distributed pursuant to the Plan to holders of Claims and Interests shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by provision of applicable law, regulation, order or rule. Holders of New Common Stock issued in respect of Allowed Unsecured Claims will be provided with reasonable and customary registration rights, to be set forth in more detail in the Plan Supplement, solely to the extent such New Common Stock may not be transferred without restriction pursuant to Rule 144 or is otherwise not freely saleable under the securities laws notwithstanding section 1145 of the Bankruptcy Code. Additionally, to the extent Class 13a for Chemtura Corporation votes to accept the Plan and the Rights Offering is subscribed in an amount such that the issuance of New Common Stock pursuant to the Rights Offering does not qualify for the statutory exemption from securities law provided under section 1145 of the Bankruptcy Code, a registration of the New Common Stock with the U.S. Securities and Exchange Commission will be required.

(xvi)    **Corporate Existence**

Except as otherwise provided in the Plan, in the Corporate Governance Documents or elsewhere in the Plan Supplement, each Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed. The Corporate Governance Documents shall be in the form filed with the Plan Supplement.

(xvii)    **New Certificate of Incorporation and New By-Laws**

On or immediately before the Effective Date, New Chemtura and each of the other Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective jurisdictions of incorporation in accordance with the corporate laws of the respective jurisdictions of incorporation. After the Effective Date, New Chemtura and each of the other Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation and their respective New Certificates of Incorporation and New By-Laws. The New Certificates of Incorporation and New By-Laws shall be included in the Plan Supplement and shall be subject to the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld.

(xviii)    **New Chemtura's and Reorganized Debtors' Boards of Directors**

The Plan provides that, on the Effective Date, the New Board will consist of 9 directors, one of which shall be the chief executive officer. The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee shall establish a board selection committee to select 8 members of the New Board of New Chemtura in addition to the chief executive officer. The board selection committee, which shall be advised by an independent search firm, shall be charged with working together to try to reach consensus upon a list of the members of the New Board of New Chemtura.

In the event, however, that consensus is not reached by the board selection committee, the Plan provides that the Creditors' Committee and the Ad Hoc Bondholders' Committee shall, together, be entitled to designate 6 members of the New Board of New Chemtura and the Debtors shall be entitled to designate 2 members of the New Board of New Chemtura. Each designated member of the New Board of New Chemtura shall meet minimum eligibility requirements consistent with service on the board of a public company of comparable size to New Chemtura and the other Reorganized Debtors, with such minimum requirements to be identified by the independent search firm advising the board selection committee.

To the extent known, the identity of the members of the New Boards of New Chemtura and of each of the other Reorganized Debtors and the nature and compensation for any member of a New Board who is an "insider" under section 101(31) of the Bankruptcy Code will be identified in the Plan Supplement but, in any event, shall be disclosed at or before the Confirmation Hearing.

136

### (xix)    *Officers of New Chemtura and Reorganized Debtors*

To the extent known, officers of New Chemtura and each of the other Reorganized Debtors shall be identified in the Plan Supplement but, in any event, shall be disclosed at or before the Confirmation Hearing. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements with New Chemtura and each of the other Reorganized Debtors.

### (xx)    *Employee Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may in the ordinary course of business, honor any prepetition contracts, agreements, policies, programs and plans for, among other things, compensation (other than prepetition equity based compensation related to Interests, which shall receive appropriate compensation as provided for pursuant to the Plan), health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation benefits, savings plans, severance benefits, welfare benefits, workers' compensation insurance, life insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time; *provided, however,* that the Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any contract, agreement, policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such contract, agreement, policy, program or plan.

The Plan further provides that nothing therein shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans, including the Reorganized Debtors' rights to modify unvested benefits pursuant to their terms.

### (xxi)    *Retiree Benefits*

All employment, retirement, and other agreements or arrangements in place as of the Effective Date with the Debtors' officers, directors, or employees, who will continue in such capacities or similar capacities after the Effective Date, or retirement income plans and welfare benefit plans for such persons, shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; provided, however, that the foregoing shall not apply to any stock-based compensation or incentive plan, agreement, or arrangement existing as of the Petition Date.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Pursuant to the Plan, the Debtors or Reorganized Debtors, as applicable, shall continue the U.S. Pension Plans.  The U.S. Pension Plans shall be continued in accordance with their terms, and the Debtors or the Reorganized Debtors, as applicable, shall satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, be liable for the payment of PBGC premiums in accordance with Title IV of ERISA, 29 U.S.C. §§ 1306 and 1307, subject to any and all applicable rights and defenses of the Debtors, and administer the U.S. Pension Plans in accordance with the provisions of ERISA and the Internal Revenue Code. Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, the U.S. Pension Plans shall be continued and administered in accordance with ERISA and the Internal Revenue Code.

The Plan defines "Non-Qualified Pension Arrangements" as the non-qualified pension and other deferred compensation arrangements pursuant to which the Debtors provided benefits to certain executive officers and former executive officers of the Debtors, predecessor companies and other legacy entities whose liabilities and obligations were assumed by the Debtors either contractually or by law, including through past merger and acquisition activity, before the Petition Date.

All Non-Qualified Pension Arrangements shall be deemed assumed as of the Effective Date to the extent they are Executory Contracts, or will be Reinstated pursuant to Section 3.3(d)(i)(B) or Section 3.3(d)(ii)(B), as applicable.  Any monetary default under the Non-Qualified Pension Arrangements to be so assumed or Reinstated hereunder shall be satisfied in accordance with Section 6.3 or as otherwise may be agreed to by the Debtors  (with

137

the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) and the beneficiaries of the Non-Qualified Pension Arrangements and any postpetition interest paid on account of such Claims shall be paid at the federal judgment rate as of the Petition Date. Assumption or Reinstatement of any Non-Qualified Pension Arrangement pursuant to the Plan or otherwise and payment of postpetition interest in accordance with the preceding sentence shall be deemed to provide full satisfaction of all prepetition Claims arising under any assumed Non-Qualified Pension Arrangement including those set forth in Proofs of Claim Nos. 1973, 1974, 1975, 2046, 2048, 2049, 2081, 2084, 2086, 2088, 2165, 2166, 2167, 2168, 2169, 2170, 2171, 2172, 2173, 2174, 2198, 2199, 2239, 2336, 2337, 2338, 2353, 2355, 9496 and 10234.

### (xxii)    The Incentive Plans

The Plan defines the "Incentive Plans" as the Emergence Incentive Plan and the New Incentive Plan.  The "New Incentive Plan" is defined under the Plan to be the compensation program that will be implemented by the New Board of Chemtura Corporation and will become effective upon the Effective Date, which shall include a stock-based long-term incentive plan and may include other stock-based compensation consistent with the New Employment Agreements that will be adopted and become effective upon the Effective Date as well as a cash-based annual incentive plan consistent with past practice, as to which awards are subject to the approval of the New Board. Certain New Common Stock shall be reserved for issuance under the New Incentive Plan, in addition to shares reserved that may be issued pursuant to the Emergence Incentive Plan, as the Emergence Incentive Plan may be modified, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, and which modification shall be disclosed in the Plan Supplement.  The terms of the New Incentive Plan shall be included in the Plan Supplement.  The reserve number and New Incentive Plan terms are to be agreed to prior to the hearing on the Disclosure Statement.

The "Emergence Incentive Plan" is defined under the Plan to include payments on account of:

- any awards earned under the Bankruptcy Court's *Order (A) Approving the Debtors' Key Employee Incentive Plan and (B) Authorizing the Debtors to Honor Certain Prepetition Bonus Programs* [Docket No. 847], as such awards may be modified or implemented with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on terms set forth in the Plan Supplement; and

- any awards earned under the Bankruptcy Court's *Order Approving the Debtors' 2010 Key Employee Incentive Plan* [Docket No. 2707], as such awards may be modified or implemented with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on terms set forth in the Plan Supplement.

The Debtors, the Creditors' Committees and the Ad Hoc Bondholders' Committee continue to negotiate certain metrics, terms and elements of the Incentive Plans and the New Employment Agreements.  The terms of the Incentive Plans and the New Employment Agreements shall be as set forth in the Plan Supplement.

### (xxiii)    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date and all property in each Estate, all Causes of Action (except those released pursuant to the Releases by the Debtors) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure the Exit Financing).

On and after the Effective Date, except as otherwise provided in the Plan (including, without limitation, the provisions of Section 8.1 of the Plan), each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

K&E 17416258.15

### (xxiv)   Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors intend to simplify and rationalize their corporate structure by eliminating certain entities that are deemed no longer essential to the Reorganized Debtors and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  Prior to the Effective Date, the Debtors shall have obtained the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, regarding their intentions with respect to the restructuring transactions.

### (xxv)   Corporate Action

Upon the Effective Date, all actions contemplated by the Plan (including the simplification of the Reorganized Debtors' corporate structure) shall be deemed authorized and approved in all respects, including:

- entry into the New Employment Agreements;

- selection of the directors and officers of the Reorganized Debtors;

- the execution of and entry into the Exit Financing;

- the distribution of the New Common Stock as provided therein;

- the establishment of the Diacetyl Reserve and the Environmental Reserve and, if elected by the Debtors, the Diacetyl Trust and the Environmental Trust; and

- all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors.

### (xxvi)   Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents related to the foregoing and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan (including the Exit Financing) and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.  The authorizations and approvals contemplated by Section 5.26 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### (xxvii)    Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to:

- the creation of any mortgage, deed of trust, lien or other security interest;

- the making or assignment of any lease or sublease;

- any restructuring transaction authorized by Section 5.24 of the Plan; or

- the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including:

    - any merger agreements;

    - agreements of consolidation, restructuring, disposition, liquidation or dissolution;

    - deeds; or

    - assignments executed in connection with any transaction occurring under the Plan.

### (xxviii)    D&O Liability Insurance Policies

The Plan provides that, notwithstanding anything therein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.

Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.  On or before the Effective Date, the Reorganized Debtors shall obtain reasonably sufficient tail coverage (i.e., D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers for a period of five years, and placed with such insurers, the terms of which shall be set forth in the Plan Supplement.

### (xxix)    Preservation of Rights of Action

The Plan provides that, in accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided by Section 11.2 of the Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as

140

any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

### (xxx)    *Single Satisfaction of Claims*

The Plan provides that holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim plus applicable interest.

### E.    Treatment of Executory Contracts and Unexpired Leases

### (i)    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

The Plan provides that, except as otherwise provided therein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of Chemtura Corporation's and the Subsidiary Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease:

- was assumed or rejected previously by the Debtors;

- previously expired or terminated pursuant to its own terms;

- is the subject of a motion to assume filed on or before the Effective Date; or

- is identified as an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan Supplement before the Effective Date.

In the event that Chemtura Canada becomes a Debtor before the Effective Date, each of Chemtura Canada's Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.

Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date.  After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

141

(ii)     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 4 General Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan.

The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the <u>later</u> of:

- 90 days following the date on which such Claim was filed; and

- such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

(iii)     *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

The Plan provides that any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases (and the Creditors' Committee and the Ad Hoc Bondholders' Committee, whose consent shall not be unreasonably withheld) may otherwise agree.

In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least fourteen days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall be in a format reasonably acceptable to the Creditors' Committee and shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by counsel to the Debtors and the Creditors' Committee at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount. A list of the Executory Contracts and Unexpired Leases to be assumed and the notices of proposed assumption and proposed amounts of Cure Claims shall be included in the Plan Supplement.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

K&E 17416258.15

### (iv) Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

### (v) Reservation of Rights

The Plan provides that, neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### (vi) Contracts and Leases Entered Into After the Petition Date

The Plan provides that contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### (vii) Assumption of Insurance Policies

Notwithstanding anything contained in this Disclosure Statement, the Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, each of the Insurance Policies shall, as applicable, be deemed assumed to the extent such Insurance Policies are Executory Contracts of the applicable Debtor(s) pursuant to section 365 of the Bankruptcy Code.

## F. Provisions Governing Distributions

### (i) Total Enterprise Value

The Plan defines "New Chemtura Total Enterprise Value" as $2.05 billion plus, except as otherwise agreed among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee in their discretion, total Cash available to satisfy Allowed Unsecured Claims plus the amount of Cash to be retained following the Effective Date (which is expected to be approximately $125 million).

The Plan provides that distributions of New Common Stock to holders of Allowed Claims, and the establishment and maintenance of the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve, as described below, shall be based upon, among other things, the New Chemtura Total Enterprise Value.  For purposes of distribution, the New Common Stock shall be deemed to have the value assigned to it based upon, among other things, the New Chemtura Total Enterprise Value regardless of the date of distribution.

K&E 17416258.15

     *(ii)*       ***Record Date for Distributions***

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

     *(i)*       ***Timing and Calculation of Amounts to Be Distributed***

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in the applicable Class and in the manner provided therein.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan.

Except as otherwise provided in the Plan (including in Section 7.6(a) of the Plan with respect to Disputed Claims), holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

     *(ii)*       ***Disbursing Agent***

The Plan provides that, except as otherwise provided therein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date. To the extent that any Entity other than the Reorganized Debtors or any of the Indenture Trustees is designated as a Disbursing Agent, such Entity's designation and service thereunder shall be conditioned upon such Entity posting a bond satisfactory to the Bankruptcy Court.

     *(iii)*       ***Rights and Powers of Disbursing Agent***

        **a.**        **Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to:

- affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan;

- make all distributions contemplated hereby;

- employ professionals to represent it with respect to its responsibilities; and

- exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

        **b.**        **Expenses Incurred On or After the Effective Date**

The Plan provides that, except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

K&E 17416258.15

(iv)    *Distributions on Account of Claims Allowed After the Effective Date*

a.    **Payments and Distributions on Disputed Claims and Interests**

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim or Interest, unless and until such Claim or Interest becomes an Allowed Claim or Interest. Distributions made after the Effective Date to holders of Disputed Claims and Interests that are not Allowed Claims and Interests as of the Effective Date but which later become Allowed Claims and Interests shall be deemed to have been made on the Effective Date. The Plan provides, however, that to the extent a distribution after the Effective Date to the holder of a Disputed Claim or Interest includes New Common Stock, such New Common Stock shall be distributed together with all post-Effective Date accruals or dividends in connection therewith, and, moreover, that to the extent a Disputed Claim constituting a contract or trade claim arising in the ordinary course of the Debtors' business becomes an Allowed Claim, such Allowed Claim shall include interest calculated in accordance with the principles set forth in Section 3.3(n)(i) of the Plan, and described in section VIII.B(iii)n of this Disclosure Statement.

b.    **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until all Disputed Claims and Interests held by the holder of such Disputed Claim or Interest have become Allowed Claims or Interests or have otherwise been resolved by settlement or Final Order.

(v)    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

a.    **Delivery of Distributions in General**

The Plan provides that, except as otherwise provided therein, distributions to holders of Allowed Claims or Interests shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent:

- to the signatory set forth on any of the Proof of Claim or Interest filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim or Interest is filed or if the Debtors have been notified in writing of a change of address);

- at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim or Interest;

- at the addresses reflected in the Schedules if no Proof of Claim or Interest has been filed and the Disbursing Agent has not received a written notice of a change of address; or

- on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.

Distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.

None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, all distributions to holders of Prepetition Secured Lender Claims and Prepetition Unsecured Lender Claims shall be governed by the Prepetition Credit Agreement, and shall be deemed completed when made to the Prepetition Administrative Agent, who shall in turn make distributions in accordance with the Prepetition Credit Agreement.

145

Except as otherwise provided in the Plan, all distributions to holders of Notes Claims shall be governed by the Notes and Indentures, and shall be deemed completed when made to the Indenture Trustees, who shall in turn make distributions in accordance with the Notes and Indentures.

###### b.  Fractional Distributions

The Plan provides that, whenever any payment of New Common Stock of a fraction pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole share (up or down), with half or less being rounded down.  Pursuant to the Plan, whenever any payment of Cash of a fraction of a dollar would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

###### c.  Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

###### (vi)  *Compliance with Tax Requirements and Allocations*

In connection with the Plan and all instruments issued in connection therewith, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

###### (vii)  *Setoffs*

The Debtors and the Reorganized Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest.

In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim or Interest and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim or Interest) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest, but only to the extent of such adjudicated or resolved amount.

Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such holder, except as specifically provided therein.

### (viii)    *Claims Paid or Payable by Third Parties*

#### a.    **Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, shall reduce in part or in full an Allowed Claim to the extent that the holder of such Allowed Claim receives payment in part or in full on account of such Allowed Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a holder of an Allowed Claim receives a distribution on account of such Allowed Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Allowed Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Allowed Claim from the third party and under the Plan exceeds the amount of such Allowed Claim as of the date of any such distribution under the Plan.

#### b.    **Claims Payable by Third Parties**

To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, such Claim shall be treated as an Allowed Insured Claim to the extent of the insurer's agreement and may be expunged or reduced without a Claim objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

#### c.    **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to holders of Allowed Insured Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained therein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### G.    **Procedures for Resolving Contingent, Unliquidated and Disputed Claims Other than Diacetyl Claims**

#### (i)    *Prosecution of Objections to Claims*

The Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court if the Allowed amount of such Disputed Claim is equal to or less than $100,000. If, however, the Allowed amount of such Disputed Claim is greater than $100,000, the Reorganized Debtors shall file a notice of the proposed settlement with the Bankruptcy Court. Parties in interest shall have ten days from the filing of such notice to object to the proposed settlement. If no objections are received on or before the tenth day, the Disputed Claim shall be deemed resolved for the amount proposed in the notice. If, however, any objections are made in writing to the proposed settlement, a hearing shall be held before the Bankruptcy Court to resolve such objection. Subject to the procedures set forth in the Plan, the Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

#### (ii)    *Allowance of Claims and Interests*

Except as expressly provided, in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and

retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date.  All claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

#### (iii)    *Disputed Claims Reserve*

The Plan provides that, on the Effective Date (or as soon thereafter as is reasonably practicable), New Chemtura shall deposit in the Disputed Claims Reserve the amount of Cash and New Common Stock that would have been distributed to the holders of all Disputed Unsecured Claims as if such Disputed Unsecured Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the <u>lesser</u> of:

- the asserted amount of the Disputed Unsecured Claims filed with the Bankruptcy Court, or (if no proof of such Claim was filed) scheduled by the Debtors;

- the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code pursuant to Section 8.7 of the Plan; or

- the amount otherwise agreed to by the Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the holder of such Disputed Unsecured Claims for reserve purposes.

#### (iv)    *Distributions After Allowance*

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim, except that Claims on account of goods and services shall receive interest for the time period between the Petition Date and the date such Claim becomes Allowed, payable at the contract rate to the extent allowable under law, or, if no allowable contract rate is specified, the federal judgment rate as of the Petition Date.

#### (v)    *Distribution of Excess Amounts in the Disputed Claims Reserve*

When all Disputed Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash or New Common Stock remains in the Disputed Claims Reserve after all holders of Disputed Claims that have become Allowed for each of the Debtors have been paid the full amount they are entitled to pursuant to the treatment set forth for the appropriate Class under the Plan, then:

- if Class 13a for Chemtura Corporation has voted to accept the Plan, then holders of Claims in the Participating Creditor Classes (to the extent they have not been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan) shall receive their Pro Rata share of such remaining Cash and New Common Stock, in accordance with the Shortfall Readjustment, until they have been paid in full with all applicable interest, with any excess Cash returned to the Reorganized Debtors for general corporate use and with any excess New Common Stock being cancelled or held as treasury stock; and

- if Class 13a for Chemtura Corporation has voted to reject the Plan and if all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash and New Common Stock.

#### (vi)    *Property Held in the Disputed Claims Reserve*

148

The Plan provides that each holder of a Disputed Unsecured Claim that ultimately becomes an Allowed Unsecured Claim will have recourse only to the undistributed Cash and New Common Stock held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Unsecured Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

### (vii)    *Estimation of Claims*

The Debtors and the Creditors' Committee in consultation with the Ad Hoc Bondholders' Committee (before the Effective Date) or Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors and the Creditors' Committee (before the Effective Date) or the Reorganized Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### (viii)    *Deadline to File Objections to Claims*

The Plan defines "Claims Objection Bar Date," for each Claim, the <u>later</u> of as

- the Confirmation Date; and

- such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

The Plan provides that any objections to Claims shall be filed no later than the Claims Objection Bar Date.

### H.    **Procedures for Reserving Environmental Claims**

### (i)    *Formation of Environmental Trust*

The Debtors, with the consent of the Creditors' Committee and Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the authority to establish an Environmental Trust, and shall be authorized to contribute to such Environmental Trust the Cash that constitutes the Environmental Reserve.  To the extent deemed appropriate and helpful by the Reorganized Debtors, the Debtors shall treat and designate such Environmental Trust as a qualified settlement fund pursuant to Treasury Regulation Section 1.468-1B.

### (ii)    *Environmental Reserve*

The Plan provides that on the Effective Date (or as soon thereafter as is reasonably practicable), and solely to the extent that the Debtors do not reach a negotiated settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and approved by order of the Bankruptcy Court and that a Disputed Environmental Claim is not Reinstated (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) based upon the applicable Debtor's election pursuant to Section 3.3(k) of the Plan, Chemtura Corporation and the Subsidiary Debtors shall fully fund the Environmental Reserve with Cash based upon the amount determined by the Bankruptcy Court or agreed to by the Debtors (with the consent

149

of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) and the holders of Disputed Environmental Claims.

### (iii)    *Distributions from the Environmental Reserve*

The Plan provides that to the extent that Chemtura Corporation and the Subsidiary Debtors fund the Environmental Reserve pursuant to Section 9.2 of the Plan, and to the extent that a Disputed Environmental Claim ultimately becomes an Allowed Environmental Claim, distributions (if any) shall be made to the holder of such Allowed Environmental Claim in accordance with the terms of the Plan.  On the Initial Distribution Date, the Disbursing Agent shall provide to each holder an of Allowed Environmental Claim a distribution (if any) from the Environmental Reserve equal to its Allowed Environmental Claim, without any interest to be paid on account of such Claim.

### (iv)    *Distribution of Excess Amounts in the Environmental Reserve*

When all Environmental Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash remains in the Environmental Reserve after all holders of Environmental Claims that have become Allowed for Chemtura Corporation and each of the Subsidiary Debtors have been paid in full, then (a) if Class 13a for Chemtura Corporation has voted to accept the Plan, then such remaining Cash shall be divided on a Pro Rata basis among holders of Claims in the Participating Creditor Classes (to the extent they have not been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan) and the Disputed Claims Reserve, until all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan), with any excess to be transferred to, and become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII of the Plan, and (b) if Class 13a for Chemtura Corporation has voted to reject the Plan, any Cash remaining in the Environmental Reserve shall be transferred to, and shall become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII of the Plan, and if all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash.

### (v)    *Property Held in the Environmental Reserve*

The Plan provides that each holder of a Disputed Environmental Claim that ultimately becomes an Allowed Environmental Claim will have recourse only to the Environmental Reserve for satisfaction of the distributions to which holders of Allowed Environmental Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

## I.    Procedures for Reserving For and Resolving Diacetyl Claims

### (i)    *Formation of Diacetyl Trust*

The Debtors, with the consent of the Creditors' Committee and Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the authority to establish a Diacetyl Trust, and shall be authorized to contribute to such Diacetyl Trust the Cash that constitutes the Diacetyl Reserve.  To the extent deemed appropriate and helpful by the Reorganized Debtors, the Debtors shall treat and designate such Diacetyl Trust as a qualified settlement fund pursuant to Treasury Regulation Section 1.468-1B.

### (ii)    *Objections to Diacetyl Claims*

The Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Diacetyl Claims as permitted under the Plan.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Diacetyl Claim without approval of the Bankruptcy Court if the Allowed amount of such Disputed Diacetyl Claim is equal to or less than $100,000.  If,

however, the Allowed amount of such Disputed Diacetyl Claim is greater than $100,000, the Reorganized Debtors shall file a notice of the proposed settlement with the Bankruptcy Court. Parties in interest shall have ten days from the filing of such notice to object to the proposed settlement. If no objections are received on or before the tenth day, the Disputed Diacetyl Claim shall be deemed resolved for the amount proposed in the notice. If, however, any objections are made in writing to the proposed settlement, a hearing shall be held before the Bankruptcy Court to resolve such objection. Subject to the procedures set forth in the Plan, the Debtors reserve all rights to resolve any Disputed Diacetyl Claim outside the Bankruptcy Court under applicable governing law.

### (iii)     *Diacetyl Reserve*

The Plan defines "Diacetyl Claim Value" as (a) the estimated aggregate liability of the Debtors in respect of Diacetyl Claims as determined by the Bankruptcy Court through an estimation proceeding before the Effective Date *minus* (b) Insurance Proceeds, if any, available in respect of Diacetyl Claims as of the Effective Date pursuant to (i) a separate settlement or agreement that has been approved by the Bankruptcy Court as of the Effective Date or (ii) a Final Order by the Bankruptcy Court or other court of competent jurisdiction.

The Plan provide that, on the Effective Date (or as soon thereafter as is reasonably practicable), New Chemtura and Chemtura Canada shall fully fund the Diacetyl Reserve with Cash based upon the Diacetyl Claim Value.

### (iv)     *Distributions from the Diacetyl Reserve*

The Plan defines "Disputed" to be, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed. To the extent that a Disputed Diacetyl Claim ultimately becomes an Allowed Diacetyl Claim, distributions (if any) shall be made to the holder of such Allowed Diacetyl Claim in accordance with the terms of the Plan. On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Diacetyl Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Allowed Diacetyl Claim an initial distribution (if any) from the Diacetyl Reserve equal to 50% of:

- its Allowed Insured Deficiency Claim, if such Diacetyl Claim is an Insured Claim; or

- its Allowed Diacetyl Claim, if such Diacetyl Claim is not an Insured Claim.

In no event shall any interest be paid on account of any such Claim.

On the Distribution Date following the date when (i) all Diacetyl Claims have been either Allowed or disallowed by Final Order and (ii) the amount of the Allowed Insured Deficiency Claim (if applicable) for each Allowed Diacetyl Claim is known, the Disbursing Agent shall distribute from the Diacetyl Reserve to each holder of an Allowed Diacetyl Claim an amount equal to the Diacetyl Recovery Ratio multiplied by: (a) the amount of such holder's Allowed Insured Deficiency Claim, (if such Diacetyl Claim is an Insured Claim) less any amounts already distributed pursuant to the immediately preceding paragraph; or (b) the amount of such holder's Allowed Diacetyl Claim (if such Claim is not an Insured Claim) less any amounts already distributed pursuant to the immediately preceding paragraph. If the Diacetyl Reserve does not contain sufficient Cash to make the foregoing distribution to all holders of Allowed Diacetyl Claims, then each holder of an Allowed Diacetyl Claim shall receive on account of its Allowed Insured Deficiency Claim (if such Allowed Diacetyl Claim is an Insured Claim) or its Allowed Diacetyl Claim (if such Allowed Diacetyl Claim is not an Insured Claim), as the case may be, its Pro Rata share of the remaining Cash in the Diacetyl Reserve calculated based upon all Claims participating in the Diacetyl Reserve, less any amounts already distributed pursuant to the immediately preceding paragraph. For the avoidance of doubt, no holder of an Allowed Diacetyl Claim shall receive more than 100% of such Allowed Claim through payments under Insurance Policies or distributions pursuant to the Plan or any combination thereof.

### (v)     *Distribution of Excess Amounts in the Diacetyl Reserve*

When all Diacetyl Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash remains in the Diacetyl Reserve after all holders of Diacetyl Claims that have become Allowed for Chemtura Corporation and Chemtura Canada have been paid in full, then (a) if Class 13a for Chemtura Corporation

151

has voted to accept the Plan, then such remaining Cash shall be divided on a Pro Rata basis among holders of Claims in the Participating Creditor Classes (to the extent they have not been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan) and the Disputed Claims Reserve, until all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan), with any excess to be transferred to, and become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII of the Plan, and (b) if Class 13a for Chemtura Corporation has voted to reject the Plan, any Cash remaining in the Diacetyl Reserve shall be transferred to, and shall become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII of the Plan, and if all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i) of the Plan, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash.

### (vi)    *Property Held in the Diacetyl Reserve*

Each holder of a Disputed Diacetyl Claim that ultimately becomes an Allowed Diacetyl Claim will have recourse only to the Diacetyl Reserve and any available Insurance Proceeds for satisfaction of the distributions to which holders of Allowed Diacetyl Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

### J.    Settlement, Release, Injunction and Related Provisions

### (i)    *Compromise and Settlement of Claims, Interests and Controversies*

The Plan provides that, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

### (ii)    *Releases by the Debtors*

The Plan contains the following releases provided by the Debtors, which should be read in their entirety:

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, New Chemtura, the Reorganized Debtors and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, New Chemtura, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual**

152

arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan and Disclosure Statement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Released Party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, nor does it release any Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement.  Additionally, the Plan provides that nothing in the Chapter 11 Cases, the Confirmation Order, the Plan, the Bankruptcy Code (including section 1141 thereof) or any other document filed in the Chapter 11 Cases shall in any way be construed to discharge, release, limit, or relieve the Debtors, the Reorganized Debtors, or any other party, in any capacity, from any liability or responsibility with respect to the U.S. Pension Plans or any other defined benefit plan under any law, governmental policy, or regulatory provision.  PBGC and the U.S. Pension Plans shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code, or any other document filed in the Chapter 11 Cases.

### (iii)    *Releases by Holders of Claims and Interests*

The Plan defines "Releasing Parties" as all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to Sections 11.2, 11.3 or 11.4 of the Plan, discharged pursuant to Section 11.6 of the Plan or are subject to exculpation pursuant to Section 11.5 of the Plan.  The Plan contains the following release provisions with respect to holders of Claims and Interests, which should be read in its entirety:

As of the Effective Date, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, New Chemtura, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, each of the Released Parties afforded value to the Debtors and aided in the reorganization process.  The Debtors believe that the Released Parties played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.

K&E 17416258.15

Certain parties in interest, including the U.S. Trustee, have asserted that the releases contained in the Plan are overbroad and do not comport with applicable case law.  The Debtors disagree and will defend the releases at the Confirmation Hearing.  The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan to the extent the Bankruptcy Court does not approve the releases.

*(iv)*     ***Releases by Holders of Diacetyl Claims***

**The Plan provides that, as of the Effective Date, each holder of a Claim in Class 10 shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged Chemtura Canada from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), consisting of, based on or relating to, or in any manner arising from, in whole or in part, any Diacetyl Claim.**

*(v)*     ***Exculpation***

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for gross negligence or willful misconduct (including fraud), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

*(vi)*     ***Discharge of Claims and Termination of Interests***

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:

- a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code;

- a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or

- the holder of such a Claim or Interest has accepted the Plan.

Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

(vii)    *Injunction*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE XI OF THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE XI OF THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.2, 11.3 OR 11.4 OF THE PLAN, OR DISCHARGED PURSUANT TO SECTION 11.6 OF THE PLAN OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.5 OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:

- COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS;

- ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS;

- CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND

- COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS THEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### (viii)    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### (ix)    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### (x)    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

### K.    Conditions Precedent to Confirmation of the Plan and the Effective Date

### (i)    *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation thereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.5 of the Plan.

1. The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2. The Confirmation Order (a) shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee and (b) shall include a finding by the Bankruptcy Court that the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

3. The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto (in each case in form and substance) shall be reasonably acceptable to the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee.

156

(ii)      *Additional Condition Precedent to Confirmation*

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, it shall also be a condition to Confirmation hereof that the following provision, term and condition shall have been satisfied or waived pursuant to the provisions of Section 12.4 of the Plan:  The Canadian Recognition Order shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

(iii)      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.4 of the Plan.

1.      The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated in the Plan.

2.      The Exit Financing shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived by the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, or satisfied in accordance with the terms thereof, and funding pursuant to the Exit Financing shall have occurred.

3.      The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

4.      All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee.

5.      The Effective Date shall occur no later than October 15, 2010.

(iv)      *Additional Conditions Precedent to the Effective Date*

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, it shall also be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.5 of the Plan:

1.      The Canadian Recognition Order shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

2.      The Canadian Confirmation Order shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

(v)      *Waiver of Conditions*

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article XII of the Plan may be waived at any time by the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld; *provided, however,* that the Debtors may not waive entry of the Order approving the Disclosure Statement and the Confirmation Order, and, to the extent Sections 12.2 and 12.4 of the Plan apply, the Canadian Recognition Order and the Canadian Confirmation Order.

K&E 17416258.15

*(vi)*      ***Effect of Failure of Conditions***

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:

- constitute a waiver or release of any claims by or Claims against or Interests in the Debtors;

- prejudice in any manner the rights of the Debtors, any holders of Claims or Interests or any other Entity; or

- constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other Entity in any respect.

**L.      Modification, Revocation or Withdrawal of the Plan**

*(i)      Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee expressly reserve their rights to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIII of the Plan.

*(ii)      Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*(iii)      Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.   If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:

- the Plan shall be null and void in all respects;

- any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and

- nothing contained in the Plan shall:

  - constitute a waiver or release of any Claims or Interests;

  - prejudice in any manner the rights of such Debtor or any other Entity; or

- constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

## M.    Retention of Jurisdiction

### (i)    *Jurisdiction of the Bankruptcy Court*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4.    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide or resolve any and all matters related to any Cause of Action;

7.    adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.    enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.    resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

10.    resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

11.    resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the Prepetition Security Agreement and related intercreditor agreement;

159

12.   resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the DIP Loan Agreement;

13.   resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the Notes;

14.   issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation or enforcement of the Plan;

15.   resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article XI of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

16.   resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Section 7.10(a) of the Plan;

17.   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

18.   determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

19.   adjudicate any and all disputes arising from or relating to distributions under the Plan;

20.   consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

21.   determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

22.   hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

23.   hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

24.   hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

25.   enforce all orders previously entered by the Bankruptcy Court;

26.   hear any other matter not inconsistent with the Bankruptcy Code; and

27.   enter an order concluding or closing the Chapter 11 Cases.

Certain parties in interest have asserted that the retention of jurisdiction provision contained in the Plan is overbroad. The Debtors disagree and will defend the provision at the Confirmation Hearing. The Debtors reserve the right to make appropriate changes to the Plan to the extent the Bankruptcy Court does not approve the retention of jurisdiction provision.

K&E 17416258.15

(ii) *Jurisdiction of the Bankruptcy Court in the Event Chemtura Canada Becomes a Debtor*

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, all disputes involving the rights of a Canadian Entity that is (a) the holder of a Claim against or an Interest in Chemtura Canada, in the event it becomes a Debtor before the Confirmation Date, and (b) not subject to the jurisdiction of the Bankruptcy Court, will be determined by the Bankruptcy Court without prejudice to such Entity's right to seek to have such dispute heard instead by the Canadian Court. Notwithstanding the foregoing, all such Canadian Entities will be bound by the terms and provisions of this Plan.

## N.    Miscellaneous Provisions

### (i)    *Immediate Binding Effect*

Subject to Section 12.3 of the Plan and Section 12.4 of the Plan (if applicable), and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### (ii)    *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### (iii)    *Dissolution of Creditors' Committee and Equity Committee*

On the Effective Date, the Creditors' Committee and the Equity Committee shall dissolve, except:

- the Creditors' Committee will remain intact with respect to any pending litigation or contested matter to which the Creditors' Committee is a party, any appeals filed regarding Confirmation, the resolution of any substantial contribution applications, the resolution of applications for Accrued Professional Compensation and all disputes regarding allowance of Disputed Claims; and

- the Equity Committee will remain intact:

  - to the extent that Class 13a for Chemtura Corporation has voted to reject the Plan, with respect to the resolution of applications for Accrued Professional Compensation and all disputes regarding allowance of Disputed Claims; and

  - to the extent that Class 13a for Chemtura Corporation has voted to accept the Plan, with respect to:

    - the resolution of any substantial contribution applications; and

    - the resolution of applications for Accrued Professional Compensation

On the Effective Date, subject to the above, the members of the Creditors' Committee and the Equity Committee shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The

K&E 17416258.15

Reorganized Debtors shall continue to compensate the Creditors' Committee's and the Equity Committee's Professionals for reasonable services provided in connection with any of the foregoing post-Effective Date activities.

> **(iv)** **Payment of Fees and Expenses of the Creditors' Committee, the Equity Committee, the Prepetition Administrative Agent and the Indenture Trustees**

Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors shall promptly pay in Cash in full reasonable, documented and necessary out-of-pocket fees and expenses incurred by the members of the Creditors' Committee, the members of the Equity Committee, the Prepetition Administrative Agent and the Indenture Trustees without the need of such parties to file fee applications with the Bankruptcy Court; provided that each party and its counsel shall provide the Debtors, the Creditors' Committee and the Equity Committee with the invoices (or such other documentation as the Debtors or another of such parties may reasonably request) for which it seeks payment on or before the Effective Date and provided that the Debtors and the other parties have no objection to such fees, such fees shall be paid within five business days of the Effective Date. To the extent that the Debtors or any of the other parties object to any of the fees and expenses of the members of the Creditors' Committee, the members of the Equity Committee, the Prepetition Administrative Agent or the Indenture Trustees or their counsel or advisors, the Debtors shall not be required to pay any disputed portion of such fees until a resolution of such objection is agreed to by the Debtors and such party and/or their counsel or a further order of the Bankruptcy Court upon a motion by such party.

> **(v)** **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before the Effective Date.

> **(vi)** **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

> **(vii)** **Service of Documents**

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

Chemtura Corporation
199 Benson Road
Middlebury, Connecticut 06749
Attn: General Counsel

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: M. Natasha Labovitz

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list

of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

### (viii)    *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

### (ix)    *Severability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:

- valid and enforceable pursuant to its terms;

- integral to the Plan and may not be deleted or modified without the consent of the Debtors' and consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee (which consent shall not be unreasonably withheld); and

- nonseverable and mutually dependent.

### (x)    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, by contacting Anna del Rosario, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Telephone: (212) 446-3487, email: anna.delrosario@kirkland.com, at the Bankruptcy Court's web site at *http://ecf.nysb.uscourts.gov* or at the website of the Notice and Claims Agent, at www.kccllc.net/chemtura. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### (xi)    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock offered and sold under the Plan.

### (xii)    *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

K&E 17416258.15

(xiii)    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control.

(xiv)    ***Insurance Neutrality***

Unless otherwise expressly agreed to by an insurer in writing, notwithstanding any provision in the Plan, the Confirmation Order or any other Plan document, nothing contained in any such documents or in this paragraph shall impose, or shall be deemed or construed to impose, any obligation on any insurer to provide a defense for, settle, or pay any judgment with respect to, any Claim, including any Insured Claim; rather, an insurer's obligations, if any, with respect to any Claim, including any Insured Claim, shall be determined solely by and in accordance with the allegedly applicable Insurance Policies.

Unless otherwise expressly agreed to by an insurer in writing, nothing in the Plan, the Confirmation Order or any other Plan document shall diminish or impair, or be deemed to diminish or impair, the rights of any insurer to assert any claim, including any claim for contribution or subrogation, defense, right, setoff or counterclaim in connection with any Claim, including any Insured Claim, or any of the Insurance Policies. Without limiting the generality of the foregoing, nothing in the Plan, the Confirmation Order or any other Plan document shall, under any theory, (1) constitute a trial, an adjudication on the merits or evidence establishing the liability of any insurer in subsequent litigation for any Claim, including any Insured Claim, or under any of the Insurance Policies, (2) constitute, or be deemed to constitute, a determination of the reasonableness of the amount of any Claim, including any Insured Claim, either individually or in the aggregate with other Claims, (3) be deemed to grant to any Person any right to sue any insurer directly, in connection with a Claim, including any Insured Claim, or any of the Insurance Policies, (4) constitute a finding or determination that any Debtor is a named insured, additional insured or insured in any other way under any of the Insurance Policies, or (5) that any insurer has any defense or indemnity obligation with respect to any Claim or Insured Claim. It is the intent of the Plan that insurers shall retain, and be permitted to assert, (y) all of their rights and defenses with respect to coverage of any Claim, including any Insured Claim, notwithstanding any provision of the Plan, the Confirmation Order or any other Plan document, and (z) all of the Debtors' defenses to liability in connection with any Claim, including any Insured Claim, and that the Insurers' rights to assert all such underlying defenses to liability and all such defenses to coverage of any Claim, including any Insured Claim, will not be impaired in any way by the Plan, the Confirmation Order or any other Plan document.

Except as expressly set forth therein, nothing in the Plan, the Confirmation Order or any other Plan document shall diminish or impair any of the rights and defenses of the Debtors or the Reorganized Debtors, if any, both legal and equitable, with respect to the Insurance Policies.

Several insurers contend that, as presently written, the Plan is not insurance neutral and therefore, is unconfirmable or, if confirmed may vitiate insurance coverage under the Insurance Policies or insurance-related agreements. The Debtors disagree and believe the Plan is insurance neutral. The parties have agreed to work together on modifications to the Plan that would resolve the disputes with regard to this issue. The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to make appropriate changes to the Plan.

K&E 17416258.15

## IX.
## ADDITIONAL DISCLOSURE REGARDING CLAIMS AND RECOVERIES UNDER THE PLAN

### A.    Overview of the Debtors' Insurance Policies

Article VII of the Plan requires, among other things, that no distributions under the Plan will be made on account of an Allowed Insured Claim until the holder of such Allowed Insured Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. Additionally, the Plan provides that, to the extent one or more of the Debtors' insurers agrees to satisfy in full an Insured Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Generally, Chemtura maintains (and has maintained) certain Insurance Policies essential to the continued operation of its businesses. The terms of these Insurance Policies (including self-insured retentions ("**SIRs**") and deductibles) are characteristic of insurance policies typically maintained by corporate entities that are similar in size and nature to Chemtura. What follows is a brief summary of the Debtors' current and historical insurance coverage.

**This summary is <u>not</u> an exhaustive description of all of the Debtors' insurance coverage. The descriptions provided herein are for informational purposes only and in no way shall constitute a waiver of any of the Debtors' rights with respect to such policies. Actual recoveries available to claimants under the Debtors' Insurance Policies may vary materially from the descriptions provided herein and the Debtors cannot guarantee that proceeds under the Insurance Policies, if any, will be available to their creditors.**

#### (i)    *Current Policies*

##### a.    **Commercial General Liability Insurance**

Commercial General Liability Insurance includes coverage for damage to third parties caused by Chemtura's operations and products. The primary layer policy provides limits of $10,000,000 per occurrence and in the aggregate, however, the policy also is subject to a deductible in the same amount. Supplemental umbrella policies provide coverage excess of a $10,000,000 SIR equal to the primary layer policy. The limits of the umbrella policies total $300,000,000 in ten layers. Policy terms are on a claims-reported basis and defense costs as well as indemnity payments erode the SIR underlying the umbrella coverage.

##### b.    **Commercial Auto Liability Insurance**

Commercial Auto Liability Insurance includes coverage for Chemtura's owned and leased fleet of vehicles. The limits of this coverage are $5,000,000 per accident with a deductible of $500,000 per accident. The $300,000,000 general liability umbrella program, described above, provides further Auto Liability Insurance coverage to Chemtura in excess of this policy and an additional $5,000,000 SIR.

##### c.    **Workers Compensation Insurance**

Workers Compensation Insurance provides statutory coverage for injury to all employees throughout the United States in accordance with the laws of each state in which Chemtura conducts business. The policy contains a deductible of $250,000 per claim. This policy also provides Employers Liability Insurance with limits of $5,000,000. The $300,000,000 general liability umbrella program, described above, provides further Employers Liability Insurance to Chemtura in excess of the Workers Compensation Insurance policy.

##### d.    **Property Insurance**

Property Insurance includes "all-risk" coverage for physical damage to property owned, leased or under the control of Chemtura, including business interruption and extra expenses incurred in the event of a property loss. The limits of this insurance total $600,000,000 with a deductible that varies from $250,000 to $5,000,000 depending on the value of the site and other factors.

<div align="center">165</div>

### e.        Directors and Officers Liability Insurance

Directors and Officers Liability Insurance provides coverage for past, present and future directors or officers of Chemtura.  The total limits of coverage are $100,000,000 in nine layers.  A deductible of $1,000,000 applies to claims entitled to corporate reimbursement under Chemtura's by-laws, and a deductible of $1,500,000 applies to "Security Claims" (as that term is defined in the policy) made against Chemtura.

### f.        Marine Cargo Insurance

Marine Cargo Insurance provides "all risk" coverage for Chemtura's goods while in transit.  The total limits of coverage are $10,000,000 per conveyance with a deductible of $2,500.

### g.        Aircraft Products Liability Insurance

Aircraft Products Liability Insurance provides coverage for damage to third parties caused by aircraft products manufactured, distributed or sold by Chemtura.  The total limits of coverage are $300,000,000.  Chemtura purchases this coverage separately from its commercial general liability coverage because of a specific exclusion in the umbrella liability policies described above.

### h.        Crime Insurance

Crime Insurance provides coverage for certain criminal activities to the extent such activities are carried out by employees or third parties.  The total limits of coverage are $15,000,000 with a deductible of $200,000.

### i.        Miscellaneous Insurance

Miscellaneous Insurance provides coverage for certain other activities, including fiduciary liability resulting from Chemtura's administration of several pension and retirement plans under ERISA and certain necessary surety bonds.

### (ii)        *Historic Insurance Programs*

Chemtura also has liability coverage under insurance policies issued to predecessor or acquired companies, including GLCC, Witco, The Richardson Company ("**Richardson**"), and UCCI.

### a.        Great Lakes Chemical Corporation

GLCC purchased liability coverage with limits per policy period ranging from under $5 million in the 1960s, the period of the earliest known policies, to $300 million in 2005 when Chemtura acquired GLCC and merged both companies' liability insurance programs into one.  The general liability policies purchased by GLCC provide coverage for injury or damage to third parties caused by GLCC's operations and products, subject to the varying terms and conditions, including exclusions, of the policies.  These policies consist of two types: occurrence policies and claims made policies.  Occurrence policies provide coverage for injury or damage caused during the policy period, and GLCC's general liability policies issued through the mid-1980s are of this type.  Occurrence policies do not expire, and these policies remain available, subject to some exhaustion of limits by payment of prior claims, to cover future claims according to their terms.  Claims made policies provide coverage for claims made against the policyholder during the policy period, and GLCC's general liability policies issued after the mid-1980s are of this type.  Because, absent special circumstances (*e.g.*, the purchase of an extended reporting period), a claims made policy only covers a claim made during the policy period, these claims made policies, which have expired, are not available to cover a future claim.

### b.        Witco Corporation

Witco purchased liability coverage with limits per policy period ranging from $1 million in the late 1950s, the period of the earliest known policies, to $200 million in various periods before 1999 when Witco and C&K merged to form CK Witco Corporation ("**CK Witco**"), Chemtura's predecessor, in 1999.  The general liability policies purchased by Witco provide coverage for injury or damage to third parties caused by Witco's operations and products, subject to the varying terms and conditions, including exclusions, of the policies.  Witco's general

liability policies also consist of occurrence policies and claims made policies. Witco's general liability policies issued through the mid-1980s, as well as some issued in the 1990s, are occurrence policies, which, as noted above, do not expire. These occurrence policies remain available, subject to some exhaustion of limits by payment of prior claims, to cover future claims according to their terms. Some of the Witco occurrence policies were issued by Travelers, and Travelers and Chemtura have entered into certain confidential agreements confirming both parties' rights and obligations under the subject policies with respect to certain types of claims that may be made against Chemtura as successor to Witco. Many of Witco's general liability policies issued after the mid-1980s are claims made policies. Because, absent special circumstances, a claims made policy only covers a claim made against the policyholder during the policy period, these claims made policies, which have expired, are not available to cover a future claim.

###       c.       The Richardson Company

Richardson purchased liability coverage from 1967, the year of the earliest known policies, until 1982 when it was acquired by Witco and became insured under Witco's general liability insurance program effective March 1, 1982. The annual limits of Richardson's coverage are $11 million, except January 1 – July 24, 1967 when the limits are $6 million and March 1, 1981 – March 1, 1982 when the limits are $10.5 million. The general liability policies purchased by Richardson are occurrence policies and provide coverage for injury or damage to third parties caused during the policy period by Richardson's operations and products, subject to the varying terms and conditions, including exclusions, of the policies. Some of these occurrence policies were issued by Travelers, and Travelers and Chemtura have entered into certain confidential agreements confirming both parties' rights and obligations under the subject policies with respect to certain types of claims that may be made against Chemtura as successor to Richardson. Richardson acquired Hercules Packing Corporation ("**Hercules Packing**") in 1967, and most of the Richardson policies also provide coverage for injury or damage to third parties caused during the policy period by Hercules Packing's operations and products. As described above, occurrence policies do not expire, and these policies remain available, subject to some exhaustion of limits by payment of prior claims, to cover future claims according to their terms.

###       d.       Uniroyal Chemical Company, Inc.

Uniroyal Chemical Company, Inc. ("**UCCI**") is insured under occurrence based liability policies covering the period from 1986 to 2001. UCCI or its parents / successors C&K, CK Witco and Crompton Corporation ("**Crompton**") purchased these policies, which provide coverage for injury or damage to third parties caused during the policy period by the company's operations and products, subject to the varying terms and conditions, including exclusions, of the policies. As described above, occurrence policies do not expire, and these policies remain available to cover future claims subject to their terms. The annual limits of these policies range from $75 million to $300 million, but in all years except one, they only apply excess of a $2.5 to $3 million SIR per occurrence. After 2001, UCCI is insured under claims made liability policies, which, as explained above, only provide coverage for claims made against the policyholder during the policy period absent special circumstances, which exist with the policies purchased for the 2004-05 policy period. In 2004, Crompton, UCCI's parent, purchased claims made liability coverage of $100 million in four policy layers of $25 million each in excess of a $5 million SIR. As these policies were expiring in 2005, Crompton purchased an extended reporting period allowing the company to make claims under these policies until July 1, 2008. In 2008, Chemtura purchased a second reporting period for the first two layers of coverage ($50 million excess of a $5 million SIR) allowing the company to make claims under these policies until July 1, 2011. Accordingly, the first two policy layers in this period have not expired yet and remain available to pay future claims subject to their terms.

##       B.       Discussion of Settlements Contemplated Pursuant to the Plan

As discussed in this Disclosure Statement, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders. In light of the complexity and contentiousness of the issues presented by the Chapter 11 Cases, the Debtors engaged the Creditors' Committee, the Equity Committee and the Ad Hoc Bondholders' Committee in negotiations to reach an agreement resolving certain threshold issues discussed below, among others. These negotiations included many meetings, the exchange of multiple term sheets or related settlement proposals and the regular correspondence and conference calls among the parties and their advisors, as described in section VII.L(ii) of this Disclosure Statement entitled "<u>The Equity Committee's Motion to Terminate Exclusivity and the Debtors' Opposition Thereto</u>."

Notwithstanding the Debtors' extensive efforts to reach agreement with the Equity Committee on plan terms, the Debtors determined that the proposals submitted by the Equity Committee were not feasible. Accordingly, the Debtors were only able to reach a global settlement on a range of issues with the Creditors' Committee and the Ad Hoc Bondholders' Committee (the "**Supporting Parties**").  The Debtors and the Supporting Parties reached an agreement on key threshold items, including the estimated enterprise value of the Debtors, as reorganized, the Reorganized Debtors' capital structure at emergence and resolving numerous other contested issues. Among the settlements agreed to among the Debtors and the Supporting Parties are the PBGC Settlement, the CHCI Preferred Stock Settlement, the Make-Whole-Settlement, the No-Call Settlement and the Professional Fee Settlement, which are described in sections 5.3 through 5.6 of the Plan and detailed in this section VIII of this Disclosure Statement.

The agreement of the Supporting Parties not to contest the Debtors' determination of enterprise value for the Debtors, as reorganized, notwithstanding the Supporting Parties' views that the value is less than that determined by the Debtors, allows the Debtors to provide a distribution to their equity holders that is consistent with the Debtors' enterprise value without the expense, delay and risk of litigation in which the Supporting Parties would seek to prove a lower valuation.  Additionally, the Debtors believe that the Plan provides them, with the support of the Supporting Parties, the opportunity to restructure their debt obligations, resolve certain legacy liabilities and ultimately, compete effectively post-emergence.  Absent the broad creditor support for the Plan and the expeditious implementation of the compromises set forth therein, the Debtors believe that they would face a longer, costlier and more uncertain chapter 11 process mired with contentious litigation, which could materially delay the Debtors' emergence from chapter 11 and ultimately reduce distributions to creditors.  Accordingly, the Debtors believe, in the exercise of their business judgment, that the consensual resolution of litigable issues as part of a global settlement and timely emergence from chapter 11 outweighed the costs of litigation on multiple fronts, which would be expensive, time-consuming and would have uncertain results.   The terms of the Plan Support Agreement are described in section VII.M of this Disclosure Statement.  Further detail regarding certain settlements included in the Plan Support Agreement is provided below.

The Equity Committee has indicated that it does not support the settlements described herein and it intends to vigorously oppose approval of these settlements at Confirmation.  Although the Debtors are confident they will prevail at Confirmation, in the event the Equity Committee is successful in contesting the settlements at the Confirmation Hearing, the Plan would not be confirmable as set forth below.

The settlement payments aggregating $127 million represent 9% of the pro forma equity value (using the Debtors' valuation).  The Equity Committee believes that by making these settlement payments, the Debtors are effectuating a dollar-for-dollar reduction in shareholder recoveries.   The Debtors strongly disagree that the settlements contemplated by the Plan will effectuate a dollar-for-dollar reduction in shareholder recoveries.

Although this Disclosure Statement addresses each settlement individually for purposes of providing analysis and detail, it is important to note that the Plan Support Agreement represents a global settlement of a range of issues relating to the Plan, each of which is a necessary component of the overall global settlement.  Failure by the Bankruptcy Court to approve any of the settlements described in the Plan Support Agreement, the treatment of any class set forth in the Plan or any other material term of the Plan would result in the Plan not being confirmable. Specifically, pursuant to the terms of the Plan Support Agreement, if any of the Equity Committee's objections to the Plan Support Agreement is upheld, the Supporting Parties have the right to terminate the Plan Support Agreement and oppose the Plan.  Among other things, the Supporting Parties could argue for a lower valuation of the Debtors' total enterprise value, as reorganized, than the current consensual valuation among the Supporting Parties.  In the event that the Plan Support Agreement is terminated, it is not likely this Plan could be effectuated and, at a minimum, a substantial delay in Confirmation would likely result.

The Plan constitutes a good faith compromise and settlement of all Claims and controversies resolved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases and other benefits provided under the Plan.

K&E 17416258.15

Under Bankruptcy Rule 9019, a bankruptcy court can approve a compromise or settlement if it is in the best interests of the debtor's estate.[56]  In evaluating a settlement, the bankruptcy court must exercise its discretion and make an independent determination that the settlement is fair and equitable.[57]  To evaluate whether a settlement is fair and equitable, courts in the Second Circuit have considered the following factors:  (i) the balance between any litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience and delay; (iii) the paramount interests of creditors, including each affected class's benefits and the degree to which creditors object or support the settlement; (iv) the support, or lack thereof, of other parties in interest; (v) the competency and experience of counsel supporting the settlement; and (vi) the extent to which the settlement is the product of arm's length bargaining.[58]

Subject to approval by the Bankruptcy Court, the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee have entered into a good faith compromise and settlement of a number of Claims and issues asserted in the Chapter 11 Cases and relating to the Plan, including (i) potential objections to the New Chemtura Total Enterprise Value, (ii) a framework for addressing and resolving Disputed Claims relating to Diacetyl Claims and environmental liabilities asserted by certain governmental entities and (iii) the settlement resolving the Creditors' Committee Action in a manner acceptable to the Creditors' Committee, the Debtors and the Ad Hoc Bondholders' Committee.

The settlement further provides for an agreement resolving the following, each of which is discussed in detail below: (i) the extent and validity of GLCC's ownership interest in Non-Debtor Affiliate Chemtura Holding Company, Inc., (ii) the enforceability and allowance of Claims held by holders of the 2016 Notes and the holders of the 2026 Notes relating to damages for breach of certain make-whole and no-call provisions, (iii) Claims of the Ad Hoc Bondholders' Committee for its unpaid, reasonable, documented and necessary third-party fees and expenses in an amount not to exceed the Ad Hoc Committee Fee Cap and (iv) the extent, validity and appropriate resolution of Claims and asserted rights of regulatory action held by PBGC.

(i)      **Settlement of Claims and Causes of Action Relating to CHCI Preferred Stock**

The Plan constitutes a good faith compromise and settlement, subject to approval by the Bankruptcy Court, of all Claims and controversies between the Estates and Chemtura Holding Company, Inc. ("**CHCI**") arising from or related to Great Lakes Chemical Corporation's ("**GLCC**") ownership of 500 shares of preferred stock for CHCI worth $2.2 million per share, or $1.1 billion (the "**CHCI Preferred Stock**"), whereby the CHCI Preferred Stock will be given effect for 50% of its value (the "**CHCI Preferred Stock Settlement**").  The following sections describe the terms and background with respect to the CHCI Preferred Stock Settlement.

---

[56]   *See Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (noting that the settlement need not result in the best possible outcome for the debtor, but must not "fall below the lowest point of reasonableness").

[57]   *Protective Comm. for Indep. S'holders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Nellis v. Shugrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994); *see also In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (bankruptcy court may exercise its discretion "in light of the general public policy favoring settlements").

[58]   *See In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *see also In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 428 (S.D.N.Y. 1993).

169

### a.        Issuance of the CHCI Preferred Stock

In 2005, Crompton Corporation (n/k/a Chemtura) acquired Great Lakes Chemical Company ("**GLCC**"). Following the acquisition of GLCC, Chemtura began implementing a tax reorganization of certain of its foreign and domestic affiliates (the "**Tax Reorganization**"). The Tax Reorganization was to be effectuated in numerous steps over several years. These steps included a contribution by GLCC of its full interest in Knight Investment B.V. ("**Knight**") and Knight's wholly owned subsidiary, Great Lakes Holdings Europe AG, to CHCI, a corporation to be formed and owned primarily by Chemtura.[59]    In exchange for this transfer, GLCC was to receive the CHCI Preferred Stock (the "**Transaction**").

On November 21, 2005, Chemtura's board of directors approved and adopted a comprehensive plan for the Tax Reorganization. In furtherance of the Tax Reorganization, Chemtura formed CHCI on November 21, 2005 and filed its certificate of incorporation with the Delaware Secretary of State on the same day. CHCI's certificate of incorporation purportedly authorized CHCI to issue (1) 10,000 shares of common stock with a par value of $0.01 and (2) 1,000 shares of preferred stock with a par value of $1.00.

Subsequently, on December 15, 2005, CHCI and GLCC entered into a contribution and subscription agreement governed by Delaware law (the "**Contribution and Subscription Agreement**"). Under the Contribution and Subscription Agreement, GLCC, as the sole shareholder of Knight, agreed to transfer its shares in Knight[60] to CHCI in exchange for the CHCI Preferred Stock. Under the Contribution and Subscription Agreement, CHCI represented and warranted that (1) CHCI had legal title to the CHCI Preferred Stock; (2) the CHCI Preferred Stock was unencumbered, fully paid, and non-assessable; and (3) the CHCI Preferred Stock would vest in GLCC at the time of ownership. On December 16, 2005, GLCC delivered a deed of trust evidencing the transfer of GLCC's capital stock in Knight to CHCI. However, CHCI did not issue the CHCI Preferred Stock to GLCC until June 12, 2007.

On June 11, 2009, GLCC filed its schedules of assets and liabilities, which listed the CHCI Preferred Stock on Schedule B-13 ("Personal Property - Stock and interests in incorporated and unincorporated businesses"). During the course of the Chapter 11 Cases, the Debtors have investigated concerns of creditors of GLCC and Chemtura as to whether the CHCI Preferred Stock was properly issued and transferred to GLCC.

### b.        Validity of the CHCI Preferred Stock

Under Delaware law, a corporation can issue more than one class of stock, including preferred shares.[61] However, before issuing shares, a corporation must define the powers, preferences, rights and other characteristics of the shares in (1) the certificate of incorporation or (2) a board resolution adopted pursuant to an explicit grant of authority in the certificate of incorporation.[62] Corporations must file a certificate of designation with the Delaware Secretary of State when the certificate of incorporation permits the board to issue new securities through a resolution adopted by the board.[63]

In issuing the CHCI Preferred Stock, CHCI did not comply with certain requirements under Delaware law. Specifically, CHCI's certificate of incorporation did not authorize CHCI's board of directors to issue the CHCI Preferred Stock. The CHCI Certificate of Incorporation only authorized the CHCI's board of directors to issue common stock with a par value of $0.01 and preferred stock with a par value of $1.00 rather than 500 shares of

---

[59]    Chemtura owns 99% of the common stock of CHCI.

[60]    Specifically, GLCC transferred 2,500,000 shares in Knight, with a par value of €0.01.

[61]    *See e.g.*, 8 Del. C. § 151(a), (g)

[62]    *See* 8 Del. C. § §§ 102(a)(4), 151(a)

[63]    *See e.g.*, 8 Del. C. § 151(g)

K&E 17416258.15

preferred stock with a value of $2.2 million per share. Additionally, CHCI did not file a certificate of designation setting forth the terms and priority of the CHCI Preferred Stock, as required under section 151(g) of the Delaware General Corporation Law. As a result of CHCI's failure to comply with Delaware General Corporation Law, the CHCI Preferred Stock is likely void.[64]

### c.    GLCC's Claims and Causes of Action Against CHCI

GLCC may have claims against CHCI for breach of the Contribution and Subscription Agreement, unjust enrichment and equitable relief in light of the defective issuance of the CHCI Preferred Stock.[65] Pursuant to these claims, GLCC may assert significant damage claims against CHCI, including with respect to the loss of approximately $1.1 billion in value as represented by the value of Knight when it was transferred to CHCI. The ultimate disposition of GLCC's claims, however, would depend on whether or not CHCI is able to assert any valid defenses to GLCC's claims.

Specifically, CHCI could assert, among other defenses, that GLCC's claims are time-barred under an applicable statute of limitations. The validity of this defense would depend on which state's law is applied to the case. If GLCC asserts its claims under Delaware law based on the governing law provision of the Contribution and Subscription Agreement, CHCI could allege that Delaware's three year statute of limitations period applies and the claims are time-barred under Delaware law.[66] GLCC could attempt to overcome the statute of limitations by arguing that it is tolled in cases in which the injury is "inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."[67]

Additionally, GLCC could argue that its cause of action for breach of contract is not subject to Delaware law's statute of limitations. If the case is brought in the Bankruptcy Court, that court could apply New York's borrowing statute to determine the applicable statute of limitations.[68] Under section 202 of the Civil Practice Law

---

[64]    *See STARR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. Sup. Ct. 1991) (observing that the failure of a board of directors to adopt a resolution approving the issuance of preferred shares and to file a certificate of designation "cannot be deemed a mere 'technical' error" and is incapable of cure thereby rendering the preferred shares void); *but see Carramerica Realty Corp. v. Kaidanow*, 321 F.3d 165, 171 (D.C. Cir. 2003) (holding that shares, prior to ratification, were merely voidable, not void because only voidable acts would be open to ratification).

[65]    To establish breach of contract, a plaintiff must prove that: (a) an enforceable contract existed; (b) the defendant breached an obligation imposed by the contract; and (c) the plaintiff suffered damages as a result of the breach. *Gutridge v. Iffland*, 889 A.2d 283 (Del. 2005). *See also Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406 (Del. Ch. 2006) (observing that a valid contract requires mutual asset, or intent to agree and consideration). The elements of unjust enrichment are: (a) an enrichment; (b) an impoverishment; (c) a connection between the enrichment and the impoverishment; (d) the absence of justification; and (e) the absence of a remedy provided by law. *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063 (Del. Ch. Dec. 23, 2008); *but see Kuroda v. SPJS Holdings, LLC.*, 971 A.2d 872 (Del. Ch. 2009) ("[W]hen the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed."); *BAE Systems Info. and Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088 (Del. Ch. 2009) (recognizing that "both a breach of contract and an unjust enrichment claim may survive a motion to dismiss when pled as alternative theories for recovery").

[66]    A three-year statute of limitation period applies to (a) breach of contract claims; (b) gross and negligent misrepresentation claims; (c) unjust enrichment claims and (d) promissory estoppels or quasi-contract claims. 10 Del. Ch. § 8106; *see also Fruehauf Trailer Corp. v. Tere Corp*, 250 B.R. 168, 184 (D. Del. 2004) (noting that the statute of limitations period runs from the time of the wrongful act, not when the plaintiff suffers a loss).

[67]    *See, e.g., Wal-Mart Stores, Inc. v. AIG Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

[68]    Specifically, section 202 of the Civil Practice Law and Rules provides, ". . . An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply." *See also In re Gaston & Snow*, 243 F.3d 599 (2d Cir. 2001) ("New York State residents are always subject to the New York statute of limitations"); *In re Adelphia*, 356 B.R. 24, 57-58 (Bankr. S.D.N.Y. 2007) ("Where a plaintiff is not a New York resident (as here), the court should apply the shorter of New York's period of limitations or the statute of limitations applicable where the plaintiff resides."); *Seghers v. Olympia Capital*, No. 117054/7, 2009 WL 3866338 at *5 (N.Y. Sup. Oct. 28, 2009) (borrowing statute designed to prevent forum-shopping by non-resident litigants).

and Rules of New York (the "**CPLR**"), the statute of limitations of where the action accrues applies unless the plaintiff is a New York resident. Courts have not, however, established a single test to determine where a breach of contract action accrues for a corporate plaintiff under section 202 of the CPLR. In certain cases, courts have determined that an action accrues at the place of incorporation of the corporation.[69] Other courts, however, have held that an action accrues at the principal place of business.[70] Thus, with respect to GLCC's potential breach of contract claim, the Bankruptcy Court could apply the statute of limitations of New York, Connecticut or Arkansas, each of which has a longer statute of limitations than Delaware. Accordingly, it is unclear whether the Bankruptcy Court would apply the statute of limitations of Delaware, New York, Connecticut or Arkansas.

### d.    Impact of the Transfer of CHCI Preferred Stock on the Chapter 11 Cases

Because of the projected value allocated to GLCC without taking into account the CHCI Preferred Stock and the estimated claims asserted against GLCC, GLCC's ability to assert claims and Causes of Action relating to the CHCI Preferred Stock is not expected to impact recoveries for creditors of Chemtura or GLCC. The dispute concerning the issuance of the CHCI Preferred Stock could be more significant to creditors of Chemtura and GLCC if GLCC were not otherwise able to pay its creditors in full. Because GLCC is able to pay its creditors in full, without taking into account the value of the CHCI Preferred Stock, any value that it obtains from the Preferred Stock or Causes of Action in relation thereto will inure to the benefit of Chemtura as increased equity value of GLCC.

### e.    CHCI Preferred Stock Settlement

During the Chapter 11 Cases, the Debtors, to avoid unnecessary litigation, engaged with the Creditors' Committee and the Ad Hoc Bondholders' Committee in discussions to consensually resolve disputes relating to the issuance and transfer of the CHCI Preferred Stock. The result of these discussions is the CHCI Preferred Stock Settlement contained in the Plan, pursuant to which 50% of the value of the CHCI Preferred Stock will be allocated to Chemtura and 50% will be allocated to GLCC.

The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee have evaluated the CHCI Preferred Stock Settlement and weighed it against the costs of pursuing litigation relating to the CHCI Preferred Stock. In particular, the parties have determined that the benefits of settlement, including allowing the Debtors to focus their efforts on Confirmation and the avoidance of unnecessary expense to the Estates, outweigh proceeding with litigation concerning the validity of the CHCI Preferred Stock. Additionally, as discussed above, any litigation relating to the issuance of the CHCI Preferred Stock would not likely impact recoveries in the Chapter 11 Cases. Accordingly, the CHCI Preferred Stock Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and, therefore, is a valid exercise of the Debtors' sound business judgment.

### (ii)    Settlement of Claims Relating to the Make-Whole and No-Call Provisions

As noted previously in this Disclosure Statement, the Plan constitutes a good faith compromise and global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims and controversies between the Estates, the Creditors' Committee and the Ad Hoc Bondholders' Committee arising from or related to certain provisions of the 2016 Notes and the 2026 Notes, as described below.

The Equity Committee believes that reinstatement is a viable option with respect to the 2016 Notes and the 2026 Notes without payment of the Make-Whole Settlement Amount and the No-Call Settlement Amount,

---

[69]    *Maslan v. American Airlines Inc.*, 885 F. Supp. 90, 95 (S.D.N.Y. 1995) (noting "[f]or a corporation the place where economic injury is felt is usually understood to be its place of incorporation…").

[70]    *See Haberman v. Tobin*, 466 F. Supp. 47, n.5 (N.Y. 1979) (corporation that transacts business primarily somewhere other than its state of incorporation may present exception to "traditional rule" that corporation resides in its state of incorporation); *see also Adelphia*, 365 B.R. at 58 (finding Debtor resided at its principal place of business).

K&E 17416258.15

particularly in light of what the Equity Committee characterizes as recent favorable reinstatement precedent in this jurisdiction.  *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009).  The Debtors believe that any attempt at reinstatement would result in substantial litigation, in which the holders of the 2016 Notes and the 2026 Notes would argue that a plan involving reinstatement was not feasible and, if the reinstatement were proposed in the context of an alternate plan such as that proposed by the Equity Committee, that the change in control provisions of the 2016 Notes and the 2026 Notes effectively would prevent such a reinstatement.  Indeed, the Ad Hoc Bondholders' Committee has made clear that it would object to reinstatement on each of these legal grounds.  While it is possible that the proponents of reinstatement would ultimately prevail, the litigation would be expensive and time-consuming and would carry the risk of an adverse result.  Further, the Debtors note that each of the 2016 Notes Indenture and the 2026 Notes Indenture sets forth a restriction on the maintenance or incurrence (depending on the covenant) of the Company's secured debt level (the "**Equal and Ratable Clauses**").  Before the Petition Date, the Prepetition Security Agreement provided for a carve-out from each of the Equal and Ratable Clauses by consensually limiting the security interests granted to the Prepetition Lenders thereunder.  Absent a similar limitation in the terms of the Exit Financing, the Debtors likely would be required to secure the obligations under the 2016 Notes Indenture and the 2026 Notes Indenture in accordance with the Equal and Ratable Clause in order to reinstate those obligations, or, at the very least, engage in potentially expensive and time-consuming litigation that could delay the Debtors' emergence from chapter 11.  If the 2016 Notes and the 2026 Notes were to be reinstated and secured, in a structure similar to that proposed in the Equity Committee's proposed alternate plan, the Debtors would emerge from chapter 11 with at least as much debt outstanding as before the Chapter 11 Cases, but with a substantially higher percentage of secured debt.  For all of these reasons, the Debtors believe that the treatment of the 2016 Notes and the 2026 Notes in their Plan, combined with the other aspects of the global settlement underlying the Plan (including the Make-Whole Settlement and the No-Call Settlement as described in this section of the Disclosure Statement), provide a superior alternative to reinstatement.  Additionally, the Ad Hoc Committee of Bondholders have indicated that it would vigorously oppose reinstatement of the 2016 Notes and the 2026 Notes.

The Equity Committee has indicated that it intends to vigorously oppose approval of the Plan treatment of the 2016 Notes and the 2026 Notes at Confirmation.  Although the Debtors are confident they will prevail at Confirmation, as described in section IX.B of the Disclosure Statement, in the event the Equity Committee is successful in contesting any aspect of the global settlement underlying the Plan Support Agreement, it is not likely this Plan could be effectuated and, at a minimum, a substantial delay in Confirmation would likely result.

### a.        Analysis of 2016 Notes Claims

The 2016 Notes have a stated maturity date of June 1, 2016 and are governed by the 2016 Notes Indenture.  The 2016 Notes are jointly and severally, fully and unconditionally guaranteed by certain wholly-owned domestic subsidiaries of Chemtura, including each of Chemtura's 26 affiliated Debtors in the Chapter 11 Cases.  Pursuant to the terms of the 2016 Notes Indenture, holders of the 2016 Notes are entitled to the contract rate of interest specified as 6.875% on the principal amount of the 2016 Notes.

On or around October 27, 2009, U.S. Bank National Association, as the successor trustee for the 2016 Notes (the "**2016 Notes Trustee**"), filed a Proof of Claim on behalf of holders of the 2016 Notes asserting a general unsecured claim of at least $510,217,013.89 for the principal amount outstanding under the 2016 Notes and accrued interest as of the Petition Date (the "**2016 Notes Claims**").  The Proof of Claim asserts that "Chemtura is obligated to pay duly and punctually the principal (and premium, if any) and interest on the 2016 Notes in accordance with the terms of the 2016 Notes and the Indenture."  Certain holders of the 2016 Notes Claims have claimed that the Plan's proposed repayment of the 2016 Notes, before the originally stated maturity date, also entitles them to what is commonly referred to as a "pre-payment premium" in the event of a voluntary redemption of the 2016 Notes (the "**Make-Whole Provision**").[71]

---

[71]    Specifically, paragraph 5 of the 2016 Notes states, "[a]t any time and from time to time prior to the Maturity Date, the Company may, at its option, redeem all or any portion of the Securities at the Make-Whole Price plus accrued and unpaid interest to the date of redemption."

Although Chemtura would dispute any Claim that the Plan's proposed treatment of the 2016 Notes constitutes a voluntary redemption of 2016 Notes or otherwise somehow obligates Chemtura to pay a prepayment premium to holders of the 2016 Notes, the ultimate resolution of such dispute would turn on the validity of arguments and defenses that could be raised by the 2016 Notes Trustee, the holders of the 2016 Notes Claims and Chemtura.

Specifically, the 2016 Notes Trustee and the holders of the 2016 Notes Claims could allege, assuming the Debtors are paying Claims in full, that the balance of equities favors enforcing the Make-Whole Provision and providing holders of the 2016 Notes with the benefit of their bargain, notwithstanding the Debtors' status as chapter 11 debtors.[72]  The Debtors, on the other hand, could argue that in cases in which a lender asserting repayment by a chapter 11 debtor of unsecured debt gives rise to a make-whole obligation, courts have disallowed such unsecured claims for a make-whole obligation as unmatured interest under section 502(b)(2) of the Bankruptcy Code.[73]

Additionally, the Debtors would dispute any Claim for a make-whole obligation by relying on the plain terms of the 2016 Notes Indenture's acceleration provision,[74] which does not explicitly state that a prepayment premium shall be due in the event the 2016 Notes are repaid  pursuant to an acceleration of the 2016 Notes upon the filing of a chapter 11 case.[75]  Importantly, unlike other indentures with make-whole provisions that expressly require that repayment of accelerated debt by a chapter 11 debtor shall be deemed a voluntary redemption or optional prepayment that triggers a make-whole obligation, the 2016 Notes Indenture does not contain such protective language,[76] thus providing an argument that the parties never intended for a make-whole obligation to be due in these circumstances.[77]

---

[72]  *See Gencarelli v. UPS Capital Business Credit*, 501 F.3d 1, 2 (1st Cir. 2007) (holding that there is no basis in a solvent case to limit a prepayment fee); *In re Chi. Milw. St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (observing that "if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights); *In re Calpine Corp.*, 365 B.R. 392, 400 (Bankr. S.D.N.Y. 2007) (observing "[t]he fact that a debtor is solvent, while not dispositive, is also a consideration when determining the rate of interest due.").

[73]  *See* 11 U.S.C. § 502(b)(2); *see also Continental Secs. Corp. v. Shenandoah Nursing Home P'ship.*, 188 B.R. 205, 213-14 (W.D. Va. 1995) ("paying the full value of the [n]ote through its maturity . . . would essentially be allowing the payment of unmatured interest which is prohibited by § 502."); *In re NRG Energy, Inc.*, Case No. 03-13024 (S.D.N.Y. Nov. 24, 2003), Tr. at 9 ("It seems to me that a make-whole premium is nothing but a claim for unmatured interest put in a fancy form; and if it is a claim for unmatured interest, it is not allowable – period."); *In re Ridgewood Apartments of DeKalb County, Ltd.*, 174 B.R. 712, 721 (Bankr. S.D. Oh. 1994) (stating "[a]ny claim for a prepayment penalty in this circumstance would violate the prohibition and would fly in the face of the legislative history to §502(b)(2)").

[74]  Section 502 of the 2016 Notes Indenture provides, "The commencement of a voluntary bankruptcy case constitutes an event of default such that all "Outstanding Securities shall become immediately due and payable without any declaration or other act on the part of the Trustee or the Holders."  However, this provision does not provide that a voluntary bankruptcy case results in a voluntary redemption or provide a make-whole premium in the event of a commencement of a voluntary bankruptcy case.  *See In re AE Hotel Venture*, 321 B.R. 209, 219 (Bankr. N.D. Ill. 2005) (finding "[b]ecause the loan documents here expressly provide for a prepayment premium even when the debt is accelerated, the premium is 'provided for under the agreement'") ; *In re Financial Center Assocs. of East Meadow, L.P.*, 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (noting "[i]t is not disputed that the agreement between the parties specifically provides for the pre-payment charge even in the event of acceleration")

[75]  *In re Solutia*, 379 B.R. 473, 485 n.7 (Bankr. S.D.N.Y. 2007) (stating "[t]his Court respectfully disagrees with *Calpine* because it reads into agreements between sophisticated parties that are not there.  Perhaps the parties negotiated on the subject but were unable to reach an agreement. . . .  In either case, the court cannot supply what is absent.").  *Calpine Corp.*, 365 B.R. at 400 ("Absent a provision in the underlying agreement authorizing the payment of fees, costs or charges, the secured party is prohibited from incorporating such amounts into its allowed secured claim.); *In re Vest Assocs.*, 217 B.R. 696, 699-700 (Bankr. S.D.N.Y. 1998) (holding that a court cannot "read into a contract damage provisions which the parties themselves had to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan"); *Cont'l Sec. Corp.* 188 B.R. at, 215-16 (noting the oversecured creditor was not entitled to a prepayment penalty pursuant to section 506(b) because there was no prepayment penalty provision in the contract).

[76]  *See, e.g., AE Hotel Venture*, 321 B.R. at 218 (observing that the note provided for a prepayment premium in acceleration: the principal balance "may be prepaid in whole (but not in part) on thirty days written notice," on payment of the prepayment premium).

[77]  *See, e.g., In re LHD Realty Corp.*, 726 F.2d 327, 331 (7th Cir.1984) (observing that by accelerating the debt, the lender signals that it "prefers accelerated payment to the opportunity to earn interest over a period of years" as opposed to interest in the form of a prepayment
(Continued…)

174

Notwithstanding the foregoing, however, holders of the 2016 Notes Claims could rely on certain precedent to argue that repayment of accelerated debt by a chapter 11 debtor, before the debt's originally-stated maturity date (i.e., before the chapter 11 filing advanced the maturity date to the petition date) gives rise to breach of contract damages.    Additionally, the holders of the 2016 Notes Claims could argue that the terms of Make-Whole Provision[78] provide an available damages measure.[79]

On the other hand, the Debtors could respond that the explicit terms of the 2016 Notes Indenture provide that that the Debtors' chapter 11 filings were an event of default that accelerated the maturity of the 2016 Notes, such that the 2016 Notes became fully due and payable as of the petition date.    Stated differently, the Debtors could argue that it is legally and logically impossible for the Debtors to "optionally redeem" or "voluntarily prepay" debt that is presently due and payable.[80]    Additionally, the Debtors could argue that requiring the Debtors to pay a make-whole obligation could prevent other stakeholders from receiving full recovery, and thus, may hinder a central goal of the chapter 11 process of treating creditors and interest holders fairly.

Holders of the 2016 Notes Claims could respond, however, that bankruptcy alone does not preclude creditors from receiving the benefit of their bargain.[81]

Based on the foregoing, both the Debtors and the holders of 2016 Notes Claims bear significant litigation risk as to whether the Bankruptcy Court would determine if the Plan's proposed repayment of the 2016 Notes (through a combination of New Common Stock and Cash) is an optional redemption of that debt that gives rise to a make-whole obligation or otherwise triggers breach of contract damages.

### b.    Analysis of 2026 Notes Claims

The 2026 Notes are obligations of Chemtura, as successor in interest to Witco, and are governed by the 2026 Notes Indenture.    Pursuant to the provisions of the 2026 Notes Indenture, holders of the 2026 Notes are entitled to the contract rate of interest specified as 6.875% on the principal amount of the 2026 Notes.    Additionally,

---

premium); *AE Hotel Venture*, 321 B.R at 218 (recognizing that the general rule "that usual effect of acceleration . . . on the enforceability of prepayment premiums can 'be modified by the parties through appropriate contractual provisions'") (quoting *LHD Realty*, 726 F.2d at 331 n.5); *Zwayer v. Ford Motor C.r. Co.*, 665 N.E.2d 843, 845-46 (Ill. App. Ct. 1996) (denying request for premium in connection with post-acceleration repayment where "[t]here is a provision specifying that the [prepayment premium provision] will be applied . . . upon acceleration"); *see also Anchor Resolution Corp. v. State St. Bank & Tr. Co. (In re Anchor Resolution Corp.)*, 221 B.R. 330, 334 (Bankr. D. Del. 1998) (allowing lender to collect prepayment premium where debt instrument explicitly provided for prepayment premium in connection with post-acceleration repayment of debt); *Financial Center Assocs. of East Meadow, L.P.*, 140 B.R. at 834-35 ("rejecting [the] argument that acceleration waived prepayment charge where agreement provided for charge after acceleration"); *In re Schaumburg Hotel Owner Ltd. P'Ship*, 97 B.R. 943, 953 (Bankr. N.D. Ill. 1989) (same).

[78]    Paragraph 5 of the 2016 Notes defines the Make-Whole Amount as "an amount equal to the excess, if any, of (a) the present value of the remaining interest and principal payments due on such Security (excluding any portion of such payments of interest accrued as of the redemption date) as if such Security were redeemed on the Maturity Date, computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (b) the outstanding principal amount of such Security. . ."

[79]    *See, e.g., Calpine* 365 B.R. at 399 ("[W]hile the agreements do not provide a premium or liquidated damages for repayment during the period the Debtors propose, the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements.") (citing *United States v. Winstar*, 518 U.S. 839, 885, (1996) ("damages are always the default remedy for breach of contract").

[80]    Section 502 of the 2016 Notes Indenture states, "The commencement of a voluntary bankruptcy case constitutes an event of default such that all "Outstanding Securities shall become immediately due and payable without any declaration or other act on the part of the Trustee or the Holders." *See In re Manville Forest Prods. Corp.*, 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984), *aff'd in part, rev'd in part on other grounds*, 60 B.R. 403 (S.D.N.Y. 1986) (holding that debt is automatically accelerated upon filing bankruptcy); *Ridgewood Apartments*, 174 B.R. at 720 ("Even without specific contractual language, a bankruptcy filing acts as an acceleration of all of a debtor's obligations).

[81]    *See In re Skyler Ridge* for the proposition that acceleration of debt under the Bankruptcy Code is not the kind that prevents recovery of a make-whole premium.    80 B.R. 500, 507 (Bankr. C.D. Cal. 1987) (stating "If automatic acceleration of a debt defeats a prepayment premium clause, such a clause could never be enforced in a bankruptcy case . . . Neither the Bankruptcy Code nor case law compels so drastic a result. No bankruptcy policy compels the invalidation of a properly drawn prepayment premium clause in all cases").

the 2026 Notes Indenture prohibits the optional redemption of the 2026 Notes at any point before the maturity date of February 1, 2026 (the "**No-Call Provision**").

On or around October 23, 2009, Manufacturers and Traders Trust Company, as trustee for the 2026 Notes, (the "**2026 Notes Trustee**") filed a Proof of Claim asserting a general unsecured claim in the amount of $151,346,354.17 for the principal amount outstanding under the 2026 Notes and accrued interest as of the Petition Date (the "**2026 Notes Claims**").[82]   Because the terms of the 2026 Notes Indenture do not allow Chemtura to optionally redeem the 2026 Notes before 2026, certain holders of the 2026 Notes Claims have asserted damages arising from an alleged breach of the No-Call Provision.  Although Chemtura would vigorously contest any such Claim, the ultimate resolution of such dispute would turn on the validity of arguments raised by the 2026 Notes Trustee, the holders of the 2026 Notes Claims and Chemtura.  Holders of the 2026 Notes Claims could allege that Chemtura's repayment of the 2026 Notes pursuant to its Plan—i.e., before the originally-stated maturity date of February 1, 2026—constitutes a breach of the No-Call Provision, thus entitling holders of the 2026 Notes Claims to damages.  Chemtura would respond, however, that while Annex II of the 2026 Notes Indenture provides that the 2026 Notes may not be redeemed at the option of Chemtura, that provision does not specify damages in the event of a breach.

However, holders of the 2026 Notes Claims could argue that damages can be inferred by the intent of the No-Call Provision of the 2026 Notes Indenture; namely, the losses suffered by holders of the 2026 Notes Claims are the sum total of the interest payments Chemtura will not be making between the Plan distribution date and the 2026 Notes' originally-stated maturity date.  Alternatively, holders of the 2026 Notes Claims could argue a damages measure can be "borrowed" from the Make-Whole Provision in the 2016 Notes Indenture.

Chemtura, on the other hand, could dispute any claim for damages arising from the No-Call Provision on the basis that such provisions are generally unenforceable in chapter 11 cases because (1) the filing of a bankruptcy case acts as an acceleration of all of a debtor's debt, thus necessarily nullifying a no-call provision; and (2) if no-call provisions were enforceable against chapter 11 debtors, lenders could force debtors to remain in bankruptcy until the maturity date of the debt in question, an absurd result plainly at odds with the rehabilitative intent of the Bankruptcy Code.[83]

Holders of the 2026 Notes Claims could respond that even if no-call provisions are generally unenforceable against chapter 11 debtors, the holders are still entitled to damages arising from repayment of the 2026 Notes in defiance of the No-Call Provision based on a breach of contract theory.[84]   Chemtura would dispute any claims for damages because (1) there is no explicit damages provision in the 2026 Notes Claims and (2) holders of the 2026 Notes Claims have General Unsecured Claims and, therefore, any such damages should be disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code.[85]

Holders of the 2026 Notes Claims, however, could contend that, assuming Chemtura is paying Claims in full, the balance of the equities favors enforcing the No-Call Provision and providing the lenders with the benefit of their bargain, notwithstanding Chemtura's status as a chapter 11 debtor.[86]   Additionally, holders of the 2026 Notes

---

[82]   The 2026 Notes Claims reserve the right to, among other things, adjust the amount of the proof of claim.

[83]   *See Calpine* 365 B.R. at 398 (observing "[i]t would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it") (citing *Cont'l. Secs. Corp.* 193 B.R. at 774 (affirming Bankruptcy Court's holding that "while there is a prepayment prohibition, [it] is not enforceable in this [Chapter 11] context"); *Skyler Ridge*, 80 B.R. at 502; *360 Inns*, 76 B.R. at 576 (authorizing repayment of a note despite ten-year prohibition on repayment); *LHD Realty Corp.*, 726 F.2d at 329 (allowing repayment of promissory note notwithstanding clause that states "no prepayment of principal may be made during the first ten (10) loan years."); *but see In re Premier Entertainment Biloxi LLC*, Case No. 06-50975 (Bankr. S.D. Miss. Feb. 2, 2007) (enforcing a no-call provision against a Chapter 11 debtor).

[84]   *See supra* note 79.

[85]   *See* 11 U.S.C. § 502(b)(2).

[86]   *See supra* note 72.

K&E 17416258.15

Claims could argue that they are not receiving the bargained portion of the contract, particularly in light of the February 1, 2026 maturity date of the 2026 Notes.

Accordingly, it is unclear whether the Bankruptcy Court would determine that (1) No-Call Provision is enforceable and (2) holders of the 2026 Notes Claims are entitled to damages for a breach of the No-Call Provision.

<div align="center">

**c.**     **Settlement of Make-Whole Premiums or Prepayment Penalties and No-Call Penalties**

</div>

During the Chapter 11 Cases, the Debtors engaged the Creditors' Committee and the Ad Hoc Bondholders' Committee in discussions to consensually resolve disputes relating to both the Make-Whole Provision and the No-Call Provision (the "**Make-Whole / No-Call Settlement**") in order to avoid unnecessary litigation.  Under the terms of the Make-Whole / No-Call Settlement, holders of 2016 Notes will be entitled to an Allowed Claim in the amount of $50 million, approximately 50% of the value payable if the Make-Whole Provision amount specified in paragraph 5 of the 2016 Notes were found to be applicable and enforceable (the "**Make-Whole Settlement Amount**"). Holders of the 2026 Notes will be entitled to an Allowed Claim in the amount of $20 million, approximately 50% of the value payable if the Bankruptcy Court were to find a breach of the No-Call Provision set forth in the 2026 Notes (the "**No-Call Settlement Amount**").

As an additional component of the Make-Whole / No-Call Settlement, the parties have agreed that, to the extent that there is insufficient value in the Unsecured Distribution Pool to provide for payment of the Make-Whole Claims and the No-Call Claims under the Make-Whole / No-Call Settlement and the General Unsecured Claims against Chemtura, including postpetition interest pursuant to the Plan, then such deficit will be adjusted in the following order (the "**Shortfall Adjustment**"): (1) the No-Call Settlement Amount, (2) the Make-Whole Settlement Amount, (3) on a pro rata basis, postpetition interest payments payable to either the General Unsecured Claims against Chemtura and the 2026 Claims and (4) on a pro rata basis, payments payable on account of all other prepetition amounts of General Unsecured Claims against Chemtura and the 2026 Claims.  Thus, the No-Call Settlement Amount and the Make-Whole Settlement Amount will be, by agreement, effectively subordinated to other unsecured claims.

The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee have evaluated the Make-Whole / No-Call Settlement and weighed it against the costs of pursuing litigation relating to the enforceability of the Make-Whole Provision and the No-Call Provision.  In particular, in light of the strength of the arguments and defenses that could be raised by the parties, any litigation contesting claims arising from these provisions poses a significant risk of loss.  Additionally, the relative lack of precedent addressing the enforceability of make-whole and no-call provisions in cases in which Claims are paid in full further adds to the inherent uncertainty of any litigation of these matters.  Based on the foregoing, the parties determined that the benefits of settlement, including allowing the Debtors to focus their efforts on Confirmation and the unnecessary expense and harm to the Estates, outweigh proceeding with litigation concerning the validity of the Make-Whole Provision and the No-Call Provision.  Accordingly, the Make-Whole / No-Call Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

<div align="center">

*(iii)*     *Settlement of Ad Hoc Bondholders' Committee's Professional Fees*

</div>

As part of the global settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Claims and controversies between the Estates and the Ad Hoc Bondholders' Committee, including to the Ad Hoc Bondholders' Committee's agreement to the New Chemtura Total Enterprise Value, which value is higher than the Ad Hoc Bondholders' Committee's independent valuation, and the Ad Hoc Bondholders' Committee's agreement to encourage its members and other holders of Notes to support the Plan, and to alleviate the risk of further economic loss for members of the Ad Hoc Bondholders' Committee, the Plan further provides for payment of the actual, reasonable and documented third-party fees and expenses of the Ad Hoc Bondholders' Committee, not to exceed the Ad Hoc Committee Fee Cap (the "**Professional Fee Settlement**").

Had the Ad Hoc Bondholders' Committee's fees not been settled as a key component of the Plan, pursuant to section 503(b)(4) of the Bankruptcy Code, the Ad Hoc Bondholders' Committee may assert claims against the Estates for the third-party fees and expenses incurred for services provided in the Chapter 11 Cases in light of its

<div align="center">177</div>

substantial contribution to the case.[87] Although the Debtors could dispute such a claim, the ultimate resolution of such dispute would turn on the validity of arguments raised by the Ad Hoc Bondholders' Committee demonstrating a substantial contribution pursuant to 503(b) of the Bankruptcy Code and the defenses raised by the Debtors in response to such an application.

Specifically, in evaluating whether a party requesting payment for administrative expenses has made a substantial contribution to a chapter 11 case under section 503(b) of the Bankruptcy Code, courts in the Second Circuit generally consider: (a) whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; (b) whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and (c) whether the services were duplicative of services performed by others.[88]   The Ad Hoc Bondholders' Committee would likely argue that it has made a substantial contribution to the Chapter 11 Cases in light of its support for the Plan and the work that it did, resulting from its representation of holders of claims in all Classes of funded unsecured debt, to assist with the consensual resolution of intercreditor disputes and the global settlement of all Claims and controversies under the Plan, including the issues resolved in the Make-Whole / No-Call Settlement described above and its agreement to accept the New Chemtura Total Enterprise Value.[89]   The Ad Hoc Bondholders' Committee may further claim that it has conferred a direct benefit upon the Debtors through all of its efforts leading up to the negotiation and proposal of the Plan, including sharing analysis and drafting efforts.[90]

Parties in interest contesting the request for administrative expense payment might argue that the efforts of the Ad Hoc Bondholders' Committee were self-serving, benefiting only the holders of the 2016 Notes Claims and the 2026 Notes Claims.[91]   Objecting parties also might argue that the services of the Ad Hoc Bondholders' Committee were duplicative of those provided by the Creditors' Committee and its professionals.   The Ad Hoc Bondholders' Committee may be able to overcome these objections, however, as a result of the arguments set forth above and by asserting the Ad Hoc Bondholders' Committee collectively holds more than $770 million, or

---

[87]   Section 503(b) provides, in relevant part, "After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –

. . .

(3)(D) . . . a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in this case under chapter 9 or 11 of this title;

. . .

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(3)(1) – (4).

[88]   *See, e.g., In re Best Prods. Co., Inc.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994) (noting that compensable services are those that advance the case, rather than those which interrupt or hinder the progress of the case); *see also In re U.S. Lines*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989) (noting that an applicant satisfies the substantial contribution test if it provides an "actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders").

[89]   *See, e.g., In re Richton Int'l Corp.*, 15 B.R. 854, 855-56 (Bankr. S.D.N.Y. 1981) (observing that "[t]he policy aim of authorization of such compensation is to promote meaningful creditor participation in the reorganization process").

[90]   *Id.* at 856 (noting that a committee provides a substantial contribution when the committee's services help move the case forward and aid the formulation and confirmation of a plan of reorganization and merits compensation from the estate); *see also In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997) (substantial contribution is appropriate when, among other things, "the creditor took an active role in facilitating the negotiation and successful confirmation of the plan").

[91]   *See Dana Corp.*, 390 B.R. at 108 (noting that the term "substantial" requires benefits to the debtor's estate that arise beyond the party's actions in pursuing its own interests); *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) ("Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection").

K&E 17416258.15

approximately 68%, of the principal amount of the Debtors' prepetition funded debt,[92] and that the services provided by these holders, including the consensual resolution of certain intercreditor disputes were not duplicative of those provided by the Creditors' Committee, which represents the interests of a more diverse creditor base.

Ultimately, based on the foregoing considerations, and in furtherance of the global settlement underlying the Plan, the Debtors, together with the Creditors' Committee, determined that it was appropriate to enter into the Professional Fee Settlement as one element of the overall global settlement with the Ad Hoc Bondholders' Committee and as consistent with the obligations of the parties under the Plan Support Agreement.

The Equity Committee has questioned the appropriateness of the Professional Fee Settlement. Among other things, the Equity Committee has questioned (a) whether the Debtors have authority to grant administrative expense status to the Ad Hoc Bondholders' Committee's fees, (b) the basis for seeking approval of the Professional Fee Settlement under section 1129(a)(4) of the Bankruptcy Code as opposed to under section 503(b) of the Bankruptcy Code and (c) whether the Equity Committee should be permitted to review the Ad Hoc Bondholders' Committee's fee invoices for reasonableness. The Equity Committee has indicated that it does not believe the Ad Hoc Bondholders' Committee has made a credible claim for having made a substantial contribution to the Chapter 11 Cases at this junction.

The Professional Fee Settlement requires Bankruptcy Court approval in all respects, including as to the priority of the fees, the applicable legal standard and the requirement of any review. The Debtors will provide support for the Professional Fee Settlement at the appropriate time.

### (iv)    *The PBGC Settlement*

As described in section VII.G of this Disclosure Statement, the Debtors sponsor three Single-Employer Plans, each of which is governed by the provisions of ERISA and the Internal Revenue Code. Specifically, the Single-Employer Plans are covered by the termination insurance program under Title IV of ERISA. PBGC, a United States government agency that administers this termination insurance program, has authority with respect to the Single-Employer Plans and is a member of the Creditors' Committee. As of October 30, 2009, PBGC estimated that the Single-Employer Plans' total combined unfunded liability was approximately $330.8 million.

As described below, the Debtors and the PBGC have agreed, as part of the global settlement embodied in the Plan Support Agreement, that (a) the Debtors will make a one-time cash contribution in the amount of $50 million to the Chemtura Retirement Plan on the Effective Date in exchange for PBGC agreeing not to pursue such terminations based solely on the facts of the Debtors' proposed restructuring plan in the Chapter 11 Cases, and (b) the Debtors have further agreed that neither the Debtors nor the Reorganized Debtors will elect to apply any portion of the $50 million contribution to increase the Chemtura Retirement Plan's "prefunding balance," as that term is defined in 26 U.S.C. § 430(f)(6)(A) (the "**PBGC Settlement**").

The Equity Committee intends to vigorously oppose the PBGC Settlement at the Confirmation Hearing. The Debtors will provide support for the PBGC Settlement at the Confirmation Hearing.

If certain criteria and procedural requirements are satisfied, termination of a defined benefit pension plan can be initiated by the plan's sponsor or by PBGC. If initiated by the plan sponsor, the termination is referred to as a "voluntary termination." If initiated by PBGC, the termination is referred to as a "PBGC-initiated termination."[93]

PBGC generally has wide latitude to institute termination of a defined benefit pension plan. Specifically, PBGC may institute proceedings to terminate such a plan if it determines that any of the following is true:

---

[92]    As discussed in section [VII] of this Disclosure Statement, the Ad Hoc Bondholders' Committee represents certain holders of the 2009 Notes, the 2016 Notes, the 2026 Notes and Prepetition Unsecured Lender Claims. The Ad Hoc Bondholders' Committee claims that its members collectively hold or represent approximately 62% of the obligations owing under the 2009 Notes Claims, approximately 67% of the obligations owing under the 2016 Notes and approximately 62% of the obligations owing under the 2026 Notes.

[93]    *See* 29 U.S.C. § 1342(a).

K&E 17416258.15

- the plan has not been funded in accordance with the minimum funding requirements of the Internal Revenue Code or it has been notified that the Internal Revenue Service has issued a notice of deficiency with respect to excise taxes due to such a failure;

- the plan will be unable to pay benefits when due;

- there has been a distribution under the plan in excess of $10,000 to a substantial owner (other than in case of a death) while unfunded nonforfeitable benefits remain in the plan; or

- the possible long-run loss of PBGC with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

PBGC has broad discretion with respect to its determination that the criteria for a PBGC-initiated termination have been satisfied and, generally, PBGC's decision is subject to judicial deference and will not be overturned unless it is determined to be "arbitrary and capricious" (generally meaning that no reasonable person could have reached the decision to terminate the plan on the evidence contained in the administrative record). Moreover, PBGC can initiate termination of a pension plan even if the plan is required by the terms of a collective bargaining agreement.

Accordingly, although the Debtors have determined during the course of their Chapter 11 Cases not to seek voluntary termination of any of the Single-Employer Plans, the PBGC could initiate proceedings to terminate one or more of the Single-Employer Plans. The Debtors, however, would vigorously contest whether, and do not believe, the PBGC has any basis for a PBGC-initiated termination of the Single-Employer Plans.

The Equity Committee does not agree with the Debtors' view that an involuntary termination of the Debtors' Single-Employer Pension Plans is a possibility that should be taken into account with a settlement. The Equity Committee believes that of the four possible grounds upon which the PBGC can terminate a pension plan under 29 U.S.C. § 1342(a), only the "long run loss" provision allowing the PBGC to terminate if it determines that "possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated" could be implicated. The Equity Committee further argues, with respect to the process that the PBGC would have to follow to terminate any pension plan, that in the unlikely event that the agency's internal working group did find that grounds to terminate exist, it is highly unlikely, given the current economic, political and policy environment, that the head of the agency would seek to terminate these plans where the Debtors have "determined . . . not to seek voluntary termination." And, moreover, the Equity Committee believes that even if the Trusteeship Working Group, an internal working group and the Executive Director all decided to punish a debtor that maintained its pension plans, the PBGC would have to commence a legal action asking a court to find that "the plan[s] must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the [insurance] fund." 29 U.S.C. §1342(c).

PBGC notes that it has the authority to seek termination of any or all of the Single Employer Plans if "the possible long-run loss of [PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." *See* 29 U.S.C. § 1342(a)(4). PBGC believes the plans are at risk, and contends that the debt structure proposed by Debtors, without the $50 million contribution into the Chemtura Retirement Plan, would result in a "possible long-run loss" to PBGC. PBGC asserts that termination of the Debtors' Single Employer Plans during bankruptcy would provide full or near full recovery on PBGC's bankruptcy claims, while termination in the future after emergence would not. Based on these factors alone (which were not present in the cases mentioned by the Equity Committee), PBGC contends that it has ample grounds to terminate the Single Employer Plans if the Debtors do not enter into the PBGC Settlement. As explained below, PBGC's termination would also trigger "termination premiums," *see* 29 U.S.C. § 1306(a)(7), which PBGC contends would result in nearly $56.3 million dollars in additional payments from the reorganized Debtors to PBGC in the first three years after the Effective Date.

In the event PBGC sought to terminate the Single-Employer Plans, it would become the statutory trustee of the Single-Employer Plans and would pay the participants up to statutory limits. In that case, the PBGC would have

180

a claim against the Debtors, as well as each of the entities in the Debtors' controlled group, including foreign and non-Debtor controlled group members.[94]

Generally, PBGC's unfunded benefit liability claim is equal to the excess of the plan's liabilities over the value of the plan's assets on the termination date. If the Single-Employer Plans terminate in a distress termination or a PBGC-initiated termination while the Debtors are attempting to reorganize pursuant to chapter 11 of the Bankruptcy Code, and the Debtors ultimately are the subject of a confirmed chapter 11 plan of reorganization, the Debtors will become liable to PBGC – in addition to the flat- and variable-rate premiums – for termination premiums in the amount of $1,250 for each of the Single-Employer Plans' participants for three years. Additionally, PBGC will argue that its claims based on the unfunded pension liabilities should be valued using assumptions set forth in ERISA regulations (which may mandate a lower discount rate than used for funding and accounting purposes and therefore may create higher liabilities), whereas plan sponsors generally argue that the plan's liabilities should be valued using a so-called "prudent investor" rate (a rate that would generally estimate the amount of cash that when prudently invested would allow obligations to be met as they come due).

Moreover, PBGC is likely to assert that its claim for pension underfunding is entitled to priority because the termination liability should be considered an administrative expense and/or a tax. PBGC will likely be entitled to administrative priority for any portion of its claims that are based upon postpetition service – for example, the actuarial cost of any benefits that accrued under the Pension Plans as a result of post-petition service to the plan sponsor, even if no contributions are due for that period.

The Equity Committee also disputes that the PBGC would be entitled to a priority claim and contends that well-settled case law holds that, with the small exception of benefits that accrued post petition, PBGC's claims would receive no such priority. The Debtors would review any claims asserted by the PBGC and would contest the amount or classification of those claims to the extent appropriate. Additionally, the Equity Committee asserts that the U.S. Pension Plans are largely frozen, making it likely that postpetition accrual, if any, would be immaterial. The Debtors would review any claims asserted by the PBGC and would contest the amount or classification of those claims to the extent appropriate.

Additionally, the termination premium liability does not exist until after the chapter 11 plan is confirmed and the Debtors exit from bankruptcy.[95] Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of sections 101(5) and 1141 of the Bankruptcy Code.

The Equity Committee notes that the PBGC did not seek termination in the recent chapter 11 cases of Lyondell Chemical Co. and Smurfit-Stone Container Corp. The Debtors agree that pension termination was not pursued in the *Lyondell* and *Smurfit-Stone* cases. Nevertheless, as described herein, the PBGC has vigorously threatened termination in this case (where the facts, plan structure and constituent recoveries are different from those in the *Lyondell* and *Smurfit-Stone* cases). The Debtors believe that, even if the risk of a termination is relatively low, the potential impact of such a termination on the Debtors and the Chapter 11 Cases is so substantial that any chance of such termination should be avoided. For this reason, and for the other reasons set forth herein, and because a contribution to the Pension Plan now will result in reduced contributions in the future, thus inuring to the benefit of the Reorganized Debtors and their equity holders, the Debtors believe that the PBGC Settlement is appropriate in the exercise of their business judgment.

---

[94]  An ERISA controlled group is determined under complex tax rules set forth within and under Sections 414 and 1563 of the Internal Revenue Code, which very generally provide that a plan sponsor's controlled group consists of a group of trades or businesses:  (a) linked by 80% ownership in a parent-subsidiary relationship, (b) 80% owned by 5 or fewer individuals, trusts or estates (if such persons' identical ownership in the entities is at least 50%) in a brother-sister relationship and (c) one or more combinations of parent-subsidiary and/or brother-sister groups.

[95]  *See* 29 U.S.C. § 1306(a)(7)(B).

K&E 17416258.15

### a.    PBGC's Claims

On or about October 30, 2009, PBGC filed 324 separate proofs of claim against the Debtors.  In accordance with the *Order Approving Stipulation Permitting Pension Benefit Guaranty Corporation to File Consolidated Claims Under a Single Case Number* [Docket No. 1226], a single Proof of Claim was deemed to constitute the filing of a Proof of Claim against each and every Debtor in the Chapter 11 Cases, except Chemtura Canada as it was not a Debtor at that time.  Specifically, PBGC filed a claim for each of the Single-Employer Pension Plans (collectively, the "**PBGC Claims**") based on:

- the estimated amount of the unfunded benefit liabilities if the Single-Employer Plans were to terminate; ("**Unfunded Liability Claims**");[96]

- the estimated amount of unpaid minimum funding contributions that may be owed to the Single-Employer Plans (the "**Funding Claims**"), in unliquidated amounts;

- the estimated amount of insurance premiums, including termination premiums under 29 U.S.C. § 1306(a)(7) ("**DRA Premiums**"), interest and penalties that may be owed to PBGC if the Single-Employer Plans were to terminate or be terminated, in unliquidated amounts; and

- the shortfall and waiver amortization charges that may be owed to the Single-Employer Plans.[97]

PBGC's Claims for the Single-Employer Plans' Unfunded Liability and Termination Premiums are contingent on the Single-Employer Plans terminating, other than through a standard termination, during the Chapter 11 Cases and would be withdrawn if no such termination occurs.

### b.    The Terms of the PBGC Settlement

Throughout discussions with respect to the Plan, PBGC has raised concerns about the Debtors' ability to fund their obligations with respect to the Single-Employer Plans after the Effective Date, taking into account, among other things, the Debtors' capital structure and financial projections upon emergence from chapter 11.

In order to address PBGC's concerns, and to avoid the risk of PBGC-initiated termination of the Single-Employer Plans, the Debtors and PBGC have agreed to the terms of the PBGC Settlement.

The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee have evaluated the PBGC Settlement and weighed it against the risk of PBGC seeking PBGC-initiated terminations and asserting the PBGC Claims.  In determining to proceed with the PBGC Settlement, those parties determined that the benefits of settlement, including allowing the Debtors to focus their efforts on Confirmation and avoiding unnecessary expense and potential harm to the Estates, outweigh the significant risks and costs associated with PBGC-initiated terminations of the Single-Employer Plans.

Accordingly, the Debtors firmly believe that the PBGC Settlement is well within the range of reasonableness for settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and therefore, is a valid exercise of the Debtors' sound business judgment.

---

[96]    Specifically, PBGC filed claims for the unfunded benefit liabilities of:  (a) the Chemtura Retirement Plan in the amount of $327.7 million; (b) the Perth Amboy Plan in the amount of $2.1 million; and (c) the Marshall Plan in the amount of $1.0 million.  PBGC asserted a portion of these amounts is entitled to status as an administrative and/or priority claim.

[97]    Specifically, PBGC filed claims for shortfall and waiver amortization charge under (a) the Chemtura Retirement Plan in the amount of $174.1 million; (b) the Perth Amboy Plan in an unliquidated amount; and (c) the Marshall Plan in an unliquidated amount.

K&E 17416258.15

<div align="center">

**X.**
**VOTING ON THE PLAN**

</div>

A.    **Overview**

On August 5, 2010, the Bankruptcy Court entered the Solicitation Order, approving, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures and establishing the deadline for filing objections to the Plan and scheduling the Confirmation Hearing.  Copies of the Solicitation Order and the Disclosure Statement Order are attached hereto as collective **Exhibit B**.  The Solicitation Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

---

**THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS ONLY A SUMMARY**.
PLEASE REFER TO THE SOLICITATION ORDER ATTACHED HERETO FOR A MORE
COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

B.    **Holders of Claims and Interests Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan.  As shown in the table above, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims and Interests in Classes 1, 4a, 4b, 5, 6, 7, 8, 10, 11 and 13a (collectively, the "**Voting Classes**").

The holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may receive a distribution under the Plan.  Accordingly, holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from holders of Classes 2, 3, 4c, 9, 12 and 13b.  Additionally, the Solicitation Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.  The table in section I of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

C.    **Voting Record Date**

**The Voting Record Date is July 23, 2010**.  The Voting Record Date is the date on which it will be determined which holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim or Interest.

D.    **Voting on the Plan**

**The Voting Deadline is 5:00 p.m. Eastern Daylight Time on September 9, 2010**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that they are **actually received** on or before the Voting Deadline by either the Voting and Claims Agent or the Securities Voting Agent at the following addresses:

<div align="center">

183

</div>

| |
|---|
| **DELIVERY OF BALLOTS** |
| Ballots must be **actually** **received** by the Voting and Claims Agent or Securities Voting Agent, as appropriate, by the Voting Deadline of 5:00 p.m. Eastern Daylight Time on September 9, 2010 at the following addresses: |

<div align="center">

***Voting and Claims Agent:***
***[For Classes 1, 4a, 4b, 5, 10 and 11]***

Chemtura Balloting Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California  90245

* * * * * * *

***Securities Voting Agent:***
***[For Classes 6, 7, 8 and 13a]***

Chemtura Ballot Processing
c/o Epiq Bankruptcy Solutions LLC
757 Third Avenue, 3rd Floor
New York, New York 10017

</div>

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a Ballot before the Voting Deadline.

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

<div align="center">

**(866) 967-0261**

</div>

E.       **Ballots Not Counted**

        **No Ballot will be counted toward Confirmation if, among other things**:  (a) it is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest; (b) it was transmitted by facsimile or other electronic means; (c) it was cast by an entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no Proof of Claim was timely filed; (e) it was cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Solicitation Order); (f) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent or Securities Voting Agent, as applicable), an Indenture Trustee or the Debtors' financial or legal advisors instead of  the Voting and Claims Agent or the Securities Voting Agent; (g) it is unsigned; or (h) it is not marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Solicitation Order set forth in the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

F.       **Recovery Preference Election**

        The Plan provides that (a) each holder of a Prepetition Unsecured Lender Claim, or a General Unsecured Claim against a Debtor other than Chemtura Canada may, at the time of voting upon the Plan, make a binding election to seek to receive the maximum available percentage of its recovery in the form of Cash or the maximum available percentage of its recovery in the form of New Common Stock and (b) holders of Notes Claims may, before the Voting Deadline, make a binding election to seek to receive the maximum available percentage of its recovery in the form of Cash or the maximum available percentage of its recovery in the form of New Common Stock (collectively, the "**Recovery Preference Election**").  The implementation of this aspect of the Plan as part of the solicitation process is described in the Solicitation Order.

<div align="center">184</div>

K&E 17416258.15

G.        **Rights Offering**

As described in the Executive Summary, the Plan provides that to the extent Class 13a Interests in Chemtura votes to accept the Plan, holders of an Interest in Chemtura as of the business day before the date on which the Debtors first send the Rights Exercise Forms to Eligible Holders pursuant to the terms of the Plan and the Rights Offering Procedures will receive the right, but not the obligation, to purchase their respective Pro Rata share of 7.38 million shares of New Common Stock (the "**Rights Offering**").  The implementation of the Rights Offering is described in the Solicitation Order.

H.        **Additional Disclosures for Class 13a Interests in Chemtura**

For the further avoidance of doubt, in the event Class 13a Interests in Chemtura Corporation vote to accept the Plan, excess Cash in the Disputed Claims Reserve after all Allowed Unsecured Claims are paid in full will be returned to the Reorganized Debtors for general corporate use in accordance with the terms of the Plan.  Additionally, any excess New Common Stock will be cancelled or held as treasury stock, rather than distributed to holders of Class 13a Interests in Chemtura Corporation.  Also for the avoidance of doubt, in the event Class 13a Interests in Chemtura votes to reject the Plan, excess amounts in the Environmental Reserve and the Diacetyl Reserve will become part of the Disputed Claims Reserve, and, after all Allowed Unsecured Claims are paid in full, each equity holder will be entitled to its Pro Rata share of excess Cash and New Common Stock in the Disputed Claims Reserve (if any).

The Plan provides that, in the event Class 13a votes to reject the Plan, each holder of an Interest in Chemtura Corporation will receive its Pro Rata share of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of the Plan and the Plan Reserves have been established.

It is difficult to predict with certainty whether and to what extent holders of Class 13a Interests in Chemtura Corporation will receive a recovery in the event Class 13a votes to reject the Plan.  As described elsewhere in the Disclosure Statement, the distribution available for Class 13a in such an event will include New Common Stock and, to the extent the Plan Reserves exceed all Claims that are ultimately Allowed, may include an additional distribution in a combination of New Common Stock and Cash.  The Debtors estimate that the aggregate value of the distribution available to Class 13a if the class rejects the plan would be an equivalent of between 1.6% and 10.4% of the value of the New Common Stock.  For the avoidance of any doubt, the Debtors note that the estimated range of recovery to holders of Class 13a Interests in Chemtura Corporation in the event Class 13a votes to reject the Plan, which the Debtors estimate to be from 1.6% to 10.4%, expressed as a percentage of New Common Stock, after all Unsecured Claims have been paid in full and appropriate reserves have been established, only indirectly takes into account possible recovery on account of follow-on distributions in the event that the Plan Reserves exceed the amount necessary to pay all Claims in full.

The value available for Class 13a if it rejects the Plan will depend on the amount of Allowed Claims.  While some of the Claims against the Debtors will be Allowed or agreed in a fixed amount as of the Effective Date, other Claims are Disputed Claims for which the value is not now known and may not be known as of the Effective Date.  Specifically, the Debtors are faced with numerous litigation claims and other unliquidated claims that are not expected to be fixed at the Effective Date.  Under the Plan, the Debtors will ask the Bankruptcy Court to establish reserves (the "**Plan Reserves**") for three separate categories of disputed claims: the Diacetyl Reserve, the Environmental Reserve and the Disputed Claims Reserve.  The amount of the Plan Reserves will determine the initial amount of New Common Stock available for distribution to Class 13a if it rejects the Plan, and the overall value of the Disputed Claims that ultimately become Allowed by the Bankruptcy Court will determine whether, and to what extent, there is any later distribution to Class 13a on account of excess Plan Reserves after all creditors have been paid in full.

The Debtors have calculated the estimated range of recoveries set forth above based on an estimate assuming the amount of Allowed Claims asserted against the Debtors to date is either high or low (*i.e.*, a "best case" or "worst case" scenario).  The ultimate determination of whether such Claims will be Allowed against the Debtors, or the amount the Debtors must fund in the Plan Reserves pending allowance, depends on a number of complex factors, including the particular legal bases and factual circumstances underlying each Disputed Claim and the Bankruptcy Court's approach in establishing reserves for such claims.  Among other things, the amount of the initial

185

distribution of New Common Stock to Class 13a will depend on (a) the amount that the Bankruptcy Court determines must be reserved for Diacetyl Claims in the Diacetyl Reserve, (b) the amount, if any, of insurance coverage that has been determined as of the Effective Date, by settlement or litigation judgment, to be available for Diacetyl Claims, (c) the amount that the Bankruptcy Court determines must be reserved for Environmental Claims in the Environmental Reserve and (d) the amount that the Bankruptcy Court determines must be reserved for all other Disputed General Unsecured Claims, including both trade claims and non-diacetyl litigation claims, in the Disputed Claims Reserve. The Debtors currently estimate that the aggregate value of all Unsecured Claims (other than bank and bond claims) must either be satisfied as of the Effective Date or included in the Plan Reserves. Ultimately, whether any excess value remains in the Plan Reserves after all Unsecured Claims have been either Allowed or Disallowed and all Allowed Claims have been paid in full will depend on the settlement or litigation of each Claim that is Disputed as of the Effective Date. Because of the inherent difficulty in predicting the approach by the Bankruptcy Court in establishing the Plan Reserves or predicting the ultimate outcome of litigating Disputed Claims, the Debtors cannot say at this time whether and to what extent the total amount of Allowed Claims will ultimately fall within the estimated low or high ranges, or even exceed those amounts. Estimates of potential recoveries to holders of Class 13a Interests in Chemtura in the event Class 13a does not vote to accept the Plan are provided for **illustrative purposes only** in section I.I.C(iv)I.C(iv), on page 30, of this Disclosure Statement, entitled, "Additional Disclosure with Respect to Recoveries to Holders of Class 13a Interests in Chemtura Corporation in the Event Class 13a Votes to Reject the Plan."

Additionally, the form of consideration available to holders of Interests in Chemtura Corporation in the event Class 13a votes to reject the Plan depends on a number of considerations, including the actual amount of Allowed Diacetyl Claims and Allowed Environmental Claims as well as the amount of other Disputed Claims that are ultimately Allowed and satisfied from the Plan Reserves. On this point, it is important to note that the Plan provides that the Disputed Claims Reserve is funded with both Cash and New Common Stock, while the Environmental Reserve and the Diacetyl Reserve are both funded only in Cash. Thus, the ultimate combination of Cash and/or New Common Stock that holders of Class 13a Interests in Chemtura Corporation may receive (if any) in the event Class 13a votes to reject the Plan depends not only on the ultimate amount of Allowed Claims, but also the extent to which such Allowed Claims are Diacetyl Claims, Environmental Claims or other subsequently Allowed Claims that are satisfied from the appropriate Plan Reserve.

Although the Debtors are not able to provide more specific estimates at this time, the Debtors believe that the Plan's treatment of holders of Class 13a Interests in Chemtura Corporation in the event such Class votes to reject the Plan is consistent with what such holders would otherwise be entitled to under applicable law, including the absolute priority rule contained in the Bankruptcy Code.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT OR SECURITIES VOTING AGENT, AS APPROPRIATE. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

K&E 17416258.15

**XI.**
**CONFIRMATION OF THE PLAN**

A.        **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

The Bankruptcy Court has scheduled the Confirmation Hearing for September 16, 2010 at 9:45 a.m. (Eastern Daylight Time) before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in the Bankruptcy Court, located at Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

B.        **Deadline to Object to Confirmation**

Objections to Confirmation must be filed and served on or before 4:00 p.m. (Eastern Daylight Time) on September 9, 2010 in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.  **Unless objections to Confirmation are timely served and filed, they may not be considered by the Bankruptcy Court.**

C.        **Requirements for Confirmation**

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an impaired Class, that it "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of holders of Claims and Interests that are impaired under its provisions.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation is reasonable or (ii) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each holder of an impaired Claim against the Debtors or Interest in Chemtura has accepted the Plan, or each non-accepting creditor will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

187

- Each Class of Claims or Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of the Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

### D.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, a bankruptcy court must:  (i) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (ii) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (iii) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

To satisfy the requirements of section 1129(a)(7) of the Bankruptcy Code, the Debtors, together with their retained advisors, prepared the liquidation analysis attached hereto as **Exhibit D** to this Disclosure Statement (the "**Liquidation Analysis**").  Based upon on the Liquidation Analysis, the Debtors believe that holders of Claims and Interests will receive equal or greater value as of the Effective Date than such holders would receive in a chapter 7 liquidation and that the Plan will therefore meet the "best interests" test provided in section 1129(a)(7) of the Bankruptcy Code.

### E.    Feasibility/Financial Projections

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the projections attached to this Disclosure Statement as **Exhibit E**.  Based upon the projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### F.    Acceptance by Impaired Classes

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable and contractual rights to which the

claim or the interest entitles the holder of the claim or interest or (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of non-insider allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### G.    Confirmation Without Acceptance by All Impaired Classes/Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

#### (i)    No Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### (ii)    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, this test sets different standards depending upon the type of claims or interests in such class:

##### a.    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the Effective Date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

##### b.    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

189

c.        Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the Effective Date, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class of Claims and Interests rejects the Plan, the Debtors reserve the right to seek Confirmation utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  Specifically, to the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan before Confirmation, including to amend or modify the Plan to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors need to "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for cramdown.

H.        Valuation of the Debtors

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-Confirmation going-concern of New Chemtura and the Reorganized Debtors (the "**Valuation Analysis**").  The Valuation Analysis is set forth on the exhibit attached hereto as **Exhibit F**.

K&E 17416258.15

## XII.
## RISK FACTORS

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.*

*The risk factors described herein may apply to the Debtors and/or the Reorganized Debtors, as the conditions require.*

Additional risk factors are provided in Chemtura's SEC filings, including the Form 10-K for the fiscal year ended December 31, 2009 and the Form 10-Q for the quarterly period ended March 31, 2010, filed with the SEC on May 10, 2010 and any other recent report to the Securities and Exchange Commission. Holders of Claims and Interests entitled to vote on the Plan are advised to read such risk factors in their entirety before voting to accept or reject the Plan.

### A.    Risks Related to Confirmation

#### (i)    The Debtors May Not Be Able to Obtain Confirmation

To emerge successfully from chapter 11 as a viable business, the Debtors, like any debtor, must obtain approval of a plan of reorganization, and thereafter confirm and successfully implement the Plan. This process requires the Debtors to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan; (b) solicit and obtain acceptances of the proposed plan; and (c) fulfill other statutory conditions with respect to plan confirmation.

As with regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek Confirmation notwithstanding the dissent of certain Classes of Claims or Interests. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an "impaired" class of claims or interests if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code. As discussed in section XI of this Disclosure Statement, to confirm a plan over the objection of a dissenting class, a bankruptcy court also must find that at least one impaired class of claims has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting holder of a Claim or Interest could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Further, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) a debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims or interests within a particular class under the debtor's plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. A bankruptcy court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by a bankruptcy court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether and when the Debtors would be able to reorganize their businesses and what, if any, distributions holders of Claims or Interests ultimately would receive on account of their Claims or Interests. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan of reorganization that is acceptable to

K&E 17416258.15

the Bankruptcy Court and the Debtors' creditors and other parties in interest.  Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusive periods under section 1121 of the Bankruptcy Code during which only the Debtors may propose and solicit votes on a plan of reorganization.  Finally, the Debtors' emergence from bankruptcy is not assured.  While the Debtors expect to emerge from bankruptcy, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur.

In addition, if the Plan is not confirmed, the settlements embodied in the Plan among the Debtors, the Creditors' Committee and the Ad Hoc Committee may never be approved.  As a result, there may be litigation among such parties in connection with any other plan or plans of reorganization that may be filed in the Chapter 11 Cases.  This litigation may include, among other things, disputes related to the value of the Debtors' estates as the Creditors' Committee and Ad Hoc Committee have consented to the New Chemtura Enterprise Value of $2.05 billion based, in part, on the other settlements embodied in the Plan.  The Debtors believe that, absent the settlements embodied in the Plan, the Creditors' Committee and the Ad Hoc Committee would challenge the New Chemtura Enterprise Value and the resolution of any litigation related thereto would be uncertain.

<div align="center">(ii)   <strong><em>Parties in Interest May Object to the Debtors' Classification of Claims and Interests</em></strong></div>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Interests that are substantially similar to similarly classified Claims or Interests.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

<div align="center">(iii)   <strong><em>The Conditions Precedent to the Effective Date May Not Occur</em></strong></div>

As more fully set forth in the Plan, which is attached hereto as **<u>Exhibit A</u>**, the Effective Date is subject to a number of conditions precedent.  If these conditions precedent are not met or waived, the Effective Date will not occur.

<div align="center">(iv)   <strong><em>Historical Financial Information of the Debtors May Not Be Comparable to the Financial Information of New Chemtura and the Reorganized Debtors</em></strong></div>

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of New Chemtura and the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

<div align="center">(v)   <strong><em>The Debtors May Object to the Amount or Classification of a Claim</em></strong></div>

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

<div align="center">(vi)   <strong><em>In the Event Chemtura Canada Commences a Chapter 11 Case, the Canadian Court May Not Enter an Order Recognizing the Chapter 11 Case or an Order Recognizing the Confirmation Order</em></strong></div>

In the event Chemtura Canada files a Chapter 11 Case, Chemtura Canada will also file an application to commence the Canadian Case in order to allow for the recognition in Canada of the Chapter 11 Case, which is a condition to the effectiveness of the Plan.  The Debtors believe that the Canadian Court will likely grant the Canadian Recognition Order; however there can be no assurance that the Canadian Court will do so.  In the event

<div align="center">192</div>

Chemtura Canada initiates a Chapter 11 Case and the Canadian Case, its exit from bankruptcy protection will depend on, among other things, the Canadian Court's entry of the Canadian Confirmation Order recognizing the treatment of Diacetyl Claims under the Plan.  The Debtors believe that if the Confirmation Order is granted, the Canadian Court will likely grant the Canadian Confirmation Order recognition of the Confirmation Order.

**B.      Risks Related to the Company's Businesses**

**(i)      Further Decline In General Economic Conditions and Other External Factors May Adversely Impact the Company's Operations**

Some of the markets in which the Company's customers participate, such as the automotive, electronics and building and construction industries, are cyclical in nature, thus posing a risk to the Company that is beyond their control.  These markets are highly competitive, to a large extent driven by end-use markets, and may experience overcapacity, all of which may affect demand for and pricing of their products.

External factors, including domestic and global economic conditions, international events and circumstances, competitor actions, government regulation, are beyond the Company's control and can cause fluctuations in demand and volatility in the price of raw materials and other costs that can intensify the impact of economic cycles on the Company's operations.  The Company produces a broad range of products that are used as additives and components in other products in a wide variety of end-use markets.  As a result, the Company's products may be negatively impacted by supply and demand instability in other industries and the effects of that instability on supply chain participants.  Economic and political conditions in countries in which the Company operates may also adversely impact the Company's operations.  Although the Company's diversified product portfolio and international presence lessen their dependence on a single market and exposure to economic conditions or political instability in any one country or region, the Company's businesses are nonetheless sensitive to changes in economic conditions.  Accordingly, if the global financial crisis and current economic downturn continue or worsen, the Company's businesses could be further adversely affected.

**(ii)      Significant Competition May Force the Company to Reduce Prices, Which May Adversely Impact the Company's Results of Operations**

The Company faces significant competition in many of the markets in which they operate due to the trend toward global expansion and consolidation by competitors.  Some of the Company's existing competitors are larger than the Company and may have more resources and better access to capital markets to facilitate continued expansion or new product development.  Additionally, some of the Company's competitors have greater product range and distributional capability than the Company for certain products and in specific regions.  The Company also expects that it will continue to face new competitive challenges as well as additional risks inherent in international operations in developing regions.

The Company is also susceptible to price competition in certain markets in which customers are sensitive to changes in price.  At the same time, the Company faces downward pressure on prices from industry overcapacity and lower cost structures in certain businesses.  The further use and introduction of generic and alternative products by the Company's competitors will result in increased competition and could result in the Company reducing its prices and taking other steps to compete effectively.  These measures could negatively affect the Company's results of operations and cash flows.  Alternatively, if the Company was to increase prices in response to this competition, the reactions of the Company's competitors and customers to such price increases could cause the Company to reevaluate and possibly reverse such price increases or risk a loss in sales volumes.

**(iii)      The Cyclicality of the Chemicals Industry May Cause Significant Fluctuations in the Company's Results of Operations and Cash Flows**

The Company's historical operating results reflect the cyclical and volatile nature of the supply and demand balance of the chemicals industry.  The chemicals industry has experienced alternating periods of inadequate capacity and supply, allowing prices and profit margins to increase, followed by periods when substantial capacity is added, resulting in oversupply, over-capacity, corresponding declining utilization rates and, ultimately, declining

193

prices and profit margins. The cyclicality of the markets in which the Company operates may result in volatile operating results and cash flow over their business cycle. Future growth in product demand may not be sufficient to utilize current or future capacity. Excess industry capacity may continue to depress the Company's volumes and margins on some products. Due to excess industry capacity, rising energy costs and rising raw materials costs, operating results may be volatile.

> ### (iv)    *Any Disruption in the Availability or Price of the Raw Materials or Energy Utilized for the Company's Products May Have a Material Adverse Effect on the Company's Operating Results*

The Company purchases significant amounts of raw materials and energy for its businesses. The cost of these materials and energy, in the aggregate, represents a substantial portion of the Company's operating expenses. The prices and availability of the raw materials utilized by the Company vary with market conditions and may be highly volatile. Over the past few years, the Company has experienced significant cost increases in purchases of petrochemicals, tin, soybean oil, other raw materials and, the Company's primary energy source, natural gas. Although the Company has and will continue to attempt to match increases in the prices of raw material or energy with corresponding increases in product prices, the Company may not be able to immediately raise product prices, if at all. Ultimately, the Company's ability to pass on increases in the cost of raw materials or energy to customers is highly dependent upon market conditions. Specifically, there is a risk that raising prices charged to the Company's customers could result in a loss of sales volume. In the past, the Company has not always been able to pass on increases in the prices of raw materials and energy to the Company's customers, in whole or in part, and there will likely be periods in the future when the Company will not be able to pass on these price increases in the future. Reactions by the Company's customers and competitors to the Company's price increases could cause the Company to reevaluate and possibly reverse such price increases, which may raise the Company's operating expenses and negatively affect operating results.

> ### (v)    *The Results of the Company's Chemtura AgroSolutions Engineered Products Segment Are Dependent on Weather, Disease and Pest Conditions and Can Be Affected by Local and Regional Economic Circumstances and the Results of the Company's Consumer Performance Products Business Are Also Dependent on Weather Conditions, All of Which Could Materially Affect the Company's Results of Operations*

Sales volumes for the Company's Chemtura AgroSolutions Engineered Products (the "**Chemtura AgroSolutions Products**"), like all agricultural products, are subject to the sector's dependency on weather, disease and pest infestation conditions. Adverse weather conditions in a particular region could materially adversely affect the Chemtura AgroSolutions segment. Demand for Chemtura AgroSolutions Products is also influenced by the agricultural policies of governments and regulatory authorities, particularly in developing countries in Asia and Latin America, where the Company conducts business. Moreover, changes in governmental policies or product registration requirements could have an adverse impact on the Company's ability to market and sell their products. Additionally, Chemtura AgroSolutions Products are typically sold pursuant to contracts with extended payment terms in Latin America and Europe. Customary extended payment periods, which are tied to particular crop growing cycles, render the Chemtura AgroSolutions Products business susceptible to losses from receivables during economic downturns and may adversely affect the Company's results of operation and cash flows.

The Company's pool and spa products in the Company's Consumer Performance Products segment are primarily used in swimming pools and spas. Demand for these products is influenced by a variety of factors, including seasonal weather patterns. An adverse change in weather patterns during pool season could negatively affect the demand for, and profitability, of the Company's Consumer Performance Products segment.

(vi)    *Future Litigation, Governmental Investigations and Administrative Claims, Including Antitrust-Related Governmental Investigations and Lawsuits, Could Harm the Company's Financial Condition, Results of Operations and Cash Flows*

The Company is involved in several significant lawsuits and similar proceedings relating to environmental and chemical exposure matters.  Additionally, the Company is routinely subject to other civil claims, litigation and arbitration and regulatory investigations arising in the ordinary course of the Company's business as well as with respect to the Company's divested businesses.  Some of these claims and lawsuits relate to product liability claims, including claims related to current and former products and asbestos-related claims concerning the premises and historic products of the Company and their predecessors.  The Company could become subject to additional claims – an adverse outcome of these claims could have a material effect on the Company's business, financial conditions, results of operations or cash flows.

The Company is also currently involved in a number of government investigations and similar proceedings, including antitrust-related governmental investigations and civil lawsuits.  Additionally, the Company has incurred and could again incur expenses in connection with antitrust-related matters, including expenses related to the Company's cooperation with governmental authorities and defense related civil lawsuits.

(vii)   *Environmental, Health and Safety Regulation Matters Could Have a Substantial Negative Impact on the Company's Results of Operations and Cash Flows*

The Company is subject to extensive federal, state, local and foreign environmental, safety and health laws and regulations concerning, among other things, emissions in the air, discharges to land and water and the generation, handling, treatment and disposal of hazardous waste and other materials.  The Company's operations entail the risk of violations of those laws and sanctions for violations such as clean-up and removal costs, long-term monitoring and maintenance costs, costs of waste disposal, natural resource damages and payments for property damage and personal injury.  Although it is the Company's policy to comply with such laws and regulations, it is possible that the Company has not been or may not be at all times in compliance with all of these requirements.

Additionally, these requirements, and enforcement of these requirements, may become more stringent in the future.  The ultimate additional cost of compliance with any such requirements could be material.  Non-compliance could subject the Company to material liabilities such as government fines or orders, criminal sanctions, third-party lawsuits, remediations and settlements, the suspension, modification or revocation of necessary permits and licenses, or the suspension of non-compliant operations.  The Company may also be required to make significant site or operational modifications at substantial cost.  Future regulatory or other developments could also restrict or eliminate the use of or require the Company to make modifications to the Company's products, packaging, manufacturing processes and technology, which could have a significant adverse impact on the Company's cash flow and results of operations.

At any given time, the Company may be involved in claims, litigation, administrative proceedings, settlements and investigations of various types in a number of jurisdictions involving potential environmental liabilities, including clean-up costs associated with hazardous waste disposal sites, natural resource damages, property damage, personal injury and regulatory compliance or noncompliance.  The resolution of these environmental matters could have a material adverse effect on the Company's results of operations or cash flow.

(viii)  *The Company Operates on an International Scale and Are Exposed to Risks in the Countries in Which the Company Has Significant Operations or Interests.  Changes in Foreign Laws and Regulatory Requirements, Export Controls or International Tax Treaties Could Adversely Affect the Company's Results of Operations or Cash Flows*

The Company is dependent, in large part, on the economies of the countries in which the Company and their subsidiaries manufacture and market their products.  Of the Company's 2009 net sales, 49% were to customers in the U.S. and Canada, 31% to Europe and Africa, 15% to the Asia/Pacific region and 5% to Latin America.  As of

195

December 31, 2009, the net property, plant and equipment of the Company and their subsidiaries were located as follows: 64% in the U.S. and Canada, 29% in Europe and Africa, 5% in the Asia/Pacific region and 2% in Latin America.

The economies of countries in these areas are in different stages of socioeconomic development. Consequently, the Company is exposed to risks from changes in foreign currency exchange rates, interest rates, inflation, governmental spending, social instability and other political, economic or social developments that may materially affect, positively or negatively, the Company's results of operations or cash flows.

The Company may also face difficulties managing and administering an internationally dispersed business. In particular, the management of the Company's personnel across several countries can present logistical and managerial challenges. Additionally, international operations present challenges related to operating under different business cultures and languages. The Company may have to comply with unexpected changes in foreign laws and regulatory requirements, which could negatively impact their operations and ability to manage the Company's global financial resources. Export controls or other regulatory restrictions could prevent the Company from shipping their products into and from some markets. Moreover, the Company may not be able to adequately protect their trademarks and other intellectual property overseas due to uncertainty of laws and enforcement in a number of countries relating to the protection of intellectual property rights. Changes in tax regulation and international tax treaties could significantly reduce the financial performance of the Company's foreign operations or the magnitude of their contributions to the Company's overall financial performance.

### (ix) *The Company's Inability to Register their Products in Member States of the European Union under the REACH Legislation May Lead to Some Restrictions or Cancellations of Registrations, Which Could Impact the Company's Ability to Manufacture and Sell Certain Products*

In December 2006, the European Union signed the Registration, Evaluation and Authorization of Chemicals ("**REACH**") legislation. This legislation requires chemical manufacturers and importers in the European Union to demonstrate the safety of the chemical substances contained in products. The effective date of the legislation was June 1, 2007, and it required all covered substances to be pre-registered by November 30, 2008. Since December 1, 2008, no product containing covered substances can be manufactured in or imported into the European Union unless the substances therein have been pre-registered. The full registration of REACH will be phased in over the next ten years. The registration deadlines are as follows: 2010 for chemical substances manufactured or imported in excess of 1,000 metric tons per year and for substances deemed to be particularly harmful to humans or the environment, 2013 for substances manufactured or imported in the European Union between 100 and 1,000 metric tons per year and 2018 for substances manufactured or imported in the European Union in quantities greater than 1 metric ton per year. The registration process will require expenditures and resource commitments to compile and file comprehensive chemical dossiers on the use and attributes of each chemical substance and to perform chemical safety assessments. Additionally, each registration phase carries with it a registration fee, which ranges from €31,500 (approximately $45,000) per substance for high-risk, high tonnage band substances to €1,600 (approximately $2,000) for substances registered in the lowest tonnage band. The Company pre-registered approximately 1,100 substances and submitted 2,100 pre-registration dossiers covering multiple affiliated legal entities. REACH costs in 2009 were approximately $1 million. The Company anticipates REACH-related costs of approximately $11 million in 2010 (including the first wave of registration fees), $3 million in 2011 and $6 million in 2012. The implementation of REACH registration processes may affect the Company's ability to manufacture and sell certain products in the future.

### (x) *The Company's Results of Operations are Subject to Exchange Rate and Other Currency Risks. A Significant Movement in Exchange Rates Could Adversely Impact the Company's Results of Operations*

Significant portions of the businesses of the Company and their subsidiaries are conducted in currencies other than the United States dollar. Accordingly, foreign currency exchange rates affect the Company's operating results. The Company faces risks arising from the imposition of exchange controls and currency devaluations. Exchange controls may limit the Company's ability to convert foreign currencies into United States dollars or to

remit dividends and other payments by the Company's foreign subsidiaries or businesses located in or conducted within a country imposing controls.

> ### *(xi)    The Company is Dependent Upon a Trained, Dedicated Sales Force, the Loss of Which Could Materially Affect their Operations*

Many of the Company's products are sold and supported through dedicated staff and specifically trained personnel. The loss of this sales force due to market or other conditions could affect the Company's ability to sell and support their products effectively, which could have an adverse effect on their results of operations.

> ### *(xii)    Production Facilities Are Subject to Operating Risks that May Adversely Affect the Company's Financial Condition or Results of Operations*

The Company is dependent on the continued operation of their production facilities. Such production facilities are subject to hazards associated with the manufacturing, handling, storage and transportation of chemical materials and products, including pipeline leaks and ruptures, explosions, fires, inclement weather and natural disasters, mechanical failure, unscheduled downtime, labor difficulties, transportation interruptions, remediation complications, chemical spills, discharges or releases of toxic or hazardous gases, storage tank leaks and other environmental risks. These hazards can cause personal injury and loss of life, severe damage to, or destruction of, property and equipment and environmental damage, fines and liabilities and could have a material adverse effect on the Company's business, financial condition, results of operations or cash flows.

> ### *(xiii)    The Company's Business Depends Upon Many Proprietary Technologies, Including Patents and Licenses. The Company's Competitive Position Could be Adversely Affected if They Fail to Protect Their Patents or Other Intellectual Property Rights, or if the Company Becomes Subject to Claims that the Company is Infringing Upon the Rights of Others*

The Company's intellectual property is of particular importance for a number of the specialty chemicals that they manufacture and sell. The Company is licensed to use certain patents and technology owned by other companies, including foreign companies, to manufacture products complementary to the Company's own products. The Company pays royalties for these licenses in amounts not considered material, in the aggregate, to the Company's consolidated results. The Company's trademarks and patents that they own or license may be challenged, and because of such challenges, the Company could eventually lose their exclusive rights to the proprietary technologies, which would adversely affect the Company's competitive position and results of operations.

The Company also relies on unpatented proprietary know-how and continuing technological innovation and other trade secrets to develop and maintain their competitive position. Although it is the Company's policy to enter into confidentiality agreements with their employees and third parties to restrict the use and disclosure of trade secrets and proprietary know-how, those confidentiality agreements may be breached. Additionally, adequate remedies may not be available in the event of an unauthorized use or disclosure of such trade secrets and know-how, and others could obtain knowledge of such trade secrets through independent development or other access by legal means. The failure of the Company's patents, trademarks or confidentiality agreements to protect their processes, apparatuses, technology, trade secrets or proprietary know-how could have a material adverse effect on the Company's business, financial condition, results of operations or cash flows.

K&E 17416258.15

    *(xiv)*    ***The Company's Patents May Not Provide Full Protection Against Competing Manufacturers Outside of the United States, the European Union Countries and Certain Other Developed Countries. Weaker Protection May Adversely Impact the Company's Sales and Results of Operations***

In some of the countries in which the Company operates, such as China, the laws protecting patent holders are significantly weaker than in the United States, countries in the European Union and certain other developed countries. Weaker protection may assist competing manufacturers in becoming more competitive in markets in which they might not have otherwise been able to introduce competing products for a number of years. In these regions, the Company, therefore, tends to rely more heavily upon trade secret and know-how protection, as applicable, rather than patents. Additionally, for the Company's Chemtura AgroSolutions Products sold in China, the Company relies on regulatory protection of intellectual property provided by regulatory agencies that may not provide the Company with complete protection against competitors.

    *(xv)*    ***An Inability to Remain Technologically Innovative and to Offer Improved Products and Services in a Cost-Effective Manner Could Adversely Impact the Company's Operating Results***

The Company's operating results are influenced in part by the Company's ability to introduce new products and services that offer distinct value to the Company's customers. For example, the Chemtura AgroSolutions Products business seeks to provide tailored products for customers' often unique problems, which requires an ongoing level of innovation. In many of the markets where the Company sells its products, the products are subject to a traditional product life cycle. The Company devotes significant human and financial resources to develop new technologically advanced products and services, and the Company may not be successful in future research and development efforts.

    *(xvi)*    ***Any Discord with the Company's Venture Partners Could Potentially Adversely Affect the Business and Operations of the Ventures and, in Turn, Adversely Affect the Company's Business and Operations***

A portion of the Company's operations is conducted through certain ventures in which the Company shares control with third parties. In the event that the Company's venture partners do not observe their venture obligations, it is possible that the affected venture would not be able to operate in accordance with its business plans or that the Company would have to increase their level of commitment to the venture to give effect to those plans. By making these arrangements with third parties, the Company also faces the risk of encountering differences of opinion and having difficulty in reaching consensus with respect to certain business issues.

    *(xvii)*    ***The Company's Unfunded and Underfunded Pension Plans and Post-Retirement Health Care Plans Could Adversely Impact the Company's Financial Condition, Results of Operation or Cash Flows***

As discussed in section VII.G of this Disclosure Statement, the Company has unfunded obligations under the U.S. Pension Plans. Further declines in the value of the plan investments or unfavorable changes in law or regulations that govern pension plan funding could materially change the timing and amount of required funding. Additionally, the Company sponsors foreign and non-qualified pension plans under which there are substantial unfunded liabilities. Foreign regulatory authorities may seek to have the Company takes responsibility for some portion of these obligations. Mandatory funding contributions with respect to these obligations and potential unfunded benefit liability claims could have a material adverse effect on the Company's financial condition, results of operation or future cash flows.

K&E 17416258.15

C.      **Risks Relating to Recoveries Under the Plan**

(i)      *The Recovery to Holders of Allowed Claims and Interests Cannot Be Stated With Absolute Certainty*

Exhibit E to this Disclosure Statement contains projections concerning the financial results of the Reorganized Debtors' operations, including financial projections, that are, by their nature, forward looking, and are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, their ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future results of the Reorganized Debtors may turn out to be different from the financial projections.

Due to the inherent uncertainties associated with projecting financial results litigation outcomes and the projections contained in this Disclosure Statement should not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims and Interests, if applicable, may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to holders of Allowed Claims and Interests, if applicable, under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the financial projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations and (e) the assumption that capital and equity markets remain consistent with current conditions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to holders of Allowed Claims and Interests, if applicable, under the Plan, in some instances adversely.

Additionally, the Plan provides that, to the extent that the class of Interest holders for Chemtura votes in favor of the Plan, each Interest holder will receive its pro rata share of 5% of the New Common Stock, subject to dilution for the Incentive Plans. However, to the extent that the class of Equity holders for Chemtura votes to reject the Plan, each Interest holder will receive its pro rata share of value available for distribution after all Unsecured Claims have been paid in full with postpetition interest and appropriate reserves have been established for Disputed Unsecured Claims. Thus, the recovery to holders of Allowed Claims and Interests will be impacted by the vote of the class of Interest holders for Chemtura.

(ii)      *The Type of Consideration Available for Distribution to Holders of Allowed Claims and Interests Cannot Be Stated with Certainty*

The Plan provides that each holder of an Allowed Claim in the Participating Creditor Classes may, at the time of voting upon the Plan, make a binding election to seek to receive the maximum available percentage of its recovery in the form of Cash or the maximum available percentage of its recovery in the form of New Common Stock. Whether and to what extent any electing Claim holder will receive an increased percentage of the consideration it requested will depend upon the elections of all Claim holders taken as a whole. The Debtors will not be able to determine what elections are taken until voting on the Plan is completed. Therefore, the Debtors cannot state with certainty the percentage of New Common Stock and/or Cash holders of Allowed Claims and, if applicable, Interests who elect to participate in the Electing Creditors' Pool will receive under the Plan.

199

### (iii)    *The Value of New Common Stock Cannot be Stated With Absolute Certainty*

On the Effective Date, the Plan contemplates that New Common Stock will be issued to holders of Claims and Interests in Classes 4a, 4b, 5, 6, 7, 8 and, if applicable 13a, subject to dilution for the Incentive Plans. Based on a number of factors, including those described herein, the value of the New Common Stock cannot be stated with absolute certainty.

### (iv)    *The Reorganized Debtors' Corporate Governance Documents May Restrict Trading of the New Common Stock*

The term sheet attached to the Plan Support Agreement provides that the Debtors will adopt revised by-laws and revised certificates of incorporation, forms of which will be included in the Plan Supplement and will be subject to the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent will not be unreasonably withheld. The Corporate Governance Documents will be filed with the Bankruptcy Court in the Plan Supplement no later than fourteen days before the Confirmation hearing or such later date as approved by the Bankruptcy Court. The Debtors' corporate governance documents may include certain trading restrictions designed to protect Chemtura's tax attributes after emergence from chapter 11. The Debtors, in conjunction with the Creditors' Committee and the Ad Hoc Bondholders' Committee, believe, based on preliminary analysis, that the potential benefit of the Debtors' tax attributes may be protected by the adoption of these transfer restrictions could be significant and thus, will serve to increase the overall value of the Reorganized Debtors.

### D.    Disclosure Statement Disclaimer

### (i)    *No Representations Made Outside this Disclosure Statement Are Authorized*

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee, the counsel to the Equity Committee and the U.S. Trustee.

### (ii)    *The Debtors Relied on Certain Exemptions from Registration Under the Securities Act*

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

The offer of New Common Stock under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Common Stock or any shares reserved for issuance under the Emergence Incentive Plan and New Incentive Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act as described herein.

(iii)     *The Information Herein Was Provided by the Debtors and Relied Upon by the Advisors*

Counsel to, and other advisors retained by, the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

(iv)     *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(v)     *No Admissions Are Made by This Disclosure Statement*

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, New Chemtura, the Reorganized Debtors, holders of Allowed Claims or Interest or any other parties in interest.  The vote by a holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim or Interest, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors, the Creditors' Committee, New Chemtura or the Reorganized Debtors may seek to investigate, file and/or prosecute Objections to Claims or Interests and may object to Claims or Interests after the Confirmation or Effective Date irrespective of whether this Disclosure Statement or the Plan Supplement (which is incorporated herein by reference) identifies such Claims or Interests or Objections to such Claims or Interests or Objections thereto.

## XIII.
## IMPORTANT SECURITIES LAW DISCLOSURE

Under the Plan, shares of New Common Stock will be distributed to holders of Claims and Interests in Classes 4a, 4b, 5, 6, 7, 8 and, if applicable, 13a.  Additionally, under the Plan, if Class 13a for Chemtura Corporation votes to accept the Plan, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata Share of the Rights to participate in the Rights Offering.

The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Common Stock contemplated by Article V of the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.  In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive New Common Stock are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell New Common Stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Additionally, except to the extent provided herein, the issuance of the New Common Stock distributed pursuant to the Plan to holders of Claims and Interests shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by provision of applicable law, regulation, order or rule.  Holders of New Common Stock issued in respect of Allowed Unsecured Claims will be provided with reasonable and customary registration rights, to be set forth in more detail in the Plan Supplement, solely to the extent such New Common Stock may not be transferred without restriction pursuant to Rule 144 or is otherwise not freely saleable under the securities laws notwithstanding section 1145 of the Bankruptcy Code.

Additionally, in the event that Class 13a holders of Interests in Chemtura vote in favor of the Plan and the volume of Rights acquired in connection with the Rights Offering is in an amount such that the issuance of New Common Stock pursuant to the Rights Offering does not qualify for the statutory exemption from securities law provided under section 1145 of the Bankruptcy Code, a registration of the New Common Stock with the SEC will be required, which may delay the Effective Date of the Plan.

K&E 17416258.15

## XIV.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain holders of Claims and Interests, including holders of Allowed DIP Revolver Claims, DIP Term Claims, Secured Lender Claims, Unsecured Convenience Claims, Lien Claims, Diacetyl Claims, General Unsecured Claims, Prepetition Unsecured Lender Claims, 2009 Notes Claims, 2016 Notes Claims, 2026 Notes Claims and Interests in Chemtura. This summary is based on the Internal Revenue Code of 1986 (the "**IRC**"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "**IRS**") as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims or Interests that are not United States persons (as such term is defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who receive their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed DIP Revolver Claims, DIP Term Claims, Secured Lender Claims, Unsecured Convenience Claims, Lien Claims, Diacetyl Claims, General Unsecured Claims, Prepetition Unsecured Lender Claims, 2009 Notes Claims, 2016 Notes Claims, 2026 Notes Claims and Interests in Chemtura hold such Claims and Interests as "capital assets" within the meaning of section 1221 of the IRC. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and holders of Allowed DIP Revolver Claims, DIP Term Claims, Secured Lender Claims, Unsecured Convenience Claims, Lien Claims, Diacetyl Claims, General Unsecured Claims, Prepetition Unsecured Lender Claims, 2009 Notes Claims, 2016 Notes Claims, 2026 Notes Claims and Interests in Chemtura based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local or foreign tax law.

**The following summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim or Interest, including holders of DIP Revolver Claims, DIP Term Claims, Secured Lender Claims, Unsecured Convenience Claims, Lien Claims, Diacetyl Claims, General Unsecured Claims, Prepetition Unsecured Lender Claims, 2009 Notes Claims, 2016 Notes Claims, 2026 Notes Claims and Interests in Chemtura. Each holder of a Claim or Interest is urged to consult his, her or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local and foreign law, of the restructuring described in the Plan.**

**IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement (including attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. The tax advice contained in this Disclosure Statement (including attachments) was written to support the promotion or marketing of the transactions described in this Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

A.    **Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims and Interests**

(i)    *Consequences to Holders of Allowed DIP Revolver Claims, DIP Term Claims, Secured Lender Claims and Unsecured Convenience Claims*

Pursuant to Article III of the Plan, each Allowed DIP Revolver Claim, DIP Term Claim, Secured Lender Claim and Unsecured Convenience Claim will be paid in full in Cash.  If a holder of an Allowed DIP Revolver Claim, DIP Term Claim, Secured Lender Claim or Unsecured Convenience Claim receives Cash in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under section 1001 of the IRC.  The holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss if the holder has held the debt instrument underlying its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (a) the amount of Cash received and (b) the holder's adjusted tax basis in the debt instrument underlying its Claim.  To the extent that the Cash received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income.  *See* section VIII of this Disclosure Statement for further information with respect to this allocation.

(ii)    *Consequences to Holders of Allowed Lien Claims*

Pursuant to the Plan, each Allowed Lien Claim will either be (a) Reinstated, (b) paid in full in Cash or (c) such other treatment as may be agreed to by the applicable Debtor (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld) and the holder.  If a holder of an Allowed Lien Claim receives Cash in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under section 1001 of the IRC.  The holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash received and (y) the holder's adjusted tax basis in its Claim.  To the extent that the Cash received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income.  *See* section XIV.A(vii) below for further information.  If an Allowed Lien Claim is Reinstated, the holder of such Claim should not recognize gain or loss except to the extent collateral securing such Claim is changed and the change in collateral constitutes a "significant modification" of the Allowed Lien Claim within the meaning of Treasury Regulations promulgated under section 1001 of the IRC.

(iii)    *Consequences to Holders of Diacetyl Claims*

Pursuant to the Plan, holders of Allowed Diacetyl Claims will receive Cash from the Diacetyl Reserve in satisfaction of their Claims.

To the extent that a distribution made from the Diacetyl Reserve to holders of Allowed Diacetyl Claims constitutes damages received by such holders on account of personal injuries, such payments should not constitute gross income to such holders, except to the extent that such payments gave rise to a tax benefit as medical expense deductions allowed under section 213 of the IRC for a prior taxable year.

To the extent that payments from the Diacetyl Reserve to holders of Allowed Diacetyl Claims constitute compensatory damages for destruction or damage to property and the amount of such payments does not exceed such holder's tax basis in its property, such payments should not be included in taxable income.  Instead, such payments would be treated as a return of capital to such holder, reducing the holder's tax basis in the property by the amount of such payments.  Any amounts received in excess of the holder's tax basis should be treated as gain from the disposition of the property, and would, therefore, give rise to capital gain assuming that the holder held such property as a capital asset.

To the extent that payments from the Diacetyl Reserve to holders of Allowed Diacetyl Claims constitute damages that are not on account of personal injury or compensation for destruction or damage to property, such payments should be treated as ordinary income equal to the amount of such payments.

204

(iv)    *Consequences to Holders of Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2009 Notes Claims, 2016 Notes Claims and 2026 Notes Claims*

a.    **Exchange of Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims for New Common Stock**

Pursuant to the Plan, holders of Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims will receive New Common Stock and Cash in respect of their Allowed Claims on account of principal and accrued but unpaid interest, but may elect to receive the maximum possible percentage of New Common Stock or the maximum possible percentage of Cash. Depending on the elections of all of the Electing Creditors, an Electing Creditor electing the maximum possible percentage of New Common Stock may receive exclusively New Common Stock, and an Electing Creditor electing the maximum possible percentage of Cash may receive exclusively Cash.

Pursuant to the Plan, holders of 2016 Notes Claims will receive additional New Common Stock and / or Cash from the Unsecured Distribution Pool for the Make-Whole Settlement Amount and holders of 2026 Notes Claims will receive additional New Common Stock and / or Cash from the Unsecured Distribution Pool for the No-Call Settlement Amount. To the extent that the holders of the 2016 Notes Claims and 2026 Notes Claims receive additional New Common Stock and / or Cash on account of the Make-Whole Settlement Amount or the No-Call Settlement Amount, such New Common Stock and/or Cash should be treated in the same manner, described below, as the other New Common Stock and / or Cash received by the holders of the 2016 Notes Claims and the 2026 Notes Claims in respect of their Allowed Claims on account of principal but not interest.

The U.S. federal income tax consequences to Electing Creditors that elect to receive the maximum percentage of New Common Stock and receive exclusively New Common Stock depend on whether: (i) the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims are treated as "securities" of New Chemtura (as opposed to not being treated as "securities" or being treated as "securities" of Chemtura's subsidiaries) for purposes of the reorganization provisions of the IRC; and (ii) the Debtors' restructuring qualifies as a tax-free reorganization. Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others: the security for payment; the creditworthiness of the obligor; the subordination or lack thereof to other creditors; the right to vote or otherwise participate in the management of the obligor; convertibility of the instrument into an equity interest of the obligor; whether payments of interest are fixed, variable or contingent; and whether such payments are made on a current basis, or accrued. While not free from doubt, the Debtors intend to take the position that the 2016 Notes and the 2026 Notes are securities.

To the extent that all or some of the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims are treated as securities of Chemtura, then the exchange of such Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims for New Common Stock pursuant to the Plan should be treated as a recapitalization and, therefore, a tax-free reorganization. In such case, each holder of such Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims that are treated as securities of Chemtura that receives exclusively New Common Stock should not recognize any gain or loss on the exchange, except that a holder of such Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims may recognize ordinary income to the extent that New Common Stock is treated as received in satisfaction of accrued but untaxed interest on such Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims. *See* section XIV.A(vii) below for further information. Such holder should obtain a tax basis in the New Common Stock equal to the tax basis of the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims surrendered for the New Common Stock and should have a holding period for the New Common Stock that includes the holding period for

the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims exchanged for the New Common Stock; provided, however, that the tax basis of any share of New Common Stock (or portion thereof) treated as received in satisfaction of accrued interest should equal the fair value of such New Common Stock, and the holding period for such New Common Stock (or portion thereof) should not include the holding period of the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims exchanged for the New Common Stock.

If the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims are treated as securities, but the holder receives a combination of Cash and New Common Stock (whether on account of making an election or not), then the exchange of such Claims for New Common Stock and Cash should still be treated as a recapitalization and therefore a tax-free reorganization, but only with respect to the New Common Stock. In general, this means that a holder will not recognize loss with respect to the exchange and will not recognize gain except to the extent of the Cash received. In addition, to the extent that Cash or New Common Stock received is allocable to accrued but untaxed interest, the holder may recognize ordinary interest income. A holder should obtain a tax basis in the New Common Stock equal to the tax basis of the Claims exchanged therefore (less the Cash received plus any income or gain recognized in receipt of the Cash). A holder should have a holding period for the New Common Stock that includes the holding period for the Claims; provided that the tax basis of any New Common Stock treated as received in satisfaction of accrued interest should equal the fair value of such New Common Stock, and the holding period for such New Common Stock should not include the holding period of the Claims.

To the extent that Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims or 2026 Notes Claims are not treated as securities of New Chemtura or the Electing Creditors elect to receive the maximum available percentage of Cash and receive exclusively Cash, a holder of such Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims, or 2026 Notes Claims will be treated as exchanging such Allowed General Unsecured Claim, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims for New Common Stock or Cash in a taxable exchange under section 1001 of the IRC. Accordingly, each holder of such Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims should recognize gain or loss equal to the difference between: (1) the fair market value of New Common Stock (as of the date the stock is distributed to the holder) and the amount of Cash received in exchange for the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims; and (2) the holder's adjusted basis, if any, in such Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims. Such gain or loss should be capital in nature so long as the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims are held as capital assets (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the holder has a holding period for Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims of more than one year. To the extent that a portion of the New Common Stock or the Cash received in exchange for the Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, 2016 Notes Claims and 2026 Notes Claims is allocable to accrued but untaxed interest, the holder may recognize ordinary income. *See* section XIV.A(vii) below for further information. A holder's tax basis in New Common Stock received should equal the fair market value of the New Common Stock as of the date such stock is distributed to the holder. A holder's holding period for New Common Stock should begin on the day following the Effective Date.

**b.    Exchange of Allowed General Unsecured Claims, Prepetition Unsecured Lender Claims, and 2009 Notes Claims Against Chemtura's Subsidiaries**

To the extent that holders of Allowed 2009 Notes Claims and holders of Allowed General Unsecured Claims and Prepetition Unsecured Lender Claims against Chemtura's subsidiaries other than Chemtura Receivables LLC (together with the 2009 Notes Claims, the "**Subsidiary Claims**") elect to receive the maximum percentage of New Common Stock and receive exclusively New Common Stock, they may recognize gain or loss on the exchange of such Claims for New Common Stock. Although certain Subsidiary Claims may constitute securities, the exchange of Subsidiary Claims for New Common Stock is unlikely to qualify as a tax-free reorganization because the Subsidiary Claims were issued by Debtors other than Chemtura and will be exchanged for equity in Chemtura. Accordingly, holders of Subsidiary Claims, whether they receive exclusively New Common Stock, New Common Stock and Cash, or exclusively Cash, may be deemed to recognize gain or loss equal to the difference between:

(i) the fair market value of New Common Stock (as of the date the stock is distributed to the holder) and the amount of Cash received in exchange for the Subsidiary Claims; and (ii) the holder's adjusted basis in the Subsidiary Claims.  Such gain or loss should be capital in nature so long as the Subsidiary Claims are held as capital assets (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Subsidiary Claims were held for more than one year.  To the extent that a portion of the New Common Stock or Cash received in exchange for the Subsidiary Claims is allocable to accrued but untaxed interest, the holder may recognize ordinary income.  *See* section XIV.A(vii) below for further information.  If gains or losses are recognized, a holder's tax basis in New Common Stock received should equal the fair market value of the New Common Stock as of the date the stock is distributed to the holder, and a holder's holding period for New Common Stock should begin on the day following the Effective Date.

<div align="center">

*(v)*        ***Consequences to Holders of Interests in Chemtura***

</div>

Holders of Interests in Chemtura that are exchanged for New Common Stock and the right to participate in a rights offering for New Common Stock (the "**Stock Rights**"), to the extent holders of Interests in Chemtura vote to accept the Plan, should not recognize any gain or loss on such exchange.  The holder's tax basis in its New Common Stock and the Stock Rights should equal its tax basis in the shares surrendered, and the holder's holding period for such New Common Stock and Stock Rights should include the period during which such holder held its Interests in Chemtura.

If holders of Interests in Chemtura receive Cash in addition to New Common Stock, then the holder may recognize gain to the extent of the Cash received.  A holder should obtain a tax basis in the New Common Stock equal to the tax basis in the shares surrendered (less the Cash received plus any gain recognized in receipt of the Cash).  A holder should have a holding period for the New Common Stock that includes the period during which such holder held its Interests in Chemtura.

If holders of Interests in Chemtura do not receive any New Common Stock and Cash, then holders of Interests in Chemtura may be eligible for a worthless stock deduction when their Interests in Chemtura are cancelled.

<div align="center">

*(vi)*       ***Treatment of Any Diacetyl Trust or Environmental Trust***

</div>

Pursuant to the Plan, the Debtors may contribute the Cash that constitutes the Diacetyl Reserve to a Diacetyl Trust for the exclusive benefit of holders of Diacetyl Claims.  Pursuant to the Plan, the Debtors may also contribute the Cash that constitutes the Environmental Reserve to an Environmental Trust for the exclusive benefit of holders of Environmental Claims.  Chemtura currently expects that, if established, the Diacetyl Trust and the Environmental Trust could each be eligible to be treated as a "qualified settlement fund" ("**QSF**") for federal income tax purposes.  If either or both of the Diacetyl Trust and the Environmental Trust are established and are treated as QSFs, each trust would be subject to a separate entity level tax on its income at the maximum rate applicable to trusts and estates.  In determining the taxable income of any trust treated as a QSF, (a) any amounts contributed to such trust would not be treated as taxable income, (b) any sale, exchange or distribution of property by such trust would result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of the sale, exchange or distribution and the adjusted tax basis of such property, (c) interest income and dividend income would be treated as taxable income and (d) administrative costs (including state and local taxes) would be deductible.  In general, the adjusted tax basis of property received by any trust treated as a QSF would be its fair market value at the time of receipt.

<div align="center">

*(vii)*      ***Accrued But Untaxed Interest***

</div>

It is expected that a portion of the New Common Stock and / or Cash received by holders of certain Claims will be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes.  Conversely, holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

<div align="center">

207

</div>

If the fair value of the New Common Stock and / or the amount of Cash received by holders is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such New Common Stock and / or Cash will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes and the Debtors intend to take this position and follow the Plan for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. Accordingly, the IRS could take the position that the consideration received by a holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(viii)    *Market Discount*

Holders who exchange Claims for New Common Stock and/or Cash may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if such excess is less than a statutory *de minimis* amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Claims (*i.e.*, up to the time of the exchange) but was not recognized by the holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

(ix)    *Limitation on Use of Capital Losses*

Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

(x)    *Post-Effective Date Distributions*

To the extent holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, receive distributions after the Effective Date, a portion of the subsequent distributions may be treated as interest. Additionally, to the extent holders of Allowed Claims receive distributions in a taxable year or years,

208

following the year of initial distribution, any loss and a portion of any gain realized by such holders may be deferred.  All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

### (xi)    *Information Reporting and Backup Withholding*

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the IRC.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### B.    **Certain U.S. Federal Income Tax Consequences to New Chemtura and the Reorganized Subsidiary Debtors**

#### (i)    *Deduction of Amounts Transferred to Satisfy Diacetyl Claims and Amounts Transferred to Satisfy Environmental Claims*

If the Debtors establish the Diacetyl Trust and/or the Environmental Trust, the tax treatment of transfers of property by Chemtura to the Diacetyl Trust and/or the Environmental Trust will vary depending on the characterization of the trust, *e.g.*, as a "grantor trust" as defined by section 671 *et seq.* of the IRC, or as a QSF as defined by Treasury Regulations section 1.468B-1 *et seq.*  Chemtura currently expects that, if established, the Diacetyl Trust and the Environmental Trust could be eligible to be treated as QSFs for federal income tax purposes, meaning that Chemtura generally would be entitled to an immediate deduction for the fair market value of property contributed by Chemtura to such trusts.  Such deduction would not include any amounts contributed to the Diacetyl Trust or the Environmental Trust by Chemtura Canada.

#### (ii)    *Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, and (y) the fair market value of any consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the IRC.  In general, tax attributes will be reduced in the following order:  (a) NOLs; (b) most tax credits and capital loss

carryovers; (c) tax basis in assets; and (d) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the IRC.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes is not subject to United States federal income tax.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to the reduction of certain remaining consolidated tax attributes of the affiliated group.  Because the Plan provides that certain holders of Allowed Unsecured Claims may receive New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock and the amount of Cash, if any, exchanged therefor.  As an alternative to exclusion and attribute reduction, taxpayers realizing COD income in 2010 may elect to recognize it ratably over a five-year period beginning in 2014 and ending in 2018.  This election may be made on a debt-by-debt basis.  The Debtors have not yet determined whether they will elect to defer their COD income under this new provision or instead have the exclusion and attribute reduction rules described above apply.

> (iii)    *Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes*

New Chemtura and the Reorganized Subsidiary Debtors expect to have NOL carryovers and other tax attributes at emergence of approximately $250 to $300 million.  The precise amount of NOL carryovers that will be available to New Chemtura and the Reorganized Subsidiary Debtors after emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available NOLs include: the amount of tax losses, if any, incurred by Chemtura and the Subsidiary Debtors in 2010; the value of the New Common Stock; and the amount of COD Income, if any, incurred by Chemtura and the Subsidiary Debtors in connection with Consummation.

Following Consummation, the Debtors anticipate that any remaining NOL and tax credit carryovers and, possibly, certain other tax attributes of New Chemtura and the Reorganized Subsidiary Debtors allocable to periods before the Effective Date (collectively, "**Pre-Change Losses**") may be subject to limitation under section 382 and 383 of the IRC as a result of an "ownership change" of New Chemtura and the Reorganized Subsidiary Debtors by reason of the transactions pursuant to the Plan.

Under section 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed more fully below, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of New Chemtura and the Reorganized Subsidiary Debtors for these purposes, and that New Chemtura and the Reorganized Subsidiary Debtors' use of their NOL carryovers will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### a.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the "ownership change" occurs).  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

In addition, the annual limitation may be increased if Chemtura and the Subsidiary Debtors have a net unrealized built-in gain in their assets at the time of an ownership change.  If, however, Chemtura and the Subsidiary Debtors have a net unrealized built-in loss in their assets at the time of an ownership change, the annual limitation may apply to such net unrealized built-in loss.  Although the issue is not free from doubt, the Debtors anticipate that

Chemtura and the Subsidiary Debtors will be in a net unrealized built-in gain position at the time the Plan is implemented.

If New Chemtura and the Reorganized Subsidiary Debtors do not continue their historic businesses or use a significant portion of their assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

### b.        Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and New Chemtura and the Reorganized Subsidiary Debtors undergo another "ownership change" within two years after Consummation, then New Chemtura's and the Reorganized Subsidiary Debtors' ability to utilize their Pre-Change Losses against its future income effectively would be eliminated in its entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "**382(l)(6) Exception**").  Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

While it is not certain, it is doubtful at this point that New Chemtura and the Reorganized Subsidiary Debtors will elect to utilize the 382(l)(5) Exception.  In the event that New Chemtura and the Reorganized Subsidiary Debtors do not use the 382(l)(5) Exception, the Debtors expect that New Chemtura's and the Reorganized Subsidiary Debtors' use of their NOLs after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.  Regardless of whether New Chemtura and the Reorganized Subsidiary Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, New Chemtura and the Reorganized Subsidiary Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.  In order to minimize the risk of such a future ownership change, New Chemtura's Restated Certificate of Incorporation may include certain restrictions of trading by certain 5% shareholders of New Chemtura common stock.

### (iv)        *Alternative Minimum Tax*

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for certain alternative tax NOLs generated in taxable years beginning or ending in 2008 or 2009, which can offset 100% of a corporation's AMTI, generally only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  The effect of this rule could cause New Chemtura and the Reorganized Subsidiary Debtors to owe some amount of federal and state income tax on taxable income in future years even though NOL carryforwards are available to offset that taxable income.  Additionally, under section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized

built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the IRC, immediately before the ownership change.

K&E 17416258.15

## XV.
## <u>RECOMMENDATION</u>

Chemtura and its Debtor affiliates submit that the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' holders of Claims and Interests than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses, resulting in smaller distributions to holders of Allowed Claims against and Interests in Chemtura than those proposed under the Plan. Accordingly, the Debtors recommend that holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan.

Dated: August 4, 2010

Respectfully submitted,

Chemtura Corporation

By: _____
     Stephen C. Forsyth
     Executive Vice President and
     Chief Financial Officer

BioLab Company Store, LLC
BioLab Franchise Company LLC

By: _____
     Stephen C. Forsyth
     Manager

GLCC Laurel, LLC

By: _____
     Billie S. Flaherty
     Vice President

A&M Cleaning Products, LLC
Aqua Clear Industries, LLC
ASCK, Inc.
ASEPSIS, Inc.
BioLab Textile Additives, LLC
Bio-Lab Inc.
CNK Chemical Realty Corp.
Crompton Colors Incorporated
Crompton Holding Corporation
Crompton Monochem, Inc.
Great Lakes Chemical Corporation
Great Lakes Chemical Global, Inc.
GT Seed Treatment, Inc.
HomeCare Labs, Inc.
ISCI, Inc.
Kem Manufacturing Corporation
Laurel Industries Holdings, Inc.
Monochem, Inc.
Naugatuck Treatment Company
Recreational Water Products, Inc.
Uniroyal Chemical Company Limited (Delaware)
Weber City Road LLC
WRL of Indiana, Inc.

By: _____
       Robert J. Cicero
       Secretary

Chemtura Canada Co./Cie

By: _____
       Noel C. Blake
       Regional Comptroller
       Canada and Latin America

Prepared by:

Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
Brian E. Schartz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900

Counsel to the Debtors and Debtors in Possession

172

<u>**Appendix**</u>

**Glossary of Certain Frequently Used Terms in this Disclosure Statement**

The following is a "plain-meaning" definition of some of the defined terms that used in this Disclosure Statement. This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but it has been provided for your convenience for illustrative purposes only. Please refer to the Plan for additional definitions. In the event of any inconsistency between the Plan and this Appendix, the Plan is controlling.

| | |
|---|---|
| *2009 Notes Claim* | Any Claim that arises under the 7% unsecured notes due July 15, 2009. |
| *2016 Notes Claim* | Any Claim that arises under the 6.875% unsecured notes due June 1, 2016. |
| *2026 Notes Claim* | Any Claim that arises under the 6.875% debentures due February 1, 2026. |
| *Ad Hoc Bondholders' Committee* | The *ad hoc* committee representing certain holders of the 2009 Notes Claims, the 2016 Notes Claims, the 2026 Notes Claims and the Prepetition Unsecured Lender Claims. |
| *Administrative Claims* | Claims that arise after the Petition Date and which must be paid in order for the Debtors to exit bankruptcy. These Claims include, but are not limited to, the following: (a) the actual and necessary costs and expenses of preserving the respective estates and operating the businesses of the Debtors; (b) various professional fees; (c) statutory fees owed to the U.S. Trustee; (d) allowed reimbursable expenses of members of the Creditors' Committee; and (e) allowed claims under section 503(b)(9) of the Bankruptcy Code (*e.g.*, for goods provided to the Debtors in the 20-day period before the Petition Date). |
| *Allowed Claim* | A Claim that is entitled to a distribution under the Plan. A Claim is generally Allowed if the Debtors have not objected to the Claim, or if the Debtors have objected to the Claim but the Bankruptcy Court has overruled the objections. As described in section VII.D of this Disclosure Statement, the Debtors have objected to numerous Claims during the course of the chapter 11 cases and will continue to do so until Confirmation. |
| *Bankruptcy Code* | Title 11 of the United States Code. The Debtors' bankruptcy cases are proceeding under chapter 11 of the Bankruptcy Code. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the Southern District of New York. The Bankruptcy Judge overseeing the Chapter 11 Cases is the Honorable Robert E. Gerber. The Bankruptcy Court is located in Manhattan, New York at One Bowling Green, New York, New York 10004-1408. |
| *Bankruptcy Rules* | The Federal Rules of Bankruptcy Procedure. |
| *BioLab* | BioLab, Inc., a Debtor in the Chapter 11 Cases and a wholly-owned subsidiary of Great Lakes Chemical Corporation. |
| *Canadian Court* | The Ontario Superior Court of Justice located in Ontario, Canada. |
| *CCAA* | Companies' Creditors Arrangement Act (Canada). |
| *Canadian Case* | The proceedings initiated by Chemtura Canada in the Canadian Court pursuant to the provisions of the CCAA. |

215

| | |
|---|---|
| *Chemtura or Chemtura Corporation* | Chemtura Corporation, a Debtor in the Chapter 11 Cases and the direct or indirect parent company of each of the other Debtors. |
| *Chemtura Canada* | Chemtura Canada Co./Cie, a potential Debtor in the Chapter 11 Cases and in the Canadian Case and Chemtura's indirectly owned subsidiary. |
| *Class* | A category of Claims or Interests that are entitled to similar treatment under the Plan. |
| *Claim* | Any claim against a Debtor or, to the extent specifically referenced in the Plan, a non-Debtor, as defined in section 101(5) of the Bankruptcy Code. |
| *Company* | Chemtura and all of its direct and indirect affiliates and subsidiaries, including Subsidiary Debtors and affiliates. |
| *Confirmation* | Approval of the Plan by the Bankruptcy Court. |
| *Confirmation Date* | The date that the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases. |
| *Confirmation Hearing* | The hearing at which the Debtors will present the Plan to the Bankruptcy Court for confirmation.  The Confirmation Hearing is scheduled for September 16, 2010, but may be adjourned without further notice. |
| *Creditors' Committee* | The official committee of unsecured creditors that has been appointed by the U.S. Trustee in the Chapter 11 Cases.  As discussed in section VII.A of this Disclosure Statement, the Creditors' Committee is comprised of various holders of Unsecured Claims against the Debtors.  The Creditors' Committee has retained a number of professionals during the chapter 11 cases, including the law firm of Akin Gump Strauss Hauer & Feld LLP, as bankruptcy counsel. |
| *Debtors* | All of the 27 Debtors in the Chapter 11 Cases as follows: Chemtura Corporation; A&M Cleaning Products, LLC; Aqua Clear Industries, LLC; ASCK, Incorporated; ASEPSIS, Incorporated; BioLab Company Store, LLC; BioLab Franchise Company, LLC; Bio-Lab, Incorporated; BioLab Textile Additives, LLC; CNK Chemical Realty Corporation; Crompton Colors Incorporated; Crompton Holding Corporation; Crompton Monochem, Inc.; GLCC Laurel, LLC; Great Lakes Chemical Corporation; Great Lakes Chemical Global, Incorporated; GT Seed Treatment, Incorporated; HomeCare Labs, Incorporated; ISCI, Incorporated; Kem Manufacturing Corporation; Laurel Industries Holdings, Incorporated; Monochem, Incorporated; Naugatuck Treatment Company; Recreational Water Products, Incorporated; Uniroyal Chemical Company Limited (Delaware); Weber City Road LLC; and WRL of Indiana, Incorporated.<br><br>The Plan and this Disclosure Statement use the term "Debtors" to refer to all current Debtors and, to the extent Chemtura Canada commences a proceeding under the Bankruptcy Code and the CCAA, the term "Debtors" refers to Chemtura Canada as the context requires. |

| | |
|---|---|
| *Diacetyl Claims* | All Claims against any Debtor or any non-Debtor affiliate that arise, directly or indirectly, from an alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde. It also includes all Claims for indemnification or contribution arising from an alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde. |
| *DIP Claim* | Any Claim based on the Amended and Restated Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of February 3, 2010, among Chemtura Corporation, as borrower, each of the other Debtors, as guarantors, the DIP Agent and the DIP Lenders, as well as any other documents entered into in connection therewith. |
| *Disclosure Statement* | This document together with the annexed exhibits. |
| *Disclosure Statement Order* | The order of the Bankruptcy Court, dated August 5, 2010 approving this Disclosure Statement [Docket No. 3492]. A copy of the Disclosure Statement Order is attached hereto together with the Solicitation order as collective **Exhibit B**. |
| *Disputed Claim* | Any Claim that is not yet Allowed. |
| *[Docket No.____]* | A reference to a "docket entry" on the Bankruptcy Court's docket. Each document identified as a docket entry in this Disclosure Statement or the Plan is available, free of charge, at http://www.kccllc.net/chemtura or, on a subscription basis, at http://pacer.psc.uscourts.gov. |
| *Effective Date* | The first business day after the terms and conditions set forth in the Plan have been satisfied or waived. This day will occur after the Confirmation Date. |
| *Electing Creditor* | A holder of an Allowed Claim in the Participating Creditor Classes who, when voting for the Plan, makes a binding election to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock. |
| *Equity Committee* | The official committee of equity security holders that has been appointed by the U.S. Trustee in the Chapter 11 Cases. As discussed in section VII.A of this Disclosure Statement, the Equity Committee is comprised of various holders of equity interests in the Debtors. The Equity Committee has retained a number of professionals during the chapter 11 cases, including the law firm of Skadden, Arps, Slate, Meagher & Flom, LLP, as bankruptcy counsel. |
| *General Unsecured Claims* | A Claim that is not secured by a lien on the property of any Debtor, but does not include: (a) 2009 Notes Claims, (b) 2016 Notes Claims, (c) 2026 Notes Claim, (d) Diacetyl Claims, (e) an Environmental Claim, (f) any Claim arising from the Prepetition Credit Agreement that is not a secured Claim, (g) Unsecured Convenience Claims, (h) Intercompany Claims, (i) Administrative Claims, (j) Priority Tax Claims, (k) Other Priority Claims, (l) a Claim for Professional Compensation or (m) a portion of any Insured Claim that is not an Insured Deficiency Claim. |
| *Great Lakes Chemical Corporation or GLCC* | Great Lakes Chemical Corporation, a Debtor in these Chapter 11 Cases and a wholly-owned subsidiary of Chemtura Corporation. |

| | |
|---|---|
| *Incentive Plans* | Collectively, (a) payments on account of (1) any awards earned under the Bankruptcy Court's *Order (A) Approving the Debtors' Key Employee Incentive Plan and (B) Authorizing the Debtors to Honor Certain Prepetition Bonus Programs* (Docket No. 847), as such awards may be modified or implemented with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on terms set forth in the Plan Supplement; (2) any awards earned under the Bankruptcy Court's *Order Approving the Debtors' 2010 Key Employee Incentive Plan* (Docket No. 2707), as such awards may be modified or implemented with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on terms set forth in the Plan Supplement and (b) the compensation program that will be implemented by the New Board of Chemtura Corporation and will become effective upon the Effective Date, which shall include a stock-based long-term incentive plan and may include other stock-based compensation consistent with the New Employment Agreements that will be adopted and become effective upon the Effective Date as well as a cash-based annual incentive plan consistent with past practice, as to which awards are subject to approval by the New Board. Certain New Common Stock shall be reserved for issuance under the New Incentive Plan, in addition to shares reserved that may be issued pursuant to the Emergence Incentive Plan, as the Emergence Incentive Plan may be modified, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, and which modification shall be disclosed in the Plan Supplement. The terms of the New Incentive Plan shall be included in the Plan Supplement. The reserve number and New Incentive Plan terms are to be agreed to prior to the hearing on the Disclosure Statement. |
| *Interest* | Any share of common stock, preferred stock or other instrument evidencing an ownership interest in the Debtors, whether or not transferable. It also includes any option, warrant or other right, contractual or otherwise, to acquire any an interest in the Debtor that existed before the Effective Date, any phantom stock or similar stock unit provided under prepetition employee compensation programs and any Claim related to the purchase of Interests subject to subordination pursuant to section 510(b) of the Bankruptcy Code. |
| *Intercompany Claims* | Any Claim held against another Debtor by a Debtor a non-Debtor affiliate that is a direct or indirect subsidiary of Chemtura. |
| *Lien Claims* | Any Secured Claim that is not a DIP Claim or a Prepetition Secured Lender Claim. |
| *Liquidation Analysis* | The analysis prepared by the Debtors and their advisors in which the Debtors determine whether holders of Claims and Interests would receive more under a liquidation or the Plan. *See* **Exhibit D** entitled "Liquidation Analysis." |
| *New Chemtura* | The new Entity that will be formed before the Effective Date and will hold all of the stock of Reorganized Chemtura. |
| *Other Priority Claim* | Any Claim that is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim. |

| | |
|---|---|
| *Participating Creditor Classes* | Prepetition Unsecured Lender Claims, the 2009 Notes Claims, the 2016 Notes Claims, the 2026 Notes Claims and General Unsecured Claims (other than General Unsecured Claims against Chemtura Canada, in the event it becomes a Debtor before the Confirmation Date). |
| *Petition Date* | March 18, 2009, the Date on which each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. |
| *Plan* | The *Joint Chapter 11 Plan of Chemtura Corporation, et al.* [Docket No. 3497] including the Plan Supplement. |
| *Plan Objection Deadline* | September 9, 2010, the last day on which all objections to the Plan must be filed with the Bankruptcy Court and actually received by the Debtors and other appropriate parties pursuant to the Solicitation Order. |
| *Plan Reserves* | Collectively, the Disputed Claims Reserve, the Diacetyl Reserve and the Environmental Reserve. |
| *Plan Support Agreement* | The agreement dated as of June 17, 2010 by and among the Debtors, the Creditors' Committee and certain of the members of the Ad Hoc Bondholders' Committee which provides that the parties thereto will support the Plan and the members of the Ad Hoc Bondholders' Committee will vote in favor thereof so long as such votes have been solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code. |
| *Plan Supplement* | The compilation of documents and forms, schedules and exhibits to the Plans that the Debtors will file no later than 14 days before the Confirmation Hearing. The Debtors will also file additional documents with the Bankruptcy Court before the Effective Date, including amendments, modifications or additional supplements. |
| *Prepetition Secured Lender Claims* | Any Claim arising from the Prepetition Credit Agreement that is Secured by the "collateral," as defined in section 2 of the Prepetition Credit Agreement. |
| *Prepetition Unsecured Lender Claims* | Any Claim derived from or based upon the Prepetition Credit Agreement other than the Prepetition Secured Lender Claims |
| *Priority Tax Claims* | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| *Reorganized Debtors* | The Debtors, as reorganized under the Plan. |
| *Rights Offering* | The offering of the right by the Debtors to the holders of Interests in Chemtura to subscribe for, and acquire, New Common Stock on the Effective Date having an aggregate value of $100 million. This Rights Offering will be in accordance with the terms of the Plan and will be available only if holders of Interests in Chemtura vote in favor of the Plan. |
| *Securities Voting Agent* | Epiq Bankruptcy Solutions, LLC is the Securities Voting Agent. The Securities Voting Agent can be reached at 757 Third Avenue, 3rd Floor, New York, New York 10017, 646.282.1800, Chemtura@epiqsystems.com. |

| | |
|---|---|
| *Secured Claim* | A Claim that is (a) secured by a lien on the property of the Debtor; (b) subject to setoff under section 553 of the Bankruptcy Code; or (c) otherwise Allowed as a Secured Claim. |
| *Solicitation Order* | The order of the Bankruptcy Court, dated August 5, 2010 approving among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan and providing notice of the Plan and certain vote tabulation procedures and establishing the deadline for filing objections to the Plan and scheduling the Confirmation Hearing [Docket No. 3491].  A copy of the Solicitation Order is attached hereto together with the Disclosure Statement Order as collective **Exhibit B**. |
| *Subsidiary Debtors* | Each of the Debtors other than Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date). |
| *Unsecured Convenience Claim* | An unsecured Claim against any Debtor, except Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date), that would be a General Unsecured Claim and is Allowed in the amount specified on the condition that the Allowed Claim is reduced to that amount.  For the avoidance of doubt, any General Unsecured Claim against Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) that would be an Unsecured Convenience Claim will be treated as a General Unsecured Claim against Chemtura Canada. |
| *Unsecured Distribution Pool* | The pool from which distributions will be made to the Participating Creditor Classes.  The pool will be funded with: (a) available distributable Cash after funding of the Diacetyl Reserve and payment to all holders of Allowed Unsecured Convenience Claims, (b) all proceeds of the Rights Offering, if holders of Interests in Chemtura vote to accept the Plan and holders of Interests in Chemtura elect to participate in the Rights Offering and (c) the New Common Stock, subject to reduction in the amount of the 5% of the New Common Stock made available to holders of Interests in Chemtura and up to $100 million in value of New Common Stock made available to holders of Interests in Chemtura in the form of the Rights Offering solely to the extent that holders of Interests in Chemtura vote to accept the Plan. |
| *U.S. Trustee* | The United States Trustee's office for the Southern District of New York. |
| *Voting and Claims Agent* | Kurtzman Carson Consultants, LLC is the Voting and Claims Agent.  The Voting and Claims Agent can be reached at 2335 Alaska Avenue, El Segundo, California, 866.967.0261, kcc_chemtura@kccllc.com. |
| *Voting Classes* | Classes 4a, 4b, 5, 6, 7, 8, 10, 11 and 13a under the Plan, each of which is entitled to vote to accept or reject the Plan. |
| *Voting Deadline* | 5:00 p.m. (EDT) on September 9, 2010, the date by which all completed Ballots must be **actually received** by the Voting and Claims Agent or the Securities Voting Agent, as applicable. |
| *Voting Record Date* | July 23, 2010, the date that will determines which holders of Claims and Interests in the Voting Classes are entitled to vote or reject the Plan. |

| | |
|---|---|
| *Voting and Tabulation Procedures* | The procedures outlining the process for soliciting, receiving and tabulating votes on the Plan.   They are included as Exhibit 1 to the Debtors' Motion to Approve the Disclosure Statement and Solicitation Procedures. |

**Exhibit A**

**Plan**

Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
Dana Yankowitz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHEMTURA CORPORATION, *et al.*,[1] | ) Case No. 09-11233 (REG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

### JOINT CHAPTER 11 PLAN OF CHEMTURA CORPORATION, *ET AL.*

---

<div style="border:1px solid">

**THIS CHAPTER 11 PLAN IS BEING SUBMITTED FOR**
**APPROVAL BY THE BANKRUPTCY COURT.  THIS CHAPTER 11 PLAN**
**HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCORDINGLY, THIS IS**
**NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE CHAPTER 11**
**PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE,**
**11 U.S.C. § 1125.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL**
**A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

</div>

Dated:  August 4, 2010

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

**TABLE OF CONTENTS**

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME
    AND GOVERNING LAW**.................................................................................................**1**
    **1.1**    **Defined Terms** ...................................................................................**1**
    **1.2**    **Additional Defined Terms** ...............................................................**13**
    **1.3**    **Rules of Interpretation** ...................................................................**14**
    **1.4**    **Computation of Time** .......................................................................**14**
    **1.5**    **Governing Law** ...............................................................................**14**
    **1.6**    **Reference to Monetary Figures**.......................................................**14**
    **1.7**    **Reference to the Debtors or the Reorganized Debtors**.....................**14**

**ARTICLE II ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS AND
    STATUTORY FEES** ...................................................................................................**15**
    **2.1**    **Administrative Claims**.....................................................................**15**
    **2.2**    **Priority Tax Claims** ........................................................................**16**
    **2.3**    **DIP Claims** ....................................................................................**16**
    **2.4**    **Statutory Fees**................................................................................**16**
    **2.5**    **Administrative Claims, Priority Tax Claims and DIP Claims Against Chemtura
        Canada** ...........................................................................................**16**

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**............................**17**
    **3.1**    **Classification of Claims and Interests** .............................................**17**
    **3.2**    **Summary of Classification** ..............................................................**17**
    **3.3**    **Treatment of Claims and Interests** ..................................................**18**
    **3.4**    **Treatment of Claims Against and Interests in Chemtura Canada** ........**25**

**ARTICLE IV ACCEPTANCE REQUIREMENTS** .........................................................................**25**
    **4.1**    **Acceptance or Rejection of the Plan** ...............................................**25**
    **4.2**    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code** ..........**26**

**ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN** .....................................................**26**
    **5.1**    **General Settlement of Claims and Interests** ....................................**26**
    **5.2**    **The Creditors' Committee Action** ....................................................**26**
    **5.3**    **The PBGC Settlement**.....................................................................**26**
    **5.4**    **The CHCI Preferred Stock Settlement** ............................................**26**
    **5.5**    **The Make-Whole Settlement and the No-Call Settlement**..................**27**
    **5.6**    **The Settlement Regarding the Fees of the Ad Hoc Bondholders' Committee** ..............**27**
    **5.7**    **Environmental Matters** ...................................................................**28**
    **5.8**    **The Unsecured Distribution Pool** .....................................................**28**
    **5.9**    **Election of Cash and New Common Stock**..........................................**29**
    **5.10**    **Exit Financing/Incurrence of New Indebtedness** ..............................**29**
    **5.11**    **Sources of Consideration for Plan Distributions** ..............................**29**
    **5.12**    **The Rights Offering** .........................................................................**30**
    **5.13**    **Cancellation of Securities and Agreements**.......................................**30**
    **5.14**    **Surrender of Existing Securities** ......................................................**30**
    **5.15**    **Section 1145 Exemption**..................................................................**31**
    **5.16**    **Corporate Existence**........................................................................**31**
    **5.17**    **New Certificate of Incorporation and New By-Laws**..........................**31**
    **5.18**    **New Chemtura's and Reorganized Debtors' Boards of Directors** ........**31**
    **5.19**    **Officers of New Chemtura and Reorganized Debtors** ........................**32**
    **5.20**    **Employee Benefits** ..........................................................................**32**
    **5.21**    **Retiree Benefits** .............................................................................**32**
    **5.22**    **The Incentive Plans**.........................................................................**33**
    **5.23**    **Vesting of Assets in the Reorganized Debtors** ..................................**33**

5.24    Restructuring Transactions.................................................................................33
5.25    Corporate Action...............................................................................................33
5.26    Effectuating Documents; Further Transactions..................................................34
5.27    Section 1146 Exemption from Certain Taxes and Fees......................................34
5.28    D&O Liability Insurance Policies......................................................................34
5.29    Preservation of Rights of Action.......................................................................34
5.30    Single Satisfaction of Claims............................................................................35

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.....................35
6.1     Assumption and Rejection of Executory Contracts and Unexpired Leases.............35
6.2     Claims Based on Rejection of Executory Contracts or Unexpired Leases...............35
6.3     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. .........36
6.4     Modifications, Amendments, Supplements, Restatements or Other Agreements...................36
6.5     Reservation of Rights.........................................................................................36
6.6     Contracts and Leases Entered Into After the Petition Date.................................37
6.7     Assumption of Insurance Policies......................................................................37

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS.........................................37
7.1     Total Enterprise Value .......................................................................................37
7.2     Record Date for Distributions............................................................................37
7.3     Timing and Calculation of Amounts to Be Distributed .....................................37
7.4     Disbursing Agent...............................................................................................37
7.5     Rights and Powers of Disbursing Agent.............................................................38
7.6     Distributions on Account of Claims Allowed After the Effective Date................38
7.7     Delivery of Distributions and Undeliverable or Unclaimed Distributions..............38
7.8     Compliance with Tax Requirements and Allocations.........................................39
7.9     Setoffs................................................................................................................39
7.10    Claims Paid or Payable by Third Parties............................................................40

ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
        DISPUTED CLAIMS OTHER THAN DIACETYL CLAIMS .................................40
8.1     Prosecution of Objections to Claims..................................................................40
8.2     Allowance of Claims and Interests....................................................................41
8.3     Disputed Claims Reserve...................................................................................41
8.4     Distributions After Allowance...........................................................................41
8.5     Distribution of Excess Amounts in the Disputed Claims Reserve.......................41
8.6     Property Held in the Disputed Claims Reserve..................................................42
8.7     Estimation of Claims.........................................................................................42
8.8     Deadline to File Objections to Claims...............................................................42

ARTICLE IX PROCEDURES FOR RESERVING FOR ENVIRONMENTAL CLAIMS.................42
9.1     Formation of Environmental Trust.....................................................................42
9.2     Environmental Reserve......................................................................................42
9.3     Distributions from the Environmental Reserve ..................................................43
9.4     Distribution of Excess Amounts in the Environmental Reserve..........................43
9.5     Property Held in the Environmental Reserve .....................................................43

ARTICLE X PROCEDURES FOR RESERVING FOR AND RESOLVING DIACETYL CLAIMS .............43
10.1    Formation of Diacetyl Trust..............................................................................43
10.2    Objections to Diacetyl Claims...........................................................................43
10.3    Diacetyl Reserve ...............................................................................................44
10.4    Distributions from the Diacetyl Reserve............................................................44
10.5    Distribution of Excess Amounts in the Diacetyl Reserve...................................44
10.6    Property Held in the Diacetyl Reserve...............................................................45

ARTICLE XI SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ........................45

11.1     Compromise and Settlement of Claims, Interests and Controversies ....................................45
11.2     Releases by the Debtors ..................................................................................................45
11.3     Releases by Holders of Claims and Interests .......................................................................46
11.4     Releases by Holders of Diacetyl Claims .............................................................................46
11.5     Exculpation .................................................................................................................46
11.6     Discharge of Claims and Termination of Interests ...............................................................46
11.7     Injunction ..................................................................................................................47
11.8     Term of Injunctions or Stays ..........................................................................................48
11.9     Protection Against Discriminatory Treatment .....................................................................48
11.10    Release of Liens ...........................................................................................................48

ARTICLE XII CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
        EFFECTIVE DATE ......................................................................................................48
12.1     Conditions Precedent to Confirmation ..............................................................................48
12.2     Additional Condition Precedent to Confirmation .................................................................49
12.3     Conditions Precedent to the Effective Date ........................................................................49
12.4     Additional Conditions Precedent to the Effective Date .........................................................49
12.5     Waiver of Conditions ....................................................................................................49
12.6     Effect of Failure of Conditions ........................................................................................50

ARTICLE XIII MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ...........................50
13.1     Modification and Amendments ........................................................................................50
13.2     Effect of Confirmation on Modifications ...........................................................................50
13.3     Revocation or Withdrawal of the Plan ..............................................................................50

ARTICLE XIV RETENTION OF JURISDICTION .......................................................................50
14.1     Jurisdiction of the Bankruptcy Court ...............................................................................50
14.2     Jurisdiction of the Bankruptcy Court in the Event Chemtura Canada Becomes a
        Debtor ......................................................................................................................52

ARTICLE XV MISCELLANEOUS PROVISIONS ........................................................................52
15.1     Immediate Binding Effect...............................................................................................52
15.2     Additional Documents ...................................................................................................53
15.3     Dissolution of Creditors' Committee and Equity Committee ..................................................53
15.4     Payment of Fees and Expenses of the Creditors' Committee, the Equity Committee,
        the Prepetition Administrative Agent and the Indenture Trustees ...........................................53
15.5     Reservation of Rights....................................................................................................53
15.6     Successors and Assigns ..................................................................................................54
15.7     Service of Documents ....................................................................................................54
15.8     Entire Agreement .........................................................................................................54
15.9     Severability of Plan Provisions ........................................................................................54
15.10    Exhibits ....................................................................................................................54
15.11    Votes Solicited in Good Faith..........................................................................................55
15.12    Closing of Chapter 11 Cases...........................................................................................55
15.13    Conflicts ...................................................................................................................55
15.14    Insurance Neutrality .....................................................................................................55

## INTRODUCTION

Chemtura Corporation and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases respectfully propose the following joint chapter 11 plan of reorganization.  Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Section 1.1 hereof.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

**1.1**    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

1.    "*2009 Notes*" means the approximately $370 million in principal amount outstanding of 7% unsecured notes, issued by Great Lakes Chemical Corporation pursuant to the 2009 Notes Indenture.

2.    "*2009 Notes Claims*" means any Claim arising under the 2009 Notes.

3.    "*2009 Notes Indenture*" means the Indenture, dated as of July 16, 1999, between Great Lakes Chemical Corporation, as issuer and the 2009 Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended by a Supplemental Indenture, dated as of July 1, 2005.

4.    "*2009 Notes Indenture Trustee*" means The Bank of New York Mellon Trust Company and/or its duly appointed successor, in its capacity as indenture trustee under the 2009 Notes Indenture.

5.    "*2016 Notes*" means the approximately $500 million in principal amount outstanding of 6.875% unsecured notes, issued by Chemtura Corporation pursuant to the 2016 Notes Indenture.

6.    "*2016 Notes Claims*" means any Claim arising under the 2016 Notes.

7.    "*2016 Notes Indenture*" means the Indenture, dated as of April 24, 2006 between Chemtura Corporation, as issuer, each of the guarantors named therein and the 2016 Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended by a Supplemental Indenture, dated as of February 11, 2009.

8.    "*2016 Notes Indenture Trustee*" means U.S. Bank National Association and/or its duly appointed successor, in its capacity as indenture trustee under the 2016 Notes Indenture.

9.    "*2026 Notes*" means the approximately $150 million in principal amount outstanding of 6.875% unsecured debentures, issued by Witco Corporation, predecessor in interest to Chemtura Corporation, pursuant to the 2026 Notes Indenture.

10.    "*2026 Notes Claims*" means any Claim arising under the 2026 Notes.

11.    "*2026 Notes Indenture*" means the Indenture, dated as of February 1, 1993, between Chemtura Corporation (as successor to Witco Corporation), as issuer and the 2026 Notes Trustee, as well any guarantees and other documents entered into in connection therewith, and as amended by a First Supplemental Indenture, dated as of February 1, 1996, a Second Supplemental Indenture, dated as of August 31, 1999, a Third Supplemental Indenture, dated as of August 5, 2004, and a Fourth Supplemental Indenture, dated as of July 1, 2005.

12.      *"2026 Notes Indenture Trustee"* means Manufacturers & Traders Trust Co. and/or its duly appointed successor, in its capacity as indenture trustee under the 2026 Notes Indenture.

13.      *"Accrued Professional Compensation"* means, at any given moment, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, accounting and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that has not been denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation shall not include any accrued, contingent and/or unpaid fees for services and obligations for reimbursement of expenses rendered or incurred before the Effective Date by any Entity retained pursuant to the Ordinary Course Professional Order and authorized to be compensated thereunder without filing a fee application.

14.      *"Ad Hoc Bondholders' Committee"* means the *ad hoc* committee representing certain holders of Notes Claims and Prepetition Unsecured Lender Claims.

15.      *"Administrative Claim"* means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

16.      *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

17.      *"Allowed"* means, (a) with respect to Claims, and including applicable premiums and penalties to the extent allowable: (i) any Claim proof of which is timely filed by the applicable Claims Bar Date; (ii) any Claim that is listed in the Schedules as not contingent, not unliquidated and not disputed, and for which no Proof of Claim has been timely filed; or (iii) any Claim that is allowed pursuant to the Plan; *provided, however,* that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance of such Claim has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or such an objection is filed and the Claim shall have been Allowed by a Final Order, and (b) with respect to Interests: (i) any Interest reflected in the Debtors' books and records; (ii) any Interest in Chemtura Corporation reflected in files maintained by Chemtura Corporation's stock transfer agent; (iii) any Interest that is allowed pursuant to the Plan; or (iv) any other Interest that has been allowed by a Final Order of the Bankruptcy Court.

18.      *"Bankruptcy Code"* means title 11 of the United States Code, as amended from time to time.

19.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

20.      *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court and *Case Management Order #2* (Docket No. 351).

21.      *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

22.    *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.    Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

23.    *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 09-11233 (REG).

24.    *"CHCI"* means the Non-Debtor Affiliate Chemtura Holding Company, Inc.

25.    *"CHCI Preferred Stock"* means the 500 shares of preferred stock in CHCI, with a face preference value at issuance of $1.1 billion, issued in favor of Great Lakes Chemical Corporation.

26.    *"Chemtura Canada"* means the Non-Debtor Affiliate Chemtura Canada Company/Cie.

27.    *"Claim"* means any claim against a Debtor or, to the extent specifically referenced in the Plan, a Non-Debtor Affiliate, as defined in section 101(5) of the Bankruptcy Code.

28.    *"Claims Bar Date"* means, as applicable, (a) October 30, 2009 or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for the filing of certain Claims.

29.    *"Claims Objection Bar Date"* means, for each Claim, the later of (a) the Confirmation Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

30.    *"Claims Register"* means the official register of Claims maintained by the Notice and Claims Agent.

*31.*    *"Class"* means a category of Claims or Interests as set forth in <u>Article III</u>.

*32.*    *"Company"* means, collectively, Chemtura Corporation and all of its direct and indirect affiliates and subsidiaries, including Subsidiary Debtors and Non-Debtor Affiliates.

33.    *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.    *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

35.    *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36. *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

37.    *"Consummation"* means the occurrence of the Effective Date.

38.      "*Contract Interest Rate Procedures*" means certain procedures by which any holder of an Unsecured Claim may substantiate the existence of an existing contract that specifies the payment of interest, in substantially the form approved by the Bankruptcy Court before the Confirmation Hearing.

39.      "*Corporate Governance Documents*" means the New Certificates of Incorporation and the New By-Laws, each of which shall be filed with the Bankruptcy Court in the Plan Supplement.

40.      "*Creditors' Committee*" means the statutory committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on March 26, 2009, membership of which was reconstituted on August 10, 2009 (Docket Nos. 895 and 897) and as may be further reconstituted from time to time.

41.      "*Creditors' Committee Action*" means the adversary proceeding [Adv. Case. No. 09-01394] commenced by the Creditors' Committee against the Prepetition Administrative Agent, as such complaint and the parties thereto may be amended from time to time, seeking, among other things, to avoid certain transfers as preferences and seeking certain declaratory relief related to the Prepetition Secured Lender Claims requiring, among other things, disgorgement of certain payments made to the Prepetition Administrative Agent and unwinding the postpetition refinancing of certain amounts outstanding under the Prepetition Security Agreement.

42.      "*Cure Claim*" means a Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

43.      "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors or Reorganized Debtors for directors', managers' and officers' liability.

44.      "*Debtor*" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

45.      "*Debtors*" means, collectively:  Chemtura Corporation; A&M Cleaning Products, LLC; Aqua Clear Industries, LLC; ASCK, Inc.; ASEPSIS, Inc.; BioLab Company Store, LLC; BioLab Franchise Company, LLC; BioLab, Inc.; BioLab Textile Additives, LLC; CNK Chemical Realty Corporation; Crompton Colors Incorporated; Crompton Holding Corporation; Crompton Monochem, Inc.; GLCC Laurel, LLC; Great Lakes Chemical Corporation; Great Lakes Chemical Global, Inc.; GT Seed Treatment, Inc.; HomeCare Labs, Inc.; ISCI, Inc.; Kem Manufacturing Corporation; Laurel Industries Holdings, Inc.; Monochem, Inc.; Naugatuck Treatment Company; Recreational Water Products, Inc.; Uniroyal Chemical Company Limited (Delaware); Weber City Road LLC; WRL of Indiana, Inc; and, in the event it files a voluntary petition for relief under chapter 11 of the Bankruptcy Code before the Confirmation Date, Chemtura Canada.

46.      "*Diacetyl Claim Value*" means (a) the estimated aggregate liability of the Debtors in respect of Diacetyl Claims as determined by the Bankruptcy Court through an estimation proceeding before the Effective Date *minus* (b) Insurance Proceeds, if any, available in respect of Diacetyl Claims as of the Effective Date pursuant to (i) a separate settlement or agreement that has been approved by the Bankruptcy Court as of the Effective Date or (ii) a Final Order by the Bankruptcy Court or other court of competent jurisdiction.

47.      "*Diacetyl Claims*" means, collectively, all Claims against any Debtor or any Non-Debtor Affiliate resulting, directly or indirectly, from alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde, including all Claims for indemnification or contribution relating to alleged injury from exposure to diacetyl, acetoin and/or acetaldehyde.

48.      "*Diacetyl Recovery Ratio*" means the Pro Rata share of the Diacetyl Reserve of: (a) each Allowed Insured Deficiency Claim that is a Diacetyl Claim which is also an Insured Claim or (b) each Allowed Diacetyl Claim that is not an Insured Claim; *provided, however*, that in no event shall the recovery of any holder of an Allowed Diacetyl Claim exceed 100% through any combination of payments under Insurance Policies or distributions pursuant to this Plan.

49.    *"Diacetyl Reserve"* means the reserve to be created by the Debtors to hold a contribution of Cash from Chemtura Corporation and Chemtura Canada in the amount of the Diacetyl Claim Value, which reserve shall be held for the benefit of holders of Allowed Diacetyl Claims for distribution according to the procedures set forth in Article X.

50.    *"Diacetyl Trust"* means a trust that the Debtors may, at their option, establish for the exclusive benefit of the holders of Diacetyl Claims.

51.    *"DIP Agent"* means Citibank, N.A. or its duly appointed successor, in its capacity as administrative agent under the DIP Loan Agreement.

52.    *"DIP Claims"* means any Claim derived from or based upon the DIP Loan Agreement, including the DIP Revolver Claims and the DIP Term Claims.

53.    *"DIP Lenders"* means the banks, financial institutions and other lender parties to the DIP Loan Agreement from time to time, each in their capacity as such.

54.    *"DIP Loan Agreement"* means that certain Amended and Restated Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of February 3, 2010, among Chemtura Corporation, as borrower, each of the other Debtors, as guarantors, the DIP Agent and the DIP Lenders, as well as any other documents entered into in connection therewith.

55.    *"DIP Revolver Claims"* means any Claim derived from or based upon the DIP Revolver Loan under the DIP Loan Agreement.

56.    *"DIP Revolver Loan"* means the superpriority priming revolver loan and letter of credit facility up to an aggregate principal amount of $150 million made available to the Debtors under section 2.01(b) of the DIP Loan Agreement.

57.    *"DIP Term Claims"* means any Claim derived from or based upon the DIP Term Loan under the DIP Loan Agreement.

58.    *"DIP Term Loan"* means the superpriority priming term loan facility in an aggregate principal amount of up to $300 million made available to the Debtors under section 2.01(a) of the DIP Loan Agreement.

59.    *"Disbursing Agent"* means the Reorganized Debtors or the Entity or Entities chosen by the Reorganized Debtors to make or facilitate distributions pursuant to the Plan, including each of the Indenture Trustees.

60.    *"Disclosure Statement"* means the *Disclosure Statement for the Joint Chapter 11 Plan of Chemtura Corporation et al.*, dated June 17, 2010, including all exhibits and schedules thereto and references therein that relate to the Plan that is prepared, approved by order of the Bankruptcy Court and distributed in accordance with such order of approval.

61.    *"Disputed"* means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

62.    *"Disputed Claims Reserve"* means the reserve to be created by the Debtors to hold a contribution of Cash and New Common Stock, which reserve shall be held for the benefit of holders of subsequently Allowed Claims for distribution according to the procedures set forth in Article VIII.

63.    *"Distribution Date"* means any of the Initial Distribution Date or the Periodic Distribution Dates.

64.    *"Distribution Record Date"* means, except with respect to publicly traded debt securities, the date that the Confirmation Order is entered by the Bankruptcy Court.

65.    *"DTC"* means The Depository Trust Company.

66.    *"Effective Date"* means the first business day after which all provisions, terms and conditions specified in Section 12.3 have been satisfied or waived pursuant to Section 12.5.

67.    *"Electing Creditors"* means the holders of Allowed Claims in the Participating Creditor Classes who, at the time of voting on the Plan, make a binding election to seek to receive the maximum available percentage of their recovery in the form of Cash or the maximum available percentage of their recovery in the form of New Common Stock.

68.    *"Electing Creditors' Pool"* means the pool of Cash and New Common Stock that otherwise would be distributable to the Electing Creditors.

69.    *"Emergence Deadline"* means October 15, 2010.

70.    *"Emergence Incentive Plan"* means payments on account of (a) any awards earned under the Bankruptcy Court's *Order (A) Approving the Debtors' Key Employee Incentive Plan and (B) Authorizing the Debtors to Honor Certain Prepetition Bonus Programs* (Docket No. 847), as such awards may be modified or implemented with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on terms set forth in the Plan Supplement, and (b) any awards earned under the Bankruptcy Court's *Order Approving the Debtors' 2010 Key Employee Incentive Plan* (Docket No. 2707), as such awards may be modified or implemented with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on terms set forth in the Plan Supplement.

71.    *"Entity"* has the meaning set forth in section 101(15) of the Bankruptcy Code.

72.    *"Environmental Claim"* means any Claim by a Governmental Unit against Chemtura Corporation or any of the Subsidiary Debtors arising out of, related to or based upon federal or state environmental laws or regulations, environmental orders, consent decrees and other obligations in connection with (a) sites that are not part of the Debtors' bankruptcy estates, including previously owned or operated sites that are no longer owned or operated by the Debtors and third-party sites that have never been owned or operated by the Debtors to which the Debtors or their predecessors are alleged to have sent waste or other materials and (b) the Debtors' owned or operated sites solely to the extent that such Claims arise out of, relate to or are based upon costs expended or paid by a Governmental Unit before the Petition Date or penalties owing to a Governmental Unit for violations of environmental laws or regulations that occurred before the Petition Date.

73.    *"Environmental Reserve"* means the reserve to be created by Chemtura Corporation and the Subsidiary Debtors to hold a contribution of Cash from Chemtura Corporation and the Subsidiary Debtors in an amount to be determined by the Bankruptcy Court or agreed to by the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) and the holders of Disputed Environmental Claims, which reserve shall be held for the benefit of holders of Allowed Environmental Claims for distribution according to the procedures set forth in Article IX.

74.    *"Environmental Trust"* means a trust that the Debtors may, at their option, establish for the exclusive benefit of the holders of Environmental Claims.

75.    *"Equity Committee"* means the official committee of equity security holders of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on December 29, 2009 (Docket No. 1676), membership of which was reconstituted on January 7, 2010 and January 12, 2010 (Docket Nos. 1718 and 1748) and as may be further reconstituted from time to time.

76.    *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

77.    *"Exculpated Claim"* means any claim related to any act or omission in connection with, relating to or arising out of the Debtors' in or out of court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement; *provided, however,* that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

78.    *"Exculpated Party"* means each of:  (a) the Debtors, the Reorganized Debtors and their Affiliates, (b) the Creditors' Committee and the current and former members thereof, in their capacity as such; (c) the Indenture Trustees in their capacity as such; (d) the Ad Hoc Bondholders' Committee and the members thereof, in their capacity as such; (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, affiliates and representatives, in each case only in their capacity as such; and (f) the PBGC and its agents, attorneys and financial advisors.

79.    *"Exculpation"* means the exculpation provision set forth in <u>Section 11.5</u> hereof.

80.    *"Executory Contract"* means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

81.    *"Exit Credit Facility Agreement"* means one or more financing agreements to be executed by the Reorganized Debtors on or before the Effective Date, providing for a senior secured revolving credit facility and, if entered into, a senior secured or unsecured term loan or notes, including any agreements, amendments, supplements or documents related thereto, the substantially final form of which shall be filed as part of the Plan Supplement.

82.    *"Exit Financing"* means, together, (a) a senior secured or unsecured term loan and/or the issuance of senior secured or unsecured notes which, in the aggregate, have a principal amount of $750 million and (b) a senior secured revolver facility up to a principal amount of $250 million entered into pursuant to an Exit Credit Facility Agreement.

83.    *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

84.    *"General Unsecured Claims"* means any Unsecured Claim against any Debtor, unless such Claim is:  (a) a 2009 Notes Claim, (b) a 2016 Notes Claim, (c) a 2026 Notes Claim, (d) a Diacetyl Claim, (e) an Environmental Claim, (f) a Prepetition Unsecured Lender Claim, (g) an Unsecured Convenience Claim, (h) an Intercompany Claim (i) an Administrative Claim, (j) a Priority Tax Claim, (k) an Other Priority Claim, (l) a Claim Accrued for Professional Compensation or (m) the portion of any Insured Claim that is not an Insured Deficiency Claim.

85.    *"Governmental Unit"* means any domestic, foreign, provincial, federal, state, local or municipal (a) government, (b) governmental agency, commission, department, bureau, ministry or other governmental entity, (c) natural resource trustee agency or (d) any other governmental unit as defined in section 101(27) of the Bankruptcy Code.

86.    *"Impaired"* means any Claim or Interest in an Impaired Class.

87.     *"Impaired Class"* means a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.  For the avoidance of doubt, Impaired Classes are Class 4a for Chemtura Corporation, Class 4b for each of the applicable Subsidiary Debtors, Classes 5, 6 and 11 for Chemtura Corporation and each of the applicable Subsidiary Debtors, Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation, Classes 8 and 13a for Chemtura Corporation and Class 10 for Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date).  For the avoidance of doubt, the only Impaired Class with respect to Chemtura Canada, in the event it becomes a Debtor before the Confirmation Date, will be Class 10.

88.     *"Incentive Plans"* means the Emergence Incentive Plan and the New Incentive Plan.

89.     *"Indemnification Provision"* means each of the indemnification provisions, agreements or obligations currently in place, whether in the bylaws, certificates of incorporation or other formation documents in the case of a limited liability company, board resolutions or employment contracts, for the Debtors and the current and former directors, officers, members (including *ex officio* members), employees, attorneys, other professionals and agents of the Debtors and such current and former directors, officers and members' respective Affiliates.

90.     *"Indemnified Parties"* means, collectively, any Debtor and current and former director, officer, member (including *ex officio* members), employee, attorney, other professional and agent of the Debtors and such current and former directors, officers and members' respective Affiliates who is the beneficiary of an Indemnification Provision.

91.     *"Indenture Trustees"* means, collectively, the 2009 Notes Indenture Trustee, the 2016 Notes Indenture Trustee and the 2026 Notes Indenture Trustee.

92.     *"Indentures"* means, collectively, the 2009 Notes Indenture, the 2016 Notes Indenture and the 2026 Notes Indenture.

93.     *"Initial Distribution Date"* means the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence.

94.     *"Insurance Policies"* means, collectively, all of the Debtors' insurance policies.

95.     *"Insurance Proceeds"* the insurance proceeds available to the Debtors or holders of Claims under any of the Insurance Policies.

96.     *"Insured Claim"* means any Claim asserted against a Debtor that is payable or subject to indemnification, in whole or in part, from Insurance Proceeds under one or more of the Insurance Policies.

97.     *"Insured Deficiency Claim"* means the unsecured balance, if any, of an Insured Claim that remains after deducting the amount of Insurance Proceeds available on account of such Insured Claim.

98.     *"Intercompany Claim"* means (a) any Claim held by a Debtor against another Debtor or (b) any Claim held against a Debtor by a Non-Debtor Affiliate that is a direct or indirect subsidiary of Chemtura Corporation.

99.     *"Interest"* means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or other right, contractual or otherwise, to acquire any such interest in a Debtor that existed before the Effective Date, any phantom stock or other similar stock unit provided pursuant to the Debtors' prepetition employee compensation programs and any Claim related to the purchase of interests subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

100.    *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 112).

101.    *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

102.    *"Lien Claim"* means any Secured Claim that is not: (a) a DIP Claim or (b) a Prepetition Secured Lender Claim.

103.    *"Make-Whole Premium"* means the claim asserted by certain holders of 2016 Notes and the 2016 Notes Indenture Trustee for obligations, if any, for payment of a make-whole premium or similar damages or prepayment penalties as required in connection with the 2016 Notes Indenture.

104.    *"Make-Whole Settlement Amount"* is $50 million.

105.    *"New Board"* means, with respect to each Reorganized Debtor and New Chemtura, the initial board of directors of such Entity appointed as of the Effective Date, the members of which shall be determined in accordance with Section 5.18.

106.    *"New By-Laws"* means, with respect to each Reorganized Debtor and New Chemtura, the new by-laws of such Entity, the form of which shall be included in the Plan Supplement.

107.    *"New Certificate of Incorporation"* means, with respect to each Reorganized Debtor and New Chemtura, the form of the initial certificate of incorporation of each such Entity, the form of which shall be included in the Plan Supplement.

108.    *"New Chemtura"* means Reorganized Chemtura.

109.    *"New Chemtura Total Enterprise Value"* is $2.05 billion plus, except as otherwise agreed among the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee in their discretion, total Cash available to satisfy Allowed Unsecured Claims plus the amount of Cash to be retained following the Effective Date (which is expected to be approximately $125 million).

110.    *"New Common Stock"* means a certain number of common shares in the capital of New Chemtura authorized pursuant to the Plan, of which up to 100 million shares shall be initially issued and outstanding pursuant to the Plan as of the Effective Date.

111.    *"New Employment Agreements"* means employment agreements between the Debtors and certain individuals in the Debtors' senior management, the terms of which shall be included in the Plan Supplement. The individuals and terms are to be agreed to prior to the hearing on the Disclosure Statement.

112.    *"New Incentive Plan"* means the compensation program that will be implemented by the New Board of Chemtura Corporation and will become effective upon the Effective Date, which shall include a stock-based long-term incentive plan and may include other stock-based compensation consistent with the New Employment Agreements that will be adopted and become effective upon the Effective Date as well as a cash-based annual incentive plan consistent with past practice, as to which awards are subject to the approval of the New Board. Certain New Common Stock shall be reserved for issuance under the New Incentive Plan, in addition to shares reserved that may be issued pursuant to the Emergence Incentive Plan, as the Emergence Incentive Plan may be modified, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, and which modification shall be disclosed in the Plan Supplement. The terms of the New Incentive Plan shall be included in the Plan Supplement. The reserve number and New Incentive Plan terms are to be agreed to prior to the hearing on the Disclosure Statement.

113.    *"No-Call Penalty"* means the claim asserted by certain holders of 2026 Notes and the 2026 Notes Indenture Trustee for obligations, if any, for payment of damages or prepayment penalties in connection with the 2026 Notes Indenture.

114.    *"No-Call Settlement Amount"* is $20 million.

115.    "*Non-Debtor Affiliate*" means any Entity that is either directly or indirectly a wholly-owned subsidiary of Chemtura Corporation that is not or does not become, before the Confirmation Date, a Debtor in the Chapter 11 Cases.

116.    "*Non-Qualified Pension Arrangements*" means the non-qualified pension and other deferred compensation arrangements pursuant to which the Debtors provided benefits to certain executive officers and former executive officers of the Debtors, predecessor companies and other legacy entities whose liabilities and obligations were assumed by the Debtors either contractually or by law, including through past merger and acquisition activity, before the Petition Date.

117.    "*Notes*" means, collectively, the 2009 Notes, the 2016 Notes and the 2026 Notes.

118.    "*Notes Claims*" means, collectively, the 2009 Notes Claims, the 2016 Notes Claims and the 2026 Notes Claims.

119.    "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (866) 967-0678, retained as the Debtors' notice, claims and solicitation agent.

120.    "*Ordinary Course Professional Order*" means the *Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Docket No. 181).

121.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim or (b) a Priority Tax Claim.

122.    "*Participating Creditor Classes*" means the Classes of Prepetition Unsecured Lender Claims, Notes Claims and General Unsecured Claims (other than General Unsecured Claims against Chemtura Canada, in the event it becomes a Debtor before the Confirmation Date), the holders of which Claims shall receive distributions from the Unsecured Distribution Pool.

123.    "*PBGC*" means the Pension Benefit Guaranty Corporation.

124.    "*Periodic Distribution Date*" means, unless otherwise ordered by the Bankruptcy Court, the first business day that is 120 days after the Initial Distribution Date, and for the first year thereafter, the first business day that is 120 days after the immediately preceding Periodic Distribution Date.  After one year following the Distribution Date, the Periodic Distribution Date will occur on the first business day that is 180 days after the immediately preceding Periodic Distribution Date.

125.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

126.    "*Petition Date*" means March 18, 2009.

127.    "*Plan*" means this *Joint Chapter 11 Plan of Chemtura Corporation* et al., including the Plan Supplement, which is incorporated herein by reference.

128.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Debtors no later than fourteen days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications or supplements to the Plan Supplement, including the following:  (a) to the extent known, the identity of the members of the New Boards of New Chemtura and each of the other Reorganized Debtors, as well as the nature and amount of compensation for any member of a New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (b) a list of Executory Contracts and Unexpired Leases to be assumed, together with the proposed Cure Claim amount for each such contract or lease; (c) a list of retained Causes of Action; (d) the form of the Exit Credit Facility Agreement and any other indenture or similar operative credit document setting forth the terms of the Exit Financing; (e) the Corporate Governance Documents;

(f) the elected treatment of Intercompany Claims; (g) the terms of the New Incentive Plan and the terms of the New Employment Agreements; (h) the terms of the coverage under any new D&O Liability Insurance Policies, including the policy or policies providing tail coverage; and (i) to the extent the Disbursing Agent includes an Entity or Entities other than the Reorganized Debtors, the identity of such Entity or Entities.

129.    *"Prepetition Administrative Agent"* means Citibank, N.A. and/or its duly appointed successor, as administrative agent under the Prepetition Credit Agreement.

130.    *"Prepetition Credit Agreement"* means the Credit Agreement, dated as of July 1, 2005, among Chemtura Corporation, as borrower, each of the guarantors named therein, the lenders party thereto and the Prepetition Administrative Agent, as amended by the Amended and Restated Credit Agreement, dated as of July 31, 2007, together with any guarantees and other documents entered into in connection therewith including the Prepetition Security Agreement.

131.    *"Prepetition Lenders"* means those lenders party to the Prepetition Credit Agreement from time to time.

132.    *"Prepetition Secured Lender Claims"* means any Claim derived from or based upon the Prepetition Credit Agreement that is Secured by the "collateral," as such term is defined in section 2 of the Prepetition Security Agreement, including unpaid reasonable, documented and necessary out-of-pocket fees and expenses of the Prepetition Administrative Agent through and including the Effective Date, all to the extent not previously paid by any of the Debtors.

133.    *"Prepetition Security Agreement"* means the Second Amended and Restated Pledge and Security Agreement, dated as of December 30, 2008, among certain of the Debtors, as grantors, and Citibank, N.A., as agent.

134.    *"Prepetition Unsecured Lender Claims"* means any Claim derived from or based upon the Prepetition Credit Agreement other than the Prepetition Secured Lender Claims.

135.    *"Priority Tax Claim"* means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

136.    *"Pro Rata"* means, as applicable, the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that all Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims or Interests in such Class and other Classes entitled to share in the same recovery under the Plan.

137.    *"Professional"* means an Entity:   (a) retained pursuant to a Final Order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363 and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

138.    *"Proof of Claim"* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

139.    *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

140.    *"Rejection Claim"* means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

141.    *"Releasing Parties"* means all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to <u>Sections 11.2</u>, <u>11.3</u> or <u>11.4</u>, discharged pursuant to <u>Section 11.6</u> or are subject to exculpation pursuant to <u>Section 11.5</u>.

11

142.    *"Released Party"* means each of: (a) the Debtors, New Chemtura and the other Reorganized Debtors; (b) the current and former directors and officers of the Debtors; (c) the Creditors' Committee and the current and former members thereof, in their capacity as such; (d) the Indenture Trustees; (e) the Ad Hoc Bondholders' Committee and the current members thereof, in their capacity as such; (f) the DIP Agent; (g) the DIP Lenders; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives, in each case, only in their capacity as such; and (i) the PBGC and its agents, attorneys and financial advisors.

143.    *"Reorganized"* means, with respect to the Debtors, any Debtor or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

144.    *"Rights"* means the rights to subscribe for and acquire on the Effective Date New Common Stock in exchange for $100 million in Cash, with such subscription and acquisition to be at a price consistent with the New Chemtura Total Enterprise Value, and in accordance with the other terms and conditions of the Rights Offering as set forth in the Rights Offering Procedures.

145.    *"Rights Offering"* means the offering of the Rights by the Debtors to the holders of Interests in Class 13a for Chemtura Corporation, to the extent such Class votes to accept the Plan.

146.    *"Rights Offering Deadline"* means 5:00 p.m. (EDT) on the date that is 30 days after the Debtors commence the Rights Offering in accordance with the Rights Offering Procedures.

147.    *"Rights Offering Procedures"* means certain procedures setting forth the terms and conditions of the Rights Offering, in substantially the form annexed hereto as Exhibit 1.

148.    *"Rights Offering Record Date"* means [DATE], 2010.

149.    *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms.

150.    *"Secured"* means, when referring to a Claim: (a) secured by a Lien on property in which the Estate of the Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed pursuant to the Plan as a Secured Claim.

151.    *"Shortfall Adjustment"* means the reduction to the distributions to certain Classes pursuant to the Plan, in the following order: (a) first, distributions to the holders of 2026 Notes Claims on account of the No-Call Settlement Amount; (b) second, distributions to the holders of 2016 Notes Claims on account of the Make-Whole Settlement Amount; (c) third, on a pro rata basis, postpetition interest payments payable to the General Unsecured Claims against Chemtura Corporation and the 2026 Notes Claims, and (d) fourth, on a pro rata basis, payments payable on account of the General Unsecured Claims against Chemtura Corporation and 2026 Notes Claims.

152.    *"Shortfall Readjustment"* means the increase in the distributions to certain Classes pursuant to the Plan, in the following order: (d) first, on a pro rata basis, payments payable on account of the General Unsecured Claims against Chemtura Corporation and 2026 Notes Claims; (b) second, on a pro rata basis, postpetition interest payments payable to the General Unsecured Claims against Chemtura Corporation and the 2026 Notes Claims; (c) third, distributions to the holders of 2016 Notes Claims on account of the Make-Whole Settlement Amount; and (d) fourth, distributions to the holders of 2026 Notes Claims on account of the No-Call Settlement Amount.

153.    *"Subsidiary Debtors"* means all of the Debtors other than Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date).

154.     *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

155.     *"Unimpaired"* means any Claim or Interest that is not designated as Impaired.  For the avoidance of doubt, Unimpaired Classes are Classes 1, 2, 3 and 9 for each of the applicable Debtors and Class 4c for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date).

156.     *"Unsecured Claims"* means any unsecured claim against any Debtor including (a) a General Unsecured Claim, (b) a Prepetition Unsecured Lender Claim, (c) a 2009 Notes Claim, (d) a 2016 Notes Claim, (e) a 2026 Notes Claim, (f) a Diacetyl Claim, (g) an Environmental Claim, (h) an Unsecured Convenience Claim or (i) an Insured Deficiency Claim.

157.     *"Unsecured Convenience Claims"* means any Unsecured Claim against any of the Debtors, except Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date), that, but for being defined as an Unsecured Convenience Claim, would be a General Unsecured Claim, and either (a) is Allowed in an amount of $50,000 or less or (b) is Allowed in an amount greater than $50,000, but is subject to an irrevocable election by the holder thereof to reduce the Allowed amount of the Claim to $50,000 for the purpose of rendering the Claim an Unsecured Convenience Claim.

158.     *"Unsecured Distribution Pool"* means the pool from which distributions shall be made to the Participating Creditor Classes, which pool shall be funded with: (a) available distributable Cash following funding of the Diacetyl Reserve and payment to all holders of Allowed Unsecured Convenience Claims, (b) all proceeds of the Rights Offering, to the extent that Class 13a for Chemtura Corporation votes to accept the Plan and holders of Interests in such Class elect to participate in the Rights Offering and (c) the New Common Stock, subject to reduction solely to the extent that Class 13a for Chemtura Corporation votes to accept the Plan in the amount of the 5% of the New Common Stock made available to holders of Interests in such Class and up to $100 million in value of New Common Stock made available to holders of Interests in such Class in the form of the Rights Offering, and subject to dilution for the Incentive Plans.

159.     *"U.S. Pension Plans"* means the tax-qualified defined benefit pension plans maintained by Chemtura Corporation.

160.     *"U.S. Trustee"* means the United States Trustee for the Southern District of New York.

161.     *"Waiver Rate"* means the interest rate applicable with respect to the Prepetition Credit Agreement as determined pursuant to section 2 of the Waiver and Amendment No. 2 to the Amended and Restated Credit Agreement, dated December 30, 2008, by and among Chemtura Corporation, as borrower, each of the guarantors named therein, the lenders party thereto and the Prepetition Administrative Agent.

## 1.2    <u>Additional Defined Terms</u>

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, the following defined terms shall apply in addition to (or, where applicable, in the stead of) the defined terms set forth in <u>Section 1.1</u>:

1.     *"Canadian Case"* means the recognition proceedings commenced by Chemtura Canada under Part IV of the *Companies' Creditors Arrangement Act* in the Canadian Court.

2.     *"Canadian Confirmation Order"* means the order of the Canadian Court, which shall, among other things, order and declare that the Confirmation Order and this Plan, as they relate to Chemtura Canada, are recognized and shall be implemented and effective in Canada in accordance with their terms.

3.     *"Canadian Court"* means the Ontario Superior Court of Justice (Commercial List).

4.      *"Canadian Recognition Order"* means the order of the Canadian Court, which shall, among other things, order and declare that the Chapter 11 Case for Chemtura Canada is recognized and given full force and effect in Canada.

5.      *"Chemtura Canada"* means Chemtura Canada Company/Cie, in its capacity as a Debtor.

## 1.3      Rules of Interpretation

For purposes of this Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

## 1.4      Computation of Time

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## 1.5      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

## 1.6      Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## 1.7      Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

# ARTICLE II

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III and shall receive the following treatment:

### 2.1    Administrative Claims

(a)    **Administrative Claims**

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim and the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or Reorganized Debtor agrees to less favorable treatment to such holder, each holder of an Allowed Administrative Claim shall be paid in full, in Cash, on the later of: (a) the Initial Distribution Date; (b) the first date such Administrative Claim is Allowed or as soon as reasonable practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is practicable.

(b)    **Professional Compensation**

(i)    Claims for Accrued Professional Compensation

Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 45 days after the Effective Date; *provided* that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Effective Date without the need to file a final fee application. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Creditors' Committee, the U.S. Trustee and the requesting party no later than 75 days after the Effective Date.

(ii)    Post- Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business, including fees and expenses for the Creditors' Committee's Professionals for services rendered post-Effective Date as contemplated by the Plan, if any, without any further notice to any party or action, order or approval of the Bankruptcy Court.

(c)    **Administrative Claim Bar Date**

Except as otherwise provided in this Section 2.1, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 60 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or Reorganized Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than 90 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under this Plan.

**2.2**    **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld), one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or otherwise determined upon an order of the Bankruptcy Court.

**2.3**    **DIP Claims**

    **(a)**    **DIP Revolver Claims**

The DIP Revolver Claims shall be Allowed and deemed to be Allowed Claims in the full amount due and owing under the DIP Revolver Loan, including principal, interest, reasonable fees, reasonable expenses and issued, outstanding and undrawn letters of credit, in each case to the extent required to be paid under the terms of the DIP Loan Agreement.  Holders of DIP Revolver Claims will receive, on or as soon as practicable after the Initial Distribution Date, as indefeasible payment in full and final satisfaction of the DIP Revolver Claims, Cash in the full Allowed amount of their Claims, provided, however, that any DIP Revolver Claims representing unfunded letters of credit shall be deemed fully satisfied without any payment in Cash upon such letters of credit being replaced by new letters of credit issued under the Exit Financing.

    **(b)**    **DIP Term Claims**

The DIP Term Claims shall be Allowed and deemed to be Allowed Claims in the amount of $300 million, plus contingent and unliquidated claims arising under the DIP Refinancing Facility.  Holders of DIP Term Claims will receive, on or as soon as practicable after the Initial Distribution Date, as indefeasible payment in full and final satisfaction of the DIP Term Claims, Cash in the full Allowed amount of their Claims.

**2.4**    **Statutory Fees**

The Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee, including quarterly fees payable under 28 U.S.C. §1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business at the time of Confirmation.  On and after the Effective Date, the Reorganized Debtors shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors when due in the ordinary course until such time as the Bankruptcy Court enters a final decree in such Reorganized Debtor's Chapter 11 Case.

**2.5**    **Administrative Claims, Priority Tax Claims and DIP Claims Against Chemtura Canada**

This Plan constitutes a pre-arranged Plan for Chemtura Canada in the event it becomes a Debtor before the Confirmation Date.  For the avoidance of doubt, in the event Chemtura Canada becomes a Debtor before the Confirmation Date, each holder of an Administrative Claim, Priority Tax Claim or DIP Claim against Chemtura Canada (to the extent there are any such Claims against Chemtura Canada) shall receive the same treatment as the treatment for holders of Administrative Claims, Priority Tax Claims and DIP Claims, respectively, as set forth in this Article II.

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1    Classification of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

### 3.2    Summary of Classification

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below (and described in more detail in Section 3.3 below), except that Class 7 shall be applicable only to Chemtura Corporation and Great Lakes Chemical Corporation, Class 8 shall be applicable only to Chemtura Corporation and Class 10 shall be applicable only to Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date).  For the avoidance of doubt, to the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, such Class is designated with respect to such Debtor.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.

The following chart represents the general classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Prepetition Secured Lender Claims | Unimpaired | Permitted to Vote on a Provisional Basis[1] |
| 2 | Lien Claims | Unimpaired | Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 4a | General Unsecured Claims Against Chemtura Corporation | Impaired | Entitled to Vote |
| 4b | General Unsecured Claims Against the Subsidiary Debtors | Impaired | Entitled to Vote |
| 4c | General Unsecured Claims Against Chemtura Canada | Unimpaired | Deemed to Accept |
| 5 | Prepetition Unsecured Lender Claims | Impaired | Entitled to Vote |
| 6 | 2016 Notes Claims | Impaired | Entitled to Vote |
| 7 | 2009 Notes Claims | Impaired | Entitled to Vote |
| 8 | 2026 Notes Claims | Impaired | Entitled to Vote |
| 9 | Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 10 | Diacetyl Claims | Impaired | Entitled to Vote |
| 11 | Environmental Claims | Impaired | Entitled to Vote |
| 12 | Intercompany Claims | Impaired | Deemed to Accept |
| 13a | Interests in Chemtura Corporation | Impaired | Entitled to Vote |
| 13b | Interests in the Subsidiary Debtors and Chemtura Canada | Unimpaired / Impaired | Deemed to Accept |

---

[1] Although the Debtors believe that Class 1 holders of Prepetition Secured Lender Claims are Unimpaired by the terms of the Plan and therefore are deemed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code, such Class shall be permitted to vote to accept or reject the Plan on a provisional basis.  The Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the Prepetition Administrative Agent reserve all rights with respect to whether holders of Class 1 Prepetition Secured Lender Claims are in fact Unimpaired by the terms of the Plan.

3.3     **Treatment of Claims and Interests**

    To the extent a Class contains Allowed Claims or Interests with respect to any Debtor, the classification of Allowed Claims and Interests is specified below.

    **(a)**    **Treatment of Class 1 - Prepetition Secured Lender Claims.**

    (i)    *Allowance*:  The Prepetition Secured Lender Claims against Chemtura Corporation and each of the Subsidiary Debtors shall be Allowed in the amount of $52.7 million less any amounts attributable to letters of credit that expire undrawn before the Effective Date, plus unpaid postpetition interest, if any, at the Waiver Rate and unpaid reasonable, documented and necessary out-of-pocket fees and expenses of the Prepetition Administrative Agent through and including the Effective Date.  Holders of Class 1 Prepetition Secured Lender Claims are not entitled to and will not receive default interest in addition to interest at the Waiver Rate.

    (ii)    *Treatment*:  Each holder of a Prepetition Secured Lender Claim will receive, on the Effective Date, in full and final satisfaction of its Prepetition Secured Lender Claim, payment in full in Cash.

    (iii)    *Voting*:  Class 1 for Chemtura Corporation and each of the Subsidiary Debtors is Unimpaired; however, holders of Class 1 Prepetition Secured Lenders Claims shall be permitted to vote to accept or reject the Plan on a provisional basis.  The Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the Prepetition Administrative Agent reserve all rights with respect to whether holders of Class 1 Prepetition Secured Lender Claims are in fact Unimpaired by the terms of the Plan.

    **(b)**    **Treatment of Class 2 - Lien Claims.**

    (i)    *Treatment*:  On or as soon as practicable after the Initial Distribution Date, each holder of an Allowed Claim in Class 2 for each of the applicable Debtors, in full and final satisfaction of its Secured Claim, shall receive one of the following treatments at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld):

    A.    payment of the Allowed Claim in full in Cash on the later of the Initial Distribution Date or as soon as practicable after a particular Claim becomes Allowed and, to the extent such allowed Lien Claim is oversecured, interest as applicable pursuant to Section 3.3(n)(i) from and after the later of the date such Lien Claim (I) became due in the ordinary course of business or (II) was invoiced to the applicable Debtor;

    B.    such other treatment as may be agreed to by the applicable Debtor and the holder; or

    C.    the holder shall retain its Lien on such property and be Reinstated.

    (ii)    *Voting*:  Class 2 for each of the applicable Debtors is Unimpaired, and holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Lien Claims are not entitled to vote to accept or reject the Plan.

(c)     **Treatment of Class 3 - Other Priority Claims.**

(i)     *Treatment*:  Each holder of an Allowed Claim in Class 3 for each of the applicable Debtors shall receive, on or as soon as reasonably practicable after the Initial Distribution Date, in full and final satisfaction of its Claim, one of the following treatments on account of such Claim, determined at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld):

A.     payment of the Allowed Claim in full in Cash, plus interest as applicable pursuant to Section 3.3(n)(i), on the later of the Initial Distribution Date or as soon as practicable after such claim becomes Allowed or

B.     such other treatment as may be agreed to by the applicable Debtor.

(ii)    *Voting*:  Class 3 for each of the applicable Debtors is Unimpaired, and holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 3 Other Priority Claims are not entitled to vote to accept or reject the Plan.

(d)     **Treatment of Class 4 - General Unsecured Claims.**

(i)     *Treatment of Class 4a for Chemtura Corporation*:  Each holder of an Allowed Claim in Class 4a for Chemtura Corporation, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date: (A) shall receive its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and all Claims in Class 8) of the Cash and New Common Stock available in the Unsecured Distribution Pool following payment in full of (or appropriate funding of the Disputed Claims Reserve for) all Claims in Classes 4, 5, 6 and 7 for each of the Subsidiary Debtors, with the distribution of New Common Stock subject to dilution for the Incentive Plans, up to the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i); or (B) will be Reinstated, unless the holder and Chemtura Corporation (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment.  Each payment of Cash and New Common Stock shall have an aggregate value equal to the full amount of such holder's Allowed Claim plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.

To the extent that insufficient value is available in the Unsecured Distribution Pool to pay all holders of Allowed Claims in Class 4a for Chemtura Corporation, in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i), each holder shall be entitled to payment pursuant to Section 8.5 of its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and in Class 8), in accordance with the Shortfall Adjustment and Shortfall Readjustment, if any, of the excess amounts of Cash and New Common Stock, if any, held in the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve following liquidation of all Disputed Claims, Diacetyl Claims and Environmental Claims and payment of all formerly Disputed Claims that have become Allowed.

(ii)    *Treatment of Class 4b for each of the applicable Subsidiary Debtors:*  Each holder of an Allowed Claim in Class 4b for each of the applicable Subsidiary Debtors, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date:  (A) shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim,

plus postpetition interest as applicable pursuant to <u>Section 3.3(n)(i)</u>; or (B) will be Reinstated, unless the holder and the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment.

(iii)    *Treatment of Class 4c for Chemtura Canada:*  Each holder of a Claim in Class 4c for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall, unless the holder of such Claim and Chemtura Canada (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) otherwise agree to a different treatment, and unless otherwise satisfied pursuant to an order of the Bankruptcy Court before the Initial Distribution Date, be paid in full, in Cash, on the later of: (A) the Initial Distribution Date; (B) the first date such Claim is Allowed or as soon as reasonable practicable thereafter; and (C) the date such Allowed Claim becomes due and payable by its terms, or as soon thereafter as is practicable.

(iv)    *Voting for Class 4a for Chemtura Corporation*:  Class 4a for Chemtura Corporation is Impaired.  Therefore, holders of Class 4a General Unsecured Claims are entitled to vote to accept or reject the Plan.

(v)    *Voting for Class 4b for each of the applicable Subsidiary Debtors*:  Class 4b for each of the applicable Subsidiary Debtors is Impaired.  Therefore, holders of Class 4b General Unsecured Claims are entitled to vote to accept or reject the Plan.

(vi)    *Voting for Class 4c for Chemtura Canada*:  Class 4c for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) is Unimpaired, and holders of Class 4c Claims against Chemtura Canada are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 4c General Unsecured Claims against Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are not entitled to vote to accept or reject the Plan.

(vii)    *Election for Class 4a for Chemtura Corporation and for Class 4b for each of the applicable Subsidiary Debtors:*  Each holder of an Allowed Claim in Class 4a for Chemtura Corporation and Class 4b for each of the applicable Subsidiary Debtors shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in <u>Section 5.9</u>.

**(e)**    **Treatment of Class 5 - Prepetition Unsecured Lender Claims.**

(i)    *Allowance*:  The Prepetition Unsecured Lender Claims against Chemtura Corporation and each of the Subsidiary Debtors shall be Allowed in the amount of $118.1 million less any amounts attributable to letters of credit that expire undrawn before the Effective Date, plus unpaid postpetition interest, if any, at the Waiver Rate.  Holders of Class 5 Prepetition Unsecured Lender Claims are not entitled to and will not receive default interest in addition to interest at the Waiver Rate.

(ii)    *Treatment*:  Each holder of an Allowed Claim in Class 5 for Chemtura Corporation and each of the Subsidiary Debtors, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to <u>Section 3.3(n)(i)</u>, provided, however, that any Prepetition Unsecured Lender Claims representing unfunded letters of credit shall be deemed fully satisfied without any

payment in the form of Cash or New Common Stock upon such letters of credit being replaced by new letters of credit issued under the Exit Financing.

(iii)     *Election:*  Each holder of an Allowed Claim in Class 5 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in <u>Section 5.9</u>.

(iv)     *Voting*:  Class 5 for Chemtura Corporation and each of the Subsidiary Debtors is Impaired.  Therefore, holders of Class 5 Prepetition Unsecured Lender Claims are entitled to vote to accept or reject the Plan.

**(f)     Treatment of Class 6 - 2016 Notes Claims.**

(i)     *Allowance*:  The 2016 Notes Claims against Chemtura Corporation and each of the Subsidiary Debtors shall be Allowed in the amount of $508,263,159 on account of principal and prepetition interest, plus postpetition interest at the contract rate, including amortization of original issue discount, as provided in the 2016 Notes Indenture, plus the Make-Whole Settlement Amount of $50 million, provided, however, that interest shall not apply to or accrue on the Make-Whole Settlement Amount.

(ii)     *Treatment*:  Each holder of an Allowed Claim in Class 6 for Chemtura Corporation and each of the Subsidiary Debtors, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the amount of its Allowed Claim, plus postpetition interest as applicable pursuant to <u>Section 3.3(n)(i)</u>, with such payment of Cash and New Common Stock having an aggregate value equal to the full amount of such holder's Allowed Claim plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.

(iii)     *Election:*  Each holder of an Allowed Claim in Class 6 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available Cash or the maximum available New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in <u>Section 5.9</u>.

(iv)     *Voting*:   Class 6 for Chemtura Corporation and each of the Subsidiary Debtors is Impaired.  Therefore, holders of Class 6 2016 Notes Claims are entitled to vote to accept or reject the Plan.

**(g)     Treatment of Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation- 2009 Notes Claims.**

(i)     *Allowance*:  The 2009 Notes Claims against Chemtura Corporation and Great Lakes Chemical Corporation shall be Allowed in the amount of $374,508,524 on account of principal and pre petition interest, plus all postpetition interest at the contract rate as provided in the 2009 Notes Indenture, and, for the avoidance of doubt, the amount of any original issue discount amortized post petition, which is estimated in the amount of $23,976 as of July 15, 2009.

(ii)     *Treatment*:  Each holder of an Allowed Claim in Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive payment

from the Cash and New Common Stock available in the Unsecured Distribution Pool, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the full amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i).

(iii)     *Election:*  Each holder of an Allowed Claim in Class 7 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available Cash or the maximum available New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9.

(iv)     *Voting*:  Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation is Impaired.  Therefore, holders of Class 7 2009 Notes Claims are entitled to vote to accept or reject the Plan.

**(h)     Treatment of Class 8 for Chemtura Corporation - 2026 Notes Claims.**

(i)     *Allowance*:  Allowance: The 2026 Notes Claims against Chemtura Corporation shall be Allowed in the amount of $151,253,447 on account of principal and prepetition interest, plus postpetition interest at the contract rate, including amortization of original issue discount, as provided in the 2026 Notes Indenture, plus the No-Call Settlement Amount of $20 million, provided, however, that interest shall not apply to or accrue on the No-Call Settlement Amount.

(ii)     *Treatment*:  Each holder of an Allowed Claim in Class 8 for Chemtura Corporation, in full and final satisfaction of its Claim, on or as soon as reasonably practicable after the Initial Distribution Date shall receive its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and all Claims in Class 8) of the Cash and New Common Stock available in the Unsecured Distribution Pool following payment in full of (or appropriate funding of the Disputed Claims Reserve for) all Claims in Classes 4, 5, 6 and 7 for each of the Subsidiary Debtors, with the distribution of New Common Stock subject to dilution for the Incentive Plans, in the amount of its Allowed Claim, plus postpetition interest as applicable pursuant to Section 3.3(n)(i), with such payment of Cash and New Common Stock having an aggregate value equal to the full amount of such holder's Allowed Claim plus postpetition interest, as applicable, in each case, subject to the applicable Shortfall Adjustment, if any, or the applicable Shortfall Readjustment, if any.

To the extent that insufficient value is available in the Unsecured Distribution Pool to pay all holders of Allowed Claims in Class 8, in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i), each holder shall be entitled to payment pursuant to Section 8.5 of its Pro Rata share (determined with respect to all Claims in Class 4a for Chemtura Corporation and in Class 8), in accordance with the Shortfall Adjustment and Shortfall Readjustment, if any, of the excess amounts of Cash and New Common Stock, if any, held in the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve following liquidation of all Disputed Claims, Diacetyl Claims and Environmental Claims and payment of all formerly Disputed Claims that have become Allowed.

(iii)     *Election:*  Each holder of an Allowed Claim in Class 8 shall have the right to make a binding election to seek to receive its recovery in the form of the maximum available Cash or the maximum available New Common Stock, to the extent such recovery is available from the Electing Creditors' Pool, as described in Section 5.9.

(iv)     *Voting*:  Class 8 for Chemtura Corporation is Impaired.  Therefore, holders of Class 8 2026 Notes Claims are entitled to vote to accept or reject the Plan.

(i)        **Treatment of Class 9 - Unsecured Convenience Claims.**

    (i)        *Treatment*: Each holder of an Allowed Unsecured Convenience Claim in Class 9 for Chemtura Corporation and each of the applicable Subsidiary Debtors shall receive, in full and final satisfaction of such Unsecured Convenience Claim, Cash in the amount of its Allowed Unsecured Convenience Claim, plus interest as applicable pursuant to Section 3.3(n)(i).

    (ii)       *Voting*: Class 9 for Chemtura Corporation and each of the applicable Subsidiary Debtors is Unimpaired and holders of Class 9 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 9 Unsecured Convenience Claims are not entitled to vote to accept or reject the Plan.

(j)        **Treatment of Class 10 for Chemtura Corporation and Chemtura Canada - Diacetyl Claims.**

    (i)        *Treatment*: Each holder of an Allowed Diacetyl Claim in Class 10 for Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall receive, in full and final satisfaction of such holder's Allowed Diacetyl Claim:  (A) payment in Cash on the Effective Date pursuant to a negotiated settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and as approved by order of the Bankruptcy Court or (B) to the extent an Allowed Diacetyl Claim is not subject to a negotiated settlement as of the Effective Date, a distribution from the Diacetyl Reserve in accordance with the procedures set forth in Article X (I) if such Allowed Diacetyl Claim is an Insured Claim, in the amount of such holder's Allowed Insured Deficiency Claim multiplied by the Diacetyl Recovery Ratio, or (II) if such Allowed Diacetyl Claim is not an Insured Claim, in the amount of such holder's Allowed Diacetyl Claim multiplied by the Diacetyl Recovery Ratio.

    (ii)       *Voting*:  Class 10 for Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) is Impaired.  Therefore, holders of Class 10 Diacetyl Claims are entitled to vote to accept or reject the Plan.

(k)        **Treatment of Class 11 - Environmental Claims.**

    (i)        *Treatment*: Each holder of an Allowed Environmental Claim in Class 11 for Chemtura Corporation and each of the applicable Subsidiary Debtors shall receive one of the following treatments at the option of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld):  (A) payment in Cash on the Effective Date or such other treatment as agreed pursuant to a negotiated settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and as approved by order of the Bankruptcy Court, (B) to the extent an Allowed Environmental Claim is not subject to a negotiated settlement as of the Effective Date, a distribution from the Environmental Reserve in Cash in accordance with the procedures set forth in Article IX, in the amount of such holder's Allowed Environmental Claim or (C) the holder will retain its Environmental Claim, which will be Reinstated.

    (ii)       *Voting*:  Class 11 for Chemtura Corporation and each of the applicable Subsidiary Debtors is Impaired.  Therefore, holders of Class 11 Environmental Claims are entitled to vote to accept or reject the Plan.

(l)        **Treatment of Class 12 - Intercompany Claims.**

    (i)        *Treatment:*  At the election of the applicable Debtor (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be

unreasonably withheld), Intercompany Claims shall (A) be Reinstated, (B) remain in place subject to certain revised documentation, (C) be modified or cancelled as of the Effective Date, (D) include Cash payments to address the treatment of certain foreign pension obligations of the Company and/or (E) with respect to certain Intercompany Claims in respect of goods, services, interest and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, may be settled in Cash in an amount not to exceed $25 million. The Plan Supplement shall set forth the applicable Debtor's election with respect to the treatment of each Intercompany Claim.

(ii) *Voting:* Class 12 for each of the applicable Debtors is Impaired. Holders of Class 12 Intercompany Claims are deemed to accept the Plan.

**(m)     Treatment of Class 13 - Interests.**

(i) *Treatment of Class 13a for Chemtura Corporation*: On and after the Effective Date, all Class 13a Interests in Chemtura Corporation shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and each holder of an Interest shall receive, in full and final satisfaction of such Interest, on the Effective Date, one of the following treatments:

A.      to the extent that Class 13a for Chemtura Corporation votes to accept the Plan, on or as soon as practicable after the Effective Date, each holder of a share of prepetition common stock or equivalent Interest in Chemtura Corporation shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of 5% of the New Common Stock, subject to dilution for the New Incentive Plan, and its Pro Rata share of the Rights to participate in the Rights Offering; and

B.      to the extent that Class 13a for Chemtura Corporation votes to reject the Plan, each holder of an Interest shall receive its Pro Rata share (determined with respect to all holders of Interests in Class 13a) of value available for distribution after all Allowed Unsecured Claims have been paid in full in accordance with the terms of this Plan and the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve have been established in accordance with the terms of this Plan.

(ii) *Treatment of Class 13b for the applicable Subsidiary Debtors and Chemtura Canada*: At the option of the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, on the Effective Date, all Class 13b Interests in the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) shall remain outstanding, shall be cancelled or shall be transferred pursuant to the Plan, including as set forth in Section 5.22.

(iii) *Voting for Class 13a for Chemtura Corporation*: Class 13a for Chemtura Corporation is Impaired. Therefore, holders of Class 13a Interests in Chemtura Corporation are entitled to vote to accept or reject the Plan.

(iv) *Voting for Class 13b for the applicable Subsidiary Debtors and Chemtura Canada*: Class 13b for each of the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) is Unimpaired or Impaired, and holders of Class 13b Subsidiary Debtor and Chemtura Canada Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Interests in Class 13b for each of the applicable Subsidiary Debtors

and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are not entitled to vote to accept or reject the Plan.

(n)     **Treatment Provisions Applicable to All Classes of Unsecured Claims and Interests.**

(i)     *Payment of Interest:*  To the extent that the Plan provides for payment of interest to holders of Allowed Unsecured Claim, such interest shall be paid in the same form of consideration as the underlying Allowed Unsecured Claim, and the amount of Allowed interest shall be calculated between the later of the date such Allowed Claim (A) became due in the ordinary course of business or (B) was invoiced to the applicable Debtor, on the one hand, and the Effective Date, on the other hand, with such interest to be payable (except as expressly specified herein) at the federal judgment rate as of the Petition Date or at the contract rate to the extent allowable under applicable law in accordance with the Contract Interest Rate Procedures.  For the avoidance of doubt, to the extent interest is payable on a particular Allowed Claim in accordance with the foregoing, the amount of such Allowed Claim shall be increased to include interest.

(ii)    *Distribution from the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve:*  To the extent excess Cash or New Common Stock remains in the Disputed Claims Reserve, Diacetyl Reserve or Environmental Reserve following the resolution of all Disputed Claims, Diacetyl Claims and Environmental Claims, such excess Cash or New Common Stock shall be distributed among Claims and Interests as and to the extent provided in <u>Section 8.5</u>.

**3.4     <u>Treatment of Claims Against and Interests in Chemtura Canada</u>**

This Plan constitutes a pre-arranged Plan for Chemtura Canada in the event it becomes a Debtor before the Confirmation Date.  For the avoidance of doubt, in the event Chemtura Canada becomes a Debtor before the Confirmation Date:  (a) each holder of a Lien Claim, Other Priority Claim or Intercompany Claim against Chemtura Canada shall receive the same treatment as the treatment for holders of all other Lien Claims, Other Priority Claims and Intercompany Claims, respectively, as set forth in this <u>Article III</u>, (b) each holder of a General Unsecured Claim against Chemtura Canada shall receive the treatment as set forth in <u>Section 3.3(d)(iii)</u>, (c) each holder of a Diacetyl Claim against Chemtura Canada shall receive the treatment as set forth in <u>Section 3.3(j)</u> and (d) each holder of an Interest in Chemtura Canada shall receive the same treatment as the treatment for holders of Interests in Subsidiary Debtors as set forth in <u>Section 3.3(m)(ii)</u>.

**ARTICLE IV**

**ACCEPTANCE REQUIREMENTS**

**4.1     <u>Acceptance or Rejection of the Plan</u>**

(a)     **Voting Class**

Class 4a for Chemtura Corporation and Class 4b for each of the applicable Subsidiary Debtors, Classes 5, 6 and 11 for Chemtura Corporation and each of the applicable Subsidiary Debtors, Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation, Classes 8 and 13a for Chemtura Corporation and Class 10 for Chemtura Corporation and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are Impaired under the Plan and are, therefore, entitled to vote to accept or reject the Plan.

(b)     **Presumed Acceptance of the Plan**

Classes 1 and 9 for Chemtura Corporation and each of the applicable Subsidiary Debtors, Classes 2 and 3 for each of the applicable Debtors and Class 4c for Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the

Plan pursuant to section 1126(f) of the Bankruptcy Code, provided, however, that holders of Class 1 Prepetition Secured Lender Claims shall be permitted to vote to accept or reject the Plan on a provisional basis.  Class 12 for each of the Debtors and Class 13b for each of the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims in Class 12 for each of the Debtors and holders of Interests in Class 13b for each of the applicable Subsidiary Debtors and Chemtura Canada (in the event it becomes a Debtor before the Confirmation Date) are either Plan proponents or affiliates of Plan proponents.

## 4.2    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right to modify the Plan in accordance with Article XIII hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

### 5.1    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, Distributions, Releases and other benefits provided under the Plan, the provisions of the Plan shall upon Consummation constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan.  Subject to Article VII, all distributions made to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

### 5.2    The Creditors' Committee Action

As discussed in detail in the Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, on the Effective Date of the Plan the Creditors' Committee will agree to dismiss the Creditors' Committee Action with prejudice, provided, however, that the Creditors' Committee reserves all rights to pursue the Creditors' Committee Action in the event that, for any reason, the Effective Date does not occur.

### 5.3    The PBGC Settlement

As discussed in detail in the Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, the provisions of the Plan shall constitute a good faith compromise and settlement between the Debtors, Creditors' Committee and the PBGC, with the consent of the Ad Hoc Bondholders' Committee, arising from or related to the disputed Claims and PBGC's asserted rights of regulatory action, whereby Chemtura Corporation shall make a contribution in the amount of $50 million with respect to its underfunded U.S. pension obligations on the Effective Date, which shall have the effect of reducing later contribution requirements according to statute.

### 5.4    The CHCI Preferred Stock Settlement

As discussed in detail in the Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed

claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies between the Estates and CHCI arising from or related to Great Lakes Chemical Corporation's ownership of the CHCI Preferred Stock, whereby for all purposes related to distributions and allocated value among the Debtors pursuant to the Plan (and solely for Plan purposes) the CHCI Preferred Stock shall be given effect for 50% of its value.

## 5.5    The Make-Whole Settlement and the No-Call Settlement

As discussed in detail in the Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, the provisions of the Plan shall constitute (a) a good faith compromise and settlement of all Claims and controversies between the Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the 2016 Notes Indenture Trustee arising from or related to the Make-Whole Premium and (b) a good faith compromise and settlement of all Claims and controversies between the Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the 2026 Notes Indenture Trustee arising from or related to the No-Call Penalty. The holders of 2016 Notes will be entitled to an Allowed Claim equal to the Make-Whole Settlement Amount. The holders of 2026 Notes will be entitled to an Allowed Claim equal to the No-Call Settlement Amount. The terms of the Make-Whole Settlement and the No-Call Settlement were available to the Debtors by the Creditors' Committee, the Ad Hoc Bondholders' Committee, the 2016 Notes Indenture Trustee and the 2026 Notes Indenture Trustee only if the Debtors settled all of the Claims and controversies as a whole on the terms as offered. Postpetition interest will not be paid on the Make-Whole Settlement Amount or the No-Call Settlement Amount.

## 5.6    The Settlement Regarding the Fees of the Ad Hoc Bondholders' Committee

As discussed in detail in the Disclosure Statement, as set forth in the Confirmation Order and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors shall pay in full in Cash within five business days of the Effective Date (unless otherwise provided herein) the reasonable, documented and necessary out-of-pocket fees and expenses incurred by the Ad Hoc Bondholders' Committee up to an aggregate cap of $7 million, consistent with that certain Plan Support Agreement, dated as of June 17, 2010, among the Debtors, the Creditors' Committee, members of the Ad Hoc Bondholders' Committee and certain other holders of Notes Claims, without the need of any party to file fee applications with the Bankruptcy Court.

The Ad Hoc Bondholders' Committee shall provide the Debtors and the Creditors' Committee with the invoices (or such other documentation as the Debtors and the Creditors' Committee may reasonably request) for services rendered on a periodic basis, and in any event no later than fifteen days before the Effective Date. The Debtors and the Creditors' Committee will have ten business days from receipt of such invoices to review and raise any objections to the reasonableness of the fees or expense items set forth therein. All invoiced fees shall be deemed reasonable if no notice of objection is provided within ten business days of their receipt by the Debtors and the Creditors' Committee, and if deemed reasonable shall be paid within five business days of the Effective Date (other than for fees and costs incurred in the 60 days prior to the Effective Date, which fees and costs, if not objected to, will be paid within fifteen business days of receipt if the Debtors and the Creditors' Committee do not object to the reasonableness of such fees). To the extent that the Debtors or the Creditors' Committee object to any of the fees of the Ad Hoc Bondholders' Committee, the Debtors shall not be required to pay any disputed portion of such fees until a resolution of such objection is agreed to by the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee, or until issuance of a further order of the Bankruptcy Court upon motion by the Ad Hoc Bondholders' Committee.

Notwithstanding the foregoing, the Debtors and the Creditors' Committee acknowledge that they have reviewed the December 19, 2009 retainer agreement between Jones Day and Moelis & Company outlining the fees payable to Moelis & Company for its work in this matter, and hereby agree that the Monthly Fee and the

Restructuring Fee (each as defined therein) are deemed reasonable and will be paid within five business days of the Effective Date; provided, however, that because the Debtors and Creditors' Committee do not believe it will be necessary for Moelis & Company to provide testimony in this case, any Testimony Fees (as defined in the retainer agreement) are not deemed reasonable at this time, and will be subject to future consideration if and when incurred by the Ad Hoc Bondholders' Committee, and would not cause the aggregate cap to be increased from $7 million unless specifically and subsequently agreed to by the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee.

The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee expressly agree and acknowledge that pursuant to Bankruptcy Rule 9019 and section 1129(a)(4) of the Bankruptcy Code, because the payment of the Ad Hoc Bondholders' Committee's fees is pursuant to the overall settlement underlying the Plan, the sole ground for objecting to any of the Ad Hoc Bondholders' Committees fees, whether informally or before the Bankruptcy Court or other court of competent jurisdiction, shall be as to matters of reasonableness under section 1129(a)(4) of the Bankruptcy Code.

## 5.7    Environmental Matters

### (a)    Post-Effective Date Environmental Obligations

All environmental obligations owing to Governmental Units relating to sites owned or operated by Chemtura Corporation or the Subsidiary Debtors as of the Effective Date, except those obligations that constitute Environmental Claims on account of costs expended or paid by a Governmental Unit before the Petition Date or penalties owing to a Governmental Unit for violations of environmental laws or regulations that occurred before the Petition Date, shall remain in place after the Effective Date. Nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any environmental obligations owing to Governmental Units at owned or operated sites.

### (b)    Environmental Adversary Proceeding

Nothing in the Plan shall constitute or be construed as an adjudication or settlement of the disputed issues between the parties to the adversary proceeding [Adv. Case. No. 09-01719] commenced by Chemtura Corporation and the Subsidiary Debtors against certain Governmental Units seeking a declaratory judgment that certain environmental orders and obligations that are or may be asserted against Chemtura Corporation and the Subsidiary Debtors by the Governmental Units with respect to non-owned former sites and non-owned off-site disposal sites are Claims that are dischargeable in the Chapter 11 Cases, which adversary proceeding is currently pending as of the date of the Plan before the United States District Court for the Southern District of New York.

## 5.8    The Unsecured Distribution Pool

The Unsecured Distribution Pool shall be used to fund (a) the payments pursuant to this Plan of all Allowed Claims in the Participating Creditor Classes, all on the terms set forth herein with respect to each such Class and (b) the Disputed Claims Reserve. To the extent that Class 13a for Chemtura Corporation votes to reject the Plan, any Cash or New Common Stock available in the Unsecured Distribution Pool following the funding described above (which shall include, for the avoidance of doubt, payment of all Allowed Claims in the Participating Creditor Classes in full and with interest in the full Allowed amount), then each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash and New Common Stock.

To the extent that there is insufficient value available in the Unsecured Distribution Pool to satisfy in full all Allowed Claims in the Participating Creditor Classes pursuant to this Plan, the resulting shortfall in distributable value shall result in the Shortfall Adjustment. Notwithstanding the foregoing, to the extent that additional Cash and New Common Stock become available for distribution after the Initial Distribution Date pursuant to Section 8.5, the resulting distributable value shall result in the Shortfall Readjustment.

**5.9**     **Election of Cash and New Common Stock**

Each holder of an Allowed Claim in any Participating Creditor Class (except Classes of Notes Claims) may, at the time of voting upon the Plan, or, with respect to holders of Notes Claims, before the Voting Deadline, whether or not such holder votes on the Plan, make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock. To the extent that a creditor makes such an election, the Cash or New Common Stock that otherwise would be distributable to such creditor will be aggregated in the Electing Creditors' Pool and will be reallocated among all Electing Creditors according to their recovery preferences (with all distributions to be made such that each Electing Creditor receives the aggregate value of consideration it otherwise would be entitled to, in the form of the preferred distribution to the extent possible). Whether and to what extent any Electing Creditor receives an increased percentage of the consideration it requested will depend upon the elections of all holders of Allowed Claims in the Participating Creditor Classes taken as a whole. The failure of a holder to make a binding election to participate in the Electing Creditors' Pool during the voting period (including the failure to submit a validly executed ballot or other form) will reflect an agreement that such holder will receive its recovery in the Cash-to-New Common Stock ratio reflecting the Cash and New Common Stock in the Unsecured Distribution Pool.

**5.10**     **Exit Financing/Incurrence of New Indebtedness**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Credit Facility Agreement and complete the Exit Financing in order to fund distributions under the Plan and to fund the Reorganized Debtors' business operations, and the Debtors shall be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Financing, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization or approval of any person. The terms of the Exit Financing, including sizing, composition, fees, interest rates, and maturity will be reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee and will be market-based.

**5.11**     **Sources of Consideration for Plan Distributions**

**(a)**     **Cash Consideration**

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Exit Financing(s) or other Cash on hand of the Debtors, including Cash derived from business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

**(b)**     **Issuance of New Common Stock**

On the Effective Date, New Chemtura shall issue up to 100 million shares of New Common Stock for distribution to the holders of Allowed Claims against or Interests in Class 4a for Chemtura Corporation, Class 4b for each of the applicable Subsidiary Debtors, Classes 5 and 6 for Chemtura Corporation and each of the Subsidiary Debtors, Class 7 for Chemtura Corporation and Great Lakes Chemical Corporation and Classes 8 and 13a for Chemtura Corporation pursuant to the terms set forth herein. All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance referred to in <u>Article VII</u> shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Reorganized Debtors will use their commercially reasonable best efforts to list the New Common Stock on a national securities exchange, with the initial goal of listing on the New York Stock Exchange or NASDAQ by the Effective Date.

**5.12**    **The Rights Offering**

(a)    **Use of Rights Offering Proceeds**

As set forth in Section 3.3(m)(i)A), if Class 13a for Chemtura Corporation votes to accept the Plan, each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of the Rights to participate in the Rights Offering.  The proceeds of the Rights Offering will be used to provide $100 million in Cash (or such lesser amount of proceeds actually achieved, to the extent the Rights Offering is not fully subscribed) funding to the Reorganized Debtors to fund distributions pursuant to the Plan.

(b)    **Rights Offering Procedures**

If Class 13a for Chemtura Corporation votes to accept the Plan, each holder of an Interest in Class 13a for Chemtura Corporation will be entitled to subscribe for and to acquire the Rights being offered pursuant to the Rights Offering in accordance with the terms of the Rights Offering Procedures, in substantially the form annexed hereto as Exhibit 1.  The Rights Offering shall be subject to compliance with the Securities Act of 1933, as amended, including the filing and approval of an appropriate securities registration form with the Securities and Exchange Commission.  In the event such registration statement is not effective at the time all conditions precedent to the Plan are satisfied or waived, the Effective Date may be delayed until the effective date of the registration statement. Alternatively, the Debtors will work with the Creditors' Committee and the Ad Hoc Bondholders' Committee to explore alternatives that would allow the Effective Date to occur before the effective date of the registration statement.

**5.13**    **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Credit Agreement and the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares (including the CHCI Preferred Stock), certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, that any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of Prepetition Secured Lender Claims, Prepetition Unsecured Lender Claims, 2009 Notes Claims, 2016 Notes Claims and 2026 Notes Claims (as applicable) to receive distributions under the Plan as provided herein, (b) allowing the Prepetition Administrative Agent and the Indenture Trustees, if applicable, to make distributions under the Plan as provided herein, and deduct therefrom such compensation, fees and expenses due thereunder or incurred in making such distributions and (c) allowing the Prepetition Administrative Agent and the Indenture Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.  On and after the Effective Date, all duties and responsibilities of the Prepetition Administrative Agent under the Prepetition Credit Agreement and the Indenture Trustees under the Indentures, as applicable, shall be discharged except to the extent required in order to effectuate the Plan.

**5.14**    **Surrender of Existing Securities**

As a condition precedent to receiving any distribution on account of any Note, each record holder of any Notes shall be deemed to have surrendered such Notes or other documentation underlying such Notes and all such

surrendered Notes and other documentation shall be deemed to be cancelled in accordance with <u>Section 5.12</u> of the Plan.

### 5.15    Section 1145 Exemption

The issuance of the New Common Stock distributed pursuant to the Plan to holders of Claims and Interests shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by provision of applicable law, regulation, order or rule.  Holders of New Common Stock issued in respect of Allowed Unsecured Claims will be provided with reasonable and customary registration rights, to be set forth in more detail in the Plan Supplement, solely to the extent such New Common Stock may not be transferred without restriction pursuant to Rule 144 or is otherwise not freely saleable under the securities laws notwithstanding section 1145 of the Bankruptcy Code.  Additionally, to the extent Class 13a for Chemtura Corporation votes to accept the Plan and the Rights Offering is subscribed in an amount such that the issuance of New Common Stock pursuant to the Rights Offering does not qualify for the statutory exemption from securities law provided under section 1145 of the Bankruptcy Code, a registration of the New Common Stock with the U.S. Securities and Exchange Commission will be required.

### 5.16    Corporate Existence

Except as otherwise provided herein, in the Corporate Governance Documents or elsewhere in the Plan Supplement, each Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed.  The Corporate Governance Documents shall be in the form filed with the Plan Supplement.

### 5.17    New Certificate of Incorporation and New By-Laws

On or immediately before the Effective Date, New Chemtura and each of the other Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective jurisdictions of incorporation in accordance with the corporate laws of the respective jurisdictions of incorporation.  After the Effective Date, New Chemtura and each of the other Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation and their respective New Certificates of Incorporation and New By-Laws.  The New Certificates of Incorporation and New By-Laws shall be included in the Plan Supplement and shall be subject to the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld.

### 5.18    New Chemtura's and Reorganized Debtors' Boards of Directors

On the Effective Date, the New Board will consist of 9 directors, one of which shall be the chief executive officer.  The Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee shall establish a board selection committee to select 8 members of the New Board of New Chemtura in addition to the chief executive officer.  The board selection committee, which shall be advised by an independent search firm, shall be charged with working together to try to reach consensus upon a list of the members of the New Board of New Chemtura.  In the event, however, that consensus is not reached by the board selection committee, the Creditors' Committee and the Ad Hoc Bondholders' Committee shall, together, be entitled to designate 6 members of the New Board of New Chemtura and the Debtors shall be entitled to designate 2 members of the New Board of New Chemtura.  Each designated member of the New Board of New Chemtura shall meet minimum eligibility requirements consistent with service on the board of a public company of comparable size to New Chemtura and the other Reorganized Debtors, with such minimum requirements to be identified by the independent search firm advising the board selection committee.

To the extent known, the identity of the members of the New Boards of New Chemtura and of each of the other Reorganized Debtors and the nature and compensation for any member of a New Board who is an "insider"

under section 101(31) of the Bankruptcy Code will be identified in the Plan Supplement but, in any event, shall be disclosed at or before the Confirmation Hearing.

**5.19**    **Officers of New Chemtura and Reorganized Debtors**

To the extent known, officers of New Chemtura and each of the other Reorganized Debtors shall be identified in the Plan Supplement but, in any event, shall be disclosed at or before the Confirmation Hearing. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements with New Chemtura and each of the other Reorganized Debtors.

**5.20**    **Employee Benefits**

Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may honor, in the ordinary course of business, any prepetition contracts, agreements, policies, programs and plans for, among other things, compensation (other than prepetition equity based compensation related to Interests, which shall receive appropriate compensation as provided for pursuant to the Plan), health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation benefits, savings plans, severance benefits, welfare benefits, workers' compensation insurance, life insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time; *provided, however,* that the Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any contract, agreement, policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such contract, agreement, policy, program or plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans, including the Reorganized Debtors' rights to modify unvested benefits pursuant to their terms.

**5.21**    **Retiree Benefits**

All employment, retirement and other agreements or arrangements in place as of the Effective Date with the Debtors' officers, directors, or employees, who will continue in such capacities or similar capacities after the Effective Date, or retirement income plans and welfare benefit plans for such persons, shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; provided, however, that the foregoing shall not apply to any stock-based compensation or incentive plan, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Pursuant to the Plan, the Debtors or Reorganized Debtors, as applicable, shall continue the U.S. Pension Plans. The U.S. Pension Plans shall be continued in accordance with their terms, and the Debtors or the Reorganized Debtors, as applicable, shall satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, be liable for the payment of PBGC premiums in accordance with Title IV of ERISA, 29 U.S.C. §§ 1306 and 1307, subject to any and all applicable rights and defenses of the Debtors, and administer the U.S. Pension Plans in accordance with the provisions of ERISA and the Internal Revenue Code. Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, the U.S. Pension Plans shall be continued and administered in accordance with ERISA and the Internal Revenue Code.

All Non-Qualified Pension Arrangements shall be deemed assumed as of the Effective Date to the extent they are Executory Contracts, or will be Reinstated pursuant to Section 3.3(d)(i)(B) or Section 3.3(d)(ii)(B), as applicable. Any monetary default under the Non-Qualified Pension Arrangements to be so assumed or Reinstated hereunder shall be satisfied in accordance with Section 6.3 or as otherwise may be agreed to by the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) and the beneficiaries of the Non-Qualified Pension Arrangements, and any postpetition interest paid on account of such Claims shall be paid at the federal judgment rate as of the Petition Date.

Assumption or Reinstatement of any Non-Qualified Pension Arrangement pursuant to the Plan or otherwise and payment of postpetition interest in accordance with the preceding sentence shall be deemed to provide full satisfaction of all prepetition Claims arising under any assumed Non-Qualified Pension Arrangement including those set forth in Proofs of Claim Nos. 1973, 1974, 1975, 2046, 2048, 2049, 2081, 2084, 2086, 2088, 2165, 2166, 2167, 2168, 2169, 2170, 2171, 2172, 2173, 2174, 2198, 2199, 2239, 2336, 2337, 2338, 2353, 2355, 9496 and 10234.

### 5.22    The Incentive Plans

The terms of the Incentive Plans shall be as set forth in the Plan Supplement.

### 5.23    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date and all property in each Estate, all Causes of Action (except those released pursuant to the Releases by the Debtors) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure the Exit Financing).  On and after the Effective Date, except as otherwise provided in the Plan (including, without limitation, the provisions of Section 8.1 of the Plan), each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5.24    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors intend to simplify and rationalize their corporate structure by eliminating certain entities that are deemed no longer essential to the Reorganized Debtors and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  Prior to the Effective Date, the Debtors shall have obtained the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, regarding their intentions with respect to the restructuring transactions.

### 5.25    Corporate Action

Upon the Effective Date, all actions contemplated by the Plan (including the simplification of the Reorganized Debtors' corporate structure) shall be deemed authorized and approved in all respects, including (1) entry into the New Employment Agreements; (2) selection of the directors and officers of the Reorganized Debtors; (3) the execution of and entry into the Exit Financing; (4) the distribution of the New Common Stock as provided herein; (5) the establishment of the Diacetyl Reserve and the Environmental Reserve and, if elected by the Debtors, the Diacetyl Trust and the Environmental Trust; and (6) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors.

5.26    **Effectuating Documents; Further Transactions**

        On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents related to the foregoing and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan (including the Exit Financing) and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.  The authorizations and approvals contemplated by this Section 5.26 shall be effective notwithstanding any requirements under non-bankruptcy law.

5.27    **Section 1146 Exemption from Certain Taxes and Fees**

        Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Section 5.24 hereof; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

5.28    **D&O Liability Insurance Policies**

        Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.  On or before the Effective Date, the Reorganized Debtors shall obtain reasonably sufficient tail coverage (*i.e.*, D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers for a period of five years, and placed with such insurers, the terms of which shall be set forth in the Plan Supplement.

5.29    **Preservation of Rights of Action**

        In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided by Section 11.2 hereof), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan

or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

**5.30** **Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim plus applicable interest.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**6.1** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of Chemtura Corporation's and the Subsidiary Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan Supplement before the Effective Date. In the event that Chemtura Canada becomes a Debtor before the Effective Date, each of Chemtura Canada's Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

**6.2** **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 4 General Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the later of (a) 90 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

**6.3     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases (and the Creditors' Committee and the Ad Hoc Bondholders' Committee, whose consent shall not be unreasonably withheld) may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  At least fourteen days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall be in a format reasonably acceptable to the Creditors' Committee and shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by counsel to the Debtors and the Creditors' Committee at least three days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  A list of the Executory Contracts and Unexpired Leases to be assumed and the notices of proposed assumption and proposed amounts of Cure Claims shall be included in the Plan Supplement.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

**6.4     Modifications, Amendments, Supplements, Restatements or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**6.5     Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**6.6**       **Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**6.7**       **Assumption of Insurance Policies**

Notwithstanding anything contained herein, in the Disclosure Statement, the Plan Supplement or the Confirmation Order, on the Effective Date, each of the Insurance Policies shall, as applicable, be deemed assumed to the extent such Insurance Policies are Executory Contracts of the applicable Debtor(s) pursuant to section 365 of the Bankruptcy Code.

<div align="center">

**ARTICLE VII**

**PROVISIONS GOVERNING DISTRIBUTIONS**

</div>

**7.1**       **Total Enterprise Value**

Distributions of New Common Stock to Holders of Allowed Claims, and the establishment and maintenance of the Disputed Claims Reserve, Diacetyl Reserve and Environmental Reserve, as described below, shall be based upon, among other things, the New Chemtura Total Enterprise Value.  For purposes of distribution, the New Common Stock shall be deemed to have the value assigned to it based upon, among other things, the New Chemtura Total Enterprise Value regardless of the date of distribution.

**7.2**       **Record Date for Distributions**

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

**7.3**       **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Interest against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof.  Except as otherwise provided herein (including in Section 7.6(a) with respect to Disputed Claims), holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**7.4**       **Disbursing Agent**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.  To the extent that any Entity other than the Reorganized Debtors or any of the Indenture Trustees is designated as a Disbursing Agent, such Entity's designation and service thereunder shall be conditioned upon such Entity posting a bond satisfactory to the Bankruptcy Court.

**7.5**     <u>Rights and Powers of Disbursing Agent</u>

**(a)**     **Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(b)**     **Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**7.6**     <u>Distributions on Account of Claims Allowed After the Effective Date</u>

**(a)**     **Payments and Distributions on Disputed Claims and Interests**

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim or Interest, unless and until such Claim or Interest becomes an Allowed Claim or Interest. Distributions made after the Effective Date to holders of Disputed Claims and Interests that are not Allowed Claims and Interests as of the Effective Date but which later become Allowed Claims and Interests shall be deemed to have been made on the Effective Date, *provided, however,* that to the extent a distribution after the Effective Date to the holder of a Disputed Claim or Interest includes New Common Stock, such New Common Stock shall be distributed together with all post-Effective Date accruals or dividends in connection therewith, and *provided, further,* that to the extent a Disputed Claim constituting a contract or trade claim arising in the ordinary course of the Debtors' business becomes an Allowed Claim, such Allowed Claim shall include interest calculated in accordance with the principles set forth in <u>Section 3.3(n)(i)</u>.

**(b)**     **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until all Disputed Claims and Interests held by the holder of such Disputed Claim or Interest have become Allowed Claims or Interests or have otherwise been resolved by settlement or Final Order.

**7.7**     <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>

**(a)**     **Delivery of Distributions in General**

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims or Interests shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proof of Claim or Interest filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim or Interest is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim or Interest; (c) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim or Interest shall have and receive the

benefit of the distributions in the manner set forth in the Plan.  None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, all distributions to holders of Prepetition Secured Lender Claims and Prepetition Unsecured Lender Claims shall be governed by the Prepetition Credit Agreement, and shall be deemed completed when made to the Prepetition Administrative Agent, who shall in turn make distributions in accordance with the Prepetition Credit Agreement.

Except as otherwise provided in the Plan, all distributions to holders of Notes Claims shall be governed by the Notes and Indentures, and shall be deemed completed when made to the Indenture Trustees, who shall in turn make distributions in accordance with the Notes and Indentures.

> **(b)**      **Fractional Distributions**

Whenever any payment of New Common Stock of a fraction pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole share (up or down), with half or less being rounded down.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

> **(c)**      **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

## 7.8      Compliance with Tax Requirements and Allocations

In connection with the Plan and all instruments issued in connection therewith, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

## 7.9      Setoffs

The Debtors and the Reorganized Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against

the holder of any such Allowed Claim or Interest.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim or Interest and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim or Interest) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such holder, except as specifically provided herein.

**7.10    Claims Paid or Payable by Third Parties**

**(a)    Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, shall reduce in part or in full an Allowed Claim to the extent that the holder of such Allowed Claim receives payment in part or in full on account of such Allowed Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of an Allowed Claim receives a distribution on account of such Allowed Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Allowed Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Allowed Claim from the third party and under the Plan exceeds the amount of such Allowed Claim as of the date of any such distribution under the Plan.

**(b)    Claims Payable by Third Parties**

To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, such Claim shall be treated as an Allowed Insured Claim to the extent of the insurer's agreement and may be expunged or reduced without a Claim objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

**(c)    Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to holders of Allowed Insured Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VIII**

**PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS OTHER THAN DIACETYL CLAIMS**

**8.1    Prosecution of Objections to Claims**

The Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court if the Allowed amount of such Disputed Claim is equal to or less than $100,000.  If, however, the Allowed amount of such Disputed Claim is greater than $100,000, the Reorganized Debtors shall file a notice of the proposed settlement with the Bankruptcy Court.  Parties in interest shall have ten days from the filing of such notice to object to the proposed

settlement.  If no objections are received on or before the tenth day, the Disputed Claim shall be deemed resolved for the amount proposed in the notice.  If, however, any objections are made in writing to the proposed settlement, a hearing shall be held before the Bankruptcy Court to resolve such objection.  Subject to the procedures set forth herein, the Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

## 8.2    Allowance of Claims and Interests

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date.  All claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

## 8.3    Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), New Chemtura shall deposit in the Disputed Claims Reserve the amount of Cash and New Common Stock that would have been distributed to the holders of all Disputed Unsecured Claims as if such Disputed Unsecured Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Unsecured Claims filed with the Bankruptcy Court, or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code pursuant to Section 8.7 or (c) the amount otherwise agreed to by the Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the holder of such Disputed Unsecured Claims for reserve purposes.

## 8.4    Distributions After Allowance

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim, except that Claims on account of goods and services shall receive interest for the time period between the Petition Date and the date such Claim becomes Allowed, payable at the contract rate to the extent allowable under law, or, if no allowable contract rate is specified, the federal judgment rate as of the Petition Date.

## 8.5    Distribution of Excess Amounts in the Disputed Claims Reserve

When all Disputed Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash or New Common Stock remains in the Disputed Claims Reserve after all holders of Disputed Claims that have become Allowed for each of the Debtors have been paid the full amount they are entitled to pursuant to the treatment set forth for the appropriate Class under the Plan, then (a) if Class 13a for Chemtura Corporation has voted to accept the Plan, then holders of Claims in the Participating Creditor Classes (to the extent they have not been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i)) shall receive their Pro Rata share of such remaining Cash and New Common Stock, in accordance with the Shortfall Readjustment, until they have been paid in full with all applicable interest, with any excess Cash returned to the Reorganized Debtors for general corporate use and with any excess New Common Stock being cancelled or held as treasury stock and (b) if Class 13a for Chemtura Corporation has voted to reject the Plan, and if all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i), each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash and New Common Stock.

**8.6**     **Property Held in the Disputed Claims Reserve**

Each holder of a Disputed Unsecured Claim that ultimately becomes an Allowed Unsecured Claim will have recourse only to the undistributed Cash and New Common Stock held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Unsecured Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

**8.7**     **Estimation of Claims**

The Debtors and the Creditors' Committee, in consultation with the Ad Hoc Bondholders' Committee (before the Effective Date), or Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors and the Creditors' Committee (before the Effective Date) or the Reorganized Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**8.8**     **Deadline to File Objections to Claims**

Any objections to Claims shall be filed no later than the Claims Objection Bar Date.

<div align="center">

**ARTICLE IX**

**PROCEDURES FOR RESERVING FOR ENVIRONMENTAL CLAIMS**

</div>

**9.1**     **Formation of Environmental Trust**

The Debtors, with the consent of the Creditors' Committee and Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the authority to establish an Environmental Trust, and shall be authorized to contribute to such Environmental Trust the Cash that constitutes the Environmental Reserve.  To the extent deemed appropriate and helpful by the Reorganized Debtors, the Debtors shall treat and designate such Environmental Trust as a qualified settlement fund pursuant to Treasury Regulation Section 1.468-1B.

**9.2**     **Environmental Reserve**

On the Effective Date (or as soon thereafter as is reasonably practicable), and solely to the extent that the Debtors do not reach a negotiated settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and approved by order of the Bankruptcy Court and that a Disputed Environmental Claim is not Reinstated (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) based upon the applicable Debtor's election pursuant to Section 3.3(k) of the Plan, Chemtura Corporation and the Subsidiary Debtors shall fully fund the Environmental Reserve with Cash based upon the amount determined by the Bankruptcy Court or agreed to by the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) and the holders of Disputed Environmental Claims.

**9.3**    **Distributions from the Environmental Reserve**

To the extent that Chemtura Corporation and the Subsidiary Debtors fund the Environmental Reserve pursuant to Section 9.2, and to the extent that a Disputed Environmental Claim ultimately becomes an Allowed Environmental Claim, distributions (if any) shall be made to the holder of such Allowed Environmental Claim in accordance with the terms of this Plan. On the Initial Distribution Date, the Disbursing Agent shall provide to each holder an of Allowed Environmental Claim a distribution (if any) from the Environmental Reserve equal to its Allowed Environmental Claim, without any interest to be paid on account of such Claim.

**9.4**    **Distribution of Excess Amounts in the Environmental Reserve**

When all Environmental Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash remains in the Environmental Reserve after all holders of Environmental Claims that have become Allowed for Chemtura Corporation and each of the Subsidiary Debtors have been paid in full, then (a) if Class 13a for Chemtura Corporation has voted to accept the Plan, then such remaining Cash shall be divided on a Pro Rata basis among holders of Claims in the Participating Creditor Classes (to the extent they have not been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i)) and the Disputed Claims Reserve, until all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i)), with any excess to be transferred to, and become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII, and (b) if Class 13a for Chemtura Corporation has voted to reject the Plan, any Cash remaining in the Environmental Reserve shall be transferred to, and shall become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII, and if all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i), each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash.

**9.5**    **Property Held in the Environmental Reserve**

Each holder of a Disputed Environmental Claim that ultimately becomes an Allowed Environmental Claim will have recourse only to the Environmental Reserve for satisfaction of the distributions to which holders of Allowed Environmental Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

## ARTICLE X

### PROCEDURES FOR RESERVING FOR AND RESOLVING DIACETYL CLAIMS

**10.1**    **Formation of Diacetyl Trust**

The Debtors, with the consent of the Creditors' Committee and Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the authority to establish a Diacetyl Trust, and shall be authorized to contribute to such Diacetyl Trust the Cash that constitutes the Diacetyl Reserve. To the extent deemed appropriate and helpful by the Reorganized Debtors, the Debtors shall treat and designate such Diacetyl Trust as a qualified settlement fund pursuant to Treasury Regulation Section 1.468-1B.

**10.2**    **Objections to Diacetyl Claims**

The Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld (before the Effective Date), or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Diacetyl Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Diacetyl Claim without approval of the Bankruptcy Court if the Allowed amount of such Disputed Diacetyl Claim is equal to or less than $100,000. If, however, the Allowed amount of such Disputed Diacetyl Claim is greater than $100,000, the Reorganized Debtors

shall file a notice of the proposed settlement with the Bankruptcy Court. Parties in interest shall have ten days from the filing of such notice to object to the proposed settlement. If no objections are received on or before the tenth day, the Disputed Diacetyl Claim shall be deemed resolved for the amount proposed in the notice. If, however, any objections are made in writing to the proposed settlement, a hearing shall be held before the Bankruptcy Court to resolve such objection. Subject to the procedures set forth herein, the Debtors reserve all rights to resolve any Disputed Diacetyl Claim outside the Bankruptcy Court under applicable governing law.

**10.3    Diacetyl Reserve**

On the Effective Date (or as soon thereafter as is reasonably practicable), New Chemtura and Chemtura Canada shall fully fund the Diacetyl Reserve with Cash based upon the Diacetyl Claim Value.

**10.4    Distributions from the Diacetyl Reserve**

To the extent that a Disputed Diacetyl Claim ultimately becomes an Allowed Diacetyl Claim, distributions (if any) shall be made to the holder of such Allowed Diacetyl Claim in accordance with the terms of this Plan. On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Diacetyl Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Allowed Diacetyl Claim an initial distribution (if any) from the Diacetyl Reserve equal to 50% of: (a) its Allowed Insured Deficiency Claim, if such Diacetyl Claim is an Insured Claim, or (b) its Allowed Diacetyl Claim, if such Diacetyl Claim is not an Insured Claim. In no event shall any interest be paid on account of any such Claim.

On the Distribution Date following the date when (i) all Diacetyl Claims have been either Allowed or disallowed by Final Order and (ii) the amount of the Allowed Insured Deficiency Claim (if applicable) for each Allowed Diacetyl Claim is known, the Disbursing Agent shall distribute from the Diacetyl Reserve to each holder of an Allowed Diacetyl Claim an amount equal to the Diacetyl Recovery Ratio multiplied by: (a) the amount of such holder's Allowed Insured Deficiency Claim, (if such Diacetyl Claim is an Insured Claim) less any amounts already distributed pursuant to the immediately preceding paragraph; or (b) the amount of such holder's Allowed Diacetyl Claim (if such Claim is not an Insured Claim) less any amounts already distributed pursuant to the immediately preceding paragraph. If the Diacetyl Reserve does not contain sufficient Cash to make the foregoing distribution to all holders of Allowed Diacetyl Claims, then each holder of an Allowed Diacetyl Claim shall receive on account of its Allowed Insured Deficiency Claim (if such Allowed Diacetyl Claim is an Insured Claim) or its Allowed Diacetyl Claim (if such Allowed Diacetyl Claim is not an Insured Claim), as the case may be, its Pro Rata share of the remaining Cash in the Diacetyl Reserve calculated based upon all Claims participating in the Diacetyl Reserve, less any amounts already distributed pursuant to the immediately preceding paragraph. For the avoidance of doubt, no holder of an Allowed Diacetyl Claim shall receive more than 100% of such Allowed Claim through payments under Insurance Policies or distributions pursuant to this Plan or any combination thereof.

**10.5    Distribution of Excess Amounts in the Diacetyl Reserve**

When all Diacetyl Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent Cash remains in the Diacetyl Reserve after all holders of Diacetyl Claims that have become Allowed for Chemtura Corporation and Chemtura Canada have been paid in full, then (a) if Class 13a for Chemtura Corporation has voted to accept the Plan, then such remaining Cash shall be divided on a Pro Rata basis among holders of Claims in the Participating Creditor Classes (to the extent they have not been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i)) and the Disputed Claims Reserve, until all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i)), with any excess to be transferred to, and become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII, and (b) if Class 13a for Chemtura Corporation has voted to reject the Plan, any Cash remaining in the Diacetyl Reserve shall be transferred to, and shall become a part of, the Disputed Claims Reserve for ultimate distribution pursuant to Article VIII, and if all holders of Claims in the Participating Creditor Classes have been paid in full, plus postpetition interest as applicable pursuant to Section 3.3(n)(i), each holder of an Interest in Class 13a for Chemtura Corporation shall receive its Pro Rata share of such excess Cash.

10.6 **Property Held in the Diacetyl Reserve**

Each holder of a Disputed Diacetyl Claim that ultimately becomes an Allowed Diacetyl Claim will have recourse only to the Diacetyl Reserve and any available Insurance Proceeds for satisfaction of the distributions to which holders of Allowed Diacetyl Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

## ARTICLE XI

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

11.1 **Compromise and Settlement of Claims, Interests and Controversies**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

11.2 **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, New Chemtura, the Reorganized Debtors and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, New Chemtura, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan and Disclosure Statement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Released Party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, nor does it release any Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement. Additionally, nothing in the Chapter 11 Cases, the Confirmation Order, the Plan, the Bankruptcy Code (including section 1141 thereof) or any other document filed in the Chapter 11 Cases shall in any way be construed to discharge, release, limit, or relieve the Debtors, the Reorganized Debtors, or any other party, in any capacity, from any liability or responsibility with respect to the U.S. Pension Plans or any other defined benefit plan under any law, governmental policy, or regulatory provision. PBGC and the U.S. Pension Plans shall not be enjoined or precluded from enforcing such liability or responsibility by any of the**

provisions of the Plan, Confirmation Order, Bankruptcy Code, or any other document filed in the Chapter 11 Cases.

**11.3      Releases by Holders of Claims and Interests**

As of the Effective Date, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, New Chemtura, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**11.4      Releases by Holders of Diacetyl Claims**

As of the Effective Date, each holder of a Claim in Class 10 shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged Chemtura Canada from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), consisting of, based on or relating to, or in any manner arising from, in whole or in part, any Diacetyl Claim.

**11.5      Exculpation**

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for gross negligence or willful misconduct (including fraud), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**11.6      Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the

Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

**11.7** **Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE XI HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE XI HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.2, 11.3 OR 11.4, OR DISCHARGED PURSUANT TO SECTION 11.6 OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.5, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE

CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

**11.8**     **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**11.9**     **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**11.10**     **Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## ARTICLE XII

### CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

**12.1**     **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.5.

1.     The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.     The Confirmation Order (a) shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee and (b) shall include a

finding by the Bankruptcy Court that the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

3.    The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto (in each case in form and substance) shall be reasonably acceptable to the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee.

## 12.2    Additional Condition Precedent to Confirmation

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, it shall also be a condition to Confirmation hereof that the following provision, term and condition shall have been satisfied or waived pursuant to the provisions of Section 12.4:  The Canadian Recognition Order shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

## 12.3    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.4.

1.    The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated herein.

2.    The Exit Financing shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived by the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld, or satisfied in accordance with the terms thereof, and funding pursuant to the Exit Financing shall have occurred.

3.    The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

4.    All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee.

5.    The Effective Date shall occur no later than October 15, 2010.

## 12.4    Additional Conditions Precedent to the Effective Date

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, it shall also be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.5:

1.    The Canadian Recognition Order shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

2.    The Canadian Confirmation Order shall be a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Ad Hoc Bondholders' Committee.

## 12.5    Waiver of Conditions

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article XII may be waived at any time by the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld; *provided, however,* that the Debtors

49

may not waive entry of the Order approving the Disclosure Statement and the Confirmation Order, and, to the extent Sections 12.2 and 12.4 apply, the Canadian Recognition Order and the Canadian Confirmation Order.

**12.6**    **Effect of Failure of Conditions**

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other Entity in any respect.

## ARTICLE XIII

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

**13.1**    **Modification and Amendments**

Except as otherwise specifically provided herein, the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee expressly reserve their rights to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XIII.

**13.2**    **Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**13.3**    **Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.   If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XIV

## RETENTION OF JURISDICTION

**14.1**    **Jurisdiction of the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1.　　　allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

2.　　　decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.　　　resolve any matters related to:  (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4.　　　ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.　　　adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.　　　adjudicate, decide or resolve any and all matters related to any Cause of Action;

7.　　　adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.　　　enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.　　　resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

10.　　　resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

11.　　　resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the Prepetition Security Agreement and related intercreditor agreement;

12.　　　resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the DIP Loan Agreement;

13.　　　resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the Notes;

14.　　　issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation or enforcement of the Plan;

15.　　　resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article XI and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

51

16.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Section 7.10(a);

17.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

18.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

19.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

20.     consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

21.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

22.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

23.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

24.     hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

25.     enforce all orders previously entered by the Bankruptcy Court;

26.     hear any other matter not inconsistent with the Bankruptcy Code; and

27.     enter an order concluding or closing the Chapter 11 Cases.

**14.2     Jurisdiction of the Bankruptcy Court in the Event Chemtura Canada Becomes a Debtor**

In the event Chemtura Canada becomes a Debtor before the Confirmation Date, all disputes involving the rights of a Canadian Entity that is (a) the holder of a Claim against or an Interest in Chemtura Canada, in the event it becomes a Debtor before the Confirmation Date, and (b) not subject to the jurisdiction of the Bankruptcy Court, will be determined by the Bankruptcy Court without prejudice to such Entity's right to seek to have such dispute heard instead by the Canadian Court.  Notwithstanding the foregoing, all such Canadian Entities will be bound by the terms and provisions of this Plan.

**ARTICLE XV**

**MISCELLANEOUS PROVISIONS**

**15.1     Immediate Binding Effect**

Subject to Section 12.3 and Section 12.4 (if applicable), and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized

Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**15.2    Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.   The Debtors or Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**15.3    Dissolution of Creditors' Committee and Equity Committee**

On the Effective Date, the Creditors' Committee and the Equity Committee shall dissolve, except: (a) the Creditors' Committee will remain intact with respect to any pending litigation or contested matter to which the Creditors' Committee is a party, any appeals filed regarding Confirmation, the resolution of any substantial contribution applications, the resolution of applications for Accrued Professional Compensation and all disputes regarding allowance of Disputed Claims and (b) the Equity Committee will remain intact (i) to the extent that Class 13a for Chemtura Corporation has voted to reject the Plan, with respect to the resolution of applications for Accrued Professional Compensation and all disputes regarding allowance of Disputed Claims, and (ii) to the extent that Class 13a for Chemtura Corporation has voted to accept the Plan, with respect to the resolution of any substantial contribution applications and the resolution of applications for Accrued Professional Compensation.   On the Effective Date, subject to the proviso above, the members of the Creditors' Committee and the Equity Committee shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall continue to compensate the Creditors' Committee's and the Equity Committee's Professionals for reasonable services provided in connection with any of the foregoing post-Effective Date activities.

**15.4    Payment of Fees and Expenses of the Creditors' Committee, the Equity Committee, the Prepetition Administrative Agent and the Indenture Trustees**

Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors shall promptly pay in Cash in full reasonable, documented and necessary  out-of-pocket fees and expenses incurred by the members of the Creditors' Committee, the members of the Equity Committee, the Prepetition Administrative Agent and the Indenture Trustees without the need of such parties to file fee applications with the Bankruptcy Court; provided that each party and its counsel shall provide the Debtors, the Creditors' Committee and the Equity Committee with the invoices (or such other documentation as the Debtors or another of such parties may reasonably request) for which it seeks payment on or before the Effective Date and provided that the Debtors and the other parties have no objection to such fees, such fees shall be paid within five business days of the Effective Date.  To the extent that the Debtors or any of the other parties object to any of the fees and expenses of the members of the Creditors' Committee, the members of the Equity Committee, the Prepetition Administrative Agent or the Indenture Trustees or their counsel or advisors, the Debtors shall not be required to pay any disputed portion of such fees until a resolution of such objection is agreed to by the Debtors and such party and/or their counsel or a further order of the Bankruptcy Court upon a motion by such party.

**15.5    Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before the Effective Date.

**15.6**     **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

**15.7**     **Service of Documents**

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

Chemtura Corporation
199 Benson Road
Middlebury, Connecticut 06749
Attn:  General Counsel

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: M. Natasha Labovitz

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

**15.8**     **Entire Agreement**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

**15.9**     **Severability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors' and consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee (which consent shall not be unreasonably withheld); and (3) nonseverable and mutually dependent.

**15.10**     **Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, by contacting Anna del Rosario, Kirkland & Ellis LLP, 601

Lexington Avenue, New York, NY 10022, Telephone: (212) 446-3487, email: anna.delrosario@kirkland.com, at the Bankruptcy Court's web site at *http://ecf.nysb.uscourts.gov* or at the website of the Notice and Claims Agent, at *www.kccllc.net/chemtura*. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**15.11    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock offered and sold under the Plan.

**15.12    Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**15.13    Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control.

**15.14    Insurance Neutrality**

Unless otherwise expressly agreed to by an insurer in writing, notwithstanding any provision in the Plan, the Confirmation Order or any other Plan document, nothing contained in any such documents or in this paragraph shall impose, or shall be deemed or construed to impose, any obligation on any insurer to provide a defense for, settle, or pay any judgment with respect to, any Claim, including any Insured Claim; rather, an insurer's obligations, if any, with respect to any Claim, including any Insured Claim, shall be determined solely by and in accordance with the allegedly applicable Insurance Policies.

Unless otherwise expressly agreed to by an insurer in writing, nothing in the Plan, the Confirmation Order or any other Plan document shall diminish or impair, or be deemed to diminish or impair, the rights of any insurer to assert any claim, including any claim for contribution or subrogation, defense, right, setoff or counterclaim in connection with any Claim, including any Insured Claim, or any of the Insurance Policies. Without limiting the generality of the foregoing, nothing in the Plan, the Confirmation Order or any other Plan document shall, under any theory, (1) constitute a trial, an adjudication on the merits or evidence establishing the liability of any insurer in subsequent litigation for any Claim, including any Insured Claim, or under any of the Insurance Policies, (2) constitute, or be deemed to constitute, a determination of the reasonableness of the amount of any Claim, including any Insured Claim, either individually or in the aggregate with other Claims, (3) be deemed to grant to any Person any right to sue any insurer directly, in connection with a Claim, including any Insured Claim, or any of the Insurance Policies, (4) constitute a finding or determination that any Debtor is a named insured, additional insured or insured in any other way under any of the Insurance Policies, or (5) that any insurer has any defense or indemnity obligation with respect to any Claim or Insured Claim. It is the intent of this Plan that insurers shall retain, and be permitted to assert, (y) all of their rights and defenses with respect to coverage of any Claim, including any Insured Claim, notwithstanding any provision of the Plan, the Confirmation Order or any other Plan document, and (z) all of the Debtors' defenses to liability in connection with any Claim, including any Insured Claim, and that the Insurers'

rights to assert all such underlying defenses to liability and all such defenses to coverage of any Claim, including any Insured Claim, will not be impaired in any way by the Plan, the Confirmation Order or any other Plan document.

Except as expressly set forth therein, nothing in the Plan, the Confirmation Order or any other Plan document shall diminish or impair any of the rights and defenses of the Debtors or the Reorganized Debtors, if any, both legal and equitable, with respect to the Insurance Policies.

*[Remainder of page intentionally left blank.]*

Dated: August 4, 2010

Respectfully submitted,

Chemtura Corporation

By:  _S. C. Hunt_____

Stephen C. Forsyth
Executive Vice President and
Chief Financial Officer

BioLab Company Store, LLC
BioLab Franchise Company LLC

By:  _S. C. Hunt_____

Stephen C. Forsyth
Manager

GLCC Laurel, LLC

By:  _Billie S. Flaherty_____

Billie S. Flaherty
Vice President

A&M Cleaning Products, LLC
Aqua Clear Industries, LLC
ASCK, Inc.
ASEPSIS, Inc.
BioLab Textile Additives, LLC
Bio-Lab Inc.
CNK Chemical Realty Corp.
Crompton Colors Incorporated
Crompton Holding Corporation
Crompton Monochem, Inc.
Great Lakes Chemical Corporation
Great Lakes Chemical Global, Inc.
GT Seed Treatment, Inc.
HomeCare Labs, Inc.
ISCI, Inc.
Kem Manufacturing Corporation
Laurel Industries Holdings, Inc.
Monochem, Inc.
Naugatuck Treatment Company
Recreational Water Products, Inc.
Uniroyal Chemical Company Limited (Delaware)
Weber City Road LLC
WRL of Indiana, Inc.

By:  _____

Robert J. Cicero
Secretary

Chemtura Canada Co./Cie

By: _____

Noel C. Blake
Regional Comptroller
Canada and Latin America

Prepared by:

Richard M. Cieri
M. Natasha Labovitz
Craig A. Bruens
Dana Yankowitz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Counsel to the Debtors and Debtors in Possession

**<u>Exhibit 1</u>**


**Rights Offering Procedures**

**Rights Offering Procedures**[1]

1.    **Introduction**

As set forth in Section 3.3(m)(i)A) of the Plan, to the extent that Class 13a for Chemtura Corporation votes to accept the Plan, each holder of a share of common stock or equivalent Interest in Chemtura Corporation (each, an "**Eligible Holder**") as of the Rights Offering Record Date shall receive the right, but not the obligation, to purchase its Pro Rata share of 7.38 million shares of New Common Stock (the "**Rights Offering**") exercisable pursuant to the rights offering subscription exercise form, substantially in the form attached as Exhibit 17 to the *Order (A) Fixing Dates and Deadlines Related to Confirmation of the Plan; (B) Approving Procedures for Soliciting And Tabulating the Votes on, and for Objecting to, the Plan; (C) Approving Rights Offering Procedures; and (D) Approving the Manner and Form of Notices and Documents Relating to the Plan* (Docket No. [XX]) (the "**Rights Exercise Form**").  The Rights Exercise Form will be sent to each Eligible Holder 30 days before the deadline established by the Debtors for expiration of the rights offering (the "**Rights Offering Deadline**").  Such Rights Exercise Form will indicate the price per share of New Common Stock (the "**Rights Exercise Price**") payable in connection with the Rights Offering.

Each Eligible Holder shall have the right to purchase up to its Pro Rata share of New Common Stock (the "**Initial Rights**") subject to the Rights Offering.  Each Eligible Holder's Pro Rata share will be based upon the following equation:

$$\text{(Shares of common stock or equivalent Interest held as of the Rights Offering Record Date)} \quad \text{x} \quad [XX]^2 \quad = \quad \text{(Maximum Number of Initial Rights - Round Down to the Nearest Whole Number)}$$

In addition, the Rights Exercise Form will provide that Eligible Holders that have exercised their full Pro Rata share of Initial Rights may indicate the amount of additional Rights (the "**Additional Rights**," and, together with the Initial Rights, the "**Rights**") that they commit to exercise in the event that the Eligible Holders do not exercise their Initial Rights to purchase all of the New Common Stock available pursuant to the Rights Offering (an "**Under-Subscription**") as of the Rights Offering Deadline.  In the event of an Under-Subscription, Eligible Holders that elected to exercise Additional Rights will be entitled to purchase a number of additional shares of New Common Stock in an amount equal to the number of Additional Rights specified on each Eligible Holder's Rights Exercise Form; *provided, however,* that in the event that Eligible Holders, in the aggregate, attempt to exercise more Additional Rights than are available for all Eligible Holders electing to exercise Additional Rights, Eligible Holders will only be able to exercise their Pro Rata share of Additional Rights (as determined by the Rights Participation Amounts of all such properly exercising Eligible Holders).

After the Rights Offering Record Date, each Eligible Holder that is a registered holder will be sent a Rights Exercise Form and each nominee (a "**Nominee**") representing beneficial owners will be sent Rights Exercise Forms for the beneficial owners the Nominee represents, which shall enable such Eligible Holder or Nominee (on behalf of beneficial owners that are Eligible Holders) to elect to purchase New Common Stock.  The Rights Exercise Form shall contain related instructions for the proper completion, due execution, and timely delivery of the Rights Exercise Form along with payment by an Eligible Holder or a Nominee (who is responding on behalf of beneficial owners) to the Subscription Agent.  **An Eligible Holder's election to exercise Rights will be binding upon such Eligible Holder and irrevocable.**

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings set forth in the Disclosure Statement.

[2]    [Amount to be inserted will be calculated by dividing the number of shares of New Common Stock subject to the Rights Offering by the total of all Eligible Holders' Rights Participation Amounts].

Each Right can be exercised for one share of New Common Stock.  No Eligible Holder will be granted or allowed to exercise any fractional Rights.

"**Disclosure Statement**" means the *Disclosure Statement for the Joint Chapter 11 Plan of Chemtura Corporation et al.*, dated June 17, 2010, as may be modified, amended or supplemented from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan that is prepared, approved by order of the Bankruptcy Court and distributed in accordance with such order of approval.

"**Subscription Agent**" means Epiq Bankruptcy Solutions, in its capacity as such.

"**Rights Offering Record Date**" means the business day before the date on which the Debtors first send the Rights Exercise Forms to Eligible Holders pursuant to the terms of the Plan and these Rights Offering Procedures.

"**Rights Participation Amount**" means, for each Eligible Holder, the amount of the shares of common stock or equivalent Interest listed on the Rights Exercise Form sent to such Eligible Holder, which shall reflect the amount of the Eligible Holder's shares of common stock or equivalent Interest for voting purposes, or the amount adjudicated in an order of the Bankruptcy Court obtained by the Eligible Holder of the shares of common stock or equivalent Interest at least five days before the Rights Offering Deadline.

**Notwithstanding anything contained in the Plan to the contrary, under no circumstances shall any holder of shares of common stock or equivalent Interest that is not entitled to vote on the Plan have any Rights with respect to such shares of common stock or equivalent Interest.  Notwithstanding anything contained in the Plan to the contrary, in the event that Class 13a for Chemtura Corporation votes to reject the Plan, under no circumstances shall any holder of shares of common stock or equivalent Interest in Chemtura Corporation have any Rights with respect to such shares of common stock or equivalent Interest, all Rights Exercise Forms received by the Subscription Agent shall be null and void and any payments received by the Subscription Agent will be refunded, without interest, to the Eligible Holders as soon as reasonably practicable after the Effective Date.**

*Before exercising any Rights, Eligible Holders should read the Disclosure Statement, including the section entitled "Risks Related to the Debtors' Businesses" and the New Chemtura Total Enterprise Value contained therein.*

**The issuance of the New Common Stock will be registered under the Securities Act of 1933, as amended, and applicable state, local or foreign laws, or issued without registration in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.**

2.      **Commencement/Expiration of the Rights Offering**

The Rights Offering shall commence on the day upon which the Rights Exercise Forms are mailed to Eligible Holders.  The Rights Offering shall expire on the Rights Offering Deadline.  Each Eligible Holder intending to participate in the Rights Offering must affirmatively elect to exercise its Rights on or prior to the Rights Offering Deadline in accordance with the procedures set forth herein.

3.      **Exercise of Rights**

*Exercise of and Payment for Initial Rights*

Each Eligible Holder may designate on its Rights Exercise Form whether it wishes to exercise its Initial Rights.  For those Eligible Holders holding shares through a Nominee, to exercise its Rights, such Eligible Holder must provide instructions to its bank, broker, or other nominee or agent.  The bank, broker, or other nominee or agent, in turn, must then convey the instruction to the Subscription Agent on or before the Rights Offering Deadline through the Automated Subscription Offer Program of The Depository Trust Company ("**DTC**").

To exercise its Initial Rights, each Eligible Holder or Nominee on behalf of an Eligible Holder must pay or arrange for payment of the total exercise price to be paid based upon the Rights Exercise Price (the "**Initial Rights Total Exercise Price**") to the Subscription Agent on or before the Rights Offering Deadline, or payment by DTC to the Subscription Agent.

If the Subscription Agent for any reason does not timely receive from or on behalf of the participating Eligible Holder a duly completed Rights Exercise Form and immediately available funds by wire transfer in an amount equal to the Initial Rights Total Exercise Price for such Eligible Holder, or payment by DTC, such Eligible Holder shall be deemed to have relinquished and waived its Initial Rights.

### Exercise of and Payment for Additional Rights

Any Eligible Holder (whether a registered holder or through a Nominee) that exercises all of its Initial Rights may indicate on its Rights Exercise Form how many additional shares of New Common Stock such Eligible Holder wishes to purchase through the exercise of Additional Rights, *provided*, *however*, that an Eligible Holder shall only be entitled to Additional Rights to the extent that the Rights Offering is Under-Subscribed. Election and payment for Additional Rights must be made at the same time and under the same terms and conditions as the election and payment for Initial Rights.

### Disputes, Waivers and Extensions

Any and all disputes concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be addressed in good faith by the Debtors (in consultation with the Creditors' Committee and the Ad Hoc Bondholders' Committee), subject to a final and binding determination by the Bankruptcy Court. The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld), subject to Bankruptcy Court approval, may seek to waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine in good faith to be appropriate, or reject the purported exercise of any Rights. The Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) reserve the right, but are under no obligation, to give notice to any Eligible Holder or Nominee regarding any defect or irregularity in connection with any purported exercise of Rights by such Eligible Holder and the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) may, but are under no obligation, permit such defect or irregularity to be cured within such time as they may determine in good faith, subject to Bankruptcy Court approval, to be appropriate; *provided*, *however*, that none of the Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee or the Subscription Agent shall incur any liability for failure to give such notification.

The Debtors, with the approval of the Bankruptcy Court, may extend the duration of the Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Rights.

### Funds

The proceeds of the Rights Offering (the "**Rights Offering Funds**") will be used to provide $100 million in Cash (or such lesser amount of proceeds actually achieved, in the event of an Under-Subscription) funding to the Reorganized Debtors to fund distributions pursuant to the Plan.

The Rights Offering Funds shall be deposited and held by the Subscription Agent in escrow pending the Effective Date in an account or accounts (a) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or any cash collateral arrangements and (b) which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date. The Subscription Agent shall not use the Rights Offering Funds for any other purpose before the Rights Offering Deadline and shall not encumber or permit the Rights Offering Funds to be encumbered by any lien or similar encumbrance.

*Waiver*

Each Eligible Holder that participates in the Rights Offering shall be deemed by virtue of such participation, to have waived and released, to the fullest extent permitted under applicable law, all rights, claims or causes of action against the Debtors, the Reorganized Debtors and the Subscription Agent and each of their subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives arising out of or related to the receipt, delivery, disbursements, calculations, transmission or segregation of Cash, Rights and shares of New Common Stock in connection with the Rights Offering.

**4.    Transfer Restriction; Revocation**

Pursuant to the Plan, the Rights are not transferable independently of the underlying shares of common stock or equivalent Interests from which such Rights arise.  Rights may only be exercised by or through the Eligible Holder entitled to exercise such Rights on the Rights Offering Record Date.  Any such independent transfer or attempted transfer of the Rights will be null and void and the Debtors will not treat any purported transferee as the holder of any Rights.  Once the Eligible Holder has properly exercised its Rights, such exercise will not be permitted to be revoked by such Eligible Holder.

**5.    Subsequent Adjustments of Additional Rights**

If, as of the Rights Offering Deadline, Eligible Holders, in the aggregate, attempt to exercise more Additional Rights than are available for all Eligible Holders electing to exercise Additional Rights, Eligible Holders will only be able to exercise their Pro Rata share of Additional Rights (as determined by the Rights Participation Amounts of all such properly exercising Eligible Holders), and each properly exercising Eligible Holder shall have the Additional Rights which it may exercise reduced on a Pro Rata basis.  The difference between the price actually paid by such exercising Eligible Holder and the Eligible Holder's Rights Exercise Price of New Common Stock that such Eligible Holder is entitled to acquire after giving effect to the reduction, if any, shall be refunded, without interest, as soon as reasonably practicable after the Effective Date.

**6.    Inquiries and Transmittal of Documents; Subscription Agent**

The exercise instructions contained in the Rights Exercise Form should be carefully read and strictly followed.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following address and phone number:

> Epiq Bankruptcy Solutions
> 757 Third Avenue, 3rd Floor
> New York, New York 10017

The risk of delivery of all documents and payments is on the Eligible Holders electing to exercise their Rights, not the Debtors or the Subscription Agent.  If mail is used, it is recommended that a reputable overnight courier or insured registered mail be used and that a sufficient number of days be allowed to ensure delivery to the Subscription Agent before the Rights Offering Deadline.

**7.    Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights**

All exercises of Rights are subject to and conditioned upon the confirmation of the Plan and the occurrence of the Effective Date of the Plan.  All exercises of Rights are subject to and conditioned upon Class 13a for Chemtura Corporation voting to accept the Plan.

**<u>Exhibit B</u>**

**Disclosure Statement Order and Solicitation Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09-11233 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER APPROVING (A) THE ADEQUACY OF THE**
**DISCLOSURE STATEMENT AND (B) NOTICE OF THE**
**HEARING TO APPROVE THE DISCLOSURE STATEMENT**

Upon the motion (the "**Motion**") of Chemtura Corporation and its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") for

entry of an order pursuant to sections 1125 of the Bankruptcy Code, Rules 2002, 3016 and 3017

of the Bankruptcy Rules and Rule 3017-1 of the Local Bankruptcy Rules for the Southern

District of New York (the "**Local Bankruptcy Rules**") approving (a) the *Disclosure Statement*

*for the Joint Chapter 11 Plan of Chemtura Corporation, et al.* in the form attached hereto as

Exhibit 1 (the "**Disclosure Statement**");[2] and (b) the form of notice of the hearing to approve the

Disclosure Statement, substantially in the form attached hereto as Exhibit 2 (the "**Disclosure**

**Statement Hearing Notice**"); and the Court having jurisdiction to consider the Motion and the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement.

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion

and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing

that the Disclosure Statement contains "adequate information" within the meaning of section

1125 of the Bankruptcy Code and that the relief requested in the Motion is appropriate and will

benefit the Debtors' estates, their creditors and all other parties in interest; and due and proper

notice of the Motion having been provided, and it appearing that no other or further notice need

be provided; and upon the arguments and testimony presented at the hearing before the Court,

and any objections to the Motion having been withdrawn, resolved or overruled on the merits;

and after due deliberation and sufficient cause appearing therefor, it is **ORDERED** that:

1.       The Motion is granted.

2.       The Disclosure Statement is hereby approved pursuant to section 1125 of the

Bankruptcy Code, as providing holders of Claims and Interests entitled to vote on the Plan with

adequate information to make an informed decision as to whether to vote to accept or reject the

Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

3.       The Disclosure Statement (including all applicable exhibits thereto) provides

holders of Claims, holders of Interests and other parties in interest with sufficient notice of the

injunction, exculpation and release provisions contained in Article XI of the Plan, in satisfaction

of the requirements of Bankruptcy Rule 3016(c).

4.       The Disclosure Statement Hearing Notice, attached hereto as Exhibit 2 and

incorporated by reference herein, filed by the Debtors, constitutes adequate and sufficient notice

of the hearing to consider approval of the Disclosure Statement, which was held on July 21, 2010

K&E 17404522.2

at 9:00 a.m. (Eastern Daylight Time), and satisfies the requirements of the applicable provisions

of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

5.      The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

6.      Notwithstanding anything contained in the Bankruptcy Code, the Bankruptcy

Rules or the Local Bankruptcy Rules, the terms and conditions of this Order shall be

immediately effective and enforceable upon its entry.


New York, New York                              *s/ Robert E. Gerber*
Date: **_August 5, 2010_**                         Honorable Robert E. Gerber
                                                United States Bankruptcy Judge

3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09-11233 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**ORDER (A) FIXING DATES AND DEADLINES**
**RELATED TO CONFIRMATION OF THE PLAN; (B) APPROVING**
**PROCEDURES FOR SOLICITING AND TABULATING THE**
**VOTES ON, AND FOR OBJECTING TO, THE PLAN; (C) APPROVING**
**RIGHTS OFFERING PROCEDURES; AND (D) APPROVING THE**
**MANNER AND FORM OF NOTICES AND DOCUMENTS RELATING TO THE PLAN**

Upon the motion [Docket No. 3220] (the "**Motion**")[2] of Chemtura Corporation and its

affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"**Debtors**") for entry of an order pursuant to sections 1123(a), 1124, 1125, 1126 and 1128 of the

Bankruptcy Code, Rules 2002, 3003, 3016, 3018 and 3020 of the Bankruptcy Rules and Rule 3017-1

of the Local Bankruptcy Rules (a) establishing the Voting Record Date, Voting Deadline and other

related dates and scheduling the Confirmation Hearing; (b) approving the voting and tabulation

procedures attached hereto as <u>Exhibit 1</u>, which are incorporated herein by reference and are hereby

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification
number, are:  Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC
(1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company,
LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340);
Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574);
GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT
Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603);
Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational
Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381);
and WRL of Indiana, Inc. (9136).

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion
and the Voting and Tabulation Procedures attached hereto as <u>Exhibit 1</u> and incorporated herein by reference.

1

approved in their entirety (the "**Voting and Tabulation Procedures**"); (c) approving the Rights

Offering Procedures substantially in the form attached to the Plan as <u>Exhibit 1</u>; and (d) approving the

manner and form of the notices and ancillary documents related to the foregoing; and upon the revised

Exhibits to the Motion filed with Court on July 13, 2010 and July 20, 2010; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this court pursuant to 28 U.S.C.

§§ 1408 and 1409; and it appearing that the relief requested in the Motion will benefit the Debtors'

estates, their creditors and all other stakeholders and parties in interest; and due and proper notice of

the Motion having been provided, and it appearing that no other or further notice need be provided;

and upon the arguments and testimony presented at the hearing before the Court, and any objections to

the Motion having been withdrawn, resolved or overruled on the merits; and after due deliberation and

sufficient cause appearing therefor, it is **ORDERED** that:

1.      The Motion is granted.

**A.      Approval of the Voting and Tabulation Procedures**

2.      The Debtors are authorized to solicit, receive and tabulate votes to accept or reject the

Plan in accordance with the Voting and Tabulation Procedures attached hereto as <u>Exhibit 1</u> and

incorporated by reference herein, which are hereby approved in their entirety.

**B.      Approval of Key Dates and Deadlines With Respect to Confirmation of the Plan**

3.      The following dates and deadlines are hereby established with respect to voting on and

confirmation of the Plan:

> (i)      **July 23, 2010** shall be the date for determining: (i) the holders of Claims and Interests entitled to receive Solicitation Packages; (ii) the holders of Claims and Interests entitled to vote to accept or reject the Plan; and (iii) whether Claims have been properly transferred to an

2

assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of such Claim (the "**Voting Record Date**");

(ii)     the Debtors shall distribute Solicitation Packages as well as the Confirmation Hearing Notice on or before five business days from entry of this order (the "**Solicitation Deadline**");

(iii)    all holders of Claims and Interests entitled to vote on the Plan must complete, execute and return their Ballots so that they are **actually** **received** by the Voting and Claims Agent or the Securities Voting Agent, as applicable, pursuant to the Voting and Tabulation Procedures, on or before **September 9, 2010 at 5:00 p.m. (Eastern Daylight Time)** (the "**Voting Deadline**");

(iv)     **September 9, 2010 at 4:00 p.m. (Eastern Daylight Time)** shall be date by which objections to the Plan must be filed with the Court and served so as to be **actually** **received** by the appropriate notice parties (the "**Plan Objection Deadline**"); and

(v)      the Court shall consider confirmation of the Plan at the hearing to be held on **September 16, 2010 at 9:45 a.m. (Eastern Daylight Time)** (the "**Confirmation Hearing**").

4.      Additionally, the Debtors may file the Voting Report on September 13, 2010, notwithstanding the requirements set forth in Local Bankruptcy Rule 3018-1(a).

## C.     Approval of Notices in Connection with Confirmation of the Plan

5.      The form of notice of the Confirmation Hearing, substantially in the form attached hereto as Exhibit 2 and incorporated herein by reference is hereby approved (the "**Confirmation Hearing Notice**").  The Debtors shall serve the Confirmation Hearing Notice on all known holders of Claims and Interests, all parties to Executory Contracts and Unexpired Leases and the 2002 List[3] (regardless of whether such parties are entitled to vote on the Plan) by no later than August 12, 2010.

---

[3]   As used in this Order, the "**2002 List**" refers to the list of all parties required to be notified under Bankruptcy Rule 2002.

Additionally, the Debtors shall publish the Confirmation Hearing Notice (in a format modified for publication) once within seven business days before the Plan Objection Deadline in the national editions of *The New York Times* and *USA Today* (the "**Confirmation Publication Notice**").

**D.    Approval of the Recovery Preference Election Form and Related Actions**

6.    The forms of the notice of (i) the Plan Supplement (as defined in the Plan) and (ii) the election form by which each holder of an Allowed Claim in the Participating Creditor Classes may, at the time of voting upon the Plan, make a binding election to seek to receive the maximum available percentage of its recovery in the form of Cash or the maximum available percentage of its recovery in the form of New Common Stock (the "**Recovery Preference Election Form**"), substantially in the forms attached hereto as Exhibit 3 and Exhibit 4, respectively and incorporated herein by reference are hereby approved.

7.    The Debtors will deliver the Recovery Preference Election Forms to Nominees holding Note Claims as of the Voting Record Date; **provided**, **however**, that any holder of Note Claims may make the Recovery Preference Election prior to the expiration of the Voting Deadline even if such holder was not a holder as of the Voting Record Date; **provided**, **further**, **however**, that the final allocation will be determined solely by the Debtors based on the preferences expressed by claimants (on the Ballots or a Recovery Preference Election Form) and is not subject to further challenge; **provided**, **further**, **however**, that, notwithstanding anything to the contrary in this Order or the Voting and Tabulation Procedures, distributions shall be made in accordance with the Plan, as confirmed by the Court.

8.    Nominees holding Note Claims will be required to forward information with respect to the Recovery Preference Election to Beneficial Holders of such securities and to effect any Recovery Preference Election on their behalf through the Depository Trust Company's ("**DTC**") Automated Tender Offer Program system.  Such Nominees may use the Recovery Preference Election Form

4

provided or such other form as they may customarily use for the purpose of obtaining instructions with respect to a treatment election on account of the Beneficial Holder's Claim.

9.      Nominees must retain the original Recovery Preference Election Forms and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Court.

10.     All Recovery Preference Election requests must be received by either the Voting and Claims Agent or the Securities Voting Agent, as applicable, before the expiration of the Voting Deadline.

11.     The Debtors, the Securities Voting Agent, Nominees, the Indenture Trustees and the Voting and Claims Agent are authorized, but not directed, to give notice to any holder of a Claim in a Participating Creditor Class who has submitted a Recovery Preference Election Form regarding any defect or irregularity with respect to such Recovery Preference Election Form and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; **provided**, **however**, that the Debtors, the Securities Voting Agent, Nominees, the Indenture Trustees and the Voting and Claims Agent shall not have any obligation to provide such notice, nor will they incur any liability for failure to give such notification.

**E.      Approval of the Form of Ballots and Master Ballots**

12.     The forms of the ballots and master ballots (collectively, the "**Ballots**"), substantially in the forms attached hereto as Exhibits 5 through Exhibit 13B and incorporated herein by reference are hereby approved.[4]

---

[4]     Although the Debtors believe that Class 1 holders of Prepetition Secured Lender Claims are Unimpaired by the terms of the Plan and therefore are deemed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code, such Class shall be permitted to vote to accept or reject the Plan on a provisional basis.  The Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the Prepetition Administrative Agent reserve all rights with respect to whether holders of Class 1 Prepetition Secured Lender Claims are in fact Unimpaired by the terms of the Plan.

13.     Nominees must retain the original Ballot and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Court.

**F.      Approval of the Solicitation Packages**

14.     In addition to the Disclosure Statement and exhibits thereto, including the Plan and this Order, the Solicitation Packages to be transmitted on or before the Solicitation Deadline to those holders of Claims and Interests in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:[5]

> (i)      the cover letter to be sent by the Debtors to holders of Claims and Interests in the Voting Classes urging such parties to vote in favor of the Plan, substantially in the form attached hereto as <u>Exhibit 14</u>;
>
> (ii)     a letter from the Creditors' Committee in support of the Plan (as will be included in the Disclosure Statement);
>
> (iii)    the Disclosure Statement (and exhibits thereto, including the Plan);
>
> (iv)     this Order, including the Voting and Tabulation Procedures;
>
> (v)      the Confirmation Hearing Notice; and
>
> (vi)     an appropriate form of Ballot and, if appropriate, a Recovery Preference Election Form.

15.     The Solicitation Packages provide holders of Claims and Interests entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code and the Local Bankruptcy Rules.

---

[5]   The Debtors will make reasonable efforts to ensure that any holder of a Claim who has filed duplicate Claims against the Debtors (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class, receive no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim with respect to that Class.

16.     The Debtors shall distribute Solicitation Packages to all holders of Claims and Interests entitled to vote on the Plan on or before the Solicitation Deadline.  With respect to holders of Notes Claims and Interests in Chemtura Corporation, such distribution shall be done pursuant to the terms and requirements set forth in the Voting and Tabulation Procedures.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

17.     The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement and this Order to holders of Claims and Interests entitled to vote on the Plan in CD-ROM format.  The Ballots and the Confirmation Hearing Notice will *only* be provided in paper form.  On or before the Solicitation Deadline, the Debtors shall also provide (i) complete Solicitation Packages to the Notice Parties and (ii) the Solicitation Procedures Order (in CD-ROM format) and the Confirmation Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

18.     Any party who receives a CD-ROM, but who would prefer paper format, may contact the Voting and Claims Agent and request paper copies of the corresponding materials previously received in CD-ROM format, which will then be provided at the Debtors' expense.

19.     The Prepetition Administrative Agent will provide all necessary contact and other relevant information for holders of Class 1 Prepetition Secured Lender Claims and Class 5 Prepetition Unsecured Lender Claims to the Voting and Claims Agent within three business days of the entry of this Order.

20.     In light of the Plan's proposed treatment of the Claims asserted by the Pension Benefit Guaranty Company (the "**PBGC Claims**"), including the settlement contemplated by the Plan and included in the Plan Support Agreement, the Debtors will not be required to solicit the votes from the PBGC.  Instead, the Debtors shall transmit to the PBGC a copy of the Disclosure Statement and the Plan in CD-ROM format.

**G.      Approval of Notices to Non-Voting Classes and Claims and Contract and Lease Counterparties**

21.      Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims or Interests in non-Voting Classes or holders of Claims or Interests otherwise not entitled to vote on the Plan pursuant to the Voting and Tabulation Procedures.  Instead, on or before the Solicitation Deadline, the Voting and Claims Agent shall mail (first-class postage prepaid) to parties who are not entitled to vote on the Plan one of the following Non-Voting Status Notices in lieu of Solicitation Packages, the form of each of which is hereby approved:

> (i)      *Unimpaired Claims – Conclusively Presumed to Accept*: Holders of Claims in Classes 2, 3, 4c, and 9, which are conclusively presumed to have accepted the Plan, shall receive the notice substantially in the form attached hereto as Exhibit 15 and incorporated by reference herein; and

> (ii)     *Objected-to Claims – Not Entitled to Vote*:  Holders of Claims subject to a pending objection deadline as of the Voting Record Date who are not entitled to vote on the Plan pursuant to the Voting and Tabulation Procedures shall receive the notice, substantially in the form attached hereto as Exhibit 16 and incorporated by reference herein.

22.      Counterparties to the Debtors' Executory Contracts and Unexpired Leases that are subject to assumption or rejection pursuant to Article VI of the Plan shall receive an appropriate notice substantially in the form attached hereto as Exhibit 17 or Exhibit 18 and incorporated herein by reference, the form of which are hereby approved incorporated by reference herein.  Such notices will be mailed to such parties no later than 14 days before the Confirmation Hearing.

23.      The Debtors are not required to provide the holders of Class 12 Intercompany Claims and Class 13b Interests in the Subsidiary Debtors and Chemtura Canada with a Solicitation Package or any other type of notice.

24.     Except as otherwise provided in this Order or the Voting and Tabulation Procedures, the Debtors are not required to mail Solicitation Packages or any other solicitation materials to those holders of Claims or Interests that are not entitled to vote to accept or reject the Plan in accordance with the Voting and Tabulation Procedures or any party to whom the Disclosure Statement Hearing Notice was sent but returned as undeliverable.

**H.     Approval of the Rights Offering Procedures**

25.     The Rights Offering Procedures, attached to the Plan as Exhibit 1 and incorporated herein by reference, are hereby approved.

26.     In the event Class 13a holders of Interests in Chemtura Corporation votes to accept the Plan and each holder of an Interest in Chemtura Corporation (each, an "**Eligible Holder**") receives the right, but not the obligation, to purchase its Pro Rata share of 7.38 million shares of New Common Stock pursuant to the terms of the Plan (the "**Rights Offering**"), the Debtors (together with Epiq Bankruptcy Solutions, LLC, acting as the Subscription Agent) are hereby authorized, but not directed, to take all actions necessary to implement the Rights Offering Procedures.

27.     The rights exercise form, substantially in the form attached hereto as Exhibit 19 (the "**Rights Exercise Form**") is hereby approved.  On or as soon as practicable after the business day before the date on which the Debtors first send the Rights Exercise Forms to Eligible Holders pursuant to the terms of the Plan and the Rights Offering Procedures (the "**Rights Offering Record Date**"), each Eligible Holder that is a registered holder will be sent a Rights Exercise Form and each Nominee representing Beneficial Holders will be sent Rights Exercise Forms for the Beneficial Holders that the Nominee represents, which shall enable such Eligible Holder or Nominee (of behalf of the Beneficial Holders) to elect to purchase New Common Stock pursuant to the Rights Offering Procedures.

28.     To participate in the Rights Offering, Eligible Holders must comply with the terms and conditions set forth in the Rights Offering Procedures.  In particular, but without limitation to the conditions set forth therein:

(i)     if any Eligible Holder fails to deliver a duly completed Rights Exercise Form so that such form is **actually received** by the Subscription Agent, on or before the date that is 30 days after the Debtors mail the Rights Exercise Forms to Eligible Holders (or such other date as may be determined pursuant to section 5.12(b) of the Plan) (the "**Rights Offering Deadline**"), such Eligible Holder shall be deemed to have relinquished and waived its Initial Rights (and for those Eligible Holders holding shares through a Nominee, to exercise its rights, such Eligible Holder must provide instructions to its bank, broker or other nominee or agent, who then, in turn, must convey the instruction to the Subscription Agent on or before the Rights Offering Deadline);

(ii)    each Eligible Holder or Nominee on behalf of an Eligible Holder must pay or arrange for payment of the total exercise price to be paid based upon the price determined pursuant to the Rights Offering Procedures (the "**Initial Rights Total Exercise Price**") to the Subscription Agent on or before the Rights Offering Deadline, or pay via the DTC to the Subscription Agent; and

(iii)   if the Subscription Agent for any reason does not timely receive from or on behalf of the participating Eligible Holder a duly completed Rights Exercise Form and immediately available funds by wire transfer in an amount equal to the Initial Rights Total Exercise Price for such Eligible Holder (as determined pursuant to the Rights Offering Procedures), such Eligible Holder shall be deemed to have relinquished and waived its Initial Rights.

29.     The Debtors and the Subscription Agent are authorized, but not directed, to give notice to any Eligible Holder regarding any defect or irregularity in connection with any purported exercise of Rights (as defined in the Rights Offering Procedures) by such holder and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate;

**provided**, **however**, that neither the Debtors nor the Subscription Agent nor DTC shall have any obligation to provide such notice, nor will they incur any liability for failure to give such notification.

30.    The Debtors are authorized to adopt any additional detailed procedures consistent with the provision and intent of the Rights Offering, as provided for in the Plan.

I.    **Approval of the Procedures for Filing Objections to the Plan**

31.    Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order, including the Voting and Tabulation Procedures.  Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (iii) state the name and address of the objecting party and the amount and nature of their respective claim or interest; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Court and served so as to be **actually received** by the following parties on or before the Plan Objection Deadline, September 9, 2010 at 4:00 p.m. (Eastern Daylight Time):

| |
|---|
| **KIRKLAND & ELLIS LLP**<br>Attn:  Richard M. Cieri<br>Attn:  M. Natasha Labovitz<br>Attn:  Craig A. Bruens<br>Attn:  Brian E. Schartz<br>601 Lexington Avenue<br>New York, New York 10022-4611<br><br>*Counsel to the Debtors and Debtors in Possession* |
| **AKIN GUMP STRAUSS HAUER & FELD LLP**<br>Attn:  Daniel H. Golden<br>Attn:  Philip C. Dublin<br>Attn: Meredith Lahaie<br>One Bryant Park<br>New York, New York 10036<br><br>*Counsel to the Statutory Committee of Unsecured Creditors* |

| |
|---|
| **SKADDEN ARPS SLATE MEAGHER & FLOM LLP**<br>Attn: Jay Goffman<br>Attn:  David M. Turetsky<br>Four Times Square<br>New York, New York 10036<br><br>*Counsel to the Statutory Committee of Equity Security Holders* |
| **SHEARMAN & STERLING LLP**<br>Attn:  Fred Sosnick<br>599 Lexington Avenue<br>New York, New York 10022<br><br>*Counsel to the Agent for the Debtors' Postpetition and Prepetition Secured Lenders* |
| **JONES DAY**<br>Attn:  Richard Wynne<br>Attn:  Erin Brady<br>555 S. Flower Street<br>Los Angeles, California 90071<br><br>*Counsel to the Ad Hoc Bondholders' Committee* |
| **THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK**<br>Attn:  Susan D. Golden<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br><br>*U.S. Trustee* |

## J.    Reservation of Rights

32.    The Debtors may make non-substantive changes or modifications to the Plan and the other exhibits to this Order, including the Confirmation Hearing Notice, Solicitation Packages, Non-Voting Status Notices, Ballots and related documents without further order of the Court, including changes to correct typographical and grammatical errors and to make conforming changes to the Plan and any other materials to be included in the Solicitation Packages before distribution.

33.    Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

34.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.    The Debtors are authorized to take all actions necessary to effectuate the relief granted

pursuant to this Order in accordance with the Motion.

36.    The terms and conditions of this Order shall be immediately effective and enforceable

upon its entry.

New York, New York                          *s/ Robert E. Gerber*
Date: **_August 5, 2010_**                      Honorable Robert E. Gerber
                                            United States Bankruptcy Judge

## <u>Exhibit 1</u>

**Voting and Tabulation Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHEMTURA CORPORATION, *et al.*,[1] | ) | Case No. 09-11233 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---

## VOTING AND TABULATION PROCEDURES

Pursuant to the *Order (A) Fixing Dates and Deadlines Related to Confirmation of the Plan; (B) Approving Procedures for Soliciting and Tabulating the Votes on, and for Objecting to, the Plan; (C) Approving Rights Offering Procedures; and (D) Approving the Manner and Form of Notices and Documents Relating to the Plan* (the "**Order**"), the following procedures (the "**Voting and Tabulation Procedures**") shall govern the solicitation and tabulation of votes to accept or reject the *Joint Chapter 11 Plan of Chemtura Corporation, et al.* (as may be amended, modified or supplemented from time to time, the "**Plan**"). These Voting and Tabulation Procedures comprise a material part of the Order and are incorporated therein by reference.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Chemtura Corporation (3153); A&M Cleaning Products, LLC (4712); Aqua Clear Industries, LLC (1394); ASCK, Inc. (4489); ASEPSIS, Inc. (6270); BioLab Company Store, LLC (0131); BioLab Franchise Company, LLC (6709); Bio-Lab, Inc. (8754); BioLab Textile Additives, LLC (4348); CNK Chemical Realty Corporation (5340); Crompton Colors Incorporated (3341); Crompton Holding Corporation (3342); Crompton Monochem, Inc. (3574); GLCC Laurel, LLC (5687); Great Lakes Chemical Corporation (5035); Great Lakes Chemical Global, Inc. (4486); GT Seed Treatment, Inc. (5292); HomeCare Labs, Inc. (5038); ISCI, Inc. (7696); Kem Manufacturing Corporation (0603); Laurel Industries Holdings, Inc. (3635); Monochem, Inc. (5612); Naugatuck Treatment Company (2035); Recreational Water Products, Inc. (8754); Uniroyal Chemical Company Limited (Delaware) (9910); Weber City Road LLC (4381); and WRL of Indiana, Inc. (9136).

1

A.    **Defined Terms**

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.  Capitalized terms not otherwise defined in the Plan shall have the following meaning in these Voting and Tabulation Procedures:

1.    "**Ballot**" means the form or forms distributed to certain holders of Claims or Interests or their Nominees by which such parties may indicate acceptance or rejection of the Plan, including the ballots substantially in the forms attached as Exhibit 5 through Exhibit 13B to the Order.

2.    "**Beneficial Holder**" means the beneficial owner of a security for whom a Nominee acts.

3.    "**Master Ballot**" means either (a) a Ballot submitted on behalf of one or more Beneficial Holders of Notes Claims or (b) a Ballot submitted on behalf of one or more Beneficial Holders of Interests in Chemtura Corporation.

4.    "**Nominee**" means the institutional record holder of a Claim or Interest who holds such Claim or Interest in "street name" on behalf of Beneficial Holders, including brokers, banks, and dealers, or their agents or intermediaries.

5.    "**Objected-to Claim**" has the meaning set forth in paragraph B.1 of these Voting and Tabulation Procedures.

6.    "**Order**" has the meaning set forth in the introductory paragraph to these Voting and Tabulation Procedures.

7.    "**Resolution Event**" means one or more of the events described in Section D of these Voting and Tabulation Procedures.

8.    "**Scheduled**" means, when referring to a Claim or Interest, the manner in which a Claim or Interest appears on the Debtors' Schedules.

9.    "**Securities Voting Agent**" means Epiq Bankruptcy Solutions LLC.

10.    "**Solicitation Deadline**" means no later than five business days after entry of the Order.

11.    "**Solicitation Package**" means the solicitation materials and documents to be sent to holders of Claims and Interests in the Voting Classes as provided in the Order, which materials will provide such holders with the information needed to vote on the Plan.

12.    "**Transfer Agent**" means the transfer agent for the common stock of Chemtura Corporation.

13.    "**Voting and Claims Agent**" means Kurtzman Carson Consultants LLC.

2

14.    "**Voting Classes**" means the following impaired classes of Claims and Interests entitled to vote on the Plan:

| Class | Description |
|-------|-------------|
| 1 | Prepetition Secured Lender Claims[2] |
| 4a | General Unsecured Claims Against Chemtura Corporation |
| 4b | General Unsecured Claims Against the Subsidiary Debtors |
| 5 | Prepetition Unsecured Lender Claims |
| 6 | 2016 Notes Claims |
| 7 | 2009 Notes Claims |
| 8 | 2026 Notes Claims |
| 10 | Diacetyl Claims |
| 11 | Environmental Claims |
| 13a | Interests in Chemtura Corporation |

15.    "**Voting Deadline**" means September 9, 2010 at 5:00 p.m. Eastern Daylight Time.

16.    "**Voting Record Date**" means July 23, 2010, the date for purposes of determining those holders of Claims and Interests that are entitled to vote to accept or reject the Plan.

17.    "**Voting Report**" means the report (or reports) submitted by either the Voting and Claims Agent or Securities Voting Agent, as applicable, detailing the results of the plan solicitation process.

**B.    Holders of Claims Entitled to Vote to Accept or Reject the Plan**

Only the following holders of Claims in the Voting Classes shall be entitled to vote to accept or reject the Plan with regard to such Claims:

1.    holders of Claims for which Proofs of Claim have been timely filed by the applicable Claims Bar Date; provided, however, that such Proofs of Claim (a) have not been withdrawn, expunged or disallowed as of the Voting Record Date, and (b) are not the subject of a pending objection as of the Voting Record Date (an "**Objected-to Claim**"); provided further that a Claim that is subject to a

---

2    Although the Debtors believe that Class 1 holders of Prepetition Secured Lender Claims are Unimpaired by the terms of the Plan and therefore are deemed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code, such Class shall be permitted to vote to accept or reject the Plan on a provisional basis. The Debtors, the Creditors' Committee, the Ad Hoc Bondholders' Committee and the Prepetition Administrative Agent reserve all rights with respect to whether holders of Class 1 Prepetition Secured Lender Claims are in fact Unimpaired by the terms of the Plan.

pending objection as of the Voting Record Date shall be entitled to vote if the Claim becomes eligible to vote through a Resolution Event pursuant to the procedures set forth in Section D below;

2.    holders of Claims that are listed in the Schedules in amounts in excess of $0, that are not listed as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed; and

3.    holders of Claims that arise pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim has been filed.

**C.    Holders of Interests Entitled to Vote to Accept or Reject the Plan**

Each registered holder or Beneficial Holder of Interests in Chemtura Corporation shall be entitled to a vote equal to the number of such registered holder's or Beneficial Holder's shares of Interests in Chemtura Corporation as of the Voting Record Date.

**D.    Temporary Allowance of Claims for Voting Purposes Only**

The following procedures shall govern the temporary allowance of Claims solely for the purpose of voting on the Plan.  For the avoidance of doubt, these procedures shall **not** be used for determining allowance of any Claim for purposes of distributions under the Plan.

1.    The holder of an Objected-to Claim cannot vote to accept or reject the Plan unless one or more of the following Resolution Events has taken place at least seven business days before the Voting Deadline:

(a)    an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

(b)    an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

(c)    a stipulation or other agreement is executed between the holder of such Claim and the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) resolving the objection and allowing such Claim in an agreed-upon amount;

(d)    a stipulation or other agreement is executed between the holder of such Claim and the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld) temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or

4

    (e)    the pending objection to such Claim is voluntarily withdrawn.

2.    On or before the Solicitation Deadline, each holder of an Objected-to Claim shall be sent a notice of such holder's non-voting status in substantially the form attached as <u>Exhibit 16</u> to the Order.

3.    No later than two business days after a Resolution Event, the Voting and Claims Agent shall distribute a Solicitation Package to the relevant holder of such Claim that has been allowed for voting purposes only by such Resolution Event, which must be completed and returned by no later than the Voting Deadline.

4.    Notwithstanding any other Voting and Tabulation Procedures, if an individual Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, such Claim will be allowed temporarily for voting purposes only in the amount so estimated or allowed by the Bankruptcy Court.

5.    Notwithstanding anything contained in these Voting and Tabulation Procedures, any Claim or Class of Claims that is Allowed in an amount specified in the Plan shall be Allowed for voting purposes in such Allowed amount set forth in the Plan.

## E.    Establishing Claim Amounts for Voting Purposes

In tabulating votes, the hierarchy below shall be used to determine the amount of the Claim associated with each holder's vote:

1.    the Claim amount settled and/or agreed upon by the Debtors (with the consent of the Creditors' Committee and the Ad Hoc Bondholders' Committee, which consent shall not be unreasonably withheld), as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

2.    the Claim amount allowed (temporarily or otherwise) pursuant to a Resolution Event under the procedures set forth herein;

3.    if a Claim (a) has been objected to after the Voting Record Date and at least 14 days before the Voting Deadline and (b) the objection has not been adjudicated or otherwise resolved, such Claim will be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, in the amount of $1.00, except to the extent and in the manner as may be otherwise set forth in the objection or as otherwise ordered by the Bankruptcy Court;

4.    the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Bankruptcy Court); <u>provided</u>, <u>however</u>, that timely filed Proofs of Claim in an unliquidated or unknown amount will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, and will count as Ballots for Claims in

the amount of one dollar ($1.00) solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code;

5.      the Claim amount listed in the Schedules, provided that such Claim is not Scheduled as contingent, disputed or unliquidated and has not been paid in full or in part during these chapter 11 cases; and

6.      in the absence of any of the foregoing, zero.

In the event that a holder of a Claim identifies a Claim amount on its Ballot that is different from the amount otherwise calculated in accordance with these Voting and Tabulation Procedures, such Claim will be allowed temporarily for voting purposes in an amount calculated in accordance with the procedures described herein.  The Claim amounts established pursuant to the procedures set forth herein shall control solely for voting purposes only, and shall not constitute the allowed amount of any Claim for distribution purposes under the Plan.  Moreover, any amounts filled in on Ballots or Master Ballots by the Debtors through the Voting and Claims Agent or the Securities Voting Agent, as applicable, are not binding for purposes of allowance and distribution.

## F.      General Ballot Tabulation

Subject to <u>Section I</u> below, the following voting procedures and standard assumptions shall be used in tabulating Ballots:

1.      except as otherwise provided herein, unless a Ballot is timely submitted on or before the Voting Deadline, the Debtors shall reject such Ballot as invalid and, therefore, decline to count it in connection with Confirmation;

2.      the Voting and Claims Agent or the Securities Voting Agent, as applicable, will date all Ballots when received.  The Voting and Claims Agent or the Securities Voting Agent, as applicable, shall retain the original Ballots and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Bankruptcy Court;

3.      the Debtors will file with the Bankruptcy Court, within three days before the Confirmation Hearing, the Voting Report.  The Voting Report shall, among other things, delineate every irregular Ballot, including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged.  The Voting Report shall indicate the Debtors' intentions with regard to such irregular Ballots;

4.      the method of delivery of Ballots to be sent to the Voting and Claims Agent or the Securities Voting Agent, as appropriate, is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Voting and Claims Agent or the Securities Voting Agent, as appropriate, **<u>actually receives</u>** the appropriately, originally executed Ballot;

6

5.      an original executed Ballot is required to be submitted by the entity submitting such Ballot.  Delivery of a Ballot to the Voting and Claims Agent or the Securities Voting Agent, as applicable, by facsimile, email or any other electronic means will not be valid;

6.      no Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Voting and Claims Agent or the Securities Voting Agent), any indenture trustee (unless specifically instructed to do so) or the Debtors' financial or legal advisors or the Creditors' Committee or its financial or legal advisors, and if so sent will not be counted;

7.      if multiple Ballots are received from the same holder or Nominee with respect to the same Claim or Interest before the Voting Deadline, the latest-dated Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot;

8.      holders must vote all of their Claims or Interests within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes;

9.      a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity must indicate such capacity when signing and, if required or requested by the applicable Nominee or its agent, the Voting and Claims Agent, the Securities Voting Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder or Beneficial Holder;

10.     the Debtors, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

11.     neither the Debtors, nor any other entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

12.     unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with deliveries of Ballots must be cured before the Voting Deadline or such Ballots will not be counted;

13.     in the event a designation to vote on the Plan is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to

that Claim or Interest will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

14.    subject to any contrary order of the Bankruptcy Court, the Debtors reserve the right to reject any Ballot or Master Ballot not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided, however, that any such rejections will be documented in the Voting Report; and

15.    the following Ballots shall **not** be counted in determining the acceptance or rejection of the Plan:

(a)    any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest;

(b)    any Ballot cast by or on behalf of an entity that does not hold a Claim or Interest in a Class that is entitled to vote on the Plan;

(c)    any unsigned Ballot;

(d)    any Ballot that is signed but does not otherwise comply with the requirement set forth in Section F.9., above;

(e)    any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and

(f)    any Ballot submitted by or on behalf of any entity not entitled to vote pursuant to the Plan, the Order or these Voting and Tabulation Procedures.

16.    If any Class 11 Environmental Claim is reinstated under Section 3.3(k)(i)(c) of the Plan, then any Ballot submitted by the holder of such Class 11 Environmental Claim will not be counted as either an acceptance or rejection of the Plan.

## G.    Voting Procedures Applicable to Beneficial Holders of Notes Claims and Interests

The following additional procedures, as well as the other procedures described herein and in the Order shall apply to the voting of Notes Claims and Interests held by Beneficial Holders:

1.    within three business days after the Voting Record Date, the Transfer Agent shall provide the Securities Voting Agent with (a) a copy of the list of the names, addresses and holdings of the holders of Interests in Chemtura Corporation as of the Voting Record Date in an electronic file and (b) such other information the Securities Voting Agent deems reasonable and necessary to perform its duties hereunder.  The Securities Voting Agent shall use such information only for purposes consistent with these Voting and Tabulation Procedures;

2.    on or before the Solicitation Deadline, the Securities Voting Agent shall distribute or cause to be distributed the appropriate number of copies of Solicitation

Packages[3] to each registered holder of a Notes Claim or Interest as of the Voting Record Date, and to any Nominees identified by the Securities Voting Agent;

3.    any Nominee that is a holder of record with respect to the Note Claims or Interests in Chemtura shall either:

    (a)    vote on behalf of Beneficial Holders of such Note Claims or Interests by (i) immediately distributing the Solicitation Package, including Ballots, it receives from the Securities Voting Agent to all such Beneficial Holders, (ii) promptly collecting Ballots from such Beneficial Holders that cast votes on the Plan, (iii) compiling and validating the votes and other relevant information of all such Beneficial Holders on the Master Ballot, and (iv) transmitting the Master Ballot to the Securities Voting Agent by the Voting Deadline; or

    (b)    distribute pre-validated Ballots pursuant to the following procedures:

        (i)    the Nominee shall forward to each Beneficial Holder as of the Voting Record Date the Solicitation Package, an individual Ballot that has been pre-validated, as indicated in paragraph (ii) below and a return envelope provided by and addressed to the Securities Voting Agent;

        (ii)    to pre-validate a Ballot, the Nominee should complete the first item only and execute the Ballot and indicate on the Ballot the name of the Nominee, the amount of securities held by the Nominee for the Beneficial Holder and the account number(s) for the account(s) in which such securities are held by the Nominee; and

        (iii)    the Beneficial Holder shall return the pre-validated Ballot to the Securities Voting Agent by the Voting Deadline.

4.    any Beneficial Holder of a Notes Claim or Interest holding such securities as a record holder in its own name should vote on the Plan by completing and signing a Ballot and returning it directly to the Securities Voting Agent on or before the Voting Deadline;

5.    any indenture trustee (unless otherwise empowered to do so) will not be entitled to vote on behalf of Beneficial Holders; rather, each such Beneficial Holder must submit his or her own Ballot;

---

[3]    The Solicitation Packages shall contain Ballots for voting by the Beneficial Holders.  In accordance with its customary practice, the Securities Voting Agent shall distribute copies of Master Ballots to any relevant Nominees after the Solicitation Packages have been forwarded to Beneficial Owners.

6.      any Ballot returned to a Nominee by a Beneficial Holder of a Notes Claim or Interest will not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Securities Voting Agent by the Voting Deadline a Master Ballot that reflects the vote of such Beneficial Holders, or otherwise validates the Ballot in a manner acceptable to the Securities Voting Agent. Nominees shall retain all Ballots returned by Beneficial Holders for a period of one year after the effective date of the Plan, or, in the case of pre-validated Ballots, a list of Beneficial Holders to whom pre-validated Ballots were sent for a period of at least one year after the Voting Deadline;

7.      if a Beneficial Holder of a Notes Claim or Interest holds securities through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Ballot, and each such Beneficial Holder should execute a separate Ballot for each block of securities that it holds through any Nominee and must return each such Ballot to the appropriate Nominee; and

8.      if a Beneficial Holder of a Notes Claim or Interest holds a portion of its securities through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures herein to vote the portion held in its own name and to vote the portion held by the Nominee(s).

H.      **Voting Procedures Applicable to Holders of Prepetition Secured Lender Claims and Prepetition Unsecured Lender Claims**

1.      Within three business days of the entry of the Order, the Prepetition Administrative Agent shall provide the Voting and Claims Agent with (a) a copy of the list of the names, addresses and holdings of all holders of Class 1 Prepetition Secured Lender Claims and Class 5 Prepetition Unsecured Lender Claims as of the Voting Record Date in an electronic file and (b) such other information the Voting and Claims Agent deems reasonable and necessary to perform its duties pursuant to the Order. The Voting and Claims Agent shall use such information only for purposes consistent with the Order and these Voting and Tabulation Procedures.

I.      **Tabulation of Master Ballots**

These rules will apply with respect to the tabulation of Master Ballots:

1.      votes cast by Beneficial Holders through Nominees will be applied to the positions held by such Nominees as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Ballot, will not be counted in excess of the amount of such securities held by such Nominee as of the Voting Record Date;

2.      if conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Ballot, the Debtors will attempt to reconcile discrepancies with the Nominees;

3.      if over-votes on a Master Ballot or pre-validated Ballot are not reconciled before the preparation of the vote certification, the Debtors will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Ballot that contained the overvote, but only to the extent of the Nominee's position in the relevant Class;

4.      for purposes of tabulating votes of any Notes Claims, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Claims in the appropriate Class, although any principal amounts may be adjusted by the Securities Voting Agent to reflect Claim amounts actually voted, including prepetition interest (if applicable); and

5.      a single Nominee may complete and deliver to the Securities Voting Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest dated Master Ballot received before the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior Master Ballot.

**J.      Distribution Preference Election for Participating Creditor Classes**

As set forth in the Plan, each holder of an Allowed Claim in any Participating Creditor Class may, at the time of voting upon the Plan, or, with respect to holders of Notes Claims, before the Voting Deadline, make a binding election to seek to receive its recovery in the form of the maximum available percentage of Cash or the maximum available percentage of New Common Stock.  To implement this aspect of the Plan, the Debtors will (i) send Ballots to holders of Claims in the Participating Creditor Classes for Claims that are not Notes Claims which will include a box by which such holder may make its election and (ii) with respect to holders of Notes Claims, in addition to the appropriate Ballot, if they so choose, to submit or otherwise follow the holders' Nominee's instructions to process the separate election form on which such holders may exercise their election and have the Notes electronically delivered, as of the Voting Deadline, into the Automated Tender Offer Program ("**ATOP**") system at The Depository Trust Company.  If a creditor makes an election, the Cash or New Common Stock that otherwise would be distributable to such creditor will be aggregated in the Electing Creditors' Pool and will be reallocated among all Electing Creditors according to their recovery preferences to the extent possible (with all distributions to be made such that each Electing Creditor receives the aggregate value of consideration it otherwise would be entitled to, in the form of the preferred distribution to the extent possible).

The failure of a creditor to make a binding election to participate in the Electing Creditors' Pool during the voting period (including the failure to submit a validly executed Ballot or Preference Election Form, as applicable) will reflect an agreement that such holder will receive its recovery in the Cash-to-New Common Stock ratio reflecting the Cash and New Common Stock in the Unsecured Distribution Pool.  In addition, if a creditor's Ballot or applicable form is completed with an election that chooses both preferences (i.e. the maximum available percentage of Cash and the maximum available percentage of New Common Stock), then such creditor will be treated as if it had failed to make a binding election.

For the avoidance of doubt, consistent with the Plan, a holder of an Allowed Claim in a Participating Creditor Class may participate in the election without voting on the Plan.

**K.      Procedures for Voting on an Individual Debtor's Chapter 11 Plan Under Bankruptcy Rule 3018**

To the extent a creditor holds Claims against multiple Debtors and would like to vote separately with respect to one or more of such Debtors' chapter 11 plans, such creditor is required to file a motion under Bankruptcy Rule 3018 seeking relief from the Voting and Tabulation Procedures.

**L.      Transferred Claim Procedures**

1.      Pre-Voting Record Date Transfers.  With respect to a transferred Claim, the transferee shall be entitled to receive a Solicitation Package and, if the holder of such Claim is entitled to vote with respect to the Plan, cast a Ballot on account of such Claim only if (a) all actions necessary to effectuate the transfer of the Claim, pursuant to Bankruptcy Rule 3001(e), have been completed by the Voting Record Date, or (b) the transferee files and the Bankruptcy Court has docketed by the Voting Record Date (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer.

2.      Post-Voting Record Date Transfers.  In the event a Claim or Interest is transferred after the Voting Record Date, the transferee of such Claim or Interest shall be bound by any vote made by the holder of such Claim or Interest as of the Voting Record Date.

**M.      Debtors' Reservation of Rights Regarding Modification to the Plan**

The Debtors expressly reserve the right to amend from time to time the terms of the Plan in accordance with the terms thereof (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the applicable terms of the Plan regarding modification).

**N.      Contact Information**

1.      Voting and Claims Agent.

Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California  90245
Phone:  (866) 967-0261
E-mail:  kcc_chemtura@kccllc.com
Website:  www.kccllc.net/chemtura

2.      Securities Voting Agent.

Epiq Bankruptcy Solutions LLC
757 Third Avenue, 3rd Floor
New York, New York 10017
Phone:  (866) 734-9387
E-mail:  chemtura@epiqsystems.com

**<u>Exhibit C</u>**

**Organizational Chart of the Debtors and their Non-Debtor Affiliates and Subsidiaries**



## **Exhibit D**

**Liquidation Analysis**

## Liquidation Analysis

### A.    Introduction

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  11 U.S.C. §1129(a)(7).  Accordingly, to demonstrate that the Plan[1] satisfies the "best interests" of creditors test, the Debtors have prepared a hypothetical liquidation analysis for each of the 27 Debtors (collectively, the "**Liquidation Analysis**"). The Liquidation Analysis is based upon certain assumptions discussed in the Disclosure Statement and in the global and specific notes below.

The Liquidation Analysis estimates potential Cash distributions to holders of Allowed Claims and Interests in a hypothetical chapter 7 liquidation of the Debtors' assets.  Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and in this Disclosure Statement.  The Debtors prepared the Liquidation Analysis with the assistance of their advisors.

**THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF GENERATING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE WHEN COMPARED TO RECOVERIES UNDER THE PLAN. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION.**

### B.    Scope, Intent and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not

---

[1]    Capitalized terms used but not defined in this **Exhibit D** shall have the meaning given to such terms in the Disclosure Statement or, if not defined therein, in the *Joint Chapter 11 Plan of Chemtura Corporation, et al.* (the "**Plan**").

intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.

**THIS LIQUIDATION ANALYSIS ASSUMES VALUES BASED ON APPRAISALS, WHERE AVAILABLE, AND THE DEBTORS' BUSINESS JUDGMENT, WHERE APPRAISALS ARE NOT AVAILABLE. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.**

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules and proofs of claim filed to date.

The Liquidation Analysis also takes into account various assumptions regarding liquidation of assets and satisfaction of various claims in a liquidation scenario. While the Liquidation Analysis assumes the cessation of business operations and conversion to a chapter 7, it does not estimate all Claims that could be triggered as a result. Examples of these kinds of Claims include various potential employee claims (for such items as severance and potential WARN Act claims) and rejection damages on account of rejection of Executory Contracts and Unexpired Leases that otherwise are likely to be assumed in a going-concern scenario. Some of these Claims could be significant and might be entitled to priority in payment over other Claims. The Liquidation Analysis assumes that holders of Claims and Interests recover (if at all) according to their relative priority under applicable law, as discussed below. With the exception of Claims related to unfunded pension and Other Post-Employment Benefits, no attempt has been made to estimate other additional Unsecured Claims that may result from such events under a chapter 7 liquidation scenario. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. For purposes of the Liquidation Analysis, the Debtors used specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

**NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS.**

C.    **Global Notes to the Liquidation Analysis**

   (i)    *Dependence on Assumptions*

The Liquidation Analysis depends on a number of estimates and assumptions that, although developed and considered reasonable by the management and the advisors of the Debtors, are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management and advisors. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis

2

would be realized if the Debtors were, in fact, to undergo such a liquidation, and actual results could vary materially and adversely from those contained herein.

### (ii)    Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' chapter 11 cases to chapter 7 liquidation cases on March 31, 2010 (the "**Conversion Date**").  On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (a "**Trustee**") to oversee the liquidation of the Estates.  Should multiple Trustees be appointed to administer the Debtors' estates, lower recoveries and higher administrative costs could result and distributions to Creditors could be delayed.

### (iii)    Dependence on Unaudited Financial Statements

This Liquidation Analysis contains numerous estimates and is based upon the Debtors' unaudited financial statements as of March 31, 2010.

### (iv)    Preference or Fraudulent Transfers

No recovery or related litigation cost attributed to any potential avoidance actions under chapter 5 of the Bankruptcy Code, including potential preference or fraudulent transfer actions, is assumed within this Liquidation Analysis.

### (v)    Liquidation of Assets

The Debtors have assumed that all operations of the Debtors and non-Debtor affiliates would cease as of the Conversion Date, and a limited group of personnel would be retained in order to pursue orderly sales of substantially all the remaining assets, collect receivables, arrange distributions and otherwise administer and close the estates.

### (vi)    Liquidation Analysis Waterfall and Recovery Ranges

The Debtors believe that a conversion of the chapter 11 cases to cases under chapter 7 would force the shutdown of most of the operations of the Debtors' non-Debtor subsidiaries and affiliates.  The Liquidation Analysis assumes that the proceeds generated from the liquidation of the non-Debtor affiliates would be used to satisfy (a) the costs and expenses of the liquidation and (b) each of the non-Debtor liabilities (in accordance with local law), with remaining value (if any) going to the respective Debtor parent.  The Debtors' total proceeds are used to fund liquidation costs, Trustee fees, and such additional Administrative and Priority Claims that are estimated to be incurred in a chapter 7 liquidation.  Any remaining net Liquidation Proceeds would then be allocated to holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.  Although it is likely that the Pension Benefit Guarantee Corporation would assert claims against all of the non-Debtor entities and pursue recovery from any excess proceeds prior to those proceeds becoming available to other debtor creditors, the Liquidation Analysis was not developed based on that assumption.

### (vii)    Payment of Claims Against One or More of the Debtors

Certain holders of Claims have Claims against one or more of the Debtors.  In such instances where practicable, the Debtors have assumed that such Claims are asserted first against the issuer or original obligor, if any, and, if payment is not made in full, then the Claims are asserted against each guarantor.  Guarantors assert a reimbursement claim against the issuer for any amounts paid.  As discussed, the Liquidation Analysis is presented on a Debtor-by-Debtor basis.  However, for illustrative

3

purposes only, the following table provides a summary of total estimated recoveries across all Debtors for known holders of Claims (other than Intercompany Claims) against more than one Debtor under the Liquidation Analysis.

| *($'s in millions)* | Claim | | Recovery Across Debtors | |
|---|---|---|---|---|
| | | | $'s | % |
| Senior Secured Superpriority DIP Facility | $ | 322 | $ 322 | 100% |
| Secured Portion of the Prepetition Bank Debt | | 53 | 53 | 100% |
| Unsecured Bank Debt | | 120 | 43 | 36% |
| General Unsecured Notes 2009 | | 374 | 68 | 18% |
| General Unsecured Notes 2016 | | 508 | 182 | 36% |
| Pension and Other Post-Employment Benefits | | 492 | 146 | 30% |

*[Liquidation Analyses for each Debtor follow.]*

K&E 16821461.9

**D.    Liquidation Analysis for Each Debtor**

   *(i)      Chemtura Corporation*

*($'s in millions)*

Chemtura Corporation

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $      35 | | $      35 | 100% | a |
| Trade Receivables | 180 | | 135 | 75% | b |
| Inventory | 153 | | 106 | 69% | c |
| Other Current Assets | 117 | | 27 | 23% | d |
| PP&E, Net | 158 | | 83 | 52% | e |
| Goodwill | 146 | | - | 0% | |
| Intangibles, Net | 86 | | 26 | 31% | f |
| Investments in Subsidiaries | 1,878 | | 172 | 9% | g |
| Other Noncurrent Assets | 97 | | - | 0% | h |
| Intercompany Receivables | 1,191 | | 163 | 14% | i |
| Reimbursement Claim Value | NA | | 2 | NA | j |
| **Gross Proceeds** | **$    4,041** | | **$    749** | 19% | |
| Liquidation Costs | | 33 | 33 | 100% | k |
| **Net Liquidation Proceeds** | | | **$    716** | | |
| Senior Secured Superpriority DIP Facility | | 322 | 322 | 100% | l |
| Secured Portion of the Prepetition Bank Debt | | 53 | 53 | 100% | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$    341** | | |
| Total Chapter 11 Administrative & Priority Claims | | 205 | 205 | 100% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$    136** | | |
| Unsecured Bank Debt | | 120 | 4 | 3% | o |
| General Unsecured Notes 2009 | | 374 | 13 | 3% | |
| General Unsecured Notes 2016 | | 508 | 18 | 3% | p |
| General Unsecured Notes 2026 | | 151 | 5 | 3% | p |
| All Other General Unsecured Claims | | 360 | 13 | 3% | q |
| Pension and Other Post-Employment Benefits | | 492 | 17 | 3% | r |
| Intercompany General Unsecured Claims | | 1,697 | 59 | 3% | |
| Reimbursement Claims | | 203 | 7 | 3% | |
| **Equity Interests** | | | **$      -** | NA | s |

5

*(ii)*   ***BioLab, Inc.***

*($'s in millions)*

|  | Biolab Inc | | Recovery | | |
|---|---|---|---|---|---|
|  | Net Book Value | Claim Amount | Dollars | % | Note |
| Cash | $          - |  | $          - | NA | a |
| Trade Receivables | 79 |  | 59 | 75% | b |
| Inventory | 73 |  | 58 | 79% | c |
| Other Current Assets | 23 |  | 4 | 19% | d |
| PP&E, Net | 78 |  | 24 | 30% | e |
| Goodwill | - |  | - | NA |  |
| Intangibles, Net | 137 |  | 42 | 31% | f |
| Investments in Subsidiaries | 27 |  | - | 0% | g |
| Other Noncurrent Assets | 9 |  | - | 0% | h |
| Intercompany Receivables | 460 |  | 39 | 8% | i |
| Reimbursement Claim Value | NA |  | 4 | NA | j |
| **Gross Proceeds** | **$        886** |  | **$        229** | **26%** |  |
| Liquidation Costs |  | 15 | 15 | 100% | k |
| **Net Liquidation Proceeds** |  |  | **$        214** |  |  |
| Senior Secured Superpriority DIP Facility |  | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt |  | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** |  |  | **$        214** |  |  |
| Total Chapter 11 Administrative & Priority Claims |  | 35 | 35 | 100% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** |  |  | **$        180** |  |  |
| Unsecured Bank Debt |  | 120 | 20 | 17% | o |
| General Unsecured Notes 2009 |  | - | - | NA |  |
| General Unsecured Notes 2016 |  | 508 | 85 | 17% | p |
| General Unsecured Notes 2026 |  | - | - | NA | p |
| All Other General Unsecured Claims |  | 24 | 4 | 17% | q |
| Pension and Other Post-Employment Benefits |  | 399 | 66 | 17% | r |
| Intercompany General Unsecured Claims |  | 28 | 5 | 17% |  |
| Reimbursement Claims |  | - | - | NA |  |
| **Equity Interests** |  |  | **$          -** | **NA** | s |

6

(iii)   *Great Lakes Chemical Corporation*

*($'s in millions)*

|  | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $   - | | $   - | NA | a |
| Trade Receivables | (1) | | (1) | 75% | b |
| Inventory | 61 | | 34 | 56% | c |
| Other Current Assets | 12 | | 2 | 19% | d |
| PP&E, Net | 164 | | 49 | 30% | e |
| Goodwill | 3 | | - | 0% | |
| Intangibles, Net | 62 | | 19 | 31% | f |
| Investments in Subsidiaries | 1,211 | | 47 | 4% | g |
| Other Noncurrent Assets | 2 | | - | 0% | h |
| Intercompany Receivables | 1,016 | | 122 | 12% | i |
| Reimbursement Claim Value | NA | | 3 | NA | j |
| **Gross Proceeds** | **$   2,530** | | **$   275** | **11%** | |
| Liquidation Costs | | 8 | 8 | 100% | k |
| **Net Liquidation Proceeds** | | | **$   267** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$   267** | | |
| Total Chapter 11 Administrative & Priority Claims | | 52 | 52 | 100% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$   215** | | |
| Unsecured Bank Debt | | 120 | 18 | 15% | o |
| General Unsecured Notes 2009 | | 374 | 55 | 15% | |
| General Unsecured Notes 2016 | | 508 | 75 | 15% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 26 | 4 | 15% | q |
| Pension and Other Post-Employment Benefits | | 399 | 59 | 15% | r |
| Intercompany General Unsecured Claims | | 10 | 2 | 15% | |
| Reimbursement Claims | | 13 | 2 | 15% | |
| **Equity Interests** | | | **$   -** | **NA** | s |

### (iv)    *Crompton Colors Incorporated*

*($'s in millions)*

**Crompton Colors Incorporated**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $          - | | $          - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | 0 | | 0 | 25% | d |
| PP&E, Net | 1 | | 0 | 5% | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$          1** | | **$          0** | 6% | |
| Liquidation Costs | | 0 | 0 | 100% | k |
| **Net Liquidation Proceeds** | | | **$          0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$          0** | | |
| Total Chapter 11 Administrative & Priority Claims | | 4 | 0 | 1% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$          -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | 28 | - | 0% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$          -** | NA | s |

8

### (v)    GLCC Laurel LLC

*($'s in millions)*

**GLCC Laurel LLC**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | (0) | | (0) | 75% | b |
| Inventory | 4 | | 3 | 71% | c |
| Other Current Assets | 0 | | 0 | 25% | d |
| PP&E, Net | - | | 0 | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | 7 | | 0 | 6% | g |
| Other Noncurrent Assets | 0 | | - | 0% | h |
| Intercompany Receivables | 49 | | 9 | 18% | i |
| Reimbursement Claim Value | NA | | 0 | NA | j |
| **Gross Proceeds** | **$ 60** | | **$ 13** | **21%** | |
| Liquidation Costs | | 0 | 0 | 100% | k |
| **Net Liquidation Proceeds** | | | **$ 12** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ 12** | | |
| Total Chapter 11 Administrative & Priority Claims | | 6 | 6 | 100% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ 7** | | |
| Unsecured Bank Debt | | 120 | 1 | 1% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | 3 | 1% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 1 | 0 | 1% | q |
| Pension and Other Post-Employment Benefits | | 399 | 3 | 1% | r |
| Intercompany General Unsecured Claims | | 6 | 0 | 1% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | **NA** | s |

9

### (vi)    Crompton Monochem, Inc.

*($'s in millions)*

**Crompton Monochem, Inc.**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 0 | | 0 | 100% | i |
| Reimbursement Claim Value | NA | | 0 | NA | j |
| **Gross Proceeds** | **$ 0** | **$ 0** | | 102% | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$ 0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ 0** | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ 0** | | |
| Unsecured Bank Debt | | 120 | 0 | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | 0 | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | - | - | NA | q |
| Pension and Other Post-Employment Benefits | | 399 | 0 | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | NA | s |

### *(vii)    Weber City Road LLC*

*($'s in millions)*

**Weber City Road LLC**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | 0 | | 0 | 100% | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 0 | | - | 0% | i |
| Reimbursement Claim Value | NA | | 0 | NA | j |
| **Gross Proceeds** | **$ 0** | | **$ 0** | 102% | |
| Liquidation Costs | | 0 | 0 | 100% | k |
| **Net Liquidation Proceeds** | | | **$ 0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ 0** | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ 0** | | |
| Unsecured Bank Debt | | 120 | 0 | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | 0 | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | 0 | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | 0 | 0% | r |
| Intercompany General Unsecured Claims | | 0 | 0 | 0% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | NA | s |

11

### (viii)    Great Lakes Chemical Global, Inc.

*($'s in millions)*

**Great Lakes Chemical Global, Inc.**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | 12 | | - | 0% | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 0 | | - | 0% | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$      12** | | **$      -** | **0%** | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$      -** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$      -** | | |
| Total Chapter 11 Administrative & Priority Claims | | 0 | - | 0% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$      -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | 16 | - | 0% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$      -** | **NA** | s |

### (ix)    GT Seed Treatment Inc

*($'s in millions)*

**GT Seed Treatment Inc**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $            - | | $            - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 304 | | - | 0% | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$        304** | | **$            -** | **0%** | |
| Liquidation Costs | - | | | NA | k |
| **Net Liquidation Proceeds** | | | **$            -** | | |
| Senior Secured Superpriority DIP Facility | - | | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | - | | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$            -** | | |
| Total Chapter 11 Administrative & Priority Claims | - | | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$            -** | | |
| Unsecured Bank Debt | 120 | | - | 0% | o |
| General Unsecured Notes 2009 | - | | - | NA | |
| General Unsecured Notes 2016 | 508 | | - | 0% | p |
| General Unsecured Notes 2026 | - | | - | NA | p |
| All Other General Unsecured Claims | - | | - | NA | q |
| Pension and Other Post-Employment Benefits | 399 | | - | 0% | r |
| Intercompany General Unsecured Claims | - | | - | NA | |
| Reimbursement Claims | - | | - | NA | |
| **Equity Interests** | | | **$            -** | NA | s |

13

(x)    *HomeCare Labs, Inc.*

*($'s in millions)*

HomeCare Labs, Inc.

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | $ - | | $ - | NA | |
| Liquidation Costs | | - | | NA | k |
| **Net Liquidation Proceeds** | | | $ - | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | $ - | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | $ - | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | 0 | - | 0% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | $ - | NA | s |

14

### (xi)    ISCI, Inc.

*($'s in millions)*

ISCI, Inc.

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $    - | | $    - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 1 | | 0 | 15% | i |
| Reimbursement Claim Value | NA | | 0 | NA | j |
| **Gross Proceeds** | **$    1** | | **$    0** | **15%** | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$    0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$    0** | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$    0** | | |
| Unsecured Bank Debt | | 120 | 0 | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | 0 | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | 0 | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | 0 | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$    -** | NA | s |

15

### (xii)    *Kem Manufacturing Corporation*

*($'s in millions)*

**Kem Manufacturing Corporation**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $    - | | $    - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 12 | | 0 | 3% | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$    12** | | **$    0** | 3% | |
| Liquidation Costs | - | | - | NA | k |
| **Net Liquidation Proceeds** | | | **$    0** | | |
| Senior Secured Superpriority DIP Facility | - | | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | - | | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$    0** | | |
| Total Chapter 11 Administrative & Priority Claims | 2 | | 0 | 21% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$    -** | | |
| Unsecured Bank Debt | 120 | | - | 0% | o |
| General Unsecured Notes 2009 | - | | - | NA | |
| General Unsecured Notes 2016 | 508 | | - | 0% | p |
| General Unsecured Notes 2026 | - | | - | NA | p |
| All Other General Unsecured Claims | 4 | | - | 0% | q |
| Pension and Other Post-Employment Benefits | 399 | | - | 0% | r |
| Intercompany General Unsecured Claims | - | | - | NA | |
| Reimbursement Claims | - | | - | NA | |
| **Equity Interests** | | | **$    -** | NA | s |

16

### (xiii)    Monochem, Inc.

*($'s in millions)*

Monochem, Inc.

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 67 | | 1 | 1% | i |
| Reimbursement Claim Value | NA | | 0 | NA | j |
| **Gross Proceeds** | **$ 67** | | **$ 1** | 1% | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$ 1** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ 1** | | |
| Total Chapter 11 Administrative & Priority Claims | | 0 | 0 | 100% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ 1** | | |
| Unsecured Bank Debt | | 120 | 0 | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | 0 | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 1 | 0 | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | 0 | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | NA | s |

17

### (xiv)    ASCK, Inc.

*($'s in millions)*

ASCK, Inc.

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 18 | | 1 | 5% | i |
| Reimbursement Claim Value | NA | | 0 | NA | j |
| **Gross Proceeds** | **$ 18** | | **$ 1** | **5%** | |
| Liquidation Costs | - | | - | NA | k |
| **Net Liquidation Proceeds** | | | **$ 1** | | |
| Senior Secured Superpriority DIP Facility | - | | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | - | | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ 1** | | |
| Total Chapter 11 Administrative & Priority Claims | - | | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ 1** | | |
| Unsecured Bank Debt | 120 | | 0 | 0% | o |
| General Unsecured Notes 2009 | - | | - | NA | |
| General Unsecured Notes 2016 | 508 | | 0 | 0% | p |
| General Unsecured Notes 2026 | - | | - | NA | p |
| All Other General Unsecured Claims | - | | - | NA | q |
| Pension and Other Post-Employment Benefits | 399 | | 0 | 0% | r |
| Intercompany General Unsecured Claims | - | | - | NA | |
| Reimbursement Claims | - | | - | NA | |
| **Equity Interests** | | | **$ -** | **NA** | s |

18

(xv)    *WRL of Indiana, Inc.*

*($'s in millions)*

**WRL of Indiana, Inc.**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $    - | | $    - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 0 | | 0 | 15% | i |
| Reimbursement Claim Value | NA | | 0 | NA | j |
| **Gross Proceeds** | **$    0** | | **$    0** | 15% | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$    0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$    0** | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$    0** | | |
| Unsecured Bank Debt | | 120 | 0 | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | 0 | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | - | - | NA | q |
| Pension and Other Post-Employment Benefits | | 399 | 0 | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$    -** | NA | s |

19

### (xvi)    BioLab Textile Additives, LLC

*($'s in millions)*

**BioLab Textile Additives, LLC**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $        - | | $        - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$        -** | | **$        -** | NA | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$        -** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$        -** | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$        -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | 1 | - | 0% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$        -** | NA | s |

### (xvii)   A&M Cleaning Products, LLC

*($'s in millions)*

**A&M Cleaning Products, LLC**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$ -** | | **$ -** | NA | |
| Liquidation Costs | | - | | NA | k |
| **Net Liquidation Proceeds** | | | **$ -** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ -** | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | NA | s |

*(xviii)* **BioLab Company Store, LLC**

*($'s in millions)*

**BioLab Company Store, LLC**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | 0 | | 0 | 77% | c |
| Other Current Assets | 0 | | 0 | 25% | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | (0) | | 0 | -6% | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$ (0)** | | **$ 0** | -66% | |
| Liquidation Costs | | 0 | 0 | 100% | k |
| **Net Liquidation Proceeds** | | | **$ 0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ 0** | | |
| Total Chapter 11 Administrative & Priority Claims | | 0 | 0 | 4% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | 1 | - | 0% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | NA | s |

### (xix)    Biolab Franchise Company LLC

*($'s in millions)*

**Biolab Franchise Company LLC**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | 0 | | 0 | 25% | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | 0 | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 0 | | - | 0% | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$ 0** | | **$ 0** | 46% | |
| Liquidation Costs | | 0 | 0 | 100% | k |
| **Net Liquidation Proceeds** | | | **$ 0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ 0** | | |
| Total Chapter 11 Administrative & Priority Claims | | 0 | 0 | 15% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ 0** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | 2 | - | 0% | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | NA | s |

(xx)    *Laurel Industries Holdings, Inc.*

*($'s in millions)*

**Laurel Industries Holdings, Inc.**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $        - | | $        - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | 12 | | - | 0% | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | 6 | | 0 | 1% | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$        18** | | **$        0** | 0% | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$        0** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$        0** | | |
| Total Chapter 11 Administrative & Priority Claims | | 6 | 0 | 1% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$        -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$        -** | NA | s |

24

(xxi)    *ASEPSIS, Inc.*

*($'s in millions)*

ASEPSIS, Inc.

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$ -** | | **$ -** | NA | |
| Liquidation Costs | | - | | NA | k |
| **Net Liquidation Proceeds** | | | **$ -** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$ -** | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$ -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | - | - | NA | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$ -** | NA | s |

25

### (xxii)  *Crompton Holding Corporation*

*($'s in millions)*

**Crompton Holding Corporation**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $        - | | $        - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | $        - | | $        - | NA | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | $        - | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | $        - | | |
| Total Chapter 11 Administrative & Priority Claims | | 0 | - | 0% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | $        - | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | $        - | NA | s |

### (xxiii)  Naugatuck Treatment Company

*($'s in millions)*

**Naugatuck Treatment Company**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $    - | | $    - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | $    - | | $    - | NA | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | $    - | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | $    - | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | $    - | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | - | - | NA | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | $    - | NA | s |

27

### (xxiv)   Recreational Water Products, Inc.

*($'s in millions)*

**Recreational Water Products, Inc.**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $  - | | $  - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | $  - | | $  - | NA | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | $  - | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | $  - | | |
| Total Chapter 11 Administrative & Priority Claims | | 0 | - | 0% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | $  - | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | $  - | NA | s |

28

### (xxv)   *Aqua Clear Industries, LLC*

*($'s in millions)*

**Aqua Clear Industries, LLC**

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $          - | | $          - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | $          - | | $          - | NA | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | $          - | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | $          - | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | $          - | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | - | - | NA | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | $          - | NA | s |

### (xxvi)  Uniroyal Chemical Company Limited (Bahamas)

*($'s in millions)*

#### Uniroyal Chemical Company Limited (Bahamas)

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $    - | | $    - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | **$    -** | | **$    -** | NA | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | **$    -** | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | **$    -** | | |
| Total Chapter 11 Administrative & Priority Claims | | 37 | - | 0% | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | **$    -** | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | - | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | 0 | - | 0% | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | **$    -** | NA | s |

### (xxvii)  CNK Chemical Realty Corporation

*($'s in millions)*

CNK Chemical Realty Corporation

| | Net Book Value | Claim Amount | Recovery Dollars | % | Note |
|---|---|---|---|---|---|
| Cash | $ - | | $ - | NA | a |
| Trade Receivables | - | | - | NA | b |
| Inventory | - | | - | NA | c |
| Other Current Assets | - | | - | NA | d |
| PP&E, Net | - | | - | NA | e |
| Goodwill | - | | - | NA | |
| Intangibles, Net | - | | - | NA | f |
| Investments in Subsidiaries | - | | - | NA | g |
| Other Noncurrent Assets | - | | - | NA | h |
| Intercompany Receivables | - | | - | NA | i |
| Reimbursement Claim Value | NA | | - | NA | j |
| **Gross Proceeds** | $ - | | $ - | NA | |
| Liquidation Costs | | - | - | NA | k |
| **Net Liquidation Proceeds** | | | $ - | | |
| Senior Secured Superpriority DIP Facility | | - | - | NA | l |
| Secured Portion of the Prepetition Bank Debt | | - | - | NA | m |
| **Proceeds Available for Chapter 11 Administrative & Priority Claims** | | | $ - | | |
| Total Chapter 11 Administrative & Priority Claims | | - | - | NA | n |
| **Proceeds Available for Chapter 11 General Unsecured Claims** | | | $ - | | |
| Unsecured Bank Debt | | 120 | - | 0% | o |
| General Unsecured Notes 2009 | | - | | NA | |
| General Unsecured Notes 2016 | | 508 | - | 0% | p |
| General Unsecured Notes 2026 | | - | - | NA | p |
| All Other General Unsecured Claims | | - | - | NA | q |
| Pension and Other Post-Employment Benefits | | 399 | - | 0% | r |
| Intercompany General Unsecured Claims | | - | - | NA | |
| Reimbursement Claims | | - | - | NA | |
| **Equity Interests** | | | $ - | NA | s |

E.    **Specific Notes to Assumptions Contained in the Liquidation Analysis**

The Liquidation Analysis refers to certain categories of assets and liabilities.  The alphabetic designation below corresponds to each line item in the above tables with a specific note.

(a)    <u>Cash:</u>  Based on book cash as of the assumed Conversion Date.

(b)    <u>Trade Receivables:</u>  Accounts receivable reflects a 75% recovery on net book accounts receivables balances.  Recovery is based on a review of certain ineligible accounts used to calculate the accounts receivable component of the borrowing base in accordance with the DIP Credit Agreement with an additional discount applied to the remaining balance.

(c)    <u>Inventory:</u>  Recovery rates for raw materials and finished goods inventory were based upon February 8, 2010 appraised rates of recovery for net orderly liquidation values in accordance with the DIP Credit Agreement.

(d)    <u>Other Current Assets:</u> Estimated recoveries are based upon assessed collectability of certain pre-paid accounts, vendor deposits, and tax receivables.

(e)    <u>Plant, Property & Equipment:</u> Based on December 2009 high level appraisal of the liquidation value of the Company's fixed assets.  Orderly liquidation values are based on limited procedures, rather than an asset-by-asset assessment of liquidation value.  AS SUCH, THE ASSUMED RECOVERY RATES ON THESE ASSETS REPRESENT A SIGNIFICANT RISK TO ACHIEVING THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS.

(f)    <u>Intangibles, Net:</u>  Based on December 2009 high level appraisal of the liquidation value of the Company's trademarks and other intellectual property.  In arriving at an indication of liquidation value, a relief-from-royalty to the Debtors 5-year revenue projections was applied as a simplifying assumption.  A 1.5% royalty rate was applied to all revenue.  AS SUCH, THE ASSUMED RECOVERY RATES ON THESE ASSETS REPRESENT A SIGNIFICANT RISK TO ACHIEVING THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS.

(g)    <u>Investments in Subsidiaries:</u>  Wind down scenarios for non-debtor affiliates were reviewed in order to estimate proceeds from the equity interest of non-debtor affiliates.

(h)    <u>Other Noncurrent Assets:</u>  Includes deferred tax assets; therefore, no cash recovery was assumed. Deferred tax assets represent temporary differences between internal and tax records.  In a liquidation scenario, there are assumed to be no future proceeds, and therefore no opportunity to realize the tax asset benefit.

(i)    <u>Intercompany Receivables:</u> Wind down scenarios for non-debtor affiliates were reviewed in order to estimate recovery on intercompany receivables.

(j)    <u>Reimbursement Claims:</u>  Recoveries received from other Debtors for payments made as a guarantor.

(k)    <u>Liquidation Costs:</u>  To maximize recoveries on remaining assets, minimize the amount of Claims, and generally ensure an orderly liquidation, the Trustee will need to retain a substantial number of individuals currently employed by the Debtors during the chapter 7

liquidation process. These individuals will primarily be responsible for operating and maintaining the Debtor's assets, providing historical knowledge and insight to the Trustee regarding the Debtors' businesses and the chapter 11 cases, and concluding the administrative wind-down of the business after the sale of the Debtors' assets. Wind-down costs consist of the regularly occurring general and administrative costs required to operate the Debtors' assets during the liquidation process, and the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors. Pursuant to section 326 of the Bankruptcy Code, the Liquidation costs assume Trustee fees of 3.0% for liquidation proceeds in excess of $1,000,000.

(l)     DIP Facility: There is forecasted to be $322 million of debt outstanding under the DIP Facility (including letters of credit) as of the Conversion Date, which is assumed to be satisfied in full, in Cash, under the Liquidation Analysis.

(m)     Prepetition Secured Bank Claims: The Liquidation Analysis assumes that holders of Prepetition Secured Bank Claims would not be entitled to default interest or interest-on-interest (i.e., compound interest). Should the Bankruptcy Court determine otherwise, projected recoveries for holders of junior Claims would be reduced materially under the Liquidation Analysis.

(n)     Chapter 11 Administrative and Priority Claims: Administrative and Priority Claims have the meaning provided in the Plan. Amounts do not include potential employee claims for such items as severance and potential WARN Act claims.

(o)     Unsecured Bank Debt: Assumes all outstanding letters of credit are drawn, with a corresponding increase in the various claims against the Debtors.

(p)     2016 Notes Claims and 2026 Notes Claims: Amounts do not include any Claims on account of "make-whole" provision under the 2016 Notes Indenture or "no-call" provision with respect to the 2026 Notes. Should the Bankruptcy Court determine that such Claims are Allowed, the projected recoveries for holders of junior Claims in the Liquidation Analysis would be reduced materially.

(q)     All Other General Unsecured Claims: Includes unsecured trade claims, third-party accounts-payable, diacetyl, other litigation, environmental claims and employee/benefits claims. The Liquidation Analysis' estimates are based upon the Debtors' estimates of remaining Claims after the Claims objection, reconciliation and resolution process as described in the Disclosure Statement, subject to certain adjustments. The Liquidation Analysis includes certain additional Claims resulting from conversion of the chapter 11 cases to chapter 7 cases. For purposes of the Liquidation Analysis, these estimates do not include interest accrued after the Petition Date because the Debtors would not be solvent in a chapter 7 liquidation.

(r)     Pension and Other Post-Employment Benefits: Pension claim amount included is based on the termination liability as of April 1, 2010. Other Post-Employment Benefit amounts are based on the book liability as of March 31, 2010. Although it is likely that the Pension Benefit Guarantee Corporation would assert claims against all of the non-Debtor entities and pursue recovery from any excess proceeds prior to those proceeds becoming available to other debtor creditors, the Liquidation Analysis was not developed based on that assumption.

33

(s)    <u>Equity Interests:</u>  The Liquidation Analysis concludes there are insufficient proceeds to provide a recovery to holders of Interests in Chemtura Corporation.

K&E 16821461.9

<u>**Exhibit E**</u>

**Financial Projections**

**Financial Projections**

For purposes of evaluating the Plan pursuant to the "feasibility" requirement set forth in section 1129(a)(11) of the Bankruptcy Code, the Debtors analyzed their ability to satisfy their financial obligations under the Plan while maintaining sufficient liquidity and capital resources, consistent with the Debtors' Long-Range Business Plan (the "**LRBP**"),[1] to prepare the following financial projections (the "**Projections**") for the calendar years 2010 through 2014 (the "**Projection Period**"). As discussed in detail below, the Debtors believe that the Plan meets the Bankruptcy Code feasibility requirement, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or Interests or other parties in interest after the Confirmation Date or to include such information in documents required to be filed with the United States Securities and Exchange Commission (the "**SEC**") or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and this Disclosure Statement. Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections, estimates and assumptions are not necessarily indicative of these current values or future performance, which may be significantly less or more favorable than set forth herein. The Projections were prepared in August 2009 and refreshed in April 2010. Management is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Projections due to a material change in the Debtors' prospects.

The assumptions, qualifications and notes set forth below comprise a material part of the Projections and should be read in conjunction with the Projections. Additionally, the Projections should be read in conjunction with the assumptions, qualifications and explanations set forth in this Disclosure Statement and the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in Chemtura's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, Chemtura's Quarterly Report on Form 10-Q for the first quarter ending March 31, 2010, and any other recent Chemtura report to the SEC. These filings are available by visiting the Securities and Exchange Commission's website at http://www.sec.gov or the Debtors' website at http://www.chemtura.com.

**THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND**

---

[1]    Additional disclosure with respect to the LRBP is provided in section VII.C. of this Disclosure Statement. Capitalized terms used but not defined in this **Exhibit E** shall have the meaning given to such terms in the Disclosure Statement or, if not defined therein, in the *Joint Chapter 11 Plan of Chemtura Corporation, et al.* (the "**Plan**").

1

REGULATIONS OF THE SEC.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND   OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN SECTION XII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS") AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE DEBTORS AND REORGANIZED DEBTORS, AS

2

**APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THIS DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.    THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.**

1. **Basis of Presentation**

The Projections reflect the reorganization and related transactions pursuant to the Plan; however, the Projections do not reflect the comprehensive implementation of estimated "fresh start" accounting adjustments pursuant with Accounting Standards Codification ("**ASC**") Section 852-10-45, Reorganizations – Other Presentation Matters.  It has not yet been determined if "fresh start" accounting will be applicable.  However, the pro forma balance sheet presents a "fresh start" accounting adjustment to reconcile the carrying value of the Company's assets to the implied reorganization value with an adjustment to the Goodwill carrying amount. If "fresh start" accounting is applicable upon the Confirmation, the reorganization value of the Company will be assigned to its assets and liabilities in accordance ASC Topic 805, Business Combination.  These actual "fresh start" accounting adjustments will restate the value of the Company's assets and liabilities to fair market value and may result in the recognition of additional intangible assets including goodwill.  The presentation of inventory, plant, property and equipment and intangibles at fair value will likely change the cost of sales and depreciation and amortization expense from that shown herein.  While the actual "fresh start" accounting adjustments may result in materially different values for certain balance sheet assets and liabilities from those presented herein, such adjustments are not anticipated to have an impact on the underlying economics of the Plan.  The pro forma adjustments presented herein are unaudited.

The Company currently establishes a valuation allowance against the deferred tax assets of its U.S. operations and the deferred tax assets of certain of its foreign subsidiaries.  The tax assets and liabilities presented in these projections have not been adjusted to reflect the release or creation of any valuation allowances as of the emergence date, any other "fresh start" adjustments, if required, or for all of the effects of the reorganization and related transactions contemplated by the Plan.  The tax presentation in the Statement of Operations does not provide for the continuing application of a valuation allowance against any domestic or foreign deferred tax asset resulting from operations after the Effective Date.  The Projections do not make any assumptions to the liability for uncertain tax positions that will need to be re-established for U.S. operations after the Effective Date under the provisions of FASB Interpretation No. 48 - Uncertain tax positions (ASC 740).  The Projections provide that existing U.S. liability for uncertain tax positions is released at emergence.

The Company's operations are global and it recognizes income, purchases raw materials and incurs expense in many currencies.  The assets and liabilities of its foreign subsidiaries are recorded in their functional currency.  The projections assume constant foreign exchange rates for the Projection Period.  In practice, foreign exchange rates will vary constantly throughout the Projection Period and it is unlikely that the Company will be able to hedge a majority, if any, of its foreign exchange exposures.

2. **Assumptions to Projections**

The Projections are based on a number of assumptions and qualifications made by management with respect to the future performance of the Company's operations, which are reflected in the discussion below and the footnotes set forth herein. These assumptions and footnotes comprise a material part of the Projections and should be reviewed in conjunction with the Projections. Additionally, although management has prepared the Projections in good faith and believes the assumptions to be reasonable, the Debtors can provide no assurance that such assumptions will be realized.  As described in detail in section XII of this Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' future financial position and results of operations and must be considered in connection with the Projections.

A.    **General**

1.    ***Methodology:*** The Projections are based upon the Company's detailed operating budget for calendar 2010 and for calendar years 2011 through 2014 incorporate management's assumptions regarding the strength of the economy, implementation of various strategic and operating initiatives, including the impact of new products and rationalization of the operating footprint and projected customer and end market trends. The Projections do not reflect any acquisitions or divestitures other than a small divestiture expected to be completed prior to emergence.

2.    ***Plan Consummation:*** The operating assumptions assume that the Plan will be confirmed and consummated in the third quarter of 2010 with an expected emergence date of October 1, 2010. Although the Debtors would seek to cause the effective date to occur as soon as practicable, there can be no assurance as to when, or whether, the effective date actually will occur.

3.    ***General Market Conditions:*** The Projections assume that the global economy continues to improve and that 2011 economic output is comparable to 2007 economic output. After 2011, the global economy is expected to continue to grow at historical norms.

4.    ***Claims Estimates:*** The estimates presented herein assume the midpoint of the high and low Claims estimates presented in the Plan and reflected in section I of this Disclosure Statement. Actual cash sources and uses and other distributions pursuant to the Plan may be different from the estimates presented herein based on the amount of actual Allowed Claims.

5.    ***Foreign Exchange Rates:*** The Company's operations are global and it recognizes income, purchases raw materials and incurs expense in many currencies. The assets and liabilities of its foreign subsidiaries are recorded in their functional currency. The Projections assume constant foreign exchange rates for the Projection Period. In practice, foreign exchange rates will vary constantly throughout the Projection Period and it is unlikely that the Company will be able to hedge a majority, if any, of its foreign exchange exposures.

B.    **Projected Statements of Operations**

1.    ***Net Sales:*** Projected net sales are the aggregation of revenues from the Company's Consumer Performance Products, Industrial Performance Products, Chemtura AgroSolutions[TM] Engineered Products and Industrial Engineered Products business units. Sales are projected to grow at a 7.1% compound annual growth rate from 2010 through 2014. Sales growth is driven by increased customer demand due to macro-economic recovery and secular trends in certain industries, new product introductions and geographic expansion.

2.    ***Cost of Goods Sold:*** Cost of goods sold ("**COGS**") consists of costs incurred to produce and manufacture the Company's products including raw materials and fixed operating costs. COGS are assumed to increase over the Projection Period as a result of increased sales; however, gross margins are expected to increase over the Projection Period due to the introduction of higher margin products, reductions in the operating footprint, the leverage of higher volumes on fixed cost absorption, strategic sourcing initiatives and other cost reduction initiatives.

5

3.    ***Selling, General and Administrative Expenses:*** Selling, general and administrative ("**SG&A**") expenses include costs related to sales and marketing, accounting and finance, legal, information systems and other corporate functions.  The Company implemented several SG&A reduction programs before the Petition Date, including staff  reductions and development and application of a common enterprise resource planning system in the vast majority of its global locations.  As sales grow over the Projection Period, SG&A expenses will likely increase.   SG&A expenses are projected to grow at a 3.2% compound annual growth rate from 2010 to 2014, but are expected to decline as a percent of sales.  The decline as a percent of sales is due to a number of productivity initiatives, including improvements to systems, the use of regional shared service centers and other initiatives.

4.    ***Research and Development:*** Research and development ("**R&D**") expenses are projected to grow at a 6.3% compound annual growth rate from 2010 to 2014.  The Company expects to invest in new development projects, product registrations and other projects targeted at protecting its industry positions and generating organic sales growth.

5.    ***Other:*** Other includes expenses associated with operational restructuring initiatives including several manufacturing plant consolidation projects.  Major expenses will likely include severance, non-cash asset impairments, decommissioning costs and other.  Also included is income and losses from equity method investments.

6.    ***Interest Expense:*** Interest expense following the Effective Date reflects the extinguishment of prepetition Claims as well as the issuance of Exit Financing in the form of (a) a $750 million high-yield note, which is assumed to yield 8.0% and (b) a senior secured asset-based revolver.   The exact structure and pricing of the Exit Financing may change based on market conditions at the time of the financing.  Other interest includes unused line fees on the new revolving asset-based credit facility and the amortization of deferred financing fees.

7.    ***Other Expense / (Income):*** Other includes sundry expenses, foreign exchange (gains) / losses net of potential hedges and related costs, interest income and other.

8.    ***Income Taxes:*** The tax effects of the Plan are still under evaluation.  For purposes of creating the Projections, the Company has assumed that a majority of its net operating losses are reduced by other taxable transactions and the remaining net operating losses are subject to a section 382 limitation.  The Projections make certain assumptions regarding the U.S. and non-U.S. taxes, profit and the deductibility of certain expenses. The Company's existing deferred tax asset and liability may be revalued in the "fresh start" process, but are assumed to be frozen at the emergence date in the Projections. A new deferred tax liability is accrued for expected timing differences in the Projection Period.  The Projections also assume that there will be no valuation allowance established against any tax asset in the Projection Period and do not provide for the release of previously established valuation allowances.  Actual cash taxes may differ materially based on varying levels of debt, interest rates, actual results, geographic income distribution assumptions and final resolution of the remaining U.S. tax attributes in the reorganization process.   There may continue to be valuation allowances in certain jurisdictions that cause the book tax expense to differ from that presented in these Projections.

6

C.      **Projected Balance Sheets and Statements of Cash Flows**

1.      ***Working Capital:*** Trade receivables and inventory have been projected according to historical relationships with respect to receivable days outstanding and inventory turns and expected improvements.  Due to the Chapter 11 Cases, the Company is experiencing shorter terms and in some cases cash in advance in the purchase of certain raw materials and services.  The Projections assume that the Company' accounts payable return to normalized terms in the Projection Period.

2.      ***Capital Expenditures:*** The Company continues to invest in capital expenditures for maintenance, environmental, health and safety and growth initiatives.  2010 and 2011 capital expenditures are higher than the other years in the Projection Period due to specific initiatives.  Investments in capital expenditures are recorded at cost and are depreciated over their estimated useful lives.

### 3. Pro Forma Projected Balance Sheet *(Unaudited)*[a]
### (As of September 30, 2010)

| ($ in millions) | 3Q'10E | Reorganization Adjustments | | Pro Forma 3Q'10E |
| --- | --- | --- | --- | --- |
| | | Recapitalization Adjustments | Fresh Start Adjustments | |
| **Assets** | | | | |
| Cash and Cash Equivalents | $290 | (165) (b) | - | $125 |
| Trade Accounts Receivable | 486 | - | - | 486 |
| Inventories | 486 | - | - | 486 |
| Other Current Assets | 231 | - | - | 231 |
| **Total Current Assets** | **1,492** | **(165)** | **-** | **1,328** |
| Property, Plant and Equipment | 722 | - | - | 722 |
| Goodwill and Intangibles, net | 669 | - | 133 (e) | 802 |
| Other Assets | 176 | 35 (b) | - | 210 |
| **Total Assets** | **$3,059** | **($130)** | **$133** | **$3,062** |
| **Liabilities and Stockholders' Equity** | | | | |
| Short-Term Borrowings | $300 | ($300) (b) | - | - |
| Accounts Payable | 162 | - | - | 162 |
| Accrued Expenses | 196 | (25) (b) | - | 171 |
| Accrued Income Taxes | 4 | - | - | 4 |
| **Total Current Liabilities** | **662** | **(325)** | **-** | **337** |
| Long-Term Debt | 3 | 750 (b) | - | 753 |
| Pension and Post-Retirement Healthcare Liabilities | 135 | 305 (c) | - | 440 |
| Other Liabilities | 178 | - | - | 178 |
| **Total Liabilities** | **979** | **730** | **-** | **1,709** |
| Liabilities Subject to Compromise | 2,104 | (2,104) (d) | - | - |
| Stockholders' Equity | (24) | 1,244 (d) | 133 (e) | 1,353 |
| **Total Liabilities and Stockholders' Equity** | **$3,059** | **($130)** | **$133** | **$3,062** |

8

### Notes to Pro Forma Projected Balance Sheet (Unaudited)

(a)     See Basis of Presentation section for important information regarding the preparation of the financial exhibits.

(b)     These amounts reflect the issuance of $750 million of debt at the time of exit and the payment of certain expenses and claims pursuant to the Plan. The Projections assume that the Exit Financing will likely consist of a high-yield note offering and a senior secured asset-based revolver. The ultimate structure of the Exit Financing may vary depending on market conditions and will be disclosed in the Plan Supplement in advance of the Confirmation Hearing. The other amounts reflect the repayment of various amounts pursuant to and in connection with Confirmation, including payment of the DIP Claims, the Prepetition Secured Lender Claims, Accrued Professional Compensation, General Unsecured Claims, Administrative Claims, Priority Tax Claims, Unsecured Convenience Claims, pension contributions and payments in connection with the Exit Financing. A deferred financing fee account has been created based on estimated financing fees. The estimated cash sources and uses as of the Effective Date are presented below.

| Cash Sources & Uses | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Funded Exit Financing | $750 | DIP Loan | $300 |
| Rights Offering | 100 | Admin & Priority Claims | 10 |
| Cash on Balance Sheet | 290 | Professional Fees | 64 |
| **Total** | **$1,140** | Exit Financing Fees & Expenses | 35 |
| | | Payments to Creditors and Other | 556 |
| | | US Pension Contribution | 50 |
| | | Cash to Balance Sheet | 125 |
| | | **Total** | **$1,140** |

(c)     This amount reflects the reclassification of liabilities subject to compromise with respect to pension and post-retirement healthcare liabilities[2]. Specifically, the amount represents the GAAP accrual for the underfunded portion of the domestic pension and post-retirement healthcare liabilities. The amount of the accrual may change due to the implementation of "fresh start" accounting. As described in section IX.B. of this Disclosure Statement, the Plan provides that the Debtors' domestic pension plans will be Reinstated pursuant the Plan at emergence and will not be compromised or terminated. The amount also reflects a $50 million contribution to the domestic pension plans, as further described in section IX.B. of this Disclosure Statement.

(d)     This amount reflects the settlement of liabilities subject to compromise that will be converted to equity, repaid with cash or forgiven, as applicable, pursuant to the terms of the Plan and as described in this Disclosure Statement. The balance includes (i) the 2016 Notes Claims, (ii) the 2009 Notes Claims, (iii) the 2026 Notes Claims, (iv) the Prepetition Secured Lender Claims, (v) Prepetition Unsecured Lender Claims, (vi) prepetition accounts payable, (vii) litigation and environmental reserves and (viii) accrued interest expense and other prepetition liabilities and miscellaneous unsecured claims. The equity amounts reflect the issuance of New Common Stock to holders of Claims (and if applicable Interests in Chemtura) and the proceeds of the Rights Offering less fees that are expensed as of the Effective Date.

(e)     Although the Company has not restated its assets and liabilities to fair market value, as would be required by the application of "fresh start" accounting, if required, an accounting adjustment has

---

[2]     Additional disclosure with respect to these obligations is provided in sections V.D. and VII.G. of the Disclosure Statement.

been made to reset the Company's equity balance to the Plan equity value.  The offsetting entry has been recorded as Goodwill and Intangibles, net.

## 4. Projected Statements of Operations (*Unaudited*)[a]

|  | **Fiscal Year Ended December 31** | | | | | |
|  | **1Q'10A - 3Q'10E** | **Post-Emergence** | | | | |
| *($ in millions)* |  | **4Q'10E** | **2011E** | **2012E** | **2013E** | **2014E** |
| Net Sales | $1,940 | $615 | $2,861 | $3,038 | $3,224 | $3,358 |
| Cost of Goods Sold | 1,450 | 448 | 2,084 | 2,195 | 2,317 | 2,409 |
| Selling, General and Administrative | 240 | 89 | 343 | 357 | 366 | 373 |
| Depreciation and Amortization | 117 | 34 | 133 | 140 | 138 | 133 |
| Research and Development | 30 | 11 | 49 | 52 | 54 | 52 |
| Other (b) | 142 | 2 | 66 | 4 | (3) | (27) |
| **Operating Income / (Loss)** | **(39)** | **30** | **185** | **292** | **353** | **419** |
| Interest Expense | 25 | 17 | 70 | 67 | 67 | 67 |
| Loss on Extinguishment of Debt | 20 | 0 | 0 | 0 | 0 | 0 |
| Other Expense, net (c) | 102 | 8 | 10 | 10 | 10 | 10 |
| **Pre-Tax Income / (Loss)** | **(187)** | **5** | **106** | **215** | **276** | **342** |
| Income Tax Provision / (Benefit) | 20 | 4 | 45 | 85 | 116 | 134 |
| (Loss) from Discontinued Operations | (9) | 0 | 0 | 0 | 0 | 0 |
| **Net Income / (Loss)** | **($216)** | **$1** | **$61** | **$129** | **$160** | **$208** |
| **Operating Income** | **($39)** | **$30** | **$185** | **$292** | **$353** | **$419** |
| Plus: Depreciation and Amortization | 117 | 34 | 133 | 140 | 138 | 133 |
| Plus: Operational Restructuring Expenses | 20 | 3 | 69 | 6 | 0 | (24) |
| Plus: Adj. to Estimates to Expected Allowed Claims | 122 | 0 | 0 | 0 | 0 | 0 |
| Plus: Other (d) | 6 | 7 | 8 | 8 | 1 | 0 |
| **EBITDAR** | **$226** | **$75** | **$395** | **$446** | **$492** | **$528** |

### Notes to Projected Statements of Operations (Unaudited)

(a)    See Basis of Presentation section for important information regarding the preparation of the financial exhibits.

(b)    Includes expenses for changes in estimates related to expected allowable claims, antitrust costs, operational restructuring charges, (income) / loss from equity method investments and (gain) on the sale of a business.

(c)    Represents expenses related to the bankruptcy reorganization process and other non-operational costs.

(d)    Includes adjustments for non-cash incentive compensation, (gain) on the sale of a business among other customary adjustments.  As presented, EBITDAR may not be defined in the same manner as it will be defined in any credit agreements entered into as of the Effective Date.

11

## 5. Projected Balance Sheets (*Unaudited*)[a]

| | Fiscal Year Ended December 31 | | | | |
|---|---|---|---|---|---|
| (*$ in millions*) | **2010E** | **2011E** | **2012E** | **2013E** | **2014E** |
| **Assets** | | | | | |
| Cash and Cash Equivalents (b) | $149 | $234 | $405 | $585 | $802 |
| Trade Accounts Receivable | 471 | 519 | 542 | 575 | 605 |
| Inventories | 470 | 497 | 514 | 536 | 555 |
| Other Current Assets | 229 | 228 | 228 | 228 | 228 |
| **Total Current Assets** | **1,320** | **1,477** | **1,689** | **1,924** | **2,190** |
| Property, Plant and Equipment | 727 | 742 | 729 | 710 | 701 |
| Goodwill and Intangibles, net | 793 | 757 | 721 | 685 | 655 |
| Other Assets | 210 | 208 | 206 | 205 | 204 |
| **Total Assets** | **$3,050** | **$3,184** | **$3,346** | **$3,524** | **$3,749** |
| **Liabilities and Stockholders' Equity** | | | | | |
| Short-Term Borrowings | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable | 151 | 161 | 207 | 215 | 223 |
| Accrued Expenses | 170 | 228 | 224 | 220 | 220 |
| Accrued Income Taxes | 4 | 4 | 4 | 4 | 4 |
| **Total Current Liabilities** | **324** | **394** | **435** | **439** | **448** |
| Long-Term Debt | 753 | 753 | 753 | 753 | 753 |
| Pension and Post-Retirement Healthcare Liabilities (c) | 436 | 420 | 359 | 308 | 252 |
| Deferred Tax Liability | 2 | 17 | 56 | 106 | 158 |
| Other Liabilities | 172 | 163 | 157 | 154 | 146 |
| **Total Liabilities** | **1,688** | **1,747** | **1,760** | **1,759** | **1,757** |
| Stockholders' Equity (d) | 1,362 | 1,437 | 1,586 | 1,765 | 1,992 |
| **Total Liabilities and Stockholders' Equity** | **$3,050** | **$3,184** | **$3,346** | **$3,524** | **$3,749** |

### Notes to Projected Balance Sheets (Unaudited)

(a)    See Basis of Presentation section for important information regarding the preparation of the financial exhibits.

(b)    The projections provide for the accumulation of Cash and Cash equivalents resulting from cash provided from operations less cash used in investing activities.  In practice, such surplus cash will be used to prepay debt obligations or reinvested.

(c)    Pension and Post-Retirement Healthcare Liabilities are computed based upon actuarial assumptions including investment return and discount rates as of December 31, 2009.  The projection of the Liabilities reflects projected annual pension and post-retirement healthcare expense and annual cash contributions to both domestic and foreign pension and post-retirement healthcare plans.

(d)    Includes estimates for stock based compensation expense related to stock compensation awards assumed to be made.

### 6.  Projected Statements of Cash Flows *(Unaudited)*[a]

| | 1Q'10A - 3Q'10E | Fiscal Year Ended December 31 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Post-Emergence | | | | |
| ($ in millions) | | 4Q10E | 2011E | 2012E | 2013E | 2014E |
| **Cash Flow From Operating Activities** | | | | | | |
| Net Income / (Loss) | ($216) | $1 | $61 | $129 | $160 | $208 |
| Loss on Extinguishment of Debt | 20 | 0 | 0 | 0 | 0 | 0 |
| Depreciation and Amortization | 117 | 34 | 133 | 140 | 138 | 133 |
| Non-Cash Impairment Charges | 14 | 2 | 30 | 6 | 0 | 0 |
| Stock-Based Compensation Expense | 2 | 8 | 14 | 19 | 18 | 19 |
| Change in Estimates to Expected Allowed Claims | (421) | 0 | 0 | 0 | 0 | 0 |
| Amortization of Deferred Financing Fees | 0 | 1 | 4 | 4 | 4 | 4 |
| Change in Deferred Tax Liability | 0 | 2 | 15 | 39 | 50 | 52 |
| Decrease/(Increase) in Trade Receivables | (62) | 15 | (47) | (23) | (33) | (30) |
| Decrease/(Increase) in Inventories | (0) | 16 | (26) | (18) | (22) | (19) |
| Increase/(Decrease) in Accounts Payable | 37 | (12) | 11 | 45 | 8 | 8 |
| Increase/(Decrease) in Pension and Post-Retirement Healthcare (b) | (87) | (3) | (16) | (61) | (51) | (56) |
| Increase/(Decrease) in Other | (35) | (7) | 48 | (13) | (11) | (10) |
| **Cash Flow From Operating Activities** | **(632)** | **56** | **227** | **267** | **263** | **310** |
| **Cash Flow From Investing Activities** | | | | | | |
| Net Proceeds from Divestments | 46 | 0 | 0 | 0 | 0 | 0 |
| Capital Expenditures | (86) | (32) | (143) | (96) | (83) | (93) |
| **Cash Flow From Investing Activities** | **(40)** | **(32)** | **(143)** | **(96)** | **(83)** | **(93)** |
| **Cash Flow From Financing Activities** | | | | | | |
| Debt Proceeds / (Repayments) | 514 | 0 | 0 | 0 | 0 | 0 |
| Equity Offering Proceeds | 100 | 0 | 0 | 0 | 0 | 0 |
| Payments for Debt Issuance and Refinancing Costs | (51) | 0 | 0 | 0 | 0 | 0 |
| **Cash Flow From Financing Activities** | **563** | **0** | **0** | **0** | **0** | **0** |
| Effects of Foreign Exchange Rate | (2) | 0 | 0 | 0 | 0 | 0 |
| Beginning Cash | 236 | 125 | 149 | 234 | 405 | 585 |
| Change in Cash | (111) | 24 | 85 | 171 | 180 | 218 |
| **Ending Cash** | **$125** | **$149** | **$234** | **$405** | **$585** | **$802** |

### Notes to Projected Statements of Cash Flows (Unaudited)

(a)   See Basis of Presentation section for important information regarding the preparation of the financial exhibits.

(b)   Pension and Post-Retirement Healthcare reflect projected cash contributions to domestic and foreign pension and post-retirement healthcare plans.  In the case of qualified domestic pension plans, contributions have been computed to maintain compliance with the Reorganized Debtors' funding obligations under the Pension Protection Act of 2006.  Actual cash contributions may vary due to changes in interest rates, investment returns and applicable regulations, among other matters.

## Exhibit F

**Valuation Analysis**

### Valuation Analysis

In order to provide information to parties in interest regarding the possible range of values of their distributions under the Plan, the Debtors have been advised by Lazard Frères & Co. LLC ("**Lazard**"),[1], their retained investment banker and financial advisor, with respect to the estimated consolidated value of the Reorganized Debtors on a going-concern basis (this "**Valuation Analysis**"), including Enterprise Value, Distributable Value and Equity Value (each as defined herein).

The Equity Committee and certain other parties in interest believe that the valuation analysis included in the Disclosure Statement undervalues the Debtors on a going concern basis.

**THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE CONTAINED IN THIS EXHIBIT DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS. THE VALUATION INFORMATION CONTAINED IN THIS SECTION IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

A.      **Overview**

Lazard has estimated the consolidated value of the Reorganized Debtors as of an assumed Effective Date of September 30, 2010 (the "**Assumed Effective Date**"). Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims as well as value available for distribution to holders of Interests in Chemtura Corporation pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.

The estimated total value available for distribution to holders of Allowed Claims and Interests in Chemtura Corporation (the "**Distributable Value**")[2] consists of the estimated value of the Reorganized Debtors' operations on a going concern basis (the "**Enterprise Value**"), plus the estimated cash balance at the Assumed Effective Date, less non-compromised tax-effected environmental liabilities at each of the Debtor and non-Debtor entities and indebtedness at non-Debtor entities and other obligations (collectively, the "**Obligations**"). The valuation analysis assumes that the Plan becomes effective on September 30, 2010 and is based on projections provided by the Debtors' management ("**Projections**") for the calendar years 2010 through 2014 (the "**Projection Period**"). The Projections are attached to this Disclosure Statement as **Exhibit E**.

---

[1]     Capitalized terms used but not defined in this **Exhibit F** shall have the meaning given to such terms in the Disclosure Statement or, if not defined therein, in the *Joint Chapter 11 Plan of Chemtura Corporation, et al.* (the "**Plan**").

[2]     For the avoidance of doubt, the term "Distributable Value" as used in this **Exhibit F** is only with respect to the Valuation Analysis presented herein. If the term "distributable value" is used elsewhere in the Disclosure Statement, it does not have the same meaning as the defined term "Distributable Value" in this **Exhibit F**.

Based on these Projections, and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $1,900 - $2,200 million, with a midpoint Enterprise Value of $2,050 million. Including the estimated cash balance at the Assumed Effective Date of approximately $290 million with the Enterprise Value and deducting the Obligations of approximately $71 million yields a range of Distributable Value of the Reorganized Debtors from $2,119 million to $2,419 million with a mid-point estimate of $2,269 million.

Based on an estimated $750 million of funded Exit Financing as of the Assumed Effective Date, including the Obligations and an estimated cash balance of $125 million after the transactions contemplated by the Plan, Lazard's mid-point estimate of Enterprise Value implies a value for the New Common Stock of the Reorganized Debtors (the "**Equity Value**") of approximately $1,354 million, with a range from $1,204 million to $1,504 million. These values assume that any Rights Offering proceeds are distributed as part of the Unsecured Distribution Pool and do not give effect to the potentially dilutive impact of any shares issued upon exercise of options or restricted shares that may be granted under long-term incentive plan(s), all as set forth in the Plan.

**THE ESTIMATED ENTERPRISE VALUE AND EQUITY VALUE DESCRIBED HEREIN ARE PRESENTED AS OF THE ASSUMED EFFECTIVE DATE OF SEPTEMBER 30, 2010 AND REFLECT WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS, HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THE ESTIMATES PROVIDED IN THIS VALUATION ANALYSIS.**

Lazard assumed that the Projections prepared by the Debtors' management were reasonably prepared in good faith and reflect the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated range of Enterprise Value and Equity Value assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue and growth in earnings before interest, taxes, depreciation and amortization ("**EBITDA**") and improvements in EBITDA margins, earnings and cash flow as projected. If the Reorganized Debtors' businesses perform at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value and/or Equity Value. Conversely, if the Debtors' businesses perform at levels above those set forth in the Projections, such performance may have a materially positive impact on Enterprise Value and/or Equity Value.

In estimating the hypothetical range of the Enterprise Value and Equity Value of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Reorganized Debtors' businesses and their prospects; (c) met with and discussed the Debtors' operations and future prospects with the Debtors' management team; (d) reviewed certain publicly-available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating business; (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate; and (g) considered recent precedent transactions in the specialty chemicals industry. Although Lazard reviewed the Reorganized Debtors' businesses, operating assets and liabilities and business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Reorganized Debtors, as well as publicly-available information.

2

In addition, Lazard did not independently verify the Projections in connection with preparing estimates of Enterprise Value or Equity Value; no independent valuations or appraisals of the Debtors were sought or obtained in connection with this Valuation Analysis. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims and Interests thereunder.

Lazard's estimated range of Enterprise Value and Equity Value does not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to, and does not, express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated range of Enterprise Value and Equity Value set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimates reflect the application of standard valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated range of Enterprise Value and Equity Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Reorganized Debtors, nor any other person or entity (including Lazard) assumes responsibility for any differences between the estimates set forth herein and such actual outcomes. Actual market prices of such securities at issuance will depend upon numerous factors, including the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized Debtors' industry and economic conditions generally and other factors which generally influence the prices of securities.

As noted above, the estimate of the hypothetical range of Enterprise Value and Equity Value consists of the aggregate Enterprise Value of the Reorganized Debtors on a going-concern basis. The Plan is not a substantive consolidation plan and hence treats the Debtors as separate legal entities. As such, the ultimate Distributable Value under the Plan available to each of the individual 27 Debtors and the Allowed Claims against such Debtors may affect what is available for distribution to the creditors of each separate Debtor entity after resolution of Disputed Claims, and ultimately whether there is recovery for holders of Class 13a Interests in Chemtura in the event Class 13a does not vote to accept the Plan.

## B.    Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Value and Equity Value. Lazard's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to Enterprise Value.

### (i)    *Discounted Cash Flow Analysis*

The discounted cash flow ("**DCF**") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash

flows are discounted by the business' weighted average cost of capital (the "**Discount Rate**"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its target capital structure. The Enterprise Value was determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the Reorganized Debtors beyond the Projection Period known as the terminal value. The terminal value was derived by applying a multiple to the Reorganized Debtors' mid-cycle projected EBITDA discounted back to the Assumed Effective Date by the Discount Rate.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term debt-to-total capitalization ratio. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly-traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard estimated what would be the Reorganized Debtors' blended cost of debt based on the current assumed pricing on the Reorganized Debtors' proposed Exit Financing. In determining EBITDA terminal multiples, Lazard relied upon various analyses including a review of trading multiples for comparable companies operating in the specialty chemicals industry. Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples.

In applying the above methodology, Lazard utilized the Projections for the period beginning October 1, 2010, and ending December 31, 2014, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as capital expenditures, cash taxes, changes in working capital, pension contributions and other cash flows. These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using a range of Discount Rates calculated in a manner described above to arrive at a range of Enterprise Values.

In order to understand the affect of the Debtors' large underfunded pension and other post-retirement benefit obligations on the valuation, Lazard prepared a sensitivity analysis to the DCF. In the sensitivity analysis, Lazard excluded the cash payments on pension and post-retirement benefit obligations from free cash flow and adjusted EBITDA for pension and post-retirement benefit expenses, but used similar assumptions to those described in the preceding paragraphs for the DCF analysis. The tax-effected unfunded obligation for the pension and other post-retirement benefits is then subtracted from the range of values derived from this sensitivity analysis to derive a range of Enterprise Values. The sensitivity analysis confirmed the results derived from the traditional DCF analysis.

*(ii)    Comparable Company Analysis*

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value), minority interests, tax-effected environmental liabilities and accrued asbestos liabilities. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly EBITDA. As a sensitivity analysis, Lazard examined enterprise values for each selected public company by including the tax-effected pension and other post-retirement benefit underfunding of each company in enterprise value and then expressing those enterprise values as multiples of "EBITDAP," which is EBITDA adjusted for the non-service components of pension and other-post retirement

benefit expenses. In addition, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Reorganized Debtors' actual and projected operational performance. Lazard focused primarily on EBITDA multiples of the selected comparable companies to value the Reorganized Debtors.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Lazard selected the following publicly-traded companies (the "**Peer Group**") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: Albemarle Corporation, Arch Chemical, Arkema SA, Ashland Inc., Clariant AG, Cytec Industries Inc., Royal DSM N.V., Ferro Corporation, FMC Corporation, Huntsman Corporation, Lanxess AG, Lubrizol Corporation, Rhodia SA, Rockwood Holdings and Solutia Inc.

Lazard calculated market multiples for the Peer Group based on 2010-2011 estimated EBITDA, EBITDAP and EBITDA less capital expenditures by dividing the appropriate enterprise value of each comparable company as of June 2010 by the consensus 2010-2011 projections as estimated by equity research analysts. In determining the applicable multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue, EBITDA and capital expenditure amounts, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines. Lazard then applied the range of multiples described above to the Reorganized Debtors' 2010E and 2011E EBITDA to determine a range of Enterprise Values.

### (iii)   Precedent Transactions Analysis

The precedent transactions analysis estimates value by examining public merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Reorganized Debtors. Since precedent transaction analysis reflects aspects of value other than the intrinsic value of a company, there are limitations as to its applicability in determining the Enterprise Value. Nonetheless, Lazard reviewed recent M&A transactions involving specialty chemicals companies. Many of the transactions analyzed occurred in different fundamental and other market conditions from those prevailing in the marketplace and therefore may not be the best indication of value in the current market. Lazard focused mainly on EBITDA multiples in comparing the valuations of the selected companies involved in the relevant precedent transactions.

**THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF THIS VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE REORGANIZED DEBTORS MADE NUMEROUS**

ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.