**Hearing September 16, 2010**
**Objection Timely Per Extension (ftn. 2)**
**Oral Argument Requested on 9/16**

Steven Brower, PRO HAC (CA Bar No. 93568)
J. Alexandra Rhim (CA Bar No. 180636)
Austin K. Barron (CA Bar No. 204452)
BUCHALTER NEMER
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

Counsel for Pentair Water Pool and Spa Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                           )
In re:                                                    )        Chapter 11
                                                           )
CHEMTURA CORPORATION, *et al.,*        )        Case No. 09-11233 (REG)
                                                           )
                Debtors.                              )        Jointly Administered
_____)


**OBJECTIONS OF PENTAIR WATER POOL AND SPA INC. TO DEBTORS'
(I) JOINT PLAN OF REORGANIZATION AND (II) MOTION SEEKING
ESTABLISHMENT OF A DISPUTED CLAIMS RESERVE**
_____

Pentair Water Pool and Spa Inc. ("Pentair") hereby respectfully submits its initial objections[1] to Debtors' (i) Joint Plan of Reorganization (the "Plan") and (ii) Motion Seeking Establishment of a Disputed Claims Reserve (the "Reserve Motion"), which Reserve Motion is supplementary to the Plan.[2] Terms used but not defined herein have the meanings given them in the Plan and/or the Reserve Motion. In support hereof, Pentair respectfully states as follows:

---

[1]     Pentair recognizes the fluidity of the plan confirmation process and reserves the right to submit supplemental objections and/or evidence as appropriate as this process moves forward. Pentair specifically notes that Debtors provided an extremely abbreviated time period to respond to the Reserve Motion (which itself was filed on the eve of a holiday weekend) and specifically reserve the right to supplement these objections.

[2]     By prior agreement with Debtors' counsel, Pentair's initial response deadlines to the Plan and the Reserve Motion were extended until Monday, September 13 at 4:00 p.m. EDT.

**PRELIMINARY STATEMENT AND SUMMARY OF OBJECTIONS**

Pentair recognizes that Debtors have struggled to assemble a Plan and they have, in many aspects, performed admirably. However, as it relates to the treatment of thousands of general unsecured claims, Debtors are asking this Court to sanction what Pentair contends are blatant violations of due process and clear abuses of the Bankruptcy Code. Specifically, the Plan cannot be confirmed as presented because (i) **the Plan provides markedly and materially different treatment to different members of the same class**, depending only on whether such members' claims are, in the sole estimation of Debtors, presently unliquidated or disputed; and (ii) **the Disclosure Statement is facially misleading in (among other things) promising full payment to all general unsecured creditors when the Plan fails to actually provide a mechanism that ensures such treatment for over 2,000 members of that Class**.

Similarly, through the Reserve Motion – which is properly read only as an adjunct to the Plan and certainly not an actual motion to estimate claims under section 503(c) – **Debtors effectively ask this Court cap more than 2,000 claims at an average of some $22,000 per claim (less than half of the "convenience claim" amount) without a shred of actual evidence[3] to support the overall estimated claims or any given estimated claim**. Debtors' Reserve Motion is even more deficient when one considers that Debtors propose to reject hundreds of executory contracts through the Plan, and the claims arising from such rejection (at least some of which are likely to be disputed or unliquidated) will not be due until some 30 days after entry of a confirmation order. Not only is Debtors' proposed treatment of such known and unknown claims unsupported in fact or in law – Debtors' citation to estimation proceedings are utterly inapplicable and the Motion itself fails to provide this Court or any creditor any meaningful evidence with which to challenge Debtors' assertions – it is blatantly and

---

[3] Pentair recognizes that the Court, in the CMO, generally provided that pleadings would be deemed evidence, presumably subject to FRCP Rule 11. However, as reflected in this Opposition, and in several others which have been filed with the Court, such treatment is insufficient where, as more fully set forth herein, there is substantive evidence which must be evaluated before this Court can make a determination on the actual adequacy of the estimates which have been made by the Debtors.

inexcusably prejudicial to those creditors who (i) have asserted their rights to prosecute their full claims rather than accept a facially inadequate "convenience claim" or (ii) have the misfortune of being on the rejected contract list.  Such treatment fails to provide due process and flies in the face of the Bankruptcy Code and its principles.  Put another way, **if the claims that Debtors intend to address by the Disputed Claims Reserve are truly as indisputably meritless as Debtors contend in the Reserve Motion, Debtors should have little difficulty addressing them in a manner that is supported by evidence and mindful of due process** rather that through a twelve page motion without even a schedule to support it.  Indeed, the significant effort expended by Debtors in estimating these claims and the incredible array of experts consulted completely belie any assertion that such claims can or should be so summarily dismissed by this Court.

