UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                 :

In re                                  :                Chapter 11
                                                 :

CHEMTURA CORPORATION, *et al.*,     :                Case No. 09-11233 (REG)
                                               :

                        Debtors.      :               (Jointly Administered)
                                               :

------------------------------------------------------------x

## BENCH DECISION[1] ON CONFIRMATION

APPEARANCES:

**KIRKLAND & ELLIS LLP**
*Attorneys for the Debtors and Debtors-in-Possession*
601 Lexington Avenue
New York, NY 10022
By:    M. Natasha Labovitz, Esq. (argued)
       Craig A. Bruens, Esq.
       Richard M. Cieri, Esq.


-and-


300 North LaSalle Street
Chicago, IL 60654
By:    David J. Zott, Esq. (argued)
       Nader R. Boulos, Esq. (argued)
       Micah E. Marcus, Esq.
       Benjamin T. Kurtz, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion.  Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

DUANE MORRIS LLP
*Conflicts Counsel for the Debtors*
1540 Broadway
New York, NY 10036
By:     Gerard S. Catalanello, Esq.

-and-

30 South 17th Street
Philadelphia, PA 19103
By:     Lawrence J. Kotler, Esq.

AKIN, GUMP, STRAUSS, HAUSER & FELD LLP
*Counsel for the Official Committee of Unsecured Creditors*
One Bryant Park
New York, NY 10036
By:     David M. Zensky, Esq. (argued)
        Abid Qureshi, Esq. (argued)
        Daniel H. Golden, Esq.
        Philip C. Dublin, Esq. (argued)
        Meredith A. Lahaie, Esq.
        Jason Goldsmith, Esq.

JONES DAY
*Attorneys for the Ad Hoc Committee of Bondholders*
222 East 41st Street
New York, NY 10017
By:     Richard L. Wynne, Esq. (argued)
        Steven C. Bennett, Esq. (argued)
        Lance E. Miller, Esq.

-and-

555 South Flower Street, 50th Floor
Los Angeles, CA 90071
By:     Erin N. Brady, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Counsel for the Official Committee of Equity Security Holders*
Four Times Square
New York, NY 10036
By:    Jay M. Goffman, Esq. (argued)
        George A. Zimmerman, Esq. (argued)
        Michael H. Gruenglas, Esq.


-and-

One Rodney Square
P.O. Box 636
Wilmington, DE 19889
By:    Thomas J. Allingham, Esq. (argued)

COVINGTON & BURLING, LLP
*Attorneys for Fiduciary Counselors*
1201 Pennsylvania Avenue
Washington, D.C. 20004
By:    Michael St. Patrick Baxter, Esq. (argued)

SCHULTE, ROTH, & ZABEL LLP
*Attorneys for Interlachen Investcorp.*
919 Third Avenue
New York, NY 10022
By:    Lawrence Gelber, Esq. (argued)

Bench Decision on Confirmation..................................................................... 1
Findings of Fact ............................................................................................ 2
1. Background ............................................................................................. 2
2. Pre-Petition Debt and Liabilities............................................................. 3
3. Bankruptcy Filing .................................................................................. 4
4. Post-Petition .......................................................................................... 4
5. The Plan ................................................................................................ 5
6. Marketing of the Company ..................................................................... 10
7. Valuation ............................................................................................... 10
   A. The Experts' Analyses ....................................................................... 10
   B. The Experts' Methodologies ............................................................... 12
      i. Discounted Cash Flow .................................................................... 13
      ii. Comparable Companies .................................................................. 15
      iii. Precedent Transactions ................................................................. 18
   C. Valuation Conclusions ....................................................................... 21
      i. Methodology .................................................................................. 22
      ii. DCF Analysis ................................................................................ 24
      iii. Comparable Companies Analysis ................................................... 28
      iv. Precedent Transactions Analysis ................................................... 30
      v. Marketing Efforts .......................................................................... 33
      vi. Creditors' Preferences for Cash ..................................................... 35
      vii. Credibility ................................................................................... 36
   D. Conclusions re: Valuation .................................................................. 40
8. Reasonableness of the Settlement ........................................................... 41
9. Good Faith ............................................................................................ 41
10. Ultimate Findings of Fact ..................................................................... 42
Discussion .................................................................................................... 43
1. "Fair and Equitable" under Section 1129(b)(1) ....................................... 43
2. The Settlement ....................................................................................... 45
   A. Standards for Approval of Settlement ................................................. 45
   B. Settlement Analysis ........................................................................... 48
      i. Issuance of New Common Stock ...................................................... 48
      ii. Make-Whole and No-Call Provisions .............................................. 49
      iii. Other Settlement Components ........................................................ 65
      iv. Other Iridium Factors ................................................................... 66
3. Other Objections .................................................................................... 68
   A. Good Faith ........................................................................................ 68
   B. Releases ............................................................................................ 71
   C. Dissolution of Equity Committee ........................................................ 75
4. Miscellaneous Objections ....................................................................... 77
Conclusion ................................................................................................... 77

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the chapter 11 cases of specialty chemicals company Chemtura

Corporation ("**Chemtura**") and its affiliates (collectively, the "**Debtors**"), the Debtors seek

confirmation of their chapter 11 plan (the "**Plan**").  Confirmation is supported by the Official

Committee of Unsecured Creditors (the "**Creditors' Committee**") and an *ad hoc* committee of

Chemtura bondholders (the "**Bondholders Committee**,"[2] and together with the Debtors and the

Creditors' Committee, the "**Plan Supporters**").  But confirmation is opposed by the Official

Committee of Equity Security Holders ("the **Equity Committee**"), and two other entities that are

equity holders or act on equity holders' behalf.

The Equity Committee expresses several objections to confirmation.  But the most

serious of them is that the Plan—which as described below, effects its distributions to

bondholders and most other creditors by means of a combination of cash and stock—undervalues

the Debtors, and that a global settlement of several constituencies' entitlements (the

"**Settlement**"), upon which the Plan is based, does likewise.  While the Plan proposes a

distribution to equity, the Equity Committee contends that the Plan doesn't deliver enough—and,

as relevant to the Code's requirements for confirmation, that each of the Settlement and the Plan

provide for payment to creditors more than in full, violating section 1129(b)'s "fair and

equitable" requirement.[3]

---

[2]     Members of the Bondholders Committee hold approximately 68% of the Debtors' bonds.  *See* Verified
Statement Of Jones Day Regarding Representation Of An Ad Hoc Committee Of Bondholders Pursuant To
Federal Rule Of Bankruptcy Procedure 2019, ECF # 2879, at ¶ 1 (the "**Bondholders R.2019 Statement**").

[3]     The Equity Committee also contends that, apart from the valuation issue, an element of the settlement
allocating value to bondholders for claims based on "make-whole" premium and "no-call" provisions in
their contractual documents too generously respects the bondholders' likelihood of success on those issues,
materially diverting value to those bondholders that would otherwise go to equity.  See page 49 below.

1

After an evidentiary hearing focusing nearly entirely on the disputed issues of valuation, I find that the Debtors' total enterprise value ("**TEV**") is no higher than the valuation upon which the Settlement was based.  Under those circumstances, I find that the creditors in this case will not be overpaid, or, more to the point, will not be paid more than in full.

As I ultimately reject most of the remaining Equity Committee contentions as well,[4] the Plan will be confirmed.  The Plan Supporters may, if they wish, give me more extensive Findings of Fact and Conclusions of Law that also cover matters that were not in controversy.  My Findings of Fact and Conclusions of Law on the basic background and disputed matters follow.

Findings of Fact

*1.  Background*

On March 18, 2009 (the "**Filing Date**"), Chemtura, a publicly-traded company, and 27 of its affiliates filed chapter 11 petitions in this Court.   The Debtors produce specialty chemicals, polymer products, crop protection chemicals, and pool and spa chemicals.  They have operations in the U.S. and Canada and hold direct and indirect interests in more than 140 nondebtor affiliates world-wide.

The Debtors' specialty chemical products are sold to industrial manufacturing customers for use as additives, ingredients, or intermediates; the company's crop protection products are sold globally through distributors and dealers to growers of produce; and the company's pool and spa chemicals are sold to consumers through local dealers, large retailers, and mass merchants.

---

[4]    There are some relatively minor deficiencies in the Plan, which are fairly criticized by the Equity Committee, and as discussed below, I sustain the Equity Committee's objections in two respects.  But in each of those respects the Plan has been drafted to be "self-correcting," to provide for its automatic amendment to address any deficiencies the Court finds.  See pages 71 and 75 below.

2. *Pre-Petition Debt and Liabilities*

On the filing date, the Debtors had funded debt facilities with a face amount of approximately $1.37 billion, including:

(a) $370 million outstanding under 7% unsecured notes due 2009 (the "**2009 Notes**");

(b) $500 million outstanding under 6.875% unsecured notes due 2016 (the "**2016 Notes**");

(c) $150 million outstanding under 6.875% unsecured debentures due 2026 (the "**2026 Notes**"); and

(d) a $350 million secured and unsecured revolving credit and letter of credit facility with a maturity date of 2010.

In addition to their funded debt and trade debt, the Debtors also had other liabilities that they'd need to address. When the chapter 11 cases were filed, the Debtors were paying for remediation activities, engaged in litigation and administrative proceedings, and defending investigations for potential environmental liabilities at nearly 200 sites in the United States. They also faced potential fines from the U.S. EPA, 6 putative class action lawsuits, and 15 other lawsuits, all arising from a 2004 fire at their warehouse in Conyers, Georgia.

In addition, 23 lawsuits were pending against the Debtors based upon allegations that exposure to Diacetyl, a butter flavoring ingredient distributed by Chemtura and produced by one of its affiliates before 2005, caused respiratory illness in numerous food industry factory workers. And the Debtors also had significant legacy liabilities with respect to pension obligations and medical and life insurance benefits for retired employees.

### 3. Bankruptcy Filing

These debts and legacy liabilities, combined with sharp declines in demand and restricted access to credit resulting from the global recession, forced the Debtors into reorganization in March 2009.

### 4. Post-Petition

After the Filing Date, the Debtors continued to operate their businesses as debtors in possession and improved their financial condition, particularly as a consequence of settling and otherwise reducing claims. More than 8,300 claims filed against the Debtors were expunged or altered, leading to a reduction in liabilities of more than $9.4 billion. The Debtors reached settlements with all of the Diacetyl claimants; reached settlements with respect to their insurance coverage for their Diacetyl liabilities; and put agreements into place with most of the regulatory authorities to resolve preexisting environmental remediation liabilities. Though they disagree as to the extent, all constituencies in this case now agree that, due in substantial part to the resolution of these liabilities, the Debtors are once again solvent.

In addition, the Debtors' management team formulated a Long Range Plan (the "**LRP**") by directing each business unit and cost center to, among other things, identify specific initiatives that could drive revenue growth and reduce costs, and then to build its own projections.[5] By aggregating these projections, management projected earnings before interest, taxes, depreciation, and amortization ("**EBITDA**")[6] for the period 2010 through 2014. A macroeconomic assumption that drove management's LRP was that economic activity would

---

[5]    *See* Forsyth Decl. ¶ 38.

[6]    A variant sometimes used was earnings before interest, taxes, depreciation, amortization, and restructuring costs ("**EBITDAR**"), which would be similar but which would also take into account restructuring costs like those that the Debtors now incur.

recover to 2007 levels by 2011, resulting in increased earnings each year through 2014.[7]  The

Debtors' actual EBITDAR through the end of the second quarter was $167 million, which was

$30 million ahead of the LRP projected EBITDAR for this period.[8]  But in July, EBITDAR was

"roughly on budget",[9] and in August, the Debtors missed budget by $4 million.[10]  The Debtors

have not changed their projections for the year as whole.

*5. The Plan*

On June 17, 2010, the Debtors filed the Plan and disclosure statement (the **"Disclosure

Statement"**).  The foundation for the Plan was the Settlement, which was negotiated between the

Debtors, the Creditors' Committee, the Bondholders' Committee, and the Pension Benefit

Guarantee Corporation ("***PBGC***").  In this settlement, the parties resolved a number of key

issues:

a. *Debtors' total enterprise value for Plan and distribution purposes*: In
   accordance with a June 4 valuation of the Debtors' TEV prepared by Lazard
   (the "**Lazard June Report**"), the Plan would be based on a value of
   Chemtura of $2.05 billion.

b. *Make-whole and no-call settlement*: The parties agreed that the 2016 and 2026
   Notes would be paid, rather than reinstated.  In addition, the Debtors agreed to
   pay nearly $70 million to the 2016 and 2026 bondholders to settle potential
   claims for alleged breaches of the Make-Whole provision in the 2016 Notes
   and the No-Call provision in the 2026 Notes.  The Ad Hoc Bondholders'

---

[7]      *See* Forsyth Decl. ¶ 43.

[8]      *See* Forsyth Decl. ¶ 53.

[9]      *See* Forsyth Decl. ¶ 54.

[10]     *See* 9/16/10 Hrg. Tr. 111.

Committee asserted that, if allowed in full, these claims would total approximately $170.4 million.

c. *Payment of certain unsecured creditors, including bondholders, with a combination of New Common Stock and cash*: The parties agreed that, as discussed below, certain unsecured creditors, including those holding the 2016 and 2026 Notes, would be paid with a combination of common stock of a reorganized Chemtura ("**New Common Stock**") and cash, while other unsecured creditors, such as holders of Diacetyl and environmental claims, would be paid entirely in cash.

d. *Settlement with the PBGC (the "**PBGC Settlement**")*: The Plan also contemplates, as part of the of the Global Settlement, that the Debtors will make a one-time cash contribution in the amount of $50 million to the Chemtura Retirement Plan on the Effective Date, and neither the Debtors nor the Reorganized Debtors will elect to apply any portion of the $50 million contribution to increase the Chemtura Retirement Plan's "prefunding balance."  In exchange for these concessions, the PBGC has agreed not to initiate termination of the Debtors' single-employer pension plans based on the terms of the Debtors' proposed restructuring.

e. *Reimbursement of Bondholders' professional fees and expenses*: The global settlement provided that the Debtors and Creditors' Committee would not object to the payment of fees and expenses to the Bondholders' Committee up to $7 Million.

6

Although the Debtors are solvent, the Plan does not provide for a simple "waterfall" recovery of residual equity to Chemtura's common stockholders ("**Equity**").  Under the Plan, a distribution pool (the "**Distribution Pool**") will be established from which distributions will be made to 2009, 2016, and 2026 bondholder claims, prepetition unsecured lender claims, and "General Unsecured Claims"[11] (collectively, the "**Participating Creditor Classes**").  The Distribution Pool will be funded with

> (a) available cash following payment of the Diacetyl claims and Unsecured Convenience Claims and the funding of the Environmental and Disputed Claims Reserves,

> (b) proceeds of a $100 million rights offering ("**Rights Offering**"), and

> (c) the New Common Stock, subject to reduction of 5% in amount for holders of interests and up to $100 million in value made available to holders of interests in the form of the Rights Offering.[12]

The Participating Creditor Classes have the right to elect recovery in the form of the maximum available percentage of cash or New Common Stock, to the extent such recovery is available from that Distribution Pool.[13]

By these means, the Plan seeks to strengthen the Debtors' balance sheet, and to materially deleverage them.  Upon the date that the Plan, after confirmation, goes effective (the "**Effective Date**"), the Debtors will have approximately $750 million in funded debt, just over 50% of the

---

[11]    The term "General Unsecured Claims" refers to claims against the Debtors other than Chemtura Canada, and is defined to exclude certain specified unsecured claims, including those on the 2009, 2016, and 2026 Notes, Diacetyl claims, and environmental claims.  *See* Disclosure Statement §I.C.i.  Holders of general unsecured claims against Chemtura Canada are to be paid in full in cash, rather than out of the Distribution Pool.

[12]    However, as explained below, because Equity as a class voted against confirmation, holders of interests did not become entitled to a guaranteed 5% of the New Common Stock or the right to participate in the Rights Offering.

[13]    *See* Disclosure Statement § I.C.ii.

prepetition amount.[14]   The Debtors' costs of emergence, including the cash required for

distribution in settlement of certain claims, will be financed primarily from an Exit Financing

consisting of a $275 million senior secured asset-based revolving credit facility, a $295 million

senior secured term loan, and $455 million of unsecured senior notes due 2018.   Under the plan,

reorganized Chemtura will issue up to 100 million shares of New Common Stock for distribution

on the Effective Date.[15]

Because the Debtors are solvent, creditors will be left unimpaired, reinstated, or paid in

full.   They also will get postpetition interest.   Diacetyl claims, all of which have been resolved by

settlement, will be paid in full in cash.[16]   The Plan creates a reserve (the "**Environmental**

**Reserve**"), to be funded wholly in cash, for federal or state environmental law claims against the

Debtors held by governmental units that have not yet been settled or received requisite regulatory

approval.[17]   The Plan also establishes a reserve (the "**Disputed Claims Reserve**") for the benefit

of holders of general unsecured claims that remain disputed as of the Effective Date.   To the

extent such claims are allowed after the Effective Date, they'll be paid out of the Disputed

Claims Reserve, funded by a mixture of New Common Stock and cash.[18]

If Equity as a class had voted in favor of the Plan, then equity holders would have had a

guaranteed recovery of 5% of the New Common Stock and the right to participate pro rata in the

Rights Offering.   In addition, Equity would not have borne the risk that the eventual amount of

allowed claims would exceed the Debtors' estimates.   But in balloting, Equity voted against the

Plan.   Thus, if I confirm, Equity will receive distributions of whatever cash and New Common

---

[14]     *See* Disclosure Statement § I.B.

[15]     *See* Disclosure Statement § VIII.D.xi.

[16]     *See* Disclosure Statement § VIII.B.iii.j and § VIII.I.

[17]     *See* Disclosure Statement § VIII.B.iii.k and § VIII.H.

[18]     *See* Disclosure Statement § VIII.G.

Stock is available after all allowed claims have been paid in full, and the Environmental and Disputed Claims Reserves have been fully funded in the amounts I ultimately require.[19]

On August 9, 2010, I authorized the Debtors to enter into a Plan Support Agreement with the Creditors' Committee and certain of the members of the Ad Hoc Bondholders' Committee.[20] The Plan Support Agreement ("**PSA**"), which embodies the terms of the Settlement, requires its creditor signatories to vote in favor of the Plan.

