UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHEMTURA CORPORATION, *et al.*, | ) |  |
|  | ) | Case No. 09-11233 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

BENCH DECISION[1] ON SIX FORMER EXECUTIVES'
OBJECTIONS TO DEBTORS' MOTION FOR AN ORDER
AUTHORIZING TERMINATION OF RETIREE
MEDICAL AND DENTAL BENEFITS

APPEARANCES:

KIRKLAND & ELLIS, LLP
Attorneys for Debtors and Debtors-in-Possession
Citigroup Center
153 East 53rd Street
New York, NY 10022

BY:   M. Natasha Labovitz, Esq.
      Craig A. Bruens, Esq.

AKIN GUMP STRAUSS HAUER & FELD, LLP
Counsel for Official Committee of Unsecured Creditors
One Bryant Park
New York, NY 10036

BY:   Meredith A. Lahaie, Esq.

---

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where time or other circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have fewer citations and other footnotes, and have a more conversational tone.

MCKOOL SMITH
Attorneys for Vincent A. Calarco
One Bryant Park
47th Floor
New York, NY 10036

BY:     Peter Goodman, Esq.

NEUBERT, PEPE & MONTEITH, P.C.
Attorneys for Peter Barna
195 Church Street
13th Floor
New Haven, CT 06510

BY:     Douglas S. Skalka, Esq.

ROBINSON BROG LEINWAND GREENE
   GENOVESE & GLUCK P.C.
Attorneys for Charles Marsden
1345 Avenue of the Americas
New York, NY 10105

BY:     Robert R. Leinwand, Esq.

ZEISLER & ZEISLER, P.C.
Attorneys for Gerald Fickenscher
558 Clinton Avenue
Bridgeport, CT 06605

BY:     Kellianne Baranowsky, Esq.

O'KELLEY & FALLER, P.C.
Attorneys for Karen Osar
445 Hamilton Avenue
Suite 405
White Plains, NY 10601

BY:     Robert J. Faller, Jr.

JOHN T. FERGUSON, PRO SE
9 Beacon Place
Daufuskie Island, SC  29915

By:     John T. Ferguson, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this contested matter in the jointly administered chapter 11 cases of reorganized debtor Chemtura Corporation and its affiliates (collectively, the "**Debtors**"), the Debtors moved for entry of an order authorizing the modification or termination of five "other post-employment benefit" plans ("**OPEB Plans**")—referred to (often by reason of their origins) as the Uniroyal Non-Union Plan, the Sistersville Plan, the Sherex Plan, the Witco Plan, and the Executive Plan—each of which contained provisions providing, in substance, that the employer reserved the right to modify or terminate the plan at will.

The motion was granted for those who did not object or appear in court, and was taken under advisement for six former employees (most or all of them senior executives) who appeared or filed objections:

> (1) Charles J. Marsden, Chemtura predecessor Crompton Corporation's Vice President of Finance, and later Senior Vice President of Strategy and Development;
>
> (2) Gerald H. Fickenscher, who was employed in "different [otherwise unstated] capacities by the Debtor and its predecessors," and whose exact position was not apparent from the motion papers (except to note that he was sufficiently senior to be one of the eight senior executives who received the special benefits of the "Senior Executives' Supplemental Benefits Plan," discussed below);
>
> (3) Vincent A. Calarco, former Crompton Chairman, President, and CEO;
>
> (4) Peter Barna, Crompton's former CFO;
>
> (5) John T. Ferguson, Crompton's general counsel and later Senior Vice President of Legal Affairs; and

-1-

(6) Karen Osar, whose former position likewise does not appear in any of the documents presented to me (collectively, the "**Objecting Executives**").

