UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                          :

In re                                 :         Chapter 11
                                            :

CHEMTURA CORPORATION, *et al.*,      :         Case No. 09-11233 (REG)
                                            :

                    Debtors.       :         (Jointly Administered)
                                            :

------------------------------------------------------------------x

## BENCH DECISION[1] ON ESTIMATION OF CLAIMS OF CREDITOR OILDALE ENERGY LLC

APPEARANCES:

DUANE MORRIS LLP
*Conflicts Counsel for the Debtors*
1540 Broadway
New York, NY 10036
By:    Gerard S. Catalanello, Esq. (argued)

-and-

30 South 17th Street
Philadelphia, PA 19103
By:    Lawrence J. Kotler, Esq.

MUSICK, PEELER & GARRETT LLP
*Attorneys for Creditor Oildale Energy LLC*
One Wilshire Boulevard, Suite 2000
Los Angeles, CA 90017
By:    Richard S. Conn, Esq. (argued)
       Brian L. Holman, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone. In some instances in this decision, I use species of shorthand to describe more nuanced concepts or claims by parties; my more precise descriptions of those things elsewhere control, and this discussion is without prejudice to rights any party might have in further proceedings or on appeal with respect to such matters.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

## Introduction

In this contested matter in the chapter 11 cases of specialty chemicals company Chemtura

Corporation ("**Chemtura**") and its affiliates (collectively, the "**Debtors**"), the Debtors move for

an order estimating the claim—filed in the original amount of approximately $16.3 million[2]—of

Oildale Energy LLC ("**Oildale**"), to which the Debtors have objected, for purposes of setting a

distribution reserve.

For the reasons discussed below, I conclude that Oildale's claims will ultimately be found

to be released as a consequence of provisions in its 2002 settlement with its primary obligor, and

to be barred by the statute of limitations by reason of Chemtura's predecessor Crompton's very

clear repudiation of any obligations to Oildale in a letter Crompton sent Oildale 7-1/2 years

before the filing of Chemtura's chapter 11 case.  Thus I conclude that Oildale's claims ultimately

will be disallowed.  While that would suggest estimating Oildale's claim at $0, I recognize that

the application of the law here is somewhat debatable, and recognize the possibility—though

much less than a likelihood—that an appellate court might disagree with me.  Accordingly, for

the purpose of setting reserves in this case, I am estimating the claim at 30% of the amount of

damages that I'd find if the Oildale claim were timely.  The parties are to agree upon the

appropriate reserve, based on the principles set forth in this decision, or, failing agreement, to

arrange for further submissions in support of their alternative positions.

My Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion in

connection with this determination follow.

---

[2]    Thereafter, when Oildale was persuaded of various Chemtura points with respect to the amount of Oildale's
otherwise recoverable damages, Oildale reduced the requested amount in its claim to approximately
$14.5 million.

<u>Findings of Fact</u>

As discussed below,[3] courts needn't make traditional findings of fact in connection with estimation hearings; they need only decide the probability of each side's success before a traditional trier of fact. But here I have the benefit of the submissions that were made on summary judgment motions—including the documentary exhibits and statements of undisputed facts, and responses, that are required under Local Bankruptcy Rule 7056-1(b). With the benefit of those submissions, it's clear that the great majority of the underlying facts are undisputed. And because I don't find any of the disputed facts to be relevant to my decision here, I here rely upon only undisputed facts.

Those facts reveal a chain of successive agreements, amendments to agreements, and assignments, and no less than three separate bankruptcies, and agreements and rulings in the two earlier bankruptcy cases.

*1.    The Original Cogeneration Agreement (July 1991)*

Before 1991, Witco Corporation ("**Witco**"), a Chemtura predecessor, owned and operated an oil refinery in the City of Oildale, California (the "**Refinery**").[4] The Witco Refinery was adjacent to a gas-fired electricity "cogeneration" facility[5] owned and operated by Oildale

---

[3]      *See* page 16 *infra*.

[4]      "Oildale" is the name of the city where the relevant facilities were located and also the name of at least two different "Oildale" business entities located there, including Oildale Energy LLC, the claimant here. As used here, the simple "Oildale" refers to claimant Oildale Energy, LLC, and "the City of Oildale" and "Oildale Cogeneration" are used when necessary.

[5]      In very general terms, "cogeneration" allows for the efficient production of two forms of energy from a single fuel powered device or facility. By way of example, a cogeneration facility can salvage heat created in the electricity generation process (which might otherwise be wasted), and convert that waste heat energy into other useful forms, such as hot water or steam. As explained by Judge Rimel in Oildale's own chapter 11 case, discussed below:

> Through the process of "cogeneration," Oildale simultaneously generates electricity for sale to electricity buyers (primarily, PG&E) and also generates steam and process heat for sale to the owner of the adjacent oil refinery or to others.

Cogeneration Partners, L.P ("**Oildale Cogeneration**").  In July 1991, Witco and Oildale

Cogeneration entered into a cogeneration agreement ("**Cogeneration Agreement**") and an

industrial ground lease ("**Ground Lease**"), pursuant to which Oildale Cogeneration, as lessee,

leased the land on which the cogeneration facility was located from Witco, the lessor.

The Cogeneration Agreement thereby created a symbiotic relationship between Witco

and Oildale Cogeneration.  Witco needed steam and process heat from Oildale Cogeneration to

operate the Refinery, and Oildale Cogeneration needed both raw materials and access to

wastewater treatment and disposal services to operate its neighboring cogeneration facility.

Under the Cogeneration Agreement, Witco would purchase certain minimum amounts of steam

and process heat on an annual basis from Oildale Cogeneration for use at Witco's Refinery—and

irrespective of actual usage, Witco was obligated to pay Oildale Cogeneration for these

minimum amounts of steam and process heat.[6]  In addition, the Cogeneration Agreement

provided that Witco would provide (a) certain raw materials to Oildale Cogeneration at a fixed

cost, and (b) treatment and disposal facilities and services with respect to water treatment waste

and wastewater generated by Oildale Cogeneration, at Witco's own expense.[7]  By reason of the

latter obligations, Witco's obligations under the Cogeneration Agreement were for more than the

payment of money.

2.    *Assignment By Oildale Cogeneration to Oildale*
     *Execution of First Amendment (both April 1996)*

About five years later, a new player stepped into Oildale Cogeneration's shoes.  In April

1996, Oildale Cogeneration assigned its rights and obligations under the Cogeneration

---

*See* Findings of Fact and Conclusions of Law on Oildale Motion to Assume, Catalanello Certif. Exh. K., at 1.

[6]    *See* Cogeneration Agreement, Catalanello Certif. Exh. A ("**Cogeneration Agreement**"), Section 3.2.

[7]    *See* Cogeneration Agreement, Section 4.2.

Agreement and Ground Lease to claimant Oildale—and Witco and Oildale executed an

amendment to the Cogeneration Agreement (the "**First Amendment**"), which substituted

Oildale as a party to the Cogeneration Agreement in the place of Oildale Cogeneration, and also

made certain other modifications to the agreement.

The First Amendment also amended Section 16.2 of the Cogeneration Agreement,

addressing Witco's rights to assign, mortgage, pledge, or transfer its rights under the

Cogeneration Agreement.  As amended, it then provided:

> 16.2    Assignment and Mortgaging by Witco
>
> (a)  Nothing in this Agreement shall prevent Witco from assigning, mortgaging, pledging, encumbering or transferring or hypothecating this Agreement provided that any and such assignment shall be made subject to this Agreement, and shall not operate to diminish the obligations of Witco hereunder.
>
> (b)  Anything herein to the contrary notwithstanding, Witco shall have the right to assign its interest in all (but not part) of this Agreement to any purchaser of all or substantially all of Witco's interest in the Refinery ("Assignee"), but Witco shall not be released from its obligations hereunder as a result thereof.  However, Witco shall be fully and completely discharged from its obligations hereunder, provided that such Assignee shall agree to and shall assume and be bound by the terms of this Agreement, and is reasonably deemed in writing by Cogen and TCW (or other future secured lenders of Cogen), to be capable of performing under the terms of this Agreement.[8]

---

[8]    First Amendment to Cogeneration Agreement, Catalanello Certif. Exh. B ("**First Amendment**"), at 10. "Cogen" is defined as Oildale Energy.  *Id.* at 1.  "TCW" is defined as Trust Company of the West, which was presumably a lender.  *Id.* at 3.

3.      *Assignment by Witco to Golden Bear (July 1997)*

A little over a year later, in July 1997, Witco sold certain of its assets, including the

Refinery in Oildale, to Golden Bear Oil Specialties, Inc. (f/k/a Golden Bear Acquisition

Corporation) ("**Golden Bear**").  Along with the sale, Witco assigned all of its rights and

obligations under the Cogeneration Agreement and the Ground Lease to Golden Bear as well.

For approximately three years following the assignment of the Cogeneration Agreement

to Golden Bear, Golden Bear performed all of its obligations, as Witco's assignee, under the

Cogeneration Agreement.  And during those same three years, Oildale accepted Golden Bear'

performance of the obligations due and owing under the Cogeneration Agreement.

4.      *The Second Amendment (April 2000)*

In April 2000, Oildale and Golden Bear—each of the parties, by that time, to the

Cogeneration Agreement after the earlier assignments by Oildale Cogeneration and Witco,

respectively—executed a Second Amendment to Cogeneration Agreement (the "**Second**

**Amendment**").

The Second Amendment provided that "[Golden Bear] has succeeded to Witco's right,

title and interest in, under and to the Cogeneration Agreement"[9]—and replaced Witco with

Golden Bear as a party throughout the Cogeneration Agreement.  But the Second Amendment

further stated that "nothing herein shall be construed as operating to release any obligation of

Witco to Oildale Energy arising under the Cogeneration Agreement or otherwise."[10]

---

[9]     Second Amendment to the Cogeneration Agreement, Catalanello Certif. Exh. C ("**Second Amendment**"), at 1.

[10]    *Id.* at ¶ 1.

-5-

In addition, the Second Amendment modified the provisions of the Cogeneration Agreement that established the mechanism for calculating the "fuel price reimbursement" under that contract, in ways that I consider unnecessary to discuss here.

Witco was not a party to the Second Amendment, nor was Witco's consent or authorization sought or obtained prior to the execution of the Second Amendment. Following the execution of the Second Amendment, Golden Bear continued to perform under the Cogeneration Agreement, as modified by the First and Second Amendments.

5.     *Bankruptcy #1 (of Golden Bear, in C.D. Cal., Apr. 2001)*

In April 2001, Golden Bear, which had acquired the Refinery in the City of Oildale and was Witco's earlier assignee, commenced the first of the three bankruptcies involving parties in the chain of contractual obligations at issue here—a chapter 11 case in the Central District of California, in Los Angeles.

In June 2001, about three months after the Golden Bear chapter 11 filing, Bankruptcy Judge Sheri Bluebond, of the Central District of California Bankruptcy Court, entered an order authorizing the sale of substantially all of Golden Bear's assets, including the Refinery, in a 363 sale to Tricor Refining, Inc. ("**Tricor**"), the successful bidder. At the same time, Judge Bluebond also authorized the rejection of several of Golden Bear's executory contracts, including the Cogeneration Agreement and Ground Lease.[11]

The schedule of contracts to be rejected in accordance with the order authorizing Golden Bears's 363 sale (the "**363 Sale Order**") presented Oildale's cure amount relating to the Cogeneration Agreement at the time of rejection as approximately $1.78 million. In September

---

[11]    As the lessee of the Ground Lease, which was rejected in Golden Bear's chapter 11 case (Bankruptcy #1), Oildale had rights to continue in occupancy under section 365(h) of the Code, some of which were addressed by Judge Rimel in Oildale's own chapter 11 case (Bankruptcy #2), discussed below. But I note that Oildale's section 365(h) rights arose from events in Golden Bear's chapter 11 case, not Oildale's. Ultimately, rights that Oildale had under section 365(h) aren't relevant here.

2001, Oildale filed claims in the Golden Bear chapter 11 case seeking damages exceeding

$1.03 million arising out of Golden Bear's breach and rejection of the Cogeneration Agreement

and Ground Lease, and for an additional administrative claim in the amount of approximately

$114,000.

6.    *Bankruptcy #2 (of Oildale, in E.D. Cal., June 2001)*

On June 4, 2001, about three months after the filing of Golden Bear's chapter 11 case in

Los Angeles, Oildale filed its own voluntary chapter 11 petition in the Eastern District of

California (where the City of Oildale is located), before Bankruptcy Judge Whitney Rimel, in

Fresno.  Oildale's chapter 11 filing was at least allegedly the result of a "triple whammy" of

rising natural gas prices, the bankruptcy filing of its electricity customer Pacific Gas & Electric,

and Golden Bear's bankruptcy filing.[12]  In its schedules, Oildale listed the Cogeneration

Agreement as an executory contract, describing it as "Cogeneration Agreement between Oildale

LLC and Golden Bear Specialties," and identifying Golden Bear as the only other party to the

Cogeneration Agreement—in each case leaving out reference to Witco.  Similarly, Oildale

identified Golden Bear as the only other party to the Ground Lease.

Oildale suspended regular operations at the cogeneration facility in February 2001 (at

least assertedly because of a failure on the part of Pacific Gas & Electric to make payments due

to Oildale for electricity under a power purchase agreement), and operations were not resumed

until July 2001.  During that period of suspension of operations, Oildale was unable to perform

under the Cogeneration Agreement.  Also, Oildale's "sporadic electrical production" during that

period "resulted in irregular thermal heat deliveries to Golden Bear."[13]

---

[12]    Oildale Motion to Assume, Catalanello Certif. Exh. H, at ¶ 19.

[13]    *Id.* at ¶ 7.

On August 2, 2001, Oildale—which, it will be recalled, was as successor to Oildale

Cogeneration, the *lessee* under the Ground Lease[14]—filed a motion (the "**Oildale Motion to**

**Assume**") seeking authorization for its assumption of the Ground Lease.  In connection with that

motion, Oildale acknowledged that Golden Bear—the successor *lessor* under the Ground

Lease—had rejected the Cogeneration Agreement and Ground Lease, and that Golden Bear's

rejection of those agreements constituted a breach of the Cogeneration Agreement and Ground

Lease under section 365(g) of the Code.[15]

Tricor, which by August 2001 was the owner and operator of the Refinery (as successor

to Golden Bear, which in turn had been the successor to Witco), objected to the Oildale Motion

to Assume—based in large part on the fact that the Cogeneration Agreement and Ground Lease

had been rejected in Golden Bear's own bankruptcy prior to the filing of Oildale's Motion to

Assume.  Golden Bear, Oildale's lessor prior to Golden Bear's rejection, also objected to the

Oildale Motion to Assume.

In October 2001, Golden Bear filed a proof of claim in Oildale's bankruptcy case in

Fresno, asserting damages in the amount of $3.5 million, based on allegations that, among other

things, "Oildale precipitously and without proper notice shut down its cogeneration facility in

February 2001, causing Golden Bear substantial economic harm."[16]  In January 2002, Oildale

objected to that proof of claim.

