Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-11233-REG

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  CHEMTURA CORPORATION, et al.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            December 13, 2011

19            9:49 AM

20

21  B E F O R E:

22  HON. ROBERT E. GERBER

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    HEARING re Doc #5533 - Hearing on Notice of Proposed Order

3    Regarding Bio-Lab Conyers, Georgia Fire Settlement Claimant

4    Appeals - 6 Objections.

5

6    HEARING re Doc #5265 Debtors' Summary Judgment Motion with

7    Respect NPC Services.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Pnina Eilberg

Page 3

```
 1
 2   A P P E A R A N C E S :
 3   KIRKLAND & ELLIS LLP
 4         Attorneys for Chemtura & Reorganized Debtors
 5         601 Lexington Avenue
 6         New York, NY 10022
 7
 8   BY:   CRAIG A. BRUENS, ESQ.
 9
10
11   DUANE MORRIS LLP
12         Attorneys for Chemtura Corporation
13         1540 Broadway
14         New York, NY 10036
15
16   BY:   GERARD S. CATALANELLO, ESQ.
17         WILLIAM C. HEUER, ESQ.
18
19
20   EDGAR C. GENTLE, III, ATTORNEY AT LAW
21         501 Riverchase Parkway East
22         Suite 100
23         Hoover, AL 35244
24
25   BY:   EDGAR C. GENTLE, III, ESQ.
```

Page 4

1

2    ROBERT E. MICHAEL & ASSOCIATES PLLC

3         Attorneys for NPC Services

4         950 Third Avenue

5         Suite 2500

6         New York, NY 10022

7

8    BY:   ROBERT E. MICHAEL, ESQ.

9

10

11   TAYLOR, PORTER, Brooks & Phillips L.L.P.

12        Attorneys for NPC Services

13        451 Florida Street

14        8th Floor

15        Baton Rouge, LA 70821

16

17   BY:   MICHAEL A. CRAWFORD, ESQ.

18

19

20   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

21        Four Times Square

22        New York, NY 10036

23

24   BY:   SHANA A. ELBERG, ESQ.

25

1

2    ALSO PRESENT TELEPHONICALLY:

3         REBECCA Y. BLACKWELL, In Pro Per/Pro Se

4         KATRINA DUNCAN-NAJIB, In Pro Per/Pro Se

5         BRENDA JOHNSON, In Pro Per/Pro Se

6         SCOTT T. MCCABE, Interested Party, Latigo Partners

7         MRS. HORACE STROUD, In Pro Per/Pro Se

8         NATALIE M. WHYLLY, In Pro Per/Pro Se

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            THE COURT:  Good morning.  Have seats, please.

 4            All right, folks.  This is a Chemtura day.  I'll deal

 5    with preliminary matters first, such as the Conyers Fire and

 6    then I'll deal with NPC.

 7            MR. GENTLE:  Good morning, Your Honor.  Ed Gentle with

 8    Gentle, Turner & Sexton in Birmingham, Alabama.  I'm your

 9    Conyers Fire settlement administrator.

10            THE COURT:  Yeah.

11            MR. GENTLE:  And we have before the Court nine

12    remaining claims to be resolved.  We've resolved 2,800.  I have

13    a proposed disposition for eight out of nine, recognizing that

14    the Court has equity powers that perhaps a settlement

15    administrator lacks and as we try to balance guarding the fisk

16    (ph.) but being fair, finding that sweet spot, Your Honor.

17            So if the Court thinks well of it, I've provided you a

18    one-page score card and I thought what I would suggest, for

19    your consideration, is to just march through them and provide a

20    recommended disposition which I think would be fair to both the

21    fisk and the claimant.

22            THE COURT:  Pause for just a second please, Mr.

23    Gentle.

24            MR. GENTLE:  Yes, sir.

25            THE COURT:  Are any of the folks whose appeals are
```

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 7 of 93

Page 7

1    before me on the phone now?

2             MR. GENTLE:  Your Honor, I think there's Brenda

3    Johnson, Horace Stroud, Brenda Johnson's number two, Mr. Stroud

4    number five, Natalie Whylly number six and then of the lates

5    Katrina Duncan-Najib.

6             THE COURT:  Okay.  Ms. Johnson, are you on the phone?

7    Ms. Johnson, Brenda Johnson.

8             MS. JOHNSON:  This is Brenda Johnson.

9             THE COURT:  Oh, okay, Ms. Johnson.  Thank you.

10            MR. GENTLE:  Ms. Blackwell too, Your Honor.

11            THE COURT:  Okay.  Stand by for just a minute please,

12   Ms. Johnson.

13            MS. JOHNSON:  Okay.

14            THE COURT:  Yes.

15            MS. NAJIB:  My name is Katrina Najib.

16            THE COURT:  Okay.  Ms. Najib, I have you and I have

17   Ms. Johnson.  If any other folks were speaking I couldn't

18   understand what was being said.

19            MS. BLACKWELL:  Well, I'm Rebecca Blackwell.  You put

20   me on hold.

21            THE COURT:  Your name please, ma'am?

22            MS. BLACKWELL:  Rebecca Blackwell.  That's R-E-B-E-C-

23   C-A --

24            THE COURT:  Yes.

25            MS. BLACKWELL:  B-L-A-C-K-W-E-L-L.

Page 8

```
 1            THE COURT:  Oh, Ms. Blackwell.

 2            MS. BLACKWELL:  Uh-huh.

 3            THE COURT:  Okay.  Okay.  Forgive me.  Okay.  I have

 4    Ms. Najib, Ms. Blackwell, Ms. Johnson.  Okay.

 5            Folks on the phone, I'm going to ask Mr. Gentle to

 6    speak first in general terms and then to talk about each of you

 7    individually.  And then I'm going to ask him to pause, after

 8    he's finished each person individually, to give you folks a

 9    chance to comment if you want to.  Okay.

10            Start, please, Mr. Gentle.

11            MR. GENTLE:  Yes, sir.  For Ms. Blackwell --

12            MS. BLACKWELL:  Uh-huh.

13            MR. GENTLE:  She shows, Your Honor, a current address

14    in the evacuation area.  Technically speaking, the claim form

15    required proof that she was there during the fire period in

16    2004.  However, Your Honor, I think speaking in equity, I think

17    you wouldn't move to the evacuation area just to get a payment.

18    So I think -- and she did sign the claim form under oath saying

19    that she was in the evacuation area.  So I think, Your Honor,

20    that her appeal should be granted.

21            THE COURT:  Okay.

22            MS. BLACKWELL:  Uh-huh.

23            THE COURT:  Ms. Blackwell?

24            MS. BLACKWELL:  Uh-huh.

25            THE COURT:  I know you have some noise in the
```

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 9 of 93

                                                              Page 9

1    background but --

2              MS. BLACKWELL:  Yeah, it's my grandson.

3              THE COURT:  Okay.  But Ms. Blackwell, he recommended

4    that your appeal be granted and that you get the money.  I

5    assume that's okay with you?

6              MS. BLACKWELL:  Yes.  Uh-huh.

7              THE COURT:  Okay.  So your appeal is granted and now

8    you can either stay on the phone or drop off.  But to tell you

9    the truth, if you have childcare responsibilities, I would

10   suggest that you drop off and quit while you're ahead.

11             MS. BLACKWELL:  Well, do you have any more questions

12   to ask?

13             THE COURT:  I think Mr. Gentle can take care of

14   everything from here.  Am I correct, Mr. Gentle?

15             MR. GENTLE:  Yes, Your Honor.

16             THE COURT:  Yes, he nodded.

17             MS. BLACKWELL:  Okay.

18             THE COURT:  So your appeal is granted, Ms. Blackwell

19   and I would suggest that you drop off the phone.

20             MS. BLACKWELL:  Oh, okay.  So you don't have anything

21   else to ask?

22             THE COURT:  Not of you, I don't.

23             MS. BLACKWELL:  Oh, okay.  So I assume I don't have to

24   talk with anyone else?

25             THE COURT:  That's correct.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 10 of 93

Page 10

```
 1              MS. BLACKWELL:  Oh, okay.  Thank you now.

 2              THE COURT:  Have a good day.

 3              MS. BLACKWELL:  You too.  Bye bye.

 4              THE COURT:  Next, Mr. Gentle.

 5              MR. GENTLE:  Yes, Your Honor.  Brenda Johnson, I had

 6    an issue about a possible prior payment by Bio-Lab of 1,400

 7    dollars and the settlement agreement requires that there be no

 8    double dipping.

 9              However, the payment to the Brenda Johnson under the

10    Bio-Lab database does not have a Social Security number and was

11    to a different address and Ms. Johnson said she didn't get the

12    money.  So I think her appeal should be granted also, Your

13    Honor, and that setoff should not be applied.

14              THE COURT:  Okay.  Ms. Johnson, did you hear Mr.

15    Gentle's recommendation?

16              MS. JOHNSON:  Yes I did, sir.

17              THE COURT:  And I assume you're fine with that as

18    well?

19              MS. JOHNSON:  I am, sir.

20              THE COURT:  Okay.  Your appeal is granted and I'm

21    going to tell you the same thing I told Ms. Blackwell, that

22    you're free to drop off the phone and you may choose to do

23    that.

24              MS. JOHNSON:  Thank you, sir.  That's what I'm going

25    to do.
```

CHEMTURA CORPORATION, et al.

Page 11

```
 1              THE COURT:  Okay.  Have a good day.

 2              MS. JOHNSON:  Have a good day.

 3              THE COURT:  All right.  Mr. Gentle, continue please.

 4              MR. GENTLE:  Yes, sir.  Edna Lynch, in my opinion Your

 5   Honor, should have the same disposition as Ms. Blackwell.  She

 6   does live in the evacuation area, just didn't show proof she

 7   was there at the time.  But in light of that and her signing

 8   the claim form under oath, I think it should be granted.

 9              THE COURT:  Okay.  I don't know if I have a record of

10   Ms. Lynch being on the phone.  Ms. Lynch, are you on the phone?

11              THE OPERATOR:  No, sir.  There's no telephonic

12   appearance for that matter, Your Honor.

13              THE COURT:  Okay.  But I'm going to go with your

14   recommendation, Mr. Gentle.

15              MR. GENTLE:  Yes, sir.

16              THE COURT:  Okay.

17              MR. GENTLE:  Theresa Roberts, Your Honor.

18              THE COURT:  Yes, sir.

19              MR. GENTLE:  We had a database we obtained from Spirit

20   Environmental that does a lot of class actions with me, showing

21   that her address is not in the class area.  However, with

22   Google Earth she's on the line.  So in light of that, Your

23   Honor, I think she should be allowed as being in the class area

24   with her appeal to be granted.

