NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x
                                 :

In re:                           :         Chapter 11
                                   :

CHEMTURA CORPORATION, *et al.*,    :         Case No. 09-11233 (JLG)
                                   :

                Reorganized Debtors.    :
-------------------------------------------------------------------------x

**MEMORANDUM DECISION GRANTING MOTION TO ENFORCE DISCHARGE
INJUNCTION UNDER CHAPTER 11 PLAN OF REORGANIZATION AND
DENYING SANCTIONS AGAINST BENZENE CLAIMANTS AND COUNSEL**

<u>**A P P E A R A N C E S**</u> **:**

DEBEVOISE & PLIMPTON LLP
*Counsel to the Reorganized Debtors*
919 Third Avenue
New York, NY 10019
By:    M. Natasha Labovitz, Esq.
       Craig A. Bruens, Esq. (argued)

LOCKS LAW FIRM PLLC
*Attorneys for the Benzene Claimants*
800 Third Avenue, 12th floor
New York, NY 10019
By:    Janet Walsh, Esq.

-and-

The Curtis Center, Suite 720E
601 Walnut Street
Philadelphia, PA 19106
By:    Andrew J. Dupont, Esq. (argued)

JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

In this reopened Chapter 11 case,[1] Chemtura Corporation ("Chemtura") and its affiliates

that were debtors in the above captioned cases (collectively, the "Reorganized Debtors" or

"Debtors," before the effective date of the Debtors' joint plan of reorganization (the "Plan")),[2]

have filed a motion (the "Motion")[3] seeking the entry of an order pursuant to sections 105(a),

524, and 1141 of the Bankruptcy Code, Bankruptcy Rules 3020(d), 9014, and 9020, and 28

U.S.C. §1927: (i) enforcing the permanent injunction prohibiting the pursuit of discharged claims

against Chemtura (the "Discharge Injunction") under the Court's November 3, 2010 order

confirming the Plan (the "Confirmation Order")[4] against eight individuals and an estate

representative (collectively, the "Benzene Claimants"), as plaintiffs in six post-confirmation

lawsuits pending in the Court of Common Pleas of Philadelphia County as described below

(collectively, the "Benzene Lawsuits") and their counsel, the Locks Law Firm; (ii) declaring the

Locks Law Firm and Benzene Claimants in civil contempt; and (iii) imposing sanctions on the

Locks Law Firm and Benzene Claimants by awarding Chemtura its reasonable attorneys' fees

and costs incurred in connection with the Motion and the Benzene Lawsuits.  In those lawsuits

the Benzene Claimants seek damages for personal injuries that they contend arose from exposure

to benzene and other organic solvent-containing products, including mineral spirits allegedly

manufactured or sold by Chemtura's predecessor in interest, Witco Corporation ("Witco"), to

---

[1]   *See* Order Reopening The Chapter 11 Case of Chemtura Corporation for the Limited Purpose of Enforcing the Discharge Injunction, dated July 21, 2016 [ECF No. 5894].

[2]   *See* Joint Chapter 11 Plan of Chemtura Corporation, *et al.,* dated October 29, 2010 [ECF No. 4387].

[3]   *See* The Reorganized Debtors' Motion for an Order Enforcing the Discharge Injunction Under the Debtors' Chapter 11 Plan of Reorganization, dated April 18, 2016 [ECF No. 5873].

[4]   *See* Findings of Fact and Conclusions of Law and Order Confirming the Joint Chapter 11 Plan of Chemtura Corporation, *et al.,* dated November 3, 2010 [ECF No. 4409].

1

and used by Safety-Kleen Systems, Inc. ("Safety-Kleen") in the manufacture and sale of parts-washing machines and parts-washing solvents.

The Reorganized Debtors contend that the Discharge Injunction bars the prosecution of those lawsuits because those actions are on account of prepetition claims against the Debtors that were discharged under the Plan.  They assert that the Benzene Claimants and Locks Law Firm have continued to prosecute those lawsuits willfully, despite their knowledge of the injunction and Chemtura's repeated requests that they dismiss those actions.  The Benzene Claimants and Locks Law Firm oppose the Motion,[5] arguing that: (i) enforcing the Discharge Injunction would violate the Benzene Claimants' due process rights because they were not provided with adequate notice of the claims Bar Date (as defined below) in these cases; and (ii) in any event, the Discharge Injunction does not bar the Benzene Claimants from proceeding with their lawsuits if only to establish Chemtura's insurers' liability for their injuries.  Thus, the Benzene Claimants deny that there are grounds to enforce the Discharge Injunction or to hold them in contempt.  They also contend that they should be given additional discovery with respect to Debtors' insurance policies and, pending completion of that discovery, the Court should defer from ruling on the Motion.

As discussed below, the Court denies the Benzene Claimants' request for discovery.  Further, the Court finds that, as of the Petition Date (as defined below), the Benzene Claimants were "unknown" creditors of the Debtors holding prepetition tort claims and were afforded due process and received adequate notice of the Bar Date by publication.  As such, the claims underlying the Benzene Lawsuits were discharged pursuant to the Plan.  The Court also finds that the Discharge Injunction permanently enjoins the Benzene Claimants from proceeding

---

[5]    *See* Benzene Claimants Objection to the Reorganized Debtors Motion to Enforce Discharge Injunction, dated May 18, 2016 [ECF No. 5884] (the "Claimants' Objection").

against Chemtura in those actions, even if only nominally for the purpose of establishing liability

of Chemtura's insurers, since Chemtura would bear defense costs under its insurance policies

and/or cost sharing agreements with its insurers.  Thus, the Court finds that there are grounds to

enforce the Discharge Injunction.  However, the Court declines to find the Benzene Claimants

and Locks Law Firm in civil contempt for prosecuting the Benzene Lawsuits.

Accordingly, the Motion is **GRANTED in part** and **DENIED in part**, as set forth

herein.

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the

Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District

Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).  This is a

core proceeding.  28 U.S.C. §157(b)(2)(A).  It is well settled that a Bankruptcy Court retains

jurisdiction post-confirmation to interpret and enforce its orders.  *See Travelers Indem. Co. v.

Bailey,* 557 U.S. 137, 151 (2009) ("[A]s the Second Circuit recognized . . . the Bankruptcy Court

plainly had jurisdiction to interpret and enforce its own prior orders."); *see also In re Lyondell

Chem. Co.,* 445 B.R. 277, 287 (Bankr. S.D.N.Y. 2011) (same).  That is especially true where, as

here, the Plan provides for the broadest possible retention of jurisdiction by the Court.  *See LTV

Corp. v. Back (In re Chateaugay Corp.),* 201 B.R. 48, 64 (Bankr. S.D.N.Y. 1996), *aff'd in part,

Back v. LTV Corp. (In re Chateaugay Corp.),* 213 B.R. 633 (S.D.N.Y. 1997).[6]

---

[6]    In relevant part, Article XIV of the Plan provides, among other things, that the Court retains jurisdiction to: (i) adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code; (ii) issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation or enforcement of the Plan; (iii) resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article XI of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions; and (iv) hear any other matter not inconsistent with the Bankruptcy Code.  Plan, Art. XIV, ¶¶ 7, 10, 14 & 26.

3

# FACTUAL AND PROCEDURAL BACKGROUND[7]

## *The Bankruptcy Proceedings*

On March 18, 2009 (the "Petition Date"), the Debtors filed for relief under Chapter 11 of the Bankruptcy Code in this Court.[8]  Chemtura is a specialty chemical company with an operating history of more than 100 years.  *See* Motion ¶ 11.[9]  Although not characterized as a mass tort bankruptcy,[10] within the year preceding the Petition Date, Chemtura was party to approximately 2,200 civil tort suits in state and federal courts.  *Id.*; *see also* Debtors' Statement of Financial Affairs ("SOFA") [ECF No. 535].  The vast majority of those actions were asbestos related, but there were also actions for personal injuries from exposure to other substances, including coal tar, vinyl chloride, and diacetyl.  *See* Motion ¶ 11.  Among those were three

---

Additionally, paragraph 150 of the Confirmation Order provides:

> Notwithstanding the entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction with respect to those items enumerated in Article XIV of the Plan, which are incorporated herein by reference.

Confirmation Order ¶ 150.

[7]    This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, made applicable herein by Rules 9014(c) and 7052 of the Federal Rules of Bankruptcy Procedure.  Except where noted, the relevant facts here are not disputed.

[8]    The Debtors' Chapter 11 cases were originally assigned to the Honorable Robert E. Gerber.  Following Judge Gerber's retirement from the bench on January 22, 2016, this case was reassigned, initially, to the Honorable Mary Kay Vyskocil, and then to the Honorable James L. Garrity, Jr.

[9]    Chemtura is the successor to Crompton & Knowles Corporation ("C&K"), which was incorporated in 1900 and engaged in the manufacture and sale of specialty chemicals beginning in 1954.  C&K traces its roots to Crompton Loom Works, which was incorporated in the 1840s.  In 1996, C&K acquired Uniroyal Chemical Company Inc.  In 1999, C&K merged with Witco and became CK Witco Corporation.  In 2000, CK Witco Corporation changed its name to Crompton Corporation.  In 2005, Crompton Corporation acquired Great Lakes Chemical Corporation ("GLCC") and several of its affiliates and subsidiaries.  Concurrently with the acquisition of GLCC, Crompton Corporation changed its name to Chemtura.  *See* Motion ¶ 10, n.4.

[10]    The Debtors filed these Chapter 11 cases in the face of a severe lack of liquidity that was causing supply chain disruptions and threatening the value of their operating business.  Moreover, the Debtors were burdened by funded debt of $1.2 billion and other obligations including liabilities related to indemnity obligations, environmental remediation, tort, pension and other post-retirement obligations, many of which were legacy obligations resulting from acquisitions and mergers of chemical companies over many decades.  *See* Motion ¶ 10.

benzene-related actions. Two of those actions involved claims alleging injury from exposure to benzene contained in Witco products. *Id.* The third was based on exposure to benzene as a raw material at a particular premises, rather than from any product. *See* Reorganized Debtors' Reply to the Benzene Claimants' Objection to the Motion to Enforce Discharge Injunction ("Debtors' Reply") [ECF No. 5887] ¶ 12, n.3. None of those actions related to benzene-containing products used or sold by Safety-Kleen. *Id.* ¶ 12. To put the Debtors' tort liabilities in perspective, of the $1.5 billion of allowed claims in the cases, the most significant of the Debtors' tort liabilities were the approximately 370 diacetyl-related claims that were resolved in the Debtors' Chapter 11 cases for an aggregate amount of less than $65 million. *See* Motion ¶ 12.