Moreover, **the shortcomings in the Plan's mechanisms to address Disputed and Unliquidated Claims are particularly inexcusable given the simplicity with which they could be rectified**.  Debtors have provided no justification for the extreme solution of capping the Disputed Claims Reserve nor for any need to make full distributions on undisputed or liquidated claims immediately following confirmation other than simple *convenience*.  At no point in the Reserve Motion do Debtors mention, let alone address, fundamental bankruptcy concepts such as *equity* and *pro rata distribution to similarly situated creditors*.  Indeed, given the fact that the lion's share of distributions to general unsecured creditors will be in the form of New Common Stock, *which cannot be traded*, there is absolutely no reason that Debtors cannot take a more conservative approach to reserves and distributions, particularly in light of the hundreds of millions of dollars of claims that are at risk of receiving pennies on the dollar or less out of a nominally "full payment" plan.

Pentair's claims in particular are illustrative of the fundamental unfairness and impracticality of the structure proposed by Debtors.  Pentair has an explicit contractual indemnity from Debtors for liability and legal fees relating to a state law products liability case

in which it is facing a settlement demand in excess of $30 million and has incurred over $750,000 in legal fees.[4]  However, **Debtors have informed Pentair that Debtors have not reserved anything in the Disputed Claims Reserve for Pentair's claims (or the underlying claims) because they consider them to be "Insured" claims**.  Debtors have not indicated that they believe Pentair's claims against Debtors to be without merit (although the Debtors, like Pentair, maintain that they have good and sufficient defenses to the underlying claim).  Rather, Debtors have apparently not set aside any reserves for *any* so-called "Insured Claim."  Pentair has no objection to being indemnified through Debtors' insurance policies, nor to insurance being used to satisfy the underlying claims being indemnified.  However, **Debtors have been unable to provide (i) documentation indicating that their insurers agree to coverage or (ii) proof that the $5 million "deductible" has been, or will be, satisfied**.  Debtors have **similarly refused to provide any assurances that Debtors will supplement the Disputed Claims Reserve or accept liability on Pentair's claims (or the underlying indemnified claims) if Debtors are incorrect in their assumption that Pentair's claims will be fully satisfied from insurance**.[5]

**Debtors' failure to reserve against Pentair's claim is wholly unacceptable if Pentair (*or any other "Insured" claim*) would ever have to claim against the Disputed Claims Reserve**.  Importantly, such a situation could arise not only if Debtors are incorrect in their assumption that Debtors' insurance covers Pentair's claims, but it could also arise if Debtors' insurance coverage is monetarily exhausted before Pentair's claims are liquidated and paid.

---

[4]   All descriptions herein of the underlying State Court Action (defined below) are set forth in summary terms and with an eye on explaining the *possible* extent of liability to Pentair and/or Debtors. Nothing herein or in oral argument concerning the Plan or the Reserve Motion is intended to or should be construed as any admission concerning any facts or the application of law in the State Court Suit or the underlying claims, and Pentair reserves all rights, claims and defenses relating thereto.

[5]   There are other issues with the Debtors insurance which complicate potential collection.  Pentair does not believe that it would be in Pentair's interest <u>or</u> in the Debtors' interest to describe those exact issues, because they may not yet be known to the insurers.  However, given that the insurers and their counsel can be expected to seek and exercise every possible avenue to avoid payment, it leads to the potential that the claims of Pentair will not, ultimately, be Insured Claims.

Given the fact that a significant portion of the Diecetyl insurance settlement has been filed under seal (i.e. – the amount) and given that the Reserve Motion contains not a single schedule, it seems virtually impossible for Pentair (or this Court) to properly and adequately determine whether Debtors' cavalier assumption that "insurance will cover it" is a proper disposition for Pentair's claims or the claims of similarly situated creditors.  Accordingly, **the Plan should be modified and clarified to provide for assumption by the Debtors of so-called "Insured" claims (including Pentair's claims) to the full extent such claims are not satisfied from Debtors' insurance policies**.  **In the alternative, a separate reserve should be established in the full amount of Pentair's Claims**.