After the balloting came in, the Plan was accepted by all creditor classes, with votes ranging from 93% to 100% in amount, and 91 % to 100% in number.  But it was rejected by the Equity, with acceptances of only 26% in amount.[21]

---

[19]    *See* Disclosure Statement § I.C.ii.  Additionally, should the Plan Reserves exceed the amount of environmental and disputed claims ultimately allowed, the excess value in the Reserves will also fall to Equity.

[20]    *See* Order, ECF #3527.

[21]    *See* Klamser and Kjontvedt Voting Results Declarations, ECF # 3955 and # 3956, respectively.

| Class Name | Class Description | Amount Accepting | Number Accepting |
|---|---|---|---|
| 1 | Prepetition Secured Lender Claims | $26,617,022.27 (100%) | 3 (100%) |
| 4a | General Unsecured Claims against Chemtura Corp. | $52,777,334.84 (93%) | 138 (91%) |
| 4b | General Unsecured Claims against Subsidiary Debtors | $15,098,122.32 (99%) | 109 (93%) |
| 5 | Prepetition Unsecured Lender Claims | $126,867,300.87 (100%) | 8 (100%) |
| 6 | 2016 Notes Claims | $422,441,690.00 (99.8%) | 126 (99.2%) |
| 7 | 2009 Notes Claims | $330,169,000.00 (99.5%) | 119 (98.3%) |
| 8 | 2026 Notes Claims | $136,029,000.00 (95.7%) | 71 (97.3%) |
| 10 | Diacetyl Claims | $52,210818.00 (97%) | 364 (99%) |
| 11 | Environmental Claims | $1,694,983.50 (100%) | 6 (100%) |
| 13a | Interests in Chemtura Corp. | 42,062,054.6497 (25.94%) | N/A |

### 6. Marketing of the Company

After the Debtors issued the Plan and Disclosure Statement, but before the time for

voting on the Plan, the Equity Committee, in the hope of having a fully-funded alternative plan,

marketed Chemtura to try to secure investors willing to purchase equity in it.  Although the

Debtors had plan exclusivity, and on July 21, 2010 defeated an Equity Committee motion to end

exclusivity, they cooperated in the Equity Committee's marketing efforts, in a manner that I find

to be in good faith and fully satisfactory.

A total of 19 parties were contacted, and the Debtors signed non-disclosure agreements

with 7 investors, including certain members of the Equity Committee themselves.  The

presentations made to these potential investors relied on valuation reports prepared by UBS in

June 2010 (the "**Paulson Presentation**"),[22] which estimated the TEV of Chemtura to be between

$2.2 and $2.7 billion.[23]  The Equity Committee's attempts to solicit investments at that value, or

any other, were ultimately unsuccessful.[24]  That fact, along with others, informs my finding,

discussed below, that the Debtors' TEV is not as high as the Equity Committee contends.

### 7. Valuation

#### A. The Experts' Analyses

Before the valuation hearing (and in the Debtors' case, before the Settlement was

reached), the Debtors and Equity Committee each secured expert opinions as to the Debtors'

TEV, reflected first in expert reports and then in testimony before me.[25]  The Debtors' analysis,

---

[22]     *See* Paulson Presentation, Debtors' Exhibit 70.

[23]     *See* 9/21/10 Hrg. Tr. 49-51.

[24]     *See* 9/21/10 Hrg. Tr. 53-57.

[25]     The testimony, consistent with my Case Management Order #1, ECF # 73 and my historic practice in cases
where the evidence is heavily historic, numeric, and/or technical, was heard by declaration on direct, and
live on cross, redirect, and anything thereafter.  Each expert witness made reference to his firm's expert
report in his testimony, with the Equity Committee incorporating it by reference in direct testimony and the

dated August 29, 2010 and also prepared by Lazard (the "**Lazard Expert Report**") estimated the Debtors' TEV to be in a range of $1.9 billion to $2.2 billion, with a midpoint at $2.05 billion.[26]  The Equity Committee's analysis, expressed in a report prepared by UBS on August 29, 2010 (the "**UBS Expert Report**"), estimated the Debtors' TEV to be in a range of $2.3 billion to $2.6 billion, with a midpoint of $2.45 billion.[27]

Both the Lazard and UBS analyses employed three standard valuation methodologies:

(i) discounted cash flow ("**DCF**");

(ii) comparable companies ("**Comparable Companies**");  and

(iii) precedent comparable transactions ("**Precedent Transactions**").

Lazard prepared a chart, colloquially referred to as the "football field," upon which the valuation ranges that resulted from each methodology appeared, and which showed a range near the middle where the individual methodology results, for the most part, overlapped.  This area of overlap correlated to Lazard's conclusion of that valuation range of $1.9 billion to $2.2 billion.[28]  The UBS Report, under UBS policy, did not include a football field.[29]

---

Debtors referring to it and pasting into the direct testimony declaration significant portions of the report's contents.  *See* Smith Decl. ¶ 3; Aronson Decl. ¶ 4, 11, and in many other places.  The direct testimony came in without objection, and the expert reports were also offered into evidence, without objection.  Though the expert reports themselves may technically have been hearsay, I wasn't asked to rule on whether they were, or otherwise to rule that the expert reports were inappropriate for consideration after the various parties' opportunities to cross-examine the witnesses.  And as both sides relied on testimony and the expert reports essentially interchangeably, I'll do likewise.

[26]    *See* Lazard Expert Report at 1.  The Lazard Expert Report was prepared by Daniel Aronson.

[27]    *See* UBS Expert Report at 4.  The UBS Expert Report was prepared by Steven Smith and Ajay Singh.

[28]    *See* Lazard Expert Report at 5.

[29]    *See* 9/20/10 Hrg. Tr. 220; 9/21/10 Hrg. Tr. 87. The Paulson Presentation, also prepared by UBS, did contain a football field representation of value ranges.  *See* Debtors Exhibit 70 at 1.  UBS's second witness differentiated between the Paulson Presentation and more "formal valuations" like the UBS Expert Report, where football fields were not permitted.  *See* 9/20/10 Hrg. Tr. 220; 9/21/10 Hrg. Tr. 87.

The Creditors' Committee also obtained expert analysis as to TEV.  It secured an expert opinion from its financial advisor, Houlihan, Lockey, Howard & Zukin, confirmed in a report dated August 29, 2010 (the "**Houlihan Expert Report**"), and thereafter, live testimony.

The Houlihan analyses did not provide a valuation of Chemtura, but instead critiqued the analyses of Lazard and, particularly, UBS.  Houlihan made a number of observations, many of which I ultimately came to agree with, the most significant of which were that:

> (a) Chemtura had historically traded at a discount relative to its peers prior to the bankruptcy, and that any valuation would require a discount as a consequence; and

> (b) the Debtors' admittedly aggressive projections in the LRP were overly aggressive, because they were based on assumptions of near-term economic growth that were not supported by recent evidence, and that any valuation of Chemtura that assumed that the Debtors would exceed their 2010 EBITDA forecast or meet their projections for 2011-2014 would, without appropriate risk adjustments, overstate the value of the Debtors.[30]

### B. The Experts' Methodologies

Though Lazard and UBS implemented their methodologies in different ways (and seemingly modest differences in assumptions, comparables, and means of implementation resulted in substantial differences in valuation), their basic methodologies were largely similar.[31] Each, as noted, gave at least some attention to DCF, Comparable Companies, and Precedent Transactions.  And they applied those valuation techniques in largely similar ways—though UBS

---

[30]    *See* Cerimele Decl. ¶ 5.  The Houlihan Expert Report was prepared by Christopher Cerimele.

[31]    *See* Equity Comm. Obj. Br. at 20 ("What is remarkable about the competing valuations presented by the Equity Committee and the Debtors' respective experts is how similar they are, *in most respects.*") (emphasis in original).

did not compute actual valuations based on the latter two means, and instead used them only as a check on its DCF conclusion.

    *i.  Discounted Cash Flow*

The DCF valuation methodology estimates the net present value of a company by:

> (i) projecting unlevered free cash flows over a given fixed forecast period, then discounting those cash flows back to the present using an estimated discount rate based upon the company's weighted average cost of capital ("**WACC**") and

> (ii) deriving the value of all unlevered free cash flows beyond the explicit forecast period—the "terminal value"—and  then discounting that terminal value back to the present by applying the estimated discount rate.[32]

The enterprise value is determined by adding the numbers derived from (i) and (ii).

Translating that technical jargon into more easily understood terms and applying it here, the two DCF analyses computed TEV by adding the present value of two assumed future cash flow streams:

> (1) the cash flow projected for each of years during which the LRP made a specific projection, and

> (2) the cash flow projected for the period thereafter, as derived from a figure—the terminal value—that was used as a basis to capture those later cash flows.

---

[32]     *See* Singh Decl. ¶ 12.  *See also* Aronson Decl. ¶ 29 ("the DCF analysis derives an estimated TEV using a combination of projected [unlevered free cash flows] and a terminal value at the end of the projected period, each discounted to a present value based on the company's weighted average cost of capital….").

The terminal value captures the value of all cash flows after the period for which particular cash flows were projected, here after 2014.

With respect to the years for which there was a specific forecast, Lazard and UBS, for the most part,[33] used the annual future cash flows from 2010 to 2014 that had been projected in the LRP.[34] The two also used similar discount rate rates.[35] In their terminal value calculations, however, the two reports differed, most significantly, in the EBITDA value to which the multiples were applied.

To calculate terminal value, UBS applied its multiples to the EBITDA for the *last year* of the forecast period (2014), or $528 million, taken from the Debtors' LRP.[36] Discount rates between 11.6% and 13.6% were applied.[37] Using this method, UBS calculated a DCF range for TEV between $2.47 billion and $2.927 billion.[38]

Lazard calculated terminal value by applying multiples of a higher 6.5x to 7.5x based on an analysis of enterprise values and 5-year and 3-year average EBITDA for the peer group to a *mid-cycle or normalized* EBITDAR of $404 million.[39] The mid-cycle EBITDAR was based on the *average* of 2009 through 2014 EBITDAR, which included both actual results and forecasted EBITDAR from the LRP.[40] Lazard applied discount rates between 11.75% and 13.75% and calculated the Debtor's TEV range to be between $2.175 billion and $2.570 billion.[41]

---

[33]    I say "for the most part" by reason of the "6+6" technique used for 2010. *See* page 16 below.

[34]    *See* Singh Decl. ¶ 13; Aronson Decl. ¶ 29.

[35]    *See* Lazard Expert Report at 16 (applying discount rates between 11.75% and 13.75%); UBS Expert Report at 8 (applying discount rates between 11.6% and 13.6%).

[36]    *See* Aronson Decl. ¶ 66; UBS Report at 8.

[37]    *See* UBS Expert Report at 8.

[38]    *See* UBS Expert Report at 8.

[39]    *See* Aronson Decl. at ¶ 30-31; *See* 9/16/10 Hrg. Tr. 208.

[40]    *See* Lazard Expert Report at 7.

[41]    *See* Aronson Decl. at ¶ 37-38.

Lazard's witness explained that a multiple of mid-cycle EBITDAR was used to account for the cyclical nature of the Debtors' earnings and cash flows after the projection period.[42]  But UBS and Lazard debated the extent of the Debtors' cyclicality, which could affect the appropriate terminal value calculation.  UBS contended that Lazard's use of a normalized EBITDAR inappropriately drove the present worth of the terminal value down.[43]  Conversely, Lazard contended that UBS's use of the EBITDAR for the final year, at a level never before achieved in Chemtura's history, caused the UBS DCF analysis to significantly overstate value.[44]

### ii.  Comparable Companies

The comparable company analysis estimates the value of a firm by taking the value of comparable peer firms and using their values as an indicator of the subject company.  Values are standardized using one or more common variables such as revenue, earnings, or cash flow, with the expert then applying a multiple of the financial metric or metrics that yields the market's valuation of these comparable companies.[45]  A key element in this analysis is the choice of the "comparables"—the selection of companies that are most comparable to the subject firm or its specific businesses.[46]  Each of the Lazard and UBS expert reports gave at least some attention to both consolidated and sum-of-the-parts comparable company analyses.  While the consolidated approach looks at comparables for the entire company as a whole, a "Sum-of-the-Parts" analysis uses similar techniques for individual lines of the Debtors' businesses and then aggregates those results to estimate overall TEV.

---

[42]        See Aronson Decl. ¶ 30.

[43]        See 9/20/10 Hrg. Tr. 151.  See also Singh Decl. ¶ 20.

[44]        See Aronson Decl. ¶ 66.

[45]        See Singh Decl. ¶ 61; Aronson Decl. ¶ 41.

[46]        See Singh Decl. ¶ 61; Aronson Decl. ¶ 42.

For the consolidated analysis, UBS examined 4 categories of multiples (LTM, and 2010, 2011 and 2012 Estimated EBITDAR) for each of 11 *domestic* companies in its peer group and calculated the mean multiple for each category.[47]  Again, UBS did not actually calculate a TEV range from these mean multiples; it back-calculated multiples from its overall Chemtura TEV range of $2.3 million to $2.6 million using LTM and actual and projected EBITDAR to demonstrate the reasonableness of its estimated DCF TEV.[48]  The UBS Report did provide an implied valuation range from its Sum-of-the-Parts analysis, which was $2.394 billion to $2.789 billion.[49]

Lazard's trading peer group contained 15 companies—10 domestic and 5 *foreign*.[50]  Lazard analyzed 5 categories of multiples on a full-company basis:  multiples based on 2010 and 2011 Estimated EBITDAR, 2010 and 2011 Estimated EBITDAR less capital expenditures,[51] and 2010 Estimated EBITDAR, taking also into account underfunded pension and OPEB obligations, which Lazard referred to as "**EBITDARP**."[52]  Lazard also performed a Sum-of-the-Parts analysis.

In its various EBITDAR computations, Lazard, like UBS, used "6+6" figures—actual results for the first 6 months of 2010 and the LRP projections for the last 6 months—for the three

---

[47]    *See* UBS Expert Report at 6.

[48]    *See* 9/20/10 Hrg. Tr. 229-230; 9/21/10 Hrg. Tr. 52.

[49]    *See* UBS Expert Report at 7.

[50]    *See* Lazard Expert Report at 23.

[51]    Lazard examined these because "EBITDA less capital expenditures provides insight into each [company's] cash flow generating capability adjusted for capital reinvestment."  Aronson Decl. ¶ 45.

[52]    This was important, in Lazard's view, because EBITDA would not take into account the full cash outflows relating to pension and OPEB liabilities; pension and OPEB underfunding would be reflected in a lower market value of the company (which would also cause a lower trading multiple); and including underfunded pension and OPEB liabilities in enterprise value as a "debt-like" obligation would "normalize" the multiples.  *See* Aronson Decl. ¶ 46.  I found no reason to quarrel with this view, or Lazard's use of this method, but consideration of this methodology ultimately did not have a material effect on my valuation findings, discussed below.

2010 analyses.  Lazard applied the derived range of multiples to "6+6" figures for the three 2010

analyses, and to LRP projections for the 2011 analyses.[53]

Three differences in those analyses are worthy of note.  First, while UBS used foreign

comparables in its Sum-of-the-Parts analysis but only domestic comparables in its consolidated

company analysis, Lazard *included foreign comparables in both*.[54]  UBS contended that the

foreign companies were, on the whole, inappropriate comparables for Chemtura, and noted that

Lazard's inclusion of foreign companies (which all had EBITDA lower than any of the domestic

companies) drove down the mean multiples and reduced the derived TEV for Chemtura by $198

million to $237 million.[55]  However, Lazard and Houlihan contended that any analysis could not

exclude foreign companies that were otherwise comparable.  And they noted that in the period

2005 to 2008, Chemtura on average traded below its full peer group—including Lazard's foreign

and domestic comparables.[56]

Second, UBS's list of comparables included DuPont and PPG Industries, but not Solutia,

while the Lazard comparables contained the opposite.[57]  Lazard and the Creditors' Committee

argued that the inclusion of DuPont and PPG, which are much larger than Chemtura and not

specialty chemical companies, inappropriately inflated the multiples that UBS derived from the

analysis,[58] and that the failure to include Solutia, an assertedly very similar company, did

likewise.[59]

---

[53]     *See* Lazard Expert Report at 5, 23.

[54]     *See* Singh Decl. ¶ 62-66; Aronson Decl. ¶ 70.

[55]     *See* Singh Decl. ¶ 63.

[56]     *See* Lazard Expert Report at 22; Cerimele Decl. ¶ 30-31 and Exhibit B.

[57]     *See* Lazard Expert Report at 23; UBS Report at 6.

[58]     *See* Aronson Decl. ¶ 71; Cerimele Decl. ¶ 19, 23.

[59]     *See* Aronson Decl. ¶ 72.

17

Third, the Lazard and UBS analyses differed with respect to the year chosen for their Sum-of-the-Parts analysis. Lazard derived multiple ranges from select comparable companies' business units, then valued unallocated corporate overhead using a weighted average multiple calculated on the basis of each business unit's contribution to total to *2010* 6+6 EBIDTAR.[60] Its estimated TEV range from this analysis was $1.88 billion to $2.23 billion.[61] By contrast, UBS pegged its valuations of the Debtors' component businesses on multiples of *2011* EBITDAR. UBS found Lazard's reliance on 2010 actual and projected numbers to be flawed, contending that generally by Q3, market valuations would be driven by projections for the following year, and that 2010 was a transition year for the Debtors, with uniquely depressed EBITDAR numbers.[62]

### iii. Precedent Transactions

Precedent Transaction methodology applies multiples derived from the purchase prices of comparable companies in *past M&A transactions* to the subject firm's LTM earnings, cash flow, or EBITDA to determine a range of TEV.[63] This method requires qualitative judgments in light of the unique circumstances of each precedent transaction and inherent differences between the precedent acquired companies and the subject company.[64] In considering the circumstances as to the various precedent transactions, the parties debated the extent to which a Precedent Transactions analysis would appropriately take into account the financial environment at the present time.

---

[60]    *See* Lazard Expert Report at 25; Aronson Decl. ¶ 52.

[61]    *See* Lazard Expert Report at 25.

[62]    *See* UBS Expert Report at 7; Singh Decl. ¶ 55-57.

[63]    *See* Aronson Decl. ¶ 53; Singh Decl. ¶ 44.

[64]    *See* Aronson Decl. ¶ 54.