For the most part, the Objecting Executives generally contended that provisions in documents or plans applicable to small numbers of the Debtors' highest ranking executives or to them personally made their situations unique, giving them rights beyond those available to the Debtors' rank and file and other executives. The Objecting Executives and the Debtors were thus provided with the opportunity to submit to me the bundles of documents that defined the Objecting Executives' personal rights, and upon which the Objecting Executives contended that they should be carved out from the order granting the Debtors' motion.[2]

Upon review of those documents, I determine that with respect to the Objecting Executives, the motion must be granted in part and denied in part. While each of them remained subject to plan provisions under which the Debtors reserved the right to modify or terminate their benefits, some had entitlements to which the general reservation of rights did not apply. With respect to the latter, as discussed below, the Debtors will have to comply with section 1114 of the Bankruptcy Code if they wish to disavow them.

My Findings of Fact and Conclusions of Law in connection with these determinations follow.

---

[2] Two others, William Stephenson and Edward L. Hagen, who were covered under the Uniroyal Plan, but who offered no evidence of any unique arrangements, also objected, but to the extent their objections were not already overruled, they must be, as that Plan reserved management's right to modify or terminate, and they offered no evidence of any agreements that would arguably support a contrary conclusion.

-2-

Facts

*1. Background*

The Debtors have provided OPEBs—in this case, medical and dental benefits[3]—to retirees, their spouses and dependents (collectively, "**Retirees**"), under plans originally put in place by three of their predecessor companies, Uniroyal Chemical Company, Inc. ("**Uniroyal**"), Witco Corporation ("**Witco**") and Crompton & Knowles ("**C&K**"). The Debtors' contend, and no factual allegations to the contrary have been made, that each plan's document and respective summary plan description ("**SPD**") expressly reserved the employer's unilateral right to modify or terminate the named benefits. Each of the Objecting Executives here was covered under an underlying plan that expressly reserved the employer's right to terminate or modify it.

But four[4] of the six Objecting Executives here (all at least seemingly more senior than the Debtors' executives generally) also received benefits under another contractual arrangement (or, assertedly, a plan), the "Supplemental Medical and Dental Plan for Executives of Crompton Corporation" (the "**Senior Executives' Supplemental Benefits Plan**"), put in place in 2003— which, as its name suggests, provided medical and dental benefits to supplement the benefits

---

[3]   The Debtors here, as others have done, used Human Resources and/or ERISA jargon in their motion instead of getting more directly to the point and describing the benefits in question more directly. *See In re Delphi Corp.*, No. 05-44481, 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009) (Drain, J.) ("***Delphi***"). The underlying issue here, as in *Delphi*, is better understood without using OPEB jargon:

> I have before me a motion by the debtors in this case for authority under Section 363(b) of the Bankruptcy Code to modify, in various significant measures, what they refer to as "OPEB" but what also can be described as welfare plans, including health and insurance plans, under ERISA. The debtors take the position that notwithstanding that the subject matter of these plans involves reimbursing or providing for the reimbursement of "payments for retired employees and their spouses and defendants, for medical, surgical or hospital care benefits, or benefits in the event of sickness, accident, disability or death," that their request need not, and in fact should not, be governed by Section 1114 of the Bankruptcy Code. The language I was quoting appears in Section 1114(a), which defines, for purposes of Section 1114, the term "retiree benefits."

*Id.* at *1.

[4]   Calarco, Barna, Ferguson, and Fickenscher.

-3-

under other plans. A fifth Objecting Executive[5] retired while covered under an earlier plan, dated April 6, 1999 (the "**1999 Senior Executives' Supplemental Benefits Plan"),** which was similar in relevant respects to the Senior Executives' Supplemental Benefits Plan. Additionally, five of the six Objecting Executives entered into separation agreements that were at least to some extent custom-tailored, and as to which arguments could be made that special personalized benefits were provided.[6]

*2. The Senior Executives' Supplemental Benefits Plan*

The Senior Executives' Supplemental Benefits Plan, which covers Calarco, Barna, Ferguson, and Fickenscher, does not mention procedures or standards for amending that plan. But it makes reference to two underlying plans, the "Crompton Corporation Medical Expense Plan" (the "**Crompton Medical Plan**") and the "Crompton Corporation Dental Expense Plan" (the "**Crompton Dental Plan,**" and together with the Crompton Medical Plan, the "**Crompton Benefits Plans**"), under each of which the employer retained the right to unilaterally modify or terminate the benefits provided.