---

[14]    *See* page 3 *supra*.

[15]    *See* Oildale's Supp. Mem. of Points and Authorities in Support of Motion to Assume, Catalanello Certif.
Exh. I, at 15 ("Moreover, Golden Bear's rejection of the Project Agreements constitutes a breach of the
Progress Agreements.  11 U.S.C. § 365(g).  Under California law, a party in breach of a contract cannot
recover for a breach of the contract by the other party.").

[16]    Oildale and Golden Bear Settlement Agreement, Catalanello Certif. Exh. M ("**Oildale-Golden Bear**
**Settlement**"), Recital L.

-8-

In December 2001, in the time in between the two events just mentioned, Golden Bear filed objections to proofs of claim filed by Oildale in Golden Bear's chapter 11 case in Los Angeles.

7.      *The Oildale-Golden Bear Settlement*

Thereafter, by agreement dated as of February 4, 2002, Oildale and Golden Bear entered into a settlement agreement (the "**Oildale-Golden Bear Settlement**") which resolved the outstanding disputes between Oildale and Golden Bear—addressing, among other things:

> (a) the disputed claims asserted by Golden Bear against Oildale, in Fresno;
>
> (b) the disputed claims asserted by Oildale against Golden Bear, in L.A., and
>
> (c) Golden Bear's objection to Oildale's Motion to Assume, in Fresno.

The Oildale-Golden Bear Settlement included a considerable number of provisions that were at least arguably relevant to this controversy.  Oildale and Golden Bear stated, within their recitals, that:

> (a) Golden Bear acquired Witco's interest in the real property that was the subject of the Ground Lease and "assumed Witco's rights and obligations" under the Ground Lease and the Cogeneration Agreement;[17]
>
> (b) "Oildale did not release Witco from liability" under the Ground Lease or the Cogeneration Agreement and "Oildale reserves all its rights and remedies against Witco";[18]
>
> (c) On February 6, 2001, "Oildale temporarily suspended operation of the cogeneration facility";[19] and

---

[17]     *Id.* at Recital C.

[18]     *Id.* at Recital D.

(d) Golden Bear had filed a claim in Oildale's bankruptcy case asserting damages of at least $3.5 million, based on allegations that, among other things, Oildale precipitously and without proper notice shut down its cogeneration facility in February 2001.[20]

In covenants, Oildale and Golden Bear provided, among other things, that

(a) Golden Bear "waive[d] and release[d]," among other things:

(1) any claim that that there had been a default by Oildale under the Cogeneration Agreement;[21]

(2) any right to the cure of any such default;[22]

(3) any right to compensation for pecuniary loss resulting from any such default;[23] and

(4) any claim that Oildale had to assume the Cogeneration Agreement in order to assume the Ground Lease;[24]

(5) any claim that Oildale was obligated to deliver steam or process heat to Golden Bear on or after February 6, 2001;[25]

---

[19]   *Id.* at Recital E.  They did not further acknowledge that this was a material breach, or even a breach, of the Cogeneration Agreement, though the suspension, which lasted about five months, was at least arguably such.

[20]   *Id.* at Recital L.

[21]   *Id.* at ¶ 6(i).  The Oildale-Golden Bear Settlement was not a model of careful drafting.  The word "Agreement" as used in ¶ 6 was not defined there or in any earlier place in the Oildale-Golden Bear Settlement, and in fact the term "Cogen Agreement" had been used elsewhere to describe the Cogeneration Agreement.  But from the context, the undefined term "Agreement" as used in ¶ 6 could refer only to the Cogeneration Agreement.

[22]   *Id.* at ¶ 6(ii).

[23]   *Id.* at ¶ 6(iii).

[24]   *Id.* at ¶ 6(v).

[25]   *Id.* at ¶ 7.

(b) Golden Bear agreed that Oildale "shall be deemed to have made
available to Golden Bear the 'Required Level of Production' (as defined in the
[Cogeneration] Agreement) with respect to both steam and process heat during
the entire period from January 1, 2001 through July 6, 2001" (even though, as
acknowledged, Oildale had suspended operation of the Cogeneration Facility
from February 6, 2001 to some later time, which appears to be in July 2001, five
months later), and Golden Bear "waive[d] and release[d] any claim for Guarantee
Fuel Costs (as defined in the [Cogeneration] Agreement) arising out of non-
delivery of steam or process heat" during the January 1 through July 6, 2001
period;[26]

(c) Golden Bear agreed to drop its opposition to Oildale's Motion to
Assume the Ground Lease;[27] and

(d) Oildale and Golden Bear agreed that "[n]othing herein shall prejudice
or be deemed to impair any claims or counterclaims of Oildale against Witco or
any other third party…."[28]

The Oildale-Golden Bear Settlement also provided that Oildale's claims in the Golden
Bear chapter 11 case, in L.A., would be allowed in the amount of a $113,945 administrative
claim, and a $500,000 general unsecured claim.  Judge Rimel approved the Settlement in
Oildale's chapter 11 case in March 2002.  There is no indication in the record that Witco or any

---

[26]     *Id.*

[27]     *Id.* at ¶ 8.  It should be observed that by this time, Golden Bear had already rejected the Ground Lease, incident to the sale to Tricor.

[28]     *Id.* at ¶ 10.  Of course, Witco was not a party to the Oildale-Golden Bear Settlement.  I read the quoted language as quite a clear indication of Oildale's desire not to affect any rights it might have against Witco. But whether it was effective to preserve rights against Witco—and, especially, to trump California law with respect to whether rights would remain against Witco—is a matter of dispute.

-11-

of its successors objected to the Oildale-Golden Bear Settlement in either the Golden Bear or

Oildale chapter 11 case.

Under the Oildale-Golden Bear Settlement, Golden Bear agreed to drop its objection to

the Oildale Motion to Assume.  But Golden Bear was only one of the two objectors that motion.

As noted above, Tricor had also objected to the Oildale Motion to Assume the Ground Lease.

By that time, Tricor, if anyone, would have been the lessor under that Lease.  At the hearing on

the motion, though Oildale had failed to do so earlier in schedules and pleadings where it should

have done so, Oildale made known its contentions as to the continuing liability of Witco under

the Cogeneration Agreement.[29]  In June 2002, Judge Rimel granted Oildale's motion and issued

written findings of fact and conclusions of law in connection with her ruling.[30]  She stated,

among other things:

> The court agrees with Tricor that "The only thing that the
> rejection by Golden Bear accomplishes is to relieve Golden
> Bear of any further obligation under the lease or
> cogeneration agreement."  Oildale must continue to
> perform the requirements under the lease and the
> cogeneration agreement during the life of these
> agreements. . . .[31]

8.    *The Crompton August 2001 Letter*

After the entry of the Sale Order in Golden Bear's bankruptcy case in June 2001, Tricor

began operating the Refinery.  Although the Cogeneration Agreement was rejected in connection

with the Sale Order, Tricor began purchasing steam and process heat from Oildale in accordance

with separate agreements with Oildale.

---

[29]    Findings of Fact and Conclusions of Law Regarding Motion to Assume, Catalanello Certif. Exh. K, at 6
("Oildale informed the court at the hearing that Witco is still obligated under the lease and cogeneration
agreement.").

[30]    *Id.* at 3.

[31]    *Id.* at 6.

On July 10, 2001, after Golden Bear's rejection of the Cogeneration Agreement and

Ground Lease, and while Tricor was operating the Refinery, Oildale contacted Witco by letter

(the "**Oildale July 2001 Letter**"), advising Witco of Golden Bear's rejection, and asserting:

> (a) that the rejection constituted a breach of the Cogeneration Agreement
> and Ground Lease;

> (b) that Golden Bear was in default under the Cogeneration Agreement in
> the amount of $1,228,523; and

> (c) that Witco remained "obligated to perform all obligations of Golden
> Bear under the [Cogeneration] Agreement and the Lease."[32]

Oildale also demanded:

> (a) immediate payment of the amounts owing under the Cogeneration
> Agreement and

> (b) Witco's "acknowledgement that Witco remains liable for all other
> obligations of Golden Bear under the [Cogeneration] Agreement and the [Ground]
> Lease, including Witco's indemnity obligations under the Lease."[33]

On August 7, 2001, in response to the July 10 Oildale Letter, counsel for Crompton

Corporation ("**Crompton**"), which by this time was the successor-in-interest to Witco (and was a

predecessor-in-interest to Chemtura), replied by letter (the **"Crompton August 2001 Letter"**) to

Oildale's counsel.  The Crompton August 2001 Letter stated in part:

> Crompton *hereby rejects Oildale's demand for payment of
> any amount owed by Golden Bear.*  Crompton's
> predecessor, Witco Corporation, validly assigned the
> Industrial Ground Lease and Cogeneration Agreement to
> Golden Bear when it sold the Bakersfield Refinery to

---

[32]   Oildale July 2001 Ltr., Catalanello Certif. Exh. P.

[33]   *Id.*

-13-

> Golden Bear in July 1997.  Since that time, Oildale and
> Golden Bear have dealt exclusively with each other in all
> matters relating to these agreements.  Accordingly,
> *Oildale's sole recourse for the breach of these agreements*
> *is against Golden Bear.*[34]

Starting in January 2002 and continuing on a yearly basis through January 2010, Oildale

sent one-page letters to Crompton (and later Chemtura) at the beginning of each calendar year,

advising of shortfalls as to steam and process heat that Oildale said were due and owing to

Oildale under the Cogeneration Agreement for the immediately preceding calendar year.  These

letters also expressed Oildale's position that Crompton, as successor-in-interest to Witco,

remained liable for the contractual shortfalls.[35]  The letters did not mention any claim for

amounts due and owing with respect to any other obligation under the Cogeneration Agreement,

including the obligation to provide raw materials and wastewater treatment and disposal

facilities.  In addition, none of the correspondence received from Oildale from 2002 through

2010 responded to or addressed the Crompton August 2001 letter.

Oildale never commenced any action or proceeding against Witco, Crompton, or

Chemtura to collect any amounts allegedly due under the Cogeneration Agreement.

9.      *Bankruptcy #3 (Chemtura, in S.D.N.Y., Mar. 2009)*

On March 18, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions for

chapter 11 relief in this Court.  In October 2009, Oildale filed a timely proof of claim against

---

[34]     Crompton August 2001 Ltr., Catalanello Certif. Exh. Q.

[35]     *See* copies of those letters, Catalanello Certif. Exh. R.  For example, in a February 5, 2003 letter, Oildale
explained its rationale as follows:

> As you are aware, Crompton assigned its interest under the
> [Cogeneration Agreement and Ground Lease] to [Golden Bear] in July
> 1997.  No consent of Oildale or its lenders was obtained in connection
> with such assignment, and therefore Crompton was not relieved of its
> obligations under the [Cogeneration Agreement and Ground Lease].

-14-

Chemtura, originally asserting an unsecured claim in the total amount of $16,263,764 (the

"**Claim**").  Oildale claimed that Chemtura was liable under the Cogeneration Agreement for:

> (1) alleged payment shortfalls on steam purchase obligations for the 12
> years 2005 through 2016; and
>
> (2) reimbursement for failing to provide Oildale with raw materials at the
> prices specified in the Cogeneration Agreement and with wastewater
> treatment and disposal facilities at no cost.

After the Debtors filed an objection to the Oildale claim (seeking an order disallowing the

claim in its entirety), and Oildale filed a response, the Debtors were granted leave to file a

summary judgment motion with respect to the Oildale claim, and the matter was fully briefed

pursuant to a consensual scheduling order.  The summary judgment motion is currently pending

before this Court.

In accordance with a provision in the Debtors' Plan of Reorganization ("**Plan**"), the

Debtors moved for an order establishing a reserve fund for disputed claims and designating a

specific amount for the reserve.  Oildale objected to that motion, arguing that the proposed

disputed claims reserve was insufficiently funded.  After a hearing on the issue, I granted the

motion with respect to creditors that did not object, but required the Debtors to establish a

separate reserve for each of the objecting creditors with funds in the full amount of their claims,

including Oildale—thereby creating the "**Oildale Segregated Reserve.**"  But the parties agreed

to submit the Oildale claim to this Court for estimation under Section 502(c) of the Code to

determine whether the Oildale Segregated Reserve should be reduced after an estimation of the

Oildale claim.

At a hearing in November 2010, the parties both presented argument on the summary judgment motion, and argued and offered expert witnesses on issues unique to estimation, such as the appropriate discount rate and spot versus futures pricing to be used in calculating damages. At this point, Oildale contends that its claim should be estimated at $14,487,386.[36]  The Debtors seek estimation of the claim at $0, or at least no greater than $6.9 million.

10.    *Calculation of Damages*

As just noted, the Debtors and Oildale each offered expert opinions as to the amount of Oildale's claim if it were otherwise allowed, reflected first in expert reports and then in testimony before me at the hearing.

Two issues relevant to the calculation of damages were disputed:

(a) whether *spot* prices, on the one hand, or *futures* prices, on the other, should be used for the fuel costs component of Oildale's claim, and

(b) whether a "risk free" discount rate should be used to determine the present value of any recoverable damages, and if not, what the discount rate should be.

The specifics of the parties' positions are discussed below.

Discussion

I.

Estimation Generally

Section 502(c) of the Code provides, in relevant part:

---

[36]    As explained in its papers, Oildale accepted, at least in part, three arguments made by the Debtors: (1) the contract rate should be applied to historic damages; (2) assuming that gas futures should be used to calculate future prices, gas prices should have been computed as of the day before the Debtors' petition date, or March, 18, 2009; and (3) the claim should allow credit for future steam purchases by Tricor. Accordingly, Oildale reduced its claim to $14,487,386.  *See* Oildale Estimation Opp. Br., at 2-3.

-16-

> There shall be estimated for purpose of allowance under
> this section—
>
>> (1) any contingent or unliquidated claim, the fixing
>> or liquidation of which, as the case may be, would
>> unduly delay the administration of the case; ...

But neither the Code nor the Federal Rules of Bankruptcy Procedure provides any

procedures or guidelines for estimation, and a bankruptcy court has wide discretion in

accomplishing it.[37]  The court is bound by the legal rules that may govern the ultimate value of

the claim.[38]  But there are no other limitations on the court's authority to evaluate the claim save

those general principles which should inform all decisions made pursuant to the Code.[39]  "The

court need not don the garb of the clairvoyant; rather, all that is required is a 'rough estimate.'"[40]

For both procedure and analytical methodology, bankruptcy courts may use whatever method is

best suited to the contingencies of the case.