25              THE COURT:  Okay.  Ms. Roberts, are you on the phone?
```

Page 12

1      I don't have a record of that either, I don't think.

2          (No response)

3              THE COURT:   Okay.   I'm going to go with your

4      recommendation on that, Mr. Gentle.   So her appeal will be

5      granted.

6              MR. GENTLE:   Yes, sir.

7              THE COURT:   Okay.

8              MR. GENTLE:   Mr. Stroud claimed in his claim form that

9      he had received 1,000 dollars from Bio-Lab.   It would be a

10     setoff, Your Honor, like we discussed with another claimant.

11     However, Bio-Lab does not show it in its records.   So if Mr.

12     Stroud is on the line, perhaps he could tell us if he really

13     got the 1,000 dollars.   We're just at a dilemma on that one.

14             THE COURT:   Mr. Stroud, are you on the line?

15             MS. STROUD:   Yes, sir.

16             THE COURT:   Okay.

17             MS. STROUD:   I'm Mrs. Stroud, the wife.   He has, like,

18     a hearing problem.

19             THE COURT:   Okay.

20             MS. STROUD:   So I'm hoping I can answer whatever you

21     need.

22             THE COURT:   Mr. Gentle, we're going to do rough

23     justice here.   Do you have any objection to Ms. Stroud speaking

24     on behalf of her husband?

25             MR. GENTLE:   No, sir.

CHEMTURA CORPORATION, et al.

Page 13

1           THE COURT:  Okay.  Ms. Stroud?

2           MS. STROUD:  Yes, sir.

3           THE COURT:  I am going to put you under oath over the

4    phone and ask that you solemnly swear that whatever you tell me

5    is the truth, the whole truth and nothing but the truth, so

6    help you God.  Do you so swear?

7           THE WITNESS:  I do.

8         (Witness duly sworn)

9           THE COURT:  Okay.  I would like you now to answer Mr.

10   Gentle's questions, as he puts them to you in front of me.  Go

11   ahead, Mr. Gentle.

12   DIRECT EXAMINATION

13   BY MR. GENTLE:

14   Q.   Ms. Stroud, good morning.

15   A.   Good morning.

16   Q.   Did Mr. Stroud receive 1,000 dollars from Bio-Lab in

17   connection with the fire?

18   A.   Yes, he did.

19   Q.   Okay.  Thank you.

20          THE COURT:  Okay.  Then your recommendation is that

21   that 1,000 will be subtracted from what he's otherwise entitled

22   to get?

23          MR. GENTLE:  Yes, Your Honor.

24          THE COURT:  So there's no double counting?

25          MR. GENTLE:  That's correct, Your Honor.

CHEMTURA CORPORATION, et al.

1          THE COURT:  Okay.  Ms. Stroud, do you understand what

2     the ruling is?  You're going to get the difference but the

3     1,000 that he already received is, in essence, applied to the

4     total amount.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Okay.  That's the ruling.  I don't know if

7     that's considered an appeal denied or an appeal granted but the

8     question's answered, Mr. Gentle.

9          MR. GENTLE:  And we'll draft for your review, Your

10    Honor, a proposed order.

11         THE COURT:  Fair enough.

12         MR. GENTLE:  Ms. Whylly provided us --

13         THE COURT:  Pause please, Mr. Gentle.

14         MR. GENTLE:  Yes, sir.  Yes, sir.

15         THE COURT:  Ms. Stroud, I'm going to tell you the same

16    thing I told the other folks, which is you're free to drop off

17    the line if you choose to.

18         THE WITNESS:  Thanks, Your Honor.

19         THE COURT:  Have a good day.

20         THE WITNESS:  Good day.

21         THE COURT:  Go ahead please, Mr. Gentle.

22         MR. GENTLE:  Yes, Your Honor.  Ms. Whylly provided

23    documentation now, Your Honor, showing that with a name change

24    she is the verified claimant and so her appeal should be

25    granted also because she's provided the necessary additional

1    documentation.

2           THE COURT:  Okay.  Ms. Whylly are you on the phone?

3           MS. WHYLLY:  Yes, I am.

4           THE COURT:  Did you hear and follow Mr. Gentle's

5    recommendation?  Basically, as I understood what he told me, he

6    said that now that you've provided the extra information he

7    agrees with you.

8           MS. WHYLLY:  Okay.  Thank you.

9           THE COURT:  Okay.  So I'm going with your

10   recommendation on that as well, Mr. Gentle.

11          MR. GENTLE:  Yes, Your Honor.  The next one, Ms.

12   Najib, she applied as an extraordinary claimant.  There were

13   two categories, extraordinary and ordinary.  A bit complex and

14   really I think we should look at the substance of the claim,

15   Your Honor.

16          If we recharacterize her as an ordinary claimant she

17   is in the evacuation area and she would get approximately 1,800

18   dollars.  So if she thinks well of it, I would just recommend

19   that we cure her claim in equity, Your Honor, and award her as

20   if she was an ordinary claimant.  And after we to a true up

21   we're going to file with the Court in a few weeks, she'll see

22   that she'll get somewhere in that neighborhood of 1,800

23   dollars.

24          THE COURT:  Okay.  Ms. Najib, do you want to comment

25   on that?

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 16 of 93

Page 16

1             MS. NAJIB:  I don't think that I have a comment.

2     That's okay with me if that's the Court's recommendation.

3             THE COURT:  Okay.  Then your recommendation's

4     approved, Mr. Gentle.

5             MR. GENTLE:  Thank you, Judge.

6             THE COURT:  And Ms. Najib, you're free to drop off the

7     line too, if you choose to.

8             MS. NAJIB:  Thank you so much.

9             THE COURT:  Have a good day.

10            MS. NAJIB:  You too.

11            MR. GENTLE:  The next one, Your Honor, Ms. Holomb

12    (ph.), should be cured just like Ms. Blackwell was.  She's

13    sworn under oath that she was in the evacuation area.  So I'd

14    recommend it be granted.

15            THE COURT:  Okay.  Ms. Holomb, are you on the phone?

16    I don't show a Ms. Holomb on the log.

17        (No response)

18            THE COURT:  Okay.  Your recommendation's approved, Mr.

19    Gentle.

20            MR. GENTLE:  Thank you, Judge.  And Judge, the last

21    one, this Thai Ocean Restaurant, they provided us, after we

22    made our submission, the necessary document to be awarded

23    $3,085.55.  So we'd recommend that their appeal also be granted

24    for that amount, $3,085.55.

25            THE COURT:  Okay.  I don't have any indication of

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
Pg 17 of 93
CHEMTURA CORPORATION, et al.

Page 17

1    those folks on my phone log.  Are either the company or the

2    individual on the phone?

3              THE OPERATOR:  There's no telephonic appearance for

4    that matter, Your Honor.

5              THE COURT:  Okay.  Thank you, CourtCall.

6              I'll go with your recommendation on that as well, Mr.

7    Gentle.

8              MR. GENTLE:  That completes my presentation, Your

9    Honor.

10             THE COURT:  Okay.  Very good.  Mr. Gentle, I simply

11   want to say that I want to thank you for the care that you gave

12   to these individual folks and the fairness that you've showed

13   in your role on this.  I appreciate it.

14             MR. GENTLE:  Our great pleasure, Your Honor.  Thank

15   you.

16             MR. GENTLE:  Thank you.

17             THE OPERATOR:  Excuse me, Your Honor.

18             THE COURT:  Yes.

19             THE OPERATOR:  We have a counsel, Scott McCabe on the

20   line.

21             THE COURT:  Yeah, I see that.  But also -- in a listen

22   only mode.  Mr. McCabe, do you have a desire to be heard on

23   anything that I just dealt with?

24             MR. MCCABE:  No, I don't.

25             THE COURT:  Okay.  Are you staying for the remaining

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
Pg 18 of 93
CHEMTURA CORPORATION, et al.

Page 18

1      arguments, the environmental issues?

2            MR. MCCABE:  Yes, I was planning on it.

3            THE COURT:  Okay.  Yeah.  All right.  CourtCall, keep

4      him on the phone and am I right, CourtCall, that Mr. McCabe is

5      the only one left on the phone at this point?

6            THE OPERATOR:  Yes, Your Honor.

7            THE COURT:  Okay.  That's fine.

8            THE OPERATOR:  Thank you.

9            THE COURT:  All right.  Let's now turn to Chemtura and

10     NPC.  Come on up for that and I have some preliminary comments.

11         (Pause)

12            THE COURT:  I'd like to get appearances from everybody

13     and then ask you all to sit down and I, as I said, have

14     comments.

15            MR. CATALANELLO:  Good morning, Your Honor.  Gerard

16     Catalanello from the law firm of Duane Morris, accompanied here

17     today by my partner Bill Heuer on behalf of Chemtura

18     Corporation.

19            THE COURT:  Okay.  Thank you.

20            MR. CRAWFORD:  Good morning, Your Honor.  Michael

21     Crawford of the law firm Taylor Porter Brooks & Phillips in

22     Baton Rouge, Louisiana.

23            THE COURT:  Mr. Crawford.

24            MR. CRAWFORD:  On behalf of NPC Services Inc and local

25     counsel, Robert Michael.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
Pg 19 of 93
CHEMTURA CORPORATION, et al.

Page 19

1          THE COURT:  Right.  Okay.  Will I be hearing mainly

2     from you, Mr. Crawford?

3          MR. CRAWFORD:  Yes, Your Honor.

4          THE COURT:  Okay.  Mr. Michael, you're free to either

5     stay or leave, as you prefer.  I don't have a local counsel

6     requirement but I think that you're probably riding shotgun to

7     give Mr. Crawford some support and that's fine as well, of

8     course.

9          MR. MICHAEL:  Hopefully not, Your Honor.

10         THE COURT:  Okay.  Folks, make your presentations as

11    you see fit but I want you to deal with the following questions

12    and concerns that I have because, to tell you the truth, I have

13    problems with both of your positions.

14         I want both sides to talk about the severally and not

15    jointly language that appears at the beginning of the June 8th,

16    1984 contract because it may be said to talk about how the

17    parties are entering into the agreement and it's less clear as

18    to whether it describes the obligations that are undertaken by

19    each of the parties in that connection.  And I want the two

20    sides to help me identify everything in the three key documents

21    that talks about severally and not jointly or any variation of

22    that in terms of what the obligations are.

23         But with that said, it appeared to me when I read the

24    three agreements, the three agreements being the contract I

25    just described which seems to be the number three document in

Page 20

1    the trilogy, the consent decree that is, at least seemingly,

2    number one in the trilogy and the agreement of settlement and

3    compromise of disputed liability, which I'll simply call the

4    settlement agreement, being the second of the three.

5            The important or seemingly important point that the

6    debtor, Chemtura, wants to rely on -- that Mr. Catalanello

7    wants to rely on, appears to be what I call document number

8    two, the settlement agreement which has language in it that

9    says, at I think it's fourth page, in the event of the

10   insolvency or other inability of any of the industry defendants

11   to meet any obligations under the consent decree and such

12   obligations being imposed on the remaining industry defendants,

13   they agree to share the other entities' obligation by pro

14   rating the unavailable percentage, according to the formula

15   that's prescribed there, and of course I'm paraphrasing.

16           First, I want both sides to address the extent, if

17   any, to which the obligations that I described in contract

18   number two, the settlement agreement, is incorporated by

19   reference or otherwise in the contract of June 8th, 1984, which

20   is what I call contract number three.

21           Now I saw at the end of contract number three, I

22   thought I saw, an Exhibit A that makes reference to what I call

23   contract number two.  But it does so in an arguably ambiguous

24   way, and I'm reading, "Each defendant company shall pay the

25   share of the contract price stated in that certain agreement of

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 21 of 93

Page 21

 1    settlement and compromise of disputed liability dated December

 2    16th, 1983".  It doesn't quite say that the whole contract is

 3    incorporated by reference.  But I guess whether or not it does

 4    is something you may want to be heard on because it may not

 5    make a difference, it's still an agreement between the parties.

 6          But Mr. Catalanello, I'm going to need help from you

 7    because the clause that you're relying upon so heavily begins

 8    "In the event of the insolvency or other inability of any of

 9    the industry defendants to pay".  And Chemtura isn't insolvent.

10    That's why the equity committee got a distribution.  And

11    although I didn't agree with the equity committee that the

12    company was worth as much as the equity committee asserted back

13    at the time, there was no doubt, I think it was undisputed,

14    that there was definitely value for the equity and your

15    creditors got paid in full.

16          So the question I need you to help me on, I'm going to

17    allow, of course, and invite both sides to comment on it, is

18    how I should read the language that precedes that clause that

19    says, "In the event of the insolvency or other inability to

20    pay".  At least seemingly Chemtura can pay and the question is

21    whether or not it should.

22          Mr. Catalanello, before you're done, because remember,

23    folks, that I'm not an appellate court.  All I care about is

24    you addressing these issues by the time you're done.  I don't

25    care what order you do.  Has Chemtura already been asked to

1  belly up to the bar to pay, on account of this consent decree,

2  by the federal government or any state environmental

3  authorities?

4       One of the rationales for 502, and I keep forgetting

5  all of the letters that follow it, disallowance of claims, is

6  to protect the estate from double payment and it's not clear to

7  me whether the estate is being tagged for double payment here

8  or not.  I'd like help from you on that.

9       Mr. Crawford, when it's your turn I need you to talk

10  about agency -- actually, I need both sides to talk about

11  agency because I think there is some showing of agency here,

12  although I'm not sure if I can find agency as a matter of law.

13       The settlement agreement, which is contract number

14  two, and the June 8th, 1984 contract, which is number three,

15  especially read together walk and talk and quack like NPC was

16  set up to act on behalf of the PRPs in that earlier

17  environmental action that led to the consent decree.

18       I'm looking, in particular, at contract number two

19  where it says "The industry defendants shall jointly designate

20  a representative or separate entity to implement the remedial

21  action and carry out the additional maintenance and monitoring

22  required by the consent decree".  That, arguably, or perhaps

23  more than arguably creates an agency.  But Mr. Crawford, you

24  cited the Cajun Electric case which is a decision after trial;

25  it's not on summary judgment if I read it correctly.  Well, of

Page 23

1    course both sides can speak to that.  And it seemed to look at

2    a lot of the extraneous facts and circumstances as to whether

3    an agency was created and my tentative, based on reading a pile

4    of paper you guys gave me before you, you know, had a chance to

5    make your oral presentations, is that if NPC had asked for

6    summary judgment in its favor on agency, I could not in any

7    way, shape or form grant that.  But I'm not sure if Chemtura,

8    on the other hand, has gotten over the goal line on the matter

9    of agency as well.  And I think that I'm going to need evidence

10   on the degree of control and the intention of the various

11   parties in creating NPC.  Which, if I didn't change my mind,

12   would mean that neither side wins or loses today and that the

13   party simply continues.

14        In several places, Mr. Catalanello, you talk about in

15   reality and you're characterizing the arrangement in a pro-

16   Chemtura form, which of course is your job.  But it seems to me

17   that when you're looking at stuff like in reality, that's the

18   stuff that creates issues of fact.

19        Now Mr. Catalanello, you say that NPC is co-liable

20   with the debtor, at pages 13 and 14 of your first brief.  I

21   didn't follow that so you'll have to help me on that.  It would

22   seem to me, subject to your rights to be heard, Mr. Crawford,

23   that the other companies, the other defendants which became the

24   shareholders of NPC and which are signatories to contract

25   number three, the June 8th, 1984 contract, would be co-liable.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
Pg 24 of 93
CHEMTURA CORPORATION, et al.

Page 24

1    But it would seem to me that whether or not they are -- their

2    co-liability transfers to NPC would depend on the agency issue

3    that I just described.

4            Now I don't, for half a second, suggest that the

5    questions that I articulated are the only ones but before

6    you're done I want you to focus on them.

7            I don't think this is a classic piercing the corporate

8    veil analysis as much as it's an agency analysis.  But I'll

9    hear your respective views on that if you want to be because

10   I'll readily confess that I read a lot of paper and that while

11   I obviously have some reactions to it, as I shared with you,

12   this matter is still very much jump ball and will be until you

13   complete your oral arguments.

14           So since I have concerns with both of your positions,

15   I think I'll hear first from Mr. Catalanello and then from Mr.

16   Crawford.  And so you can plan your lives, Mr. Catalanello, I

17   will give you a chance to reply and I'm going to give you, Mr.

18   Crawford, a chance to surreply verbally but hopefully at much

19   less length than all of the paper you guys already gave me.

20           Come on up to the main lecturn, please, Mr.

21   Catalanello.

22           MR. CATALANELLO:  Well thank you, Your Honor.

23           We are here today in connection with a motion that was

24   filed by Chemtura which seeks summary judgment expunging the

25   claim of NPC Services Inc.  For purposes of the hearing I'll