In the summer of 2009, the Debtors sought bankruptcy court approval of a bar date notice program (the "Bar Date Motion") that called for direct mailings of general and site specific bar date notices to known creditors, and publication of general and site specific notices to unknown creditors. *Id.* ¶ 13. At that time, diacetyl claims were viewed as an emerging tort and, as a result of a small number of substantial verdicts taken against other defendants, the Debtors believed that it was possible that diacetyl-related claims could, in the aggregate, represent a meaningful block of claims and impact creditor recoveries in the case. *Id.* ¶ 18. The Debtors were able to determine that workers at food flavoring factories in specific, reasonably identifiable locations, might hold diacetyl-related claims. *Id.* Consequently, in the Bar Date Motion, the Debtors proposed to include site specific notices related to diacetyl claims. Certain holders of diacetyl-related claims objected to the adequacy of the proposed notice. *See* Objection of the Diacetyl Claimants to Bar Date Motion [ECF Nos. 914, 920]. After a hearing on the Debtors' Bar Date Motion, and with certain agreed-to modifications by the Debtors to address the objections, the Court approved the Debtors' bar date notice program, and entered an order granting the Bar Date

Motion on August 21, 2009 (the "Bar Date Order") [ECF No. 992]. Among other things, the Bar

Date Order:

- Established October 30, 2009 (the "Bar Date") as the deadline for filing proofs of claims against the Debtors for claims that arose before the Petition Date [Bar Date Order ¶ 3];

- Approved the forms of the proof of claim [*id.* ¶ 5], and the general and site specific Bar Date notices [*id.* ¶ 11];

- Required the Debtors to modify the form of the general Bar Date notice and site-specific notices for diacetyl related claims to reflect "Reasonable Suggestions" (meaning revisions to clauses, additions to geographic regions, and/or additions of particular individuals for direct mailing) from the creditors committee and/or the Diacetyl Claimants [*id.* ¶ 11];

- Authorized and directed the Debtors to serve notice of the Bar Date, together with a proof of claim form by mail to all known creditors of the Debtors and certain other parties in interest [*id.* ¶¶ 10, 12];

- Authorized and directed the Debtors to publish notice of the Bar Date in the *New York Times* and *USA Today*, and approved the form of the general publication notice [*id.* ¶ 15]; and

- Authorized and directed the Debtors to publish site-specific notice of the Bar Date in 112 different publications in varying regions, and approved the forms of those notices [*id.* ¶¶ 16-17].

The site specific notices identified the names and addresses of specific facilities or sites

associated with potential environmental contamination or chemical exposure, and the potential

contamination or chemicals used at or near such locations. Those notices were intended to

provide notice to diacetyl claimants and persons who had been exposed to asbestos, vinyl

chloride, coal tar pitch, benzene, and certain other chemicals allegedly produced or disposed of

by the Debtors to the extent that geographical locations were known to be associated with

potential or alleged exposure. Motion ¶ 16. Fourteen of the Debtors' site-specific Bar Date

notices identified benzene as a contaminant at or near specific facilities where it was used as a

6

raw material.  None of the site specific notices identified benzene contained in Witco mineral

spirits or used in Safety-Kleen parts-washing machines and solvents or as potential contaminant.

*Id.*; *see, e.g.*, Special Notice to Residents of the Richmond Area [Ex. D to Bar Date Order, ECF

No. 992-4] (indicating that "the Debtors are required to provide notice to those who may have a

claim caused by exposure to the following 'Richmond Materials'" and identifying benzene as

one of the materials); *see also* Motion ¶ 16.[11]  In response to the Bar Date notices, the Debtors

received nearly 15,500 proofs of claim.  One such proof of claim alleged personal injury

damages from exposure to benzene relating to Witco.  The claim was not a products liability

claim.  Rather, it asserted personal injuries from exposure to benzene as a contaminant on real

property.  *Id.* ¶ 21.

As noted, on November 3, 2010, the Court entered the Confirmation Order.  Among other

things, the Confirmation Order implements the discharge and injunctive provisions in Sections

11.7 and 11.8 of the Plan.  Specifically, as relevant here, paragraph 141 of the Confirmation

Order provides that:

> Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise
> specifically provided in the Plan, the distributions, rights and treatment that are
> provided in the Plan shall be in full and final satisfaction, settlement, release and
> discharge, effective as of the Effective Date, of all Claims, Interests and Causes of
> Action of any nature whatsoever, including any interest accrued on Claims or
> Interests from and after the Petition Date, whether known or unknown, against,
> liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors
> or any of their assets or properties, regardless of whether any property shall have
> been distributed or retained pursuant to the Plan on account of such Claims and
> Interests, including demands, liabilities and Causes of Action that arose before the
> Effective Date, any contingent or non-contingent liability on account of
> representations or warranties issued on or before the Effective Date, and all debts
> of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code,
> in each case whether or not: (a) a Proof of Claim or Interest based upon such
> Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of
> the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right

---

[11]   The Debtors' claims agent filed an affidavit on October 9, 2009 [ECF No. 1205], confirming that the Debtors
served and published the Bar Date notices in accordance with the terms of the Bar Date Order.

7

or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the
holder of such a Claim or Interest has accepted the Plan.

Confirmation Order ¶ 141. Further, paragraph 144 of the Confirmation Order states:

> EXCEPT AS OTHERWISE EXPRESSLY PROVIDED … ALL ENTITIES
> WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT
> HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.2, 11.3 OR 11.4, OR
> DISCHARGED PURSUANT TO SECTION 11.7 OR ARE SUBJECT TO
> EXCULPATION PURSUANT TO SECTION 11.6, ARE PERMANENTLY
> ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING
> ANY OF THE FOLLOWING ACTIONS: (A) COMMENCING OR
> CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING
> OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH
> RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING,
> ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR
> MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST
> SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH
> RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING,
> PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND
> AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH
> ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH
> RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D)
> COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR
> OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN
> CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR
> INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO
> THE PLAN.

Confirmation Order ¶ 144 (emphasis in original).  The Plan was consummated and became

effective on November 10, 2010 (the "Effective Date").  *See* Motion ¶ 22.  The Debtors' Chapter

11 cases were closed on April 23, 2014.

### *The Diacetyl Injunction Motion*

This is not the first time that the Court has been asked to enforce the Discharge Injunction

against tort claimants.  On July 26, 2012, the Reorganized Debtors filed a motion (the "Diacetyl

Injunction Motion") seeking to enforce the Discharge Injunction against nine individual

plaintiffs (the "Diacetyl Plaintiffs") who had commenced post-confirmation diacetyl lawsuits

against Chemtura and Chemtura Canada in the Superior Court of Middlesex County, New Jersey

(the "Diacetyl Lawsuits").  *See* Motion for an Order Enforcing the Discharge Injunction Under

the Debtors' Chapter 11 Plan of Reorganization [ECF No. 5769].  The Diacetyl Plaintiffs

objected to the Diacetyl Injunction Motion, arguing, among other things, that their claims were

future claims, not prepetition claims, and that they were denied due process, such that their

claims were not discharged under the Plan.  *See* Objection of Firmenich Claimants to

Reorganized Debtors' Motion Enforcing the Discharge Injunction [ECF No. 5777].

Following a hearing on January 31, 2013, the Court issued a bench ruling (the

"Enforcement Decision") granting the Diacetyl Injunction Motion.[12]  In that decision, the Court

held that: (i) the claims asserted by the Diacetyl Plaintiffs were prepetition claims, irrespective of

when the injuries manifested themselves or when the plaintiffs received formal diagnoses of their

injuries, because the alleged injuries resulted from prepetition exposure to diacetyl (*see* 1/31

Hr'g Tr. at 33:14-34:9); (ii) the Diacetyl Plaintiffs were "unknown" creditors (as that term was

used in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)) (*see id.* at

36:9-17); and (iii) the Bar Date noticing program that the Debtors had implemented with respect

to the diacetyl claims was "unusually thorough" and sufficient to satisfy due process for the

claimants (*see id.* at 36:18-37:4).  The Enforcement Decision was affirmed on appeal.  *See*

*Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*, 505 B.R. 427 (S.D.N.Y. 2014).

### *The Debtors' Insurance Coverage*

Prepetition, Travelers Indemnity Company and Travelers Casualty & Surety Company,

formerly known as The Aetna Casualty and Surety Company ("Travelers"), sold or allegedly

sold liability insurance policies issued or allegedly issued to Witco.  As Witco's successor,

Chemtura was incurring defense and indemnity costs associated with claims brought against it by

---

[12]    The transcript of the January 31, 2013 hearing (the "1/31 Hr'g Tr.") [ECF No. 5818] is annexed to the Motion
as Exhibit C.  The Enforcement Decision is found at 25:2-40:23 of the transcript.

9

persons seeking damages for bodily injuries, illnesses, ailments or disease of any kind or death

resulting from exposure to goods or products allegedly manufactured, sold, distributed, leased,

made, supplied, marketed, handled, fabricated, stored, installed, used, specified, removed, or

released by Witco (the "Products Claims").  A dispute arose between Chemtura and Travelers

over whether and to what extent those policies obligated Travelers to provide insurance coverage

for Products Claims.  In 2006, the parties resolved that dispute pursuant to that certain Cost

Sharing and Settlement Agreement among the parties (the "Cost Sharing Agreement").  Briefly,

and without limitation, that agreement supersedes the underlying insurance policies and obligates

Chemtura to pay a percentage of defense costs and a portion (fixed by formula) of any payments

made in settlement of or to satisfy a judgment in any Products Claim covered by the Cost

Sharing Agreement.  Under the Plan, the Debtors assumed the Cost Sharing Agreement and it

remains in effect.  The parties agree that the Benzene Lawsuits implicate the Cost Sharing

Agreement.  *See* Debtors' Supplemental Reply (defined below), at 5.

### *The Benzene Lawsuits*

The Benzene Claimants are individuals asserting toxic tort personal injury claims against

Chemtura allegedly caused by their exposure to benzene used in parts-washing solvents sold by

Safety-Kleen.  *See* Motion ¶¶ 26-27; Claimants' Objection ¶ 4.  They contend the parts-washing

solvents were comprised of mineral spirits manufactured and sold by Witco and Kendall

Refining Company ("Kendall"), and that Chemtura is the successor in interest to Witco and

Kendall.  *See* Claimants' Objection ¶¶ 4-5.  As noted previously, Witco (and indirectly,

Kendall[13]) was one of the many different chemical companies that was, over many decades,

---

[13]    The Reorganized Debtors contend that "[a]ccording to the Reorganized Debtors' research, Witco Distribution, Inc. was a separate company that was incorporated in 1993 and dissolved in 1996.  None of the Debtors is a successor to Witco Distribution, Inc.  In addition, Kendall Refining Co. appears to have been merged out of existence into Witco in 1966, more than 40 years before the Debtors' Chapter 11 cases."  Debtors' Reply ¶ 18, n.4.

merged into or acquired by Chemtura, as the successor to Crompton & Knowles Corporation. *See* note 9 *supra*.