Simply put, the Plan's reserve mechanism for disputed and unliquidated claims is structurally unsound and legally impermissible on its face, and is wholly unjustified and inequitable when specifically applied to "Insured" claims such as Pentair's.  As they presently stand, the Plan cannot be confirmed, nor can the Reserve Motion be approved.  Pentair has discussed these concerns with Debtors, but to date has received no assurances that the Plan will properly and effectively address Pentair's claims.  Accordingly, for these and the reasons set forth below, Pentair respectfully requests that this Court deny confirmation of the Plan (and therefore approval of the Reserve Motion) unless and until the shortcomings in the reserve mechanisms and amounts are properly and equitably rectified.

## BACKGROUND

Pentair timely filed proofs of claim against debtors Chemtura Corporation (Claim No. 11731) and Great Lakes Chemical Corporation (Claim No. 11554) (the "Proof of Claim"). Broadly speaking, the Proofs of Claim relate to claims arising out of a Cross Complaint filed September 29, 2008 by Pentair (the "Cross Complaint") and currently pending before the Superior Court of the State of California, County of Riverside as Case No RIC 434823 (the "State Court Case"). which State Court Case has been stayed.  The issues raised in the Cross Complaint, in turn, relate in part to a March 1994 asset purchase agreement between Hydrotech

Chemical Corporation and Purex Pool Systems, Inc. (the "Purchase Agreement"), which Purchase Agreement has been listed by Debtors as a contract to be rejected pursuant to the Plan.[6] Pentair's claims relating to the rejection of the Purchase Agreement (the "Rejection Claims") and claims asserted in the Proof of Claim are variously referred to herein as Pentair's "Claims."

As a matter of general description, Pentair's Claims relate to a product (a part of a residential swimming pool filter) which was manufactured by a predecessor in interest, through merger/acquisition, of the Debtors. A defect in the product is alleged to have caused grievous bodily injury to an individual, Kurt Stetler. The Purchase Agreement specifically provides that manufacture of the product, which is now alleged to have caused the injury to Mr. Stetler, had been discontinued before the sale of assets to Pentair. Further, pursuant to the Purchase Agreement, Pentair was indemnified and held harmless for all costs, including attorney's fees, which might be incurred as a result of allegations that products manufactured by the selling company were defective.

Both Pentair and the Debtor are defendants in a the State Court Suit, originally filed by Mr. Stetler and his wife prior to the petition date. Pentair has already incurred and will continue to incur substantial costs of defense in the State Court Suit, which it contends are a liability of the Debtor as a consequence of the express contractual indemnity. Moreover, Pentair is informed and believes that the Stetlers may be requesting damages in excess of $30 million.

---

[6] Pentair is currently reviewing the purported rejection of the Purchase Agreement, including whether the Purchase Agreement is in fact an executory contract, and reserves all rights with respect thereto. In that regard, Pentair notes that, despite rejecting the Purchase Agreement, Debtors purport to list claims against Pentair in their plan supplement as "retained" causes of action. Such retention would be improper to the extent such claims arise under the Purchase Agreement if the Purchase Agreement is an executory contract and is rejected pursuant to the Plan, as rejection constitutes a breach by a debtor that excuses further performance by the non-debtor party. Such retention would also be improper to the extent it would override Pentair's rights of setoff or recoupment. Furthermore, Debtors' actions and apparent intentions in this regard simply serve to underline the inequity and fundamental unfairness of Debtors' proposed treatment of disputed and unliquidated claims, and Pentair's claims in particular.

Pentair understands that Debtors intend that their Plan be "insurance neutral" and that Debtors intend to "assume" each of their insurance policies, to the extent such policies are executory.[7] Pentair has reason to believe that its Claims are potentially covered, in whole or in part, by Debtors' insurance. However, Pentair has insufficient information to know whether or how many other General Unsecured Creditors or General Unsecured Claims are, or are not, similarly situated or have equal or superior claims on Debtors' insurance. Similarly, while Pentair is aware of the Debtors' proposed Diecetyl settlement, that settlement has been filed under seal and its impact on Debtors' insurance policies is unknown and, to a very real extent, unknowable.