The Lazard Expert Report analyzed 14 transactions between 2004 and 2010, all between $1 billion and $10 billion in value.[65] But over this time, there were dramatic changes in the global economy and capital markets, as evidenced most dramatically by the economic and financial environments after the reversals suffered by Bear Stearns and Lehman Brothers. Considering these changes to be highly material, Lazard "reviewed many transactions and presented transactions from before the Lehman Brothers bankruptcy in [its] Report, but [] ultimately relied upon" the transactions that occurred after September 15, 2008, the day Lehman Brothers filed for chapter 11.[66] Three transactions fell into this category: the K+S acquisition of Morton, the Bain acquisition of Styron Plastics, and the BASF acquisition of Cognis.[67]

The mean EBITDA multiple for these three transactions was 6.2x.[68] Using that mean as a midpoint, Lazard determined the appropriate multiple range for Chemtura to be 5.75x to 6.75x LTM estimated EBITDAR.[69] After applying this multiple range to LTM EBITDAR as of September 30, 2010, or $342 million, Lazard estimated the Debtors' TEV to be between $1.970 billion and $2.315 billion.[70]

The UBS Expert Report considered 19 transactions between 2005 and 2009, which had a range of values between $290 million and $18.666 billion and a mean EBITDAR multiple of 9.7x.[71] But UBS did not actually calculate a TEV range from these mean multiples. Instead, as a way to demonstrate the reasonableness of its TEV range, it took its estimated TEV range for the

---

[65]    See Lazard Expert Report at 28.

[66]    Aronson Decl. ¶ 79.

[67]    See Lazard Expert Report at 28.  These three transactions were separated from the earlier transactions by a dotted line.

[68]    See Lazard Expert Report at 28.  The multiple for the BASF-Cognis transaction, which I find to be the closest comparable transaction in both nature of subject company and closeness in time, was exactly 6.2x.

[69]    See Aronson Decl. ¶ 27.

[70]    See Lazard Expert Report at 5.

[71]    See UBS Expert Report at 9.

Debtors of $2.3 million to $2.6 million, and, using an LTM EBITDAR of $331 million, back-calculated EBITDAR multiples of 6.9x to 7.9x.[72]  That back-calculated multiple range of 6.9x to 7.9x was lower than the Precedent Transaction analysis mean of 9.7x LTM EBITDAR, which caused UBS to believe that its TEV did not exceed the actual value of Chemtura.[73]

With respect to their consideration of precedent transactions, the two reports differed materially in their lists of transactions considered.  Most notably, UBS included many transactions pre-dating the Lehman bankruptcy and the change in the financial climate, while Lazard did not.  Additionally, the Cognis transaction was omitted from the UBS Report and the Nufarm transaction was omitted from the Lazard report.  UBS stated that the Cognis transaction was omitted because, as of the time of the report (and of the hearing), the Cognis deal had not closed.[74]  Thus, the most recent (and only "post-Lehman") transaction included in the UBS Expert Report was the Sumitomo acquisition of a 20% interest in Nufarm.  Lazard explained that it excluded the Nufarm transaction from its Precedent Transactions analysis because Nufarm was only an appropriate comparable for the Debtors' AgroSolutions business, but not for Chemtura on a whole, and because Sumitomo was a "white knight" in that transaction.[75]

However, Lazard and Houlihan contended that the heavy reliance by UBS on pre-Lehman transactions, entered into before the financial markets crashed, was a serious flaw.

Cutting in the other direction, however (though the parties would differ as to the extent), were differences in the Precedent Transactions analyses between the Lazard Expert Report (prepared in August) and the earlier Lazard June Report.  As mentioned above, in its Expert

---

[72]     *See* UBS Expert Report at 9.  *See also* 9/20/10 Hrg. Tr. 226-27; 9/21/10 Hrg. Tr. 52.

[73]     *See* UBS Expert Report at 9.

[74]     *See* 9/20/10 Hrg. Tr. 209-210.

[75]     *See* Aronson Decl. ¶ 80.

Report, Lazard relied on 3 post-Lehman Bankruptcy transactions— Morton Inc. (in April 2009),

Styron Plastics (in March 2010), and Cognis (in June 2010)—which Lazard placed above a

dotted line in the reverse chronologically ordered table in the report.[76]  The BASF acquisition of

Ciba Inc. (in September 2008) and the Ashland acquisition of Hercules (in July 2008) fell below

that line.  In the earlier June Report, however, Lazard had focused on 4 precedent transactions

from 2008 forward, including the Ciba and Hercules transactions, along with the Styron and

Morton acquisitions.[77]  If the Ciba and Hercules transactions, with multiples of 7.8x and 9.0x

respectively, had been included in the August 29 analysis, the average non-pension adjusted

multiple since 2008 would have been 7.6x—higher than the average non-pension adjusted post-

Lehman EBITDA multiple of 6.8x calculated in the Lazard Expert Report.[78]  UBS contended

that this was a methodology flaw, tending to drive Lazard's TEV computation down—or, more

to the point, which if absent would have caused Lazard TEV computation now to be higher.

   C.  *Valuation Conclusions*

If I were required to find a specific valuation for the Chemtura Debtors here, I think that,

based on the foregoing and the additional factual analysis discussed below, any valuation would

be at the low end of the Lazard range.[79]  But for the purposes of this controversy, I don't need to

find an exact valuation.  To determine that the Plan does not violate section 1129(b)'s "fair and

equitable" requirement by paying creditors more than in full, I need only find that the Debtors'

TEV doesn't exceed the TEV underlying the Settlement.

---

[76]     *See* Lazard Expert Report at 28.  In other words, the most recent transactions were shown first, and on top.

[77]     *See* Lazard June Report at 27.  In the June Report, the dotted line separated 2007 and earlier transactions
from post-2008 transactions.  Hercules and Ciba were above the line.  The BASF acquisition of Cognis was
not included in Lazard's June Report because it was not announced until later in June.

[78]     *See* Singh Decl. ¶ 46-50 and Appendix I, 4.  Lazard's pension adjusted average EBITDA multiple was 6.2x
in the June 4 report, and would have been 7.0x in the August report had Ciba and Hercules been included.

[79]     Or, putting it differently, the $2.05 billion midpoint of the Debtors' proposed TEV range (and the TEV
upon which the Settlement was based) represents the high-end of the Debtors' actual TEV.

For the reasons set forth below, I so find.  I do so for the following reasons.

### i. Methodology

As previously indicated, Lazard's valuation presented a TEV in the range of from $1.9 to $2.2 billion, with a midpoint of $2.05 billion.  The Settlement was based on that midpoint valuation.  Lazard's valuation conclusion was reached after consideration of three traditional methods—value implied by consideration of:  (1) discounted cash flow (2) comparable companies; and (3) prices in precedent comparable transactions.

The UBS valuation, by contrast, presented a TEV in the range of from $2.3 to $2.6 billion, with a midpoint at $2.45 billion, approximately 20% higher than the Lazard valuation.  But the UBS valuation was reached by computation only of DCF, which, as discussed below, is subject to projections under an aggressive LRP in an uncertain economic environment.  In such an environment, I think that Precedent Transactions (if in that same environment and if the sample size wasn't too small) and, especially, Comparable Companies, would provide a more persuasive indicator of value, and I was surprised that these latter two techniques did not play a greater role in the UBS analysis.  Comparable Companies and Precedent Transactions analyses were employed, but not to reach separate valuations that would then be considered to provide a composite or blended valuation.  Instead, they were used only as a species of check—sometimes referred to as a "sanity check"—on the valuation UBS arrived at by its use of DCF.

Although in holding valuation hearings before, I've seen experts come to valuation conclusions using several different methodologies, and then come to various weighted averages for the final valuation,[80] that was not done here.  Instead, Lazard prepared the "football field"

---

[80]    See, e.g., In re DBSD North America, Inc., 419 B.R. 179 (Bankr. S.D.N.Y. 2009) ("**DBSD**"), aff'd 2010 WL 1223109 (S.D.N.Y. 2010), appeal pending, No. 10-1175 (2d Cir., appeal filed Apr. 1, 2010):

> Each expert also weighted the values produced by the three
> methodologies differently.  Mr. Henkin effectively weighted the

chart, described above and pictured below, reflecting the general overlap in valuation ranges

derived from its various methodologies, and then submitted an essentially subjective valuation

consistent, for the most part,[81] with the overlap.

### SUMMARY OF VALUATION CONCLUSIONS



| METHODOLOGY | ENTERPRISE VALUE RANGE | DESCRIPTION |
|---|---|---|
| Discounted Cash Flow | $2,175 – $2,570 | ■ Management free cash flow forecast discounted at 11.75% - 13.75%<br>■ Exit Multiple: 6.5x – 7.5x on mid-cycle EBITDAR<br>■ Implies a perpetuity growth rate of 1.0% to 4.2% |
| Adjusted Discounted Cash Flow(a) | $2,055 – $2,470 | ■ Management free cash flow forecast discounted at 11.75% - 13.75%<br>■ Exit Multiple: 6.5x – 7.5x on mid-cycle EBITDARP<br>■ Implies a perpetuity growth rate of 0.3% to 3.5%<br>■ Tax-Adjusted Obligations: $279 million(a) |
| 2010E EBITDAR | $1,730 – $2,060 | ■ 2010E "6+6" EBITDAR: $330 million<br>■ Multiple Range: 5.25x – 6.25x |
| 2010E EBITDARP | $1,690 – $2,035 | ■ 2010E "6+6" EBITDARP of $343 million<br>■ Multiple Range: 5.75x – 6.75x<br>■ Tax-Adjusted Obligations: $279 million(a) |
| 2010E EBITDAR – Cap Ex | $1,680 – $1,890 | ■ 2010E "6+6" EBITDAR less Cap. Ex.: $210 million<br>■ Multiple Range: 8.0x – 9.0x |
| 2011E EBITDAR | $1,875 – $2,270 | ■ 2011E EBITDAR: $395 million<br>■ Multiple Range: 4.75x – 5.75x |
| 2011E EBITDAR – Cap Ex | $1,890 – $2,145 | ■ 2011E EBITDAR less Cap. Ex: $252 million<br>■ Multiple Range: 7.5x – 8.5x |
| Sum-of-the-Parts 2010E EBITDAR | $1,880 – $2,230 | ■ Various multiples range from 5.25x – 8.5x 2010E "6+6" EBITDAR |
| Precedent Transaction | $1,970 – $2,315 | ■ LTM September 30, 2010E "9+3" EBITDAR: $342 million<br>■ Multiple Range: 5.75x – 6.75x |

$1,400   $1,600   $1,800   $2,000   $2,200   $2,400   $2,600   $2,800

(a) Assumes $429 million of pension and OPEB liabilities, which is tax-effected at a 35% assumed tax rate
Note: "6+6" EBITDAR is defined as 6 months of actual results (January – June 2010) plus 6 months per the LRP budget (July – December 2010); "9+3" EBITDAR defined as 9 months of actual results (October 2009 – June 2010) plus 3 months per the LRP budget (July – September 2010)

    While Lazard developed a valuation range using individual valuations derived from

several different methodologies, UBS did not do so.  UBS computed valuations like Lazard's

only by DCF.  The Creditors' Committee noted this in its briefing on this motion.[82]  Though I

---

Trading Comparables Analysis at 90%, and the other two
methodologies at 5% each.  By contrast, Mr. Nabholz weighted the
Trading Comparables Analysis at 20%, and the other two
methodologies at 40% each.

*DBSD*, 419 B.R at 195 (footnotes deleted).

[81]     The result using EBITDAR-Capital Expenditures did not fall within the range.  But it fell *below* it, and any
error in failing to rely on it more heavily would be in the Equity Committee's favor.

[82]     *See* Creditors' Comm. Reply Br. at ¶ 21 ("Although UBS claims to have applied the same widely-accepted
methodologies as the Debtors' expert, UBS did not even calculate the Debtors' enterprise value based upon

wouldn't express the thought in quite the way that the Creditors' Committee did, I agree with the Creditors' Committee's underlying point: the difference in technique makes the Lazard analysis superior.

### ii. DCF Analysis

As previously mentioned, the DCF valuations by each of Lazard and UBS were for the most part predicated on the cash flows anticipated in management's LRP, which was unchallenged by UBS or the Equity Committee.[83] The LRP assumed that a general macroeconomic recovery to pre-recessionary levels would occur in 2011, which would result in further earnings improvements through 2014. It projected EBITDAR of $528 million in 2014, after five years of increasing EBITDA, without any drops, or even flatness, each year.

The Debtors' CFO, whom I found competent and credible, described the Long Range Plan as "aggressive,"[84] and I so find. The Long Range Plan called for levels of performance, for years after 2011, that had never before been achieved at Chemtura.[85] And it was prepared in the context of an economy that, while certainly improved since 2008 (when the U.S. nearly faced a depression), is improving only slowly. The Equity Committee's expert conceded that UBS has lowered its GDP forecasts for 2010 and 2011.[86] I don't have any greater ability than the political

---

either the comparable-company or precedent-transactions analyses. Instead, UBS merely shows a range of comparable-company and precedent-transaction multiples that UBS argues are supportive of the selected multiple range applied in its discounted cash flow ("**DCF**") analysis. In other words, UBS worked backwards.").

[83] While both Lazard and UBS seemingly started with the assumption that they'd work off the projections of the Long Range Plan, each did not do so wholly faithfully, making adjustments in each case. Lazard used 6+6—actual results for the first six months of 2010, and the Long Range Plan for the last six months. UBS did the same. Although the wisdom of the use of 6+6 is subject to fair debate (especially since results were flat in July and below plan in August, but these additional actual results were not taken into account), the use of 6+6 by each of Lazard and UBS resulted in no differences between them in this regard.

[84] See Forsyth Decl. ¶ 60; 9/16/10 Hrg. Tr. 136.

[85] See 9/16/10 Hrg. Tr. 137; 9/16/10 Hrg. Tr. 256. See also Aronson Decl. ¶ 24.

[86] See 9/20/10 Hrg. Tr. 142.

and economic pundits to predict how quickly the economy will improve, and I don't think that I

should do so.  But I can and do find that since the Debtors' Long Range Plan is already

aggressive, and since the speed (and in the views of some, the fact) of the economic recovery is

uncertain, it is inappropriate to be as confident as the Equity Committee is as to future growth in

the American economy and increasing Chemtura EBITDA growth.

The Lazard and UBS DCF analyses both assume continuously increasing growth, but the

effect of that assumption is magnified in the UBS analysis, which uses the $528 million

EBITDAR in the last year, 2014, as the basis for determining terminal value.  I take it as true, as

the Equity Committee and UBS contended, that, for the terminal value calculations, using the

cash flows in the last projected year is not just common, but the more traditional approach (at

least before considering the cyclicality of the company's business).  But that reality underscores

the importance of the projections that get us the $528 million in expected EBITDAR for that last

year.  The extent to which that $528 million is an appropriate benchmark for gauging future

performance (and hence terminal value) depends upon both the confidence that one has in

expectations as to the Debtors' future economic growth as well as the extent to which the

expectations would be subject to cyclical variations.

I've previously noted that the Debtors' projections are aggressive, and that I have

uncertainty as to the country's—apart from Chemtura's—economic prospects over the next five

years.  This uncertainty cuts materially in favor of the Lazard view, which doesn't place as much

reliance on the unprecedented EBITDA for 2014.

However, I agree with Lazard only in part with respect to how to deal with cyclicality.

Determining the appropriate Terminal Value may be a challenge in cyclical businesses, as the

projected period might end at various points near the top, bottom, or middle of the business

cycle, and using the cash flows at that point might or might not provide a reasonable basis for projected cash flows going forward.  I didn't understand anyone in this case to question the view of NYU business professor Aswath Damodaran that for cyclical businesses, taking the business cycle into account makes for a better analysis—that "trying to forecast the next cycle is not only futile but dangerous[,] and that it is far better to normalize earnings and cash flows across the cycle."[87]  But the experts had different views on the extent of cyclicality of the Debtors' business, and how to "normalize" their projected cash flows for years after 2014.

Lazard considered it appropriate to regard the Debtors as cyclical, requiring their actual and projected cash flows—which went down from 2007 to 2009 and then were projected to go up to 2014,[88] with a graph resembling a hockey stick—to be normalized to account for the business cycle.  Lazard did that by computing 3-year and 5-year averages for EBITDA, which at least seemingly were not necessarily for complete business cycles.  But the Equity Committee contended that Chemtura, a specialty (as contrasted to commodity) chemicals company, is not that cyclical, and that Lazard thus erred by failing to compute Terminal Value based on the final year's cash flows[89] and/or by failing to capture an entire business cycle.  In the hearing, the extent of Chemtura's cyclicality was a matter of sharp debate.

I find that Chemtura, as a specialty chemicals company that in several significant respects can differentiate its products from others, is not as cyclical as other chemical companies, particularly those that are wholly or largely commodity chemical companies.  But I find that its

---

[87]     Aronson Decl. ¶ 30 (quoting ASWATH DAMODARAN, UPS AND DOWNS: VALUING CYCLICAL AND COMMODITY COMPANIES (2009)).  *See also* Singh Decl. ¶ 22.

[88]     EBITDAR went from an all-time high of $419 million in 2007, the year before the financial crisis, down to $263 million in 2009, and under the Long Range Plan was projected to thereafter increase up to $528 million in 2014.  *See* Aronson Decl. ¶ 24.

[89]     As noted in n. 88, the shape of the hockey stick was such that projected EBITDAR reached its peak in the final year, 2014.  Using an average from the middle would result in use of a lower EBITDAR in computing the Terminal Value, and result in a lower TEV.  Conversely, use of the EBITDAR at the time of the 2014 high point would result a higher Terminal Value, and result in a higher TEV.

business still is cyclical in material respects, in no small part because many of its customers are. Thus I think that normalizing for cyclicality was not inappropriate.

But with that said, I believe that to engage in normalization best, one would need to capture an entire business cycle, and I don't believe that Lazard necessarily did so. Also, the Equity Committee established by cross-examination that in Lazard's valuations of several other chapter 11 debtors (at least some of which would seemingly be as cyclical as Chemtura), Lazard nevertheless used the final year's cash flows in its computation of Terminal Value, and did not use the normalization technique it used here.[90] One may legitimately wonder, then, why the normalization technique was appropriate here but was not appropriate there—or vice versa.

While Lazard was not necessarily wrong to take cyclicality into account, its failure to do so over a complete business cycle, and its doing so here but not in other cases, undercut the persuasiveness of its cyclicality normalization techniques.

Looking back, then, at the Lazard and UBS DCF analyses, I find flaws in each. But in my mind, the flaws in the UBS analysis are more pronounced. In this economic environment, relying on the very high terminal value in the last year of an admittedly aggressive string of growth projections is in my mind too aggressive. In a more stable economic environment, I'd likely consider use of the last year's cash flows for determining terminal value to be perfectly ordinary, if not also preferred. But I don't think that the present economic uncertainties permit an analysis that is so subject to assumptions that are so optimistic. Also, though I find flaws in Lazard's efforts to capture cyclicality, I'm troubled that UBS made no effort to address cyclicality at all.