The Senior Executives Supplemental Benefits Plan provided, in relevant part, with respect to supplemental medical coverage:

> [1] Upon retirement as approved by the company or at
> retirement at age 62, the Plan will provide continued
> coverage as under the Crompton Corporation Medical
> Expense Plan until the participant is Medicare eligible.
> [2] The Plan will also cover out of pocket expenses not
> paid under the continued Crompton Corporation Medical
> Expense Plan.  [3] At the time the participant becomes
> Medicare Eligible, the participant must enroll in Medicare
> and the Supplemental Plan will cover medical expenses not

---

[5] Marsden.

[6] The sixth, Marsden, who was the first to retire, received a personalized letter describing the benefits that he would receive.

>   paid by Medicare to a maximum of $20,000 per calendar
>   year per person.[7]

It provided, in relevant part, with respect to supplemental dental coverage:

>   [1] Upon retirement as approved by the company or at
>   retirement at age 62, the Plan will provide continued
>   coverage as under the Crompton Corporation Dental
>   Expense Plan until the participant is Medicare eligible.
>   [2] The Plan will also cover out of pocket expenses not
>   paid under the continued Crompton Corporation Dental
>   Expense Plan. [3] At the time the participant becomes
>   Medicare Eligible, the participant must enroll in Medicare
>   and the Supplemental Plan will cover dental expenses not
>   paid by Medicare to a maximum of $2,500 per calendar
>   year per person.[8]

In each case, Sentence 1 stated that the Senior Executives' Supplemental Benefits Plan would provide continued coverage "*as under* the Crompton Corporation Medical [or Dental] Expense Plan."[9] That language did not appear in Sentence 2 or Sentence 3.

*3. Individual Separation Agreements*

The separation agreements that were executed for each of the objecting Executives varied in some respects, and as a result I'll address them individually.

*(1) Marsden*

Charles J. Marsden retired from Crompton in January 2001. He was Vice President of Finance, and thereafter Senior Vice President of Strategy and Development. He was the first of

---

[7]   I've added bracketed numbers to refer to the separate sentences within the quoted language, and will refer to them as "**Sentence 1**," **Sentence 2**," and **Sentence 3**," respectively. As the provisions with respect to dental coverage don't differ in material respects, I'll only occasionally burden the discussion by separate mention of dental benefits.

[8]   The 1999 Senior Executives' Supplemental Benefits Plan, applicable to Marsden, contains the same Sentence 1, Sentence 2 and Sentence 3 with respect to medical benefits, though it does not provide for dental benefits after retirement.

   Marsden at least seemingly approved the document under which he now claims benefits, being one of three individuals who signed it under the words "Description of Plan Approved on April 6, 1999." The significance of the signatures by Marsden and the two others who did likewise was not fleshed out in the papers. Though that fact, if not satisfactorily explained, might be troublesome, I don't need to address it, in light of the discussion of Marsden's situation that follows. *See* page 9 below.

[9]   Senior Executives' Supplemental Benefits Plan (emphasis added).

the Objecting Executives to leave the Debtors, and retired before the issuance of the Senior Executives' Supplemental Benefits Plan, discussed above. Rather he was a beneficiary of the similar 1999 Senior Executives' Supplemental Benefits Plan, discussed above.[10]

In January 2002, Marsden was sent a letter by a Crompton Senior Vice President "with information relative to the benefits that are available to you because of your retirement from Crompton Corporation." The letter said, among other things, that Marsden's "current health coverage (including the executive medical and dental programs [*i.e.*, the predecessor version of the Senior Executives' Supplemental Benefits Plan]) will continue into retirement, and will be provided by the company at no cost to you."[11] Significantly, the letter further stated, expressly, that:

> These programs may be altered from time to time, or may be terminated by the company.[12]

*(2) Fickenscher*

Gerald Fickenscher retired from Crompton effective August 31, 2003. The documents he and the Debtors submitted on this motion did not specify his exact position at the time of his retirement, but he was one of the eight select executives who were covered under the Senior Executives' Supplemental Benefits Plan, discussed above, which had been put in place at some time during that same month. A letter agreement dated October 28, 2003 and countersigned by Fickenscher about a month later (and apparently retroactive to the August 31 retroactive date set forth in the letter agreement) described the benefits Fickenscher would receive upon retirement.

The letter agreement provided, among other things:

---

[10]   *See* page 4 above.

[11]   Happel 1/4/02 Ltr. to Marsden at 1-2.

[12]   *Id.* at 2.

-6-

> Effective September 1, 2003, you are eligible to participate
> in the Supplemental Medical and Dental Plan for
> Executives of Crompton Corporation in accordance with
> the terms of such plan, a copy of which is attached hereto
> as Attachment 2 and incorporated herein by reference.[13]

*(3) Calarco*

Vincent A. Calarco retired from Crompton effective June 30. 2004. He was previously Crompton's Chairman, President and CEO. In that capacity, he was one of the eight select executives who were covered under the Senior Executives' Supplemental Benefits Plan, discussed above.

A letter agreement dated April 27, 2004 described the benefits Calarco would receive upon retirement. The letter agreement provided, among other things:

> Effective July 1, 2004, you and your spouse are eligible to
> participate in the Supplemental Medical and Dental Plan
> for Executives of Crompton Corporation in accordance
> with the terms of such plan, a copy of which is attached
> hereto as Attachment 4 and incorporated herein by
> reference.[14]

*(4) Barna*

Peter Barna retired from Crompton effective August 1. 2004. He was previously Crompton's CFO. In that capacity, he was one of the eight select executives who were covered under the Senior Executives' Supplemental Benefits Plan, discussed above.

A letter agreement dated June 22, 2004 described the benefits Barna would receive upon retirement. The letter agreement provided, among other things:

> Effective September 1, 2004, you and your spouse are
> eligible to participate in the Supplemental Medical and
> Dental Plan for Executives of Crompton Corporation in
> accordance with the terms of such plan, a copy of which is

---

[13] Fickenscher 10/28/03 Ltr. Agreement ¶ 1(d) at 3.

[14] Calarco 4/27/04 Ltr. Agreement ¶ 2(h) at 3.

attached hereto as Attachment 3 and incorporated herein by reference.[15]

*(5) Ferguson*

John T. Ferguson was separated from Chemtura effective December 31, 2005, at which time he resigned as an employee and officer of Chemtura. At the time of his separation, he was Senior Vice-President and General Counsel.

A "Separation Agreement and General Release," "dated as of June __, 2006" (with the date not filled in) and countersigned by Ferguson on July 5, 2006 (and apparently retroactive to the December 31, 2005 effective date set forth in the letter agreement), described the benefits Ferguson would receive upon his separation. The separation agreement provided, among other things:

> Effective with the first of the month following the [December 31, 2005] separation date, the Executive and his spouse shall be eligible to participate in the Supplemental Medical and Dental Plan for Executives of Crompton Corporation (a copy of which is attached hereto as Attachment 3) in accordance with the terms and conditions of such Plan.[16]

*(6) Osar*

Karen R. Osar and Chemtura agreed to her resignation as of April 1, 2007. Her position as of the time of her resignation does not appear in any of the documents presented to me, but she was sufficiently senior to have an employment agreement, dated September 13, 2004. Unlike most of the others, she does not claim to be one of the eight select executives who were covered under the Senior Executives' Supplemental Benefits Plan, discussed above.