Claims estimation under Section 502(c)(1), which most commonly is used with respect to

prepetition claims,[41] can be used for a variety of purposes, including determining voting rights on

a reorganization plan,[42] gauging plan feasibility,[43] determining the likely aggregate amount of a

---

[37]   *See In re Thomson McKinnon Securities, Inc.*, 191 B.R. 976, 989 (Bankr. S.D.N.Y. 1996) (Connelly, J.) ("***Thompson McKinnon***") (*citing In re Windsor Plumbing Supply Co.,* 170 B.R. 503, 520 (E.D.N.Y. 1994) (Holland, J.) ("***Windsor Plumbing Supply***")).

[38]   *Bittner v. Borne Chemical Co., Inc.* 691 F.2d 134, 135 (3rd Cir. 1982) ("***Bittner***").  "For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law."  *Id.*

[39]   *Id.* at 136.

[40]   *Thomson McKinnon,* 191 B.R. at 989 (*citing In re Chateaugay Corp.,* 944 F.2d 997, 1006 (2d Cir. 1991)).

[41]   While estimation is much more commonly used with respect to prepetition claims, it can also be used for administrative expense claims.  *See* my earlier decision in *In re Adelphia Business Solutions*, 341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003) ("***ABIZ***").  "ABIZ" was Adelphia Business Solutions' stock ticker symbol and commonly used nickname.

[42]   *See, e.g., In re Ralph Lauren Womenswear, Inc.,* 197 B.R. 771 (Bankr. S.D.N.Y. 1996) (Brozman, C.J.) ("***Ralph Lauren Womenswear***").

[43]   *See*, *e.g., In re MacDonald,* 128 B.R. 161, 164 (W.D. Tex. 1991) (Leif Clark, J.) ("***MacDonald***"); *ABIZ*, 341 B.R. at 418 (relying heavily on *MacDonald*).

related series of claims,[44] setting claim distribution reserves,[45] or (though this is less commonly

wise) allowing claims.[46]  As I explained in my 2003 decision in *ABIZ,* "[e]stimation, authorized

under section 502(c) of the Code, provides a means for a bankruptcy court to achieve

reorganization, and/or distributions on claims, without awaiting the results of legal proceedings

that could take a very long time to determine."[47]  Bankruptcy courts have employed a wide

variety of methods to estimate claims, including summary trial,[48] a full-blown evidentiary

hearing,[49] and a review of pleadings and briefs followed by oral argument of counsel.[50]

There are also diverse analytical methods that bankruptcy courts have utilized to estimate

claims under §502(c).[51]  Some courts have proceeded on an "all or nothing" basis, awarding the

full value of the claim if the claimant proves its case by preponderance, and awarding a zero

---

[44]    Until a recent settlement of the issue, estimation was to be used in the *Motors Liquidation* (formerly, *General Motors*) chapter 11 case, to judge the aggregate size of Motors Liquidation's asbestos injury claims.  *See General Motors,* No. 09-50026, Debtors' Motion to Estimate Debtors' Aggregate Asbestos Liability and Establish a Schedule for Estimation, Dkt. No. 7782 (Bankr. S.D.N.Y. Nov. 15, 2010).

[45]    That is the purpose here.  Reserves are frequently established to permit distributions to creditors and other stakeholders with undisputed claims and interests, to avoid prejudice to them resulting from having to wait for distributions that otherwise could be materially delayed by residual litigation on the disputed claims, or by needs to hold back value in reserve that could far exceed the likely distributions on the contested claims.

There is no dispute here between the parties as to the propriety of estimation for the purposes of fixing the proper amount of the reserve for the Oildale claim.  They differ only as to the appropriate amount.

[46]    Using estimation for claims allowance purposes, while permissible (and, indeed, expressly mentioned in section 502(c)(1)), can sometimes raise due process concerns, and for that reason, in *ABIZ,* I used estimation solely for purposes of gauging feasibility, and not for determining ultimate claims allowance. *See* 341 B.R. at 418; *MacDonald*, 128 B.R. at 164 (using estimation of admin claim to determine feasibility, but not ultimate allowance).

[47]    *ABIZ,* 341 B.R. at 422 (*citing In re Continental Airlines, Inc.,* 981 F.2d 1450, 1461 (5th Cir. 1993) (bankruptcy courts may estimate claims under § 502(c)(1) in order to (i) "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions," and (ii) "promote a fair distribution to creditors through a realistic assessment of uncertain claims")).

[48]    *See, e.g., In re Baldwin-United Corp.*, 55 B.R. 885, 899 (Bankr. S.D. Ohio 1985).

[49]    *See, e.g., In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 65 (Bankr. E.D. Va. 1982).

[50]    *See, e.g., In re Lane*, 68 B.R. 609, 613 (Bankr. D. Haw. 1986).

[51]    *See* David S. Salsburg and Jack F. Williams, *A Statistical Approach to Claims Estimation in Bankruptcy*, 32 Wake Forest L.Rev. 1119 (1997).

value if the claimant fails to prove its claim.[52]  Using this method, the New Jersey bankruptcy

court in *Bittner* valued the claims at issue at zero, and that was held by the Third Circuit to not be

an abuse of discretion.

However, courts in the Southern and Eastern Districts of New York have rejected the so-

called *Bittner* method, choosing instead to estimate the expected value of a claim based on the

probability of the success of various potential outcomes if decided on the merits.[53]  With respect

to the disputed *facts* component of an estimation analysis, *Windsor Plumbing Supply*, whose

analysis was later accepted by Judge Connelly when visiting in this district in *Thompson*

*McKinnon*, articulates this approach:

> An estimator of claims must take into account the
> likelihood that each party's version might or might not be
> accepted by a trier of fact.  The estimated value of a claim
> is then the amount of the claim diminished by probability
> that it may be sustainable only in part or not at all . . .
> Recognizing that the magnitude of recovery is to a large
> extent dependent upon the individual backgrounds of the
> triers of the facts, what we are given to deal with is a range
> of possible awards which we must first turn into a range of
> probable awards running from zero to the full amount of
> the claim.  An *expected value* can then be found by
> multiplying a number of possible recovery values by the
> probability of their occurrence and taking the sum of these
> products.[54]

With respect to the disputed *legal issues* component of an estimation analysis, Chief

Judge Brozman's decision in *Ralph Lauren Womenswear*[55] put forward a different approach.

She contrasted the estimation of factual disputes with legal ones:

---

[52]    *Bittner*, 691 F.2d at 134.

[53]    *Thomson McKinnon*, 191 B.R. at 989; *Windsor Plumbing,* 170 B.R. at 521.

[54]    170 B.R. at 521(emphasis in original); *accord In re Farley, Inc.*, 146 B.R. 748, 753-54 (Bankr. N.D. Ill. 1992).

[55]    *Ralph Lauren Womenswear*, 197 B.R. at 775.

> Thus, to the extent that I have had to analyze the facts presented by the parties, I have sought not to make definitive findings of fact, but instead to assess the probabilities of the various contentions made by the parties passing muster upon my final adjudication of Kreisler's claim.  In contrast, the parties' legal arguments must be evaluated not for the probability that they have merit, but rather for their correctness as a matter of governing law.  *In re Thomas McKinnon Securities*, 191 B.R. at 979 (in estimating a claim, court is "bound by the legal rules which may govern the ultimate value of the claim").[56]

Chief Judge Brozman made those observations in the context of estimation for voting purposes.  But as I noted above, estimation is used for a variety of purposes, and when it is used for the purposes of setting a reserve—the size of which can have a practical effect on the claimant's ultimate ability to recover on its claim, in whatever amount it's ultimately allowed—I think a more nuanced approach is appropriate.  Since the views of the bankruptcy court aren't necessarily the last word on the legal issues, and an appellate court might look at them differently, I think that any responsible estimation analysis at the bankruptcy court level should, while still evaluating the parties positions "for their correctness as a matter of governing law,"[57] also recognize the possibility (and try to estimate the *probability*) of different conclusions in the appellate process.

Except in the easiest cases, "double or nothing" approaches are in my view inappropriate when estimating for the purpose of setting plan reserves.  If the required reserve is set at a level that's too high (to accommodate, for example, a mere possibility that an appellate court might conclude that the bankruptcy court should ultimately allow the claim in a greater amount), the whole purpose of the claims estimation will be frustrated, and other stakeholders will be prejudiced.  If the reserve is set at a level that's too low, the claimant will as a practical matter

---

[56]    *Id.* at 775.

[57]    *Id.*

-20-

lose any ability to recover on its claim at all, as remaining fund reserves may be insufficient to satisfy the claim if an appellate court concludes that the bankruptcy court erred in its legal analysis when disallowing the claim, even though the appellate court's conclusion was thought to be improbable.

Just as Judge Connelly, with respect to the disputed facts component of an estimation process, appropriately considered that "recovery is to a large extent dependent upon the individual backgrounds of the triers of the facts,"[58] analogous considerations apply to some extent when other judges might be analyzing the applicable law on appeal. Thus, while I simply determine and apply the legal rules that govern the claim, I feel that I also have to recognize that I've been reversed from time to time over the last 10 years, and appellate courts have not always agreed with me. As a result, as discussed below, while I ultimately agree with Chemtura's view of the law, I don't consider it appropriate to disregard the possibility of an appellate reversal— especially on a claims reserve matter, which has a potential adverse effect on a claimant's ability to recover on its claim beyond the effect that would flow merely from a decision on feasibility or claims voting. My ultimate conclusions, discussed below, flow from this more nuanced approach.

## II.

### Estimation of Liability Outcomes Here

Under the law applicable to the claims Oildale asserts here,[59] the Debtors here assert four defenses—two premised on contentions that Witco and its successors Crompton and Chemtura

---

[58]     *Thomson-McKinnon*, 191 B.R. at 989.

[59]     Though the parties disagree as to how certain issues would be decided under California law, both sides agree that the Cogeneration Agreement is governed by California law.

were released from their obligations on the Cogeneration Agreement, and two premised on contentions that even if claims remained, the statute of limitations has run on them.

In the first of the two discharge arguments, the Debtors contend that Witco (and thus its successors Crompton and Chemtura) was discharged from liability on the Cogeneration Agreement by virtue of Golden Bear's and Oildale's execution of the Second Amendment, in April 2000. In the second, the Debtors contend that Witco (and thus its successors) was discharged from liability under the Cogeneration Agreement by virtue of the Oildale-Golden Bear Settlement.

In the first of the two statute of limitations arguments, the Debtors contend that the right to recover from Witco accrued when Golden Bear rejected the Cogeneration Agreement (thereby breaching it), in June 2001. In the second of them, the Debtors contend that Witco successor Crompton unequivocally repudiated any and all obligations Crompton had under the Cogeneration Agreement when it sent Oildale the Crompton August 2001 Letter, and that the statute of limitations on any Oildale claims began to run in August 2001. In either case, the Debtors argue, Oildale's claims, which are deemed to have been asserted as of the March 18, 2009 Petition Date, 7-1/2 years later, were untimely.[60]

Each of these contentions is disputed by Oildale. I address them in turn. But first I address a threshold issue—one that provides the underpinnings for each of the discharge contentions—whether, after the assignment of the Cogeneration Agreement from Witco to

---

[60] The Debtors also contend that even if they still have enforceable obligations under the Cogeneration Agreement, they can terminate them on notice by exercising that alleged right at this point in time, and thereby limit Oildale's rights to damages for amounts due in the future. Though this contention is moot in light of my conclusions, discussed below, that the Debtors will prevail on summary judgment as to one each of their discharge and statute of limitations contentions, I conclude that the Debtors' termination right contention is unpersuasive, for the reasons set forth on pages 49-50 below.

Golden Bear, Witco remained as a principal obligor, on the one hand, or then became a surety for

Golden Bear's performance, on the other.

1.      *Did Witco Remain as an Obligor or become a Surety?*

The Parties disagree as to Witco's status on the Cogeneration Agreement after July 1997,

when Witco sold the Refinery and assigned its rights and obligations under the Cogeneration

Agreement and Ground Lease to Golden Bear.  Oildale contends that Witco remained a principal

obligor and became a co-obligor with Golden Bear under the Cogeneration Agreement.  The

Debtors argue that even absent any consent to the assignment from Oildale, Witco became at

most a surety on the Cogeneration Agreement following the assignment, and dispute even that.

Under California law, a surety is described as "one who promises to answer for the debt,

default or miscarriage of another[.]"[61]  A surety relationship

> arises where two persons are under obligation to the same
> obligee, who is entitled to but one performance, as between
> the two who are bound, and one of them should ultimately
> bear the burden of the obligation.  The obligor ultimately
> responsible for the debt is the principal and the other is a
> surety.[62]

The suretyship may be made by express agreement or implied by law.[63]  One such

"implied by law" suretyship is relevant here:  California law recognizes that where a contract has

been assigned to an assignee, the assignor remains liable on the contract as a surety, absent a

novation.[64]

---

[61]     *Mead v. Sanwa Bank California*, 61 Cal.App.4th 561, 567 (1998) ("**Mead**") (*quoting* California Civil Code §2787).  In addition, under California law, there is no longer a distinction between sureties and guarantors. *See id.* at 566, n.1.

[62]     *Id.* at 566-67 (*citing Everts v. Matteson*, 21 Cal.2d. 437, 447 (1942)).

[63]     *Id.* at 566 (*citing Braun v. Crew*, 183 Cal. 728, 731 (1920) (mortgagor and maker of secured note becomes surety when the property is sold and buyer assumes the debt)).

[64]     *See, e.g., Cutting Packing Co. v. Packers' Exch.*, 86 Cal. 574, 577 (1890) (because supplier had neither consented to a novation of contract nor released plaintiff from its obligations, plaintiff "stood in the nature of a surety for [the defendant] for the performance of the obligation"); *Baer v. Associated Life Ins. Co.*, 202

-23-

Section 16.2(b) of the Cogeneration Agreement (as amended by the First Amendment) provides:

> Witco shall have the right to assign its interest in all (but not part) of this Agreement to any purchaser of all or substantially all of Witco's interest in the Refinery ("Assignee"), *but Witco shall not be released from its obligations hereunder as a result thereof.* However, Witco shall be fully and completely discharged from its obligations hereunder, provided that such Assignee shall agree to and shall assume and be bound by the terms of this Agreement, and is reasonably deemed in writing by Cogen and TCW (or other future secured lenders of Cogen) to be capable of performing under the terms of this Agreement.[65]

Here, Witco assigned its rights under the contract to Golden Bear. But the Debtors do not contend that Oildale Cogeneration (or TCW or any later secured lender) provided the written consent required to satisfy the second sentence of Section 16.2. Likewise, because Oildale and the lender did not consent to this assignment, there was no novation, and Witco was not relieved of all liability on the contract. Thus Witco remains liable in some capacity, either as an obligor or as a surety.