09-11233-jlg    Doc 5628    Filed 12/14/11    Entered 12/27/11 08:40:16    Main Document
CHEMTURA CORPORATION, et al.
Pg 25 of 93

Page 25

1    refer to that just as NPC in its entirety.

2         The motion, as Your Honor just indicated, was fully

3    briefed pursuant to a prior scheduling order entered by the

4    Court back in May.

5         The claim at issue, Your Honor, is a rejection damages

6    claim and it was filed in response to the debtors' rejection of

7    the underlying NPC contract, which Your Honor also briefly

8    described a few minutes ago.  That contract was entered into

9    pre-petition by Chemtura, along with seven other potentially

10   responsible parties, PRPs or, as referred to throughout all of

11   these lengthy briefs, the industry defendants on the one hand

12   and NPC Services Inc. on the other.

13        The claim at issue at this proceeding is annexed to my

14   certification as Exhibit 5 and was filed in the amount, in the

15   approximate amount of 12.8 million dollars.  It has two

16   components, Your Honor.  Approximately four million of the

17   claim represents alleged future remediation and monitoring

18   costs allocable to Chemtura, to be conducted at the PPI site,

19   the Petro Processors Inc. site in Louisiana.  And a second

20   component, approximately eight and a half million dollars,

21   which is a so-called 200 percent risk premium.

22        The motion that we're here to argue and debate today

23   does not challenge the underlying components of the claim, Your

24   Honor.  Rather, as I said, the motion seeks expungement of all

25   or, at a minimum, the future component of the claim.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 26 of 93

Page 26

1          THE COURT:  Do I correctly deduce that if you don't

2     win either now or on your home run objection, you would be

3     raising issues on the numbers underlying those, especially the

4     risk premium?

5          MR. CATALANELLO:  That was going to be my next

6     sentence, Your Honor.  Exactly.

7          THE COURT:  But your opponents seem to recognize that

8     and they say that the numbers aren't before me today.

9          MR. CATALANELLO:  That's correct, Your Honor.  We

10    agree on that.

11         THE COURT:  Okay.

12         MR. CATALANELLO:  In sum, Your Honor, the motion that

13    is before the Court today can be broken down into two sections,

14    two parts.  The first section seeks expungement of the claim in

15    its entirety, filed by NPC, on the basis that NPC has suffered

16    no damages given the reallocation mechanisms built into, as I

17    will argue shortly, the contract itself.  That's the 12.75

18    percent allocable share for Chemtura.

19         The second section of the brief or the motion gives an

20    independent basis for expungement of those components of the

21    claim, Your Honor, that seek the future costs of remediation

22    and monitoring, which I believe -- I believe is just about the

23    entire claim.  But again, we're not here to debate that

24    particular minutia, if you will.  But I think it's the entire

25    claim.  The basis for expungement, that independent basis, is

Page 27

1    Section 502(e)(1)(B) of the Bankruptcy Code.

2            Given the facts at hand and arguably, or not arguably

3    but understandably there are a number of facts, the section

4    502(e)(1)(B) analysis has two branches.  It has two branches.

5    The first is satisfaction of the three elements of 502(e)(1)(B)

6    if, as we allege, NPC is merely an agent of the industry

7    defendants.

8            The second branch of the 502(e)(1)(B) argument, Your

9    Honor, the satisfaction of the three elements required if, as

10   NPC alleges, they themselves or itself has a claim in this case

11   for 12.8 million dollars.  Either way we contend we get to the

12   same result, which is expungement under 502(e)(1)(B).  And it's

13   actually there, Your Honor, that I'd like to begin the

14   presentation on 502(e)(1)(B).

15           The starting point, under 502(e)(1)(B) is that we

16   contend that NPC has filed the claim as an agent of the

17   industry defendants.  That, of course, leads us, necessarily,

18   to Louisiana law on agency.  The good news is we don't dispute

19   the law.  The law is laid out in a number of cases cited in

20   both of our briefs, in particular the Cajun case, but for

21   brevity it's the restatement.

22           THE COURT:  You're not contending that Cajun is wrong

23   in any way, the issue is simply how the principles set forth in

24   Cajun should be applied to the facts we have here?

25           MR. CATALANELLO:  That's exactly right, Your Honor.

Page 28

1    WE don't dispute the underlying components of Louisiana law as

2    articulated in Cajun.  It's the application to the facts at

3    hand.

4           THE COURT:  Okay.

5           MR. CATALANELLO:  An agent is one who acts in place of

6    another with authority.  The key test, and again Mr. Crawford

7    and I don't dispute this, the key test is control.  Control.

8           Now, let's look at our facts and circumstance.  Before

9    I get into the particular documents, Your Honor, which I think

10   unquestionably demonstrate control, let's just step back for a

11   minute and understand, more at a 30,000 foot level, the

12   relationship amongst the parties.

13          You had, way back when -- I was in high school -- way

14   back when you had a lawsuit that was commenced by the federal

15   government.  At some point in time the State of Louisiana

16   intervened.

17          THE COURT:  We're talking about shortly before 1983?

18          MR. CATALANELLO:  Correct, Your Honor.  You had a

19   lawsuit by the federal government and at some point the State

20   of Louisiana intervened with respect to this PPI site and

21   circle all the relevant state and federal statutes.

22          At that time the industry defendants, including

23   Chemtura, they got together and they recognized that there

24   probably was going to be a finding of some liability with

25   respect to that site.  And so what those parties did is they

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 29 of 93

                                                                    Page 29

1     entered into the first document, the one you mentioned earlier

2     which is the settlement and compromise or the settlement

3     agreement.  It's the first important document in the series of

4     documents which give rise to this relationship by and among

5     these parties.  That document contemplated that there was going

6     to be cleanup and it was going to allocate the cost of that

7     cleanup amongst the parties.

8              The second document that comes along is the underlying

9     consent decree, a few months later, two or three months later.

10    They all get together --

11             THE COURT:  So I flip-flopped the order when I

12    described them in my preliminary remarks.

13             MR. CATALANELLO:  I've done it in my head many times,

14    Your Honor.

15             THE COURT:  Okay.

16             MR. CATALANELLO:  But the consent order comes next.

17    The consent order comes next.  The consent order is with the

18    government, the settlement agreement is not.  The consent order

19    is with the government.

20             The consent order, as I'll talk about in a minute,

21    requires all the industry --

22             THE COURT:  Pause please, Mr. Catalanello.

23             MR. CATALANELLO:  Sure.

24             THE COURT:  Although it was chronologically executed

25    first, or at least first conceptually, it was, in essence, a

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 30 of 93

                                                                    Page 30

1    game plan amongst the remaining defendants to satisfy the

2    obligations to the government that would be satisfied under the

3    consent decree?

4            MR. CATALANELLO:  Right, Your Honor.  I mean, the way,

5    as a non-environmental lawyer, the way I see it, they got a

6    jump on what ultimately would be a fight over 113, how we're

7    going to allocate the cost of remediation because remediation

8    was coming.  It was coming.  The question is whether they were

9    going to agree with the government or there was going to be

10   some kind of trial with respect to their obligations.  So they

11   did a little bit of a jump start, if you will, and they entered

12   into that settlement agreement.  Consent decree follows.

13   Consent decree secures the obligations the industry defendants

14   have with the government and we'll get into that document in a

15   moment.

16           The next thing that happens is they create NPC.  Why?

17   Seven or eight very large companies that had to have this

18   remediation completed, how were they going to do it?  Well,

19   they weren't going to fight amongst themselves.  So they picked

20   one entity, they create one entity, to perform the work.  And

21   we're going to get into the differences shortly about DSG Trust

22   that we're all very familiar with and why DSG Trust is

23   completely different than these facts and circumstances.  But

24   they create NPC for this specific role.  That's the high level.

25   That's the 30,000 foot, sort of, context that we now find

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 31 of 93

Page 31

1    ourselves in.

2            Now let's go to the specific documents that I believe

3    demonstrate an agency relationship.  I'm going to start with

4    the consent decree first.  I'm going to flip-flop them again.

5    The consent decree, which is Exhibit 1 in my certification,

6    that document itself dictated that the industry defendants were

7    going to appoint a third-party representative.  What does it

8    say?  At paragraph 20 it says, and I quote, "The industry

9    defendants" --

10           THE COURT:  Give me a second, please.  Pause please,

11   Mr. Catalanello.

12           MR. CATALANELLO:  Certainly

13           THE COURT:  Did you say paragraph 20?

14           MR. CATALANELLO:  Yes, Your Honor.

15           THE COURT:  Beginning at the bottom of the page?

16           MR. CATALANELLO:  Yes, Your Honor.

17           THE COURT:  I'm with you.

18           MR. CATALANELLO:  And I quote, "The industry

19   defendants shall appoint a remedial plan coordinator, RPC, to

20   implement the remedial design and monitoring plants," paragraph

21   20.

22           Now let's go to the second document, it's the

23   settlement agreement Your Honor.  Now that comes up in two

24   places in the documents we gave the Court.  It comes up as a

25   standalone Exhibit 2 but it also comes up as an attachment, if

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 32 of 93

Page 32

1    you will, or behind the consent decree.  But it's in the

2    record, Your Honor, as Exhibit 2.

3            That settlement agreement, like the consent decree,

4    contemplated the appointment of a third-party representative.

5    It says, at page 5, and I quote, "The industry defendants shall

6    jointly designate a representative or separate entity to

7    implement the remedial action and carry out the additional

8    maintenance and monitoring required by the consent decree".

9            Okay.  So we've got the consent decree, we've got the

10   settlement agreement.  Now the next very important step occurs

11   in the beginning of this, what we believe, agency relationship

12   and that's the creation of NPC.

13           As we said throughout our papers, Your Honor, we

14   believe that NPC was formed by the defendant companies, is

15   comprised of the defendant companies and is for the benefit of

16   the defendant companies.

17           Now let me get specific.  First, NPC's shareholders,

18   since its founding, have been and always will be the PRPs

19   identified in the consent decree.  That's first.

20           Second, the members of NPC's board of directors have

21   been and always will be the representatives of the PRPs

22   identified in the consent decree with one exception.  The

23   exception is the bylaws do provide that NPC, it's president Mr.

24   Dawson who submitted an affidavit, can sit on the board.  I'll

25   tell you why it really doesn't matter in a minute, but the

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 33 of 93

Page 33

1    board itself are the shareholders, which are the industry

2    defendants, and Mr. Dawson.

3          Record reflects that NPC is not-for-profit entity that

4    was organized, and I quote, according to the articles of

5    incorporation, Exhibit 3, Your Honor, to my certification, and

6    I quote, "And it shall be operated exclusively for the purpose

7    of carrying out and/or supervising the cleanup of hazardous

8    waste sites".  Right in the articles of incorporation, Exhibit

9    3, article 3.

10         Now, it gets better.  The corporate powers and the

11   management of NPC are vested in the board.  Again, the board

12   has to be the members who are the industry defendants.  That's

13   article 5 of Exhibit 3, Your Honor.

14         Articles of incorporation go further and they provide

15   that the corporate powers and management of NPC shall be vested

16   in and exercised by a board of directors of three persons.  It

17   was expanded to five, as I said, later in the bylaws.  Articles

18   say three, bylaws, which trump, say five.  You've got four

19   PRPs, industry defendants and then Mr. Dawson.

20         Very important, Your Honor, the bylaws make clear that

21   you need an affirmative vote of four members of the board to

22   act.  That's article five.

23         THE COURT:  That's four out of five?

24         MR. CATALANELLO:  Correct.  You need four out of five.

25   The organic documents, Your Honor, further provide that NPC's

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 34 of 93

Page 34

1    board of directors "Shall be charged with the management of all

2    of the affairs of the corporation subject to the provisions of

3    the articles of incorporation and bylaws".  It's Exhibit 3,

4    article 2.  Those are the bylaws, Your Honor.

5          Now the bylaws go further to say, and I quote, "That

6    the president," which is Mr. Dawson, "must see that all orders

7    and resolutions of the board are carried into effect."  It's

8    Exhibit 3 of the bylaws, article 1, page 1.

9          THE COURT:  Pause please, Mr. Catalanello.

10          MR. CATALANELLO:  Yes.

11          THE COURT:  Because what you just said seems to be

12    subject to a double entendre or multiple inferences.  One, of

13    course, is the argument you're making but the second is that

14    the board of directors is acting as boards of directors

15    typically do, acting to manage the company and, presumably

16    consistent with any fiduciary duties they would have as

17    directors.  But I haven't heard you say yet that they're love

18    slaves of the people who put them on the board.  I mean, that

19    they're required, as directors, to do what whoever nominated

20    them said they were supposed to do.

21          And that is one of the reasons why I'm still inclined

22    to believe there's an issue of fact.  I need to know what

23    understandings there were about how the board was going to

24    implement its responsibilities.

25          MR. CATALANELLO:  Okay.  Your Honor, just so I'm clear

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 35 of 93

Page 35

1    with the Court, the board members, the four board members, have

2    to be -- have to be shareholders of NPC.  The shareholders have

3    to be --

4           THE COURT:  And I take it that various defendants put

5    their guys on the board, so to speak.  But, you know, those of

6    all who follow corporate governance matters over the years have

7    always wondered, I think I know, but when, you know, somebody

8    has the right to put somebody on the board, once they put that

9    person on the board I'm not sure, unless the charter or bylaws

10   answer the question, as to whether that board member is allowed

11   to do what his nominator wants him to do or whether once he's

12   on the board he still exercises his ordinary fiduciary duties.

13          MR. CATALANELLO:  I can understand the Court's

14   question but let me try to put it in context.  This is not the

15   situation where one of these industry defendants designated

16   somebody from their shop, if you will, to sit on the board of

17   an independent company.  That's not the situation.

18          The situation is exactly the opposite.  They created

19   NPC at the same time that they were binding themselves

20   contractually, under the consent decree with the government.

21   And at the same time that they were binding themselves

22   contractually under the settlement agreement to carry out

23   jointly, and we'll get there in a minute, jointly the

24   obligations required under the consent decree.

25          It's different, Your Honor.  It's different because

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 36 of 93

Page 36

1    everything here that we're talking about, everything here was

2    structured to ensure that these industry defendants were going

3    to carry out the obligations that were required of them under

4    the consent decree and they were going to do it as the consent

5    decree and settlement of compromise contemplated, with an

6    entity, but that entity was going to be controlled by them.

7    And that's why these documents provide for very specific

8    control mechanisms over governance.  It's different, according

9    to us.

10          Let's move now, Your Honor, to the NPC contract.

11   Again, in the waive, if you will, or in the list of documents

12   which we believe give rise to an agency relationship, the NPC

13   contract, we think, confirms the relationship.  And by the way,

14   that's Exhibit 4 to my certification, Your Honor.  I'll quote

15   two particular provisions.  One is in article 1 and it says,

16   "NPC shall, in an expeditious and workman-like manner,

17   undertake and complete all work called for to be done by

18   defendant companies in the consent decree".

19          It goes further.  "This work shall not be considered a

20   construction undertaking but rather an undertaking to fulfill

21   the requirements of the consent decree and shall be subject to

22   the terms set out in that decree".  That's article 1 of the NPC

23   contract, Exhibit 4 to my certification.

24          The second provision I'd like to point out, Your

25   Honor, is found at article 12.  What that provision says, and I

Page 37