The Benzene Lawsuits consist of six civil actions filed in the Court of Common Pleas of Philadelphia County between 2015 and early 2016, five of which were described in the Motion.[14] Before those actions were commenced, Chemtura had never been subject to any lawsuits alleging exposure to benzene from Witco products used in Safety-Kleen parts-washing machines and solvents, or exposure to mineral spirits.  Indeed, the Reorganized Debtors dispute the allegation that Witco had manufactured mineral spirits or sold those mineral spirits to Safety-Kleen.  *See* Motion ¶ 26 ("Before the filing of the first Benzene Lawsuit, Chemtura had never been subject to any lawsuits alleging exposure to benzene from Witco products used in Safety-Kleen parts-washing machines and solvents, or exposure to mineral spirits (which Witco did not manufacture)."); Debtors' Reply ¶ 9 ("Chemtura has no record that Witco even made mineral spirits, let alone sold them to Safety-Kleen.").  Below is a brief description of the Benzene Lawsuits and, where applicable, the correspondence among the parties regarding the applicability of the Discharge Injunction to the lawsuits.

### Benzene Lawsuit #1

Filed by plaintiff Shirley Lee, individually, and as executrix for the Estate of Jack Lee on or about May 12, 2015, alleging exposure to benzene from approximately 1962 to 1995.  *See* Lee Complaint [Ex. B-1 to Motion, ECF No. 5873-4].  Initially, Chemtura was not named in the complaint, but was subsequently added as a defendant as a successor to Witco and Kendall.  *See* Claimants' Objection ¶ 9.  On September 21, 2015, after being served with a copy of the Lee Complaint, Chemtura's counsel wrote to the Locks Law Firm (the "September 21 Letter") and,

---

"Before the Benzene Claimants responded to the Motion, Chemtura was unaware that it was being sued as a successor to Kendall, and it has not been served in that capacity in any of the Benzene Lawsuits." *Id.* ¶ 43.

[14]    The Motion and Claimants' Reply only identified and discussed five civil actions.  In a filed letter dated May 23, 2016 (the "May 23 Letter") [ECF No. 5886], counsel for the Benzene Claimants disclosed a sixth Benzene Lawsuit, titled *James Jones and Franco Jones v. Sunoco, Inc. et al.*, in the Court of Common Pleas of Philadelphia County, February Term, 2016 No. 04098 (the "Jones Action").  The Locks Law Firm indicated in the May 23 Letter that Witco and Kendall are named as defendant parties in the Jones Action, but not Chemtura.

among other things, demanded that Chemtura be dismissed from the Lee Complaint. *Id.* ¶ 24; *see also* September 21 Letter [Ex. F to Motion, ECF No. 5873-8].

### Benzene Lawsuit #2

Filed by plaintiffs Paul and Donna Simmons on September 1, 2015, alleging exposure to benzene from 1965 to 2013. *See* Motion ¶ 28; *see also* Simmons Complaint [Ex. B-2 to Motion, ECF No. 5873-4]. Chemtura was a named defendant, as successor to Witco, and served with the Simmons Complaint on September 1, 2015. On September 8, 2015, Chemtura, through its counsel, wrote to the Locks Law Firm (the "September 8 Letter") contending, among other things, that the lawsuit was barred by the Discharge Injunction and demanding that Chemtura be dismissed from their complaint. Motion ¶ 28; *see also* September 8 Letter [Ex. E to Motion, ECF No. 5873-7].

Although the Locks Law Firm did not respond in writing to Chemtura's letters regarding the Lee and Simmons lawsuits, the parties had several telephone calls in October of 2015 regarding those actions. Motion ¶ 29; *see also* Claimants' Objection ¶ 28.

### Benzene Lawsuit #3

Filed by plaintiff Pamela Rapoza on November 16, 2015, against Chemtura and other defendants, alleging exposure to benzene from 1973 to 1995. *See* Rapoza Complaint [Ex. B-3 to Motion, ECF No. 5873-4].

### Benzene Lawsuit #4

Commenced on December 2, 2015, when the Locks Law Firm filed a Praecipe for Writ of Summons on behalf of plaintiffs Robert and Janice Whited. The Locks Law Firm later filed a complaint alleging exposure to benzene at different employment sites from 1960 to 2001, and non-occupational exposure from 1958 to 2009. *See* Whited Complaint ¶ 4 [Ex. B-4 to Motion, ECF No. 5873-4]. In response, Chemtura's counsel sent a letter dated December 11, 2015 (the "December 11 Letter") to the Locks Law Firm requesting that Chemtura be dismissed from all the Benzene Lawsuits then filed to date. *See* December 11 Letter [Ex. G to Motion, ECF No. 5873-9].

### Benzene Lawsuit #5

Filed on December 21, 2015 by plaintiffs Bruce and Janice Rhyne (the "Rhyne Action") against various defendants, including Chemtura, as successor to Witco, alleging exposure to benzene from 1975 to 2015. Chemtura was not served with the underlying complaint until February 5, 2016. *See* Motion ¶¶ 32, 35; *see also* Rhyne Complaint [Ex. B-5 to Motion, ECF No. 5873-4]. Chemtura's counsel sent a letter dated February 12, 2016 (the "February 12 Letter") to the Locks Law Firm regarding the Discharge Injunction and again, demanded dismissal of Chemtura from the, by then, five Benzene Lawsuits. *See* Motion ¶ 35; February 12 Letter [Ex. H to Motion, ECF No. 5873-4].

According to Chemtura, during January and February of 2016, its counsel made numerous efforts by telephone and email correspondence to discuss with the Locks Law Firm the scope of the Discharge Injunction and its impact on their prosecution of the Benzene Lawsuits. In those communications, Chemtura contended that the Discharge Injunction barred continued prosecution of the lawsuits, and demanded that it be dismissed from them. Included in those communications was correspondence on January 5, 2016 in which Chemtura's counsel informed the Locks Law Firm of this Court's Enforcement Decision and provided a copy of same. *See* Motion ¶ 33. From February 29 through March 8, 2016, Chemtura filed notices of the Discharge Injunction in the Benzene Lawsuits (*id.* ¶ 38) and sent another letter to counsel for the Benzene Claimants on March 24, 2016 (the "March 24 Letter") requesting the dismissal of Chemtura (*id.* ¶ 39).

In response to the March 24 Letter, the Locks Law Firm sent a letter dated March 31, 2016 (the "Claimants' Letter") to Chemtura's counsel, stating, in effect, counsel's belief that the Benzene Claimants' claims were not discharged by the Debtors' bankruptcy. *See id.* ¶¶ 40-41. Specifically, in part, the Claimants' Letter: (i) argued that the Benzene Lawsuits were distinguishable from the actions brought by the Diacetyl Plaintiffs that were addressed in the Enforcement Decision, (ii) asserted that there are due process issues associated with the Bar Date Order because the Benzene Claimants did not receive adequate notice of the Debtors' Bar Date, and (iii) implied that their claims arose post-petition and are not subject to the automatic stay provisions of section 362 of the Bankruptcy Code. *See* Claimants' Letter [Ex. J to Motion, ECF No. 5873-12]. The Claimants' Letter also included an offer to sever Chemtura from the Benzene Lawsuits to allow the Benzene Claimants to proceed against Chemtura's insurers. *Id.*

13

By letter dated April 6, 2016 (the "April 6 Letter"), Chemtura rejected the offer to sever it from the Benzene Lawsuits and advised the Benzene Claimants that it would be filing a motion to enforce the Discharge Injunction and impose sanctions for civil contempt if they did not promptly dismiss Chemtura from the Benzene Lawsuits.  *See* April 6 Letter [Ex. K to Motion, ECF No. 5873-13].  On April 18, 2016, the Reorganized Debtors filed the Motion.

### *Hearings on the Motion*

The Court heard argument on the Motion on July 19, 2016.  During that hearing, in response to the Benzene Claimants' contention that they should be provided with a copy of the Cost Sharing Agreement, the Reorganized Debtors agreed to produce a lightly redacted copy of the agreement to the Locks Law Firm, subject to the parties' execution of a confidentiality agreement.  They also agreed to provide the Court with an unredacted copy of the agreement for its *in camera* review.  After hearing argument, the Court authorized the parties to supplement their papers, including the submission of confidential materials under seal: (i) to address whether the Benzene Claimants should be permitted to prosecute the Benzene Lawsuits for the limited purpose of establishing liability against Chemtura's insurers under the Cost Sharing Agreement or insurance policies, and (ii) for the Benzene Claimants to submit evidence in support of their contention that Bruce Rhyne's (one of the Benzene Claimants) continued exposure to benzene past the Debtors' bankruptcy was due to Safety-Kleen's use of recycled mineral spirits supplied to it by Witco.  *See* Scheduling Order Regarding Post-Hearing Submissions [ECF No. 5896]; Order Authorizing the filing of Confidential Material under Seal [ECF No. 5897].  On July 26, 2016, the Benzene Claimants filed the Supplemental Response to Motion Enforcing the Discharge Injunction (the "Claimants' Supplemental Response") [ECF No. 5898], which was partially redacted.  On August 2, 2016, the Reorganized Debtors filed their Reply to the Benzene

Claimants' Supplemental Response (the "Debtors' Supplemental Reply") [ECF No. 5902],

which was also partially redacted.  Unredacted versions of those documents were filed under seal

[ECF Nos. 5901 & 5906, respectively].

On September 28, 2016, the Court held a further hearing on the Motion.  Thereafter, the

Reorganized Debtors filed an Ex-Parte Motion Authorizing Reorganized Debtors to File Under

Seal Unredacted Cost Sharing Agreement (the "Sealing Motion") [ECF No. 5907].  By order

entered on November 1, 2016 (the "Sealing Order") [ECF No. 5908], the Court granted the

Sealing Motion.  In that order, the Court: (i) authorized the Reorganized Debtors to file under

seal an unredacted version of the Cost Sharing Agreement; (ii) directed that the redacted version

of the Cost Sharing Agreement annexed as Exhibit A to the Sealing Order become part of the

record of the Motion; and (iii) directed that the unredacted versions of the parties' post hearing

submissions that were filed under seal be unsealed and filed on the docket.

## DISCUSSION

### I.     The Discharge Injunction

Section 1141(d)(1) of the Bankruptcy Code provides that confirmation of a plan of

reorganization discharges a debtor from all debts and claims against such debtor that arose prior

to the confirmation.  In relevant part, it states:

> (d)(1) Except as otherwise provided in this subsection, in the plan, or in the order
> confirming the plan, the confirmation of a plan—
>
>> (A) discharges the debtor from any debt that arose before the date of such
>> confirmation . . . whether or not—
>>
>>> (i) a proof of claim based on such debt is filed or deemed filed
>>> under section 501 of this title;
>>> (ii) such claim is allowed under section 502 of this title; or
>>> (iii) the holder of such claim has accepted the plan.