On information and belief, Debtors have classified or will classify Pentair's Claims as General Unsecured Claims which are Contingent and Unliquidated. Also on information and belief, based on numerous discussions between counsel, Debtors have classified Pentair's Claims as "Insured" claims and have not included any funds in the Disputed Claims Reserve on account of Pentair's Claims.

As presently written, it appears that Debtors do not intend to reserve against "Insured" claims under the Plan should such claims not be satisfied from Debtors' insurance policies. It also appears that, to the extent such claims are contingent, unliquidated or disputed by Debtors, such claims would have to be satisfied by from insurance, from the Disputed Claims Reserve or not at all. Debtors have also recently filed their "plan supplement," seeking approval to reject hundreds of nominally executory contracts through the Plan. As set forth in the Plan, proofs of claim arising from rejection of such executory contracts will not be due until 30 days after entry of an order, including a confirmation order, approving the rejection. Although the Reserve

---

[7] Pentair reserves and preserves all rights, claims, issues and defenses with respect to any "insurance neutrality" language proposed by Debtors or any other party in interest with respect to the Plan. Specifically, and without limiting the foregoing, Pentair assumes in these objections, for the sake of argument, that whatever language is ultimately proposed for such "insurance neutrality" will preserve the underlying nature of Pentair's Claims against Debtors and against their insurers notwithstanding any "rejection" under section 365 with respect to any contracts underlying such Claims.

Motion does not explicitly address projected rejection damages – either by stating they were included in the estimation process or by stating that the Disputed Claims Reserve will be later supplemented – the Plan as currently written would delegate any disputed or unliquidated rejection damage claims to the Disputed Claims Reserve.

## **OBJECTIONS**

Pentair's objections to the Plan and the Reserve Motion essentially consist of the same issues: Debtors' proposed treatment of disputed and unliquidated claims through the Disputed Claims Reserve is legally not permitted under the Bankruptcy Code and is factually unsupported, both as a general matter and with specific reference to Pentair. The Plan cannot be confirmed (nor the Disputed Claims Reserve established as proposed) unless and until the shortcomings in the reserve mechanisms and amounts are properly and equitably rectified.

A. **The proposed Disputed Claims Reserve and the Reserve Motion is facially inadequate with respect to Pentair's claims and provides no backup mechanism if insurance is not available**.

By means of the Reserve Motion, Debtors seek to set aside a fund of $47,850,000 to pay 2,250 disputed claims that total at least $468 million, if and when allowed. This amount has allegedly been determined by the Debtors' good faith estimation of disputed claims at $39,850,000 plus 20% to account for any errors in estimation.

Debtors have provided no assurances that Pentair's Claims (or those of the underlying Stetler product liability claim), or any other claims, are accurately accounted for in the proposed amounts for the Disputed Claims Reserve. In fact, Debtors have informed Pentair that the Disputed Claims Reserve includes <u>no</u> funds on account of Pentair's Claims or the underlying Stetler claims, on the assumption that they will both be Insured Claims. .

While Debtors contend that Pentair's Claims will be paid by insurance, they have provided no assurances that: a) the insurance companies agree with that assessment; or, b) that

the insurance policies will not be depleted by paying other "Insured" claims including, but not limited to, the Diacetyl settlements and/or the Motion, filed just today, under seal, which appears (from the limited information on the docket) to portend even a greater depletion of insurance proceeds available for Pentair.

Pentair's insurance counsel has reviewed two policies of insurance provided by Debtors. Without waiver of the attorney work-product doctrine, that review has indicated that there are substantial unresolved issues regarding the insurance policies. Because it appears that Pentair may have a direct interest, as an insured, under one or more of those policies, Pentair has filed suit against the insurers in an effort to obtain the insurance coverage to which it is entitled.

However, to the extent that the claims of Pentair and/or Stetler are not covered by insurance, there is a potential for a substantial Allowed Claim, potentially exceeding 50% of the entire proposed Disputed Claim Reserve.