---

[90]    See 9/16/10 Hrg. Tr. 231-34.

As I indicated, I have problems with Lazard's implementation of its efforts to address cyclicality. But on balance, I believe its DCF analysis is somewhat superior because it is less subject to the economic uncertainty that I find to be of material concern.

### iii. Comparable Companies Analysis

As noted above,[91] Lazard engaged in an extensive Comparable Companies analysis, examining the values suggested by comparable companies by six means. (Of the value ranges derived from that Comparable Companies analysis, one[92] was wholly below Lazard's overall TEV range (and presumably disregarded by Lazard, in a decision that the Equity Committee would presumably welcome), and two others[93] would support valuations only at the lower end of Lazard's range). But for the most part UBS did not engage in Comparable Companies to provide an independent indicator of value, instead using it merely as a means of confirming the reasonableness of its DCF analysis.

That's disappointing, as I consider Comparable Companies analysis to be somewhat more meaningful here than either DCF or Comparable Transactions analysis, because it's less susceptible to uncertainties in projections (in the case of DCF) or extraneous factors such as control premiums, synergies, or bidding wars (in the case of Precedent Transactions). Though Lazard didn't assign numeric weights to the results derived from its various methodologies (and I don't do so either), and neither Lazard nor I would characterize our valuation conclusions as the result of a mathematical computation, I note that for these reasons, I give Comparable Companies analysis relatively greater weight.

---

[91]    See page 16 supra.

[92]    2010E EBITDAR–Cap Ex. See Lazard Report at 5.

[93]    2010E EBITDAR and 2010E EBITDARP. See Lazard Report at 5.

UBS did consider Comparable Companies analysis in the manner I described above,[94] and critiqued the Lazard Comparable Companies analysis for leaving off DuPont and PPG, for including Solutia, and for including European companies.  In each of those respects, I believe Lazard was right.

DuPont and PPG dwarf the Debtors in sales, EBITDA, enterprise value, and market cap.  For instance, DuPont's revenues are nearly 18 times that of Chemtura's.  As materially larger companies, they aren't as risky and trade at higher multiples.  They trade at multiples well above the average of UBS's guideline companies.  Their inclusion in the analysis inappropriately results in a higher value.

I also believe that Lazard was right to take Solutia into account in its analysis, and that UBS, to examine the full universe of comparables, should have done likewise.  Solutia is a specialty chemical company of a similar size to Chemtura, and has similar product lines that are used in the same end markets as the products Chemtura sells.[95]  I think that UBS's failure to consider Solutia undercuts the Equity Committee's Comparable Companies criticism of Lazard.

I also think that Lazard was right to include European companies as part of its Comparable Companies analysis, and that UBS was wrong to leave them out—especially since UBS considered them at other times and for other purposes.  I accept Lazard's testimony that the European companies that Lazard included in its comparables analysis operate in many of the same markets as Chemtura, make similar products, and are subject to similar tax and regulatory environments.[96]  And half of Chemtura's revenue comes from outside the U.S.,[97] where

---

[94]    *See* page 16 *supra.*

[95]    *See* Aronson Decl. ¶ 72.

[96]    *See* Aronson Decl. ¶ 70.

[97]    *See* Cerimele Decl. ¶ 25.

29

Chemtura would have to compete with those foreign companies. It also is puzzling that UBS included several European companies in its Precedent Transactions Analysis,[98] and in its Sum-of-the-Parts Comparable Companies analysis,[99] but left them out here—a fact that further undercuts UBS criticisms in this regard.

Thus I find Lazard's reasoning to be sound in its Comparable Companies analysis, which I find, in turn, to be one of the most important indicia of value here. Especially since UBS didn't put forward an alternate valuation on this basis, I give Lazard's conclusions here substantial weight.

### iv. Precedent Transactions Analysis

Here too, I note that Lazard derived a valuation range based on Precedent Transactions Analysis and that UBS didn't do so. Instead, UBS used this methodology merely as a means of verifying its DCF conclusions. I think that Precedent Transactions analysis has to be used with some care to normalize for extraneous factors that may be present in individual cases and increase the prices in those transactions—like control premiums, a willingness to pay more to obtain operational synergies, and hostile transactions. And I'm a little concerned about the post-Lehman bankruptcy sample size. But I think that Precedent Transactions methodology still is helpful, and that it tends to support a valuation lower than the valuation for which the Equity Committee argues. Additionally, I believe that UBS's criticism of Lazard's Precedent Transactions was materially flawed itself.

---

[98]    *See* UBS Expert Report at 9. The Debtors note that UBS included European companies in its Precedent Transactions analysis when that would lead to higher multiples. *See* Debtors Reply Br. ¶ 81.

[99]    *See* UBS Expert Report at 7. Though the Equity Committee, through its expert, argues that Sum-of-the-Parts analysis should be regarded differently, *see* 9/20/10 Hrg. Tr. 293-94, I'm not persuaded that this should be the case.

As noted above, a significant difference between the Lazard and UBS approaches was the heavy reliance by UBS on transactions that predated the recent financial collapse, as measured by the date of filing of the Lehman bankruptcy case. Lazard noted that the global economy fell into a tailspin after the Lehman bankruptcy, and that the financial system froze and global stock markets collapsed, causing the worst recession since the Great Depression. Credit necessary to finance acquisitions is far less available today. I accept Lazard's testimony that advanced economies are fundamentally different today, and that relying on multiples from a time period before the crash is inappropriate.

Two transactions followed the crash, one which in my view was of dubious comparability, and the other of which plainly should have been considered. UBS considered the former, giving it normal weight, and did not consider the latter. I have problems with each decision.

UBS included in its Precedent Transactions analysis Sumitomo's acquisition of a 20% interest in Nufarm, an Australian manufacturer of crop chemicals; Lazard did not. Lazard explained that Nufarm is comparable to Chemtura's AgroSolutions business, but is not comparable to the whole company.[100] Lazard provided an additional reason not to rely on the Nufarm multiple: Sumitomo acquired the stake in Nufarm by making a "white knight" proposal at a higher value than Sinochem, a Chinese Chemical Company that was pursuing Nufarm at the time, and, with the benefit of hindsight, arguably overpaid for it.[101] I can't make a factual finding that Sumitomo in fact overpaid for Nufarm, but I also can't ignore the fact that Sumitomo bought its stake in a competitive environment, which would be relevant even if I agreed with UBS that Nufarm is an appropriate comparable for Chemtura as a whole. In my

---

[100]   *See* Aronson Decl. ¶ 80.

[101]   *See* Aronson Decl. ¶ 80.

31

view, Sumitomo's white knight role does not necessarily mean that the transaction should have been left out altogether, but it does suggest that any valuation derived from the deal would be on the high side.

I also share Lazard's view that UBS was wrong to exclude the BASF acquisition of Cognis from its analysis. Lazard testified that BASF's acquisition of Cognis, which is also a specialty chemicals manufacturer, provided the best precedent benchmark of value for Chemtura,[102] and I find that the BASF-Cognis transaction was indeed the most appropriate comparable transaction, both by nature of company being acquired and in time.

UBS was unpersuasive in its testimony that the Cognis deal was properly excluded because it had not yet closed. UBS admitted at trial that it was unaware of any facts that would suggest that the deal would not close, and that had the deal already closed, UBS would have included it in its precedent transactions analysis.[103] The Equity Committee stipulated to the fact that definitive documentation had been entered into that (unless conditions providing for rights of withdrawal were satisfied) *obligated* the parties to close, and that neither buyer nor seller could walk from the deal.[104] The price of the deal already was fixed, by documentation binding on the parties. If the whole idea of a valuation is to determine what a willing buyer will pay and a willing seller will accept, and that already has been determined, it is not at all persuasive to contend that a deal with executed definitive documentation must be ignored simply because it has not yet closed. Indeed, if there is temporal proximity, as there is here, such a deal, even if not yet closed, may be the best comparable of all.

---

[102]     *See* Aronson Decl. ¶ 56.

[103]     *See* 9/20/10 Hrg. Tr. 209; 9/21/10 Hrg. Tr. 86.

[104]     *See* 9/22/10 Hrg. Tr. 132.

To be sure, the Cognis transaction, like the Sumitomo-Nufarm transaction, also had unique characteristics. It was a control transaction, with synergies that would come out of it, once again suggesting that any valuation derived from it could be on the high side. But to its credit, Lazard used it anyway, and used its 6.2 multiple as a mid-range transaction, rather than as a high one. As with the Sumitomo-Nufarm transaction, I take the high-side character of the Cognis transaction into account.

Of course, the small number of transactions in the post-Lehman environment makes for a small sample size. That's a cause for some concern, and a reason for not giving this methodology as much weight as I otherwise would. But with two comparables coming in at 6.2x EBITDA in the post-Lehman bankruptcy era, I feel relatively comfortable in still giving some weight to this methodology. The upper end of Lazard's Precedent Transactions range ($2.315 billion) is somewhat higher than the upper end of Lazard's final valuation range ($2.2 billion).[105] But the transactions on which Lazard relies had synergistic and control characteristics, which would result in a higher implied valuation, and we know that Chemtura has historically traded lower than its peers. Lazard's Precedent Transactions upper end is of course well below the upper end of UBS's valuation (based solely on DCF and the aggressive projections) of $2.6 billion, and suggests that UBS' valuation is too high.

*v. Marketing Efforts*

Another matter that informs my finding that the Debtors' TEV doesn't exceed $2.05 billion is the lack of buyers or investors for the Debtors at higher values or values within the

---

[105]    *See* Aronson Decl. ¶ 4.

33

Equity Committee's range—a species of "market" information that informs, though it does not solely support, my conclusion that the Debtors have met their burden as to value here.[106]

As I've discussed before,[107] the Debtors cooperated with Equity Committee efforts to market the company, which led to contacts with 19 potential investors, of whom 7 signed confidentiality agreements. UBS made presentations to potential investors valuing the company at $2.2 to $2.7 billion,[108] a valuation which would have the same midpoint (of $2.45 billion) as the present UBS valuation. But there were no takers, or offers, at that price or at any price that might ultimately lead to that price.[109] Nor were any members of the Equity Committee itself, though several were hedge funds, prepared to put their own money into the Debtors at those (or even lower) prices—a fact that I also find meaningful.[110] Though I hardly expect that investors

---

[106]    Many observers believe that behavior in the marketplace is the best indicator of enterprise value. *See*, *e.g.*, *Bank of America Nat. Trust and Sav. Ass'n v. 203 North La Salle Partnership*, 526 U.S. 434, 457 (1999) (acknowledging that "the best way to determine value is exposure to a market"). *See also In re Granite Broad. Corp.*, 369 B.R. 120, 140-43 (Bankr. S.D.N.Y. 2007) (Gropper, J.) ("**Granite Broadcasting**") (noting that what a willing purchaser is willing to pay "typically trumps all other[ ]" indications of value."). I don't believe that always to be the case, since as I saw in the *Global Crossing* and *Adelphia* cases on my watch, financial accounting techniques (such as capitalizing expenses without writing them down to realizable value) or fraud can give the marketplace a distorted impression of a company's worth. But as a general matter, where, as here, there isn't a suggestion that the company's financials or projections are inflated or misleading, I think the marketplace is often as good or better an indication of a company's value than expert testimony alone would be. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d. Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (internal citations omitted).

[107]    *See* page 10 above.

[108]    This was the Paulson Presentation, Debtors' Exhibit 70, discussed at page 10 above.

[109]    Early in the marketing process, one Equity Committee member, hedge fund Strategic Value Partners, expressed the position that Chemtura was worth 7.5x 2011 normalized EBITDAR, or $3 billion, and three days later, UBS sent a presentation to the debtors with that same value. *See* Debtors Exhibits 52, 55. While the Debtors criticize UBS for that, contending that UBS was acting under pressure by Equity Committee members, see 9/22/10 Hrg. Tr. 45, I don't find fault with it. At that time, UBS was acting as an advocate for its constituency in a deal making process, a function customarily performed by investment bankers and financial advisors.

[110]    *See Granite Broadcasting*, 369 B.R. at 140-41 ("there is no question that in appropriate circumstances, 'People who must back their beliefs with their purses are more likely to assess the value of the [asset] correctly than are people who simply seek to make an argument.'") (*quoting In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 n.3 (7th Cir. 1987)).

would have simply accepted offers to invest at the prices that the presentations were putting forward, the lack of any interest in proposals at those values lends further support to my conclusion that a $2.45 billion midpoint would be too high.[111]

### vi. Creditors' Preferences for Cash

I take note of another kind of "market" type information—the fact that the Plan gave most creditors[112] and all bondholders the right to elect, within limits, to take stock or cash as the currency by which they'd get their distributions.  The overwhelming majority of them elected to take the maximum recovery in cash, rather than stock.[113]  A very major proportion of the Debtors' non-Diacetyl and environmental creditors (including all or substantially all of the Bondholders' Committee, which held about 68% of the bonds[114]) were hedge funds and other distressed debt investors, sophisticated in financial analysis and having the ability to efficiently dispose of stock if it were received as an alternative currency.  Yet approximately 78% of the electing bondholders indicated a preference for cash[115]—even though they'd make an immediate

---

Though there were indications, as the Bondholders' Committee notes (*see* Bondholders' Comm. Reply Br. at 6-7 & Exhibits 5, 6), that hedge fund members of the Equity Committee Strategic Value Partners and Canyon Capital Partners sought to advance their interests over "retail" equity holders—a matter that, if true, would be a matter of concern to me, as they were supposed to be fiduciaries—I don't now need to make findings in that regard.

[111] Though I don't place reliance on what prospective investors said (as I regard those statements as hearsay, inherently self-serving, and, possibly, bottom-fishing), the bottom line is that there were no serious responses.

[112] Recall that creditors with Diacetyl and environmental claims were in separate classes, and they'd simply get cash.  *See* page 8 above.

[113] *See* Klamser Voting Results Decl., ECF # 3955, at Exhibit D; Kjontvedt Voting Results Decl., ECF # 3956, at Exhibit C.

[114] *See* Bondholders R.2019 Statement, ECF # 2879, at ¶ 1.

[115] *See* Kjontvedt Voting Results Decl., ECF # 3956, at Exhibit C.

return of 20 or 25% by taking stock if it were worth as much as the Equity Committee contends.[116]

I agree with the point made by several Plan supporters that if those creditors thought the New Common Stock was undervalued at the price at which it was offered—the natural consequence of the Equity Committee's position—they would have snapped it up.  And if they thought Chemtura was worth what UBS says it's worth, they would *really* have snapped it up.  Their failure to do so, and their preference for cash under the Plan, suggests to me that they don't think that the stock is worth more than the cash, and, more fundamentally, the higher amount that the Equity Committee contends.

### vii. Credibility

While, over the years, very few of the cases before me have involved witness credibility to any material degree, this case was an exception.  The opinions of all four experts were subject to at least some question by reason of their prior activities, the circumstances under which they testified, inconsistencies between their trial and deposition testimony, or some combination of those factors.  With respect to the Equity Committee's two experts, these issues—causing reason to question their judgment, their credibility, or both—were particularly pronounced.

---

[116]    *See* 9/21/10 Hrg. Tr. 58-59:

> Q:  …[Were you] asked this question, sir, and did you give this answer?  And do you agree as a general matter if creditors receive equity based on a distribution that valued the company at 2.05 billion, but in fact the company was worth 2.45 billion, that would certainly be a good investment for those creditors? Answer, yes.  Were you asked that question, did you give that answer?

> A:  I was asked that question.  I did give that answer.

> Q:  And that's because those creditors would stand to make an immediate return of like 20 or 25 percent on their investment, right?

> …

> A:  The way the arithmetic you just said, they would have that sort of return on their investment.

(apparent transcription error corrected).

36

UBS's first witness (a UBS Chemicals Industry expert)[117] repeatedly seemed unwilling to give straight answers to questions on cross-examination, even questions that were quite preliminary and not at all argumentative.  Much more troublesome, however, were the many times he was impeached by inconsistent statements in his deposition testimony.[118]

UBS's second witness (the more senior of the Equity Committee's two experts, who pitched the engagement and who signed the Equity Committee-UBS retention letter) was likewise impeached on many occasions by inconsistent deposition testimony.[119]  In addition, he showed unusually strong indications of bias.  In making the pitch to the Equity Committee secure the engagement for UBS in the first place, he told the Equity Committee that he would "try to be aggressive in valuation,"[120] and in depositions acknowledged acting "with the outlook of what would achieve the maximum value for the equity."[121]

Also undermining the credibility of the two experts for the Equity Committee—and similarly, albeit to a lesser degree, the experts for the Debtors and the Creditors' Committee— were the terms of their engagement agreements.  The UBS retention agreement provided that in addition to getting the customary monthly fee, UBS would get a "transaction fee" of 1.25% of amounts distributed to Equity between $225 million and $450 million, and 2.0% of amounts over $450 million.[122]  (At the Lazard $2.05 billion valuation, UBS would not get a transaction fee.)

---

[117]    While the Debtors attacked his lack of scholarly work and the fact that he had not testified before, I was comfortable that he had the requisite knowledge of the chemicals industry.  My concerns go much more to his unwillingness in his testimony to agree to things as to which agreement plainly was appropriate, and the ways in which his testimony changed between the time of his deposition and the time of trial, only a week or so later.

[118]    *See* 9/20/10 Hrg. Tr. 105, 108, 132, 140, 221, 251.

[119]    *See* 9/21/10 Hrg. Tr. 29, 44, 59, 87, 89, 143.

[120]    *See* 9/21/10 Hrg. Tr. 29.

[121]    *See* 9/21/10 Hrg. Tr. 29.

[122]    *See* 9/21/10 Hrg. Tr. 30.

The distribution to Equity would of course turn on the ultimate TEV, upon which the UBS experts would later testify.

The Lazard retention agreement provided for an additional $7 million fee payable upon consummation of a reorganization plan,[123] and the Houlihan agreement provided for a "deferred fee" of $3 million on the confirmation of a plan that was supported by the Creditors' Committee.[124]  It was foreseeable that Lazard would have to offer trial testimony—which, of course, is exactly what happened here.  Likewise, although Houlihan could (and ultimately did) rely in substantial part on Lazard, it too would financially gain if a plan were confirmed based on its testimony generally supporting Lazard.