The terms of Osar's resignation were set forth in a Separation Agreement and General Release, dated as of April 1, 2007. It provided, with respect to her medical, dental, and vision

---

[15] Barna 6/22/04 Ltr. Agreement ¶ 2(f) at 3.

[16] Ferguson 7/5/06 Separation Agreement and General Release ¶ 2(g) at 3.

insurance, that at the end of 12 months after her separation, she would be eligible to participate in Chemtura's "Insured Medical Program for Pre-age 65 former participants" by paying the full cost of such coverage, and "subject to and in accordance with the terms and conditions of such program."[17]

That program contains an employer reservation of rights to modify or terminate.

## Discussion

The bulk of the Objecting Executives here argue that Chemtura doesn't have the authority to modify or terminate benefits under the Senior Executives' Supplemental Benefits Plan,[18] or under individually negotiated severance agreements.[19] For the most part they argue that the Senior Executives' Supplemental Benefits Plan is a standalone plan, the terms of which don't give the Debtors the contractual right to modify or terminate. Osar argues that her benefits were part of a negotiated separation agreement and accepted in lieu of other financial consideration. The contentions require individualized analysis, and I address them in turn.

*(a) Marsden*

Marsden's objection does not require extensive discussion. He was expressly told with respect to his health benefits (including those under the 1999 Senior Executives' Supplemental Benefits Plan), back in January 2002, that "[t]hese programs may be altered from time to time, or may be terminated by the company."[20]

Neither Marsden's objection, nor his supplemental submissions, provides any basis for disregarding that language. He secured these supplemental benefits for 12 years, but if the

---

17   Osar 4/1/07 Separation Agreement and General Release ¶ 2(e) at 3.

18   Calarco, Barna, Marsden, Fickenscher.

19   Osar.

20   *See* page 6 above.

-9-

Debtors now wish to alter or terminate them going forward, they have the right to do so, as Marsden was expressly advised.

Marsden's objection is overruled.

*(b) Osar*

Osar's situation is not materially different. She was not expressly told, as Marsden was, that the benefit programs in which she would continue to be enrolled after her departure "may be altered from time to time, or may be terminated by the company." But her separation agreement provided, expressly, that she would participate in those plans "subject to and in accordance with the terms and conditions of such program," and the underlying program contains an employer reservation of rights to terminate or modify.[21]

Thus, while it may be true, as Osar contends, that she bargained for post-employment benefits, and that they were accepted in lieu of other consideration,[22] the terms of the post-employment benefits that she secured included, as a consequence of the language just quoted, the employer right to terminate or modify those plans. Nothing else in Osar's separation agreement provides differently. The right to modify or terminate in the underlying plan, to which Osar's separation agreement was subject, protects the Debtors from section 1114 attack, and from Osar's contention that she must be carved out from the order granting relief with respect to other Debtor employees.[23]

---

[21] *See* page 9 & n.17 above.

[22] Osar Obj. ¶ 3.

[23] *See, e.g., In re Lyondell Chemical Co*, No. 09-10023, 2009 WL 3491068, *1 & n.2 (Bankr. S.D.N.Y. Oct. 27, 2009) ("**Lyondell Chemical**") (declining to carve out executive from order authorizing termination of executive benefit plans without compliance with the extra requirements of section 1114 where executive's settlement agreement and release provided for benefits "to the extent and on the terms those plans may be offered at such time to retirees of Basell USA generally, subject to such amendments as may be made to such plans from time to time in the sole discretion of Basell USA Inc.").

Osar secured her supplemental benefits for four years. But if the Debtors now wish to alter or terminate them going forward, they have the right to do so, in accordance with terms and conditions of the underlying programs to which her separation agreement referred.[24]

Osar's objection is overruled.

*(c) Fickenscher, Calarco, Barna, & Ferguson*

Each of Fickenscher, Calarco, Barna, and Ferguson was covered not only under the underlying Crompton medical and dental plans, but also under the Senior Executives' Supplemental Benefits Plan.