As noted, however, Oildale argues that Witco remained liable as an obligor, and not just as a surety. Oildale makes two contentions in this respect. Oildale first contends that the language in Section 16.2(b) providing that in the absence of written consent by Oildale, "Witco shall not be released from its obligations hereunder as a result thereof," means that even if, under California law, Witco would have become a surety on the contract, the parties agreed on something different. Oildale further argues, based in material part on findings in the Oildale chapter 11 case (to which Witco wasn't a party) that the Ground Lease had to be construed

---

Cal.App.3d 117, 123 (1988) (when assignee assumes assignor's obligation, assignor must respond in the event of assignee's default, unless there is a novation); *Walker v. Phillips,* 205 Cal.App.2d 26, 33 (1962) (absent novation or release, "the assignor remains secondarily liable as a surety or guarantor if the assignee is found to have assumed the obligation").

[65] First Amendment, at 10 (emphasis added).

-24-

together with the Cogeneration Agreement, that the Cogeneration Agreement should be subject to special rules applicable to real estate transactions.  But in each case, I disagree.

First, the clause "Witco shall not be released from its obligations hereunder as a result thereof"[66] does not mean that Witco remained a principal obligor.  The beginning of the sentence reveals that the parties contemplated that any assignment of the Cogeneration Agreement by Witco would be "to any purchaser of all or substantially all of Witco's interest in the Refinery."[67]  Thus following any assignment, it would be impossible for Witco to perform as a primary obligor because Witco would no longer own and operate the Refinery.  The parties could not have intended that Witco would be required to perform after such an assignment.  Instead, they could only have intended that Witco would pay Oildale if the assignee failed to perform or pay.  That, of course, is the essence of a suretyship.  The clause cited by Oildale must therefore be read to say that without Oildale's consent to an assignment, Witco would lose the right to be "released from its obligations" altogether, but would not be released of its obligations *as a surety*.

Second, though I agree, to the extent my views matter, with the findings by Judge Rimel that the Cogeneration Agreement and the Ground Lease were related and had to be considered together for the purposes then before her, those findings hardly convert the Cogeneration Agreement into a lease or other real estate transaction, especially in any way that would be binding on the Debtors here.  First, of course, Witco wasn't a party to the dispute in which Judge Rimel made her findings, and there is no basis for binding Witco or its successors to those findings.  Second, Judge Rimel made those findings in a wholly different context, and extracting her conclusions for this wholly different purpose distorts their meaning.  Third, Oildale's

---

[66]     *Id.*

[67]     *Id.*

contentions are simply a play on words.  While related, the Cogeneration Agreement and Ground Lease were different documents, with different obligations.  The fact that they were related did not transmogrify the Cogeneration Agreement into a lease.

Third, undisputed facts with respect to events following the assignment further support Witco's status as a surety.  California law permits "[o]ne who appears to be a principal, whether by the terms of a written instrument or otherwise, [to] show that he is in fact a surety, except as against persons who have acted on the faith of his apparent character of principal.  It is not necessary for him to show that the creditor accepted him as surety."[68]  As the Debtors point out, after 1997, Oildale did not treat Witco as co-liable with Golden Bear on the contract:

> (a) the Second Amendment entirely removed Witco's name from the Cogeneration Agreement and Ground lease, and Witco did not execute the Amendment;

> (b) although the Cogeneration Agreement required monthly invoicing by Oildale, following the assignment, Oildale invoiced only Golden Bear;

> (c) Oildale listed only Golden Bear as the counterparty to the Ground Lease and Cogeneration Agreement in its bankruptcy schedules;

> (d) Oildale did not seek payment from Witco until after the Golden Bear bankruptcy; and

> (e) in the July 10, 2001 letter from Oildale to Crompton, Oildale stated that Witco remains liable for the *obligations of Golden Bear*.

---

[68]       Cal. Civ. Code §2832.

These facts too cause me to conclude that while Witco was ineligible for a release of all

liability on the Cogeneration Agreement following the assignment to Golden Bear, Witco's

remaining liability was as a surety, and not as an obligor.[69]

2.      *Discharge Argument #1*
        *(Discharge of Witco As a Consequence of Second Amendment)*

With that as a predicate, I turn to the first of Witco's discharge contentions—that Witco

was discharged as a surety by reason of material amendment of the Cogeneration Agreement, at

the time of execution of the Second Amendment.  Ultimately, I conclude that Witco was not.

Under California law, "[c]ertain acts by [a] promisee exonerate, or release, the surety."[70]

Cal. Civ. Code § 2819 provides that a surety "is exonerated if the promisee alters the principal

obligation in any respect or impairs or suspends the promisee's rights or remedies against the

principal, unless the surety consents or is indemnified by the principal."[71]  Though the statute's

text is seemingly absolute—referring to alteration "in any respect"—California caselaw imposes

a materiality standard.  It provides that where a contract "is altered without the consent of the

[surety] and *in respects so material* as to change the *substantial* rights of the parties thereto and

in effect to make a new contract, the [surety] is exonerated."[72]

The critical issue is the materiality of the contractual alteration or amendment.  Courts in

California applying this rule have found alterations to a contract to be sufficiently material to

---

[69]    In connection with its argument that Witco remained as a principal obligor and not a surety, Oildale argues
        that "[v]iewed most favorably to Debtor, whether Witco was a surety or a continuing co-obligor presents a
        triable issue of fact."  Oildale Summ. Judg. Opp. Br., at 16.  I'm not sure if that is true, given that the
        underlying facts that cause me to conclude as I do are undisputed.  But even if that were so, it would not
        matter on a motion, like this one, for estimation of a claim.  I can and do conclude that on this issue, either
        on summary judgment or after trial, Oildale will not prevail.

[70]    *R.P. Richards, Inc. v. Chartered Construction Corporation*, 83 Cal.App.4th 146, 154 (2000) ("**R.P.
        Richards**").

[71]    *Id.* (*citing* Cal. Civil Code §2819).

[72]    *Boteler v. Conway*, 13 Cal.App.2d 79, 82, 56 P.2d 587, 588-89 (1936) ("**Boteler**") (emphasis added) (*citing*
        Cal. Civ. Code § 2819).

-27-

release a surety where the amendments changed the time for performance and payment under the

contract[73] or where the amendments provided for additional work to be performed by one party

and paid for by the other under the contract.[74]

Here, however, the Debtors have failed to provide any evidence showing that the changes

in the Second Amendment were material—most obviously, by showing how the new definition

of "fuel costs" in the Second Amendment changed what either party would be obligated to pay

under the Cogeneration Agreement.  Such evidence might include, for example, figures for the

variables in the fuel price calculation, and what their practical significance might be.

I don't know whether any evidence of materiality exists—though it is fair to assume, at

least for purposes of a reserves estimation motion, that if it did, the Debtors would have

proffered it.  Because the Debtors failed to provide this evidence, I cannot find this to be a basis

for concluding that Witco was wholly discharged as a surety for any liability it might otherwise

have under the Cogeneration Agreement.

3.  *Discharge Argument #2*
    *(Oildale-Golden Bear Settlement)*

The Debtors also contend that the Oildale-Golden Bear Settlement, executed by Golden

Bear and Oildale in February 2002 during the course of their respective bankruptcies, had the

effect of releasing the Debtors from any liability to Oildale.  I agree.

By way of context in considering these issues, it will be recalled[75] that in its chapter 11

case (Bankruptcy #1, in Los Angeles, filed in April 2001), Golden Bear rejected two executory

---

[73]  *See id.* at 79 (finding surety released from liability on contract where "before any cabinets were delivered, the secretary of Monarch and the president of Lloyd, without the knowledge or consent of defendant [surety], made certain written changes in the contract, by which the period of time for the manufacture of 10,000 cabinets was reduced from one year to eight months and the time during which Monarch was to purchase all of its cabinet requirements was reduced from one year to about eight months").

[74]  *See First Congregational Church of Christ in Corona v. Lowrey*, 175 Cal. 124 (1917) (finding that certain alterations and omissions made and agreed to between owner and contractor, amounting to $577.25, were sufficiently material to exonerate surety).

-28-

contracts: (i) the Cogeneration Agreement, under which Golden Bear was an obligor; and (ii) the

Ground Lease, under which Golden Bear was the lessor and Oildale Cogeneration (and thereafter

Oildale), as lessee, had leased the land on which the cogeneration facility was located.  Of

course, as a consequence of those two rejections, Oildale had legal rights, which Oildale asserted

in a proof of claim filed in Golden Bear's chapter 11 case,[76] and most of which, under the

settlement, Oildale then released away.  It will also be recalled, by way of context, that in its own

chapter 11 case (Bankruptcy #2, in Fresno, filed in June 2001), Oildale sought to *assume* the

Ground Lease.[77]  And while Oildale's motion to assume (filed in August 2001) was objected to,

and was the subject of substantial litigation, it ultimately was granted in June 2002.[78]

      With that by way of context, I need to decide whether Oildale's release of claims against

Golden Bear under the Oildale-Golden Bear Settlement, or aspects of that agreement, resulted in

a discharge of claims Oildale might otherwise have against Witco and its successors.

      As previously noted,[79] acts by a promisee may under certain circumstances exonerate or

release the surety, including when the promisee (here, Oildale) alters the principal obligation.

Cal. Civ. Code § 2819 provides:

> A surety is exonerated, except so far as he or she may be
> indemnified by the principal, if by any act of the creditor,
> without the consent of the surety the original obligation of
> the principal is altered in any respect, or the remedies or
> rights of the creditor against the principal, in respect

---

[75]    *See* page 6 *supra*.

[76]    *See* Oildale's proof of claim, Catalanello Certif. Exh. E, at 1 (with respect to Cogeneration Agreement
claims) and 3 (with respect to Ground Lease claims).  It should also be noted (in connection with my earlier
conclusion that after the assignment from Witco to Golden Bear, Witco became a surety, as contrasted to
obligor), that of 14 obligations under the Cogeneration Agreement that were allegedly breached by Golden
Bear (see *id.* at 2), 10 of them would have little or no meaning with respect to an entity, like Witco, that no
longer was in possession of the property.

[77]    *See* Oildale Motion to Assume, Catalanello Certif. Exh. H.

[78]    *See* Findings of Fact and Conclusions of Law on Oildale Motion to Assume, Catalanello Certif. Exh. K.

[79]    *See* page 27 *supra*.

thereto, in any way impaired or suspended.  However,
nothing in this section shall be construed to supersede
subdivision (b) of Section 2822.

Cal Civ. Code § 2822(b), which places limits on the use of § 2819, provides:

> For purposes of this section and Section 2819, an
> agreement by a creditor to accept from the principal debtor
> a sum less than the balance owed on the original obligation,
> without the prior consent of the surety and without any
> other change to the underlying agreement between the
> creditor and principal debtor, shall not exonerate the surety
> for the lesser sum agreed upon by the creditor and principal
> debtor.

The Debtors here argue that under § 2819 and California's related caselaw, the Oildale-Golden Bear Settlement released Witco (and hence its successors) from continuing liability as a guarantor of Golden Bear's obligations.  I agree.

As noted above,[80] through that settlement, Oildale did far more than merely agree not to pursue claims (*i.e.*, sue) Golden Bear, and Golden Bear did far more than merely agree to allow claims (i.e., pay in part) Oildale.  Despite the fact that Oildale too had failed to meet all of its obligations under the Cogeneration Agreement, Oildale and Golden Bear provided, among other things, that Golden Bear "waive[d] and release[d]," among other things, (1) any claim that that there had been a default by Oildale under the Cogeneration Agreement; (2) any right to the cure of any such default; (3) any right to compensation for pecuniary loss resulting from any such default; (4) any claim that Oildale had to assume the Cogeneration Agreement in order to assume the Ground Lease; and (5) any claim that Oildale was obligated to deliver steam or process heat to Golden Bear on or after February 6, 2001[81]—one of the most significant obligations Oildale

---

[80]   *See* pages 9-12 *supra*.

[81]   Likewise, Golden Bear agreed that Oildale "shall be deemed to have made available to Golden Bear the 'Required Level of Production'" under the Cogeneration Agreement, with respect to both steam and process heat during the entire period from January 1, 2001 through July 6, 2001 even though Oildale had suspended operation of the Cogeneration Facility from February 6, 2001 to some later time, and Golden

-30-

had under the Cogeneration Agreement.  By these provisions, Oildale secured an agreement from
Golden Bear that Oildale didn't have to comply with basic elements of the deal for which Oildale
was claiming payment.[82]

Unlike the modifications to the Cogeneration Agreement by reason of the Second
Amendment, here "the original obligation of the principal" was altered in *material* respects,
much more than the "any respect" to which § 2819 makes reference.  The Oildale-Golden Bear
Settlement did not just trade a partial payment by Golden Bear for a covenant not to sue, or for a
"reduce and allow" with respect to Oildale's claim in the Golden Bear chapter 11 case.[83]  It
eliminated defenses to Oildale claims that would be based on undisputed facts.

---

Bear "waive[d] and release[d]" any claim for "Guarantee Fuel Costs" as defined in the Cogeneration
Agreement arising out of non-delivery of steam or process heat during the January 1 through July 6, 2001
period.

[82]   I've assumed, for purposes of this analysis, that since the duties of the surety were congruent with its
primary obligor, these modifications and releases were binding on Witco and its successors.  If they
weren't, then Witco would have the defenses to the Oildale claims that Golden Bear had bargained away.

Of course, I don't fault Golden Bear, its counsel, or its Creditors Committee for securing such agreements.
I merely hold that they had consequences.  Given the applicable California law at the time, if Oildale
wanted to bind Witco to further obligations (or releases of defenses), Oildale should have made Witco a
party to the settlement agreement.

[83]   I assume, without deciding, that either of these would be insufficient to release a surety, and that Oildale
could then go after a surety for unpaid amounts.  Likewise, I do not base my conclusions here on the
truisms that Golden Bear filed a chapter 11 case, rejected the Cogeneration Agreement, or, even before
rejection, would be protected under federal bankruptcy law from a demand by Oildale for specific
performance.  *See* Oildale Summ. Judg. Opp. Br., at 18 (accusing the Debtors of disregarding these facts).
Once more I assume, without deciding, that in the absence of more, these circumstances would not result in
the release of a surety.  Oildale cites section 524(e) of the Code, which provides in substance that the
discharge of a debtor doesn't affect the liability of another for such debt.  *Id.* at 16, n.7.  But the Debtors
here aren't relying on Golden Bear's ability to get a discharge; they are relying on provisions in the
Settlement Agreement that materially modified the underlying obligation, and, in particular, bargained
away potential defenses and potential counterclaims to Oildale's claim of a breach.

Similarly, Oildale also cites California Civil Code § 2825 for the proposition that a surety isn't exonerated
by the discharge of his principal by operation of law without the intervention or omission of the creditor.
*Id.*  That is true, but it misses the point.  The Debtors aren't claiming that the claims against Golden Bear
were released by operation of law; they're claiming that the obligations—and in particular defenses and
counterclaims by reason of Oildale failures of performance—were modified by *agreement.*  Thus the
provisions of Bankruptcy Code section 524(e) and Cal. Civ. Code § 2825 have no relevance to the issues
here.