```
 1    won't quote, what that provision says is that if NPC is going

 2    to go out and contract for anything over 500,000 dollars a

 3    notice has to go out to the other defendant companies to let

 4    them know that there was going to be this -- essentially this

 5    contract.  The defendant companies could object to it but

 6    ultimately the contract, and here's what I think it's important

 7    Your Honor, the contract says that "The final decision as to

 8    such contracts shall be left to the board of directors of NPC".

 9    Again, all goes back to the board.  The board, of course, is

10    controlled by the industry defendants.

11              Now let's go to the next document in the chain of

12    documents which we believe shows and demonstrates very clearly

13    the agency relationship, that's the proof of claim.  That's why

14    we're here today.  Proof of claim, Exhibit 5 to my

15    certification.

16              Well, how did they file the claim?  Well, they filed

17    the claim on its own behalf and, I quote, "On behalf of the

18    defendant companies".  It's right in the claim.  Let's be

19    clear, none of the industry defendants filed a proof of claim.

20    The only claim filed dealing with the rejection of this

21    contract is the one filed by NPC.

22              How is the claim described?  Well, it's described as a

23    "Consolidated damage claim asserted by NPC on behalf of the

24    defendant companies" other than the debtor, of course.  It goes

25    on to say, "That the claim reflects the debtors' expected
```

CHEMTURA CORPORATION, et al.

Page 38

1     unpaid share of all future cleanup costs which results in a

2     higher proportionate share of those costs being occasioned upon

3     the remaining shareholders".  Now that's important because

4     that's consistent with the settlement agreement which, as Your

5     Honor noted earlier, has an allocation mechanism.  We dispute

6     whether it applies and we'll get to that later in my

7     presentation.  But it has, indisputably, an allocation

8     mechanism.  And what does it say?  Well, it says that the

9     industry defendants reserve their rights as against the non-

10    complying industry defendants.  It's the orphan's share.  It's

11    the orphan's share and it says, well look, if we're going to

12    have to step up and pay for a non-defaulting industry

13    defendant, well we're going to reserve our rights against that

14    entity because we're paying it's share.  Here the share in

15    question is 12.75 percent.  We don't believe that the claim

16    asserts anywhere that NPC has suffered a damage.  But again,

17    we'll get to that in a minute.

18           Now let's go to the last document in the chain of

19    documents that we believe demonstrates an agency relationship

20    and that's the Dawson affidavit.  I didn't see anything in that

21    Dawson affidavit which disputes that this board is controlled

22    by the industry defendants who are the shareholders, who are

23    the same parties who are bound by, contractually, the

24    settlement agreement.  The same parties who are bound under a

25    federal consent decree.  There's nothing in that Dawson

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 39 of 93

Page 39

1    affidavit that disputes it.

2            What Dawson says, in six or seven pages, is that he

3    runs the day-to-day operations of NPC.  Okay.  We don't dispute

4    that.  But it's a bit illusory.  It's a bit illusory because we

5    just went over the organic documents of NPC.  Mr. Dawson sits

6    on the board but he can't do anything.  And I'm not attacking

7    the man, I'm sure he's doing a wonderful job, but he can't

8    control NPC.  NPC is controlled by the industry defendants.

9    It's right in the organic documents.

10           Okay.  We think, Your Honor, that everything,

11   everything in that chain of documentation, which is all in the

12   record, demonstrates that NPC is controlled by the industry

13   defendants and that's why we think, because we started out a

14   few minutes ago, a critical element, control, agency, Louisiana

15   law, that's been satisfied.

16           THE COURT:  Okay.  If that's everything you have on

17   agency now turn to the no damage contention.

18           MR. CATALANELLO:  Your Honor, I can do that.  I wanted

19   to just complete the 502(e)(1)(B) analysis because it's -- I

20   know our briefs were very lengthy and probably confusing.  But

21   ultimately, Your Honor, as I started out, you have two branches

22   under 502(e)(1)(B).  The first branch that we take the Court

23   through is if NPC is an agent why we can establish the three

24   elements of 502(e)(1)(B).

25           The second branch, of course, is if, as NPC alleges,

09-11233-jlg    Doc 5628    Filed 12/14/11    Entered 12/27/11 08:40:16    Main Document
CHEMTURA CORPORATION, et al.
Pg 40 of 93

Page 40

1    we're not an agent.

2            THE COURT:  Okay.  Here's what I need your help on.

3            MR. CATALANELLO:  Okay.

4            THE COURT:  And I'm not going to put a sock on your

5    mouth but you've been talking for a while.  I know that this is

6    a big matter but I don't want to go on forever.

7            MR. CATALANELLO:  Yeah.

8            THE COURT:  If you're talking about the other industry

9    defendants being -- meeting 502(e)(1)(B) requirements, I don't

10    need a lot of help on that.

11            MR. CATALANELLO:  Okay.

12            THE COURT:  I would even speculate that that's why

13    they didn't file their own proofs of claim, that would have

14    been a difficult thing to achieve.

15            But if you're seeking to apply 502(e)(1)(B) to NPC on

16    other than agency grounds, I need help on that because it's the

17    co-liability requirement of the tripod that troubles me there.

18            MR. CATALANELLO:  And Your Honor, that's where I was

19    going to go.

20            THE COURT:  Okay.

21            MR. CATALANELLO:  I was going to go right to co-

22    liability assuming -- assuming for a moment that this Court

23    cannot find an agency relationship at this particular hearing.

24    Let's just go down the branch, it's NPC's claim there's co-

25    liability.  We think we get there -- we get there two ways,

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 41 of 93

Page 41

1    Your Honor.  It's a different analysis, slightly, but we get to

2    the same place.

3                Where do we start?  We start with the consent decree.

4    The consent decree provides, at paragraph 2, it's Exhibit 1,

5    Your Honor, to my certification as follows:  "This decree shall

6    apply to and be binding upon the parties and upon officers,

7    agents, employees, contractors, successors and assigns of the

8    parties".  That's the consent decree.

9                Now next we turn to the NPC contract.  Article 1, it's

10   the paragraph I quoted earlier.  It's not that they're just

11   going to perform work, they've agreed, contractually, to

12   undertake and complete all of the work required to be done by

13   the defendant companies under the consent decree.  It's very

14   clear.  There may be some ambiguities in certain parts of that

15   contract, that's not ambiguous.  That's very clear.

16               It's clear, because as we said earlier, we understood

17   the context of that relationship.  We weren't going out to a

18   third party and saying, hey, we need you to perform some work.

19   They were creating an entity to undertake and perform the work

20   that they were all bound to perform jointly under the consent

21   decree.

22               The contract goes further, at article 1, to say it's

23   not a construction undertaking.  But again, it's an undertaking

24   to fulfill the requirements in the consent decree.  Take the

25   consent decree, take the contract and now you put it in the

Page 42

1    context of creating NPC to perform that work.

2              Now, I'm not attacking the underlying existence of

3    NPC.  I know Mr. Crawford spent some time in his initial reply

4    brief arguing alter ego and why it didn't satisfy the elements.

5    I'm not going to down that road.  I'm not saying it's an alter

6    ego.  I'm not saying that.  But what I am saying is let's call

7    NPC for what it truly is.  It's an entity that has assumed the

8    obligations of the industry defendants to perform the work that

9    is required to be performed jointly under the consent decree.

10             If that work's not performed, Your Honor, for any

11   reason, guess who's coming?  The federal or state government.

12   They're going to sue everybody or at least they could sue

13   everybody to perform the work.  They knew about NPC.  They knew

14   everything that went into the creation.  The consent order

15   contemplated designating an entity to do it.

16             Now, co-liability under 502(e)(1)(B), and I know Your

17   Honor's written a lot about that in the context of Lyondell,

18   two decisions in this particular case, by Diacetyl and

19   Environmental, made it clear.  Co-liability is unique in the

20   context of 502(e)(1)(B).  The Wedtech decision, which we cite

21   in our brief at 85 B.R. 285, we believe makes it also clear

22   that it does not apply only in instances where there's a

23   finding of liability.  We don't need that.  It would be nice

24   but you don't need it for 502(e)(1)(B) purposes and in the

25   Drexel Burnham decision, Your Honor, at 142 B.R. 82 also stands

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 43 of 93

Page 43

1    for that proposition.

2           In this Court's Lyondell decision, 442 B.R. 236, Your

3    Honor analyzed co-liability in the context of 502(e)(1)(B) and

4    said, and I quote, "Section 502(e)(1)(B) imposes no

5    requirements as to how or why the party asserting the claim,

6    potentially subject to 502(e)(1)(B), must be liable with the

7    debtor on the claim of a third party".

8           Your Honor goes on to state, "There is no statutory

9    requirement, for example, that the debtor and the party

10   asserting the claim be liable on the claim of the third party

11   in the same action under a common statute or on the same legal

12   theory".  That's at page 244, footnote 10 of your decision.

13          Indeed in this Court's separate 502(e)(1)(B) decision

14   where a claimant, it was Dow, Your Honor, in that particular

15   case; the claimant was voluntarily cleaning up hazardous waste.

16   This Court said that that doesn't get you out of 502(e)(1)(B)

17   co-liability.  There could be liability down the road.

18          Now, I'm going to stop for a minute and answer your

19   question.  This particular site was not the subject of a

20   settlement agreement with the federal government or the state.

21   It wasn't.  Could the government come in down the road and

22   assert that all of us are liable?  I'm not conceding any

23   liability.  But could they?  Sure.  Sure.

24          We know because in this very court there was a dispute

25   as to whether or not the government even had to file a proof of

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 44 of 93

Page 44

1    claim, which is not uncommon in the context of CERCLA.  So this

2    site is not captured by any of the other settlement agreements.

3    Certainly not the EPA settlement agreement.  As far as I know,

4    Your Honor, Mr. Bruin's is in the courtroom with no other

5    state, including the State of Louisiana.

6         502(e)(1)(B) co-liability is so unique that this Court

7    and other courts, including, I believe, Judge Shannon's

8    decision in the APCO case, which we cite, and Judge Bushman's

9    decision in the Wedtech case, stand for the proposition that

10   you don't even have to have a proof of claim filed by the third

11   party creditor.  Don't need it.

12        All of these cases, we believe Your Honor, point or

13   lead to the conclusion that for purposes of 502(e)(1)(B) NPC is

14   co-liable with all of the industry defendants to perform the

15   work required by the consent decree.

16        Now I'm going to stop for a minute because we debated

17   this back and forth over the last few months and I just want to

18   highlight this.  I'm not saying -- I'm not saying that if the

19   industry defendants went out and hired ACME, ACME Sludge &

20   Cleanup Company, they hire ACME.  And they say to ACME we need

21   you to go and get your bulldozers and get rid of this

22   potentially wasted material, that if ACME doesn't perform, well

23   ACME now is bound to perform everything.  I'm not saying that.

24   That's not logical.

25        What I am saying is, in this context, given everything

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 45 of 93

Page 45

1     we mentioned, everything I've discussed, the creation of NPC

2     for the benefit of the industry defendants, contemplated by the

3     consent decree.  What I'm saying is, it's different.  What I'm

4     saying here NPC has necessarily assumed those obligations

5     because of who it is, what it is, why it was created.  That's

6     what I'm saying, Your Honor.

7             Now the DS&G Trust case, well we looked at that a lot.

8     Had to because it's out there, but it's different.  It's

9     different.  The record on DS&G is not the same record that you

10    have here today.  Our record demonstrates that this entity,

11    according to the articles of incorporation, was to be operated

12    exclusively for the purpose of cleaning up the site.  That's

13    what it says.

14            DS&G is not an agent.  There's no mention of any

15    beneficiaries in their proof of claim.  They file it for

16    themselves.  That's how they file their proof of claim.  The

17    work -- the work to be performed by DS&G, there's nothing in

18    the record.  It was almost like an administrative entity.  It

19    was just going to collect funds and then cut checks.  That's

20    not NPC.  NPC here is performing the work, we know that.  The

21    contract says it.  They don't dispute it.  It's very, very

22    different.  It's an undertaking, that's the words, undertaking

23    to perform.  Those are the words that are used in this

24    contract.

25            Finally, the contract itself is in the record.  In

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 46 of 93

Page 46

 1    DS&G Trust there was no contract in the record, not at that

 2    time.  It's a different relationship.  Here, unlike DS&G Trust,

 3    NPC clearly was created for the benefit of the industry

 4    defendants.

 5           Now, in addition to that Your Honor, as I said there

 6    are two ways you get to co-liability.  In addition to that,

 7    sort of, sub-branch, if you will, you get there another way.

 8    Well how do you get there?  Co-liability exists because both

 9    the debtor and NPC are liable under the terms of the contract.

10    We're all liable.  We're all liable.  Well, who are we liable

11    to?  We're liable to the other industry defendants.  We have to

12    perform.  As the contract says, if we don't perform --

13           THE COURT:  Pause.  You're saying liable to the other

14    industry defendants or are you -- but you're not saying to the

15    United States government or the state of Louisiana?

16           MR. CATALANELLO:  Right.  But it's for the amount of

17    the claim.  What I'm saying is, the underlying claim, 12.8

18    million dollars that they have asserted against Chemtura,

19    represents Chemtura's alleged 12.75 percent allocable share of

20    cleanup costs.  That's the claim we're talking about.  The

21    duplication.  The claim.

22           Well, who are we liable to?  We're liable to the other

23    industry defendants to perform.  Was NPC liable?  Liable to the

24    other industry defendants, they contractually agreed to perform

25    the work.  It all runs back to the 12.85 million dollars.  What

Page 47

1    I'm saying is, yes different creditor, it's not the same third-
2    party creditor as the government in the first branch.  But what
3    it is, it's the same debt, 12.85 million, owed under the
4    contract to the other industry defendants.  We think that's a
5    separate way you get there.  First way you get there is a debt
6    owed to the government but there's a second way.  Either way we
7    think co-liability -- co-liability is demonstrated, Your Honor.
8          Now let's go to some of the questions I haven't
9    answered which deals with the triggering event, if you will,
10   the joint and several.  It's an independent basis to expunge
11   the claim.  It has nothing to do with 502(e)(1)(B).  We take
12   the position that NPC itself has not alleged or cannot allege
13   that it has suffered any damage.
14         Well, why is that?  Because of the allocation
15   provisions in the contract.  A specific provision, where is it
16   found?  Well, it's found in the exhibit to the contract, Your
17   Honor, that the Court mentioned a few moments ago.  It's in the
18   payment section which I believe is article 5 of the contract
19   that incorporates Exhibit A -- I'm sorry; it's article 2, Your
20   Honor, of the contract which incorporates Exhibit A.  And
21   Exhibit A, of course Your Honor, says, and we don't think
22   there's anything ambiguous about it, it says that "Each
23   defendant company shall pay the share of the contract price
24   stated in that certain agreement of settlement and compromise
25   of disputed liability dated December 16th, 1983 as amended".