11 U.S.C. § 1141(d)(1)(A).  Section 524 governs the effect of a discharge in a bankruptcy

case.  In relevant part, section 524(a) states that a discharge in a case under the

Bankruptcy Code:

> (1) voids any judgment at any time obtained, to the extent that such judgment is a
> determination of the personal liability of the debtor with respect to any debt
> discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or
> not discharge of such debt is waived; [and]
>
> (2) operates as an injunction against the commencement or continuation of an
> action, the employment of process, or an act, to collect or recover from, or offset
> any such debt as a personal liability of the debtor, whether or not discharge of
> such debt is waived . . . .

11 U.S.C. § 524(a)(1) and (2).

As previously discussed, the Plan contains discharge and injunctive provisions virtually

identical to the language in sections 524 and 1141, which provisions were incorporated in and

given effect by the Confirmation Order.  *See* Confirmation Order ¶¶ 141, 144 *supra*.  The

Reorganized Debtors contend that as a consequence, the Benzene Claimants are permanently

barred from continuing the Benzene Lawsuits against them.  None of the Benzene Claimants

filed claims in the Debtors' Chapter 11 cases.

Although the general rule is that "a debtor's plan of reorganization, once confirmed,

binds the debtor and all creditors, whether or not a creditor has accepted the plan[,]" *Daewoo*

*Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02-CIV-9629, 2003 U.S. Dist. LEXIS

9802, *8 (S.D.N.Y. June 11, 2003), the Discharge Injunction will bar prosecution of the Benzene

Lawsuits only if the underlying claims arose prepetition, and, if so, only if the Benzene

Claimants received adequate notice of the Bar Date.  *See id.* ("[D]ischarge under the Bankruptcy

Code presumes that all creditors bound by the plan have been given notice sufficient to satisfy

due process."); *see also Mullane v. Hanover Bankr & Trust Co.*, 339 U.S. 306, 314 (1950)

(stating that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). As the parties challenging enforcement of the Discharge Injunction, the Benzene Claimants bear the burden of proving that it does not bar their actions. *See Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*, 200 B.R. 770, 774-75 (Bankr. S.D.N.Y. 1996) (noting in the context of an adversary proceeding brought by the debtor to enforce the discharge injunction that "[i]f looked at as an objection to discharge, then it is the complaining entity that has the burden of proof . . . . If this action is looked at as an objection to claim, however, the burden of proof rests on different parties at different times, but the ultimate burden of persuasion is always on the claimant.").

As explained below, the Court finds that the Benzene Claimants have failed to meet that burden. Before turning to the merits of the Motion, and as a preliminary matter, the Court notes that in their Supplemental Reply to the Motion, the Benzene Claimants contend that based on information that they recently received, they should be afforded the opportunity to obtain discovery from Chemtura in advance of the Court's ruling on this Motion. Claimants' Supplemental Reply ¶¶ 30-34. They contend discovery is needed with respect to insurance coverage "for claims and lawsuits arising from exposures that occurred solely after May 1, 1976" and because "the issue of whether non-Travelers insurance policies are available to cover claims arising from only post May 1, 1976 exposures has not been resolved." *Id.* ¶¶ 32, 34.[15]

---

[15] The Benzene Claimants reason that:

- The Cost Sharing Agreement is limited to lawsuits and claims that meet the definition of "Product Claim."
- Product Claims are those which are alleged to have occurred as a result of exposure to a Product prior to May 1, 1976.
- This leaves open the question of whether there are insurance policies issued by companies other than Travelers which are available to provide coverage for Benzene Claimants' claims.

However, it is undisputed that each of the Benzene Lawsuits constitutes a "Products Claim" under the Cost Sharing Agreement and, as such, Chemtura is obligated to pay a percentage of the defense costs associated with each lawsuit.  Moreover, none of the Benzene Lawsuits is based upon claims arising solely from exposures after May 1, 1976.  Accordingly, the Court denies the Benzene Claimants' request for additional discovery.

The Court now considers the merits of the Motion.

### A.        <u>Whether the Benzene Claimants' Claims Arose Before the Petition Date</u>

The Court first considers whether the claims underlying the Benzene Lawsuits are prepetition claims that could be subject to the Discharge Injunction.  Section 101(5)(A) of the Bankruptcy Code broadly defines the term "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…."  11 U.S.C. § 101(5)(A).  In formulating that definition, the drafters sought "to ensure that 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'" *California Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 929 (9th Cir. 1993) (emphasis omitted) (citations omitted).  *See also FCC v. NextWave Pers. Comm'cns, Inc.,* 537 U.S. 293, 302 (2003) (Congress intended the term "claim" to have "the broadest available definition.") (citation omitted).

---

- Chemtura's counsel has confirmed that there are insurance policies that were issued by entities other than Travelers to Chemtura during the years of the Benzene Claimants' employment, and all of those policies were assumed in the bankruptcy.
- Although Chemtura's counsel has confirmed that all the benzene cases at issue are Product Claims under the Cost Sharing Agreement and trigger Chemtura's obligation to pay a percentage of defense costs, and none of the other available insurance policies has a duty to defend Product Claims, Chemtura's counsel has not indicated whether there is any insurance available for claims and lawsuits arising from exposures that occurred solely after May 1, 1976, which may not be subject to the terms of the Cost Sharing Agreement.

Claimants' Supplemental Response ¶¶ 30-32.

It is well settled in this District that claims resulting from prepetition exposure to products that are alleged to cause tort injuries are prepetition claims, regardless of when the injury was diagnosed or discovered. *See In re Johns-Manville Corp.*, 552 B.R. 221, 237 (Bankr. S.D.N.Y. 2016) ("In the context of future asbestos claimants, courts have repeatedly found that prepetition exposure to asbestos giving rise to a post-petition injury manifesting constitutes a prepetition claim in bankruptcy.") (citations omitted); *In re Chateaugay Corp.*, No. 86-11270, 2009 WL 367490, at *6 (Bankr. S.D.N.Y. Jan. 14, 2009) (holding that if a plaintiff was exposed to asbestos before the petition date, he or she holds a prepetition claim); *In re Quigley Co., Inc.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008) ("If the Asbestos PI Claimant was exposed to asbestos before the Quigley petition date, he or she holds a 'claim.'").

As applied here, all of the Benzene Claimants allege that they were exposed to benzene or products containing benzene that were used in Safety-Kleen parts-washing machines and solvents prior to the Petition Date and that the exposure caused them injuries that they did not discover or diagnose until after the Effective Date. Thus, consistent with the clear precedents noted above, the Court finds that the Benzene Claimants' alleged claims against Chemtura arose prepetition.

The Benzene Claimants assert that there is precedent for finding that they do not hold prepetition claims because some courts have ruled that a prepetition claim does not exist where there is prepetition exposure to a defective product that does not manifest injury until after confirmation. Claimants' Objection ¶ 90. However, the cited authorities are acknowledged by the Benzene Claimants as "not generally the law in the Second Circuit," (*id.*) and are, in any case, inapposite.[16] The Benzene Claimants also contend that the plaintiff in the Rhyne Action is

---

[16]    The Benzene Claimants also seem to argue that they do not have prepetition claims because under the Third Circuit's recent decision in *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012), the *Frenville* test should

not bound by the Discharge Injunction because his exposure to benzene, which commenced in 1975, continued into 2015. *See id.* ¶ 91. They argue that Mr. Rhyne is "uniquely situated" because even assuming *arguendo* that Witco/Kendall stopped selling mineral spirits to Safety-Kleen in 1999, Safety-Kleen "recycled" and reused the mineral spirits that it acquired from them prior to 1999, in the production of its parts-washing solvents in years after 1999. *Id.* Accordingly, the Benzene Claimants maintain that "mineral spirits sold in 1999 were potentially in use in 2009 and later," and that "Mr. Rhyne therefore has a claim for post-petition and post-confirmation liability." *Id.*

As noted previously, during the July 19 hearing, the Court granted the Benzene Claimants leave to submit evidence supporting their assertion that Safety-Kleen recycled Witco mineral spirits such that Mr. Rhyne could have sustained post-petition/post-confirmation exposure to Witco mineral spirits. The evidence that they rely on consists of a 1991 memorandum from Safety-Kleen to Witco concerning product specifications and excerpts from a 2007 deposition of James Breece, Ph.D. testifying as a corporate representative of Safety-Kleen,

---

continue to be applied to two groups of claims: (i) claims based on prepetition exposure, where the plan was confirmed after the Third Circuit's decision in *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010); and (ii) claims based on post-petition, but pre-confirmation exposure. *See* Claimants' Objection ¶ 74. In *Frenville*, the Third Circuit held that a claim does not arise until the underlying state law cause of action accrues. *See Avellino v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332 (3d Cir. 1984). *Frenville* was overruled by the Third Circuit in *In re Grossman's, Inc.*, *supra*.

These cases do not support the Benzene Claimants' contention that they do not hold dischargeable prepetition claims. *Grossman* stands for the proposition that a claim arises at the time of exposure. All of the Benzene Claimants were exposed to benzene prepetition. Moreover, to the extent that *Frenville* still has vitality post-*Grossman* through *Wright*, those decisions are inapplicable to Chemtura because that is not the law in this District. *See, e.g., In re Johns-Manville Corp.*, 552 B.R. 221, 232-35 (Bankr. S.D.N.Y. 2016) (stating "this Court has already rejected the *Frenville* accrual test in proceedings in this case," and discussing various standards for determining when a claim arises in the Second Circuit and other courts).

describing Safety-Kleen's process for product recycling.[17]  In summary, and without limitation, those materials reveal the following:

- Safety-Kleen purchased mineral spirits from suppliers.

- Safety-Kleen distributed drums of mineral spirits to its customers.

- In the early 1970's, Safety-Kleen began to recycle solvents it took back from customers.

- After the mineral spirits were used by their customers, Safety-Kleen retrieved the used mineral spirits and recycled them using one of a few distillation procedures.

- By application of those procedures, Safety-Kleen was able to use recycled mineral spirits in the production of their solvents.

- It was more economical for Safety-Kleen to recycle used mineral spirits than it was for Safety-Kleen to buy new mineral spirits from a supplier.

From that, the Benzene Claimants argue that "since it was economically advantageous for Safety-Kleen to reuse mineral spirits, rather than purchase new mineral spirits, it is far more likely than not that Safety-Kleen continued to use recycled Witco mineral spirits after 1999." Claimants' Supplemental Response ¶ 37; *see also id.* ¶ 35 ("Mr. Rhyne could have sustained post-petition/post-confirmation exposure to Witco mineral spirits.").  The Court finds no merit to that argument.  First, the  deposition testimony provides no support for the claimants' theory because the deposition does not relate to Mr. Rhyne's case, and: (i) the deposition transcript is incomplete and is presented without any context; (ii) the deposition testimony does not refer to mineral spirits manufactured by Witco; (iii) the deposition testimony does not mention any time frame for Safety-Kleen's alleged recycling process; and (iv) the deposition transcript is dated September 2007 and, as such, provides no evidence of the status of Safety-Kleen's products

---

[17]    *See* Claimants' Supplemental Response ¶¶ 36-37 (citing 9/20/07 Breece Depo. Tr., attached as Ex. B).  The deposition testimony is part of a lawsuit filed in 2003 to which Chemtura is not a party.

during Chemtura's Chapter 11 cases, which were filed in 2009. Moreover, the Benzene

Claimants are not only asking this Court to assume that Witco mineral spirits were among the

products re-cycled by Safety-Kleen, they are asking the Court to speculate that for years after

2010, Mr. Rhyne was exposed to benzene molecules—traceable to Witco—that had been

distributed to Safety-Kleen customers, retrieved by Safety-Kleen, recycled and then reused over

a ten year period. The Court will not do so.