B. **The proposed Disputed Claims Reserve and the Reserve Motion is facially inadequate with respect to all claims**.

More importantly, **Debtors have provided no assurances that *any* Claims are accurately accounted for in the proposed amounts for the Disputed Claims Reserve**. Debtors have not provided a schedule to support their estimations nor any other evidence other than their assertion that they have retained experts and engaged in significant analysis. However, Debtors have not provided any evidence on such analysis or even a claim by claim breakdown of the "high end" estimation of the claims that went into the proposed Disputed Claims Reserve. It does not even appear that Debtors have provided notice that would allow a particular creditor to know whether it is likely to have resort only to the Disputed Claims Reserve or will receive payment in full through confirmation. From a purely evidentiary perspective, the Reserve Motion is utterly lacking and cannot be considered as a true estimation motion.

Similarly, the Reserve Motion is legally inadequate as an estimation motion. As an initial matter, the Reserve Motion, despite requesting estimation of more than 2000 claims pursuant to section 502(c), does not mention "estimation" or "section 502(c)" in the caption. Debtors' authorities likewise simply stand for the proposition that a court may use a variety of procedures in order to estimate claims. *See*, *e.g.*, *In re Adelphia Communications Corp.*, 368 B.R. 140 (S.D.N.Y. 2007) (review of contentions of the parties, expert testimony, record of relevant proceedings); and *In re Thomson McKinnon Securities, Inc.*, (S.D.N.Y. 1992) (testimony of one live witness from each side, plus deposition testimony). *Accord In re Federal-Mogul Global*, Inc. 330 B.R. 133, 153 (D. Del. 2005) (detailed consideration of expert testimony). **Debtors have cited no case delegating to a debtor's counsel and other professionals the wholesale authority to estimate two-thirds of an entire claims – and Pentair can imagine no court violating creditors' due process rights in such a fashion – yet this is precisely what Debtors request that this Court condone**.

Moreover, Section 502(c) provides only that a court may estimate claims when failure to estimate such claims would unduly hinder administration of the case. Debtors have failed to allege, let alone demonstrate, that *each and every* disputed, contingent or unliquidated claim cannot be addressed through normal channels with respect for due process, such as claims objections or individualized estimation motions. Indeed, Debtors' own approach belies their logic: On the one hand, Debtors claim that these claims are so susceptible to estimation (by Debtors themselves) that this Court should not bother itself with checking Debtors' calculations. However, if the claims that Debtors intend to address by the Disputed Claims Reserve are truly and indisputably as meritless as Debtors contend in the Reserve Motion, Debtors should have little difficulty addressing them in a manner that is supported by evidence and mindful of due process. Indeed, the significant effort expended by Debtors in estimating these claims and the incredible array of experts consulted completely belie any assertion that such claims can or should be so summarily dismissed by this Court.

Just as importantly, Debtors propose to reject hundreds of executory contracts through the Plan, and the claims arising from such rejection will not be due until some 30 days after entry of a confirmation order, at the earliest. **The Reserve Motion does not explicitly address projected rejection damages, at least some of which are likely to be contingent, disputed or unliquidated**. That is, the Reserve Motion does not state that such claims were included in the estimation process nor does it provide a mechanism to supplement the Disputed Claims Reserve once such rejection damage claims are filed. However, as currently written, the Plan would relegate any disputed or unliquidated rejection damage claims to the Disputed Claims Reserve. This is patently unfair not only to all other creditors who must claim against the Disputed Claims Reserve – diluting the pool by inclusion of claims that are presently unknown and unknowable – but also to creditors asserting rejection damages claims, since Debtors' estimation of amounts required for the Disputed Claims Reserve do not in any way account for such rejection damages claims.

Similarly, lest Pentair praise by faint damnation, it should be pointed out that Debtors have not even made a case that distributions must be made fully and completely immediately following confirmation. For example, substantial portions of distributions to General Unsecured Creditors will be in the form of New Common Stock. Given that New Common Stock *cannot be traded*, there is absolutely no reason that Debtors cannot take a more conservative approach to reserves and distributions, particularly in light of the hundreds of millions of dollars of claims who are at risk of receiving pennies on the dollar or less out of a nominally "full payment" plan. Debtors could either create larger reserves on the front end, since creditors will initially be unable to realize any economic value from the stock portion of their distributions, or simply issue more stock on the back end should the reserves prove inadequate.