In my experience, provisions like those in the Lazard and Houlihan agreements are common, and provisions like those in the UBS agreement are, if not also common, at least not uncommon.  I approved each of them when authorizing the retentions of the three firms, and in my view there is nothing inherently wrong with them.  They're unobjectionable as a means of incentivizing investment bankers to find buyers or investors, or to make deals, if they're regarded by stakeholders as necessary or desirable to achieve those ends.  But such provisions can't be ignored when investment bankers testify.  Especially in the case of the UBS agreement—and, to a lesser degree, also in the case of Lazard's and Houlihan's—they materially and adversely affect witness credibility.

The usual stated rationale for including such provisions in retention agreements for investment bankers is to incentivize them.  But UBS had no material role in soliciting buyers or investors or capital for the enterprise; the Debtors had plan exclusivity, and the solicitation of investors to meet the Equity Committee's needs was principally engaged in by hedge fund

---

[123]    *See* Lazard Retention Motion, ECF #24, and Final Retention Order, ECF #641.

[124]    *See* Houlihan Retention Motion, ECF #412, and Retention Order, ECF #638.

members of the Equity Committee, rather than by UBS.  If the purpose of the transaction fee for

UBS was indeed to incentivize it (as contrasted to simply paying UBS more), the transaction fee

had a heavy effect on its credibility.  Likewise, if the purposes of the different contingent

compensation provisions for Lazard and Houlihan were in fact to incentivize them, as contrasted

to simply paying them more, their contingent fees—dependent on confirmation, which would

turn on Lazard's testimony supporting the underlying TEV and Houlihan's testimony generally

supporting Lazard—bore adversely on the credibility of their expert testimony as well.

The rather obvious adverse effect of incentive compensation on witness credibility has

been recognized in the caselaw, in this district and elsewhere, including in several chapter 11

valuation decisions.[125]  While it's been suggested in the commentary that an expert's contingent

fee should generally result in the expert's disqualification as a witness,[126] I think it's sufficient—

since we bankruptcy judges conduct non-jury trials and are used to provisions of this character—

that we merely take contingent fees or incentive compensation into account as adversely

affecting credibility, and ultimately take such opinions with a grain of salt.

Finally, failures by UBS and Lazard to change the midpoints of their valuations after the

passage of time, and in the face of seemingly different circumstances, tend to undercut the

persuasiveness of each.  In June 2010, UBS valued Chemtura within the range of $2.2 billion to

---

[125]    *See Granite Broadcasting*, 369 B.R. at 142 (an expert's testimony "was seriously undermined by the fact that his compensation from the Preferred Holders is contingent on the total consideration to be received by the Preferred Holders under a confirmed plan"); *In re Oneida Ltd.*, 351 B.R. 79, 92 (Bankr. S.D.N.Y. 2006) (Gropper, J.) ("***Oneida Ltd.***") (a valuation expert's retention with a contingency fee "seriously undermine[d]" the expert's credibility); *In re Tousa, Inc.*, 422 B.R. 783, 839-40 (Bankr. S.D. Fla. 2009) (taking into account fact that expert was to receive a $2 million contingency fee and where expert, after only 5 days, announced that it would have a favorable opinion ).

[126]    *See* Bernstein, Seabury & Williams, *The Empowerment Of Bankruptcy Courts In Addressing Financial Expert Testimony*, 80 AM. BANKR. L.J. 377, 432 (Summer 2006) ("[T]he existence of a contingency in the retention of an expert should generally result in the disqualification of the expert.  An expert who has a 'financial dog in the fight' cannot be objective; his opinion will be swayed by his financial stake and, thus, be inherently unreliable.").

$2.7 billion, with a midpoint of $2.45 billion.[127]  On August 29, UBS issued the valuation

opinion it offered at trial—within the narrower range of $2.3 billion to $2.6 billion, but with the

exact same midpoint.

On June 4, Lazard valued Chemtura within the range of $1.9 billion to $2.2 billion, with a

midpoint of $2.05 billion.  On August 29, Lazard issued the updated report that it offered at trial.

But Lazard's range and midpoint (the latter being the valuation upon which the Settlement was

based) were exactly the same, despite a variety of events that would at least seemingly have

affected the Debtors' ultimate TEV, American trading markets, or both—such as the Debtors'

beating EBITDA projections for Q2 by $30 million and failing to make the projections in

August, reduced uncertainty in the European trading markets, and progress in controlling the oil

spill in the Gulf.

That these similarities were mere coincidence is of course possible, but I find such

coincidence improbable in each case.  They tend to cause me to be more proactive in making my

own valuation judgment, rather than to accept either of the proffered ones.

 D. *Conclusions re: Valuation*

The facts found above underlie my ultimate factual finding, set forth above and again

now, that the Debtors' TEV is no higher than the $2.05 billion TEV underlying the Settlement.

The evidence to the contrary is unpersuasive.  In fact, the Creditors' Committee makes some

persuasive points—that the projections in the LRP are aggressive; that in the face of an economy

that, while getting better, is getting better slowly, projections will be difficult to achieve; that the

Debtors may not retain the above-forecast EBITDA generated in the first half of 2010; and that

Lazard failed to impose a valuation discount for the Debtors' historic rank below the majority of

---

[127]     *See* Paulson Presentation, Debtors' Exhibit 70.

their peers.  But I don't need to rule on the Creditors' Committee's points in that regard.  By each of the traditional valuation techniques and by the evidence of behavior in the "marketplace," the Debtors have shown, by a preponderance of the evidence, that the actual TEV of Chemtura is no higher than the level upon which the Settlement is based.

*8.  Reasonableness of the Settlement*

Whether the Settlement is reasonable, which is a finding I must make to confirm the Plan, is a mixed question of fact and law, and is thus principally discussed below.  But it has factual underpinnings, the most important of which is my conclusion, discussed above and repeated here, that under the Settlement, creditors are not being paid more than in full.  I also find that the Settlement was negotiated at arm's length and by competent professionals.

*9.  Good Faith*

If I am going to confirm the Plan, I also need to find that it was proposed in good faith.[128] Though this is a mixed question of fact and law, and thus is principally discussed below, I easily can make the underlying purely factual findings here.

There is here no evidence to the contrary.  As it became increasingly clear that the Debtors would turn out to be solvent, principally by reason of their ability to settle and reduce claims, the Debtors acted appropriately to address the needs and concerns of all stakeholders, including not just creditors but also Equity.  I've previously found that the Debtors appropriately cooperated in the marketing process.  I find that they were receptive to offers for the company at a higher valuation, and I don't believe, or find, that the failure to secure offers at higher valuations can in any way be attributed to any lack of good faith on their part.

---

[128]    *See* Bankruptcy Code § 1129(a)(3).

41

Similarly, the Debtors' dealings with their stakeholders were above board and no different from dealings that are typical in large chapter 11 cases. Their arrangements to propose a largely, but not entirely, consensual plan were typical of that which is to be expected in any large chapter 11 case.

A major point of controversy after the Equity Committee was formed was the extent to which the Debtors, after a reorganization, should be highly leveraged, as the Equity Committee hoped. I can hardly find fault on the part of the Debtors' management in concluding that this was a bad idea. And I cannot and do not find that management's desire for a less leveraged company is indicative of bad faith. If there's anything that we've learned from the events of the last two years and the failed LBOs then and in prior years, it's that high levels of leverage can be dangerous. The Debtors' management's desire to deleverage the company and avoid subjecting it to future risks from high levels of debt was fully understandable. If that is not also to be commended, at the very least it cannot be faulted.

For these reasons and others in the Discussion, I find that the Plan was proposed in good faith.

## 10. Ultimate Findings of Fact[129]

For reasons set forth above and in the Discussion below, I find:

1. The Settlement is in the best interests of the Estate.

2. Under the Plan, creditors are not being paid more than in full.

3. The Settlement is "fair and equitable" in the sense that it is fair to the Estate and to its stakeholders.

---

[129] Some of these are mixed questions of fact and law, and other facts appear in the Discussion below. To the extent it matters, facts, mixed questions of fact and law, and legal conclusions should be regarded as whatever they actually are.

4.   The Settlement is "fair and equitable" in the sense that it complies with the Absolute

Priority Rule and in the sense that creditors not be paid more than in full.

5.   The Plan was proposed in good faith.

Discussion

This controversy, almost without exception, is about the facts and not the law.[130]   It's for

that reason that the preceding factual discussion was so lengthy.   My legal analysis breaks no

new ground.   But the mixed questions of fact and law, and the residual legal issues, are discussed

below.

*1.  "Fair and Equitable" under Section 1129(b)(1)*

Of course, the Plan can be confirmed only if the requirements of section 1129 of the

Code are satisfied, the most important of which, for our purposes, is the "fair and equitable"

requirement of section 1129(b)(1) of the Code,[131] which protects the Equity as a dissenting class.

It's undisputed that the "fair and equitable" requirement encompasses a rule that a senior class

cannot receive more than full compensation for its claims.[132]   Courts will deny confirmation if a

---

[130]   The only material exception involves the need to assess the fairness of the Settlement, which requires, in part, analysis of conflicting caselaw on prepayment prohibitions and make-whole premiums.  *See* Section 2 below.

[131]   That section provides, in relevant part:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) [which requires acceptance by every class] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and *is fair and equitable,* with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(emphasis added).  As the Equity is impaired under the Plan and hasn't accepted it, it's undisputed that the Equity is entitled to the protections of section 1129(b)(1).

[132]   *In re Exide Technologies*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (Carey, J.) ("*Exide Techs.*").  *See also In re Future Energy Corp.*, 83 B.R. 470, 495 n.39 (Bankr. S.D. Ohio 1988) ("*Future Energy*"); 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][ii] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2007) ("The second major component of the 'fair and equitable' requirement is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim.  Once the participant receives or retains property equal

43

plan undervalues a debtor and therefore would have resulted in paying senior creditors more than full compensation for their allowed claims.[133]

It was for this reason that the confirmation hearing devoted so much time to the Debtors' value, as measured by TEV.  It was necessary to address the Equity Committee's legitimate concerns, if established, that "[t]he Debtors' Plan, if confirmed with the proposed TEV, [would] overpay[] unsecured creditors and bondholders" and that the Plan proposed "to equitize their allowed claims at an artificially low TEV."

After hearing the evidence, however, and making the factual findings I did after that 4-day evidentiary hearing, I'm satisfied that the Equity Committee's "fair and equitable" objections here lack merit.  I'm satisfied that the Debtors' TEV doesn't exceed the $2.05 billion TEV upon which the Settlement is based and upon which the New Common Stock will be issued.  Creditors—who of course are entitled to be paid in full, but not more than in full—will here not be overpaid.

By reason of my factual findings above, I now find, as mixed questions of fact and law, that creditors will not be paid more than in full and that the Plan is "fair and equitable" within the meaning of section 1129(b)(1).[134]  And I rule, as matter of law, that the legal requirements of section 1129(b)(1) have been satisfied.

---

to its claim, it may receive no more."); Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 AM. BANKR. L.J. 133, 148, 149, 166 (1979).

[133]  *See Exide Techs.*, 303 B.R. at 61, 66 (finding that plan undervalued debtors and denying confirmation); *In re MCorp Fin., Inc.,* 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) (Clark, J.) (denying confirmation under section 1129(b) where plan failed to establish upper limit to creditor distributions at the expense of rejecting stockholders); *Future Energy*, 83 B.R. at 495 n.39 ("Clearly, overpayment of senior creditors is violative of the fair and equitable standard."); *In re Walat Farms, Inc.*, 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987) (noting that it "would do violence to the 'fair and equitable' standard by paying [the creditor] more than its claim").

[134]  "Fair and equitable" is also a requirement for the approval of settlements, where it is subject to a double entendre requiring two separate things.  I discuss it in that separate context in Section 2 below.

2. *The Settlement*

    A. *Standards for Approval of Settlement*

The Settlement embedded in the Debtors' Plan[135] requires approval under Rule 9019 of

the Federal Rules of Bankruptcy Procedure.  Bankruptcy Rule 9019 provides "after notice and a

hearing, the court may approve a compromise or settlement."[136]  The legal standard for

determining the propriety of a bankruptcy settlement is whether the settlement is in the "best

interests of the estate."[137]  This standard is well established in this district, where my analysis of

the settlement factors in the *Adelphia DoJ/SEC Settlement Decision* was approved by the district

court.[138]  The Supreme Court held in *Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson*[139] that to determine that a settlement is in the best interests of the estate,

the settlement must be "fair and equitable."[140]  Such a finding is to be based on "the probabilities

of ultimate success should the claim be litigated," and:

> [A]n educated estimate of the complexity, expense, and likely duration of such
> litigation, the possible difficulties of collecting on any judgment which might be
> obtained, and all other factors relevant to a full and fair assessment of the wisdom
> of the proposed compromise.  Basic to this process in every instance, of course, is
> the need to compare the terms of the compromise with the likely rewards of
> litigation.[141]

---

[135]   *See* Plan at Art. 5.1.

[136]   Fed. R. Bankr. P. 9019.

[137]   *In re Purofied Down Prods. Corp.,* 150 B.R. 519, 523 (S.D.N.Y. 1993) (Leisure, J.) ("***Purofied Down Products***").

[138]   *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr. S.D.N.Y. 2005), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y. 2005), *aff'd,* 337 B.R. 475 (S.D.N.Y. 2006) (Kaplan, J.), *aff'd by summary order*, 224 Fed. Appx. 14, 2006 WL 3826695 (2d Cir. 2006), *cert. denied,* 552 U.S. 941 (2007) ("***Adelphia DoJ/SEC Settlement Decision***").

[139]   390 U.S. 414 (1968) ("***TMT***").

[140]   *Id.* at 424.

[141]   *Id.* at 424-25. See also *Purofied Down Products,* 150 B.R. at 523; *Official Comm. of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (In re Int'l Distrib. Ctrs., Inc.),* 103 B.R. 420, 422 (S.D.N.Y. 1989) (Conboy, J.) ("***International Distribution Centers***") (determination as to whether proposed compromise is fair and equitable requires exercise of informed, independent judgment by court).

A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement but must only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."[142]

It is not necessary for the court to conduct a "mini-trial" of the facts or the merits underlying the dispute.[143]  Rather, the court only need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement.[144]  In doing so, the court is permitted to rely upon "opinions of the trustee, the parties, and their attorneys."[145]

Citing *TMT* and cases from this Circuit, the Second Circuit, in *Iridium,* its well-known decision,[146] provided a list of factors (the "***Iridium* factors**") to consider in approving a settlement:

> (1) The balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures;
>
> (2) The prospect of complex and protracted litigation if the settlement is not approved;
>
> (3) The proportion of the class members who do not object or who affirmatively support the proposed settlement;

---

[142]  *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983) ("***W.T. Grant***") (internal quotation marks omitted).

[143]  *Purofied Down Products,* 150 B.R. at 522; *International Distribution Centers,* 103 B.R. at 423.

[144]  *See Purofied Down Products,* 150 B.R. at 522; *In re Energy Coop., Inc.,* 886 F.2d 921, 924-25 (7th Cir. 1989).

[145]  *International Distribution Centers,* 103 B.R. at 423.

[146]  *In re Iridium Operating* LLC, 478 F. 3d 452 (2d Cir. 2007) ("***Iridium***").

46

(4) The competency and experience of counsel who support the

settlement;

(5) The relative benefits to be received by individuals or groups within the

class;

(6) The nature and breadth of releases to be obtained by the directors and

officers as a result of the settlement; and

(7) The extent to which the settlement is truly the product of arms-length

bargaining, and not of fraud or collusion.[147]

In addition, where a settlement is presented for approval as part of a plan of

reorganization, it may only be approved where it is *also* "'fair and equitable' in the sense of

conforming to the absolute priority rule."[148]

As a general matter, settlements or compromises are favored in bankruptcy and, in fact,

encouraged.[149]  As the Supreme Court noted in *TMT*:

---

[147]    *Id.* at 462.  *See also Adelphia DoJ/SEC Settlement Decision,* 327 B.R. at 159-60 (citing *In re Texaco*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988)).

[148]    *Iridium*, 478 F.3d at 463.  The Second Circuit explained the difference between the two "fair and equitable" inquiries for the purpose of approving a settlement as part of a chapter 11 plan. The court noted, "[t]he "fair and equitable" analysis using the Rule 9019 factors, however, does not assess whether a plan conforms to the absolute priority rule." *Id*. at 463 n.18.  The court went on to clarify that:

> In the Chapter 11 context, whether a settlement's distribution plan
> complies with the Bankruptcy Code's priority scheme will often be the
> dispositive factor. However, where the remaining factors weigh heavily
> in favor of approving a settlement, the bankruptcy court, in its
> discretion, could endorse a settlement that does not comply in
> some minor respects with the priority rule if the parties to the settlement
> justify, and the reviewing court clearly articulates the reasons for
> approving, a settlement that deviates from the priority rule.

*Id.* at 464.

[149]    *See In re New York, N. H. & H. R.R. v. Smith*, 632 F.2d 955, 959 (2d Cir. 1980) (courts generally favor compromises, as compromises are "a normal part of the process or reorganization" (citing *Case v. Los Angeles Lumber Products Co*., 308 U.S. 106 (1939))); *Purified Down Products* 150 B.R. at 522-523 (settlement approved, noting that approval should not be overturned absent a clear abuse of discretion, which is evidenced by lenient standards which encourage settlement); *In re World Health Alternatives, Inc.,*

> Compromises are a normal part of the process of reorganization. In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.[150]

The decision whether to accept or reject a compromise lies within the sound discretion of the court.[151]

### B. Settlement Analysis

I then turn to the specifics of the Settlement, to determine whether, on the whole, it meets the applicable standards.

### i. Issuance of New Common Stock

The Equity Committee's different view of the Debtors' TEV, discussed above, underlies its most vigorous criticism of the Settlement's reasonableness. I doubt that if, as a premise of the Settlement, the Debtors' TEV were materially understated (and if, as a result, an excessive amount of New Common Stock were issued to satisfy creditor claims), any such settlement could be regarded as reasonable—at least unless outweighed by other aspects of the settlement that would trump the negative aspects of this scenario. The Settlement wouldn't be "fair and equitable" in the first sense in which courts use that expression, or in other words, it wouldn't be in the best interests of the estate; the estate would have given away the store.

And I assume, without needing to decide the issue, that if, as a premise of the Settlement, the Debtors' TEV were understated *at all* (and, if, as a result, creditors were paid more than in full), any such settlement would fail under *Iridium*'s implementation of the second type of "fair

---

344 B.R. 291, 296 (Bankr. D. Del 2006) (settlement approved, noting that settlements are favored, minimize litigation, and expedite administration of the estate).