None of those Objecting Executives even argued that he should be treated differently from other employees with respect to the Debtors' rights to modify or terminate the underlying plans. Each did not dispute the principle of law upon which I granted the Debtors' motion with respect to the underlying plans—that, as I held in *General Motors*[25] and *Lyondell Chemical*, relying heavily on Judge Drain's earlier decision in *Delphi*:

> Section 1114 doesn't apply to employee benefit plans that are terminable or amendable unilaterally by the plan sponsor. Putting it another way, section 1114 does not trump any agreement between a company and its employee that gives the company the right to amend or terminate a welfare plan.[26]

But each argues in his objection that his rights under the Senior Executives' Supplemental Benefits Plan could not similarly be modified or terminated—contending that it

---

[24] Osar, unlike the others, had to pay for her coverage. Of course, if the Debtors do modify or terminate it, any duties on her part to keep paying for it will have to be adjusted accordingly.

[25] *In re General Motors Corp.*, No. 09-50026, dictated decision appearing in Tr. of Hr'g of 6/25/09 at 99-117 (Bankr. S.D.N.Y. 2009).

[26] *Id.* at 109-110. *Accord Delphi*, 2009 WL 637315 at *6-*7 ("I believe that the debtors' interpretation of Section 1114 is the correct one, and that, if, in fact, the debtors have the unilateral right to modify a health or welfare plan, that modifiable plan is the plan that is to be maintained under Section 1114(e), with the debtors' pre-bankruptcy rights not being abrogated by the requirements of Section 1114."); *Lyondell Chemical,* 2009 WL 3491068 at *1 (declining to carve executive out of order authorizing termination of retiree medical benefits, where his separation agreement incorporated provisions of underlying plans, subject to employer's rights to amend them).

was a separate "plan, fund, or program," lacking in the reservation of rights to modify or terminate that appears in the underlying plans.[27] The Debtors disagree, and argue that the Senior Executives' Supplemental Benefits Plan is not a standalone benefits plan.

The Bankruptcy Code does not define the words 'plan, fund, or program."[28] Nor does the Code include any other definitional building blocks that might be helpful in connection with this controversy. To fill those gaps, bankruptcy courts have for the most part looked to other federal legislation, particularly the Employee Retirement Income Security Act (**ERISA**),[29] for guidance[30]—though after the Supreme Court's issuance of its well known *Howard Delivery* decision[31] (discussed more fully below), looking to ERISA now cannot fairly be said to be mandated, and doing so should now more appropriately be regarded, at best, as being merely helpful.[32]

Assuming that ERISA doctrine remains applicable, most of the ERISA factors are satisfied here, though I don't think that I could find that they were satisfied in every respect. In *Pegram v. Herdrich*[33] (a non-bankruptcy case), the United States Supreme Court, in deciding issues turning on the application of ERISA to the delivery of medical benefits, noted the "ultimately circular" definition of an "employee welfare benefit plan." The *Pegram* court then

---

[27] In the absence of a reservation of rights to modify or terminate, section 1114 of the Code would require the debtors to continue to pay retiree benefits throughout reorganization "until or unless a modification is agreed to by the parties or so ordered by the court." *In re New York Trap Rock Corp.*, 126 B.R. 19, 22 (Bankr. S.D.N.Y. 1991) (Schwartzberg, J.) ("***New York Trap Rock***").

[28] *Id.* at 21 (so noting); *In re Exide Technologies*, 378 B.R. 762, 768 (Bankr. D. Del. 2007) (Carey, J.) ("***Exide***") (same).

[29] 29 U.S.C. §1001, *et seq.*

[30] *See, e.g., New York Trap Rock*, 126 B.R. at 22-23; *Exide*, 378 B.R. at 768.