I well understand that when Oildale entered into the Oildale-Golden Bear Settlement, it

wanted to keep the right to go against Witco, and even provided, in a recital, that it "reserves all

its rights and remedies against Witco."  But after Oildale chose to modify the underlying

obligations by executing the Settlement (and in particular to secure waivers of claims and

defenses with respect to Oildale's failures to perform, on February 6, 2001 and thereafter),

Oildale had no rights to reserve.  Similarly, while Oildale secured a covenant (from Golden Bear,

not Witco), that "[n]othing herein shall prejudice or be deemed to impair any claims or

counterclaims of Oildale against Witco," that *ipse dixit* statement couldn't trump California

statutory law.  Once more, if Oildale wanted to bind Witco in any way, it should have made

Witco a party.[84]

Thus on this point I agree with the Debtors, and rule that by reason of provisions in the

Oildale-Golden Bear Settlement, Witco and its successors were released from the obligations

they'd otherwise have under the Cogeneration Agreement.

4.  *Statute of Limitations Argument #1*
    *(Rejection of Cogeneration Agreement*
    *in the Golden Bear Bankruptcy)*

In the first of their two statute of limitations contentions,[85]  the Debtors contend that

Oildale's causes of action accrued, and the statute of limitations began to run, when Golden Bear

rejected the Cogeneration Agreement—thereby breaching the Cogeneration Agreement, and

---

[84]    I similarly reject Oildale's contention (Oildale Summ. Judg. Opp. Br., at 17) that the failure by Crompton
(which by this time was Witco's successor) to object to the approval of the Oildale-Golden Bear
Settlement, in either of the Golden Bear and Oildale chapter 11 cases, caused Witco to forfeit its right not
to be bound under California law.  The Oildale-Settlement Agreement did not seek affirmative relief
against Witco or its successors and in substance provided for a unilateral reservation of rights.  Oildale did
not cite any authority for its contention that failure of a party to object under those circumstances would
result in a forfeiture of state law rights, and I'm aware of none.

[85]    Though the two sides differ on when the statute of limitations began to run, both sides agree that the
applicable statute of limitations is California's, and that its duration is 4 years.  *See* Cal. Code Civ. Pro.
§ 337.  In California, as in many states, a "cause of action for breach of contact accrues at the time of
breach, which then starts the limitations period running."  *Cochran v. Cochran*, 56 Cal.App.4th 1115, 1120
(1997) (*citing Whorton v. Dillingham*, 202 Cal.App.3d 447, 456 (1988)).

commencing the time for Oildale to commence suit against Crompton on its secondary liability.
Ultimately, I don't agree.

Both sides seem to agree that if Witco or its successors hadn't been released from
obligations to Oildale by reason of material amendment (discussed above), Oildale could look to
Crompton[86] for payment after Golden Bear rejected, and that Crompton was liable for past sums
due to Oildale that Golden Bear had failed to pay.  But I believe that California's highest court
would hold that future Crompton obligations should be regarded as payable under an
"installment contract," and that Oildale's causes of action against Crompton would continue to
accrue in installments, unless and until Crompton repudiated them—which Crompton didn't do
until two months later.

The Debtors are right that Cal. Civ. Code § 2807 provides that "[a] surety who has
assumed liability for payment or performance is liable to the creditor immediately upon the
default of the principal, and without demand or notice," and that "[t]he general rule is that the
liability of a surety (in the absence of a different contractual provision) accrues at the same time
as that of the principal, or upon default of the principal."[87]  Likewise, it is hornbook bankruptcy
law, under section 365(g) of the Code and caselaw, that "the rejection of an executory contract
constitutes a breach of the contract."[88]

But it doesn't necessarily follow from that California state law and federal bankruptcy
law that under other California law, the statute of limitations then began to run with respect to
the surety for future sums that were due from the rejecting debtor.  While it is true that upon
rejection of an executory contract in bankruptcy, the contract counterparty must file a claim

---

[86]    By this time, Crompton was successor to Witco.

[87]    *Bloom v. Bender*, 48 Cal.2d 793 (1957).

[88]    *In re Ortiz*, 400 B.R. 755, 764 (C.D. Cal. 2009); *accord In re Hooker Investments., Inc.,* 131 B.R. 922, 927
n.6 (Bankr. S.D.N.Y. 1991) (Brozman, C.J.) (*citing* section 365(g)(1)).

-33-

against the estate for the entirety of the debtor's liabilities under the contract, state law

determines whether the statute of limitations then begins to run for the rejected future obligations

against the *guarantor*.  Since breach by the debtor principal isn't the same as breach by the

nondebtor guarantor, it doesn't follow that the statute of limitations would start to run against the

guarantor at the same time for anything more than the installment whose payment was missed.

Decisions under California law recognize a general principle that where performance

under a contract is owed by payments of installments over time, and the promisor does not

repudiate its future obligations, the right to sue for those installments accrues only when those

installments come due and are unpaid.  As discussed below,[89] I think California's highest court

would recognize the exception—recognized in California caselaw, Ninth Circuit and other

decisions, and in *Corbin*—that the general rule doesn't apply where there has been an outright

repudiation after some performance has become due.  But when Golden Bear rejected, the

repudiation was by *Golden Bear*, and Golden Bear alone.  Although Crompton failed to pay

Golden Bear's past monetary obligations (which became due from Crompton "immediately upon

the default of the principal, and without demand or notice"),[90] and was in breach of its

obligations to Oildale for that relatively small portion of Oildale's total claim, Crompton did not

immediately breach any further duties to pay Oildale, by either failure of performance or

repudiation.  Crompton's breach came only two months later.

I therefore conclude that the statute of limitations for claims against Witco successors

Crompton and Chemtura *did not* start to run solely as a result of Golden Bear's rejection of the

Cogeneration Agreement.

---

[89]     *See* page 36 *infra*.

[90]     Cal. Civ. Code § 2807.

-34-

5. *Statute of Limitations Argument #2*
   *(Crompton August 2001 Letter)*

In their second statute of limitations point, the Debtors contend that even if, *arguendo*,

Witco successor Crompton remained liable after modifications to the Cogeneration Agreement

(and even if the statute of limitations for future claims against Crompton and its successor

Chemtura didn't begin to run by reason of Golden Bear's rejection), California's 4-year statute

of limitations for breach of contract began to run as a consequence of the Crompton August 2001

Letter.[91]  With this letter, the Debtors contend, Crompton repudiated any duty to satisfy Golden

Bear obligations, resulting in a total breach of the contract and commencing the running of the

statute of limitations.

Oildale responds that the Crompton August 2001 Letter did not rise to the level of

repudiation, and that even if it did, the repudiation did not trigger the statute of limitations for *all*

claims under the Cogeneration Agreement because the Cogeneration Agreement was an

installment contract.  Thus, Oildale argues, it could, if it wished, elect to wait for individualized

payment of each installment as it came due—and that under these circumstances, the statute of

limitations did not start to run for all Oildale claims upon repudiation, but rather started running

at different times for each payment, when each payment came due and went unpaid.

I agree that the Cogeneration Agreement was in the respects relevant here an installment

contract,[92] but can't agree with the remainder of Oildale's contentions.  To the contrary, I rule

that the Crompton August 2001 Letter was a paradigmatic example of a contractual repudiation,

---

[91]    If the Debtors are right in this respect, they would prevail even if their liability under the Cogeneration
Agreement was as a principal obligor, as contrasted to surety.  For the reasons that follow, I conclude that
the Debtors *are* right, and that the statute of limitations began to run by reason of the Crompton August
2001 Letter whether or not Crompton was a principal obligor, on the one hand, or a surety, on the other.

[92]    The Debtors do too.  *See* 11/10/10 Hr'g Tr. at 70 ("We agree with [counsel for Oildale].  It was an
installment contract.").

and that when it was sent or at least received,[93] the statute of limitations began to run for any past or future amounts that might be due.  I also rule that upon Crompton's repudiation, the statute of limitations then began to run, and that Oildale did not have the luxury of waiting 7-1/2 years before asserting its claim.

### (a)  The Repudiation Exception

With respect to the underlying legal principles, I agree with the Debtors that while the timing of the monetary obligations under the Cogeneration Agreement made the contract an "installment contract" as that expression is used in California law, an unequivocal repudiation could take the situation out of the general rule that, for statute of limitations purposes, a party may sit back and wait for each required payment as such payments come due in the future.[94]

When a federal court deals with an issue of state law upon which the highest court of a state hasn't spoken, "a prediction must be made, taking into consideration relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data,

---

[93]    Assuming that the Crompton August 2001 Letter was (as I ultimately find) a repudiation, I don't need here to address whether the time to sue would start to run from the time of mailing (when Crompton breached any obligations it then had), or the time the mailing was received—when Oildale was put on notice of its need to sue.  In either case, Oildale's claims would be stale by more than 3-1/2 years, and plainly time barred.

[94]    As an example of that general rule—one that applies where there has been a failure to pay an installment but no repudiation at all—see *Romano v. Rockwell Intl., Inc.*, 14 Cal.4th 479, 489 (1996); *Bank of America v. McLaughlin*, 152 Cal.App.2d Supp. 911, 915, 313 P.2d 220 (App. Dep't San Diego Co. Super. Ct. 1957) ("*Bank of America*") ("the statute of limitations begins to run against the cause of action for the recovery of an unpaid installment at the time it is payable.").  But importantly, in *Bank of America* there was simply a claim for periodic payments that were due, and there were no allegations, much less proof, of any repudiation by the obligor.

A like situation was addressed in *Trustees For Alaska Laborers-Construction Industry Health and Security Fund*, 812 F.2d 512 (9th Cir. 1987) ("*Alaska Laborers Fund*"), a case under ERISA, rather than California law, but which was decided under general common law principles and authorities, including *Corbin on Contracts*.  The *Alaska Laborers Fund* court recognized that a contract requiring payments on a periodic basic was capable of a series of partial breaches or "a single total breach by repudiation." *Id.* at 517.  It stated that "*[a]bsent a repudiation of a contract* that requires continuing performance, the plaintiff may only sue for partial breaches as they occur, and the statute of limitations does not begin to run against a subsequent failure to perform until it occurs. *Id.* (emphasis added).  *Because it found no repudiation there*, it held that a new breach occurred every time an obligor failed to make an additional required payment. *See id.* at 517-518.

-36-

tending convincingly to show how the highest court in the state would decide the issue at hand."[95]  Since there here is no California Supreme Court directly on point, my task is to determine how the California Supreme Court would decide this issue.  I conclude that where there was an unequivocal repudiation of duties under an installment contract after some performance was due, the California Supreme Court would conclude that the statute of limitations with respect to all of the claims under that repudiated contract began to run with repudiation.

Here there are several indicators of how the California Supreme Court would decide the issue, and all of the relevant ones support the Debtors' position.  Consistent with the caselaw in this area,[96] the Court starts with the decisions of California's intermediate appellate courts.  The most significant of these is *Fox v. Dehn,*[97] a 1974 case which, like this one, also involved payments due over time; a repudiation by a promisor before full performance was due; and contentions that even though there had been a repudiation after partial breach, the promisee had an asserted right of "election" to await performance of future obligations before initiating suit[98]—and that because of this asserted right of election, the statute of limitations would not begin to run upon repudiation.

---

[95] *Reis v. Barley, Snyder, Senft & Cohen LLC,* 484 F.Supp.2d 337, 349 (E.D. Pa. 2007) ("**Reis**") *aff'd in part and rvs'd in part on other grounds,* 2011 WL 477653 (3d Cir. Feb. 11, 2011) (*citing Nationwide Mutual Ins. Co. v. Buffetta,* 230 F.3d 634, 637 (3d Cir. 2000) ("**Buffetta**")); *accord Adelphia Communications Corp. v. Bank of America (In re Adelphia Communications Corp.),* 365 B.R. 24, 43-44 (Bankr. S.D.N.Y. 2007) (Gerber, J.) (applying this rule, and citing *Buffetta* and *Reis* when determining Pennsylvania law).

[96] In predicting how the highest court of a state will rule, a federal court should "give due regard, but not conclusive effect, to the decisional law of lower state courts."  *Buffetta,* 230 F.3d at 637.  "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court in the state would decide otherwise."  *West v. AT&T Co.,* 311 U.S. 223, 237 (1940).

[97] 42 Cal.App.3d 165 (1974) ("**Fox**").

[98] *Id.* at 171.

-37-

The *Fox* court rejected those contentions—rejecting as well the contention that the repudiation was merely an "anticipatory breach," as that expression had been used in California caselaw,[99] under which the promisee would have a right of election to wait to see if performance might still be forthcoming so that the statute of limitations would not start to run with repudiation.  In reliance on the California Supreme Court's earlier decision in *Gold Mining & Water Co.*, the *Fox* court held, to the contrary:

> An essential element of an anticipatory breach is that repudiation by the promisor occur before his performance is due. … However, "where there is a partial breach of the contract *followed by a repudiation of the contract* by the promisor, although the breach is total, *it is not characterized as an anticipatory breach as to which an election would lie*."[100]

---

[99]     As more fully explained in the following footnote, the words "anticipatory breach," at least as used in *Fox* and *Gold Mining & Water Co. v. Swinerton*, 23 Cal.2d 19, 28 (1943) ("***Gold Mining &Water Co.***"), were used to describe a repudiation before *any* performance yet was due, in contrast to a repudiation where future performance was due but there already was at least a partial breach.  In the former case (*i.e.*, where there hadn't yet been any kind of a performance default, and where the promisee could wait to see if one would be forthcoming), the promisee could elect to await performance of future obligations without the statute of limitations beginning to run.  In the latter case (where repudiation was coupled with at least a partial performance default as well), the breach would be "total," not just "anticipatory," giving the promisee the right to sue for the entire benefit of its bargain, and, as important here, causing the statute of limitations on all of the promisee's claims to begin to run.

[100]     *Fox*, 42 Cal. App. 3d at 171 (emphasis added) (twice citing *Gold Mining & Water Co.*).  In *Gold Mining & Water Co.*, the California Supreme Court noted that total breaches of a contract can occur in two ways, one where the repudiation comes before any performance is due, and one where repudiation comes after some performance (but less than all) has come due.  The *Gold Mining & Water Co.* court stated:

> Strictly speaking, a total breach of a contract may arise in two ways, which although different, have been frequently confused with each other.  One is an anticipatory breach, or as it may be termed, a breach by anticipatory repudiation, which is necessarily total and which is of importance both with relation to an excuse for nonperformance by the promisee, the repudiation being by the promisor, and the right of the promisee to recover damages immediately for a total breach of the contract before performance by the promisor is due thereunder.  By its very name an essential element of a true anticipatory breach of a contract is that the repudiation by the promisor occur before his performance is due under the contract.  On the other hand there may be a total breach of a contract where there has been a partial breach by the promisor, which means of course that the time for a portion of the performance was due, followed thereafter by a repudiation of the contract by him.