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 48 of 93

Page 48

1          Well that's the agreement, Your Honor, that has the

2     reallocation provision.  It's built right into our contract.  I

3     know NPC disputes it but I don't see how they can.

4          Now, much is made throughout these briefs, and I

5     apologize for it, of joint and several and whereas clauses and

6     it's a little bit of a confusing sort of chain, if you will.

7     But what's clear is the consent decree itself.  The consent

8     decree itself represents a joint obligation of all of the

9     parties to perform the work.  That can't be disputed, Your

10    Honor.

11         THE COURT:  Help me find the clause that says that.

12         MR. CATALANELLO:  Yeah.  There are a number of them,

13    Your Honor.  If we go to Exhibit 1 to my certification, which

14    is the consent decree -- I'm going to quote a number of

15    provisions of the consent decree, Your Honor.  We can start

16    with, Your Honor, paragraph 14 of the consent decree which

17    states that "The industry defendants shall implement the

18    remedial actions for both sites as provided in this decree".

19         I'm going to stop for a moment.  There's nothing in

20    this consent decree that talks about allocation.  Now, the

21    government recognizes that industry defendants may go off and

22    have their own separate allocation, but that's not with the

23    government.  That's just with the industry defendants

24    themselves.  The consent decree, at paragraph 14, and there are

25    a number of paragraphs that I'll get to, talk about the

1    industry defendants shall do things, they're going to implement

2    the remedial actions of paragraph 14.

3            Paragraph 23, Your Honor, talks about the industry

4    defendants shall cause the work to be formed hereunder within

5    the time limits set forth herein.  Paragraph 26 and 27 talk

6    about the industry defendants paying money to the federal

7    government, it was about 600,000, to the state government about

8    30,000.  It doesn't allocate it.  Jointly they have to do it.

9            THE COURT:  Forgive me but I had read paragraph 14 as

10   saying that of course each of them is on the hook but they're

11   not liable for the entire thing, they'll implement what the

12   schedules established in the various plans and in the second

13   paragraph of 14, you know, again it's a reprise of the

14   insolvency provision, "To complete all such activities and

15   actions on such basis of contribution as shall be agreed upon

16   by them".  Which, at least seemingly, does not say that each of

17   them is responsible for the entirety of the costs of the

18   project, it's just billing up to the bar to plug a hole.

19           MR. CATALANELLO:  But Your Honor, we get to the same

20   place, which is ultimately they have a joint obligation to do

21   this work, to pay these amounts under those paragraphs.  And

22   then there's a recognition that if there's an insolvency or an

23   inability to pay, it doesn't say when or how, it just says an

24   inability to pay, if any one of them it recognizes and requires

25   that the other defendants, as you just said, step up to the

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 50 of 93

Page 50

1    plate.  And they can figure out how to step up to the plate but

2    that's not the government's problem.  That's an allocation

3    among themselves.  Again, almost like they got a jump on 113

4    and contribution but that's not the government's problem.

5    That's between the parties who entered into the settlement

6    agreement, not the government.

7           But ultimately, Your Honor, all of these provisions,

8    and I would argue this provision makes abundantly clear that

9    the work has to be performed and if it's not performed, they're

10   all going to be hit with some kind of enforcement action or

11   some type of additional claim, Your Honor.

12          Now, we believe the NPC contract likewise acknowledges

13   that the industry defendants' obligations are joint.  If you

14   look at the third whereas clause, Exhibit 4, Your Honor, to the

15   contract.  The third whereas clause says, and I quote on page 1

16   of the contract, "The defendant companies wish to complete

17   these studies and actions which must be undertaken jointly

18   under the decree".  They recognized it.  They're all jointly

19   liable under the consent decree, Your Honor.

20          Again, how they were going to whack it up, that was

21   left for the contract.  That was left for the contract but

22   that's not the government's concern.  And it's not surprising,

23   Your Honor, because there's joint liability under CERCLA and

24   applicable or similar state statutes, they're all going to be

25   on the hook.  And again, then there would be an allocation

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 51 of 93

Page 51

1    based on 113 of contribution requirements, but they're all

2    going to be on the hook.  They recognize that.

3            So Your Honor the contract, yes, they entered into the

4    contract there's several.  I get it.  I saw it.  We don't

5    dispute it.  They entered on their own but what does that

6    really mean in the context of joint liability under the consent

7    decree?  What does that really mean when the exhibit attached

8    to the contract, it's not a separate document here it's

9    attached.  The exhibit incorporates the reallocation mechanism.

10   It incorporates it because it incorporates all of the terms and

11   conditions of the settlement agreement.  So what does several

12   really mean?  In this context we don't think it means anything

13   for purposes of this analysis.  It just doesn't.

14           Now, I heard your concern and question about

15   insolvency or other inability and we tried to address that in

16   our papers.  And Your Honor, the way we approached that is as

17   follows:  At the time of the bankruptcy filing it's undisputed

18   we couldn't pay it, pre-petition debt, couldn't pay it.  I

19   don't believe, Your Honor, and I'm certainly not challenging

20   the Court but I don't believe there's ever been a finding of

21   solvency.  No, I get it, just equity had value under a plan

22   that was agreed to, there was never a finding of solvency.

23           But it's clear that at the time of the filing, as a

24   matter of law, we couldn't pay the pre-petition debt.  We

25   couldn't pay it.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 52 of 93

Page 52

 1          THE COURT:  But contrary to what's been said by

 2     certain district judges, there's no requirement that you be

 3     insolvent to file a Chapter 11 petition.

 4          MR. CATALANELLO:  Right.  Right.  But the contract

 5     doesn't just talk about insolvency; it talks about or other

 6     inability to pay.  That's what it says, it's insolvency or

 7     other inability to pay, those are the exact words.

 8          NPC could have, I suppose, made some kind of motion,

 9     run in here, some kind of relief to force us to pay, they

10     didn't do that.  Nobody did anything, of course, other than

11     they filed the rejection damage claim which is treated as a

12     pre-petition rejection claim.

13          THE COURT:  So then you get to the issue as to how a

14     guy like me, a judge like me, should deal with the situation

15     where the inability to pay is temporary.  And you want to

16     give -- I'll certainly want to hear what Mr. Crawford has to

17     say about that as well, but do you want to, since you're up

18     there, give me your view on how I should deal with it?

19          I take it, from what you're saying, that you're saying

20     that a temporary inability to pay gives you a permanent get-

21     out-of-jail free card on that.

22          MR. CATALANELLO:  That's right, Your Honor, because

23     the contract doesn't say otherwise.  The contract doesn't say

24     otherwise and in fact what happened here, and it's Exhibit 6 in

25     the record, is NPC went out to the other shareholders and

CHEMTURA CORPORATION, et al.

Page 53

1   essentially pro-rated, and that's the word that they use, they

2   say that as of today Chemtura has not come out of bankruptcy

3   and their share is still being, "pro-rated" among the other

4   shareholders.  They, themselves, were operating under the terms

5   of the settlement agreement and the reallocation provisions.

6   They were reallocating.  The proof of claim talks about a

7   higher proportionate share of the damages to be suffered by the

8   industry defendants.

9          So I would say, Your Honor, that's correct.  There's

10  nothing in the contract that says it has to be a permanent

11  inability. It says inability.  It was an inability, without

12  question an inability because it was pre-petition and they

13  couldn't pay it.

14         THE COURT:  The flip side of that, of course, is that

15  Chemtura's fully capable of paying it now.

16         MR. CATALANELLO:  I don't dispute that, Your Honor.

17  There's a DCR in place that provides for the payment of claims.

18  We believe it'll pay unsecured creditors a hundred percent.

19  There's no guarantee of that anywhere in any of the documents

20  but I understand -- I understand the Court's concern.  But we

21  don't think we have to get there because it's an inability to

22  pay.  At the time that we filed we could not pay, a matter of

23  law.

24         So Your Honor, we do think there was a trigger event.

25  We think that they, most importantly, NPC, has operated as if

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 54 of 93

Page 54

1   there's been a triggering event.  That's the most important

2   evidence.  I can say all I can say about words, but it's the

3   conduct of NPC that's very important.  And I know there's

4   something in the record here about these loans, I'm sure Mr.

5   Crawford will talk about that, I don't know where, in any of

6   these documents and most importantly in the consent -- the

7   settlement agreement, it talks about loans.  There's nothing in

8   the settlement agreement about loans, there's nothing,

9   cer4tainly, in the bylaws or the articles of incorporation.

10  The only thing we have that deals with the orphan's share,

11  because that's what it is, is the allocation and reallocation

12  mechanism.  That's the only thing that's in the record.

13          People can write letters all day long saying, you

14  know, this is for a loan, where's the authority for a loan?  I

15  didn't see anything in the record that gave the board -- did

16  the board approve loans?  Nothing in Mr. Dawson's affidavit

17  that said that.  I didn't see any resolution authorizing loans.

18  Why?  Because I think it's inconsistent with the document,

19  inconsistent with the proof of claim, inconsistent with that

20  letter they sent to the shareholders, the industry defendants

21  which allocated Chemtura's orphaned share.  So we think there

22  was a triggering event, Your Honor.

23          That's all I really have to say on that, if the Court

24  has any other questions.

25          THE COURT:  Okay.  Does that take care of it?

Page 55

1          MR. CATALANELLO:  It does, Your Honor.

2          THE COURT:  Thank you.

3          MR. CATALANELLO:  Thank you.

4          THE COURT:  Mr. Crawford, we went on for a while.

5    Let's take a little less than ten minutes, until ten after 11

6    on the clock and then I'll hear from you.

7          MR. CRAWFORD:  Okay.  Thank you.

8        (Recess from 11:03 a.m. until 11:13 p.m.)

9          THE CLERK:  All rise.

10         THE COURT:  Have seats, please.  Okay.  Mr. Crawford.

11         MR. CRAWFORD:  Thank you, Your Honor.

12         I believe I will be brief on this, as I think you

13   acknowledged, we have briefed this extensively and I'm going to

14   try to stick to the things that I think you asked of me and

15   certainly any follow-up questions that you have.  And I am

16   going to talk about agency, I think it's important, some things

17   that need to be said about agency.

18         But before I forget, I'd like to address something

19   that was raised right at the end of Mr. Catalanello's argument,

20   which dealt with temporary inability to pay.  I would just

21   suggest, respectfully Your Honor, that if that were the law or

22   the case here any inability, for even a very short period of

23   time, let's say God forbid another hurricane hit Louisiana and

24   one of these industry defendants was unable to make its payment

25   for two weeks, does that mean they're excused forever?  I don't

Page 56

1    think so.  There's nothing in the record to suggest that a

2    temporary inability to pay is some grounds, somehow or another,

3    for these industry defendants to be relieved of any obligation

4    they have to NPC to pay for the remediation costs.

5           Now with that being said, the agency issue, and we did

6    brief this, we went back and forth, I'll try not to belabor the

7    point, but Your Honor recognized what I was going to focus a

8    lot on which is, as I'm aware anyway, corporate America is

9    governed very similarly to this.  Every corporation in America

10   has bylaws, articles of incorporation, establishes a board, the

11   president answers to the board, the officers, there are

12   fiduciary duties that flow from that.  And essentially what the

13   reorganized debtors would have you do today is make a finding

14   that simply because a board of directors has governing

15   authority, if you will, over the officers of a company, that

16   that somehow transforms every corporation in America to an

17   agency-principal relationship and that can't possibly be the

18   law, Your Honor.

19          I will point out something that, kind of, sets forth

20   or establishes that that's not the case even here.  And the

21   articles of incorporation that Mr. Catalanello referred to

22   extensively during his oral argument, there was one article

23   that he did not allude to, which is article 11 and it goes

24   right to the Cajun Electric inquiry under Louisiana law as to

25   whether an agency -- a principal-agent relationship has been

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
Pg 57 of 93
CHEMTURA CORPORATION, et al.

Page 57

1    established.

2         Article 11 says no stockholder of this corporation

3    shall ever be held liable or responsible for contracts, debts

4    or defaults of this corporation, nor shall any mere informality

5    in organization have the effect or rendering the articles of

6    incorporation annulled.

7         That's an important point because in the Cajun

8    Electric case Judge Schiff made a big deal out of the issue of

9    whether Cajun Electric, as the alleged agent of Gulf States

10   Utilities, had the ability to bind Gulf States Utilities to

11   contracts to third parties.  So taken that in this case, the

12   ability of NPC services, for example, to bind Chemtura with

13   respect to its subcontract relationships or what have you in

14   the course of cleaning up this super fun site.

15        The -- if this isn't -- if NPC is the agent of these

16   shareholders, which we submit to you there is no evidence in

17   the record to suggest that, but if they are that means

18   Chemtura, in effect, is personally liable for all the debts of

19   NPC as its agent.

20        THE COURT:  Are they a hundred percent congruent?  I

21   can certainly see how the distinction you're making could make

22   Cajun Electric a little less on point than it might otherwise

23   be.  But from the perspective of a bankruptcy judge, the

24   question is not whether Chemtura or any of the other companies

25   that were defendants could be held liable for NPG's (sic)

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 58 of 93

Page 58

1    obligations.  But rather when NPG (sic) is being used as an

2    intermediary for the benefit of the others and that's why I

3    cared so much as to the extent, if any, to which the various

4    shareholders, not because they're shareholders necessarily but

5    for whatever reason might be able to tell NPG (sic) what to do

6    or to use NPG (sic) as the instrumentality for their benefit.

7    That does not strike me as exactly the same question as the one

8    you articulated.  I don't think it follows that because

9    Chemtura wouldn't be liable for NPG (sic) debts, various

10   companies in the NPG (sic) family could tell NPG (sic) what to

11   do.

12           MR. CRAWFORD:  You're right, Your Honor.  It is

13   different but Louisiana law, which is what Judge Schiff was

14   looking at in Cajun Electric, that case talks about the legal

15   effects of a mandatory, we call it in Louisiana, same as an

16   agent, and principal relationship and that is one of the

17   consequences that flow from it.  That was the point I was

18   making.

19           THE COURT:  Forgive me, Mr. Crawford.  Did he consider

20   that as determinative or as one of several factors that you

21   would look at?

22           MR. CRAWFORD:  It was one of several factors.  It was.

23           THE COURT:  Okay.

24           MR. CRAWFORD:  And Mr. Catalanello is correct; it is

25   an issue of control, okay.  And so at the very -- at the very

Page 59

1    beginning of all of this, I would submit to you that there has

2    certainly been no showing whatsoever in the record that there