Finally, aside from Chemtura's denial that Witco (and by extension, Kendall) ever sold

mineral spirits to Safety-Kleen at all, it is undisputed that Witco was merged out of existence in

1999, approximately 10 years before the Petition Date and that since at least 1999, the Debtors

and Reorganized Debtors have not sold any benzene-containing products, organic solvents or

mineral spirits (which Witco purportedly never manufactured) to Safety-Kleen. Thus, that Mr.

Rhyne's exposure to benzene may have continued past 2009 does not except him from the

Discharge Injunction because there is no evidence that the Debtors were the source of the

benzene.[18]

---

[18]    This Court reached the same conclusion in response to a similar argument made by the Diacetyl Plaintiffs.
They contended that their claims were excepted from the Discharge Injunction because their exposure to diacetyl
continued through 2011. However, since the Debtors ceased manufacturing and selling diacetyl in 2005, the Court
held that the Diacetyl Plaintiffs' claims were discharged even though their exposure to diacetyl continued through
2011. In part, the Court stated, as follows:

> I must conclude that the claimants hold prepetition claims because any exposure of the claimants to
> diacetyl that was manufactured or sold by the Debtors occurred prepetition. Each of the nine
> claimants alleges that he or she was exposed to diacetyl during the course of employment at the
> Firmenich facility during various time periods starting from 1984 to 2000 and continuing to 2011.
> The Debtors ceased manufacturing and/or selling diacetyl in 2005, four years prior to filing a
> Chapter 11 petition in this Court. The claimants' claims as to injuries arising from alleged exposure
> to diacetyl manufactured or sold by the Debtors arose at the time of exposure, which under these
> facts would be 2005 at the latest. Thus, the Claimants' claims are prepetition claims.

Enforcement Decision, 1/31 Hr'g Tr. at 33:22-34:9. The recent decision in *In re Johns Manville Corp.*, is
instructive. There, the plaintiff argued that her claim should not be treated as a prepetition claim because her
mesothelioma could have been caused by exposure to asbestos that continued post-confirmation. *In re Johns-
Manville Corp.*, 552 B.R. 221, 237 (Bankr. S.D.N.Y. 2016). Stating that "[plaintiff's] theories of continuing
exposure do not change this Court's conclusion that her repeated prepetition exposures to asbestos should be treated
as a dischargeable pre-petition claim," Chief Judge Morris reasoned that "[plaintiff] admits that it is scientifically

B.    _Adequacy of Notice_

        i.    <u>Whether the Benzene Claimants were Known or Unknown Creditors</u>

Having determined that the Benzene Claimants hold prepetition claims against the Debtors, the Court will consider whether they received adequate notice of the Bar Date.  In determining whether notice to a creditor is sufficient to satisfy due process the Court must first consider whether such creditor is a "known" creditor or an "unknown" creditor.  *See DePippo v. Kmart Corp.*, 335 B.R. 290, 295 (S.D.N.Y. 2005) ("Thus, what constitutes 'reasonable notice' principally depends on the status of the parties and whether the creditor is a 'known' creditor or an 'unknown' creditor." (citing *City of New York v. New York N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953))).  An "unknown" creditor is one whose interests "are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950).  In contrast, a "known" creditor is one whose identity is either known or "reasonably ascertainable by the debtor."  *Tulsa Prof'l Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988).  "A creditor's identity is 'reasonably ascertainable' if that creditor can be identified through 'reasonably diligent efforts.'"  *Grant v. U. S. Home Corp. (In re U.S.H. Corp.)*, 223 B.R. 654, 659 (Bankr. S.D.N.Y. 1998) (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4, (1983)).  "Reasonably diligent efforts" does not require "impracticable and extended searches . . . in the name of due process."  *Mullane*, 339 U.S. at 317.  A debtor need only focus the search on its "own books and records."  *In re U.S.H. Corp.*, 223 B.R. at 659.  *See also In re*

---

impossible to prove which set of exposures caused her asbestos injuries, and further states that the earlier exposures were more likely to have caused her injuries."  *Id.* at 239.  Here, there is nothing in the record establishing that Mr. Rhyne's injury was caused by exposure to benzene post-confirmation (from 2010 to 2015), and not by his significant 35-year exposure to benzene prepetition (from 1975 to 2009).

*Drexel Burnham Lambert Grp, Inc.*, 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993) ("A debtor need

not be omnipotent or clairvoyant.").

It is well settled that "when a creditor is 'unknown' to the debtor, publication notice of

the claims bar date is adequate constructive notice sufficient to satisfy due process

requirements." *DePippo v. Kmart Corp.*, 335 B.R. at 296; *see also Mullane,* 339 U.S. at 317

("[I]n the case of persons missing or unknown, employment of an indirect and even a probably

futile means of notification is all that the situation permits and creates no constitutional bar to a

final decree foreclosing their rights."); *Tulsa Prof'l Collection Servs., Inc.*, 485 U.S. at 490 ("For

creditors who are not 'reasonably ascertainable,' publication notice can suffice."); *Chemetron

Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995) (affirming district court's ruling that creditors were

unknown and notice by publication was sufficient).  In contrast, known claimants are entitled to

actual notice of the bar date.  *See In re Drexel Burnham Lambert, Grp, Inc.*, 151 B.R. at 680;

*Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*, 157 B.R. 220, 222 (S.D.N.Y. 1993);

*In re Brooks Fashion Stores, Inc.*, 124 B.R. 436, 443-44 (Bankr. S.D.N.Y. 1991).

Although there is no dispute that as of the Effective Date, the Debtors did not know the

identities of the Benzene Claimants, the Benzene Claimants contend that the Debtors were not

reasonably diligent in attempting to ascertain their identities as of the Bar Date and, as such, their

due process rights were not protected by the Debtors' Bar Date notices.  *See* Claimants'

Objection ¶ 87.  The Benzene Claimants maintain that the Debtors had sufficient cause to give

"benzene specific" notice of the Bar Date because: (i) benzene is a known human carcinogen and

has been recognized as such by the United States Occupational Health and Safety Agency and

National Institute for Occupational Safety and Health since no later than 1977, 29 C.F.R.

§ 1910.1028; (ii) as reflected in their SOFA, the Debtors had knowledge of two personal injury

benzene product liability actions pending against it and environmental contamination litigation

pending against it from which additional personal injury lawsuits could be brought;[19] and (iii) the

Debtors' predecessors, Witco and Kendall, corresponded with Safety-Kleen concerning the

benzene content of their mineral spirits and benzene health hazards.  *See id.* ¶¶ 87-88.  They

argue that Safety-Kleen maintains detailed records of where it places its parts-washing solvents

and parts-washing machines and, as such, the Debtors could have simply reached out to Safety-

Kleen to ascertain the geographical area and customers to which it distributed the mineral spirits

based parts-washing solvent, but failed to do so.  *Id.*  The Court finds no merit to that argument.

The argument ignores the fact that, as of the Bar Date, the Debtors had no knowledge of

any potential benzene exposure claims relating to Witco mineral spirits used by Safety-Kleen.

Although fourteen of the site-specific notices identified benzene as a potential contaminant at or

near specific facilities where it was used as a raw material, none of them identified benzene

contained in Witco mineral spirits or used in Safety-Kleen parts-washing machines and solvents

as a potential contaminant.  *See* Motion ¶ 16.  At the time of the Bar Date noticing, the Debtors

had no knowledge of any potential claimants with unmanifested injuries resulting from exposure

to Witco benzene products used in Safety-Kleen parts-washing machines and solvents.  *Id.* ¶ 17.

None of the three benzene-related actions identified in the Debtors' SOFA were based upon

benzene exposure to any of Safety-Kleen's products.  It is undisputed that the Benzene Lawsuits

were the first lawsuits ever filed against the Reorganized Debtors or their predecessors relating to

any Safety-Kleen products.  *See id.* ¶¶ 17, 58.  Thus, as of the Bar Date, the Debtors had no

reason to reach out to Safety-Kleen and could not have been expected to foresee that, post-

confirmation, exposure to Safety-Kleen's washing parts solvents would give rise to litigation.

---

[19]    Chemtura's SOFA, filed on June 11, 2009, lists three benzene products liability claims.

The argument also fails because it seeks to impose an unreasonable burden on Chemtura to look beyond its books and records to seek out its creditors. Those books and records would have shown that Witco and Kendall's sales to Safety-Kleen ceased ten years prior to the Debtors' bankruptcy cases and that there were no benzene related product liability suits tied to Safety-Kleen as of the Petition Date. It is undisputed that the Debtors produced more than 3,000 products containing different chemical substances and, as of the Petition Date, had more than 45,000 customers. *See* Debtors' Reply ¶ 13. It is plainly unreasonable to have required the Debtors to communicate with every one of the current and former customers to determine where their end products were distributed so that the Debtors could ascertain the identities of potential creditors. In that light, and contrary to the Benzene Claimants' assertions, due process did not mandate that based on three previous benzene lawsuits unrelated to Safety-Kleen, the Debtors provide them and other Safety-Kleen customers in Safety-Kleen based geographic locations with specific notice of the Bar Date. That is especially so given that the Debtors' bankruptcy cases were precipitated by overleveraged debt, not mass tort litigation. Moreover, the logical extension of such argument is that the Debtors had to ascertain the customers and geographic locations of not only Safety-Kleen's distributed products, but other companies that purchased chemicals from the Debtors, so that specific notices identifying the more than 3,000 chemicals the Debtors manufacture, the exposure of which may give rise to a claim, can be given to potential claimants in the name of due process. That is exactly the kind of impractical and onerous notice that the Supreme Court cautioned against in *Mullane*, and it is simply not the standard.

Based on the foregoing, the Court concludes that the Benzene Claimants were "unknown creditors" as of the Petition Date.

   ii.  Whether Publication of the General Bar Date Order was
      <u>Constitutionally Sufficient to Bind the Benzene Claimants</u>

  It is well settled that publication of a general notice of a debtor's bar date satisfies due

process standards where, as here, the debtor is faced with post-confirmation tort claimants who

were not part of a class of claimants that the debtor knew existed at the time of the notice, and

whose injuries had not manifested at that time.  *See, e.g.*, *Williams v. Placid Oil Co. (In re Placid*

*Oil Co.)*, 753 F.3d 151, 158 (5th Cir. 2014) (affirming the bankruptcy court's holding that

publication of a general notice of the bar date in the Wall Street Journal was sufficient notice to

satisfy due process for unknown asbestos creditors whose injuries manifested after

confirmation); *In re Chateaugay Corp.*, No. 86-11270, 2009 WL 367490, at *5 (Bankr. S.D.N.Y.