Simply put, by the Reserve Motion and the proposed Disputed Claims Reserve, Debtors not only paint with too broad a brush, but completely neglect to put any paint on the brush. Due process at a minimum requires at least a modicum of scrutiny of relevant facts and law pertaining

to any given claim by the court before such claim may be estimated under section 502(c). *See*, *e.g.*, *In re Federal-Mogul Global Inc.*, 330 B.R. 133, 155 (D. Del. 2005) ("In accomplishing this task [of estimating claims], the estimating court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. It is, after all, a general principle in bankruptcy law that, for bankruptcy purposes, state law governs the validity and amount of a claim.")

Here, Debtors ask the court to forego even the barest of scrutiny, and to utterly disregard the application of any law, and simply take on faith the hearsay opinions of unidentified estimators, employed by Debtors themselves, as to the value of wholly unspecified claims. Far from a proper estimation motion, Debtors' request amounts to a *class* treatment, without separate classification under the Plan. The procedure and reserves proposed by Debtors clearly do not satisfy any substantive or procedural requirements under section 502(c), constitute a clear violation of section 1123 by treating different members of the same class differently, and violate fundamental bankruptcy concepts of equity and pro rata distribution. Such treatment cannot be approved by this Court.

C. **The Plan provides markedly and materially different treatment to different members of the same class in violation of 11 U.S.C. § 1123**.

Section 1123 of the Bankruptcy Code sets forth the requirements and restrictions on a chapter 11 plan. Importantly, the statute clearly provides that a plan "<u>shall</u> ... provide the same treatment for each claim or interest of a particular class...." 11 U.S.C. § 1123(a)(4) (emphasis added). The Plan, as proposed by Debtors, does not provide the same treatment to members of the class of General Unsecured Creditors.

Specifically, while General Unsecured Creditors have been promised "payment in full," and while Debtors propose to make payment in full to the "easy" claims – those claims that

Debtors have determined, in their own discretion, not to dispute – they propose an entirely different treatment for disputed or unliquidated claims, i.e. those claims that they have chosen, again in their own discretion, to challenge, or those claims that, by their very nature, are subject to a modicum of proof not in liability but merely in amount.

In contrast to liquidated, undisputed claims, which Debtors propose to pay in full, Debtors propose to provide holders of disputed or unliquidated claims with a "pot plan." That is, through the provisions of the Plan relating to the Disputed Claims Reserve (including the Reserve Motion itself), Debtors propose to provide such creditors with a pot that consists of approximately ten percent of the aggregate amount of such claims, with no provision for supplements or backstops should Debtor s' reserves prove insufficient. **This treatment effectively amounts to a separate classification, is a material and wholly unjustified difference in the treatment accorded to members of the same class and is in clear contravention of section 1123**. **What makes Debtors' proposed treatment even more unjustified is the fact that disputed, unliquidated claims outnumber allowed claims nearly two to one**. *See* Reserve Motion at p. 9-10 (noting that only 1380 Claims (of whatever class) have been "Allowed," while approximately 2,250 Claims will have to resort to the Disputed Claims Reserve).

While this one structural distinction alone would be sufficient to bar confirmation, the proposed Disputed Claims Reserve is unsustainable on a number of bases. For example, **Debtors appear to propose distributions from the Disputed Claims Reserve on a first-come, first-served basis**, in contravention of all notions of fairness, equity and pro rata distributions embodied by the Bankruptcy Code. **Debtors also propose to pay post-petition interest to claims that are "Allowed" as of confirmation, but not to claims that are later determined to be allowed**. Similarly, despite being clear that the Joint Plan constitutes a *separate* plan with respect to each Debtor, Debtors appear to want to create a single Disputed Claims Reserve with respect to *all* disputed, contingent or unliquidated for *all* creditors, of *all* Debtors, without so

much as implying how much of the proposed reserves relate to the claims against any given Debtor. Thus, **Debtors effectively propose to substantively consolidate their estates but *only* with respect to disputed, contingent or unliquidated claims**.

Such disparate treatment of members of the same class is not justified in law or on general principles of equity, and the Plan cannot be confirmed with the present proposed structure for resolution of disputed and unliquidated claims.

### D. **The Disclosure Statement is facially misleading**.

The Disclosure Statement and related statements pertaining to the Plan, such as press releases, repeatedly and in numerous ways promise that General Unsecured Creditors will receive "payment in full." Unfortunately, as discussed above, General Unsecured Creditors with claims that are disputed, contingent or unliquidated are not receiving payment in full, and instead are being forced to share in a "pot" that is facially inadequate.