[150] *TMT,* 390 U.S. at 424.

[151] *See Purofied Down Products,* 150 B.R. at 522 ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and a 'clear abuse of discretion.'").

and equitable" requirement as applied to settlements[152]—that creditors simply can't be paid more than in full.

But neither of those concerns is applicable here, and I can't find the Settlement unacceptable by reason of its TEV underpinnings.  As discussed at extensive length above, I find that the Debtors' TEV *does not* exceed the $2.05 billion enterprise value upon which the Settlement was based.  Accordingly, there's nothing wrong with the Settlement's having provided for an issuance of stock on the assumption that the Debtors' TEV wouldn't exceed that amount.  Basing the Settlement on that premise was entirely reasonable (and not just within the bounds of reasonableness), and was hardly giving away the store.  And because creditors wouldn't be paid more than in full, it would be "fair and equitable" for *Iridium* second-requirement purposes as well.

### ii. Make-Whole and No-Call Provisions

The second most controversial aspect of the Settlement is its allocation of value to bondholders on account of the "Make-Whole" and "No-Call" Provisions in the 2016 and 2026 Notes' documentation, respectively.  Make-whole and no-call provisions in bond indentures protect lenders' right to the yield that was expected at the time that they made their loans, though such provisions sometimes raise concerns, particularly (or, it could be argued, only) when they come at the expense of other creditors.  When a loan is redeemed before maturity or (sometimes) upon default, a make-whole provision requires a borrower to pay a premium to compensate the lender for the loss of anticipated interest that might result—as, for example, the loss that a lender might suffer if the bond were redeemed in an environment where prevailing interest rates are

---

[152]    *See Iridium,* 478 F.3d at 462 (". . . the Supreme Court has held that a settlement presented for approval as part of a plan of reorganization, because it constitutes part of the plan, may only be approved if it, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule.").

lower than those the parties bargained for at the time the bond was issued.[153]  Similarly, a no-call

provision prohibits the borrower from prepaying the indenture obligations at all,[154] again

protecting the lender's yield.

The Settlement provides for an allowed claim of $50 million to holders of the 2016 Notes

to resolve Debtor's potential liability arising from the Make-Whole Provision in the 2016 Notes.

That provision provides:

> At any time and from time to time prior to the Maturity Date,[155] the Company
> may, at its option, redeem all or any portion of the Securities at the Make-Whole
> Price plus accrued and unpaid interest to the date of redemption.[156]

The Make-Whole Settlement Amount is equal to about 42% of the amount that would be

payable if the Make-Whole Provision were found to be enforceable.[157]

In addition, the Settlement provides holders of the 2026 Notes with an allowed claim in

the amount of $20 million to resolve the Debtor's potential liability under the No-Call Provision

in those Notes.  The 2026 Notes Indenture states that the notes may not be redeemed prior to

their stated maturity date.[158]  Unlike the 2016 Notes, the 2026 Notes don't contain a Make-

Whole Provision or a formula for calculating the amount of damages payable if the No-Call

Provision is breached.  But considering the possibility that I or a higher court would award

damages for a breach of the No-Call Provision (and that the damages would be computed using

the formula provided in the 2016 Notes), the parties provided for a No-Call Settlement Amount

---

[153]     *See In re MarketXT Holdings Corp*, 376 B.R. 390, 417 (Bankr. S.D.N.Y 2007) (Gropper, J.).

[154]     *See In re Calpine Corp*., 365 B.R. 392, 397-400 (Bankr. S.D.N.Y 2007) (Lifland, J.) ("***Calpine I***"), *aff'd
with a disagreement as to this issue after the Settlement here was reached*, HSBC Bank USA, N.A. v.
Calpine Corp, 2010 U.S. Dist. LEXIS 96792, 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) (Daniels, J.)
("***Calpine II***").

[155]     The maturity date of the 2016 Notes is June 1, 2016.

[156]     *See* 2016 Notes at A-3 ¶ 5.

[157]     If the 2016 Notes were breached, the related claim would total $119,721,901.48, as calculated on the date
the Disclosure Statement was approved.  *See* Plan at §3.3(f)(i).

[158]     *See* First Supplemental Indenture to the 2026 Notes Indenture at Annex II.

fixed at approximately 39% of the amount that would be payable if damages were awarded for the Debtors' breach of the No-Call Provision.[159]

Thus we have bondholder claims for the Make-Whole Premium, in one case, and for damages for alleged breach of the No-Call Provision, in the other.  The Equity Committee disputes the reasonableness of the settlements of those claims, at 42% and 39% of the claimed amounts, respectively.

The parties seem to acknowledge that the most relevant *Iridium* factor to an assessment of the wisdom of this aspect of the Settlement is each side's likelihood of success in litigation as to bondholder entitlements on those claims. I agree.

When the Settlement between the Debtors, the Creditors' Committee, and the Bondholders' Committee was reached, there were two leading decisions in this district on claims premised on make-whole and no-call provisions in bond indentures.

In *Calpine I*,[160] each of two issues of secured notes (with one having a first priority, and one having a second priority) contained no-call provisions and make-whole provisions in their loan documentation.  In each case, no-call provisions in the documentation prohibited repayment altogether in all but the last two years of the borrowing.  And make-whole provisions in the documentation permitted repayment in the last two years before maturity, but only upon payment of a make-whole premium.  A third issue of secured notes (with a third priority) contained only a no-call provision.[161]

---

[159]    If the 2026 Notes were breached, the related claim would total $50,748,400.26, as calculated on the date the Disclosure Statement was approved. *See* Plan at §3.3(h)(i).

[160]    365 B.R. at 392.

[161]    The first-priority notes matured in 2009.  Their documentation prohibited repayment before April 1, 2007 and required payment of a premium in the case of repayment between April 1, 2007 and their maturity in 2009.  The second-priority notes had a maturity date of 2010.  Their documentation prohibited repayment before April 1, 2008 and required payment of a premium in the case of repayment between after April 1, 2008 and maturity. The third-priority notes prohibited repayment prior to their maturity in 2011.

None of the notes required the payment of a premium in the event of repayment pursuant to acceleration. The debtors in *Calpine I* filed a chapter 11 case, at a time when the no-call provisions in each of those three issues of notes were still in effect. The Debtors sought to replace those three issues of secured notes with postpetition financing, at a lower rate.

Judge Lifland declined to award what would have been in substance specific performance of the no-call provisions, and also ruled that claims for breach of the no-call provisions weren't secured claims. However, he ruled (over the objections of the Debtors and Creditors' Committee) that the no-call provisions would support unsecured claims for expectation damages resulting from the Calpine debtors' breach of them.[162] Judge Lifland calculated the damages based upon the premiums in the make-whole provisions of the first and second priority debt documentation, even though they hadn't yet been triggered, as a useful measure of the resulting loss.

In the second of the two key cases in this district at the time the Settlement was struck, *In re Solutia*,[163] bondholders relying on Judge Lifland's *Calpine I* decision sought similar expectation damages for loss of the future stream of interest payments. But Judge Beatty rejected this claim. First, she found that because the bondholders had provided for an automatic acceleration clause in the indenture, they had chosen to give up their future income stream in favor of having an immediate right to collect. The notes had become fully mature, and because prepayment could only occur *prior* to maturity, Judge Beatty ruled that by definition, there was

---

[162]    *See Calpine I*, 365 B.R. at 399 ("while the agreements do not provide a premium or liquidated damages for repayment during the period the Debtors propose, the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements" (citing *Noonan v. Fremont Financial, (In re Lappin Electric Co.)*, 245 B.R. 326, 330 (Bankr. E.D. Wis. 2000) (McGarity, J.) ("this court is in agreement with a majority of courts that view a prepayment charge as liquidated damages, not as unmatured . . . interest that would be disallowed under section 502(b)(2)"))).

[163]    379 B.R. 473 (Bankr. S.D.N.Y. 2007) (Beatty, J.) ("***Solutia***").

no prepayment.[164]  Second, she found that the bond indenture lacked language requiring the

payment of a premium upon automatic acceleration.  And third, she determined that the

noteholders failed to establish the existence of a no-call provision in the indentures.[165]

　　　　Rejecting the reasoning in *Calpine I*, Judge Beatty stated:

> This Court respectfully disagrees with *Calpine* because it reads into agreements
> between sophisticated parties provisions that are not there.  Perhaps the parties
> negotiated on the subject but were unable to reach an agreement.  It may simply,
> although less probably, be that this subject was overlooked.  In either case, the
> court cannot supply what is absent . . . .  Nothing in the Bankruptcy Code requires
> this court to provide the 2009 Noteholders with *more* than the Original Indenture
> provides.  Put yet another way, they have no dashed expectations for which
> compensation is due.[166]

　　　　Here, neither the 2016 nor 2026 Notes contain make-whole provisions that specifically

address the payment of a premium upon the filing of a chapter 11 case, and the resulting

automatic acceleration to maturity.  As discussed at greater length below, I'd have to make the

decision on more generalized language.  As of the time the Settlement was reached, if the issue

were litigated on the merits, the bondholders would prevail if I were to follow Judge Lifland in

*Calpine I,* or otherwise consider it appropriate to award "expectation damages" for the loss of the

future incremental interest.  Conversely, the bondholders would lose if I were to follow *Solutia*,

or find other reasons for denying them their alleged Make-Whole Premium entitlement or

damages for interest they might earn in the future.  Of course, at the time that the Settlement with

the Bondholders' Committee was entered into, it was impossible to predict with any certainty

which of the two conflicting decisions, *Calpine I* or *Solutia*, I or any appellate courts would

follow, or the extent to which we'd look to authority outside of this district, or our own

---

[164]　　*See id.* at 488.

[165]　　*See id.* at 489.

[166]　　*Id.* at 485 n. 7.  The reference to "dashed expectations" was apparently to provide a contrast to the situation
in *Calpine I*, where similar language was used.  *See* 365 B.R. at 399.

independent analysis, in deciding the bondholders' entitlement to the future interest income that

they'd no longer obtain.[167]

Since the Settlement was entered into, however, two new decisions have come down, one

on each side of the controversy.

In the first of them, *Premier Entertainment Biloxi*, on September 3, Judge Olack rejected

a contention that the make-whole provision there gave rise to a secured claim.[168]  But he ruled

that a breach of the no-call provision would give rise to an unsecured claim.[169]  In a lengthy and

very thorough analysis (too long to discuss in comparable length here), Judge Olack first looked

at the indentures' contractual language; then looked at the New York law on the subject; and

then looked at particular bankruptcy considerations, with extensive consideration of *Calpine I*

and *Solutia*.  Although he ruled that the requisite language was lacking in the documentation

before him to support a claim for the make-whole, he awarded an allowed unsecured claim for

the breach of the no-call.

In the second of the very recent decisions, *Calpine II*, on September 15,[170] Judge Daniels,

at the district court level, differed with the allowance of unsecured claims in *Calpine I,* though he

---

[167]    I say "future interest income" as a shorthand, though I believe that at least under New York law (which is applicable here), the appropriate measure of damages for breach of a no-call provision wouldn't be the total interest that the lenders would secure if there hadn't been early payment, but instead would be only the present value of the difference between (1) the interest income the lender would have earned on the loan through maturity and (2) the interest income that the lender could have earned by making an investment comparable to the loan (*i.e.*, mitigating its damages).  *See Teachers Ins. & Annuity Ass'n of Am. v. Butler,* 626 F.Supp. 1229, 1236 (S.D.N.Y. 1986) (Weinfeld, J.); *Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal,* 791 F.Supp. 401, 415-16 (S.D.N.Y. 1991) (Wood, C.J.); *Teachers Ins. & Annuity Ass'n of Am. v. Coaxial Communs. of Cent. Ohio,* 799 F.Supp. 16, 19 (S.D.N.Y. 1992) (Broderick, J.) (collectively, the "*TIAA Cases*," the first two of which I tried as a lawyer).  *See also Premier Entertainment Biloxi LLC v. U.S. Nat'l Ass'n* (*In re Premier Entertainment Biloxi LLC),* 2010 Bankr. LEXIS 2994, 2010 WL 3504105 (Bankr. S.D. Miss. 2010) (Olack, J.) ("***Premier Entertainment Biloxi***") (citing the *TIAA Cases*).

[168]    *See Premier Entertainment Biloxi,* 2010 Bankr. LEXIS 2994 at *91-*131, 2010 WL 3504105 at *25-*37.

[169]    *See id.,* 2010 Bankr. LEXIS 2994 at *173-*175, 2010 WL 3504105 at *49.

[170]    In *Calpine II,* Judge Daniels did not discuss *Premier Entertainment Biloxi,* which had been decided only 12 days earlier, and it is fair to assume that nobody brought that case to his attention, or gave him the benefit of the *Premier Entertainment Biloxi* analysis.

did not, in so many words, reverse it.[171]  Judge Daniels reasoned that "[b]ecause Debtor's

bankruptcy filing rendered the no-call provision in the notes unenforceable and liability cannot

be incurred pursuant to an unenforceable contractual provision, Debtor did not incur any liability

for repaying the notes."[172]  In addition, he concluded that no payment could be awarded under

the make-whole provisions because they were not yet triggered according to their terms.

Following *Solutia*, Judge Daniels concluded, "[T]he notes could have provided for the payment

of premiums in the event of payment pursuant to acceleration . . . [w]ithout such a provision,

however, no damages are recoverable after acceleration."[173]

      With the *Calpine II* decision having come down, the Equity Committee contends that the

bondholders are not entitled to any damages under the Make-Whole and No-Call Provisions, and

that I should therefore reject the Settlement as unreasonable.  The Equity Committee cites

*Newman v. Stein*, in which the Second Circuit, speaking through Judge Friendly, wrote "it would

be inappropriate for a reviewing court to freeze matters as of the moment at which the parties

entered into an agreement and ignore subsequent developments which either reinforce or

undermine the original decision to settle."[174]

      Accordingly, the *Calpine II* decision must be considered, but so must *Premier*

*Entertainment Biloxi*—especially since neither is binding on me and each should be considered

to the extent, but only the extent, it's persuasive.  But of course, I'm not being asked to decide

the entitlements issues on the merits.  My task here is merely to decide whether, in light of all

---

[171]    *See Calpine II*, 2010 U.S. Dist. LEXIS 96792, 2010 WL 3835200.

[172]    *Id.,* 2010 U.S. Dist. LEXIS 96792 at *12; 2010 WL 3835200 at *4.

[173]    *Id.,* 2010 U.S. Dist. LEXIS 96792 at *14; 2010 WL 3835200 at *4.

[174]    *Newman v. Stein*, 464 F. 2d 689, 696 (2d Cir. 1972).

applicable case law and my own analysis, "the settlement falls below the lowest point in the range of reasonableness."[175]

Determining whether the Make-Whole and No-Call Provisions of the two series of notes would support claims would require at least two layers of analysis. The first layer would involve matters of state law—whether a payment or damages would become due, and, if so, to what extent. This layer, in turn, would present multiple issues. I'd first have to determine, as a matter of contractual interpretation, whether there was a breach of the No-Call or a trigger of the Make-Whole in the first place—looking particularly at the extent to which, under the documents, there would in fact be a prepayment before "maturity" (or whatever the documents make relevant), which would then turn on the extent to which the maturity date (or any other relevant date) could be deemed to have changed as a consequence of the bankruptcy filing, by acceleration or otherwise. If state law triggered a bondholder entitlement, I'd then have to determine the appropriate damages for a violation of the No-Call, and whether, under the Make-Whole, the "punishment fits the crime"—and if it didn't, whether the Make-Whole Premium should thus be wholly disallowed as a penalty, or simply reduced to an appropriate amount.

The second layer would involve the special considerations that apply in bankruptcy cases.

*(a) The State Law Layer*

I turn first to the state law layer, and then to the first state law issue. Since the documentation for the 2016 Notes makes the entitlement to the Make-Whole turn on payment before "the Maturity Date,"[176] we have an issue as to that, based on what I think is some, but not

---

[175]    *W.T. Grant*, 699 F.2d at 608.

[176]    The Make-Whole Provision appeared only in the 2016 Notes, as contrasted to their indenture. It provided:

> At any time and from time to time prior to the Maturity Date, the Company may, at its option, redeem all or any portion of the Securities at the Make-Whole Price plus accrued and unpaid interest to the date of redemption.

much, ambiguity in the documents.  As the 2016 Notes themselves were drafted, "Maturity

Date" was defined as June 1, 2016,[177] and the right to accelerate or to file a proof of claim did

not change that contractual definition.  But the 2016 Notes' related indenture, which at least

seemingly would have to be read together with the Notes themselves, was somewhat different.  It

had separate definitions for "Maturity Date,"[178] "Stated Maturity,"[179] and "Maturity."[180]  The

bondholders would rely on plain meaning doctrine, based on the Notes' definition of "Maturity

Date."  The bondholders' opponents could say that "Maturity Date" as used in the notes

themselves shouldn't be looked at in a vacuum, and that "Maturity Date" was changed by the

separate definition of "Maturity" in the indenture and then by operation of law.

But as a matter of contractual interpretation, I think such an argument would be weak,

and that the bondholders would have substantially the better argument as to this issue.  The

Notes could have made the Make-Whole applicable to payment before "Maturity," but instead

referred to payment before the "Maturity Date."  And it's obvious that the indentures drafters

considered it appropriate to provide separate definitions for these terms.  This, then, would

distinguish the present case from cases like *Solutia*, where the contractual drafting was

inadequate.

The second state law issue would deal with the measure of bondholder entitlement if a

Make-Whole Premium were recoverable.  The 2016 Notes' Make-Whole Provision provided for

---

2016 Notes ¶ 5.

[177]   "Maturity Date" was a defined term, appearing in ¶ 5 as well:  "'Maturity Date' means June 1, 2016."

[178]   *See* Indenture Art. I ("Maturity Date," with respect to the Initial Securities, means June 1, 2016.").

[179]   *See id.* ("Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the payment of principle of such security is due and payable.").

[180]   *See id.* ("Maturity," when used with respect to any Security, means the date on which the principal of such Security or an installment of principal becomes due and payable as provided therein *or in this Indenture*, whether at the Stated Maturity, on a Change of Control Payment Date, or by declaration of acceleration, notice of redemption, notice of option to elect repayment *or otherwise*.") (emphasis added).

a bondholder entitlement based on a fairly complex and inartfully drafted formula.[181]  I don't

have the mathematical expertise to gauge whether this Make-Whole Provision would be the

equivalent of the measure of damages approved in the *TIAA Cases* (or otherwise would be a fair

approximation of the lenders' loss by early repayment), but I'd have a number of questions in

that regard.