[31] *Howard Delivery Services, Inc. v. Zurich American Insurance Co.*, 547 U.S. 651 (2006) ("***Howard Delivery***").

[32] *See*, *e.g.*, *Exide*, 378 B.R. at 768-769 & n.7 (finding that SERP payments weren't subject to section 1114, "[e]ven if I were to look for ERISA for guidance," but expressing uncertainty as to whether ERISA doctrine would be applicable: "Query whether borrowing from ERISA would be appropriate in any event," citing *Howard*)

[33] 530 U.S. 211 (2000) ("***Pegram***").

continued, relying on a dictionary definition, that "[o]ne is left to the common understanding of the word 'plan' as referring to a scheme decided upon in advance."[34] The Senior Executives' Supplemental Benefits Plan easily passes muster under that definition of "plan."

Then, in *Feifer v. Prudential Insurance Company,* the Second Circuit (again in an ERISA, but not bankruptcy, context) read *Pegram* to say that the term "plan" in ERISA "means *nothing more* than 'a scheme decided upon in advance.'"[35] The *Feifer* court continued, however, by noting its earlier holding that a "'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."[36] Assuming (as I think I should) that the Circuit was adding requirements beyond those set forth in *Pegram,* I believe that the Senior Executives' Supplemental Benefits Plan for the most part passes muster under that standard as well. The benefits are explicitly identified, the class of beneficiaries is explicitly identified as well, the source of financing (*i.e.*, the employer's general resources) can be implied, and the procedures for receiving benefits ("as under" the underlying plans), while not fully fleshed out, are fleshed out in part. Much as in *Feifer* (where the documents, "however slap-dash,"[37] were found to fulfill the requirements for an ERISA plan), the documents here fully satisfy *Pegram* requirements, and substantially satisfy those in *Feifer*.

But the issue here ultimately is not whether the Senior Executives' Supplemental Benefits Plan meets ERISA standards for purposes of compliance with ERISA, but whether it's a "plan, fund, or program" under section 1114. Thus, despite the fair number of cases that have looked to ERISA for guidance, I'm reluctant, especially in this post-*Howard Delivery* era, to place too

---

[34]   *Id.* at 223.

[35]   306 F.3d 1202, 1209 (2d Cir. 2002) ("***Feifer***") (emphasis added).

[36]   *Id.* (citing *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994).

[37]   *Id.*

much reliance on the non-bankruptcy ERISA cases, which inevitably address ERISA needs and concerns—and as importantly or more so, don't address bankruptcy needs and concerns.

I think that is the teaching of *Howard Delivery,* which *was* a bankruptcy case. There the Supreme Court declined to import ERISA's definition of "employee benefit plan" into section 507(a)(5) of the Bankruptcy Code to decide whether premiums for workers' compensation coverage would qualify for section 507(a)(5) priority for an "employee benefit plan."[38] The *Howard Delivery* court observed that lower federal courts "have questioned whether ERISA is appropriately used to fill in blanks in a Bankruptcy Code provision."[39] And it thereafter stated:

> We follow the lead of an earlier decision, *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 219 … (1996), in noting that "[h]ere and there in the Bankruptcy Code Congress has included specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes." ... No such directions are contained in § 507(a)(5), and we have no warrant to write them into the text.
>
> *This case turns, we hold, not on a definition borrowed from a statute designed without bankruptcy in mind, but on the essential character* of workers' compensation regimes.[40]

Here the "essential character" of the Senior Executives' Supplemental Benefits Plan was to provide supplemental medical and dental benefits—in meaningful part like those made available to other employees, though more generous in amount. The fact that plan benefits were payable out of the Debtors' general funds, rather than any kind of trust (and at least seemingly without a separate administrator), is not determinative.[41] Likewise, the fact that the Senior

---

[38]     547 U.S. at 668.

[39]     *Id.* at 661.

[40]     *Id.* at 662 (emphasis added; citations omitted).