-38-

The *Fox* court rejected the contention that the agreement in question was severable, and with it the contention that "as such the statute of limitations only began to run at the time of breach of each obligation."[101]   Once more citing *Gold Mining & Water Co.*, the *Fox* court held:

> We have concluded that decedent's action of February 22, 1970 constituted a total breach of contract and that appellants' cause of action was not one arising from an anticipatory breach.  At what point then is a claim for breach of contract 'due' so as to set the statute of limitations in motion?  In general, where there has been a willful and wrongful termination of a contract and prevention of the other party's performance, an action lies to recover all damages sustained by the injured party; the statute of limitations begins to run against such a cause of action for breach of contract at the time of the breach.[102]

The breach thus was not an "anticipatory breach" but rather was a "total breach,"[103] causing the statute of limitations to begin to run.[104]   For this reason, the *Fox* court held that the delay in bringing suit after the repudiation made the claims untimely.

I think that if called upon to decide to the issue, the California Supreme Court would rule consistently with *Fox*, especially since the principles articulated in *Fox* were likewise articulated in three Ninth Circuit decisions—*Alaska Laborers Fund*,[105] and two decisions in *Minidoka Irrigation District v. Department of the Interior*[106]—and are no more than basic common law, as laid out in *Corbin*,[107] which each of those cite.

---

23 Cal. 2d at 29.

[101]   *Fox*, 42 Cal. App. 3d at 172.

[102]   *Id.* at 173.

[103]   *Id.*

[104]   *Id.* at 174.

[105]   *See*  n.94 *supra*.

[106]   154 F.3d 924 (9th Cir. 1998) ("**Minidoka I**"), and 406 F.3d 567 (9th Cir. 2005) ("**Minidoka II**").

[107]   *See* 4 A. Corbin, *Corbin on Contracts* §§ 951, 956 (1951).

In *Alaska Laborers Fund*, trustees of a pension plan sued a successor employer under ERISA for unpaid contributions to a pension plan, which required the employer to make contributions on a monthly basis. Although the Ninth Circuit ruled that the defendant employer had not repudiated the contract, it made clear, as part of its expression of the basic contract rule, how repudiation would change that result:

> The compliance agreement required Ferrell to make contributions on a monthly basis. This type of contract, which is analogous to an installment contract, requires continuing performance. The contract is capable of a series of partial breaches *or a single total breach by repudiation.* 4 A. Corbin, *Corbin on Contracts* § 956 (1951). *Absent a repudiation of a contract* that requires continuing performance, the plaintiff may only sue for partial breaches as they occur, and the statute of limitations does not begin to run against a subsequent failure to perform until it occurs. 4 A. Corbin, *Corbin on Contracts* § 951 (1951).[108]

Similarly, in *Minidoka I*, an irrigation district sued the U.S. Department of the Interior alleging that the government breached its contract to provide the Irrigation District with annual credits based upon profits derived from the operation of a power plant and lease of farm land. The district court found that the Irrigation District's contract claim, brought in 1991, was barred by the 6-year statute of limitations which began to run when the government repudiated the contract in 1985. In its analysis, the *Minidoka I* court determined that the statute of limitations issue would turn on whether or not there had been a repudiation, citing *Alaska Laborers Fund* for the proposition that "[a] contract that creates continuing obligations 'is capable of a series of partial breaches *or a single total breach by repudiation.*'"[109]  Thus the *Minidoka I* court

---

[108]     *Alaska Laborers Fund*, 812 F.2d at 517 (emphasis added).

[109]     154 F.3d at 926 (emphasis added). It thereafter stated, citing the *Restatement of Contracts*, that "[l]anguage that is accompanied by a breach by non-performance may amount to a repudiation even though, standing alone, it would not be sufficiently positive." *Id.* at 927. While the context in which the *Minidoka I* court made that observation appears to be a discussion of what would be required to show the necessary repudiation, that language was later read, in *Minidoka II*, as embodying an element of the *Minidoka I*

-40-

determined that the only question that it needed to address was whether the United States repudiated the contract. It remanded to the district court to make a finding as to that critical issue.

Then, following a remand upon which the district court determined that the United States had indeed repudiated the contract, and thus that the Irrigation District's claims were time barred, the Irrigation District appealed. It challenged the district court's finding that the statute of limitations barred its suit, making an argument, similar to that here, that the statute of limitations didn't run against continuing violations that occurred during the limitations period. The Irrigation District also argued that that the government's conduct amounted only to an "anticipatory" repudiation and breach, instead of actual repudiation and breach—and that the statute of limitations didn't begin to run with an anticipatory repudiation until the time for performance came due, unless the nonbreaching elected to treat the anticipatory repudiation as a final breach and bring suit earlier.[110]

The government contended that consideration of this argument was precluded by the law of the case,[111] which would normally preclude reconsideration of the legal premise unless certain exceptions were applicable, one of which would be an earlier decision that was clearly erroneous.[112] And the *Minidoka II* court found that the *Minidoka I* court's earlier ruling as to this issue didn't qualify under that exception.[113] It stated, in analysis highly relevant here:

---

court's holding. *See* 406 F.3d at 573. And *Minidoka II* at least seemingly clarified that at least some non-performance should accompany repudiation to result in total repudiation and to get the statute of limitations to start to run. *See id.* and the discussion that follows.

[110] 406 F.3d at 572.

[111] *Id.*

[112] *Id.* at 572-573.

[113] *Id.* at 573.

We therefore conclude that *Minidoka I's* holding that actual repudiation can cause the statute of limitations on a continuing contract to run is still good law."[114]

Given all of that authority, and more from other jurisdictions,[115] I regard it as very unlikely that the California Supreme Court would diverge from *Fox* and the general common law rule.[116]

---

[114]    *Id.* at 574.  It previously had explained:

> The panel in *Minidoka I* relied on our Circuit's decision in *Trustees for Alaska*, which held that contracts requiring "continuing performance" are "capable of ... a single total breach by repudiation."  812 F.2d at 517.  The *Minidoka I* decision is supported by the leading treatises.  *See* 4 A. Corbin, Corbin on Contracts ("Corbin") § 956 (1951) (noting that continuing contracts "are capable of ... a single total breach by repudiation" and that there are cases where "the breach is such that the plaintiff must treat it as 'total' and sue once and for all"); *id.* at § 989 (noting that where there is "actual present breach ... accompanied by definite repudiation ... according to the weight of authority there is a total breach by the repudiator, creating in the injured party a single right of action"); Restatement (Second) of Contracts § 243(2) (1981) ("[A] breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach.").

*Id.* at 573.

[115]    *See, e.g., LeTarte v. West Side Development, LLC*, 151 N.H. 291 (2004) (*citing* 9 A. Corbin, *Corbin on Contracts* § 956 (2002); *Hoyt v. Horst*, 105 N.H. 380 (1964)) (*citing Corbin* for proposition that "successive breaches of a continuing contract, while generally viewed as a series of partial breaches, can result in a total breach when there is a repudiation or a material failure of performance" and citing an earlier New Hampshire Supreme Court case finding total breach of contract where defendants failed to make further payments on a contract and it was clear that they would never pay further installments); *Central States, Southeast and Southwest Areas Pension Fund*, No. 91-C-824, 1993 WL 303128, at *3 (N.D. Ill. Aug. 9, 1993) (*citing* 9 A. Corbin, *Corbin on Contracts* § 956; *Alaska Laborers*, 812 F.2d at 517) (finding no repudiation of contract but acknowledging that if contract had been repudiated, statute of limitations would have run for the entire contract).

[116]    Oildale states that the *Minidoka* cases were decided under federal common law and that *Alaska Laborers Fund* was decided under Alaska law—in neither case California's—arguing that they thus should be disregarded.  I agree that the *Minidoka* cases were decided under federal common law, and while I think *Alaska Labors Fund* (with claims having their origins under ERISA) was too (with Alaska law being used only to borrow the applicable statute of limitations), I understand the point that Oildale is trying to make.  But I disagree with it.  Existing caselaw, discussed above, see n.96 *supra*, articulates how a federal court should address an issue of state law upon which a decision of the state's highest court is lacking.  Here the object, as I noted, is to predict how California's highest court would decide an issue upon which it previously had not ruled.  While I believe that I should give the greatest weight to *Fox*, *Buffetta* teaches us, in trying to ascertain how a state's highest court would rule on an issue, to consider, in addition to "relevant state precedents," "analogous decisions, considered dicta, scholarly works, and any other reliable data." 230 F.3d at 637.  Especially when California's own intermediate appellate court has ruled consistently with principles of law commonly accepted across the country, I think it quite unlikely that the California Supreme Court would disregard what the Ninth Circuit and *Corbin* said about an issue, even if they were discussing principles of contract law applicable in the United States generally.

-42-

In response, Oildale relies on another California decision at the intermediate appellate court level, *Conway v. The Bughouse, Inc.*[117]  I have little doubt that the California Supreme Court would consider *Bughouse* as well, but I don't think that *Bughouse* would be regarded as sufficiently on point, or, especially, as casting doubt in any way on *Fox*.

In *Bughouse*, plaintiff Janet Conway's former husband Dalton Adams and one Dan Budnick each formerly owned half of defendant Bughouse Inc., an importer of novelty items made in the Orient.  In May 1970, Adams and Budnick entered into a contract under which Adams transferred his half interest in the company to Budnick, in exchange for which Budnick and/or the company agreed to pay Adams $40,000 up front, $1,000 per month for the rest of Adams' life, and $500 per month to plaintiff Janet Conway should she survive the death of her then-husband Adams.  Adams also agreed to refrain from engaging in any competitive business, and to make trips to the Orient at Budnick's request.

About a year later, in June 1971, apparently in response to bizarre conduct on Adams part that was perceived to be a breach of Adams' non-compete obligations under the contract, Budnick and the company stopped paying Adams and his wife, who had taken an assignment of part of Adams' entitlement as part of a marital property settlement.  In June 1976, about five years later, Conway sued Budnick and the company for the installment payments due under the contract.

The trial court ruled that Adams hadn't violated the non-compete clause, and that the lawsuit was still timely with respect to payments due in the preceding four years.  The *Bughouse* court affirmed on appeal, agreeing that while Adams' conduct was indeed bizarre, he still hadn't violated the noncompete clause.  It also found that the contract was in substance an installment

---

[117]    105 Cal. App. 3d 194 (1980) ("***Bughouse***").

contract, and, citing *Bank of America*, determined that the statute of limitations for unpaid

installments would run only when those installments became payable.[118]  Thus it permitted

recovery of installments that fell due within the four-year statute of limitations period.

Significantly, it found Budnick's and the company's breach to be a failure to pay, as contrasted

to a repudiation of their obligations, and never used the word repudiation or any variant of it

except to describe defendant contentions.[119]

Oildale doesn't argue that *Bughouse* overruled or criticized *Fox*.  Plainly *Bughouse* did

neither; it merely took *Fox* as a given, and then distinguished it.[120]  Nevertheless, Oildale seems

to contend that *Bughouse* decided that the *Fox* rule that a partial breach plus repudiation results

in a total breach—and, as a consequence, starts the statute of limitations running—does not apply

to installment contracts.  I disagree.

Like the *Minidoka* cases (and the Debtors here), *Bughouse* merely took the installment

contract context of the case as a given.  It never found a repudiation by the promisor defendants,

and thus had no occasion to consider, as *Fox*, *Alaska Laborers Fund*, and the *Minidoka* cases did,

the repudiation exception.  The defendants in *Bughouse* didn't repudiate, and their refusal to

perform on the contract was premised on their belief that Adams had already breached the

contract.

---

[118]    *Id.* at 200.

[119]    *See id.* at 199 (the only reference:  "Defendants contend that Adams' breach was followed by their own repudiation of the contract, thereby resulting in its termination as of 1971.").

[120]    In that connection, the *Bughouse* court wrote:

> Defendants contend that Adams' breach was followed by their own repudiation of the contract, thereby resulting in its termination as of 1971.  (See *Fox v. Dehn*, 42 Cal.App.3d 165, 172, 116 Cal. Rptr. 786 (1974)).  As we accept the lower court's finding that *there was no breach* by Adams, these theories barring recovery become untenable.

*Id.* at 199 (emphasis added).

Thus, while I consider *Bughouse* no less a part of California law than *Fox*, I don't think

that *Bughouse* undercuts *Fox* in any way, or limits it.  And I don't think that the California

Supreme Court is likely to regard *Bughouse* as in any way determinative on the issues we have

here.[121]

*(b)  Repudiation Here*

Of course, as the preceding discussion makes clear, Oildale could sit back and wait for

Crompton's performance on the various obligations that would come due in the future so long as

there wasn't a repudiation on the part of Crompton or any of its successors.  Thus, as in the

*Minidoka* cases, I need to determine whether there was, in fact, a repudiation.

Oildale contends that Crompton's statements in the Crompton August 2001 Letter

weren't sufficiently strong or definite to constitute a repudiation.  But I disagree.

---

[121]    Oildale relies on two additional cases in making its argument, but I find both to be easily distinguishable.
*See Tsemetzin v. Coast Federal Savings & Loan Assn.*, 57 Cal.App.4th 1334 (1997) ("***Tsemetzin***");
*Peterson v. Highland Music, Inc.*, 140 F.3d 1313 (9th Cir. 1998) ("***Peterson***").  *Tsemetzin* has little
relevance here.  In *Tsemetzin*, as here, the plaintiff brought a breach of contract action against the assignor
of an installment contract (there a lease), which presented a statute of limitations defense.  But that is the
only commonality.  In *Tsemetzin*, it was the non-defendant *assignee* that repudiated the contract (the RTC,
as successor to another Savings & Loan which was the original assignee), not the assignor defendant.  *See*
57 Cal. App. 4th at 1339-1340.  The assignee repudiator was the equivalent of Golden Bear here—not
Crompton.  The Debtors' do not contend (or at least I do not agree) that it was Golden Bear's repudiation
that started the statute of limitations running; it was Crompton's.

In *Peterson*, the Kingsmen (which many may still remember as the band that recorded "Louie, Louie," of
fraternity party fame) sued a recording company and others that had bought the masters and other rights to
"Louie, Louie" in exchange for the duty to pay the Kingsmen royalties, and then denied the Kingsmen their
royalties over many years.  The Kingsmen sought rescission of the contract under which they had given up
the rights to the song many years earlier, which the district court granted and the Ninth Circuit affirmed on
appeal, in each case rejecting contentions that relief was barred under the statute of limitations.  The
*Peterson* court, citing *Bughouse*, found the action to be timely under installment contract doctrine.  But
significantly, in *Peterson* there was no claim, or proof, that the defendants had earlier ever repudiated the
contract.  In fact, the words "repudiate" or "repudiation" never appear in the decision.  Thus the *Peterson*
court had no occasion to consider or mention *Fox* or the repudiation exception to the general installment
contract rule, and did not mention *Fox* or that exception.  *Peterson*, like *Bank of America*, *see* n.94 *supra*, is
thus simply another example of the general rule that applies in the absence of a repudiation.