3    has been a factual finding, that that necessary control was

4    exerted by the shareholders over NPC.  To the contrary, the

5    only fact-based affidavit in the record, by Mr. Dawson as the

6    president of NPC, made clear, we believe certainly, that Mr.

7    Dawson makes the decisions for the company.  It's like any

8    other company, certainly.  The board of directors ultimately

9    has some say so but I think Your Honor pointed out, better than

10   I could have, that these board members of NPC are not Exxon,

11   Dow and Shell.  They are representatives, individual human

12   beings, that serve on the board of NPC and they have separate

13   fiduciary duties to NPC as a company and there is nothing in

14   the record, certainly on a summary judgment, that would suggest

15   that say, for example, Exxon directly told Bill Dawson what to

16   do with respect to the cleanup of this site.  It's not in the

17   record.

18         So at best, at best Your Honor --

19         THE COURT:  You guys fight another day.

20         MR. CRAWFORD:  -- we fight another day.  We suggest

21   that there's enough in the record for you to make a finding

22   that NPC is not the agent of the shareholders.  But as you say,

23   at a minimum we fight another day.

24         I would like to talk, and I'm not going to go on and

25   on about veil piercing, but the reason we went that route is

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 60 of 93

Page 60

 1    because in effect what they're trying to do, by summary

 2    judgment, is disregard NPC as an entity.  All of their papers

 3    suggest that we know what really happened here, NPC is not --

 4    not a real entity.  There's nothing in the record to suggest

 5    that's not the case.  The affidavit of Mr. Dawson sets out, in

 6    painstaking detail, the separateness of NPC over almost thirty

 7    years.

 8            Now I would like to -- and certainly the degree of

 9    control -- getting back -- one last point on the agency.  The

10    degree of control that Judge Schiff was talking about was a

11    uniquely factual determination.  Judge Schiff, you're right, I

12    was there.  I had the good fortune, I guess, of being one of

13    the young lawyers for the unsecured creditors committee in that

14    case.  Judge Schiff had a full-blown evidentiary hearing on

15    that issue as the opinion reflects.  And so he didn't make a

16    decision on the degree of control based on a summary judgment

17    motion.

18            Now, the -- I'd like to talk a little bit about the

19    contract.  The notion of several not joint liability and how

20    the contract before the Court relates to the other contracts.

21    And I apologize, I'm not sure about other jurisdictions but in

22    Louisiana if a contract is several it is distinct and apart

23    from liability with anyone else.

24            I think one of the words in the contract that is very

25    important, it hasn't been talked about a lot, is that the

CHEMTURA CORPORATION, et al.

Page 61

1    contract is not only several but not joint but it's also

2    separately entered into with each of the industry defendants

3    and NPC.

4            So what we're talking about is a contract that was

5    rejected by Chemtura, the several and separate contract between

6    Chemtura and NPC.  The contractual obligations of Chemtura,

7    Dow, Exxon, et al, those obligations are set forth in the

8    settlement agreement.  Okay.  And the relationship between the

9    industry defendants and the government or environmental

10   regulatory authorities, whether it be federal, state or local,

11   those are set forth in the consent decree.

12           THE COURT:  Pause please --

13           MR. CRAWFORD:  Yes.

14           THE COURT:  -- Mr. Crawford.  Because there is, I

15   think, very little debate or could be very little debate that

16   each of the settlement agreement and the consent decree talk

17   about the nature of the several obligations in much greater

18   detail than the other contract, the 1984 contract does, the '84

19   contract, the June '84, I think it's June '84, contract says

20   that they enter into the agreement severally.  It doesn't say

21   in baby talk, unless I missed it, that their obligations are

22   several.  Let me see where I developed that understanding from.

23   It says in the "Now therefore clause" on the first page of the

24   agreement, just before article 1, "It is agreed between each

25   defendant, severally and not jointly".

Page 62

1          I take it your point or your contention is that when

2     they agree severally and not jointly, that means that their

3     covenants are likewise several and not joint?

4          MR. CRAWFORD:  With respect to NPC, Your Honor, yes.

5     The rest of that, I think, is very important because it talks

6     not only about several not joint, but right below that it also

7     says and separately with NPC.  And it says, "NPC Services Inc.

8     separately".

9          THE COURT:  But I take it your more fundamental point

10    is that however you characterize that the settlement and the

11    consent decree more specifically describe how each of them will

12    have obligations and won't have obligations.

13         MR. CRAWFORD:  Amongst themselves, correct.  Remember,

14    NPC is not a party to either one of the other contracts and

15    this -- I call it the NPC contract because it's easier for me

16    to remember since that's the only one that NPC was a party to.

17         THE COURT:  That being the contract of June 8, 1984?

18         MR. CRAWFORD:  Yes, sir.

19         THE COURT:  Uh-huh.

20         MR. CRAWFORD:  If it's all right I'll call that the

21    NPC contract.  I don't think anybody's arguing that NPC was a

22    party to any of the other contracts.  But I think that's a real

23    important point because unlike a lot of contracts that I've

24    read over the years, while the settlement agreement amongst the

25    industry defendants and the consent decree are referenced in

Page 63

1    this contract, and in fact attached, they don't have that

2    language that says incorporated herein by reference.  The only

3    reference to the settlement agreement in the NPC contract is

4    through Exhibit A to the contract and it refers to the

5    percentages as may be amended in the future, the percentages

6    that each of the industry defendants will be responsible for,

7    in this case, to NPC on a several basis.

8             The reason that's important is, as we set forth in our

9    multiple briefs, is NPC does not have the legal right to compel

10   the other industry defendants to pay more.  Now, whether we get

11   loans, whether we get voluntary advances, all of those things

12   may very well be true.  But a several relationship, under

13   Louisiana law, means you cannot sue someone else for that

14   share, okay.  So we're not talking about the federal government

15   coming in and telling Exxon you've got to clean this thing up.

16   I think you're right, you mentioned earlier that, you know, if

17   we got down twenty years from now and God forbid Exxon was the

18   only company left in America, I feel pretty confident that

19   Exxon would have to clean this thing up.

20            But that's not what we're here on today.  We're on a

21   claim of NPC under this contract.  So -- and our position is,

22   we never get to that triggering event under the settlement

23   agreement at all.  We don't even get there.  If we do get

24   there, then we've got some issues of fact, again, better left

25   for another day.  But we don't even get there.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 64 of 93

Page 64

1          And the issue -- and that all goes back to the issue

2     of whether NPC has suffered damage, okay.  And the reorganized

3     debtors go on and on in their briefs, they didn't mention it

4     today but go on about mitigation of damages under Louisiana

5     law.  I'll just briefly mention that that is a defense, a very

6     fact-based defense on whether someone has mitigated the

7     damages.  And oh by the way, that's a failure to mitigate

8     damages that could result in a reduction of damages.

9          The extent of damages that NPC will and has suffered

10    with respect to the rejection of this contract is a uniquely

11    fact-based inquiry and there has been no showing that that

12    decision is ripe for summary judgment.  And I will agree that

13    we -- we don't believe that you should enter a judgment for

14    12.8 million.  We recognize the fact that there are factual

15    issues on, you know, how much the damages are.  We've cited to

16    cases on that, that's not brain surgery by any stretch.

17              THE COURT:  Pause please, there, Mr. Crawford because

18    while I agree that it's not a today issue you hit something

19    that had occurred to me when I was reading the papers.  Under

20    New York law, and I assume Louisiana law applies here, under

21    New York law to be recoverable damages can't be too

22    speculative.  Does Louisiana have a similar law?

23              MR. CRAWFORD:  Not at all.  Not at all.

24              THE COURT:  You can collect speculative damages under

25    Louisiana law?

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 65 of 93

Page 65

1          MR. CRAWFORD:  Yes, Your Honor.  Absolutely.  And I

2    would submit to you that under bankruptcy law, specifically a

3    rejection damage claim, is by its very nature speculative.  I

4    mean, I know it's a pre-petition claim but when you're talking

5    about breach of contract, that, by definition, is going to have

6    a court look at prospective damages.

7          THE COURT:  Prospective is one thing and maybe we have

8    a play on words on what speculative means and I'll grant that

9    it's not an issue for today, but there has to be a reasonable

10   basis, under New York law, for computing the damages.

11   Louisiana has no similar law -- similar rule?

12         MR. CRAWFORD:  Oh, I'm sorry, Your Honor.  I think I

13   was focusing more on whether it was --

14         THE COURT:  If you're talking future damages or that

15   they're not liquidated yet, I think many people would agree

16   with you.  But --

17         MR. CRAWFORD:  I'm sorry, Your Honor.

18         THE COURT:  You have to have a reasonable basis for

19   what you're asking for.

20         MR. CRAWFORD:  Absolutely.  Absolutely.  And our

21   affidavits set forth -- the affidavits filed not in opposition

22   to summary judgment but with the original objection to the

23   claim, those set forth in painstaking detail how we get to the

24   12.8 million.

25         I think the point is that we will, if we have a trial

Page 66

1    on this we'll be able to show that those aren't speculative.

2    There is a, as I appreciate it, there may be an unlimited

3    ceiling on this but the floor is pretty solid.  And by that I

4    mean, as we put forth in the affidavit and we kind of laughed

5    about it a little bit, it's almost ridiculous to think, but Mr.

6    Dawson really thinks this is going to go on till the year 2500,

7    so he won't really care much.

8            THE COURT:  2500?

9            MR. CRAWFORD:  2500, that's correct.  We limited it to

10   sixty-three years because, you know, how do you do a present

11   value analysis on, you know, 480 some-odd years.

12           THE COURT:  Well, I would also think as a matter of

13   discount arithmetic you wouldn't want to.

14           MR. CRAWFORD:  Right.

15           THE COURT:  Because those damages from 2500 are going

16   to have a very low present worth.

17           MR. CRAWFORD:  Exactly.  My point in saying that, Your

18   Honor, is we don't know what the ultimate cleanup's going to

19   be, but if we have a trial on this we're going to be able to

20   show, we believe, with very, very clear specificity that it's

21   going to be at least this much; probably a lot more but at

22   least this much.  To that extent it would not be speculative.

23           Briefly on the co-liable with the debtor.  I'm going

24   to confess, Your Honor, I don't understand their argument.

25   This is a contract between NPC and Chemtura.  NPC bills

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 67 of 93

Page 67

1    Chemtura for its share of the cleanup and so far, well,

2    Chemtura paid about twenty million dollars.  Then they filed

3    bankruptcy, they stopped paying.

4          I don't know how NPC could be liable for its debts or

5    not its debts, its bills that it sends to Chemtura.  And

6    equally confusing to me is how NPC, who's not a party to the

7    consent decree or the settlement agreement, is somehow liable

8    to the federal government for this cleanup.

9          You know, Mr. Catalanello mentioned ACME as opposed to

10   NPC.  It's the same thing.  Under Louisiana law, if you don't

11   guarantee in writing the debt of another, there's no personal

12   liability.  The only way they could possibly pull NPC in

13   through the back door is through an agency argument.  The

14   consent decree does mention the word agent.  For the reasons

15   that I set forth earlier, we believe there's been no showing of

16   an agency relationship here at all, other than what would

17   happen with every corporation in America.  But for today, for

18   summary judgment purposes, it would be a leap; I would submit

19   respectfully, an impermissible leap to say that NPC, on summary

20   judgment, is the agent for the shareholders, that a sufficient

21   showing of control has been demonstrated such that NPC has now,

22   somehow, become personally liable for this gargantuan

23   undertaking to cleanup this petro processors site.  There has

24   been no showing of that whatsoever and that's the only way --

25   that's the only way you can tie NPC into the 502(e) argument as

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 68 of 93

Page 68

1    far as I can tell.

2         And that's kind of why we talked about veil piercing,

3    because they really want to disregard NPC where they can fit

4    this claim comfortably under 502(e)(1).  And Your Honor, I've

5    read your decisions from Lyondell and from this case.  I

6    understand where you come down on that and that's fine.  But

7    you can't get there without making this extraordinary leap to

8    find, as a matter of summary judgment, that NPC is the agent of

9    these shareholders.

10        And of course -- and you get there and then you have

11   that co-liability argument.  As you well know, that's one of

12   the three absolute requirements to file under 502(e).  You have

13   to be co-liable for the debt.  I just don't see how NPC can be

14   co-liable for its bills that it sends out to Chemtura.  It

15   makes absolutely no sense at all to me.

16        Briefly, Your Honor, on the proof of claim; I think

17   you hit the nail on the head.  You know, we represent NPC.  We,

18   meaning my law firm, me.  Maybe we could have filed duplicative

19   claims for these folks.  We didn't.  We filed this claim in the

20   first instance for NPC.  And, you know, we didn't want to

21   get -- we didn't want to get tagged with an argument that

22   nobody knew about these other parties or that somehow or

23   another if you were to find at the end of the day that they are

24   the parties with the claim, oh by the way it's too late to file

25   a claim.

Page 69

1         But frankly, our first position and primary position

2    has always been that NPC is the party here and that was, at

3    best, alternative pleading to avoid some gotcha litigation down

4    the road.

5         In sum -- I do want to mention something about the

6    work.  Article 1 of -- with respect to the work.  The way I

7    read that and, you know, if there's a differing interpretation

8    of that then it's not right for summary judgment either.  The

9    way I read that in the NPC contract, article 1, is the work

10   that's referenced is, you know, the scope of the actual

11   undertaking that's going to be done to clean this stuff up.

12   That would be the same whether it was ACME or NPC.  You still

13   can't -- you still have that same separateness and you have to

14   disregard NPC as an entity to get around that, and we don't

15   believe there's any basis, in the law or fact, for you to do

16   that, Your Honor.

17        And if you have any other questions, I'd be happy to

18   answer them.

19        THE COURT:  No.  No, thank you.  Mr. Catalanello, any

20   reply?

21        MR. CATALANELLO:  Brief, Your Honor.

22        THE COURT:  All right.  Limited, of course, to what

23   Mr. Crawford raised.

24        MR. CATALANELLO:  Understood.

25        THE COURT:  Okay.

Page 70

1        (Pause)

2            MR. CATALANELLO:  Your Honor, let's start with the

3    inability to pay.  I heard the example that Mr. Crawford gave

4    the Court about some brief, temporary reprieve, Your Honor.

5    And I agree, that would be illogical, but that's not what

6    happened here.  It's been years since Chemtura has not paid

7    this particular obligation under the contract.

8            And again, if you look at Exhibit 6 to my

9    certification, NPC has acknowledged the failure or the

10   inability to Chemtura to pay and is reallocating that orphan's

11   share to the other defendants.  That's what it's been doing.

12   It's exactly what's in the record, a reallocation.  It's not as