Jan. 14, 2009) (holding that asbestos plaintiffs who did not manifest any sign of disease during

the debtors' Chapter 11 cases were unknown creditors who received sufficient notice of the bar

date by publication of the bar date notice in approximately 186 newspapers throughout the

country); *In re Charter Int'l Oil Co. v. Young (In re Charter Int'l Oil Co.)*, No. 84-319-BK-JGP,

2007 WL 879176, at *7 (Bankr. M.D. Fla. Mar. 14, 2007) (holding that publication of the bar

date notice in The New York Times, Wall Street Journal and three regional newspapers satisfied

due process for an unknown creditor alleging injury from exposure to benzene that did not

manifest until after confirmation).

  The Benzene Claimants do not dispute application of that line of cases.  Nonetheless,

citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997), they assert that an assessment

of the adequacy of the Bar Date notice is "multifaceted" and that it must address the method and

content of the notice and whether the claimant had a sufficient understanding of her or his injury

or claim so as to be able to act on the notice in order to preserve her or his legal rights.  *See*

Claimants' Objection ¶ 77.  The Benzene Claimants maintain that an "[a]nalysis of the

claimant's understanding of her of his injury is necessary because even in the presence of

sufficient notice, 'those without current afflictions may not have the information or foresight

needed to decide, intelligently, where [sic] to stay in or opt out.'" *Id.* (quoting *Amchem*, 521

U.S. at 628.) They contend that the Debtors' general Bar Date notice was deficient because:

> (i)    It did not mention: (a) benzene, mineral spirits or Safety-Kleen; (b)
>        the Benzene Claimants' employers; or (c) the plants or other
>        worksites where the Benzene Claimants were exposed;
>
> (ii)   There is no evidence that the Bar Date Order was published in
>        regions or states local to the Benzene Claimants; and
>
> (iii)  The notice does not mention Kendall Refining Company and
>        Witco Distribution, Inc., two predecessor entities that the Benzene
>        Claimants identified as the manufacturers of the mineral spirits
>        sold to Safety-Kleen.

Claimants' Objection ¶ 80.  Thus, the Benzene Claimants maintain that even if they had read the

notice, they would not under any circumstances have known that (a) they had rights stemming

from their exposure to benzene, (b) they may have injuries caused by past exposure to benzene

that only manifest in the future, (c) the bankruptcy involved Witco Distribution, Inc. and Kendall

Refining Company – the only known links to Chemtura, (d) Chemtura, Witco and Kendall were

involved in exposing them to benzene or the Safety-Kleen products, or (e) they needed to take

action to object in the bankruptcy in order to preserve their rights.  *Id.* ¶ 81.

However, *Amchem* was a class action case, not a bankruptcy case.  As noted in the

Enforcement Decision, it is inappropriate to apply the subjective notice standards under class

action law in evaluating the adequacy of a bar date notice in a bankruptcy case.  Instead, *Mullane*

and its progeny control.  *See* Enforcement Decision, 1/31 Hr'g Tr. at 6:3-23; 34:10-35:1.[20]  Thus,

---

[20]    The Bankruptcy Court in *Johns-Manville Corp.* rejected virtually identical *Amchem*-based notice arguments by
the tort plaintiff in that case:

in assessing whether the general bar date notice was constitutionally sufficient to bar the Benzene Claimants' lawsuits, this Court must determine whether such notice was "reasonably calculated, under all the circumstances, to apprise [the Benzene Claimants] of [the Bar Date] and afford them an opportunity [to file their claims]." *Mullane v. Central Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The comprehensive Bar Date noticing program at issue here was fully vetted with the input of the Debtors' general unsecured creditors and the Diacetyl Claimants and was approved by the Bankruptcy Court. The Debtors published the general Bar Date notice in the *New York Times*, *USA Today* and in 112 local newspapers across the country. *See* Motion ¶ 59. The latter included newspapers in Indiana, North Carolina, South Carolina, Pennsylvania and New York— representing the states in which the Benzene Claimants were located in 2009 based upon allegations in the Benzene Lawsuits or, if no such allegations were made, the states in which the claimants reside. *See id.*

---

[Plaintiff's] assertions that notice to future claimants is impossible are completely irrelevant here. [Plaintiff's] arguments are based on a line of reasoning developed in a class action case decided under Federal Rule of Civil Procedure 23. In [*Amchem*, 521 U.S. 591], the Supreme Court found that the requirements to establish a class of asbestos plaintiffs under Rule 23(b)(3) had not been satisfied. […] While declining to hold that the notice to the nonlitigant asbestos plaintiffs' of their right to opt-out of the class under Rule 23 was insufficient, the Supreme Court "recognize[d] the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." This notice the Supreme Court was referring to is the notice from the class representative to other would-be class members that non-litigants must elect to opt out of the class or forever lose their right to sue independently.

Not only was the case decided under Rule 23(b)(3) grounds, the Supreme Court in *Amchem* was not worried about notice to unknown claimants generally speaking. The Supreme Court was specifically considering the mandatory notice of a putative class members' right to opt-out from the class. [Debtor] was not giving notice to [plaintiff] for the purpose of establishing itself as a representative of all asbestos plaintiffs in a class action. [Debtor] was not giving notice to claimants for purposes of allowing them to opt-out of a certified class. [Debtor] was giving notice of its confirmation hearing and the bar date for claims against it for purposes of discharge. […] Notice in a bankruptcy case is not for the purpose of allowing a creditor to retain the right to sue the debtor at a later time. The discharge created by the Bankruptcy Code permanently enjoins any right to sue on a prepetition claim. The reasoning in *Amchem* simply does not apply here.

*In re Johns-Manville Corp.*, 552 B.R. 221, 243-44 (Bankr. S.D.N.Y. 2016) (internal citations omitted).

The general Bar Date notice included the Bankruptcy Code's definition of "claim" and alerted unknown creditors that "[a]cts or omissions that occurred before March 18, 2009 may give rise to Claims that are subject to the Bar Date, even if the Claims *may not have become known or fixed or liquidated until after March 18, 2009*." *See* General Publication Notice [ECF No. 992-5], at 2 (emphasis added). In addition, the general Bar Date notice informed unknown creditors of the Bar Date and advised unknown creditors that the failure to file a proof of claim by the Bar Date would result in the claim being "FOREVER BARRED." *Id.* at 1. Finally, that notice identified "CERTAIN PRIOR NAMES OF THE DEBTOR (INCLUDING ALL PRIOR NAMES USED IN THE LAST 6 YEARS)" that included, as relevant here, "Witco Corporation; Witco Enterprises, Inc.; Witco Oil and Gas Corp." as well as "Kendall Motor Oil; Kendall Oil Company." *See id.* at 3 (emphasis in original).

The Bar Date notice contained more than adequate information and language that placed parties on notice of the opportunity to assert claims (and even potential claims) against the Debtors (including the Debtors' predecessors) by the Bar Date, and was disseminated to different geographical regions of the country intended to maximize the reach of unknown creditors, such as the Benzene Claimants. In light of the foregoing, the Court finds that the Benzene Claimants received adequate notice of the Bar Date and are bound by and subject to the Discharge Injunction.

### C.     *Whether the Benzene Claimants Can Proceed Against Chemtura Only to Fix the Insurers' Liability Under the Insurance Policies*

The discharge under section 1141 triggers operation of section 524(a) which protects the debtor from any personal liability with respect to a discharged debt. *See* 11 U.S.C. §§ 542(a), 1141. "A bankruptcy discharge and the concomitant injunction against subsequent actions are designed to provide the debtor a financial 'fresh start.'" *In re Jet Florida System, Inc.*, 883 F.2d

970, 972 (11th Cir. 1989) (per curiam) (citing Thomas H. Jackson, *The Fresh-Start Policy in*

*Bankruptcy Law*, 98 Harv. L. Rev. 1393, 1396-97 (1985)).  *See also Texaco, Inc. v. Sanders (In*

*re Texaco, Inc.)*, 182 B.R. 937, 950 (Bankr. S.D.N.Y. 1995) ("There is no question that the

concept of the debtor's discharge is fundamental to [the Bankruptcy Code's "fresh start"]

philosophy and, in particular, to the practical implementation of a plan of reorganization under

Chapter 11.")  However, the statute is clear that the "fresh start" is the debtor's alone, since the

"discharge of a debt of the debtor does not affect the liability of any other entity on, or the

property of another entity for, such debtor."  11 U.S.C. §524(e).  "Together, the language of

those sections reveals that Congress sought to free the debtor of his personal obligations while

ensuring that no one else reaps a similar benefit."  *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir.

1992) (citations omitted).  *See also Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 53

(5th Cir. 1993) ("A discharge in bankruptcy does not extinguish the debt itself, but merely

releases the debtor for personal liability for the debt.  Section 524(e) specifies that the debt still

exists and can be collected from any other entity that might be liable.") (footnote omitted).  Thus,

it is well settled that by application of sections 524(a) and 524(e), the discharge injunction does

not bar a tort claimant from bringing suit against a discharged debtor only to recover from the

debtor's insurer, where that suit comes with no cost to the debtor.  In those cases, the discharged

debtor's "fresh start" is not compromised.  *See Bank of India v. Trendi Sportswear, Inc.*, No. 89

CIV 5996, 2002 WL 84631, at *5 (S.D.N.Y. Jan. 17, 2002) (when determining whether

confirmation discharge applies to permit litigation against a debtor to continue, application of the

following three criteria insures that the Bankruptcy Code's fresh start is respected:  (1) the

plaintiff can maintain the action against the debtor only when it is necessary to establish liability

against a third party; (2) the plaintiff can maintain the action against the debtor only if the debtor

bears none of the expense of the defense; and (3) the plaintiff may not execute on any judgment
he may obtain against the debtor, either against the debtor personally, or against his assets.
(citing *In re Catania*, 94 B.R. 250, 253 (Bankr. D. Mass. 1989))).