Once again, Pentair's Claims provide a perfect foil to understand the fundamental unfairness and inequity of the structure proposed by Debtors to address disputed, contingent and unliquidated claims (which, again, appear to constitute the lion's share of claims against the Debtors). Without admitting liability, Mr. Stetler avers he was injured by a product that Debtors' predecessors in interest stopped manufacturing years ago. His injuries are real and his damages are extensive, including medical expenses, loss of earnings (past and future), long-term care and pain and suffering. Mr. Stetler's injuries occurred prior to the commencement of these cases, he filed suit prior to the commencement of these cases, and he has waited nearly two years while that suit has been stayed as a result of these cases. Again without admitting liability, there is a possibility that Pentair would, as a result of joint and several liability relating to products liability law, be liable with Debtors for Mr. Stetler's injuries, despite the fact that Pentair has a clear, explicit and enforceable indemnity from Debtors that covers Mr. Stetler's claims. Pentair understands that Mr. Stetler should be made whole regardless of source as a matter of public

policy, but Debtors are attempting to minimize their own relative liability to Mr. Stetler by forcing Pentair to share in a wholly inadequate "pot" should its claims not be satisfied from insurance. Were Debtors proposing a liquidating plan or a true debt-for-equity plan, such a result might well be appropriate and legal under the Bankruptcy Code. However, Debtors are proposing a full payment plan, Debtors' pre-existing equity will receive distributions on account of their ownership interests, and Debtors will continue as a going concern post petition. Debtors should not be permitted to delay Mr. Stetler's prosecution of his claims for two years, then claim that because his claims are unliquidated at some wholly arbitrary point in time when confirmation occurs he should not be allowed to seek his remedy against Debtors. Likewise, Debtors should not be permitted to argue that the presently unliquidated nature of Pentair's claims against Debtors in any way alters the fundamental nature of those claims such that Reorganized Debtors, as a going concern, should not be liable for their full and fair share. Bankruptcy law is intended to restructure debts, not to fundamentally alter the nature of a debtor's liabilities under state law.

## REQUEST FOR RELIEF

In light of the above, it is clear that the Plan cannot be approved, nor the Disputed Claims Reserve established, as presently requested by Debtors. At minimum, Pentair requests, and equity requires, that the following modifications be made and :

- The Plan should be modified and clarified to provide for assumption by the Debtors of so-called "Insured" claims (including Pentair's claims) to the full extent such claims are not satisfied from Debtors' insurance policies. In the alternative, Debtors should be required to fully reserve against the full amount of Pentair's Claims unless and until Debtors can provide either (i) [an acceptance of liability/coverage letter from the applicable insurance carriers] or (ii) full assurances that Debtors can and will accept liability on Pentair's claims (or supplement the Disputed Claims Reserve) if Debtors are incorrect in their

assumption that Pentair's claims will be fully satisfied from insurance.

- The Plan should be modified and clarified to ensure that the Disputed Claims Reserve either (i) will reserve against the true "high end" of the contingent, disputed or unliquidated claims, i.e. the *higher* of the amounts scheduled or claimed, or (ii) will be supplemented should it prove inadequate.

- The Debtors should be required to follow applicable law and bankruptcy rules concerning notice and an opportunity for a hearing in seeking to object to or estimate any claim, including providing specific and identified notice of their intentions to estimate or object to a claim, to the specifically identified creditors, with specific notice of the bases for such estimation or objection.

## CONCLUSION

For the reasons stated above, Pentair respectfully requests that this Court deny confirmation of the Plan (and therefore approval of the Reserve Motion) unless and until the shortcomings in the reserve mechanisms and amounts are properly and equitably rectified.

Los Angeles, California  
Dated:  September 13, 2010

___/s/ Steven Brower & Austin K. Barron_  
Steven Brower  
J. Alexandra Rhim  
Austin K. Barron  
BUCHALTER NEMER  
1000 Wilshire Boulevard, Suite 1500  
Los Angeles, California 90017  
Telephone: (213) 891-0700  
Facsimile:  (213) 896-0400

Counsel to Pentair Water Pool and Spa Inc.