First, I'd ask about the mathematical basis for the formula.  The 2016 Notes' Make-

Whole formula at least seemingly doesn't measure the difference in present worth of two

alternate cash flow streams—one based on this borrowing and one based on any alternative

investment in which the bondholders would then reinvest their repayment, even at 50 basis

points over Treasuries.

Second, I don't have the investment banking expertise to determine whether the discount

rate is too low, but I'd also have questions in that regard.  I'd ask whether, as a matter of

discount rate mathematics, choosing a low discount rate would result in a higher present worth—

and, thus, a higher Make-Whole Amount.  And I'd ask whether it's correct to select a discount

---

[181]     In a huge single-spaced block of text, it provided, in relevant part, after I pruned it, hopefully without
deleting essential language (and after reformatting to make it somewhat easier to read):

> "Make-Whole Amount" with respect to a Security means an amount
> equal to the excess, if any, of
>
> > (a) the present value of the remaining interest and principal
> > payments due on Such Security … as if such Security were
> > redeemed on the Maturity Date, computed using a discount
> > rate equal to the Treasury Rate plus 50 basis points, over
> >
> > (b) the outstanding principal amount of such Security.
>
> "Treasury Rate" with respect to a Security means the yield to maturity
> … at the time of the computation of United States Treasury securities
> with a constant maturity… which has become publicly available at
> lease two Business Days prior to the date of the redemption notice …
> most nearly equal to the then remaining maturity of such Security
> assuming that such Security will be redeemed on the Maturity Date….

It then provided, in a proviso, for a mathematical adjustment, using linear interpolation, to deal with any
differences in the average life of the Treasury securities used to determine the discount rate.

rate of only 50 basis points over Treasuries, as I'd wonder whether substitute corporate borrowings would have a materially higher yield.

If my concerns in these respects turned out to be well-founded (though of course I don't know if they would be), I might be reluctant to enforce such a provision as written, as it would at least arguably amount to a penalty, as insufficiently related to the lenders' actual damages. We'd then get to the subsequent issue of whether I should entirely disregard the Make-Whole Provision or cut it down to conform to existing New York law. And I think all of these issues would be subjects of fair debate.

But if, as seems to be the case, the sophisticated parties who agreed to these provisions were trying to approximate the lenders' loss in the event of early repayment, I think I and many other courts would be reluctant to invalidate the Make-Whole Provision (or, especially, to invalidate it in full), unless it turned out to be truly an unjustifiable penalty. And, of course, unless the bondholders' opponents won on every single one of the issues involving the 2016 Notes, the 2016 bondholders would have the better argument—again, as a state law matter—that they're still entitled to a recovery on the Make-Whole Provision, in some meaningful amount.

Slightly different issues would exist with respect to the 2026 Notes, whose documentation is less extensive, and whose damages issues would be subject to only partly similar analysis under state law. The "No-Call" provision in the First Supplemental Indenture to the 2026 Notes Indenture states merely "Optional Redemption: None."[182] But there is no definition of "Redemption" in either the Indenture, Supplement, or Notes. Also, while the 2026 Notes state that the Company "hereby promises to pay . . . the principal sum of 150,000,000

---

[182]    Annex II to the First Supplemental Indenture to the 2026 Notes Indenture.

Dollars on February 1, 2026,"[183] and the 2026 Notes have a materially different definition for

"Maturity,"[184] the No-Call Provision does not tie its applicability to either of those formulations.

These factors, especially taken together, give rise to uncertainties as to how to deal with

the No-Call under state law, since I don't know whether the repayment to which the bondholders

are entitled now can fairly be described, in the absence of more, as "Optional Redemption." On

the 2026 Notes (as contrasted to the 2016 Notes), I believe that, as a matter of state law, the

bondholders might have *Solutia* problems—inadequate drafting to give them the state law rights

they wish to enforce—and it would be the bondholders' opponents who'd have the stronger

argument.[185]

### (b) The Bankruptcy Considerations Layer

The second layer of analysis would require consideration of any claims that were

allowable under state law under the different, and generally more restrictive, requirements of

federal bankruptcy law. I'd have to determine whether the particular provisions of the Code (or,

to the extent applicable, bankruptcy caselaw or policy) would require disallowance of such a

claim even if it might otherwise have validity under applicable nonbankruptcy law.[186]

---

[183]    2026 Notes at 1.

[184]    "'Maturity,' when used with respect to any Security, means the date on which the principal of such Security or an instalment of principal becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise." 2026 Indenture § 101.

[185]    As to the damages on the No-Call Provision in the 2026 Notes, I see no provision in their documentation saying that the remedies for breach are limited to those expressly provided. So I would think that there'd be a pretty good argument that damages for breach of the No-Call Provisions would be recoverable as a matter of state law, presumably under the principles laid out in the *TIAA Cases*. While the Settlement uses the 2016 Notes' Make-Whole Provision as the proxy for the resulting damages, and the Equity Committee questions the propriety of that, the issue a is a debatable one. A similar technique was utilized in *Capline I. See* 365 B.R. at 400.

[186]    A third layer might exist in some cases, though I don't think anyone could seriously argue that it applies here. If a bankruptcy case were filed with the *purpose* (or, arguably, a material purpose) of sidestepping a no-call provision, or to avoid liability for a make-whole, such a circumstance would trouble me, and I think that arguments to disallow claims based on either would be much weaker.

Given that the key cases are in several material respects in conflict, I necessarily can't agree with all of them.  Some of the things that I would care about have been addressed in the cases to date, but others have not been—or have been addressed in less than all of the cases.  I take these in turn.

First, while I don't think anybody could seriously argue that a no-call provision could ever be specifically enforceable in bankruptcy,[187] the extent to which a claim for *damages* for a no-call's breach would nevertheless be sustainable is a very different question.[188]  I'd suggest that it's an overly broad statement of the law, as stated in *Calpine II*, that "[b]ecause Debtor's bankruptcy filing rendered the no-call provision in the notes unenforceable and liability cannot be incurred pursuant to an unenforceable contractual provision, Debtor did not incur any liability for repaying the notes."[189]  While the notion of specific performance is generally repugnant to bankruptcy policy, bankruptcy courts allow claims for damages for breaches of contracts they won't specifically enforce with great frequency.  The *Premier Entertainment Biloxi* court—

---

[187]    *See, e.g.*, Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy,* 15 ABI L. Rev. 537, 563-64 (Winter 2007) ("***Charles & Kleinhaus***") (collecting cases and stating that "the cases . . . agree on one thing: [a] contractual prohibition on prepayment should not be specifically enforced in bankruptcy to *prevent* prepayment") (emphasis in original); *Calpine II*, 2010 WL 3835200 at *3 (quoting *Charles & Kleinhaus* in that regard, though leaving out the seemingly quite important words "to *prevent* prepayment").

[188]    Two sentences after noting the unavailability of specific performance, as quoted in n.187 above, *Charles & Kleinhaus* continued:  "[t]he real issue is whether, when a debtor prepays a loan in the face of no call, the damages resulting from such prepayment should be allowed under the Bankruptcy Code."  *Charles & Kleinhaus*, 15 ABI L. Rev. at 564.  Their article then discussed the "two approaches" in the cases as to that issue.  *Id.*

I think I'd likely ask, at the outset of any oral argument if called upon to decide the merits of the controversy, whether the fact that specific performance is unavailable is irrelevant, and whether the issue of the allowance of a claim for damages must instead be decided on what I'd consider to be more relevant factors, several of which were addressed in *Premier Entertainment Biloxi*, including the circumstances surrounding the early payment, the nature of any acceleration, whether such damages could be regarded as a proxy for unmatured interest, and the relevance of the solvency of the debtor.

[189]    *Calpine II*, 2010 U.S. Dist. LEXIS 96792 at *12; 2010 WL 3835200 at *4.

properly, in my view—did exactly that.  On this issue, I believe that the bondholders would have

by far the better argument.

Second, it's at least arguable that in bankruptcy cases, make-whole premiums and

damages for breach of a no-call are proxies for unmatured interest—and that where unmatured

interest must be disallowed, they likewise should be disallowed.  The cases on this are split.  The

majority view says that they shouldn't be disallowed, and the minority view says that they

should.[190]  Acceptance of the majority view would favor lenders with such provisions, while

acceptance of the minority view would favor estates and the other creditors (and as relevant here,

the Equity Committee).  I personally find analysis in *Charles & Kleinhaus*,[191] which

accompanies its discussion of the conflicting caselaw,[192] rather persuasive, and subject to parties'

rights to be heard, might thus favor the minority view—though (as noted below) I think this

could be relevant only in the case of an insolvent debtor, which we don't have here.  I any event,

I think this issue must be regarded as still open.

---

[190]     *See Charles & Kleinhaus*, 15 ABI L. REV. at 580 ("Most cases to consider the issue have concluded that
claims based on prepayment clauses are *not* claims for unmatured interest. . . . The minority view is that a
claim based on a prepayment fee *is* a claim for unmatured interest. . . . The same logic has been applied to
damages for breach of a no call, which are likewise intended to compensate lenders fully for lost interest
income.") (emphasis in each case in the original).

[191]     As noted there:

> Reading section 502(b)(2) to disallow a claim for unmatured interest,
> but not a claim for the present value of that interest, is difficult to
> defend.  A better reading of section 502(b)(2) is that it disallows
> unsecured claims for interest or its equivalent that are "unmatured" as
> of the *petition date*.  Under that reading, if the right to the present value
> of interest "matures" after the petition date (for example, when a no call
> is breached), section 502(b)(2) could not be avoided by distinguishing
> that right from the right to unmatured interest that existed just before
> the breach.

*Id.* at 581 (emphasis in original).

[192]     *See id.* at 581-82.

Third, though *Premier Entertainment Biloxi* discusses how the allowance of claims for breach of a no-call may be affected by a debtor's solvency,[193] the other cases don't—probably because cases involving solvent debtors are so rare. *Premier Entertainment Biloxi* permits allowance of such a claim under those circumstances, and in a solvent debtor situation, I think there's a good likelihood that other courts will as well. While I, like *Charles & Kleinhaus,* assume "that section 502(b)(2)'s disallowance of unmatured interest is operative"[194] in the much more common chapter 11 cases where the debtor is insolvent, I believe that it's at least strongly arguable, as *Charles & Kleinhaus* states in its following sentence, that "[this] assumption[], as well as other assumptions predicated on the Bankruptcy Court's equitable discretion over the distribution of estate property, [is] not applicable in solvent cases."[195]

The Sixth Circuit has held that in a solvent debtor case, a "bankruptcy judge does not have free floating discretion to redistribute rights in accordance with his personal views of justice and fairness;" rather, "it is the role of the bankruptcy court to enforce the creditors' contractual rights."[196] Similarly, the First Circuit, upholding the award of what it referred to as a "prepayment penalty" from a solvent debtor, has held that "[w]hen the debtor is solvent, 'the bankruptcy rule is that where there is a contractual provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision.'"[197] In an analysis that I once more find persuasive, *Charles & Kleinhaus* note that a distinction should be made between insolvent and

---

[193]     *See Premier Entertainment Biloxi*, 2010 Bankr. LEXIS 2994 at *145-*147, 2010 WL 3504105 at *41-*42 (debtor was solvent, and since, "when a debtor is solvent, bankruptcy courts generally will enforce the debtor's contractual obligations to the extent they are valid under applicable state law," considering solvency as an important factor in determining whether to allow damages for breach of a no-call).

[194]     *Charles & Kleinhaus,* 15 ABI L. Rev. at 582.

[195]     *Id.*

[196]     *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) (internal quotation marks omitted).

[197]     *Gencarelli v. UPS Capital Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007) ("***Gencarelli***") (quoting *Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982)).

63

solvent debtors when enforcing no-call and make-whole provisions.[198]  With a solvent debtor, issues as to fairness amongst creditors, in sharing a limited pie, no longer apply; the allowance of claims under a make-whole provision, or for damages for breach of a no-call, no longer comes at the expense of other creditors.  Thus it's at least arguable, as stated in *Charles & Kleinhaus*, that "[t]he effect of prepayment clauses in solvent cases, therefore, should be an issue of state law alone."[199]  While using a somewhat dated expression—"prepayment penalties"—that I personally wouldn't use, or favor, *Gencarelli* holds exactly that.

And damages for breach of a no-call might be regarded similarly.  These too would in my view be objectionable when the debtor is insolvent and when recovery for such comes at the expense of other creditors.  But those considerations don't apply when the debtor is solvent.

*(c) Summary*

Stepping back to look at all of these considerations at a distance, I think that as matters of state law, the bondholders' position to an entitlement in some amount under the 2016 Notes is stronger than their position on the 2026 Notes, by reason of the better language for the bondholders in the 2016 Notes.[200]  That difference results in a situation where I think that, as a state law matter, the bondholders have somewhat the better of the argument on the 2016 Notes, and their opponents have somewhat the better of the argument on the 2026 Notes.

As matters of bankruptcy law, since we here have a solvent debtor, I think the bondholders are likely to get whatever they're entitled to under state law, on both issues of notes.

---

[198]    *Charles & Kleinhaus*, 15 ABI L. REV. at 582-84.

[199]    *Charles & Kleinhaus* 15 ABI L. REV. at 584.

[200]    I'm not in a position now to conclude that there would be any imperfections in the crafting of the 2016 Notes' Make-Whole Provision, or that if there were any, that they'd make it wholly unenforceable. Arguments as to each of those issues could be made in favor of either position, and I see no side that I'd regard as clearly superior.

Here, the claims on the 2016 Notes' Make-Whole Provision were settled for approximately 42% of their asserted value, and the claims on the 2026 Notes' No-Call Provision were settled for approximately 39% of their asserted value. Obviously, each was at a level of less than 50%—though that might reflect an amalgam of assumptions as to liability and damages.

I don't think settlements at that level were unreasonable when they were entered into, and I especially don't regard them as unreasonable now. Taking into account the new thinking in the area, as articulated in *Calpine II* and *Premier Entertainment Biloxi,* the bondholders' position is, at most, no weaker. The very thorough decision in *Premier Entertainment Biloxi*, if followed by other courts (as I think is likely), helps the bondholders in several respects, especially since it too involved a solvent debtor case. And I don't find *Calpine II* to materially alter the terrain since the Settlement was entered into. Analysis in *Calpine II* as to the effect of the language in the CalGen bonds has limited applicability to the different language here. And as I've noted above,[201] one of the *Calpine II* legal premises is at the least subject to debate.

The Settlement, insofar as it allocates value to satisfy alleged liability on the part of the Debtors on account of the No-Call and Make-Whole Provisions, is well within the "range of reasonableness."

### iii. Other Settlement Components

Other aspects of the Settlement require only brief mention. Settling with the PBGC was entirely sensible. The wisdom of the notion that the Debtors should push their pension funding issues off to another day, and risk a termination of their pension plans by the PBGC, would be debatable, at best, even if I could consider the merits. And if the Debtors had not settled, they

---

[201]    *See* page 61 *supra.*

may well have had to create a huge reserve for satisfying plan termination claims by the PBGC.

But again we consider settlements as to be within or without the range of reasonableness.  And

just as the Debtors did not want to push their leverage up to excessively high levels, their

decision to be responsible, and to work out a mutually satisfactory deal with the PBGC, is hardly

to be faulted—and again, is well within the range of reasonableness.

Similarly, while commitments to pay the legal fees of non-fiduciary creditor groups tend

to fuel the litigiousness of large chapter 11 cases, and while the propriety of commitments of that

character, in the various procedural contexts in which such commitments are made, is still an

open issue,[202] the Settlement was struck in a manner that is inoffensive.  If I later conclude that

those fees may not be paid under a Plan, the Bondholders Committee can seek payment for

"substantial contribution," and I'll be free to rule on such a request, as I see fit, at that time.  The

Debtors' agreement not to oppose a bondholder request for payment, which has substantial

precedent behind it, is particularly inoffensive.

### iv.  Other Iridium Factors

Finally, I'll briefly discuss the less vigorously litigated of the *Iridium* and *TMT* factors.

When the Settlement was originally negotiated, there was certainly reason to believe that

if the Settlement was not approved, protracted litigation would result.  That was the case then,

and it still is the case now.  In light of the amount of money at stake, which is potentially

upwards of $150 million in the case of the No-Call and Make-Whole claims, there is no reason to

believe that these claims would be abandoned by bondholders, especially with their ability to

rely on *Calpine I,* to question one of the two underpinnings of *Calpine II,* and to rely on a well-

reasoned analysis in *Premier Entertainment Biloxi*.  If the Debtors continued to litigate those

---

[202]    I have that issue *sub judice* in the *Adelphia* cases.

issues, they would need to remain in chapter 11, incurring several millions of dollars in administrative expenses each month, or could emerge from chapter 11 only after having tied up huge sums in a reserve pending the resolution of those claims.

While it is not clear to me that ruling on bondholder entitlements would require an evidentiary hearing, the legal issues by themselves are many and complex, as the lengthy decision in *Premier Entertainment Biloxi*, which addresses them on the merits, graphically demonstrates. Dealing with them would be expensive and time-consuming.

Another *Iridium* factor calls upon the court to consider the parties and proportion of class members that support or oppose the settlement. But this factor, which has its origin in nonbankruptcy litigation (and particularly the review of class action settlements, which usually focus on fairness to the plaintiff and class member communities, as contrasted to the defendant putting value on the table), has limited applicability in bankruptcy cases. In the latter, we bankruptcy judges nearly always see diverse constituencies fighting over their respective recoveries, in what often is a zero sum game. Though more than a few settlements by chapter 11 debtors help constituencies across the board, others not infrequently tend to favor, as a practical matter, one constituency or another. In those cases, it is natural that some constituencies will like the settlement, and others will not. As I noted in one of my *Adelphia* decisions,[203] when considering this factor in approving the Debtors' settlement with the SEC and Department of Justice, which was favored or unopposed by some constituencies but opposed by others:

> [I]n my view, the approval of a settlement cannot be regarded as a counting exercise. Rather, it must be considered in light of the *reasons* for any opposition, and the more fundamental factors-such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk-described above. That is particularly so in cases like this one where a debtor's board is the fiduciary for *all* parties in interest, who naturally have competing interests with respect to limited

---

[203]    *Adelphia DoJ/SEC Settlement Decision*, 327 B.R. at 143.

> assets that are insufficient to satisfy everyone's needs and concerns.  In such cases, where the settlement proponent is trying to maximize value for all, or to minimize risk for all, concerns of that character plainly trump the head count in support.[204]

It is no more logical to place material reliance on the Equity Committee's opposition than it would be to rely on the Creditors' Committee's and Bondholders' Committee's support—or vice versa.  This factor has no material bearing on the reasonableness of the Settlement here.