[41]     *See New York Trap Rock*, 126 B.R. at 23 (a written provision for the payment of medical benefits for the six highest ranking members of the corporate executive office qualified as a "plan, fund, or program" for section 1114 purposes, even though it was unfunded and was to be paid out of the debtors' general funds, without the supervision of an appointed administrator).

-14-

Executives' Supplemental Benefits Plan was available to only a privileged few does not change its character.[42] Though applicable to only eight favored individuals, it was nevertheless—by both plain meaning and "essential character"—a "plan, fund, or program" within the meaning of section 1114.

That is not, however, the end of the story. As noted above, and as previously held in *Delphi*, *General Motors*, and *Lyondell Chemical*, a "plan, fund, or program" may still be exempt from the requirements of section 1114 if the underlying plan reserves the right to terminate or modify. It was for that reason that I thought it important to break down the Senior Executives' Supplemental Benefits Plan into its individual components—Sentence 1, Sentence 2, and Sentence 3—which in material part grant different types of rights.

Sentence 1 provides medical (or dental) coverage upon retirement "as under" the underlying Crompton plans.[43] As previously noted, each of those underlying plans provides the employer with the right to terminate or modify. Objecting Executive Ferguson (though Ferguson alone) argues that there is something meaningful in entitlements being "'as under,' as opposed to 'under,'" the underlying plans.[44] But that is a distinction without a difference. Whether the Objecting Executives' entitlements are under the underlying plans, or under a separate plan that provides benefits "as under" the underlying plans, the *terms* of the underlying plans—including the right to modify or terminate—are still incorporated under the Senior Executives' Supplemental Benefits Plan. With respect to their Sentence 1 rights, the Objecting Executives

---

[42] *See* n.41 above. I note, however, that I'm here ruling in the context of a plan that was denominated as such and, more importantly, set up for a group, albeit a small one. I'm not ruling on a situation where benefits were granted under a severance and release agreement or other individual contract, where the result might very well be different.

[43] *See* page 4 above.

[44] Ferguson Suppl. Submission ¶ 22.

-15-

must live with that employer right, and their objection to any changes in the coverage of Sentence 1 is overruled.

Sentence 2, which covers out of pocket expenses not paid under the underlying plans before the executive becomes Medicare eligible, does not, however, have the same "as under" provision or otherwise incorporate terms and conditions of the underlying plan. Because it does not base its benefits on the terms of the underlying plan (and its purpose, in fact, is to cover expenses not covered under the underlying plan), it must be regarded as free-standing. Absent compliance with section 1114, the Debtors must live with each Objecting Executive's Sentence 2 right, until such time as each Objecting Executive becomes Medicare eligible. The Objecting Executives' objection to any changes in the coverage of Sentence 2 is sustained.

Sentence 3, which covers expenses not covered by Medicare after the executive becomes Medicare eligible (up to the $20,000 and $2,500 annual caps), likewise does not have an "as under" provision or otherwise incorporate terms and conditions of the underlying plan. Here too, absent compliance with section 1114, the Debtors must live with each Objecting Executive's Sentence 3 right, after the Objecting Executive becomes Medicare eligible. The Objecting Executives' objection to any changes in the coverage of Sentence 3 is sustained.[45]

---

[45] I don't know the extent to which any of the Objecting Executives is or is not Medicare eligible. Presumably this ruling addresses the issues fully irrespective of what any executive's present age or other eligibility status might be.

Conclusion

The Debtors' motion is granted in part and denied in part, as more particularly set forth, and for the reasons, above. The Debtors are to settle a single order (but broken down for each Objecting Executive) laying out, with specificity, the disposition of their motion as it involves each Objecting Executive, consistent with the principles laid out in the discussion above.

The time to appeal from that order will run from the date of its entry, and not from the date of entry of this Decision.

Dated: New York, New York                     *s/Robert E. Gerber*
       April 8, 2011                                  United States Bankruptcy Judge