Under these circumstances, I see little likelihood that the California Supreme Court would find either
*Tsemetzin* or *Peterson* to be relevant in deciding issues of the character presented here.

I start with the principle that under California law, "a repudiation must consist of a present, positive unequivocal refusal to perform the contract, . . . and that a mere threat alone to abandon is not a repudiation.[122]  But here what Crompton said was much more than sufficient to meet that requirement.  Crompton stated that it "hereby rejects Oildale's demand for payment of any amount owed by Golden Bear."  And it further stated that "Oildale's sole recourse for the breach of these agreements is against Golden Bear."[123]

Crompton's rejection was present, positive, and unequivocal.[124]

*(c)  The Performance Breach*

Finally, I believe it to be clear that when Crompton repudiated any obligations under the Cogeneration Agreement that were still in existence, performance on its part already was due, and it was in performance default.  Under Cal. Civ. Code § 2807, if Crompton wasn't previously released, payment by Crompton of amounts unpaid by Golden Bear (said by Oildale to be over $1 million) was due immediately upon Golden Bear's rejection.[125]  Indeed, that was recognized by Oildale in its own statements in its July 2001 letter to Witco.  There Oildale stated:

> Golden Bear is in default under the Cogen Agreement by
> reason of its failure to pay $1,228,523 . . . Witco remains
> obligated to perform all obligations of Golden Bear under
> the Cogen Agreement and Lease.  Demand is hereby made

---

[122]   *Gold Mining & Water Co.*, 23 Cal.2d at 28 (internal citations omitted).

[123]   *See* pages 13-14 *supra*.

[124]   Oildale argues, while acknowledging the two quoted passages, that they are "most appropriately viewed as posturing, rather than a definitive repudiation." (Oildale Summ. Judgm. Opp. Br. at 11).  I disagree.  The fact that the letter was thin (and unpersuasive to me) in articulating a "cognizable legal basis" for Crompton's position reinforces, rather than negates, the conclusion that it was a repudiation.  Oildale's contentions as to the circumstances precipitating it (that the letter was "written in response to a mere request, that no threat of legal action [had] been advanced, and that the letter [did] not address the contingency of [Golden Bear] being discharged of liability") likewise reinforce, rather than negate the conclusion that the letter was a repudiation.  And Crompton's perfunctory conclusion ("Please contact me if you have any questions or comments"), rather misleadingly characterized by Oildale to say that "the author solicits further comment," does not negate the clear meaning of the earlier words.

[125]   *See* page 33 *supra*.

-46-

for immediate payment of the amounts owing under the
Cogen Agreement.[126]

As Oildale itself stated, payment of $1,228,523 was due from Witco (now Crompton) by
July 2001.  Thus repudiation of any obligations on the part of Crompton, in the Crompton
August 2001 Letter, didn't take place before payment was due.  It came *after that*—after
Crompton had already failed to make payments that if not previously released were due, under
Cal. Civ. Code § 2807, "immediately upon the default of the principal."

*(d)  Conclusion*

Crompton's repudiation of the Cogeneration Agreement in the Crompton August 2001
Letter, coupled with its partial breach of any remaining obligations under the Cogeneration
Agreement as of that time, resulted in an immediate total breach of the Cogeneration Agreement.
As a result, the 4-year statute of limitations for Oildale to bring an action for beach of the
contract began to run in August 2001, and any action for breach was untimely, as a matter of
law, after August 2005.  Accordingly, I predict that summary judgment will be granted in favor
of the Debtors on this additional ground as well.  Of course, Oildale would then get nothing  in
damages.

## III.

## Amount to Reserve

For the reasons set forth at length above, I predict that the Debtors will prevail on
summary judgment on two of their four principal contentions, and that as a result Oildale will
recover nothing.  While that would normally suggest estimating Oildale's claim at $0, I need to
address the reality that Oildale would be prejudiced if nothing at all were reserved for its claim,
and then an appellate court later disagreed with me.

---

[126]    *See* Oildale July 2001 Letter.

As noted above,[127] estimation is used for a variety of different purposes.  For some of them,[128] estimation at $0 does not have monetary consequences if the estimating court is later determined to have been wrong.  But when estimation is undertaken for the purpose of setting a claims reserve, and value can leave the estate to the extent that it hasn't been held back as a reserve, the creditor whose claim was estimated can be prejudiced if an appellate court later concludes that a claim would be allowed in an amount greater than the amount upon which the reserve was established.  By the same token, if the result of an estimation in the reserves context were to be ignored by the bankruptcy court simply on the basis that an appellate court might have a different view, the bankruptcy court would generally, if not always, be overestimating the claim and directing an excessive reserve, to the prejudice of the remainder of the creditor community.

Thus, as previously discussed,[129] I think that I need to accommodate those competing concerns, and that except in the easiest cases, "double or nothing" approaches are inappropriate when estimating for the purpose of setting plan reserves.  I've tried to address the underlying issues as to the strengths of Oildale's claims in detail and with care, and frankly think that the likelihood that I'll be reversed on these matters is small.  And I recognize that it will be unfair and to a certain extent prejudicial to the Debtors' stakeholders if I make the Debtors reserve any more than my views as to likely outcome warrant.  But while my conclusions as to outcome

---

[127]   *See* page 17 *supra*.

[128]   For example, feasibility and claims voting.  Of course, creditors have rights with respect to these matters, but an inability to recover on ultimately allowed claims is a concern of a higher level.

[129]   *See* page 20 *supra*.

would warrant setting no reserve at all, I think I should still require a reserve at some level higher than zero.[130]

Based on my analysis of the issues here, I think that the likelihood of reversal is very small—probably in the range of 10% to 15%, and certainly less than 30%. Requiring a reserve will almost certainly have the effect of making the Debtors' stakeholders wait longer than they should before they could receive value that they'd get when Oildale's claims were finally disallowed. But while I won't disregard those stakeholders' entitlement to an estimation—for among, other things, avoiding the prejudice to them that might result from an appellate process that could take months or years—I will require a reserve consistent with the high end of my view as to the likelihood of an appellate reversal.

After computation of what Oildale's claim would be if it were actually allowed (including as a consequence of the remaining issues, discussed in Part IV below), the Debtors are to reserve for 30% of that amount.

## IV.

### Remaining Issues

In light of my conclusions above, other issues become moot. But for the benefit of any reviewing court, and for the purpose of setting a reserve pending the finalization of a decision on summary judgment in this Court and in the appellate process, I address them now.

*(A) Chemtura's Asserted Right to Terminate*

The Debtors argue that if all of their other summary judgment arguments fail and they are found to still be liable on the Cogeneration Agreement, the damages for breach must be sharply

---

[130]    I do not think, however, that I should ignore the results of my analysis, such as to provide, notwithstanding my views as to outcome, a reserve calculated to protect Oildale in whole or in substantial part on an appeal. Estimation is in the Code for a reason, and requiring such a large reserve would wholly frustrate its purpose.

limited.  They assert that they have an unqualified right to terminate the Cogeneration

Agreement upon providing Oildale with requisite notice, and that this would cut off any alleged

future liability beyond the effective date of termination.  I disagree.

First, I believe that even if the Cogeneration Agreement had not been repudiated,

Chemtura would not have that right.  It was a surety, not a principal, and after the assignments,

did not succeed to the rights it would need to exercise that right to terminate.

Under Section 10.3(a) of the original Cogeneration Agreement, Witco had the right

terminate it at certain times of each year, by providing 12 months' prior written notice to Oildale

if Witco substantially discontinued operations at the Refinery.  But with the execution of the

Second Amendment, all references to "Witco" in the Cogeneration Agreement were deemed

replaced with the term "Golden Bear."[131]  Thus, from that point on, it was *Golden Bear*, not

Witco or Witco's successors, that had the right to terminate.  Witco no longer had those rights,

which of course is consistent with its change in role from principal to surety.

Second, of course, Crompton repudiated the Cogeneration Agreement (to the extent it

still was binding in any way on Crompton) with the Crompton August 2001 Letter.  Having done

so, Crompton can no longer avail itself of benefits under an agreement that it repudiated.

*(B) Damages Issues*

Though I predict that Oildale will not recover anything, the two sides asked me to rule on

two damages issues that would exist if Oildale were later determined to have any timely claims

under the Cogeneration Agreement, as determination is necessary to fix the size of the reserve.  I

briefly do so now.

---

[131]     And, of course, Witco was no longer operating at the Refinery.

*(1)  Spot vs. Futures Price for Price of Natural Gas*

Natural gas is a determinant of the minimum purchase (or "take") requirement for heat
and steam under the Cogeneration Agreement.  To compute any damages if Oildale otherwise
prevails, it's necessary to determine the appropriate prices for the required future delivery of
natural gas.  The parties agree that damages must be determined as of March 17, 2009, the day
before the Petition Date.[132]

Oildale contends that one must use the *futures* prices for the delivery of the gas in the
future, as those prices existed the day before the Petition Date.  Chemtura contends that one must
use *spot* prices.[133]  On this issue, I agree with Oildale.

In his calculation of damages, Oildale's expert computed the cost of future gas supplies
using the prices of futures contracts as of the Petition Date[134] for delivery of natural gas in the
Southern California-Nevada border area through March 2016.  A different future price was used
for each point in time that an installment would be due under the contract.  Oildale's expert
argued that the use of futures contracts for pricing of natural gas would be appropriate because
the futures market generally reflects the market pricing at which a rational counterparty would be
willing to sell natural gas to Oildale for future deliveries.

The Debtors' expert utilized the "spot market" price for gas as of the Petition Date, which
he then held constant and used for the calculation of all damages between 2010 and 2016.  The
Debtors argued that spot prices would be more appropriate because the spot price for natural gas

---

[132]    For simplicity of discussion, however (with any distinctions not being significant for the purposes of this
analysis), I'll be discussing prices as of the Petition Date, without constantly referring to, or making
adjustments for, the prices on the day before.

[133]    Spot prices were known on the Petition Date for earlier dates upon which performance was due.  They
weren't yet known for dates thereafter, though some might become known between the Petition Date and
the date of trial or any other date on which damages ultimately were computed.  The inability to determine
spot prices in the future, except by experts' predictions (or what some might consider speculation) is one of
the deficiencies I find in the Debtors' approach.

[134]    *See* n.132 *supra.*

was known and fixed as of the Petition Date, whereas futures markets would be subject to market movements.[135]

While the legal principles underlying the award of damages plainly present questions of law, I think it's a very close question as to whether the *economic* factors underlying the damages do as well, or whether they instead present issues of fact.[136]    But on a matter of claims estimation, I don't need to determine that issue.  If the proper theory on the issue of spot prices versus futures prices is an issue of law, I agree with Oildale, and if it's an issue of fact, I predict that the trier of fact (which once more would be me) will agree with Oildale as well.

While it's true that the price of a futures contract is ultimately based on prediction, the futures price captures the views of willing buyers and sellers in the marketplace as to what fuel prices likely will be in the future, at the times which are relevant, which are the times for future performance.  The use of a spot price (here the price of gas on Petition Date), by contrast, does not incorporate any views or predictions of future prices.

Moreover, use of futures prices is preferable for two other reasons as well.  First, futures prices are particularly well matched to the resulting damages in a case like this one, where we know, from the Cogeneration Agreement, the particular dates (or at least years) upon when the fuel would be purchased, and therefore can look to specific futures prices for delivery corresponding to those dates.  Secondly, if we envision a model upon which the injured party,

---

[135]    The Debtors' expert stated that Oildale's use of futures prices instead of the spot price increased its claim by several million.  I hardly find it surprising that each side used a damages theory that would provide a better result for it, but either side's doing so is irrelevant to the underlying issue, which of course is what measure more accurately corresponds to an injured party's loss.

[136]    Expert testimony is often considered in damage determinations, but courts still decide the underlying principles as matters of law.  *See, e.g., Teachers Ins. & Annuity Ass'n of America v. Ormesa Geothermal*, 791 F.Supp. 401, 416-417 (S.D.N.Y. 1991) (Wood, C.J.) ("***Ormesa***") (taking expert testimony on the award of damages, but determining that whether investment risk should be considered on discount rate is a matter of law).  The plaintiff Teachers Insurance & Annuity Association of America is commonly referred to in the financial community, and is typically referred to in the decisions, as "Teachers," or "TIAA."

upon repudiation, seeks to achieve the equivalent of a "cover"—going out to buy protection as an alternative to the loss of promised performance—a damages model that seeks to approximate what the injured party would have to pay upon "covering," by determining the cost of buying a series of futures contracts, may best correspond economically to what the injured party (and ultimately the Court) needs to accomplish.[137]

The Debtors are correct that the damages are to be calculated as of the Petition Date.  But this merely requires that the futures prices that are chosen be those for futures contracts on the Petition Date for delivery of natural gas at the relevant times in the future, through 2016.  This is precisely how the futures prices were used by Oildale's expert.

Thus I believe that the futures prices, and not the spot prices, are more appropriate for any damages computation.

*(2)  Discount Rate*

Both sides, and I, agree that a discount rate must be applied to compute the present worth of the future payments that Oildale would have received under the contract in the future, to account for the time value of money.  To discount to present value, Oildale's expert used the "Ask Yield" rate for Treasury Bills of corresponding maturities, intended as a proxy for a *risk-free* discount rate.  His discount rates were at very low levels, ranging between 0.048% and 2.9% for future years.  When asked why he chose this rate, he explained that Oildale's counsel instructed him to use a risk free rate.

The Debtors disputed Oildale's interest rate, contending that it failed to take into account any risk premium.  The Debtors' expert testified that an appropriate discount rate would be the cost of capital for Chemtura, contending that such would be necessary to account for the risk that

---

[137]    I do not here determine, however, that an injured party *needs to* cover in a case of this character.

Chemtura would not be able to perform on the contract.  He argued in substance that if Oildale

were to try to sell the cash flow streams from the Cogeneration Agreement on the open market, a

buyer would pay a sum of money that would not only be reduced by the time value of money,

but would also take into account the risk that Chemtura would not be able to perform on the

contract.  Chemtura's weighted average cost of capital, he argued, should be used to capture that

risk, resulting in a very high level in this interest rate environment for this kind of risk.  He

proposed a rate of 11.75%, representing the low end of the range of Chemtura's cost of capital as

provided in expert testimony at the valuation trial that was part of the contested confirmation

hearing on Chemtura's recently confirmed chapter 11 plan.[138]

I agree with Chemtura that we cannot appropriately use a risk-free rate, and thus that the

rates proposed by Oildale are too low.[139]  But I agree with Oildale that the rate proposed by

Chemtura is too high.  Ultimately I conclude that the most suitable rate is one that does assume

risk (*i.e.*, the risk of the obligor's nonpayment), but which reflects the rate at which Oildale could

reinvest its damage award with an alternate obligor of a risk comparable to Witco's when

Oildale's predecessor Oildale Cogeneration took on Witco as a contract counterparty in July

1991.