13   if it happened for a week or two, it's been years.  And again,

14   NPC never came to this Court and sought any relief to have

15   Chemtura somehow pay their obligation.  It didn't do it.  And

16   now, of course, the contract's been rejected.  It can't perform

17   anymore.

18           THE COURT:  Well, we agree that it's a pre-petition

19   debt, right?

20           MR. CATALANELLO:  That's correct, Your Honor.

21           THE COURT:  Now, creditors trying to get paid on pre-

22   petition debts before a plan has given them whatever they're

23   entitled to under the plan.  Unless they're critical vendors

24   they've got a pretty tough row to hoe, don't they?

25           MR. CATALANELLO:  Certainly, Your Honor.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 71 of 93

Page 71

1          THE COURT:  I mean, I'm sure I wouldn't have held Mr.

2     Crawford in contempt if he had tried but I would have thought

3     he was the next coming of Tim Tebow.

4          MR. CATALANELLO:  Well, that's a great analogy.  But

5     Your Honor, it's a little different here because --

6          THE COURT:  He'd be relying a lot on faith, wouldn't

7     he?

8          MR. CATALANELLO:  He's doing a heck of a job with

9     that, Your Honor.

10          But it's a little different here because it's in the

11     papers.  I mean, I'm looking at right now, for example, page 15

12     of the reply brief where NPC they admit that there's liability

13     and that they have to borrow money.  They say it right at

14     paragraph 67 of page 15.

15          THE COURT:  Wait.  You're reading from where?

16          MR. CATALANELLO:  Page 15 of the reply brief and I

17     believe it's also in the affidavit.  Can you just check the

18     affidavit, the Dawson affidavit?  I think it's the same thing.

19     Paragraph 67, Your Honor.

20          MR. HEUER:  It's their 7056 statement, Your Honor.

21          MR. CATALANELLO:  Okay.  It's in the brief and the

22     statement.

23          THE COURT:  Just -- I'm getting buried in my paper

24     here, Mr. Catalanello.

25          MR. CATALANELLO:  Okay.  I apologize.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 72 of 93

Page 72

1            THE COURT:  Just tell me what you want to tell me and

2      I'm sure you're not going to be lying to me.  And if Mr.

3      Crawford thinks you quoted out of context, I'm sure he'll tell

4      me.

5            MR. CATALANELLO:  It's in the counter-statement filed.

6      I apologize.  In the counter-statement filed by NPC on page 15,

7      paragraph 67 where NPC says, and I believe this is an admission

8      of their own liability, that we have to borrow money to

9      perform.  They say, and I quote, "From the date of the

10     bankruptcy filing, March 18th, 2009 until today, over 700,000

11     dollars has been advanced and/or invoiced."  I don't know what

12     that means.  "Should these advances be discontinued for any

13     reason, NPC would have no choice but to defer certain expenses

14     and/or seek financing from another source, including its line

15     of credit."

16            My point is two-fold, Your Honor.  First, I think that

17     shows that NPC is acknowledging they have their own liability.

18     I mean, it's almost like a desperation that they need an

19     ability to, sort of, pay the obligation, a way to pay the

20     obligation.  But equally important, there's been a reallocation

21     for years and that's Exhibit 6 to my certification, the letter

22     to the shareholders.

23            Your Honor, the second point I want to briefly touch

24     on is the control mechanism.  And Mr. Crawford got up here and

25     said that essentially the argument I've made would, like, turn

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 73 of 93

Page 73

1    upside down corporate America.  I mean, I'm paraphrasing.  But

2    you know what, there's nothing -- there's nothing unique about

3    these documents, that's the contention, but there's something

4    very unique about the position I'm taking.  Well, I disagree.

5    There's nothing unique at all.

6           In this context this corporation, NPC, let's be honest

7    with ourselves, it wasn't some entity out there that existed

8    that we went and contracted with.  We all created it.  We

9    created it and as the bylaws say, exclusively for this purpose,

10   to clean up the waste.  It's different, Your Honor.  We created

11   it for this purpose.  And then we put all the bells and

12   whistles in the corporate documents to make it clear it was

13   going to be controlled by the shareholders.

14          Now I agree, there's nothing in this record that has

15   anywhere in it Dow or Shell saying Dawson do this, Dawson do

16   that.  But we don't need that.  That's not what Cajun says.  It

17   says you have to have the control.  The control is here.  You

18   need four out of five members of the board to do anything, four

19   out of five.  The fifth is Dawson and he can't do anything by

20   himself.  The other four are the industry defendants and they

21   have to be authorized to speak on behalf of the industry

22   defendants.

23          THE COURT:  Well more strictly speaking, Mr.

24   Catalanello, the other four are designees of corporate

25   defendants.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 74 of 93

Page 74

1           MR. CATALANELLO:  Right.  Right.

2           THE COURT:  And what you're trying to win on summary

3     judgment, because you've got a tougher task, you're not like

4     Mr. Crawford who wants to live to fight another day, you -- if

5     you want to win on that you have to say that the designees of

6     the corporate defendants who were called directors and who at

7     least arguably have the fiduciary duties of directors, are in

8     many respects the same as the corporate defendants.  Which may

9     or may not be something you should win on as a matter of law.

10          MR. CATALANELLO:  Your Honor, my colleague just

11    pointed out to me the next provision of the bylaws that I was

12    going to reference, which is -- it's article 5.  And when it

13    talks about the board it specifically says, Your Honor, article

14    5, page 3, that those board members have to be "authorized

15    representatives of the stockholders".  They are the

16    stockholders, Your Honor.  The stockholders are the defendants.

17    It all leads back to the industry defendants.  And that's not

18    surprising given, again as I said, this wasn't ACME, a third

19    party that they went out and found to perform the work.  They

20    created this entity, that's not disputed.  Nowhere in Dawson's

21    affidavit or anything in the briefs or any part of the record,

22    I should say, from an evidentiary standpoint, disputes it.

23    This was created exclusively for the benefit of these members

24    to perform the work.  It's built right into the bylaws.

25          And so I get it.  I get that the argument could be

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 75 of 93

Page 75

1    illogical in the context of a real third party that we were

2    going out to hire, ACME.  We're going to negotiate a contract

3    with ACME to perform the work.  It's different.  We created

4    ACME (sic), we don't dispute it.  And I think that's a -- I

5    think that's a very big difference but more importantly I think

6    that's why there's no question of fact here, because it's

7    undisputed how NPC came into existence and its purpose.

8            A couple of other quick points, Your Honor.  The

9    settlement agreement.  I just want to correct, Mr. Crawford.

10   He said that the only place it appeared is Exhibit A, and then

11   he mentioned something like it didn't have the typical terms

12   and conditions.  Well, I beg to differ.  I beg to differ

13   because the contract, the first page, page 1, Your Honor, of

14   the contract, says that "It shall be subject to the terms set

15   out in that decree," the consent decree.  More importantly, "As

16   well as the agreement of settlement and compromise of disputed

17   liability dated December 16th, 1983".

18           THE COURT:  Where are you reading from Mr.

19   Catalanello?

20           MR. CATALANELLO:  Page 1 of the contract.  Article 1

21   takes all of the terms of the settlement agreement, including

22   the reallocation mechanisms and sticks it right in there, Your

23   Honor.

24           THE COURT:  Where on page 1?

25           MR. CATALANELLO:  Page 1, it's the second paragraph

Page 76

1    from the bottom beginning with "This work shall not be

2    considered a construction undertaking".  So I would argue, Your

3    Honor, this document is very clear.  Nothing ambiguous about

4    it.

5            Did they enter into the contract severally?  Yeah.  We

6    never dispute that.  But it's sort of meaningless because they

7    take the settlement agreement and stick it right in there,

8    right on page 1.  And then to make it even further clear, when

9    it comes to how everyone was going to pay, they again remind

10   people on Exhibit A, oh by the way, you've got to comply with

11   the settlement agreement.  So it's in two places, page 1,

12   Exhibit A.  I just wanted to make that point.

13           My final point, Your Honor, on co-liability.  I don't

14   think my argument is confusing.  Is it a little complicated?

15   Yeah, it's a little complicated but I don't think it's

16   confusing.  It's not confusing because again, here when you

17   look at all the documents and I'm certainly not going to bore

18   the Court with where we came from in terms of the evolution of

19   this relationship, the consent decree, how it's binding on

20   agents, representatives.  It's very broad that language.  How

21   the consent decree contemplates designating an entity and then

22   the settlement agreement, how it contemplated designating an

23   entity.

24           When you put all of that together and then you top it,

25   you top it with the contract language, the undertaking

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 77 of 93

Page 77

1    language, very, very, very particular word, undertaking, to

2    fulfill the requirements of the consent decree, it shall be

3    subject to the terms set out in that decree.  That's just not

4    work.  That's as if they were assuming that obligation.  They

5    could have used different language.  They could have said, hey

6    we're just going to perform work that you guys have to perform

7    under the consent decree.  That's not what it says.  It's very

8    clear, very powerful language but it's not surprising.  It's

9    not surprising because, again, the relationship between NPC and

10   the industry defendants.  The relationship gave birth to it, it

11   created it.  That's what they did.

12           I'm not attacking Mr. Dawson and keeping separate

13   books and records, alter ego.  I'm not going down there.  I

14   could have tried but of course that's factual and I don't know

15   the facts as to whether or not they comingled assets.  It

16   doesn't matter.  I'm not arguing that.  What I'm arguing is

17   there's co-liability.

18           First they acknowledge it, I believe, in their

19   disputed -- in their statement, we just went over that.  But

20   more importantly, the contract it's as if they stepped in the

21   shoes of the PRPs and they're going to fulfill that.  And if

22   they don't perform, somebody's going to come look for them.

23   Somebody's going to come look for them.  It's going to be the

24   government.  And if they don't perform, the industry defendants

25   are all liable.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 78 of 93

Page 78

1        You get there two ways, Your Honor, two ways on co-

2    liability.  Is it different?  Yeah.  But does the law say it

3    doesn't have to be the same?  That's what it says, Wedtech,

4    your Court's decision.  It doesn't have to be the same theory.

5    It doesn't have to be the same cause of action.  There has to

6    be co-liability on the debt of a third party.  We think we have

7    it, Your Honor.  We believe we have it.  We believe this record

8    is clear we have it.  And that's why we think summary judgment

9    is appropriate, Your Honor.

10        I have no other remarks at this time, unless the Court

11    has some questions.

12        THE COURT:  All right.  Thank you.  Folks, here's

13    what -- Mr. Crawford?

14        MR. CRAWFORD:  Very briefly.  Very briefly, Your

15    Honor.  This contract it does say that it's subject to the

16    terms.  The work, and I'm talking about the NPC contract, June

17    1984, article 1.  The work is an undertaking to fill the

18    requirements of the consent decree.  We don't argue with that.

19        There's a difference between that work being subject

20    to the terms of the settlement of disputed liability and

21    somehow saying that this contract, the only one NPC is a party

22    to, is NPC coming in and saying that they are personally liable

23    for all the debts of this remediation.  To make that stretch

24    is, I would say, incredible.  This language does not, in any

25    way, say that NPC is bound.  Yes, it's going to do the work.

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 79 of 93

Page 79

1    Yes, it was created to do the work.

2         I thought it was somewhat interest Mr. Catalanello

3    admitted something we've been saying from day one, he doesn't

4    know the facts.  Well, maybe that explains why there's only one

5    affidavit.

6         THE COURT:  I think in fairness to poor Mr.

7    Catalanello that what he was saying that he wasn't aware of the

8    facts on was vis-a-vis the piercing the corporate veil issue.

9         MR. CRAWFORD:  Exactly.  Exactly.  But as we contend,

10   in order to get to NPC, because there's nothing in here that

11   saying their work is going to be subject to the consent decree

12   or the settlement agreement, that goes so far as to say, under

13   Louisiana law, and oh by the way NPC is personally guaranteeing

14   the debts of Exxon, Shell and Dow.  Why on earth would they do

15   that?  That makes no sense at all.

16        Under Louisiana law, and we didn't even brief this

17   because it didn't really come up, but under Louisiana law you

18   can't -- I mean, a guarantee of another's debt has to be

19   express and in writing.  And this, in no way, I believe under

20   Louisiana law or any law for that matter, would somehow or

21   another bind NPC to the obligations of these industry

22   defendants that they owe to the government and other regulatory

23   authorities that have oversight of this remediation.

24        So there is no -- there is nothing in this contract

25   that would even hint at that.  And so we don't believe there's

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 80 of 93

Page 80

1    been anywhere near a sufficient showing of co-liability.

2    Again, what we're talking about is NPC's bills to Chemtura.

3    It's doing the work, there's no question about that, just like

4    if it was ACME.

5            Now, I will agree with Mr. Catalanello that it's --

6    you know, we're not ACME.  We haven't hidden from that.  This

7    company was created, it has shareholders, it has a board, it

8    has a president and it operates as a separate entity and

9    there's no challenge to that.  Is it ACME?  For purposes of

10   today I would suggest that there's no distinction unless you

11   disregard NPC as an entity altogether and there's not a showing

12   here sufficient to do that, not even close.

13           And I will just point this out, there's, you know, the

14   industry defendants certainly could have hired an ACME-type

15   company, a for-profit company or could have made NPC for

16   profit, I guess.  I can only surmise that they didn't do that

17   because they didn't want to be perceived as profiting off their

18   own remediation cleanup.  But there's nothing about that,

19   whether they used ACME or NPC Services to perform their

20   obligations that each owed to the government.  There's nothing

21   before you today that would prove or establish that NPC is co-

22   liable for this debt or that there has been a sufficient

23   showing of control that could warrant a finding that NPC is the

24   mere agent of these shareholders.  It's not there, Your Honor.

25           We would suggest that summary judgment be denied.  We

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 81 of 93

Page 81

1    believe there's been a sufficient showing that it could be

2    granted to the extent that we ask for, that NPC be found to be

3    the party-in-interest and that there be a trial on the extent

4    of the damages suffered by NPC.

5         THE COURT:  Well Mr. Crawford, on your last request

6    Rule 56, as rewritten, makes it clear, rewritten a year or two

7    ago, makes it clear that you can't issue summary judgment in

8    the other direction without setting up that for a separate

9    notice and hearing, if I recall correctly.

10        MR. CRAWFORD:  Okay, Your Honor.

11        THE COURT:  Having written a section of Collier on

12    that subject.

13        MR. CRAWFORD:  I will certainly defer to you on that

14    Your Honor.

15        THE COURT:  Okay.

16        MR. CRAWFORD:  There has not been a sufficient showing

17    that summary judgment should be granted in favor the

18    reorganized debtors.  We ask you to deny their motion and allow

19    us to go forward with this.