Here, if the Benzene Lawsuits go forward against Chemtura, even if only to fix
Travelers's liability under the insurance policies and the Cost Sharing Agreement, Chemtura will
be denied its "fresh start" because it will be obligated by those agreements to pay defense costs
associated with the Benzene Lawsuits, which are personal injury actions on account of
discharged debts.  "In seeking recovery from a debtor's insurer, while simultaneously honoring
the permanent injunction against asserting post-confirmation debtor liability on discharged debt,
the creditor is confined to act within a very narrow swath of permissible conduct—squeezed, as
it were, between Section 524(a) and Section 524(c)."  *In re Jason Pharmaceuticals, Inc.*, 224
B.R. 315, 322 (Bankr. D. Md. 1998).  That is why in cases like this, where the reorganized
debtor will incur liability on account of discharged debts if litigation goes forward even if only to
fix the insurer's liability under the policy, courts enforce section 524(a) and bar prosecution of
those actions.  *See DePippo v. Kmart Corp.*, 335 B.R. 290, 298 (S.D.N.Y. 2005) (holding that a
plaintiff could not sue a reorganized debtor to collect from insurance that was subject to a self-
insured retention obligation and noting that "if the action against Kmart were permitted to
proceed, it would have to pay litigation costs, which is contrary to the fresh start policy of the
Bankruptcy Code."); *Greiner v. Columbia Gas Transmission Corp. (In re Columbia Gas
Transmission Corp.)*, 219 B.R. 716, 721 (S.D. W.Va. 1998) (dismissing a lawsuit against a
reorganized debtor who would bear the costs of defense and stating that "it would violate the
Bankruptcy Code's fresh-start policy to require [Debtor] to defend against [Creditor's] claims.
[Debtor] has provided evidence that it, not [the insurer], is responsible for costs of defending the

lawsuit."); *In re Daniels*, 493 B.R. 740, 746 (Bankr. N.D. Miss. 2013) (Discharge injunction

barred action against debtor, even nominally, to fix insurer's liability where, due to insurer's

insolvency, debtor would be forced to fund defense of action himself); *Perez v. Cumberland

Farms, Inc.*, 213 B.R. 622, 624 (D. Mass. 1997) (stating that "[a]ny economic loss to the Debtor

would . . .  result in the violation of the statutory injunction of 11 U.S.C. § 524(a)."). *See also

Houston v. Edgeworth, M.D. (In re Edgeworth, M.D.)*, 993 F.2d 51, 54 (5th Cir. 1993) (noting

that "as long as the costs of defense are borne by the insurer and there is no execution on

judgment against the debtor personally, section 524(a) will not bar a suit against the discharged

debtor as the nominal defendant."); *In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 281

B.R. 200, 211 (Bankr. S.D.N.Y. 2002) ("The decisions that have permitted a creditor to pursue a

claim based on a liability insurance policy have also stressed the fact that there would be no cost

to the estate.").

        Nonetheless, the Benzene Claimants contend that the Discharge Injunction should not bar

continued prosecution of those actions against Chemtura.  They say that the plain language of the

insurance policies and the Cost Sharing Agreement obligates Chemtura to pay defense costs, and

having assumed those agreements, Chemtura cannot now disclaim those obligations and is

estopped from invoking the Discharge Injunction as a bar to prosecution of the Benzene

Lawsuits.  *See* Claimants' Supplemental Response ¶ 22.  Moreover, they contend that if the

Court bars prosecution of these actions, it will undermine New York State's strong public policy,

embodied in section 3420 of the New York Insurance Law, of ensuring that tort victims of

bankrupt/insolvent insureds can hold the debtors' insurers accountable for payment of damages

within the scope of the underlying policies.  *Id.* ¶¶ 10-19.  As explained below, the Court finds

no merit to those arguments.

33

The Benzene Claimants contend that if they are not permitted to continue to prosecute the Benzene Lawsuits to fix Travelers' liability under the Cost Sharing Agreement and insurance policies, Chemtura's assumption of the agreements will be "devoid of any effect" because claimants will never be able to access the Travelers's policies. Claimants' Supplemental Response ¶ 3; *see also id.* ¶¶ 17-18 (arguing that insurers and insureds should not be allowed to contract around potential liability).[21] The Court disagrees. Chemtura acknowledges, as it should, that by assuming the insurance policies and the Cost Sharing Agreement, it has obligated itself to perform under those agreements. Indeed, it is because those obligations exist that Chemtura seeks to enforce the Discharge Injunction. *See* Debtors' Reply ¶ 29 ("It is precisely because Chemtura is obligated to perform under Cost Sharing Agreement and its insurance policies that Chemtura will incur costs if the Benzene Lawsuits are permitted to proceed."). Chemtura has not failed to pay any self-insured retention or refused to pay defense costs. To the contrary, Chemtura has indicated that it intends to comply with its obligations under the Cost Sharing Agreement. *Id.* ¶ 31 ("Chemtura has acknowledged that it has obligation under the Cost Sharing Agreement and insurance policies, and has not indicated that it would not pay such obligations. In fact, Chemtura has argued the exact opposite, which is why the Discharge Injunction should be enforced.").

---

[21]    In support of this argument, the Benzene Claimants relies on *Walker v. Wilde (In re Walker)*, 927 F.2d 1138 (10th Cir. 1991). However, that case is distinguishable. There, the court modified the automatic stay to allow the appellants to recover against Utah's Real Estate Recovery Fund on account of a judgment against a Chapter 7 debtor. *Id.* at 1142-44. In reaching that determination, the court noted, in part, that "[u]nder the circumstances of this case, we are not prepared to deny the Higleys the relief they seek on the ground that Walker may thereby incur some legal expense." *Id.* at 1144 (citing *In re Jet Florida Sys.*, 883 F.2d 970, 976 (11th Cir. 1989) and *Granger v. Harris (In re Harris)*, 85 B.R. 858, 860 (Bankr. D. Colo. 1988)). Like *Jet Florida Systems*, it was not conclusively established from the record in *Walker* that the debtor would incur litigation costs. Rather, the court found that it was possible that the debtor might incur litigation costs. Likewise, in *Harris*, the Court noted that there was no real litigation cost to the debtor because the debtor could simply default under the Colorado State Recovery Fund. Here, Chemtura cannot simply default and allow judgment to be entered against it. Instead, Chemtura has a contractual obligation under the Cost Sharing Agreement and applicable insurance policies to pay a percentage of defense costs of the Benzene Lawsuits, such that expense to the Reorganized Debtors is a certainty, not a possibility.

Next, the Benzene Claimants contend that the "[Cost Sharing Agreement] directly refutes Chemtura's argument that its obligation to pay defense costs is a bar to accessing the Travelers'[s] policies because the [Cost Sharing Agreement] expressly provides that Travelers must pay its share of defense costs and indemnification even where Chemtura does not pay its own share."  Claimants' Supplemental Response at ¶ 21.[22]  However, Travelers's obligation to perform under the Cost Sharing Agreement in the face of Chemtura's failure to do so has no bearing on the Benzene Claimants right to sue Chemtura.  The Benzene Claimants are not parties to the Cost Sharing Agreement and can derive no rights from it.  For the same reason, there is no merit to the Benzene Claimants' assertion that since Chemtura assumed the insurance policies and Cost Sharing Agreement (and in doing so, obligated itself to pay defense and other costs), it cannot now argue that its incurrence of such costs is grounds for enjoining the Benzene Lawsuits.  *See* Claimants' Supplemental Response ¶ 7.[23]  In assuming the agreements, Chemtura did not waive the Discharge Injunction.  That Chemtura has obligated itself to perform under those agreements is irrelevant to whether the Benzene Claimants should be permitted to continue to prosecute the Benzene Lawsuits against Chemtura.  Nor is there merit to the Benzene

---

[22]    The Benzene Claimants are correct that the specific language of the Cost Sharing Agreement is clear that Chemtura's failure to pay defense or indemnity costs does not affect Travelers' liability to pay its share of those costs.  *See* Cost Sharing Agreement ¶ 4.6 ("The failure of any Person to pay Defense Costs or other cost related to the defense of Chemtura in Product Claims shall not affect the liability of Travelers to pay its share of Defense Costs . . ."); *Id.* ¶ 5.4 ("The failure of any Person to pay any indemnity costs or other costs related to the defensed of Chemtura in Products Claims shall not affect the liability of Travelers to pay its share of Indemnity Costs . . .").

[23]    Contrary to the Benzene Claimants' assertions, neither *Wimmer v. Mann (In re Mann)*, 58 B.R. 953 (Bankr. W.D. Va. 1986) nor *Royal Ins. Co. of Am. v. McCrory Corp.*, No. 94 Civ. 5734, 1996 U.S. Dist. LEXIS 5552 (S.D.N.Y. April 25, 1996) supports their position.  In *Mann*, an uninsured debtor had been involved in a car accident with another motorist, who sued the debtor to recover from her own insurance.  The case is distinguishable from this one and supports Chemtura's position because the court found that "[t]he Debtor and his property are not subject to any risk and maintenance of the suit does not frustrate the policy of the Bankruptcy Code in giving the Debtor a fresh start in his economic life."  58 B.R. at 958.  Likewise, in *McCrory Corp.*, the district court reversed a decision by the bankruptcy court denying a motion to lift the automatic stay for claimants to pursue claims against the debtor's insurer, because it appeared to the district court that the bankruptcy court decided the motion solely based upon whether or not the movants had timely filed proofs of claim, rather than considering whether the lawsuit would impose costs on the debtor's estate.  *McCrory Corp.*, 1996 U.S. Dist. LEXIS 5552, at *7-8.  This decision is completely consistent with Chemtura's position and not contrary to it.

Claimants' assertion that Chemtura is equitably estopped from refusing to honor its obligations under the agreement. *See id.* ¶ 22. In making that argument, the claimants rely on *Eastern Air Lines, Inc. v. The Ins. Co. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992 (2d Cir. 1996) ("*Eastern*"). There, Eastern and its insurer renegotiated an insurance contract prior to, and immediately following, the commencement of the debtor's Chapter 11 case. *Id.* at 994-96. Prior to the appointment of a Chapter 11 trustee, the bankruptcy court approved the debtor's assumption of the contract. Several years later, the trustee sued the insurer for a refund of premium payments asserting that certain aspects of the assumed contracts were invalid under Florida law. *Id.* at 997. The District Court held, and the Court of Appeals agreed, that Eastern was "equitably estopped from attempting to pay a premium based on a rate below that to which it had agreed both originally and in the context of the bankruptcy proceedings." *Id.* at 997.

*Eastern* has no application to this case. It involved a dispute between the estate and the insurer over the terms of an insurance policy that was assumed by the debtor during the Chapter 11 case, not a dispute over whether to permit a third-party to bring suit against a reorganized debtor to fix its rights against the insurer. Chemtura does not dispute or seek to alter its obligations under the Cost Sharing Agreement. As Chemtura correctly notes, it is because it has acknowledged those obligations that it will incur costs if the Benzene Claimants are permitted to proceed. *See* Debtors' Reply ¶ 29.[24]

Section 3420 of the New York Insurance Law states in relevant part that:

---

[24] The Benzene Claimants also cite to *Argonaut Ins. Co. v. Ames Dep't Stores (In re Ames Dep't Stores)*, No. 93-CIV-4014, 1995 U.S. Dist. LEXIS 6704 (S.D.N.Y. May 17, 1995) ("*Ames*") in support of their proposition that because Chemtura has assumed the Cost Sharing Agreement and insurance policies in the bankruptcy, the debtor cannot escape its obligations for defense costs and the insurer cannot escape liability for claims. Claimants' Supplemental Response ¶¶ 24-25. For the same reasons noted above with *Eastern*, *Ames* does not support the Benzene Claimants' position that the Benzene Lawsuits should proceed. As discussed throughout this decision, Travelers is not seeking to avoid liability under the insurance policies and Cost Sharing Agreement, and Chemtura is not seeking to avoid its obligations to pay defense costs under the Cost Sharing Agreement.