Another factor is the competence and experience of the counsel who support the Settlement.  No argument has been made, nor could any argument be made, that the counsel who put the Settlement together were anything less than highly skilled in their craft, and knowledgeable in the considerations underlying a settlement of this character.

The breadth of the releases, another *Iridium* factor, is not a material factor in the analysis of this Settlement.  And as discussed below, the Plan contemplates that to the extent that I have any problems with the releases, they'll automatically be fixed.

Most or all parties in this case—including, I think even the Equity, will benefit from the Settlement.  Though the Equity Committee objects to it, it is hardly clear to me that Equity would do better if the bondholders' claims were litigated.  If the bondholders prevailed, Equity would be the victim.

Finally, I find that the Settlement was truly the product of arms-length bargaining, and not fraud or collusion.  It passes all of *Iridium*'s requirements easily.

### 3.  Other Objections

#### A.  Good Faith

Section 1129(a)(3) of the Code provides that a reorganization plan must be "proposed in good faith and not by any means forbidden by law."  The proponent of confirmation bears the

---

[204]    *Id.* at 165 (emphasis in original).

burden of proof by a preponderance of the evidence.[205]  Good faith is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[206]  A plan is proposed in good faith only if it has "a legitimate and honest purpose to reorganize the debtor."[207]

Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances,[208] and the requirement of Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan."[209]  "The bankruptcy judge is in the best position to assess the good faith of the parties' proposals."[210]  I find the good faith requirement to have been satisfied in this case.

The Plan has been proposed by the Debtors, the Creditors' Committee, and the Bondholders' Committee.  Although the Equity Committee does not support the Plan, I find that the Debtor's negotiated honestly and at an arm's length, including with the Equity Committee, in an effort to create a confirmable plan that would satisfy all parties.

I also find that the Debtors were flexible and responsive to the Equity Committee's concerns.  In my July 21 decision on the Equity Committee's Motion to Terminate Exclusivity ("**Exclusivity Termination Decision**"), I noted that the Debtors met with the Equity Committee on more than 20 occasions and nearly reached an agreement with the Equity Committee on a confirmable plan in May 2010.  As explained by Mr. Forsyth, it was not until the Equity

---

[205]    *In re Quigley Co., Inc.* 2010 WL 3528818, *12 (Bankr. S.D.N.Y. 2010) (Bernstein, J.).

[206]    *Matter of Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir. 1984) (internal quotations omitted); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.* 354 B.R. 1, 7 (D. Conn. 2006) ("**Mercury Capital**").

[207]    *Mercury Capital*, 354 B.R. at 7 (quoting *In re Elsinore Shore Assoc.,* 91 B.R. 238, 260 (Bankr. D.N.J. 1988)) *accord Kane v. Johns-Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988) ("The good-faith test means that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected.").

[208]    *See In re Jasik,* 727 F.2d 1379, 1383 (5th Cir. 1984) ("**Jasik**").

[209]    *In re Bush Industries, Inc.,* 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004).

[210]    *Jasik,* 727 F.2d at 1383.

Committee determined not to proceed on that agreement, as discussed at a June 3 meeting, that the Debtors reached an agreement with the Creditors' and Bondholders' Committee to put forward the current Plan. I found that these events "in the aggregate . . . demonstrate a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies in this case, most certainly and including the equity."[211] The Equity Committee does not now contest the willingness of the Debtors to negotiate with it, and the fact that the Debtors and Equity Committee did not reach an agreement in the end does not indicate a lack of good faith.

I also find that Debtors' management cooperated with the Equity Committee in its effort to market Chemtura. The Debtors negotiated and signed non-disclosure agreements with 7 potential investors. Senior management of the Debtors met with two significant investors on two separate occasions in June and later provided them with information and answered their follow-up questions.

During the course of this bankruptcy, the Debtors negotiated and reached agreements with many other parties, such as state and federal environmental regulators and Diacetyl claimants. The settlements, many of which I've already approved, are indicative of the Debtors' genuine efforts to reach consensual resolutions with other parties in interest. Moreover, the fact that the Debtors negotiated and settled so many claims after they believed Chemtura to be solvent is further evidence of real efforts made by the Debtors to maximize the recovery to Equity.

The Debtors were unwilling to support an alternative plan by the Equity Committee because they believed that it would place too much debt on the reorganized Debtors. The Equity

---

[211]    Tr. of Hg. of July 21, 2009, ECF # 3415, at 75.

Committee has argued that the Debtors' desire to emerge quickly and with a low leverage plan

became the only real factor that they considered in negotiating a plan.  But I find that it was

reasonable for management to be interested in confirming a plan that, in its business judgment,

had sufficiently low leverage to allow for a successful reorganization.  As I noted in the

Exclusivity Termination Decision, and as the past two years have demonstrated, "…even healthy

companies can be materially affected by substantial debt loads, especially secured debt loads."[212]

As all settlements require compromise on both sides, the fact that the Debtors were willing to

provide concessions to garner support for their low-leverage plan does not preclude a finding of

good faith.

### B. Releases and Exculpation

The Equity Committee also objects to third-party releases, and possibly, similar

exculpation provisions in the Plan, in each instance, under which parties other than the

Debtors—Equity, for example—would release claims against entities other than the Debtors

themselves.[213]  I agree with the Equity Committee's underlying concerns in this regard; the

releases are plainly impermissible under the applicable caselaw, including, most obviously, the

Second Circuit's decision in *Metromedia*[214] and my earlier decision in *Adelphia*.[215]  But as the

Plan has "self-correction" features,[216] the deficiencies don't make the Plan unconfirmable.  They

---

[212]    Tr. of Hg. of July 21, 2009, ECF # 3415, at 90.

[213]    Here the "Released Parties" include the Debtors' officers and directors, the Creditors' Committee, the Bondholders Committee, the bonds' indenture trustees, the DIP facility agent and lenders, the PBGC, and professionals and employees for each of them.  See Plan Section 11.3.

[214]    *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136 (2d Cir. 2005) ("*Metromedia*").

[215]    *See In re Adelphia Communications Corp.,* 368 B.R. 140, 266 (Bankr. S.D.N.Y. 2007), *stay temporarily granted*, 361 B.R. 337 (S.D.N.Y. 2007), *appeal dismissed,* 371 B.R. 660 (S.D.N.Y. 2007), *aff'd,* 544 F.3d 420 (2d Cir. 2008) ("*Adelphia Confirmation Decision*").

[216]    *See* Plan Art. 11.3 ("As of the Effective Date, *to the extent permitted by applicable law . . .*") (emphasis added).  This language was added to Article 11.3 (the "third-party releases") in the Debtors' Technical Amendments to the Plan, ECF # 3984.

merely require that the releases be limited to "the extent permitted by applicable law" —which

means, as a practical matter, that they be declared unenforceable.  I so declare, and the

confirmation order must so state.

Whether they're called "exculpation provisions" (principally dealing with the post-

petition period) or "third-party releases" (applying more broadly), the challenged provisions here

are in a now-familiar pattern, which we see in nearly every chapter 11 case.  Like those that I

addressed in my earlier decisions in *Adelphia* and *DBSD*,[217] the provisions here involve claims

owned by third parties (*e.g.,* stakeholders in the case, including holders of equity), against other

third parties (*e.g.,* other stakeholders), against whom the former may have grievances.  As I

noted in *DBSD*, exculpation provisions are included so frequently in chapter 11 plans because

stakeholders all too often blame others for failures to get the recoveries they desire; seek

vengeance against other parties; or simply wish to second guess the decisionmakers in the

chapter 11 case.[218]  Third-party releases, though perhaps to a lesser degree, have a similar

purpose.

But as I also noted in *DBSD*, though exculpation provisions have a salutary purpose, that

salutary purpose is insufficient by itself to make them proper as a general rule.  The same is true

---

There is no analogous language in Article 11.6 (the "exculpation" provisions) of the Plan.  However, Article 15.9 (the "**Severability Clause**"), which applies to all articles of the Plan, provides an alternative means of self-correction for the exculpation provisions.  It states:

> If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. . . .

Plan Art. 15.9.

[217]    *See DBSD,* 419 B.R. at 217-19.

[218]    See *id.* at 217.

with respect to third-party releases.  As the Second Circuit's decision in *Metromedia* and my

earlier decision in *Adelphia* clearly provided, exculpation provisions (and their first cousins, so-

called "third party releases") are permissible under some circumstances but not as a routine

matter.  They may be used in *some* cases, including those where the provisions are important to a

debtor's plan; where the claims are "channeled" to a settlement fund rather than extinguished;

where the enjoined claims would indirectly impact the debtor's reorganization by way of

indemnity or contribution; where the released party provides substantial consideration; where the

plan otherwise provides for the full payment of the enjoined claims; or where creditors consent.

But we have none of those circumstances here.  While in *DBSD*, I upheld some of the releases

based on creditor consent, I did so on a factual record where creditors' ballots gave them the

opportunity to opt out of the releases and they did not do so.  And I disallowed them, for the

most part, where the requisite consent was lacking.[219]

The Plan Supporters have not seriously contended here that these releases may be upheld

based on consent.[220]  Rather, they have made what in substance was the same argument I

considered and rejected in *Adelphia*—that they should get them because of the benefits of the

settlement, supposedly extraordinary efforts in reaching a deal, or give-ups as part of that deal.

Here, as in *Adelphia*, what we saw was simply what chapter 11 contemplates.  As I held in

*Adelphia*:

> The "give-ups" that parties made were of rights to recover that were subject to fair
> debate. In the case of creditors, even those that are Settling Parties, they were
> merely striking the kinds of deals with respect to their shares of the pie that
> chapter 11 contemplates.  I don't doubt that in this case the Settling Parties

---

[219]    *See id.* at 218.

[220]    But *cf.* Debtors Br. at 73 (because "most" holders of claims will receive payment in full, and because this
will be a "nearly" consensual plan, third-party releases are proper with respect to "these holders" of claims
because they are being made whole under the Plan, and their votes in favor of the Plan "effectively indicate
their consent" to the releases).

engaged, as the Plan Proponents argue, in "tireless efforts" to come together to work out a global compromise aimed at resolving these cases.  But that's not unique.  It's something creditors have to do in every chapter 11 case, at the risk of destroying themselves (or their recoveries in the case) with their own quests for incremental recoveries.[221]

Similarly, the releases don't become acceptable because they were part of the Global Settlement.  I dealt with this too in *Adelphia*.  In language as applicable here as it was then, I said:

> Nor can I accept the notion that the releases pass muster under *Metromedia* because the Settling Parties elected to make them an element of their deal.  First, of course, they provided that their releases and exculpation would remain only to the extent permissible under applicable law—fully recognizing, it appears, that their enforceability was at least debatable. But even if they had not, I could not approve them.  It would set the law on its head if parties could get around it by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even "an important part" of the reorganization. [222]

Thus, I can't approve these exculpation provisions and third-party releases.  However, as noted, the Plan as drafted provides for two applicable safety valves,[223] and that makes the Plan confirmable notwithstanding the deficiencies.  Thus I cut back on the scope of the releases, but find that their deficiencies do not bar confirmation of the Plan.[224]

However, I recognize here, as I did in *Adelphia*, the legitimate needs and concerns of parties to seek protection from frivolous claims of other stakeholders.[225]  The parties in this case already should have substantial peace of mind in that regard, because, as in *Adelphia* and most

---

[221]    *Adelphia Confirmation Decision*, 368 B.R. at 268-69.

[222]    *Id.* at 269.

[223]    *See* Plan Arts. 11.3 and 15.9, discussed *supra* n.216.

[224]    The Equity Committee also contends that releases given by the Debtors of claims the Debtors themselves own—most significantly, any they might have against their management—are inappropriate.  Here I disagree.  No potential claims were identified.  Debtors may release claims they themselves own.  *See Adelphia Confirmation Decision,* 368 B.R. at 263 n.289*; Oneida Ltd.,* 351 B.R. at 94 n.21.  Irrespective of whether the release of claims of that character is governed by a best interests of the estate or merely a business judgment standard, I see no basis for finding such releases to be inappropriate.

[225]    *See Adelphia Confirmation Decision,* 368 B.R. at 263 n.289.

74

cases, "the great bulk of any claims would at least seemingly belong to the *Debtors,* and not

individual creditors, and the *Debtors* undisputedly could, and will, release any such claims. And

targets of litigation will also have the benefit of *res judicata.*"[226]

But consistent with my ruling in *Adelphia*, I'll include a provision in the Confirmation

Order, if such is desired, providing (subject to any subject matter jurisdiction limitations) for

exclusive jurisdiction in this Court to consider any claims concerning matters for which the

released parties might wish protection to the extent that they involve the administration of the

estates during the course of these chapter 11 cases, or my earlier rulings and orders in these

cases.  I'll be able to tell the difference between legitimate claims, on the one hand, and

harassment, retaliation, or frivolous litigation, on the other.  Any claims hereafter brought will

not be released in advance, but they will be subject to Rule 9011.

### C.  Dissolution of Equity Committee

The Equity Committee also raises an objection to Article 15.3 of the Plan,[227] which

provides, in substance, for dissolution of the Equity Committee on the Effective Date.[228]  The

Equity Committee argues, partly expressly and partly impliedly, that this could be used to deny it

standing in future proceedings, most significantly in connection with any appeal from the

---

[226]      *Id.*

[227]      Pruning it to include on the most relevant clauses, Article 15.3 provides:

> On the Effective Date, the Creditors' Committee and the Equity
> Committee shall dissolve, except: . . . (i) to the extent that Class 13a for
> Chemtura Corporation has voted to reject the Plan, with respect to the
> resolution of applications for Accrued Professional Compensation and
> all disputes regarding allowance of Disputed Claims . . .  On the
> Effective Date, subject to the proviso above, the members of the
> Creditors' Committee and the Equity Committee shall be released and
> discharged from all rights and duties from or related to the Chapter 11
> Cases.

Plan Art. 15.3.

[228]      While in its Objecting Brief, the Equity Committee misspoke in its main text and referred to the
"confirmation date" (Equity Comm. Obj. Br. at 51), it got it right when it quoted the relevant portion in the
footnote quoting the provision, and the issue is almost as relevant when one speaks of the Effective Date.

Confirmation Order.  The Debtors respond (after discussing largely immaterial matters) that "[t]he Plan does not preclude any Equity Holder, as a party in interest in the Chapter 11 Cases, from pursuing an appeal from an order approving confirmation of the Plan, it merely provides that the estates are not required to fund that appeal."[229]

I well understand the Debtors' desire not to fund any appeal.  Bankruptcy judges are painfully familiar with the litigiousness of large bankruptcy cases, fueled in material part by the phenomenon (present especially with official committees, but also with *ad hoc* committees who look to estates for the payment of their fees) that those whose fees are paid by someone else have no incentive to keep costs under control, or to bring the litigiousness to an end.

But the Debtors' silence is deafening with respect to a disclaimer of any future effort to deny the Equity Committee standing on appeal after the Plan goes effective.  If the Debtors never intended that, they could have said so much more clearly.  While the Debtors should be free to make the obvious mootness arguments (and I have every expectation that they will), I think that trying to contend that the Equity Committee no longer exists, and thus to deny the Equity Committee its section 1109 standing, would go too far.[230]  If plan proponents or supporters intended to deprive the Equity Committee of appellate standing, it would raise issues under Code sections 1129(a)(1), (2) and (3).

I therefore agree with the Equity Committee that Plan Article 15.3, if not cleaned up, is objectionable.  But though I find fault with this provision, as mentioned above, the Plan provides for a self-correcting mechanism, and as a result, is still confirmable.  The Severability Clause of

---

[229]    Debtors' Reply Br. at 47.

[230]    The Debtors quote my *Adelphia* confirmation decision, 368 B.R. at 276, suggesting that it would support their position here.  But a review of the decision of the district court in that case, *see* 371 B.R. at 663 n.2, reveals the presence of a later consent order providing that "notwithstanding provisions of the Plan providing for the Equity Committee's termination, the Equity Committee shall remain in existence for several limited purposes, including the prosecution of its appeal of the Confirmation Order" —addressing the concern I have here, and providing for what I'll insist on here.

Article 15.9 of the Plan, already voted on by stakeholders, empowers this Court, before

confirmation, to amend any provision of the Plan to make it valid or enforceable.[231]  For these

reasons, Article 15.3 can and must be cured by adding one or more provisos to the Plan and

confirmation order providing, in substance (similar in material respects to the *Adelphia* consent

order):

> *provided* that notwithstanding any provisions of the Plan or confirmation order
> providing for the Equity Committee's termination, the Equity Committee shall
> remain in existence to the extent necessary for the prosecution of any appeal of
> the Confirmation Order; but *provided further* that nothing in the Plan or
> confirmation order, or by reason of the preceding proviso, shall obligate the
> reorganized debtors or any other party in interest to pay any legal fees or expenses
> incurred by the Equity Committee in connection with such efforts.[232]

### 4.  Miscellaneous Objections

I don't think I should lengthen this decision further by specifically addressing any of the

other objections that were raised on this motion, such as that by equity holder Interlachen

Investcorp., which objects to an incentive plan that was agreed to by the other stakeholders

(saying it unduly prejudices Equity) and argues for a plan that would provide for greater

leverage.[233]  I've canvassed them and satisfied myself that no material objections other than

those I've specifically addressed were raised and have merit.  To the extent those objections were

not expressly addressed in this decision, they're overruled.

## Conclusion

For the foregoing reasons, the Plan will be confirmed, if amended in accordance with

Sections 3(B) and 3(C) of the Discussion in this Decision.  An amendment to the Plan to meet

the requirements of Section 3(C) will not require resolicitation.  The Debtors are to submit for

---

[231]    See *supra* n.216, quoting the Severability Clause of Plan Article 15.9.

[232]    I'd have no objection to any reasonable modifications of that language, so long as consistent with its
purpose.

[233]    *See* Interlachen Investcorp. Confirmation Obj. Br., ECF # 3848.

my consideration and signature a separate confirmation order, and they may, if desired, also submit Findings of Fact and Conclusions of Law (either free-standing or as part of the confirmation order) supplementing those in this Decision so long as they're not inconsistent with it.

The time to appeal from the resulting confirmation order will run from the time of its entry, and not from the time of entry of this Decision.

Dated: New York, New York            _s/Robert E. Gerber_____
       October 21, 2010              United States Bankruptcy Judge