---

[138]    *See In re Chemtura*, 439 B.R. 561, 575 (Bankr. S.D.N.Y. 2010) (Debtors' expert applied discount rates
between 11.75% and 13.75%, and Equity Committee's expert applied relatively close discount rates
between 11.6% and 13.6%, based on weighted average cost of capital of Chemtura).

[139]    As a matter of discounting mathematics, high discount rates reduce present worth much more than low
discount rates do, because with higher yields on the present worth over time, a lower present worth can
grow more quickly to economically match the future payment stream.  That results in lower damages, and
thus it's no surprise to me that Chemtura and Oildale take the positions they do.  But once more, my job is
to simply determine what better measures the injured party's loss.  *See* n.135 *supra*.

-54-

*(a) Risk-free Rate*

First I need to decide whether a risk-free rate should be used, as compared and contrasted to one that is more reflective of the marketplace and that reflects the reality that the original Cogeneration Agreement from which any Oildale rights emerge was not risk-free.

The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed.[140]  But there is a tension, many might agree, between trying to match the original bargain in the damages award, on the one hand, and requiring the prevailing party to endure market risk to get the benefits of its damages award, on the other.  Ultimately, however, I believe that existing caselaw and common sense require that the discounting to fix the damages award must reflect the same payment risk, insofar as the court can accomplish that, as the original contract did.

In analyzing the appropriate discount rate, I start with *Ormesa,*[141] a decision neither side cited.  There, in another breach of contract case, Chief Judge Wood decided the exact issue presented here:

> In order to determine variable (3), the discount rate, the court must decide whether, as a matter of law, the discount rate should impute investment risk to the alternative investment (increasing the discount) or impute minimal credit risk to the alternative investment.[142]

---

[140]  *Teachers Ins. & Annuity Ass'n of America v. Butler*, 626 F.Supp. 1229, 1236 (S.D.N.Y. 1986) (Weinfeld, J.) (under New York law); *accord Ormesa*, 791 F.Supp. at 415 (ruling, accordingly, that prevailing plaintiff in case of breached loan commitment agreement was entitled to "damages equal to the discounted present value of the incremental interest income TIAA would be expected to lose as a result of the breach").

[141]  *See* n.136 *supra*.  Though *Ormesa* was decided under New York law, it did not rely on any principles of law unique to New York, and I have no reason to believe that the California courts would analyze the issues differently.  I note that here neither side relied on law unique to California, and instead analyzed the damages issues under general contract law principles.

[142]  *Ormesa*, 791 F.Supp. at 416.

The prevailing plaintiff TIAA argued, as prevailing plaintiffs usually do, that a risk free rate should be used for the discount rate, but Judge Wood rejected that contention. She noted that from an economic standpoint, "the more appropriate choice is for the discount rate to reflect the same investment risk as the alternate investment" that the plaintiff would make[143]—which in turn was an investment of a risk comparable to "another investment with similar characteristics."[144] She rejected the applicability of *Jones & Laughlin Steel Corp. v. Pfeifer*[145] (in which a risk-free discount rate had been used in computing the damages for an injured longshoreman in a tort case) because in the original contract, "TIAA assumed some risk of default."[146] Also, she observed that "although it may not be appropriate to force unsophisticated individuals to assume risks in investing monetary rewards, those same concerns do not apply to sophisticated investors such as Teachers."[147]

Judge Wood's damages analysis was expressly approved by the Third Circuit in *Prusky v. ReliaStar Life Insurance Company*,[148] though with respect to her more generalized view that courts should consider the specific nature and characteristics of the performance lost, as contrasted to the application of that principle to fix the discount rate.[149]

---

[143]    *Id.* at 417.

[144]    *Id.* at 416; *accord id.* ("The 'alternate investment' should have investment characteristics as close as possible to the original investment"). In *Ormesa*, that was to an entity of approximately Aa creditworthiness, the creditworthiness of the obligor that had breached. *Id.*

[145]    462 U.S. 523 (1983) ("***Jones & Laughlin***").

[146]    *Ormesa*, 791 F.Supp. at 417.

[147]    *Id.* For this reason, I expressly do not decide whether a risk-free rate might still be appropriate, even in a contract case, for a prevailing plaintiff who is an individual, or a very unsophisticated business entity.

[148]    532 F.3d 252 (3d Cir. 2008).

[149]    *See id.* at 259 ("careful study of analogous authorities leads us to conclude that the view espoused by the *Ormesa Geothermal* court—that courts should consider the specific nature and characteristics of the performance lost as a result of the breach in determining whether a proposed substitute was in fact reasonable—is a well-reasoned one").

Oildale cites two cases in support of the contention that a risk-free rate should be used to calculate future breach of contract damages, *In re Highland Superstores, Inc.*[150] a decision of the Sixth Circuit, and *Kucin v. Devan*, [151] a district court level decision from the District of Maryland.  Neither should be applied here.  *Highland Superstores* is easily distinguishable on its facts (and is at least arguably right in its result for less than all of the reasons stated), and *Kucin*, while arguably right in its result (because of the *Jones & Laughlin* principle, discussed above and below), is, with respect, misguided in its rationale and its reliance on *Highland Superstores*.

*Highland Superstores* involved the computation of a landlord's claim for the rejection of its lease in a chapter 11 case, and, thereafter the application of the Code's section 502(b)(6) to that claim.  But significantly, there (unlike here) the landlord *had actually secured substitute performance*, from a new tenant, Syms, which was a better credit than the defaulting debtor tenant.  For reasons not discussed in the decision (that might have flowed from the fact that Syms was a better tenant, but that might have also flowed from a host of other reasons, such as market forces or the prejudice to the landlord resulting from leaving the space vacant), the landlord's lease to the new tenant was at a lower rent.  The landlord lost a lot of money as a consequence of the debtor tenant's default and the landlord's need to take a lower rent, and understandably the Sixth Circuit rejected a contention by the *Highland Superstores* Creditors' Committee (which had persuaded the district judge, but not the bankruptcy judge) that the landlord hadn't really been injured.  The district court had accepted that argument even though as the Sixth Circuit found, and the district court acknowledged, it wasn't based on any then-existing law.

The *Highland Superstores* court rejected the contention that the cash flow streams from the original lease and the Syms substitute lease should be discounted with *two different* discount

---

[150]     154 F.3d 573 (6th Cir. 1998) ("**Highland Superstores**").

[151]     251 B.R. 269 (D. Md. 2000) ("**Kucin**").

rates—each based on the creditworthiness of the particular tenant obligor.  And it understandably

ruled as it did in material part because the landlord's partially successful attempt to mitigate

required the landlord to accept a new tenant that wasn't comparable in payment risk.

     *Highland Superstores* is plainly distinguishable.  I'm not asked here, as the *Highland*

*Superstores* courts were, to approve the use of two different discount rates;[152] I'm here required

only to approve the use of one, and to determine what that one rate should be.  And I'm here not

asked to consider cash flow streams that aren't comparable.[153]  Rather, I'm asked to take a cash

flow stream that is comparable to the original performance, and to determine the rate at which it

should be discounted—and to decide whether that rate should be based on a risk different than

the risk underlying the original bargain.[154]

---

[152]     *See Highland Superstores*, 154 F.3d at 581 ("[W]e hold that the district court erred when it concluded as a matter of law that, for purposes of calculating the present value of [landlord] Strobeck's claim, the bankruptcy court should have applied *two different discount rates* to the total future rental streams under the Highland and Syms Leases in order to account for the relative creditworthiness of the Debtor and Syms.") (emphasis added).

[153]     When a mitigating landlord is required to take a tenant of a different creditworthiness (either better or worse), either way it is hardly fair to penalize the landlord for having to accept whatever he can get, and that reality underlies the *Highland Superstores* decision.  Significantly, in my view, if the bankruptcy court in *Highland Superstores*, instead of being asked to first reduce each of the payment streams to present worth using different discount rates, had found the *difference* in the amount received each month, and then computed the present worth of the differences using a *single* discount rate, the landlord's damages would have been substantial.

[154]     To be sure, the *Highland Superstores* court approved a discounting methodology with which I would not agree, using as its discount rate the Illinois judgment rate—a rate that would only coincidentally be the same as either the rate corresponding to the risk of the old or new tenant, or, for that matter, a true risk-free rate.

    Also, the *Highland Superstores* court stated, at one point, that "collectability is simply not factored into the calculation of damages for breach of contract."  *Id.* at 580 n.9.  While that is true in the context in which it was stated (involving an alternate transaction by way of mitigation and a request that two separate discount rates be determined and used), it would be an overly broad statement if not limited to the context in which it was expressed.  *Ormesa*, for example, a case involving a present worth computation using a single discount rate in a different factual context, effectively holds directly to the opposite.

    Finally, the *Highland Superstores* court referred approvingly to a hypothetical tendered by the landlord involving two rentals, one to Microsoft's Bill Gates and another to a destitute individual, as emblematic of why a court could not approve the use of the two different discount rates there.  While I agree that use of two different discount rates would be inappropriate in an actual mitigation situation like the one encountered in *Highland Superstores*, I agree with the criticism of that hypothetical by Judge Lynn in *In re Mirant Corp.*, 332 B.R. 139 (Bankr. N.D. Texas 2005) ("***Mirant***").

In *Mirant*, dealing with these same issues, and with analysis noted above with which I

concur, Judge Lynn declined to follow *Highland Superstores*—and also *Kucin*, discussed below.

For the reasons Judge Lynn articulated, and those I previously have noted, I don't believe that

*Highland Superstores* properly can be applied to the facts we have here.

In *Kucin,* a Maryland district court affirmed the bankruptcy court's decision to apply a

risk-free discount rate in fixing the size of the damages claim for a debtor's failure to pay certain

senior executives deferred compensation after the filing of a bankruptcy case.[155]  The estate's

trustee contended that the discount rate used for determining the present value of the executives'

rights to future payment should be based on the risk that the debtor's promise to pay them

deferred compensation wouldn't ultimately be honored.[156]  Though it cited no authority other

than *Highland Superstore* (which it did with a "*Cf.*"), the *Kucin* court did indeed reject that

contention.  When it did so, it stated that the trustee's analysis had "a certain intuitive appeal,"[157]

---

Declining to accept reasoning in *Highland Superstores* and in *Kucin* (discussed below), Judge Lynn observed:

> The *Kucin* and *Highland* Courts' analyses are equally flawed in that each presents a dichotomy between a risk-free discount rate and a discount rate that takes into account the debtor's creditworthiness *at the time of breach*.  Neither Court considered the appropriateness of including in the discount rate a risk factor based upon an *ex ante* view of the debtor's creditworthiness, that is its creditworthiness at the time the parties entered into the contract. It is for this reason that the court declines to follow the *Kucin* and *Highland* Courts' reasoning. . . . With all respect to the Court of Appeals for the Sixth Circuit, the Bill Gates analogy is flawed.  The creditworthy contract party would typically not enter into the same contract as the prospective debtor; their different creditworthiness would be accounted for in dickered terms of their respective bargains.  There being small risk of Bill Gates being unable to perform, he could contract for better terms.

*Mirant*, 332 B.R. at 158.

[155]  *See* 251 B.R. at 270.

[156]  *Id.* at 273.

[157]  *Id.*

-59-

but was "unsupported by case law."[158]  In fact, there *was* caselaw supporting the trustee's

analysis—*Ormesa*—though apparently the parties didn't bring it to the *Kucin* court's attention.[159]

I think there's a very significant likelihood that if *Ormesa* had been brought to the *Kucin*

court's attention, and the later-decided *Mirant* decision had already been issued, *Kucin* would

have come out the other way—especially since the *Kucin* court viewed the underlying economic

analysis favorably, and ruled contrary to the trustee at least seemingly because it regarded the

trustee's position as unsupported by caselaw.  In any event, for the reasons previously noted, I

must respectfully decline to follow *Kucin* on this issue.[160]

Thus I rule, consistent with Judge Wood's analysis in *Ormesa* and Judge Lynn's analysis

in *Mirant*, that a risk-free rate is inappropriate.  The risk must instead correspond to the risk of

nonperformance at the time the breached underlying contract was entered into.

*(b) Appropriate Rate*

But while I agree that some risk premium is required (and thus that Oildale's discount

rate, based on a risk-free rate, cannot be used), I think that Chemtura's weighted average cost of

capital is much too high a discount rate to capture the risk here.  Chemtura's WACC dealt with

the company as it had evolved, and incorporated all of the risks that might affect the value of the

company.  But only a subset of those risks, however, would also affect Witco's ability to perform

on the contract.

---

[158]     *Id.*

[159]     There was also authority arguably supporting the executives' position—*Jones & Laughlin*, *supra*  n.145—
though apparently the parties didn't bring that to the *Kucin* court's attention either.  *Jones & Laughlin*
might support the *Kucin* court's ultimate conclusion, if the court believed that senior corporate executives
agreeing to take deferred compensation from a company that might or might not be able to later pay it
should be treated the same as an unsophisticated railroad worker.

[160]     *Kucin* dealt with other issues as well—most significantly with respect to whether claims under prepetition
contracts for deferred compensation could be elevated to administrative expense status, see *id.* at 271-73—
with conclusions and analysis with which I fully concur.

As importantly or more so, as Judge Lynn concluded in *Mirant*, the relevant time to consider the obligor's risk is the time at which the underlying contract was entered into.[161]  As the WACC offered by the Debtor has little or no relevance to risk at that time, I cannot use the Debtors' WACC as an appropriate discount rate.  And neither Oildale nor the Debtors gave me any evidence on what the appropriate rate should be if I used a discount rate based on the principles set forth in *Ormesa* and *Mirant*.

Accordingly, both sides' proposed discount rates are rejected.  For the purposes of setting a reserve, Chemtura and Oildale are to attempt to agree upon the appropriate discount rate, and on the damages that would be recoverable (or at least that should provide the basis for setting the reserve) if summary judgment were not denied, and if Oildale ultimately would prevail—all in accordance, of course, with the principles set forth in this decision.  In the event of an inability to agree, the parties may come back to me for further rulings.

<u>Conclusion</u>

For the reasons stated in Part II above, I predict that summary judgment will be granted in the Debtors' favor, and that Oildale ultimately will take nothing.  I further believe, however, as stated in Part III above, that to give Oildale some protection against what I believe to be the unlikely result that an appellate court will see the issues differently, the Debtors should still reserve for Oildale's claim to the extent of 30% of the value of that claim, as measured under the principles set forth in Part IV above.

Dated: New York, New York          *s/Robert E. Gerber*
       April  19, 2011             United States Bankruptcy Judge

---

[161]   *Mirant*, 332 B.R. at 158 n.49 (the court should focus on the "creditworthiness at the time the parties entered into the contract"); *id.* at n.50 ("The Contract dates from 2001.  It is that point that the court must look to.  If the court were determining a discount rate for a contractual relationship originating on the eve of bankruptcy, a higher discount rate would be in order.").