20        THE COURT:  Okay.  Folks, here's what we're going to

21    do.  You're going to take a long lunch and I want you back at 2

22    o'clock.  Do you have a plane that you need to catch, Mr.

23    Crawford?

24        MR. CRAWFORD:  I do, Your Honor.  I'm glad you asked

25    me that because I didn't want to -- my flight is at 4:20 from

Page 82

1   LaGuardia.  I have checked out of the hotel.  My bag is back at

2   the hotel, which is in mid-town.

3          THE COURT:  Well, if you want to be back at 1:30

4   and -- to take the chance that I may keep you waiting a little,

5   you're free to do that and maybe you guys can take an hour and

6   a half lunch and it won't take you very long to eat lunch in

7   this neighborhood, at the prices for which I want bankruptcy

8   lawyers to be eating, at least.  And if worse comes to worse, I

9   guess Mr. Michael can hear the ruling.

10         MR. CRAWFORD:  That's fair enough, Your Honor.  Thank

11  you.

12         THE COURT:  Okay.  All right.  Then we're in recess

13  until 1:30 with no guarantees.

14         MR. CATALANELLO:  Your Honor, can we leave our stuff

15  here?

16         THE COURT:  Yes, as long as you understand I can't

17  guarantee its security.  You have permission to do it.

18  Frankly, I don't think anybody's going to want to steal your

19  copies of the briefs; I'll give them mine if they're that

20  anxious.  But that's what we're going to do.

21         MR. CRAWFORD:  Yeah.  I don't even want them.

22         THE COURT:  Okay.

23      (Recess from 12:00 p.m. until 1:33 p.m.)

24         THE COURT:  Have seats, please.

25         Ladies and gentleman, I'm denying the motion for

Page 83

1  summary judgment and because I think that the issues aren't

2  particularly close, ultimately, I'm going to give this decision

3  orally and set forth the reasons for it relatively briefly.

4       In summary, I think there is an issue of fact as to

5  whether or not the various PRPs made NPC their agent for

6  satisfying their obligations under the consent decree and for

7  securing recovery on their individual reimbursement rights by

8  filing a proof of claim on their behalf in the bankruptcy

9  court.

10      The principle issue is whether the PRPs exercised the

11  requisite amount of control and I can't decide that in

12  Chemtura's favor on a motion for summary judgment.  And I think

13  the agency issue is important because I'm not in a position to

14  find that NPC, as contrasted to the individual PRPs, referred

15  to in the agreement sometimes as the defendant companies and

16  sometimes as the industry defendants and sometimes, perhaps,

17  other things, who the government sued was liable or could be

18  found to have the potential liability to governmental agencies,

19  thereby satisfying the co-liability requirement under Section

20  502(e)(1).

21      Likewise, I think there is at most an issue of fact as

22  to Chemtura's contention that NPC wasn't damaged by reason of

23  the provisions in the consent decree and the settlement

24  agreement providing for other PRPs to make good on another's

25  obligations if one PRP became insolvent or otherwise had an

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 84 of 93

Page 84

1    inability to pay.

2         In fact, it's only because the contractual wording is

3    slightly ambiguous and failing to distinguish between temporary

4    and permanent inabilities to pay that I couldn't grant summary

5    judgment in the other direction on this particular issue.

6         I'll give Chemtura a chance to show, if it can, that

7    the parties intended that a temporary inability to pay was

8    intended to let an obligor off the hook permanently on its

9    obligations to fund NPC.

10        The following are the bases for this decision

11   rearranging the issues somewhat, to deal with them in a logical

12   progression.  Turning first to the co-liability of NPC on its

13   own.  I first have to reject the contention that NPC, as a

14   principal, as contrasted to agent, satisfied the co-liability

15   requirement under 502(e)(1).  Of course it's true, as I held in

16   my earlier decisions in Lyondell Chemical and in earlier

17   proceedings in this case, see 436 B.R. 286, 442 B.R. 236 and

18   443 B.R. 601, that the co-liability requirement can be

19   satisfied by means other than a court decree holding the

20   parties seeking reimbursement to be liable.

21        For instance, the co-liability requirement can be

22   satisfied by a statutory obligation imposed upon the claimant,

23   see Lyondell 442 B.R. at 235 to 237.  It also can be satisfied

24   when a party satisfies its obligations by voluntary cleanup

25   rather than by waiting for a government action.  See one of the

Page 85

1    Chemtura decisions I issued, 443 B.R. at 622.

2           But here there has to be some basis upon which the

3    claimant would have the underlying liability, upon which co-

4    liability has been based, see Wedtech where Judge Bushman held

5    that "The co-liability requirement is to be interpreted to

6    require a finding that the causes of action in the underlying

7    lawsuit assert claims upon which, if proven, the debtor could

8    be liable but for the automatic stay."

9           Putting it a different way, there is a wide array of

10   different ways by which the debtor could be liable to a third

11   party, such as the federal government or a state environmental

12   agency, or the party seeking reimbursement could.  Judge

13   Bushman talked about one of those variants; the combinations

14   can be mixed and matched in many different ways.  But in each

15   case each one of the two sides of the seesaw must have some, at

16   least, arguable basis for liability to the federal government,

17   to the state environmental agency, to the tort litigant as we

18   had with Diacetyl or some similar party out there in the world

19   trying to go after multiple entities.  And there's no basis for

20   finding the requisite liability on the NPC side of that seesaw

21   when you look at it in those terms.

22          Here there has been no showing of any basis upon which

23   NPC, which was not a PRP or a party to the consent decree,

24   could ever be liable on the underlying obligation for which co-

25   liability would have to be measured, which would be a liability

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 86 of 93

Page 86

1      to the U.S. government, it's EPA, the State of Louisiana, its

2      EPA or any other environmental regulatory agency that might

3      have jurisdiction over the requisite cleanup.

4              Also, there's been no contention that the government

5      here has put in a claim for it, these remedial costs itself,

6      thereby subjecting Chemtura to a risk of redundant recoveries.

7      See, again, one of the Chemtura decisions, 443 B.R. at 622 to

8      623.  And in this respect this case contrasts dramatically with

9      each of the other three decisions that I issued in this regard.

10             Turning now to agency.  Notwithstanding everything I

11     just said, it's true, of course, that each of the corporate

12     defendants who were sued and became parties to the consent

13     decree would satisfy the co-liability requirement.  And I can't

14     rule out the possibility, at least on a motion for summary

15     judgment, that the PRPs who would satisfy the co-liability

16     requirement designated NPC as their agent or instrumentality to

17     act on their behalf.

18             Both sides agree on the importance of the Cajun

19     Electric Power Cooperative case, 230 B.R. 683, which discussed

20     the requirements for establishing an agency under Louisiana

21     law.  That decision held, among other things, that under

22     Louisiana law an agent is one who acts for or in the place of

23     another, with authority from the latter, that the parties

24     seeking to rely upon an agency relationship has the burden of

25     proving its existence and that control of the agent by the

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
Pg 87 of 93
CHEMTURA CORPORATION, et al.

Page 87

1    principal is an essential element in an agency relationship.

2    And that the essential test in determining whether the relation

3    of principal and agent exists between persons bound by

4    contractual relations is whether the principal has the power to

5    control the agent and such control must extend to both the

6    means and the details of the process by which the alleged agent

7    is to accomplish its task.  See 230 B.R. at 688 to 689.

8         Here there are issues of fact as to those matters.

9    That's particularly so since the defendant companies designated

10   members of the board.  There's no evidence as to the extent to

11   which members of the board were subject to directions by

12   defendant companies and those directors, at least arguably,

13   would have fiduciary duties to NPC that would impair their

14   ability to act at the direction of whoever had nominated them

15   and named them to the board.

16        On the other hand, there may have been informal

17   understandings as to how NPC would perform its duties on behalf

18   of the defendant companies.  And the settlement agreement

19   provides "The industry defendants shall jointly designate a

20   representative or separate entity to implement the remedial

21   action and carry out the additional maintenance and monitoring

22   required by the consent decree".  With, of course, the consent

23   decree imposing obligations upon the industry defendants.

24        If NPC was that entity that, together with other

25   extrinsic evidence, might support the existence of the required

09-11233-jlg   Doc 5628   Filed 12/14/11   Entered 12/27/11 08:40:16   Main Document
CHEMTURA CORPORATION, et al.
Pg 88 of 93

Page 88

1    agency.  That issue could go either way but most obviously it's

2    inappropriate for summary judgment and I can't decide it on

3    summary judgment now.

4         Chemtura also argues for an agency finding, based on

5    NPC's filing of a proof of claim on its own behalf but

6    alternatively on behalf of the defendant companies.  Given

7    NPC's honest with respect to the matter and also because of the

8    complexity of the issue and, frankly, because NPC was between a

9    rock and a hard place, I'm not in a position to find a judicial

10   estopple or otherwise bind NPC to an agency finding based

11   solely on its having filed that proof of claim.  Instead, I

12   need, with the benefit of evidence, the issue that I addressed

13   before, the extent to which NPC was used as an agent or

14   instrumentality of the defendant companies and in connection

15   with this proof of claim and otherwise, if it is so, whether it

16   was used as a device to get around the rule under 502(e)(1), to

17   which the defendant companies would so obviously be subject if

18   they had filed proofs of claim on their own.

19        Turning next to the issue as to the extent, if any, to

20   which NPC was damaged.  Chemtura also contends that it's

21   entitled to summary judgment on the premise that NPC has

22   suffered no damages and would suffer no damages going forward

23   based on language in the consent decree and the settlement

24   agreement obligating the other defendant companies to step up

25   to the plate to meet fellow defendant companies' shortfalls

09-11233-jlg    Doc 5628    Filed 12/14/11    Entered 12/27/11 08:40:16    Main Document
CHEMTURA CORPORATION, et al.
Pg 89 of 93

Page 89

1     under certain circumstances.  That, Chemtura argues, would

2     ensure that NPC would not be injured, by reason of Chemtura's

3     failure to perform.

4          More specifically, the settlement agreement provides,

5     on pages 4 and 5, "In the event of the insolvency, or other

6     inability of any of the industry defendants to meet any

7     obligations imposed under the consent decree, and such

8     obligations are imposed on the remaining industry defendants or

9     any of them pursuant to the consent decree, the remaining

10    industry defendants agree to share such obligation by pro

11    rating the unavailable percentage according to the above

12    percentages".  And of course I've truncated it.  Similar

13    language appears in the consent decree.

14         But I'm not in a position to rule that this

15    establishes that NPC wasn't injured as a matter of law.  The

16    duty to make payments that's imposed on the other industry

17    defendants in the language that I just quoted is conditional.

18    It takes place under certain circumstances, based upon certain

19    events.  One such event is insolvency; the other is the

20    inability of any of the industry defendants to pay.  But here

21    Chemtura isn't insolvent.  Nor, with the benefit of hindsight,

22    at least, can I find that it ever was.  And turning to the

23    second clause, Chemtura was only temporarily unable to pay.

24    Now it can pay just fine.

25         There is a little bit of ambiguity in the language I

CHEMTURA CORPORATION, et al.

Page 90

1    just quoted.  Did the parties intend that even a temporary

2    inability to meet obligations would get a party off the hook

3    for all time?  Or was the language that I just quoted intended

4    to deal with the problem for only as long as it was in

5    existence.  Or was it intended to achieve some other purpose or

6    to have other temporal limitations or significance?

7           I think I could divine the answer to that if no

8    further parol evidence were submitted, just as I was asked to

9    and did construe ambiguous language when both sides declined to

10   give me parol evidence in a decision I issued in General Motors

11   about a week and a half ago.  But I'll give the parties the

12   opportunity to give me any available parol evidence on this, to

13   the extent that any is available.  And in any event, I can't

14   grant summary judgment to Chemtura at this time based on

15   Chemtura's view of that language's meaning.

16          Under these circumstances and because of disclaimers

17   made by Chemtura, I don't need to deal with the veil piercing

18   contentions at this time.

19          NPC is to settle a plain vanilla order stating that

20   for the reasons set forth by the Court on the record, summary

21   judgment is denied.

22          The parties are to confer with each other to agree on

23   a schedule for discovery and any other matters necessary to tee

24   up the totality of the remaining issues for trial.  And by that

25   I mean both liability and damages.  And at the risk of stating

CHEMTURA CORPORATION, et al.

Page 91

1     the obvious, Chemtura is entitled to full discovery as to the

2     bases for the claims of damages which, in part, may be subject

3     to some debate.

4              Not by way of re-argument, are there any open issues?

5          (No response)

6              THE COURT:  All right.  Thank you folks.  Have a good

7     day.  Have a good flight.

8              MR. CRAWFORD:  Thank you, Your Honor.

9              MR. CATALANELLO:  Thank you, Your Honor.

10             MR. CRAWFORD:  For submitting the order --

11             THE COURT:  Settling an order is a word of art in New

12    York which means that you -- it's like a notice of lodging in

13    California.  You submit the order that you wanted me to

14    consider by providing a copy to your opponent and if he -- or

15    you can consult and -- it's without prejudice to the right to

16    appeal.  And he can say that order fairly reflects the ruling

17    or it doesn't.  If it doesn't, then he'll submit his own and

18    I'll decide which I'm going to sign and the time to appeal will

19    run from the time of the entry of the order.

20             MR. CRAWFORD:  Thank you, Your Honor.

21         (Whereupon these proceedings were concluded at 1:51 PM)

22

23

24

25

Page 92

1

2                          **I N D E X**

3

4    WITNESS                EXAMINATION BY        PAGE

5    Mrs. Stroud            Mr. Gentle            13

6

7                           RULINGS

8                                              Page      Line

9    Appeal of Ms. Rebecca Blackwell, Granted      9        7

10   Appeal of Ms. Brenda Johnson, Granted        10       20

11   Appeal of Ms. Edna Lynch, Granted            11       13

12   Appeal of Ms. Theresa Roberts, Granted       12        5

13   Appeal of Mr. Stroud, Granted Less the $1,000  14      3

14      Already Received

15   Appeal of Ms. Natalie Whylly, Granted        15       10

16   Recommendation for Ms. Najib's Claim to be   16        3

17   Considered an Ordinary Claim, Approved

18   Appeal of Ms. Holomb, Granted                16       18

19   Appeal of Thai Ocean Restaurant, Approved in  17       6

20   the amount of $3,085.55

21   Debtors' Motion for Summary Judgment, Denied  82      25

22

23

24

25

Page 93

1

2                       C E R T I F I C A T I O N

3

4    I, Pnina Eilberg, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8       Pnina              Digitally signed by Pnina
                           Eilberg
                           DN: cn=Pnina Eilberg, c=US
        Eilberg            Date: 2011.12.14 14:00:38
9                          -05'00'
     _____

10   PNINA EILBERG

11   AAERT Certified Electronic Transcriber CET**D 488

12

13   Veritext

14   200 Old Country Road

15   Suite 580

16   Mineola, NY 11501

17

18   Date:  December 14, 2011

19

20

21

22

23

24

25