> No policy or contract insuring against liability for injury to person ... shall be issued or delivered in this state, unless it contains in substance . . . [a] provision that the insolvency or bankruptcy of the person insured, or the insolvency of the insured's estate, shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract.

N.Y. Ins. Law § 3420(a)(1). *See also id.* § 3103(a) (Even if an insurance policy conflicts with or does not include the provisions required by section 3420, the policy "shall be enforceable as if it conformed" with the requirements of section 3420.). Under those provisions, the bankruptcy or insolvency of an insured does not release the insurer from payment of damages for injuries or losses sustained within the coverage of the policy. Thus, the statute creates "a limited statutory cause of action on behalf of injured parties directly against insurers." *Lang v. Hanover Ins. Co.*, 820 N.E. 2d 855, 858 (N.Y. 2014).[25] The Benzene Claimants contend that under the Cost Sharing Agreement, and by application of § 3420 of the New York Insurance Law, Travelers is obligated to defend and indemnify Product Claims and should not be permitted to escape those obligations. *See* Claimants' Supplemental Response ¶ 2. Chemtura does not dispute that § 3420 is applicable to the Cost Sharing Agreement, and has not asked to shield Travelers from its liability under the Cost Sharing Agreement and state law. In that light, the Benzene Claimants misplace their reliance on *Am. Safety Indem. Co. v. Official Committee of Unsecured Creditors*, No. 05-CIV-5877, 2006 WL 2850612 (E.D.N.Y. September 27, 2006) and *Admiral Ins. Co. v.*

---

[25] Section 3420 and its predecessors "were designed to protect a third party injured by a bankrupt or insolvent insured that never suffered a loss within the meaning of the insurance policy because it could not pay or did not have to pay the injured party." *Rapid-American Corp. v. Travelers Cas. and Surety Co. (In re Rapid-American Corp.)*, No. 13-10687, 2016 WL 3292355, at *12 (Bankr. S.D.N.Y. June 7, 2016). That is because at common law, "an injured person possessed no cause of action against the insurer of the tort feasor because of the lack of privity of contract." *Jackson v. Citizens Cas. Co.*, 277 N.Y. 385, 389 (1938) (citation omitted). Thus, if the tortfeasor was insolvent and could not satisfy a judgment against him, the insurer's obligations under the policy to indemnify the insured against loss suffered were never triggered because the insured had not suffered any damages. The insurer effectively was released and could not be held accountable for the damages. *See Lang* v. *Hanover Ins. Co.,* 3 N.Y.3d 350, 354-55 (2004). To remedy that inequity, "[t]he statute . . . give[s] the injured claimant a cause of action against an insurer for the same relief that would be due to a solvent principal seeking indemnity and reimbursement after the judgment had been satisfied. The cause of action is no less but also it is no greater." *Coleman v. New Amsterdam Cas. Co.*, 247 N.Y. 271, 275 (1928).

*Grace Indus.*, 409 B.R. 275 (E.D.N.Y. 2009). Those cases stand for the proposition that a debtor's failure to make a self-insured retention payment under an insurance policy governed by the New York Insurance Law or similar law of a different state, is not grounds for the insurer to deny coverage. In part, the courts in those cases reasoned that if the insurer could deny coverage, the courts would be validating conduct that the state law was meant to prohibit. *See Am. Safety*, 2006 WL 2850612, at *3; *Admiral Ins. Co.*, 409 B.R. at 281-82. Those cases do not support the Benzene Claimants' contention that application of § 3240 mandates that they be permitted to continue their actions against Chemtura since they do not implicate the Bankruptcy Code's "fresh start" policy. They are not "discharge" cases at all. They merely discuss the contractual obligations of the debtors and their insurers under the applicable insurance policies. Here, the Court is not being asked to interpret any insurance policy or the Cost Sharing Agreement or to determine Chemtura's or Travelers's obligations thereunder. Travelers has not refused coverage under any of its policies or the Cost Sharing Agreement, nor sought to be relieved of any obligations thereunder. Indeed, Travelers is not even a party to this contested matter.

In reaching this determination, the Court rejects the Benzene Claimants' contention that in enforcing the Discharge Injunction, the Court is furthering a scheme whereby Chemtura agreed in the Cost Sharing Agreement to pay a portion of the defense costs and then assumed the agreement in an effort to "insulate" itself and Travelers "from ever having to comply with any of the obligations created under the [assumed] contracts." Claimants' Supplemental Response ¶ 4. It is undisputed that Chemtura and Travelers executed the Cost Sharing Agreement in 2006—three years before the bankruptcy filing—to settle insurance coverage disputes. Moreover, throughout the course of the Chapter 11 cases, Chemtura pursued insurance coverage for asserted

38

claims and, when necessary, brought suit against its insurers.  Debtors' Supplemental Reply ¶ 10

(citing *Chemtura Corp., et al. v. AIU Insurance Company, et al. (In re Chemtura Corp.)*, AP No.

10-02881 (Bankr. S.D.N.Y. 2010)).  Finally, as Chemtura notes, since emerging from Chapter

11, using insurance proceeds, it has settled and paid hundreds of claims that had been timely

filed in the bankruptcy case.  *Id.*  Thus, not only is the record devoid of any evidence even

suggesting that Chemtura and Travelers colluded to evade their obligations under the insurance

policies and the Cost Sharing Agreement, the evidence in the record demonstrates that, when

necessary, Chemtura has vigorously pursued its insurers on coverage matters, and that the estate

and creditors have realized substantial benefits from Chemtura's assumption of its insurance

policies, the Cost Sharing Agreement and other similar agreements.

The Court denies the Benzene Claimants' request to proceed against Chemtura to fix its

insurers' liability under the Cost Sharing Agreement and relevant insurance policies.

## II.    <u>Civil Contempt and Sanctions</u>

In this Circuit, "contempt proceedings are the proper means of compensation and

punishment for willful violations of the automatic stay" as to corporate debtors.  *Maritime*

*Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 920 F.2d 183, 186-87

(2d Cir. 1990) (citing *Fidelity Mortg. Investors v. Camelia Builders Inc.*, 550 F.2d 47, 51 (2d.

Cir. 1976).  That is also true for violations of the discharge provided in section 524(a)(2).  *In re*

*McCann*, 537 B.R. 172, 181 (Bankr. S.D.N.Y. 2015) ("There is no real difference between

violating a discharge injunction and violating the stay. As such, the same standard is

applicable."); *In re Velo Holdings, Inc*., 500 B.R. 693, 700 (Bankr. S.D.N.Y. 2013) ("A

bankruptcy court may hold a party in contempt and award sanctions after that party has willfully

violated a court order, including for breach of the discharge injunction.") (citations omitted); *In*

*re Cruz*, 254 B.R. 801, 816 (Bankr. S.D.N.Y. 2000) ("bankruptcy courts have found that

'violation of the injunction is punishable by contempt.'") (citations omitted).  The burden is on

the movant to demonstrate contempt of the offending party by clear and convincing evidence.

*See Torres v. Chase Bank USA, N.A. (In re Torres)*, 367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007).

Contempt requires "a showing of maliciousness or a lack of a good faith. . . ."  *Ball v.*

*A.O. Smith Corp.*, 321 B.R. 100, 108 (N.D.N.Y. 2005) (citing *In re Crysen/Montenay Energy*

*Co.*, 902 F.2d 1098, 1104 (2d Cir. 1990)).  Thus, attorneys' fees have been awarded as

compensation for civil contempt for violating the section 524 injunction "(1) when a defendant

willfully disobeys a court order, and (2) when a losing party acts in bad faith, vexatiously,

wantonly, or for oppressive reasons."  *In re Cruz*, 254 B.R. at 816 (citing *Watkins v. Guardian*

*Loan Co. (In re Watkins)*, 240 B.R. 668, 680 (Bankr. E.D.N.Y. 1999)).

The Reorganized Debtors ask that this Court find the Benzene Claimants and their

counsel—the Locks Law Firm—to be in civil contempt for violating the Discharge Injunction,

and imposing sanctions by awarding Chemtura its reasonable attorneys' fees and costs incurred

in connection with the Benzene Lawsuits and this Motion.  The Reorganized Debtors contend

that not only did the Benzene Claimants' counsel have knowledge of the existence of the

Discharge Injunction (and the Court's prior Enforcement Decision), and continued to willfully

violate the Confirmation Order, but that their bad faith prosecution of the Benzene Lawsuits can

be inferred from the record of multiple letters, email and telephonic correspondence from

counsel for Chemtura, which were met with limited responsiveness from counsel to the Benzene

Claimants until the Claimants' Letter dated March 31, 2016.

Counsel for the Benzene Claimants counter that: (i) the Benzene Claimants and their

counsel had a good faith basis for filing and pursuing the Benzene Lawsuits against Chemtura;

(ii) the Discharge Injunction is not binding on the Benzene Claimants because they were not

afforded Constitutionally sufficient due process; and (iii) the Benzene Claimants are permitted to proceed against Chemtura nominally for the purpose of accessing liability against Chemtura's insurers.  More specifically, the Locks Law Firm asserts that it was originally unaware of Chemtura's bankruptcy, the Discharge Injunction, and the Court's Enforcement Decision, and that upon Chemtura's requests to be dismissed from the Benzene Lawsuits, counsel for the Benzene Claimants investigated the matter and concluded that the Discharge Injunction did not apply to enjoin the Benzene Lawsuits and that the Benzene Lawsuits were distinguishable from the enforcement of the Discharge Injunction against the Diacetyl Lawsuits.

The Reorganized Debtors have not met their burden of demonstrating that the Benzene Claimants and the Locks Law Firm acted wantonly, vexatiously, maliciously, or in bad faith in prosecuting the Benzene Lawsuits to warrant a finding of civil contempt and awarding attorneys' fees.  Accordingly, the Reorganized Debtors' request to hold the Benzene Claimants and the Locks Law Firm in civil contempt and awarding attorneys' fees is denied.

## CONCLUSION

For the foregoing reasons, the Motion is GRANTED IN PART and DENIED IN PART as set forth herein.  The Reorganized Debtors are to settle an order consistent with this Memorandum Decision on five days' notice.

Dated: November 23, 2016
       New York, New York

                              /s/ *James L. Garrity, Jr.*
                              Honorable James L. Garrity, Jr.
                              United States Bankruptcy Judge